No. 25-2366

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

NETCHOICE, LLC, D/B/A NETCHOICE
*Plaintiff-Appellee*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA
*Defendant-Appellant.*
_____

## On Appeal from the United States District Court
## for the Northern District of California
No. 5:22-cv-08861-BLF
The Honorable Beth Labson Freeman, Judge
_____

## ATTORNEY GENERAL'S OPENING BRIEF ON THE MERITS
_____

ROB BONTA
  *Attorney General of California*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
ANYA M. BINSACCA
  *Supervising Deputy Attorney General*
KRISTIN A. LISKA
  *Deputy Attorney General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3916
Fax: (415) 703-5480
Kristin.Liska@doj.ca.gov
*Attorneys for Defendant-Appellant*

June 10, 2025

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................ 1

Statement of Jurisdiction .................................................................................. 3

Statement of Issues ........................................................................................... 3

Statement Regarding Addendum ...................................................................... 4

Statement of the Case ....................................................................................... 4

      A.    Children and the Internet ................................................................ 4

      B.    The California Age-Appropriate Design Code Act ........................ 8

      C.    Procedural History ....................................................................... 12

Standard of Review .......................................................................................... 16

Summary of Argument .................................................................................... 17

Argument .......................................................................................................... 19

I.      The District Court Erred in Enjoining the Entire Act Based on
Plaintiff's Challenge to the Coverage Definition ................................. 19

      A.    The Act's Definitional Provision Does Not Trigger First
Amendment Scrutiny .................................................................... 19

      B.    Even if the First Amendment Applies, the Act's Definitional
Provision Is Not Content-Based and Thus Does Not Trigger
Strict Scrutiny .............................................................................. 24

      C.    The District Court Failed to Apply the Proper Framework for
Assessing Facial Challenges ........................................................ 33

II.     The District Court Erred in Individually Enjoining the Age
Estimation, Data Use, and Dark Patterns Provisions in the Alternative ....... 39

      A.    The Age Estimation Requirement Does Not Violate the First
Amendment .................................................................................. 39

      B.    The Data Use Restrictions Are Not Unconstitutionally Vague ......... 44

      C.    The Dark Patterns Restriction Is Not Unduly Vague ................... 50

III.    The Lower Court Erred in Finding the Remaining Provisions of the
Act Are Not Severable ........................................................................... 52

i

## TABLE OF CONTENTS
### (continued)

**Page**

Conclusion .................................................................................57

Statement of Related Cases.....................................................58

Certificate of Compliance ......................................................59

# TABLE OF AUTHORITIES

**Page**

CASES

*Arcara v. Cloud Books, Inc.*
478 U.S. 697 (1986)...................................................................19, 20

*Arce v. Douglas*
793 F.3d 968 (9th Cir. 2015) ................................................44

*Arizona Att'ys for Crim. Just. v. Mayes*
127 F.4th 105 (9th Cir. 2015) ...............................................36

*Cal. Redevelopment Ass'n v. Matosantos*
53 Cal. 4th 231 (2011) .................................................52, 53, 55, 56

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*
596 U.S. 61 (2022)...........................................................27, 28, 32, 33

*County of Sonoma v. Superior Court*
173 Cal. App. 4th 322 (2009) ...............................................52

*Hill v. Colorado*
530 U.S. 703 (2000)...............................................................44, 47

*Holder v. Humanitarian Law Project*
561 U.S. 1 (2010)..................................................................46

*HomeAway.com, Inc. v. City of Santa Monica*
918 F.3d 676 (9th Cir. 2019) ..............................................20

*In re Jonathan C.M.*
91 Cal. App. 5th 1039 (2023) ...............................................48

*In re Marriage of Vargas & Ross*
17 Cal. App. 5th 1235 (2017) ...............................................48

*Int'l Franchise Ass'n, Inc. v. City of Seattle*
803 F.3d 389 (9th Cir. 2015) ................................................20, 22

# TABLE OF AUTHORITIES
## (continued)

Page

*Interpipe Contracting, Inc. v. Becerra*
    898 F.3d (9th Cir. 2018) ................................................................23

*Johnson v. United States*
    576 U.S. 591 (2015) .......................................................................47

*Klein v. City of San Clemente*
    584 F.3d 1196 (9th Cir. 2009) .......................................................17

*Legislature v. Eu*
    54 Cal. 3d 492 (1991) ....................................................................52

*Mazurek v. Armstrong*
    520 U.S. 968 (1997) .......................................................................17

*Minneapolis Star & Trib. Co. v. Minnesota Com'r of Revenue*
    460 U.S. 575 (1983) .......................................................................23

*Moody v. NetChoice, LLC*
    603 U.S. 707 (2024) ..................................................................*passim*

*Nash v. United States*
    229 U.S. 373 (1913) .......................................................................47

*NetChoice, LLC v. Bonta* (*NetChoice I*)
    692 F. Supp. 3d 924 (N.D. Cal. 2023) ...........................................12

*NetChoice, LLC v. Bonta* (*NetChoice II*)
    114 F.4th 1101 (9th Cir. 2024) ..................................................*passim*

*NetChoice, LLC v. Fitch*
    134 F.4th 799 (5th Cir. 2025) ...........................................36, 37, 38

*NetChoice, LLC v. Yost*
    716 F. Supp. 3d 539 (S.D. Ohio 2024) .....................................29, 32

*New York v. Ferber*
    458 U.S. 747 (1982) .......................................................................41

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*Petition of Daniels*
    177 Cal. App. 2d 376 (1960) ...............................................................48

*Pimentel v. Dreyfus*
    670 F.3d 1096 (9th Cir. 2011) ....................................................16, 17

*Porter v. Martinez*
    68 F.4h 429, 438 (9th Cir. 2023) .............................................*passim*

*Project Veritas v. Schmidt*
    125 F.4th 929 (9th Cir. 2025) ..................................................*passim*

*Quintano v. Mercury Cas. Co.*
    11 Cal. 4th 1049 (1995) .....................................................................54

*Recycle for Change v. City of Oakland*
    856 F.3d 666 (9th Cir. 2017) .............................................................19

*Reed v. Town of Gilbert*
    576 U.S. 155 (2015)....................................................................24, 30

*Skidgel v. California Unemployment Ins. Appeals Bd.*
    12 Cal. 5th 1 (2021) ..........................................................................45

*Sorrell v. IMS Health Inc.*
    564 U.S. 552 (2011)....................................................................19, 20

*Turner Broadcasting System, Inc. v. FCC*
    512 U.S. 622 (1994).........................................................................31

*United States v. Jae Gab Kim*
    449 F.3d 933 (9th Cir. 2006) .............................................................47

*United States v. Yazzie*
    743 F.3d 1278 (9th Cir. 2014) .........................................................41

*Vivid Ent., LLC v. Fielding*
    774 F.3d 566 (9th Cir. 2014) .............................................................52

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Ward v. Rock Against Racism*
  491 U.S. 781 (1989) .......................................................................25

*Winter v. Nat. Res. Def. Council, Inc.*
  555 U.S. 7 (2008) ...........................................................................17

CONSTITUTIONAL PROVISIONS

United States Constitution
  First Amendment ...................................................................*passim*
  Fourth Amendment ........................................................................12
  Fourteenth Amendment ................................................................12

FEDERAL STATUTES

United States Code, Title 15
  § 6502(a)(1) ......................................................................................7

United States Code, Title 28
  § 1292(a)(1) ......................................................................................3
  § 1331 ................................................................................................3

CALIFORNIA STATUTES

2022 Cal. Stat., Chapter 320 (AB 2273)
  § 1(a)(7) ..........................................................................................30
  § 1(a)(8) ..........................................................................................30
  § 1(a)(9) ..........................................................................................30
  § 1(b) .........................................................................................30, 53

## TABLE OF AUTHORITIES
### (continued)

Page

California Civil Code

§ 1798.99.29.................................................................................8

§ 1798.99.30(a) .............................................................................8

§ 1798.99.30(b)(2) .......................................................................11

§ 1798.99.30(b)(4) ................................................................*passim*

§ 1798.99.30(b)(4)(B).............................................................21, 26

§ 1798.99.30(b)(4)(C)...................................................................22

§ 1798.99.30(b)(4)(D)...................................................................22

§ 1798.99.30(b)(4)(F).............................................................21, 26

§ 1798.99.31(a).........................................................8, 9, 20, 32

§ 1798.99.31(a)(1) .......................................................................11

§ 1798.99.31(a)(1)(B)(i)...............................................................42

§ 1798.99.31(a)(5)................................................................9, 39, 42

§ 1798.99.31(a)(6)........................................................................36

§ 1798.99.31(a)(9)........................................................................14

§ 1798.99.31(a)(10)......................................................................36

§ 1798.99.31(b).........................................................8, 9, 20, 32

§ 1798.99.31(b)(1)..............................................................10, 45, 47

§ 1798.99.31(b)(2)...............................................................10, 48

§ 1798.99.31(b)(3)...............................................................10, 48

§ 1798.99.31(b)(4)...............................................................10, 48

§ 1798.99.31(b)(5)........................................................................36

§ 1798.99.31(b)(7)...............................................................11, 50

§ 1798.99.31(b)(8)........................................................................41

§ 1798.99.35(a) ...........................................................................11

§ 1798.99.35(c) ...........................................................................12

§ 1798.120(c) ................................................................................7

§ 1798.140(d) ................................................................................8

§ 1798.140(*l*)...............................................................11, 50, 51

## COURT RULES

Federal Rules of Appellate Procedure

Rule 4(a)(1)(A) ..............................................................................3

vii

# TABLE OF AUTHORITIES
## (continued)

**Page**

Ninth Circuit Rule 28-2.7 ........................................................................4

**OTHER AUTHORITIES**

*Detrimental*, Black's Law Dictionary (12th ed. 2024) ...........................46

*Material*, Black's Law Dictionary (12th ed. 2024) ...........................45, 46

Restatement (Second) of Torts, § 339 ...................................................29

## INTRODUCTION

The California Age-Appropriate Design Code Act was unanimously passed by the California Legislature to protect the privacy and safety of children online. For the second time, industry group NetChoice, LLC's challenge to the Act is before this Court on the State's appeal of a preliminary injunction of the entire Act. In the prior appeal, this Court vacated the majority of the first preliminary injunction and remanded.  It held that, as to all but one of the challenged provisions of the Act, plaintiff NetChoice had not carried its burden to show a likelihood of success on a facial First Amendment challenge under the standard laid out while the appeal was pending in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).  The majority of the Act's provisions, this Court noted, "by their plain language, do not necessarily impact protected speech in all or even most applications."  *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1122 (9th Cir. 2024).

