No. 25-2366

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————

NETCHOICE, LLC, D/B/A NETCHOICE,
*Plaintiff-Appellee*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,
*Defendant-Appellant*.

————————————

## On Appeal from the United States District Court
## for the Northern District of California
No. 5:22-cv-08861-BLF
The Honorable Beth Labson Freeman, Judge

————————————

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 1 of 4

————————————

ROB BONTA
  *Attorney General of California*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
ANYA M. BINSACCA
  *Supervising Deputy Attorney General*
KRISTIN A. LISKA
  *Deputy Attorney General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3916
Fax: (415) 703-5480
Kristin.Liska@doj.ca.gov
*Attorneys for Defendant-Appellant*

June 10, 2025

ER_1

1
2
3
4

**UNITED STATES DISTRICT COURT**

5

**NORTHERN DISTRICT OF CALIFORNIA**

6

**SAN JOSE DIVISION**

7

| | |
|---|---|
| 8  NETCHOICE, LLC, doing business as | Case No.  22-cv-08861-BLF |
|     NETCHOICE, | |
| 9 | |
|          Plaintiff, | **ORDER GRANTING PLAINTIFF'S** |
| 10 | **SECOND MOTION FOR** |
|     v. | **PRELIMINARY INJUNCTION** |
| 11 | |
|     ROB BONTA, Attorney General of the State | [Re:  ECF 101] |
| 12  of California, | |
| 13          Defendant. | |
| 14 | |

15

16          Committed to protecting children from harmful online products and services, the

17    California State Legislature enacted the California Age-Appropriate Design Code Act

18    ("CAADCA" or "Act"), Cal. Civ. Code §§ 1798.99.28 *et seq.*, for the stated purpose of protecting

19    the "privacy, safety, and well-being" of children when they are online, *id*. § 1798.99.29.  The Act

20    was intended to take effect on July 1, 2024.  *See id.* § 1798.99.30(d).  Before that date, this suit

21    was filed by Plaintiff NetChoice, LLC ("NetChoice"), a trade association comprised of internet

22    companies such as Amazon, Google, Meta, and Netflix, challenging the CAADCA on

23    constitutional and federal preemption grounds.  *See* Compl., ECF 1.  NetChoice also filed a

24    motion for a preliminary injunction to enjoin enforcement of the CAADCA.  *See* Pl.'s Mot. for

25    Prelim. Inj., ECF 29.  This Court granted the motion based on its determination that NetChoice

26    was likely to succeed on its facial challenge to the Act under the First Amendment.  *See*

27    *NetChoice, LLC v. Bonta* ("*NetChoice I*"), 692 F. Supp. 3d 924 (N.D. Cal. 2023), *aff'd in part,*

28    *vacated in part,* 113 F.4th 1101 (9th Cir. 2024).  The State appealed.

United States District Court
Northern District of California

1    While the appeal was pending, the Supreme Court decided *Moody v. NetChoice, LLC*, 603

2    U.S. 707 (2024), which clarified the standard for analyzing a facial challenge to a statute under the

3    First Amendment.  Applying *Moody*, the United States Court of Appeals for the Ninth Circuit

4    concluded that this Court's preliminary injunction order did not conduct the analysis required for a

5    First Amendment facial challenge.  *See NetChoice, LLC v. Bonta ("NetChoice II")*, 113 F.4th

6    1101, 1108 (9th Cir. 2024).  The Ninth Circuit nonetheless affirmed the preliminary injunction as

7    to one aspect of the CAADCA, the requirement that each covered business create a Data

8    Protection Impact Assessment ("DPIA") identifying, for each offered online service, product, or

9    feature likely to be accessed by children, any risk of material detriment to children arising from

10   the business's data management practices.  *See id.* at 1108-09.  The Ninth Circuit also affirmed the

11   injunction as to provisions of the CAADCA that are not grammatically severable from the DPIA

12   requirement.  *See id.* at 1108.  The preliminary injunction was vacated in all other respects, and the

13   case was remanded for further proceedings.  *See id.*

14   On remand, NetChoice filed a first amended complaint ("FAC"), and a second motion for a

15   preliminary injunction.  *See FAC*, ECF 100; Pl.'s Second Mot. for Prelim. Inj., ECF 101.  The

16   motion is opposed by the State.  *See Def.'s Opp'n.*, ECF 112.  The Court has considered the

17   motion, the State's opposition, NetChoice's reply, the parties' supplemental briefs, the briefs filed

18   by five sets of *amici curiae*, and the record evidence.  The Court heard oral argument on January

19   23, 2025, and the State agreed to defer enforcement of the non-enjoined portions of the CAADCA

20   until April 5, 2025, to allow the Court time to issue a reasoned decision.

21   NetChoice's second motion for a preliminary injunction is GRANTED for the reasons

22   discussed below.

23   **I.     BACKGROUND**

24   In recent years, "[s]ocial-media platforms, as well as other websites, have gone from

25   unheard-of to inescapable."  *Moody*, 603 U.S. at 716.  "They structure how we relate to family and

26   friends, as well as to businesses, civic organizations, and governments."  *Id.*  "The questions of

27   whether, when, and how to regulate online entities, and in particular the social-media giants, are

28   understandably on the front-burner of many legislatures and agencies."  *Id.*

In general, government actors are better positioned than courts to address public policy issues relating to online platforms. *See Moody*, 603 U.S. at 716. However, "courts still have a necessary role in protecting those entities' rights of speech, as courts have historically protected traditional media's rights." *Id.* The tension between legislative interests in regulating online entities and those entities' First Amendment rights has generated lawsuits throughout the United States, many – like this one – brought by NetChoice. *See, e.g., Moody*, 603 U.S. 707; *NetChoice v. Bonta*, No. 5:24-CV-07885-EJD, 2024 WL 5264045 (N.D. Cal. Dec. 31, 2024); *NetChoice, LLC v. Reyes*, No. 2:23-CV-00911-RJS-CMR, 2024 WL 4135626 (D. Utah Sept. 10, 2024); *Computer & Commc'ns Indus. Ass'n v. Paxton*,[1] 747 F. Supp. 3d 1011 (W.D. Tex. 2024); *NetChoice, LLC v. Fitch*, 738 F. Supp. 3d 753 (S.D. Miss. 2024); *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539 (S.D. Ohio 2024).

The CAADCA was enacted for the purpose of regulating "business[es] that provide[] an online service, product, or feature likely to be accessed by children" ("coverage definition"). Cal. Civ. Code §§ 1798.99.31(a), (b). "Children" are "consumers who are under 18 years of age." *Id.* § 1798.99.30(b)(1). The Act covers online businesses that meet certain criteria, including earning more than $25 million in gross annual revenue or sharing at least 100,000 consumers' information annually. *See id.* § 1798.140(d).[2] NetChoice alleges that the Act would apply to the vast majority of companies operating online, including major news outlets (New York Times, Wall Street Journal, ABC, CBS, Fox News, etc.), sports leagues, magazines, podcasts, social media services, online video games, and online self-help and suicide prevention services treating adults and children. *See* FAC ¶ 26. As used in the coverage definition, "online service, product, or feature" does not include telecommunications services, delivery or use of a physical product, or healthcare services. *See* Cal. Civ. Code §§ 1798.99.30(b)(5), 1798.99.40. The Act does not apply to government agencies or nonprofits. *See id.* § 1798.140(d).

---

[1] NetChoice, LLC was the second named plaintiff in this suit.

[2] The definitions section of the California Consumer Privacy Act, Cal. Civ. Code § 1798.140, is incorporated into the CAADCA unless otherwise specified, *id.* § 1798.99.30(a).

The CAADCA imposes numerous affirmative requirements and prohibitions on covered businesses (collectively, "Regulatory Provisions"). *See* Cal. Civ. Code §§ 1798.99.31(a), (b). The Act's affirmative requirements are set forth in California Civil Code § 1798.99.31(a), while its prohibitions are set forth in California Civil Code § 1798.99.31(b).

*DPIA Requirement and Notice and Cure Provision*

The cornerstone of the Act's affirmative requirements "is the provision requiring online businesses to create a Data Protection Impact Assessment (DPIA) report identifying, for each offered online service, product, or feature likely to be accessed by children, any risk of 'material detriment to children that arise from the data management practices of the business.'" *NetChoice II*, 113 F.4th at 1109 (quoting Cal. Civ. Code §§ 1798.99.31(a)(1)). Related provisions require covered businesses to create a plan to mitigate or eliminate the risks identified in the DPIA, *see* Cal. Civ. Code § 1798.99.31(a)(2), and to provide a list of all completed DPIAs (or the DPIAs themselves) to the California Attorney General upon request, *see id.* §§ 1798.99.31(a)(3)-(4).

A covered business that is in substantial compliance with the DPIA requirement is entitled to written notice and a 90-day cure period before civil penalties may be assessed for violation of the Act. *See* Cal. Civ. Code § 1798.99.35(c). The CAADCA provides for civil penalties of up to $2,500 per child for each negligent violation and up to $7,500 per child for each intentional violation. *See* Cal. Civ. Code § 1798.99.35(a). Such penalties may be assessed and recovered in a civil action brought by the California Attorney General. *See id.*

The DPIA requirement is currently enjoined, as are other provisions of the CAADCA that the Ninth Circuit found to be not grammatically severable from the DPIA requirement, including the notice and cure provision. *See NetChoice, LLC v. Bonta*, 113 F.4th at 1108. The enjoined provisions are California Civil Code §§ 1798.99.31(a)(1)-(4), (c), 1798.99.33, and 1798.99.35(c) (collectively, "DPIA provisions"). *See id.*

*Other Affirmative Requirements*

In addition to complying with the DPIA requirement and related provisions, covered businesses must take the following actions enumerated in California Civil Code §§ 1798.99.31(a)(5)-(10):

4

(5) Estimate the age of child users with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business or apply the privacy and data protections afforded to children to all consumers.

(6) Configure all default privacy settings provided to children by the online service, product, or feature to settings that offer a high level of privacy, unless the business can demonstrate a compelling reason that a different setting is in the best interests of children.

(7) Provide any privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children likely to access that online service, product, or feature.

(8) If the online service, product, or feature allows the child's parent, guardian, or any other consumer to monitor the child's online activity or track the child's

location, provide an obvious signal to the child when the child is being monitored or tracked.

(9) Enforce published terms, policies, and community standards established by the business, including, but not limited to, privacy policies and those concerning children.

(10) Provide prominent, accessible, and responsive tools to help children, or if applicable their parents or guardians, exercise their privacy rights and report concerns.

Cal. Civ. Code §§ 1798.99.31(a)(5)-(10).

*Prohibitions*

Covered businesses are prohibited from taking the following actions enumerated in

California Civil Code §§ 1798.99.31(b)(1)-(8):

(1) Use the personal information of any child in a way that the business knows, or has reason to know, is materially detrimental to the physical health, mental health, or well-being of a child.

(2) Profile a child by default unless both of the following criteria are met:

(A) The business can demonstrate it has appropriate safeguards in place to protect children.

(B) Either of the following is true:

(i) Profiling is necessary to provide the online service, product, or feature requested and only with respect to the aspects of the online service, product, or feature with which the child is actively and knowingly engaged.

(ii) The business can demonstrate a compelling reason that profiling is in the best interests of children.

(3) Collect, sell, share, or retain any personal information that is not necessary to provide an online service, product, or feature . . . unless the business can demonstrate a compelling reason that [doing so] is in the best interests of children likely to access the online service, product, or feature.

(4) If the end user is a child, use personal information for any reason other than a reason for which that personal information was collected, unless the business can demonstrate a compelling reason that use of the personal information is in the best interests of children.

(5) Collect, sell, or share any precise geolocation information of children by default unless the collection of that precise geolocation information is strictly necessary for the business to provide the service, product, or feature requested. . . .

(6) Collect any precise geolocation information of a child without providing an obvious sign to the child for the duration of that collection that precise geolocation information is being collected.

(7) Use dark patterns to lead or encourage children to provide personal information beyond what is reasonably expected to provide that online service, product, or feature to forego privacy protections, or to take any action that the business knows, or has reason to know, is materially detrimental to the child's physical health, mental health, or well-being.

(8) Use any personal information collected to estimate age or age range for any other purpose or retain that personal information longer than necessary to estimate age. Age assurance shall be proportionate to the risks and data practice of an online service, product, or feature.

Cal. Civ. Code §§ 1798.99.31(b)(1)-(8).

Taking these provisions directly from a law enacted in the United Kingdom, the California Legislature left it to the courts to pass the CAADCA through the filter of our First Amendment. *See* 2022 Cal. Stat. ch. 320 (A.B. 2273), §§ (1)(d)-(e).

*NetChoice's Complaint and First Motion for Preliminary Injunction*

Before the CAADCA's original effective date of July 1, 2024, NetChoice filed this suit alleging six claims – four facial challenges to the Act on constitutional grounds and two challenges to the Act on federal preemption grounds. *See* Compl. ¶¶ 76-122. NetChoice also filed a motion for a preliminary injunction to enjoin the Act's enforcement. *See* Pl.'s Mot. for Prelim. Inj. This Court granted the motion for a preliminary injunction on September 18, 2023, concluding that that NetChoice had shown it was likely to succeed on its facial challenge to the CAADCA under the First Amendment. *See NetChoice I*, 629 F. Supp. 3d at 961. The Court did not reach NetChoice's additional constitutional challenges to the Act or its challenges based on

6

federal preemption. *See id.* at 962-63.

The Ninth Circuit affirmed the preliminary injunction only as to the DPIA provisions. *See NetChoice II*, 113 F.4th at 1108. The Ninth Circuit found that the DPIA requirement triggers review under the First Amendment because it "compels speech by requiring covered businesses to opine on potential harm to children," and because "it deputizes covered businesses into serving as censors for the State." *See id.* at 1117-18. The Ninth Circuit found a facial challenge to the DPIA requirement appropriate, because "[i]n every application of the DPIA report requirement to a covered business, the DPIA report requirement raises the same First Amendment issues." *Id.* at 1123. When determining what level of scrutiny applies to the DPIA requirement, the Ninth Circuit held that "[s]trict scrutiny is warranted because the DPIA report requirement (1) compels speech with a particular message about controversial issues; and (2) deputizes private actors into censoring speech based on its content." *Id.* at 1118 (internal quotation marks and citations omitted). The Ninth Circuit concluded that the DPIA requirement is likely to fail strict scrutiny, because (among other reasons) "a disclosure regime that requires the forced creation and disclosure of highly subjective opinions about content-related harms to children is unnecessary for fostering a proactive environment in which companies, the State, and the general public work to protect children's safety online." *Id.* at 1122.

