No. 25-2366

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

NETCHOICE, LLC, D/B/A NETCHOICE,
*Plaintiff-Appellee*,

V.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,
*Defendant-Appellant*.

**On Appeal from the United States District Court**
**for the Northern District of California**
No. 5:22-cv-08861-BLF
The Honorable Beth Labson Freeman, Judge

# APPELLANT'S EXCERPTS OF RECORD
# VOLUME 2 of 4

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
ANYA M. BINSACCA
*Supervising Deputy Attorney General*
KRISTIN A. LISKA
*Deputy Attorney General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3916
Fax: (415) 703-5480
Kristin.Liska@doj.ca.gov
*Attorneys for Defendant-Appellant*

June 10, 2025

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
BIANCA CHAMUSCO (*pro hac vice* forthcoming)
biancachamusco@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
Telephone: (213) 633-6800

DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (*pro hac vice*)
bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE OF LEGISLATIVE HISTORY**<br><br>Date: January 23, 2025<br>Time: 9:00 a.m.<br>Dept.: Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

At oral argument on January 23, 2025, the Court asked Plaintiff NetChoice LLC to submit the various versions of AB 2273 that were considered by the California legislature prior to enactment, as well as an explanation of the vote history on the Bill. The requested material is attached, and detailed below. All of this material has been obtained from the website of the California legislature; the primary link for records of the Act is https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202120220AB2273. These materials are all subject to judicial notice. *See Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012).

1. The "History" of the bill—each action taken by the Assembly, the Senate, and Senate and Assembly committees—is attached as **Attachment 1** (and is available at https://leginfo.legislature.ca.gov/faces/billHistoryClient.xhtml?bill_id=202120220AB2273). Further details of each formal vote taken on the bill—which are also included in abbreviated form in the "History" tab"—is attached as **Attachment 2** (and is available at https://leginfo.legislature.ca.gov/faces/billVotesClient.xhtml?bill_id=202120220AB2273).

2. There are five versions of the Act available on the legislature's website. The first publicly available version of the Act—as introduced in the Assembly—is dated February 16, 2022. Neither that version nor the April 26, 2022 "Amended Assembly" version include a "cure" provision. (Both versions are available by selecting the relevant version from the pull-down menu "Version:" on the right side of the website.)

3. On June 28, 2022, the Senate Judiciary Committee voted (by a vote of 9-1, with one member not voting) to refer the bill to the full Senate, with a recommendation to amend the bill and then re-refer the bill to the Senate Committee on Appropriations.

4. On June 30, 2022, the Senate amended the bill and re-referred it to the Senate Appropriations Committee. (There is no recorded Senate vote on this, but the action is summarized on the "History" tab of the website.)

5. Attached as **Attachment 3** is a true and correct copy of the June 30, 2022 version of the Act. This version also contained no "cure" provision. (We attach this version because it is the last version ***not*** to include a cure provision.)





DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

6. On August 1, 2022, the Senate Appropriations Committee voted unanimously (7-0) to place the June 30, 2022 version of the bill on the suspense file.

7. On August 11, 2022, the Senate Appropriations Committee voted unanimously (5-0, with two members not voting) to recommend that the Senate amend and pass the Act, thus returning the bill to the Senate floor. According to the bill History, the Senate approved those amendments that day.

8. Attached as **Attachment 4** is a true and correct copy of the August 11, 2022, version of the Act. This version contains (in section 1798.99.35(c)) a 45-day cure provision.

9. On August 22, 2022, the full Senate "read" the bill a third time and amended it again.

10. Attached as **Attachment 5** is a true and correct copy of the August 22, 2022, version of the Act. This version extends the cure provision to 90 days, and further clarifies that provision.

11. That version was eventually enacted without further amendment, after votes in the Assembly and Senate on August 30, 2022, and the Governor's approval on September 15, 2022.

DATED: January 28, 2025

DAVIS WRIGHT TREMAINE LLP

By: */s/ Ambika Kumar*
Ambika Kumar

Attorneys for Plaintiff
NetChoice LLC, d/b/a NetChoice



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

# ATTACHMENT 1

Bill PDF | Add To My Favorites | Version: 09/15/22 - Chaptered Go

**AB-2273 The California Age-Appropriate Design Code Act.** (2021-2022)

Text | Votes | **History** | Bill Analysis | Today's Law As Amended | Compare Versions | Status | Comments To Author

| Date | Action |
|---|---|
| 09/15/22 | Chaptered by Secretary of State - Chapter 320, Statutes of 2022. |
| 09/15/22 | Approved by the Governor. |
| 09/02/22 | Enrolled and presented to the Governor at 4 p.m. |
| 08/30/22 | Senate amendments concurred in. To Engrossing and Enrolling. (Ayes 75. Noes 0. Page 6481.). |
| 08/30/22 | In Assembly. Concurrence in Senate amendments pending. |
| 08/30/22 | Read third time. Passed. Ordered to the Assembly. (Ayes 33. Noes 0. Page 5235.). |
| 08/23/22 | Read second time. Ordered to third reading. |
| 08/22/22 | Read third time and amended. Ordered to second reading. |
| 08/15/22 | Read second time. Ordered to third reading. |
| 08/11/22 | Read second time and amended. Ordered returned to second reading. |
| 08/11/22 | From committee: Amend, and do pass as amended. (Ayes 5. Noes 0.) (August 11). |
| 08/02/22 | In committee: Referred to suspense file. |
| 06/30/22 | Read second time and amended. Re-referred to Com. on APPR. |
| 06/29/22 | From committee: Amend, and do pass as amended and re-refer to Com. on APPR. (Ayes 9. Noes 1.) (June 28). |
| 06/08/22 | Referred to Com. on JUD. |
| 05/27/22 | In Senate. Read first time. To Com. on RLS. for assignment. |
| 05/26/22 | Read third time. Passed. Ordered to the Senate. (Ayes 72. Noes 0.) |
| 05/19/22 | Read second time. Ordered to third reading. |
| 05/19/22 | From committee: Do pass. (Ayes 16. Noes 0.) (May 19). |
| 05/11/22 | In committee: Set, first hearing. Referred to suspense file. |
| 04/27/22 | Re-referred to Com. on APPR. |
| 04/26/22 | Read second time and amended. |
| 04/25/22 | From committee: Amend, and do pass as amended and re-refer to Com. on APPR. (Ayes 10. Noes 0.) (April 19). |
| 03/03/22 | Referred to Com. on P. & C.P. |
| 02/17/22 | From printer. May be heard in committee March 19. |
| 02/16/22 | Read first time. To print. |

# ATTACHMENT 2

**AB-2273 The California Age-Appropriate Design Code Act.** (2021-2022)

| Bill Votes | |
|---|---|
| Date | 08/30/22 |
| Result | (PASS) |
| Location | Assembly Floor |
| Ayes Count | 75 |
| Noes Count | 0 |
| NVR Count | 5 |
| Motion | AB 2273 Wicks Concurrence in Senate Amendments |
| Ayes | Aguiar-Curry, Alvarez, Arambula, Bauer-Kahan, Bennett, Berman, Bigelow, Bloom, Boerner Horvath, Mia Bonta, Bryan, Calderon, Carrillo, Cervantes, Chen, Choi, Cooley, Cooper, Cunningham, Megan Dahle, Daly, Davies, Flora, Mike Fong, Fong, Friedman, Gabriel, Gallagher, Cristina Garcia, Eduardo Garcia, Gray, Grayson, Haney, Holden, Jones-Sawyer, Kalra, Lackey, Lee, Levine, Low, Maienschein, Mathis, Mayes, McCarty, McKinnor, Medina, Mullin, Muratsuchi, Nazarian, Nguyen, O'Donnell, Patterson, Petrie-Norris, Quirk, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Blanca Rubio, Salas, Santiago, Smith, Stone, Ting, Valladares, Villapudua, Voepel, Waldron, Ward, Akilah Weber, Wicks, Wilson, Wood, Rendon |
| Noes | |
| NVR | Gipson, Irwin, Kiley, Rodriguez, Seyarto |

| Bill Votes | |
|---|---|
| Date | 08/30/22 |
| Result | (PASS) |
| Location | Senate Floor |
| Ayes Count | 33 |
| Noes Count | 0 |
| NVR Count | 7 |
| Motion | Assembly 3rd Reading AB2273 Wicks et al. By Newman |
| Ayes | Allen, Archuleta, Atkins, Becker, Bradford, Caballero, Cortese, Dahle, Dodd, Durazo, Eggman, Glazer, Gonzalez, Hertzberg, Hueso, Hurtado, Kamlager, Laird, Leyva, Limón, McGuire, Min, Newman, Nielsen, Pan, Portantino, Roth, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener |
| Noes | |
| NVR | Bates, Borgeas, Grove, Jones, Melendez, Ochoa Bogh, Wilk |

| Bill Votes | |
|---|---|
| Date | 08/11/22 |
| Result | (PASS) |
| Location | Sen Appropriations |
| Ayes Count | 5 |
| Noes Count | 0 |
| NVR Count | 2 |
| Motion | Do pass as amended |
| Ayes | Bradford, Laird, McGuire, Portantino, Wieckowski |
| Noes | |
| NVR | Bates, Jones |

| Bill Votes | |
|---|---|
| Date | 08/01/22 |
| Result | (PASS) |
| Location | Sen Appropriations |
| Ayes Count | 7 |
| Noes Count | 0 |
| NVR Count | 0 |
| Motion | Placed on suspense file |
| Ayes | Bates, Bradford, Jones, Kamlager, Laird, Portantino, Wieckowski |
| Noes | |
| NVR | |

| Bill Votes | |
|---|---|
| Date | 06/28/22 |
| Result | (PASS) |
| Location | Sen Judiciary |
| Ayes Count | 9 |
| Noes Count | 1 |
| NVR Count | 1 |
| Motion | Do pass as amended, but first amend, and re-refer to the Committee on [Appropriations] |
| Ayes | Caballero, Cortese, Durazo, Hertzberg, McGuire, Stern, Umberg, Wieckowski, Wiener |
| Noes | Jones |
| NVR | Borgeas |

| Bill Votes | |
|---|---|
| **Date** | 05/26/22 |
| **Result** | (PASS) |
| **Location** | Assembly Floor |
| **Ayes Count** | 72 |
| **Noes Count** | 0 |
| **NVR Count** | 6 |
| **Motion** | AB 2273 Wicks Assembly Third Reading |
| **Ayes** | Aguiar-Curry, Arambula, Bauer-Kahan, Bennett, Bigelow, Bloom, Boerner Horvath, Mia Bonta, Bryan, Calderon, Carrillo, Cervantes, Chen, Cooley, Cooper, Cunningham, Megan Dahle, Davies, Flora, Mike Fong, Fong, Friedman, Gabriel, Gallagher, Cristina Garcia, Eduardo Garcia, Gray, Grayson, Haney, Holden, Irwin, Jones-Sawyer, Kalra, Lackey, Lee, Levine, Low, Maienschein, Mathis, Mayes, McCarty, Medina, Mullin, Muratsuchi, Nazarian, Nguyen, Patterson, Petrie-Norris, Quirk, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Rodriguez, Blanca Rubio, Salas, Santiago, Seyarto, Smith, Stone, Ting, Valladares, Villapudua, Voepel, Waldron, Ward, Akilah Weber, Wicks, Wilson, Wood, Rendon |
| **Noes** | |
| **NVR** | Berman, Choi, Daly, Gipson, Kiley, O'Donnell |

| Bill Votes | |
|---|---|
| **Date** | 05/19/22 |
| **Result** | (PASS) |
| **Location** | Asm Appropriations |
| **Ayes Count** | 16 |
| **Noes Count** | 0 |
| **NVR Count** | 0 |
| **Motion** | Do pass. |
| **Ayes** | Bigelow, Bryan, Calderon, Carrillo, Megan Dahle, Davies, Mike Fong, Fong, Gabriel, Eduardo Garcia, Holden, Levine, Quirk, Robert Rivas, Akilah Weber, Wilson |
| **Noes** | |
| **NVR** | |

| Bill Votes | |
|---|---|
| **Date** | 04/19/22 |
| **Result** | (PASS) |
| **Location** | Asm Privacy and Consumer Protection |
| **Ayes Count** | 10 |
| **Noes Count** | 0 |
| **NVR Count** | 1 |
| **Motion** | Do pass as amended and be re-referred to the Committee on [Appropriations] |
| **Ayes** | Bauer-Kahan, Bennett, Berman, Cunningham, Mike Fong, Gabriel, Irwin, Valladares, Wicks, Wilson |
| **Noes** | |
| **NVR** | Kiley |

# ATTACHMENT 3

AMENDED IN SENATE JUNE 30, 2022

AMENDED IN ASSEMBLY APRIL 26, 2022

CALIFORNIA LEGISLATURE—2021–22 REGULAR SESSION

# ASSEMBLY BILL No. 2273

**Introduced by Assembly Members Wicks, Cunningham, and Petrie-Norris**
(Coauthors: Senators Allen and Newman)

February 16, 2022

An act to add Title 1.81.46 (commencing with Section 1798.99.28) to Part 4 of Division 3 of the Civil Code, relating to consumer privacy.

LEGISLATIVE COUNSEL'S DIGEST

AB 2273, as amended, Wicks. The California Age-Appropriate Design Code Act.

(1) Existing law, the California Privacy Rights Act of 2020, approved by the voters as Proposition 24 at the November 3, 2020, statewide general election, establishes the California Privacy Protection Agency. Existing law vests the agency with full administrative power, authority, and jurisdiction to implement and enforce the California Consumer Privacy Act of 2018, and requires the agency to be governed by a board. Existing law requires businesses to protect consumer privacy and information, make certain disclosures to consumers regarding a consumer's rights under the act in a specified manner, and disclose to consumers that a consumer has the right to request specific pieces of information, including the categories of information those businesses have collected about that consumer.

Existing law, the Parent's Accountability and Child Protection Act, requires a person or business that conducts business in California and

that seeks to sell specified products or services to take reasonable steps to ensure that the purchaser is of legal age at the time of purchase or delivery, including verifying the age of the purchaser. Existing law prohibits a person or business that is required to comply with these provisions from retaining, using, or disclosing any information it receives in an effort to verify age from a purchaser or recipient for any other purpose, except as specified, and subjects a business or person that violates these provisions to a civil penalty.

This bill would enact the California Age-Appropriate Design Code Act, which, commencing July 1, 2024, would require a business that provides an online service, product, or feature likely to be accessed by a child to comply with specified requirements, including configuring all default privacy settings offered by the online service, product, or feature to the settings that offer a high level of privacy protection offered by the business, and providing privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children likely to access that online service, product, or feature. The bill would prohibit a business that provides an online service, product, or feature likely to be accessed by a child from taking proscribed action, including using the personal information of a child for any reason other than the reason or reasons for which the personal information was collected.

This bill would require the California Privacy Protection Agency to establish and convene the California Children's Data Protection Taskforce to evaluate best practices for the implementation of these provisions, and to provide support to businesses, as specified. The bill would require the agency's board to appoint the members of the taskforce by April 1, 2023, and would require those members to have certain expertise, including in the areas of privacy and children's rights. The bill would require the taskforce to make prescribed recommendations on best practices, including identifying online services, products, or features likely to be accessed by children. By April 1, 2024, the bill would require the agency, in consultation with the taskforce, to adopt regulations, as necessary.

*This bill would authorize the Attorney General to seek an injunction or civil penalty against any business that violates it provisions. The bill would hold violators liable for a civil penalty of not more than $2,500 per affected child for each negligent violation, or not more than $7,500 per affected child for each intentional violation.*

(2) The California Privacy Rights Act of 2020 authorizes the Legislature to amend the act to further the purposes and intent of the act by a majority vote of both houses of the Legislature, as specified.

This bill would declare that its provisions further the purposes and intent of the California Privacy Rights Act of 2020.

Vote: majority. Appropriation: no. Fiscal committee: yes. State-mandated local program: no.

*The people of the State of California do enact as follows:*

SECTION 1. (a) The Legislature hereby finds and declares all of the following:

(1) The United Nations Convention on the Rights of the Child recognizes that children need special safeguards and care in all aspects of their lives.

(2) As children spend more of their time interacting with the online world, the impact of the design of online products and services on children's well-being has become a focus of significant concern.

(3) There is bipartisan agreement at the international level, in both the United States and in the State of California, that more needs to be done to create a safer online space for children to learn, explore, and play.

(4) Lawmakers around the globe have taken steps to enhance privacy protections for children on the understanding that, in relation to data protection, greater privacy necessarily means greater security and well-being.

(5) Children should be afforded protections not only by online products and services specifically directed at them, but by all online products and services they are likely to access.

(6) In 2019, 81 percent of voters said they wanted to prohibit companies from collecting personal information about children without parental consent, and a 2018 poll of Californian parents and teens found that only 36 percent of teenagers and 32 percent of parents say that social networking internet websites do a good job explaining what they do with users' data.

(7) While it is clear that the same data protection regime may not be appropriate for children of all ages, children of all ages should nonetheless be afforded privacy and protection, and online products and services should adopt data protection regimes

appropriate for children of the ages likely to access those products and services.

(8) Products and services that are likely to be accessed by children should offer strong privacy protections by design and by default, including by disabling features that profile children using their previous behavior, browsing history, or assumptions of their similarity to other children, to offer detrimental material.

(9) Ensuring robust privacy protections for children by design is consistent with the intent of the Legislature in passing the California Consumer Privacy Act of 2018, and with the intent of the people of the State of California in passing the California Privacy Rights Act of 2020, which finds and declares that children are particularly vulnerable from a negotiating perspective with respect to their privacy rights.

(b) Therefore, it is the intent of the Legislature to promote privacy protections for children pursuant to the California Age-Appropriate Design Code Act.

SEC. 2. Title 1.81.46 (commencing with Section 1798.99.28) is added to Part 4 of Division 3 of the Civil Code, to read:

TITLE 1.81.46. THE CALIFORNIA AGE-APPROPRIATE DESIGN CODE ACT

1798.99.28. This chapter shall be known, and may be cited, as the California Age-Appropriate Design Code Act.

1798.99.29. The Legislature declares that children should be afforded protections not only by online products and services specifically directed at them, but by all online products and services they are likely to access and makes the following findings:

(a) Companies that develop and provide online services, products, or features that children are likely to access should consider the best interests of children when designing, developing, and providing that service, product, or feature.

(b) If a conflict arises between commercial interests and the best interests of children, companies should prioritizes the privacy, safety, and well-being of children over commercial interests.

1798.99.30. (a) For purposes of this title, the definitions in Section 1798.140 shall apply unless otherwise specified in this title.

(b) For the purposes of this title, the following terms apply:

(1) "Agency" means the California Privacy Protection Agency, as established by the California Privacy Rights Act of 2020, approved by the voters as Proposition 24 at the November 3, 2020, statewide general election.

(2) "Board" means the agency's board, as established in Section 1798.199.10.

(3) "Child" or "children," unless otherwise specified, ~~mean~~ *means* a consumer or consumers who is under 18 years of age.

(4) "Data Protection Impact Assessment" means a systematic survey to assess and mitigate risks to children who are reasonably likely to access the service, product, or feature at issue that arises from the provision of that service, product, or feature in accordance with specifications promulgated by the California Children's Data Protection Taskforce established pursuant to Section 1798.99.32.

(5) "Default" means a preselected option adopted by the business for the online service, product, or feature.

(6) "Likely to be accessed by a child" means it is reasonable to expect, based on the ~~nature of the content, the associated marketing, the online context, or academic or internal research, that the service, product, or feature would be accessed by children.~~ *following factors, that the online service, product, or feature would be accessed by children:*

*(A) The online service, product, or feature is directed to children as defined by the Children's Online Privacy Protection Act (15 U.S.C. Sec. 6501 et seq.).*

*(B) The online service, product, or feature is determined to be routinely accessed by children through academic, market, or internal company research.*

*(C) An online service, product, or feature advertises to children.*

*(D) An online service, product, or feature that is substantially similar or the same as an online service, product, or feature subject to subparagraph (B).*

*(E) An online service, product, or feature that has design elements that are known to be of interest to children, including, but not limited to, games, cartoons, music, and celebrities who appeal to children.*

(7) "Taskforce" means the California Children's Data Protection Taskforce as established by Section 1798.99.32.

1798.99.31. (a) A business that provides an online service, product, or feature likely to be accessed by a child shall comply with all of the following:

(1) Undertake a Data Protection Impact Assessment for any online service, product, or feature likely to be accessed by a child and maintain documentation of this assessment as long as the online service, product, or feature is likely to be accessed by a child. A report of the assessment must be provided to the agency within 12 months of the implementation of this act and reviewed every 24 months or before any new features are offered to the public.

(2) Establish the age of consumers with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business, or apply the privacy and data protections afforded to children to all consumers.

(3) Configure all default privacy settings offered by the online service, product, or feature to the settings that offer a high level of privacy protection offered by the business.

(4) Provide any privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children likely to access that online service, product, or feature.

(5) If the online service, product, or feature allows the child's parent, guardian, or any other consumer to monitor the child's online activity or track their location, provide an obvious signal to the child when they are being monitored or tracked.

(6) Enforce published terms, policies, and community standards established by the business, including, but not limited to, privacy policies and those concerning children.

(7) Provide prominent, accessible, and responsive tools to help children, or where applicable their parent or guardian, exercise their privacy rights and report concerns.

(b) A business that provides an online service, product, or feature likely to be accessed by a child shall not take any of the following actions:

(1) Use the personal information of any child in a way that the business knows or has reason to know the online service, product, or feature more likely than not causes or contributes to a more than de minimis risk of harm to the physical health, mental health, or well-being of a child.

(2) Profile a child by default.

(3) Collect, sell, share, or retain any personal information that is not necessary to provide a service, product, or feature with which a child is actively and knowingly ~~engaged.~~ *engaged, or as described in paragraphs (1) to (4), inclusive, of subdivision (a) of Section 1798.145.*

*(4) Use personal information for any reason other than the reason or reasons for which that personal information was collected, where the end user is a child.*

~~(4) If a business does not have actual knowledge of the age of a consumer, it shall not collect, share, sell, or retain any personal information that is not necessary to provide a service, product, or feature with which a consumer is actively and knowingly engaged.~~

~~(5) Use the personal information of a child for any reason other than the reason or reasons for which that personal information was collected. If the business does not have actual knowledge of the age of the consumer, the business shall not use any personal information for any reason other than the reason or reasons for which that personal information was collected.~~

~~(6) Notwithstanding Section 1798.120, share or sell the personal information of any child unless the sharing or selling of that personal information is necessary to provide the online service, product, or feature as permitted by paragraphs (1) to (4), inclusive, of subdivision (a) of Section 1798.145.~~

~~(7)~~

*(5)* Collect, sell, or share any precise geolocation information of children by default unless the collection of that precise geolocation information is necessary *for the business* to provide the service, product, or feature requested and then only for the limited time that the collection of precise geolocation information is necessary to provide the service, product, or feature.

~~(8)~~

*(6)* ~~Collect, sell, or share~~ *Collect* any precise geolocation information *of a child* without providing an obvious sign to the child for the duration of that collection that precise geolocation information is being collected.

~~(9)~~

*(7)* Use dark patterns ~~or other techniques~~ to lead or encourage ~~consumers~~ *children* to provide personal information beyond what is reasonably expected ~~for the service the child is accessing and~~

~~necessary~~ to provide that ~~service or product~~ *online service, product, or feature* to forego privacy protections, or to ~~otherwise~~ take any action that the business knows or has reason to know ~~the online service or product~~ more likely than not causes or contributes to a more than de minimis risk of harm to the child’s physical health, mental health, or well-being.

~~(10)~~

*(8)* Use any personal information collected or processed to establish age or age range for any other purpose, or retain that personal information longer than necessary to establish age. Age assurance shall be proportionate to the risks and data practice of a service, product, or feature.

(c) This section shall become operative on July 1, 2024.

1798.99.32. (a) The agency shall establish and convene a taskforce, the California Children’s Data Protection Taskforce, to evaluate best practices for the implementation of this title, and to provide support to businesses, with an emphasis on small and medium businesses, to comply with this title.

(b) By April 1, 2023, the board shall appoint members of the taskforce. Taskforce members shall consist of Californians with expertise in the areas of privacy, physical health, mental health, and well-being, technology, and children’s rights.

(c) The taskforce shall make recommendations on best practices regarding, but not limited to, all of the following:

(1) Identifying online services, products, or features likely to be accessed by children.

(2) Evaluating and prioritizing the best interests of children with respect to their privacy, health, and well-being, and issuing guidance to businesses on how those interests may be furthered by the design, development, and implementation of an online service, product, or feature.

(3) Ensuring that age verification methods used by businesses that provide online services, products, or features likely to be accessed by children are proportionate to the risks that arise from the data management practices of the business, privacy protective, and minimally invasive.

(4) Assessing and mitigating risks to children that arise from the use of an online service, product, or feature, including specific issues businesses must address to perform a Data Protection Impact Assessment.

(5) Publishing privacy information, policies, and standards in concise, clear language suited for the age of children likely to access that service or product.

(d) By April 1, 2024, the agency, in consultation with the taskforce, shall adopt regulations, as necessary, to effectuate the purposes of this title.

*1798.99.35. (a) Any business that violates this title shall be subject to an injunction and liable for a civil penalty of not more than two thousand five hundred dollars ($2,500) per affected child for each negligent violation or not more than seven thousand five hundred dollars ($7,500) per affected child for each intentional violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General.*

*(b) Nothing in this title shall be interpreted to serve as the basis for a private right of action under this title.*

SEC. 3. The Legislature finds and declares that this act furthers the purposes and intent of the California Privacy Rights Act of 2020.

O

# ATTACHMENT 4

AMENDED IN SENATE AUGUST 11, 2022

AMENDED IN SENATE JUNE 30, 2022

AMENDED IN ASSEMBLY APRIL 26, 2022

CALIFORNIA LEGISLATURE—2021–22 REGULAR SESSION

# ASSEMBLY BILL No. 2273

**Introduced by Assembly Members Wicks, Cunningham, and Petrie-Norris**
(Coauthors: Senators ~~Allen and Newman)~~ *Allen, Newman, and Stern)*

February 16, 2022

An act to add Title 1.81.46 (commencing with Section 1798.99.28) to Part 4 of Division 3 of the Civil Code, relating to consumer privacy.

LEGISLATIVE COUNSEL'S DIGEST

AB 2273, as amended, Wicks. The California Age-Appropriate Design Code Act.

(1) Existing law, the California Privacy Rights Act of 2020, approved by the voters as Proposition 24 at the November 3, 2020, statewide general election, establishes the California Privacy Protection Agency. Existing law vests the agency with full administrative power, authority, and jurisdiction to implement and enforce the California Consumer Privacy Act of ~~2018,~~ *2018* and requires the agency to be governed by a board. Existing law requires businesses to protect consumer privacy and information, make certain disclosures to consumers regarding a consumer's rights under the act in a specified manner, and disclose to consumers that a consumer has the right to request specific pieces of information, including the categories of information those businesses have collected about that consumer.

Existing law, the Parent's Accountability and Child Protection Act, requires a person or business that conducts business in California and that seeks to sell specified products or services to take reasonable steps to ensure that the purchaser is of legal age at the time of purchase or delivery, including verifying the age of the purchaser. Existing law prohibits a person or business that is required to comply with these provisions from retaining, using, or disclosing any information it receives in an effort to verify age from a purchaser or recipient for any other purpose, except as specified, and subjects a business or person that violates these provisions to a civil penalty.

This bill would enact the California Age-Appropriate Design Code Act, which, commencing July 1, 2024, ~~would~~ *would, among other things,* require a business that provides an online service, product, or feature likely to be accessed by ~~a child~~ *children* to comply with specified requirements, including configuring all default privacy settings offered by the online service, product, or feature to the settings that offer a high level of ~~privacy protection offered by the business,~~ *privacy, unless the business can demonstrate a compelling reason that a different setting is in the best interests of children,* and providing privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children likely to access that online service, product, or feature. *The bill would require a business, before any new online services, products, or features are offered to the public, to complete a Data Protection Impact Assessment, as defined, for any online service, product, or feature likely to be accessed by children and maintain documentation of this assessment as long as the online service, product, or feature is likely to be accessed by children. The bill would require a business to make a Data Protection Impact Assessment available, within 5 business days, to the Attorney General pursuant to a written request and would exempt a Data Protection Impact Assessment from public disclose, as prescribed.* The bill would prohibit a business that provides an online service, product, or feature likely to be accessed by ~~a child~~ *children* from taking proscribed action, ~~including~~ *including, if the end user is a child,* using ~~the~~ personal information ~~of a child~~ for any reason other than ~~the~~ *a* reason ~~or reasons~~ for which the personal information was ~~collected.~~ *collected, unless the business can demonstrate a compelling reason that use of the personal information is in the best interests of children.*

This bill would ~~require the California Privacy Protection Agency to establish and convene~~ *create* the California Children's Data Protection ~~Taskforce to evaluate~~ *Working Group to deliver a report to the Legislature regarding* best practices for the implementation of these ~~provisions, and to provide support to businesses,~~ *provisions,* as specified. The bill would require the ~~agency's board to appoint the members of the taskforce by April 1, 2023, and would require those~~ members *of the working group* to have certain expertise, including in the areas of *children's data* privacy and children's rights. The bill would require the ~~taskforce to~~ *working group to take input from a broad range of stakeholders, including from academia, consumer advocacy groups, and small, medium, and large businesses affected by data privacy policies and* make prescribed recommendations on best practices, including identifying online services, products, or features likely to be accessed by children. ~~By April 1, 2024, the bill would require the agency, in consultation with the taskforce, to adopt regulations, as necessary.~~

This bill would authorize the Attorney General to seek an injunction or civil penalty against any business that violates it provisions. The bill would hold violators liable for a civil penalty of not more than $2,500 per affected child for each negligent ~~violation,~~ *violation* or not more than $7,500 per affected child for each intentional violation. *The bill would require any penalties, fees, and expenses recovered in an action brought under the act to be deposited in the Consumer Privacy Fund with the intent that they be used to fully offset costs incurred by the Attorney General in connection with the act.*

(2) The California Privacy Rights Act of 2020 authorizes the Legislature to amend the act to further the purposes and intent of the act by a majority vote of both houses of the Legislature, as specified.

This bill would declare that its provisions further the purposes and intent of the California Privacy Rights Act of 2020.

*(3) Existing constitutional provisions require that a statute that limits the right of access to the meetings of public bodies or the writings of public officials and agencies be adopted with findings demonstrating the interest protected by the limitation and the need for protecting that interest.*

*This bill would make legislative findings to that effect.*

Vote: majority. Appropriation: no. Fiscal committee: yes. State-mandated local program: no.

*The people of the State of California do enact as follows:*

SECTION 1. (a) The Legislature hereby finds and declares all of the following:

(1) The United Nations Convention on the Rights of the Child recognizes that children need special safeguards and care in all aspects of their lives.

(2) As children spend more of their time interacting with the online world, the impact of the design of online products and services on children's well-being has become a focus of significant concern.

(3) There is bipartisan agreement at the international level, in both the United States and in the State of California, that more needs to be done to create a safer online space for children to learn, explore, and play.

(4) Lawmakers around the globe have taken steps to enhance privacy protections for children on the understanding that, in relation to data protection, greater privacy necessarily means greater security and well-being.

(5) Children should be afforded protections not only by online products and services specifically directed at them, but by all online products and services they are likely to access. *In order to help support the design of online products, services, and features, businesses should take into account the unique needs of different age ranges, including the following developmental stages: 0 to 5 years of age or "preliterate and early literacy"; 6 to 9 years of age or "core primary school years"; 10 to 12 years of age or "transition years"; 13 to 15 years of age or "early teens"; and 16 to 17 years of age or "approaching adulthood".*

(6) In 2019, 81 percent of voters said they wanted to prohibit companies from collecting personal information about children without parental consent, and a 2018 poll of Californian parents and teens found that only 36 percent of teenagers and 32 percent of parents say that social networking internet websites do a good job explaining what they do with users' data.

(7) While it is clear that the same data protection regime may not be appropriate for children of all ages, children of all ages should nonetheless be afforded privacy and protection, and online products and services should adopt data protection regimes

appropriate for children of the ages likely to access those products and services.

(8) ~~Products and services~~ *Online services, products, or features* that are likely to be accessed by children should offer strong privacy protections by design and by default, including by disabling features that profile children using their previous behavior, browsing history, or assumptions of their similarity to other children, to offer detrimental material.

(9) Ensuring robust privacy protections for children by design is consistent with the intent of the Legislature in passing the California Consumer Privacy Act of 2018, and with the intent of the people of the State of California in passing the California Privacy Rights Act of 2020, which finds and declares that children are particularly vulnerable from a negotiating perspective with respect to their privacy rights.

*(10) The California Privacy Protection Agency, created by the California Privacy Rights Act of 2020, has substantial and growing expertise that is integral to the development of privacy policy in California.*

(b) Therefore, it is the intent of the Legislature to promote privacy protections for children pursuant to the California Age-Appropriate Design Code Act.

*(c) It is the intent of the Legislature that the California Age-Appropriate Design Code promote innovation by businesses whose online products, services, or features are likely to be accessed by children by ensuring that those online products, services, or features are designed in a manner that recognizes the distinct needs of children at different age ranges.*

*(d) It is the intent of the Legislature that businesses covered by the California Age-Appropriate Design Code may look to guidance and innovation in response to the Age-Appropriate Design Code established in the United Kingdom when developing online services, products, or features likely to be accessed by children.*

*(e) It is the intent of the Legislature that the California Children's Data Protection Working Group consider the guidance provided by the Information Commissioner's Office in the United Kingdom when developing and reviewing best practices or other recommendations related to the California Age-Appropriate Design Code.*

*(f) It is the intent of the Legislature that the California Children's Data Protection Working Group and the Department of Justice leverage the substantial and growing expertise of the California Privacy Protection Agency in the implementation of this title.*

SEC. 2. Title 1.81.46 (commencing with Section 1798.99.28) is added to Part 4 of Division 3 of the Civil Code, to read:

TITLE 1.81.46. THE CALIFORNIA AGE-APPROPRIATE DESIGN CODE ACT

1798.99.28. This ~~chapter~~ *title* shall be known, and may be cited, as the California Age-Appropriate Design Code Act.

1798.99.29. The Legislature declares that children should be afforded protections not only by online products and services specifically directed at ~~them,~~ *them* but by all online products and services they are likely to access and makes the following findings:

(a) ~~Companies~~ *Businesses* that develop and provide online services, products, or features that children are likely to access should consider the best interests of children when designing, developing, and providing that *online* service, product, or feature.

(b) If a conflict arises between commercial interests and the best interests of children, companies should ~~prioritizes~~ *prioritize* the privacy, safety, and well-being of children over commercial interests.

1798.99.30. (a) For purposes of this title, the definitions in Section 1798.140 shall apply unless otherwise specified in this title.

(b) For the purposes of this ~~title, the following terms apply:~~ *title:*

~~(1) "Agency" means the California Privacy Protection Agency, as established by the California Privacy Rights Act of 2020, approved by the voters as Proposition 24 at the November 3, 2020, statewide general election.~~

~~(2) "Board" means the agency's board, as established in Section 1798.199.10.~~

~~(3)~~

*(1)* "Child" or "children," unless otherwise specified, means a consumer or consumers who is under 18 years of age.

~~(4)~~

*(2)* "Data Protection Impact Assessment" means a systematic survey to assess and mitigate risks *that arise from the data management practices of the business* to children who are reasonably likely to access the *online* service, product, or feature at issue that arises from the provision of that *online* service, product, or ~~feature in accordance with specifications promulgated by the California Children's Data Protection Taskforce established pursuant to Section 1798.99.32.~~ *feature.*

~~(5)~~

*(3)* "Default" means a preselected option adopted by the business for the online service, product, or feature.

~~(6)~~

*(4)* "Likely to be accessed by ~~a child"~~ *children"* means it is reasonable to expect, based on *any of* the following factors, that the online service, product, or feature would be accessed by children:

(A) The online service, product, or feature is directed to children as defined by the Children's Online Privacy Protection Act (15 U.S.C. Sec. 6501 et seq.).

(B) The online service, product, or feature is ~~determined~~ *determined, based on competent and reliable evidence regarding audience composition,* to be routinely accessed by ~~children through academic, market, or internal company research.~~ *a significant number of children.*

(C) An online service, product, or feature ~~advertises~~ *with advertisements marketed* to children.

(D) An online service, product, or feature that is substantially similar or the same as an online service, product, or feature subject to subparagraph (B).

(E) An online service, product, or feature that has design elements that are known to be of interest to children, including, but not limited to, games, cartoons, music, and celebrities who appeal to children.

~~(7) "Taskforce" means the California Children's Data Protection Taskforce as established by Section 1798.99.32.~~

*(F) A significant amount of the audience of the online service, product, or feature is determined, based on internal company research, to be children.*

*(5) "Profiling" means any form of automated processing of personal information that uses personal information to evaluate*

*certain aspects relating to a natural person, including analyzing or predicting aspects concerning a natural person's performance at work, economic situation, health, personal preferences, interests, reliability, behavior, location, or movements.*

1798.99.31. (a) A business that provides an online service, product, or feature likely to be accessed by ~~a child~~ *children* shall ~~comply with~~ *take* all of the ~~following:~~ *following actions:*

(1) ~~Undertake~~ *(A) Before any new online services, products, or features are offered to the public, complete* a Data Protection Impact Assessment for any online service, product, or feature likely to be accessed by ~~a child~~ *children* and maintain documentation of this assessment as long as the online service, product, or feature is likely to be accessed by ~~a child. A report of the assessment must be provided to the agency within 12 months of the implementation of this act and reviewed every 24 months or before any new features are offered to the public.~~ *children. A business shall biennially review all Data Protection Impact Assessments.*

*(B) The Data Protection Impact Assessment required by this paragraph shall identify the purpose of the online service, product, or feature, how it uses children's personal information, and the risks of material detriment to children that arise from the data management practices of the business. The Data Protection Impact Assessment shall address, to the extent applicable, all of the following:*

*(i) Whether the design of the online product, service, or feature could harm children, including by exposing children to harmful, or potentially harmful, content on the online product, service, or feature.*

*(ii) Whether the design of the online product, service, or feature could lead to children experiencing or being targeted by harmful, or potentially harmful, contacts on the online product, service, or feature.*

*(iii) Whether the design of the online product, service, or feature could permit children to witness, participate in, or be subject to harmful, or potentially harmful, conduct on the online product, service, or feature.*

*(iv) Whether the design of the online product, service, or feature could allow children to be party to or exploited by a harmful, or potentially harmful, contact on the online product, service, or feature.*

*(v) Whether algorithms used by the online product, service, or feature could harm children.*

*(vi) Whether targeted advertising systems used by the online product, service, or feature could harm children.*

*(vii) Whether and how the online product, service, or feature uses system design features to increase, sustain, or extend use of the online product, service, or feature by children, including the automatic playing of media, rewards for time spent, and notifications.*

*(viii) Whether, how, and for what purpose the online product, service, or feature collects or processes sensitive personal information of children.*

*(2) Document any risk of material detriment to children that arises from the data management practices of the business identified in the Data Protection Impact Assessment required by paragraph (1) and create a timed plan to mitigate or eliminate the risk before the online service, product, or feature is accessed by children.*

*(3) Within 48 hours of a written request by the Attorney General, provide to the Attorney General a list of all Data Protection Impact Assessments the business has completed.*

*(4) (A) For any Data Protection Impact Assessment completed pursuant to paragraph (1), make the Data Protection Impact Assessment available, within five business days, to the Attorney General pursuant to a written request.*

*(B) Notwithstanding any other law, a Data Protection Impact Assessment is protected as confidential and shall be exempt from public disclosure, including under the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code).*

*(C) To the extent any information contained in a Data Protection Impact Assessment disclosed to the Attorney General includes information subject to attorney-client privilege or work product protection, disclosure pursuant to this paragraph shall not constitute a waiver of that privilege or protection.*

~~(2) Establish~~

*(5) Estimate* the age of ~~consumers~~ *child users* with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the ~~business,~~ *business* or apply the privacy and data protections afforded to children to all consumers.

~~(3)~~

*(6)* Configure all default privacy settings ~~offered~~ *provided to children* by the online service, product, or feature to ~~the~~ settings that offer a high level of ~~privacy protection offered by the business.~~ *privacy, unless the business can demonstrate a compelling reason that a different setting is in the best interests of children.*

~~(4)~~

*(7)* Provide any privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children likely to access that online service, product, or feature.

~~(5)~~

*(8)* If the online service, product, or feature allows the child's parent, guardian, or any other consumer to monitor the child's online activity or track ~~their~~ *the child's* location, provide an obvious signal to the child when ~~they are~~ *the child is* being monitored or tracked.

~~(6)~~

*(9)* Enforce published terms, policies, and community standards established by the business, including, but not limited to, privacy policies and those concerning children.

~~(7)~~

*(10)* Provide prominent, accessible, and responsive tools to help children, or ~~where~~ *if* applicable their ~~parent~~ *parents* or ~~guardian,~~ *guardians,* exercise their privacy rights and report concerns.

(b) A business that provides an online service, product, or feature likely to be accessed by ~~a child~~ *children* shall not take any of the following actions:

(1) Use the personal information of any child in a way that the business ~~knows~~ *knows,* or has reason to ~~know the online service, product, or feature more likely than not causes or contributes to a more than de minimis risk of harm~~ *know, is materially detrimental* to the physical health, mental health, or well-being of a child.

(2) Profile a child by ~~default.~~ *default unless both of the following criteria are met:*

*(A) The business can demonstrate it has appropriate safeguards in place to protect children.*

*(B) Either of the following is true:*

*(i) Profiling is necessary to provide the online service, product, or feature requested and only with respect to the aspects of the*

*online service, product, or feature with which the child is actively and knowingly engaged.*

*(ii) The business can demonstrate a compelling reason that profiling is in the best interests of children.*

(3) Collect, sell, share, or retain any personal information that is not necessary to provide ~~a~~ *an online* service, product, or feature with which a child is actively and knowingly engaged, or as described in paragraphs (1) to (4), inclusive, of subdivision (a) of Section ~~1798.145.~~ *1798.145, unless the business can demonstrate a compelling reason that the collecting, selling, sharing, or retaining of the personal information is in the best interests of children likely to access the online service, product, or feature.*

(4) ~~Use~~ *If the end user is a child, use* personal information for any reason other than ~~the~~ *a* reason ~~or reasons~~ for which that personal information was collected, ~~where the end user is a child.~~ *unless the business can demonstrate a compelling reason that use of the personal information is in the best interests of children.*

(5) Collect, sell, or share any precise geolocation information of children by default unless the collection of that precise geolocation information is *strictly* necessary for the business to provide the service, product, or feature requested and then only for the limited time that the collection of precise geolocation information is necessary to provide the service, product, or feature.

(6) Collect any precise geolocation information of a child without providing an obvious sign to the child for the duration of that collection that precise geolocation information is being collected.

(7) Use dark patterns to lead or encourage children to provide personal information beyond what is reasonably expected to provide that online service, product, or feature to forego privacy protections, or to take any action that the business ~~knows~~ *knows,* or has reason to ~~know more likely than not causes or contributes to a more than de minimis risk of harm~~ *know, is materially detrimental* to the child's physical health, mental health, or well-being.

(8) Use any personal information collected ~~or processed to establish~~ *to estimate* age or age range for any other ~~purpose,~~ *purpose* or retain that personal information longer than necessary to ~~establish~~ *estimate* age. Age assurance shall be proportionate to

the risks and data practice of ~~a~~ *an online* service, product, or feature.

*(c) A Data Protection Impact Assessment conducted by a business for the purpose of compliance with any other law complies with this section if the Data Protection Impact Assessment meets the requirements of this title.*

~~(c)~~

*(d)* This section shall become operative on July 1, 2024.

1798.99.32. (a) The ~~agency shall establish and convene a taskforce, the~~ California Children's Data Protection ~~Taskforce,~~ *Working Group is hereby created* to ~~evaluate~~ *deliver a report to the Legislature, pursuant to subdivision (e), regarding* best practices for the implementation of this ~~title, and to provide support to businesses, with an emphasis on small and medium businesses, to comply with this~~ title.

(b) ~~By April 1, 2023, the board shall appoint members of the taskforce. Taskforce~~ *Working Group* members shall consist of Californians ~~with expertise in the areas of privacy, physical health, mental health, and well-being, technology, and children's rights.~~ *with expertise in at least two of the following areas:*

*(1) Children's data privacy.*

*(2) Physical health.*

*(3) Mental health and well-being.*

*(4) Computer science.*

*(5) Children's rights.*

*(c) The working group shall select a chair and a vice chair from among its members and shall consist of the following 10 members:*

*(1) Two appointees by the Governor.*

*(2) Two appointees by the President Pro Tempore of the Senate.*

*(3) Two appointees by the Speaker of the Assembly.*

*(4) Two appointees by the Attorney General.*

*(5) Two appointees by the California Privacy Protection Agency.*

~~(c)~~

*(d)* The ~~taskforce~~ *working group shall take input from a broad range of stakeholders, including from academia, consumer advocacy groups, and small, medium, and large businesses affected by data privacy policies and* shall make recommendations *to the Legislature* on best practices regarding, ~~but not limited to,~~ *at minimum,* all of the following:

(1) Identifying online services, products, or features likely to be accessed by children.

(2) Evaluating and prioritizing the best interests of children with respect to their privacy, *physical* health, *and mental health* and ~~well-being, and issuing guidance to businesses on~~ *well-being and evaluating* how those interests may be furthered by the design, development, and implementation of an online service, product, or feature.

(3) Ensuring that age ~~verification~~ *assurance* methods used by businesses that provide online services, products, or features likely to be accessed by children are proportionate to the risks that arise from the data management practices of the business, privacy protective, and minimally invasive.

(4) Assessing and mitigating risks to children that arise from the use of an online service, product, or ~~feature, including specific issues businesses must address to perform a Data Protection Impact Assessment.~~ *feature.*

(5) Publishing privacy information, policies, and standards in concise, clear language suited for the age of children likely to access ~~that service or product.~~ *an online service, product, or feature.*

~~(d) By April 1, 2024, the agency, in consultation with the taskforce, shall adopt regulations, as necessary, to effectuate the purposes of this title.~~

*(6) How the working group and the Department of Justice may leverage the substantial and growing expertise of the California Privacy Protection Agency in the long-term development of data privacy policies that affect the privacy, rights, and safety of children online.*

*(e) On or before January 1, 2024, and every two years thereafter, the working group shall submit, pursuant to Section 9795 of the Government Code, a report to the Legislature regarding the recommendations described in subdivision (d).*

*(f) The members of the working group shall serve without compensation but shall be reimbursed for all necessary expenses actually incurred in the performance of their duties.*

*(g) This section shall remain in effect until January 1, 2030, and as of that date is repealed.*

*1798.99.33. (a) A business shall complete a Data Protection Impact Assessment on or before July 1, 2024, for any online*

*service, product, or feature likely to be accessed by children offered to the public before July 1, 2024.*

*(b) This section does not apply to an online service, product, or feature that is not offered to the public on or after July 1, 2024.*

1798.99.35. (a) Any business that violates this title shall be subject to an injunction and liable for a civil penalty of not more than two thousand five hundred dollars ($2,500) per affected child for each negligent violation or not more than seven thousand five hundred dollars ($7,500) per affected child for each intentional violation, which shall be assessed and recovered *only* in a civil action brought in the name of the people of the State of California by the Attorney General.

*(b) Any penalties, fees, and expenses recovered in an action brought under this title shall be deposited in the Consumer Privacy Fund, created within the General Fund pursuant to subdivision (a) of Section 1798.160, with the intent that they be used to fully offset costs incurred by the Attorney General in connection with this title.*

*(c) (1) If a business is in substantial compliance with the requirements of paragraphs (1) through (4), inclusive, of subdivision (a) of Section 1798.99.31, the Attorney General shall provide written notice to the business, before initiating an action under this title, identifying the specific provisions of this title that the Attorney General alleges have been or are being violated.*

*(2) If, within 45 days of the notice required by this subdivision, the business actually cures any noticed violation and provides the Attorney General a written statement that the alleged violations have been cured and that such further violations shall not occur, the Attorney General shall not bring a civil action against the business for any violation cured pursuant to this subdivision.*

~~(b)~~

*(d)* Nothing in this title shall be interpreted to serve as the basis for a private right of action under this ~~title.~~ *title or any other law.*

*(e) The Attorney General may solicit broad public participation and adopt regulations to clarify the requirements of this title.*

*1798.99.40. This title does not apply to the information or entities described in subdivision (c) of Section 1798.145.*

SEC. 3. The Legislature finds and declares that this act furthers the purposes and intent of the California Privacy Rights Act of 2020.

*SEC. 4. The Legislature finds and declares that Section 2 of this act, which adds Title 1.81.46 (commencing with Section 1798.99.28) to Part 4 of Division 3 of the Civil Code, imposes a limitation on the public's right of access to the meetings of public bodies or the writings of public officials and agencies within the meaning of Section 3 of Article I of the California Constitution. Pursuant to that constitutional provision, the Legislature makes the following findings to demonstrate the interest protected by this limitation and the need for protecting that interest:*

*The limitation is needed to encourage businesses, by protecting their proprietary interests, to mitigate risks to children online.*

O

# ATTACHMENT 5

AMENDED IN SENATE AUGUST 22, 2022

AMENDED IN SENATE AUGUST 11, 2022

AMENDED IN SENATE JUNE 30, 2022

AMENDED IN ASSEMBLY APRIL 26, 2022

CALIFORNIA LEGISLATURE—2021–22 REGULAR SESSION

# ASSEMBLY BILL No. 2273

**Introduced by Assembly Members Wicks, Cunningham, and Petrie-Norris**
(Coauthors: Senators Allen, Newman, and Stern)

February 16, 2022

An act to add Title ~~1.81.46~~ *1.81.47* (commencing with Section 1798.99.28) to Part 4 of Division 3 ~~of~~ *of, and to repeal Section 1798.99.32 of,* the Civil Code, relating to consumer privacy.

LEGISLATIVE COUNSEL'S DIGEST

AB 2273, as amended, Wicks. The California Age-Appropriate Design Code Act.

(1) Existing law, the California Privacy Rights Act of 2020, approved by the voters as Proposition 24 at the November 3, 2020, statewide general election, establishes the California Privacy Protection Agency. Existing law vests the agency with full administrative power, authority, and jurisdiction to implement and enforce the California Consumer Privacy Act of 2018 and requires the agency to be governed by a board. Existing law requires businesses to protect consumer privacy and information, make certain disclosures to consumers regarding a consumer's rights under the act in a specified manner, and disclose to consumers that a consumer has the right to request specific pieces of

information, including the categories of information those businesses have collected about that consumer.

Existing law, the Parent's Accountability and Child Protection Act, requires a person or business that conducts business in California and that seeks to sell specified products or services to take reasonable steps to ensure that the purchaser is of legal age at the time of purchase or delivery, including verifying the age of the purchaser. Existing law prohibits a person or business that is required to comply with these provisions from retaining, using, or disclosing any information it receives in an effort to verify age from a purchaser or recipient for any other purpose, except as specified, and subjects a business or person that violates these provisions to a civil penalty.

This bill would enact the California Age-Appropriate Design Code Act, which, commencing July 1, 2024, would, among other things, require a business that provides an online service, product, or feature likely to be accessed by children to comply with specified requirements, including ~~configuring~~ *a requirement to configure* all default privacy settings offered by the online service, product, or feature to the settings that offer a high level of privacy, unless the business can demonstrate a compelling reason that a different setting is in the best interests of children, and ~~providing~~ *to provide* privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children likely to access that online service, product, or feature. The bill would require a business, before any new online services, products, or features are offered to the public, to complete a Data Protection Impact Assessment, as defined, for any online service, product, or feature likely to be accessed by children and maintain documentation of this assessment as long as the online service, product, or feature is likely to be accessed by children. The bill would require a business to make a Data Protection Impact Assessment available, within 5 business days, to the Attorney General pursuant to a written request and would exempt a Data Protection Impact Assessment from public ~~disclose,~~ *disclosure,* as prescribed. The bill would prohibit a business that provides an online service, product, or feature likely to be accessed by children from taking proscribed action, including, if the end user is a child, using personal information for any reason other than a reason for which the personal information was collected, unless the business can demonstrate a compelling reason that use of the personal information is in the best interests of children.

This bill would create the California Children's Data Protection Working Group to deliver a report to the Legislature regarding best practices for the implementation of these provisions, as specified. The bill would require the members of the working group to have certain expertise, including in the areas of children's data privacy and children's rights. The bill would require the working group to take input from a broad range of stakeholders, including from academia, consumer advocacy groups, and small, medium, and large businesses affected by data privacy ~~policies~~ *policies*, and make prescribed recommendations on best practices, including identifying online services, products, or features likely to be accessed by children.

This bill would authorize the Attorney General to seek an injunction or civil penalty against any business that violates it provisions. The bill would hold violators liable for a civil penalty of not more than $2,500 per affected child for each negligent violation or not more than $7,500 per affected child for each intentional violation. The bill would require any penalties, fees, and expenses recovered in an action brought under the act to be deposited in the Consumer Privacy Fund with the intent that they be used to fully offset costs incurred by the Attorney General in connection with the act.

(2) The California Privacy Rights Act of 2020 authorizes the Legislature to amend the act to further the purposes and intent of the act by a majority vote of both houses of the Legislature, as specified.

This bill would declare that its provisions further the purposes and intent of the California Privacy Rights Act of 2020.

(3) Existing constitutional provisions require that a statute that limits the right of access to the meetings of public bodies or the writings of public officials and agencies be adopted with findings demonstrating the interest protected by the limitation and the need for protecting that interest.

This bill would make legislative findings to that effect.

Vote: majority. Appropriation: no. Fiscal committee: yes. State-mandated local program: no.

*The people of the State of California do enact as follows:*

SECTION 1. (a) The Legislature hereby finds and declares all of the following:

(1) The United Nations Convention on the Rights of the Child recognizes that children need special safeguards and care in all aspects of their lives.

(2) As children spend more of their time interacting with the online world, the impact of the design of online products and services on children's well-being has become a focus of significant concern.

(3) There is bipartisan agreement at the international level, in both the United States and in the State of California, that more needs to be done to create a safer online space for children to learn, explore, and play.

(4) Lawmakers around the globe have taken steps to enhance privacy protections for children on the understanding that, in relation to data protection, greater privacy necessarily means greater security and well-being.

(5) Children should be afforded protections not only by online products and services specifically directed at them, but by all online products and services they are likely to access. In order to help support the design of online products, services, and features, businesses should take into account the unique needs of different age ranges, including the following developmental stages: 0 to 5 years of age or "preliterate and early literacy"; 6 to 9 years of age or "core primary school years"; 10 to 12 years of age or "transition years"; 13 to 15 years of age or "early teens"; and 16 to 17 years of age or "approaching ~~adulthood".~~ *adulthood.*"

(6) In 2019, 81 percent of voters said they wanted to prohibit companies from collecting personal information about children without parental consent, and a 2018 poll of Californian parents and teens found that only 36 percent of teenagers and 32 percent of parents say that social networking internet websites do a good job explaining what they do with users' data.

(7) While it is clear that the same data protection regime may not be appropriate for children of all ages, children of all ages should nonetheless be afforded privacy and protection, and online products and services should adopt data protection regimes appropriate for children of the ages likely to access those products and services.

(8) Online services, products, or features that are likely to be accessed by children should offer strong privacy protections by design and by default, including by disabling features that profile

children using their previous behavior, browsing history, or assumptions of their similarity to other children, to offer detrimental material.

(9) Ensuring robust privacy protections for children by design is consistent with the intent of the Legislature in passing the California Consumer Privacy Act of 2018, and with the intent of the people of the State of California in passing the California Privacy Rights Act of 2020, which finds and declares that children are particularly vulnerable from a negotiating perspective with respect to their privacy rights.

(10) The California Privacy Protection Agency, created by the California Privacy Rights Act of 2020, has substantial and growing expertise that is integral to the development of privacy policy in California.

(b) Therefore, it is the intent of the Legislature to promote privacy protections for children pursuant to the California Age-Appropriate Design Code Act.

(c) It is the intent of the Legislature that the California Age-Appropriate Design Code promote innovation by businesses whose online products, services, or features are likely to be accessed by children by ensuring that those online products, services, or features are designed in a manner that recognizes the distinct needs of children at different age ranges.

(d) It is the intent of the Legislature that businesses covered by the California Age-Appropriate Design Code may look to guidance and innovation in response to the Age-Appropriate Design Code established in the United Kingdom when developing online services, products, or features likely to be accessed by children.

(e) It is the intent of the Legislature that the California Children's Data Protection Working Group consider the guidance provided by the Information Commissioner's Office in the United Kingdom when developing and reviewing best practices or other recommendations related to the California Age-Appropriate Design Code.

(f) It is the intent of the Legislature that the California Children's Data Protection Working Group and the Department of Justice leverage the substantial and growing expertise of the California Privacy Protection Agency in the implementation of this title.

~~SEC. 2. Title 1.81.46 (commencing with Section 1798.99.28) is added to Part 4 of Division 3 of the Civil Code, to read:~~

*SEC. 2. Title 1.81.47 (commencing with Section 1798.99.28) is added to Part 4 of Division 3 of the Civil Code, to read:*

TITLE ~~1.81.46.~~ *1.81.47.* THE CALIFORNIA AGE-APPROPRIATE DESIGN CODE ACT

1798.99.28. This title shall be known, and may be cited, as the California Age-Appropriate Design Code Act.

1798.99.29. The Legislature declares that children should be afforded protections not only by online products and services specifically directed at them but by all online products and services they are likely to access and makes the following findings:

(a) Businesses that develop and provide online services, products, or features that children are likely to access should consider the best interests of children when designing, developing, and providing that online service, product, or feature.

(b) If a conflict arises between commercial interests and the best interests of children, companies should prioritize the privacy, safety, and well-being of children over commercial interests.

1798.99.30. (a) For purposes of this title, the definitions in Section 1798.140 shall apply unless otherwise specified in this title.

(b) For the purposes of this title:

(1) "Child" or "children," unless otherwise specified, means a consumer or consumers who ~~is~~ *are* under 18 years of age.

(2) "Data Protection Impact Assessment" means a systematic survey to assess and mitigate risks that arise from the data management practices of the business to children who are reasonably likely to access the online service, product, or feature at issue that arises from the provision of that online service, product, or feature.

(3) "Default" means a preselected option adopted by the business for the online service, product, or feature.

(4) "Likely to be accessed by children" means it is reasonable to expect, based on ~~any of~~ the following ~~factors,~~ *indicators,* that the online service, product, or feature would be accessed by children:

(A) The online service, product, or feature is directed to children as defined by the Children's Online Privacy Protection Act (15 U.S.C. Sec. 6501 et seq.).

(B) The online service, product, or feature is determined, based on competent and reliable evidence regarding audience composition, to be routinely accessed by a significant number of children.

(C) An online service, product, or feature with advertisements marketed to children.

(D) An online service, product, or feature that is substantially similar or the same as an online service, product, or feature subject to subparagraph (B).

(E) An online service, product, or feature that has design elements that are known to be of interest to children, including, but not limited to, games, cartoons, music, and celebrities who appeal to children.

(F) A significant amount of the audience of the online service, product, or feature is determined, based on internal company research, to be children.

*(5) “Online service, product, or feature” does not mean any of the following:*

*(A) A broadband internet access service, as defined in Section 3100.*

*(B) A telecommunications service, as defined in Section 153 of Title 47 of the United States Code.*

*(C) The delivery or use of a physical product.*

~~(5)~~

*(6)* “Profiling” means any form of automated processing of personal information that uses personal information to evaluate certain aspects relating to a natural person, including analyzing or predicting aspects concerning a natural person’s performance at work, economic situation, health, personal preferences, interests, reliability, behavior, location, or movements.

1798.99.31. (a) A business that provides an online service, product, or feature likely to be accessed by children shall take all of the following actions:

(1) (A) Before any new online services, products, or features are offered to the public, complete a Data Protection Impact Assessment for any online service, product, or feature likely to be accessed by children and maintain documentation of this assessment as long as the online service, product, or feature is likely to be accessed by children. A business shall biennially review all Data Protection Impact Assessments.

(B) The Data Protection Impact Assessment required by this paragraph shall identify the purpose of the online service, product, or feature, how it uses children's personal information, and the risks of material detriment to children that arise from the data management practices of the business. The Data Protection Impact Assessment shall address, to the extent applicable, all of the following:

(i) Whether the design of the online product, service, or feature could harm children, including by exposing children to harmful, or potentially harmful, content on the online product, service, or feature.

(ii) Whether the design of the online product, service, or feature could lead to children experiencing or being targeted by harmful, or potentially harmful, contacts on the online product, service, or feature.

(iii) Whether the design of the online product, service, or feature could permit children to witness, participate in, or be subject to harmful, or potentially harmful, conduct on the online product, service, or feature.

(iv) Whether the design of the online product, service, or feature could allow children to be party to or exploited by a harmful, or potentially harmful, contact on the online product, service, or feature.

(v) Whether algorithms used by the online product, service, or feature could harm children.

(vi) Whether targeted advertising systems used by the online product, service, or feature could harm children.

(vii) Whether and how the online product, service, or feature uses system design features to increase, sustain, or extend use of the online product, service, or feature by children, including the automatic playing of media, rewards for time spent, and notifications.

(viii) Whether, how, and for what purpose the online product, service, or feature collects or processes sensitive personal information of children.

(2) Document any risk of material detriment to children that arises from the data management practices of the business identified in the Data Protection Impact Assessment required by paragraph (1) and create a timed plan to mitigate or eliminate the

risk before the online service, product, or feature is accessed by children.

(3) Within ~~48 hours~~ *three business days* of a written request by the Attorney General, provide to the Attorney General a list of all Data Protection Impact Assessments the business has completed.

(4) (A) For any Data Protection Impact Assessment completed pursuant to paragraph (1), make the Data Protection Impact Assessment available, within five business days, to the Attorney General pursuant to a written request.

(B) Notwithstanding any other law, a Data Protection Impact Assessment is protected as confidential and shall be exempt from public disclosure, including under the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code).

(C) To the extent any information contained in a Data Protection Impact Assessment disclosed to the Attorney General includes information subject to attorney-client privilege or work product protection, disclosure pursuant to this paragraph shall not constitute a waiver of that privilege or protection.

(5) Estimate the age of child users with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business or apply the privacy and data protections afforded to children to all consumers.

(6) Configure all default privacy settings provided to children by the online service, product, or feature to settings that offer a high level of privacy, unless the business can demonstrate a compelling reason that a different setting is in the best interests of children.

(7) Provide any privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children likely to access that online service, product, or feature.

(8) If the online service, product, or feature allows the child's parent, guardian, or any other consumer to monitor the child's online activity or track the child's location, provide an obvious signal to the child when the child is being monitored or tracked.

(9) Enforce published terms, policies, and community standards established by the business, including, but not limited to, privacy policies and those concerning children.

(10) Provide prominent, accessible, and responsive tools to help children, or if applicable their parents or guardians, exercise their privacy rights and report concerns.

(b) A business that provides an online service, product, or feature likely to be accessed by children shall not take any of the following actions:

(1) Use the personal information of any child in a way that the business knows, or has reason to know, is materially detrimental to the physical health, mental health, or well-being of a child.

(2) Profile a child by default unless both of the following criteria are met:

(A) The business can demonstrate it has appropriate safeguards in place to protect children.

(B) Either of the following is true:

(i) Profiling is necessary to provide the online service, product, or feature requested and only with respect to the aspects of the online service, product, or feature with which the child is actively and knowingly engaged.

(ii) The business can demonstrate a compelling reason that profiling is in the best interests of children.

(3) Collect, sell, share, or retain any personal information that is not necessary to provide an online service, product, or feature with which a child is actively and knowingly engaged, or as described in paragraphs (1) to (4), inclusive, of subdivision (a) of Section 1798.145, unless the business can demonstrate a compelling reason that the collecting, selling, sharing, or retaining of the personal information is in the best interests of children likely to access the online service, product, or feature.

(4) If the end user is a child, use personal information for any reason other than a reason for which that personal information was collected, unless the business can demonstrate a compelling reason that use of the personal information is in the best interests of children.

(5) Collect, sell, or share any precise geolocation information of children by default unless the collection of that precise geolocation information is strictly necessary for the business to provide the service, product, or feature requested and then only for the limited time that the collection of precise geolocation information is necessary to provide the service, product, or feature.

(6) Collect any precise geolocation information of a child without providing an obvious sign to the child for the duration of that collection that precise geolocation information is being collected.

(7) Use dark patterns to lead or encourage children to provide personal information beyond what is reasonably expected to provide that online service, product, or feature to forego privacy protections, or to take any action that the business knows, or has reason to know, is materially detrimental to the child's physical health, mental health, or well-being.

(8) Use any personal information collected to estimate age or age range for any other purpose or retain that personal information longer than necessary to estimate age. Age assurance shall be proportionate to the risks and data practice of an online service, product, or feature.

(c) *(1)* A Data Protection Impact Assessment conducted by a business for the purpose of compliance with any other law complies with this section if the Data Protection Impact Assessment meets the requirements of this title.

*(2) A single data protection impact assessment may contain multiple similar processing operations that present similar risks only if each relevant online service, product, or feature is addressed.*

(d) This section shall become operative on July 1, 2024.

1798.99.32. (a) The California Children's Data Protection Working Group is hereby created to deliver a report to the Legislature, pursuant to subdivision (e), regarding best practices for the implementation of this title.

(b) Working Group members shall consist of Californians with expertise in at least two of the following areas:

(1) Children's data privacy.

(2) Physical health.

(3) Mental health and well-being.

(4) Computer science.

(5) Children's rights.

(c) The working group shall select a chair and a vice chair from among its members and shall consist of the following 10 members:

(1) Two appointees by the Governor.

(2) Two appointees by the President Pro Tempore of the Senate.

(3) Two appointees by the Speaker of the Assembly.

(4) Two appointees by the Attorney General.

(5) Two appointees by the California Privacy Protection Agency.

(d) The working group shall take input from a broad range of stakeholders, including from academia, consumer advocacy groups, and small, medium, and large businesses affected by data privacy policies and shall make recommendations to the Legislature on best practices regarding, at minimum, all of the following:

(1) Identifying online services, products, or features likely to be accessed by children.

(2) Evaluating and prioritizing the best interests of children with respect to their privacy, physical health, and mental health and well-being and evaluating how those interests may be furthered by the design, development, and implementation of an online service, product, or feature.

(3) Ensuring that age assurance methods used by businesses that provide online services, products, or features likely to be accessed by children are proportionate to the risks that arise from the data management practices of the business, privacy protective, and minimally invasive.

(4) Assessing and mitigating risks to children that arise from the use of an online service, product, or feature.

(5) Publishing privacy information, policies, and standards in concise, clear language suited for the age of children likely to access an online service, product, or feature.

(6) How the working group and the Department of Justice may leverage the substantial and growing expertise of the California Privacy Protection Agency in the long-term development of data privacy policies that affect the privacy, rights, and safety of children online.

(e) On or before January 1, 2024, and every two years thereafter, the working group shall submit, pursuant to Section 9795 of the Government Code, a report to the Legislature regarding the recommendations described in subdivision (d).

(f) The members of the working group shall serve without compensation but shall be reimbursed for all necessary expenses actually incurred in the performance of their duties.

(g) This section shall remain in effect until January 1, 2030, and as of that date is repealed.

1798.99.33. (a) A business shall complete a Data Protection Impact Assessment on or before July 1, 2024, for any online

service, product, or feature likely to be accessed by children offered to the public before July 1, 2024.

(b) This section does not apply to an online service, product, or feature that is not offered to the public on or after July 1, 2024.

1798.99.35. (a) Any business that violates this title shall be subject to an injunction and liable for a civil penalty of not more than two thousand five hundred dollars ($2,500) per affected child for each negligent violation or not more than seven thousand five hundred dollars ($7,500) per affected child for each intentional violation, which shall be assessed and recovered only in a civil action brought in the name of the people of the State of California by the Attorney General.

(b) Any penalties, fees, and expenses recovered in an action brought under this title shall be deposited in the Consumer Privacy Fund, created within the General Fund pursuant to subdivision (a) of Section 1798.160, with the intent that they be used to fully offset costs incurred by the Attorney General in connection with this title.

(c) (1) If a business is in substantial compliance with the requirements of paragraphs (1) through (4), inclusive, of subdivision (a) of Section 1798.99.31, the Attorney General shall provide written notice to the business, before initiating an action under this title, identifying the specific provisions of this title that the Attorney General alleges have been or are being violated.

(2) If, within ~~45~~ *90* days of the notice required by this subdivision, the business ~~actually~~ cures any noticed violation and provides the Attorney General a written statement that the alleged violations have been ~~cured and that such further violations shall not occur, the Attorney General shall not bring a civil action against the business~~ *cured, and sufficient measures have been taken to prevent future violations, the business shall not be liable for a civil penalty* for any violation cured pursuant to this subdivision.

(d) Nothing in this title shall be interpreted to serve as the basis for a private right of action under this title or any other law.

(e) The Attorney General may solicit broad public participation and adopt regulations to clarify the requirements of this title.

1798.99.40. This title does not apply to the information or entities described in subdivision (c) of Section 1798.145.

SEC. 3. The Legislature finds and declares that this act furthers the purposes and intent of the California Privacy Rights Act of 2020.

SEC. 4. The Legislature finds and declares that Section 2 of this act, which adds Title 1.81.46 (commencing with Section 1798.99.28) to Part 4 of Division 3 of the Civil Code, imposes a limitation on the public's right of access to the meetings of public bodies or the writings of public officials and agencies within the meaning of Section 3 of Article I of the California Constitution. Pursuant to that constitutional provision, the Legislature makes the following findings to demonstrate the interest protected by this limitation and the need for protecting that interest:

The limitation is needed to encourage businesses, by protecting their proprietary interests, to mitigate risks to children online.

O

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| NETCHOICE, LLC D/B/A NETCHOICE, | ) | C-22-08861 BLF |
| PLAINTIFF, | ) | SAN JOSE, CALIFORNIA |
| VS. | ) | JANUARY 23, 2025 |
| ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, IN HIS OFFICIAL CAPACITY, | ) | PAGES 1-119 |
| DEFENDANT. | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF: DAVIS WRIGHT TREMAINE LLP
BY: AMBIKA A. KUMAR
920 FIFTH AVENUE, SUITE 3300
SEATTLE, WASHINGTON 98104

BY: ADAM S. SIEFF
865 SOUTH FIGUEROA STREET, 24TH FLOOR
LOS ANGELES, CALIFORNIA 90017

APPEARANCES CONTINUED ON THE NEXT PAGE

OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

APPEARANCES (CONTINUED)

FOR THE PLAINTIFF: DAVIS WRIGHT TREMAINE LLP
BY: DAVID M. GOSSETT
1301 K STREET NW, SUITE 500 EAST
WASHINGTON, D.C. 20005

FOR THE DEFENDANT: CALIFORNIA DEPARTMENT OF JUSTICE
ATTORNEY GENERAL'S OFFICE
BY: KRISTIN A. LISKA
455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CALIFORNIA 94102

SAN JOSE, CALIFORNIA JANUARY 23, 2025

P R O C E E D I N G S

(COURT CONVENED AT 9:03 A.M.)

THE COURT: GOOD MORNING, EVERYONE. WELCOME. PLEASE BE SEATED.

ALL RIGHT. LET'S CALL THE CASE AND GET YOUR APPEARANCES.

THE CLERK: CALLING CASE 22-8861, NETCHOICE LLC VERSUS BONTA.

COUNSEL, PLEASE STATE YOUR APPEARANCES.

MS. KUMAR: AMBIKA KUMAR FROM DAVIS WRIGHT TREMAINE FOR THE PLAINTIFF. ALONG WITH ME IS ADAM SIEFF, ALSO FROM DAVIS WRIGHT TREMAINE, AND DAVID GOSSETT FROM THE SAME FIRM.

THE COURT: GOOD MORNING. WELCOME.

MS. LISKA: GOOD MORNING, YOUR HONOR.

KRISTIN LISKA FOR THE ATTORNEY GENERAL FROM THE A.G.'S OFFICE.

THE COURT: GOOD MORNING.

ALL RIGHT. WE HAVE A LOT TO TALK ABOUT TODAY. I'VE ACTUALLY CLEARED THE CALENDAR OF OTHER CASES SO THAT WE WOULDN'T BE RUSHED, AND I WANT TO BE ABLE TO GIVE YOU A SUMMARY, OR MAYBE A LIST OF QUESTIONS ON THE VARIOUS ISSUES. BUT I CERTAINLY WELCOME YOUR ARGUMENT ON ALL OF THE ISSUES THAT HAVE BEEN RAISED.

IT LOOKS TO ME AS THOUGH, IN THE AFTERMATH OF THE NINTH CIRCUIT'S DECISION IN THIS CASE SENDING IT BACK TO ME,

THAT PLAINTIFFS HAVE REGROUPED, FILED AN AMENDED COMPLAINT, AND BASICALLY COME FORWARD WITH A COMPLETELY NEW THEORY FOR THE CASE AND FOR THE PRELIMINARY INJUNCTION.

THAT DOESN'T DIRECTLY MAP ON TO THE NINTH CIRCUIT'S REMAND, ALTHOUGH THAT WAS NOT A MANDATE PER SE.

SO THE COVERAGE DEFINITION CHALLENGE APPEARS TO BE COMPLETELY NEW TO THE CASE. AND I'M NOT CRITICAL OF THAT, IT'S AN AMENDED COMPLAINT, AND ALL OF THAT IS FAIR GAME.

BUT I DON'T BELIEVE THE NINTH CIRCUIT HAD ANY OPPORTUNITY TO REVIEW THAT THEORY, NOR DID I.

IS THAT CORRECT, MS. KUMAR?

MS. KUMAR: I THINK WE DID POINT OUT IN THE -- WHEN WE WERE HERE THE LAST TIME, YOUR HONOR, THAT THE COVERAGE DEFINITION WAS CONTENT BASED AND WE HAD A, YOU KNOW, A DIALOGUE ABOUT THAT.

THE COURT: BUT I DIDN'T RULE ON THAT.

MS. KUMAR: NO, YOU DIDN'T, YOUR HONOR.

THE COURT: OKAY. AND THE NINTH CIRCUIT CERTAINLY DIDN'T.

MS. KUMAR: THAT'S RIGHT.

THE COURT: OKAY. ALL RIGHT. THANK YOU. THAT'S HELPFUL.

SO I -- I THINK THIS IS AN IMPORTANT ISSUE, I THINK IT MAY BE PERSUASIVE, BUT I HAVE A NUMBER OF QUESTIONS ABOUT IT.

I THINK THE REYES CASE IS THE BEST AUTHORITY OF THE THREE

CASES, INCLUDING FITCH AND YOST. ONE, I THINK IT'S MORE SIMILAR AND, TWO, IT'S POST-MOODY, SO IT HAD THAT ADVANTAGE.

AND I THINK -- WHAT I'M NOT SURE OF IS WHETHER YOU'VE PROPERLY ANALYZED THE FACIAL CHALLENGE REQUIREMENT OF ARTICULATING EVERY APPLICATION OF THE STATUTE.

YOU SAY THAT THE COVERAGE DEFINITION COVERS EVERY APPLICATION OF THE LAW, AND IN A SENSE, YOU'RE RIGHT BECAUSE IT IS THE GATING PROVISION, WHO'S COVERED AND WHO ISN'T.

BUT MY QUESTION TO YOU IS THAT DO I STILL NEED TO ANALYZE EACH OF THE CHALLENGED SECTIONS FOR THE -- TO UNDERSTAND THE FULL APPLICATION UNDER THIS ISSUE THAT YOU'VE RAISED OF THE COVERAGE DEFINITION?

SO THAT'S MY -- THAT'S MY FIRST QUESTION.

AND IT REALLY THEN GOES TO WHETHER STRICT SCRUTINY WOULD APPLY TO MY EVALUATION OF EVERY SECTION, OR WHETHER I HAVE TO LOOK MORE SPECIFICALLY AT THE CHALLENGED SECTIONS TO DETERMINE WHETHER I'D BE LOOKING AT STRICT SCRUTINY OR INTERMEDIATE SCRUTINY, AND I THINK WE ALL GENERALLY CAN APPRECIATE THAT THAT MAKES OR BREAKS YOUR CASE, THE LEVEL OF SCRUTINY THAT I'M GOING TO APPLY.

MOVING ON, THOUGH, TO YOUR CHALLENGE OF THE INDIVIDUAL PROVISIONS, YOU FIRST RAISE THE ISSUE OF WHETHER YOU CAN EXTRACT A PARTICULAR APPLICATION OF THE STATUTE AND STILL CHALLENGE IT UNDER FACIAL INFIRMITY UNDER JOHN DOE #1 VERSUS REED.

SO IT'S CLEARLY -- YOU CLEARLY BROUGHT UP THE RIGHT CASE AND I'VE LOOKED AT THAT VERY CAREFULLY.

HERE'S MY QUESTION FOR YOU: I'M NOT SURE THAT YOU HAVEN'T FALLEN INTO THE SAME TRAP THAT THE PLAINTIFFS DID IN JOHN DOE #1, AND THAT IS TO REVERT TO A TRADITIONAL AS-APPLIED CHALLENGE AS THE LAW IS APPLIED TO OUR MEMBERS, TO EACH OF US, AS OPPOSED TO SHOWING THE MORE GENERALIZED HARM.

AND SO THAT'S -- THAT'S MY FIRST CONCERN AT THAT HIGH LEVEL AS TO WHETHER YOU'VE EVEN MADE THIS OUT, AND I THINK MS. LISKA DEALS WITH THAT ISSUE IN HER OPPOSITION, AND ALSO APPROPRIATELY ADDS, WHAT EXACTLY ARE YOU TALKING ABOUT, WHICH I THINK -- AND IN A -- YOU'RE SAYING THAT IT'S, IT'S LIMITED APPLICATIONS, LIKE I RULED BEFORE. BUT YOU DON'T ACTUALLY TELL ME WHAT YOU MEAN BY THAT. I THINK THAT'S A BIG PROBLEM HERE.

SO I HAVE CONCERNS AT THAT HIGH LEVEL ON WHETHER YOU'VE PROPERLY BRIEFED IT.

GOING ON, THOUGH, ON THE FIRST ISSUE, POLICY ENFORCEMENT UNDER 31(A)(9), YOU SAY THAT THIS IS LIMITED TO CONTENT POLICIES. I'M NOT SURE I KNOW WHAT THAT MEANS.

THE STATUTE USES COMMUNITY STANDARDS. IT'S HARD TO KNOW WHAT THAT MEANS, TOO, BUT I THINK WE ALL HAVE A PRETTY GOOD SENSE.

I ACTUALLY -- I WANT TO BE SURE THAT THIS ISN'T REALLY LIMITED TO SOCIAL MEDIA COMPANIES THAT ARE COVERED BY THE ACT, BECAUSE THEN WE GET AWAY, AGAIN, FROM THE JOHN DOE #1 ANALYSIS.

HOWEVER -- AND I'M GOING TO JUMP AHEAD HERE BECAUSE I'M GOING TO GIVE IT SHORT SHRIFT LATER -- I ACTUALLY THINK THIS IS THE ONLY SECTION WHERE SECTION 230 PREEMPTION MAY APPLY, SO I WANT TO FOCUS ON THAT.

ON YOUR INFORMATION RESTRICTIONS UNDER 31(B)(1)-(4), I DON'T THINK YOU'VE PROPERLY ANALYZED THAT UNDER JOHN DOE #1 TO SHOW ME ALL APPLICATIONS. I THINK YOU'RE REALLY FOCUSSING ON THE EFFECT ON YOUR MEMBERS, AND I DON'T THINK THAT YOU'VE -- I DON'T THINK YOUR EVIDENCE SUPPORTS IT, AND I DON'T THINK YOUR BRIEFING SUPPORTS IT.

ON DARK PATTERNS, YOU AGAIN SAY THIS IS SPECIFIC APPLICATIONS. I'M NOT QUITE SURE WHICH ONES THEY ARE.

AND FOR SOME OF THESE ITEMS THAT ARE CONSIDERED DARK PATTERNS, LIKE AUTOPLAY, I DON'T THINK YOU'VE ADDRESSED THE ISSUE OF WHOSE EXPRESSION IS AT ISSUE, AND I DON'T KNOW THAT IN EVERY INSTANCE IT'S YOUR MEMBERS' EXPRESSION THAT'S AT ISSUE, AS OPPOSED TO THE USER'S EXPRESSION.

ON AGE ESTIMATION, THIS GOT COMPLICATED THIS LAST WEEK WITH THE FREE SPEECH COALITION VERSUS PAXTON ARGUMENT. I KNOW THAT CASE IS QUITE DIFFERENT, BUT I THINK -- I HAVE A FEW CONCERNS.

FIRST OF ALL, IT APPEARS TO ME IN FREE SPEECH COALITION THAT THE TEXAS LAW WAS AN AGE VERIFICATION STATUTE, AND THAT'S VERY DIFFERENT IN ITS APPLICATION THAN WHAT APPEARS -- WHAT IS EXPRESSLY AN AGE ESTIMATION REQUIREMENT HERE.

AND SO TWO THINGS. I BELIEVE THAT ONE OF THE DISCUSSION POINTS BEFORE THE SUPREME COURT WAS THE LEVEL OF SCRUTINY TO APPLY TO AGE VERIFICATION, AND THE COURT MEMBERS DISCUSSED WHETHER THE LEVEL OF SCRUTINY WOULD CHANGE DEPENDING ON THE BURDEN ON THE USERS AND WHETHER THE BURDEN WAS THE ADULT POPULATION OR THE CHILD POPULATION.

SO A LOT OF THAT IS DIFFERENT, BUT WE HAVE TO PAY ATTENTION TO WHAT THE LEVEL OF SCRUTINY WOULD BE.

HERE, THOUGH, BECAUSE IT'S AGE ESTIMATION, I DON'T THINK YOU'VE SHOWN ME ALL APPLICATIONS OF AGE ESTIMATION, AND I DON'T THINK I CAN DETERMINE WHETHER SPEECH IS INVOLVED IN AGE ESTIMATION.

IT SEEMS TO ME THAT THE DEGREE OF CERTAINTY OF THE ACCURACY OF THE AGE ESTIMATION DEPENDS ON THE DEGREE OF HARM TO THE CHILD, AND THE DEGREE OF HARM TO THE CHILD -- THIS ALL FOLDS BACK ON ITSELF -- DEPENDS ON THE AGE OF A CHILD. SO WHAT IS HARMFUL TO A FIVE-YEAR-OLD MIGHT BE JUST FINE FOR A SEVENTEEN-YEAR-OLD. THAT'S A LOT WRAPPED INTO THIS STATUTE.

BUT I DON'T THINK YOU'VE SHOWN ME EVERY APPLICATION. I DON'T THINK YOU'VE SHOWN -- YOU HAVEN'T DISCUSSED AT ALL -- WHAT I THINK THE ACT WOULD ALLOW WOULD BE USING THE INFORMATION THAT THE COMPANY ALREADY HAS ABOUT AGE OF ITS USERS TO GIVE AGE ESTIMATION, AND -- BECAUSE A LOT OF THIS COULD BE -- LET'S TAKE A CARTOON, BECAUSE THAT'S CALLED OUT IN THE STATUTE AS SOMETHING THAT IS LIKELY TO BE ACCESSED BY CHILDREN.

WELL, IF WE'RE LOOKING AT A ROAD RUNNER AND WILE E. COYOTE CARTOON, WHEN THE SAFE FALLS ON WILE E. COYOTE, ONE COULD CONSIDER THAT VIOLENT.

HOWEVER, THE DEGREE OF HARM TO A FIVE-YEAR-OLD IS PROBABLY SMALL. I'M NOT SCARRED. I SAW IT WHEN I WAS FIVE. AND THE DEGREE OF HARM TO A SEVENTEEN-YEAR-OLD IS NON-EXISTENT.

AND SO I -- IT SEEMS TO ME THAT THERE IS -- THERE IS A GREAT REACH OF THE AGE ESTIMATION THAT ACTUALLY DOESN'T INVOLVE SPEECH. IT DEALS WITH WHAT'S ALREADY KNOWN TO THE COMPANY. THEY DON'T HAVE TO GET ANY VERIFICATION. THAT'S NOT EVEN REQUIRED.

SO I DON'T THINK YOU'VE ACTUALLY MET THE NINTH CIRCUIT'S STANDARD ON AGE ESTIMATION, AND I WILL TELL YOU, I COME AT AGE ESTIMATION WITH A LITTLE BIT OF A VISCERAL REACTION TO NOT LIKING IT, BUT THAT DOESN'T MATTER. IT'S JUST -- YOU KNOW, IT DOES BURDEN PEOPLE.

BUT UNLIKE THE TEXAS CASE, THIS STATUTE IS NOT FOCUSSED ON MATERIAL THAT IS ALREADY ILLEGAL TO PROVIDE TO CHILDREN, WHEREAS THE TEXAS STATUTE, THEY DON'T ACTUALLY CALL IT ILLEGAL, BUT I -- I MEAN, I THINK IN CALIFORNIA IT'S ILLEGAL FOR PORNOGRAPHY TO BE MADE AVAILABLE TO CHILDREN WHERE IT'S LEGAL FOR ADULTS.

SO I THINK THAT'S A BIG DIFFERENCE.

AND THE LAST THING I'LL SAY ABOUT AGE ESTIMATION -- AND I'D LIKE YOUR VIEW ON IT -- SHOULD I SIMPLY DEFER ON THIS UNTIL

THE SUPREME COURT ISSUES ITS DECISION?

I ACTUALLY THINK THAT MIGHT BE THE WISEST THING TO DO AND TO HAVE FURTHER GUIDANCE ON SOMETHING THAT -- AND I'M SURE YOU READ OR LISTENED TO THE ARGUMENT, AS WE DID, AND, YOU KNOW, MY CRYSTAL BALL IS NO BETTER THAN YOURS, BUT I KNOW THAT CERTAIN ISSUES ARE BEFORE THE COURT.

ALL RIGHT. LET ME GO ON, AND THEN WE'RE GOING TO GET TO YOUR PART, WHICH IS WHERE WE'RE GOING TO SPEND THE REST OF THE MORNING.

I DON'T THINK THIS IS THE TIME TO REALLY EVALUATE VAGUENESS OF THE STATUTE. I DON'T THINK I HAVE ENOUGH BRIEFNESS ON IT.

YOU RAISE IN PASSING THE AS-APPLIED CHALLENGE, BUT YOU HAVEN'T DEVELOPED THAT AT ALL. THERE ARE FIVE LINES. I DON'T THINK YOU'VE DONE THE ANALYSIS TO JUST TELL ME, FOR ALL THE REASONS WE SAID BEFORE, AND SO I DON'T THINK IT'S BRIEFED.

SEVERABILITY. SO THIS IS ANOTHER ISSUE THAT I THINK IS WORTHY OF SOME DISCUSSION. I'M NOT SURE I BUY THE FUNCTIONAL SEVERABILITY ARGUMENT, BUT THE VOLITIONAL SEVERABILITY ARGUMENT LIMITED, AS I READ YOUR BRIEF, TO THE ENJOINED DPIA PROVISIONS, WHICH CATCH UP IN THAT INJUNCTION THE NOTICE AND CURE PROVISION.

SO YOU FOCUS ON THE NOTICE AND CURE PROVISION, AND I READ THE LEGISLATIVE HISTORY THAT YOU PROVIDED TO ME.

I AGREE WITH MS. LISKA THAT THE COMMENTS ON THE FLOOR BY

THE AUTHOR ARE INTERESTING, BUT THEY'RE NOT -- THAT ALONE IS NOT ENOUGH TO BE CERTAIN OF THE LEGISLATIVE INTENT.

WHAT I'M FOCUSSING ON, THOUGH, AND I NEED -- I MAY NEED SOME MORE INFORMATION FROM YOU UNLESS I JUST MISSED IT IN THE DOCUMENTS, I THINK YOUR ARGUMENT THAT THE LEGISLATURE TWICE VOTED AND EITHER -- AND DEFEATED, ESSENTIALLY, OR DID NOT PASS THIS LAW WHEN IT DID NOT HAVE THE 90-DAY NOTICE AND CURE PROVISION IS VERY PERSUASIVE LEGISLATIVE HISTORY.

BUT IN READING THE DOCUMENTS YOU DID GIVE ME, WHICH WERE THE ANALYSTS' SUMMARIES, THERE WERE A NUMBER OF AMENDMENTS THAT WERE THEN VOTED ON, AND I COULDN'T -- WHEN THE BILL WENT INTO THE SUSPENSE FILE, I DIDN'T HAVE A COPY OF THE BILL THAT DIDN'T PASS. I DON'T BELIEVE YOU GAVE THAT TO ME, SO I COULDN'T ACTUALLY HAVE EYES ON THAT IT DID NOT HAVE A NOTICE AND CURE PROVISION, AND I WOULD NEED TO SEE THAT.

THEN -- AND I THINK THAT WAS AUGUST 11.

ON AUGUST 22ND, YOU PROVIDE ME ANOTHER VOTE WHERE IT FAILED WITH A 45-DAY NOTICE PROVISION -- I MAY HAVE THE DATES WRONG ON THIS -- A 45-DAY NOTICE PROVISION THAT ALSO FAILED, AND THEN IT WAS AMENDED AGAIN FOR THE 90-DAY.

I WOULD NEED EACH -- THAT'S THEN THREE ITERATIONS OF THE BILL, I BELIEVE, AND I WOULD LIKE TO SEE EACH OF THOSE. AND THOSE ARE EASY TO COME BY, BUT I -- I WENT ON WESTLAW, I COULDN'T PICK THEM UP, AND I KNEW YOU WOULD BE MORE THAN GLAD TO PROVIDE THAT TO ME. SO I NEED THAT.

BUT I AM VERY -- I THINK THAT COULD BE ENOUGH, BUT I WANT TO HEAR MORE FROM MS. LISKA ON THAT.

SECTION 230 GENERALLY, I REALLY THINK THE ONLY PIECE -- THAT I'M INCLINED TO LOOK AT FOR SECTION 230 PREEMPTION IS THE ENFORCEMENT OF THE COMMUNITY STANDARDS. I THINK THE COMMERCE CLAUSE IS NOT -- I DON'T THINK THAT'S A GOOD CLAIM, AND THE COPPA -- I CAN'T TELL AT THIS POINT THAT THIS ACT WOULD BE INCOMPATIBLE WITH COPPA -- WHICH IS ALL CAPITALS, C-O-P-P-A.

I THINK THAT'S ENOUGH FOR ME.

I THINK I'VE COVERED THE WATERFRONT. I WANTED TO JUST LET YOU KNOW MY THINKING, WHERE MY QUESTIONS ARE.

I KNOW I'VE GIVEN SHORT SHRIFT, MS. KUMAR, TO SOME OF YOUR ARGUMENTS. THAT'S AN INDICATION OF HOW I'M LOOKING AT THEM.

YOU'RE HERE TO PERSUADE ME OTHERWISE, AND I WELCOME YOUR ARGUMENT ON ANY OF THE ISSUES, BUT IN PARTICULAR THESE ISSUES THAT I'VE RAISED.

SO AS I SAID, WE REALLY HAVE ALL MORNING. I'M GLAD TO GIVE YOU A SIGNIFICANT AMOUNT OF TIME TO MAKE YOUR INITIAL PRESENTATIONS. I'M SURE I'LL INTERRUPT WITH QUESTIONS, BUT I WOULD LIKE TO LET YOU DO THAT.

I'M GOING TO ASK THAT YOU COME FORWARD TO THE PODIUM TO MAKE YOUR ARGUMENT, AND LET'S MAKE SURE THAT MICROPHONE IS AVAILABLE FOR YOU.

MS. KUMAR: WHICH ONE?

THE COURT: TIFFANY WILL SUGGEST ONE FOR YOU.

THE CLERK: THIS ONE HERE.

THE COURT: THANK YOU.

MS. KUMAR: THANK YOU, YOUR HONOR, FOR YOUR INSIGHTFUL COMMENTS, AND I WILL TRY TO ADDRESS THEM AS I GO THROUGH MY OPENING.

TIME AND AGAIN, THE STATE HAS CLAIMED THAT AB 2273 IS ABOUT PRIVACY, NOT SPEECH, BUT THE NINTH CIRCUIT DISAGREED. IT HELD THAT THE DPI REGIME, THE CENTERPIECE OF A LAW, REQUIRES BUSINESSES TO IDENTIFY --

THE COURT: COULD YOU SLOW DOWN A LITTLE BIT?

MS. KUMAR: YEAH.

THE NINTH CIRCUIT DID NOT DISTURB THIS COURT'S CONCLUSIONS AS TO THE REST OF THE LAW. INSTEAD, IT DIRECTED THE COURT TO APPLY THE ANALYSIS SET FORTH IN THE MOODY VERSUS NETCHOICE CASE, A DECISION THAT CAME DOWN AFTER THIS COURT'S RULING, BUT BEFORE THE NINTH CIRCUIT'S REVIEW.

APPLYING MOODY, THE LAW CANNOT STAND, AND I WILL TAKE YOU THROUGH THE MOODY ANALYSIS AS WE PRESENTED IT IN OUR BRIEFS.

BUT AS YOU'LL SEE, THE REST OF THE LAW IS JUST AS MUCH ABOUT CENSORSHIP AS THE DPI PROVISIONS, DEMANDING THAT COVERED SERVICES PUBLISH ONLY WHAT'S IN THE, QUOTE, BEST INTERESTS OF CHILDREN OR NOT MATERIALLY DETRIMENTAL TO THEM, JUST A COUPLE TERMS THAT MAKE THE LAW HOPELESSLY VAGUE.

AND I DO WANT TO TALK ABOUT VAGUENESS BECAUSE I DO THINK IT IS A REAL PROBLEM WITH THIS LAW, AND I CAN EXPLAIN WHY.

SHOULD THE COURT AGREE WITH ME, IT NEED NOT REACH THE REMAINING CHALLENGE ATTENTION UNDER COPPA, 230, AND THE DORMANT COMMERCE CLAUSE.

AND TO THE EXTENT THE COURT WANTS TO HEAR ABOUT THOSE ISSUES, HOWEVER, MY COLLEAGUE, DAVID GOSSETT, IS PREPARED TO TALK ABOUT THEM.

THE COURT: THANK YOU.

MS. KUMAR: OF COURSE, AS THE COURT ACKNOWLEDGED, WE DON'T NEED TO REACH ANY OF THIS IF YOU RULE THAT THE CURE PERIOD IS NOT SEVERABLE.

WE THINK IT'S -- YOU KNOW, WHICHEVER GROUND YOU RULE ON, THERE IS AMPLE BASIS FOR YOU TO ENJOIN ENFORCEMENT OF THE LAW AS CHALLENGED BY NETCHOICE.

SO I'LL START WITH THE COVERAGE DEFINITION ARGUMENT, AND THERE'S TWO FRAMINGS, AS YOU PICKED UP ON. ONE IS, DOES THE COVERAGE DEFINITION ITSELF RENDER THE LAW SUBJECT TO STRICT SCRUTINY? AND TWO IS, ARE THE INDIVIDUAL PROVISIONS, AS NARROWED, CAN THEY BE ENJOINED IF YOU DON'T RULE ON THE COVERAGE DEFINITION ARGUMENT?

SO STARTING WITH THE COVERAGE DEFINITION ARGUMENT, EVERY APPLICATION OF THE PROVISIONS IN 31(A) AND 31(B) HINGE ON THE DEFINITION OF LIKELY TO BE ACCESSED BY A CHILD.

THAT DEFINITION IDENTIFIES BUSINESSES BASED ON THE CONTENT THEY PUBLISH. BY THEIR DESIGN ELEMENTS THAT ARE KNOWN TO BE OF INTEREST TO CHILDREN, SUCH AS GAMES, CARTOONS, AND MUSIC, DOES

THE AUDIENCE, I.E., THE RECIPIENT OF SPEECH, COMPRISE CHILDREN?

I THINK YOUR HONOR HAS MADE IT THAT FAR AND YOUR QUESTION IS, WELL, WHAT DO I DO NOW?

THE COURT: UM-HUM.

MS. KUMAR: THE STATE HAS IDENTIFIED NO APPLICATIONS OF 30(A)(1) -- I MEAN 30(A) OR (A)(1) OR (B) -- SORRY. I'VE GOT MY NUMBERS WRITTEN DOWN WRONG HERE -- OF THOSE SECTIONS.

THAT DOES NOT IMPLICATE CONTENT. WE CAN'T THINK OF ANY.

EVERYONE AGREES THAT CHILDREN ARE SPENDING ENORMOUS AMOUNTS OF TIME ONLINE, AND EVERYONE AGREES THAT TIME IS SPENT CONSUMING CONTENT, SOCIAL MEDIA, GAMES, VIDEO SHARING SITES.

PERHAPS CHILDREN ALSO SPEND TIME BUYING THINGS ONLINE, BUT THAT IS EXPRESSLY EXEMPTED FROM THE STATUTE.

THE COURT: UM-HUM.

MS. KUMAR: MAYBE CHILDREN -- YOU KNOW, WE WERE, YOU KNOW, SCRATCHING OUR HEADS THINKING, LIKE, WHAT POSSIBLE NON-EXPRESSIVE APPLICATION DOES THIS HAVE? AND WE COULDN'T REALLY THINK OF ANYTHING.

THE COURT: SO, YOU KNOW, WITH THE DPIA, IT, IN A SENSE, WAS EASY, BECAUSE THERE WAS THE PRODUCTION OF A REPORT, SO IT WAS FOR SPEECH.

AND SO THIS IS DIFFERENT, AND IT'S AS EASY A CASE AS THE DPIA WAS. SO THE NINTH CIRCUIT WAS VERY CLEAR -- WELL, AGAIN, IT WAS SORT OF A GATEWAY ISSUE. EVERY COVERED SERVICE MUST PREPARE THIS REPORT, AND THAT'S SPEECH, AND IT'S COMPELLED

SPEECH. SO IT GETS STRICT SCRUTINY AND IT'S OUT.

THIS IS NOT COMPELLED SPEECH, BUT IT'S -- YOU'RE REALLY RELYING ON IT BEING CONTENT BASED UNDER THE REED CASE; ISN'T THAT CORRECT?

MS. KUMAR: CORRECT. YES, THAT'S RIGHT, WE DO THINK IT, AND WE THINK REYES IS A GOOD CASE FOR US AND IT DOES EXPLAIN THAT ANALYSIS.

THE REALITY IS BY HINGING APPLICATION OF THE LAW ON THIS CONTENT-BASED STANDARD, THE LAW IMPOSES A DISPROPORTIONATE BURDEN ON PUBLISHERS, PERIOD.

AND WHETHER THAT BURDEN IS SOMETHING LIKE, YOU KNOW, ENFORCING CONTENT POLICIES OR WHETHER IT'S SOMETHING LIKE GEOLOCATION, WHAT HAVE YOU, THAT -- BECAUSE THE BURDEN ONLY FALLS ON PUBLISHERS OF CONTENT THAT IS LIKELY TO APPEAL TO CHILDREN --

THE COURT: ARE ALL COVERED SERVICES PUBLISHERS OF CONTENT?

MS. KUMAR: I -- YES, BUT I WOULD --

THE COURT: BECAUSE WE HAVE TO TALK ABOUT EVERY APPLICATION.

MS. KUMAR: WELL, LET'S GO BACK -- LET'S TALK ABOUT THAT IN THE MOODY CASE, EVERY APPLICATION, RIGHT?

I DON'T -- YOU KNOW, IF THE COURT IS ENVISIONING A PROCESS WHERE IT IDENTIFIES EVERY HYPOTHETICAL POSSIBLE APPLICATION OF THE LAW, I DON'T THINK THAT'S WHAT MOODY REQUIRES, AND MOODY

DID NOT, YOU KNOW, REPRESENT A WHOLESALE CHANGE OR REJECTION --

THE COURT: SO YOU JUST SAID FOR PUBLISHERS, THERE'S A DISPROPORTIONATE BURDEN.

MS. KUMAR: RIGHT.

THE COURT: SO I'M REALLY ASKING IN A MORE GENERAL CATEGORICAL SENSE, ARE THERE SERVICES COVERED BY THE LAW THAT ARE NOT PUBLISHERS?

MS. KUMAR: WE CAN'T THINK OF VERY MANY. ONE EXAMPLE WE COULD THINK ABOUT IS, LET'S SAY, UBER OR RIDE SHARING SERVICES. ARGUABLY -- YOU KNOW, WE DON'T KNOW IF CHILDREN ARE USING UBER. THAT INFORMATION IS NOT IN THE RECORD.

BUT EVEN IF WE ASSUME THAT CHILDREN ARE USING UBER, WE CAN ALSO LOGICALLY ASSUME THAT THEY SPEND VERY LITTLE TIME ON UBER, THEY'RE ORDERING A RIDE AND THEN THEY'RE GETTING IN A CAR; WHEREAS THE STATE'S DECLARATION AND THE PURPOSE OF THE LAW IS ALL FOCUSSED ON CONTENT, ON STOPPING CHILDREN FROM SEEING HARMFUL CONTENT.

THE COURT: WELL, YOU DON'T -- I DON'T THINK IT'S FAIR TO FLIP INTO THE PURPOSE OF THE LAW WHEN WE'RE TRYING TO ANALYZE THE LAW ITSELF. WHEN I GET TO SEVERANCE, I CAN DO THAT.

MS. KUMAR: OKAY.

THE COURT: BUT NOT HERE.

MS. KUMAR: OKAY.

THE COURT: SO I'M JUST -- SO I AGREE WITH YOU THAT

MOODY DOES NOT DIRECT THE COURTS TO HAVE AN EXHAUSTIVE LIST. THAT'S NOT POSSIBLE.

BUT YOU REALLY FLAG THE ISSUE WHEN YOU SAY -- WHEN YOU IDENTIFY PUBLISHERS. AND I -- YOU KNOW, I THINK THAT IT MAY BE THAT IN THE GATING ANALYSIS HERE -- LET ME JUST GET THE STATUTE IN FRONT OF ME -- THAT IN DETERMINING WHETHER A COMPANY OR A SERVICE IS COVERED, THAT -- SO IT'S A BUSINESS THAT PROVIDES AN ONLINE SERVICE, SO THAT'S BEYOND PUBLISHERS, SO EVERY ONLINE SERVICE HAS TO LOOK AT THIS STATUTE, SO IT'S A SERVICE, A PRODUCT, OR FEATURE LIKELY TO BE ACCESSED BY CHILDREN.

LET'S TAKE UBER. UBER -- I DON'T KNOW HOW HIGH THE STANDARD IS FOR LIKELIHOOD, BUT THERE'S SOME LIKELIHOOD -- SHALL TAKE THE FOLLOWING ACTIONS, AND THEN THERE ARE EXEMPTIONS.

SO IF YOU'RE SELLING A PRODUCT, YOU'RE EXEMPT. IF YOU ARE A MEDICAL -- I THINK MEDICAL IS EXEMPT.

MS. KUMAR: THAT'S RIGHT.

THE COURT: BUT I DON'T KNOW THAT THESE -- IT'S NOT LIKE REYES THAT WAS LIMITED TO SOCIAL MEDIA.

MS. KUMAR: I -- SO A COUPLE OF THINGS, YOUR HONOR.

YOU KNOW, WE COULD SIT HERE AND THINK, WELL, WHAT COULD IT POSSIBLY BE?

I THINK THAT THAT'S AN INDICATION OF WHAT IT REALLY IS, RIGHT? THE STATE HASN'T COME BACK AND SAID, WELL, YOUR HONOR, IT'S UBER, IT'S SOME OTHER SERVICE, AND THE REASON -- THERE'S A

REASON FOR THAT. THAT'S BECAUSE THIS LAW IS ALL ABOUT SPEECH, AND RESPECTFULLY, I KNOW YOU SAID WE CAN'T GO BACK TO THE PURPOSE OF LAW, BUT I THINK YOU CAN.

THE COURT: UM-HUM.

MS. KUMAR: AND THE REASON FOR THAT IS BECAUSE COURTS DON'T JUST LOOK AT THE TEXT OF THE STATUTE TO DETERMINE IF IT'S CONTENT BASED AND IMPERMISSIBLE. THEY ALSO LOOK AT THE LAW'S PURPOSE.

THE COURT: OKAY.

MS. KUMAR: AND WE DON'T REALLY -- I MEAN, FROM THE STATE, WE DON'T HAVE -- I MEAN, THE ONLY INFORMATION WE HAVE FROM THE STATE COMES IN THE FORM OF LEGISLATIVE HISTORY AS TO WHAT MIGHT BE COVERED, OR FROM THE DECLARATION OF DR. RADESKY, RIGHT? SO WE DON'T HAVE TO LOOK AT THE LEGISLATIVE HISTORY. YOU CAN LOOK AT DR. RADESKY'S DECLARATION WHICH HAS MORE THAN -- YOU KNOW, THE FIRST DECLARATION -- THE SECOND DECLARATION, THEY WERE MUCH MORE --

THE COURT: SLOW DOWN, PLEASE.

MS. KUMAR: SORRY. THE SECOND DECLARATION -- THE SUPPLEMENTAL RADESKY DECLARATION --

THE COURT: THAT'S NOT SLOWER.

MS. KUMAR: I'M SORRY.

THAT SECOND DECLARATION IS MUCH -- IT'S MUCH MORE CAREFUL, RIGHT? YOU SHOULD GO BACK TO THE FIRST DECLARATION, WHICH IS STILL IN THE RECORD AND STILL THE EVIDENCE THAT IS BEFORE THE

COURT, AND SHE MENTIONS CONTENT MORE THAN 70 TIMES, RIGHT?

AND WE HAVE GONE THROUGH, YOUR HONOR, AND GIVEN YOU CITATIONS TO THE DECLARATIONS --

THE COURT: YES.

MS. KUMAR: -- WHERE THAT -- WHERE WHAT SHE'S -- LIKE, SHE DOES NOT MENTION -- SHE DOESN'T MENTION UBER. SHE DOESN'T MENTION ANYTHING ELSE.

WE STUDIED -- WE CITED A PEW RESEARCH STUDY THAT CHILDREN, WHAT THEY'RE DOING ONLINE, THEY'RE CONSUMING CONTENT BY AND LARGE, AND I DON'T THINK YOUR HONOR HAS TO THINK ABOUT WHAT ARE THE FRINGE APPLICATIONS, THE HANDFUL OF APPLICATIONS THAT MAYBE ARE NON-EXPRESSIVE?

AND I SAY THAT BECAUSE THE STANDARD IS, DO THE, YOU KNOW, IMPERMISSIBLE APPLICATIONS OF THE LAW SUBSTANTIALLY EXCEED ANY PLAINLY LEGITIMATE SWEEP?

SO EVEN IF WE SAY A SMALL FRACTION --

THE COURT: AND THAT'S FINE, BECAUSE IT IS -- I NEED -- SO I THINK MS. LISKA RAISES THIS IN HER OPPOSITION, TOO.

IT'S NOT HER BURDEN. IT'S YOURS. IT'S YOUR BURDEN TO SHOW THE FULL SWEEP OF THE LAW, AND THEN TO IDENTIFY THE IMPERMISSIBLE PORTION, AND TO THEN DETERMINE WHETHER THAT SUBSTANTIALLY OUTWEIGHS THE GENERAL SWEEP OF THE LAW.

SO YOU NEED TO SET IT UP, AND I THINK YOU HAVE.

AND I -- AND, YOU KNOW, IT'S -- YOU HAVE GENERALLY SAID,

AND I THINK YOUR IDENTITY -- IDENTIFICATION OF ALL THOSE PARAGRAPHS IN THE RADESKY DECLARATION MAKE A GOOD POINT.

SO LET'S MOVE ON FROM THAT.

MS. KUMAR: OKAY. WELL, THE OTHER THING I WOULD SAY, YOUR HONOR, IS YOU CAN LOOK AT THE STATUTORY TEXT AND THE EXCLUSIONS, YOU KNOW, IT'S NOT JUST --

THE COURT: YES.

MS. KUMAR: -- PRODUCTS OR HEALTH CARE, IT'S ALSO TELECOM SERVICE, BROADBAND SERVICE.

I THINK IT REFLECTS A DELIBERATE ISOLATION OF PUBLISHERS, AND I THINK -- AND SO I THINK THAT IT'S NOT -- YOU DON'T HAVE TO -- I MEAN, I DON'T EVEN -- YOU'RE RIGHT, IT IS OUR BURDEN TO SHOW THE APPLICATIONS OF THE STATUTE, AND WE'VE DONE THE BEST THAT WE CAN, AND WE'VE EVEN POSITED FOR THE STATE A NON-EXPRESSIVE APPLICATION.

IT'S NOT THE STATE'S JOB TO PROVE IT, BUT CERTAINLY THE STATE COULD COME FORWARD AND SAY, WELL, HERE ARE THE OTHER MANY APPLICATIONS OF THE LAW THAT HAVE NOTHING TO DO WITH EXPRESSION.

THE STATE HASN'T DONE IT, BECAUSE THERE ARE NONE.

SO TURNING TO THE LEVEL OF SCRUTINY, BECAUSE THE -- BECAUSE ALL THOSE PROVISIONS ARE TRIGGERED BY A CONTENT BASED DEFINITION, OUR ARGUMENT IS THAT THEY'RE ALL SUBJECT TO STRICT SCRUTINY AND THAT THEY CAN'T SURVIVE STRICT SCRUTINY.

DO YOU HAVE TO GO THROUGH EACH PROVISION AND ANALYZE? I

DON'T KNOW THAT MOODY ANSWERS THAT QUESTION, AND I THINK THAT NO MATTER WHAT YOU DO, THERE -- STRICT SCRUTINY IS NOT SATISFIED.

AND I WILL ALSO SAY, YOUR HONOR, I HEARD YOU SAY THIS CASE, YOU KNOW, RISES AND FALLS WITH THE STANDARD THAT APPLIES.

I DON'T THINK IT DOES. AND I SAY THAT BECAUSE I DON'T THINK INTERMEDIATE SCRUTINY --

THE COURT: WELL, I DID RULE LAST TIME THAT EVEN UNDER INTERMEDIATE SCRUTINY --

MS. KUMAR: THAT'S RIGHT.

THE COURT: -- THE STATE HAD NOT MET ITS BURDEN. I CERTAINLY DID.

MS. KUMAR: YEAH. AND I THINK YOU COULD MAKE THE SAME RULING HERE.

SO WE TALKED LAST TIME I WAS HERE ABOUT WHAT IS THE STATE'S INTEREST? THE STATE'S -- I THINK WE'RE CLEAR FROM THE CASES, LIKE BROWN, THAT THE STATE DOESN'T ACTUALLY HAVE AN INTEREST IN LIMITING MINORS FROM SEEING PROTECTED SPEECH.

THE COURT: IT'S -- YOU KNOW, I STRUGGLE WITH A STATUTE LIKE THIS WHERE I THINK IT'S FAIR TO ASSUME THAT ALL OF THE SPEECH IS LEGAL. CHILDREN ARE LEGALLY ENTITLED TO SEE THIS SPEECH.

I DON'T THINK THIS STATUTE IS ABOUT PORNOGRAPHY, AND I DON'T THINK THIS STATUTE IS ABOUT -- WELL, IT'S NOT ABOUT PRODUCTS. SO THERE ARE LOTS OF PRODUCTS KIDS CAN'T BUY, BUT

THIS EXEMPTS THE PURCHASE OF PRODUCTS, SO ALCOHOL, DRUGS, ALL OF THAT.

BUT, YOU KNOW, I COMMENTED IN MY FIRST ORDER -- AND YOU RAISE THE *NEW YORK TIMES* AMICUS BRIEF. YOU REFERENCE IT IN YOUR PAPERS.

IF A NEWSPAPER IS PUBLISHING AN ARTICLE ABOUT THE HAMAS ISRAELI WAR AND SHOWS PHOTOGRAPHS OF THE DEVASTATION AND THE DEATH TOLL, IT'S REASONABLE TO SAY THAT'S HARMFUL -- LIKELY TO BE HARMFUL TO MINORS. IT'S LEGAL. IT'S LEGAL.

AND I GUESS MY -- AND SO I -- I'M REALLY TROUBLED BY THE BREADTH OF THIS STATUTE FOR MATERIAL THAT IS LEGAL FOR CHILDREN TO SEE AT ANY AGE.

MS. KUMAR: I THINK THAT'S RIGHT.

AND I THINK THAT IS ANOTHER REASON, OR ONE REASON YOUR HONOR MENTIONED THAT THE PAXTON FREE SPEECH COALITION CASE IS -- I DON'T THINK YOU NEED TO WAIT FOR IT.

THE COURT: YEAH.

MS. KUMAR: BECAUSE THAT CASE IS ABOUT PORNOGRAPHY WEBSITES.

THE COURT: RIGHT.

MS. KUMAR: AND THAT WAS CLEAR FROM THE ARGUMENT WHEN THERE WAS A LOT OF CONVERSATION ABOUT PORNOGRAPHY.

THE COURT: YES, THERE WAS A LOT. THERE WAS A LOT. I KNOW THAT.

BUT THE COURT SEEMED INTERESTED -- QUESTIONED WHETHER THEY

SHOULD MAKE A MORE GENERAL RULING THAT APPLIES MORE BROADLY. AND IT'S -- I -- IN FACT, IN MOST CASES THE COURT WOULD MAKE A NARROWER RULING AND NOT A BROADER ONE BECAUSE THEY DON'T HAVE THE FACTS BEFORE THEM.

MS. KUMAR: RIGHT. AND I THINK WHAT WAS TELLING ABOUT THAT ARGUMENT WAS THAT THERE WAS NO -- NOBODY SAID THE FIFTH CIRCUIT GOT IT RIGHT. NOBODY SAID RATIONAL BASIS REVIEW IS THE RIGHT STANDARD. THEY ALL AGREE THAT STRICT SCRUTINY WAS THE RIGHT STANDARD.

THE COURT: UM-HUM.

MS. KUMAR: AND SO WHILE THE COURT WAS MUSING ABOUT AGE VERIFICATION, AGE ESTIMATION, YOU KNOW, IT'S CLEAR ONE THING THEY'RE GOING TO DO IS TELL THE FIFTH CIRCUIT, YOU SHOULD HAVE APPLIED STRICT SCRUTINY.

NOW, IS THERE A DILUTED VERSION OF STRICT SCRUTINY THEY MIGHT -- I DON'T -- IT SEEMS UNLIKELY TO ME. OF COURSE WE'RE ALL READING TEA LEAVES HERE. IT SEEMS UNLIKELY TO ME. THEY'RE GOING TO REMAND AND SAY, YOU APPLIED THE WRONG STANDARD, AND THE RIGHT STANDARD, HOWEVER, IS MET, SO YOU CAN GO.

AND SO, YOU KNOW, I DON'T THINK THAT CASE IS NECESSARILY GOING TO IMPLICATE THE ISSUES IN THIS CASE.

SO AS I WAS SAYING, YOU KNOW, THE CONTENT IS BY AND LARGE PROTECTED. I THINK WE HAVE A PEW STUDY THAT TALKED ABOUT LESS THAN 1 PERCENT OF --

THE COURT: YES.

MS. KUMAR: -- YOU KNOW, CONTENT ON SERVICES CHILDREN USE IS UNPROTECTED.

SO TURNING TO, YOU KNOW, THE -- I WOULD SAY THAT THERE'S NO LEGITIMATE INTEREST AT THE OUTSET, OUT OF THE GATE. YOU CAN RULE ON THAT BASIS THAT SCRUTINY IS NOT MET.

AND YOU CAN ALSO LOOK AT THE STUDIES THAT DR. RADESKY HAS CITED AND THE DECLARATION OF DR. FERGUSON -- BY THE WAY, I WAS PUZZLED WHY DR. RADESKY DIDN'T ACTUALLY DISCUSS DR. FERGUSON'S DECLARATION AND EXPLAIN WHAT WAS WRONG WITH IT.

THE COURT: UM-HUM.

MS. KUMAR: BUT JUST TO GIVE YOU A FEW EXAMPLES, THE STUDIES SHOW CORRELATION, NOT CAUSATION, RIGHT? SO, FOR EXAMPLE, DEPRESSION MIGHT BE ASSOCIATED WITH INCREASED SOCIAL MEDIA USE, BUT IS THAT BECAUSE DEPRESSION IS COMMON AMONG LONELY KIDS WHO ARE GOING TO BE MORE LIKELY TO GO ON SOCIAL MEDIA TO MAKE CONNECTIONS?

SIMILARLY, THE STUDIES ON SLEEP AND SOCIAL MEDIA USE, WE KNOW THAT KIDS WHO ARE OLDER -- MY 12 YEAR OLD IS STARTING TO DO IT, STARTING TO SLEEP IN AND HER CIRCADIAN RHYTHMS HAVE SHIFTED. AND THAT'S WHY, WHEN SOUTH KOREA HAD A SHUT DOWN LAW OF, I THINK IT WAS, I DON'T KNOW IF IT WAS GAMING OR DEVICES AFTER A CERTAIN PERIOD OF TIME, THEY ENDED UP GETTING RID OF IT. WHY? BECAUSE IT WASN'T LEADING TO MORE SLEEP. MAYBE IT WASN'T LEADING TO MORE SLEEP BECAUSE KIDS WERE GOING TO BE AWAKE ANYWAYS.

THE COURT: YEAH.

MS. KUMAR: SO I THINK -- AND EVEN UNDER INTERMEDIATE SCRUTINY, YOU KNOW, YOU HAVE TO CONSIDER THAT.

THE COURT: SO I -- IT WAS INTERESTING TO ME THAT THE NINTH CIRCUIT, IN EVALUATING THE DPIA, DETERMINED THAT STRICT SCRUTINY HAD TO BE APPLIED, RECOGNIZING THAT IT WAS CAUTIOUS FOR ME TO APPLY A LOWER STANDARD, BUT MAKING IT CLEAR THAT IT WAS -- THAT WAS INCORRECT.

DO YOU THINK THAT THAT WAS THE NINTH CIRCUIT AS ACTUALLY SAYING THAT STRICT SCRUTINY APPLIES TO EVERYTHING IN THIS STATUTE IF SPEECH AND EXPRESSION ARE IMPLICATED?

MS. KUMAR: I THINK -- I DON'T THINK THE COURT REACHED THAT CONCLUSION, BUT I THINK IT WOULD REACH THAT CONCLUSION, BECAUSE THE REASON FOR, YOU KNOW, REMANDING TO THIS COURT WAS TO CONSIDER HOW MANY OF THE APPLICATIONS ARE REGULATIONS OF EXPRESSION VERSUS NOT.

IT WAS NOT TO REDETERMINE WHETHER -- YOU KNOW, WHETHER IT'S STRICT OR INTERMEDIATE SCRUTINY.

BUT I UNDERSTAND WHY YOUR HONOR, YOU KNOW, APPLIED THE INTERMEDIATE SCRUTINY STANDARD, AND IT IS A VERY COMMON THING FOR COURTS TO DO.

THE COURT: AT A PRELIMINARY INJUNCTION, IT'S VERY COMMON.

MS. KUMAR: YEAH.

THE COURT: AND, YOU KNOW, SO I MIGHT -- AND I MIGHT

EVEN DO THAT AGAIN.

MS. KUMAR: AND I WOULDN'T FAULT YOU FOR THAT.

THE COURT: YEAH.

MS. KUMAR: YOU KNOW, I THINK IT -- YOU KNOW, I DON'T THINK INTERMEDIATE SCRUTINY HAS BEEN MET HERE, AND THAT'S JUST, ARE THE HARMS REAL?

THERE'S STILL THE REST OF THE SCRUTINY TEST, INTERMEDIATE OR STRICT.

THE COURT: RIGHT.

MS. KUMAR: SO, YOU KNOW, ARE THE HARMS ACTUALLY ALLEVIATED? SO ONE OF THE MAIN HARMS THAT THE STATE HAS IDENTIFIED IS THAT THERE'S TOO MUCH SCREEN TIME, KIDS ARE SPENDING TOO MUCH TIME ON THEIR -- CONSUMING CONTENT.

AND SO, YOU KNOW, NATURALLY THE, THE REACTION OF DR. RADESKY IS, WELL, LET'S DO -- LET'S TAKE AWAY THE THINGS THAT MAKE THEM ENGAGE IN MORE TIME, LIKE NOTIFICATIONS OR WHAT HAVE YOU.

BUT THE REALITY IS, THAT'S A VERY CONCLUSORY -- I MEAN, I THINK IN -- I THINK SHE HAD, LIKE, THREE PARAGRAPHS OF OPINIONS AFTER SETTING FORTH THE FACTS.

BUT THE REALITY IS, I CAN THINK OF LOTS OF EXAMPLES OF WHEN TAKING THESE FEATURES AWAY WOULD ACTUALLY LEAD TO INCREASED SCREEN TIME. SO, FOR EXAMPLE, A BOOK IS SET TO BE RELEASED ON A SPECIFIED DAY. A CHILD CAN EITHER RECEIVE A NOTIFICATION WHEN IT'S AVAILABLE, OR THE CHILD COULD, WITHOUT

NOTIFICATIONS, HIT REFRESH ON THE BROWSER UNTIL SHE SEES IT. THAT'S ONE EXAMPLE.

TAKE ANOTHER EXAMPLE. A CHILD IS RESEARCHING THE UKRAINE CONFLICT FOR A SCHOOL ESSAY. ORDINARILY THE CHILD WOULD SEE RECOMMENDATIONS FOR SPECIFIC RELATED CONTENT. WITHOUT THOSE RECOMMENDATIONS, THE CHILD WOULD HAVE TO SPEND MORE TIME ONLINE LOOKING FOR MORE SOURCES.

SO IT'S NOT OBVIOUS TO ME, AND I THINK DR. FERGUSON, YOU KNOW, REENFORCES THIS, THAT IT'S AS SIMPLE AS ONLINE CONTENT HARMS CHILDREN, YOU KNOW, WE ENCOURAGE THEM TO BE ON -- YOU KNOW, NETCHOICE'S MEMBERS ENCOURAGE THEM TO BE ONLINE TOO MUCH, AND WE SHOULD TAKE AWAY THE FEATURES THAT, YOU KNOW, WE THINK, WE SURMISE ARE WHAT ARE LEADING TO THE ALLEGED PROBLEM.

AND EVEN IF YOU GET THROUGH ALL OF THAT, THERE'S A TAILORING PROBLEM, AND THERE DOES HAVE TO BE SOME TAILORING. IT'S NOT INTERMEDIATE SCRUTINY, IT'S NOT RATIONAL BASIS, IT'S NOT A FREE-FOR-ALL. YOU CAN'T DO WHATEVER YOU WANT. THERE HAS TO BE SOME TAILORING.

AND WHAT COULD BE MORE NARROWLY TAILORED?

WELL, THE NINTH CIRCUIT GAVE US SOME EXAMPLES. THE NINTH CIRCUIT SAID YOU CAN INCENTIVIZE COMPANIES TO OFFER VOLUNTARY CONTENT FILTERS OR APPLICATION BLOCKERS, EDUCATE FAMILIES ABOUT THEM, AND RELY ON EXISTING LAW.

IT IS NO ANSWER THAT EXISTING LAW IS NOT ENFORCED, RIGHT? IT SHOULD BE ENFORCED.

NOR IS AN ANSWER TO SAY THAT PARENTS OR TEENS WON'T USE THE TOOLS. IN FACT, DR. RADESKY, IN HER SUPPLEMENTAL JURISDICTION -- SUPPLEMENTAL DECLARATION ADMITS, WE DON'T KNOW WHETHER THESE MEASURES -- I'M QUOTING. WE DON'T KNOW WHETHER THESE MEASURES ACTUALLY MITIGATE HARMS.

AND WHY IS THAT? THAT'S BECAUSE THE GOVERNMENT IS NOT OVERSEEING IT.

THAT CAN'T -- THAT CAN'T POSSIBLY BE THE STANDARD THAT WE FIND ACCEPTABLE, FOR THE GOVERNMENT TO BE LOOKING OVER OUR SHOULDERS AS TO WHAT CONTENT WE'RE SEEING OR NOT SEEING.

THE COURT: IT'S INTERESTING, WHEN YOU LIST THE THINGS THAT THE NINTH CIRCUIT SUGGESTS COULD BE MORE NARROWLY TAILORED REMEDIES, NOTICE AND CURE WOULD JUMP RIGHT OUT THERE, WOULDN'T IT?

MS. KUMAR: YES, IT SURE WOULD.

AND ALL OF THESE ALTERNATIVES THAT THE NINTH CIRCUIT POSITED ARE LESS RESTRICTIVE ALTERNATIVES FOR THE REST OF THE LAW, TOO, AND THAT'S WHY I THINK, YOU KNOW, WE -- YOU'RE ENGAGED IN THE RIGHT INQUIRY, WHICH IS, WHAT ARE THE APPLICATIONS? WHAT ARE THE POSSIBLE NON-EXPRESSIVE APPLICATIONS?

AND I -- IT CAN'T BE THE CASE THAT A PLAINTIFF WHO IS UNABLE TO IDENTIFY NON-EXPRESSIVE APPLICATIONS --

THE COURT: I GET THAT.

MS. KUMAR: OKAY.

AND SO IN OUR VIEW, BECAUSE THE STATE HAS FAILED TO SHOW THAT ANY APPLICATION OF 31(A) AND 31(B) SATISFIES STRICT OR EVEN INTERMEDIATE SCRUTINY, ALL APPLICATIONS, OR NEARLY ALL OF THEM, ARE IMPERMISSIBLE.

UNDER MOODY THERE IS NO OR VERY LITTLE PLAINLY LEGITIMATE SWEEP, AND THAT CAN BE THE END OF YOUR INQUIRY ALTOGETHER.

BUT IF THE COURT DISAGREES, THE COURT CAN MOVE ON TO THE NARROW INDIVIDUAL PROVISION CHALLENGES.

FOR THESE CHALLENGES, NETCHOICE HAS ISOLATED THE APPLICATIONS THAT -- THE ONLY APPLICATIONS -- ONLY THE APPLICATIONS THAT ARE ALL IMPERMISSIBLE. IN OTHER WORDS, UNDER THE MOODY ANALYSIS, THE NUMERATOR, WHAT WE CHALLENGE, AND THE DENOMINATOR, THE RELEVANT SCOPE, ARE THE SAME, SUCH THAT THERE IS NO LEGITIMATE SWEEP.

THE COURT: SO THIS IS WHERE I THINK YOUR BRIEFING FALLS SHORT, AND LET ME JUST SAY THAT WHEN I READ YOUR BRIEFING, I DO IT THROUGH THE LENS OF HOW I COULD DRAFT AN ENFORCEABLE INJUNCTION, AND YOU DON'T GIVE ME THAT.

AND YOUR PROPOSED ORDER DOESN'T GIVE ME THAT LANGUAGE, EITHER.

MS. KUMAR: I THINK IT DOES. BUT EVEN IF IT DOES NOT --

THE COURT: I THINK -- BECAUSE I THINK YOUR PROPOSED INJUNCTION ASSUMES YOU'RE GOING TO WIN THE COVERAGE DEFINITION, AND YOU DID NOT GIVE ME LANGUAGE --

MS. KUMAR: OH, I SEE, YEAH.

THE COURT: -- IF YOU ONLY WIN HERE. SO THERE'S ONLY SO MUCH YOU CAN DO IN A PROPOSED ORDER.

MS. KUMAR: THAT'S RIGHT.

THE COURT: BUT I DON'T HAVE IT.

MS. KUMAR: WELL, I'M HAPPY TO PROVIDE IT. BUT I WOULD -- IN LIEU OF THAT, I WOULD DIRECT THE COURT TO THE PRAYER FOR RELIEF IN THE AMENDED COMPLAINT.

THE COURT: AND I DID LOOK AT THAT, AND BECAUSE YOU -- BECAUSE YOU DID DIRECT ME THERE AT THE GET-GO.

LET ME -- BUT I WAS NOT -- LET'S SEE HERE.

(PAUSE IN PROCEEDINGS.)

THE COURT: SO I THINK THAT YOUR PRAYER FOR RELIEF IS WHAT THE JOHN DOE #1 COURT SAID WAS THE TRADITIONAL AS-APPLIED STANDARD.

SO I'M LOOKING AT PRAYER FOR RELIEF NUMBER 5 ON 31(A)(9). YOU SAY -- YOU'RE ASKING FOR RELIEF TO THE EXTENT THAT SECTION APPLIES TO COVERED SERVICES, CONTENT POLICIES, AND COMMUNITY STANDARDS.

THAT'S THE ONE THAT I THINK I MIGHT BE ABLE TO ENFORCE.

BUT THEN WE GO ON TO 6, WHICH IS YOUR -- THE INDIVIDUAL PROVISIONS TO THE EXTENT THOSE SECTIONS APPLY TO COVERED SERVICES, USE OF PERSONAL INFORMATION TO PUBLISH CONTENT, OR MAKE INFORMATION AVAILABLE AND VIOLATE THE FIRST AND FOURTEENTH AMENDMENT.

I THINK THAT'S AS APPLIED. YOU'RE TALKING ABOUT -- I DON'T KNOW HOW -- IF I WERE TO WRITE THAT, THERE'S NOTHING TO ENFORCE.

MS. KUMAR: I DON'T THINK THAT'S RIGHT. I MEAN, WE CAN TALK ABOUT HOW DO YOU -- HOW DOES YOUR HONOR CRAFT AN INJUNCTION.

THE COURT: SO IN JOHN DOE #1, THE INJUNCTION, IF IT HAD BEEN SUCCESSFUL, WOULD HAVE BEEN TO ENJOIN DISCLOSURE UNDER THE PUBLIC RECORDS ACT OF PETITIONS FOR BALLOT -- SIGNATURES OF BALLOT PETITIONS, OR THE WHOLE PETITION PERHAPS. THAT WAS VERY SPECIFIC.

THIS IS -- I DON'T KNOW WHEN THERE'S GOING TO BE A USE OF PERSONAL INFORMATION TO PUBLISH CONTENT. IT MIGHT BE, IT MIGHT NOT BE.

I DON'T KNOW WHEN THERE'S GOING TO BE A USE OF PERSONAL INFORMATION TO MAKE INFORMATION AVAILABLE.

THAT'S THE THING. I THINK IT'S -- WHEN I DO IT, I GET TO DO IT. BUT I CAN'T IN TERMS OF A COVERED SERVICE.

AND I THINK THIS NECESSARILY GETS DOWN TO THE MANNER IN WHICH EACH OF YOUR MEMBERS ACTUALLY UTILIZES OR IS RESTRICTED BY THE APPLICATION OF THE LAW, AND I THINK THAT IS NOT -- I THINK THAT'S THE DIVISION THE SUPREME COURT MADE IN JOHN DOE #1 IS THAT THIS -- YOUR PRAYERS FOR RELIEF REALLY DISSEMBLE INTO THE AS-APPLIED STANDARD, WHICH YOU HAVE NOT MADE OUT.

I DO THINK ON THE POLICY -- I THINK THERE'S A LOT TO SAY

ABOUT THE CONTENT POLICIES AND COMMUNITY STANDARDS PORTION. THAT'S THE ONE I'M LOOKING AT.

SO THAT'S A PROBLEM THAT I HAVE IS THAT I -- AND I THINK THE ATTORNEY GENERAL IS CORRECT THAT I DON'T ACTUALLY KNOW WHAT YOU'RE TALKING ABOUT THERE.

MS. KUMAR: SO LET ME TRY TO PERSUADE YOU OTHERWISE.

THE COURT: OKAY. THANK YOU.

MS. KUMAR: SO, YOU KNOW, I THINK THAT -- YOU KNOW, THE ATTORNEY GENERAL'S POSITION IS YOU'RE TRYING TO SHORT CIRCUIT MOODY, AND THE REALITY IS THESE CHALLENGES TO SPECIFIC PROVISIONS OF LAWS AS APPLIED TO EVERYBODY ARE ROUTINE.

THE COURT: UM-HUM.

MS. KUMAR: SO JOHN DOE VERSUS REED IS ONE EXAMPLE. IT DIDN'T GO -- IT DOESN'T -- YOU KNOW, SCRUTINY WAS MET THERE.

BUT ANOTHER EXAMPLE IS BONTA VERSUS AMERICANS FOR PROSPERITY WHERE THERE WAS AN INJUNCTION, AND IT WASN'T JUST AS TO THE PLAINTIFFS BEFORE THEM.

AND MAYBE YOU AND I ARE NOT USING "AS APPLIED" IN THE SAME WAY. I DO FIND THAT TERM CONFUSING.

THE COURT: IT -- SO IT HAS BEEN A LITTLE MADDENING WHEN THE COURT TALKS ABOUT A FACIAL CHALLENGE AS APPLIED TO THESE PROVISIONS AND THEY USE THAT SAME TERM.

MS. KUMAR: THAT'S RIGHT.

THE COURT: VERY DIFFICULT, YES.

MS. KUMAR: I TOTALLY AGREE WITH YOU.

BUT THE FACT THAT WE'RE TALKING ABOUT THIS MEANS THAT YOU AND I ARE ON THE SAME PAGE.

THE COURT: YES.

MS. KUMAR: OKAY, SO THAT YOU CAN CHALLENGE -- SO IN THE, I THINK THE JOHN DOE -- ONE OF THE TWO -- I THINK, YEAH, THE JOHN DOE, THE REED CASE, THAT ONE WAS ABOUT WASHINGTON'S PUBLIC RECORDS ACT, RIGHT?

THE COURT: YES.

MS. KUMAR: AND THE PLAINTIFFS, RIGHTFULLY, WERE NOT LIKE, WE WANT YOU TO INVALIDATE THE ENTIRE PUBLIC RECORDS ACT.

THE COURT: SURE.

MS. KUMAR: THEY SAID, JUST THIS ONE PART, BUT WE WANT THAT RELIEF NOT JUST APPLIED TO US, BUT TO EVERYBODY ELSE.

THE COURT: AND THE SUPREME COURT SAID WHEN YOU LOOK AT THE FULL APPLICATION OF THE LAW, TAX PETITIONS, WHO CARES? BUDGET PETITIONS, WHO CARES?

AND THEY SAID, WHAT YOU'RE REALLY SAYING IS PETITIONS ON CONTROVERSIAL SOCIAL ISSUES CAN CAUSE HARM.

AND SO THEY -- THEY JUST -- THEY KNOCKED THEM OUT, EVEN THOUGH THEY ALLOWED FOR THAT TARGETED FACIAL CONSIDERATION. THEY SAID THAT THE PLAINTIFFS THERE HAD NOT MET THEIR BURDEN OF SHOWING THE FULL APPLICATION OF THE LAW AND, IN FACT, IT WAS AS APPLIED TO THEM ON THE PARTICULAR PETITION.

AND THAT'S WHERE I THINK -- I THINK YOU HAVE NOT MADE THAT -- I THINK YOU'VE FALLEN INTO A SIMILAR TRAP, MAYBE NOT

QUITE AS CLEARLY AS IN JOHN DOE #1.

MS. KUMAR: WELL, LET ME GIVE YOU ANOTHER SUPREME COURT CASE THAT MAYBE -- THAT AT LEAST HELPS US UNDERSTAND THAT -- THE STATE HAS ALSO SAID THESE ARE AMORPHOUS, AND YOU HAVE SUGGESTED ALSO THAT THESE ARE AMORPHOUS.

THE COURT: YES.

MS. KUMAR: BUT THE CASE VERSUS BROCKETT VERSUS SPOKANE ARCADE, THAT WAS A WASHINGTON -- AND THAT'S A U.S. SUPREME COURT CASE. THAT WAS A WASHINGTON STATUTE THAT REGULATED THOSE DEALING OBSCENITY, WHICH INCLUDED LUST AND THE DEFINITION OF PRURIENT.

NOW, THIS CASE WAS AWHILE AGO, SO THE COURT HELD IT WAS INVALID INSOFAR AS THE WORD "LUST" REFERRED TO NORMAL INTEREST IN SEX, REJECTING CLAIMS THAT IT COULD NOT BE DEFINED AND LISTING A SET OF CASES.

SO I WOULD URGE YOUR HONOR TO READ THAT CASE AND LOOK AT THE CASES THAT IT ALSO CITES, AND WE'RE HAPPY TO PROVIDE SUPPLEMENTAL BRIEFING ON THIS IF YOU WOULD LIKE.

BUT THIS IS A ROUTINE THING. SO IN THE AFP CASE VERSUS BONTA, THE APPLICATION -- THE INJUNCTION WAS A FACIAL INJUNCTION AS APPLIED TO CERTAIN TAX FORMS, AND SO IT WAS FOR EVERYBODY, RIGHT?

THE COURT: UM-HUM.

MS. KUMAR: I THINK WHAT I HEAR YOU SAYING IS, WELL, GEE, YOU KNOW -- AND THAT CASE DID HOLD THAT IN EVERY

APPLICATION, RIGHT, THERE WAS A PROBLEM.

WHAT I HEAR YOU SAYING IS MAYBE THAT'S NOT TRUE HERE.

BUT THAT'S THE PURPOSE OF THE NARROW CHALLENGES. THAT'S WHAT -- SO, FOR EXAMPLE -- LET'S JUST TAKE THE CONTENT POLICY EXAMPLE.

THE TEXT OF THE STATUTE IS VERY BROAD. IT SAYS ALL POLICIES, PRIVACY POLICIES, CONTENT POLICIES, ALL POLICIES.

AND WE HAVE TAKEN THAT CHALLENGE AND WE HAVE MADE IT NARROWER TO ONLY APPLY TO CONTENT MODERATION POLICIES.

AND TO THE EXTENT YOUR HONOR IS CONCERNED ABOUT, WELL, WHAT DOES THAT MEAN, I THINK WE JUST GO TO MOODY, RIGHT? MOODY SAYS CONTENT MODERATION POLICIES ARE RULES THAT LIST SUBJECTS OR MESSAGES THAT THE SERVICE PROHIBITS OR DISCOURAGES, AND WHICH LEAD THEM TO REMOVE, DISFAVOR, OR LABEL POSTS BASED ON THEIR CONTENT. OKAY?

THE COURT: UM-HUM, YES. THIS ONE I THINK HAS LEGS FOR -- BUT I THINK UNDER SECTION 230 AS WELL.

MS. KUMAR: OKAY.

THE COURT: SO THIS IS THE ONE -- AND THIS IS -- I THINK THIS IS A BIG PART OF YOUR CHALLENGE. I THINK THIS IS AN IMPORTANT PART OF YOUR CHALLENGE.

AND, YOU KNOW, I THINK IN YOUR REPLY BRIEF, YOU ALSO CITE SOME CASES THAT THESE CONTENT POLICY AND COMMUNITY STANDARDS ARE NOT CONTRACTUAL OBLIGATIONS --

MS. KUMAR: THAT'S RIGHT.

THE COURT: -- WHICH I THOUGHT WAS HELPFUL.

MS. KUMAR: YEAH. AND TO THE EXTENT THAT THE STATE IS CONCERNED ABOUT ENFORCEABLE PROMISES, THERE IS LAW TO -- THAT ALLOWS THOSE TO BE ENFORCED.

SO LET ME --

THE COURT: OKAY. SO LET'S MOVE OFF --

MS. KUMAR: YES.

THE COURT: -- OF POLICY ENFORCEMENT.

MS. KUMAR: YEP.

THE COURT: BECAUSE, I MEAN, MS. LISKA MAY PERSUADE ME OTHERWISE, BUT I THINK YOU'VE GONE AS FAR AS YOU NEED TO.

LET'S LOOK AT YOUR PARAGRAPH NUMBER 6 REGARDING (1) THROUGH (4), B(1)-(4). WELL, I GUESS (B)(1), (2), AND (4).

MS. KUMAR: SORRY. ONE SECOND.

THE COURT: THIS IS TO THE EXTENT THE SECTIONS APPLY TO COVERED SERVICES' USE OF PERSONAL INFORMATION TO PUBLISH CONTENT OR MAKE INFORMATION AVAILABLE.

SO I'M NOT SURE I KNOW WHAT THAT MEANS.

THIS IS A -- I GUESS THIS IS A SPECIFIC APPLICATION OF THE LAW. IT'S A -- BUT IT'S -- BUT THE LAW -- ALL RIGHT. LET'S --

(PAUSE IN PROCEEDINGS.)

THE COURT: SO LET'S PICK ONE OF THESE. THIS IS FOR (1), (2), AND (4).

MS. KUMAR: UM-HUM.

THE COURT: SO NUMBER (2), PROFILE A CHILD BY DEFAULT

UNLESS BOTH OF THE FOLLOWING CRITERION ARE MET.

AND SO YOU WANT TO ENJOIN THE USE OF PERSONAL INFORMATION TO PUBLISH CONTENT OR MAKE INFORMATION AVAILABLE.

WELL, PROFILING A CHILD IS USING INFORMATION, ISN'T IT?

MS. KUMAR: THAT'S RIGHT.

THE COURT: SO WHY ARE -- WHAT IS IT YOU'RE EXEMPTING FROM THIS CHALLENGE I GUESS IS WHAT I'M REALLY WONDERING? YOU'RE SAYING THIS IS SPECIFIC, TARGETED. BUT I DON'T --

MS. KUMAR: GIVE ME ONE -- GIVE ME A MINUTE TO THINK THROUGH THAT QUESTION.

(PAUSE IN PROCEEDINGS.)

MS. KUMAR: WELL, LET'S -- MAYBE WE SHOULD LOOK AT THE DEFINITION OF PROFILING.

THE COURT: IS THAT IN SECTION 30?

MS. KUMAR: I BELIEVE IT IS.

THE COURT: PROFILING, YES, NUMBER 6.

MS. KUMAR: OKAY. PROFILING MEANS ANY FORM OF AUTOMATED PROCESSING OF PERSONAL INFORMATION -- THAT USES PERSONAL INFORMATION TO EVALUATE CERTAIN ASPECTS RELATING TO A NATURAL PERSON.

THE COURT: SO YOU'RE NOT TRYING TO NARROW IT AT ALL, BECAUSE PROFILING IS USING PERSONAL INFORMATION.

YOU'RE TRYING TO ENJOIN THE USE OF PERSONAL INFORMATION.

MS. KUMAR: NO, NOT THE USE OF INFORMATION FOR ANY PURPOSE.

THE COURT: OKAY.

MS. KUMAR: THE USE OF INFORMATION TO, YOU KNOW, I BELIEVE THE LANGUAGE IS PUBLISH AND ORGANIZE CONTENT.

THE COURT: I SEE.

MS. KUMAR: SO IF THERE'S SOME HYPOTHETICAL -- I DON'T EVEN KNOW -- I DON'T KNOW, BECAUSE I WILL TELL YOU, I THINK, AGAIN, THAT VAGUENESS IS A FUNDAMENTAL PROBLEM WITH THIS LAW, OKAY? WHAT DOES IT MEAN TO -- FOR PROFILING TO BE IN THE BEST INTERESTS OF CHILDREN?

THE COURT: OKAY.

MS. KUMAR: OKAY? SO LET'S JUST, YOU KNOW, WHAT WE DO KNOW IS WE KNOW --

THE COURT: SO, YOU KNOW, I HAVE NO INTENTION OF TAKING THE FIRMLY EMBEDDED CONCEPT IN CALIFORNIA LAW OF BEST INTERESTS OF A CHILD AND CALL IT VAGUE. I'M NOT DOING THAT.

I WAS A FAMILY LAW JUDGE FOR TWO YEARS A LONG TIME AGO, AND EVERY DAY I GOT ON THE BENCH I DECIDED THE BEST INTERESTS OF CHILDREN.

MS. KUMAR: BUT --

THE COURT: IT WAS NOT UNCONSTITUTIONALLY VAGUE.

MS. KUMAR: NO, AND I WOULD NOT SAY THAT IT IS, OKAY?

BUT WHAT WE'RE TALKING ABOUT HERE IS WHAT CONTENT IS IN THE BEST INTERESTS OF CHILDREN.

WE'RE NOT TALKING ABOUT DAY-TO-DAY DECISIONS MADE BY FAMILY COURT JUDGES WHOSE JOB IS TO CONSIDER WHAT IS THE BEST

INTERESTS OF CHILDREN.

THIS IS THE STATE DETERMINING WHAT CONTENT AND WHAT PROFILING IS IN THE BEST INTERESTS OF CHILDREN. SO RESPECTFULLY, I THINK IT'S A VERY, VERY DIFFERENT CONTEXT.

THE COURT: UM-HUM.

MS. KUMAR: AND IT MIGHT BE FINE FOR THAT STANDARD TO APPLY IN FAMILY LAW. THERE'S PROBABLY NO -- I MEAN -- BUT THERE'S NO PROSCRIPTION ON CONSIDERING WHAT'S -- WHETHER A CUSTODY SCHEDULE IS IN THE BEST INTERESTS OF A CHILD.

THE COURT: SO I'M NOW -- I HAVE PLENTY OF TIME, BUT NOW I'VE DIVERTED YOU SO MUCH, SO NOW I THINK I'M GOING TO LET YOU GET BACK ON TRACK WITH YOUR ARGUMENT --

MS. KUMAR: OKAY.

THE COURT: -- BECAUSE I'D LIKE YOU TO BE DONE BY A QUARTER PAST.

MS. KUMAR: OKAY. UNDERSTOOD.

THE COURT: THANK YOU.

MS. KUMAR: SO JUST TALKING ABOUT THESE INFORMATION RESTRICTIONS, THEY'RE ALL CONDITIONED ON THE USE OF INFORMATION TO PUBLISH CONTENT OR MAKE INFORMATION AVAILABLE.

NOW, IF YOU'RE ASKING ME, ARE THERE -- ARE THERE THINGS THAT WE'RE NOT INCLUDING? WELL, YOU KNOW, I DON'T KNOW THE ANSWER TO THAT. AND THE REASON WHY IS I CAN'T THINK, IN GENERAL, OF OTHER APPLICATIONS.

SO I'M NOT SURE, YOU KNOW, I MEAN, THE STATE MAY COME UP

AND SAY, WELL, PROFILING IS BAD WHEN SOMETHING NON-EXPRESSIVE HAPPENS. I DON'T KNOW.

ALL I KNOW IS I CAN'T THINK OF ANOTHER REASON, ANOTHER, LIKE, APPLICATION OF THIS LAW. DR. RADESKY, YOU KNOW, WE GAVE YOU A SERIES OF QUOTES FROM HER DECLARATION ABOUT WHAT PROFILING MEANS.

AND TO THE EXTENT THE COURT FEELS LIKE IT CAN'T ENJOIN ENFORCEMENT OF THE PROVISION AS A WHOLE BECAUSE THERE ARE SOME APPLICATIONS THAT ARE NON-EXPRESSIVE, WE HAVE TOLD THE COURT, FINE, TAKE THOSE OUT OF THE EQUATION AND DON'T ENJOIN IT AS TO THE OTHER APPLICATIONS.

THAT WAS WHAT WE WERE TRYING TO DO.

THE COURT: UM-HUM.

MS. KUMAR: AND YOUR HONOR MIGHT SAY, WELL, I DON'T KNOW IF THIS LANGUAGE IS PRECISE ENOUGH, AND THAT'S FINE. WE CAN TALK ABOUT HOW DOES YOUR HONOR CRAFT AN ORDER.

THE COURT: SURE.

MS. KUMAR: AND I THINK THAT'S TRUE OF ALL OF THE, YOU KNOW, INFORMATION. LOOK, I COULD GO THROUGH EVERY (B)(1), (B)(2), (B)(3), (B)(4). I DON'T WANT TO DO THAT.

THE COURT: I DON'T THINK WE NEED TO, BECAUSE WE HAVE A LOT OF OTHER THINGS TO TALK ABOUT.

MS. KUMAR: I THINK THAT'S RIGHT.

AND I WOULD -- YOU KNOW, I THINK FOCUSSING ON THE THRESHOLD ISSUE, FOCUSSING ON A THRESHOLD ISSUE AS TO THE USE

PROVISIONS.

SO TURNING TO AGE ESTIMATION, I THINK I'LL ADDRESS AGE ESTIMATION.

THE COURT: HOW ABOUT -- ARE YOU GOING TO ADDRESS DARK PATTERNS, OR NOT?

MS. KUMAR: I CAN.

THE COURT: IT'S UP TO YOU.

MS. KUMAR: WELL, I MEAN --

THE COURT: BECAUSE I WAS CONCERNED THAT FOR SOME OF THE DARK PATTERNS, THAT YOU HADN'T CLEARLY IDENTIFIED WHOSE EXPRESSION WAS AT ISSUE.

MS. KUMAR: THAT'S RIGHT, YES, YOU DID SAY THAT.

THE COURT: THAT WAS MY QUESTION.

MS. KUMAR: WELL, I GUESS I WOULD ASK THE QUESTION -- FIRST OF ALL, I WOULD SAY IT'S THE SERVICE'S EXPRESSION, RIGHT? THESE ARE FEATURES --

THE COURT: SO I THINK JUDGE DAVILA IN HIS DECISION JUST LAST MONTH -- I DON'T KNOW WHETHER YOU WERE INVOLVED IN THAT ONE.

MS. KUMAR: NO.

THE COURT: BUT YOU READ IT, OF COURSE.

MS. KUMAR: YEP.

THE COURT: I THINK HE FOUND THE FEATURES LIKE AUTOPLAY WERE -- WHERE IT IS A LOOP CREATED BY THE USER, IF I'VE LIKED PUPPY VIDEOS, SEGMENTS, NOW I'M GOING TO GET TEN

MORE, BUT THAT THE -- ALL IT'S DOING IS PUTTING ME ON AN INFINITE LOOP OF WHAT I'VE ALREADY LIKED. IT'S MY EXPRESSION, NOT THE SERVICE PROVIDER'S.

MS. KUMAR: SO I DON'T THINK THAT'S RIGHT.

THE COURT: OKAY.

MS. KUMAR: WHETHER JUDGE DAVILA SAID THAT OR NOT.

THE COURT: I'M NOT -- WE'LL TAKE IT -- I'LL OWN THIS, AND I THINK THAT'S WHAT HE SAID, BUT HE MAY NOT HAVE.

MS. KUMAR: OKAY. THAT'S FINE.

I MEAN, LOOK, I DID READ HIS OPINION, AND I DO THINK IT SORT OF BREEDS INTO, FOR EXAMPLE, JUSTICE BARRETT'S CONCURRENCE IN MOODY, WHICH IS NOT THE LAW.

AND SO, YOU KNOW, LET'S JUST TAKE THE AUTOPLAY. LET'S ANALOGIZE IT TO A NEWSPAPER. SUPPOSE THE NEWSPAPER PUBLISHES THE SAME ARTICLE REPEATEDLY IN, YOU KNOW, ON SUCCESSIVE DAYS, OR HAS A NOTICE AT THE TOP OF THE PAPER THAT SAYS SOMETHING REPEATEDLY.

YOU KNOW, AND SUPPOSE -- I GUESS MAYBE SUPPOSE IT PUBLISHES THE SAME LETTER TO THE EDITOR MANY TIMES, RIGHT? THAT'S SOMEONE ELSE'S CONTENT.

BUT WHOSE DECISION IS IT TO PRESENT THAT CONTENT TO AN AUDIENCE? IT'S THE NEWSPAPER'S DECISION.

SO IT IS THE SERVICE PROVIDER'S DECISION TO, TO SHOW WHATEVER CONTENT IT IS TO A USER. SO AUTOPLAY IS, YOU KNOW, SURE, LIKE YOU'RE ON ONE EPISODE OF A TV SHOW AND THEN YOU'RE

MOVED TO THE NEXT ONE. THAT'S BECAUSE THE SERVICE PROVIDER IS EXPRESSING AND ORGANIZING CONTENT IN A CERTAIN WAY THAT IS EXPRESSIVE, AND WE KNOW THAT FROM MOODY, RIGHT, BECAUSE THAT WAS THE STATE'S ARGUMENT IN MOODY WAS ORGANIZING CONTENT AND DOING THAT KIND OF THING IS NOT PROTECTED, AND THE SUPREME COURT EXPRESSLY FOUND THAT THAT'S NOT THE CASE.

AND TO THE EXTENT THAT JUDGE DAVILA, YOU KNOW, SUGGESTED THAT ALGORITHMS THAT REFLECT ONLY USER INPUT ARE NOT PROTECTED EXPRESSION, I THINK THAT'S WRONG, TOO.

IF YOU LOOKED AT THE EGELMAN DECLARATION, HE SAYS ALGORITHMS ALL HAVE A PURPOSE. NONE OF THEM ARE NEUTRAL.

SO EVEN IF WE TALK ABOUT CHRONOLOGICAL ORDER, RIGHT, THAT IS A DECISION THAT THE NEWEST INFORMATION IS THE INFORMATION THAT A USER SHOULD SEE. THERE IS NO ALGORITHM -- I MEAN, ALL ALGORITHMS DO IS TRANSMUTE -- TRANSLATE HUMAN JUDGMENT INTO CONTENT, RIGHT, OR EXPRESSIVE CHOICES.

THE COURT: YEAH, SURE.

MS. KUMAR: SO RESPECTFULLY, TO THE EXTENT THAT JUDGE DAVILA FOUND OTHERWISE, I DON'T AGREE WITH THAT.

THE COURT: OKAY. AND I'LL GO BACK AND READ WHAT HE SAID, AND I WILL -- BECAUSE I MAY HAVE MISREPRESENTED HIM AND I WOULD APOLOGIZE FOR THAT.

LET'S TALK ABOUT AGE ESTIMATION.

MS. KUMAR: YEAH. SO I HEARD WHAT YOU SAID. I DON'T THINK THAT THERE IS -- THAT THERE IS EVIDENCE IN THE RECORD

THAT SUGGESTS THAT AGE ESTIMATION -- WHAT -- THAT AGE ESTIMATION IS ANY LESS ONEROUS THAN AGE VERIFICATION, AND WHAT YOU DO HAVE, AND I WOULD DIRECT YOUR HONOR TO THE DECLARATIONS THAT WE FILED IN THE FIRST INSTANCE -- LET ME JUST -- I HAVE THEM.

THE COURT: YOU CITED THEM IN YOUR BRIEF NOW. I AM NOT -- YOU KNOW -- YOU CITED ME BACK TO A NUMBER OF THINGS AS EVIDENCE THAT WERE ALREADY ON THE DOCKET. BUT IF THEY'RE NOT IN YOUR BRIEF, THEY'RE NOT IN THIS RECORD. I WANT TO BE CLEAR.

MS. KUMAR: OKAY. I -- I WOULD HAVE TO GO BACK AND SEE WHAT -- I'M PRETTY SURE WE CITED ALL OF THESE DECLARATIONS, AND WE HEEDED YOUR HONOR'S ADMONITION OF THAT.

AND SO JUST TO GIVE YOU AN EXAMPLE, THE UNREBUTTED TESTIMONY IN THE RECORD SHOWS THAT SERVICES DON'T KNOW WHO IS A KID AND WHO IS NOT. IT IS NOT -- I WENT BACK AND LOOKED AT THE TRANSCRIPT FROM THE FIRST HEARING. IT IS NOT AS IF A SERVICE HAS ALL THE INFORMATION THEY NEED TO KNOW WHETHER SOMEBODY IS 18 OR NOT.

AND THAT'S THE ROIN DECLARATION, WHICH WE DID CITE.

THE COURT: YES.

MS. KUMAR: THE CAIRELLA DECLARATION, WHICH IS IMDB.

AND MOREOVER, THE TESTIMONY, UNREBUTTED TESTIMONY IS THAT IT WOULD BE VERY EXPENSIVE TO FIND OUT WHO'S A CHILD AND WHO'S NOT. I THINK ROIN SAID IT WOULD COST A DOLLAR PER, YOU KNOW, PER ESTIMATION.

THE COURT: IS THAT A CONSIDERATION, THE EXPENSE?

MS. KUMAR: YEAH, I THINK IT IS. I MEAN, I THINK THE -- YOU KNOW, THE -- LOOK, THE DEGREE OF BURDEN FACTORS INTO HOW ONEROUS A STATUTE IS.

THE COURT: I HAVEN'T PICKED UP IN ANY OF THE CASES A COST BURDEN. I PICK UP A PRIVACY BURDEN ON THE USER, THE ADULT USER AND THE CHILD USER HAVING TO GIVE UP THE ANONYMITY OF THE WEB.

I HAVEN'T PICKED UP THE COST. THAT SEEMS TO ME TO BE MORE OF A POLITICAL DETERMINATION WHERE THE SERVICE PROVIDERS CAN LOBBY THE LEGISLATURE BASED ON THAT.

I DON'T THINK THAT'S FOR THIS.

MS. KUMAR: THAT'S FAIR.

THE COURT: I'M NOT SAYING IT'S NOT A BURDEN. I DON'T THINK IT'S RECOGNIZED.

MS. KUMAR: OKAY, YEAH.

WELL, I THINK TO FOCUS ON THE PRIVACY INTEREST IS JUST AS WELL, TOO, BECAUSE --

THE COURT: BUT IT'S NOT THE PRIVACY INTEREST OF THE SERVICE PROVIDER.

SO LAST TIME -- AND IT'S IN MY ORDER AND THE NINTH CIRCUIT ACCEPTED IT -- I -- YOU ARGUED ON BEHALF OF USERS UNDER THE FIRST AMENDMENT SPECIAL STANDARD.

MS. KUMAR: RIGHT.

THE COURT: YOU DIDN'T DO THAT HERE, AND THAT'S FINE.

BUT YOU REALLY ARGUED ABOUT YOUR -- THE EFFECT ON YOUR MEMBERS.

MS. KUMAR: I THINK WE DID MAKE THAT ARGUMENT, AND I WILL SAY -- AND MAYBE IT'S IN THE DECLARATIONS THAT ARE CITED IN THE BRIEFING AND YOU CAN GO BACK TO THEM.

THE COURT: BUT IF IT'S -- YOU KNOW, THE RECORD DOESN'T WORK THAT WAY. YOU DON'T HAVE STEALTH THINGS PLANTED IN DECLARATIONS THAT YOU DIDN'T DRAW OUT TO ME IN YOUR BRIEFING AND THEN SAY I DIDN'T CONSIDER THE RECORD. IT DOESN'T WORK THAT WAY.

I WILL READ THE PARAGRAPHS THAT YOU CITE.

MS. KUMAR: THAT'S ALL I'M ASKING YOUR HONOR TO DO.

THE COURT: THAT'S GREAT, BECAUSE I ACTUALLY WENT THROUGH YOUR BRIEF AND I TAGGED EVERY PART OF THE OLD RECORD THAT YOU CITED SO THAT I COULD BE SURE TO GO BACK AND GET THOSE.

MS. KUMAR: OKAY. SO THE UNREBUTTED TESTIMONY, WHICH I BELIEVE WE CITED --

THE COURT: OKAY.

MS. KUMAR: I CAN'T TELL YOU RIGHT THIS SECOND WHICH, YOU KNOW, WHICH PARAGRAPHS WERE CITED BECAUSE I DON'T --

THE COURT: THAT'S FAIR.

MS. KUMAR: BUT, YOU KNOW, THE UNREBUTTED TESTIMONY IS, ONE, PEOPLE HAVE TO GIVE UP THEIR PRIVACY, AND IF THEY GIVE UP THEIR PRIVACY, THEY'RE LESS LIKELY TO ACCESS THE SPEECH.

SO, TWO, THE AUDIENCE IS DRAMATICALLY LIMITED BY THE REQUIREMENTS OF THE STATUTE.

AND SO, YOU KNOW, THE PARTS THAT WE CITED -- AND I NOW HAVE IT IN FRONT OF ME -- RUMENAP, PARAGRAPHS 7 TO 10, MASNICK, THE SUPPLEMENTAL MASNICK DECLARATION AT 7, AND THE PAOLUCCI SUPPLEMENTAL DECLARATION, AND THE GOLDMAN BRIEF, RIGHT.

THE COURT: YES.

MS. KUMAR: I THINK YOU CAN GO BACK TO ALL OF THAT AND YOU CAN SEE IT'S EXTREMELY INTRUSIVE.

AND GOLDMAN TALKS ABOUT AGE ESTIMATION AND AGE VERIFICATION.

THE COURT: BUT ONE OF THE PROBLEMS WITH HIS ARGUMENT IS THAT IT MAY PROVE TOO MUCH, BECAUSE YOU'RE REALLY SAYING THAT AGE ESTIMATION IS PER SE A VIOLATION OF THE FIRST AMENDMENT.

I DON'T HAVE GUIDANCE FROM THE NINTH CIRCUIT OR SUPREME COURT TO SUPPORT THAT.

MS. KUMAR: I THINK YOU DO. AND NOT PER SE A --

THE COURT: PER SE, I DO NOT. OTHERWISE THE TEXAS STATUTE WOULDN'T BE BEFORE THE SUPREME COURT.

MS. KUMAR: WELL, HOLD ON. HOLD ON.

THE COURT: OKAY.

MS. KUMAR: SO AGE VERIFICATION TO, LIKE, I DON'T KNOW, STOP PEOPLE FROM BUYING PRODUCTS LIKE, YOU KNOW, ONE -- THAT MIGHT BE ONE THING.

BUT IF IT'S TO ACCESS SPEECH, THE SUPREME COURT'S -- WE'LL SEE WHAT HAPPENS IN THE PAXTON CASE.

THE COURT: BUT THE PAXTON CASE IS ABOUT ACCESSING SPEECH.

MS. KUMAR: RIGHT. BUT SO IS ASHCROFT VERSUS ACLU, WHICH IS THE 2002 SUPREME COURT CASE ON THIS POINT.

THE COURT: YES. BUT, YOU KNOW, AND I THINK JUDGE DAVILA IS THE ONE WHO SAID THOSE CASES ARE OLD NOW.

MS. KUMAR: IT'S THE LAW OF THE LAND.

THE COURT: YES, BUT WE HAVE TO LOOK AT -- YES, IT IS. I MEAN, I'VE -- I DON'T GET TO -- I FOLLOW ALL SUPREME COURT CASES THAT ARE VALID, AND THE NINTH CIRCUIT, YEAH.

BUT YOU'RE SAYING AGE VERIFICATION TO ACCESS MATERIAL'S CONTENT ON THE WEB, NOT PRODUCTS TO PURCHASE --

MS. KUMAR: YES.

THE COURT: -- IS PER SE A VIOLATION OF THE FIRST AMENDMENT.

MS. KUMAR: NO. I THINK IT GETS YOU INTO STRICT SCRUTINY LAND. I'M NOT SAYING YOU SHOULD -- I MEAN, YES, AND EVEN IF THAT'S NOT THE ANSWER, THE ANSWER IS TO GO THROUGH THE SCRUTINY ANALYSIS.

AND I REMIND YOU THAT --

THE COURT: WELL, THAT'S WHERE I STARTED IS THAT IN THE FULL APPLICATION OF THE LAW, I'M NOT SURE EXPRESSION IS IMPLICATED WHEN THE COMPANY, THE COVERED SERVICE COULD SIMPLY

USE THE INFORMATION THEY ALREADY HAVE TO RESTRICT.

MS. KUMAR: RIGHT. AND I DON'T THINK THAT -- THEY CAN'T. I MEAN, THAT'S --

THE COURT: THAT -- I DON'T THINK I HAVE ENOUGH OF A RECORD ON THE ISSUE OF THEY CAN'T.

MS. KUMAR: I THINK YOU DO, AND I THINK -- AND, AGAIN, I -- I WOULD POINT YOU TO THE GOLDMAN -- THE GOLDMAN BRIEF AND TO THE -- I MEAN, I DON'T HAVE THE PARAGRAPH NUMBER -- I CAN GET THE PARAGRAPH NUMBERS WHEN I COME BACK UP -- THAT WE CITED THAT SAY WE CAN'T DO THIS, IT'S EXTREMELY INTRUSIVE.

AND ONE OF THE DECLARANTS, PAOLUCCI, SAYS WE MAY JUST SHUT DOWN, RIGHT, AND THIS IS ALL TO ACCESS SPEECH THAT IS CONSTITUTIONALLY PROTECTED WHICH, AGAIN, IS A FUNDAMENTAL DIFFERENCE --

THE COURT: IS THAT THE TECHDIRT PROVIDER?

MS. KUMAR: NO. SHE'S DREAMWIDTH.

THE COURT: OKAY.

MS. KUMAR: ASHCROFT VERSUS ACLU, PAXTON VERSUS FREE SPEECH COALITION, THOSE ARE CASES ABOUT ACCESS TO PORNOGRAPHY.

WE'RE TALKING ABOUT ACCESS TO ALL SORTS OF CONTENT, *NEW YORK TIMES* NEWS REPORTS ON, YOU KNOW, CONFLICT; YOU KNOW, BIOGRAPHICAL BOOKS ABOUT -- YOU KNOW, I WAS JUST THINKING, LIKE, VINCENT VAN GOGH, HE HAD A VERY TROUBLED LIFE. ARE WE NOT -- DO WE NOT WANT CHILDREN TO READ ABOUT WHAT EXACTLY

HAPPENED TO HIM?

THE COURT: I THINK -- AND I DON'T KNOW THAT IT'S CAPTURED HERE, BUT WHAT TROUBLED ME WITH THE BREADTH OF THE STATUTE IS THAT THERE ARE AN INFINITE NUMBER OF CALCULATIONS THAT WOULD HAVE TO BE MADE. IT WOULD BE FOR EACH AGE OF THE CHILD AND EACH INDIVIDUAL PIECE OF CONTENT TO BE ACCESSIBLE.

MS. KUMAR: THAT'S RIGHT.

THE COURT: SO A FIVE YEAR OLD READING THE -- WELL, LET'S CHANGE IT A LITTLE. A SEVEN YEAR OLD READING THE BOX SCORES IS GOING TO GET A DIFFERENT ESTIMATION THAN THE SEVEN YEAR OLD READING -- THAN THE SEVEN YEAR OLD READING THE FRONT PAGE OF THE *NEW YORK TIMES*.

MS. KUMAR: THAT'S RIGHT.

THE COURT: AND AT EVERY AGE AND AT EVERY INDIVIDUAL PIECE OF CONTENT, THE LAW WOULD REQUIRE A DIFFERENT CALCULATION IS THE WAY I READ IT.

IT'S NOT JUST, IF YOU'RE UNDER 18, YOU DON'T GET IT.

AND THAT'S THE BEAUTY OF THE PAXTON CASE. IT'S AN ALL OR NOTHING, I BELIEVE.

MS. KUMAR: WELL, ACTUALLY, TO -- YOU KNOW, WE DON'T NEED TO GET INTO THE WEEDS, BUT THE STATUTE IN PAXTON TALKS ABOUT CITES THAT HAVE MORE THAN ONE-THIRD CONTENT HARMFUL TO MINORS.

THE COURT: THAT'S RIGHT, THEY DO, YES.

MS. KUMAR: SO THE FOCUS OF THE SUPREME COURT WAS ON

PORNOGRAPHY.

THE COURT: YES.

MS. KUMAR: SO THAT'S ANOTHER WRINKLE IN THE LAW THAT YOU DON'T HAVE HERE AND THEY DIDN'T DISCUSS IN THE SUPREME COURT.

BUT EVEN IF YOU'RE NOT INCLINED TO BE BOUND BY -- TO FIND THAT ASHCROFT VERSUS ACLU IS BINDING, AT A MINIMUM, YOU KNOW THIS IS A CONTENT-BASED RESTRICTION.

AND HOW DO YOU KNOW THAT? BECAUSE IT'S REASONABLE -- TO A REASONABLE CERTAINTY APPROPRIATE TO THE RISKS OF THE DATA MANAGEMENT PRACTICES.

AND THE NINTH CIRCUIT WAS VERY CLEAR ABOUT THIS. THE NINTH CIRCUIT SAID DATA MANAGEMENT PRACTICES IS DEFINED BY THE NOW ENJOINED DPIA REQUIREMENT IN SECTION 31(A)(2) TO REQUIRE CONSIDERATION OF CONTENT OR PROXIES FOR CONTENT.

SO THE STATE CAN'T GET UP -- CAN'T TELL YOU, YOUR HONOR, THAT DATA MANAGEMENT PRACTICES IS, YOU KNOW, SELF-EVIDENT. IT IS A PROXY FOR CONTENT.

AND SO THEN YOU HAVE TO GO INTO THE LEVEL OF SCRUTINY. AGAIN, BROWN SAYS THAT THE GOVERNMENT DOESN'T HAVE A LEGITIMATE INTEREST IN SHIELDING KIDS FROM PROTECTED CONTENT.

THE STATE HAS ALSO NOT SHOWN THAT THE AGE VERIFICATION -- AGE ESTIMATION REQUIREMENT WOULD ALLEVIATE ANY HARMS. YOU DON'T HAVE TO JUST SAY THIS IS PER SE UNCONSTITUTIONAL. GO THROUGH THE ANALYSIS AND LOOK AT WHAT THE STATE'S TELLING YOU.

AGAIN, THERE'S, THERE'S -- YOU KNOW, WE HAVE TESTIMONY IN THE RECORD THAT, YOU KNOW, IT MIGHT BE THAT PEOPLE -- KIDS ARE JUST CUT OFF FROM THE *NEW YORK TIMES* OR WHAT HAVE YOU, OR SERVICES.

THE COURT: BUT WHEN I READ IT, I'M JUST GETTING THE BOX SCORES.

(LAUGHTER.)

MS. KUMAR: BUT, AGAIN, THE STATE DOESN'T ADDRESS THE LESS RESTRICTIVE ALTERNATES THE NINTH CIRCUIT POSITED, EDUCATION, TOOLS -- EDUCATION ABOUT THOSE TOOLS AND ENFORCEMENT OF EXISTING LAWS.

AND, BY THE WAY, WE HAVEN'T TALKED ABOUT THIS YET, BUT THEY ALSO DON'T ADDRESS ANY EXISTING PRIVACY LAW, LIKE COPPA, LIKE THE CALIFORNIA PRIVACY REGIME, BOTH OF WHICH CAN -- YOU KNOW, THAT ONE REGULATES DARK PATTERNS ALREADY.

AND SO, YOU KNOW, AGAIN, UNDER THE <u>GARCIA</u> AND <u>PATEL</u> SORT OF LINE OF CASES, YOU ONLY LOOK AT THE NEW APPLICATIONS TO DETERMINE WHETHER THEY'RE CONSTITUTIONAL OR NOT.

THE COURT: OKAY. LET'S -- I'M GOING TO MOVE YOU ALONG A LITTLE BIT.

MS. KUMAR: OKAY.

THE COURT: YOU'VE GONE AT MY PACE.

LET'S --

MS. KUMAR: SEVERABILITY.

THE COURT: SO DO YOU WANT TO -- WE CAN TALK ABOUT

SEVERABILITY. YOU'VE ALSO GOT VAGUENESS, OVERBREADTH, SECTION 230, COMMERCE CLAUSE, AND COPPA, AND YOU HAVE ABOUT FIVE MINUTES, SO TAKE YOUR PICK.

MS. KUMAR: I THINK I WILL TALK ABOUT SEVERABILITY.

THE COURT: OKAY.

MS. KUMAR: AND I THINK ON 230, I WILL SAY, YOUR HONOR, THAT I AGREE THE CONTENT POLICY ENFORCEMENT PROVISION IS PREEMPTED BY SECTION 230.

I THINK THERE ARE OTHER THINGS THAT ARE ALSO PREEMPTED, BUT AS I SAY, IF YOU'RE GOING TO RULE ON THE FIRST AMENDMENT OR SEVERABILITY AND ENJOY THE LAW ON THAT BASIS, YOU DON'T NEED TO GET THERE.

THE COURT: OKAY.

MS. KUMAR: SEVERABILITY, WE CAN PROVIDE YOU -- I HAVE A LINK TO ALL THE VERSIONS OF THE LAW. YOU KNOW, I UNDERSTAND THAT YOUR HONOR, YOU MAY WANT TO LOOK AT EACH VERSION AND SEE IF WE'VE ACCURATELY DESCRIBED THEM.

THE COURT: WHAT I COULDN'T TRACK IS WHAT BILL THE LEGISLATURE VOTED ON WHEN THEY PUT IT IN SUSPENSE, AND I COULDN'T TRACK WHAT THE FULL BILL WAS WHEN THEY DEFEATED IT WITH THE 45-DAY CURE PERIOD.

MS. KUMAR: SURE.

THE COURT: AND THEN -- SO THERE ARE THREE VERSIONS OF THE BILL I WANT: THE VERSION THAT GOT VOTED INTO SUSPENSE; THE VERSION THAT GOT DEFEATED WITH A 45-DAY CURE; AND THE

VERSION THAT GOT APPROVED WITH A 90-DAY.

AND THEN I HAVE TO DETERMINE WHETHER I CAN CLEARLY FIND THAT IT WAS THE CURE PROVISION THAT DROVE THE VOTES.

MS. KUMAR: OKAY.

THE COURT: THERE WERE OTHER AMENDMENTS, SO I HAVE TO REALLY -- AND THOSE ARE LISTED IN THE ANALYSIS.

MS. KUMAR: OKAY.

THE COURT: THEY HIGHLIGHT WHAT THE AMENDMENTS ARE.

MS. KUMAR: OKAY. WE CAN PROVIDE THAT TO YOU.

YOU KNOW, I KNOW YOU WEREN'T PERSUADED ON FUNCTIONAL SEVERABILITY, BUT I WILL, YOU KNOW, JUST SAY THAT THE POINT OF THE LAW WAS TO ENCOURAGE COMPLIANCE, THAT'S WHAT THE STATE HAS SAID, AND NOW IT'S JUST A PUNITIVE LAW.

SO I DO THINK YOU CAN FIND THAT, YOU KNOW, IT'S FUNCTIONALLY NOT SEVERABLE, EITHER.

SO -- AND, YOU KNOW, THERE'S NO SEVERABILITY CLAUSE, AND IT'S THE STATE'S BURDEN TO SHOW --

THE COURT: YEAH.

MS. KUMAR: -- THAT IT WOULD HAVE ENACTED THIS LAW WITHOUT THE CURE PROVISION, AND I DON'T THINK IT WOULD HAVE.

THE COURT: OKAY. WELL, I THINK YOUR ARGUMENT AS TO THE AMENDMENTS IS PRETTY STRONG, AND THAT'S A --

MS. KUMAR: I DIDN'T GET TO GET TO ALL THE STUFF.

THE COURT: WELL, YOU DON'T, BUT THAT'S A WELL ESTABLISHED PRINCIPLE OF STATUTORY CONSTRUCTION.

MS. KUMAR: YEAH.

THE COURT: OKAY.

MS. KUMAR: OKAY. THANK YOU.

THE COURT: THANK YOU.

MAYBE WE SHOULD TAKE OUR BREAK NOW.

MS. LISKA, I NEED TO TAKE A BREAK AND I HATE TO INTERRUPT YOUR ARGUMENT, SO WOULD YOU MIND IF WE TAKE A TEN MINUTE BREAK BEFORE YOU START?

MS. LISKA: NOT AT ALL. I'LL GO GET SOME WATER.

THE COURT: THERE YOU GO. THAT'LL HELP EVERYONE. THANK YOU.

THE CLERK: THIS COURT IS IN RECESS.

(RECESS FROM 10:18 A.M. UNTIL 10:29 A.M.)

THE COURT: ALL RIGHT. MS. LISKA, I'M GOING TO LET YOU GET STARTED. YOU KNOW MY CONCERNS, YOU KNOW THE PLAINTIFF'S ARGUMENT.

MS. LISKA: THANK YOU, YOUR HONOR. I WILL TRY TO FOCUS ON THE ISSUES THAT HAVE BEEN DISCUSSED AND THAT YOUR HONOR RAISED.

I'M MAKING SURE YOU CAN HEAR ME.

THE COURT: THAT'S PERFECT.

MS. LISKA: IN THE EARLIER ARGUMENT -- WELL, WE APPRECIATE YOUR GENEROSITY OF TIME, SO I DON'T WANT TO BELABOR THINGS MORE THAN NECESSARY.

I WANT TO START WITH MAKING TWO BIG PICTURE POINTS AND

THEN I'LL DRILL FURTHER DOWN.

THE FIRST IS THAT WHEN WE'RE DISCUSSING THE FIRST AMENDMENT, THERE IS ALWAYS A THRESHOLD QUESTION ABOUT WHETHER OR NOT EXPRESSION OR SPEECH IS ACTUALLY BEING IMPACTED OR TARGETED, AND I THINK THAT THIS IS RELEVANT AND SALIENT THROUGHOUT THE ENTIRETY OF THIS MOTION.

I THINK ONE OF THE POINTS WE MAKE, AND THAT YOUR HONOR HAS SORT OF TOUCHED UPON WITH MY FRIEND ON THE OTHER SIDE, IS WHAT EVEN -- WHAT EVEN DOES THIS LAW DO TO THESE COMPANIES? THEY DON'T REALLY DRILL INTO HOW IS THERE EXPRESSIVE ACTIVITY BEING IMPACTED BY THE REGULATIONS?

AND THE SECOND THING IS, AND THIS IS RELATED, IS THAT I THINK IT'S HELPFUL TO REALLY DRILL DOWN INTO WHAT DOES THIS LAW ACTUALLY DO?

YOU KNOW, YOUR HONOR PUT FORWARD THE EXAMPLE OF, YOU KNOW, AN ARTICLE ABOUT THE HAMAS ISRAELI WAR PUBLISHED IN THE *NEW YORK TIMES*.

SO I THINK IT'S IMPORTANT TO SAY FIRST, THE LAW NOWHERE SAYS THAT YOU CANNOT PUBLISH THAT TYPE OF CONTENT TO A CHILD. IT WOULD NOT SANCTION A COMPANY IF A CHILD WERE TO OPEN UP THEIR BROWSER, GO TO THE *NEW YORK TIMES*, AND ON THE FRONT PAGE OF THE *NEW YORK TIMES* IS AN ARTICLE ON THE HAMAS ISRAELI CONFLICT.

THERE WOULD BE NO PENALTY IMPOSED ON ANY COMPANY SIMPLY BECAUSE A CHILD WENT TO THEIR WEBSITE AND THE FIRST THING THEY

SAW WAS AN ARTICLE ON THE HAMAS ISRAELI WAR.

THE COURT: BUT THEY CAN'T PUSH IT TO A CHILD.

MS. LISKA: THEY CANNOT USE THE CHILD'S PERSONAL INFORMATION IN THE THREE DISTINCT WAYS, AND THEY HAVE NOT ARTICULATED HOW, IN THEIR DECLARATIONS, THEY'RE USING PERSONAL INFORMATION TO DELIVER CONTENT THAT MIGHT BE CONSIDERED HARMFUL.

THE COURT: WELL, LET'S TALK ABOUT AUTOPLAY. YOU'VE GOT A 12 YEAR OLD DOING A REPORT ON THE MID-EAST CRISIS AND THE ALGORITHMS WOULD PICK UP ON A COUPLE OF INQUIRIES MADE TO WEBSITES ABOUT THAT AND START PUSHING OTHER THINGS.

MS. LISKA: SO TWO, TWO RESPONSES TO THAT, YOUR HONOR.

FIRST, I THINK IT'S HELPFUL TO LOOK AT WHAT THE SPECIFIC PROVISIONS THAT ARE AT ISSUE HERE ACTUALLY DO.

THE COURT: OKAY.

MS. LISKA: IT'S UNCLEAR -- WITH RESPECT TO THE FOUR THAT RELATE TO INFORMATION USAGE, IT'S UNCLEAR HOW THAT SPECIFIC EXAMPLE OF AUTOPLAY INVOLVED PROFILING A CHILD BY DEFAULT. AND, AGAIN, THAT'S BY DEFAULT. THEY CAN STILL PROFILE CHILDREN, THEY SIMPLY HAVE TO ALLOW CHILDREN TO OPT IN RATHER THAN DOING SO BY DEFAULT.

IT'S UNCLEAR HOW THEY ARE USING THE INFORMATION PROVIDED IN A WAY THAT IS NOT NECESSARY TO PROVIDE A SERVICE. FOR INSTANCE, ONE COULD ARGUE -- AND I DON'T WANT TO -- I DON'T

WANT TO, YOU KNOW, SAY DEFINITIVELY HOW THE LAW WOULD BE INTERPRETED IN A VERY FACT-SPECIFIC CONTENT, WHICH IS WHAT WE'RE LACKING HERE, BUT ONE COULD ARGUE THAT USING PERSONAL INFORMATION TO GIVE A USER ACCESS TO A VIDEO IS USING IT IN A WAY THAT IS NECESSARY TO PROVIDE A SERVICE TO THE CHILD.

IT'S NOT CLEAR THAT THEY'RE USING IT FOR A REASON OTHER THAN WHAT IT WAS COLLECTED FOR. THAT'S (B)(4). I JUST TALKED ABOUT (B)(2), (B)(3), AND THAT'S (B)(4). IF THE DATA HAS BEEN COLLECTED FOR PURPOSES OF PROVIDING -- YOU KNOW, YOU GO INTO YOUTUBE, YOUTUBE HAS COLLECTED PERSONAL INFORMATION, THE PURPOSE IT COLLECTED IT FOR WAS TO GIVE A CHILD ACCESS TO A VIDEO, THEN GIVING THE CHILD ACCESS TO THAT VIDEO IS CLEARLY WITHIN THE SCOPE OF (B)(4) BECAUSE THAT'S THE PURPOSE FOR WHICH IT WAS COLLECTED.

SO THE ONLY ONE WHICH WITH THERE MAY BE SOME ARGUMENT IS THAT THERE IS AN ISSUE WITH (B)(1), AND I THINK THAT THIS THEN GOES BACK TO THE FIRST OF MY TWO BIG PICTURE POINTS, WHICH IS HOW HAS EXPRESSIVE CONDUCT, EXPRESSIVE ACTIVITY BEEN IMPACTED?

WE DON'T UNDERSTAND -- THEY SAY WE USE DATA IN ALGORITHMS. ALGORITHMS THAT DO WHAT?

AND I THINK, YOU KNOW, MOODY IS VERY CLEAR -- AND YOU KNOW JUDGE DAVILA MAKES A NOTE OF THIS -- ALL NINE JUSTICES IN MOODY WERE VERY CLEAR THAT THEIR OPINION DID NOT SPEAK TO ALGORITHMS THAT SOLELY RESPOND TO DATA FROM A USER.

AND FOUR OF THOSE JUSTICES, THE BARRETT CONCURRENCE AND

THE ALITO OPINION, WERE PRETTY SKEPTICAL THAT AN ALGORITHMIC SITUATION WHERE YOU HAD ARTIFICIAL INTELLIGENCE, MACHINE LEARNING, WHERE SOMETHING IS DESIGNED AND LET LOOSE AND IS OUT IN THE WORLD OPERATING ON ITS OWN WHERE IT'S MAKING DECISIONS ABOUT WHAT TO SHOW A USER, THAT MAY NOT EVEN BE EXPRESSIVE ALTOGETHER.

IT'S VERY DIFFERENT FROM A NEWSPAPER DECIDING, OH, WHICH ARTICLE DO WE WANT TO RUN? THAT'S A HUMAN MAKING DECISIONS ABOUT WHAT, YOU KNOW, WHAT SUBJECTS ARE IMPORTANT, WHAT SPEECH SHOULD I SHOW?

THE COURT: I DON'T THINK THIS STATUTE IS GOING TO CALL UPON ME TO DECIDE WHETHER A.I. IS EXPRESSIVE ACTIVITY. THAT'S NOT HAPPENING.

(LAUGHTER.)

MS. LISKA: NO, BUT --

THE COURT: I'M GOING TO LEAVE THAT FOR PEOPLE WAY SMARTER THAN ME.

MS. LISKA: YEAH, BUT I DO THINK THAT THAT SPEAKS TO THE BURDEN THAT IS ON PLAINTIFF TO SHOW THAT EXPRESSIVE ACTIVITY HAS BEEN IMPACTED.

AND, YOU KNOW, THAT IS A REAL QUESTION ABOUT, YOU KNOW, TO WHAT EXTENT.

THE COURT: WHAT A SERVICE CHOOSES TO PUBLISH TO A USER IS EXPRESSIVE ACTIVITY. THAT IS WELL SETTLED.

MS. LISKA: I THINK WHAT MOODY SETTLES IS THAT WHERE

HUMANS ARE MAKING VALUE JUDGMENTS ABOUT THE MESSAGES THEY WANT TO PROMOTE, THAT IS EXPRESSIVE.

THE COURT: I DON'T THINK MOODY IS LIMITED TO A PERSON MAKING -- PUSHING BUTTONS.

I THINK THAT CREATION OF AN ALGORITHM THAT DOES THAT FOR THE SERVICE, WHICH IS MADE UP OF PEOPLE, IS THE IMPLEMENTATION OF THEIR EXPRESSIVE ACTIVITIES.

I DON'T THINK THERE'S ANYTHING IN MOODY THAT SAYS OTHERWISE.

MS. LISKA: NO, BUT I DO THINK THAT MOODY IS CLEAR IT'S NOT SAYING THAT THAT IS EXPRESSIVE ACTIVITY.

THE COURT: BECAUSE OTHERWISE YOU JUST CREATED A FULL EMPLOYMENT ACT FOR THE MILLENNIUM OF NOW WE'RE GOING TO HAVE PEOPLE DO THIS AND NOT ALGORITHMS. IT'S BILLIONS AND BILLIONS OF EXPRESSIONS, OR PUSHES OF CONTENT EVERY DAY.

MS. LISKA: YOU KNOW, BUT I DO WANT TO TAKE A STEP BACK, THOUGH, AND GO BACK TO THAT AUTOPLAY EXAMPLE --

THE COURT: UM-HUM.

MS. LISKA: -- WHICH IS, AGAIN, IT HAS TO BE A USE OF PERSONAL INFORMATION IN A WAY THAT THE BUSINESS KNOWS OR HAS REASON TO KNOW IS MATERIALLY DETRIMENTAL.

AND I DON'T KNOW THAT THEY SAY, FOR INSTANCE -- AND THIS ALSO SPEAKS TO THE SCOPE OF RELIEF. WE'RE TALKING ABOUT ONE VERY SPECIFIC THING, AUTOPLAY. THEY HAVEN'T COME INTO THIS COURT AND SAID, WE WANT AN INJUNCTION THAT SAYS THAT WE CAN USE

PERSONAL INFORMATION FOR THE PURPOSE OF HAVING AUTOPLAY ON SOME, NOT ALL -- BECAUSE LET'S BE CLEAR, NOT ALL OF THE MEMBERS INVOLVED HERE USE AUTOPLAY -- SOME OF OUR MEMBERS USE AUTOPLAY AND WE WANT AN INJUNCTION THAT ALLOWS THOSE MEMBERS TO USE AUTOPLAY.

THIS WOULD BE A DIFFERENT CASE IF THAT WAS WHAT WE WERE LITIGATING ABOUT.

THE COURT: SO YOU'VE JUMPED INTO THE JOHN DOE #1 ANALYSIS, AND OF COURSE THAT'S WHAT THE SUPREME COURT SAID. IT'S NOT HOW IT AFFECTS JUST YOUR MEMBER. WE HAVE TO GENERALIZE IT.

OTHERWISE WE ARE IN THAT AS-APPLIED FRAMEWORK WHERE I'M NOT GOING. I DON'T THINK -- I'M NOT GOING TO MAKE AN AS-APPLIED RULING BECAUSE I DON'T THINK IT'S PROPERLY BRIEFED, SO YOU'RE GOOD ON THAT.

BUT THEY ARE -- SO I THINK THEY'RE TRYING TO SAY THAT THESE PARTICULAR FEATURES AS APPLIED TO ALL COVERED SERVICES ARE -- IMPLICATE EXPRESSIVE ACTIVITY.

MS. LISKA: BUT, AGAIN, THIS IS ONE FEATURE, AND IT'S NOT EVEN CLEAR THAT ALL OF THEIR MEMBERS WHO ARE SUBJECT TO THE ACT WOULD EVEN USE THIS FEATURE.

THE COURT: I DON'T KNOW -- THAT'S -- AGAIN, YOU'RE GOING BACK INTO THE AS-APPLIED, AND I'M NOT GOING THERE.

MS. LISKA: I THINK THE REASON I'M SLIGHTLY CONFUSED -- MY --

THE COURT: NO ONE RAISED A STANDING ISSUE.

MS. LISKA: MY UNDERSTANDING OF HOW THEY'RE FRAMING THEIR FACIAL CHALLENGE IS THAT IT'S A FACIAL CHALLENGE AS TO A SPECIFIC SET OF APPLICATIONS.

THE COURT: THAT'S RIGHT.

MS. LISKA: AND SO MY POINT IS SIMPLY THAT WE HAVE LOOKED AT ONE AND ZEROED IN ON ONE APPLICATION, WHICH IS AUTOPLAY. AND I THINK THAT THAT --

THE COURT: I RAISED THAT.

MS. LISKA: YEAH.

THE COURT: BUT THE PLAINTIFFS DIDN'T.

MS. LISKA: NO, NO, BUT I THINK THIS IS REFLECTIVE OF THE GENERAL WAY THAT PLAINTIFFS ARE LITIGATING THIS IS THAT THEY'RE TRYING TO FOCUS IN ON ONE SPECIFIC THING, BUT THEY HAVEN'T LAID THE FOUNDATION THAT THAT EVEN CONSTITUTES A SUBSTANTIAL NUMBER OF THE APPLICATIONS OF THIS LAW.

THE COURT: OKAY. THAT'S FAIR.

MS. LISKA: THAT'S MY POINT.

AND I THINK IF YOU LOOK TO, FOR INSTANCE, THE CLELAND DECLARATION AT PAGE 4, THE LIST OF COMPANIES -- AND I'LL JUMP FROM HERE INTO THE QUESTION ABOUT THE STRICT SCRUTINY AND THE COVERAGE DEFINITION IF THAT'S ALL RIGHT WITH YOUR HONOR -- THIS INCLUDES A LOT OF COMPANIES THAT DO NOT INVOLVE THE USE OF A -- THE USE OR DELIVERY OF A PHYSICAL PRODUCT, WHICH IS WHAT THE --

THE COURT: SO I'M NOT CONSIDERING PHYSICAL BECAUSE

THAT'S NOT COVERED BY THE STATUTE.

MS. LISKA: CORRECT. SO THERE ARE COMPANIES THAT DON'T DO THAT THAT WOULD ARGUABLY STILL POTENTIALLY FALL WITHIN THE SCOPE OF THIS LAW, LIKE LYFT, HOTELS.COM, PAYPAL, TRAVELOCITY, TRIVAGO, STUBHUB, VRBO, AND WAYMO FOR INSTANCE ARE ALL MEMBERS LISTED IN THE CLELAND DECLARATION, ALL OF WHOM ARGUE THAT THEY DO NOT INVOLVE THE USE OF A PHYSICAL PRODUCT, BUT ONE MAY SAY IT'S POSSIBLE THAT A SUBSTANTIAL NUMBER OF CHILDREN USE STUBHUB, FOR INSTANCE, TO BUY TICKETS TO EVENTS.

THE COURT: SURE.

MS. LISKA: OR USE LYFT TO OBTAIN A RIDE, OR USE PAYPAL TO ENGAGE IN A FINANCIAL TRANSACTION.

SO ALL OF THOSE COMPANIES COULD POTENTIALLY BE SUBJECT TO THE LAW. AND, AGAIN, WE DON'T KNOW THE RECORD THAT ANY OF THEM ARE. WE DON'T KNOW THE RECORD THAT ANY OF THEM COULD -- WOULD BE. WE DON'T KNOW HOW THEIR BEHAVIOR IS GOING TO BE IMPACTED.

THE COURT: YOU'RE GOING TO TELL THEM IF THEY'RE COVERED, BECAUSE YOU WROTE THIS LAW.

MS. LISKA: CORRECT.

BUT TO ME IT'S THE MOODY BURDEN. THE PLAINTIFFS NEED TO COME IN AND SHOW US THAT A SUBSTANTIAL NUMBER OF THE APPLICATIONS OF THE LAW -- WHICH, AGAIN, COULD VERY WELL BE TO THESE SORTS OF COMPANIES THAT ARE NOT PUBLISHERS, THAT I DON'T KNOW THAT I WOULD CALL LYFT OR PAYPAL A PUBLISHER -- BUT ARE NOT THE SORT OF QUINTESSENTIAL SOCIAL MEDIA LIKE TWITTER, X, OR

YOUTUBE, OR FACEBOOK, THAT COMPANIES THAT A SUBSTANTIAL NUMBER OF CHILDREN STILL MAY BE ACCESSING THAT ARE SUBJECT TO THIS LAW, AND THEY HAVE NOT DEMONSTRATED THAT THOSE COMPANIES' EXPRESSIVE ACTIVITY IS GOING TO BE AT ALL IMPACTED BY THIS STATUTE.

SO THEY CANNOT MAKE THAT THRESHOLD SHOWING THAT THE FIRST AMENDMENT IS TRIGGERED BY A SUBSTANTIAL NUMBER OF APPLICATIONS.

THE COURT: AND WHAT SECTION ARE YOU MAKING THIS ARGUMENT ABOUT? THE B(1)-(4)?

MS. LISKA: SO WE -- I MEAN, WE THINK THEY FAIL ON ALL OF THEM.

THE COURT: OKAY. I'M SORRY.

MS. LISKA: BUT THIS IS SPECIFICALLY (1) THROUGH (4) THAT I'M TALKING ABOUT RIGHT NOW.

THE COURT: SO IF YOU MAKE GENERAL ARGUMENTS AND I CAN'T DRAW A LINE TO WHAT YOU'RE TRYING TO SAVE, THEN YOU WILL LOSE. SO IT'S REALLY IMPORTANT.

SO THIS IS -- THIS -- THESE COMMENTS -- AND THESE ARE GOOD COMMENTS -- ARE FOCUSSED ON B(1)-(4)?

MS. LISKA: CORRECT, THE DATA USE PROVISIONS RIGHT NOW.

THE COURT: OKAY.

MS. LISKA: BUT I DO WANT TO SHIFT FROM THERE TO THEIR POINT ABOUT THE APPLICATION OF STRICT SCRUTINY, BECAUSE I DO THINK THAT THIS REALLY CUTS AGAINST THEIR ARGUMENT THAT THE

COVERAGE DEFINITION IS CONTENT BASED.

THE COURT: ARE YOU -- SO WE'RE SWITCHING TO THE COVERAGE?

MS. LISKA: YES, I'D LIKE TO TALK ABOUT THE COVERAGE DEFINITION.

THE COURT: OKAY. SO THAT IS -- I THINK YOU'VE GOT -- THAT'S A REALLY TOUGH ARGUMENT FOR YOU.

MS. LISKA: WELL, I THINK THAT IT WOULD BE HELPFUL TO TAKE THE RECENT EN BANC DECISION FROM THE PROJECT VERITAS CASE THAT WE'VE PUT IN FRONT OF THIS COURT.

FIRST, PROJECT VERITAS MAKES CLEAR THAT THERE IS STILL THAT THRESHOLD PROBLEM OF IS EXPRESSIVE ACTIVITY BEING IMPACTED? AND SINCE THIS IS FACIAL, THEY WOULD NEED TO SHOW THAT A SUBSTANTIAL NUMBER OF APPLICATIONS ACTUALLY IMPACT EXPRESSIVE ACTIVITY, BECAUSE IF EXPRESSIVE ACTIVITY --

THE COURT: SO WHAT THEY'RE SAYING IS THAT IN ORDER TO DETERMINE IF YOU'RE COVERED, YOU HAVE TO REVIEW CONTENT. THAT'S A VERY STRONG ARGUMENT.

MS. LISKA: I THINK THAT PROJECT VERITAS CLEARLY PUSHES BACK ON THAT, BECAUSE PROJECT VERITAS IS QUITE CLEAR THAT SIMPLY BECAUSE YOU HAVE TO --

THE COURT: I'M SORRY. I THINK YOU GAVE THAT TO ME YESTERDAY.

MS. LISKA: I THINK SO.

THE COURT: I HAVEN'T READ IT.

MS. LISKA: TWO DAYS AGO.

THE COURT: THERE --

MS. LISKA: MY APOLOGIES.

THE COURT: I HAVEN'T READ IT.

MS. LISKA: MY APOLOGIES, YOUR HONOR.

THE COURT: SO I DON'T KNOW WHAT YOU'RE TALKING ABOUT.

MS. LISKA: THEN I WILL BACK UP.

THE COURT: IS THAT A NINTH CIRCUIT DECISION?

MS. LISKA: YES. THERE'S A RECENT NINTH CIRCUIT DECISION, I THINK IT WAS ISSUED ON THE 7TH, BUT WE PUT IT IN WITH THE TIKTOK CASE WHICH CAME OUT ON THE 17TH.

THE COURT: YES, I DID SEE THAT YOU GAVE ME NEW CASES, BUT --

MS. LISKA: I UNDERSTAND. I APOLOGIZE. THEY WERE IN SO LATE. THE TIKTOK ONE WE PUT IN THE FIRST BUSINESS DAY WE COULD.

IN PROJECT VERITAS, WHICH IS A NINTH CIRCUIT EN BANC DECISION, THE COURT CONSIDERED THE VALIDITY OF THE STATUTE OUT OF OREGON THAT INVOLVED SURREPTITIOUSLY RECORDING CONVERSATIONS.

AND IN THE ANALYSIS OF THAT LAW, THE COURT HAS A VERY LENGTHY DISCUSSION OF WHAT MAKES A STATUTE CONTENT NEUTRAL.

BUT WHAT IS RELEVANT HERE IS THAT THE FIRST STEP IN THE COURT'S ANALYSIS WAS WHETHER OR NOT THE STATUTE ACTUALLY

IMPLICATED EXPRESSIVE ACTIVITY OR CONDUCT SUBJECT TO THE FIRST AMENDMENT.

SO THE FIRST QUESTION HAS TO BE, IS EXPRESSIVE ACTIVITY REGULATED?

THE NEXT QUESTION IS, IS IT REGULATED IN A CONTENT BASED WAY?

SO UNLESS WE CAN CLEAR THAT FIRST HURDLE OF THE REGULATED ENTITIES, THEIR EXPRESSION IS WHAT'S REGULATED.

I DON'T BELIEVE WE CAN EVEN GET TO THE QUESTION OF, IS THIS CONTENT BASED OR CONTENT NEUTRAL?

AND I THINK THE CASE LAW IS CLEAR, WE CITE TO SOME OF THAT IN OUR BRIEF, BUT I THINK PROJECT VERITAS ALSO MAKES IT CLEAR, HOPEFULLY WHEN YOUR HONOR HAS A CHANCE TO REVIEW IT -- AND, AGAIN, WE APOLOGIZE WE WERE SO LATE IN GETTING THAT TO YOU -- IT SHOWS THAT THAT IS THE FIRST THRESHOLD STEP.

SO I THINK THAT GOES BACK TO THE HEART WHICH RELATES TO, YOU KNOW, ESPECIALLY THE DATA USE PROVISIONS, BUT ALSO AGE ESTIMATION AND TO SOME EXTENT THE DARK PATTERNS, WHETHER OR NOT THOSE --

THE COURT: ALL RIGHT. SO LET'S TAKE A LOOK AT SECTION 31(A). THIS IS THE COVERAGE DEFINITION. A BUSINESS THAT PROVIDES AN ONLINE SERVICE, PRODUCT, OR FEATURE LIKELY TO BE ACCESSED BY CHILDREN.

SO THEN WE GO TO OUR DEFINITIONS. HOW DO I KNOW IF SOMETHING IS LIKELY TO BE ACCESSED BY CHILDREN IF I DON'T LOOK

AT THE CONTENT AND DETERMINE WHETHER IT'S ATTRACTIVE?

SO I'M LOOKING AT THE DEFINITION SECTION, 30(B)(4), LIKELY TO BE ACCESSED BY CHILDREN MEANS IT IS REASONABLE TO EXPECT, BASED ON THE FOLLOWING INDICATORS, THAT THE ONLINE SERVICE, PRODUCT, OR FEATURE WOULD BE ACCESSED BY CHILDREN.

MS. LISKA: YES.

THE COURT: AND THEN WE GO TO -- AND THEN THERE ARE THE FOLLOWING GUIDELINES. (E), AN ONLINE SERVICE, PRODUCT, OR FEATURE THAT HAS DESIGN ELEMENTS THAT ARE KNOWN TO BE OF INTEREST TO CHILDREN, INCLUDING GAMES, CARTOONS, MUSIC, AND CELEBRITIES WHO APPEAL TO CHILDREN.

IT'S THE "WHO APPEAL TO CHILDREN."

SO IT'S NOT JUST GAMES. IT'S GAMES THAT APPEAL TO CHILDREN. IT'S CARTOONS THAT APPEAL TO CHILDREN.

HOW DO I KNOW IF IT APPEALS TO CHILDREN WITHOUT LOOKING AT THE CONTENT?

MS. LISKA: SO THE CASES -- SO FIRST -- I GUESS --

THE COURT: AND YOU CITE CITY OF AUSTIN AS YOUR SUPPORT HERE.

MS. LISKA: YES.

THE COURT: I DON'T THINK AUSTIN --

MS. LISKA: PROJECT VERITAS AS WELL IN THIS INSTANCE.

THE COURT: AND I APPRECIATE THAT, BUT IT CAME OUT TOO LATE TO BRIEF IT.

MS. LISKA: NO, I UNDERSTAND.

I -- TWO -- JUST A COUPLE DIFFERENT WAYS I'D LIKE TO COMMENT ON THIS.

THE FIRST IS THAT THIS IS ONE FACTOR AMONG MANY, AND THE OTHER INDICATORS DO NOT INVOLVE LOOKING AT THE CONTENT, THINGS LIKE, BASED UPON EVIDENCE, WHAT IS THE AUDIENCE COMPOSITION? THAT HAS NOTHING TO DO --

THE COURT: SO AUDIENCE IS -- AUDIENCE IS CONSIDERED A, A CONTENT-BASED INDICATOR, THOUGH.

MS. LISKA: SO IT SAYS IT'S -- THE QUESTION IS, IS IT A SIGNIFICANT NUMBER OF CHILDREN WHO ROUTINELY ACCESS IT? THAT'S THE SPECIFIC LANGUAGE.

SO THAT'S -- (A) IS, IS IT DIRECTED TO CHILDREN AS DEFINED BY COPPA? (B) IS, IS IT BASED UPON EVIDENCE REGARDING AUDIENCE COMPOSITION TO BE ROUTINELY ACCESSED BY A SIGNIFICANT NUMBER OF CHILDREN? THE THIRD IS ADVERTISEMENTS MARKETED TO CHILDREN. THE FOURTH IS SUBSTANTIALLY SIMILAR TO --

THE COURT: SO ADVERTISEMENTS MARKETED TO CHILDREN IS BASED ON WHAT THE CONTENT OF THE AD IS.

MS. LISKA: SO, AGAIN, I --

THE COURT: SO IT'S CONTENT BASED.

MS. LISKA: THIS IS GOING TO, ARE THE USERS CHILDREN?

AND THE REASON THAT WE KNOW THIS IS THAT IF THE USERS ARE CHILDREN, IT DOESN'T MATTER WHAT MESSAGES OR TOPICS THE COMPANY HAS. IT CAN BE A SERVICE THAT HAS VIDEOS ABOUT POLITICAL COMMENTARY, BUT IS ACCESSED BY CHILDREN. IT CAN BE A SERVICE

THAT HAS, YOU KNOW, CARTOONS, BUT IS ACCESSED BY CHILDREN.

AND I THINK, YOU KNOW, AGAIN, GOING TO ANOTHER CASE THAT HASN'T NECESSARILY BEEN FULLY, YOU KNOW, ISSUED -- DISCUSSED, WHICH IS THE TIKTOK ONE AS WELL, IT REFERENCES, YOU KNOW, THAT CHANGING THE SPEECH DOESN'T NECESSARILY LIFT A COMPANY FROM HAVING TO COMPLY WITH THIS BURDEN.

IF IT CHANGED THE CONTENT OF THEIR SPEECH, BUT THEY ARE STILL ACCESSED BY CHILDREN, THEY ARE STILL SUBJECT TO THIS LAW.

AND I THINK IT'S ALSO SALIENT -- AND PROJECT VERITAS, AND TO SOME EXTENT A LITTLE BIT THE TIKTOK DECISION AS WELL --

THE COURT: I NEED YOU TO SLOW DOWN.

MS. LISKA: MY APOLOGIES.

THE COURT: YOU HAVE TWO HOURS. I CAN'T LISTEN THAT FAST.

MS. LISKA: I APOLOGIZE. YOU JOIN A LONG LINE OF TEACHERS WHO HAVE TOLD ME IN EVERY BOOK REPORT TO SLOW DOWN.

THE COURT: SO YOU'RE OLD ENOUGH TO HAVE LEARNED YOUR LESSON. LET'S DO IT RIGHT NOW.

MS. LISKA: I'LL TRY. I'LL DO MY BEST.

THE COURT: I HAVE NO SYMPATHY FOR SOMEONE WHO'S BEEN TOLD BEFORE. IT CHANGES NOW. TALK SLOWLY.

MS. LISKA: WILL DO.

I THINK THAT THE COURTS HAVE -- THE NINTH CIRCUIT IN TIKTOK, AND THE NINTH CIRCUIT ESPECIALLY IN THE PROJECT VERITAS CASE, IS CLEAR THAT SIMPLY BECAUSE YOU LOOK AT CONTENT DOES NOT

MAKE IT CONTENT BASED.

THE QUESTION IS WHETHER OR NOT THE STATUTE WAS ADOPTED BECAUSE OF THE IDEAS OR VIEWS EXPRESSED, AND THIS STATUTE IS NOT ABOUT IDEAS OR VIEWS OR MESSAGES EXPRESSED.

WE ARE NOT REGULATING THESE COMPANIES BECAUSE OF THE IDEAS OR VIEWS THAT THEY HAVE IN ANY EXPRESSIVE SPEECH OR CONTENT ON THEIR PAGES.

THE COURT: SO WHY ARE YOU REGULATING IT?

MS. LISKA: BECAUSE CHILDREN USE THEM AND WE'RE CONCERNED ABOUT THE SAFETY OF CHILDREN.

THE COURT: SO WHAT'S -- OKAY. SO THEN -- YOU JUST ANSWERED THE QUESTION THEN. OF COURSE YOU'RE CONCERNED ABOUT THE IDEAS, BECAUSE THE IDEAS EXPRESSED AFFECT CHILDREN DIFFERENTLY THAN ADULTS. YOU JUST TOLD ME THAT.

MS. LISKA: NO. WE'RE CONCERNED ABOUT THE PRIVACY AND SAFETY OF CHILDREN AND THE WAYS IN WHICH DATA IS BEING USED FOR CHILDREN.

YOU KNOW, I KNOW THERE'S BEEN A LOT OF DISCUSSION ABOUT, YOU KNOW, THE EXTENT TO WHICH SOCIAL -- ONLINE PRODUCTS OR SOCIAL MEDIA HARM CHILDREN.

BUT NONE OF THAT SPEAKS TO THE STATE'S CONCERN ABOUT PRIVACY, THE PRIVACY OF CHILDREN WHOSE DATA IS BEING COLLECTED BY COMPANIES AND USED IN WAYS THAT THEY DON'T NECESSARILY NEED TO USE THAT DATA, OR SOLD TO OTHER ENTITIES.

THIS ISN'T ABOUT SPEECH THE STATE DOESN'T LIKE. THIS IS

ABOUT DATA COLLECTION.

THE COURT: I THINK YOU MADE ALL THESE ARGUMENTS LAST TIME, AND I DIDN'T BUY THEM, BUT NEITHER DID THE NINTH CIRCUIT.

MS. LISKA: MAYBE INSOFAR AS WE'RE TALKING ABOUT THE DPIA PROVISION, BUT I DON'T THINK THE NINTH CIRCUIT DRILLED INTO THE QUESTIONS ABOUT PRIVACY WITH RESPECT TO THE OTHER SUBSTANTIVE PARTS OF THIS STATUTE.

THE COURT: SO HAVING GUTTED THE DPIA, AT LEAST PRELIMINARILY, WHERE THE IDENTIFICATION OF CONTENT LIKELY TO BE HARMFUL TO CHILDREN, YOU'RE SAYING THAT -- YOU'RE SAYING THERE'S NOTHING HERE ABOUT HARM TO CHILDREN ANYMORE. THIS STATUTE IS NO LONGER ABOUT THE CONTENT BEING HARMFUL TO CHILDREN.

MS. LISKA: TO SOME EXTENT -- I MEAN, WE DISPUTE THAT THAT'S EVER WHAT IT WAS ABOUT. IT MAY BE A PARTIAL MOTIVATION OF SOME PEOPLE.

BUT THAT THIS WAS ABOUT THE, THE HARM TO CHILDREN FROM THEIR PRIVACY BEING INFRINGED. I MEAN, THAT'S IN THE FINDINGS THEMSELVES. YOU KNOW, THE FINDINGS AND DECLARATION OF THE STATUTE THEMSELVES, WHICH MENTION THINGS ABOUT PRIVACY PROTECTIONS FOR CHILDREN, YOU KNOW, PROFILING CHILDREN.

I THINK, YOU KNOW, THE CONCERN ABOUT PRIVACY IS ONE THAT IS THROUGHOUT THE LAW IN MANY DIFFERENT, YOU KNOW, AREAS AND ASPECTS, CONCERN ABOUT THE KIND OF INFORMATION PEOPLE COLLECT ON YOU.

I MEAN, I THINK -- YOU KNOW, THE RADESKY DECLARATION NOTES THAT ONE STUDY DETERMINED COMPANIES HAVE UP TO 72 MILLION DATA POINTS ON A CHILD BY AGE 13.

AND I THINK THE STATE IS MOTIVATED IN ITS CONCERNS ABOUT THE PRIVACY FOR CHILDREN FROM THAT KIND OF DATA COLLECTION AND THE WAYS COMPANIES USE IT.

AND IF YOU LOOK AT SPECIFICALLY WHAT THE PROVISIONS AT ISSUE HERE INVOLVE, MANY OF THEM INVOLVE SPECIFICALLY REGULATIONS ON HOW DATA IS BEING USED, NOT DIRECTIONS TO LOOK AT THE CONTENT OF THE, THE -- YOU KNOW, WHATEVER IS ON THE SITE.

THE COURT: OKAY. I CERTAINLY DON'T THINK YOU COULD SAY THAT AS TO THE USE OF THE -- TO THE POLICY ENFORCEMENT, BECAUSE POLICY ENFORCEMENT OF COMMUNITY STANDARDS IS COMPLETELY SEPARATE AND IT'S COMPLETELY ABOUT CONTENT AND CONTENT POLICIES. THAT I THINK YOU WOULD JUST BE WRONG ON.

MS. LISKA: IF YOU'RE LOOKING AT IT SOLELY AS A YOUTUBE CONTENT MODERATION POLICY, PERHAPS.

BUT THE PROVISION ITSELF IS BROADER AND SPECIFICALLY --

THE COURT: BUT THE ONLY CHALLENGE --

MS. LISKA: -- CALLS OUT PRIVACY POLICIES.

THE COURT: THE ONLY CHALLENGE TO THE POLICY ENFORCEMENT, WHICH IS (A)(9), IS AS IT APPLIES TO CONTENT POLICIES AND COMMUNITY STANDARDS.

MS. LISKA: AND I THINK IN THAT INSTANCE AS WELL, I

DO THINK THAT SOME OF THE CONCERN AND INTERESTS OF THE STATE IS IN, YOU KNOW, CHILDREN WHO MAKE DECISIONS ABOUT WHERE THEY WANT TO GO BASED UPON THE REPRESENTATIONS OF WHAT THE TERMS OF SERVICE ARE AND MAKING SURE THAT THOSE TERMS OF SERVICE ARE, IN FACT, FIRST.

THE COURT: GARDEN VARIETY TERMS OF SERVICE AREN'T AT ISSUE.

MS. LISKA: NO, THEY AREN'T.

BUT TERMS OF SERVICE INCLUDES THINGS LIKE CONTENT COMMUNITY STANDARDS. THOSE ARE PART OF THE CONTRACTS USERS AGREE TO.

I MEAN, I THINK WE CITE TO TWO EXAMPLES THAT ARE CITED IN OUR BRIEF THAT SPECIFICALLY SAY THINGS LIKE YOUR USE OF THIS PRODUCT IS, YOU KNOW, CONDITIONED UPON YOUR ADHERENCE TO THESE TERMS OF SERVICE AND COMMUNITY STANDARDS.

SO IT'S PART OF THE AGREEMENT MADE TO GAIN ACCESS TO THE PRODUCT. YOU WILL FOLLOW THE COMMUNITY STANDARDS.

AND SO IT'S -- IT'S ESSENTIALLY A CONTRACTUAL AGREEMENT BETWEEN THE TWO SIDES. YOUR ABILITY TO USE IT IS CONDITIONED ON ADHERENCE TO THE COMMUNITY STANDARDS, AND THAT'S A REPRESENTATION BY THE COMPANY THAT THEY HAVE ON ITS SITE.

THE COURT: SO WHEN I LOOK AT -- LET ME MAKE SURE I HAVE THE RIGHT THING HERE -- (B), SECTION (B) OF 31, A COVERED SERVICE MAY NOT USE PERSONAL INFORMATION IN A WAY THAT IS MATERIALLY DETRIMENTAL TO THE PHYSICAL HEALTH, MENTAL HEALTH,

OR WELL-BEING OF A CHILD.

SO USE -- THEY USE PERSONAL INFORMATION TO DETERMINE WHAT TO PUBLISH TO THEIR USERS.

MS. LISKA: SO I -- THEY -- THERE ARE VAGUE ATTESTATIONS TO THAT EFFECT.

I THINK THERE ARE SEVERAL PROBLEMS WITH THAT. I'M NOT SURE WHAT DIRECTION YOUR HONOR WOULD LIKE ME TO HEAD WITH THAT, THOUGH.

THE COURT: WELL, I JUST THINK THIS IS ABOUT CURTAILING CONTENT THAT COVERED SERVICES CAN PROVIDE ONLINE.

MS. LISKA: I DON'T BELIEVE THAT THAT IS WHAT THAT PROVISION IS ABOUT.

THE COURT: OKAY.

MS. LISKA: I MEAN, WE REFERENCE THINGS, FOR INSTANCE, LIKE USING PERSONAL INFORMATION IN A WAY THAT RECOMMENDS THAT USERS CONNECT WITH OTHER USERS WHO MAY BE OUT TO EXPLOIT THEM. THAT'S A CONCERN THAT IS DEFINITELY RAISED.

YOU KNOW, THE CONCERNS WITH RESPECT TO -- I KNOW YOUR HONOR REFERENCES CONTENT THAT IS ILLEGAL, BUT THAT IS A CONCERN, TOO --

THE COURT: SO --

MS. LISKA: -- THAT CHILDREN WILL BE SHOWN ILLEGAL CONTENT.

THE COURT: SO WHEN I APPLY EITHER STRICT SCRUTINY OR INTERMEDIATE, THE REASONS THAT THE STATE HAS FOR ENACTING THIS

ARE VALID AND I -- I'VE SAID, AND NO ONE HAS REALLY CONTESTED, THAT THE STATE HAS A COMPELLING INTEREST IN PROTECTING CHILDREN.

BUT THE -- SO TO THE EXTENT YOU MIGHT LOSE, YOU'RE NOT GOING TO LOSE ON THAT.

IT'S THE NARROW TAILORING BASED UPON THE EVIDENCE THAT YOU HAVE TO ACTUALLY CORRECT A BEHAVIOR OR PROBLEM WITH THESE METHODS.

SO NO ONE NEEDS TO BE CONVINCED OF THE -- OF THAT.

SO LET'S -- I'M -- I DON'T THINK -- SO, I MEAN, HAVE YOU TOLD ME EVERYTHING YOU WANT TO TELL ME ABOUT THE COVERAGE DEFINITION AND WHY THAT IS NOT CONTENT BASED?

MS. LISKA: I BELIEVE SO. I THINK --

THE COURT: OKAY.

MS. LISKA: I'LL -- JUST TO SUM UP TO MAKE SURE I DID.

THE COURT: SURE.

MS. LISKA: THE THRESHOLD QUESTION THEY STILL NEED TO ADDRESS WITH RESPECT TO EACH PROVISION IS WHETHER OR NOT IT'S REGULATING EXPRESSIVE ACTIVITY.

THE COURT: SO YOU MIGHT SAY -- AND THIS WAS THE QUESTION I ASKED.

MS. LISKA: YES.

THE COURT: YOU WOULD SAY THAT EVEN IF I FIND THAT THE COVERAGE DEFINITION IMPLICATES SPEECH AND EXPRESSION, I

STILL THEN HAVE TO ANALYZE EACH OF THE CHALLENGED SECTIONS?

MS. LISKA: CORRECT. AND I THINK THAT --

THE COURT: AND TELL ME -- SO I ASKED THE QUESTION, SO I WAS -- I THOUGHT THAT MIGHT -- NOW TELL ME THE BASIS FOR THAT. WHY DO I?

MS. LISKA: SO TWO BASES FOR THAT. FIRST, BECAUSE THE THRESHOLD QUESTION OF EXPRESSIVE ACTIVITY BEING REGULATED STILL MUST BE ANSWERED BEFORE SCRUTINY IS APPLIED.

THE COURT: BUT IN EVERY INSTANCE, THE GATING PROVISION OF WHO'S COVERED AND WHO ISN'T IMPLICATES SPEECH.

THE PLAINTIFFS SAY THAT MEANS THE ENTIRE STATUTE AS A WHOLE REGULATES SPEECH AND HAS -- AND THEN I HAVE TO GO TO STRICT SCRUTINY. THAT'S THEIR ARGUMENT.

MS. LISKA: YES.

THE COURT: AND SO I'M LOOKING FOR YOUR ARGUMENT AS TO EVEN IF I FIND THE GATING PROVISION -- THE COVERAGE DEFINITION IS WHAT THEY CALL IT -- IMPLICATES SPEECH, I STILL HAVE TO DETERMINE SECTION BY SECTION.

MS. LISKA: YES.

THE COURT: TELL ME THE AUTHORITY FOR THAT.

MS. LISKA: SO TWO. FIRST, I'LL SET ASIDE THAT FIRST PART ABOUT THE EXPRESSION, WHICH I THINK THAT'S A CLEAR THRESHOLD ISSUE, THAT THERE HAS TO BE AN IMPACT ON THEIR EXPRESSION, NOT SIMPLY SPEECH IS INVOLVED, BUT THEIR EXPRESSIVE ACTIVITY MUST BE REGULATED ITSELF. THAT'S THE FIRST ONE.

THE SECOND ONE IS THAT IN ORDER FOR THE COURT TO ACTUALLY DO THE ANALYSIS OF THINGS LIKE SCRUTINY, IT'S GOING TO NEED TO LOOK AT EACH PROVISION, BECAUSE FOR EACH PROVISION, THERE ARE DIFFERENT ARGUMENTS THAT COULD BE MADE ABOUT TAILORING.

YOU KNOW, LOOKING, FOR INSTANCE, AT THE ANALOGY -- I KNOW THE ALTERNATIVES FROM THE NINTH CIRCUIT HAVE COME UP. ONE OF THOSE WAS, YOU KNOW, ENCOURAGING CONTENT FILTERS.

WELL, YOU COULD ARGUE THAT THAT RELATES TO THE USE OF DATA IN A WAY THAT IS KNOWN TO BE HARMFUL, BUT THAT HAS NOTHING TO DO WITH PROFILING A CHILD BY DEFAULT, WITH USING INFORMATION FOR A REASON IT WASN'T COLLECTED FOR, WITH AGE ESTIMATION.

SO I THINK IN ORDER TO REALLY UNDERSTAND, IS THIS PROPERLY TAILORED TO THE INTEREST, YOU'RE GOING TO HAVE TO LOOK AT EACH SPECIFIC PROVISION.

THE COURT: I'M WITH YOU ON THAT. THAT'S A DIFFERENT ARGUMENT, AND I DON'T THINK I ADDRESSED THAT WITH MS. KUMAR.

SO YOU AGREE THAT IF I FIND, LIKE THE COURT IN REYES DID, THAT THE COVERAGE DEFINITION, SERVICE LIKELY TO BE ACCESSED BY CHILDREN, DEPENDS ON THE CONTENT PUBLISHED BY A BUSINESS, THEN THEY'VE -- WE HAVE A FACIAL CHALLENGE THAT, IN ALL ITS APPLICATIONS, APPLIES TO SPEECH, THEN I APPLY THE PROPER LEVEL OF SCRUTINY, AND YOU'RE SAYING I HAVE TO LOOK AT EACH SECTION TO DETERMINE IF THE STATE HAS SHOWN IT'S NARROWLY TAILORED.

I DON'T DISAGREE WITH YOU ON THAT.

MS. LISKA: YES.

THE COURT: OKAY.

MS. LISKA: THAT'S WHAT WE WOULD SAY.

THE COURT: THANK YOU. THAT IS VERY CLEAR AND I -- THAT HELPS ME A LOT.

MS. LISKA: CAN I DO --

THE COURT: BEG YOUR PARDON.

MS. LISKA: JUST ONE MORE THING ON THE COVERAGE ISSUE --

THE COURT: OF COURSE.

MS. LISKA: -- IS I JUST -- THE WAY THAT I UNDERSTAND THE CASE LAW, AND I THINK THAT IT'S CLEAR, IS THAT SIMPLY HAVING TO LOOK AT CONTENT IS NOT ENOUGH TO MAKE IT CONTENT BASED.

THE COURT: AND THAT'S CITY OF AUSTIN?

MS. LISKA: CITY OF AUSTIN, FOR INSTANCE, PROJECT VERITAS, PORTER, THE CAR HONKING CASE AS WELL, THE HORN HONKING CASE.

THE COURT: YEAH.

MS. LISKA: THEY -- SOLICITATION IS A CLASSIC EXAMPLE. A STATE CAN PERMISSIBLY REGULATE SOLICITATION. THAT'S NOT A CONTENT-BASED RESTRICTION.

BUT WE HAVE TO LOOK AT WHAT THE SPEECH IS TO DETERMINE IF IT'S SOLICITATION.

SO I THINK THE WAY THAT IT'S BEST TO FRAME THE CONTENT-BASED RESTRICTIONS AFTER CITY OF AUSTIN IS, WAS IT

ENACTED BECAUSE OF A DISAGREEMENT WITH THE MESSAGE OR IDEAS EXPRESSED?

AND I THINK THAT THIS COVERAGE DEFINITION IS NOT REFLECTING A DISAGREEMENT WITH THE IDEAS EXPRESSED.

IT'S NOT DEFINING BUSINESSES A CERTAIN WAY BECAUSE THE STATE DOESN'T LIKE SPEECH FOR CHILDREN. IT'S DEFINING IT BASED UPON FEATURES THAT HAVE NOTHING -- THAT ARE CONTENT AGNOSTIC IN THE SENSE THAT IF A SERVICE HAS LOTS OF CHILDREN THAT USE IT, IT'S REGULATED REGARDLESS OF WHAT KIND OF CONTENT IS ON THE SERVICE.

THE STATE DOES NOT CARE IF IT'S YOUTUBE VIDEOS OR TICKETS TO A TAYLOR SWIFT CONCERT OR TICKETS TO WWE FIGHTS OR HOCKEY GAMES. IF A LOT OF CHILDREN USE IT, IT'S UNDER THE DEFINITION OF A REGULATED ENTITY HERE, IRRESPECTIVE OF CONTENT, AND THAT IS, I WOULD SAY, PRETTY CLEARLY CONTENT NEUTRAL IN THE COVERAGE DEFINITION.

THE COURT: SO YOU'RE SAYING THAT ONCE IT'S A GATHERING PLACE FOR CHILDREN, IT'S THAT -- IT'S THE INFORMATION GATHERED ABOUT THE AUDIENCE THAT YOU'RE REGULATING?

MS. LISKA: THAT'S -- YES, THAT'S HOW WE VIEW THIS LAW.

THE COURT: ALL RIGHT. SO EVEN IF -- AND WE'RE NOT GOING INTO THE ILLEGAL PORNOGRAPHY REALM BECAUSE THAT'S NOT WHAT THIS STATUTE IS ABOUT.

EVEN IF EVERYONE WOULD AGREE THAT CHILDREN SHOULD NOT SEE

CERTAIN CONTENT, SHOULD NOT, THAT'S A PARENTAL ISSUE, THAT -- AND I'M TRYING TO THINK OF AN EXAMPLE. I MEAN, THERE ARE SO MANY.

BUT, I MEAN, YOU KNOW, THE HORRORS AND DEVASTATION OF THE WILDFIRES IN PALISADES IS -- COULD BE TERRIFYING TO CHILDREN FEARING THAT THEIR OWN HOUSES WOULD BURN DOWN, AND I'M SURE MANY DID.

BUT IT'S -- YOU WOULD SAY, LET THE INFORMATION FLOW TO THOSE KIDS, BUT YOU JUST CAN'T -- YOU'VE GOT TO TURN OFF ALL OF YOUR, YOUR SCRAPING MECHANISMS THAT TAKE THEIR PERSONAL INFORMATION.

MS. LISKA: CORRECT, THAT'S WHAT WE WOULD SAY, THAT THIS IS NOT ABOUT BLOCKING CHILDREN FROM SEEING SOMETHING.

THAT'S -- THIS IS A WAY IN WHICH IT'S VERY DIFFERENT FROM LAWS LIKE THOSE IN MOODY, OR EVEN THE FREE SPEECH COALITION. THE STATUTE DOES NOT SAY THAT IF A CHILD SEES THIS CONTENT, YOU'RE PENALIZED.

AND, AGAIN, I THINK, TOO, YOU KNOW, IT -- I DO WANT TO EMPHASIZE, LOOKING AT EACH OF THESE PROVISIONS INDIVIDUALLY, A LOT OF THIS DISCUSSION ABOUT USING INFORMATION TO SHOW A CHILD, YOU KNOW, A NEWS STORY ABOUT WILDFIRES IS ONLY (B)(1), AND IF THE COURT DOES BELIEVE THAT THAT'S A PROBLEM, THAT'S A PROBLEM AS TO (B)(1).

THE COURT: SO DID WE -- DID THE NINTH CIRCUIT, IN AGREEING WITH MY ORDER ON ENJOINING THE DPIA, TAKE OUT OF THIS

LAW EVERY REFERENCE TO LIKELY TO HARM CHILDREN?

MS. LISKA: I DON'T BELIEVE SO.

THE COURT: SO THAT'S -- THAT'S WHERE WE GET BACK TO, BECAUSE THERE'S -- AT ONE LEVEL THERE'S THINGS THAT APPEAL TO CHILDREN, SO WE KNOW WE'VE GOT A LOT OF CHILDREN AT A LOCATION, AND THEN THERE'S THE EVALUATION, WHICH IS EXPRESSIVE, OF WHAT IS HARMFUL.

AND I'M TRYING TO -- I READ THIS SO MANY TIMES, BUT I'M NOT FINDING ANY EXAMPLE OF WHERE HARM TO CHILDREN IS -- THERE ARE SECTIONS ON BEST INTERESTS OF CHILDREN.

MS. LISKA: I BELIEVE THAT THE ONE YOU'RE THINKING OF IS (B)(1), WHICH IS THE USE THE PERSONAL INFORMATION OF ANY CHILD IN A WAY THAT THE BUSINESS KNOWS OR HAS REASON TO KNOW IS MATERIALLY DETRIMENTAL TO THE PHYSICAL HEALTH, MENTAL HEALTH, OR WELL-BEING OF A CHILD.

THAT IS, I THINK, THE ONLY PLACE WHERE THAT LANGUAGE IS.

THERE IS THE, THE COMPELLING REASON AND BEST INTEREST EXCEPTIONS IN OTHER PLACES.

BUT THE REST OF THEM DO NOT REFERENCE THAT LANGUAGE ABOUT KNOWING OR HAVE REASON TO KNOW IS MATERIALLY DETRIMENTAL TO THE WELL-BEING OF A CHILD.

THE COURT: SO THAT ONE GOES DIRECTLY, IN MY VIEW, TO THE EXPRESSIVE ACTIVITY OF THE PUBLISHER IN USING INFORMATION ABOUT A CHILD USER IN ORDER TO COLLATE OR COLLECT INFORMATION TO SEND TO THE CHILD.

MS. LISKA: SO I THINK THAT IS SOMETHING THAT, THAT -- WE WOULD ARGUE THEY HAVE NOT ESTABLISHED IN THE RECORD THEY'VE DONE THAT, BUT I'LL SET THAT ASIDE.

AND TO THE EXTENT THAT YOU BELIEVE THAT THEY HAVE SHOWN IN THE RECORD FACTUALLY THAT OCCURS, I DO THINK THAT THERE ARE STILL ISSUES WHEN DOING A FACIAL CHALLENGE UNDER MOODY, WHICH IS, WHAT TYPE OF CONTENT ARE WE TALKING ABOUT? ARE WE TALKING ABOUT STUBHUB DECIDING WHAT TICKETS TO SAY A CHILD SHOULD PURCHASE? ARE WE TALKING ABOUT LYFT, YOU KNOW, USING PERSONAL INFORMATION TO GIVE YOU, YOU KNOW, A CHOICE OF WHAT DRIVER TO SELECT? ARE WE TALKING ABOUT YOUTUBE USING PERSONAL INFORMATION TO RECOMMEND A VIDEO?

I THINK THAT THEY HAVE NOT -- I MEAN, THERE ARE WAYS THEY COULD HAVE COME IN HERE AND TRIED TO MAKE A CHALLENGE THAT FOCUSSED ON SOMETHING LIKE, LOOK, WHEN WE USE INFORMATION FOR THIS SPECIFIC THING BY THIS SPECIFIC COMPANY, IT'S EXPRESSIVE.

BUT THEY HAVE NOT DONE THAT HERE, ESPECIALLY GIVEN THAT WHAT THEY COULD SAY, A USE OF INFORMATION FOR CONTENT IS TO DETERMINE WHAT ADS TO PLACE ON A WEBSITE, WHICH IS CLEARLY COMMERCIAL SPEECH, WHICH IS A COMPLETELY DIFFERENT STANDARD.

AND I THINK BECAUSE IT'S SO INTERWOVEN, ARE WE TALKING ABOUT WHAT CONTENT SHOULD BE SHOWN BECAUSE WE'RE DOING THE KIND OF CONTENT MODERATION IN MOODY WHERE WE'RE SAYING WE DON'T WANT TO HOST CERTAIN SPEECH? ARE WE TALKING ABOUT CONTENT MODERATION DECISIONS THAT ARE DONE BY, YOU KNOW, WE JUST WANT

TO MAXIMIZE YOUR VIEWING, OR THE INFINITE USER BASED LOOP LIKE JUDGE DAVILA? ARE WE TALKING ABOUT CONTENT THAT'S COMMERCIAL?

WITHOUT FURTHER UNDERSTANDING THE RANGE OF WAYS THAT THEY'RE USING PERSONAL INFORMATION TO DELIVER CONTENT, I DON'T THINK WE CAN GET -- THAT THEY HAVE SHOWN THAT A SUBSTANTIAL NUMBER OF THESE APPLICATIONS ARE EXPRESSIVE, TRIGGER WHAT LEVEL OF SCRUTINY, AND WHETHER AN -- YOU KNOW, I UNDERSTAND IT'S OUR BURDEN TO SHOW SCRUTINY IS MET.

BUT IF WE DON'T EVEN KNOW WHAT KIND OF SPEECH WE'RE TALKING ABOUT BECAUSE THEY HAVEN'T TOLD US WHAT SPEECH IS AFFECTED, WE CAN'T MEET THAT BURDEN TO SAY, WELL, OKAY, WE'RE TALKING ABOUT ADVERTISEMENTS, ESPECIALLY BECAUSE, YOU KNOW, AT THE END OF THE DAY, THIS IS ABOUT CONCERNS ABOUT EXPRESSION, AND THERE ARE A LOT OF WAYS THAT BUSINESSES CAN STILL BE EXPRESSIVE WITHOUT USING PERSONAL INFORMATION.

WE TALK ABOUT --

THE COURT: BUT THAT'S NOT THE POINT. IT'S NOT THAT THEY HAVE OTHER AVENUES HERE. IT'S WHAT -- THIS IS THE -- THIS IS THE AVENUE THAT THE LAW SHUTS DOWN. THAT'S WHAT I'M LOOKING AT.

MS. LISKA: BUT THE OTHER AVENUES IS RELEVANT FOR TAILORING ANALYSES UNDER THE LEVEL OF SCRUTINY.

THE COURT: OKAY, SURE. SO THE WAY I READ THE NINTH CIRCUIT DECISION WAS THAT THE NINTH CIRCUIT SENT THIS BACK FOR ME TO DO THE FACIAL ANALYSIS OF DETERMINING IF, IN

EVERY APPLICATION, WHETHER AT LEAST A SUBSTANTIAL MAJORITY OF THE APPLICATIONS IMPLICATE PROTECTED SPEECH.

THE NINTH CIRCUIT DID NOT OVERRULE ANY OF MY DETERMINATIONS UNDER INTERMEDIATE SCRUTINY. THEY JUST SAID IT WAS A HIGHER STANDARD.

BUT CLEARLY IF YOU DON'T MEET THE LOW ONE, YOU CAN'T MEET THE HIGH ONE.

THEY DIDN'T ADDRESS MY ANALYSIS ON MANY OF THE SECTIONS BECAUSE THEY SAID I DIDN'T PERFORM THE PROPER THRESHOLD ANALYSIS, WHICH I NEED TO DO NOW.

THE CASE IS IN A DIFFERENT POSTURE NOW. I'M CONSIDERING DIFFERENT, DIFFERENT CLAIMS BY THE PLAINTIFFS.

BUT I THINK -- I UNDERSTAND YOUR ARGUMENTS ON THE TAILORING, AND ONCE I'M AT THAT PLACE, I THINK -- I MEAN, I DON'T KNOW THAT I'LL CHANGE MY MIND ON IT, BUT I UNDERSTAND WHAT YOU'RE SAYING.

MS. LISKA: YES. AND I DO JUST WANT TO SAY, YOU KNOW, I THINK THAT -- I THINK THAT PART OF HAVING TO CONSIDER THE FULL RANGE OF APPLICATIONS IS THAT DIFFERENT APPLICATIONS MAY HAVE DIFFERENT STANDARDS THAT ARE ATTACHED TO THEM.

YOU KNOW, THE WAY THAT I VIEW THE <u>MOODY</u> STANDARD IS THAT YOU HAVE TO LOOK AT, OKAY, THE LAW DOES -- YOU KNOW, WE HAVE A SPECTRUM OF THINGS THE LAW DOES, LIKE A RAINBOW. THERE ARE DIFFERENT COLORS BECAUSE THERE'S DIFFERENT APPLICATIONS.

AND THE QUESTION IS, HOW MANY OF THOSE COLORS ARE AN

APPLICATION THAT IS UNCONSTITUTIONAL?

BUT IF SOME OF THEM ARE RED AND SOME OF THEM ARE GREEN, RED MAY HAVE ONE STANDARD AND GREEN MAY HAVE ANOTHER.

THE COURT: WELL, THE WAY I UNDERSTAND IT IS A LITTLE DIFFERENT. THERE ARE TWO BUCKETS. ONE IS A BUCKET OF APPLICATIONS THAT IMPLICATE THE FIRST AMENDMENT, AND THOSE THAT DON'T. AND THEN IF THEY DON'T, THEN I'M JUST DONE.

AND THEY MAY BE INVALID FOR SOME OTHER REASON I'M NOT CONSIDERING, BUT THIS CASE IS NOT ABOUT THE ONES THAT AREN'T IN THE BUCKET OF EXPRESSIVE ACTIVITY.

MS. LISKA: WELL, TWO RESPONSES. ONE IS --

THE COURT: AND THAT -- BUT, I MEAN, ONLY TO THE EXTENT THAT I'VE GOT A UNIVERSE OF APPLICATIONS, THE FULL RANGE OF APPLICATIONS, AND THEN I'M GOING TO LOOK AT THE -- WHAT MAY BE A SMALLER BUCKET OF THOSE THAT IMPLICATE SPEECH.

AND IN THE DPIA, THE NINTH CIRCUIT SAID THEY WERE THE SAME. IN ALL APPLICATIONS, SPEECH IS IMPLICATED. THAT WAS PRODUCTION OF A REPORT. SO THAT WAS -- AS I SAY, THAT WAS MORE OBVIOUS THAN WHAT WE'RE DEALING WITH NOW.

BUT IF I ACCEPT YOUR EXAMPLES OF STUBHUB AND LYFT AND PAYPAL AND SOME OF THESE OTHERS, THEN IT'S -- WHAT I -- WHAT -- I HAVE NO EVIDENCE FROM YOU AS TO HOW MANY OF THE USERS ON THOSE SITES ARE EVEN CHILDREN.

AND SO, YES, I DON'T KNOW THAT THEY EVEN MEET THE THRESHOLD LIKELY TO BE -- AS ACCESSED BY CHILDREN. I DON'T

KNOW WHAT "LIKELY" MEANS.

THERE IT -- CERTAINLY IN SOME INSTANCES A KID IS GOING TO CALL A CAB, BUT NOT, NOT REALLY BECAUSE CHILDREN UNDER 18 DON'T NECESSARILY HAVE THE MEANS TO PAY FOR LYFT BECAUSE IT'S ON A CREDIT CARD. AND SO, I MEAN, IT'S JUST A VERY SMALL GROUP.

STUBHUB, I MEAN, YOU'RE TALKING ABOUT OLDER TEENAGERS, MOST DEFINITELY. THE 12 TO 18 YEAR OLD SET IS PROBABLY ALL OVER STUBHUB.

MS. LISKA: I THINK, THOUGH, THAT WHAT MOODY SAYS IS THAT WAS PART OF THE PROBLEM THERE --

THE COURT: UM-HUM.

MS. LISKA: -- IS THAT NETCHOICE HAS A LOT OF MEMBERS, AND THEY'RE SAYING THEIR MEMBERS ARE AFFECTED BY THE STATUTE.

BUT THEY'RE NOT ELABORATING HOW, AND WE'RE DEFAULTING TO LOOKING AT, YOU KNOW, THE QUINTESSENTIAL SOCIAL MEDIA EXAMPLE WITHOUT CONSIDERING THE FULL RANGE.

AND JUST RESPONDING TO YOUR POINT ABOUT THE BUCKET, I AGREE COMPLETELY THAT THE QUESTION IS, WHAT'S IN THE BUCKET THAT REGULATES EXPRESSIVE ACTIVITY?

BUT THE BUCKET CAN HAVE DIFFERENT KINDS OF STONES IN IT. SOME OF THE THINGS IN THE BUCKET MIGHT BE COMMERCIAL SPEECH.

THE COURT: OKAY.

MS. LISKA: SOME OF THE THINGS MIGHT NOT BE.

THE COURT: THAT'S FAIR.

MS. LISKA: AND I DO THINK THAT'S SALIENT --

THE COURT: YEAH.

MS. LISKA: -- BECAUSE TO DO THE TAILORING ANALYSIS --

THE COURT: OKAY.

MS. LISKA: -- WE NEED TO KNOW, IS THIS IMPACTING A COMPANY'S COMMERCIAL SPEECH, OR IS THIS IMPACTING OTHER SPEECH?

BECAUSE, YOU KNOW, THE EXAMPLE OF THINGS LIKE CONTEXTUAL ADVERTISING ARE VERY RELEVANT TO IF WHAT'S BEING IMPACTED IS THE COMMERCIAL SPEECH OF A COMPANY AND NOT OTHER EXPRESSIVE ACTIVITY, AND I DON'T THINK WE KNOW TO WHAT EXTENT, BECAUSE WHEN THEY SAY WE USE INFORMATION TO DELIVER CONTENT, WHAT IS THAT CONTENT? IS IT ADVERTISEMENTS? IS IT RECOMMENDED TICKETS TO BUY? OR IS IT, YOU KNOW, WE DON'T WANT TO HOST, YOU KNOW, VIDEOS THAT ARE ANTI NAZI OR THAT ARE ANTI DONALD TRUMP.

THE COURT: SO THAT'S WHERE REYES IN A SENSE WAS EASIER BECAUSE IT WAS GEARED TO SOCIAL MEDIA.

MS. LISKA: IT WAS, AND I THINK THAT THOSE CASES ARE ALSO EASIER BECAUSE THEY'RE VERY CLEARLY SAYING, IF YOU SHOW CHILDREN CERTAIN CONTENT, YOU'RE IN TROUBLE.

AND THIS CASE -- THIS LAW DOES NOT EVER SAY, IF YOU SHOW CHILDREN CERTAIN CONTENT, YOU'RE IN TROUBLE, BECAUSE A CHILD CAN COME IN AND LOOK FOR WHAT THEY WANT AND THAT'S COMPLETELY FINE.

THE COURT: YOU KNOW, AND WE TALKED ABOUT THIS LAST

TIME. IT'S ALWAYS INTERESTING, WHEN I READ THE LEGISLATIVE HISTORY AND READ WHAT THE LEGISLATORS SAY, AND THEY'RE SAYING, WE TOOK THIS FROM THE UNITED KINGDOM, ISN'T THIS DANDY? THIS IS JUST A GREAT THING.

AND IT MIGHT BE FROM A POLICY STANDPOINT. THAT'S NOT MY DOMAIN.

BUT THEY DON'T HAVE THE FIRST AMENDMENT. AND SO THE FILTER HERE IS COMPLETELY LACKING, AND NOTHING THAT'S BEEN POINTED OUT TO ME HAS -- TO SHOW THE LEGISLATURE CARED ONE WHIT ABOUT WHETHER THIS WOULD PASS FIRST AMENDMENT MUSTER.

BUT, YOU KNOW, IT'S -- IT WAS NOT DESIGNED TO PASS SUCCESSFULLY THROUGH THE FILTER OF THE FIRST AMENDMENT, AND NOW YOU'RE TRYING TO REVERSE ENGINEER IT, AND THAT'S HARD.

MS. LISKA: I THINK, THOUGH, THAT THAT SPEAKS, YOUR HONOR, TO THE FACT THAT THE LEGISLATURE WASN'T VIEWING THIS AS A CENSORSHIP LAW, THAT THEY WEREN'T COMING INTO THIS WITH THE IDEA OF --

THE COURT: WELL, SPEECH ISN'T THE ONLY CENSORSHIP.

MS. LISKA: NO, I UNDERSTAND.

BUT I THINK THEY WEREN'T COMING INTO THIS WITH THE IDEA THAT THEY'RE TRYING TO RESTRICT OR REGULATE WHAT COMPANIES SAY AND DO IN A SPEECH SENSE.

THE COURT: WELL, THE DPIA CERTAINLY WAS.

MS. LISKA: WELL, WE CAN SET ASIDE THE DPIA -- AND, YOU KNOW, LOOK, IF I COULD GET IN THERE AND HELP THE

LEGISLATURE DRAFT LAWS, MY JOB WOULD BE SO MUCH EASIER.

THE COURT: I GET IT. I GET IT COMPLETELY.

MS. LISKA: BUT I THINK IF WE SET ASIDE THE DPIA, I THINK A LOT OF THE DISCUSSION SHOWS THAT THEY'RE CONCERNED ABOUT CHILDREN'S PRIVACY AND SAFETY.

THE COURT: UM-HUM.

MS. LISKA: THIS ISN'T ABOUT WANTING TO REGULATE THE SPEECH.

AND, LOOK, I DON'T WANT TO MINIMIZE THE IMPORTANCE OF THE FIRST AMENDMENT, AND I DON'T WANT TO SAY THAT, YOU KNOW, WE AREN'T CONCERNED ABOUT LAWS THAT ARE CLEAR ATTEMPTS AT CENSORSHIP.

WE JUST THINK THAT THIS LAW IS NOT ONE OF THOSE.

THE COURT: OKAY. SO THAT'S AN INTERESTING THING. CERTAINLY CHILDREN'S PRIVACY AND SAFETY IS WRITTEN INTO THE LAW IN MANY PLACES, AND THERE MAY BE AN EFFORT NOT TO REGULATE THE EXPRESSIVE ACTIVITY OF CHILDREN.

BUT IT MAY HAVE HAD THE CONSEQUENCE OF REGULATING THE EXPRESSIVE ACTIVITY OF THE COVERED SERVICES, AND THAT'S WHAT WE'RE FOCUSSING ON.

MS. LISKA: YES, OF COURSE.

THE COURT: OKAY. SO LET'S MOVE -- SO DID YOU WANT TO SAY ANYTHING ABOUT -- SO I WANT TO GIVE YOU THE CHANCE TO TALK ABOUT THE POLICY CONSIDERATIONS AS TO CONTENT MODERATION AND COMMUNITY STANDARDS, IF YOU WISH. YOU BRIEFED IT, BUT IF

YOU'D LIKE TO SAY SOMETHING ELSE.

AND THEN -- AND DARK PATTERNS AND AGE ESTIMATION, AND THEN I WANT TO MOVE TO THE OTHER ISSUES.

MS. LISKA: YES. I MEAN, I'LL JUST BRIEFLY SAY I THINK OUR POSITION ON THE DARK PATTERNS IS THAT IT'S ENFORCING A CONTRACTUAL AGREEMENT. YOU KNOW --

THE COURT: I'M SORRY, THE DARK PATTERNS AREN'T CONTRACTUAL.

MS. LISKA: NOT THE --

THE COURT: THE POLICY.

MS. LISKA: THE POLICY. I'M STARING AT THE WRONG PART.

THE COURT: THAT'S OKAY.

MS. LISKA: THE POLICY PROVISION.

I HAVE THEM NEXT TO EACH OTHER. THAT'S MY BAD HANDWRITING THERE.

THE COURT: THAT'S OKAY.

MS. LISKA: THE POLICY PROVISIONS ARE ENFORCING A CONTRACTUAL AGREEMENT.

I DON'T THINK WE MADE ARGUMENTS WITH RESPECT TO TAILORING OR SCRUTINY, SO I GUESS --

THE COURT: SO IN THE REPLY BRIEF, MS. KUMAR CITES TO CASES THAT SAY THINGS LIKE COMMUNITY STANDARDS ARE ACTUALLY NOT CONTRACTUAL.

MS. LISKA: I WOULD DISAGREE BASED UPON WHAT RECORD

EVIDENCE WE HAVE HERE. I THINK WE CITE TO TWO EXAMPLES FROM, I THINK IT'S THE KUMAR DECLARATION, EXHIBITS 5 AND 6, WHICH ARE TERMS OF SERVICE IN THE RECORD FROM THE FIRST, THE FIRST MOTION, WHICH CLEARLY SAY USE OF THIS PRODUCT -- I DON'T HAVE THE SPECIFIC LANGUAGE RIGHT HERE, BUT THEY SAY THINGS ALONG THE LINES OF YOUR USE AND ACCESS TO OUR SERVICE IS CONDITIONED ON YOUR AGREEMENT TO ABIDE BY OUR COMMUNITY STANDARDS.

THAT SOUNDS PRETTY TERMS OF SERVICE TO ME.

THE COURT: OKAY. HOWEVER, YOU HAVE TO TAKE IT TO THE NEXT STEP, WHAT DOES ENFORCEMENT OF THAT MEAN? THAT THEN THE COMPANY HAS TO LOOK AT THE CONTENT THE USER HAS PUT ONLINE AND DETERMINE WHETHER IT OFFENDS THE COMMUNITY STANDARDS, AND THEN DETERMINE WHETHER TO TAKE TO DOWN.

ISN'T THAT -- THAT'S PUBLISHING DECISIONS. THAT'S WHERE I THINK THIS IS REALLY RIGHT IN THE SWEET SPOT OF SECTION 230.

MS. LISKA: SO I THINK THAT WHAT COHEN WOULD SAY, THOUGH, IS THAT WHERE PRIVATE PARTIES HAVE MADE AGREEMENTS BY -- BETWEEN THEMSELVES THAT INVOLVE LIMITATIONS ON SPEECH, THE STATE ENFORCING A PRIVATE AGREEMENT THAT LIMITS SPEECH IS NOT RUNNING AFOUL OF THE FIRST AMENDMENT.

THE COURT: OKAY.

MS. LISKA: SO THAT'S -- THAT WOULD BE OUR ARGUMENT. OF COURSE THE COURT IS FREE TO TAKE THAT AS IT WILL.

THE COURT: OKAY.

MS. LISKA: WITH RESPECT TO 230, I JUST WANT TO POINT

TO, I THINK WE CITE CASES LIKE BARNES AND CALISE -- THAT'S C-A-L-I-S-E -- THAT SAY THAT SIMILARLY WHERE THERE IS AN AGREEMENT TO AGREE -- WHERE A COMPANY SAYS THAT WE WILL NOT HAVE CERTAIN CONTENT AND MAKES THAT PROMISE TO ITS USERS, ENFORCING THAT PROMISE, NOT, YOU KNOW, INDEPENDENTLY OBLIGATING CERTAIN TYPES OF MODERATION, BUT ENFORCING WHAT THE COMPANY HAS ITSELF PROMISED USERS TO DO, THAT DOES NOT RUN AFOUL OF SECTION 230.

THE COURT: OKAY.

MS. LISKA: SO THAT'S HOW WE VIEW WHAT THIS PROVISION DOES.

THE COURT: OKAY. AND THEN ANY COMMENTS ON DARK PATTERNS? I -- I'M NOT -- I DON'T THINK I'M READY TO ENJOIN DARK PATTERNS, BUT PART OF THAT IS I'M NOT SURE I HAVE ENOUGH IN THE RECORD. IT'S A TERRIBLE WORD BECAUSE IT'S NOT ALL EVIL.

MS. LISKA: I KNOW, BUT IT'S --

THE COURT: BUT IT'S THE -- IT'S THE RIGHT -- IT'S THE TERM OF ART. I GET THAT.

MS. LISKA: IT'S THE TERM OF ART. I THINK ONE OF THE AMICUS BRIEFS CITES THAT IT'S BEEN AROUND SINCE 2010.

THE COURT: YES.

MS. LISKA: THE FTC USES IT.

THE COURT: YEAH.

MS. LISKA: AND LIKE I SAID, IF I COULD WRITE THE STATUTES MYSELF -- I DON'T KNOW THAT I HAVE MUCH MORE TO SAY ON

THAT ONE.

THE COURT: OKAY. THAT'S FINE.

HOW ABOUT AGE ESTIMATION?

MS. LISKA: YES, JUST TO TOUCH VERY BRIEFLY ON THAT.

I WAS ORGANIZED, AND NOW I'M NOT.

I THINK, AS HAS BEEN NOTED, TWO QUICK POINTS. THE FIRST IS IT DOESN'T HAVE TO BE INTRUSIVE, LIKE AN AGE VERIFICATION. THERE'S NOTHING THAT INDICATES THAT SIMPLY ATTESTATION WOULD NOT BE SUFFICIENT, ESPECIALLY IF A COMPANY SAYS THAT THEY'RE NOT COLLECTING DATA OR USING IT FOR ANY, YOU KNOW, PURPOSES.

THE COURT: SO I'M A USER AND I HAVE TO CLICK A BOX, "I AM OVER 18."

MS. LISKA: CORRECT. THAT CAN BE SUFFICIENT IF THE RISKS FROM HOW THEY'RE COLLECTING AND USING DATA ARE MINIMAL.

SO IF THE COMPANY IS --

THE COURT: SO UNDER THE STATUTE -- THAT TAKES CARE OF ALL THE ADULTS.

IT DOESN'T TAKE CARE OF HOW THE STATUTE REGULATES CHILDREN. SO THEN CHILDREN HAVE TO ACTUALLY SAY HOW OLD THEY ARE.

MS. LISKA: NO. IT -- AN ESTIMATE COULD BE AN AGE RANGE. THERE'S NOTHING IN THE STATUTE THAT SAYS YOU COULDN'T ESTIMATE --

THE COURT: SO 0 TO 18 IS NOT GOING TO CUT IT HERE.

MS. LISKA: NO, BUT IT'S AN ESTIMATE OF AN AGE, AND

YOU KNOW AN ATTESTATION WHERE THEY SAY, HOW OLD ARE YOU? OR THEY COULD ASK, ARE YOU UNDER 13? OR A QUESTION LIKE, DO YOU FALL IN THE 0 TO 5? 5 TO 10? 10 TO 15? 15 TO 18?

THERE'S NO INDICATION THAT AN ATTESTATION LIKE THAT WOULDN'T WORK.

THE COURT: OKAY.

MS. LISKA: I DO BELIEVE THAT THERE'S ALSO INDICATIONS IN THE RECORD, AND COMMON SENSE WOULD SAY, THAT SOME COMPANIES ARE GOING TO BE POSITIONED TO USE THE DATA THEY HAVE COLLECTED. I MEAN, IF THEY'VE GOT 72 MILLION DATA POINTS ON A CHILD, THEY CAN PROBABLY ESTIMATE THAT CHILD'S AGE.

SO IF THEY ALREADY HAVE THE CHILD'S BIRTH DATE BECAUSE THEY COLLECT IT FOR OTHER PURPOSE, LIKE FOR COMPLIANCE WITH COPPA, THEN THEY HAVE THE INFORMATION THEY NEED TO ESTIMATE AGE.

THIS IS -- AND THE SECOND THING ON THIS POINT IS I DO THINK IT'S IMPORTANT TO LOOK AT THE "OR" IN THE SITUATION, THAT WHEN THE STATE IS SAYING --

THE COURT: THAT'S THE -- THAT IS THE REALLY BAD PART OF THIS STATUTE, THE "OR" PART.

MS. LISKA: THE --

THE COURT: OR DUMB IT DOWN FOR EVERYBODY. WHAT A TREMENDOUS BURDEN ON EVERYBODY.

I MEAN, NOT ONLY DO PEOPLE OVER 18 HAVE A TREMENDOUS BURDEN ON THEIR RIGHTS, 17 YEAR OLDS, 16 YEAR OLDS, 15,

DEPENDING ON THE CONTENT, IT AFFECTS ALL OF THEM.

MS. LISKA: IT SAYS -- WHAT THE STATUTE SAYS IS -- THE EXAMPLE YOUR HONOR GAVE EARLIER, THE WAY YOU FRAMED IT EARLIER, EITHER ESTIMATE THEIR AGE, OR DON'T SCAPE THEIR DATA AND USE IT FOR OTHER PURPOSES FOR ALL USERS. THAT'S THE "OR."

THERE'S NO BLOCKING OF CONTENT. THERE'S NO -- IT'S NOT LIKE IN FREE SPEECH WHERE YOU EITHER HAD TO VERIFY YOUR AGE OR WE HAD TO PUT UP A WALL THAT SAID YOU CANNOT ACCESS THIS, AN AFFIRMATIVE WALL MUST BE BUILT.

THE STATUTE DOES NOT REQUIRE ANY WALLS BE BUILT.

THE COURT: OKAY.

MS. LISKA: IT JUST SAYS, IF YOU CANNOT ESTIMATE THEIR AGE -- WHICH, AGAIN, CAN BE AN ATTESTATION, THEY CAN USE YOUR EXISTING INFORMATION, THERE ARE OTHER EVIDENCE IN THE RECORD THAT THIS MAY NOT BE ENTIRELY BURDENSOME, IT'S A SLIDING SCALE -- OR DON'T SCRAPE DATA AND USE IT ON OTHER PEOPLE FOR -- YOU KNOW, IT'S THE DATA AND PRIVACY, SO IT WOULD BE THE DEFAULT PRIVACY SETTINGS.

THE COURT: OKAY.

MS. LISKA: DON'T SCRAPE THE DATA.

I THINK, TOO, THE ONLY WAY THAT YOU CAN SAY TO A COMPANY, REGULATE HOW YOU TREAT CHILDREN, IS TO REQUIRE THEM TO FIGURE OUT WHO IS A CHILD.

AND SO THERE IS NO OTHER WAY EXCEPT FOR THE STATE TO TAKE THE FAR LESS TAILORED RULE OF, OKAY, DO THIS FOR EVERYONE.

SO IT'S -- IF WE CAN'T SAY ESTIMATE AGE, OR APPLY THE SAME REGULATION FRAMEWORK TO BOTH, IT'S -- THE WHOLE LAW IS A PROBLEM.

AND ESPECIALLY HERE WHERE THEY HAVE NOT CHALLENGED LARGE SWATHS OF THIS. YOU KNOW, I THINK CLEARLY REQUIRING AGE TAILORING, OR AGE ESTIMATION IN ORDER TO ENFORCE PARTS OF THE STATUTE THAT ARE NOT CHALLENGED HERE IS SUFFICIENTLY, YOU KNOW, TAILORED.

THE COURT: OKAY. SO I THINK THE NEXT THING WE NEED TO DO IS TO TALK ABOUT SEVERABILITY.

MS. LISKA: YES. I'M HAPPY TO -- I DIDN'T KNOW IF YOU HAD A SPECIFIC QUESTION OR IF YOU'D LIKE ME TO GET STARTED.

THE COURT: WELL, I THINK YOU'RE CORRECT THAT JUST READING THE STATEMENTS OF THE AUTHOR OR OTHER LEGISLATORS IN FAVOR OF THE BILL IS NOT ENOUGH FOR VOLITIONAL SEVERABILITY.

BUT WHAT I HAVE IS EVIDENCE THAT THIS LEGISLATION FAILED TWICE WHEN IT DID NOT HAVE A 90-DAY NOTICE AND CURE, AND NOW WITH THE NINTH CIRCUIT'S APPROVED INJUNCTION, WE DO NOT HAVE A 90-DAY NOTICE AND CURE.

SO THAT IS PROPER LEGISLATIVE HISTORY ARGUMENT ON -- TO SHOW THAT THE LEGISLATURE WOULD NOT AND, IN FACT, DID NOT PASS THE LAW WITHOUT THE 90-DAY NOTICE AND CURE.

SO I WANT TO HEAR YOUR ARGUMENT ON THAT.

MS. LISKA: SURE. I THINK WHAT MATOSANTOS -- THAT'S M-A-T-O-S-A-N-T-O-S -- SAYS IS THAT THE QUESTION -- OBVIOUSLY

THE LEGISLATURE PREFERS WHAT IT DID TO ANYTHING SEVERED.

THE COURT: SURE.

MS. LISKA: THAT SEEMS PRETTY APPARENT.

THE COURT: YEAH.

MS. LISKA: THE QUESTION IS, WOULD THEY HAVE PREFERRED IT TO DO NOTHING?

THE COURT: UM-HUM.

MS. LISKA: AND I THINK IT'S NOT SO MUCH WHAT HORSES WERE TRADED TO MAKE THIS HAPPEN.

IT'S AS IF SOMEONE HAD STOOD IN THE ROOM AND SAID, HEY, LEGISLATURE, IF YOU PUT THIS NOTICE AND CURE PROVISION IN DPIA IN, THE WHOLE STATUTE, IT'S GOING TO BE UNCONSTITUTIONAL. YOU GET NOTHING.

WOULD THE LEGISLATURE HAVE SAID, OH, OKAY, WELL, WE DON'T WANT ANY OF IT THEN.

OR WOULD THE LEGISLATURE HAVE SAID, OKAY, WELL, IF WE CAN'T HAVE THAT, WE WANT EVERYTHING THAT WE CAN GET.

THE COURT: SO I DON'T THINK THAT'S THE RIGHT QUESTION TO ASK.

I THINK THE RIGHT QUESTION TO ASK IS, IS THIS -- DID THE LEGISLATURE DETERMINE THAT THIS WAS GOOD PUBLIC POLICY IF IT HAD A 90-DAY NOTICE AND CURE, BUT BAD PUBLIC POLICY IF IT DID NOT?

MS. LISKA: SO I THINK THE -- I THINK WE'RE SAYING THE SAME SORT OF THING.

THE COURT: NO, BECAUSE YOU SAID, IF THEY WERE TOLD IT'S NOT GOING TO PASS FIRST AMENDMENT MUSTER, WHAT WOULD THEY HAVE DONE? I THINK THAT'S THE WRONG QUESTION.

MS. LISKA: I THINK THE WAY MATOSANTOS FRAMES IT IS, WOULD THEY PREFER WHAT THEY COULD GET TO NOTHING?

THE COURT: YES.

MS. LISKA: AND THAT'S WHAT I'M SAYING.

THE COURT: OKAY. SO THAT -- I AGREE WITH YOU.

AND SO THEN WE LOOK THROUGH THE RECORD TO DETERMINE IF THERE'S -- AND IT'S A HIGH STANDARD. IF WE CAN DETERMINE THAT THERE'S ANY INDICIA THAT THEY ACTUALLY PREFERRED NOTHING WITHOUT THE NOTICE AND CURE, AND THE PLAINTIFFS HAVE GIVEN ME TWO DEFEATING VOTES.

MS. LISKA: WHICH I THINK YOUR HONOR HAS POINTED OUT, YOU KNOW, IS IT CLEAR THAT THEY WERE BECAUSE OF THE LACK OF A NOTICE AND CURE?

THE COURT: SO THAT'S -- YOU DIDN'T GIVE ME ANY ARGUMENT ON THAT. I DON'T KNOW HOW MUCH WAS IN THEIR REPLY. SO I WANT TO GIVE YOU -- YOU ARE VASTLY FAMILIAR WITH THE LEGISLATIVE HISTORY ARGUMENTS.

MS. LISKA: I THINK THAT THE BEST PLACE TO START, THOUGH, IS NOT THE HISTORY. IT'S THE TEXT OF THE LAW.

SO, FOR INSTANCE, LOOKING AT THE FINDINGS AND DECLARATION, THE CONCERNS ABOUT THE PRIVACY PROTECTIONS OF CHILDREN, YOU KNOW, THE NEED TO HAVE -- THAT CHILDREN BE AFFORDED PRIVACY AND

PROVISION ONLINE, STRONG PRIVACY PROTECTIONS.

I THINK THAT THOSE FINDINGS INDICATE A GENUINE DEEP LEGISLATIVE DESIRE TO PROTECT THE PRIVACY OF CHILDREN, AND I THINK THAT THAT IS A BETTER INDICIA OF THEIR CONCERN AND WHAT THEY WOULD HAVE CHOSEN TO DO, WHICH IS TO PROTECT CHILDREN, TO THE AMOUNT POSSIBLE, UNDER THE CONSTITUTION.

AND I THINK A LOT OF THE CASES ARE CLEAR, YOU KNOW, IT'S HARD TO DELVE INTO THE MIND OF WHAT THE LEGISLATURES WERE THINKING. THERE ARE A LOT OF PEOPLE --

THE COURT: SO UNFORTUNATELY FOR YOU, THE LEGISLATURE DIDN'T LIMIT ITS FINDINGS TO PRIVACY AND SAFETY. IT WENT ON TO SAY WELL-BEING.

MS. LISKA: WELL, AND I THINK --

THE COURT: WHICH IS GOOD. I MEAN, I'M ALL FOR THE WELL-BEING OF CHILDREN.

MS. LISKA: AND WELL-BEING DOESN'T ALWAYS JUST MEAN BECAUSE OF CONTENT. WELL-BEING CAN ALSO MEAN THINGS LIKE THE EXPLOITATION OF THE CHILDREN.

THE COURT: BUT IF YOU LOOK AT FINDING A, IT TALKS ABOUT PRODUCTS OR FEATURES THAT ARE LIKELY TO BE -- TO -- THAT CHILDREN ARE LIKELY TO ACCESS SHOULD CONSIDER THE BEST INTERESTS OF CHILDREN WHEN DESIGNING, DEVELOPING, AND PROVIDING THAT ONLINE SERVICE, PRODUCT, OR FEATURE WHEN PROVIDING CONTENT.

MS. LISKA: SO I THINK -- WELL, I DISPUTE THAT ALL

SERVICE PROJECTS AND FEATURES ARE CONTENT.

BUT I THINK IF YOU LOOK TO THE ENACTING BILL ITSELF, THE LEGISLATIVE FINDINGS IN THE BILL --

THE COURT: AREN'T I LOOKING AT THAT?

MS. LISKA: SO SECTION (A)(1), THE UNITED NATIONS CONVENTION ON THE RIGHTS OF THE CHILD, THAT PART --

THE COURT: I'M NOT SURE WHERE YOU'RE -- I PRINTED IT OFF. I HAVE A 1798.99.29.

MS. LISKA: I'M LOOKING AT AB 2273 ITSELF, THE LEGISLATIVE FINDINGS WHICH WE CITE TO IN OUR BRIEF.

THE COURT: DID YOU GIVE ME THAT?

MS. LISKA: I DON'T KNOW IF WE GAVE YOU A COPY OF IT.

THE COURT: THAT WOULD HAVE BEEN NICE, DON'T YOU THINK?

MS. LISKA: IT'S IN THE RECORD, SO I FIGURED IT'S THE STATUTE THAT WAS PASSED. WE CITED TO IT PROPERLY IN OUR BRIEF.

THE COURT: DID -- YOU'LL SEND ME A COPY OF IT.

MS. LISKA: WE CAN SEND YOU A COPY OF IT.

THE COURT: OKAY.

MS. LISKA: I'LL MAKE A NOTE OF THAT. I'M HAPPY TO HAND YOU MY COPY IF YOU WOULD LIKE IT.

THE COURT: NO. THANK YOU.

I'VE ASKED MS. KUMAR TO SUPPLEMENT WITH PRIOR VERSIONS OF THE BILL, AND YOU CAN DO THAT.

MS. LISKA: WE'LL SEND THE ONE THAT WAS PASSED, YEAH.

THERE ARE SEVERAL REFERENCES IN -- THEY'RE NOT CODIFIED. IT'S THE UNCODIFIED FINDINGS, BUT I THINK THOSE ARE STILL SALIENT BECAUSE THAT'S THE LANGUAGE THAT WAS PASSED. IT REFERENCED REPEATEDLY PRIVACY PROTECTIONS SPECIFICALLY.

THE COURT: OKAY.

MS. LISKA: SO I DO THINK THAT THAT IS --

THE COURT: SO I SHOULD IGNORE THIS THAT THEY PUBLISHED? THEY DIDN'T MEAN IT?

MS. LISKA: NO. I MEAN, I THINK THAT NEEDS TO BE CONSIDERED --

THE COURT: OKAY.

MS. LISKA: -- WITH THE OTHER FINDINGS THAT THE LEGISLATURE PUT IN THE BILL IT ENACTED, WHICH REFERENCE PRIVACY PROTECTIONS IN MULTIPLE PLACES.

THE COURT: OH, I DON'T -- I DON'T DOUBT THAT THAT WAS FRONT OF MIND.

BUT SO WAS THE WELL-BEING OF CHILDREN.

MS. LISKA: CORRECT.

THE COURT: SO WERE THE BEST INTERESTS OF CHILDREN --

MS. LISKA: YES.

THE COURT: -- WHEN PROVIDING THE ONLINE SERVICE.

"WHEN PROVIDING," THAT'S THE CENSORSHIP PART.

MS. LISKA: NO, BUT THAT'S --

THE COURT: THAT'S NOT THE COLLECTING OF INFORMATION.

MS. LISKA: I MEAN, IT -- AT THE RISK OF BELABORING

THE POINT, I THINK THAT OUR CONCERN THERE ARE THINGS THAT HAVE NOTHING TO DO WITH THE CONTENT, WHICH ARE DESIGN FEATURES THAT MAYBE KEEP CHILDREN ONLINE TOO LONG, ADVERTISEMENTS, SELLING, YOU KNOW, THIRD PARTY ADS THAT ARE PLACED. I THINK THOSE ARE THINGS THAT THEY WERE THINKING WITH WELL-BEING AND PROVISION OF SERVICES.

AND, YOU KNOW, I -- I UNDERSTAND THAT IT'S EASY TO THINK ABOUT SOCIAL MEDIA AND HOW THIS LAW AFFECTS THEM.

BUT THIS IS A BIG STATUTE THAT AFFECTS A LOT OF OTHER COMPANIES --

THE COURT: YES, IT DOES.

MS. LISKA: -- THAT DO NOT PROVIDE THESE SORT OF, YOU KNOW, EXPRESSIVE TYPES OF PRODUCTS AND SERVICES, AND THEY ARE STILL REGULATED, AND THAT IS ALSO IMPORTANT TO CONSIDER IN THIS FACIAL CHALLENGE.

THE COURT: OKAY.

MS. LISKA: AND IF YOU HAVE NO FURTHER QUESTIONS?

THE COURT: I THINK YOU'VE COVERED EVERYTHING, AND I APPRECIATE IT. IT'S A TREMENDOUS AMOUNT OF WORK.

THANK YOU.

MS. LISKA: IT IS.

THANK YOU, YOUR HONOR, FOR THE TIME. I APPRECIATE THAT.

THE COURT: ALL RIGHT. MS. KUMAR, IT'S YOUR MOTION, YOU GET THE LAST WORD.

MS. KUMAR: THANK YOU.

THE COURT: WHOOPS, UNPLUG. OH, WATER. GOOD CATCH.

MS. KUMAR: I DON'T WANT TO SPILL THE WATER.

I'M JUST GOING TO GIVE YOU CITE THAT THE STATE WAS LOOKING FOR.

THE COURT: OH, THAT'S NICE.

MS. KUMAR: OKAY, YOUR HONOR.

WELL, FIRST OF ALL, IF YOU HAVE MORE QUESTIONS FOR ME, I WANT TO HEAR THEM BECAUSE THAT'S OBVIOUSLY --

THE COURT: NO, NO. I WANT YOU TO -- I THINK AT THIS POINT --

MS. KUMAR: OKAY.

THE COURT: I THINK I EXHAUSTED MY LIST OF QUESTIONS THE FIRST TIME THROUGH.

MS. KUMAR: OKAY.

THE COURT: AND I WOULD LIKE TO HEAR YOUR REBUTTAL TO THE STATE'S ARGUMENT.

MS. KUMAR: OKAY, YOUR HONOR.

SO I'LL, AGAIN, GO IN THE SAME ORDER. I'M GOING TO START WITH THE COVERAGE DEFINITION.

THE COURT: UM-HUM.

MS. KUMAR: I THINK ONE OF THE MORE IMPORTANT THINGS IS THAT THE COURT HAS NOT EVEN TRIED -- I MEAN, NOT THE COURT -- THE STATE HAS NOT EVEN TRIED TO SATISFY INTERMEDIATE OR STRICT SCRUTINY. I BELIEVE MS. LISKA SAID SOMETHING LIKE THERE HASN'T -- WE HAVEN'T DONE THAT, AND THAT'S -- THIS IS

THE -- THAT WAS THE TIME, THE BRIEFING WAS THE TIME FOR THE STATE TO SAY, EVEN IF THE INTERMEDIATE SCRUTINY APPLIES OR STRICT SCRUTINY APPLIES, THIS IS WHY IT IS SATISFIED, AND THEY HAVEN'T DONE IT. THAT'S THEIR BURDEN. IT'S NOT OUR BURDEN.

AND FOR THE REASONS YOUR HONOR SUGGESTED, WE THINK THAT THAT BURDEN IS NOT MET.

THE COURT: UM-HUM.

MS. KUMAR: ON WHETHER IT IS CONTENT BASED, I THINK, YOU KNOW, ONE WAY TO THINK ABOUT THIS IS, HOW DO YOU VOID THE APPLICATION OF THE STATUTE? YOU HAVE TO CHANGE THE CONTENT THAT YOU'RE PUBLISHING, RIGHT? YOU HAVE TO CHANGE -- SO, FOR EXAMPLE, YOU KNOW, CAN A SERVICE PUT TAYLOR SWIFT ON THEIR WEBSITE IF SHE WOULD ATTRACT TEENS? RIGHT? WOULD THAT MAKE THEM SUBJECT TO THE LAW?

AND I THINK THAT'S, YOU KNOW, YOU HAVE TO -- AT THE OUTSET, THE COVERAGE DEFINITION REQUIRES CENSORING CONTENT UPFRONT TO GET OUT OF THE STATUTE'S RESTRICTIONS.

THE COURT: UM-HUM.

MS. KUMAR: MS. LISKA SAID SOMETHING ABOUT THE PROJECT VERITAS CASE AND AUSTIN AND PORTER IN AN EFFORT TO SUGGEST THIS IS NOT CONTENT BASED.

I THINK WE EXPLAINED IN OUR BRIEFING WHY AUSTIN AND PORTER ARE NOT ABOUT THE CONTENT BASIS. AUSTIN IS ABOUT THE LOCATION OF A SIGN. PORTER IS ABOUT THE TRAFFIC CIRCUMSTANCES.

PROJECT VERITAS, SIMILARLY, RECORDING SPEECH OF A FELONY

REGULATED -- REGULATES WHEN SPEECH CAN HAPPEN, NOT ITS SUBJECT MATTER.

RECORDING LAW ENFORCEMENT IS ALSO NOT A TOPIC OF SPEECH. IT IS -- YOU KNOW, IT'S NOT A -- IT'S NOT A SUBJECT MATTER.

BUT THE COVERAGE DEFINITION IN AB 2273 MAKES OVERT CONTENT-BASED DISTINCTIONS THAT DO SINGLE OUT -- THAT DO SINGLE OUT PARTICULAR TOPICS AND SUBJECT MATTER, AND NOT JUST WHEN SPEECH IS RECORDED OR WHETHER IT IS RECORDED SECRETLY OR NOT, BECAUSE THAT WAS ONE OF THE EXCEPTIONS IN THE PROJECT VERITAS STATUTE.

I THINK THE BOTTOM LINE IS UNDER MOODY, EVERY APPLICATION BURDEN IS IMPERMISSIBLE. SO THE NUMERATORS, THE DENOMINATOR ARE THE SAME, AND THE COURT SHOULD APPLY STRICT SCRUTINY OR, AT A MINIMUM, INTERMEDIATE SCRUTINY.

TURNING TO THE RESTRICTIONS UNDER B(1)-(4), SO WE WEREN'T ASKING THE COURT TO ENJOIN THE NON-EXPRESSIVE USES. SO THE EXAMPLES THAT MS. LISKA WAS GIVING YOU OF STUBHUB OR WHAT HAVE YOU, LET ME SAY A COUPLE THINGS.

ONE IS I THINK BUYING A TICKET ON STUBHUB IS PROBABLY EXEMPT UNDER THE NO PHYSICAL PRODUCT EXEMPTION.

THE COURT: YES.

MS. KUMAR: SECOND OF ALL, I WOULD NOT BE SURPRISED IF STUBHUB IS SUGGESTING SHOWS TO PEOPLE BASED ON WHAT THEY HAVE PURCHASED TICKETS FOR BEFORE. SO, AGAIN, THAT CONTENT, IS A RECOMMENDATION FOR A HEAVY METAL SHOW, LIKE, A PROBLEM? IS

IT HARMFUL TO CHILDREN? HOW OLD IS THE CHILD? YOU KNOW, THAT KIND OF THING.

WE ARE ALSO NOT ASKING THE COURT -- YOU KNOW, THERE WAS A DISCUSSION OF COLLECTING AND GATHERING INFORMATION. WE WERE VERY CAREFUL IN TAILORING OUR CHALLENGE, OUR NARROW CHALLENGES TO NOT TARGET THE COLLECTING OF DATA.

SO IF -- YOU KNOW, WE'RE HAPPY TO PROVIDE -- I UNDERSTAND THAT THE PROPOSED ORDER DID NOT GO THROUGH THIS INDIVIDUAL PROVISION CHALLENGE AND WHAT IT WOULD LOOK LIKE. WE'RE HAPPY TO PROVIDE THAT TO THE COURT.

BUT ONE OF THE THINGS THAT THAT WILL DO IS IT WILL NOT ASK THE COURT TO ENJOIN THE PORTION OF THE LAW RELATING TO COLLECTION OF DATA.

I THINK, YOU KNOW, MS. LISKA GOT UP THERE AND SAID WE'RE NOT REQUIRING THE *NEW YORK TIMES* TO STOP PUBLISHING AN ARTICLE ABOUT THE HAMAS ISRAEL CONFLICT, JUST, YOU KNOW -- BUT THAT BEGS THE QUESTION, WHAT IS IT? IT'S RECOMMENDING IT. IT'S -- AGAIN, IF SOMEONE IS DOING RESEARCH ON A PROJECT AND THAT IS A RECOMMENDED PIECE OF CONTENT, THE STATE IS SAYING YOU CAN'T DO THAT.

AND MORE GENERALLY, WHAT WE'RE TALKING ABOUT HERE IS THE PERSONALIZATION OF CONTENT. WHAT THE STATE IS SAYING IS YOU CAN'T PERSONALIZE CONTENT FOR CHILDREN, AND THAT GOES BACK TO THE AGE VERIFICATION, AGE ESTIMATION STANDARD AND ALL THAT KIND OF STUFF TO KNOW WHO IS A CHILD.

BUT THAT'S WHAT WE'RE TALKING ABOUT HERE.

AND, YOU KNOW, SO I THINK YOUR HONOR, YOU KNOW, GOING BACK TO OUR INITIAL COLLOQUY ABOUT --

THE COURT: SO LET ME JUST BACK UP.

MS. KUMAR: YEP.

THE COURT: YOU SAID THAT YOU'RE NOT TARGETING THE COLLECTION OF DATA ON CHILDREN.

MS. KUMAR: CORRECT.

THE COURT: SO THAT'S AS IT APPLIES TO B(1)-(4)?

MS. KUMAR: LET ME -- SORRY, LET ME JUST PULL UP THE LAW REAL QUICK, BECAUSE I CAN -- OR DID I BRING IT UP?

OKAY. I DID BRING IT UP. GIVE ME ONE SECOND.

SO JUST AS AN EXAMPLE, I THINK THE ONLY ONE THAT TALKS ABOUT COLLECTION IS (B)(3), AND IT SAYS COLLECT, SELL, SHARE, OR RETAIN ANY PERSONAL INFORMATION THAT IS NOT NECESSARY TO PROVIDE AN ONLINE PRODUCT.

THE COURT: SO YOU SEPARATED (3) FROM SOME PART OF YOUR ARGUMENT, BUT THEN YOU BROUGHT IT BACK IN UNDER ANOTHER PART OF THE ARGUMENT.

MS. KUMAR: UM --

THE COURT: ARE YOU -- WHERE -- ARE YOU NOW SAYING THAT (B)(3) IS NOT SOMETHING YOU'RE SEEKING TO ENJOIN?

MS. KUMAR: WE ARE SEEKING TO ENJOIN IT, JUST NOT THE COLLECTION ASPECT -- I MEAN, I THINK IT'S COLLECTION AND SALE, BUT I HAVE TO GO BACK TO OUR AMENDED COMPLAINT.

THE COURT: BUT THE SHARING -- WHAT PART ARE YOU TRYING TO ENJOIN?

MS. KUMAR: HOLD ON ONE MINUTE. LET ME JUST LOOK AT THE PRAYER FOR RELIEF.

(PAUSE IN PROCEEDINGS.)

THE COURT: SO THIS HAS TO DO WITH INFORMATION IN WHICH A CHILD IS ACTIVELY AND KNOWINGLY ENGAGED.

MS. KUMAR: SO THE PRAYER FOR RELIEF SEEKS AN INJUNCTION TO THE EXTENT THE SECTION APPLIES TO COVERED SERVICES' RETENTION, SALE, AND SHARING.

SO COLLECTION IS NOT SOMETHING THAT WE WANT THE COURT TO ENJOIN.

AGAIN, WHEN WE WENT THROUGH -- WE WERE VERY CAREFUL WHEN WE WENT THROUGH, AND I -- YOU KNOW, I KNOW YOUR HONOR IS SUGGESTING THAT REALLY WHAT WE'RE TALKING ABOUT IS MEMBERS, AND I'LL EXPLAIN WHY I DON'T THINK THAT'S THE CASE.

BUT I WOULD URGE YOU TO EITHER HAVE US SUBMIT A PROPOSED ORDER --

THE COURT: ARE YOU TRYING TO ENJOIN SELL?

MS. KUMAR: YES.

THE COURT: REALLY? OKAY.

ARE YOU TRYING TO ENJOIN SHARE AND RETAIN?

MS. KUMAR: YES.

THE COURT: JUST COLLECT?

MS. KUMAR: THAT'S RIGHT.

THE COURT: SO THEY CAN --

MS. KUMAR: AND TO BE -- I'M SORRY, LET ME JUST --

THE COURT: SO HOW DO YOU GET TO THE REST? IF YOU DON'T COLLECT IT, WHAT DO YOU HAVE TO SELL, SHARE, OR RETAIN?

MS. KUMAR: WELL, THE STATE ALLOWS COLLECTION OF INFORMATION NEEDED TO PROVIDE THE SERVICE, RIGHT, SO WE WILL HAVE THAT INFORMATION.

THE STATE DOESN'T WANT US TO USE THAT INFORMATION TO TAILOR CONTENT.

THE COURT: I'M SORRY. I DON'T KNOW WHAT YOU'RE TALKING ABOUT.

MS. KUMAR: OKAY. SO --

THE COURT: YOU WANT THE LAW TO PROHIBIT THE COLLECTION OF DATA THAT IS NOT NEEDED.

MS. KUMAR: I DON'T WANT THAT. I'M SAYING THAT WE'RE NOT ASKING THE COURT TO ENJOIN THAT PART.

THE COURT: WELL, THEN, YOU -- THEN YOU'RE WANTING THAT TO BE ENFORCED AGAINST YOUR MEMBERS.

MS. KUMAR: AGAIN, YOU KNOW, WE HAVE -- I MEAN, LOOK, IT -- IN MY VIEW, THE ENTIRE STATUTE SHOULD BE THROWN OUT, RIGHT?

THE COURT: I'M JUST TRYING TO -- IF I DON'T AGREE WITH THAT, I'M TRYING TO UNDERSTAND --

MS. KUMAR: NO, I UNDERSTAND.

THE COURT: AND THAT'S WHY YOU'RE GOING TO LOSE ON

(1) THROUGH (4), BECAUSE I DON'T KNOW WHAT YOU'RE ASKING.

AND THEN IF YOU TELL ME IN A NEW DOCUMENT, IT'S NOT GOING TO MAP ON TO YOUR BRIEFING.

MS. KUMAR: WELL, RESPECTFULLY, YOUR HONOR, THE BRIEFING IS, IS -- SETS OUT --

THE COURT: OKAY.

MS. KUMAR: -- YOU KNOW, WHAT IT IS. I'M HAPPY TO GO THROUGH THE REPLY BRIEF --

THE COURT: NO. I'LL READ IT.

MS. KUMAR: OKAY.

THE COURT: I'VE READ IT TWICE. I DIDN'T GET IT. AND IF I DON'T GET IT, YOU DON'T WIN.

BUT THAT'S -- I'LL READ IT A THIRD TIME. I'M MORE THAN GLAD TO.

MS. KUMAR: I WOULD ALSO DIRECT THE COURT TO THE AMENDED COMPLAINT, WHICH IS --

THE COURT: I KNOW, AND I'VE GOT THAT.

MS. KUMAR: AND IT DOES NOT -- AND IF YOU LOOK AT -- I DON'T WANT TO POINT YOU IN, BUT IF YOU LOOK AT PARAGRAPH 7 --

THE COURT: OF THE PRAYER?

MS. KUMAR: OF THE PRAYER, IT SAYS, TO THE EXTENT THAT SECTION APPLIES TO COVERED SERVICES' RETENTION, SALE, AND SHARING OF PERSONAL INFORMATION TO PUBLISH CONTENT OR MAKE INFORMATION AVAILABLE.

THE COURT: OKAY. THANK YOU.

AND JUST TO SORT OF ZOOM OUT ON THIS, RIGHT, I THINK ONE OF TWO THINGS IS TRUE GIVEN THE WAY YOUR HONOR IS THINKING ABOUT THIS.

ONE IS THE INDIVIDUAL PROVISIONS, WE'VE ONLY CHALLENGED THEM AS TO OUR MEMBERS' CONDUCT. THAT'S KIND OF WHAT YOU SUGGESTED TO ME.

THE COURT: YEAH.

MS. KUMAR: IF THAT'S THE CASE, YOU CAN ENJOIN IT ON AN AS-APPLIED BASIS.

THE COURT: THAT'S RIGHT.

MS. KUMAR: SO THIS IDEA THAT WE DIDN'T BRIEF THE AS-APPLIED, I WANT TO BE SURE THAT --

THE COURT: OKAY, SURE. SO MS. LISKA ACKNOWLEDGED THAT ON YOUR COVERAGE DEFINITION ARGUMENT, THAT IF I FIND THAT THE -- EVERY APPLICATION IMPLICATES CONTENT, SHE'S ONLY ARGUING THAT THE SECTION-BY-SECTION ANALYSIS RELATE TO THE STANDARD OF REVIEW, STRICT SCRUTINY OR INTERMEDIATE SCRUTINY.

YOU DON'T DISAGREE WITH THAT, TO YOU?

MS. KUMAR: THAT'S RIGHT.

IF YOU'RE ASKING WHETHER I THINK YOU HAVE TO GO THROUGH THE PROVISIONS AND APPLY THE LEVEL OF SCRUTINY, I THINK, YES, THAT'S WHAT I THINK YOU HAVE TO DO.

THE COURT: THAT'S GREAT. OKAY. I'M GLAD WE HAVE THAT UNDERSTANDING.

LET'S NOT TALK ABOUT THE (1) THROUGH (4).

SO ANYTHING ELSE YOU WANT TO COMMENT ON ON THE DARK PATTERNS?

MS. KUMAR: YES, I DO, YOUR HONOR --

THE COURT: OKAY.

MS. KUMAR: -- BECAUSE I DIDN'T REALLY GO THROUGH IT THE FIRST TIME, BUT I'LL TRY TO BE BRIEF.

THE COURT: OKAY.

MS. KUMAR: YOU KNOW, AGAIN, I WOULD DIRECT THE COURT TO, YOU KNOW, THE RELIEF THAT IS BEING SOUGHT, WHICH IS TO ENJOIN THAT TO THE EXTENT IT APPLIES TO COVERED SERVICES' USE OF RECOMMENDATION ALGORITHMS, CONTINUOUS SCROLL, AUTOPLAY, AND OTHER FEATURES THAT ORGANIZE CONTENT.

THE COURT: OKAY.

MS. KUMAR: THOSE FIRST FEW THINGS ARE VERY SPECIFIC AS TO WHAT WE WANT THE INJUNCTION ON.

THE COURT: YES, IT IS.

MS. KUMAR: AND I THINK THAT IS CERTAINLY A WORKABLE THING.

THE COURT: YES.

MS. KUMAR: AND, YOU KNOW, THE OTHER THING I WOULD SAY IS ON THE SCRUTINY PART, WE HAVEN'T EVEN ADDRESSED THE FACT THAT CALIFORNIA ALREADY REGULATES DARK PATTERNS, RIGHT? AND THAT'S ON PAGE 18 OF ECF 101 OF OUR BRIEF, WHICH IDENTIFIES, THOUGH, PROHIBITS USING DECEPTIVE PRACTICES, DARK PATTERNS, TO OBTAIN A WAIVER OF PRIVACY PROTECTIONS, REQUIRES -- AND THERE

ARE A BUNCH OF OTHER CITATIONS.

THE COURT: YEAH.

MS. KUMAR: SO WHAT DOES THIS LAW ADD?

IT'S AGAIN ABOUT THE PUBLICATION OF CONTENT. AGAIN, WE'RE NOT ASKING YOU TO ENJOIN ALL APPLICATIONS OF THIS PROVISION, JUST THE APPLICATIONS THAT CONCERN SPEECH, AND THAT'S TRUE FOR ALL OF THE USE RESTRICTIONS. WE'VE IDENTIFIED THE APPLICATIONS THAT ARE IMPERMISSIBLE.

THE COURT: OKAY.

MS. KUMAR: OKAY.

THE COURT: UM-HUM.

MS. KUMAR: ON VAGUENESS, I KNOW YOU'RE NOT INCLINED TO ADDRESS IT, BUT I WOULD BE REMISS IF I DIDN'T SAY, YOU JUST NOW SAID, I DON'T KNOW WHAT LIKELY MEANS.

AND THE REALITY IS, THAT'S TRUE THROUGHOUT THE LAW. WHAT IS MATERIAL AND DETRIMENTAL?

AND, YOU KNOW, I KNOW THAT BEST INTEREST IS A STANDARD IN FAMILY LAW, BUT THERE'S A SET OF CIRCUMSTANCES, DISCRETE -- IT'S ABOUT ONE CHILD, NOT ABOUT A BUNCH OF CHILDREN -- AND IT'S ABOUT, YOU KNOW, A SPECIFIC CIRCUMSTANCE AND A MEANING OF THE LAW -- JUST BECAUSE THAT TERM IS USED IN A DIFFERENT PART OF LAW DOESN'T MEAN THAT IT'S NOT VAGUE IN THIS ONE.

THE COURT: OKAY.

MS. KUMAR: AND THEN ON SEVERABILITY, JUST TO BE CLEAR, THE STANDARD IS THAT THE COURT HAS TO BE ABLE TO SAY,

WITH CERTAINTY, THAT THE LEGISLATURE WOULD HAVE PASSED THE ACT WITHOUT THE PROVISION.

IF THERE'S ANY DOUBT, IT'S NOT SEVERABLE. AND I THINK --

THE COURT: OH, I FLIPPED IT. OKAY.

MS. KUMAR: YEAH. I THINK AT A MINIMUM, THERE WAS DOUBT. AND, YOU KNOW, THAT'S ANOTHER WAY FOR THE COURT TO REACH THE RESULT.

THE COURT: SO I'M EXPECTING -- AND I APPRECIATE ALL OF YOU GIVING ME THE COPIES OF THE BILLS -- THAT I WILL SEE A VERSION OF THE BILL THAT WAS DEFEATED --

MS. KUMAR: YES.

THE COURT: -- IN TWO INSTANCES. ONE DOESN'T HAVE A CURE -- A CURE PROVISION, ONE HAS A 45-DAY CURE PROVISION. THEY BOTH FAILED. AND THEN ONE HAS A 90-DAY AND IT PASSED.

MS. KUMAR: I'M NOT GOING TO -- I'M NOT GOING TO ATTEST TO THIS BECAUSE I -- BUT THERE WERE THREE VERSIONS THAT WE'RE TALKING ABOUT. I DON'T KNOW --

THE COURT: OKAY. AND TWO FAILED?

MS. KUMAR: TWO -- WHEN YOU SAY TWO FAILED, LIKE, ONE WAS PUT IN THE SUSPENSE FILE. DOES THAT MAKE IT A FAILURE? IN OUR VIEW, YES.

THE COURT: I THINK THAT'S A FAILURE.

MS. KUMAR: YES. OKAY.

SO ALL I'M SAYING IS THERE MAY NOT HAVE BEEN A VOTE. IT MAY HAVE NOT ADVANCED. IT MAY HAVE BEEN PUT IN THE SUSPENSE

FILE.

THE COURT: OKAY. BECAUSE I DON'T REMEMBER HOW A BILL GOES TO A SUSPENSE FILE. MAYBE IT FAILED FOR LACK OF A SECOND. MAYBE THE CHAIRMAN SAID, I'M NOT BRINGING IT UP FOR A VOTE. THERE ARE LOTS OF REASONS.

MS. KUMAR: YES, I THINK IT MIGHT BE THE LATTER. I'VE READ ABOUT THE SUSPENSE FILE. I'M NOT WELL VERSED IN IT.

BUT I DON'T WANT TO TELL YOU THAT THERE WERE TWO VOTES WHEN I DON'T KNOW THAT THERE WERE TWO VOTES.

THE COURT: OKAY. AND SO I'LL BE PRECISE IN CHARACTERIZING WHAT HAPPENED.

MS. KUMAR: OKAY. SO IT LOOKS LIKE THE COMMITTEE VOTED FOR IT TO BE PUT IN THE SUSPENSE FILE.

THE COURT: THEY DID VOTE, OKAY.

MS. KUMAR: YEAH, BUT IT'S NOT A VOTE ON THE ENTIRE -- LIKE I SAID, IT JUST --

THE COURT: SO IT DOESN'T GO TO THE LEGISLATURE UNLESS IT GETS OUT OF COMMITTEE.

MS. KUMAR: RIGHT.

THE COURT: SO EVEN THE COMMITTEE WASN'T DOING THAT.

MS. KUMAR: THAT'S RIGHT. THAT'S RIGHT.

AND WE DO HAVE ALL VERSIONS OF THE LAW --

THE COURT: THAT ARE AVAILABLE, YEAH.

MS. KUMAR: -- THAT WE CAN SHARE WITH YOU.

THERE WAS ONE MORE THING, AND I'M TRYING TO REMEMBER IF

I -- OH, GOING BACK TO JOHN DOE, I MEAN THE REED CASE THAT WE TALKED ABOUT, I DID GO BACK AND READ IT.

THE COURT: AND YOU'RE TALKING ABOUT JOHN DOE VERSUS REED, NOT THE REED --

MS. KUMAR: YES, NOT REED VERSUS TOWN OF GILBERT, RIGHT.

I WENT BACK AND READ IT DURING MY BREAK TO SORT OF GET AN UNDERSTANDING FOR WHAT THE COURT IS THINKING, AND ALL I WOULD SAY THERE IS THAT YOU'RE RIGHT THAT, LIKE, THE PLAINTIFF IN THAT CASE DIDN'T SHOW THAT -- ALTHOUGH THEY SPECIFICALLY -- ON THEIR VERY HARM.

BUT THE NARROWED CHALLENGES FOCUSSED ON THE HARM TO SPEECH. THEY DON'T ASK FOR AN INJUNCTION OF THE WHOLE PROVISION, SO YOU DON'T NEED TO LOOK AT ALL THE APPLICATIONS. WE'VE ISOLATED THE IMPERMISSIBLE APPLICATIONS FOR YOU.

THE COURT: OKAY. ALL RIGHT. THANK YOU.

ALL RIGHT. THIS HAS BEEN ENORMOUSLY HELPFUL. I WANT TO THANK ALL OF YOU FOR THE TREMENDOUS WORK THAT YOU'VE PUT IN ON THIS.

ALTHOUGH I'M NOT MAKING PROMISES, I DID UNDERSTAND THAT THE PARTIES HAVE AGREED THAT THE STATE WOULD HOLD OFF IMPLEMENTATION UNTIL SOME PARTICULAR DATE.

CAN YOU REMIND ME WHAT THAT IS?

MS. LISKA: MARCH 6TH, YOUR HONOR, I BELIEVE.

THE COURT: OKAY. SO I'LL KEEP THAT IN MIND.

MS. LISKA: OF COURSE.

THE COURT: AND WE MOVED THIS UP TO THIS DATE SO THAT I WOULD HAVE A REASONABLE SHOT AT IT. AND, AGAIN, I JUST WANT YOU TO KNOW, IT'S MY HOPE, BUT IT'S NOT MY PROMISE.

SO IT WILL GIVE YOU THE OPPORTUNITY, IF YOU DON'T HEAR FROM ME, TO DECIDE WHETHER YOU'RE GOING TO GIVE SOME EXTENSION, BECAUSE I'M NOT GOING TO BE ABLE TO HAVE THAT CONVERSATION WITH YOU ABOUT HOW MUCH LONGER DO I NEED.

BUT WE -- I'VE KNOWN THAT ALL ALONG, SO WE'VE PUT A LOT OF WORK IN IT UP FRONT.

MS. LISKA: AND WE APPRECIATE YOU TAKING THAT INTO ACCOUNT. LIKE I SAID, I THINK ON OUR STATUS CONFERENCE, WE DIDN'T SET THAT TO TRY TO FORCE TO YOU MAKE ANY DECISIONS, BUT TO TRY AND FACILITATE THE CASE MOVING ALONG SMOOTHLY.

THE COURT: YES, AND YOU DID.

IT WAS -- I HAD ORIGINALLY PLANNED TO SET THIS IN LATE FEBRUARY, SO THAT'S WHY I ADVANCED IT TO THIS DATE SO THAT I HAVE A SHOT AT GETTING SOMETHING OUT TO YOU.

ALL RIGHT. WELL, I THINK WE ARE DONE HERE, AND THANK YOU ALL.

THE CLERK: COURT IS ADJOURNED.

(THE PROCEEDINGS WERE CONCLUDED AT 11:46 A.M.)

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED: FEBRUARY 5, 2025

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
Telephone: (213) 633-6800

DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (*pro hac vice*)
bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**REPLY IN SUPPORT OF MOTION FOR SECOND PRELIMINARY INJUNCTION**<br><br>Date: January 23, 2025<br>Time: 9:00 AM<br>Dept.: Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

**TABLE OF CONTENTS**


**Page**

TABLE OF AUTHORITIES .......... ii

I. INTRODUCTION .......... 1

II. NETCHOICE IS LIKELY TO PREVAIL ON ITS FIRST AMENDMENT CLAIMS. .......... 2

A. The Act's Content-Based Coverage Definition Renders All The Regulatory Provisions Facially Invalid. .......... 2

1. The Regulatory Provisions are subject to strict scrutiny in every case. .......... 2

2. No application of the Regulatory Provisions survives strict scrutiny. .......... 4

3. The overbreadth standard is satisfied. .......... 6

B. The Individual Provisions, As Challenged, Are Also Facially Invalid. .......... 7

1. Policy-enforcement mandate: § 31(a)(9) .......... 7

2. Information-use restrictions: § 31(b)(1)-(4) .......... 9

3. "Dark pattern" restriction: § 31(b)(7) .......... 12

4. Age-estimation mandate: § 31(a)(5) .......... 13

C. The Individual Provisions Are Unconstitutionally Vague. .......... 13

D. The State Does Not Contest NetChoice's As-Applied Claims. .......... 15

III. THE ALREADY-INVALIDATED DPIA PROVISIONS ARE NOT SEVERABLE. .......... 15

A. The DPIA Provisions Are Not Volitionally Severable. .......... 15

B. The DPIA Provisions Are Not Functionally Severable. .......... 16

IV. NETCHOICE IS LIKELY TO PREVAIL ON ITS OTHER CLAIMS. .......... 16

V. THE STATE CONCEDES THE OTHER INJUNCTION FACTORS. .......... 17

VI. CONCLUSION .......... 17




DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. FTB*,
175 Cal. App. 4th 1346 (2009) ..... 16

*ACLU v. Mukasey*,
534 F.3d 181 (3d Cir. 2008) ..... 13, 14

*AFSCME Council No. 79 v. Scott*,
717 F.3d 851 (11th Cir. 2013) ..... 9

*Am. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ..... 1, 7, 8, 12

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) ..... 13

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) ..... 6

*Bartnicki v. Vopper*,
532 U.S. 514 (2001) ..... 10

*Boos v. Barry*,
485 U.S. 312 (1988) ..... 3

*Bride v. Yolo Techs., Inc.*,
112 F.4th 1168 (9th Cir. 2024) ..... 17

*Brockett v. Spokane Arcades, Inc.*,
472 U.S. 491 (1985) ..... 7

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ..... 2, 5, 6, 13

*Bullfrog Films, Inc. v. Wick*,
847 F.2d 502 (9th Cir. 1988) ..... 14

*Bursey v. United States*,
466 F.2d 1059 (9th Cir. 1972) ..... 12

*Butcher v. Knudsen*,
38 F.4th 1163 (9th Cir. 2022) ..... 15

*Butler v. Michigan*,
352 U.S. 380 (1957) ..... 13





DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

*Cal. Redevelopment Ass'n v. Matosantos*,
53 Cal. 4th 231 (2011) .......... 15, 16

*Citizens United v. FEC*,
558 U.S. 310 (2010) .......... 7

*City of Austin v. Reagan Nat'l Advertising of Austin LLC*,
596 U.S. 61 (2022) .......... 3

*City of L.A. v. Patel*,
576 U.S. 409 (2015) .......... 8

*Cody v. Ring LLC*,
718 F. Supp. 3d 993 (N.D. Cal. 2024) .......... 15

*Corner Computing Sols. v. Google LLC*,
2024 WL 4290764 (W.D. Wash. 2024) .......... 8

*Counterman v. Colorado*,
600 U.S. 66 (2023) .......... 15

*County of Sonoma v. Superior Ct.*,
173 Cal. App. 4th 322 (2009) .......... 15

*Daghlian v. DeVry Univ., Inc.*,
582 F. Supp. 2d 1231 (C.D. Cal. 2007) .......... 16

*DoorDash, Inc. v. City of N.Y.*,
2024 WL 4276245 (S.D.N.Y. 2024) .......... 10

*Engdahl v. City of Kenosha*,
317 F. Supp. 1133 (E.D. Wis. 1970) .......... 8

*Ent. Software Ass'n v. Foti*,
451 F. Supp. 2d 823 (M.D. La. 2006) .......... 8

*Est. of Sanders*,
2 Cal. App. 4th 462 (1992) .......... 16

*Fayetteville Pub. Libr. v. Crawford Cnty.*,
2024 WL 5202774 (W.D. Ark. 2024) .......... 14

*Foti v. City of Menlo Park*,
146 F.3d 629 (9th Cir. 1998) .......... 1

*Garcia v. City of L.A.*,
11 F.4th 1113 (9th Cir. 2021) .......... 8

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) .......... 15





DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

*Harris v. Quinn*,
573 U.S. 616 (2014) .......... 11

*HERE Int'l Union v. Davis*,
21 Cal. 4th 585 (1999).......... 16

*IMDB.com Inc. v. Becerra*,
962 F.3d 1111 (9th Cir. 2020).......... 11

*In re Matthew B.*,
232 Cal. App. 3d 1239 (1991).......... 14

*Isaacson v. Horne*,
716 F.3d 1213 (9th Cir. 2013).......... 7

*John Doe # 1 v. Reed*,
561 U.S. 186 (2010) .......... 7

*Kasler v. Lungren*,
72 Cal. Rptr. 2d 260 (1998).......... 16

*King v. Facebook, Inc.*,
2023 WL 5318464 (9th Cir. 2023).......... 8

*Kohls v. Bonta*,
2024 WL 4374134 (E.D. Cal. 2024) .......... 14

*Lemmon v. Snap, Inc.*,
995 F.3d 1085 (9th Cir. 2021).......... 17

*Lloyd v. Facebook, Inc.*,
2024 WL 5121035 (N.D. Cal. 2024).......... 8

*Matsumoto v. Labrador*,
122 F.4th 787 (9th Cir. 2024).......... 1, 4, 7, 8

*Mills v. United States*,
713 F.2d 1249 (7th Cir. 1983).......... 16

*Mont. PIRG v. Jacobsen*,
2024 WL 4023781 (9th Cir. 2024).......... 1

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... *passim*

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) .......... 4

*NAACP v. Button*,
371 U.S. 415 (1963) .......... 14



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

*National Pork Producers Council v. Ross*,
598 U.S. 356 (2023) .......... 17

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) .......... *passim*

*NetChoice, LLC v. Fitch*,
2024 WL 3276409 (S.D. Miss. 2024) .......... 3

*NetChoice, LLC v. Paxton*,
573 F. Supp. 3d 1092 (W.D. Tex. 2021) .......... 10

*NetChoice, LLC v. Reyes*,
2024 WL 4135626 (D. Utah 2024) .......... 3, 12

*NetChoice, LLC v. Yost*,
716 F. Supp. 3d 539 (S.D. Ohio 2024) .......... 3

*O'Handley v. Padilla*,
579 F. Supp. 3d 1163 (N.D. Cal. 2022), *aff'd*, 62 F.4th 1145 (9th Cir. 2023) .......... 10

*People v. Nguyen*,
222 Cal. App. 4th 1168 (2014) .......... 16

*PETA, Inc. v. N.C. Farm Bur. Fed'n*,
60 F.4th 815 (4th Cir. 2023) .......... 7

*Porter v. Martinez*,
68 F.4th 429 (9th Cir. 2023) .......... 3, 11

*Proj. Veritas Action Fund v. Rollins*,
982 F.3d 813 (1st Cir. 2020) .......... 7

*PSINet, Inc. v. Chapman*,
362 F.3d 227 (4th Cir. 2004) .......... 13

*Publius v. Boyer-Vine*,
237 F. Supp. 3d 997 (E.D. Cal. 2017) .......... 17

*Quintano v. Mercury Casualty Co.*,
11 Cal. 4th 1049 (1995) .......... 16

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 3, 9, 11

*Reno v. ACLU*,
521 U.S. 844 (1997) .......... 13

*Riley v. NFB of N.C., Inc.*,
487 U.S. 781 (1988) .......... 6



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

*Sam Francis Found. v. Christies, Inc.*,
784 F.3d 1320 (9th Cir. 2015) (en banc) .......... 17

*Smith v. Butterworth*,
866 F.2d 1318 (11th Cir. 1989), *aff'd*, 494 U.S. 624 (1990) .......... 7

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 4

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......... 4, 11

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) .......... 11

*United States v. Eichman*,
496 U.S. 310 (1990) .......... 11

*United States v. Grace*,
461 U.S. 171 (1983) .......... 7

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000) .......... *passim*

*Video Soft. Dealers Ass'n v. Schwarzenegger*,
556 F.3d 950 (9th Cir. 2009), *aff'd*, 564 U.S. 786 (2011) .......... 5

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) .......... 8

*Yim v. City of Seattle*,
63 F.4th 783 (9th Cir. 2023) .......... 5, 9, 11, 13

**Statutes**

Children's Online Privacy Protection Act (COPPA),
15 U.S.C. §§ 6501-05 .......... 2, 6, 17

47 U.S.C. § 230 .......... 2, 16, 17

Cal. Civil Code
§ 1798.99.29 .......... 2, 17
§ 1798.99.30 .......... 2, 3, 6, 17
§ 1798.99.31 .......... *passim*
§ 1798.99.40 .......... 2

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3 .......... 17

U.S. Const. amend I .......... *passim*



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

**Other Authorities**

Seth F. Kreimer, *Censorship by Proxy*, 155 U. PA. L. REV. 11 (2006) .......................................... 8



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

## I. INTRODUCTION

The State never seriously disputes that the Regulatory Provisions are intended to, and will dramatically, alter speech published online. The State also essentially ignores NetChoice's narrowed alternate challenges, instead recycling its rejected argument that the Act only concerns privacy, not speech. Its defense of the law on the merits fails, and the remaining preliminary injunction factors are undisputed. A preliminary injunction is warranted.

*First*, the Regulatory Provisions are facially invalid across the board. Strict scrutiny applies because the Act requires services to consider content—whether they publish "cartoons," "games," "celebrities," and other material that "appeal to children"—to decide whether they are covered. The Legislature drew those lines to censor "detrimental material" and reduce minors' engagement with protected expression. Rather than try to satisfy strict scrutiny, the State erroneously reads *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), to stiffen NetChoice's burden in a way that would render facial relief virtually impossible in First Amendment challenges. But *Moody* did not "reformulat[e]" the overbreadth test, *Mont. PIRG v. Jacobsen*, 2024 WL 4023781, at *2 n.2 (9th Cir. 2024), and the Ninth Circuit just applied it to invalidate a law that, like this one, "sweeps in a large swath of expressive activities," *Matsumoto v. Labrador*, 122 F.4th 787, 814 (9th Cir. 2024).

*Second*, the Individual Provisions, as challenged, are also facially invalid. The State does not show otherwise and instead mischaracterizes NetChoice's narrowing of its claims as an effort to "short-circuit" *Moody*. Opp. 10. The State is wrong. Courts routinely analyze the facial validity of statutes in specific applications and regularly invalidate them as to those applications. *See, e.g.*, *Am. for Prosperity Found. v. Bonta*, 594 U.S. 595, 611, 617-18 (2021) ("*AFP*").

*Third*, the Individual Provisions are impermissibly vague. Rather than define the specific activities regulated and harms to be avoided, the Individual Provisions require companies to guess whether their expressive features and content curation practices are "detrimental" or in children's "best interests," and to police themselves accordingly. But it is the State's job to "clearly delineate the conduct it proscribes" and not delegate such "policy matters … for resolution on an ad hoc and subjective basis." *Foti v. City of Menlo Park*, 146 F.3d 629, 638-39 (9th Cir. 1998). Absent relief, services will self-censor to avoid the whims of whatever regulator happens to be in charge.



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

*Fourth*, the Regulatory Provisions are not volitionally or functionally severable from the already-enjoined DPIA provisions. The State's response ignores the history of the Act and the undeniable fact that enforcing the remainder of the Act fundamentally alters the scheme enacted.

*Finally*, the Regulatory Provisions also violate the Commerce Clause, and certain Individual Provisions violate Section 230 and COPPA.

## II. NETCHOICE IS LIKELY TO PREVAIL ON ITS FIRST AMENDMENT CLAIMS.

### A. The Act's Content-Based Coverage Definition Renders All The Regulatory Provisions Facially Invalid.

As NetChoice has shown, application of each Regulatory Provision is based on the content a business publishes. As a result, the Regulatory Provisions are subject to strict scrutiny—a standard the State cannot (and does not even try to) satisfy. *See* Mot. 11-14.

#### 1. The Regulatory Provisions are subject to strict scrutiny in every case.

The State tries to avoid the First Amendment by claiming the "determining factor as to whether a business is subject to the Act is" not content, but "whether or not its users are children." Opp. 12. But the Act uniformly requires considering the *content* of services' online material to decide whether the Regulatory Provisions apply to those services. Services that publish "advertisements," "games," "cartoons," "music," or "celebrities" with "appeal to children" are regulated, § 30(b)(4), but not services used by children that do not publish such content. *See* § 30(b)(5) (exempting services that offer "delivery or use of a physical product"); § 40 (exempting health care providers and researchers). This scheme shows the Legislature was focused on expression, not just the composition of a service's user base. And the Legislature confirmed that focus by twice referring to a service's "audience" (not "users"). § 30(b)(4)(B), (F). Strict scrutiny thus applies to every application of the Regulatory Provisions.

The State cannot deny that this content-based scheme is designed to control the expression that minors access through "features distinctive to the medium" of online communication. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011). The Act seeks to suppress those features to the extent they "offer detrimental material," Findings § 1(a)(8), but protects those same features if they deliver content in "the best interests of children," § 29. As the State's expert confirms, the objective is to regulate expressive features that "keep[] users coming back" to allegedly harmful



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

speech on services like "Instagram, YouTube, Reddit, Discord and Twitter/X." Radesky ¶¶ 83, 95; *see id.* ¶¶ 86-87, 90, 92 (criticizing "ephemeral designs," content "notifications," expressive engagement such as "likes" and "hearts," and "low-friction" "scrolling"). This "focus on the direct impact of speech on its audience" triggers strict scrutiny. *Boos v. Barry*, 485 U.S. 312, 321 (1988); *see* Mot. 12; Radesky Supp. ¶¶ 22-28.

The State relies on *City of Austin v. Reagan National Advertising of Austin LLC*, 596 U.S. 61 (2022) and *Porter v. Martinez*, 68 F.4th 429 (9th Cir. 2023) (Opp. 11-13), but those decisions support NetChoice. *City of Austin* involved an ordinance that regulated advertisements differently depending on whether or not the goods were sold "on premises." 596 U.S. at 73-74. The ordinance discriminated based on where the goods were sold, *not* "the topic discussed or the idea or message expressed," rendering strict scrutiny inapplicable. *Id.* So, too, in *Porter*, the application of a law regulating honking hinged on "traffic circumstances," not "the 'content' of the honk." 68 F.4th at 441-42. Both cases, however, confirmed that laws "singl[ing] out specific subject matter for differential treatment"—like the political sign ordinance in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015)—demand strict scrutiny. *City of Austin*, 596 U.S. at 94; *Porter*, 68 F.4th at 442-43. Here, the Act singles out services with expressive appeal to children and requires them to redesign their offerings in the "best interests of children." That is censorship, and it requires strict scrutiny.

The State also cannot distinguish the trio of recent cases enjoining other online-content restrictions. *See* Mot. 13 (citing *NetChoice, LLC v. Reyes*, 2024 WL 4135626 (D. Utah 2024), *NetChoice, LLC v. Fitch*, 2024 WL 3276409 (S.D. Miss. 2024), and *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539 (S.D. Ohio 2024)). The State notes those restrictions distinguished between "social speech" and "other forms of speech." Opp. 13. But the Act is even more vulnerable because it targets services based on specific kinds of content, not just general categories of speech. *See Reed*, 576 U.S. at 160-61. Although *Yost* declined to find a law content-based *solely* on the basis that it applied to services "reasonably anticipated to be accessed by children," 716 F. Supp. 3d at 556-57 (Opp. 13), even that (flawed) holding is irrelevant: The Act identifies examples of content that bring a service into its ambit. *See* § 30(b)(4)(E). Like the ordinance in *Reed*, the Act thus "draw[s] facially content-based distinctions between subjects of speech." *Reyes*, 2024 WL 4135626, at *10.



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

The State's empty claim that it seeks to regulate children's "privacy and health," Opp. 13, changes none of this. The State cannot rely on purported privacy interests unless it can show it would have passed the Act "even … absen[t]" its censorial motive. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The record demonstrates the opposite—that the Act is aimed at the "suppression of free expression." *Moody*, 603 U.S. at 742. This is obvious from the Act's stated intent to prevent services from "offer[ing] detrimental material," Findings § 1(a)(8); similar statements from the Act's sponsor, the Governor, and the Attorney General, *see* Mot. 12; and the Ninth Circuit's finding that the State used the term "data management" as a "prox[y] for content." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1118, 1121 (9th Cir. 2024). It is similarly obvious from the State's evidence in this litigation. *See* Radesky Supp. ¶¶ 3, 5 (Act targets harms from "media use," "educational content/interactive design," "advertising," "games," "video-sharing platforms like YouTube," and "interactive media"); *id.* ¶¶ 24-26, 29-31, 43, 70-75 (Act targets speech involving "hate and discrimination," "violation of dignity," "problematic/excessive social media use," "bullying/harassment," "negative social media content," "offensive name-calling," "false rumors," "negative things," "explicit images," and age-inappropriate "advertisements"). Even the State's "privacy" harms boil down to a concern that content is too interesting, Opp. 2, 3, 19, and its "financial harms" relate to spending money on "content," Radesky Supp. ¶¶ 54-55. "It is not difficult to conclude from these examples that the statute encompasses, and may realistically be applied to, a substantial amount of protected speech." *Matsumoto*, 122 F.4th at 815.

**2. No application of the Regulatory Provisions survives strict scrutiny.**

"That the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578 (2011). The same goes for speech the State believes causes "negative social comparisons" or "displace[s] … healthy activities." Radesky Supp. ¶¶ 26-27. "[S]peech cannot be restricted simply because it is upsetting." *Snyder v. Phelps*, 562 U.S. 443, 450-51, 458 (2011). Since the Act is content-based both by its defined coverage and express purpose, the Regulatory Provisions are "presumptively invalid" and must survive strict scrutiny. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 817 (2000).



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

The State does not argue that scrutiny is satisfied, nor do its declarations carry that burden.

***No compelling interest.*** "[W]hen the government seeks to restrict speech" to protect minors, "it must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Video Soft. Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 962 (9th Cir. 2009), *aff'd*, 564 U.S. 786 (2011). Here, the State has not shown the wide range of maladies it seeks to address—such as depression, anxiety, disrupted sleep, poor academic performance, sedentary habits, and hurt feelings, Radesky Supp. ¶¶ 23-27, 30, 43—is attributable to online services. *See* Ferguson ¶¶ 10-40; Ferguson Supp. ¶¶ 22-47. As before, Dr. Radesky's testimony "do[es] not prove" that online speech "cause[s]" these harms, but "at best" shows "some correlation" between "exposure" and small "effects." *Brown*, 564 U.S. at 800-01; Radesky ¶ 50. Dr. Radesky now claims to have discovered a "causal link" to poorer mental health, Radesky Supp. ¶¶ 52, 96, but the new studies, too, are correlational (*id.* ¶ 52 nn.51 & 52) and methodologically flawed, Ferguson Supp. ¶¶ 10-21, 65-69. Further, Dr. Radesky's testimony does not show how any Regulatory Provision "will in fact alleviate" any targeted harm. *Video Soft. Dealers Ass'n*, 556 F.3d at 962; *see* Ferguson Supp. ¶¶ 22-47, 55-69, 80-81.

***No narrow tailoring.*** The State also has not shown that any Regulatory Provision is the least speech-restrictive alternative, *Playboy*, 529 U.S. at 813, or restricts no more speech than necessary, *Yim v. City of Seattle*, 63 F.4th 783, 794 (9th Cir. 2023).

First, the Act is not limited to speech unprotected by the First Amendment, such as child sexual abuse material ("CSAM"), speech promoting illegal drugs and gambling, or deceptive advertising. *Cf.* Radesky Supp. ¶¶ 63-67, 69, 71-75, 106-107(a)-(c). Rather, it regulates any "materially detrimental" information that is not "in the best interests of children." According to the State, this includes any speech that extends minors' time online, *id.* ¶¶ 25-27, 43-52, 78-101, 107(d), promotes "negative social comparison," *id.* ¶¶ 25-26, 29, 53, involves "name-calling," "negative things," or "risky, shocking, or attention-grabbing posts," *id.* ¶¶ 30, 31, 64, or exposes minors to "marketing" and "advertising" that is not "age-appropriate," *id.* ¶¶ 42, 70, 75. The State may not like it, but that speech is constitutionally protected: The government has no "free-floating





DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. And the State's alternate argument that protected speech may be regulated to shield minors from conduct like "sexual exploitation" or "grooming," Radesky Supp. ¶¶ 32-36, 63, "turns the First Amendment upside down." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002).

Second, the State could accomplish its goals by enforcing existing laws, including COPPA, the CPRA, *see* Mot. 4-5, and laws governing CSAM, sexual abuse, deceptive advertising, and gambling. The State asserts these laws are not adequately enforced, Egelman ¶¶ 19, 24, 37-40; Radesky ¶¶ 31-39, Radesky Supp. ¶ 42, and that is the point: A law is not tailored when "the State may vigorously enforce" less-restrictive rules. *Riley v. NFB of N.C., Inc.*, 487 U.S. 781, 800 (1988); *see also NetChoice*, 113 F.4th at 1121 (DPIA requirement invalid partially because State could have "rel[ied] on existing criminal laws that prohibit unlawful conduct").

Third, even as to the Act's real but illegitimate purpose—to shield minors from speech—the Regulatory Provisions are not the least restrictive means because they apply a one-size-fits-all instead of a "household-by-household" approach. *Playboy*, 529 U.S. at 816, 818, 823. Dr. Radesky admits some services provide parents tools to limit access to "age-appropriate video content." Radesky ¶ 96(d). The State does not explain why it did not mandate such tools. *See NetChoice*, 113 F.4th at 1121 (State could have "easily employed less restrictive means," such as by "incentivizing companies to offer voluntary content filters or application blockers" or "educating children and parents on the importance of using such tools").

**3. The overbreadth standard is satisfied.**

This record easily satisfies the facial overbreadth standard. In terms of "[w]hat activities, by what actors" the Act regulates, *Moody*, 603 U.S. at 724, the Act's scoping provisions mean that virtually all (if not all) applications of the Regulatory Provisions burden speech based on content. Indeed, it appears undisputed that the vast majority of services "accessed by children," § 30(b)(4), publish expressive content like videos, games, music, and social media. *See* Gossett Ex. 11 at 2-4, 9, 11; Radesky ¶¶ 22, 34-41, 48, 50, 60-62, 65, 67, 69-72, 96, 98 (focusing on social media, digital media, and interactive gaming); Radesky Supp. ¶¶ 22-55 (same); Ferguson Supp. ¶¶ 10-21 (same). Consequently, the Act's "broad contours … overlap extensively with the First Amendment" and



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

unconstitutionally "sweep[] in a large swath of expressive activities" that are "substantial in proportion" to any "plainly legitimate sweep." *Matsumoto*, 122 F.4th at 814-15.

**B. The Individual Provisions, As Challenged, Are Also Facially Invalid.**

Each challenged Individual Provision is also facially invalid in the applications NetChoice now challenges. Rather than grapple with the narrowed relief NetChoice seeks, Am. Compl. ¶¶ 84-90, Prayer ¶¶ 1-13, the State faults NetChoice for trying to "short-circuit" its burden under *Moody*. Opp. 10. Not so. NetChoice's burden depends on "the breadth of the remedy" sought, *Citizens United v. FEC*, 558 U.S. 310, 331 (2010), and the possibility that an Individual Provision violates the First Amendment "only in some cases" does not foreclose relief; it simply affects "the breadth of the relief to which [NetChoice is] entitled." *Isaacson v. Horne*, 716 F.3d 1213, 1230 (9th Cir. 2013). Courts routinely consider challenges to laws on their face as to some but not all applications. *See* Mot. 14 (citing cases); *see also, e.g.*, *AFP*, 594 U.S. at 611, 618-19 (granting facial relief as applied to specific tax schedule); *John Doe # 1 v. Reed*, 561 U.S. 186, 194 (2010) (explaining nature of challenge with both as-applied and facial aspects); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503-07 (1985) (facial relief "insofar" as law "reach[ed] protected materials"); *United States v. Grace*, 461 U.S. 171, 175, 183 (1983) (facial relief as to law's applications to sidewalks); *PETA, Inc. v. N.C. Farm Bur. Fed'n*, 60 F.4th 815, 835-38 (4th Cir. 2023) (facial relief as "applied" to certain newsgathering activities); *Proj. Veritas Action Fund v. Rollins*, 982 F.3d 813, 826, 840 (1st Cir. 2020) (facial relief with "'as-applied' … characteristics") (citing cases); *Smith v. Butterworth*, 866 F.2d 1318, 1320-21 (11th Cir. 1989) (facial relief "insofar as [law] applie[d] to" certain witnesses and circumstances), *aff'd*, 494 U.S. 624 (1990). The Court should do so here.

**1. Policy-enforcement mandate: § 31(a)(9)**

NetChoice has limited this challenge to the Act's requirement that services enforce their content moderation policies, *not* their privacy policies. *See* Am. Compl. ¶ 5, Prayer ¶ 5. This narrowing is not "amorphous," as the State asserts, Opp. 1, but confined to editorial standards that describe the "subjects or messages the platform prohibits or discourages," and content a service reserves the right to "remove, disfavor, or label." *Moody*, 603 U.S. at 719-20; *see* Roin ¶¶ 11-17; Cairella ¶¶ 15-17; Szabo ¶¶ 8-12; Rumenap ¶ 6. Because telling a publisher what kinds of content



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

to moderate would "alter a private speaker's own editorial choices," *Moody*, 603 U.S. at 734, the mandate is invalid "in every [such] case," *AFP*, 594 U.S. at 615.

The State argues that this requirement only compels services to honor their own editorial commitments. Opp. 14. But the same could be said of efforts—held unconstitutional—to supervise theaters that voluntarily adopt MPAA ratings, *Engdahl v. City of Kenosha*, 317 F. Supp. 1133, 1136 (E.D. Wis. 1970), or game distributors that choose to enforce ESRB rules, *Ent. Software Ass'n v. Foti*, 451 F. Supp. 2d 823, 834-35 (M.D. La. 2006). Here, too, as this Court found, applying the policy-enforcement mandate to content policies would "press private companies into service as government censors" and interfere with the exercise of "their editorial judgment." ECF 74 at 14, 27. In fact, the Ninth Circuit just held that even the *prospect* of state-supervised content moderation chills such judgment because it pressures services to block content that some (but not others) might consider problematic. *X Corp. v. Bonta*, 116 F.4th 888, 898-903 (9th Cir. 2024); *see also* Seth F. Kreimer, *Censorship by Proxy*, 155 U. PA. L. REV. 11, 48-50 (2006) (collecting cases).

The State gets nowhere by citing cases that allow enforcement of legally binding promises. *See* Opp. 14. Contracts are already enforceable, rendering such obligations irrelevant "to th[is] law's facial constitutionality." *Garcia v. City of L.A.*, 11 F.4th 1113, 1119 n.7 (9th Cir. 2021); *see also City of L.A. v. Patel*, 576 U.S. 409, 418-19 (2015) (in a facial challenge, courts consider "only applications of the statute in which it actually authorizes or prohibits conduct," not those addressed by existing authority). NetChoice is not asking the Court to void services' contractual obligations, but to enjoin *the State* from second-guessing the way they apply editorial standards. Am. Compl. ¶ 85, Prayer ¶ 5; *see, e.g.*, *Lloyd v. Facebook, Inc.*, 2024 WL 5121035, at *5 (N.D. Cal. 2024) (content policy is not a contract); *Corner Computing Sols. v. Google LLC*, 2024 WL 4290764, at *2 (W.D. Wash. 2024) (same); *King v. Facebook, Inc.*, 2023 WL 5318464, at *2 (9th Cir. 2023) (statements about how a service intends to "exercise … editorial discretion" are unenforceable). In any event, the State's speculation about hypothetical enforceable promises cannot overcome the "substantial" number of concrete unconstitutional applications of § 31(a)(9) to content policies that NetChoice has shown and that the State's expert, Radesky ¶ 72, confirms would result. *Matsumoto*, 122 F.4th at 814; *see* Cairella ¶ 17; Roin ¶ 17; Szabo ¶¶ 8-12; Cleland ¶¶ 8-14. The



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

State does not attempt to justify these applications (Opp. 14-15), and none are tailored to alleviate actual harm, *see Yim*, 63 F.4th at 794-96. *E.g.*, ECF 74 at 26-28.

**2. Information-use restrictions: § 31(b)(1)-(4)**

The State's arguments on the information-use restrictions fare no better. NetChoice seeks to enjoin those provisions only to the extent they "apply to covered services' use of personal information to publish content or to make information available." Am. Compl., Prayer ¶¶ 6-7. NetChoice has met its burden to show that these applications of § 31(b)(1)-(4) are facially invalid.

The State feigns ignorance as to "what content" will be affected and "how." Opp. 16. It wonders, for example, how the "prohibition on profiling a minor by default," § 31(b)(2), has "any impact on a business's content or other expressive activity." *Id.* But the State's own expert testifies repeatedly that profiling is a problem because it causes services to make editorial decisions to show allegedly harmful content to minors. *See, e.g.*, Radesky ¶ 65 (profiling causes minors to receive "detrimental" "material"); *id.* ¶ 78 (users are "profiled" to "predict[] what content" they want to see); ¶ 80 ("behavioral profile[s]" lead to "less extreme" "content"); ¶ 89(a) (profiling enables detrimental "content" to be "amplified or recommended to children"); Radesky Supp. ¶ 70 (profiling leads to "advertising for harmful or illegal activities"); *see also NetChoice*, 113 F.4th at 1118 (discussing "the State's own example" that "data profiling may cause a student who conducts research for a school project about eating disorders to see additional content about eating disorders"). So, too, § 31(b)(1), (3), and (4) regulate speech based on content because they condition the use of data on whether the published material is "materially detrimental" or in a child's "best interests." *See Reed*, 576 U.S. at 163-64, 169.

NetChoice need not show, as the State claims, how the *collection* or *sale* of information is "protected expressive activity." Opp. 16. This challenge is limited to the ways online services *use* information to suggest, target, and personalize the compilations of expression they present to different audiences. *See, e.g.*, Roin ¶¶ 2-6, 10, 13, 22; Cairella ¶¶ 8, 20; Szabo ¶¶ 13-14; Masnick Supp. ¶ 9; Paolucci Supp. ¶ 9; Cleland ¶ 18. The State cannot insulate the applications that NetChoice challenges by pointing (Opp. 18-19) to applications NetChoice does not challenge. *Cf. NetChoice*, 113 F.4th at 1117; *AFSCME Council No. 79 v. Scott*, 717 F.3d 851, 866 n.2 (11th Cir.


DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

2013) (rejecting similar attempt to avoid facial challenge); *see also, e.g.*, *DoorDash, Inc. v. City of N.Y.*, 2024 WL 4276245, at *8-9, *13-15 (S.D.N.Y. 2024) (enjoining law that "restricts how [apps] can use the customer data they collect") (Mot. 16).

The State also is wrong that publishing "content" is not "expressive activity." Opp. 17. "[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001). *Moody* does not say otherwise. *Moody* concerned statutes aimed at preventing services from "censoring" or disfavoring user content. 603 U.S. at 720-21. The Court had no trouble concluding that some applications of those statutes impinged on editorial discretion. *Id*. at 726-43. But it declined to find the laws facially invalid absent evidence as to what proportion of the regulated entities actually exercised editorial discretion that could be burdened. *Id.* at 725 (querying whether an email provider or online marketplace filters content in an expressive way). Here, in contrast, the information-use restrictions burden the editorial discretion of all covered services (and certainly a substantial number) by requiring them to avoid showing "detrimental" content to children. That is the very exercise the Ninth Circuit already held unconstitutional "in every circumstance." *NetChoice*, 113 F.4th at 1116 (requiring services to "inquire into whether" content is harmful before publishing it is unconstitutional).

In any event, NetChoice challenges the information-use restrictions *only* to the extent they restrict how services decide what speech to publish. Even using information to remove spam—the example the State says is non-expressive, Opp. 18—is a form of editing. *See O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186-87 (N.D. Cal. 2022) (First Amendment protects "decisions about what content to include, exclude, moderate, filter, label, restrict, or promote"), *aff'd*, 62 F.4th 1145 (9th Cir. 2023). "[T]hat algorithms do some of the work" changes nothing. *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1108 (W.D. Tex. 2021). What matters is that a "private company exercises editorial discretion" over content, irrespective of "the exact process used." *Id.*; Egelman Supp. ¶¶ 60-61 (algorithms implement "subjective" "content recommendations"); Egelman ¶¶ 48-50.

The State's effort to escape strict scrutiny, Opp. 18-19, fails. The prohibitions regulate the use of data differently on the basis of the content published, such as whether that speech is



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

detrimental or in the best interests of children. *See Reed*, 576 U.S. at 163-64, 169; *cf. Sorrell*, 564 U.S. at 580 (heightened scrutiny where law restricts information use by some speakers). The prohibitions are not confined to speech that "does no more than propose a commercial transaction." *Harris v. Quinn*, 573 U.S. 616, 648 (2014). They apply to *any* online publication that relies on user data (including just an IP address) to deliver content. *See IMDB.com Inc. v. Becerra*, 962 F.3d 1111, 1122 (9th Cir. 2020); *see also NetChoice*, 113 F.4th at 1120 ("There should be no doubt that the speech children might encounter online while using covered businesses' services are not merely commercial speech.").

Regardless, the State fails to carry its burden under even intermediate scrutiny, which still demands proof that the prohibitions (1) will in fact directly advance a substantial government interest in addressing a real problem, and (2) suppress no more speech than necessary to serve that interest. *Yim*, 63 F.4th at 794; *see Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664-65 (1994). The State claims the prohibitions further an interest in "protecting … privacy," but its rationale focuses on the "collection," "gathering," and retention of personal information—not its *use* to inform the publication of personalized content, which is what NetChoice challenges. Opp. 19.

The State's only justification for restricting the use of information for publication is to minimize "a child's time online" and reduce "overuse." *Id.* But that justification is not "unrelated to the suppression of free expression," *Porter*, 68 F.4th at 439 (Opp. 8), and thus is constitutionally invalid. *United States v. Eichman*, 496 U.S. 310, 317-18 (1990) (laws suppressing speech "out of concern for its likely communicative impact" are invalid); *see also* Mot. 18-19 (discussing cases). And if this were a valid aim, the evidence does not show these prohibitions will improve mental health, even assuming they actually reduced minors' screentime. *See* Ferguson Supp. ¶¶ 22-29 (no evidence of "correlation between time spent on digital media and youth mental health").

Nor has the State shown that these prohibitions suppress no more speech than necessary. The State could pursue its claimed privacy interest by enforcing existing privacy laws. *See supra* p. 6. And it could try to reduce minors' screentime (assuming that were a permissible goal) through tools for families and media literacy efforts. *Id.*; Ferguson Supp. ¶¶ 45, 53-54, 74-75; Radesky ¶¶ 94-95, 96(d), 98. The existence of these "narrower alternatives" is fatal. *Yim*, 63 F.4th at 795-



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

97; *see also, e.g.*, *Playboy*, 529 U.S. at 816, 818, 823; *NetChoice*, 113 F.4th at 1121 (State could have "easily" used less restrictive means, such as by "incentivizing companies to offer voluntary content filters or application blockers," "educating children and parents on the importance of using such tools," and "relying on existing criminal laws that prohibit unlawful conduct").

Since the State has not shown the data use provisions have any "plainly legitimate" applications in the realm NetChoice challenges, and since NetChoice has shown there are a "substantial" number of unconstitutional applications, these provisions are facially invalid as challenged. *See AFP*, 594 U.S. at 618.

**3. "Dark pattern" restriction: § 31(b)(7)**

In defending the "dark patterns" restriction, the State similarly ignores that NetChoice has narrowed its challenge. NetChoice seeks to enjoin this prohibition only to the extent it "applies to covered services' use of recommendation algorithms, continuous scroll, autoplay, and other design features that organize content." Am. Compl., Prayer ¶ 8; *see* Mot. 17. NetChoice has met its burden to show that these applications of § 31(b)(7) are facially invalid.

The State argues that NetChoice has not identified "specific design elements" members use, and so has not shown how this provision affects "expressive activity." Opp. 22. But NetChoice has done just that, identifying features that are used and will be disrupted, such as autoplay, seamless pagination, newsfeeds, recommendation algorithms, and push notifications. Szabo ¶ 13; Cairella ¶¶ 18-19; Roin ¶¶ 11-16; Paolucci ¶¶ 7-9; Cleland ¶¶ 15-17. A court recently held invalid restrictions on these features, *Reyes*, 2024 WL 4135626, at *15, and this Court should, too.

Nor is the State correct that "impacting how content is laid out is not necessarily expressive." Opp. 23. Just as the First Amendment protects a newspaper's decisions about "the placement" of content on its front page, *Bursey v. United States*, 466 F.2d 1059, 1087 (9th Cir. 1972), it protects the subjective decisions services make about where and "how" to display content to users. *See Moody*, 603 U.S. at 718-19, 720, 738; Egelman Supp. ¶¶ 60-61; Egelman ¶¶ 48-50.

In sum, every application of this prohibition within the range NetChoice challenges restricts protected speech, and the State does not even try to defend it under any level of scrutiny. *AFP*, 594 U.S. at 618; Mot. 17-19. An injunction is warranted.



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

**4. Age-estimation mandate: § 31(a)(5)**

NetChoice challenges the age-estimation mandate in all its applications because age-estimation requirements tied to content regulations are subject to and fail strict scrutiny. This mandate is functionally identical to the law invalidated in *Ashcroft v. ACLU*, 542 U.S. 656 (2004), which would have required services either to use age-verification or to block content alleged to be harmful to children. *Id.* at 667, 673, 678. So, too, in *ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008), the Third Circuit held invalid a similar age-verification requirement, reasoning that because users would hesitate to opt for age-verification, they would be prevented from accessing content. *Id.* at 196-98; *see also PSINet, Inc. v. Chapman*, 362 F.3d 227, 236-37 (4th Cir. 2004).

The State claims that "estimating a user's age is conduct, not expressive activity." Opp. 23. But the question is not whether age-estimation is itself "conduct." The question is whether the State can require age-estimation to stop children from seeing allegedly harmful *content*—whether by cabining them off from such content (which will mean services require even adults to prove their identity before accessing protected speech, Goldman Br. 3-4), or by sanitizing all content (by requiring services to apply uniform "data protections"—i.e., content restrictions). *See* Mot. 19-20 ("data protections" require altering content); Paolucci Supp. ¶¶ 6-8; Masnick Supp. ¶¶ 7-8.

The mandate thus requires strict scrutiny, *Ashcroft*, 542 U.S. at 667, 673, but would fail any level of First Amendment review. The State claims age-estimation protects "privacy and well-being," Opp. 24, but ignores its intrusiveness. *See, e.g.*, Rumenap ¶¶ 7-10; Masnick Supp. ¶ 7; Paolucci Supp. ¶ 6; *see also* Goldman Br. 3-4. A law "cannot meaningfully advance the government's stated interests" if it "counteract[s] those goals." *Yim*, 63 F.4th at 794. Nor is the mandate tailored. The State cannot "reduce the adult population … to reading only what is fit for children," to protect children. *Butler v. Michigan*, 352 U.S. 380, 381, 383 (1957); *see Reno v. ACLU*, 521 U.S. 844, 882 (1997). And the Act denies even minors protected speech, *Brown*, 564 U.S. at 794, rather than giving adults tools to protect minors, *Playboy*, 529 U.S. at 816, 818, 823; *NetChoice*, 113 F.4th at 1121. *See* Paolucci Supp. ¶ 8.

**C. The Individual Provisions Are Unconstitutionally Vague.**

The State brushes aside NetChoice's vagueness challenge and asserts without any



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

reasoning that the Act is "sufficiently clear." Opp. 20. It is not.

***Policy enforcement.*** The State argues § 31(a)(9) is not vague because NetChoice's members should "understand their own policies well enough to be able to enforce them." Opp. 15. That is not an answer. The point is that the policies are inherently subjective and thus require the exercise of discretion—which is fine for private companies like NetChoice's members, but not for the government. What one Attorney General might consider to be "in poor taste" the next may consider acceptable. *See* Kumar Ex. 6 (Washington Post). So, too, one Attorney General might consider certain groups "vulnerable" that another does not. *Id.* Ex. 3 (Reddit). This unbridled discretion invites arbitrary and discriminatory enforcement, rendering § 31(a)(9) impermissibly vague. *See Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 514 (9th Cir. 1988).

***Information-use restrictions.*** The State declares these provisions "clear," but provides no reason why. The State never attempts to define "detrimental," even though § 31(b)(1) prohibits the use of data that a service "has reason to know" is "materially detrimental" to a child. What is detrimental? Sleep loss? Distraction? Hurt feelings? Dr. Radesky appears to think so. *Cf. Kohls v. Bonta*, 2024 WL 4374134, at *3 (E.D. Cal. 2024) (law penalizing AI content "reasonably likely" to "undermine confidence" lacked "any objective metric," was "difficult to ascertain," implicating "vast amounts" of protected speech). So, too, the term "best interests of children" in § 31(b)(2)-(4) is an "elusive guideline that belies rigid definition." *In re Matthew B.*, 232 Cal. App. 3d 1239, 1263 (1991). That term may pass in family law, where it applies to finite custodial options involving a single child and judicial criteria that do not require moral judgments about speech. But the subjectivity of applying the term to the varied expression viewable by any child in California invites arbitrary enforcement in an area where precision is required. *See NAACP v. Button*, 371 U.S. 415, 438 (1963); *Fayetteville Pub. Libr. v. Crawford Cnty.*, 2024 WL 5202774, at *9-10 (W.D. Ark. 2024) (children's book ban vague). The Legislature had an obligation to say what it meant, not create a high-stakes guessing game that compels self-censorship. *See Mukasey*, 534 F.3d at 185, 205 (vague term unconstitutional even if it appears in an affirmative defense).

***Dark patterns.*** The State claims services can tell when they "have reason to know" that dark patterns will "lead or encourage" minors to take actions "materially detrimental" to their well-



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

being. Opp. 5, 23. But again, what is "materially detrimental"? And when does a website have "reason to know" that publication through an algorithm, autoplay feature, or push notification will have such effects? Ferguson Supp. ¶ 77 ("concept of 'dark patterns'" is "diffuse and ill-defined"). The lack of an objective standard chills speech. *See Counterman v. Colorado*, 600 U.S. 66, 77-78 (2023); *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022). It is irrelevant that a service might know when a feature leads minors to disclose more information or forego privacy protections, Opp. 23, as NetChoice does not challenge those applications.

***Age estimation.*** The State does not dispute that the phrase "to a reasonable degree of certainty appropriate to the risks" is vague. Instead, it claims the provision is permissible because services can opt to apply the privacy and data protections afforded children to all users. Opp. 25. But that option, too, requires restricting speech, *see* Mot. 19-20, impermissibly "lead[ing] citizens to steer far wider of the unlawful zone." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

### D. The State Does Not Contest NetChoice's As-Applied Claims.

NetChoice is at minimum entitled to as-applied relief because the State does not contest these claims. *See Cody v. Ring LLC*, 718 F. Supp. 3d 993, 1003 n.4 (N.D. Cal. 2024).

## III. THE ALREADY-INVALIDATED DPIA PROVISIONS ARE NOT SEVERABLE.

The challenged provisions also must be enjoined because, irrespective of NetChoice's direct challenges to them, they are not severable from the already-enjoined portions of the Act.

### A. The DPIA Provisions Are Not Volitionally Severable.

The State does not dispute the Legislature shelved the Act in a "suspense file," and revived and passed it only upon addition of a cure provision, and even then, only after that cure provision was extended from 45 to 90 days. Mot. 24-25. The State instead claims that addition establishes only that the Legislature preferred a version of the Act with a cure provision to one without it. Opp. 29-30. But "what the Legislature actually *did*" is the best evidence of what it "would have" done. *Cal. Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 273 (2011)).

The State has no response to NetChoice's other points. It does not dispute the significance of the safe harbor during the floor debate, Mot. 25, or that this counsels against severance. *See County of Sonoma v. Superior Ct.*, 173 Cal. App. 4th 322, 352 (2009) (invalid provision not

severable where bill analysis relied on provision to support legislation). It does not deny that the absence of a severability clause reflects a "presumption of inseverability." *Kasler v. Lungren*, 72 Cal. Rptr. 2d 260, 273 (1998), *rev'd on other grounds*, 23 Cal. 4th 472 (2000). And it does not deny that removing the cure provision prevents the Act from functioning as intended—as primarily compliance-focused. Preserving the Act's remaining substantive obligations without the safe harbor "rewrites the statute" by broadening the scope of liability to reach parties the legislature meant to exclude. *Abbott Labs. v. FTB*, 175 Cal. App. 4th 1346, 1359 (2009); *see Mills v. United States*, 713 F.2d 1249, 1254 (7th Cir. 1983). That would "disrupt the legislature's carefully crafted scheme." *Daghlian v. DeVry Univ., Inc.*, 582 F. Supp. 2d 1231, 1260 (C.D. Cal. 2007).

**B. The DPIA Provisions Are Not Functionally Severable.**

The State claims the cure provision is functionally severable because the Act's surviving provisions are "capable of independent application." Opp. 28. But that is a necessary, not sufficient, condition for functional severance. Invalid provisions—particularly safe harbors—are not functionally severable if enforcing the remainder would alter the way the statutory scheme operates. In *People v. Nguyen*, 222 Cal. App. 4th 1168, 1172, 1190-92 (2014), for example, the court held that an invalid safe harbor providing would-be violators "permission" to undertake proscribed conduct was not severable because its absence turned the otherwise-valid remainder of the act into a "complete ban." *See also HERE Int'l Union v. Davis*, 21 Cal. 4th 585, 612-13 (1999).

The State's cases do not support a contrary conclusion. *Quintano v. Mercury Casualty Co.*, 11 Cal. 4th 1049 (1995) (Opp. 29), says nothing about severability. The State relies on *Matosantos* to argue that post-enactment statements by the Act's co-author are immaterial. Opp. 29. But *Matosantos* never held that such statements are immaterial—merely that such statements cannot support an interpretation *at odds* with the legislation. 53 Cal. 4th at 273-74. "Statements of authoring legislators that cast light on the history of the measure and the arguments before the Legislature when it considered the matter" are indicia of statutory purpose. *Est. of Sanders*, 2 Cal. App. 4th 462, 474 n.15 (1992); *Abbott Labs.*, 175 Cal. App. 4th at 1361.

**IV. NETCHOICE IS LIKELY TO PREVAIL ON ITS OTHER CLAIMS.**

***Section 230***. The State again claims that § 31(a)(9) merely requires services to enforce



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

contracts. Opp. 25-26. But content policies are not contracts, *supra* p. 8, and absent an actionable promise, Section 230 "prohibits holding companies responsible for moderating or failing to moderate content." *Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1182 (9th Cir. 2024). The State claims Section 230 does not preempt § 31(b)(1)-(4), (7) to the extent they have applications "unrelated to publishing." Opp. 26. But NetChoice challenges these prohibitions only insofar as they obligate services to moderate third-party content that is "materially detrimental" or not "in the best interests" of minors. Am. Compl., Prayer ¶ 12; Mot. 28. Thus, unlike in *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021)—where the duty had "nothing to do" with "editing, monitoring, or removing" content, *id.* at 1092—the challenged applications fault services for failing to edit content. *See Bride*, 112 F.4th at 1180 (distinguishing *Lemmon*).

***COPPA.*** The State claims the Act "supplements" COPPA. Opp. 26. Not so. *See* Mot. 28. *First*, COPPA requires knowledge that a service is "directed to children," whereas the Act applies more broadly. *See* §§ 29, 30(b)(4); Egelman Supp. ¶¶ 45, 48-49. *Second*, COPPA empowers families to make decisions; the Act usurps that power. *See* U.S. Chamber Br. (ECF 33-1) at 12. *Third*, the Act punishes conduct permissible under COPPA, like failing to age estimate with "certainty." § 31(a)(5). A service can thus comply with COPPA but be penalized under the Act.

***Commerce Clause.*** The State does not dispute that regulating wholly out-of-state activity violates the Commerce Clause even after *National Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023). Instead, the State claims the Act only applies to California residents using services subject to California law. *See* Opp. 27. But regulating activities having "no necessary connection with the state other than the residency" of a consumer fails this test since a resident could be anywhere. *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc); *see Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1023 (E.D. Cal. 2017). California cannot export its laws to regulate wholly out-of-state activity.

## V. THE STATE CONCEDES THE OTHER INJUNCTION FACTORS.

These elements for an injunction are thus met. *See* Mot. 29-30; Opp. 7.

## VI. CONCLUSION

NetChoice respectfully requests an order granting its requested relief.



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

DATED: January 2, 2025

DAVIS WRIGHT TREMAINE LLP

By: /s/ Ambika Kumar
Ambika Kumar

Attorneys for Plaintiff
NetChoice, LLC, d/b/a NetChoice



DAVIS WRIGHT TREMAINE LLP
350 S. GRAND AVE., 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
Tel: (213) 633-6800
Fax: (213) 633-6899

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
Supervising Deputy Attorney General
KRISTIN A. LISKA
Deputy Attorney General
State Bar No. 315994
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3916
Fax: (415) 703-5480
E-mail: Kristin.Liska@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **NetChoice, LLC,**<br><br>Plaintiff,<br><br>**v.**<br><br>**Rob Bonta, in his official capacity as Attorney General of the State of California,**<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**OPPOSITION TO PLAINTIFF'S MOTION FOR A SECOND PRELIMINARY INJUNCTION**<br><br>Date: January 23, 2025<br>Time: 9:00 a.m.<br>Dept: 3<br>Judge: The Honorable Beth Labson Freeman<br>Trial Date: Not scheduled<br>Action Filed: 12/14/2022 |

# TABLE OF CONTENTS


**Page**

Introduction ..... 1
Background ..... 2
- A. Children and the Internet ..... 2
- B. The California Age-Appropriate Design Code Act ..... 4
- C. Procedural History ..... 6

Legal Standards ..... 7
- I. Preliminary Injunction Standard ..... 7
- II. First Amendment Principles ..... 7
- III. Vagueness Principles ..... 9

Argument ..... 10
- I. Plaintiff Has Not Shown a Likelihood of Success on Its First Amendment Claim ..... 11
  - A. Strict Scrutiny Does Not Apply to the Act as a Whole ..... 11
  - B. Plaintiff Has Not Shown Any Individual Provision Likely Violates the First Amendment ..... 13
    - 1. Requirement to enforce published terms, policies, and community standards (§ 31(a)(9)) ..... 13
      - a. First Amendment facial challenge ..... 14
      - b. Vagueness challenge ..... 15
    - 2. Restrictions on the use of childrens' personal information (§ 31(b)(1)-(b)(4)) ..... 15
      - a. First Amendment facial challenge ..... 15
      - b. Vagueness challenge ..... 20
    - 3. Restriction on the use of dark patterns (§ 31(b)(7)) ..... 21
      - a. First Amendment challenge ..... 21
      - b. Vagueness challenge ..... 23
    - 4. Requirement to estimate age (§ 31(a)(5)) ..... 23
      - a. First Amendment challenge ..... 23
      - b. Vagueness challenge ..... 25
- II. Plaintiff Has Not Shown a Likelihood of Success on Its Other Claims ..... 25
  - A. Preemption ..... 25
    - 1. Section 230 ..... 25
    - 2. COPPA ..... 26
  - B. Dormant Commerce Clause ..... 27
- III. The Remainder of the Statute Is Severable from Any Invalid Provisions ..... 27

**TABLE OF CONTENTS**
(continued)

**Page**

Conclusion .......... 30

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Abbot Lab'ys v. Franchise Tax Bd.*
175 Cal. App. 4th 1346 (2009)........................................ 28, 30

*Am. Beverage Ass'n v. City of San Francisco*
916 F.3d 749 (9th Cir. 2019)........................................ 7

*Arcara v. Cloud Books, Inc.*
478 U.S. 697 (1986)........................................ 7, 8

*Arce v. Douglas*
793 F.3d 968 (9th Cir. 2015)........................................ 9

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*
729 F.3d 937 (9th Cir. 2013)........................................ 27

*Barnes v. Yahoo!, Inc.*
570 F.3d 1096 (9th Cir. 2009)........................................ 25, 26

*Belgau v. Inslee*
975 F.3d 940 (9th Cir. 2020)........................................ 14

*California Redevelopment Ass'n v. Matosantos*
53 Cal. 4th 231 (2011)........................................ 28, 29, 30

*Calise v. Meta Platforms, Inc.*
103 F.4th 732 (9th Cir. 2024)........................................ 25, 26

*Chinatown Neighborhood Ass'n v. Harris*
794 F.3d 1136 (9th Cir. 2015)........................................ 27

*City of Austin v. Reagan Nat'l Advertising of Austin, LLC*
596 U.S. 61 (2022)........................................ 8, 11, 12

*Cohen v. Cowles Media Co.*
501 U.S. 663 (1991)........................................ 14

*County of Sonoma v. Superior Court*
173 Cal. App. 4th 322 (2009)........................................ 28

*Cultiva La Salud v. California*
89 Cal. App. 5th 868 (2023)........................................ 30

*Est. of Bride by & through Bride v. Yolo Techs., Inc.*
112 F.4th 1168 (9th Cir. 2024)........................................ 25

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network*
742 F.3d 414 (9th Cir. 2014)........................................................................ 27

*Hill v. Colorado*
530 U.S. 703 (2000)........................................................................ 10

*HomeAway.com, Inc. v. City of Santa Monica*
918 F.3d 676 (9th Cir. 2019)........................................................................ 8

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*
515 U.S. 557 (1995)........................................................................ 17

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*
538 U.S. 600 (2003)........................................................................ 22

*In re Jonathan C.M.*
91 Cal. App. 5th 1039 (2023)........................................................................ 21

*In re Marriage of Vargas & Ross*
17 Cal. App. 5th 1235 (2017)........................................................................ 21

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*
702 F. Supp. 3d 809 (N.D. Cal. 2023)........................................................................ 26

*Jones v. Google LLC*
73 F.4th 636 (9th Cir. 2023)........................................................................ 26

*Legislature v. Eu*
54 Cal. 3d 492 (1991)........................................................................ 28, 29

*Lemmon v. Snap, Inc.*
995 F.3d 1085 (9th Cir. 2021)........................................................................ 26

*Moody v. NetChoice, LLC*
144 S. Ct. 2838 (2024)........................................................................ *passim*

*Nat'l Pork Producers Council v. Ross*
598 U.S. 356 (2023)........................................................................ 27

*NetChoice, LLC v. Bonta*
113 F.4th 1101 (9th Cir. 2024)........................................................................ *passim*

*NetChoice, LLC v. Bonta*
692 F. Supp. 3d 924 (N.D. Cal. 2023)........................................................................ 6

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*NetChoice, LLC v. Fitch*
-- F. Supp. 3d --, 2024 WL 3276409 (S.D. Miss. July 1, 2024) .......... 13

*NetChoice, LLC v. Reyes*
-- F. Supp. 3d --, 2024 WL 4135626 (D. Utah Sept. 10, 2024) .......... 13

*NetChoice, LLC v. Yost*
716 F. Supp. 3d 539 (S.D. Ohio 2024).......... 12, 13

*New York v. Ferber*
458 U.S. 747 (1982) .......... 19

*Petition of Daniels*
177 Cal. App. 2d 376 (1960).......... 21

*Porter v. Martinez*
68 F.4th 429 (9th Cir. 2023).......... 8, 12, 13

*Quintano v. Mercury Cas. Co.*
11 Cal. 4th 1049 (1995) .......... 29

*Sorrell v. IMS Health, Inc.*
564 U.S. 552 (2011) .......... 8, 16, 17

*Twitter, Inc. v. Garland*
61 F.4th 686 (9th Cir. 2023).......... 8

*United States v. Jae Gab Kim*
449 F.3d 933 (9th Cir. 2006).......... 23

*United States v. Swisher*
811 F.3d 299 (9th Cir. 2016).......... 8

*United States v. Yazzie*
743 F.3d 1278 (9th Cir. 2014).......... 19

*Valle del Sol, Inc. v. Whiting*
709 F.3d 808 (9th Cir. 2013).......... 8, 9

*Vivid Ent., LLC v. Fielding*
774 F.3d 566 (9th Cir. 2014).......... 28

*Wine & Spirit Retailers, Inc. v. Rhode Island*
418 F.3d 36 (1st Cir. 2005) .......... 13

## TABLE OF AUTHORITIES
**(continued)**

**Page**

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) .......... 7

*Young v. Am. Mini Theaters, Inc.*
427 U.S. 50 (1976) .......... 13

**STATUTES**

California Civil Code
§ 1798.99.29 .......... 4
§ 1798.99.30(a) .......... 4,11
§ 1798.99.30(a)(1) .......... 27
§ 1798.99.30(b)(4) .......... 5, 11, 12
§ 1798.99.31(a) .......... 4, 11
§ 1798.99.31(a)(1)(A) .......... 5
§ 1798.99.31(a)(5) .......... 5, 23, 24
§ 1798.99.31(a)(9) .......... 5, 13, 14
§ 1798.99.31(b) .......... 4, 11
§ 1798.99.31(b)(1) .......... 5, 15, 26
§ 1798.99.31(b)(2) .......... 5, 15, 16
§ 1798.99.31(b)(3) .......... 5, 15, 16, 26
§ 1798.99.31(b)(4) .......... 5, 15, 26
§ 1798.99.31(b)(7) .......... 5, 21, 26
§ 1798.99.31(b)(8) .......... 25
§ 1798.99.35(a) .......... 6
§ 1798.120(c) .......... 4
§ 1798.140(d) .......... 4, 11, 27
§ 1798.140(i) .......... 27
§ 1798.140(*l*) .......... 22

2022 Cal. Stat., Chapter 320 (AB 2273) .......... *passim*
§ 1(a)(2) .......... 13
§ 1(a)(4) .......... 13
§ 1(a)(6) .......... 13
§ 1(a)(7) .......... 13
§ 1(a)(8) .......... 13
§ 1(a)(9) .......... 13

United States Code, Title 15
§§ 6501–6506 .......... 26
§ 6502 .......... 4
§ 6502(d) .......... 26

## TABLE OF AUTHORITIES
**(continued)**

**Page**

United States Code, Title 47
§ 230(c)(1)........................................................................ 25
§ 230(e)(3)........................................................................ 25

**CONSTITUTIONAL PROVISIONS**

United States Constitution
First Amendment........................................................................ *passim*
Fourth Amendment........................................................................ 6
Fourteenth Amendment........................................................................ 6

## INTRODUCTION

For a second time in this case, plaintiff NetChoice, LLC is before this Court seeking a preliminary injunction of the California Age-Appropriate Design Code Act. Plaintiff previously obtained an injunction of the entire Act by contending that the Act will impact its members' content and information use and was likely to violate the First Amendment. But the Ninth Circuit in large part disagreed. It held that plaintiff had failed to meet the standard for a facial First Amendment challenge as to all but one provision of the Act. As the Ninth Circuit explained, most of the challenged provisions, "by their plain language, do not necessarily impact protected speech in all or even most applications," *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1122 (9th Cir. 2024). It found that the record was insufficient to establish that the unconstitutional applications of the all but one of the challenged provisions substantially outweighed the constitutional ones.

Plaintiff has now returned to this Court seeking a second injunction. But rather than build the factual record the Ninth Circuit found lacking, plaintiff takes a different tack. Instead, plaintiff now seeks to enjoin only an unspecific "range of applications" of the challenged provisions that involve "content." As to this amorphous range of applications, plaintiff argues that this Court's prior ruling already properly held these applications were likely to violate the First Amendment. In other words, plaintiff seeks to simply reinstate this Court's prior ruling by narrowing its request to only some applications of the challenged provisions.

This approach flies in the face of the Ninth Circuit's ruling. Plaintiff's attempt to resurrect this Court's prior ruling without first building a further factual record fails to remedy the shortfalls that the Ninth Circuit found in vacating most of the prior injunction. As that court's ruling made clear, it is plaintiff's burden to establish a factual record demonstrating: (1) how the challenged provisions will tangibly affect its members, (2) how that effect will impact the members' *expressive activity*, (3) what standard applies to any applications that impact expressive activity, and (4) whether those applications meet the requisite First Amendment standard. Without such a factual record, neither defendant nor this Court can "explore the laws' full range of applications—the constitutionally impermissible and permissible both—and compare the two sets." *Moody v. NetChoice, LLC*, 144 S. Ct. 2838, 2398 (2024).

Nor can plaintiff escape this burden by a talismanic invocation of "content." Plaintiff nowhere explains what "content" it is referring to: content generated by users, content created by its members, content of a webpage layout, content of members' editorial choices? And how does a law that regulates *privacy and data policies* even impact "content"? And how does any impact on "content" translate into an impact on *expressive activity*—for it is expressive activity, not "content" in the abstract, that the First Amendment protects. Plaintiff has wholly failed to build a record showing that the challenged subsections, even if limited to unspecified applications, impact expressive activities, let alone in an unconstitutional way. It thus has failed to carry its burden for a facial challenge, and this Court should deny its motion.

## BACKGROUND

### A. Children and the Internet

Children's internet use has exploded in the last decade. In today's connected world, up to 92% of children have used a mobile device in their first year of life. First Radesky Decl. [ECF No. 51-5] ¶ 21. As of 2021, 32% of 7-9 year olds and 49% of 10-12 year olds in the United States were reported to be using social media platforms, even though most platforms restrict use to those over 13 years of age. *Id.* ¶ 23. Almost half of adolescents report using social media "almost constantly"; 85% report spending more time online than they intended. *Id.* According to data from 2020-2021, children ages 2-4 years average around a two and a half hours online each day, those 5-8 average over three hours daily, those 6-12 average over five and a half hours daily, and those 13-17 average over eight and a half hours daily. *Id.* ¶ 25.

At the same time, children are uniquely vulnerable online. Children are curious, impulsive thinkers with still-developing brains. Second Radesky Decl. ¶ 56. Their immature brains have less impulse control, less critical thinking, and less abstract reasoning about complicated concepts like privacy. *Id*. Children are also more receptive to parasocial relationships and more attracted to novelty and rewards. *Id.* ¶¶ 56, 58-59. While these characteristics are developmentally adaptive for children to help them learn and build social relationships, they also make children more vulnerable to being manipulated or taken advantage of. *Id.* ¶ 56.

This vulnerability online also flows in part from the existing incentive structure of the

internet. The collection, sharing, selling, and similar uses of a users' personal information provides substantial revenue for online businesses. Egelman Decl. ¶ 11. Internet companies consistently collect data from children online, including what services they use, how they use them, and from where they use them. *Id.* ¶¶ 11, 14. According to one estimate, advertising technology companies collect an average of 72 million data points about a child before they turn 13. Second Radesky Decl. ¶ 42. Businesses are able to link this data to a unique child through persistent identifiers, like the identification number for the device a child uses to access the internet. Egelman Decl. ¶ 18. Once data is linked to a unique child, businesses are able to create a thorough individual profile of that child and make predictions and inferences based on that data. *Id.* ¶¶ 15,18. Businesses can even infer or learn highly personal details such as a child's religion, health conditions, sexual orientation, or socioeconomic status. *Id.* ¶¶ 14-17, 19. A child's profile can also be used by or sold to third parties, such as for targeted advertising. *Id.* ¶ 11. Businesses thus have an economic incentive to maximize the "engagement"—the amount of time and activity online—and data collected from users, whether child or adult. *Id.* ¶¶ 12-13.

Given this incentive, it is no surprise that businesses design their services to optimize revenue generation, including by using tactics that children are more susceptible to. These include tactics to maximize the time that a child spends online, such as autoplay, endless scroll, and predictive algorithms. Second Radesky Decl. ¶¶ 78, 92, 93, 97. They also include manipulative dark patterns that work through parasocial relationship pressure, fabricated time pressure, and navigation constraints. *Id.* ¶¶ 84-98, 98-99, 104. And there is evidence that such tactics work: multiple interview studies show that children feel like they spend too much time online, feel pressure to engage, and find it hard to stop using platforms. *Id.* ¶ 78. This pressure to engage brings with it tangible harms: too much time online is associated with less sleep, poor educational attainment, and other mental and physical health issues for children. *Id.* ¶ 79.

Despite the ubiquitous presence of the internet in children's lives, specific legal protections for children are limited. At the federal level, the Children's Online Privacy Protection Act (COPPA) requires that online businesses protect the personal information of children under 13, but only where the platform is "directed towards" such children or has actual knowledge that its

users are children. 15 U.S.C. § 6502. At the state level, California law provides that businesses may not sell or share the personal information of a child without consent, but only if they have actual knowledge the user is under 16. Cal. Civ. Code § 1798.120(c).

These existing privacy regulations have inadvertently created a culture of agnosticism as to whether a business's users are children. Egelman Decl. ¶ 48. Businesses are disincentivized from identifying their services as "child-directed" or from obtaining knowledge about whether a user is a child—which would make them subject to existing laws—because doing so limits the businesses' ability to monetize their products by collecting, selling, or using a child's data. *Id.* As a result, it is fairly common for apps that were almost certainly intended for children to avoid restrictions by claiming that the app is intended for users over 13 or that the company has no actual knowledge of child users. *Id.* ¶ 49. Even apps that are subject to COPPA or state law often fail to comply with these existing laws. *Id.* ¶¶ 40-44, 47-49.

**B. The California Age-Appropriate Design Code Act**

Out of concern for the well-being and privacy of children online, the California Legislature unanimously passed AB 2273, the California Age-Appropriate Design Code Act. The Act declares that "children should be afforded protections not only by online products and services specifically directed at them but by all online products and services they are likely to access"; that regulated businesses "should consider the best interest of children when designing, developing and providing" services; and that "[i]f a conflict arises between commercial interest and best interests of children, companies should prioritize the privacy, safety, and well-being of children over commercial interests." Cal. Civ. Code § 1798.99.29.

The Act applies to large companies that trade in personal information. *See* Cal. Civ. Code §§ 1798.99.30(a), 1798.99.31(a), (b), 1798.140(d). Within that group of business, the Act regulates only those that provide an online service, product, or function likely to be accessed by children. *Id.* § 1798.99.31(a), (b). "Likely to be accessed by children" means that the businesses' offering: (1) is directed to children, as defined by COPPA; (2) is determined to be routinely accessed by a significant number of children; (3) contains advertisements marketed to children;

(4) has design elements that are known to be of interest to children; or (5) is determined to have an audience that contains a significant amount of children. *Id.* § 1798.99.30(b)(4).

For each service likely to be accessed by children, a business must identify the service's purpose, "how it uses children's personal information, and the risks of material detriment to children that arise from" the business's data management practice in a Data Protection Impact Assessment ("DPIA"). Cal Civ. Code § 1798.99.31(a)(1)(A). This requirement is currently enjoined following the Ninth Circuit's affirmance of that part of the preliminary injunction previously issued by this Court. *NetChoice*, 113 F.4th at 1126. As relevant here, the Act also requires a business to: (1) estimate the age of a child user with a reasonable level of certainty or apply the privacy and data protection afforded to children to all users and (2) enforce published terms, policies, and community standards, including but not limited to, privacy policies and those concerning children. Cal. Civ. Code § 1798.99.31(a)(5), (a)(9).

Regulated businesses are also prohibited from engaging in certain business practices that implicate children's privacy. As relevant here, regulated businesses cannot: (1) use the personal information of a child in a way that the business knows or has reason to know is materially detrimental to the physical health, mental health, or well-being of the child; (2) profile a child by default except when it is necessary to provide the requested service or there is a compelling reason it is in the best interest of children; (3) collect, sell, share, or retain any personal information not necessary to provide a service absent a demonstrated compelling reason that the practice is in the best interest of children likely to access the product, service or feature; (4) if the end user is a child, use personal information for any reason other than the reason for which it was collected absent a demonstrated compelling reason it is in the best interest of children; or (5) use dark patterns—user interfaces designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision-making, or choice—to lead or encourage children to provide additional personal information, to forgo privacy protections, or to take any action that the business knows or has reason to know is materially detrimental to the child's physical health, mental health, or well-being. Cal. Civ. Code § 1798.99.31(b)(1)-(4), (7).

The Attorney General has sole authority to enforce the Act, and violators face injunctions and civil penalties. Cal. Civ. Code § 1798.99.35(a). The statute provides that businesses in substantial compliance with the DPIA requirements will receive written notice from the Attorney General of any alleged violations before the Attorney General initiates a suit, though this provision is now enjoined under the prior injunction order. *See NetChoice*, 113 F.4th at 1126.

**C. Procedural History**

Plaintiff NetChoice, LLC is a membership group composed of large tech companies. *NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924, 936 (N.D. Cal. 2023), *aff'd in part, vacated in part*, 113 F.4th 1101 (9th Cir. 2024). It filed this suit against the Attorney General alleging that the Act violates the First, Fourth, and Fourteenth Amendments and the dormant Commerce Clause and is preempted by federal law. *Id.* at 938. Shortly thereafter, plaintiff filed a motion for a preliminary injunction. This Court granted the motion. *Id.* at 966. It held that the Act was subject to heightened First Amendment scrutiny because it infringed on businesses' right to collect and use children's data and compelled speech. *Id.* at 944, 946. And the Act did not survive intermediate scrutiny because, this Court held, the Act's requirements were not properly tailored to advance a substantial state interest. *Id.* at 959.

Defendant appealed. While the appeal was pending, the U.S. Supreme Court decided *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024), which addressed the proper standard for a facial First Amendment challenge. Citing the standard laid out in *Moody*, the Ninth Circuit affirmed in part and reversed in part. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1108 (9th Cir. 2024). The Ninth Circuit stated that "[j]ust like the parties and lower courts in *Moody*, 'no one has paid much attention to' the requirements for a facial challenge so far in this case.'" *Id.* at 1116 (quoting *Moody*, 144 S. Ct. at 2398). It held, however, that "this oversight did not cause any error" in this Court's analysis of the DPIA reporting requirement because "in every application to a covered businesses," that requirement "raises the same First Amendment issues." *Id.* The Ninth Circuit thus affirmed this Court's injunction of that requirement and related provisions such as the notice and cure provision. *Id.* at 1122, 1125.

The Ninth Circuit then vacated the remainder of the injunction. It held that it could not "say, on this record, that a substantial majority of [the Act's] applications are likely to fail First Amendment scrutiny." *NetChoice*, 113 F.4th at 1123. "[M]ost of [the Act's] provisions, by their plain language, do not necessarily impact protected speech in all or even most applications," the Ninth Circuit explained, explicitly citing to the sections challenged here. *Id.* at 1122. For example, "[b]ased on the record developed so far in this litigation, it is unclear whether a 'dark pattern' itself constitutes protected speech and whether a ban on using 'dark patterns' should always trigger First Amendment scrutiny," let alone the proper level of scrutiny for any applications that do trigger First Amendment scrutiny. *Id.* at 1123. The Ninth Circuit ultimately held that the remainder of the injunction order "fail[ed] to properly consider the facial nature of NetChoice's challenges" and vacated it. *Id.* at 1124. Following remand, plaintiff filed an amended complaint and the current motion for a second preliminary injunction.

## LEGAL STANDARDS

### I. Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The party seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* at 20. With respect to cases arising under the First Amendment, showing a likelihood of success generally suffices to meet the remaining elements. *E.g.*, *Am. Beverage Ass'n v. City of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc).

### II. First Amendment Principles

The First Amendment provides that the government "shall make no law . . . abridging the freedom of speech." U.S. Const., amend. I. But this limitation on government authority is not triggered simply because a law has *some* impact on speech. *E.g.*, *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705-706 (1986). Courts "have not traditionally subjected every" law "to 'least restrictive means' scrutiny simply because each particular [law] will have some effect on the First

Amendment activities of those subject to sanction." *Id.* at 706. After all, "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities." *Id.*

Instead, as the Ninth Circuit has emphasized, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019) (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011)). Thus, a court must begin its analysis by "determin[ing] whether the First Amendment applies" to the challenged statute. *Id.* To do so, the court first asks the "'threshold question'" of "'whether conduct with a significant expressive element drew the legal remedy'" or the law "'has the inevitable effect of 'singling out those engaged in expressive activity.'" *Id.* (citation omitted). If the law does neither, it is a regulation of conduct that does not implicate the First Amendment's heightened scrutiny. *Id.*

When a law does regulate expressive activity, the next question is "whether the enactment is content-based or content-neutral." *United States v. Swisher*, 811 F.3d 299, 311 (9th Cir. 2016) (en banc). A law is content based when it "'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advertising of Austin, LLC*, 596 U.S. 61, 69 (2022) (citation omitted). If a law is content based, it is subject to strict scrutiny and "is justified only if the government demonstrates that [the law] is narrowly tailored to serve a compelling state interest." *Twitter, Inc. v. Garland*, 61 F.4th 686, 698 (9th Cir. 2023). In contrast, a law that is content neutral is subject to, at most, intermediate scrutiny. *Porter v. Martinez*, 68 F.4th 429, 439 (9th Cir. 2023). This requires that the statute: (1) must further "'an important or substantial governmental interest,'" (2) that the interest must be "'unrelated to the suppression of free expression,'" and (3) that the restriction on speech must be "'no greater than is essential to the furtherance of that interest.'" *Id.* at 443 (citation omitted).

This general framework, however, is slightly different with respect to commercial speech. "Such speech is protected by the First Amendment, but to a lesser degree than other types of speech." *Valle del Sol, Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013). Regulations on commercial speech are evaluated using a four-part test: "(1) if the communication is neither misleading nor related to unlawful activity, then it merits First Amendment scrutiny as a threshold

matter; in order for the restriction to withstand such scrutiny, (2) [t]he State must assert a substantial interest to be achieved by restrictions on commercial speech; (3) the restriction must directly advance the state interest involved; and (4) it must not be more extensive than is necessary to serve that interest." *Id.* at 820-821 (citation omitted) (alterations in original).

As plaintiff does not dispute (at 10, 14), its claims are properly analyzed under the standard for facial challenges. "For a host of good reasons, courts usually handle constitutional claims case by case, not en masse," and facial challenges are "hard to win." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024). In the First Amendment context, to prevail on a facial challenge, the plaintiff must establish that the "law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* "As *Moody* clarified, a First Amendment facial challenge has two parts: first, the courts must 'assess the state laws' scope'; and second, the courts must 'decide which of the laws' applications violate the First Amendment, and . . . measure them against the rest.'" *NetChoice, LLC v. Bonta*, 114 F.4th 1101, 1115-1116 (9th Cir. 2024) (alteration in original). For the first part, a court determines "[w]hat activities, by what actors, . . . the laws prohibit or otherwise regulate[.]" *Moody*, 144 S. Ct. at 2398. As the Court recognized in *Moody*, "[t]he online world is variegated and complex, encompassing an ever-growing number of apps, services, functionalities, and methods for communication and connection. Each might (or might not) have to change because of the provisions" challenged. *Id.* For the second part, a court "decide[s] which of the laws' applications violate the First Amendment" and "measure[s] them against the rest." *Id.* Throughout this analysis, a plaintiff must "carry its burden" to establish that the standard for a facial challenge is met. *Id.* at 2409.

## III. Vagueness Principles

A statute is impermissibly vague when it "fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (citation omitted). But this standard "does not require 'impossible standards of clarity.'" *Id.* (citation omitted). Rather, a statute must simply "give sufficient notice as to what conduct is prohibited." *Id.* Although there may be cases at the margin that can be dreamed up, a statute is not vague when it is "clear what

the [statute] as a whole prohibits." *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (citation omitted). After all, "because we are '[c]ondemned to the use of words, we can never expect mathematical certainty from our language.'" *Id.* (citation omitted) (alterations in original).

**ARGUMENT**

Plaintiff seeks to enjoin seven challenged subsections "on [their] face . . . either in [their] entirety or as to certain applications." Mot. at 14. As plaintiff rightly recognizes (at 10, 14), this requires that it meet the standard for a facial challenge as to its First Amendment claims, even if its challenge is confined to only certain applications. Despite the Ninth Circuit's holding that that standard was not met by the first preliminary injunction motion, plaintiff nonetheless relies almost entirely on this Court's prior ruling in arguing that the challenged provisions are unconstitutional. *See* Mot. at 14-15 ("This Court has already concluded [the policy enforcement] provision is facially invalid under the First Amendment to the extent applied to content policies."); *id.* at 16 ("The Court previously held [the information use] provisions facially unconstitutional, focusing on precisely the range of applications that NetChoice challenges."); *id.* at 17 ("[This Court] then held each of the [dark patterns restriction] provision's specific prohibitions invalid even under intermediate scrutiny.").

But plaintiff cannot short-circuit its burden—and avoid the shortcomings in its prior argument that led to the Ninth Circuit's ruling on appeal—simply by narrowing its challenge to some set of unknown applications that involve content. As the Ninth Circuit recognized, the relevant provisions, "by their plain language, do not necessarily impact protected speech in all or even most applications." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1122 (9th Cir. 2024). And it is plaintiff's burden to establish, via a sufficient factual record, that the challenged provisions in their challenged applications do, in fact, impact protected expression. Simply pointing to this Court's prior ruling does not meet that burden.

Nor can plaintiff meet its burden through some talismanic invocation of "content." Plaintiff does not provide sufficient evidence to determine what content is affected by the challenged provisions, how that content is affected, and how that effect leads to an impact on a member's protected expression. And plaintiff does not provide sufficient evidence to determine the

applicable legal standard for each application of each provision, let alone whether a particular application fails to meet that standard. Plaintiff simply fails to meet its burden to succeed on a facial challenge. Nor has it shown a likelihood of success on its other claims. Finally, the portions of the Act that remain enjoined are severable from the remainder of the statute. This Court should therefore deny plaintiff's motion for a second preliminary injunction.

## I. Plaintiff Has Not Shown a Likelihood of Success on Its First Amendment Claim

### A. Strict Scrutiny Does Not Apply to the Act as a Whole

As the Ninth Circuit's ruling makes clear, this Court should look to each challenged provision individually—and in the full breadth of its relevant applications—to determine the constitutional or unconstitutional applications of the specific provision. Plaintiff, however, contends that the entire statute is subject to strict scrutiny because it "target[s] businesses for 'differential treatment' based on the 'subject matter' they publish." Mot. at 11. This is so, it claims, because the statute applies if a business "publishes content that has [an] appeal to minors and caters to an 'audience' that . . . include[s] a significant number of minors." Mot. at 12.

This argument is unavailing. The Act's applicability is not based on "'the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73-74 (2022) (citation omitted). The Act applies to a "business that provides an online service, product, or feature likely to be accessed by children." Cal. Civ. Code § 1798.99.31(a), (b). A "business" is a legal, for-profit entity that "collects consumers' personal information" and "determines the purposes and means of the processing of consumers' personal information", "that does business in the State of California," and that meets a threshold for revenue or the number of transactions involving personal information. *See id.* §§ 1798.99.30(a), 1798.140(d). None of these criteria depend on the message of any expressive activity.

In turn, a business's online service, product, or feature is "likely to be accessed by children" if "it is reasonable to expect, based on [specified] indicators, that the online service, product, or feature would be accessed by children." Cal. Civ. Code § 1798.99.30(b)(4). These indicators are that the online service, product, or feature: (1) is "directed to children" as defined by COPPA, (2)

"is determined, based on competent and reliable evidence regarding audience composition, to be routinely accessed by a significant number of children," (3) has "advertisements marketed to children," (4) has "design elements that are known to be of interest to children, including, but not limited to, games, cartoons, music, and celebrities who appeal to children," or (5) a "significant amount of the audience" is children "based on internal company research." *Id.* Thus, the determining factor as to whether a business is subject to the Act is whether or not its users are children, not the content of its service, product, or feature.

That determining whether a business's users are children may involve looking at the content of a product, service, or feature does not make the Act content based. The U.S. Supreme Court has "consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." *City of Austin*, 596 U.S. at 72; *see also Porter v. Martinez*, 68 F.4th 429, 442-443 (9th Cir. 2023). For instance, the Court "has treated as content neutral regulations of solicitation . . . even though enforcement requires an examination of the speaker's message." *Porter*, 68 F.4th at 442. Nor does the fact that a regulation "considers function or purpose" mean that the regulation "is *always* content based." *City of Austin*, 596 U.S. at 74 (emphasis in original). Instead, the question is whether the regulation "discriminate[s] based on 'the topic discussed or the idea or message expressed.'" *Id.* at 73-74 (citation omitted). A regulation that requires some evaluation of content but is ultimately "agnostic as to content" is thus still content neutral. *Id.* at 69.

That is precisely the case with the Act. If a product, service, or feature has a significant number of child users—regardless of what kind of content is on that product, service, or feature—it is subject to the Act. After all, "even though covered platforms contain some subject matter likely to appeal to children, most also contain subject matter 'as diverse as human thought.'" *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 556 (S.D. Ohio 2024) (citation omitted). The Legislature's concerns were about harms to *children*. In order to remediate those harms, the Legislature regulated businesses that *serve children*, irrespective of what sort of content they host.

This case is thus distinguishable from those cited by plaintiff. In the three district court decisions plaintiff cites, the courts found the challenged statutes were content based because the

statutes "facially distinguishe[d] between 'social' speech and other forms of speech." *NetChoice, LLC v. Reyes*, -- F. Supp. 3d --, 2024 WL 4135626, at *11 (D. Utah Sept. 10, 2024), *appeal docketed* (No. 24-4100); *see also Yost*, 716 F. Supp. 3d at 557; *NetChoice, LLC v. Fitch*, -- F. Supp. 3d --, 2024 WL 3276409, at *9 (S.D. Miss. July 1, 2024), *appeal docketed* (No. 24-60341). The Act makes no such distinction. It applies to *all* businesses whose service, product, or feature is likely to be accessed by children. That is a content-neutral criteria for regulation. Indeed, the court in *Yost* rejected a similar argument about the law challenged there, explaining that that act's "'targets children' or 'reasonably anticipated to be accessed by children' language tailors the Act's applicability to only the platforms that have a chance of attracting the children the Act seeks to protect." 716 F. Supp. at 556. "NetChoice has not shown that this language—'targets children' and 'reasonably anticipated to be accessed by children'—are examples of content-based regulation." *Id.* So, too, with the language here.

Nor is it the case that the Act "cannot be 'justified without reference to the content of the regulated speech.'" *Porter*, 68 F.4th at 439. The Act's findings make clear that the Legislature was motivated by content-neutral concerns, namely protecting the privacy and security of children. *See* 2022 Cal. Stat., ch. 320 (AB 2273), § 1(a)(2), (4), (6), (7), (8), (9). So, too, does the legislative history. *See* Liska Decl., Ex. 1-5. This concern about the privacy and health of children has nothing to do with the type of content that they view. The Act is not a content-based regulation and thus is not subject to strict scrutiny.[1]

### B. Plaintiff Has Not Shown Any Individual Provision Likely Violates the First Amendment

#### 1. Requirement to enforce published terms, policies, and community standards (§ 31(a)(9))

Plaintiff challenges the requirement for companies to enforce their published polices "to the extent applied to content policies." Mot. at 15. It contends that this requirement violates the First

[1] Prospective amicus International Center for Law and Economics further contends the Act is subject to strict scrutiny because the Act's restrictions will threaten the economic viability of online companies. But "the First Amendment does not guarantee that speech will be profitable to the speaker." *Wine & Spirit Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 47 (1st Cir. 2005). "The inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of [the law] upon freedom of expression." *Young v. Am. Mini Theaters, Inc.*, 427 U.S. 50, 78 (1976) (Powell, J., concurring).

Amendment under the standard for facial challenges and that it is unconstitutionally vague; it has not shown a likelihood of success on either claim.

**a. First Amendment facial challenge**

Plaintiff contends that the policy enforcement requirement violates the First Amendment because it requires its members to "'enforce' to the State's satisfaction their 'published terms, policies, and community standards,'" including content policies. Mot. at 14. But the challenged provision requires that a company "[e]nforce published terms, policies, and community standards established by the business, including, but not limited to, privacy policies and those concerning children." Cal. Civ. Code § 1798.99.31(a)(9). That is simply a requirement that covered businesses adhere to the contractual agreement they have made with their users.[2] In requiring that businesses enforce their published policies, including content moderation policies, the Act only requires that a company adhere to the terms of its contract with users, including any promises made regarding what content will be allowed on its products, services, or features.

The First Amendment does not preclude a State from "requir[ing] those making promises to keep them." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 671 (1991). Where private parties have "determine[d] the scope of their legal obligations, and any restrictions" on their speech "are self-imposed," the First Amendment is not violated by the State enforcing those agreements. *Id.*; *see also, e.g.*, *Belgau v. Inslee*, 975 F.3d 940, 950 (9th Cir. 2020) ("The First Amendment does not support [plaintiff's] right to renege on their promise."). That is precisely what the policy enforcement requirement does. It does not obligate businesses to adopt a particular content moderation policy or to enforce their content moderation policies in a particular way. It simply requires that they adhere to the contract made with users, a private agreement between private parties. That does not offend the First Amendment.

Moreover, plaintiff's argument proceeds from a fundamental misunderstanding of how this provision works. The provision only requires that companies enforce their terms of service. It nowhere requires that companies develop content moderation or any other policies, that the

[2] *See, e.g.*, Kumar Decl. [ECF No. 29-1], Ex. 5 (users "agree not to" post certain language or content as part of terms of service for *New York Times*); *id.*, Ex. 6 (in submitting content to the *Washington Post*, users "are consenting to" the rules regarding content moderation).

policies contain any particular provisions, or that enforcement be done *in a particular way*—only that the policies *are enforced*. Plaintiff thus has not shown that the unconstitutional applications of this provision substantially outweigh the constitutional ones.

**b. Vagueness challenge**

Plaintiff contends that the policy enforcement requirement is unconstitutionally vague because content moderation policies are subjective. Mot. at 21. But plaintiff's members are the ones who created their own content moderation policies and the statute, as discussed above, solely requires that the policies be enforced. Plaintiff's members should understand their own policies well enough to be able to enforce them. It is not unconstitutionally vague to require companies to follow the policies they have themselves created and that users may have relied on when deciding whether to use their platform, service, or product.

**2. Restrictions on the use of childrens' personal information (§ 31(b)(1)-(b)(4))**

Plaintiff further challenges four distinct provisions of the Act that regulate the use of a child's personal information: the prohibition on the use of a child's personal information in a manner that the business knows is harmful; the prohibition on profiling a child by default; the prohibition on collecting, selling, sharing, or retaining personal information that is not necessary to provide a service; and the prohibition on using a child end user's personal information for a reason other than it was collected for. Plaintiff contends that these provisions violate the First Amendment as applied to publishing content or making information available. Mot. at 15. Plaintiff further argues the provisions are unconstitutionally vague. These arguments fail.

**a. First Amendment facial challenge**

In its First Amendment challenge to the Act's regulations on using a child's personal information or profiling children, plaintiff primarily relies on this Court's ruling on the prior motion for a preliminary injunction. Mot. at 16. Plaintiff appears to contend that by narrowing the range of applications it seeks to enjoin, it can revive this Court's vacated prior ruling. In so doing, plaintiff fails to grapple with its burden under *Moody*, which the Ninth Circuit held plaintiff failed to meet in its first motion for a preliminary injunction. Plaintiff still fails to meet

its burden of establishing the unconstitutional applications of the challenged provisions substantially outweigh the constitutional ones.

First and foremost, plaintiff nowhere meets its threshold burden of showing that most, let alone all, relevant applications of the challenged restrictions on data use regulate expressive activity. *See supra* at 7-8 (First Amendment is only implicated by regulations of expressive activity). Plaintiff generally contends that all of these provisions will impact content. But impact *what* content—user-generated content, business-created content, editorial discretion content, webpage layout content? And impact this unspecified content *how*? As the Ninth Circuit recognized, the challenged provisions "by their plain language do not necessarily impact protected speech in all or even most applications." *NetChoice*, 113 F.4th at 1122. For instance, how does the prohibition on profiling a minor by default, *see* Cal. Civ. Code § 1798.99.31(b)(2), have any impact on a business's content or other expressive activity? And two of these provisions allow for a business to use personal information in a way that is necessary to provide the online service, product, or feature. *See id.* § 1798.99.31(b)(2), (b)(3). Plaintiff's declarations indicate that some uses of personal information may be necessary to provide the relevant service. *E.g.*, Cleland Decl., ¶ 15. Such use of personal information would not be impacted by the challenged provisions to begin with. So what uses of personal information are actually impacted by the challenged regulations? Plaintiff has failed to carry its burden of making this showing.

Moreover, while some uses of personal information may result in an impact on expressive activity, plaintiff points to no case law establishing that *all* use of personal information or *all* content moderation is categorically or inherently expressive activity. The decision in *Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011), does not hold that *any and all* use of data is protected expressive activity. Indeed, the Supreme Court expressly declined to address whether the collection of information was speech. *See id.* at 570-571. And it acknowledged that a more comprehensive regulation of data and privacy than the law at issue in *Sorrell*, such as the Health Insurance Portability and Accountability Act of 1996 (HIPAA), would have presented "quite a different case" from the law challenged there, implying that such a law could well have been constitutional. *Id.* at 573. The ruling in *Sorrell* reflects only that *some* uses of information are

protected speech and that a law that singles out a specific message or viewpoint for less favorable treatment is a content-based law subject to strict scrutiny. *See, e.g.*, *id.* at 567 (statute was "directed at certain content and aimed at certain speakers"). The Act is not such a statute.

Even looking solely at content moderation, plaintiff has not established that all content moderation is expressive activity, nor could it. As *Moody* recognized, some content moderation is expressive activity because it involves the exercise of editorial discretion, such as a company "exercising authority to remove, label, or demote messages they disfavor." 144 S. Ct. at 2404. When a regulation "alters the platforms' choices about the views they will, and will not, convey," it interferes with protected expression. *Id.* at 2405. But *Moody* does not establish that *all* forms of content moderation involve expressive activity or editorial discretion. The Court expressly stated that even "[f]or the content-moderation provisions" challenged there, the plaintiff still had to show "as to every covered platform or function, whether there is an intrusion on protected editorial discretion." *Id.* at 2398. Plaintiff has certainly not made that showing here.

Additionally, the *Moody* majority was clear that its discussion about protected expression did not address *all* content, such as "feeds whose algorithms respond solely to how users act online—giving them the content they appear to want, without regard to independent content standards." 144 S. Ct. at 2404 n.5. For "[a] function qualifies for First Amendment protection only if it is inherently expressive." *Id.* at 2409 (Barrett, J., concurring) (citing *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 568 (1995)); *see also id.* at 2430 (Alito, J., concurring) ("The First Amendment protects only those compilations that are 'inherently expressive' in their own right, meaning that they select and present speech created by other persons in order 'to spread [the compiler's] own message.'" (alteration in original) (citation omitted)). And "technology may attenuate the connection between content-moderation *actions* (*e.g.*, removing posts) and human beings' constitutionally protected right to '*decide for [themselves]* the ideas and beliefs deserving of expression, consideration, and adherence.'" *Id.* at 2410 (Barrett, J., concurring) (alterations and emphasis in original) (citation omitted).

Plaintiff here has entirely failed to explain how every way that each of its members use a child's personal information; profile a child; collect, sell, share, or retain a child's personal

information; and use a child user's personal information for a reason other than it was collected for is expressive. Indeed, it is not difficult to imagine situations where the use of a child's personal information is *not* expressive, even if it may impact content. For instance, some of plaintiff's members use algorithms to detect bot and spam activity. *See* Cleland Decl. ¶ 17. To the extent that personal information is used in such a manner, how does limiting the use of a child's personal information to detect bot or spam activity affect any expressive activity by plaintiff's members? Or consider the use of personal information in an algorithm such as that mentioned in *Moody*, one that "respond[s] solely to how users act online—giving them the content they appear to want, without any regard to independent content standards." 144 S. Ct. at 2404 n.5. What expressive message does such an algorithm convey and how would that message be altered by limiting the use of personal information, especially if decisions are made by artificial intelligence or machine learning and not a person? *See* Egelman Decl. ¶ 60 (discussing algorithms); *cf. Moody*, 144 S. Ct. at 2410 (Barrett, J., concurring).

Plaintiff cannot simply invoke "content" as a talisman to establish that the challenged regulations *actually impact protected expressive activity*. It must instead *establish* that the challenged provisions will lead to changes in how its members use personal information or profile children and that those changes will impact expressive activity in many, if not all, cases. For if most of the applications of the personal information use restrictions do *not* impact expressive activity, those applications do not trigger First Amendment scrutiny and plaintiff has not shown that the unconstitutional applications substantially outweigh the constitutional ones.

Moreover, plaintiff has not established that most of these (hypothetical) applications with (hypothetical) impacts on expressive activity are unconstitutional. For one, the lack of clarity regarding how plaintiff's member's activities—let alone their expressive activities—will be impacted by the challenged provisions makes it difficult to know what level of scrutiny even applies. Some of the impacted activities may involve commercial speech—such as the use of personal information to select advertisements to show a user, *see* Egelman Decl. ¶¶ 15-17. Applications that impact expressive activities that do not involve commercial speech would be

subject to intermediate scrutiny: since restrictions are content neutral because their application does not signal out or depend on any particular message or topic.

And at least some, if not most or all, of these theoretical applications that are subject to either standard are likely to meet the applicable standard. With respect to either intermediate scrutiny or the commercial speech standard, the protections on the use of a minor's personal information further a significant, if not compelling, state interest in protecting children's privacy, health, and safety. *See, e.g., New York v. Ferber*, 458 U.S. 747, 756-757 (1982) ("[A] State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" (citation omitted)); *United States v. Yazzie*, 743 F.3d 1278, 1287 (9th Cir. 2014) (same). Children (as well as their parents or guardians) clearly have an interest in protecting their own privacy, which is infringed by businesses gathering and retaining their sensitive personal information. *See* Egelman Decl. ¶¶ 14-17 (discussing sensitive personal information companies collect). Limiting the collection and use of such data clearly furthers a child's interest in their own privacy. Additionally, aspects of covered businesses clearly pose a risk to children's health and safety. Too much time online is linked to detrimental health and educational outcomes or addiction-like behavior, and evidence show that such harms from problematic use of online services do occur. Second Radesky Decl. ¶¶ 43-52, 78-80. Limiting the use of personal information in algorithms or other design aspect that are meant to maximize a child's time online—and thereby increase the risk of harm from overuse—clearly furthers the State's interest in a child's well-being. So, too, does limiting the use of personal information in ways that might: (1) expose a minor to manipulative designs meant to lead them to overspend, *see id.* ¶¶ 54-55, 76; (2) expose a minor to illegal products or harmful activities, *see id.* ¶¶ 66-67 (child sexual material), ¶ 69 (illegal drugs), ¶¶ 72-73 (gambling advertisements), ¶¶ 74-75 (alcohol advertisements); or (3) expose a minor to potential exploitation, including sexual exploitation or abuse, *see id.* ¶¶ 63-67.

And the restrictions on the use of personal information—insofar as they even impact expressive activity—further these interests in a properly tailored way. For one, companies may well be able to engage in the same expressive activity without using personal information. With respect to advertisements, for instance, companies can switch from using targeted advertisements

that rely on a user's personal information to contextual advertisements that are based on other information about the webpage the user interacts with. *See* Egelman Decl. ¶ 19. And evidence indicates that the current system and existing alternatives—such as industry self-regulation, privacy policies, or blocking cookies—fail to adequately protect privacy. *Id.* ¶¶ 28-38, 40-49. So, too, does the existence of the "privacy paradox"—the fact that users frequently express a desire for greater privacy protection but nonetheless use online services they believe raise privacy concerns. *Id.* ¶¶ 21-27. In any event, it is difficult to analyze more specific alternatives that may be less restrictive without sufficient tangible information from plaintiff on what impact, precisely, there may be on expressive activity from restricting the use of children's personal information. This is especially so given that the Act nowhere directly limits or restricts the message or expression that can be shown to any user, child or adult.

Ultimately, plaintiff has not carried its burden of demonstrating that the unconstitutional applications of the statute substantially outweigh the constitutional ones. It has not established which members are subject to the challenged restrictions or will be imparted by the challenged restrictions. It has not established how limiting profiling or the use of personal information of minors will impact a member's expressive activity—as opposed to economic activity or conduct—let alone that most applications of the challenged restrictions will impact expressive activity. It has not provided sufficient information to determine what level of scrutiny would apply to applications that do affect expressive activity or whether those applications would fail the requisite level of scrutiny. Plaintiff has wholly failed to carry its burden on a facial challenge.

**b. Vagueness challenge**

Plaintiff further contends that the provisions restricting the use of personal information are unconstitutionally vague. Not so. The provisions are all sufficiently clear in what they regulate: a company cannot use a child's personal information if it knows that harm will result, cannot profile a child by default, and cannot use information for purposes not necessary to provide the online service or for purposes other than the reason it was collected for. These provisions are all, on their face, sufficiently clear to provide notice of what conduct is regulated.

Instead of focusing on the language of the prohibitions, plaintiff fixates on the language of the carve-outs or exceptions. Mot. at 21-22. But a regulated entity need not rely on the carve-outs; it knows it will be in compliance with the law if it adheres to the clear prohibition on the use of data. In any event, the carve-outs are not unduly vague. They make reference to the best interests of children, a standard that is a legal term of art with a long pedigree in family law. It is the standard used in California to determine child custody arrangements, *see, e.g.*, *In re Marriage of Vargas & Ross*, 17 Cal. App. 5th 1235, 1243 (2017); to make guardianship decisions, *see, e.g.*, *Petition of Daniels*, 177 Cal. App. 2d 376, 378 (1960); and in delinquency proceedings, *see, e.g.*, *In re Jonathan C.M.*, 91 Cal. App. 5th 1039, 1041 (2023). Given this history, such a phrase is hardly unconstitutionally vague.

Additionally, plaintiff contends that it is unclear "what types of information and ideas are detrimental to a young person's 'best interests' or 'well-being'," Mot. at 22. But it provides no factual record establishing that the challenged provisions involve such determinations. As discussed above, the challenged provisions restrict the *use of information*, not the kind of information or ideas a minor can be shown. Plaintiff has not brought forth a factual record establishing that it will even need to make such determinations under the law, let alone that most applications involve such determinations. It thus has not met its burden on a facial challenge.

**3. Restriction on the use of dark patterns (§ 31(b)(7))**

Plaintiff next challenges the restriction on the use of dark patterns to lead or encourage a child to provide further personal information, to forego privacy protections, or to take any action that the business knows is detrimental to the child's well-being. Once more, plaintiff contends that this provision violates the First Amendment and is unconstitutionally vague. Not so.

**a. First Amendment challenge**

Plaintiff challenges the restriction on the use of dark patterns as a violation of the First Amendment as applied to content moderation. But this challenge suffers from the same flaw as its challenge to the information use restrictions: plaintiff has not carried its burden of demonstrating that the alleged unconstitutional applications of the dark pattern restriction substantially outweigh the constitutional applications.

As with the information use restrictions, plaintiff has not established at the threshold that the dark pattern restriction will have any impact on expressive activity. And there is reason to doubt that may be the case. The definition of a dark pattern is a "user interface designed or manipulated with the substantial effect of subverting or impairing user autonomy, decisionmaking, or choice." Cal. Civ. Code § 1798.140(*l*). A "user interface" is the point of human-computer interaction, such as the interactive parts of a website like click boxes, scrolling bars, or menu items. Egelman Decl. ¶¶ 51-52. In other words, the dark pattern restriction regulates design elements, not content. And it only regulates those design elements that have the effect of subverting or impairing user autonomy, decision, or choice. Thus design aspects that have *no* connection to a user's autonomy—such as the placement of a scrolling bar or determining how to organize the menu bar—would not even be implicated by the restriction.

Plaintiff provides scarcely any evidence about how this restriction will impact its members. It does not identify specific design elements its members currently use that could be affected by the regulation. It does not explain how those design elements involve protected editorial discretion or other expressive activity. And it does not provide sufficient information to determine which of these design elements might involve commercial speech—many of the recognized examples of dark patterns do, *see* Liska Decl. Ex. 6, at 21-26 (listing examples of dark patterns); Second Radesky Decl. ¶¶ 104-107, Egelman Decl. ¶¶ 56-57—versus other speech.

Without understanding the ways in which plaintiff's members' conduct will be impacted by the dark pattern restriction, defendant and this Court cannot determine which applications of the Act implicate protected speech. *See NetChoice*, 113 F.4th at 1122-1123 (identifying the dark pattern restriction as a provision that "by [its] plain language, do[es] not necessarily impact protected speech in all or even most applications"). Nor can defendant or the Court know what level of scrutiny is appropriate. Does the restriction primarily impact expressive activity that constitutes commercial speech? Does it impact expressive activity that constitutes fraudulent or misleading commercial speech, which can lack First Amendment protection, *see, e.g.*, *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 624 (2003)? Many examples of dark patterns involve clearly fraudulent or misleading speech. *See* Liska Decl., Ex. 6, at pp. 21-27.

Instead, plaintiff again waves a broad brush, contending that the regulation generally impacts expressive activity "by regulating how content may be displayed." Mot. at 17. Setting aside the lack of an evidentiary record establishing that fact, simply impacting how content is laid out is not necessarily expressive; some choices about how to organize content may not involve the exercise of editorial discretion or expression and would not implicate the First Amendment. Plaintiff cannot escape its burden on a facial challenge to establish that the challenged sections of the Act impact its regulated members' protected expression, that those applications that impact expression are unconstitutional, and that such unconstitutional applications substantially outweigh the constitutional ones simply by invoking "content."

**b. Vagueness challenge**

Plaintiff also contends the dark pattern restriction is unconstitutionally vague. Not so. California law contains a definition of "dark pattern," as noted above. *See supra* at 22. The term also has a well-understood meaning in the industry. *See* Liska Decl., Ex. 6, at p. 2; Egelman Decl. ¶¶ 50, 55-58. And it is only if a design feature meets the definition of a dark pattern that a company needs to determine if that particular dark pattern involves privacy-related choices or would knowingly harm a minor user. Two of the three relevant prohibited uses—to disclose more personal information or to forego privacy protections—are clear in their limits. The remaining prohibited use requires that the business know or should know that a minor would be harmed. "[A] person of ordinary intelligence" can therefore "base his behavior on his factual knowledge of the situation at hand and thereby avoid violating the law." *United States v. Jae Gab Kim*, 449 F.3d 933, 943 (9th Cir. 2006). The requirement is thus not unconstitutionally vague.

**4. Requirement to estimate age (§ 31(a)(5))**

Finally, plaintiff challenges the requirement to estimate age to a reasonable degree of certainty, contending this requirement also violates the First Amendment in all applications and is unconstitutionally vague. It has not shown a likelihood of success on either challenge.

**a. First Amendment challenge**

Plaintiff contends the requirement to estimate age facially violates the First Amendment as to all applications. Not so. The act of estimating a user's age is conduct, not expressive activity.

Instead of contending that there is something expressive about estimating a user's age, plaintiff argues that the age estimation requirement is unconstitutional because it will limit users' access to certain content. Mot. at 19-20. Plaintiff again misconstrues how the Act works. The Act requires businesses to estimate a user's age to determine if they must apply the limitations on the use of personal information and related privacy protections to that user. Cal. Civ. Code § 1798.99.31(a)(5). As discussed in detail above, plaintiff has not established that such regulations will have *any* impact on the messages shown to that child. *See supra* at 16-19.

And even if there was an impact, that impact would be the result of the *other substantive provisions*, not the age estimation requirement itself. While age estimation may trigger the applicability of the Act's substantive protections, any impact on content shown to users would flows from the underlying substantive regulations that apply. After all, plaintiff does not contend that all of the data and policy provisions that would apply to a child user—such as the requirement for a stricter default privacy setting or to notify users if tracking geolocation data—violate the First Amendment. If the age estimation requirement solely triggered these unchallenged restrictions—or challenged restrictions that are constitutional—then the age estimation requirement would have no constitutionally suspect downstream consequences. Thus any unconstitutional impact comes from the underlying substantive provision, not the age estimation requirement. The proper remedy would then be for this Court to enjoin the allegedly unconstitutional substantive regulation, not the age estimation requirement.

Finally, the age estimation requirement would meet the standard for intermediate scrutiny—the proper standard for a content-neutral requirement—if subject to it. As with other provisions, the age estimation requirement furthers the State's substantial interest in protecting the privacy and well-being of children. *See supra* at 19. By estimating a user's age, a business will know how it can make use of that user's personal information—thereby ensuring that the Act's substantive protections will be applied to minor users. The requirement is also sufficiently tailored. For one, it is necessary for businesses to estimate a user's age to determine if the user is a minor who is protected by the Act or not—the only alternative would be to require protections for *all* users, which would be a less tailored requirement. There are also ways to estimate age that

do not further implicate privacy concerns. *See* Egelman Decl. ¶ 65. Finally, the Legislature has taken steps to help protect privacy by requiring that any data collected for age estimation not be retained or used for any other reason. Cal. Civ. Code § 1798.99.31(b)(8). Since the only way for a business to determine if a user is a minor protected by the Act's substantive regulations is to estimate the user's age, there is no more tailored way to determine whether the substantive provisions apply.

#### b. Vagueness challenge

Finally, plaintiff contends that the age estimation requirement is unconstitutionally vague. Their argument is not persuasive. Plaintiff quibbles about the "reasonable degree of certainty" language while ignoring that the law provides them with a clear alternative to age estimation: provide the default privacy and data protections to all users. It is sufficiently clear for companies to be told to estimate age or to apply protections for all users.

## II. Plaintiff Has Not Shown a Likelihood of Success on Its Other Claims

### A. Preemption

#### 1. Section 230

First, plaintiff contends that the Act is preempted by Section 230 of the Communications Decency Act. Section 230 prohibits a "provider or user of an interactive computer service" from being "treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. §230(c)(1). But section 230 does not create a "blanket" immunity, *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 739 (9th Cir. 2024), and preempts only "inconsistent" state laws, 47 U.S.C. § 230(e)(3). Accordingly, Section 230 does not preempt a state law unless it regulates (1) a provider or user of an interactive computer service by (2) treating it as a publisher or speaker of (3) third-party content. *E.g.*, *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009).

Under this framework, Section 230 does not preempt the challenged provisions. The policy enforcement requirement simply requires platforms to enforce their published terms of use. *See supra* at 14-15. The Ninth Circuit has made clear that laws requiring platforms to follow through on their promises are not preempted. *See, e.g.*, *Est. of Bride by & through Bride v. Yolo Techs.*,

*Inc.*, 112 F.4th 1168, 1178 (9th Cir. 2024); *Calise*, 103 F.4th at 740-741, 743; *Barnes*, 570 F.3d at 1107-1108. Since the policy enforcement mandate only ensures that platforms uphold their promises, it is not preempted by Section 230. Just as a brick-and-mortar store must comply with its terms of sale, so too must a platform comply with its terms of use.

Similarly, plaintiff's two-sentence discussion of the four other provisions fails to establish that they are preempted by Section 230. Each provision regulates the collection, use, or sale of personal information or the platform's design choices. *See* Cal. Civ. Code § 1798.99.31(b)(1), (3), (4), (7). These provisions regulate a platform's own conduct unrelated to publishing choices: a platform is not acting as a publisher of third party content when it collects personal information or creates a feature that subverts user autonomy. *See, e.g., Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021) (holding claims not preempted where company could have satisfied a duty "without altering the content that [its] users generate"); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, 702 F. Supp. 3d 809, 830 (N.D. Cal. 2023) (holding claims not preempted where data was collected by the business but not "published at the request of a third-party"). Accordingly, the challenged provisions are not preempted by Section 230.

### 2. COPPA

COPPA sets baseline privacy regulations for businesses that offer online services directed toward children under 13. *See generally* 15 U.S.C. §§ 6501–6506. Like Section 230, COPPA preempts only "inconsistent" state laws, 15 U.S.C. § 6502(d), which are those that are "contradictory" or "stand as obstacles to federal objectives," *Jones v. Google LLC*, 73 F.4th 636, 642 (9th Cir. 2023) (citations omitted). In its prior order, the Court expressed skepticism that the Act contradicts or stands as an obstacle to COPPA. That skepticism was correct.

Plaintiff argues that because the Act covers more platforms than COPPA, and because it does not consider parental wishes as COPPA does, the two laws are not "parallel to" each other. *See Jones*, 73 F.4th at 644. But Plaintiff reads *Jones* too narrowly. The Ninth Circuit there explained that laws that "supplement" COPPA are not preempted. *Id.* at 642 (citation omitted). Insofar as the Act merely regulates platforms not covered by COPPA, or actions that COPPA neither prohibits nor requires, it properly supplements COPPA's baseline privacy protections.

**B. Dormant Commerce Clause**

The Commerce Clause imposes "a self-executing limitation on the power of States to enact laws imposing substantial burdens" on interstate commerce. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 947 (9th Cir. 2013) (citation omitted). This "dormant" Commerce Clause "prohibits the enforcement of state laws 'driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (citation omitted) (alteration in original).

Plaintiff contends that the Act is unconstitutional under the dormant Commerce Clause because it regulates wholly extraterritorial conduct. Mot. at 29. Not so. For one, the Supreme Court recently clarified that the dormant Commerce Clause imposes no per se "extraterritoriality doctrine"—that is, no rule "forbidding enforcement of state laws that have the practical effect of controlling commerce outside the State." *Nat'l Pork*, 598 U.S. at 371. Nor are the purported extraterritorial effects of an in-state regulation enough to state a dormant Commerce Clause violation: "[E]ven when state law has significant extraterritorial effects, it passes Commerce Clause muster when, as here, those effects result from the regulation of in-state conduct." *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1145 (9th Cir. 2015). Finally, plaintiff's argument proceeds from a flawed initial premise: the Act regulates only companies that (1) do business in California and (2) provide an online service likely to be accessed by children residing in California, Cal. Civ. Code § 1798.99.30(a)(1), 1798.140(d), (i), and thus has no impact on transactions wholly outside the State, *see Greater L.A. Agency on Deafness, Inc. v. Cable News Network*, 742 F.3d 414, 433 (9th Cir. 2014) (rejecting argument that California law requiring closed captioning on cable company's online videos regulated extraterritorial conduct). It therefore does not violate the dormant Commerce Clause.

## III. THE REMAINDER OF THE STATUTE IS SEVERABLE FROM ANY INVALID PROVISIONS

Any injunctive relief this Court does grant should be narrowly tailored, because the remainder of the statute is severable—both from the provisions enjoined by the Ninth Circuit and from any other provisions this Court concludes are likely invalid. Federal courts apply California

law when analyzing severability. *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir. 2014). California courts apply a three-part test to determine severability: the invalid part of the law "must be grammatically, functionally, and volitionally separable." *California Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 271 (2011) (citation omitted). "Grammatical separability, also known as mechanical separability, depends on whether the invalid parts 'can be removed as a whole without affecting the wording' or coherence of what remains." *Id.* (citation omitted). "Functional separability depends on whether 'the remainder of the statute is complete in itself.'" *Id.* (citation omitted). "Volitional separability depends on whether the remainder 'would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute.'" *Id.* (citation omitted). While the presence of a severability clause "establishes a presumption in favor of severance," *id.* at 270, "the absence of such a clause is not conclusive," *County of Sonoma v. Superior Court*, 173 Cal. App. 4th 322, 352 (2009); *see also Legislature v. Eu*, 54 Cal. 3d 492, 535 (1991) (holding it was "clear that severance of particular provisions is permissible despite the absence of a formal severance clause").

Plaintiff does not contend that the portions enjoined by the Ninth Circuit (the requirement to prepare a Data Protection Impact Assessment and the notice and cure provision) are not grammatically separable—and for good reason. Removing those sections from the statute would not "alter the meaning of the remaining text in any way." *Vivid Ent.*, 774 F.3d at 575. So, too, for any other invalid portions of the Act. Rather, plaintiff focuses on volitional and functional separability, contending the remaining provisions do not meet these requirements. But the remainder of the statute does meet these requirements.

First, the remainder of the statute is functionally separable from the enjoined provisions and any other provisions this Court concludes are invalid. Functional separability focuses on whether "the remainder after separation of the invalid part" is "'complete in itself' and 'capable of independent application.'" *Abbot Lab'ys v. Franchise Tax Bd.*, 175 Cal. App. 4th 1346, 1358 (2009) (citation omitted). That is precisely the situation here. The enjoined DPIA requirement is distinct from the other requirements of the Act, so its invalidity does not impact the application of the Act's remaining substantive requirements. The same is true as to the enjoined notice and cure

provision. While that provision's removal may alter *how* the statute is enforced, it does not alter that the remaining provisions are *capable of being* enforced. The same holds true as to any other invalid provisions (though defendant contends there are none): each substantive obligation "can operate entirely independently of the invalid" obligations and removal of one obligation does not impact the enforceability or functionality of the remaining obligations. *Eu*, 54 Cal. 3d at 535.

Plaintiff's argument to the contrary is not persuasive. It contends that removing the notice and cure provision "would mark a foundational shift in the Act's function and focus," making it not functionally separable. Mot. at 26. As support, plaintiff cites quotes from the Act's co-author indicating her view of how the notice and cure and DPIA provisions worked within the Act's enforcement scheme. *Id.* For one, the views of one legislator rarely speak for the Legislature as a whole. *E.g.*, *Quintano v. Mercury Cas. Co.*, 11 Cal. 4th 1049, 1062 (1995) ("We have frequently stated, moreover, that the statements of an individual legislator, including the author of a bill, are generally not considered in construing a statute."). For another, "[s]peculation as to what the Legislature may have expected" regarding the practical implementation of the law "is immaterial here; the issue under this prong is simply whether [the remainder] is complete in itself such that it can be enforced notwithstanding [the other sections'] invalidity." *Matosantos*, 53 Cal. 4th at 272. The Act retains an independent mechanism for enforcement absent the notice of cure provision. Thus, the requirement for functional separability is met.

So, too, is the requirement for volitional separability. The California Supreme Court has been clear that "[t]he issue, when assessing volitional separability, is not whether a legislative body would have preferred the whole to the part; surely it would have." *Matosantos*, 53 Cal. 4th at 273. "Instead, the issue is whether a legislative body, knowing that only part of its enactment would be valid, would have preferred that part to nothing, or would instead have declined to enact the valid without the invalid." *Id.* Plaintiff's arguments about the role the notice and cure provision played in the drafting process are thus inapposite. The Legislature may have viewed the notice and cure provision and the remainder of the act "as a package," and the Court may "accept as self-evident that the Legislature preferred" a version of the Act with the notice and cure provision to one without it. *Id.* at 272. But "this evidence goes to answering the wrong

question." *Id.* at 273. The question is whether the Legislature would have preferred the Act without the notice and cure and DPIA requirement to *nothing*.

Surely, it would have. The Legislature was clear about its concerns for the privacy and safety of child users. *See supra* at 4, 13; *see also supra* at 19 (discussing harms to children remediated by Act). The substantive provisions of the Act directly regulate companies to ameliorate those concerns and thus do not "give the statute a purpose quite different from the one enacted by the legislature," *Abbot Lab'ys*, 175 Cal. App. 4th at 1359. Nor do they penalize conduct that was never subject to the Act. *Cf. Cultiva La Salud v. California*, 89 Cal. App. 5th 868, 886 (2023) (declining to sever where remainder of law would penalize conduct never subject to regulation). Given the Legislature's concerns about the safety and privacy of children, as well as the number of different substantive regulations included in the Act, it would be odd for the Legislature to have been so committed to a notice and cure or self-report provision that it would have left the entire arena *unregulated* if it could not have those provisions. Instead, it is far more likely that the Legislature would have enacted the remaining substantive obligations of the Act and its intact enforcement scheme to protect children to the full extent permissible.[3]

**CONCLUSION**

For the foregoing reasons, the motion for a second preliminary injunction should be denied.

Dated: December 6, 2024

Respectfully submitted,

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
Supervising Deputy Attorney General

*/s/ Kristin Liska*

KRISTIN A. LISKA
Deputy Attorney General
*Attorneys for Defendant*

---

[3] The Attorney General would like to acknowledge the contribution of law student Christopher Nardi (Berkeley '25) to this brief.

## CERTIFICATE OF SERVICE

Case Name: ***NetChoice, LLC v. Rob Bonta***

Case No.: **5:22-cv-08861-BLF**

I hereby certify that on December 6, 2024, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1. **OPPOSITION TO PLAINTIFF'S MOTION FOR A SECOND PRELIMINARY INJUNCTION**
2. **DECLARATION OF KRISTIN A. LISKA IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR A SECOND PRELIMINARY INJUNCTION**
3. **DECLARATION OF SERGE EGELMAN, PH.D. IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR A SECOND PRELIMINARY INJUNCTION**
4. **DECLARATION OF JENNY S. RADESKY, MD IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR A SECOND PRELIMINARY INJUNCTION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished electronically by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on December 6, 2024, at San Francisco, California.

| | |
|---|---|
| Vanessa Jordan | Vanessa Jordan |
| Declarant | Signature |