Following remand, plaintiff moved for another preliminary injunction.  But rather than build up the evidentiary record this Court found lacking on the first appeal, plaintiff changed tactics.  First, plaintiff argued the entire statute was subject to strict scrutiny because the Act's definition of "likely to be accessed by children" made the whole Act a content-based regulation subject to strict scrutiny under the First Amendment.  Second, plaintiff individually challenged a handful of the Act's provisions both facially and as applied.

1

The lower court once more granted a preliminary injunction of the entire Act—including the provisions not challenged by the plaintiff. First, the lower court agreed with plaintiff's contention that the Act's definition of "likely to be accessed by children" was content based and thus subjected the whole Act to strict scrutiny. But that definitional provision does not single out entities engaged in expressive activity or discriminate based on content; it therefore does not trigger heightened First Amendment scrutiny for the whole Act, let alone strict scrutiny. Even if it did, the lower court's application of strict scrutiny to *the entire statute* as a disambiguated whole—without analyzing who is regulated by the statute, how the regulations impact those businesses, or what provisions were challenged— repeats the same errors that led to the reversal of most of the lower court's prior injunction. Nor can the lower court's other holdings, including its ruling on severability, sustain an injunction of the entire Act.

At the end of the day, the lower court insisted that the Act is an attempt by the State to engage in content censorship. But the Act is about *privacy*, not *content*. The legislative history echoes that the Legislature's main focus was protecting children's privacy and safety by regulating how *their data* is used, not by censoring speech. Particularly in light of the high standards for a facial First Amendment challenge under *Moody*, plaintiffs have not carried their burden of

demonstrating a likelihood of success in their challenge to six provisions of the Act.  This Court should reverse.

## STATEMENT OF JURISDICTION

The district court entered a preliminary injunction on March 13, 2025.  1-ER-57.  Defendant Attorney General Rob Bonta filed a timely notice of appeal on April 11, 2025.  4-ER-631; *see* Fed. R. App. P. 4(a)(1)(A).  The district court had jurisdiction under 28 U.S.C. § 1331.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1.    Whether the definition of "likely to be accessed by children" in the Age-Appropriate Design Code Act subjects the entire Act to strict scrutiny under the First Amendment.

2.    Whether the Age-Appropriate Design Code Act's requirement for businesses to estimate a user's age likely violates the First Amendment facially.

3.    Whether the Age-Appropriate Design Code Act's four challenged restrictions on the use of children's data and challenged restriction on the use of dark patterns are likely unconstitutionally vague.

4.    Whether the remainder of the Act is severable from the portions that remain enjoined under this Court's prior ruling in *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024).

3

## STATEMENT REGARDING ADDENDUM

Pursuant to Circuit Rule 28-2.7, pertinent statutes, regulations, and rules are contained in the separate addendum.

## STATEMENT OF THE CASE

### A.    Children and the Internet

In recent years, children's time online has exploded.  According to data from 2020-2021, children aged 2-4 years averaged around 2.5 hours online each day, those 5-8 years old averaged over three hours daily, those 6-12 years old averaged over five and a half hours daily, and those 13-17 years old averaged over eight and a half hours daily.  4-ER-600.  Almost half of adolescents reported using social media "almost constantly," and 85% reported spending more time online than they intended.  4-ER-600-601.  As of 2021, 32% of 7- to 9-year olds and 49% of 10- to 12-year olds in the United States were reported to be using social media platforms—despite most platforms restricting users to those over 13 years of age. 4-ER-600.

This increasing time online for children poses a unique risk of harm. Children are curious, impulsive thinkers with still-developing brains.  3-ER-482. Their still-developing brains mean they have less impulse control, less critical thinking ability, and less ability to reason abstractly about complicated concepts like privacy.  *Id*.  And they are more receptive to parasocial relationships and more

4

attracted to novelty and rewards.  3-ER-483.  These characteristics make children more vulnerable to being manipulated or taken advantage of online.  3-ER-482.

The concern about children being manipulated or taken advantage of online is not purely hypothetical.  Part of the risk arises from the nature of the Internet.  The "free" Internet is subsidized by the collection, sale, and use of personal information, all of which provide substantial revenue for online businesses.  3-ER-415.  Thus, online companies consistently collect data from children online: according to one estimate, advertising-technology companies collect an average of 72 million data points about a child before that child turns 13.  3-ER-477.  This data includes what services a child uses online, how they use them, and from where they use them; it also includes highly personal information such as a child's gender, location, contact information, relationship status, or birthdate.  3-ER-416-420.  But online platforms do more than just collect this data: they are able to link the data they collect to a specific child through persistent identifiers, like the identification number for the device the child uses to access the internet.  3-ER-420-421.  Once data is linked to a unique child, businesses can then create a thorough individual profile and use the compiled data to make predictions about that child's other data, including inferring highly personal details such as the child's religion, health conditions, sexual orientation, or socioeconomic status.  3-ER-416-420.

Given the money made from collecting and using data from children and other users, businesses have an economic incentive to maximize the "engagement"—the amount of time and activity online—and data collected from users, whether child or adult.  3-ER-415, 3-ER-489.  They do so by using tactics that children are more susceptible to, such as autoplay, endless scroll, and predictive algorithms.  3-ER-488-496.  They also use manipulative dark patterns, design elements meant to manipulate users into taking actions against their own interest, such as dedicating additional time or money to an online activity or agreeing to give up their privacy—including dark patterns that children are uniquely vulnerable to such as those involving parasocial-relationship pressure, fabricated time pressure, and navigation constraints.  3-ER-363-365, 3-ER-436-439, 3-ER-488-496.

Evidence shows that such tactics work: multiple interview studies indicate that children feel like they spend too much time online, feel pressure to engage online, and find it hard to stop using online platforms.  3-ER-488.  This pressure to engage brings with it tangible harms: too much time online is associated with less sleep, poor educational attainment, and other mental and physical health issues for children.  3-ER-488-489.  But the harm to children from the use of their data online is not limited to harms from too much engagement; rather, evidence shows that the use of children's data online can also lead to increased exposure to cyberbullying

6

or online abuse, unwanted sexual solicitation or sextortion, involvement in child

sexual abuse material, facilitation of illegal drug sales, exposure to illegal activities

such as gambling or advertisements for alcohol or tobacco, and financial harms. 3-

ER-473-482, 3-ER-483-488, 3-ER-497-499.

Despite the ubiquitous presence of the internet in children's lives, specific

legal protections for children were limited prior to the Act's passage. At the

federal level, the Children's Online Privacy Protection Act (COPPA) requires that

online businesses protect the personal information of children under 13, but only

where the platform is "directed towards" or has actual knowledge that its users are

children under 13. 15 U.S.C. § 6502(a)(1). At the state level, California law prior

to the Act provided that businesses may not sell or share the personal information

of a child without consent, but only if they have actual knowledge the user is under

16. Cal. Civ. Code § 1798.120(c).

These existing privacy regulations have inadvertently created a culture of

agnosticism as to whether a business's users are children. 3-ER-435. Businesses

are disincentivized from identifying their services as "child-directed" or from

obtaining knowledge about whether a user is a child, since that would make them

subject to existing laws and thereby hamper their ability to make more profit from

collecting, selling, or using a child's data. *Id.* As a result, it is fairly common for

apps that were almost certainly intended for children to avoid restrictions by

7

claiming that the app is intended for users over 13 or that the company has no actual knowledge of child users. 3-ER-435. Even apps that are subject to COPPA or other state laws often fail to comply with these existing laws. 3-ER-432-436.

### B. The California Age-Appropriate Design Code Act

To protect children's privacy and well-being online, the California Legislature unanimously passed AB 2273, the California Age-Appropriate Design Code Act. In passing the Act, the Legislature declared that children under 18 "should be afforded protections not only by online products and services specifically directed at them but by all online products and services they are likely to access"; that regulated businesses "should consider the best interest of children when designing, developing and providing" services; and that "[i]f a conflict arises between commercial interest and best interests of children, companies should prioritize the privacy, safety, and well-being of children over commercial interests." Cal. Civ. Code § 1798.99.29. The legislative history reiterates that the Legislature was concerned about the privacy of children under 18, the harm to such children from data-collection practices, and the risks to such children from manipulative design aspects. *E.g.*, 3-ER-301-302, 3-ER-321, 3-ER-332, 3-ER-335, 3-ER-359.