The Ninth Circuit vacated the preliminary injunction in all other respects. *See NetChoice II*, 113 F.4th at 1108. Stating that most of the CAADCA's other provisions "by their plain language, do not necessarily impact protected speech in all or even most applications," the Ninth Circuit determined that the record needed further development before a First Amendment facial challenge could be evaluated under the standard clarified in *Moody*. *Id.* at 1122-23. The Ninth Circuit found that this Court's order "not only failed to properly consider the facial nature of NetChoice's First Amendment challenges to other provisions of the CAADCA, *id.* §§ 1798.99.31(a)(5)-(7), (9), (b)(1)-(4), (7), but also erroneously overstated the likelihood that NetChoice would ultimately succeed in showing that the unconstitutional portions of the CAADCA are not severable from its valid remainder." *Id.* at 1108. The case was remanded to this Court for further proceedings consistent with the Ninth Circuit's opinion. *See id.*

7

United States District Court
Northern District of California

*NetChoice's FAC and Second Motion for Preliminary Injunction*

On remand, NetChoice filed the operative FAC, asserting the same six claims pled in the original complaint. *See* FAC ¶¶ 77-126. However, whereas the original complaint raised only facial challenges to the CAADCA, each of the claims of the FAC is asserted both facially and as applied to NetChoice's members. *See id.*

The FAC asserts claims for: (1) violation of the First and Fourteenth Amendments to the U.S. Constitution, and Article I, Section 2(a) of the California Constitution (facial and as applied); (2) violation of the Fourth Amendment to the U.S. Constitution (facial and as applied); (3) void for vagueness under the First Amendment and Due Process Clause of the U.S. Constitution, and Article I, Section 7(a) of the California Constitution (facial and as applied); (4) violation of the dormant Commerce Clause of the U.S. Constitution (facial and as applied); (5) preemption under the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §§ 6501 *et seq.* (facial and as applied); and (6) preemption under Section 230 of the Communications Decency Act, 47 U.S.C. § 230 ("Section 230") (facial and as applied).

NetChoice adds a new First Amendment theory challenging the Regulatory Provisions, Cal. Civ. Code §§ 1798.99.31(a), (b), on the basis that the Act's coverage definition is content-based and fails strict scrutiny, thus infecting all of the Regulatory Provisions and rendering them unconstitutional in every application. *See* FAC ¶ 25, Prayer ¶ 2.

NetChoice also filed a second motion for a preliminary injunction, which is the subject of this order.

## II.    LEGAL STANDARD

"The Supreme Court has explained that plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest." *Where Do We Go Berkeley v. California Dep't of Transportation*, 32 F.4th 852, 859 (9th Cir. 2022) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The Ninth Circuit employs a sliding scale approach to the four *Winter* factors, under which a strong showing on the balance of hardships may compensate for a lesser showing of

United States District Court
Northern District of California

8

likelihood of success.  *See Where Do We Go Berkeley*, 32 F.4th at 859.

In cases arising under the First Amendment, showing a likelihood of success on the merits generally results in a finding that the remaining *Winter* factors are satisfied as well.  *See Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 757-58 (9th Cir. 2019).  Where the plaintiffs "have a colorable First Amendment claim, they have demonstrated that they likely will suffer irreparable harm if the [law] takes effect."  *Id*. at 758.  Next, a finding that the plaintiffs have raised serious First Amendment questions compels a finding that the balance of hardships tips sharply in their favor.  *See id.*  Finally, there is a "significant public interest in upholding First Amendment principles," and "it is always in the public interest to prevent the violation of a party's constitutional rights."  *Id*. (internal quotation marks and citations omitted).

## III.    DISCUSSION

The parties devote the bulk of their arguments to the first *Winter* factor, likelihood of success on the merits.  As NetChoice points out in its reply, the State effectively concedes the other three *Winter* factors.  *See* Pl.'s Reply at 17, ECF 121; Def.'s Opp'n. at 7.

NetChoice contends that it is likely to succeed on the merits of its First Amendment claims; that it is entitled to injunctive relief on the ground that the previously enjoined DPIA provisions are not severable from the remainder of the CAADCA; and that it is likely to succeed on the merits of its claims that the CAADCA is preempted by Section 230 and COPPA and is invalid under the dormant Commerce Clause.  The State disputes those contentions.  The Court addresses them in turn.

### A.     First Amendment Claims (Claims 1 and 3)

In Claim 1 of the FAC, NetChoice asserts that the CAADCA violates the expressive rights of NetChoice and its members under the First Amendment, and in Claim 3, NetChoice asserts that the CAADCA is void for vagueness under the First Amendment.[3]  NetChoice argues that it is

---

[3] Claim 1 also is brought under Article I, Section 2(a) of the California Constitution, and Claim 3 also is brought under the Due Process Clause of the United States Constitution and under Article I, Section 7(a) of the California Constitution.  Those additional aspects of Claims 1 and 3 are not bases for NetChoice's second motion for preliminary injunction, however, and so are not discussed here.

United States District Court
Northern District of California

9

likely to succeed on the merits of those claims for four reasons. First, NetChoice contends that the CAADCA as a whole, through its coverage definition, is content-based on its face and fails strict scrutiny. Because the coverage definition necessarily applies in every application of the Act, NetChoice asserts that it is likely to succeed on its First Amendment facial challenge to the Act as a whole. Second, NetChoice contends that seven Regulatory Provisions are facially invalid, specifically those addressing: content policy enforcement, Cal. Civ. Code § 1798.99.31(a)(9); information use restrictions, *id*. §§ 1798.99.31(b)(1)-(4); dark patterns, *id*. § 1798.99.31(b)(7); and age estimation, *id*. § 1798.99.31(a)(5) (collectively, the "Individual Provisions"). Third, NetChoice asserts that the Individual Provisions are impermissibly vague in violation of the First Amendment. Fourth, NetChoice asserts that "[f]or the same reasons the challenged provisions are facially invalid, they are also invalid as applied to NetChoice's members." Pl.'s Second Mot. for Prelim. Inj. at 23. The State argues that NetChoice's arguments are without merit and that NetChoice cannot demonstrate it is likely to succeed on the merits of its First Amendment claims.

The Court begins by discussing First Amendment principles generally, as well as the standard for First Amendment facial challenges clarified in *Moody*. The Court then takes up NetChoice's four asserted bases for likely success on the merits of its First Amendment claims.

### 1.    General Principles

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting U.S. Const., Amdt. 1). "Under that Clause, a government, including a municipal government vested with state authority, has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Id.* (quotation marks and citation omitted). Content-based restrictions on speech are presumptively unconstitutional and may be justified only if the government proves that they survive strict scrutiny, that is, that they are narrowly tailored to serve compelling state interests. *See id.* at 163, 171. Content-neutral laws are subject to intermediate scrutiny. *See City of Austin, Texas v. Reagan Nat'l Advert. of Austin*, LLC, 596 U.S. 61, 67 (2022). "[T]o survive intermediate scrutiny, a restriction on speech or expression must be narrowly tailored to serve a significant governmental

United States District Court
Northern District of California

1    interest." *Id*. at 76.

2          **2.**      **Standard for Evaluating First Amendment Facial Challenges**

3         In general, "a plaintiff cannot succeed on a facial challenge unless he establishes that no set

4    of circumstances exists under which the law would be valid, or he shows that the law lacks a

5    plainly legitimate sweep." *Moody*, 603 U.S. at 723 (internal quotation marks, citation, and

6    brackets omitted). "In First Amendment cases, however, [the Supreme Court] has lowered that

7    very high bar," substituting "a less demanding though still rigorous standard." *Id*. "The question

8    is whether a substantial number of the law's applications are unconstitutional, judged in relation to

9    the statute's plainly legitimate sweep." *Id*. (internal quotation marks, citation, and brackets

10    omitted).

11        "[A] First Amendment facial challenge has two parts[.]" *NetChoice II*, 113 F.4th at 1115.

12    "The first step in the proper facial analysis is to assess the state laws' scope." *Moody*, 603 U.S. at

13    724. "What activities, by what actors, do the laws prohibit or otherwise regulate?" *Id*. The

14    second step "is to decide which of the laws' applications violate the First Amendment, and to

15    measure them against the rest." *Id*. at 725.

16        The party bringing the First Amendment facial challenge has the burden to show the full

17    scope of the law's coverage; to identify which of the law's applications are constitutionally

18    permissible and which are not; and, ultimately, to show that the law "prohibits a substantial

19    amount of protected speech relative to its plainly legitimate sweep." *Moody*, 603 U.S. at 744

20    (internal quotation marks and citation omitted).

21          **3.**      **Facial Challenge to CAADCA based on Coverage Definition**

22        NetChoice contends that the CAADCA's coverage definition, limiting the Act's

23    application to "business[es] that provide[] an online service, product, or feature likely to be

24    accessed by children," is facially content-based, triggering strict scrutiny of the Act as a whole.

25    Because this gateway coverage definition controls whether the Act applies in the first instance,

26    and is facially content-based, NetChoice argues that the State must show that the burdens imposed

27    by the Act's Regulatory Provisions are the least restrictive means to achieve a compelling state

28    interest. NetChoice asserts that the State cannot make that showing, and that as a result NetChoice

United States District Court
Northern District of California

1    is likely to succeed in demonstrating that the Act as a whole is facially invalid.

2          In opposition, the State argues that the coverage definition is content-neutral.  The State

3    also argues that NetChoice's facial challenge to the Act as a whole does not comport with the

4    Ninth Circuit's opinion in this case or with the Supreme Court's opinion in *Moody*, because in the

5    State's view both of those opinions require evaluation of a First Amendment facial challenge to a

6    statute on a provision by provision basis.

7          NetChoice did not raise this argument, that the gateway coverage definition is content-

8    based, in its first motion for a preliminary injunction.  Consequently, neither this Court nor the

9    Ninth Circuit had occasion to consider whether the coverage definition causes the CAADCA's

10   Regulatory Provisions to be subject to strict scrutiny in every application.  This Court takes up that

11   analysis here.

12                      **a.          CAADCA Regulates Protected Speech**

13         NetChoice must demonstrate as an initial matter that the CAADCA, through its coverage

14   definition, regulates protected speech and thereby implicates the First Amendment.  *See NetChoice*

15   *II*, 113 F.4th at 1116-17 (determining as an initial matter whether "the DPIA report requirement

16   regulates the speech of covered businesses and thus triggers review under the First Amendment.").

17   A court considering a First Amendment facial challenge "may assume without deciding that the

18   statute 'reaches some protected speech.'"  *Arizona Attorneys for Crim. Just. v. Mayes*, 127 F.4th

19   105, 110 (9th Cir. 2025) (quoting *United States v. Hansen*, 599 U.S. 762, 784 (2023)).  The Court

20   need not rely on an assumption in this case, however, because NetChoice has demonstrated that

21   the Act regulates protected speech through its coverage definition.

22         As noted, the CAADCA regulates "business[es] that provide[] an online service, product,

23   or feature likely to be accessed by children."  Cal. Civ. Code §§ 1798.99.31(a), (b).  NetChoice

24   argues that the vast majority (if not all) of such online services, products, and features will involve

25   expressive content, pointing to examples including articles and original videos regarding the

26   entertainment industry published by IMDB, *see* Ciarella Decl. ¶¶ 2, 10, ECF 29-22;

27   recommendations for and information about books offered by Goodreads, *see* Roin Decl. ¶¶ 2, 18,

28   ECF 29-25; articles, user comments, and podcasts about technology and policy published by

United States District Court
Northern District of California

Techdirt.com, *see* Masnick Decl. ¶¶ 2, 8, ECF 29-29, Masnick Suppl. Decl. ¶ 6, ECF 101-5; and

content on social media platforms, *see* Paolucci Decl. ¶¶ 2, 11, ECF 29-28, Paolucci Suppl. Dec. ¶

5, ECF 101-6.  In addition to its own evidence, NetChoice directs the Court to the declaration of

the State's expert, Jenny Radesky, M.D., who discusses children's online access to video games,

video streaming services, social media, and educational content.  *See* Radesky Decl. ¶ 25-29, ECF

51-5.  Those types of products and services traditionally have enjoyed First Amendment

protections.  *See Davis v. Elec. Arts Inc.*, 775 F.3d 1172, 1176 (9th Cir. 2015) (recognizing that

video games are entitled to protection under the First Amendment because they communicate

ideas and social messages like protected books, plays, and movies).

     In opposition, the State does not dispute that the Act's coverage definition implicates

protected speech.  Nor does the State identify any non-speech application of the CAADCA.

Instead, the State contends that the coverage definition is content-neutral, and designed only to

identify businesses that target children so that those businesses may be regulated.  The Court

addresses the latter contention below in the context of its discussion regarding the appropriate

level of scrutiny.

### b.    The CAADCA is Content-Based on its Face

     Having concluded that the CAADCA regulates protected speech, the Court must determine

what level of scrutiny applies.  The "crucial first step" in evaluating a First Amendment challenge

to a law regulating expression is "determining whether the law is content neutral on its face."

*Reed*, 576 U.S. at 165.  "A law that is content based on its face is subject to strict scrutiny

regardless of the government's benign motive, content-neutral justification, or lack of animus

toward the ideas contained' in the regulated speech."  *Id.* (quotation marks and citation omitted).

A law is content-based on its face if it "applies to particular speech because of the topic discussed

or the idea or message expressed."  *Id.* at 163.  A law that is facially content-neutral nonetheless

will be considered a content-based regulation of speech if the law "cannot be justified without

reference to the content of the regulated speech[.]"  *Id.* at 164.  "Those laws, like those that are

content based on their face, must also satisfy strict scrutiny."  *Id.*

     In *Reed*, the Supreme Court addressed a First Amendment challenge to a town's code

United States District Court
Northern District of California

regulating display of outdoor signs. *See Reed*, 576 U.S. at 159. The code treated signs differently based on their message. *See id.* For example, signs bearing ideological messages were given more favorable treatment than signs concerning a political candidate, which were themselves given more favorable treatment than signs announcing an assembly of individuals. *See id.* at 169. The Supreme Court found the disparate treatment to be "a paradigmatic example of content-based discrimination." *Id.* Rejecting the town's argument that the code was content-neutral because it did not endorse or discriminate against any particular ideas within each category of sign, the Supreme Court held that "a speech regulation targeted at specific subject matter is content-based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 169.