The Act applies to large companies that trade in personal information. *See* Cal. Civ. Code §§ 1798.99.30(a), 1798.99.31(a), (b), 1798.140(d). Within that

group of businesses, the Act regulates only those that provide an online service, product, or function likely to be accessed by children under 18 years of age.  *Id.* § 1798.99.31(a), (b).  "Likely to be accessed by children" means that "it is reasonable to expect, based on the following indicators, that the online service, product, or feature would be accessed by children."  *Id.* § 1798.99.30(b)(4).  The critical inquiry, then, is whether it is reasonable to expect that children are using the online service, product, or feature.  The definition further list specific indicators to help guide that inquiry, namely whether the online service, product or feature: (1) is directed to children, as defined by COPPA; (2) is determined to be routinely accessed by a significant number of children; (3) contains advertisements marketed to children; (4) has design elements that are known to be of interest to children; (5) is determined to have an audience that contains a significant amount of children; or (6) is substantially similar to a product routinely accessed by a significant number of children.  *Id.*

For companies that fall within this definition, the Act imposes certain requirements and restrictions, three groups of which are at issue here.  First, the age estimation requirement.  The Act requires a business to "[e]stimate the age of a child user with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business or apply the privacy and data protections afforded to children to all consumers."  Cal. Civ. Code

9

§ 1798.99.31(a)(5).  This provision, in essence, allows companies to either distinguish between child users protected by the Act and adult users outside the Act's scope or, instead, elect to apply the Act's substantive protections to all users.

Second, the data use restrictions.  As relevant here, the Act prohibits regulated businesses from: (1) using "the personal information of any child in a way the business knows, or has reason to know, is materially detrimental to the physical health, mental health, or well-being" of the child; (2) "[p]rofil[ing] a child by default" unless "necessary to provide" the relevant service the child is actively engaged with or the business "can demonstrate a compelling reason that profiling is in the best interests of children"; (3) "collect[ing], sell[ing], shar[ing], or retain[ing] any personal information" of a child that is "not necessary to provide" the service the child is actively engaged with unless the business "can demonstrate a compelling reason" that doing so is "in the best interests of children"; and (4) "us[ing] personal information" of a child "for any reason other than a reason for which that personal information was collected" unless the business "can demonstrate a compelling reason" that doing so is "in the best interests of children."  Cal. Civ. Code § 1798.99.31(b)(1)-(4).

Third, the dark patterns restriction.  The Act prohibits regulated businesses from "us[ing] dark patterns to lead or encourage children" to (1) "provide personal information beyond what is reasonably expected" for the online service, (2)

10

"forego privacy protections," or (3) "take any action that the business knows, or has reason to know, is materially detrimental to the child's physical health, mental health, or well-being." Cal. Civ. Code § 1798.99.31(b)(7). The Act incorporates a definition of a "dark pattern" as "a user interface designed or manipulated with the substantial effect of subverting or impairing user autonomy, decisionmaking, or choice." *Id.* § 1798.140(*l*).

In addition to the above provisions at issue in this appeal, the Act also includes a reporting requirement that is not at issue in this appeal. The Act originally required companies to prepare a Data Protection Impact Assessment (DPIA) report, defined as a "systemic survey to assess and mitigate risks that arise from the data management practices of the business to children." Cal. Civ. Code § 1798.99.30(b)(2); *see also id.* § 1798.99.31(a)(1) (describing requirements of DPIA). This provision remains enjoined under the Court's ruling on the prior appeal in this matter, *see NetChoice, LLC v. Bonta* (*NetChoice II*), 113 F.4th 1101, 1125 (9th Cir. 2024), and the provision's substantive validity is not at issue in this appeal.

The Attorney General has sole authority to enforce the Act, and violators face injunctions and civil penalties. Cal. Civ. Code § 1798.99.35(a). The Act previously provided a notice-and-cure provision for businesses in substantial compliance with the DPIA requirement: such businesses would receive written

11

notice of any alleged violations from the Attorney General before any enforcement action and had 90 days to cure any noticed violations. *Id.* § 1798.99.35(c). This notice-and-cure provision also remains enjoined under this Court's prior ruling, *see NetChoice II*, 113 F.4th at 1126, and its validity is likewise not at issue in this appeal.

### C.   Procedural History

Plaintiff NetChoice, LLC is a membership group composed of large tech companies. *See NetChoice, LLC v. Bonta* (*NetChoice I*), 692 F. Supp. 3d 924, 936 (N.D. Cal. 2023), *aff'd in part, vacated in part*, 113 F.4th 1101 (9th Cir. 2024). It filed this suit against the Attorney General alleging that the Act facially violates the First, Fourth, and Fourteenth Amendments and the dormant Commerce Clause and is preempted by federal law. *Id.* at 938. Shortly thereafter, plaintiff filed a motion for a preliminary injunction; the lower court granted the motion, enjoining the Act in full. *Id.* at 966.

Defendant appealed. While that appeal was pending, the U.S. Supreme Court decided *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), which addressed the proper standard for a facial First Amendment challenge. Citing the standard laid out in *Moody*, this Court reversed the majority of the injunction. *See NetChoice II*, 113 F.4th at 1108. This Court stated that "[j]ust like the parties and lower courts in *Moody*, 'no one has paid much attention to' the requirements for a facial challenge

12

so far in this case.'" *Id.* at 1116 (quoting *Moody*, 603 U.S. at 724). It held, however, that "this oversight did not cause any error" in the lower court's analysis of the DPIA reporting requirement because "in every application to a covered business," that requirement "raises the same First Amendment issues." *Id.* This Court thus affirmed the lower court's injunction of that requirement. *Id.* at 1122.

This Court then vacated the remainder of the injunction, holding it could not "say, on this record, that a substantial majority of [the Act's] applications are likely to fail First Amendment scrutiny." *NetChoice II*, 113 F.4th at 1123. "[M]ost of [the Act's] provisions, by their plain language, do not necessarily impact protected speech in all or even most applications," this Court explained, explicitly citing to the sections challenged here. *Id.* at 1122. For example, "[b]ased on the record developed so far in this litigation, it is unclear whether a 'dark pattern' itself constitutes protected speech and whether a ban on using 'dark patterns' should always trigger First Amendment scrutiny," let alone the proper level of scrutiny for any applications that do trigger First Amendment scrutiny. *Id.* at 1123. This Court ultimately held that the remainder of the injunction order "fail[ed] to properly consider the facial nature of NetChoice's challenges" and vacated it. *Id.* at 1124.

Following remand, plaintiff filed an amended complaint. In the amended complaint, plaintiff contended that the statute's definitional provision was content based, subjecting the entire Act to strict scrutiny. It also limited its individual

13

challenges to six provisions at issue in this appeal: the age estimation requirement, the four data use restrictions, and the dark patterns restriction discussed above.[1] Plaintiff challenged these six provisions as-applied and facially as to a subset of applications.  It then filed a motion for a second preliminary injunction.

The lower court once more granted a full injunction of the Act.  1-ER-57.  It began with the new argument raised by plaintiff, that the definition of "likely to be accessed by children" subjected the entire statute to strict scrutiny and concluded the definitional provision triggered First Amendment scrutiny for the whole Act. 1-ER-14.  It further held that the definitional provision "made the Act content-based in every application" because "determin[ing] whether a particular business's online offerings are likely to be accessed by children unavoidably requires an evaluation of content."  1-ER-15.  The lower court then held the whole Act likely failed strict scrutiny because the Act "applies to *all* online content likely to be accessed by consumers under the age of 18, and imposes significant burdens on the providers of that content."  1-ER-26.

_____

[1] Plaintiff further challenged, and the district court enjoined, the Act's requirement that a business enforce its own policies with respect to content moderation and community guidelines policies, *see* Cal. Civil Code § 1798.99.31(a)(9).  Although the State does not challenge that aspect of the preliminary injunction for purpose of this interlocutory appeal, it will continue to defend that provision on the merits in further proceedings before the district court.

Although the court enjoined the full Act on this ground, it recognized there was a "lack of clarity in the case law regarding the proper application of *Moody* when the plaintiff brings a facial challenge to the statute's gateway coverage definition." 1-ER-28. Given this uncertainty about whether it was proper to apply strict scrutiny to the statute as a whole or to each challenged provision individually, the court proceeded to address plaintiff's individual facial challenges to each provision in the alternative.

The court held that "all [the Act's] provisions are subject to strict scrutiny because of the content-based coverage definition." 1-ER-32. It then held that plaintiff was not likely to succeed on its facial challenge to the data use restrictions or the dark patterns restriction. 1-ER-35-36. With respect to these five challenged provisions, the lower court held that plaintiff's attempt to narrow its facial challenge to a range of applications left it "unclear what businesses and what conduct" plaintiff sought to challenge and enjoin. 1-ER-35; *see also* 1-ER-36. The lower court was thus "not persuaded that every application [of the challenged provisions] is unconstitutional given the amorphous definitions offered by NetChoice." 1-ER-35; *see also* 1-ER-36. However, the lower court held that plaintiff was likely to succeed on its First Amendment challenge to the ag estimation provision. 1-ER-36. It concluded that because that provision

"requir[es] a business to estimate age for the purpose of determining what content is appropriate for that age," it was subject to, and failed, strict scrutiny. 1-ER-37.