Applying *Reed* to the present case, this Court finds that the CAADCA's coverage definition makes the Act content-based in every application. *See* Cal. Civ. Code §§ 1798.99.31(a), (b). Businesses that provide online services, products, or features "likely to be accessed by children" are subject to heightened regulation, while other businesses are not. "Likely to be accessed by children," means it is reasonable to expect, based on the following indicators, that the online service, product, or feature would be accessed by children:

(A) The online service, product, or feature is directed to children as defined by the Children's Online Privacy Protection Act (15 U.S.C. Sec. 6501 *et seq.*).

(B) The online service, product, or feature is determined, based on competent and reliable evidence regarding audience composition, to be routinely accessed by a significant number of children.

(C) An online service, product, or feature with advertisements marketed to children.

(D) An online service, product, or feature that is substantially similar or the same as an online service, product, or feature subject to subparagraph (B).

(E) An online service, product, or feature that has design elements that are known to be of interest to children, including, but not limited to, games, cartoons, music, and celebrities who appeal to children.

(F) A significant amount of the audience of the online service, product, or feature is determined, based on internal company research, to be children.

Cal. Civ. Code § 1798.99.30(b)(4). Application of these criteria to determine whether a particular business's online offerings are likely to be accessed by children unavoidably requires an evaluation of content.

United States District Court
Northern District of California

The State argues that the Act's coverage definition is content-neutral even though its application requires examination of the content published by a particular business, relying mainly on *City of Austin*. *City of Austin* involved a city code that distinguished between on-premises and off-premises signs and imposed additional regulations on the latter. *See City of Austin*, 596 U.S. at 66. The code defined an off-premises sign to be one "advertising a business, person, activity, goods, products, or services not located on the site where the sign is installed, or that directs persons to any location not on that site." *Id.* The Supreme Court acknowledged that application of the code required an examination of the particular sign's content, but found that such examination was required "only in service of drawing neutral, location-based lines." *Id.* at 69. Under those circumstances, the Supreme Court concluded that the code was content-neutral, observing that "[t]his Court's First Amendment precedents and doctrines have consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." *Id.* at 72.

Seizing on that language, the State argues "[t]hat determining whether a business's users are children may involve looking at the content of a product, service, or feature does not make the Act content based." Def.'s Opp'n at 12, ECF 112. The State's argument ignores the differences between the present case and *City of Austin*. The code addressed in *City of Austin* did "not single out any topic or subject matter," because a sign's substantive message itself was irrelevant to the code's application. *City of Austin*, 596 U.S. at 71. A sign was treated differently under the code based solely on whether it was located on the same premises as the thing being discussed, and the sign message mattered "only to the extent that it inform[ed] the sign's relative location." *Id.* In contrast, the CAADCA does single out particular subject matter, specifically, online content that is likely to be accessed by children. A business will be treated differently under the CAADCA if it provides online services, products, or features with design elements that are known to be of interest to children, such as games, cartoons, music, or other content that appeals to children, or the business knows that a significant portion of its audience is children. Thus, the present case is not like *City of Austin*, in which evaluation of speech was necessary only to determine whether the sign was an on-premises sign or an off-premises sign.

15

The State cites the Ninth Circuit's recent decision in *Project Veritas v. Schmidt*, 125 F.4th 929 (9th Cir. 2025), in support of its position that the necessity to examine online content to apply the CAADCA does not make it content-based. *Project Veritas* involved a nonprofit media organization's challenge to an Oregon law prohibiting the recording of oral conversations without the knowledge of all participants. *See id*. at 937. The plaintiff frequently recorded individuals without their knowledge when engaged in undercover journalism; in the plaintiff's experience, an announcement that a conversation is being recorded may cause individuals to refuse to talk or to distort their story. *See id*. The plaintiff challenged the Oregon law under the First Amendment, both facially and as-applied. *See id*. at 939.

The Ninth Circuit determined that the Oregon statute regulates speech protected by the First Amendment. *See Project Veritas*, 125 F.4th at 942. In deciding whether the statute is content-based or content-neutral, the Ninth Circuit summarized the holdings of *Reed* and *City of Austin* as follows: "a regulation of speech is facially content based . . . if it targets speech based on its communicative content – that is, if it applies to particular speech because of the topic discussed or the idea or message expressed." *Id*. at 950 (internal quotation marks, citations, and brackets omitted). Applying those standards, the Ninth Circuit found that the Oregon statute is facially neutral, as it merely limits the circumstances under which a conversation may be recorded, but does not draw distinctions based on the speaker's message. *See id*. at 950-51. Here, the CAADCA does draw distinctions based on the speaker's message, namely, whether it is content likely to be accessed by children, in which case the content is regulated to protect children's "best interests." Given that critical difference between the two statutes, this Court finds the State's arguments based on *Project Veritas* to be unpersuasive.

The Court likewise finds the State's reliance on *Porter v. Martinez*, 68 F.4th 429 (9th Cir. 2023), to be misplaced. In *Porter*, the plaintiff brought a First Amendment challenge to a state law prohibiting the honking of a vehicle's horn except when reasonably necessary to warn of a safety hazard. *See id*. at 434. Even accepting the plaintiff's "questionable assertion that honking to give a warning is a form of expression," the Ninth Circuit found that the law did not distinguish "between honks intended to convey warnings and honks intended to convey other messages." *Id*.

16

United States District Court
Northern District of California

at 441.  The Ninth Circuit rejected the plaintiff's argument that the law was content-based on its face "because an officer must examine the content of the message that is conveyed to determine whether a violation has occurred."  *Id*.  The Ninth Circuit held that an officer did not need to examine the "content" of a honk to determine whether the law had been violated; the officer only needed to "observe the traffic circumstances and determine if a safety risk is present."  *Id*. at 442.  The facts of *Porter* are so different from those of the present case that the Court finds it to have little relevance.

The State suggests that the CAADCA is not content-based if its sole purpose is to regulate businesses that serve children.  *See* Def.'s Opp'n at 12.  As NetChoice points out, however, the Act does not regulate all businesses that provide services to children, only those that provide online *content* to children.  Businesses that provide online content featuring "advertisements marketed to children," "games," "cartoons," "music," or "celebrities who appeal to children" fall within the Act's coverage definition.  Cal. Civ. Code § 1798.99.30(b)(4).  Businesses that provide other types of online services to children fall outside the Act's coverage definition.  *See* Cal. Civ. Code §§ 1798.99.30(b)(5), 1798.99.40.  The cornerstone of the Act, the DPIA requirement, directs businesses to determine whether children are exposed "to harmful, or potentially harmful, *content* on the online product, service, or feature."  *See* Cal. Civ. Code § 1798.99.3(a)(1)(B)(i) (emphasis added).  The Supreme Court has held that where "[t]he overriding justification for the regulation is concern for the effect of the subject matter on young viewers," the law "is not justified without reference to the content of the regulated speech."  *Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (internal quotation marks and citation omitted).  A law that "focuses only on the content of the speech and the direct impact that speech has on its listeners," is "the essence of content-based regulation."  *Id*. (internal quotation marks and citation omitted).  The Court therefore finds entirely unpersuasive the State's suggestion that the Act is not content-based.

NetChoice points to three recent cases in which statutes were held to be content-based on their face, and thus subject to strict scrutiny, because of their coverage definitions.  *See Reyes*, 2024 WL 4135626, at *11; *Fitch*, 738 F. Supp. 3d at 771; *Yost*, 716 F. Supp. 3d at 558.  In *Reyes*, the district court held that because "the Central Coverage Definition facially distinguishes between

United States District Court
Northern District of California

1    'social' speech and other forms of speech, it is substantially likely the Definition is content

2    based[.]" *Reyes*, 2024 WL 4135626, at *11.  The *Reyes* court went on to conclude that,

3    "Accepting that the entire Act, through the Central Coverage Definition, is facially content based,

4    strict scrutiny applies." *Id*.  In *Fitch*, the district court found that a statute was content-based, and

5    thus subject to strict scrutiny, because the coverage definition distinguished between digital

6    service provider ("DSPs") of "social interaction" (covered) and DSPs of "news, sports, commerce,

7    [or] online video games" (not covered).  *Fitch*, 738 F. Supp. 3d at 771.

8         *Yost* addressed a statute with a coverage definition that limited the statute's application to

9    websites "targeted at children, or reasonably anticipated to be accessed by children." *Yost*, 716 F.

10   Supp. 3d at 554.  The *Yost* court found the distinction between websites on the basis of whether

11   they target children was not sufficient, standing alone, to make the statute content-based.  *See id*.

12   at 556.  The *Yost* court reasoned that "[t]here is no indication that the State disfavors the sort of

13   content designed to appeal to children – cartoons and the like." *Id*.  However, the *Yost* court

14   determined that the statute's exclusion from the coverage definition of two categories of websites

15   – product review websites and "widely recognized" media outlets – were "easy to categorize as

16   content based." *Id*. at 557-58.  By crafting the coverage definition to exclude product review

17   websites and widely recognized media outlets, the State was "favoring engagement with certain

18   topics, to the exclusion of others," which was "plainly a content-based exception deserving of

19   strict scrutiny." *Id*. at 558.  Thus, while the *Yost* court declined to find the statute's coverage

20   definition to be content-based solely because it was limited to websites targeting children, the *Yost*

21   court ultimately did find the coverage definition to be content-based because of its exclusions of

22   certain categories of websites.  *See id*.  Based on that content-based coverage definition, the *Yost*

23   court went on to apply strict scrutiny to the statute as a whole.  *See id.*

24         After the hearing in the present case, NetChoice filed a statement of recent decision

25   advising the Court of another decision finding a statute to be content-based on its face because of

26   its coverage definition.  *See Students Engaged in Advancing Texas v. Paxton* ("*SEAT*"), No. 1:24-

27   CV-945-RP, 2025 WL 455463 (W.D. Tex. Feb. 7, 2025).  *SEAT* involved a statute that

28   distinguished between DSPs based on whether they allowed users to interact with each other

socially.  A DSP that did so but "primarily function[ed] to provide" access to news or commerce was unregulated, while an identical DSP that "primarily function[ed] to provide" updates on what a user's friends and family were doing was regulated.  *Id.* at \*10.  Relying on *Fitch* and *Yost*, the *SEAT* court concluded that strict scrutiny applied "because the law regulate[d] DSPs based on the content of their speech and the identity of the speaker."  *Id.*  Addressing the same statute in a companion case, the *SEAT* court found in *Computer & Commc'ns Indus. Ass'n* that the content-based coverage definition required strict scrutiny of all substantive provisions.  *See Computer & Commc'ns Indus. Ass'n*, 747 F. Supp. 3d at 1034-35.

In *Reyes*, *Fitch*, *Yost*, *SEAT*, and *Computer & Commc'ns Indus. Ass'n*, the district courts found the statutes they addressed to be content-based on their face in light of distinctions drawn by their coverage definitions.  The State argues that *Reyes*, *Fitch*, and *Yost* are distinguishable from the present case, because they addressed statutes that specifically regulated social media companies, and the courts' decisions were largely based on differential treatment between "social" speech and other speech.  The State argues that the CAADCA does not distinguish between social speech and other speech, but rather applies to all types of companies that produce all kinds of content likely to be accessed by children.  Nothing in *Reyes*, *Fitch*, and *Yost* suggests that their holdings are limited to statutes governing social media companies.  The Court reads those decisions to stand for the proposition that where a statute's gateway coverage definition divides the universe into covered and uncovered business based on the type of content they publish, those statutes are content-based and subject to strict scrutiny.

For example, in *Reyes*, the district court concluded that the statute at issue was content-based because "the Act's Central Coverage Definition divide[d] the universe of internet platforms into social media services, defined as websites or applications that 'allow users to interact socially with each other,' and other internet platforms, such as platforms for 'news, sports, commerce, [and] online video games.'"  *Reyes*, 2024 WL 4135626, at \*11.  In the present case, the coverage definition divides the universe of businesses into those that publish content likely to be accessed by children and those that publish content not likely to be accessed by children.  The fact that the dividing line is drawn differently does not render the CAADCA content-neutral.  To the extent the

*Yost* court found that drawing a line based on the likelihood that content will be accessed by children was not content-based, this Court respectfully disagrees.

The State argues that the CAADCA is not intended to regulate any particular expressive content, but rather is intended to protect children from harm. *See* Def.'s Opp'n at 12. In essence, the State argues that it may burden speech directed to, or likely to be accessed by, children because its intentions are good. *See id.* (asserting that in order to remediate harms to children, "regulate[] businesses that serve children, irrespective of what sort of content they host."). However, "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165. "No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (citations omitted). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *See id.* at 794 (internal quotation marks and citation omitted). Accordingly, the State's intentions in enacting the CAADCA cannot insulate the Act from the requirements of the First Amendment.

In summary, this Court finds that the CAADCA's coverage definition is content-based. The Court also finds persuasive the reasoning of *Reyes, Fitch, and Yost* that if a statute's gateway coverage definition is content-based, the statute as a whole is subject to strict scrutiny because the coverage definition applies in all applications of the statute. *See Reyes*, 2024 WL 4135626, at *11 ("Accepting that the entire Act, through the Central Coverage Definition, is facially content based, strict scrutiny applies."); *Fitch*, 738 F. Supp. 3d at 771 (finding that the statute's coverage definition "makes the Act content-based, and therefore subject to strict scrutiny"); *Yost*, 716 F. Supp. 3d at 558 ("Having concluded that NetChoice is likely to succeed on its argument that the Act is a content-based regulation, this Court considers whether the Act is likely to fail strict scrutiny.").

20

c.    **Strict Scrutiny Applies to the Regulatory Provisions as a Whole**

The parties disagree as to how strict scrutiny is to be applied. NetChoice argues that once it has established that the CAADCA is content-based, the burden shifts to the State to show that the Act's Regulatory Provisions, collectively, are narrowly tailored to achieve a compelling state interest. The State contends that the standard articulated by the Supreme Court in *Moody*, 603 U.S. at 724-25, and applied by the Ninth Circuit in this case, *NetChoice II*, 113 F.4th at 1108, requires NetChoice to show that the CAADCA is unconstitutional on a provision by provision basis.

*Reyes*, *Fitch*, and *Yost* took the approach urged by NetChoice here. In those cases, the district courts applied strict scrutiny to the statutes as a whole, and found that the defendants had not shown the statutes were narrowly tailored to serve a compelling state interest. *See Reyes*, 2024 WL 4135626, at *12-14; *Fitch*, 738 F. Supp. 3d at 772-76; *Yost*, 716 F. Supp. 3d at 558-60. *Yost* was decided before *Moody*, and *Fitch* was decided the same day, so neither court addressed the impact of *Moody* on the application of strict scrutiny to a statute.