Shifting gears, the lower court then turned to plaintiff's facial vagueness challenges to the six individual provisions as another possible alternative basis for an injunction. 1-ER-39. It held that plaintiff had demonstrated it was likely to succeed on its vagueness challenges to the data use restrictions and the dark patterns restriction, but not to the age estimation provision. 1-ER-43, 1-ER-45. Finally, the lower court addressed severability, holding that none of the Act was severable from the provisions that remained enjoined by the prior preliminary injunction. 1-ER-47. It concluded that while the remainder of the law was grammatically and functionally separable, it was not volitionally separable from the still-enjoined notice-and-cure provision. 1-ER-50, 1-ER-52.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion. *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2011) (per curiam). To do so, it first determines de novo whether the trial court "'identified the correct legal rule to apply to the relief requested.'" *Id.* (citation omitted). It then determines "if the 'district court's application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in the inferences that may be

16

drawn from the facts in the record.'" *Id.* (citation omitted). The Court reviews conclusions of law de novo and findings of fact for clear error. *Id.*

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The party seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* at 20. Plaintiffs, as the movants here, bear the burden of proving each element. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009). They must do so by a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

## SUMMARY OF ARGUMENT

1.     The lower court erred in concluding plaintiffs were likely to succeed on their First Amendment facial challenge predicated on the Act's definition of "likely to be accessed by children." For the First Amendment to apply, a law must regulate protected expression or single out entities engaged in expressive activity. The Act's definition of "likely to be accessed by children" does neither. But even if that provision triggered First Amendment scrutiny, it is not a content-based provision that would subject the entire Act to strict scrutiny: it covers entities based on who accesses their services, not what messages or topics they convey.

Even if it did, the lower court's application of strict scrutiny to the entire Act as a whole was erroneous.  By failing to apply *Moody*'s framework for evaluating the scope of conduct regulated, the lower court repeated the errors that led to reversal in this Court's prior ruling in this case.

2.    The lower court also erred in its conclusions finding plaintiff likely to succeed on any facial challenges to the six individual provisions relevant here. First, the Act's age estimation requirement does not trigger First Amendment scrutiny to begin with, since it is a regulation of conduct.  Even if it did, that requirement is not content-based and does not trigger strict scrutiny.  In any event, it is constitutional under any applicable level of scrutiny.  Second, the lower court erred in concluding that the data use restrictions and the dark patterns restriction are unconstitutionally vague.  Those provisions are clear as to the scope of conduct they apply to, and the specific words challenged by plaintiff as vague have clear plain and ordinary meanings.

3.    The lower court finally erred in its analysis of severability.  The provisions challenged by plaintiff are volitionally separable from the portions of the Act that remain enjoined under the prior preliminary injunction (and from any other invalid provisions).  In light of the Legislature's concerns about harms to children from the use of their data, it would have enacted the Act's substantive

18

provisions even without the reporting requirement or the associated notice-and-cure provision.

## ARGUMENT

I. **THE DISTRICT COURT ERRED IN ENJOINING THE ENTIRE ACT BASED ON PLAINTIFF'S CHALLENGE TO THE COVERAGE DEFINITION**

### A. The Act's Definitional Provision Does Not Trigger First Amendment Scrutiny

The First Amendment provides that the government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. But when it comes to the First Amendment, government "restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). For "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Id.* Thus, courts "have not traditionally subjected every" law "to 'least restrictive means' scrutiny simply because each particular [law] will have some effect on the First Amendment activities of those subject to sanction." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986). After all, "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities." *Id.*

Therefore, "[t]he first step of First Amendment analysis is to determine whether the [challenged] regulation implicates protected expression." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017). Courts must ask

19

"the threshold question" of "whether conduct with a 'significant expressive element' drew the legal remedy or the ordinance has the inevitable effect of 'singling out those engaged in expressive activity.'" *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) (quoting *Arcara*, 478 U.S. at 706-07). In this analysis, the court "may consider 'the inevitable effect of a statute on its face,' as well as a statute's 'stated purpose.'" *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019) (quoting *Sorrell*, 564 U.S. at 565). "However, absent narrow circumstances, a court may not conduct an inquiry into legislative purpose or motive beyond what is stated in the statute itself." *Id.*

The Act's definition of "likely to be accessed by children" plainly does not regulate protected expression because it does not regulate anything: it only provides a definition for a term that appears elsewhere in the Act's substantive regulations. *See* Cal. Civil Code § 1798.99.30(b)(4). The Act's various provisions apply to a "business that provides an online service, product, or feature likely to be accessed by children." Cal. Civil Code § 1798.99.31(a), (b). The definition of "likely to be accessed by children" clarifies which businesses are subject to the Act's substantive regulatory provisions.

The primary inquiry, then, is whether the definition inevitably singles out entities engaged in expressive activity for regulation by the Act's substantive provisions. It does not. The Act defines "likely to be accessed by children" to

20

mean that "it is reasonable to expect, based on the following indicators, that the online service, product, or feature would be accessed by children." Cal. Civil Code § 1798.99.30(b)(4). That it would be reasonable to expect a child to access an online service, product, or feature says nothing about the nature of the business providing that service, product, or feature. Children under 18 are capable of using ride sharing service like Lyft or Waymo, electronic ticketing services such as StubHub or Ticketmaster, financial transaction services such as Paypal or Venmo, fitness products such as NFL Play 60 or Peloton, health-related services such as iHealth, or education-related products such as Wolfram Mathematica. As long as they are likely accessed by children, any of these businesses would fall within the scope of the Act. That a business's service, product, or feature is accessed by children does not necessarily mean the business is engaged in expressive activities.

Nor do the indicators listed in the definition inevitably single out those engaged in expressive activity. Most of the indicators have no nexus to a company's activity at all, such as whether the online product, service, or feature "is determined, based on competent and reliable evidence regarding audience composition, to be routinely accessed by a significant number of children" or whether "[a] significant amount of the audience of the online service, product, or feature is determined . . . to be children." Cal. Civ. Code § 1798.99.30(b)(4)(B), (F). And even the indicators that might sometimes reference content—such as

whether the online service, product, or feature contains "advertisements marketed to children" or design elements that appeal to children, *id.* § 1798.99.30(b)(4)(C), (D)—do not single out businesses that are engaged in expressive activities. Businesses involved in entirely commercial, non-expressive activities can also fall within the scope of such indicators. A gambling website that uses characters from children's cartoons, for instance, would meet this indicator even though it is engaged in commercial rather than expressive business activity. At bottom, the Act's definition of "reasonably likely to be accessed by children" focuses on determining which online services, products, and features are being used by children, not the kind of activities a business is engaged in.

The lower court's contrary analysis is not persuasive. For one, the lower court focused on examples of the Act applying to expressive activity. 1-ER-13-14. But that the definitional provision may cover some businesses that engage in expressive activities is insufficient to trigger First Amendment scrutiny standing alone. The case law is clear: the question is whether the law has the "*inevitable* effect of 'singling out those engaged in expressive activities.'" *See, e.g.*, *Int'l Franchise*, 803 F.3d at 408 (citation omitted). Many laws apply to those that engage in expressive activities, such as prohibitions on criminal conduct, minimum wage laws, and health and safety standards. Such "generally applicable economic regulations affecting rather than targeting" businesses engaged in expressive

22

activities "pass constitutional muster." *Interpipe Contracting, Inc. v. Becerra*, 898

F.3d at 879, 896 (9th Cir. 2018); *see also Minneapolis Star & Trib. Co. v.*

*Minnesota Com'r of Revenue*, 460 U.S. 575, 581 (1983) ("It is beyond dispute that

the States and the Federal Government can subject newspapers to generally

applicable economic regulations without creating constitutional problems.").

Second, the court implied that the State had waived any argument that the

definitional provision did not trigger heightened First Amendment scrutiny, stating

that "the State does not dispute that the Act's coverage definition implicates

protected speech" and did not "identify any non-speech application" of the Act. 1-

ER-14. Not so. The State repeatedly attempted to refocus the lower court on the

proper analysis: that plaintiff had to demonstrate that the challenged regulations in

the Act impacted protected expression to prevail. *E.g.*, 2-ER-271 ("[I]t is

plaintiff's burden to establish, via a sufficient factual record, that the challenged

provisions in their challenged applications do, in fact, impact protected

expression."); 2-ER-167, 2-ER-175. And the State proffered multiple examples of

companies engaged in non-expressive businesses that could be subject to the Act,

such as Lyft, Paypal, Stubhub, and Waymo. *See* 2-ER-64, 2-ER-191. The lower

court's contrary conclusion is thus without factual basis.

The Act protects children under 18 and their privacy online. It consequently

regulates businesses that are likely to be accessed by children, regardless of the

nature of their business or any expressive activity they engage in. The definition of "likely to be accessed by children" does not regulate any expressive activity, nor does it single out those engaged in expressive activity. It therefore does not trigger First Amendment scrutiny for the whole Act.

**B.    Even if the First Amendment Applies, the Act's Definitional Provision Is Not Content-Based and Thus Does Not Trigger Strict Scrutiny**

Even if the definitional provision did trigger First Amendment scrutiny, it is not a content-based provision that would subject the entire Act to strict scrutiny. A statute is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Porter v. Martinez*, 68 F.4h 429, 438 (9th Cir. 2023) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). This Court has explained that "[t]he 'crucial first step in the content-neutrality analysis,' . . . is 'determining whether the law is content neutral on its face'—that is, whether it 'draws distinctions based on the message a speaker conveys.'" *Id.* at 438-39 (quoting *Reed*, 576 U.S. at 163, 165). "The second step . . . is to ask whether the law is content based in its justification." *Id.* at 439. A law that is content neutral on its face "will be considered content based if [it] 'cannot be justified without reference to the content of the regulated speech' or '[was] adopted by the government because of disagreement with the message.'" *Id.* (quoting *Reed*, 576 U.S. at 164).