*Reyes* was decided after *Moody*, and the *Reyes* court received supplemental briefing on the effect of *Moody*. *See Reyes*, 2024 WL 4135626, at *6 n.71, *9 n.92. "With respect to the scope-framing Central Coverage Definition," the *Reyes* court found the inquiries mandated by *Moody* to be "easily answered," as there was no dispute about who and what the statute regulated. *Id*. After determining that the state failed to show the statute passed strict scrutiny, the *Reyes* court determined that the plaintiff, NetChoice, had shown it was likely to succeed in showing that the statute had "no constitutionally permissible application." *Id*. at *9.

*SEAT* took a different approach, applying strict scrutiny to each challenged statutory provision individually. *See SEAT*, 2025 WL 455463, at *11. The *SEAT* court opined that "[e]ven if HB 18 is a content-based regulation, it does not follow as a matter of course that the law is facially invalid." *Id*. The same district court had concluded in a related case that "[p]er *Moody*, the Court must instead go through each provision and examine its respective permissibility under the First Amendment." *Computer & Commc'ns Indus. Ass'n*, 747 F. Supp. 3d at 1034-35. Accordingly, in *SEAT* the district court held that "HB 18's threshold coverage definition is a

United States District Court
Northern District of California

21

**ER_22**

content-based regulation, such that strict scrutiny applies to all regulations in HB 18." *SEAT*, 2025 WL 455463, at *9.

This Court finds that applying strict scrutiny to the Regulatory Provisions as a whole, and applying *Moody* in that context, is the better approach. Under well-established precedent, a plaintiff's showing that a statute is content-based shifts the burden to the State to show that the statute is narrowly tailored to promote a compelling Government interest. *See, e.g., Reed*, 576 U.S. at 155 (applying strict scrutiny to sign ordinance based on determination that it was content-based); *United States v. Playboy Ent.*, 529 U.S. at 813 (applying strict scrutiny to content-based statute governing cable operators). *Moody* did not disturb that precedent; it clarified that the standard for analyzing a First Amendment facial challenge requires the court to assess the law's scope and compare its unconstitutional applications to its constitutional ones. *See Moody*, 603 U.S. at 724-25. Thus, even where strict scrutiny applies, the plaintiff must show that the applications of the statute that fail strict scrutiny are substantial in comparison to any applications of the statute that do not. *See id.* at 718 ("the question . . . is whether a law's unconstitutional applications are substantial compared to its constitutional ones").

*Moody* does not require that a First Amendment facial challenge must be analyzed on a provision by provision basis. In most cases, as in *Moody*, consideration of the full range of activities covered by a statute may well require analysis of each statutory provision. *See Moody*, 603 U.S. at 724-25. However, *Moody* did not involve, and does not speak to, a First Amendment facial challenge to a statute's coverage definition that extends to every application of the statute's substantive provisions. The Act's coverage definition draws a line between businesses that provide an online service, product, or feature likely to be accessed by children (covered under the Act) and businesses that do not. NetChoice has shown that the vast majority (if not all) of such online services, products, and features will involve expressive content. Thus, even assuming the full sweep of the Act's Regulatory Provisions, collectively, may apply to some online services, products, and features that do not implicate protected speech, any such applications of the Regulatory Provisions necessarily will be substantially outweighed by the applications of the Regulatory Provisions that do implicate protected speech. And the Supreme Court has made clear

22

that imposing regulations on protected speech solely because the speech is directed at children is impermissible unless the regulations pass strict scrutiny. *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (addressing California statute imposing restrictions and labeling requirements on the sale or rental of violent video games to minors). All of the Act's Regulatory Provisions, not just those that directly regulate expression, impose burdens on covered businesses based on the expressive content they provide. For that reason, the State's argument that certain of the Regulatory Provisions do not themselves regulate speech misses the mark with respect to NetChoice's challenge to the Regulatory Provisions as a whole based on the gateway content definition.

NetChoice's prior First Amendment challenge to the CAADCA addressed only certain of the Act's Regulatory Provisions; it was not framed as a challenge based on the gateway coverage definition. Thus, the Ninth Circuit was not presented with, and did not address, a challenge to the Regulatory Provisions as a whole, as is raised in the present motion. *See NetChoice II*, 113 F.4th at 1108. Considering that challenge for the first time here, this Court finds it appropriate to apply strict scrutiny to the Regulatory Provisions as a whole, and to perform the analysis required by *Moody* in that context.

### d.     The Act's Regulatory Provisions Likely Fail Strict Scrutiny

Because strict scrutiny applies to the Regulatory Provisions as a whole, those provisions of the Act "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

The State does not even attempt to satisfy strict scrutiny. Instead, the State argues that strict scrutiny does not apply. *See* Def.'s Opp'n at 11. Consequently, the State has failed to meet its burden to prove that the Regulatory Provisions, collectively, serve a compelling state interest and are narrowly tailored. For the sake of completeness, the Court nonetheless touches on the issues of compelling state interest and narrow tailoring.

The State asserts that it has a substantial interest in "protecting the privacy and well-being of children." *See* Def.'s Opp'n at 24. In its order granting NetChoice's first motion for a preliminary injunction, this Court found that the State had submitted evidence sufficient to

23

establish a substantial state interest in protecting the well-being of minors. *See NetChoice I*, 692 F. Supp. 3d at 948. The Court will assume for purposes of discussion that the State would have asserted its interest in protecting the privacy and well-being of minors as a compelling state interest had it addressed strict scrutiny. "The Supreme Court has recognized that 'there is a compelling interest in protecting the physical and psychological well-being of minors.'" *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 961-62 (9th Cir. 2009), *aff'd sub nom. Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) (quoting *Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989)). The Court therefore accepts for purposes of the present analysis that the State has a compelling interest in protecting the privacy and well-being of children.

The demonstration of a compelling interest is not sufficient to satisfy strict scrutiny, however. The State must show that "the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Video Software Dealers Ass'n*, 556 F.3d at 961-62 *Id.* (internal quotation marks, citation, and brackets omitted). The State's expert, Dr. Radesky, opines that children suffer many types of harm as result of being online. *See* Radesky Suppl. Decl. ¶¶ 22-27, 30, 43. According to Dr. Radesky, those harms include sleep disruption, bullying, harassment, interference with attention and learning, sexual exploitation, and invasion of privacy. *See id.* Dr. Radesky claims that research has shown a causal link between nighttime media use by teens and poor sleep. *See id.* ¶ 52. The State argues that the CAADCA will address these harms.

NetChoice challenges Dr. Radesky's opinions and the State's argument based thereon, submitting declarations from its own expert, psychology professor Christopher Ferguson. *See* Ferguson Decl., ECF 101-4; Ferguson Suppl. Decl., ECF 121-1. Professor Ferguson states his view that there is no evidence establishing a cause-and-effect relationship between social media and other online media on the one hand and mental health impacts on the other. *See* Ferguson Suppl. Decl. ¶¶ 22-25. Given the conflicting evidence submitted by the parties, the Court concludes that the State has not carried its burden to prove that being online harms children in a way that can be alleviated by the CAADCA. This conclusion is consistent with the Court's first

United States District Court
Northern District of California

preliminary injunction order, in which the Court found that the State had not shown that the CAADCA advanced the State's interest in the privacy and well-being of children. *See NetChoice I*, 692 F. Supp. 3d at 948-59.

Even if the Court were to accept that the Act advances a compelling State interest in protecting the privacy and well-being of children, the State has not shown that the CAADCA is narrowly tailored to serve that interest. The Act applies to *all* online content likely to be accessed by consumers under the age of 18, and imposes significant burdens on the providers of that content. For example, California Civil Code § 1798.99.31(a)(5) requires each covered business to "[e]stimate the age of child users with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business or apply the privacy and data protections afforded to children to all consumers." Moreover, the legislative findings interpret the age estimation requirement as advising covered businesses to "take into account the unique needs of different age ranges, including the following developmental stages." 2022 Cal. Stat. ch. 320 (A.B. 2273), § 1(a)(5) (listing five separate age ranges). Record evidence describes the difficulties of age estimation, and the threats to users' privacy inherent in age estimation. *See* Paolucci Suppl. Decl. ¶ 6; Masnick Suppl. Decl. ¶ 7; Rumenap Decl. ¶¶ 7-10, ECF 29-30. If a business chooses not to take on the burden of age estimation, it must apply the privacy and data protections designed for children to all content accessed by children or adults. The State has not even attempted to explain why its interest in protecting children could not be served by a less restrictive statute. "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy Ent.*, 529 U.S. at 813.

In effect, the CAADCA controls access to features distinctive to the medium of online communication, and appears to suppress those features to the extent they offer "detrimental material" to children, 2022 Cal. Stat. ch. 320 (A.B. 2273), § 1(a)(8), but to protect the same features to the extent they deliver content in "the best interests of children," Cal. Civ. Code § 1798.99.29. A regulation that focuses on "[t]he emotive impact of speech on its audience" is content-based, *Boos v. Barry*, 485 U.S. 312, 321 (1988), and therefore must be drawn as narrowly as possible. The State has not shown that the CAADCA is narrowly drawn here.

NetChoice also faults the State for failing to protect children by enforcing existing laws, including COPPA, instead of enacting a new regime that burdens expression. The State's declarants assert that other laws are not adequately enforced. *See* Radesky Decl. ¶¶ 31-39; Radesky Suppl. Decl. ¶ 42; Egelman Decl. ¶¶ 37-40. Those assertions cut both ways, however. A law is not narrowly tailored when the State's interest could be served by vigorous enforcement of existing, less restrictive regulations. *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 800 (1988); *see also NetChoice II*, 113 F.4th at 1121 (finding that DPIA requirement was not narrowly tailored in part because the State could have relied on existing criminal laws prohibiting related unlawful conduct).

Based on the State's failure to even attempt to satisfy strict scrutiny, and the evidence and authorities discussed above, the Court concludes that the Regulatory Provisions, collectively, are likely to fail strict scrutiny. That is not the end of the Court's inquiry, however. Applying the two-step *Moody* framework, the Court must consider "the full range of activities" regulated by the Act, and then must decide whether the unconstitutional applications of the Act substantially outweigh the constitutional ones. *Moody*, 603 U.S. at 724-25. Here, the application of strict scrutiny is grounded in the content-based definition of a covered business, which applies in *all* applications of the Act. Accordingly, as in *Reyes*, the Act has "no constitutionally permissible application." *Reyes*, 2024 WL 4135626, at *9; *see also NetChoice II*, 113 F.4th at 1116 (finding Moody satisfied where "the DPIA report requirement, in every application to a covered business, raises the same First Amendment issues").

Consequently, the Court concludes that NetChoice has demonstrated a likelihood of success on the merits of its First Amendment facial challenge to the CAADCA's Regulatory Provisions, Cal. Civ. Code §§ 1798.99.31(a), (b).

The Court ordinarily would not go on to address NetChoice's other First Amendment challenges, and in particular its challenges to Individual Provisions of the CAADCA. However, as noted above, at least one district court has construed *Moody* to require facial challenges to be analyzed provision by provision. *See SEAT*, 2025 WL 455463, at *10. In light of the State's insistence that NetChoice's facial challenge to the Regulatory Provisions as a whole is improper,

United States District Court
Northern District of California

and the lack of clarity in the case law regarding the proper application of *Moody* when the plaintiff brings a facial challenge to the statute's gateway coverage definition, the Court will address NetChoice's challenges to Individual Provisions of the CAADCA.

### 2.    Facial Challenge to Individual Provisions of CAADCA

NetChoice independently asserts facial challenges to each of seven Individual Provisions of the CAADCA, "either in its entirety or as to certain applications." Pl.'s Second Mot. for Prelim. Inj. at 14. NetChoice divides its arguments regarding the Individual Provisions into four categories:

(a) specific applications of California Civil Code § 1798.99.31(a)(9), requiring a covered business to "[e]nforce published terms, policies, and community standards established by the business, including, but not limited to, privacy policies and those concerning children";

(b) specific applications of California Civil Code §§ 1798.99.31(b)(1)-(4), restricting how and for what purpose a covered business may use the personal information of children;

(c) specific applications of California Civil Code § 1798.99.31(b)(7), prohibiting covered businesses from using dark patterns "to lead or encourage children to provide personal information beyond what is reasonably expected," or to "take any action" the business has reason to know "is materially detrimental" to children's health or well-being; and

(d) all applications of California Civil Code § 1798.99.31(a)(5), requiring covered businesses to "[e]stimate the age of child users with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business or apply the privacy and data protections afforded to children to all consumers."

The State contends that under *Moody*, NetChoice cannot challenge only specific applications of the Individual Provisions. In the State's view, NetChoice must show that the asserted unconstitutional applications of an Individual Provision substantially outweigh the constitutional applications of the entire Individual Provision. The State also asserts that even if NetChoice may challenge specific applications of Individual Provisions, NetChoice has not defined a discrete, clear application of any Individual Provision that properly could be enjoined by the Court.

In *Doe v. Reed*, 561 U.S. 186 (2010), the Supreme Court considered a First Amendment facial challenge to the State of Washington's Public Records Act ("PRA"), but only as the PRA applied to referendum petitions. The plaintiffs, who had signed and/or sponsored a petition to challenge by referendum a state law extending certain benefits to same-sex couples, sought to prevent private parties from obtaining copies of the petition under the PRA. *See id.* at 191. The plaintiffs asserted that certain private parties intended to post the referendum petition online in searchable form, thus subjecting the plaintiffs to harassment and intimidation. *See id.* at 199. In seeking to prevent that outcome, the plaintiffs claimed that the PRA was "unconstitutional as applied to referendum petitions." *Id*. at 193.

The Supreme Court acknowledged that the challenge had characteristics of both a traditional as-applied challenge and a facial challenge. *See Doe*, 561 U.S. at 194. The claim was as-applied in the sense that it was not directed to the PRA in all its applications, but it was facial in the sense that it went beyond the plaintiffs' particular case by challenging the PRA's application to all referendum petitions, not just the referendum signed by the plaintiffs. *See id.* Ultimately, the Supreme Court treated the challenge as a facial one, observing that the "plaintiffs' claim and the relief that would follow – an injunction barring the secretary of state from making referendum petitions available to the public, – reach[ed] beyond the particular circumstances of these plaintiffs." *Id*. (internal quotation marks and citation omitted).