24

This Court recently addressed how to perform that analysis in the en banc decision in *Project Veritas v. Schmidt*, 125 F.4th 929 (9th Cir. 2025) (en banc), *pet. for cert. docketed*, No. 24-1061.  It began by explaining that "[f]or decades, the Supreme Court routinely emphasized that '[t]he government's purpose' in regulating speech 'is the controlling consideration' in 'determining content neutrality.'" *Project Veritas*, 125 F.4th at 947 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791-92 (1989)).  Thus, the Supreme Court "has not adopted a bright-line rule that *any* consideration of content mandates strict scrutiny." *Id.*  "Put another way, not every regulation that turns on the content of speech in the loosest sense is content based in the constitutional sense." *Id.* at 950.  Therefore, "[a] regulation may remain content neutral despite touching on content to distinguish between classes or types of speech . . . so long as it does not discriminate on the basis of viewpoint or restrict discussion of an entire topic." *Id.*

Under these principles, the Act's definitional provision is not content based.  That provision focuses on determining which online products, services, and features are being used by children under 18, which is not a content-based line to draw.  This follows from the plain language of the definitional provision.  The Act defines "likely to be accessed by children" as "reasonable to expect, based on the following indicators, that the online service, product, or feature would be accessed by children."  Cal. Civil Code § 1798.99.30(b)(4).  Thus, the key focus of the

25

definition is whether it is reasonable to expect that a business's product, service, or feature would be used by children. Asking whether a child would use a product, service, or feature is not the same as asking what message that product, service, or feature has. Indeed, children under 18 can and do use online products, services, or features that provide commercial, non-expressive services—for example, ride-sharing services, financial transaction services, health-related products, fitness products, and education-related products, *see supra* at 21.

That fact is not changed by the indicators that are included in the definitional provision to assist in determining whether children are likely to use a particular product, service, or feature. Many of these indicators have nothing to do with a service, product, or feature's message, but rather involve demographic information that demonstrates if children are, in fact, using the product—namely whether the service, product, or feature is "determined, based on competent and reliable evidence regarding audience composition, to be routinely accessed by a significant number of children," or a "significant amount of the audience" for the service, product, or feature is children. Cal. Civ. Code § 1798.99.30(b)(4)(B), (F). Thus, if a service, product, or feature is actually being used by children under 18, it meets the definition of "likely to be accessed by children" regardless of any speech or expressive aspects of that service, product, or feature.

26

Nor do the indicators that may involve looking at expression—whether there are ads directed to children or design elements that appeal to children—render the definitional provision content-based. For one, determining if a product, service, or feature is likely to be accessed by children need not necessarily involve considering any expressive elements; if there is demographics information indicating that children are using the product, service, or feature, then it is likely to be accessed by children and no consideration of any expressive elements is required. But even if there is some consideration of expressive elements, it is done "only in the service of drawing neutral . . . lines," *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022), namely whether children are using that product, service, or feature.

The Supreme Court's ruling in *City of Austin* is illustrative. That case involved a law that distinguished between signs advertising a business on the business's premise and signs advertising a business not on the premise. *City of Austin*, 596 U.S. at 66. The plaintiff in that case argued that the law was content-based because determining if it applied "require[d] reading the sign at issue." *Id.* at 69. The Court rejected that argument as "too extreme," instead holding that the law "require[d] an examination of speech only in service of drawing neutral, location-based lines" and was "agnostic as to content." *Id.* Given that, the Court

27

concluded the law was not content-based even if applying it required an examination of a sign's speech. *Id.* at 76.

The en banc Ninth Circuit rejected a similar argument in *Project Veritas*. That case concerned a law that prohibited recording conversations without advance notice to participants, but included exceptions for conversations recorded during a felony or conversations with a police officer. *Project Veritas*, 125 F.4th at 938-39. The plaintiff argued that the law was content based because "one must listen to the content of the recording" to determine if an exception applied. *Id.* at 947. This Court rejected that argument, explaining that the law's exceptions were "'agnostic as to [the] content' of a recording," and "do[] not concern a 'particular viewpoint[]' or prohibit discussion of 'an entire topic.'" *Id.* at 951 (citations omitted). Since the exception "applies to conversations that involve law enforcement officers [or a felony], regardless of what the conversation is about," it was content neutral. *Id.*; *see also Porter*, 68 F.4th at 441-42 (statute prohibiting horn use except when reasonably necessary to ensure safe operation was not content based, even if applying it required considering the contents of a message, because the law did not single out specific expressive messages for different treatment).

Just as with the laws at issue in *City of Austin* and *Project Veritas*, the definition of "likely to be accessed by children" is agnostic as to content. Any

28

consideration of expressive elements in applying the definitional provision's indicators is done for the purpose of determining if children under 18 are likely to use the product, service, or feature.  In other words, the definitional provision "tailors the Act's applicability to only the platforms that have a chance of attracting the children the Act seeks to protect." *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 556 (S.D. Ohio 2024) (holding statute not content based because it applied to platforms that "target[] children" or are "reasonably anticipated to be accessed by children").  That is a content neutral line to draw: it does not single out any particular message or viewpoint (such as hateful speech) or any particular topic (such as politics or religion) for special treatment.  "Indeed, even though covered platforms contain some subject matter likely to appeal to children, most also contain subject matter 'as diverse as human thought.'"  *Id.*  Rather, the indicators involve looking at design elements or the kind of advertisements included to determine if children are likely to access a particular product, service, or feature— and thus if it is reasonable to anticipate children under 18 would use it—just as a court might consider various factors when determining if children would be likely to enter a particular piece of property in applying the attractive nuisance doctrine in tort law, *see* Restatement (Second) of Torts, § 339.  And if children are likely to use a particular service, product, or feature, it falls within the definitional provision

29

regardless of what message or viewpoint it conveys. The definitional provision and its indicators are thus not facially content based.

Nor is it the case that the Act "cannot be 'justified without reference to the content of the regulated speech.'" *Porter*, 68 F.4th at 439 (quoting *Reed*, 376 U.S. at 164). The Act's findings make clear that the Legislature was motivated by content-neutral concerns: "promot[ing] privacy protections for children." 2022 Cal. Stat., ch. 320 (AB 2273), § 1(b); *see also id.* § 1(a)(7) ("children of all ages should nonetheless be afforded privacy and protection, and online products and services should adopt data protection regimes appropriate for children of the ages likely to access those products and services"); *id.* § 1(a)(8) (online services, products, or features "should offer strong privacy protections by design and by default" for child users); *id.* § 1(a)(9) ("children are particularly vulnerable from a negotiating perspective with respect to their privacy rights"). So, too, does the legislative history. *See, e.g.*, 3-ER-302 ("data protection for children is especially important"); 3-ER-332 ("there are also growing concerns about the systemic collection of information from children"). This concern about the privacy and health of children does not stem from the message or viewpoint of any expressive content children view online. To the extent the Act's definitional provision "confer[s] benefits or imposes burden[s] on speech," it does so "without reference

30

to the ideas or views expressed." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 643 (1994). It is therefore content neutral.

The lower court's conclusion to the contrary is unpersuasive, predicated on a misreading of the statute, and flatly erroneous under *Project Veritas*. First, the lower court held that the definitional provision is content based because applying the definition "unavoidably requires an evaluation of content." 1-ER-15. But *Project Veritas* makes clear that that is not the proper standard for determining whether a statute is content based: the contention that a statute "is facially content based because one must examine the content . . . to determine if [speech] is lawful or unlawful" is "unsupported by precedent." *Project Veritas*, 125 F.4th at 947.

Nor is it the case, as the lower court erroneously concluded, that the definitional provision "draws distinctions based on the speaker's message, namely, whether it is content likely to be accessed by children." 1-ER-17. The Act draws distinctions based on a product's, service's, or feature's *users*, namely whether those users are likely to include children. Neither the lower court nor plaintiff has identified any case law that suggests that drawing distinctions based on whether users are likely to include children or adults is drawing a distinction based on a speaker's message. On the contrary, one of the cases that both the lower court and plaintiff relied on concluded that similar language in an Ohio statute ("reasonably

anticipated to be accessed by children") did not make the statute content based. *See NetChoice, LLC v. Yost*, 716 F. Supp. 3d at 556.

Finally, the lower court's contrary holding is predicated on a misinterpretation of the Act and its definitional provision: that the Act "does not regulate all businesses that provide services to children, only those that provide online *content* to children." 1-ER-18. The lower court distinguished *City of Austin*, *Project Veritas*, and *Porter* on the basis of this misinterpretation of the statute, finding those cases inapplicable since the Act "does single out particular subject matter, specifically, online content that is likely to be accessed by children" unlike the laws at issue in those three cases. 1-ER-16. But such a conclusion is flatly contrary to the plain language of the statute. The Act does not regulate *online content* that is likely to be accessed by children; it regulates any "online *service, product, or feature* that is likely to be accessed by children." Cal. Civ. Code § 1798.99.31(a), (b) (emphasis added). A product, service, or feature is likely to be accessed by children when "it is reasonably to expect, based on the following indicators, that the online service, product, or feature would be accessed by children." *Id.* § 1798.99.30(b)(4). The word "content" nowhere appears in the definitional provision. Indeed, the only place that the word "content" appears in entire Act is once in the now-enjoined reporting requirement. *Cf.* 1-ER-18 (citing subpart of the reporting provision that "directs businesses to determine whether

32

children are exposed 'to harmful, or potentially harmful, content on the online product, service, or feature" in a report).  As discussed in more detail above, businesses that engage in entirely commercial, non-expressive activity can fall within the scope of the Act's definitional provision if they have a significant number of child users.  *See supra* at 21-24.  It was erroneous to conclude that the Act "does not regulate all businesses that provide services to children, only those that provide online *content* to children," as the district court did.  1-ER-18.  And it was further erroneous to distinguish *City of Austin*, *Project Veritas*, and *Porter* on the basis of that incorrect statutory interpretation.

At the end of the day, the Act is about protecting children under 18 online.  It thus logically defined the scope of regulated entities by whether or not a product, service, or feature was likely to be used by the children the Act seeks to protect. That is a content-neutral distinction.