In considering the plaintiffs' facial challenge, the Supreme Court found that "[t]he compelled disclosure of signatory information on referendum petitions is subject to review under the First Amendment." *Doe*, 561 U.S. at 194. The Supreme Court went on to consider whether the PRA, as limited to referendum petitions, survived what it termed "exacting scrutiny." *Id*. at 196. "That standard requires a substantial relation between the disclosure requirement and a sufficiently important' governmental interest." *Id*. (internal quotation marks and citations omitted). The Supreme Court found that "[t]he State's interest in preserving the integrity of the electoral process is undoubtedly important," encompassing efforts to identify invalid signatures caused by mistake or fraud, and to promoting transparency in the electoral process. *Id*. at 197-98. The Supreme Court compared the State's interest against any burdens to First Amendment rights

28

United States District Court
Northern District of California

1    that would be imposed by disclosure of referendum petitions generally. *See id.* at 200-01.

2    Observing that the plaintiffs had failed to show that disclosure of "typical referendum petitions

3    concern[ing] tax policy, revenue, budget, or other state law issues" would result in the type of

4    harm the plaintiffs feared in their particular circumstances, the Supreme Court found that "only

5    modest burdens attend the disclosure of a typical petition." *Id.* Consequently, the Supreme Court

6    "conclude[d] that disclosure under the PRA would not violate the First Amendment with respect

7    to referendum petitions in general[.]"

8    Although it ruled against the *Doe* plaintiffs at the end of the day, the Supreme Court did

9    consider their First Amendment facial challenge to a specific application of the PRA (referendum

10   petitions) to be properly before it. NetChoice argues that under the reasoning of *Doe*, it may raise

11   First Amendment facial challenges not only to entire provisions of the CAADCA, but to specific

12   applications of some provisions. This Court agrees that based on *Doe*, a plaintiff may assert a

13   First Amendment facial challenge to a specific application of a statutory provision.

14   The State argues that such a challenge is foreclosed by the Ninth Circuit's decision in

15   *Arizona Attorneys*, 127 F.4th 105, which issued on the same day as the hearing on NetChoice's

16   second motion for a preliminary injunction. The Court requested supplemental briefing from the

17   parties as to any potential impact *Arizona Attorneys* may have on this case. NetChoice argues that

18   *Arizona Attorneys* is factually distinguishable from the present case and therefore does not apply

19   here.

20   *Arizona Attorneys* addressed a state statute that, among other things, prohibited criminal

21   defense attorneys from initiating direct contact with crime victims, requiring the defense team to

22   initiate any contact with victims through the prosecutor's office. *See Arizona Attorneys*, 127 F.4th

23   at 107. The plaintiffs challenged that prohibition, referred to as the "Victim Contact Limit," as

24   facially invalid under the First Amendment. *See id.* The Victim Contact Limit covered any

25   communication during a criminal case, and its primary application was to requests for interviews

26   with crime victims. *See id.* at 110. The plaintiffs did not challenge the primary application of the

27   Victim Contact Limit, but instead restricted their challenge to defense team contacts with victims

28   to share information about the crime, the case, and the legal system generally. *See id.* at 111.

29

United States District Court
Northern District of California

However, the plaintiffs sought to invalidate the Victim Contact Limit entirely, in all its applications, based on their challenge to the non-primary applications of the Victim Contact Limit. *See id.* at 107. Analyzing the plaintiffs' facial challenge under *Moody*, the Ninth Circuit determined that the plaintiffs' challenge was directed "to the edges of the Victim Contact Limit," such that even if the challenged applications were assumed to be unconstitutional, they did not substantially outweigh the unchallenged primary applications of the Victim Contact Limit. *See id.* at 111-12.

NetChoice argues that because *Arizona Attorneys* involved a facial challenge to the entire Victim Contact Limit, it sheds no light on the proper analysis of a facial challenge to only specific applications of a statutory provision. This Court agrees. Accordingly, the Court does not find persuasive the State's assertion that *Arizona Attorneys* precludes NetChoice's proposed facial challenges to specific applications of the Individual Provisions under *Doe*. The Court addresses NetChoice's facial challenges to the Individual Provisions below.

This Court is mindful of the fact that the Ninth Circuit vacated the first preliminary injunction with respect to the Individual Provisions that NetChoice challenges again here. *See NetChoice II*, 113 F.4th at 1122-23. The Ninth Circuit stated that those Individual Provisions, "by their plain language, do not necessarily impact protected speech in all or even most applications." *Id.* at 1122 (citing Cal. Civ. Code §§ 1798.99.31(a)(5)-(6), (9), (b)(1)-(4), (7)). The Ninth Circuit indicated that "the record needs further development to allow the district court to determine the full range of activities" those provisions cover. *Id.* at 1123. In order to succeed on its second motion for preliminary injunction, NetChoice at a minimum must address the concerns raised by the Ninth Circuit.

### a.    Policy Enforcement Requirement – Specific Applications Cal. Civ. Code § 1798.99.31(a)(9)

California Civil Code § 1798.99.31(a)(9) requires each covered business to "Enforce published terms, policies, and community standards established by the business, including, but not limited to, privacy policies and those concerning children." In the FAC's Prayer, NetChoice asks the Court to "[d]eclare that Section 1798.99.31(a)(9) violates the First and Fourteenth

Amendments to the United States Constitution on its face *to the extent* that section applies to covered services' *content policies and community standards*[.]"  FAC Prayer ¶ 5 (emphasis added).[4]  Under the holding of *Doe*, NetChoice may assert a First Amendment facial challenge to these specific applications of § 1798.99.31(a)(9).

The State argues that NetChoice has identified an "amorphous" range of applications in its challenges to the Individual Provisions, which are not sufficiently specific to be analyzed as facial challenges.  Def.'s Opp'n at 1.  While the Court finds that argument persuasive as to NetChoice's challenges to specific applications of other provisions, it is not well-taken here.  The meaning of "content policies" and "community standards" is readily understood.  Requiring a business to enforce its own published content policies and community standards to the satisfaction of the State would burden the business's right to exercise its editorial judgment whether to permit or prohibit any given content in any given instance.  The Supreme Court has held that exercise of such editorial judgment is protected by the First Amendment, because "[a]n entity exercising editorial discretion in the selection and presentation of content is engaged in speech activity." *Moody*, 603 U.S. at 731 (internal quotation marks, citation, and brackets omitted).  Consequently, even if the Court had not determined that all Regulatory Provisions are subject to strict scrutiny because of the content-based coverage definition, the Court would find § 1798.99.31(a)(9) subject to strict scrutiny on the ground that the provision itself is facially content-based to the extent applied to covered businesses' content policies and community standards.

Applying strict scrutiny, the Court must determine whether the State has satisfied its burden to show that § 1798.99.31(a)(9) is "narrowly tailored to serve compelling state interests" to the extent it applies to a business's enforcement of its published content policies and community standards.  *Reed*, 576 U.S. at 155.  The State does not articulate any compelling interest in the portion of its brief addressing NetChoice's facial challenge to § 1798.99.31(a)(9).  And assuming that it has a compelling interest in protecting children when they are online, the State has not identified a concrete harm this provision seeks to address or shown how the requirement at issue is

---

[4] At the hearing, NetChoice advised the Court that the scope of its challenge to each section was set forth in its Prayer for Relief.

1   narrowly tailored to serve that interest.

2     The State argues that the First Amendment does not preclude it from requiring private

3   parties to honor their promises, and that the provision requiring businesses to comply with their

4   own content policies "simply requires that they adhere to the contract made with users, a private

5   agreement between private parties." Def.'s Opp'n at 14. The State cites two cases, *Cohen v.*

6   *Cowles Media Co.*, 501 U.S. 663 (1991), and *Belgau v. Inslee*, 975 F.3d 940 (9th Cir. 2020),

7   neither of which held that an internet business's published content policy is a contract. In fact,

8   neither *Cohen* nor *Belgau* involved content policies at all. *See id.* *Cohen* involved a confidential

9   source's claim that a newspaper breached a confidentiality agreement, while *Belgau* involved a

10  contractual relationship between a union and its employees. *See Cohen*, 501 U.S. at 665; *Belgau*,

11  975 F.3d at 950. Consequently, to the extent the State argues that content policies may be

12  enforced as contracts, the State has failed to offer any legal support for its position.

13    Based on the foregoing, the Court finds that § 1798.99.31(a)(9) likely fails strict scrutiny.

14  That is not the end of the Court's inquiry, however. Applying the two-step *Moody* framework, the

15  Court must consider "the full range of activities" regulated by § 1798.99.31(a)(9), as limited to

16  "content policies and community standards" pursuant to *Doe*, and then must decide whether the

17  unconstitutional applications of that provision substantially outweigh the constitutional ones.

18  *Moody*, 603 U.S. at 724-25. With respect to the range of activities, the provision will raise the

19  same First Amendment issues in every application to a covered business, as it will require every

20  business to enforce its content policies to the satisfaction of the State, and will burden the

21  business's editorial judgment in every instance. Because all applications are unconstitutional, the

22  provision has no legitimate sweep.

23    Accordingly, the Court concludes that NetChoice is likely to prevail on its claim of facial

24  invalidity with respect to California Civil Code § 1798.99.31(a)(9), as limited to content policies

25  and community standards.

26       **b.**  **Information Use Restrictions – Specific Applications**

27        **Cal. Civ. Code §§ 1798.99.31(b)(1)-(4)**

28    California Civil Code §§ 1798.99.31(b)(1)-(4) collectively restrict how and for what

United States District Court
Northern District of California

purpose a covered business may use the personal information of children. In the FAC's Prayer, NetChoice asks the Court to "[d]eclare that Sections 1798.99.31(b)(1)-(2), (b)(4) violate the First and Fourteenth Amendments to the United States Constitution on their face *to the extent* those sections apply to covered services' *use of personal information to publish content or to make information available*." FAC Prayer ¶ 6 (emphasis added). NetChoice also asks the Court to "[d]eclare that Section 1798.99.31(b)(3) violates the First and Fourteenth Amendments to the United States Constitution on its face *to the extent* that section applies to covered services' *retention, sale, and sharing of personal information to publish content or to make information available*." FAC Prayer ¶ 7 (emphasis added).

The Court finds the State's argument that NetChoice has identified an "amorphous" range of applications to be well-taken with respect to §§ 1798.99.31(b)(1)-(4). Def.'s Opp'n at 1. In *Doe*, the Supreme Court found it appropriate to consider a facial challenge to a particular application of a state public records act, specifically, application of the act to referendum petitions. *See Doe*, 561 U.S. at 194. There was no ambiguity regarding the scope of the challenged application. *See id*. This Court determined that *Doe* may be applied to permit a challenge to a particular application of California Civil Code § 1798.99.31(a)(9), specifically, application of the provision to content policies and community standards. The Court made that determination based on its conclusion that there is no ambiguity regarding the scope of the challenged application.

That is not the case with respect to NetChoice's proposed challenge to specific applications of California Civil Code §§ 1798.99.31(b)(1)-(4). The State argues persuasively that NetChoice's use of the term "content" does not explain "*what* content – user-generated content, business-created content, editorial discretion content, webpage layout content?" Def.'s Opp'n at 16. NetChoice points to the declaration of the State's expert, which discusses the ways in which data profiling can lead to children receiving detrimental material online. *See* Radesky Decl. ¶¶ 65, 78, 89. NetChoice also directs the Court to its own declarants' statements regarding ways that online businesses use information to target personalized compilations of expression to different audiences. *See, e.g.*, Roin Decl. ¶¶ 2-6, 10-13; Cairella Decl. ¶¶ 8, 20; Masnick Suppl. Decl. ¶ 9; Paolucci Suppl. Decl. ¶ 9. These examples do not render NetChoice's identification of the

33

challenged applications of the subject provisions any more definite.  If the Court were to issue an injunction incorporating the language used by NetChoice to define the challenged applications of §§ 1798.99.31(b)(1)-(4), it likely would be unenforceable because it would be entirely unclear what businesses and what conduct would be encompassed.

Although the Court identified a number of likely unconstitutional applications of § 1798.99.31(b)(1)-(4) in its prior preliminary injunction order, *see NetChoice I*, 692 F. Supp. 3d at 955-57, the Ninth Circuit directed this Court to consider the fully *Moody* analysis, including identification of the full range of activities covered by the provision.  *See NetChoice II*, 113 F.4th at 1123.

Looking to NetChoice to present this analysis, the Court finds that NetChoice's simple narrowing of the scope of its claim under *Doe* to only "use of personal information to publish content or make other information available" does not answer the critical question of what is the full sweep of the narrowed application of the provision as compared to the unconstitutional applications.  The Court is not persuaded that every application is unconstitutional given the amorphous definitions offered by NetChoice such as "restrict[ions] [on] how services decide what speech to publish.  Pl.'s Reply at 9.

Accordingly, the Court finds that NetChoice has not shown that it is likely to prevail on its claim of facial invalidity with respect to California Civil Code §§ 1798.99.31(b)(1)-(4), as limited to specific applications.

### c.    Dark Patterns Restriction – Specific Applications
### Cal. Civ. Code § 1798.99.31(b)(7)

California Civil Code § 1798.99.31(b)(7) prohibits covered businesses from using dark patterns "to lead or encourage children to provide personal information beyond what is reasonably expected," or to "take any action" the business has reason to know "is materially detrimental" to children's health or well-being.  In the FAC's Prayer, NetChoice asks the Court to "[d]eclare that Section 1798.99.31(b)(7) violates the First and Fourteenth Amendments to the United States Constitution on its face *to the extent* that section applies to covered services' *use of recommendation algorithms, continuous scroll, autoplay, and other design features that organize*

34

1  *content*[.]"  FAC Prayer ¶ 8 (emphasis added).

2      The State argues that this challenge to § 1798.99.31(b)(7) suffers from the same defect as

3  the challenge to §§ 1798.99.31(b)(1)-(4), discussed above, in that it seeks to challenge an

4  insufficiently definite range of applications.  The Court agrees.  The State argues persuasively that

5  it is unclear what design features are used by covered businesses or how those design features

6  involve protected editorial judgment or other expressive activity.  It is equally unclear what are the

7  "other design features that organize content."  The Court finds that NetChoice has not identified a

8  specific application of § 1798.99.31(b)(7) with sufficient particularity to allow the Court to

9  consider a First Amendment facial challenge under *Doe*.

10     Accordingly, the Court finds that NetChoice has not shown that it is likely to prevail on its

11 claim of facial invalidity with respect to California Civil Code § 1798.99.31(b)(7), as limited to

12 specific applications.