## C.    The District Court Failed to Apply the Proper Framework for Assessing Facial Challenges

Finally, even if strict scrutiny applied, the lower court applied that standard in a way that was inappropriate given the context of plaintiff's challenge.  "For a host of good reasons, courts usually handle constitutional claims case by case, not en masse," and facial challenges are "hard to win."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).  In the First Amendment context, to prevail on a facial challenge, the plaintiff must establish that the "law's unconstitutional applications

33

substantially outweigh its constitutional ones." *Id.* at 724. "As *Moody* clarified, a First Amendment facial challenge has two parts: first, the courts must 'assess the state laws' scope'; and second, the courts must 'decide which of the laws' applications violate the First Amendment, and . . . measure them against the rest.'" *NetChoice, LLC v. Bonta* (*NetChoice II*), 114 F.4th 1101, 1115-16 (9th Cir. 2024) (alteration in original) (quoting *Moody*, 603 U.S. at 724-25). For the first part, a court determines "[w]hat activities, by what actors, . . . the laws prohibit or otherwise regulate[.]" *Moody*, 603 U.S. at 724. For the second part, a court "decide[s] which of the laws' applications violate the First Amendment" and "measure[s] them against the rest." *Id.* Throughout this analysis, a plaintiff must "carry its burden" to establish that the standard for a facial challenge is met. *Id.* at 744.

The lower court's application of strict scrutiny to the Act was erroneous in two respects. First, the lower court erred by applying strict scrutiny to, and enjoining, the Act as a whole, without considering the constitutionality of its individual prohibitions. The Act is a complex statute that involves numerous provisions, the majority of which plaintiff did not challenge under the First Amendment. *See* 3-ER-568-569 (detailing which provisions were challenged on which grounds). While the State can proffer compelling interests that apply to the Act as a whole, applying strict scrutiny—or even a lesser standard such as

34

intermediate scrutiny or the test for commercial speech—to a law requires analyzing the fit between a law's regulations and the State's interest. This includes considering whether alternatives that impact less speech could further the State's interests adequately. That is not something that could be done by looking at the *entire Act*, including provisions not even challenged. For instance, whether the Act's prohibition on the use of dark patterns is narrowly tailored to the State's interest in protecting children is a distinct question from whether the prohibition on profiling a child by default is. And an alternative that is less restrictive compared to the prohibition on using data for a purpose other than it was collected for, may not be less restrictive (or even an adequate alternative) for the prohibition against dark patterns.

Moreover, analyzing a facial challenge requires delving into the "full range" of how the Act's prohibitions "might apply to covered businesses." *NetChoice II*, 113 F.4th at 1123. Each of the six challenged regulations have a different impact on an online product, service, or feature—to the extent they even all apply to the same online product, service, or feature. It is not possible to see the full contours of the Act's applications as needed for a facial challenge by taking the 30,000-foot view and applying strict scrutiny to the Act as a disambiguated whole—a fact well-illustrated by the lower court's conclusion that plaintiffs were *not* likely to prevail with respect to five of the six challenged provisions when it applied strict scrutiny

to each separate provision. The same holds true to applying the standard for strict
scrutiny. It is simply not logistically possible to perform a facial strict scrutiny
analysis to the Act as a whole, and the lower court erred in doing so.

Second, even if it was proper to apply strict scrutiny to the Act as a whole, the
lower court erred by failing to follow the proper standard in *Moody* when applying
strict scrutiny. First, the lower court nowhere determined "[w]hat activities, by
what actors, do[es] the law[] prohibit or otherwise regulate?" *Moody*, 603 U.S. at
725. For instance, the lower court did not take account of the fact that plaintiffs
have not challenged the majority of regulatory provisions in the statute, such as the
requirements to configure default privacy settings provided to children to settings
that offer a high level of privacy, to provide tools to help children and their
guardians exercise their privacy rights, or not to collect, sell, or share a child's
precise geolocation data unless strictly necessary for the service the child is
engaged with. *See* Cal. Civil Code § 1798.99.31(a)(6), (a)(10), (b)(5). In
analyzing a facial challenge, a court "must account for 'the rest' of the applications
not challenged." *Arizona Att'ys for Crim. Just. v. Mayes*, 127 F.4th 105, 111 (9th
Cir. 2015). And the court "must treat [those] application[s] as constitutional for
purposes of [a] facial challenge." *Id.* The lower court failed to do so here.

Nor did the lower court "determin[e] the full scope of actors regulated by the
Act and the activities it regulates." *NetChoice, LLC v. Fitch*, 134 F.4th 799, 809

(5th Cir. 2025).  For instance, the lower court did not address how the Act applies to entities that do not engage in expressive activities, such as Lyft, Uber, or Ticketmaster—all examples of potentially covered businesses that the State proffered, *see supra* at 21, 23.  It nowhere addressed which members of NetChoice would even be impacted by the statute.  *See Moody*, 603 U.S. at 725; *NetChoice, LLC v. Fitch*, 134 F.4th at 809.  Nor did it address which activities by those members would be impacted and how—a particularly salient omission given this Court's observation that "most of [the Act's] provisions, by their plain language, do not necessarily impact protected speech in all or even most applications." *NetChoice II*, 113 F.4th at 1122.

Instead of engaging in the full analysis required by *Moody*, the lower court replicated the kind of error that the Supreme Court identified in *Moody* and this Court identified in *NetChoice II*.  The lower court broadly stated that the Act "applies to *all* online content likely to be accessed by consumers under the age of 18, and imposes significant burdens on the providers of that content."  1-ER-26. In other words, the lower court "focused on possible applications of these provisions to social media companies . . . and speculated about how that subset of applications could have a substantial effect on those companies' editorial discretion or the expression of their third-party users."  *NetChoice II*, 113 F.4th at

37

1123; *see also Moody*, 603 U.S. at 724.  That is precisely the error that led to reversal in *Moody* and *NetChoice II*.

The lower court attempted to justify its effort to avoid the full analysis required by this Court in *NetChoice II* by stating that "the application of strict scrutiny is grounded in the content-based definition of a covered business, which applies in *all* applications of the Act."  1-ER-27.  But that statement does not answer the essential questions of a facial claim: "What activities, by what actors, do the laws prohibit or otherwise regulate?"  *Moody*, 603 U.S. at 724.  As the Supreme Court observed in *Moody*, "[t]he online world is variegated and complex, encompassing an ever-growing number of apps, services, functionalities, and methods for communication and connection."  *Id.* at 725.  In response to the Act, "[e]ach might (or might not) have to change because of the provisions."  *Id.* "Before a court can do anything else with these facial challenges, it must address that set of issues—in short, it must 'determine what [the law] covers.'"  *Id.* (citation omitted) (alteration in original).  The lower court wholly failed to do so here.  And "[b]y not determining the full scope of actors regulated by the Act and the activities it regulates, the district court did not apply *Moody* in the manner now required."  *NetChoice LLC v. Fitch*, 134 F.4th at 809; *see also NetChoice II*, 113 F.4th at 1124.  Its strict scrutiny analysis is thus fatally flawed.

38

## II. THE DISTRICT COURT ERRED IN INDIVIDUALLY ENJOINING THE AGE ESTIMATION, DATA USE, AND DARK PATTERNS PROVISIONS IN THE ALTERNATIVE

In addition to finding plaintiff likely to prevail on a facial challenge to the entire Act, the lower court also concluded plaintiff was likely to prevail on individual facial challenges to six provisions of the Act in the alternative, based either on the First Amendment or vagueness. 1-ER-39, 1-ER-43-44. These conclusions, too, are erroneous.

### A. The Age Estimation Requirement Does Not Violate the First Amendment

First, the lower court held that plaintiff was likely to prevail on its First Amendment challenge to the age estimation requirement. 1-ER-39. Not so. The Act requires a business with an online platform, service, or feature likely to be accessed by children to "[e]stimate the age of child users with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business or apply the privacy and data protections afforded to children to all consumers." Cal. Civil Code § 1798.99.31(a)(5).

Plaintiff's First Amendment challenge to this requirement fails at the threshold because the age estimation requirement does not trigger the First Amendment. The act of estimating a user's age is conduct, not expressive activity, so the age estimation requirement plainly does not regulate speech. True, age estimation triggers the Act's other substantive provisions for a particular user, but

39

any impact that this requirement might have on expressive activity is the result of the *other substantive provisions* in the Act, not the age estimation requirement itself.

The relevant inquiry, then, is whether the age estimation provision singles out entities engaged in expressive activity for regulation. *See supra* at 19-20. But the age estimation provision does not itself single out any particular businesses for regulation. Rather, it applies to all online products, services, and features subject to the Act itself—and, as discussed above, that includes businesses that conduct commercial, non-expressive activities. *See supra* at 21-24.

Even if the First Amendment applied to the age estimation provision, the district court erred in applying strict scrutiny. The age estimation provision is not content-based. It requires all that businesses subject to the Act estimate the age of users to determine if a user is a protected child (or, in the alternative, to apply the Act's substantive provisions to all users). The requirement to estimate age does not depend on any message or viewpoint expressed by a business, but simply whether it is subject to the Act itself. And the act of estimating age does not single out any particular message or viewpoint for regulations either. Determining if a user is a child under 18 says nothing about one's views on politics, religion, sports, or any other topic.

40

Moreover, regardless of whether intermediate or strict scrutiny is applied, the age estimation requirement passes constitutional muster. The age estimation requirement furthers the State's compelling interest in protecting the privacy and well-being of children. *See, e.g.*, *New York v. Ferber*, 458 U.S. 747, 756-57 (1982) ("[A] State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" (citation omitted)); *United States v. Yazzie*, 743 F.3d 1278, 1287 (9th Cir. 2014) (same). By estimating a user's age, a business will know how it can make use of that user's personal information—thereby ensuring that the Act's substantive protections will be applied to minor users and that children under 18 benefit from the Act's provisions.