### d.     Age Estimation Requirement – All Applications
### Cal. Civ. Code § 1798.99.31(a)(5)

15     California Civil Code § 1798.99.31(a)(5) requires each covered business to "Estimate the

16 age of child users with a reasonable level of certainty appropriate to the risks that arise from the

17 data management practices of the business or apply the privacy and data protections afforded to

18 children to all consumers."  In the FAC's Prayer, NetChoice asks the Court to "[d]eclare that

19 Section 1798.99.31(a)(5) violates the First and Fourteenth Amendments to the United States

20 Constitution on its face[.]"  FAC Prayer ¶ 4.  NetChoice does not challenge specific applications

21 of this provision, but asserts that the provision is facially invalid in all applications.  NetChoice

22 argues that the age estimation requirement would prevent covered businesses from providing

23 expressive content protected by the First Amendment to both children and adults, and likewise

24 would prevent children and adults from accessing expressive content protected by the First

25 Amendment.

26     The State contends that estimating a user's age is conduct, not expressive activity.  But this

27 provision does not merely require covered a business to estimate age.  The business must estimate

28 a user's age "with a reasonable level of certainty appropriate to the risks" to that user.  The

35

legislature contemplated that businesses would consider "the unique needs of different age ranges, including the following developmental stages: 0 to 5 years of age or 'preliterate and early literacy'; 6 to 9 years of age or 'core primary school years'; 10 to 12 years of age or 'transition years'; 13 to 15 years of age or 'early teens'; and 16 to 17 years of age or 'approaching adulthood.'" 2022 Cal. Stat. ch. 320 (A.B. 2273), § 1(a)(5). By requiring a business to estimate age for the purpose of determining what content is appropriate for that age, the CAADCA imposes limits on the content a covered business may publish and the content each user may view. In the alternative, all content must be sanitized to comport with the highest risk level, presumably, the youngest children. Imposing restrictions of that nature with respect to content published to, and accessed by, both children and adults would trigger strict scrutiny of this provision even if the Court had not already determined that strict scrutiny applies to all Regulatory Provisions based on the gateway coverage definition.

Applying strict scrutiny, the Court must determine whether the State has satisfied its burden to show that § 1798.99.31(a)(5) is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 155. The State has not addressed the requirements of strict scrutiny with respect to this provision, instead arguing that the age estimation requirement would meet the standard for intermediate scrutiny. *See* Def.'s Opp'n at 24. The State asserts that it has a substantial interest in "protecting the privacy and well-being of children." *Id*. The Court will treat that as an assertion of a compelling state interest in the privacy and well-being of children for purposes of the present analysis.

The State contends that the age estimation requirement furthers its interest in the privacy and well-being of children, because a business that estimates a user's age will know which of the Act's substantive protections must be applied. For example, once a business has estimated that a user is under the age of 18, the business must "[c]onfigure all default privacy settings . . . to settings that offer a high level of privacy," unless "a different setting is in the best interests of children." Cal. Civ. Code § 1798.99.31(a)(6). The business also is prohibited from using the personal information of children in certain ways. *Id*. §§ 1798.99.31(b)(1)-(6), (8).

The State's argument is grounded in an assumption that greater data privacy for children

36

means greater security and well-being.  As NetChoice points out, however, the State ignores that the age estimation requirement will require businesses to collect private information that users may not wish to share.  *See* Paolucci Suppl. Decl. ¶ 6; Masnick Suppl. Decl. ¶ 7; Rumenap Decl. ¶¶ 7-10, ECF 29-30.  One of NetChoice's declarants, Stacie Rumenap of the nonprofit organization Stop Child Predators, opines that the practical effect of the CAADCA's age estimation requirement is that businesses will gather and create "a trove of sensitive data" regarding children.  Rumenap Decl. ¶ 7.  Ms. Rumenap considers it "an inevitability, given the realities of data security, that one or more of these data sets will be breached, exposing the personal information of children to bad actors."  *Id.*

The State presents the declaration of Serge Egelman, Ph.D., who discusses a report on age estimation prepared by a French agency.  *See* Egelman Decl. ¶¶ 64-65, ECF 112-2. Dr. Egelman states that the report describes France's practice of using third parties for age estimation, as well as a prototype system for performing age estimation through access to restricted websites without sharing other personally identifiable data.  *Id.*  Dr. Egelman's report does not explain how using third parties for age estimation would address the intrusive aspects of that process described by Ms. Rumenap, nor does Dr. Egelman's report suggest that the prototype system described in the French report is widely available to covered businesses in the United States.  *See id.*  On this record, the Court finds that the State has not met its burden to show that age estimation furthers its interest in the privacy and well-being of children.

If a business chooses not to estimate the age of its users, it must apply the privacy and data protections afforded to children to all consumers.  However, the Supreme Court has made clear that under the First Amendment, a state "could not reduce the adult population . . . to reading only what is fit for children."  *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 252 (2002) (internal quotation marks and citation omitted).  "A statute that effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another . . . is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve."  *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004) (internal quotation marks and citation omitted).  While the State asserts that there are no

1    less restrictive alternatives, it fails to carry its burden on that point because its statement is not

2    supported by any evidence. *See* Def.'s Opp'n at 25.

3         Based on the foregoing, the Court finds that § 1798.99.31(a)(5) likely fails strict scrutiny.

4    At the first step of the *Moody* analysis, the Court finds that the provision will impose the same

5    barriers to speech on all covered businesses and their audiences. Every covered business will be

6    forced to choose between intruding into user privacy, thereby chilling publication of and access to

7    protected speech, or publishing only child-appropriate content, thereby restricting access to

8    protected speech for users of all ages. The State has not demonstrate that this choice is narrowly

9    tailored to advance the well-being of children. At the second step of Moody, the Court finds that

10   because all applications of § 1798.99.31(a)(5) will impose barriers to protected speech, the

11   provision has no legitimate sweep.

12        Accordingly, the Court concludes that NetChoice is likely to prevail on its claim of facial

13   invalidity with respect to California Civil Code § 1798.99.31(a)(5).

14              **3.    Vagueness Challenge**

15        In Claim 3 of the FAC, NetChoice asserts that the Individual Provisions are

16   unconstitutionally vague under the First Amendment.[5] Specifically, NetChoice raises vagueness

17   challenges to the policy enforcement requirement, Cal. Civ. Code § 1798.99.31(a)(9); the

18   information use restrictions, Cal. Civ. Code §§ 1798.99.31(b)(1)-(4); the dark patterns restriction,

19   Cal. Civ. Code § 1798.99.31(b)(7); and the age estimation requirement, Cal. Civ. Code §

20   1798.99.31(a)(5). The State disputes NetChoice's characterization of the Individual Provisions as

21   vague.

22        "A statute can be impermissibly vague for either of two independent reasons." *Hill v.*

23   *Colorado*, 530 U.S. 703, 732 (2000). "First, if it fails to provide people of ordinary intelligence a

24   reasonable opportunity to understand what conduct it prohibits." *Id*. "Second, if it authorizes or

25   even encourages arbitrary and discriminatory enforcement." *Id*. "Although perfect clarity is not

26

27   [5] As noted previously, Claim 3 also is brought under the Due Process Clause of the United States Constitution and under Article I, Section 7(a) of the California Constitution. Because those aspects of the claim are not addressed in NetChoice's second motion for preliminary injunction, they are not discussed here

28

United States District Court<br>Northern District of California

required even when a law regulates protected speech, vagueness concerns are more acute when a law implicates First Amendment rights, and, therefore, vagueness scrutiny is more stringent." *Butcher v. Knudsen*, 38 F.4th 1163, 1168 (9th Cir. 2022) (internal quotation marks and citation omitted). "Consistent with these principles, courts have not hesitated to reject on vagueness grounds laws regulating speech protected by the First Amendment." *Id*. at 1169 (collecting cases).

### a.     Policy Enforcement, Cal. Civ. Code § 1798.99.31(a)(9)

NetChoice's first vagueness challenge is asserted against California Civil Code § 1798.99.31(a)(9), which requires each covered businesses to "Enforce published terms, policies, and community standards established by the business, including, but not limited to, privacy policies and those concerning children." The State argues that businesses should understand their own policies well enough to enforce them, and that under those circumstances the policy enforcement provision is not vague.

NetChoice does not contend that businesses will not understand the directive to enforce their own content policies. However, NetChoice contends that the provision will authorize and invite arbitrary and discriminatory enforcement because the State will have wide discretion to interpret businesses' policies differently from the businesses themselves. NetChoice submits examples of covered businesses' content policies to illustrate its point. Reddit's Content Policy states that Reddit "is a place for creating community and belonging, not for attacking marginalized or vulnerable groups of people" and so users who "promote hate based on identity of vulnerability will be banned." Kumar Decl. Ex. 3., ECF 29-4. The New York Times' content policy requires use of "respectful language" and tells uses to "[d]ebate, but don't attack." Kumar Decl. Ex. 5, ECF 29-6. NetChoice suggests that a State regulator might understand an "attack" on a "marginalized" person differently than Reddit, or might understand the phrase "respectful language" differently than the New York Times. Certainly we all understand that language a parent might find to be disrespectful will not comport with the view of the child who uses that language. The Court agrees with NetChoice that the provision at issue, which gives the State legal authority to decide whether a covered business is complying with its own content policies, grants the State nearly unfettered discretion.

39

United States District Court
Northern District of California

The Court finds that NetChoice is likely to succeed on its vagueness challenge to the Act's policy enforcement provision, California Civil Code § 1798.99.31(a)(9).  That provision would grant the State virtually unfettered discretion to enforce as law a variety of subjective content policies that might be viewed differently by the State than by the policies' creators.

### b.    Information Use Restrictions, Cal. Civ. Code §§ 1798.99.31(b)(1)-(4)

California Civil Code §§ 1798.99.31(b)(1)-(4) collectively restrict how and for what purpose a covered business may use the personal information of children.  NetChoice asserts that several terms in those provisions are open-ended and subjective, rendering the provisions impermissibly vague.  The terms identified by NetChoice are:  "material detriment," "best interests," and "physical health, mental health, or well-being."  The challenged provisions are set forth in relevant part below, with the terms identified by NetChoice in italics:

Pursuant to California Civil Code §§ 1798.99.31(b)(1)-(4), covered businesses may not:

(1) Use the personal information of any child in a way that the business knows, or has reason to know, is *materially detrimental* to the *physical health*, *mental health*, *or well-being* of a child.

(2) Profile a child by default unless both of the following criteria are met:

(A) The business can demonstrate it has appropriate safeguards in place to protect children.

(B) Either of the following is true:

(i) Profiling is necessary to provide the online service, product, or feature requested and only with respect to the aspects of the online service, product, or feature with which the child is actively and knowingly engaged.

(ii) The business can demonstrate a compelling reason that profiling is in the *best interests* of children.

(3) Collect, sell, share, or retain any personal information that is not necessary to provide an online service, product, or feature . . .  unless the business can demonstrate a compelling reason that [doing so] is in the *best interests* of children likely to access the online service, product, or feature.

(4) If the end user is a child, use personal information for any reason other than a reason for which that personal information was collected, unless the business can demonstrate a compelling reason that use of the personal information is in the *best interests* of children.

Cal. Civ. Code §§ 1798.99.31(b)(1)-(4) (italics added).

United States District Court
Northern District of California

Reasonable minds may differ on what is "detrimental" to a child's "physical health, mental health, or well-being," as those terms are used in California Civil Code § 1798.99.31(b)(1). NetChoice queries whether the qualifying effects on children might include sleep loss? Distraction? Hurt feelings? *See* Pl.'s Second Mot. for Prelim. Inj. at 14. The challenged terms have no established meaning and the CAADCA provides no guidance. Consequently, § 1798.99.31(b)(1) runs afoul of the constitutional requirement that "a statute must clearly delineate the conduct it proscribes." *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998). The State does not offer a proposed definition or means for determining how to decide what is "detrimental" to a child's "physical health, mental health, or well-being." Instead, the State argues that the provision is clear on its face. That argument lacks merit for the reasons discussed above. The State also argues that NetChoice has failed to submit evidence showing it would ever have to construe the challenged terms. The Court is at a loss to understand the State's argument, as a covered business must understand what is "detrimental" to a child's "physical health, mental health, or well-being," in order to have fair notice of what conduct is prohibited by § 1798.99.31(b)(1).

California Civil Code §§ 1798.99.31(b)(2), (3), and (4) prohibit a covered business from taking certain acts unless the business can establish that those acts are in the "best interests" of children. The phrase "best interests" is not defined in the Act, and NetChoice argues that it has no established meaning in this context. The State argues that "best interests" of a child is a legal term of art that is well-established in family law. The State cites several cases demonstrating that family courts consider the "best interests" of the child when addressing custody arrangements, guardianship decisions, and delinquency proceedings. *See In re Jonathan C.M.*, 91 Cal. App. 5th 1039, 1046 (2023) (the "best interests" of the child must be considered in juvenile proceedings); *In re Marriage of Vargas & Ross*, 17 Cal. App. 5th 1235, 1243 (2017) (phrase "best interest of the child" was not ambiguous as used in child custody statute); *Petition of Daniels*, 177 Cal. App. 2d 376, 377 (1960) (identifying "the best interest of the child" as paramount consideration for deciding contest between nonparents for guardianship).

The undersigned is quite familiar with the family law and juvenile proceedings referenced

41

1  by the State, which indeed turn on the best interest of the child.  Those are specialized

2  proceedings, however, in which finite custodial or dependency options must be considered by the

3  court as to a particular child, on a particular factual record.  A state court's application of the "best

4  interest" standard in those specialized proceedings provides no useful guidance as to how a

5  covered business should understand what the "best interests" of children generally means as used

6  in the CAADCA.  Without an understanding of that phrase's meaning, covered businesses will not

7  have notice of what conduct is proscribed and what conduct is permitted, as required to satisfy the

8  constitution.  *See Foti*, 146 F.3d at 638.

9      The Court finds that NetChoice has demonstrated a likelihood of success on its vagueness

10  challenge to California Civil Code §§ 1798.99.31(b)(1)-(4).

11                      **c.       Dark Patterns Restriction, Cal. Civ. Code § 1798.99.31(b)(7)**

12      Under California Civil Code § 1798.99.31(b)(7), covered businesses may not:

13      Use dark patterns to lead or encourage children to provide personal information
        beyond what is reasonably expected to provide that online service, product, or
14      feature to forego privacy protections, or *to take any action* that the business knows,
        or *has reason to know*, is *materially detrimental* to the child's *physical health,*
15      *mental health, or well-being*.