The requirement is also sufficiently tailored. As a practical reality, it is necessary for businesses to estimate a user's age to determine if the user is a minor who is protected by the Act or not—the only alternative would be to require protections for *all* users, which would be a less tailored requirement. Finally, the Legislature has taken steps to help protect privacy by requiring that any data collected for age estimation not be retained or used for any other reason. Cal. Civ. Code § 1798.99.31(b)(8). Since the only way for a business to determine if a user is a minor protected by the Act's substantive regulations is to estimate the user's age, there is no more tailored way to determine whether the substantive provisions apply.

In holding to the contrary, the lower court once more began its analysis from an erroneous interpretation of the statute. It construed the statute as "requiring a business to estimate age for the purpose of determining what content is appropriate for that age." 1-ER-37. But that reading of the statute is wholly divorced from its text. The Act requires a company to estimate a user's age or apply the other substantive privacy protections of the Act to all users. *See* Cal. Civil Code § 1798.99.31(a)(5). It nowhere states—either in the age estimation provision or elsewhere—that a company must "determine what content is appropriate" for any particular child. Indeed, the word "content" only appears once in the Act's substantive provisions, in a subsection of the previously enjoined reporting requirement. *See id.* § 1798.99.31(a)(1)(B)(i) (in report company must address, among other topics, whether "the design of the online product, service, or feature could harm children, including by exposing children to harmful, or potentially harmful, content"); *supra* at 11. And even if that was something the Act requires (it does not), the proper remedy would be to challenge and enjoin *that* provision, not the age estimation requirement.

The lower court also faulted the State for its "assumption that greater data privacy for children means greater security and well-being" and noted that age estimation could require more collection of data. 1-ER-37-38. But it was reasonable for the Legislature to conclude that greater data privacy means greater

well-being and security for children.  Indeed, the evidence submitted by the State demonstrated that limiting the use of personal information in algorithms or other design aspects that are meant to maximize a child's time online—and thereby increase the risk of harm from overuse—clearly furthers the State's interest in a child's well-being. 3-ER-487-482, 3-ER4-88-489, 3-ER-498-499.  So, too, does limiting the use of personal information in ways that might: (1) expose a minor to manipulative designs meant to lead them to overspend, *see* 3-ER-481-482, 487-488, 497-498; (2) expose a minor to illegal products or harmful activities, *see* 3-ER-483-484 (child sexual material), 3-ER-475-476, 3-ER-485 (illegal drugs), 3-ER-485-486 (gambling advertisements), 3-ER-486-487 (alcohol advertisements); or (3) expose a minor to potential exploitation, including sexual exploitation or abuse, *see* 3-ER-473-475, 3-ER-483-484.  Clearly, such prohibitions on the use of a child's data furthers the State's compelling interest in protecting the privacy and well-being of children.

Finally, the lower court faulted the State for "assert[ing] that there are no less restrictive alternatives" but "not support[ing] [that statement] by any evidence."  1-ER-39.  But the State's point was one of basic logic: if companies are required to apply more protective standards for child users' data, then they *must*, as a practical reality, distinguish between child and adult users—the only alternative is to regulate *all* users, which is *more* restrictive, not less.  Indeed, plaintiff pointed to

43

no less restrictive alternatives to age estimation; rather, it argued from the same erroneous premise that the age estimation provision would "necessarily place 'restrictions on the availability of information.'" 3-ER-556; *see also* 2-ER-248. The age estimation requirement does not block any access to content standing alone, and it is necessary to effectuate the Act's purpose of protecting child users. For that reason, the age estimation provision clearly withstands scrutiny—if it even triggers First Amendment scrutiny to begin with.

### B.    The Data Use Restrictions Are Not Unconstitutionally Vague

The lower court further erroneously held that plaintiff was likely to prevail on its vagueness challenge to the data use restrictions. "A statute is impermissibly vague when it 'fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement.'" *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (citation omitted). But this standard "does not require 'impossible standards of clarity.'" *Id.* (citation omitted). Rather, a statute must simply "sufficiently give notice as to what conduct is prohibited." *Id.* Although there may be cases at the margin that can be dreamed up, a statute is not vague when it is "clear what the [statute] as a whole prohibits." *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (citation omitted). After all, "because we are '[c]ondemned to the use of words, we can never expect mathematical certainty from our language.'" *Id.* (citation omitted) (alteration in

44

original).  In challenging the data use provisions, plaintiff identified particular terms that it contended were unduly vague, specifically "material detriment," "best interests," and "physical health, mental health, or well-being."  1-ER-41.  None of these phrases render the data use provisions unconstitutionally vague.

"Material detriment" and "physical health, mental health, or well-being" appear in the first of the four data use provisions, which prohibits a business from using a child's personal information "in a way that the business knows, or has reason to know, is materially detrimental to the physical health, mental health, or well-being of a child."  Cal. Civil Code § 1798.99.31(b)(1).  California courts interpreting statutes "begin by examining the statutory language, giving it a plain and commonsense meaning."  *Skidgel v. California Unemployment Ins. Appeals Bd.*, 12 Cal. 5th 1, 14 (2021) (citation omitted).  Of course, courts do not "consider the statutory language in isolation" but rather "look to the entire substance of the statutes in order to determine their scope and purpose."  *Id.* (citation omitted).  When "the statutory language is unambiguous, then its plain meaning controls."  *Id.* (citation omitted).

Applying these tools of statutory interpretation, "materially detrimental to the physical health, mental health, or well-being of a child" has an accepted plain meaning:  it causes meaningful harm to a child's physical state, mental state, or overall condition of health and happiness.  *See, e.g.*, *Material*, Black's Law

45

Dictionary (12th ed. 2024) (defining "material" as "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential"); *Detrimental*, Black's Law Dictionary (12th ed. 2024) ("causing harm, damage, or loss; injurious or hurtful"). For instance, using a child's information to connect them to a person that seeks to abuse the child, such as through sexploitation, would be materially detrimental to the child's physical health, mental health, and well-being. *Cf.* 3-ER-483-485 (discussing how use of minors' data can lead to connecting youths to perpetrators of child sexual abuse). Using a child's information to recommend illegal products such as tobacco, alcohol, or gambling would be materially detrimental to a child's physical health and well-being. *Cf.* 3-ER-485-487 (discussing how use of minors' data can lead to targeting advertisements for illegal products at children). And revealing a child's location to a person the business knows would harm the child, such as a non-custodial parent seeking to kidnap the child, would be materially detrimental to the child's physical health and well-being.

Thus, this prohibition—not to use a child's data in a way that the business knows will cause a child harm—is clear. And the requirement that the business *know* the use of data will lead to harm "further reduces any potential for vagueness," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010), since "a person of ordinary intelligence base his behavior on his factual knowledge of the

46

situation at hand and thereby avoid violating the law," *United States v. Jae Gab Kim*, 449 F.3d 933, 943 (9th Cir. 2006).

Nor does the fact that this prohibition may involve "the application of a qualitative standard . . . to real world conduct" make the law vague, as the lower court (at 1-ER-42) seemed to suggest. *Johnson v. United States*, 576 U.S. 591, 604 (2015). As the Supreme Court has observed, "the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree." *Id.* at 605 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)) (alteration in original). And "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill*, 530 U.S. at 733. The language "material detriment" and "physical health, mental health, or well-being" meet that standard, and the first data use restriction is not unconstitutionally vague.

The lower court's contrary conclusion is not persuasive. It contended that the "challenged terms have no established meaning." 1-ER-42. But the phrases "materially detrimental" and "physical health, mental health, and well-being" all have plain meanings as typically understood, *see supra* at 45-46. And the lower court ignored that the statute requires that a business have acted *with knowledge* that the particular use of a child's information at issue will cause that child harm. *See* Cal. Civ. Code § 1798.99.31(b)(1). There is no obligation for a company to

47

catalogue all possible harms to a child; rather, the company must simply ask whether the desired use of a child's data will cause that child harm, based on the information the company has at hand. If so, then it must not use the child's data in that way. The first data use regulation is thus clear in the scope of conduct it regulates.

Nor is the phrase "best interests" unconstitutionally vague. This phrase appears in the second through fourth data use restrictions, all of which provide an exception from their general prohibitions if a business can "demonstrate a compelling reason that [doing so] is in the best interests of children." Cal. Civil Code § 1798.99.31(b)(2)-(b)(4). This phrase—"best interests of children"—is a legal term of art with a long pedigree in family law. It is the standard used in California to determine child custody arrangements, *see, e.g.*, *In re Marriage of Vargas & Ross*, 17 Cal. App. 5th 1235, 1243 (2017); to make guardianship decisions, *see, e.g.*, *Petition of Daniels*, 177 Cal. App. 2d 376, 378 (1960); and in delinquency proceedings, *see, e.g.*, *In re Jonathan C.M.*, 91 Cal. App. 5th 1039, 1041 (2023). Given the phrase's long heritage in family law, it is hardly unconstitutionally vague. This is particularly true given the phrase appears in the exception in the statute and these three data use restrictions are clear in their substance: a business may not profile a child by default; collect, sell, share, or retain personal information that is not necessary to provide a service the child is

actively engaged with; or use a child's personal information for a reason other than it was collected for.