16  Cal. Civ. Code § 1798.99.31(b)(7) (italics added).  NetChoice contends that this provision is

17  impermissibly vague because it does not advise businesses what conduct is prohibited, in part

18  because the italicized terms have not established meaning.

19      The State contends that § 1798.99.31(b)(7) is not vague, pointing out that "dark pattern" is

20  defined under California law.  "'Dark pattern' means a user interface designed or manipulated

21  with the substantial effect of subverting or impairing user autonomy, decisionmaking, or choice,

22  as further defined by regulation."  Cal. Civ. Code § 1798.140(l).  The State contends that "[t]wo of

23  the three relevant prohibited uses – to disclose more personal information or to forego privacy

24  protections – are clear in their limits."  Def.'s Opp'n at 23.  The State argues that the remaining

25  prohibited use of dark patterns, taking action that the business knows or has reason to know is

26  materially detrimental to the child, can be understood by a person of ordinary intelligence.

27      In its reply, NetChoice acknowledges the statutory definition of dark patterns, and clarifies

28  that it does not challenge the prohibitions on using dark patterns to lead or encourage children to

United States District Court
Northern District of California

42

provide personal information or to forego privacy protections. *See* Pl.'s Reply at 15. However, NetChoice argues that § 1798.99.31(b)(7) gives no guidance on how and when a business will have "reason to know" that a particular user interface covered by the restriction on dark patterns – for example, an autoplay feature or push notification – will be "materially detrimental" to the child's "physical health, mental health, or well-being."

The State argues that the phrase "reason to know" is not vague, relying on *United States v. Jae Gab Kim*, 449 F.3d 933 (9th Cir. 2006). *Kim* addressed a criminal defendant's vagueness challenge to a statute that, in relevant part, imposes penalties on "[a]ny person who knowingly or intentionally . . . possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance. . . ." *Id*. at 937 (quoting 21 U.S.C. § 841(c)(2)). The Ninth Circuit found that the statute is not vague, because "[w]hether a defendant is guilty of having 'reasonable cause to believe' that [the listed chemical] will be used to produce illicit drugs turns on the facts actually known by the defendant in a particular case." *Id*. at 942 (internal quotation marks and citation omitted). The Ninth Circuit explained that "[r]easonable cause to believe' is . . . often proven largely through circumstantial evidence and inferences, but *what* must be proven is not vague." *Id*. at 943.

The rationale set forth in *Kim* does not apply in the present case, where the "what" that must be proven *is* vague. While it may be easy to say that an individual has reason to know that a particular chemical will be used to produce illegal drugs based on the facts of a particular case, it is far more difficult to say that businesses have reason to know what effect a feature like autoplay or push notification will have on children generally. Moreover, as discussed above with respect to the Act's information use restrictions, reasonable minds may differ on what is "detrimental" to a child's "physical health, mental health, or well-being." Those terms have no established meaning and the CAADCA provides no guidance. The State does not offer a proposed definition or means for determining how to decide what is "detrimental" to a child's "physical health, mental health, or well-being." Accordingly, the Court finds that § 1798.99.31(b)(7) does not "clearly delineate the conduct it proscribes" as required under the constitution. *Foti*, 146 F.3d at 638.

The Court finds that NetChoice has demonstrated a likelihood of success on its vagueness

United States District Court
Northern District of California

1    challenge to the dark pattern restriction, Cal. Civ. Code § 1798.99.31(b)(7).

2                    **d.      Age Estimation, Cal. Civ. Code § 1798.99.31(a)(5)**

3            California Civil Code § 1798.99.31(a)(5) requires each covered business to "Estimate the

4    age of child users with a reasonable level of certainty appropriate to the risks that arise from the

5    data management practices of the business or apply the privacy and data protections afforded to

6    children to all consumers." NetChoice does not challenge the requirement that a business estimate

7    the age of child users. NetChoice's issue is with the requirement that such estimation be done

8    "with a reasonable level of certainty appropriate to the risks" that arise from the business's

9    practices.

10           The State contends that § 1798.99.31(a)(5) is not vague because it gives businesses an

11   alternative to performing age estimation, that is, applying the privacy and data protections

12   afforded to children to all consumers. That argument is unpersuasive. If the age estimation

13   requirement were impermissibly vague, the fact that a business has an alternative to performing

14   age estimation would not render the age estimation requirement itself less vague. And, as

15   discussed above, limiting all users to material appropriate to a 7-year-old is hardly a valid

16   alternative.

17           However, the Court finds that the thrust of the age estimation requirement – that a business

18   must estimate the age of child users – is clear. A vagueness challenge will fail when "it is clear

19   what the ordinance as a whole prohibits." *Hill*, 530 U.S. at 733 (internal quotation marks,

20   citations, and brackets omitted). The Court agrees that the provision is less than precise with

21   respect to the degree of certainty with which age estimation must be performed. But NetChoice

22   has not cited, and the Court has not discovered, any authority suggesting that ambiguity in the

23   degree of precision with which a task must be performed renders a statute vague when it is clear

24   *what* task must be performed.

25           The Court concludes that NetChoice has not shown a likelihood of success on its

26   vagueness challenge to California Civil Code § 1798.99.31(a)(5).

27                    **4.      As-Applied Challenge**

28           After the case was remanded to this Court by the Ninth Circuit, NetChoice amended its

United States District Court
Northern District of California

44

1   pleading to add as-applied challenges to its claims, which previously had asserted only facial

2   challenges. *See* FAC ¶¶ 77-126. NetChoice devotes a single sentence of its motion to its as-

3   applied claims, asserting, "For the same reasons the challenged provisions are facially invalid,

4   they are also invalid as applied to NetChoice's members." Pl.'s Second Mot. for Prelim. Inj. The

5   State did not respond to that argument. In its reply, NetChoice asserts that it is entitled to relief on

6   its as-applied claims, citing case authority for the proposition that a party who fails to oppose an

7   argument concedes it. *See Cody v. Ring LLC*, 718 F. Supp. 3d 993, 1003 n.4 (N.D. Cal. 2024).

8          "An as-applied challenge contends that the law is unconstitutional as applied to the

9   litigant's particular speech activity, even though the law may be capable of valid application to

10  others." *Project Veritas*, 125 F.4th at 939-40. "Where a plaintiff seeks to challenge a statute prior

11  to enforcement, there must be a genuine threat of imminent prosecution." *Id*. at 941 (internal

12  quotation marks and citation omitted). "To determine whether a plaintiff has established such a

13  threat, we consider: [1] whether the plaintiffs have articulated a concrete plan to violate the law in

14  question, [2] whether the prosecuting authorities have communicated a specific warning or threat

15  to initiate proceedings, and [3] the history of past prosecution or enforcement under the challenged

16  statute." *Id*. (internal quotation marks and citation omitted). "[T]he mere existence of a statute is

17  insufficient to create a ripe controversy[.]" *Id*. (internal quotation marks and citation omitted).

18         NetChoice does not address any of these factors. Accordingly, it is not entitled to a

19  preliminary injunction based on its as-applied challenge, regardless of the State's failure to

20  respond.

21         **B.     Severability (Prayer for Relief)**

22         In the FAC's Prayer for Relief, NetChoice asks the Court to declare that the Individual

23  Provisions, Cal. Civ. Code §§ 1798.99.31(a)(5), (9), (b)(1)-(4), (7), are facially invalid because

24  they are not severable from the enjoined DPIA provisions. *See* FAC Prayer ¶ 9. NetChoice also

25  asks the Court to declare any remaining provisions of the Act invalid to the extent the Court finds

26  those provisions inseverable from the enjoined portions. *See* id.

27         Where a portion of a law has been found to be unconstitutional, invalidation of the entire

28  law may be avoided if the unconstitutional portion may be severed from the remainder. *See*

United States District Court
Northern District of California

1    *Acosta v. City of Costa Mesa*, 718 F.3d 800, 817 (9th Cir. 2013). Severability of a state statute is

2    governed by state law. *See Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir. 2014). Under

3    California law, an invalid statutory provision may be severed, and the remainder of the statute

4    enforced, if the invalid provision is "grammatically, functionally, and volitionally separable."

5    *California Redevelopment Assn. v. Matosantos*, 53 Cal. 4th 231, 271 (2011). All three criteria

6    must be met for the invalid provision to be severed. *See McMahan v. City & Cnty. of San*

7    *Francisco*, 127 Cal. App. 4th 1368, 1374 (2005).

8    NetChoice contends that the CAADCA cannot be saved by severing the enjoined DPIA

9    provisions. The enjoined provisions include the DPIA requirement as well as the 90-day notice

10   and cure provision, which the parties also refer to as the "safe harbor." *See NetChoice, LLC v.*

11   *Bonta*, 113 F.4th at 1108 (identifying enjoined provisions). NetChoice argues that the DPIA

12   provisions are neither volitionally severable nor functionally severable from the remainder of the

13   CAADCA.

14   While this Court's order granting NetChoice's first motion for a preliminary injunction

15   addressed functional severability, as did the Ninth Circuit's opinion, neither this Court nor the

16   Ninth Circuit considered the issue of volitional severability. *See NetChoice II*, 113 F.4th at 1125;

17   *NetChoice I*, 692 F. Supp. 3d at 960-61. NetChoice raises the argument that the DPIA provisions

18   are not volitionally severable from the remainder of the CAADCA for the first time in the present

19   motion.

20   ### 1.    Volitional Severability

21   NetChoice argues that the DPIA provisions are not volitionally severable from the rest of

22   the Act for two reasons. First, NetChoice contends that the plain text counsels against severance.

23   Second, NetChoice asserts that the legislative history of the Act shows that the legislature would

24   not have passed the Act without the DPIA provisions, and in particular the 90-day notice and cure

25   provision. The State asserts that the DPIA provisions are volitionally severable.

26   An invalid portion of a statute "passes the test for volitional severability if it can be said

27   with confidence that the enacting body's attention was sufficiently focused upon the parts to be

28   validated so that it would have separately considered and adopted them in the absence of the

United States District Court
Northern District of California

46

invalid portions." *Acosta*, 718 F.3d at 817-18 (internal quotation marks, citation, and brackets omitted). A statutory provision "is volitionally separable if it was not of critical importance to the measure's enactment." *Jevne v. Superior Ct.*, 35 Cal. 4th 935, 961 (2005) (internal quotation marks and citation omitted).

"The issue, when assessing volitional separability, is not whether a legislative body would have preferred the whole to the part; surely it would have[.]" *Matosantos*, 53 Cal. 4th at 273. "Instead, the issue is whether a legislative body, knowing that only part of its enactment would be valid, would have preferred that part to nothing, or would instead have declined to enact the valid without the invalid." *Id*.

"In determining whether the invalid portions of a statute can be severed, we look first to any severability clause." *Matosantos*, 53 Cal. 4th at 270. "The presence of such a clause establishes a presumption in favor of severance." *Id*. However, "the absence of such a clause is not conclusive." *Cnty. of Sonoma v. Superior Ct.*, 173 Cal. App. 4th 322, 352 (2009). In the absence of a severability clause, "courts look to the statute's text, the intended function of the particular statutory scheme and the effect severance has on that intended function, any express policy statement or declaration of purpose, and legislative materials[.]" *Fowler Packing Co., Inc. v. Lanier*, 674 F. Supp. 3d 851, 877-78 (E.D. Cal. 2023) (internal quotation marks and citations omitted). Among the legislative materials considered by California courts are a Senate floor analysis, *see People v. Cornett*, 53 Cal. 4th 1261, 1267 (2012), and the floor statement of the sponsoring legislator, *see Dowhal v. SmithKline Beecham Consumer Healthcare*, 32 Cal. 4th 910, 926 (2004); *In re Marriage of Siller*, 187 Cal. App. 3d 36, 46 (1986).

NetChoice argues that the plain text of the statute supports a finding that the DPIA provisions are not severable, noting that the Act does not contain a severability clause. "Although the absence of a severability clause does not raise a presumption against severability, it does suggest an intent to have all components operate together or not at all." *Matter of Reyes*, 910 F.2d 611, 613 (9th Cir. 1990) (internal quotation marks and citation omitted). NetChoice also points to legislative findings directing regulators to look to the United Kingdom for guidance. *See* 2022 Cal. Stat. ch. 320 (A.B. 2273), §§ (1)(d)-(e). Guidance from the Information Commissioner's

United States District Court
Northern District of California

Office in the U.K. focuses on compliance rather than monetary penalties. *See* Gossett Decl. Exs. 1-4, ECF 101-7. If the CAADCA is permitted to take effect without the DPIA provisions, covered businesses that violate the Act will not be given an opportunity to come into compliance before they are subject to stiff monetary penalties. The CAADCA provides for civil penalties of up to $2,500 per child for each negligent violation and up to $7,500 per child for each intentional violation. *See* Cal. Civ. Code § 1798.99.35(a). That result, NetChoice argues, was not contemplated or intended.

NetChoice argues that the Act's legislative history shows that the CAADCA would not have passed without the DPIA safe harbor granting businesses the right to notice and a 90-day cure period before imposition of civil penalties. Assembly Bill 2273 went through five iterations before it ultimately passed and was codified as the CAADCA. *See* Pl.'s Request for Judicial Notice, ECF 129.[6] The first two versions of the bill, dated February 16, 2022 and April 26, 2022, are not at issue. The third version, dated June 30, 2022 ("Version 3"), was the last version without the notice and cure provision. *See id.* Ex. 3, A.B. 2273, 2021-2022 Leg., Reg. Sess. (Cal. June 30, 2022). The Senate Appropriations Committee referred Version 3 to the suspense file.

The bill was amended again on August 11, 2022 ("Version 4") to make substantial changes, including the addition of a notice and cure provision with a 45-day cure period. *See* Pl.'s Request for Judicial Notice Ex. 4, A.B. 2273, 2021-2022 Leg., Reg. Sess. (Cal. August 11, 2022). On August 22, 2022, the full Senate read the bill a third time and amended Version 4 to become the fifth and final version ("Version 5"). *See id.* Ex. 5, A.B. 2273, 2021-2022 Leg., Reg. Sess. (Cal. August 22, 2022). Version 5 increased the notice and cure period to 90 days and did not include any other significant amendments. *See id.* NetChoice argues that the fact that the legislature actually considered, but did not adopt, the bill without the 90-day notice and cure period is strong evidence that the legislature would not have adopted with bill without that provision.

---

[6] NetChoice's request for judicial notice of AB 2273's legislative history is granted. *See Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) ("Legislative history is properly a subject of judicial notice.").