The lower court contended that while "best interests of the child" is sufficiently clear in family law proceedings, it is not in the Act because family law proceedings involve "a particular child, on a particular factual record." 1-ER-43. But that is precisely how the term operates in the Act as well. The phrase appears in the exception to the general prohibitions in the three other data use conditions: the substantive prohibitions apply unless a company can demonstrate a "compelling reason" the otherwise-prohibited action is in the "best interests of children." Exceptions are, by nature, context-specific and involve a specific factual situation that will fall outside the general scope of a restriction. In determining whether the exception applies, a business will be confronting a specific situation, involving specific data, specific children, and whether a specific use of that specific data is in the best interests of children—such as sharing a missing child's data with the child's parents or investigators. Moreover, the exception only applies when a business can demonstrate a *compelling* reason the action is in the best interests of children. If there is serious debate about whether a particular data use is in the best interests of children, it is highly unlikely that that the "compelling reason" requirement of the exception will be met. None of these three data use restrictions are unconstitutionally vague.

49

## C.    The Dark Patterns Restriction Is Not Unduly Vague

Finally, the lower court held that the dark patterns restriction was unconstitutionally vague.  1-ER-44.  Not so.  This prohibition prevents a business from using "dark patterns" to "lead or encourage children" to: (1) "provide personal information beyond what is reasonably expected to provide that online service, product, or feature," (2) "forego privacy protections," or (3) "take any action that the business knows, or has reason to know, is materially determinantal to the child's physical health, mental health, or well-being."  Cal. Civil Code § 1798.99.31(b)(7).  The statute incorporates a definition of "dark patterns" as "a user interface designed or manipulated with the substantial effect of subverting or impairing user autonomy, decisionmaking, or choice."  *Id.* § 1798.140(*l*).  Plaintiff does not contend the first two parts of the dark patterns restriction are vague, only the third part that involves actions "materially detrimental" to a child's "physical health, mental health, or well-being."

As discussed above with the first data use restriction, these phrases have clear plain language meanings: something that causes meaningful harm to a child's physical or mental state.  *See supra* at 45-46.  And as with the first data use restriction, the business must know or have reason to know that the dark pattern will lead a child to take an action that will harm that child.  Such a mens rea requirement mitigates against vagueness.  *See supra* at 46-47.

50

Furthermore, a statutory provision's vagueness is determined in light of the statute as a whole. Here, the overall dark patterns prohibition is clear. For one, for the prohibition to apply, there must be a user interface—which is the point of human-computer interaction, such as the interactive parts of a website like click boxes, scrolling bars, or menu items, 3-ER-436. Second, this user interface must have been "designed or manipulated with the substantial effect of subverting or impairing user autonomy, decisionmaking, or choice." *See* Cal. Civ. Code § 1798.140(*l*). This definition greatly narrows the universe of regulated activity.

Much of the lower court's opinion and the plaintiff's arguments below appeared to focus on the contention that there is "no guidance on how and when a business will 'have reason to know' that a particular user interface covered by the restriction on dark patterns . . . will be 'materially detrimental' to the child's 'physical health, mental health, or well-being.'" 1-ER-44. This contention is predicated on a misreading of the Act as requiring a company *to figure out* if a particular user interface will harm a child. That is flatly contrary to the ordinary understanding of what it means to act "knowingly." While of course the statute does not allow a business to act as an ostrich and hide its head in the sand from any possible knowledge that a child might be harmed, it does not require a business to venture out on a quest to find all possible harms to all child users. It only requires that the business act in accordance with its existing knowledge. And if that

51

existing knowledge reveals a child will be harmed, the business must refrain from acting. When a business lacks knowledge of any harm, the restriction does not apply. There is nothing unconstitutionally vague about requiring a business not to *knowingly* cause affirmative harm to the children using its product.

## III.  THE LOWER COURT ERRED IN FINDING THE REMAINING PROVISIONS OF THE ACT ARE NOT SEVERABLE

Finally, the lower court concluded that the remaining provisions of the Act are not volitionally separable from the notice-and-cure provision that remains enjoined. Federal courts apply California law when analyzing severability. *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir. 2014). California courts apply a three-part test for separability: the "invalid provision must be grammatically, functionally, and volitionally separable." *Cal. Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 271 (2011) (citation omitted). Since plaintiff did not challenge grammatical separability and the lower court concluded functional separability was met, only volitional separability is at issue here. "Volitional separability depends on whether the remainder 'would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute.'" *Id.* (citation omitted). While the presence of a severability clause "establishes a presumption in favor of severance," *id.* at 270, "the absence of such a clause is not conclusive," *County of Sonoma v. Superior Court*, 173 Cal. App. 4th 322, 352 (2009); *see also Legislature v. Eu*, 54 Cal. 3d 492, 535 (1991) (holding it was

"clear that severance of particular provisions is permissible despite the absence of a formal severance clause").

The requirement for volitional separability—the only one at issue here—is met. The California Supreme Court has been clear that "[t]he issue, when assessing volitional separability, is not whether a legislative body would have preferred the whole to the part; surely it would have." *Matosantos*, 53 Cal. 4th at 273. "Instead, the issue is whether a legislative body, knowing that only part of its enactment would be valid, would have preferred that part to nothing, or would instead have declined to enact the valid without the invalid." *Id.* The Legislature was clear that the Act was intended to "promote privacy protections for children." AB 2273, § 1(b). The legislative history referenced the tangible harms to children from existing data and privacy practices, such as "bullying, mental health challenges, and addictive behaviors." 3-ER-302; *see also* 3-ER-332 (noting concerns with "systemic collection of information from children and its utilization to target children with advertising or to ensure engagement with various media"). The Act was intended to establish "baseline protections" for children under 18 online, including disabling profiling, limiting the collection of data on minors, and prohibiting the use of dark patterns. 3-ER-303. In light of the Legislature's concern about protecting children's privacy and safety online, it would be illogical to conclude that the Legislature would have foregone the Act's many substantive

53

protections that regulate the use of a child's data simply because the law would not include a reporting and notice-and-cure provision.

The lower court concluded to the contrary, focusing on the chronology of the Act's passage. It noted that the Act was at one point placed on the suspense file and then, after the notice-and-cure provision was added, was read by the full Senate. 1-ER-49. From this history alone, the lower court concluded that "the legislature would not have adopted the bill without that provision." 1-ER-49. But this is wholly speculative. Neither plaintiff nor the lower court have pointed to a single piece of evidence indicating that the addition of the notice-and-cure provision was the *reason* the bill left the suspense file; indeed, the lower court itself noted that this change occurred as part of "substantial changes" to the bill. 1-ER-49; *compare* 2-ER-68-76 (bill prior to suspense file), *with* 2-ER-78-92 (bill after suspense file). It is equally possible that one of the other "substantial changes" was what led to the bill's passage—if it is even possible to ascribe the passage of a large, complex Act such as this to one particular amendment or part.

The lower court also noted floor statements from the bill's co-author that "highlighted the notice and cure provisions when presenting the final version of the bill for a vote." 1-ER-50. But those statements would not receive such heavy weight as a matter of California statutory interpretation principles. *E.g.*, *Quintano v. Mercury Cas. Co.*, 11 Cal. 4th 1049, 1062 (1995) ("We have frequently stated,

54

moreover, that the statements of an individual legislator, including the author of the bill, are generally not considered in construing a statute.").  And the notice-and-cure provision was just one of several aspects of the bill that the floor statement referenced, including limiting enforcement to the Attorney General and creating "robust penalties."  3-ER-575.  And the sponsor noted that the amendments overall "reflect[ed] numerous conversations with stakeholders and ensure that California youth receive the same robust protection as their peers in the UK and Europe."  3-ER-575.  Indeed, the other co-authors of the bill did not even mention the notice-and-cure provision, and instead focused on the ways that the bill protects children online.  3-ER-575-576.  There was nothing more than speculation from which to conclude it was the notice-and-cure provision, as opposed to any other part of the bill, that led to its passage or was so critical that the Legislature would never have passed the full Act without its inclusion.

In any event, the speculation about the role the notice-and-cure provision played in the drafting process is inapposite.  The Legislature may have viewed the notice-and-cure provision and the remainder of the Act "as a package," and the Court may "accept as self-evident that the Legislature preferred" a version of the Act with the notice-and-cure provision to one without it.  *Matosantos*, 53 Cal. 4th at 272.  But "this evidence goes to answering the wrong question."  *Id.* at 273.  The question for severability is whether the Legislature would have preferred the Act

55

without the notice-and-cure and DPIA requirement to *nothing*. *Id.*  Surely, it

would have.  The Legislature was clear about its concerns for the privacy and

safety of child users.  *See supra* at 8, 30-, 53.  The non-enjoined substantive

provisions of the Act directly regulate companies to ameliorate those concerns.

Given the Legislature's concerns about the safety and privacy of children, as well

as the number of different substantive regulations included in the Act, it would be

odd for the Legislature to have been so committed to a notice-and-cure provision

that it would have left the entire arena of data protections for children under 18

*unregulated* if it could not have that provision.  Instead, it is far more likely that

the Legislature would have enacted the remaining substantive obligations of the

Act and its intact enforcement scheme to protect children to the fullest extent

permissible.

///

///

///

56

## CONCLUSION

For the foregoing reasons, the order of the lower court should be reversed and

the preliminary injunction vacated.


Dated:  June 10, 2025                    Respectfully submitted,

                                         _s/ Kristin Liska_____


                                         Rob Bonta
                                           *Attorney General of California*
                                         Thomas S. Patterson
                                           *Senior Assistant Attorney General*
                                         Anya M. Binsacca
                                           *Supervising Deputy Attorney General*
                                         KRISTIN A. LISKA
                                           *Deputy Attorney General*


57

## STATEMENT OF RELATED CASES

The State is not aware of any related cases, as defined by Ninth Circuit Rule 28-2.6, that are currently pending in this Court and are not already consolidated here.

Dated:  June 10, 2025                                    *s/ Kristin Liska*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-2366

I am the attorney or self-represented party.

**This brief contains** | 13,314 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Kristin Liska | **Date** | June 10, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                             *Rev. 12/01/22*

59