The Court notes that the DPIA regime as a whole, not just the safe harbor provision, is prominently highlighted in the Legislative Counsel's Digest in the August 11, 2022 and August 22, 2022 versions of the bill. *See* Pl.'s Request for Judicial Notice Exs. 4, 5.

NetChoice presents evidence that floor statements by the bill's co-author also support a finding that the DPIA provisions are not volitionally severable. Assemblymember Wicks highlighted the notice and cure provision when presenting the final version of the bill for a vote, explaining that the amendment ensures that businesses in substantial compliance with the Act have an opportunity to remedy violations prior to being subject to civil penalties. *See* Transcript, Assembly Floor Analysis, AB 2273 (Aug. 11, 2022), Gossett Decl. Ex. 9. Floor statements of the sponsoring legislator may be considered when interpreting a statute. *See Dowhal v. SmithKline Beecham Consumer Healthcare*, 32 Cal. 4th 910, 926 (2004); *In re Marriage of Siller*, 187 Cal. App. 3d 36, 46 (1986).

The Court finds persuasive NetChoice's showing regarding the importance of the DPIA provisions, and in particular the notice and cure provision, to the passage of the CAADCA. The State argues that the Act makes clear the depth of the legislature's concerns for the privacy and safety of child users. *See* Cal. Civ. Code § 1798.99.29 (stating purpose of protecting the privacy and well-being of children when they are online). In the State's view, the legislature would have enacted the remaining portions of the Act even had it known the notice and cure provision would not be included. The State's position is not supported by the record, which reflects that the legislature had the opportunity to pass the Act without the notice and cure provision but declined to do so. The legislature was presented with multiple versions of the bill omitting the notice and cure provision, and even a version including a shorter 45-day notice and cure period. The Act was not passed, however, until the 90-day safe harbor was included. Under those circumstances, the Court cannot "say with confidence" that the legislature would have separately considered and adopted the non-enjoined portions of the Act in the absence of the DPIA provisions. *Acosta*, 718 F.3d at 817. On this record, the Court simply cannot find that the DPIA provisions, including the safe harbor provision, were "not of critical importance to the measure's enactment." *Jevne v. Superior Ct.*, 35 Cal. 4th at 961.

1     Accordingly, the Court finds that the enjoined DPIA provisions are not volitionally

2     severable from the remainder of the statute.

3                    **2.     Functional Severability**

4     NetChoice also argues that the DPIA provisions are not functionally severable from the

5     remaining provisions of the CAADCA.  The State contends that the DPIA provisions are

6     functionally severable.

7     An invalid provision is functionally severable if it is not necessary to the law's operation

8     and purpose.  *Acosta*, 718 F.3d at 820.  "[T]he remainder after separation of the invalid part must

9     be complete in itself and capable of independent application."  *Abbott Lab'ys.*, 175 Cal. App. 4th

10    at 1358 (internal quotation marks and citation omitted).

11    NetChoice argues that the enjoined DPIA provisions are not functionally severable because

12    they are critical to what NetChoice characterizes as "a compliance-based regime enforced

13    primarily through internal compliance bureaucracies, not strict liability."  Pl.'s Second Mot. for

14    Prelim. Inj. at 25.   NetChoice cites extensively to interview statements made by

15    Assemblymember Wicks, the Act's co-author, indicating that the purpose of the Act is to bring

16    covered businesses into compliance with its regulations, not to impose penalties on them.

17    NetChoice argues that stripping out the DPIA provisions would change the Act's function and

18    focus.

19    The State responds by pointing out that under California law, "the statements of an

20    individual legislator, including the author of a bill, are generally not considered in construing a

21    statute, as the court's task is to ascertain the intent of the Legislature as a whole in adopting a

22    piece of legislation."  *Quintano v. Mercury Cas. Co.*, 11 Cal. 4th 1049, 1062 (1995).  As noted

23    above, statements made on the floor may be considered, as they are presented to the legislature as

24    a whole.  *See Dowhal*, 32 Cal. 4th at 926.  However, the Court gives little weight to the statements

25    of Assemblymember Wicks in an interview.

26    Considering the plain text of the CAADCA, it appears that the enjoined DPIA provisions

27    are distinct from other provisions of the Act, such that the invalidity of the DPIA provisions does

28    not prevent the independent application of the Act's remaining provisions.  For example, a

50

covered business still can comply with the Act's affirmative requirements that it "[e]stimate the age of child users . . . ," Cal. Civ. Code § 1798.99.31(a)(5); "[c]onfigure all default privacy settings provided to children by the online service, product, or feature to settings that offer a high level of privacy . . . ," *id.* § 1798.99.31(a)(6); "[p]rovide any privacy information, terms of service, policies, and community standards . . . ," *id.* § 1798.99.31(a)(7); "provide an obvious signal to the child when the child is being monitored or tracked," *id.* § 1798.99.31(a)(8); "[e]nforce published terms, policies, and community standards . . . ," *id.* § 1798.99.31(a)(9); and "[p]rovide prominent, accessible, and responsive tools to help children . . . exercise their privacy rights and report concerns," *id.* § 1798.99.31(a)(10). A covered business likewise still can comply with the Act's prohibitions set forth in *id.* § 1798.99.31(b)(1)-(8).

The Court concludes that the DPIA provisions are functionally severable from the remainder of the statute.

### C.    Section 230, COPPA, and Dormant Commerce Clause (Claims 4-6)

NetChoice argues that it is likely to succeed on its claims that the CAADCA is preempted by Section 230 (Claim 6); is preempted by COPPA (Claim 5); and is facially invalid under the dormant Commerce Clause (Claim 4). The State contends that NetChoice is not likely to succeed on those claims.

#### 1.    Section 230 Preemption (Claim 6)

In Claim 6, NetChoice asserts that certain provisions of the CAADCA are preempted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230. Specifically, NetChoice asserts that Section 230 preempts the Act's policy enforcement requirement, Cal. Civ. Code § 1798.99.31(a)(9); several of the information use restrictions, Cal. Civ. Code §§ 1798.99.31(b)(1), (3)-(4); and the dark patterns restriction, Cal. Civ. Code § 1798.99.31(b)(7). The State argues that Section 230 does not preempt any provisions of the CAADCA.

"Section 230 of the CDA immunizes providers of interactive computer services against liability arising from content created by third parties[.]" *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (footnotes omitted). "The operative section of the law, § 230(c) . . . is divided into two working parts." *Est. of Bride by &*

United States District Court
Northern District of California

1    *through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1175 (9th Cir. 2024).  "The first broadly states

2    that no service provider 'shall be treated as the publisher or speaker of any information provided

3    by another information content provider,' or, more colloquially, by a third-party user of the

4    service."  *Id*. (quoting § 230(c)(1)).  "The second part protects actions taken by a service provider

5    to moderate and restrict material it 'considers to be obscene, lewd, lascivious, filthy, excessively

6    violent, harassing, or otherwise objectionable.'"  *Id*. (quoting § 230(c)(2)).  "Section 230 expressly

7    preempts any state laws with which it may conflict."  *Id*. (quoting § 230(e)(3)).

8           The Ninth Circuit has emphasized "that § 230(c)(1) does not declare a general immunity

9    from liability deriving from third-party content."  *Calise v. Meta Platforms, Inc.*, 103 F.4th 732,

10   740 (9th Cir. 2024) (internal quotation marks, citation, and brackets omitted).  Immunity applies

11   only if the website operator "is not also an 'information content provider,' which is defined as

12   someone who is 'responsible, in whole or in part, for the creation or development of' the

13   offending content."  *Roommates*, 521 F.3d at 1162 (quoting § 230(f)(3)).  "A website operator can

14   be both a service provider and a content provider: If it passively displays content that is created

15   entirely by third parties, then it is only a service provider with respect to that content."  *Id*.  "But as

16   to content that it creates itself, or is 'responsible, in whole or in part' for creating or developing,

17   the website is also a content provider."  *Id*.  "Thus, a website may be immune from liability for

18   some of the content it displays to the public but be subject to liability for other content."  *Id*. at

19   1162-63.

20          Any assertion of Section 230 immunity against enforcement of the CAADCA therefore

21   will depend on the circumstances of the case.  One business's publication of content may implicate

22   Section 230 while another business's publication of the same content may not, depending on each

23   business's role (or lack thereof) in creating the published content.  Indeed, the Ninth Circuit has

24   recognized that Section 230 immunity "is a difficult and complex issue that requires case-specific,

25   and indeed claim-specific, analysis."  *Calise*, 103 F.4th at 739.  Consequently, while it may be

26   appropriate for a covered business to raise Section 230 in response to the State's attempted

27   enforcement of the CAADCA in a particular case, NetChoice has not shown that it is likely to

28   succeed on its facial challenge to the CAADCA as preempted by Section 230.

United States District Court
Northern District of California

52

### 2. COPPA Preemption (Claim 5)

In Claim 5, NetChoice asserts that the CAADCA is preempted by COPPA, which contains a preemption clause providing, "No State or local government may impose any liability for commercial activities or actions by operators in interstate or foreign commerce in connection with an activity or action described in this chapter that is inconsistent with the treatment of those activities or actions under this section." 15 U.S.C.A. § 6502(d) (emphasis added). A state law is not "inconsistent" with COPPA for preemption purposes unless the state law contains requirements that contradict those of COPPA or "stand as obstacles to federal objectives" embodied in COPPA. *Jones v. Google LLC*, 73 F.4th 636, 642 (9th Cir. 2023). A state law that supplements or requires the same thing as COPPA is not inconsistent with COPPA. *See id.*

NetChoice claims that the CAADCA is inconsistent with COPPA because the CAADCA's regulations reach more broadly to businesses providing services "likely to be accessed by children," and because the CAADCA does not grant parents the power to decide what their children an access online, as does COPPA. The State argues that the cited provisions of the CAADCA do not contradict, and indeed supplement, COPPA.

It is not clear that the cited provisions of the CAADCA contradict those of COPPA, or would stand as an obstacle to enforcement of COPPA. A determination that there is preemption would require a careful and nuanced analysis, which is not consistent with the few paragraphs the parties have devoted to the issue. The Court finds that NetChoice has not shown it is likely to succeed on its claim of COPPA preemption.

### 3. Dormant Commerce Clause (Claim 4)

Finally, in Claim 4 of the FAC, NetChoice asserts that the CAADCA violates the dormant Commerce Clause. "[T]he Commerce Clause prohibits the enforcement of state laws driven by economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023). "When a state law . . . completely bans – or even just directly affects – commercial transactions that take place entirely outside of the state's borders, it plainly contravenes the dormant Commerce Clause." *Nat'l Shooting Sports Found. v. Bonta*, 718 F. Supp. 3d 1244, 1256

53

1    (S.D. Cal. 2024) (internal quotation marks and citation omitted).  "This is so even if the regulated

2    commerce has effects within the State of California.  *Id.* (internal quotation marks and citation

3    omitted).

4            NetChoice argues that, because the CAADCA applies to "residents of California," and

5    such residents may be out of the state, the Act runs afoul of the dormant Commerce Clause.  In

6    response, the State contends that NetChoice applies the dormant Commerce Clause too broadly,

7    and that in any event the CAADCA has no impact on transactions occurring wholly outside of the

8    state.  The briefing on these issues, comprising approximately one page per party, and the record

9    regarding potential extraterritorial applications of the Act, are insufficient for the careful analysis

10   that would be required before the Court could find the Act facially invalid under the dormant

11   Commerce Clause.  The Court therefore concludes that NetChoice has not shown it is likely to

12   succeed on the merits of this claim.

13           **D.      Conclusion Re NetChoice's Entitlement to a Preliminary Injunction**

14           The Court finds that NetChoice has shown a likelihood of success on its First Amendment

15   claim (Claim 1), as NetChoice has established that the CAADCA likely is invalid on its face.

16   NetChoice also has shown that the previously enjoined DPIA provisions are not volitionally

17   severable from the remainder of the Act.  Consequently, NetChoice has satisfied the first of the

18   four *Winter* factors, as required to obtain a preliminary injunction barring enforcement of the

19   CAADCA.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (listing factors).

20           In addition, NetChoice has shown a likelihood of success on its First Amendment claim

21   (Claim 1) and its First Amendment Vagueness claim (Claim 3) as to the Act's Individual

22   Provisions, as NetChoice has established that:  the policy enforcement provision, Cal. Civ. Code §

23   1798.99.31(a)(9), likely is both facially invalid with respect to content policies and community

24   standards, and impermissibly vague; the use restrictions, *id.* §§ 1798.99.31(b)(1)-(4), likely are

25   impermissibly vague; the dark patterns restriction, *id.* § 1798.99.31(b)(7), likely is impermissibly

26   vague; and the age estimation requirement, *id.* § 1798.99.31(a)(5), likely is facially invalid.

27           The remaining *Winter* factors – the likelihood of irreparable harm, the balance of equities,

28   and the public interest – are not contested, and the Court has no difficulty finding that they are

United States District Court
Northern District of California

54

satisfied here. Because NetChoice has a colorable First Amendment claim, it likely will suffer irreparable harm if the CAADCA takes effect. *See Am. Beverage Ass'n*, 916 F.3d at 758. The fact that NetChoice has raised serious First Amendment questions necessarily means that the balance of hardships tips sharply in NetChoice's favor. *See id.* And courts have consistently recognized the significant public interest in upholding First Amendment principles. *See id.*

When a plaintiff makes a sufficient showing on all four *Winter* factors, issuance of a preliminary injunction is warranted, even if issuance of the injunction will involve intrusion into an agency's administration of state law. *See Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023). Accordingly, NetChoice's motion for a preliminary injunction will be GRANTED.

### E.    Security

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Ninth Circuit has "recognized that Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (internal quotation marks and citation omitted) (italics in original). Thus, the district court has discretion to dispense with the filing of a bond altogether, or to require only a nominal bond. *See id*.

The parties have not addressed the issue of bond in their briefing. The Court issued the first preliminary injunction without a bond and without objection from the State. The Court again finds it appropriate to issue a preliminary injunction without requiring security.

//

//

//

//

//

//

//

United States District Court
Northern District of California

**IV.  ORDER**

(1)  Plaintiff NetChoice's motion for preliminary injunction is GRANTED as follows:

    (a)  Rob Bonta, Attorney General of the State of California, and anyone acting in concert with his office are ENJOINED from enforcing the California Age-Appropriate Design Code Act;

    (b)  This preliminary injunction shall issue without the requirement of a security bond; and

    (c)  This preliminary injunction shall take effect immediately and shall remain in effect until otherwise ordered by the Court.

(2)  This order terminates ECF 101.

Dated:  March 13, 2025

BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

56

**ER_57**