No. 25-2366

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

NETCHOICE, LLC, D/B/A NETCHOICE,
*Plaintiff-Appellee*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,
*Defendant-Appellant*.

**On Appeal from the United States District Court for the Northern District of California**
No. 5:22-cv-08861-BLF
The Honorable Beth Labson Freeman, Judge

# APPELLANT'S EXCERPTS OF RECORD VOLUME 3 of 4

ROB BONTA
*Attorney General of California*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
ANYA M. BINSACCA
*Supervising Deputy Attorney General*
KRISTIN A. LISKA
*Deputy Attorney General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3916
Fax: (415) 703-5480
Kristin.Liska@doj.ca.gov
*Attorneys for Defendant-Appellant*

June 10, 2025

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
Supervising Deputy Attorney General
KRISTIN A. LISKA
Deputy Attorney General
State Bar No. 315994
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3916
Fax: (415) 703-5480
E-mail: Kristin.Liska@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **NetChoice, LLC,**<br>Plaintiff,<br>**v.**<br>**Rob Bonta, in his official capacity as Attorney General of the State of California,**<br>Defendant. | Case No. 5:22-cv-08861-BLF<br>**DECLARATION OF KRISTIN A. LISKA IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR A SECOND PRELIMINARY INJUNCTION**<br>Date: January 23, 2025<br>Time: 9:00 a.m.<br>Dept: 3<br>Judge: The Honorable Beth Labson Freeman<br>Trial Date: Not scheduled<br>Action Filed: 12/14/2022 |

I, Kristin A. Liska, declare as follows:

1. I am a Deputy Attorney General authorized to practice in this court, and I represent defendant Attorney General Rob Bonta in this action.

2. The legislative history materials attached as Exhibits 1-5 can be found at: https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220AB2273

3. Attached as **Exhibit 1** is a true and correct copy of the April 17, 2022 Assembly Committee on Privacy and Consumer Protection analysis of AB 2273.

4. Attached as **Exhibit 2** is a true and correct copy of the May 20, 2022 Assembly Floor analysis of AB 2273.

5. Attached as **Exhibit 3** is a true and correct copy of the June 24, 2022 Senate Judiciary Committee analysis of AB 2273.

6. Attached as **Exhibit 4** is a true and correct copy of the August 23, 2022 Senate floor analysis of AB 2273.

7. Attached as **Exhibit 5** is a true and correct copy of the August 30, 2022 Assembly floor analysis of AB 2273.

8. Attached as **Exhibit 6** is a true and correct copy of the Federal Trade Commission staff report "Bringing Dark Patterns to Light," from September 2022. This report is available online at: https://www.ftc.gov/reports/bringing-dark-patterns-light.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 6th day of December, 2024, at Poway, California.

Dated: December 6, 2024

*/s/ Kristin Liska*

Kristin Liska

**INDEX OF EXHIBITS**


| Exhibit | Description | Page |
|---|---|---|
| 1 | The April 17, 2022 Assembly Committee on Privacy and Consumer Protection analysis of AB 2273 | 1-21 |
| 2 | The May 20, 2022 Assembly Floor analysis of AB 2273 | 22-26 |
| 3 | The June 24, 2022 Senate Judiciary Committee analysis of AB 2273 | 27-50 |
| 4 | The August 23, 2022 Senate floor analysis of AB 2273 | 51-59 |
| 5 | The August 30, 2022 Assembly floor analysis of AB 2273 | 60-65 |
| 6 | The Federal Trade Commission staff report "Bringing Dark Patterns to Light," from September 2022 | 66-114 |

# EXHIBIT 1

Date of Hearing: April 19, 2022

ASSEMBLY COMMITTEE ON PRIVACY AND CONSUMER PROTECTION
Jesse Gabriel, Chair
AB 2273 (Wicks) – As Introduced February 16, 2022

**SUBJECT**: The California Age-Appropriate Design Code Act

**SUMMARY**: This bill would establish the California Age-Appropriate Design Code Act which generally would require businesses that create goods, services, or product features (hereinafter "services") likely to be accessed by children to comply with specified standards, including considering the best interests of children likely to access that service when designing, developing, and providing that service. Specifically, **this bill would**:

1) Provide, beginning January 1, 2024, that a business that provides a service likely to be accessed by a child shall comply with all of the following:

   - Consider the best interests of children likely to access that service when designing, developing, and providing that service and, when in conflict with commercial interests, design, develop, and provide that service in the manner that prioritizes the privacy, safety, and well-being of children.

   - Undertake a Data Protection Impact Assessment for any service likely to be accessed by a child and maintain documentation of this assessment as long as the service is likely to be accessed by a child.

   - Establish the age of consumers with a level of certainty appropriate to the risks that arise from the data management practices of the business, or apply the privacy and data protections afforded to children to all consumers.

   - Maintain the highest level of privacy possible for children by default, including, but not limited to, disabling profiling, unless the business can demonstrate a compelling reason that a different default setting is in the best interests of children likely to access that service.

   - Provide any privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children likely to access that service.

   - If the service allows the child's parent, guardian, or any other consumer to monitor the child's online activity or track their location, provide an obvious signal to the child when they are being monitored or tracked.

   - Universally uphold published terms, policies, and community standards established by the business, including, but not limited to, privacy policies and those concerning children.

   - Provide prominent, accessible, and responsive tools to help children exercise their privacy rights and report concerns.

2) Prohibit, beginning January 1, 2024, a business that provides a service likely to be accessed by a child from taking any of the following actions:

- Using the PI of any child in a way that is demonstrably harmful to the physical health, mental health, or well-being of a child.

- Collecting and retaining any PI that is not necessary to provide a service with which a child is actively and knowingly engaged.

- If a business does not have actual knowledge of the age of a consumer, it shall neither collect nor retain any PI that is not necessary to provide a service with which a consumer is actively and knowingly engaged.

- Using the PI of a child for any reason other than the reason or reasons for which that PI was collected. If the business does not have actual knowledge of the age of the consumer, the business shall not use any PI for any reason other than the reason or reasons for which that PI was collected.

- Notwithstanding the right to opt-out of the sale of the consumer's PI (if over 16 years of age, and the right to opt-in if the consumer is a minor), disclose the PI of any child unless the business can demonstrate a compelling reason that disclosure of that PI is in the best interests of the child.

- Collect any precise geolocation information by default, unless the business can demonstrate a compelling reason that doing so would be in the best interests of the child.

- Collect any precise geolocation information without providing an obvious sign to the consumer for the duration of that collection that precise geolocation information is being collected.

- Collect any sensitive PI by default, unless the business can demonstrate a compelling reason that the collection of sensitive PI by default is in the best interests of a child.

- Use dark patterns or other techniques to lead or encourage consumers to provide PI beyond what is necessary to provide that service, to forego privacy protections, or to otherwise take any action that is demonstrably harmful to the consumer's physical health, mental health, or well-being.

3) Require the California Privacy Protection Agency (CPPA) to establish and convene the California Children's Data Protection Taskforce to evaluate best practices for the implementation the AADC, and to provide support to businesses, as specified.

4) Require the taskforce to make recommendations on best practices regarding, but not limited to, all of the following:

- Identifying services likely to be accessed by children.

- Evaluating and prioritizing the best interests of children with respect to their privacy, health, and well-being, and issuing guidance to businesses on how to incorporate those interests into the design, development, and implementation of a service.

- Determining the level of certainty with which it is necessary to establish the age of a consumer appropriate to the risks that arise from the data management practices of a business.

- Determining whether a reason is sufficiently compelling to warrant practices that are not consistent with the default setting, data collection, and data disclosure practices.

- Assessing and mitigating risks to children that arise from the use of a service, including specific items for the systematic survey necessary to perform a Data Protection Impact Assessment.

- Publishing privacy information, policies, and standards in concise, clear language suited for the age of children likely to access that service.

5) Require, by April 1, 2024, the CPPA, in consultation with the taskforce, to adopt regulations and publish guidelines to effectuate the purposes of the AADC in a manner consistent, and to the extent possible, with international frameworks for the protection of the privacy and well-being of children.

6) Define terms, such as "agency," "dark pattern," "Data Protection Impact Assessment" and "likely to be accessed by a child."

7) Provide Legislative findings and declarations related to the impact of the design of digital products and services on children's well-being and state the intent of the Legislature to promote privacy protections for children pursuant to the California Age-Appropriate Design Code Act.

**EXISTING LAW**:

1) Provides, under the U.S. Constitution, that "Congress shall make no law . . . abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." (U.S. Const., 1st Amend., as applied to the states through the 14th Amendment's Due Process Clause; see Gitlow v. New York (1925) 268 U.S. 652.)

2) Requires, pursuant to the federal Children's Online Privacy Protection Act (COPPA), that an operator of an internet website or online service directed to a child, as defined, or an operator of an internet website or online service that has actual knowledge that it is collecting PI (PI) from a child to provide notice of what information is being collected and how that information is being used, and to give the parents of the child the opportunity to refuse to permit the operator's further collection of information from the child. (15 U.S.C. Sec. 6502.)

3) Establishes the California Consumer Privacy Act of 2018 (CCPA) and provides various rights to consumers pursuant to the act. Subject to various general exemptions, a consumer has, among other things:

- The right to know what PI (PI) a business collects about consumers, as specified, including the categories of third parties with whom the business shares PI.

- The right to know what PI a business sells about consumers, as specified, including the categories of PI that the business sold about the consumer and the categories of third parties to whom the PI was sold, by category or categories of PI for each third party to whom the PI was sold.

- The right to access the specific pieces of information a business has collected about the consumer.

- The right to delete information that a business has collected from the consumer.

- The right to opt-out of the sale of the consumer's PI if over 16 years of age, and the right to opt-in if the consumer is a minor (as exercised by the parent if the minor is under 13, or as exercised by the minor if the minor is between ages 13 and 16).

- The right to equal service and price, despite exercising any of these rights. (Civ. Code Sec. 1798.100 et seq.)

4) Among other things, the California Privacy Rights Act (CPRA), enacted by Proposition 24 in 2020, creates a Privacy Protection Agency (CPPA) in California, vested with full administrative power, authority, and jurisdiction to implement and enforce the CCPA. The agency shall be governed by a five-member board, with the chairperson and one member appointed by the Governor, and the three remaining members appointed by the Attorney General, the Senate Rules Committee, and the Speaker of the Assembly. (Civ. Code Sec. 1798.199.10.)

**FISCAL EFFECT**: Unknown

**COMMENTS**:

1) **Purpose of this bill**: This bill seeks to require that businesses consider the best interests of children when designing services that children are likely to access online. This bill is sponsored by the 5Rights Foundation.

2) **Author's statement**: According to the author:

> The Internet is increasingly shaping how children socialize, consume entertainment, create, and learn. According to data from UNICEF, approximately one in three internet users is a child under 18 years of age. Among parents with children who have access to the internet, there is a concern about what kids are accessing, and the potential harmful effects of the manner in which that access occurs. Data from Parents Together show that 85 percent of parents are concerned with how much time their kids are spending online – time that has increased since the pandemic. The same percentage of parents think that Congress should require protections for kids online, and help to stop sexual predators, place limits on deceptive advertising, and protect children's privacy.

Data privacy for children is especially important because its misuse can expose children to harmful material, compulsive behavior loops, and other risks. For example, research from the 5Rights Foundation found that, of the top 100 free apps for kids in one of the major app stores, one in three have overt banner ads, including ads that promote adult-appropriate apps requiring a user to watch the full promo before a box could be closed. Additionally, only 36 percent of California teens and 32 percent of California parents say that social networks do a good job explaining what they do with users' data.

While existing federal and state privacy laws offer important protections that guard children's privacy, there is no coherent, comprehensive law that protects children under 18 from goods, services, and products that endanger their welfare. As a result, online goods, services, and products that are likely to be accessed by kids have been loaded with adult design principals that do not factor in the unique needs of young minds, abilities, and sensibilities, nor offer the highest privacy protections by design and by default. As a result, children under 18 face a number of adverse impacts due to their interactions with online world, including bullying, mental health challenges, and addictive behaviors.

3) **Federal and state efforts to protect children online generally permit online platforms to treat all consumers as adults unless there is actual knowledge that a consumer is a child**: The broadcast of children's television programming stations in the United States is regulated by the Federal Communications Commission (FCC), under regulations colloquially referred to as the Children's Television Act. Since 1997, television stations have been required to broadcast at least three hours per week of programs that are specifically designed to meet the educational and informative needs of children aged 16 and younger. There are also regulations on advertising in broadcast and cable television programming targeting children 12 and younger, including limits on ad time, and prohibitions on advertising of products related to the program currently airing.

As the internet has become more accessible and attractive to children, the government has similarly created protections to protect children online. Enacted in 1998, the federal Child's Online Privacy Protection Act of 1998 (COPPA), requires the Federal Trade Commission (FTC) to issue and enforce a rule (the Rule) concerning children's online privacy. The FTC notes that:

> The primary goal of COPPA and the Rule is to place parents in control over what information is collected from their young children online. The Rule was designed to protect children under age 13 while accounting for the dynamic nature of the internet. The Rule applies to operators of commercial websites and online services directed to children under 13 that collect, use, or disclose PI from children, and operators of general audience websites or online services with actual knowledge that they are collecting, using, or disclosing PI from children under 13.[1]

In an effort to further protect minors online, California subsequently passed SB 568 (Steinberg, Ch. 336, Stats. 2013), known as Privacy Rights for California Minors in the Digital World, which prohibits the operator of an internet website or other online service or mobile application from marketing or advertising a product or service to a minor if the minor

[1] FTC: Frequently Asked Questions about the Children's Online Privacy Protection Rule, http://www.ftc.gov/privacy/coppafaqs.shtm, [as of Apr. 2, 2021].)

cannot legally purchase the product or participate in the service in California, or, compiling PI to market those products or services. This prohibition only applies to an operator that has actual knowledge that a minor is using its online service or whose site or service is directed to minors. That bill also permits a minor to remove content or information posted to a website or service, as specified.

SB 568 was opposed by the Center for Democracy and Technology, who took issue with the bill's limitation that a website must be directed to minors for the provisions of the bill to apply. SB 568, now codified beginning at Business and Professions Code Sec. 22580, provided that a site or service is "directed to minors" if it is "created for the purpose of reaching an audience that is *predominantly* composed of minors, and is not intended for a more general audience comprised of adults." (Emphasis added.) The definition adds that a site or service would not be deemed to be "directed at minors" merely because it contained links to sites or services that were directed to minors.

Further protecting the rights of minors, the Legislature enacted the California Consumer Protection Act of 2018 (CCPA; Chau, Ch. 55, Stats. 2018) which provides various rights to consumers related to the sale of their PI, as defined. Relevant to this bill, the CCPA prohibits any business, as defined, from selling the PI of minors 16 years of age and under, without prior opt-in consent to the sale of the information. For minors between the ages of 13 and 16, the minor can opt-in to the sale of their PI on their own. For minors under 13 years of age, only a parent or guardian may opt-in to the sale of the minor's information. (Civ. Code Sec. 1798.120.)

Notably, the protections for children online largely focus on regulating the collection and sale of children's PI, rather than ensuring that children are protected from manipulative design (dark patterns), adult content, or other potentially harmful design features. In addition, for the most part, the existing laws protecting minors online are only triggered when an online platform has actual knowledge that children are accessing their website. This has incentivized many social media platforms and other online services to ignore the age of their consumers, so that they do not have to adhere to the standards set out in the laws described above.

4) **Recent informational hearing highlighted challenges children and families face online**: On March 29, 2022, this Committee held an informational hearing entitled, *Protecting Kids Online: Challenges & Opportunities in a Digital World.* Testimony from the hearing indicated that adults, children, and teens alike are frustrated with the effort and expertise it takes to make online experiences safe for children. Dr. J. Radesky, a developmental behavioral pediatrician and researcher described how heavily monetized children's digital spaces are, despite children not fully understanding concepts like behavioral advertising, the value of currency, or persuasive nudges. [19] Dr. Radesky testified:

> By tracking young children's mobile devices, my research team realized how much time young children are spending on platforms not initially designed with children in mind, including YouTube. We partnered with Common Sense Media to analyze the content of children's YouTube viewing histories, finding that the majority of videos young children are watching are not educational, are highly commercialized (featuring toys or other branded products), and many have violent and stereotyped content.[20] On some channels we examined, duration of ads exceeded the duration of the video.[21] Although positive

content exists on YouTube, children appear to be watching what trends; and because algorithms elevate more outrageous and sticky content, content creators produce more such content to get more clicks and engagement.

In mobile apps, my research has focused on where digital design is crossing the line in terms of manipulating children into watching more ads, playing for longer, making more purchases – also known as 'dark patterns'. In the sample of 154 apps we analyzed, 80% contained at least one type of manipulative design – in the form of pressure from trusted characters, navigation constraints, fabricated time pressure, promises of virtual currencies or gameplay objects, or rewards for watching ads (Radesky et al., in press). It appears that adult design norms are being copied and pasted sloppily into children's products, and this is not good design.

In conclusion, Dr. Radesky noted that there are apps that have been designed with children in mind. "These apps don't collect private identifiers, they contain developmentally meaningful content with stoppage cues and nudges to apply their knowledge to social and physical spaces around them, they don't have distracting ads, don't pressure children to make purchases, and give children the autonomy to choose what to do next. They continuously evaluate their products with child-centered standards. We need more companies that show a duty of care that they understand the responsibility inherent in creating the images and stories that children consume."

This bill, modeled after the Age Appropriate Design Code recently enacted in the United Kingdom, seeks to elevate child-centered design in online products and services that are likely to be accessed by children. The bill would additionally require the CPPA to establish a taskforce to evaluate best practices for the implementation of the bill's provisions, and to provide support to businesses.

In support, a large coalition of organizations representing public health, parent, school and youth groups, researchers, and advocacy organizations write:

Children across the globe are facing an unprecedented mental health crisis. Even before the onset of COVID-19 and subsequent social distancing and isolation, teen suicide was on the rise; in the US the CDC found that between 2007 to 2017 the suicide rate among people aged 10 to 24 increased by 56%. And in the year between spring of 2020 and 2021 emergency room visits for girls ages 12 to 17 increased by 50%.

In 2020, 81% of 14 to 22-year-olds said they used social media either "daily" or "almost constantly." This is by design. As private companies beholden to shareholders, performance incentives for product developers and executives are tied to profit and therefore time spent on their platform. Social media platforms and tech companies do not design these services with their youngest and most vulnerable users in mind.

Ensuring the safety of tech products is long overdue. We have nutrition labels on food packaging, rigorous testing for cribs and car seats, and yet the technology children use daily from the youngest of ages have little to no safeguards.

5) **AB 2273 seeks to shift the paradigm for protecting children online**: This bill would take a different approach to protecting children online than the state and federal laws described in

Comment 3, above, in two distinct ways. First, the bill would require online platforms likely to be accessed by children to turn privacy and safety settings up to a level that is protective of children's mental and physical health and well-being *unless* the online platform can, with an appropriate level of certainty, determine the age of the consumer. In other words, existing law generally permits online platforms to treat all consumers as adults unless there is actual knowledge that the consumer is under 13 years of age. This bill would instead require that websites and other online services likely to be accessed by children offer privacy and safety protections by default, unless there is reasonable certainty that the consumer is an adult. In addition, the bill clearly spells out what baseline protections are required:

- Disabling profiling.
- Prohibiting businesses from collecting or retaining any PI that is not necessary to provide the service requested, or using the PI for any reason other than the reason for which it was collected.
- Prohibiting the collection of any precise geolocation information by default, unless the business can demonstrate a compelling reason that doing so is in the best interest of the child.
- Prohibiting the use of dark patterns (e.g., manipulative design) to lead or encourage consumers to provide PI beyond what is necessary to provide the requested service, or to forgo privacy protections.

In support, Roblox, an online gaming platform, writes that despite the fact that the United Kingdom's AADC is a Code of Practice specific to the UK, Roblox chose to introduce many of its protections globally. Roblox writes:

> We believe that when safety practices faithfully serve the needs of all young people, it makes sense to apply them universally. Consistent with this philosophy, we welcome the introduction of AB 2273 in California, formalizing such protections for California's youth. Specifically, we note the following characteristics of AB 2273:
>
> - It is Principle-Based: Principle-based approaches to safety promote accountability while remaining flexible enough to allow for future innovation and changes in the technology landscape. Further, as a principles-based approach, the Code can be applied to the diversity of services that are offered to children online today, from nascent, start-up technologies to large, global platforms.
> - It is Risk-Based: Companies are often best positioned to address vulnerabilities that may exist on their platforms. The risk-based approach that underpins AB 2273 allows for service-specific means to managing potential risks, avoiding the unintended consequences that a "one size fits all" approach can bring to privacy and safety.
> - It Emphasizes the "Best Interests of the Child": AB 2273 requires companies to consider the "best interests of the child" in designing and creating tools and features, helping to ensure that children's well-being remains a key part of the design and implementation process.

- It is Modeled After Existing Legislation: Having seen similar measures to AB 2273 thoughtfully introduced and implemented by UK policymakers last year, we believe they can scale effectively for children in California.

Roblox has long met the spirit of AB 2273, assuming a strong duty of care for the people who use our service regardless of age.

Second, the bill requires businesses to anticipate the likely audience of consumers when designing online products and services, and to design those products or services to prevent reasonably predictable harms to that audience. Writing in support, Oakland Privacy notes the innovative approaches Big Tech has implemented to protect children online in response to the AADC in the United Kingdom:

> Today, Big Tech has the ability to implement the requirements of AB 2273 to further protect children's data rights. In response to the recently enacted UK Age Appropriate Design Code, some of the changes Big Tech has implemented include:
>
> - Instagram (Meta) will now prohibit unknown adults to message minors under 18 years old.
> - Instagram (Meta) encourages children to take a break from the app.
> - Google made SafeSearch the default browsing for minors.
> - Google will expand safeguards to prevent age-sensitive ad categories from being shown to teens.
> - Google will block ad targeting based on the age, gender, or interests of minors.
> - Google Play Store prevents viewing and downloading adult-only apps.
> - Youtube (Google) has turned off autoplay.
> - YouTube (Google) videos uploaded by accounts under 18 years old will be set to private by default.
> - Youtube (Google) has bedtime and break reminders turned on by default.
> - TikTok (Musical.ly) set accounts to private by default.
>
> The innovation undertaken by Big Tech in the United Kingdom to comply with that country's AADC are indeed remarkable. In the United States, however, industry argues that concerns over enforcement make similar actions uncertain.

6) **Opposition expresses concern that vague requirements in the bill would make it difficult to determine how to comply**: The California Chamber of Commerce (heretofore, "Chamber") and TechNet write in opposition to AB 2273 and raise a number of concerns related to arguably vague standards in the bill which would create uncertainty with regard to compliance and enforcement. Electronic Frontier Foundation (EFF), who opposes this bill unless amended to address a number of concerns, echoes this sentiment.

TechNet and the Chamber point to two specific concepts in the bill as causing particular concern. First, they take issue with the requirement that a business must take the best interest of children into consideration when developing online services, and with the requirement that in the event of a conflict between commercial interests and the interests of children, companies should prioritize the privacy, safety, and well-being of children. They write, that the concept is "incredibly difficult to interpret. Different companies, even parents in one

household, will have very different interpretations of what is and isn't in the 'best interests' of children."

Indeed, the concept of "best interests" is one that will likely be very fact specific in practice, and as such is difficult to implement for the purposes of statute. It is unclear what level of consideration a business must give to children's best interests, which makes it difficult for businesses to know at which point they have complied with the law, and similarly makes it difficult for a court to know when a business has violated the law. Accordingly, the author has agreed to move the concept of "best interests" to codified findings and declarations in the bill, which should serve the purpose of informing a court as to the spirit and intent of the law when applying its provisions. (This amendment, along with others to which the author has agreed, are found in Comment 9, below.)

Second, TechNet and Chamber are concerned that "AB 2273 would change the threshold from COPPA's 'directed to children' to 'likely to be accessed by children'. [They argue that] this is an over inclusive standard and would capture far more websites and platforms and subject them to this bill's requirements, which as noted are difficult to interpret and implement."

As noted in Comments 3 and 4 above, creating a threshold that is more protective of children than the status quo appears to be precisely the intent of the author and sponsor. Provisions of COPPA, and similar laws have long incentivized online platforms to create websites and services for a "general audience" rather than creating platforms specifically for children, and have further permitted online products and services to intentionally disregard the reasonably predictable ages of consumers.

That being said, there is language in the federal regulations interpreting COPPA that seemingly encompasses the same concept as the author's definition of "likely to access," and should already be familiar to Californian businesses. By way of reference, this bill would define "likely to be accessed by a child" to mean that "it is reasonable to expect, based on the known audience, the nature of the content, the associated marketing, or the online context, that the good, service, or product feature is more likely than not to be accessed by children."

Separate from the "actual knowledge" standard within COPPA that has been exploited by many online business, other federal regulations interpreting COPPA provide, in part, that the concept of "directed to a child" may be analyzed according to the following:

> In determining whether a Web site or online service, or a portion thereof, is directed to children, the Commission will consider its subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children. The Commission will also consider competent and reliable empirical evidence regarding audience composition, and evidence regarding the intended audience.

Staff notes that, given the overlap between the definition of "likely to be accessed by a child" in this bill and the language from federal regulations above, the author and proponents of

this bill may actually be very close to finding a definition with which businesses know how to comply.

If this Committee were to approve this bill, the author should continue to work with stakeholders and this Committee to ensure that the concept of "likely to be accessed by children" is vetted and developed in a manner that gives businesses more clarity on how to comply with the provisions of this bill.

7) **Opposition raises concerns with age assurance elements of bill**: AB 2273 would require any business that provides an online service likely to be accessed by a child to "establish the age of consumers with a level of certainty appropriate to the risks that arise from the data management practices of the business, or apply the privacy and data protections afforded to children to all consumers." The bill would further provide that if "a business does not have actual knowledge of the age of a consumer, it shall neither collect nor retain any personal information that is not necessary to provide a good, service, or product feature with which a consumer is actively and knowingly engaged."

EFF expresses concern that this provision will drive businesses to employ invasive age assurance practices. In their "oppose unless amended" letter, EFF writes:

> Because AB 2273 applies directions to businesses to apply stronger protections for children, it is likely that this will incentivize them to affirmatively confirm the ages of their customers. Age verification systems are troubling—requiring such systems could hand over significant power, and private data, to third-party identity verification companies like Clear or ID.me. Additionally, such a system would likely lead platforms to set up elaborate age-verification systems for everyone, meaning that all users would have to submit personal data and submit to more corporate surveillance.

Staff notes that age verification is not necessarily the same thing as identity verification, though they can go hand in hand. Further, the age assurance requirement of the bill is designed to be proportionate to the risks that arise from the online service and their data management practices. Thus, platforms that do not collect geolocation data or sensitive PI , for example, would likely need less thorough age verification methods than platforms that collect and/or sell geolocation information by default. However, to further alleviate concerns raised by stakeholders related to reasonable age assurance, the author offers a variety of amendments which do the following:

- Clarify that businesses must establish the age of consumers with a *reasonable* level of certainty appropriate to the risks that arise from the data management practices of the business.
- Prohibit the use of any PI collected for the purpose of establishing age or age range from being used for any other purpose or from being retained longer than necessary to establish age.
- Require the taskforce within the CPPA to make recommendations on best practices regarding (1) ensuring that age verification methods used by businesses that provide online services, products, or features likely to be accessed by children are proportionate to the risks that arise from the data management practices of the business, privacy protective, and minimally invasive; and (2) best practices for businesses to prove

compliance with the requirement to establish age with a reasonable level of certainty if they are not permitted to retain the PI used to verify age.

8) **Bill is unclear as to enforcement**: This bill would require the CPPA to develop a task force to evaluate best practices for the implementation of the AADC and to provide support to businesses as they seek to comply with the requirements of the bill. AB 2273 would also require the CPPA, in consultation with the taskforce, to adopt regulations and publish guidelines, as specified, by April 1, 2024.

These elements of the bill appear to be designed to ensure that businesses have the support necessary to comply with the requirements of the AADC, but have provided little comfort to industry. As Chamber and TechNet note in their letter of opposition:

> [O]ur companies have a very different relationship with the Information Commissioner's Office (ICO), the regulator that enforces the AADC. The ICO provides extensive guidance on the AADC, explaining the many subjective requirements and providing detailed examples of how it interprets those standards. Companies have the ability to request additional guidance from the ICO, which also gives companies the ability to fix mistakes before fines or penalties are levied.
>
> AB 2273 would import these standards, which read more like industry best practices, directly into California statute. How these standards are enforced is deeply concerning, as California regulators provide less guidance, fewer opportunities to fix mistakes, and take a much more aggressive approach to fines and penalties.

Similarly, EFF is concerned that "because the bill's key concepts will not be more clearly articulated by the taskforce for another two years, we are concerned about the current lack of specificity."

While the bill is indeed silent on how it will be enforced, such an omission is not uncommon in statute and absent any specific language, the bill will be enforceable by the Attorney General (AG) pursuant this State's Unfair Competition Law UCL, which permits the AG to bring actions for injunctive relief. (Bus. & Prof. Code Sec. 17200 et seq.) That is not to say, however, that enforcement pursuant to the UCL is the most appropriate method by which to enforce the AADC.

Accordingly, as this bill moves through the legislative process, the author should consult with stakeholders to determine an enforcement mechanism that would best incentivize compliance with the provisions of the bill, paying special attention to attention to the following factors: 1) the entity charged with enforcement; 2) the penalties, relief, or other sanctions available; 3) any potential limitation of liability for good faith efforts to comply; and 4) the timing of enforcement in relation to any regulations issued by the CPPA.

9) **Amendments accepted by the author address a variety of concerns raised by this Committee and stakeholders**: Seeking to address a number of concerns raised by this Committee and stakeholders, the author has agreed to a significant number of amendments, which are detailed in the mockup below. In general, the amendments would:

- Move the requirement that businesses must consider the best interests of children in the design of their online products to findings and declarations.

- Replace "demonstrably harmful" with "more than a de minimis risk of harm" which is a standard frequently applied by the courts.
- Incorporate definitions from the CCPA and the CPRA to align the application of all three laws.
- Clarify the timing by which a Data Protection Impact Assessment needs to be completed and provided to the CPPA.
- Clarify in a number of places that a business cannot collect or disclose certain PI of a child, unless it is necessary to provide the service or product requested by the child.
- Strike legislative intent language about enacting future legislation related to enforcement.
- Make other clarifying and technical changes to align terms and phrases within the bill to conform, where possible, with well-established statutory language and case law.

**THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:**

**SECTION 1.** (a) The Legislature hereby finds and declares all of the following:

(1) The United Nations Convention on the Rights of the Child recognizes that children need special safeguards and care in all aspects of their lives.

(2) As children spend more of their time interacting with the ~~digital~~ **online** world, the impact of the design of ~~digital~~ **online** products and services on children's well-being has become a focus of significant concern.

(3) There is bipartisan agreement at the international level, in both the United States and in the State of California, that more needs to be done to create a safer online space for children to learn, explore, and play.

(4) Lawmakers around the globe have taken steps to enhance privacy protections for children on the understanding that, in relation to data protection, greater privacy necessarily means greater security and well-being.

(5) Children should be afforded protections not only by ~~digital~~ **online** products and services specifically directed at them, but by all ~~digital~~ **online** products and services they are likely to access.

(6) In 2019, 81 percent of voters said they wanted to prohibit companies from collecting personal information about children without parental consent, and a 2018 poll of Californian parents and teens found that only 36 percent of teenagers and 32 percent of parents say that social networking internet websites do a good job explaining what they do with users' data.

(7) While it is clear that the same data protection regime may not be appropriate for children of all ages, children of all ages should nonetheless be afforded privacy and protection, and ~~digital~~ **online** products and services should adopt data protection regimes appropriate for children of the ages likely to access those products and services.
(8) Products and services that are likely to be accessed by children should offer ~~high~~ **strong** privacy protections by design and by default**, including by disabling features that profile**

**children using their previous behavior, browsing history, or assumptions of their similarity to other children, to offer detrimental material.**
(9) Ensuring robust privacy protections for children by design is consistent with the intent of the Legislature in passing the California Consumer Privacy Act of 2018, and with the intent of the people of the State of California in passing the California Privacy Rights Act of 2020, which finds and declares that children are particularly vulnerable from a negotiating perspective with respect to their privacy rights.

(b) Therefore, it is the intent of the Legislature to promote privacy protections for children pursuant to the California Age-Appropriate Design Code Act.

**SEC. 2.** Title 1.81.46 (commencing with Section 1798.99.**28**~~30~~) is added to Part 4 of Division 3 of the Civil Code, immediately following Title 1.81.45, to read:

**TITLE 1.81.46.** The California Age-Appropriate Design Code Act

**1798.99.28. This chapter shall be known and may be cited as the California Age Appropriate Design Act.**

**1798.99.29. The Legislature declares that children should be afforded protections not only by online products and services specifically directed at them, but by all online products and services they are likely to access and makes the following findings:**

**(a) Companies that develop and provide online services, products, or features that children are likely to access should consider the best interests of children when designing, developing, and providing that service, product, or feature.**

**(b) If a conflict arises between commercial interests and the best interests of children, companies should prioritizes the privacy, safety, and well-being of children over commercial interests.**

**1798.99.30.** For the purposes of this title, the following terms apply:

**(a) For purposes of this title, the definitions in Section 1798.140 shall apply unless otherwise specified in this title.**

(a) “Agency” means the California Privacy Protection Agency, as established by the California Privacy Rights Act of 2020, approved by the voters as Proposition 24 at the November 3, 2020, statewide general election.

(b) “Board” means the agency’s board, as established in Section 1798.199.10.

(c) “Child” or “children,” unless otherwise specified, mean a consumer or consumers who is under 18 years of age.

~~(d) “Dark pattern” has the same meaning as defined in subdivision (l) of Section 1798.140.~~

(e) "Data Protection Impact Assessment" means a systematic survey to assess and mitigate risks to children who are **reasonably** likely to access the ~~good~~, service, ~~or~~ product**, or** feature at issue that arises from the provision of that ~~good,~~ service, ~~or~~ product**, or** feature in accordance with specifications promulgated by the California Children's Data Protection Taskforce established pursuant to Section 1798.99.32.

**(6) "Default" means a preselected option adopted by the business for the online service, product, or feature.**

(f) "Likely to be accessed by a child" means it is reasonable to expect, based on ~~the known audience,~~ the nature of the content, the associated marketing, ~~or~~ the online context, **or academic or internal research,** that the ~~good,~~ service, ~~or~~ product**, or feature** ~~feature is more likely than not to~~ **would** be accessed by children.

~~(g) "Personal information" has the same meaning as defined in subdivision (v) of Section 1798.140.~~

~~(h) "Sensitive personal information" has the same meaning as defined in subdivision (ae) of Section 1798.140.~~

(i) "Taskforce" means the California Children's Data Protection Taskforce as established by Section 1798.99.32.

**1798.99.31.** (a) A business that provides a**n online** ~~good,~~ service, ~~or~~ product**, or** feature likely to be accessed by a child shall comply with all of the following:

~~(1) Consider the best interests of children likely to access that good, service, or product feature when designing, developing, and providing that good, service, or product feature, and, when in conflict with commercial interests, design, develop, and provide that good, service, or product feature in the manner that prioritizes the privacy, safety, and well-being of children.~~

(2) Undertake a Data Protection Impact Assessment for any ~~good,~~**online** service, ~~or~~ product**, or feature** likely to be accessed by a child and maintain documentation of this assessment as long as the ~~good,~~ **online** service, ~~or~~ product**, or** feature is likely to be accessed by a child. **A report of the assessment must be provided to the Agency within 12 months of the implementation of this Act and reviewed every 24 months or before any new features are offered to the public.**

(3) Establish the age of consumers with a **reasonable** level of certainty appropriate to the risks that arise from the data management practices of the business, or apply the privacy and data protections afforded to children to all consumers

~~(4) Maintain the highest level of privacy possible for children by default, including, but not limited to, disabling profiling, unless the business can demonstrate a compelling reason that a different default setting is in the best interests of children likely to access that good, service, or product feature.~~

**(5) Configure all default privacy settings offered by the online service, product, or feature to the settings that offer a high level of privacy protection offered by the business.**

(5) Provide any privacy information, terms of service, ~~policies~~, and community standards concisely, prominently, and using clear language suited to the age of children likely to access that ~~good,~~**online** service, ~~or~~ product**, or** feature.

(6) If the ~~good,~~**online** service, ~~or~~ product**, or** feature allows the child's parent, guardian, or any other consumer to monitor the child's online activity or track their location, provide an obvious signal to the child when they are being monitored or tracked.

(7) ~~Universally uphold~~**Enforce** published terms, policies, and community standards established by the business, including, but not limited to, privacy policies and those concerning children.

(8) Provide prominent, accessible, and responsive tools to help children**, or where applicable their parent or guardian,** exercise their privacy rights and report concerns.

(b) A business that provides a**n online** ~~good,~~ service, ~~or~~ product**, or** feature likely to be accessed by a child shall not take any of the following actions:

~~(1)~~ Use the personal information of any child in a way that ~~is demonstrably harmful~~**the business knows or has reason to know the online service, product, or feature more likely than not causes or contributes to a more than de minimis risk of harm** to the physical health, mental health, or well-being of a child.

**(1) Profile a child by default.**

(2) Collect, sell, share, or retain any personal information that is not necessary to provide a ~~good~~, service, ~~or~~ product**, or** feature with which a child is actively and knowingly engaged.

(3) If a business does not have actual knowledge of the age of a consumer, it shall ~~neither~~ **not** collect**, share, sell, or**~~nor~~ retain any personal information that is not necessary to provide a ~~good~~, service, ~~or~~ product**, or** feature with which a consumer is actively and knowingly engaged.

(4) Use the personal information of a child for any reason other than the reason or reasons for which that personal information was collected. If the business does not have actual knowledge of the age of the consumer, the business shall not use any personal information for any reason other than the reason or reasons for which that personal information was collected.

(5) Notwithstanding Section 1798.120, ~~disclose~~ **share or sell** the personal information of any child unless ~~the business can demonstrate a compelling reason that disclosure of that personal information is in the best interests of the child.~~**the sharing or selling of that personal information is necessary to provide the online service, product, or feature as permitted by subdivision (a)(1)-(4) of Section 1798.145.**

(6) Collect**, sell, or share** any precise geolocation information **of children** by default, **unless the collection of that precise geolocation information is necessary to provide the service, product, or feature requested, and then only for the limited time that the collection of precise geolocation information is necessary to provide the service, product, or feature.** ~~unless the business can demonstrate a compelling reason that doing so would be in the best interests of the child.~~

(7) Collect**, sell, or share** any precise geolocation information without providing an obvious sign to the ~~consumer~~ **child** for the duration of that collection that precise geolocation information is being collected.

~~(8) Collect any sensitive personal information by default, unless the business can demonstrate a compelling reason that the collection of sensitive personal information by default is in the best interests of a child.~~

(9) Use dark patterns or other techniques to lead or encourage consumers to provide personal information beyond what is **reasonably expected for the service the child is accessing and** necessary to provide that ~~good~~, service, or product ~~feature~~, to forego privacy protections, or to otherwise take any action that ~~is demonstrably harmful~~**the business knows or has reason to know the online service or product more likely than not causes or contributes to a more than deminimus risk of harm to the child's** ~~to the consumer's~~ physical health, mental health, or well-being.

**(10) Use any personal information collected or processed to establish age or age range for any other purpose, or retain that personal information longer than necessary to establish age. Age assurance shall be proportionate to the risks and data practice of a service, product, or feature.**

(c) This section shall become operative on July 1, 2024.

**1798.99.32.** (a) The agency shall establish and convene a taskforce, the California Children's Data Protection Taskforce, to evaluate best practices for the implementation of this title, and to provide support to businesses, with an emphasis on small and medium businesses, to comply with this title.

(b) By April 1, 2023, the board shall appoint members of the taskforce. Taskforce members shall consist of Californians with expertise in the areas of privacy, physical health, mental health, and well-being, technology, and children's rights.

(c) The taskforce shall make recommendations on best practices regarding, but not limited to, all of the following:

(1) Identifying ~~goods,~~ **online** services, ~~and~~ product**s, or** features likely to be accessed by children.

(2) Evaluating and prioritizing the best interests of children with respect to their privacy, health, and well-being, and issuing guidance to businesses on how ~~to incorporate~~ those

interests ~~into~~ **may be furthered by** the design, development, and implementation of a**n online** ~~good~~, service, ~~or~~ product feature.

(3) ~~Determining the level of certainty with which it is necessary to establish the age of a consumer appropriate to the risks that arise from the data management practices of a business.~~**Ensuring that age verification methods used by businesses that provide online services, products, or features likely to be accessed by children are proportionate to the risks that arise from the data management practices of the business, privacy protective, and minimally invasive.**

~~(4) Determining whether a reason is sufficiently compelling to warrant practices that are not consistent with the default setting, data collection, and data disclosure practices prescribed by this title.~~

(5) Assessing and mitigating risks to children that arise from the use of a**n online** ~~good~~, service,~~or~~ product**, or** feature, including specific ~~items for the systematic survey necessary~~**issues businesses must address** to perform a Data Protection Impact Assessment.

(6) Publishing privacy information, policies, and standards in concise, clear language suited for the age of children likely to access that ~~good~~, service, or product ~~feature~~.

(d) By April 1, 2024, the agency, in consultation with the taskforce, shall adopt ~~regulations and publish guidelines~~, as necessary, to effectuate the purposes of this title~~ in a manner consistent, and to the extent possible, with international frameworks for the protection of the privacy and well-being of children~~.

~~1798.99.33. It is the intent of the Legislature to create subsequent legislation to enforce this title.~~

**SEC. 3.** The Legislature finds and declares that this act furthers the purposes and intent of the California Privacy Rights Act of 2020.

10) **Related legislation**: AB 2486 (Gabriel) would establish the Office for the Protection of Children Online within the CPPA. This bill is set to be heard in this Committee on April, 19, 2022.

AB 2408 (Cunningham) would impose on an operator of a social media platform a duty not to addict child users and would prohibit a social media platform from addicting a child user, as specified, to that platform.

11) **Prior legislation**: AB 1545 (Wicks) would have enacted the Kids Internet Design and Safety Act for the purposes of keeping children safe online and would have prohibited a platform from incorporating specified features with respect to content viewable by a child without first obtaining consent from the parent or guardian. This bill was held in the Assembly appropriations Committee.

AB 1138 (Gallagher, 2019) sought to prohibit a person or business that conducts business in California, and that operates a social media website or application, from allowing a person under 16 years of age to create an account with the website or application unless the website or application obtains the consent of the person's parent or guardian before creating the account.

AB 1665 (Chau, 2019) as introduced, would have prohibited a person or business that conducts business in California, that operates an internet website or application that seeks to use a minor's name, picture, or any information about the minor in connection with third party advertising, as specified, from doing so without obtaining prior parental consent.

AB 375 (Chau, Ch. 55, Stats. 2018) enacted the California Consumer Privacy Protection Act (CCPA), which gives consumers certain rights regarding their PI, including: (1) the right to know what PI that is collected and sold about them; (2) the right to request the categories and specific pieces of PI the business collects about them; and (3) the right to opt-out of the sale of their PI, or opt-in in the case of minors under16 years of age.

SB 568 (Steinberg, Ch. 336, Stats. 2013) *See* Comment 3.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

5rights Foundation
Accountable Tech
Alcohol Justice
Avaaz
Bekind. Tech Fund by Globant Ventures
Center for Countering Digital Hate
Center for Digital Democracy
Center for Humane Technology
Children and Screens
Common Sense
Consumer Federation of America
Consumer Federation of California
Do Curious INC.
Eating Disorders Coalition
Epic
Fair Vote
Fairplay
Je Suis Lá
Joan Ganz Cooney Center - Sesame Workshop
Livemore Screensless
Log Off
Lookup
Me2b Alliance
National Hispanic Media Coalition
Neda
Oakland Privacy
Parents Together Action

Protect Young Eyes
Public Health Advocates
Real Facebook Oversight Board
Remind
Reset Tech
Roblox Corporation
Smart Digital Kids
Sum of Us
Tech Oversight Project
The Children's Partnership
The Signals Network
The Social Dilemma
Tiramisu

**Opposition**

California Chamber of Commerce
Electronic Frontier Foundation (unless amended)
Technet-technology Network

**Analysis Prepared by**: Nichole Rocha / P. & C.P. / (916) 319-2200

# EXHIBIT 2

ASSEMBLY THIRD READING
AB 2273 (Wicks, et al.)
As Amended April 26, 2022
Majority vote

## SUMMARY

Establishes the California Age-Appropriate Design Code Act which generally requires businesses that online services, products, or features likely to be accessed by children to comply with specified standards.

**Major Provisions**

1) Provides, beginning January 1, 2024, that a business that provides a service likely to be accessed by a child shall comply with all of the following, among other things:

   a) Undertake a Data Protection Impact Assessment for any service likely to be accessed by a child and maintain documentation of this assessment as long as the service is likely to be accessed by a child.

   b) Establish the age of consumers with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business, or apply the privacy and data protections afforded to children to all consumers.

   c) Configure all default privacy settings offered by the online service, product, or feature to the settings that offer a high level of privacy protection offered by the business.

   d) Provide any privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children likely to access that service.

2) Prohibits, beginning January 1, 2024, a business that provides a service likely to be accessed by a child from taking any of the following actions:

   a) Using the personal information (PI) of any child in a way that the business knows or has reason to know is more likely than not to cause or contribute to a more than de minimis risk of harm to the physical health, mental health, or well-being of a child.

   b) Collecting, selling, or retaining any PI that is not necessary to provide a service with which a child is actively and knowingly engaged.

   c) If a business does not have actual knowledge of the age of a consumer, it shall not collect, sell, share or retain any PI that is not necessary to provide a service with which a consumer is actively and knowingly engaged.

   d) Using the PI of a child for any reason other than the reason or reasons for which that PI was collected. If the business does not have actual knowledge of the age of the consumer, the business shall not use any PI for any reason other than the reason or reasons for which that PI was collected.

e) Collect any precise geolocation information by default, unless the business can demonstrate a compelling reason that doing so would be in the best interests of the child.

f) Use dark patterns or other techniques to lead or encourage consumers to provide personal information beyond what is reasonably expected for the service the child is accessing and necessary to provide that service or product to forego privacy protections, or to otherwise take any action that the business knows or has reason to know the online service or product more likely than not causes or contributes to a more than de minimis risk of harm to the child's physical health, mental health, or well-being.

3) Requires the California Privacy Protection Agency (CPPA) to establish and convene the California Children's Data Protection Taskforce to evaluate best practices for the implementation the AADC, and to provide support to businesses, as specified.

4) Requires the taskforce to make recommendations on best practices regarding, but not limited to, all of the following:

a) Identifying services likely to be accessed by children.

b) Evaluating and prioritizing the best interests of children with respect to their privacy, health, and well-being, and issuing guidance to businesses on how those interests may be furthered by into the design, development, and implementation of a service.

c) Ensuring that age verification methods used by businesses that provide online services, products, or features likely to be accessed by children are proportionate to the risks that arise from the data management practices of the business, privacy protective, and minimally invasive.

d) Assessing and mitigating risks to children that arise from the use of a service, including specific items for the systematic survey necessary to perform a Data Protection Impact Assessment.

e) Publishing privacy information, policies, and standards in concise, clear language suited for the age of children likely to access that service.

5) Requires, by April 1, 2024, the CPPA, in consultation with the taskforce, to adopt regulations.

## COMMENTS

*Recent informational hearing highlighted challenges children and families face online*: On March 29, 2022, the Privacy and Consumer Protection Committee and the Arts, Entertainment, Sports, Tourism, and Internet Media Committee held an informational hearing entitled, *Protecting Kids Online: Challenges & Opportunities in a Digital World.* Testimony from the hearing indicated that adults, children, and teens alike are frustrated with the effort and expertise it takes to make online experiences safe for children.

This bill, modeled after the Age Appropriate Design Code recently enacted in the United Kingdom, seeks to elevate child-centered design in online products and services that are likely to be accessed by children. The bill would additionally require the CPPA to establish a taskforce to

evaluate best practices for the implementation of the bill's provisions, and to provide support to businesses.

**According to the Author**

While existing federal and state privacy laws offer important protections that guard children's privacy, there is no coherent, comprehensive law that protects children under 18 from goods, services, and products that endanger their welfare. As a result, online goods, services, and products that are likely to be accessed by kids have been loaded with adult design principals that do not factor in the unique needs of young minds, abilities, and sensibilities, nor offer the highest privacy protections by design and by default. As a result, children under 18 face a number of adverse impacts due to their interactions with online world, including bullying, mental health challenges, and addictive behaviors.

**Arguments in Support**

In support, a large coalition of organizations representing public health, parent, school and youth groups, researchers, and advocacy organizations write:

> Children across the globe are facing an unprecedented mental health crisis. Even before the onset of COVID-19 and subsequent social distancing and isolation, teen suicide was on the rise; in the US the CDC found that between 2007 to 2017 the suicide rate among people aged 10 to 24 increased by 56%. And in the year between spring of 2020 and 2021 emergency room visits for girls ages 12 to 17 increased by 50%.
>
> In 2020, 81% of 14 to 22-year-olds said they used social media either "daily" or "almost constantly." This is by design. As private companies beholden to shareholders, performance incentives for product developers and executives are tied to profit and therefore time spent on their platform. Social media platforms and tech companies do not design these services with their youngest and most vulnerable users in mind.
>
> Ensuring the safety of tech products is long overdue. We have nutrition labels on food packaging, rigorous testing for cribs and car seats, and yet the technology children use daily from the youngest of ages have little to no safeguards.

**Arguments in Opposition**

The Electronic Frontier Foundation (EFF) expresses concern that this provision will drive businesses to employ invasive age assurance practices. In their "oppose unless amended" letter, EFF writes:

> Because AB 2273 applies directions to businesses to apply stronger protections for children, it is likely that this will incentivize them to affirmatively confirm the ages of their customers. Age verification systems are troubling—requiring such systems could hand over significant power, and private data, to third-party identity verification companies like Clear or ID.me. Additionally, such a system would likely lead platforms to set up elaborate age-verification systems for everyone, meaning that all users would have to submit personal data and submit to more corporate surveillance.

The California Chamber of Commerce and TechNet additionally argue in in their letter of opposition:

[O]ur companies have a very different relationship with the Information Commissioner's Office (ICO), the regulator that enforces the AADC. The ICO provides extensive guidance on the AADC, explaining the many subjective requirements and providing detailed examples of how it interprets those standards. Companies have the ability to request additional guidance from the ICO, which also gives companies the ability to fix mistakes before fines or penalties are levied.

AB 2273 would import these standards, which read more like industry best practices, directly into California statute. How these standards are enforced is deeply concerning, as California regulators provide less guidance, fewer opportunities to fix mistakes, and take a much more aggressive approach to fines and penalties.

## FISCAL COMMENTS

According to the Assembly Appropriations Committee:

1) Costs (General Fund (GF)) of $1 million in fiscal year (FY) 2023-24 and $752,000 annually thereafter in four additional staff positions, third party vendor contract costs and related infrastructure to the CPPA to establish the taskforce for evaluating the implementation of the CAACDA and draft regulations and guidelines in support of the CAADCA. These estimates do not include costs associated with enforcement, which are unknown and dependent on the number of entities ultimately covered by this bill. Costs may also include a full complement of legal staff to ensure compliance with the CAADCA if the CPPA is ultimately responsible for enforcement. The CPPA has only a handful of staff at this time and has still has not completed its initial round of start-up regulations. The CPPA was created by Proposition 24 (2020). Propositions 24 allocated $5 million for fiscal year (FY) 2020-21 and $10 million annually thereafter to the CPPA to enforce, among other things, the California Consumer Protection Act (CCPA). The most recent budget change proposal for the CPPA requests an additional $10 million in GF money to fulfill its initial statutory responsibilities.

2) Costs (GF) of $2.3 million in fiscal year (FY) 2024-25, and $2.2 million annually thereafter to the Consumer Protection Division at the Department of Justice to the extent DOJ, rather than CPPA, is required to enforce the protections in this bill. Costs will be offset by possible attorneys' fees.

## VOTES

**ASM PRIVACY AND CONSUMER PROTECTION: 10-0-1**
**YES:** Gabriel, Bauer-Kahan, Bennett, Berman, Cunningham, Mike Fong, Irwin, Valladares, Wicks, Wilson
**ABS, ABST OR NV:** Kiley

**ASM APPROPRIATIONS: 16-0-0**
**YES:** Holden, Bigelow, Bryan, Calderon, Carrillo, Megan Dahle, Davies, Mike Fong, Fong, Gabriel, Eduardo Garcia, Levine, Quirk, Robert Rivas, Akilah Weber, Wilson

## UPDATED

VERSION: April 26, 2022

CONSULTANT: Nichole Rocha / P. & C.P. / (916) 319-2200 FN: 0002580

# EXHIBIT 3

**SENATE JUDICIARY COMMITTEE**
**Senator Thomas Umberg, Chair**
**2021-2022 Regular Session**

AB 2273 (Wicks)
Version: April 26, 2022
Hearing Date: June 28, 2022
Fiscal: Yes
Urgency: No
CK

## SUBJECT

The California Age-Appropriate Design Code Act

## DIGEST

This bill establishes the California Age-Appropriate Design Code Act, placing a series of obligations and restrictions on businesses that provide online services, products, or features likely to be accessed by a child. The bill tasks the California Privacy Protection Agency with establishing a taskforce to evaluate best practice and to adopt regulations.

## EXECUTIVE SUMMARY

The General Data Protection Regulation (GDPR) is a regulation in European Union law on data protection and privacy. The law that implemented the GDPR in the United Kingdom included an amendment that effectuated the requirement to offer children-specific protections and required the Information Commissioner to introduce an Age Appropriate Design Code to set standards that make online services' use of children's data "age appropriate."

This bill, modeled after the Age Appropriate Design Code recently enacted in the United Kingdom, institutes a series of obligations and restrictions on businesses that provide an online service, product, or feature likely to be accessed by a child. The bill additionally requires the California Privacy Protection Agency (PPA) to establish a taskforce to evaluate best practices for the implementation of the bill's provisions, to provide support to businesses, and to adopt regulations, as necessary, by a certain date.

The bill is co-sponsored by the 5Rights Foundation and Common Sense. It is supported by a variety of groups, including Oakland Privacy. It is opposed by a variety of groups, including TechNet and the California Chamber of Commerce.

**PROPOSED CHANGES TO THE LAW**

Existing law:

1) Establishes the federal Children's Online Privacy Protection Act (COPPA) to provide protections and regulations regarding the collection of personal information from children under the age of 13. (15 U.S.C. § 6501 et seq.)

2) Provides, in federal law, that a provider or user of an interactive computer service shall not be treated as the publisher or speaker of any information provided by another information content provider. (47 U.S.C. § 230(c)(2).)

3) Provides that a provider or user of an interactive computer service shall not be held liable on account of:
   a) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
   b) any action taken to enable or make available to information content providers or others the technical means to restrict access to such material. (47 U.S.C. § 230(c)(2).)

Existing state law:

1) Requires, pursuant to the Parent's Accountability and Child Protection Act, a person or business that conducts business in California, and that seeks to sell any product or service in or into California that is illegal under state law to sell to a minor to, notwithstanding any general term or condition, take reasonable steps, as specified, to ensure that the purchaser is of legal age at the time of purchase or delivery, including, but not limited to, verifying the age of the purchaser. (Civ. Code § 1798.99.1(a)(1).)

2) Establishes the Privacy Rights for California Minors in the Digital World (PRCMDW), which prohibits an operator of an internet website, online service, online application, or mobile application ("operator") from the following:
   a) marketing or advertising specified products or services, such as firearms, cigarettes, and alcoholic beverages, on its internet website, online service, online application, or mobile application that is directed to minors;
   b) marketing or advertising such products or services to minors who the operator has actual knowledge are using its site, service, or application online and is a minor, if the marketing or advertising is specifically directed to that minor based upon the personal information of the minor; and

c) knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile, the personal information of a minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising such products or services to that minor, where the website, service, or application is directed to minors or there is actual knowledge that a minor is using the website, service, or application. (Bus. & Prof. Code § 22580.)

3) Requires, pursuant to the PRCMDW, certain operators to permit a minor user to remove the minor's content or information and to further inform the minor of this right and the process for exercising it. (Bus. & Prof. Code § 22581.)

4) Establishes the California Consumer Privacy Act (CCPA), which grants consumers certain rights with regard to their personal information, including enhanced notice, access, and disclosure; the right to deletion; the right to restrict the sale of information; and protection from discrimination for exercising these rights. It places attendant obligations on businesses to respect those rights. (Civ. Code § 1798.100 et seq.)

5) Establishes the California Privacy Rights Act of 2020 (CPRA), which amends the CCPA and creates the California Privacy Protection Agency (PPA), which is charged with implementing these privacy laws, promulgating regulations, and carrying out enforcement actions. (Civ. Code § 798.100 et seq.; Proposition 24 (2020).)

6) Prohibits a business from selling or sharing the personal information of consumers if the business has actual knowledge that the consumer is less than 16 years of age, unless the consumer, in the case of consumers at least 13 years of age and less than 16 years of age, or the consumer's parent or guardian, in the case of consumers who are less than 13 years of age, has affirmatively authorized the sale or sharing of the consumer's personal information. A business that willfully disregards the consumer's age shall be deemed to have had actual knowledge of the consumer's age. (Civ. Code § 1798.120.)

This bill:

1) Requires a business that provides an online service, product, or feature likely to be accessed by a child ("covered business") to comply with all of the following:
   a) undertake a Data Protection Impact Assessment for any online service, product, or feature likely to be accessed by a child and maintain documentation of this assessment as long as the online service, product, or feature is likely to be accessed by a child;

- b) provide a report of the assessment to the California Privacy Protection Agency ("agency") within the first year, with reviews every 24 months or before new features are offered to the public;
- c) establish the age of consumers with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business, or apply the privacy and data protections afforded to children to all consumers;
- d) configure all default privacy settings offered by the online service, product, or feature to the settings that offer a high level of privacy protection offered by the business;
- e) provide any privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children likely to access that online service, product, or feature;
- f) if the online service, product, or feature allows the child's parent, guardian, or any other consumer to monitor the child's online activity or track their location, provide an obvious signal to the child when they are being monitored or tracked;
- g) enforce published terms, policies, and community standards established by the business, including, but not limited to, privacy policies and those concerning children; and
- h) provide prominent, accessible, and responsive tools to help children, or where applicable their parent or guardian, exercise their privacy rights and report concerns.

2) Provides that a covered business shall not:
    - a) use the personal information of any child in a way that the business knows or has reason to know the online service, product, or feature more likely than not causes or contributes to a more than de minimis risk of harm to the physical health, mental health, or well-being of a child;
    - b) profile a child by default;
    - c) collect, sell, share, or retain any personal information that is not necessary to provide a service, product, or feature with which a child is actively and knowingly engaged;
    - d) if a business does not have actual knowledge of the age of a consumer, it shall not collect, share, sell, or retain any personal information that is not necessary to provide a service, product, or feature with which a consumer is actively and knowingly engaged;
    - e) use the personal information of a child for any reason other than the reason or reasons for which that personal information was collected. If the business does not have actual knowledge of the age of the consumer, the business shall not use any personal information for any reason other than the reason or reasons for which that personal information was collected;

f) notwithstanding Section 1798.120, share or sell the personal information of any child unless the sharing or selling of that personal information is necessary to provide the online service, product, or feature as permitted by paragraphs (1) to (4), inclusive, of subdivision (a) of Section 1798.145;
g) collect, sell, or share any precise geolocation information of children by default unless the collection of that precise geolocation information is necessary to provide the service, product, or feature requested and then only for the limited time that the collection of precise geolocation information is necessary to provide the service, product, or feature;
h) collect, sell, or share any precise geolocation information without providing an obvious sign to the child for the duration of that collection that precise geolocation information is being collected;
i) use dark patterns or other techniques to lead or encourage consumers to provide personal information beyond what is reasonably expected for the service the child is accessing and necessary to provide that service or product to forego privacy protections, or to otherwise take any action that the business knows or has reason to know the online service or product more likely than not causes or contributes to a more than de minimis risk of harm to the child's physical health, mental health, or well-being; or
j) use any personal information collected or processed to establish age or age range for any other purpose, or retain that personal information longer than necessary to establish age. Age assurance shall be proportionate to the risks and data practice of a service, product, or feature.

3) Requires the PPA to establish and convene a taskforce, the California Children's Data Protection Taskforce, to evaluate best practices for the implementation of the bill, and to provide support to businesses, with an emphasis on small and medium businesses, to comply.

4) Requires the PPA's board to appoint, by April 1, 2023, members of the taskforce. Taskforce members shall consist of Californians with expertise in the areas of privacy, physical health, mental health and well-being, technology, and children's rights.

5) Requires the taskforce to make recommendations on best practices regarding, but not limited to, all of the following:
   a) identifying online services, products, or features likely to be accessed by children;
   b) evaluating and prioritizing the best interests of children with respect to their privacy, health, and well-being, and issuing guidance to businesses on how those interests may be furthered by the design, development, and implementation of an online service, product, or feature;
   c) ensuring that age verification methods used by businesses that provide online services, products, or features likely to be accessed by children are

proportionate to the risks that arise from the data management practices of the business, privacy protective, and minimally invasive;

d) assessing and mitigating risks to children that arise from the use of an online service, product, or feature, including specific issues businesses must address to perform a Data Protection Impact Assessment; and
e) publishing privacy information, policies, and standards in concise, clear language suited for the age of children likely to access that service or product.

6) Requires the PPA to adopt regulations, as necessary, in consultation with the taskforce, by April 1, 2024.

7) Codifies that the Legislature declares that children should be afforded protections not only by online products and services specifically directed at them, but by all online products and services they are likely to access and makes the following findings:
   a) companies that develop and provide online services, products, or features that children are likely to access should consider the best interests of children when designing, developing, and providing that service, product, or feature; and
   b) if a conflict arises between commercial interests and the best interests of children, companies should prioritizes the privacy, safety, and well-being of children over commercial interests.

8) Declares that it furthers the purposes and intent of the California Privacy Rights Act of 2020.

## COMMENTS

1. Children online

Survey data found that overall screen use among teens and tweens increased by 17 percent from 2019 to 2021, with the number of hours spent online spiking sharply during the pandemic. A recent survey found almost 40 percent of tweens stated that they used social media and estimates from 2018 put the number of teens on the sites at over 70 percent.

Research has shown that amongst American teenagers, YouTube, Instagram, and Snapchat are the most popular social media sites, and 45 percent of teenagers stated that they are "online almost constantly."[1] A meta-analysis of research on social networking site (SNS) use concluded the studies supported an association between problematic SNS

[1] Zaheer Hussain and Mark D Griffiths, *Problematic Social Networking Site Use and Comorbid Psychiatric Disorders: A Systematic Review of Recent Large-Scale Studies*."

use and psychiatric disorder symptoms, particularly in adolescents.[2] The study found most associations were between such problematic use and depression and anxiety.

As pointed out by recent Wall Street Journal reporting, the companies' employees are aware of the dangers:

> A Facebook Inc. team had a blunt message for senior executives. The company's algorithms weren't bringing people together. They were driving people apart.
>
> "Our algorithms exploit the human brain's attraction to divisiveness," read a slide from a 2018 presentation. "If left unchecked," it warned, Facebook would feed users "more and more divisive content in an effort to gain user attention & increase time on the platform."
>
> That presentation went to the heart of a question dogging Facebook almost since its founding: Does its platform aggravate polarization and tribal behavior?
>
> The answer it found, in some cases, was yes.[3]

A recent New York Times article on leadership at Facebook elaborates:

> To achieve its record-setting growth, the [Facebook] had continued building on its core technology, making business decisions based on how many hours of the day people spent on Facebook and how many times a day they returned. Facebook's algorithms didn't measure if the magnetic force pulling them back to Facebook was the habit of wishing a friend happy birthday, or a rabbit hole of conspiracies and misinformation.
>
> Facebook's problems were features, not bugs.[4]

Another paper recently released provides "Recommendations to the Biden Administration," and is relevant to the considerations here:

---

(December 14, 2018) Frontiers in psychiatry vol. 9 686, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6302102/pdf/fpsyt-09-00686.pdf. All internet citations are current as of June 23, 2022.

[2] *Ibid.*

[3] Jeff Horowitz & Deepa Seetharaman, *Facebook Executives Shut Down Efforts to Make the Site Less Divisive* (May 26, 2020) Wall Street Journal, https://www.wsj.com/articles/facebook-knows-it-encourages-division-top-executives-nixed-solutions-11590507499.

[4] Sheera Frenkel & Cecilia Kang, *Mark Zuckerberg and Sheryl Sandberg's Partnership Did Not Survive Trump* (July 8, 2021) The New York Times, https://www.nytimes.com/2021/07/08/business/mark-zuckerberg-sheryl-sandberg-facebook.html.

> The Administration should work with Congress to develop a system of financial incentives to encourage greater industry attention to the social costs, or "externalities," imposed by social media platforms. A system of meaningful fines for violating industry standards of conduct regarding harmful content on the internet is one example. In addition, the Administration should promote greater transparency of the placement of digital advertising, the dominant source of social media revenue. This would create an incentive for social media companies to modify their algorithms and practices related to harmful content, which their advertisers generally seek to avoid.[5]

A series of startling revelations unfolded after a Facebook whistle-blower, Frances Haugen began sharing internal documents. The Wall Street Journal published many of the findings:

> "Thirty-two percent of teen girls said that when they felt bad about their bodies, Instagram made them feel worse," the researchers said in a March 2020 slide presentation posted to Facebook's internal message board, reviewed by The Wall Street Journal. "Comparisons on Instagram can change how young women view and describe themselves."
>
> For the past three years, Facebook has been conducting studies into how its photo-sharing app affects its millions of young users. Repeatedly, the company's researchers found that Instagram is harmful for a sizable percentage of them, most notably teenage girls.
>
> "We make body image issues worse for one in three teen girls," said one slide from 2019, summarizing research about teen girls who experience the issues.
>
> "Teens blame Instagram for increases in the rate of anxiety and depression," said another slide. "This reaction was unprompted and consistent across all groups."
>
> Among teens who reported suicidal thoughts, 13% of British users and 6% of American users traced the desire to kill themselves to Instagram, one presentation showed.

---

[5] Caroline Atkinson, et al., *Recommendations to the Biden Administration On Regulating Disinformation and Other Harmful Content on Social Media* (March 2021) Harvard Kennedy School & New York University Stern School of Business, https://static1.squarespace.com/static/5b6df958f8370af3217d4178/t/6058a456ca24454a73370dc8/1616421974691/TechnologyRecommendations_2021final.pdf.

> Expanding its base of young users is vital to the company's more than $100 billion in annual revenue, and it doesn't want to jeopardize their engagement with the platform.
>
> More than 40% of Instagram's users are 22 years old and younger, and about 22 million teens log onto Instagram in the U.S. each day . . . .[6]

The released documents from Instagram make clear that "Facebook is acutely aware that the products and systems central to its business success routinely fail":

> The features that Instagram identifies as most harmful to teens appear to be at the platform's core.
>
> The tendency to share only the best moments, a pressure to look perfect and an addictive product can send teens spiraling toward eating disorders, an unhealthy sense of their own bodies and depression, March 2020 internal research states. It warns that the Explore page, which serves users photos and videos curated by an algorithm, can send users deep into content that can be harmful.
>
> "Aspects of Instagram exacerbate each other to create a perfect storm," the research states.[7]

There are also growing concerns about the systematic collection of information from children and its utilization to target children with advertising or to ensure prolonged engagement with various media. While advertising to children and teenagers via various forms of media is not new, it has reached new heights. In 2018 in the United States, over $3 billion was spent on nondigital and $900 million for digital advertising on children.[8] Children and teenagers encounter advertising through an assortment of media and forms, including mobile apps and games that advertise specific brands. A 2020 policy statement published by the American Academy of Pediatrics explains the dangers of sophisticated utilization of children's personal information for targeted advertising or engagement:

> [M]ost research on children's understanding of advertising involves television and print ads only, but newer forms of advertising found in

---

[6] Georgia Wells et al., *Facebook Knows Instagram Is Toxic for Teen Girls, Company Documents Show* (September 14, 2021) The Wall Street Journal, https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739?mod=article_inline.
[7] *Ibid.*
[8] Jenny Redesky et al., *Digital Advertising to Children* (July 2020) AAP Council on Communication and Media, Pediatrics, Vol. 146, No. 1, https://publications.aap.org/pediatrics/article/146/1/e20201681/37013/Digital-Advertising-to-Children?autologincheck=redirected.

> mobile and interactive media and smart technologies, often powered by personal data, are more difficult to identify. They do not necessarily occur in a predictable manner and are often integrated into the content. Advertising may also be linked to rewards or be embedded in trusted social networks or personalized digital platforms, which may undermine children's abilities to identify or critically think about advertising messages. Regulations on television advertising have not yet been updated for the modern digital environment. . . .
>
> The nature of media used by children and teenagers has changed dramatically in the past decade, and children now spend more time on the Internet, social media, user-created content, video games, mobile applications (apps), virtual or augmented reality, virtual assistants, and Internet-connected toys. The Internet allows advertisers to contact, track, and influence users, as guided by behavioral data collection; a user's digital trail of location, activities, in-app behavior, likes, and dislikes contributes to a digital profile shared among many companies that can be used to make advertising messages more effective.[9]

The AAP statement elaborates on the depth and ubiquity of data collection and the vulnerability of children to its reach and consequences:

> Data collection for commercial purposes includes use of cookies in a user's browser, which record and follow Web page history; the collection of posts, likes, purchases, and viewing history by apps such as Facebook and Instagram or search engines such as Google; and collection of data via apps granted permission to track device data, such as location or contacts. Software mines such data from user accounts, devices, and virtual assistants and often shares data with third-party companies to develop a profile of the user, which informs the delivery of targeted ads. . . . User data can be aggregated and stored, sold to third parties, and used to infer personal characteristics, such as sexual orientation or health problems. . . .
>
> [S]tudies suggest that teenagers have a more interpersonal, and less technical, conceptualization of privacy, so they may not be as aware of the ramifications of sharing data with governments or corporations compared with sharing private information with friends or parents. Young children are more trusting of privacy-invasive technologies, such as location trackers, likely because of their convenience.

---

[9] *Ibid.*

2. Responding to these concerns abroad

As stated, the UK has recently implemented the Age Appropriate Design Code to set standards that make online services' use of children's data "age appropriate": "The Children's code (or the Age appropriate design code) contains 15 standards that online services need to follow. This ensures they are complying with [their] obligations under data protection law to protect children's data online."

The UK Information Commissioner provides detail on implementation and vision:

> Data sits at the heart of the digital services children use every day. From the moment a young person opens an app, plays a game or loads a website, data begins to be gathered. Who's using the service? How are they using it? How frequently? Where from? On what device?
>
> That information may then inform techniques used to persuade young people to spend more time using services, to shape the content they are encouraged to engage with, and to tailor the advertisements they see.
>
> For all the benefits the digital economy can offer children, we are not currently creating a safe space for them to learn, explore and play.
>
> This statutory code of practice looks to change that, not by seeking to protect children from the digital world, but by protecting them within it.
>
> **This code is necessary.**
>
> This code will lead to changes that will help empower both adults and children.
>
> One in five UK internet users are children, but they are using an internet that was not designed for them.

3. Existing laws protecting children's privacy

The Children's Online Privacy Protection Act of 1998 (COPPA) imposes requirements on operators of websites or online services directed to children under 13 years of age, and on operators of other websites or online services that have actual knowledge that they are collecting personal information online from a child under 13 years of age. (15 U.S.C.S. § 6501; 16 C.F.R. Part 312.) COPPA makes it unlawful for any operator of a Web site or online service directed to children, or any operator that has actual knowledge that it is collecting or maintaining personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed under this part. Broadly, COPPA requires these operators to do the following:

- provide notice on the Web site or online service of what information it collects from children, how it uses such information, and its disclosure practices for such information;
- obtain verifiable parental consent prior to any collection, use, and/or disclosure of personal information from children;
- provide a reasonable means for a parent to review the personal information collected from a child and to refuse to permit its further use or maintenance;
- not condition a child's participation in a game, the offering of a prize, or another activity on the child disclosing more personal information than is reasonably necessary to participate in such activity; and
- establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of personal information collected from children.

The Student Online Personal Information Protection Act (SOPIPA) restricts the use and disclosure of the personally identifiable information or materials of K-12 students. (Bus. & Prof. Code § 22584.) It regulates operators of Internet Web sites, online services, online applications, or mobile applications with actual knowledge that the sites, services, or applications are used primarily for K–12 school purposes and were designed and marketed for K–12 school purposes. It prohibits operators from knowingly engaging in specified activities with respect to their site, service, or application. This includes:

- engaging in targeted advertising when the targeting of the advertising is based upon any information that the operator has acquired because of the use of that operator's site, service, or application;
- use of information, including persistent unique identifiers, created or gathered by the operator's site, service, or application to amass a profile about a K–12 student except in furtherance of K–12 school purposes; or
- selling a student's information.

SOPIPA also restricts disclosing the information but provides various exceptions, including where the disclosure is in furtherance of the K–12 purpose of the site, service, or application. Operators are also required to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, and protect that information from unauthorized access, destruction, use, modification, or disclosure. They must delete a student's information if the school or district requests deletion of data under the control of the school or district.

The CCPA grants consumers certain rights with regard to their personal information, including enhanced notice, access, and disclosure; the right to deletion; the right to restrict the sale of information; and protection from discrimination for exercising these rights. (Civ. Code § 1798.100 et seq.) It places attendant obligations on businesses to respect those rights. In the November 3, 2020 election, voters approved Proposition 24, which established the CPRA. The CPRA amends the CCPA, limits further amendment, and creates the PPA.

The CPRA prohibits a business from selling or sharing the personal information of consumers if the business has actual knowledge that the consumer is less than 16 years of age, unless the consumer, in the case of consumers at least 13 years of age and less than 16 years of age, or the consumer's parent or guardian, in the case of consumers who are less than 13 years of age, has affirmatively authorized the sale or sharing of the consumer's personal information. A business that willfully disregards the consumer's age shall be deemed to have had actual knowledge of the consumer's age. (Civ. Code § 1798.120.)

4. Establishing the California Age-Appropriate Design Code Act.

President Biden has emphasized the critical need for a response to the issues discussed above: "We must hold social media platforms accountable for the national experiment they're conducting on our children. It's time to strengthen privacy protections, ban targeted advertising to children, and demand tech companies stop collecting personal data on our children."

This bill, modeled after the Age Appropriate Design Code enacted in the United Kingdom, responds to this call to action. It institutes a series of obligations and restrictions on businesses that provide an online service, product, or feature likely to be accessed by a child ("covered business"). That term, "likely to be accessed by a child," means it is reasonable to expect, based on the nature of the content, the associated marketing, the online context, or academic or internal research, that the service, product, or feature would be accessed by children. The bill requires these covered businesses to approach design, data collection, and their offerings to better serve the best interests of children.

*a. Requiring someone to think about the children: child-centered design and approaches*

Businesses that provide an online service, product, or feature likely to be accessed by a child are required to make privacy protections for children the default by configuring all default privacy settings offered by the online service, product, or feature to the settings that offer a high level of privacy protection offered by the business. They are prohibited from profiling children by default. Covered businesses are required to provide privacy information, terms of service, policies, and community standards in a manner that is accessible to children likely to access it and to enforce those policies and standards.

Covered businesses must establish the age of consumers with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business, or apply the privacy and data protections afforded to children to all consumers.

Covered businesses are also required to undertake "Data Protection Impact Assessments" for any online service, product, or feature likely to be accessed by a child, maintain documentation of this assessment, and provide a report to the PPA within a year of implementation of this bill.

A data protection impact assessment is defined as a systematic survey to assess and mitigate risks to children who are reasonably likely to access the service, product, or feature at issue that arises from the provision of that service, product, or feature in accordance with specifications promulgated by the California Children's Data Protection Taskforce, discussed below. The assessments must be reviewed every 24 months or before any new features are offered to the public.

*b. Curtailing problematic data collection practices*

Businesses that provide an online service, product, or feature likely to be accessed by a child are also prohibited from a number of data collection and use practices with regard to children and the services and products they access.

A covered business cannot collect, sell, share, or retain any personal information that is not necessary to provide a service, product, or feature unless the business has actual knowledge the consumer is not a child. Additionally, if it is precise geolocation information, it can only be for the limited time that the collection of precise geolocation information is necessary to provide the service, product, or feature. Such sensitive location information can only be collected when providing an obvious sign to the child that such collection is happening for the duration of the collection.

These provisions provide a strong protection for users, making the default data collection abide by data minimization principles. Only when it is determined that a user is not a child can personal information be collected, sold, shared, or retained beyond what is necessary for the user's interaction with the business' service, product, or feature.

Based on this same principle, the bill also does not allow a covered business to use personal information for any reason other than the reason or reasons for which that personal information was collected unless the business has actual knowledge the consumer is not a child.

These businesses are also prohibited from using the personal information of any child in a way that the business knows or has reason to know the online service, product, or feature more likely than not causes or contributes to a more than de minimis risk of harm to the physical health, mental health, or well-being of a child. This centers children's health and welfare over other priorities. Where such risk of harm exists, businesses are able to continue to use the information for purposes other than what it was collected for once they have confirmed the user is not a child.

The bill also looks to protect problematic tactics to deepen the data collection. Specifically, these businesses cannot use dark patterns or other techniques to lead or encourage consumers:

- to provide personal information beyond what is reasonably expected for the service the child is accessing and necessary to provide that service or product;
- to forego privacy protections; or
- to otherwise take any action that the business knows or has reason to know the online service or product more likely than not causes or contributes to a more than de minimis risk of harm to the child's physical health, mental health, or well-being.

The section of the bill laying out these restrictions on businesses' data collection practices when children are involved includes some slightly duplicative provisions and some sections that could benefit from more clarity. In response, the author has agreed to the following amendments that address these concerns and streamline the bill:

<u>Amendment</u>

Amend Section 1798.99.31(b) as follows:

(b) A business that provides an online service, product, or feature likely to be accessed by a child shall not take any of the following actions:
(1) Use the personal information of any child in a way that the business knows or has reason to know the online service, product, or feature more likely than not causes or contributes to a more than de minimis risk of harm to the physical health, mental health, or well-being of a child.
(2) Profile a child by default.
(3) Collect, sell, share, or retain any personal information that is not necessary to provide a service, product, or feature with which a child is actively and knowingly engaged<u>**, or as described in paragraphs (1) to (4), inclusive, of subdivision (a) of Section 1798.145.**</u>
<u>**(4) Use personal information for any reason other than the reason or reasons for which that personal information was collected, where the end user is a child.**</u>
~~**(4) If a business does not have actual knowledge of the age of a consumer, it shall not collect, share, sell, or retain any personal information that is not necessary to provide a service, product, or feature with which a consumer is actively and knowingly engaged.**~~
~~**(5) Use the personal information of a child for any reason other than the reason or reasons for which that personal information was collected. If the business does not have actual knowledge of the age of the consumer, the business shall not use any personal information for any reason other than the reason or reasons for which that personal information was collected.**~~

~~**(6) Notwithstanding Section 1798.120, share or sell the personal information of any child unless the sharing or selling of that personal information is necessary to provide the online service, product, or feature as permitted by paragraphs (1) to (4), inclusive, of subdivision (a) of Section 1798.145.**~~
(7) Collect, sell, or share any precise geolocation information of children by default unless the collection of that precise geolocation information is necessary **for the business** to provide the service, product, or feature requested and then only for the limited time that the collection of precise geolocation information is necessary to provide the service, product, or feature.
(8) Collect~~**, sell, or share**~~ any precise geolocation information **of a child** without providing an obvious sign to the child for the duration of that collection that precise geolocation information is being collected.
(9) Use dark patterns ~~**or other techniques**~~ to lead or encourage ~~**consumers**~~ **children** to provide personal information beyond what is reasonably expected ~~**for the service the child is accessing and necessary**~~ to provide that **online service, product or feature,** ~~**or product**~~ to forego privacy protections, or to ~~**otherwise**~~ take any action that the business knows or has reason to know ~~**the online service, or product,**~~ more likely than not causes or contributes to a more than de minimis risk of harm to the child's physical health, mental health, or well-being.
(10) Use any personal information collected or processed to establish age or age range for any other purpose, or retain that personal information longer than necessary to establish age. Age assurance shall be proportionate to the risks and data practice of a service, product, or feature.

*c. Establishing a taskforce and developing regulations*

The bill additionally requires the PPA to establish a taskforce and appoint its members, who should be experts in specified fields, including privacy and technology. The taskforce will be called the California Children's Data Protection Taskforce and will evaluate best practices for the implementation of the bill's provisions, and provide support to businesses. The PPA, in consultation with the task force, is required to adopt regulations, as necessary, by April 1, 2024. Concerns have been raised about how the taskforce will be constituted and the clarity of their mission. The author may wish to consider further refinement to ensure maximal effectiveness.

5. Stakeholder positions

According to the author:

> The Internet is increasingly shaping how children socialize, consume entertainment, create, and learn. According to data from UNICEF, approximately one in three internet users is a child under 18 years of age. Among parents with children who have access to the internet, there is a

> concern about what kids are accessing, and the potential harmful effects of the way that access occurs. Data from Parents Together show that 85 percent of parents are concerned with how much time their kids are spending online – time that has increased since the pandemic. The same percentage of parents think that Congress should require protections for kids online, and help to stop sexual predators, place limits on deceptive advertising and protect children's privacy.
>
> Data privacy for children is especially important because its misuse can expose children to harmful material, compulsive behavior loops, and other risks. For example, research from the 5Rights Foundation found that, of the top 100 free apps for kids in one of the major app stores, one in three have overt banner ads, including ads that promote adult-appropriate apps requiring a user to watch the full promo before a box could be closed. Additionally, only 36 percent of California teens and 32 percent of California parents say that social networks do a good job explaining what they do with users' data.
>
> While existing federal and state privacy laws offer important protections that guard children's privacy, there is no coherent, comprehensive law that protects children under 18 from goods, services, and products that endanger their welfare. As a result, online goods, services, and products that are likely to be accessed by kids have been loaded with adult design principals that do not factor in the unique needs of young minds, abilities, and sensibilities, nor offer the highest privacy protections by design and by default. As a result, children under 18 face a number of adverse impacts due to their interactions with online world, including bullying, mental health challenges, and addictive behaviors.

An opposition coalition, including the Entertainment Software Association, argues that the "likely to be accessed by a child" standard is too broad and has requested replacing it with the "directed at children" standard found in COPPA:

> In order to ensure our companies are able to implement this bill effectively we suggest aligning the scope of AB 2273 with existing law and definitions, namely by changing "likely to be accessed by a child" to "directed to children". "Likely to be accessed by a child" is an overinclusive standard and would capture far more websites and platforms than necessary and subject them to this bill's requirements. It is also an unfamiliar standard that will present problems for companies trying to determine whether they are in the scope of the bill.
>
> "Directed to children" on the other hand is a term and scope that online services are familiar with as it is defined in COPPA, which companies

have been implementing and complying with since its passage over 20 years ago. Similarly, we suggest aligning the definition of "child" with COPPA as a person under the age of 13.

However, the "directed at" standard is extremely narrow and would carve out most of the places children are actually found online. The author disagrees that the standard should be "directed at": "The Code is designed to ensure companies children are using design their products in an age-appropriate manner with the best interest of children. This is about meeting children where they are online, not making Sesame Street safer for children." In addition, the workability of the standard is holding up in the United Kingdom where this has been the law. However, to address concerns that the likely to be accessed" standard does not provide enough clarity, the author has agreed to the following amendment that outlines the criteria:

Amendment

(6) "Likely to be accessed by a child" means it is reasonable to expect, based on the ~~**nature of the content, the associated marketing, the online context, or academic or internal research, that the service, product, or feature would be accessed by children.**~~ **following factors that the online service, product, or feature would be accessed by children:**

- **A. The online product, service, or feature is directed at children as defined by COPPA.**
- **B. The online product, service, or feature is determined to be routinely accessed by children through academic, market, or internal company research.**
- **C. An online product, service, or feature advertises to children.**
- **D. An online product, service, or feature that is substantially similar or the same as an online service, product, or feature covered by paragraph (B).**
- **E. An online product, service or feature that has design elements that are known to be of interest to children, including but not limited to, games, cartoons, music, and celebrities who appeal to children.**

This language cabins which online services, products, and features are subject to the bill's obligations and restrictions. It tailors the definition to a narrower range of businesses while still effectuating the strong policy objectives.

Privacy concerns have been raised that the age verification requirements of the bill are going to result in more invasive data collection practices. It should be noted that these businesses are prohibited from using any personal information collected or processed to establish age or age range for any other purpose or retain it longer than necessary to

establish age. The bill also tries to more precisely calibrate the intensity of the required data collection for age verification to the risks and data practice of a service, product, or feature, but a number of provisions will lead to many businesses automatically age-gating their services.

Tim Kendall, the first Director of Monetization at Facebook, "created the advertising model that has driven the company's massive profitability and growth." He writes in support:

> I know from experience that tech workers want to innovate and design products differently to prioritize well-being over profit. But until the profit motive changes, design will be at the expense of our collective well-being, especially our kids'. To change the incentives, we need our political leaders to act. And we need solutions that work.
>
> The world's largest tech companies have already said that the Age Appropriate Design Code, law in the United Kingdom, is spurring positive change. Just last month, a senior Google official told the UK Parliament, "The Age Appropriate Design Code has helped us determine new ways to keep our users safe."
>
> Wouldn't they want to ensure California kids, kids in the United States, are safe as well? By taking some very basic steps – like restricting the collection of kids' data, requiring high privacy settings by default, and providing young people clear resources to report abusive users or block unpleasant content – the State of California can protect the health and wellbeing of millions of young people in our state.
>
> We need lawmakers to regulate in order to shift the incentive structure of the tech industry. Historically, the regulation and enforcement of laws has been a primary catalyst in spurring innovation in virtually every new technology this country has seen. There is no doubt that regulating safer children's experiences online will lead to all kinds of technological innovation.
>
> The California Age Appropriate Design Code Act – already in practice in the UK – gives us the opportunity to usher in a new era of innovative product design that considers, rather than monetizes, the next generation.

Writing in support, Roblox argues:

> The United Kingdom's Age-Appropriate Design Code (AADC) came into effect in September 2021. Despite the fact that it is a Code of Practice specific to the UK, Roblox chose to introduce many of its protections

> globally. We believe that when safety practices faithfully serve the needs of all young people, it makes sense to apply them universally. Consistent with this philosophy, we welcome the introduction of AB 2273 in California, formalizing such protections for California's youth.
>
> Specifically, we note the following characteristics of AB 2273:
>
> - It is Principle-Based: Principle-based approaches to safety promote accountability while remaining flexible enough to allow for future innovation and changes in the technology landscape. Further, as a principles-based approach, the Code can be applied to the diversity of services that are offered to children online today, from nascent, start-up technologies to large, global platforms.
> - It is Risk-Based: Companies are often best positioned to address vulnerabilities that may exist on their platforms. The risk-based approach that underpins AB 2273 allows for a service-specific means to managing potential risks, avoiding the unintended consequences that a "one size fits all" approach can bring to privacy and safety.
> - It Emphasizes the "Best Interests of the Child": AB 2273 requires companies to consider the "best interests of the child" in designing and creating tools and features, helping to ensure that children's well-being remains a key part of the design and implementation process.
> - It is Modeled After Existing Legislation: Having seen similar measures to AB 2273 thoughtfully introduced and implemented by UK policymakers last year, we believe they can scale effectively for children in California.

The opposition coalition also argues for a narrow enforcement mechanism:

> We also suggest enumerating a clear enforcement mechanism such as the one found in CCPA, which grants the Attorney General the authority to investigate and enforce violations. We believe the Attorney General is the appropriate agency to enforce this bill provided our companies have the ability to seek guidance on this bill's subjective requirements and fix mistakes before fines or penalties are levied. The Attorney General's office is best equipped to provide consistent interpretations, guidance, and to enforce this bill's provisions.

In response, the author has agreed to amendments that grant authority to the Attorney General to enforce the bill's provisions and that explicitly preclude the bill serving as the basis for a private right of action:

Amendment:

Add: Sec. 1798.99.35 (a) Any business that violates this title shall be subject to an injunction and liable for a civil penalty of not more than $2,500 per affected child for each negligent violation or not more $7,500 per affected child for each intentional violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General.

(b) Nothing in this Title shall be interpreted to serve as the basis for a private right of action under this title.

## SUPPORT

5Rights Foundation (co-sponsor)
Common Sense (co-sponsor)
Alcohol Justice
Accountable Tech
ADL West
Avaaz
California Lawyers Association, Privacy Law Section
Center for Countering Digital Hate
Center for Digital Democracy
Center for Humane Technology
Children and Screens
Consumer Federation of America
Consumer Federation of California
Do Curious INC.
Eating Disorders Coalition
Epic
Fair Vote
Fairplay
Je Suis Lá
Joan Ganz Cooney Center - Sesame Workshop
LiveMore ScreenLess
Log Off
Lookup
Me2b Alliance
National Hispanic Media Coalition
Neda
Oakland Privacy
Omidyar Network
Outschool, Inc.
Parents Together Action

Protect Young Eyes
Public Health Advocates
Real Facebook Oversight Board
Remind
Reset Tech
Roblox Corporation
Smart Digital Kids
Sum of Us
Tech Oversight Project
The Children's Partnership
The Signals Network
The Social Dilemma
Tiramisu
Ultraviolet
Two individuals

**OPPOSITION**

California Chamber of Commerce
Entertainment Software Association
MPA - the Association of Magazine Media
TechNet

**RELATED LEGISLATION**

Pending Legislation:

SB 1056 (Umberg, 2022) requires a social media platform, as defined, to clearly and conspicuously state whether it has a mechanism for reporting violent posts, as defined; and allows a person who is the target, or who believes they are the target, of a violent post to seek an injunction to have the violent post removed. This bill is currently in the Assembly Judiciary Committee.

AB 587 (Gabriel, 2022) requires social media companies, as defined, to post their terms of service and report certain information to the Attorney General on a quarterly basis. This bill is currently pending before this Committee and is being heard the same day as this bill.

AB 1628 (Ramos, 2022) requires online platforms to create and post a policy that includes policies regarding distribution of controlled substances and its prevention, reporting mechanisms, and resources. This bill is currently pending before this Committee and is being heard the same day as this bill.

AB 2408 (Cunningham, 2022) establishes a negligence cause of action for a platform's use of any design, feature, or affordance that causes a child user to become addicted to the platform. It also provides for heightened civil penalties in actions brought by public prosecutors. This bill is currently pending before this Committee and is being heard the same day as this bill.

AB 2571 (Bauer-Kahan, 2022) prohibits firearm industry members from advertising or marketing, as defined, firearm-related products to minors. The bill restricts the use of minors' personal information in connection with marketing or advertising firearm-related products to those minors. This bill is currently in the Senate Appropriations Committee.

AB 2879 (Low, 2022) requires social media platforms to implement a mechanism by which school administrators can report instances of cyberbullying, and to disclose specified data related to reported instances of cyberbullying and the platform's response. This bill is currently pending before this Committee and is being heard the same day as this bill.

Prior Legislation: None known.

**PRIOR VOTES:**

Assembly Floor (Ayes 72, Noes 0)
Assembly Appropriations Committee (Ayes 16, Noes 0)
Assembly Privacy and Consumer Protection Committee (Ayes 10, Noes 0)

**************

# EXHIBIT 4

**SENATE RULES COMMITTEE**
Office of Senate Floor Analyses
(916) 651-1520 Fax: (916) 327-4478

AB 2273

---

THIRD READING

---

Bill No: AB 2273
Author: Wicks (D), Cunningham (R) and Petrie-Norris (D), et al.
Amended: 8/22/22 in Senate
Vote: 21

---

SENATE JUDICIARY COMMITTEE: 9-1, 6/28/22
AYES: Umberg, Caballero, Cortese, Durazo, Hertzberg, McGuire, Stern, Wieckowski, Wiener
NOES: Jones
NO VOTE RECORDED: Borgeas

SENATE APPROPRIATIONS COMMITTEE: 5-0, 8/11/22
AYES: Portantino, Bradford, Laird, McGuire, Wieckowski
NO VOTE RECORDED: Bates, Jones

ASSEMBLY FLOOR: 72-0, 5/26/22 - See last page for vote

---

**SUBJECT:** The California Age-Appropriate Design Code Act

**SOURCE:** 5Rights Foundation
Common Sense

---

**DIGEST:** This bill establishes the California Age-Appropriate Design Code Act, placing a series of obligations and restrictions on businesses that provide online services, products, or features likely to be accessed by children.

*Senate Floor Amendments* of 8/22/22 refine definitions within the bill, exempt a variety of online products and services, amend timelines, and expand the right to cure.

**ANALYSIS:**

Existing law:

1) Establishes the federal Children's Online Privacy Protection Act (COPPA) to provide protections and regulations regarding the collection of personal information from children under the age of 13. (15 U.S.C. § 6501 et seq.)

2) Requires, pursuant to the Parent's Accountability and Child Protection Act, a person or business that seeks to sell a product or service in California that is illegal to sell to a minor to, notwithstanding any general term or condition, take reasonable steps, as specified, to ensure that the purchaser is of legal age at the time of purchase or delivery, including, but not limited to, verifying the age of the purchaser. (Civ. Code § 1798.99.1(a)(1).)

3) Establishes the Privacy Rights for California Minors in the Digital World (PRCMDW), which prohibits an operator of an internet website, online service, online application, or mobile application ("operator") from various activities, including knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile, the personal information of a minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising specified products or services to that minor, where the website, service, or application is directed to minors or there is actual knowledge that a minor is using the website, service, or application. (Bus. & Prof. Code § 22580.)

4) Establishes the California Consumer Privacy Act (CCPA), which grants consumers certain rights with regard to their personal information. (Civ. Code § 1798.100 et seq.) Establishes the California Privacy Rights Act of 2020 (CPRA), which amends the CCPA. (Civ. Code § 798.100 et seq.; Proposition 24 (2020).)

5) Prohibits a business from selling or sharing the personal information of consumers if the business has actual knowledge that the consumer is a minor under 16 years of age, unless the consumer has authorized the sale or sharing. A business that willfully disregards the consumer's age shall be deemed to have had actual knowledge of the consumer's age. (Civ. Code § 1798.120.)

This bill:

1) Requires a business that provides an online service, product, or feature likely to be accessed by children ("covered business") to take specified actions, including to:
   a) undertake a Data Protection Impact Assessment for any online service, product, or feature likely to be accessed by children, as specified;
   b) estimate the age of child users with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the

business, or apply the privacy and data protections afforded to children to all consumers;
c) provide any privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children likely to access that online service, product, or feature;
d) if the online service, product, or feature allows the child's parent, guardian, or any other consumer to monitor the child's online activity or track the child's location, provide an obvious signal to the child when the child is being monitored or tracked;
e) enforce published terms, policies, and community standards established by the business, including, but not limited to, privacy policies and those concerning children; and
f) provide prominent, accessible, and responsive tools to help children, or if applicable their parent or guardian, exercise their privacy rights and report concerns.

2) Provides that a covered business shall not engage in specified activity, including:
   a) using the personal information of any child in a way that the business knows or has reason to know is materially detrimental to the physical health, mental health, or well-being of a child;
   b) profiling a child by default, except as specified;
   c) collecting, selling, sharing, or retaining any personal information that is not necessary to provide an online service, product, or feature with which a child is actively and knowingly engaged, except as specified;
   d) using the personal information of a child for any reason other than a reason for which that personal information was collected, except as specified;
   e) collecting, selling, or sharing any precise geolocation information of children by default unless the collection of that precise geolocation information is strictly necessary to provide the service, product, or feature requested and then only for the limited time that the collection of precise geolocation information is necessary to provide the service, product, or feature; and
   f) collecting, selling, or sharing any precise geolocation information without providing an obvious sign to the child for the duration of that collection that precise geolocation information is being collected.

3) Exempts from the definition specified broadband internet access services, telecommunications services, and the delivery or use of a physical product.

4) Delays operative date of the above to July 1, 2024.

5) Establishes the Children's Data Protection Working Group to report on the best practices for the implementation of the bill. The working group members are to be appointed as specified. The Attorney General may adopt regulations.

6) Provides for enforcement through civil actions brought by the Attorney General. The bill provides businesses in violation with a 90-day right to cure, as specified.

**Comments**

The General Data Protection Regulation (GDPR) is a regulation in European Union law on data protection and privacy. The law that implemented the GDPR in the United Kingdom included an amendment that effectuated the requirement to offer children-specific protections and required the Information Commissioner to introduce an Age Appropriate Design Code to set standards that make online services' use of children's data "age appropriate": "The Children's code (or the Age appropriate design code) contains 15 standards that online services need to follow. This ensures they are complying with [their] obligations under data protection law to protect children's data online."

This bill, modeled after the Age Appropriate Design Code recently enacted in the United Kingdom, institutes a series of obligations and restrictions on businesses that provide an online service, product, or feature likely to be accessed by a child. The bill additionally establishes a working group to evaluate best practices for the implementation of the bill's provisions. The bill grants the Attorney General sole authority to bring enforcement actions and to adopt regulations.

According to the author, "While existing federal and state privacy laws offer important protections that guard children's privacy, there is no coherent, comprehensive law that protects children under 18 from goods, services, and products that endanger their welfare. As a result, online goods, services, and products that are likely to be accessed by kids have been loaded with adult design principals that do not factor in the unique needs of young minds, abilities, and sensibilities, nor offer the highest privacy protections by design and by default. As a result, children under 18 face a number of adverse impacts due to their interactions with online world, including bullying, mental health challenges, and addictive behaviors."

**FISCAL EFFECT:** Appropriation: No Fiscal Com.: Yes Local: No

According to the Senate Appropriations Committee:

- DOJ: The Department of Justice (DOJ) reports costs of $2.4 million in Fiscal Year (FY) 2024-25 and $2.3 million in FY 2025-26 and annually thereafter (General Fund). The bill would also generate revenue to the DOJ in an unknown amount, resulting from penalty assessments of up to $7,500 per affected child, to be deposited into the Consumer Privacy Fund with the intent they be used to offset costs incurred by the DOJ.

- CCPA: The CCPA reports total costs of $1.05 million the first year, and $752 thousand ongoing to convene the task force, issue and update regulations, and review Data Protection Impact Assessments (General Fund).

- Judicial Branch: Unknown cost pressures due to increased court workload (Special Fund – Trial Court Trust Fund, General Fund).

**SUPPORT:** (Verified 8/22/22)

5Rights Foundation (co-source)
Common Sense (co-source)
Attorney General Rob Bonta
Accountable Tech
ADL West
Alcohol Justice
American Academy of Pediatrics, California
Avaaz
California Federation of Teachers, AFL-CIO
California Lawyers Association, Privacy Law Section
California Public Interest Research Group
Center for Countering Digital Hate
Center for Digital Democracy
Center for Humane Technology
Children and Screens
City of Berkeley
Consumer Federation of America
Consumer Federation of California
Do Curious Inc.
Eating Disorders Coalition
Epic
Fair Vote
Fairplay
Je Suis Lá

Joan Ganz Cooney Center - Sesame Workshop
LiveMore ScreenLess
Log Off
Lookup
Me2b Alliance
National Hispanic Media Coalition
NEDA
Oakland Privacy
Omidyar Network
Outschool, Inc.
Parents Together Action
Protect Young Eyes
Public Health Advocates
Real Facebook Oversight Board
Remind
Reset Tech
Roblox Corporation
Smart Digital Kids
Sum of Us
Tech Oversight Project
The Children's Partnership
The Signals Network
The Social Dilemma
Tiramisu
Ultraviolet
Two individuals

**OPPOSITION:** (Verified 8/22/22)

California Chamber of Commerce
California Manufacturing and Technology Association
Entertainment Software Association
MPA - the Association of Magazine Media
TechNet

**ARGUMENTS IN SUPPORT:** One of the two individuals in support, Tim Kendall, the first Director of Monetization at Facebook, writes:

"I know from experience that tech workers want to innovate and design products differently to prioritize well-being over profit. But until the profit motive changes, design will be at the expense of our collective well-being, especially our kids'. To

change the incentives, we need our political leaders to act. And we need solutions that work.

The world's largest tech companies have already said that the Age Appropriate Design Code, law in the United Kingdom, is spurring positive change. Just last month, a senior Google official told the UK Parliament, "The Age Appropriate Design Code has helped us determine new ways to keep our users safe."

Wouldn't they want to ensure California kids, kids in the United States, are safe as well? By taking some very basic steps – like restricting the collection of kids' data, requiring high privacy settings by default, and providing young people clear resources to report abusive users or block unpleasant content – the State of California can protect the health and wellbeing of millions of young people in our state.

We need lawmakers to regulate in order to shift the incentive structure of the tech industry. Historically, the regulation and enforcement of laws has been a primary catalyst in spurring innovation in virtually every new technology this country has seen. There is no doubt that regulating safer children's experiences online will lead to all kinds of technological innovation.

The California Age Appropriate Design Code Act – already in practice in the UK – gives us the opportunity to usher in a new era of innovative product design that considers, rather than monetizes, the next generation."

**ARGUMENTS IN OPPOSITION:** A coalition of industry groups, including the Entertainment Software Association, argues:

"In order to ensure our companies are able to implement this bill effectively we suggest aligning the scope of AB 2273 with existing law and definitions, namely by changing "likely to be accessed by a child" to "directed to children". "Likely to be accessed by a child" is an overinclusive standard and would capture far more websites and platforms than necessary and subject them to this bill's requirements. It is also an unfamiliar standard that will present problems for companies trying to determine whether they are in the scope of the bill.

"Directed to children" on the other hand is a term and scope that online services are familiar with as it is defined in COPPA, which companies have been implementing and complying with since its passage over 20 years ago. Similarly,

we suggest aligning the definition of "child" with COPPA as a person under the age of 13."

ASSEMBLY FLOOR: 72-0, 5/26/22
AYES: Aguiar-Curry, Arambula, Bauer-Kahan, Bennett, Bigelow, Bloom, Boerner Horvath, Mia Bonta, Bryan, Calderon, Carrillo, Cervantes, Chen, Cooley, Cooper, Cunningham, Megan Dahle, Davies, Flora, Mike Fong, Fong, Friedman, Gabriel, Gallagher, Cristina Garcia, Eduardo Garcia, Gray, Grayson, Haney, Holden, Irwin, Jones-Sawyer, Kalra, Lackey, Lee, Levine, Low, Maienschein, Mathis, Mayes, McCarty, Medina, Mullin, Muratsuchi, Nazarian, Nguyen, Patterson, Petrie-Norris, Quirk, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Rodriguez, Blanca Rubio, Salas, Santiago, Seyarto, Smith, Stone, Ting, Valladares, Villapudua, Voepel, Waldron, Ward, Akilah Weber, Wicks, Wilson, Wood, Rendon
NO VOTE RECORDED: Berman, Choi, Daly, Gipson, Kiley, O'Donnell

Prepared by: Christian Kurpiewski / JUD. / (916) 651-4113
8/23/22 13:23:20

****** END ******

# EXHIBIT 5

CONCURRENCE IN SENATE AMENDMENTS
AB 2273 (Wicks, et al.)
As Amended August 22, 2022
Majority vote

## SUMMARY

Establishes the California Age-Appropriate Design Code Act which generally requires businesses that provide online services, products, or features likely to be accessed by children to comply with specified standards.

**Senate Amendments**

1) Specify the required contents of a data protection impact assessment (DPIA), and clarify that a DPIA must only be completed if an online service, product, or feature is likely to be accessed by children, as defined.

2) Remove the requirement that a DPIA be submitted to a public agency and instead require that a business provide a completed DPIA to the Attorney General (AG) upon request.

3) Exempt DPIAs from the disclosure requirements under the California Public Records Act, and clarify that disclosure of a DPIA to the AG does not waive existing attorney-client or work product privileges.

4) Require the AG to provide written notice to a business in violation of the bill but in substantial compliance with the DPIA requirements of the bill identifying the specific provisions of the bill the AG alleges have been or are being violated before initiating an action to prosecute the violation; and provide that if, within 90 days of the notice, the business cures any noticed violation and provides the AG a written statement that the alleged violations have been cured, and sufficient measures have been taken to prevent future violations, the business shall not be liable for a civil penalty for any violation so cured.

5) Amend the standard of known harm to children that a use of personal information or dark patterns must meet to constitute a violation of the bill from "de minimus" to "materially detrimental."

6) Replace the taskforce created by the bill with a working group, with members appointed by the Governor, Senate, Assembly, California Privacy Protection Agency, and AG, to provide specified recommendations to the Legislature; and require the working group to take input from a broad range of specified stakeholders.

7) Define the term "profiling" to mean any form of automated processing of personal information that uses personal information to evaluate certain aspects relating to a natural person, including analyzing or predicting aspects concerning a natural person's performance at work, economic situation, health, personal preferences, interests, reliability, behavior, location, or movements; and permit a business to profile a child by default only if the business can demonstrate it has appropriate safeguards in place to protect children, and either of the following is true: (a) profiling is necessary to provide the online service, product, or feature requested and only with respect to the aspects of the online service, product, or feature with which the child is actively and knowingly engaged; or (b) the business can demonstrate a compelling reason that profiling is in the best interests of children.

8) Authorize, rather than require, the AG to adopt additional regulations to implement the bill's provisions, as necessary.

9) Clarify the definition of "likely to be accessed by children" by doing both of the following: (a) replacing the reference to "academic or market research" that the service, product, or feature is likely to be accessed by children with "competent and reliable evidence regarding audience composition"; and (b) clarifying that businesses that have advertisements *marketed* to children, rather than businesses that "advertise to children", are within the scope of the bill.

10) Make several technical and clarifying changes.

## COMMENTS

On March 29, 2022, the Privacy and Consumer Protection Committee and the Arts, Entertainment, Sports, Tourism, and Internet Media Committee held an informational hearing entitled, *Protecting Kids Online: Challenges & Opportunities in a Digital World.* Testimony from the hearing indicated that adults, children, and teens alike are frustrated with the effort and expertise it takes to make online experiences safe for children.

As the internet has become more accessible and attractive to children, the government has created some laws to protect children online. Enacted in 1998, the federal Child's Online Privacy Protection Act of 1998 (COPPA), requires the Federal Trade Commission (FTC) to issue and enforce a rule (the Rule) concerning children's online privacy. The FTC notes that:

> The primary goal of COPPA and the Rule is to place parents in control over what information is collected from their young children online. The Rule was designed to protect children under age 13 while accounting for the dynamic nature of the internet. The Rule applies to operators of commercial websites and online services directed to children under 13 that collect, use, or disclose PI from children, and operators of general audience websites or online services with actual knowledge that they are collecting, using, or disclosing PI from children under 13.[1]

In an effort to further protect minors online, California subsequently passed SB 568 (Steinberg), Chapter 336, Statutes of 2013, known as Privacy Rights for California Minors in the Digital World, which prohibits the operator of an internet website or other online service or mobile application from marketing or advertising a product or service to a minor if the minor cannot legally purchase the product or participate in the service in California, or, compiling PI to market those products or services. This prohibition only applies to an operator that has *actual knowledge* that a minor is using its online service or whose site or service is directed to minors. That bill also permits a minor to remove content or information posted to a website or service, as specified.

SB 568 was opposed by the Center for Democracy and Technology, who took issue with the bill's limitation that a website must be *directed to* minors for the provisions of the bill to apply. SB 568, now codified beginning at Business and Professions Code Sec. 22580, provided that a site or service is "directed to minors" if it is "created for the purpose of reaching an audience that

---

[1] FTC: Frequently Asked Questions about the Children's Online Privacy Protection Rule, http://www.ftc.gov/privacy/coppafaqs.shtm, [as of Apr. 2, 2021].)

is *predominantly* composed of minors, and is not intended for a more general audience comprised of adults." (Emphasis added.) The definition adds that a site or service would not be deemed to be "directed at minors" merely because it contained links to sites or services that were directed to minors.

Further protecting the rights of minors, the Legislature enacted the California Consumer Protection Act of 2018 (CCPA; Chau, Chapter 55, Statutes of 2018) which provides various rights to consumers related to the sale of their PI, as defined. Relevant to this bill, the CCPA prohibits any business, as defined, from selling the PI of minors 16 years of age and under, without prior opt-in consent to the sale of the information. For minors between the ages of 13 and 16, the minor can opt-in to the sale of their PI on their own. For minors under 13 years of age, only a parent or guardian may opt-in to the sale of the minor's information. (Civ. Code Sec. 1798.120.)

Notably, the protections for children online largely focus on regulating the collection and sale of children's PI, rather than ensuring that children are protected from manipulative design (dark patterns), adult content, or other potentially harmful design features. In addition, for the most part, the existing laws protecting minors online are only triggered when an online platform has actual knowledge that children are accessing their website. This has incentivized many social media platforms and other online services to ignore the age of their consumers, so that they do not have to adhere to the standards set out in the laws described above.

This bill, modeled after the Age Appropriate Design Code recently enacted in the United Kingdom, seeks to elevate child-centered design in online products and services that are likely to be accessed by children. The bill would additionally require the CPPA to establish a working group to make recommendations to the Legislature concerning best practices for complying with and enforcing the bill's provisions.

This bill would take a different approach to protecting children online than the state and federal laws described above in two distinct ways. First, the bill would require online platforms likely to be accessed by children to turn privacy and safety settings up to a level that is protective of children's mental and physical health and well-being *unless* the online platform can, with an appropriate level of certainty, determine the age of the consumer. In other words, existing law generally permits online platforms to treat all consumers as adults unless there is actual knowledge that the consumer is under 13 years of age. This bill would instead require that websites and other online services likely to be accessed by children offer privacy and safety protections by default, unless there is reasonable certainty that the consumer is an adult.

Amendments taken in the Senate provide greater detail concerning the required content of a DPIA and the circumstances in which such an assessment is necessary. Rather than requiring submission of a DPIA to a public agency, the amendments instead require a business to provide a DPIA to the AG within three days of a request. To further encourage child-centered design and comprehensive assessment of the potential impacts of services, products, and features on children prior to releasing a service, product, or feature, the amendments require that, should a business in alleged violation of the provisions of the bill be in substantial compliance with the DPIA requirements, the AG provide notice of the alleged violation and an opportunity to cure the violation, and indicate steps to prevent future violations, within 90 days.

**According to the Author**

While existing federal and state privacy laws offer important protections that guard children's privacy, there is no coherent, comprehensive law that protects children under 18 from goods, services, and products that endanger their welfare. As a result, online goods, services, and products that are likely to be accessed by kids have been loaded with adult design principals that do not factor in the unique needs of young minds, abilities, and sensibilities, nor offer the highest privacy protections by design and by default. As a result, children under 18 face a number of adverse impacts due to their interactions with online world, including bullying, mental health challenges, and addictive behaviors.

**Arguments in Support**

In support, a large coalition of organizations representing public health, parent, school and youth groups, researchers, and advocacy organizations write:

> Children across the globe are facing an unprecedented mental health crisis. Even before the onset of COVID-19 and subsequent social distancing and isolation, teen suicide was on the rise; in the US the CDC found that between 2007 to 2017 the suicide rate among people aged 10 to 24 increased by 56%. And in the year between spring of 2020 and 2021 emergency room visits for girls ages 12 to 17 increased by 50%.
>
> In 2020, 81% of 14 to 22-year-olds said they used social media either "daily" or "almost constantly." This is by design. As private companies beholden to shareholders, performance incentives for product developers and executives are tied to profit and therefore time spent on their platform. Social media platforms and tech companies do not design these services with their youngest and most vulnerable users in mind.
>
> Ensuring the safety of tech products is long overdue. We have nutrition labels on food packaging, rigorous testing for cribs and car seats, and yet the technology children use daily from the youngest of ages have little to no safeguards.

**Arguments in Opposition**

A coalition of industry trade groups comprised TechNet, California Chamber of Commerce, Entertainment Software Association, and California Manufacturers & Technology Association argues:

> AB 2273 still contains a great deal of subjectivity and our companies would benefit greatly from additional opportunities to seek guidance and feedback from the Attorney General before penalties are instituted. The UK Information Commissioner's Office (ICO), which is the authority that implements the UK Age Appropriate Design Code, produced a robust online resource for companies to better understand the ICO's interpretations of the standard's requirements and also provides the opportunity to ask questions of the regulator. If the goal is to encourage and incentivize companies to take proactive steps to protect children online, companies should have the opportunity to fix mistakes or compare their interpretations with the Attorney General as they try in good faith to comply with this new standard.

## FISCAL COMMENTS

According to the Senate Appropriations Committee:

1) *DOJ:* The Department of Justice (DOJ) reports costs of $2.4 million in Fiscal Year (FY) 2024-25 and $2.3 million in FY 2025-26 and annually thereafter (General Fund). The bill would also generate revenue to the DOJ in an unknown amount, resulting from penalty assessments of up to $7,500 per affected child, to be deposited into the Consumer Privacy Fund with the intent they be used to offset costs incurred by the DOJ.

2) *CPPA*: The [California Privacy Protection Agency] reports total costs of $1.05 million the first year, and $752 thousand ongoing to convene the task force, issue and update regulations, and review Data Protection Impact Assessments (General Fund).

3) *Judicial Branch:* Unknown cost pressures due to increased court workload (Special Fund – Trial Court Trust Fund, General Fund).

## VOTES:

**ASM PRIVACY AND CONSUMER PROTECTION: 10-0-1**
**YES:** Gabriel, Bauer-Kahan, Bennett, Berman, Cunningham, Mike Fong, Irwin, Valladares, Wicks, Wilson
**ABS, ABST OR NV:** Kiley

**ASM APPROPRIATIONS: 16-0-0**
**YES:** Holden, Bigelow, Bryan, Calderon, Carrillo, Megan Dahle, Davies, Mike Fong, Fong, Gabriel, Eduardo Garcia, Levine, Quirk, Robert Rivas, Akilah Weber, Wilson

**ASSEMBLY FLOOR: 72-0-6**
**YES:** Aguiar-Curry, Arambula, Bauer-Kahan, Bennett, Bigelow, Bloom, Boerner Horvath, Mia Bonta, Bryan, Calderon, Carrillo, Cervantes, Chen, Cooley, Cooper, Cunningham, Megan Dahle, Davies, Flora, Mike Fong, Fong, Friedman, Gabriel, Gallagher, Cristina Garcia, Eduardo Garcia, Gray, Grayson, Haney, Holden, Irwin, Jones-Sawyer, Kalra, Lackey, Lee, Levine, Low, Maienschein, Mathis, Mayes, McCarty, Medina, Mullin, Muratsuchi, Nazarian, Nguyen, Patterson, Petrie-Norris, Quirk, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Rodriguez, Blanca Rubio, Salas, Santiago, Seyarto, Smith, Stone, Ting, Valladares, Villapudua, Voepel, Waldron, Ward, Akilah Weber, Wicks, Wilson, Wood, Rendon
**ABS, ABST OR NV:** Berman, Choi, Daly, Gipson, Kiley, O'Donnell

**SENATE FLOOR: 33-0-7**
**YES:** Allen, Archuleta, Atkins, Becker, Bradford, Caballero, Cortese, Dahle, Dodd, Durazo, Eggman, Glazer, Gonzalez, Hertzberg, Hueso, Hurtado, Kamlager, Laird, Leyva, Limón, McGuire, Min, Newman, Nielsen, Pan, Portantino, Roth, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener
**ABS, ABST OR NV:** Bates, Borgeas, Grove, Jones, Melendez, Ochoa Bogh, Wilk

## UPDATED

VERSION: August 22, 2022

CONSULTANT: Landon Klein / P. & C.P. / (916) 319-2200 FN: 0004511

# EXHIBIT 6

# Bringing Dark Patterns to Light

STAFF REPORT | SEPTEMBER 2022

## Introduction

For decades, unscrupulous direct mail marketers and brick-and-mortar retailers have relied on design tricks and psychological tactics, such as pre-checked boxes, hard-to-find-and-read disclosures, and confusing cancellation policies, to get consumers to part with their money or data. As more and more commerce has moved online, so too have these manipulative design practices—termed "dark patterns"—only they have grown in scale and sophistication, creating ever greater challenges for consumers.[1]

As the nation's leading consumer protection agency, the Federal Trade Commission's ("FTC") mission is to stop deceptive or unfair business practices in the marketplace, including those that take the form of dark patterns.[2] The FTC has, for example, sued companies for requiring users to navigate a maze of screens in order to cancel recurring subscriptions, using non-descript dropdown arrows or small icons to hide the full cost and other terms of rent-to-own or other payment products, and even sneaking unwanted products into consumers' online shopping carts without their knowledge.[3] More recently, the agency issued an enforcement policy statement that warned companies against deploying illegal practices that trick or trap consumers into subscription services.[4]

On April 29, 2021, the FTC hosted a public workshop on digital dark patterns and explored whether user interfaces can have the effect of obscuring, subverting, or impairing consumer autonomy and decision-making.[5] The workshop featured a variety of speakers, including consumer advocates, members of Congress, researchers, legal experts, and other industry professionals. In this Staff Report, we discuss key topics from the workshop and academic literature, including the rise of dark patterns in the digital marketplace and common types of dark patterns. (See Appendix A.) For each common dark pattern addressed, we discuss consumer protection concerns and recommendations for companies.

Bringing **Dark Patterns** to **Light**

AN FTC WORKSHOP

# Background

Coined in 2010 by user design specialist Harry Brignull, the term "dark patterns" has been used to describe design practices that trick or manipulate users into making choices they would not otherwise have made and that may cause harm.[6] As the workshop's panelists noted, dark patterns often take advantage of consumers' cognitive biases to steer their conduct or delay access to information needed to make fully informed decisions.[7] Research shows that dark patterns are highly effective at influencing consumer behavior. For example, one study discussed at the workshop found that dark patterns doubled the percentage of consumers who signed up for a dubious identity theft protection service, as compared to consumers who were presented with a neutral interface. And these effects increased significantly when test subjects were exposed to more than one dark pattern.[8]

*...the term "dark patterns" has been used to describe design practices that trick or manipulate users into making choices they would not otherwise have made and that may cause harm.*

Dark patterns often are not used in isolation and tend to have even stronger effects when they are combined.[9] (See Appendix B.) Multiple examples from FTC enforcement matters bear this out. In *Raging Bull*, for instance, the FTC alleged that the operators of an online stock trading site used deceptive customer testimonials to lure consumers in, hid purported disclaimers in dense terms and conditions text boxes that required scrolling to find, and sold services as a subscription but made it difficult to cancel and stop the recurring charges.[10] The combination of these dark patterns had a compounding effect, increasing the impact of each and exacerbating the harm to the consumer.

Panelists noted that the use of manipulative design techniques in the digital world can pose heightened risks to consumers.[11] The pervasive nature of data collection techniques, which allow companies to gather massive amounts of information about consumers' identities and online behavior, enables businesses to adapt and leverage advertisements to target a particular demographic or even a particular consumer's interests.[12] Moreover, companies that market online can experiment with digital dark patterns more easily, frequently, and at a much larger scale than traditional brick-and-mortar retailers, to determine which design features most effectively influence consumer behavior.[13] (By contrast, consider the practical difficulties of incessantly rearranging the aisles of a grocery store that places sugary cereals at toddler eye-level and candy bars at the register to do the same.)[14] This type of design experimentation, if used to deceive consumers or manipulate them into taking unwitting or detrimental actions, is a signal of dark patterns at work.[15]

*...the use of manipulative design techniques in the digital world can pose heightened risks to consumers.*

An example of this design experimentation is in the FTC's action against Credit Karma.[16] Credit Karma advertises third-party financial products, such as credit cards, and provides links for consumers to apply for offers. Credit Karma conducted A/B testing, which is an experiment where a company shows consumers two or more variants of something, such as an advertisement or a webpage, to determine which one performs better. Credit Karma compared how consumers reacted to being told that they had been "pre-approved" for a credit card (a false claim, according to the FTC's complaint) versus being told that they had "Excellent" odds of being approved. The company ultimately decided to employ the allegedly false "pre-approved" claim, which the A/B testing had shown yielded a greater click rate.[17]

---

*Dark patterns can be found in a variety of industries and contexts, including ecommerce, cookie consent banners, children's apps, subscription sales, and more.*

---

Dark patterns can be found in a variety of industries and contexts, including ecommerce, cookie consent banners, children's apps, subscription sales, and more.[18] (See Appendix A.) The specific types of dark patterns consumers are most likely to face differ depending on the types of websites or apps they frequently use.[19] The medium through which consumers access online information also affects the number and types of dark patterns they may encounter. Studies show that some dark patterns are more common in mobile apps than on websites.[20] Additionally, some design techniques are more effective on smaller screens than on larger ones. Many companies, for instance, are able to hide important information from consumers on their mobile devices because the amount of scrolling required makes it unlikely that people will see it.[21] Such dark patterns may have a differential impact on lower-income consumers or other vulnerable populations who are more likely to rely on a mobile device as their sole or primary access to the internet.[22] Workshop panelists and researchers in the field note that dark patterns may also appear in new and evolving modalities such as augmented reality (AR) and virtual reality (VR) technologies, exposing consumers to manipulation on a whole new plane.[23]

Dark patterns also raise special enforcement challenges. Because dark patterns are covert or otherwise deceptive, many consumers don't realize they are being manipulated or misled.[24] Workshop participants theorized that even when consumers do realize they have been deceived, many don't report their experiences, some out of an unnecessary feeling of embarrassment at being tricked.[25] That is why the FTC's workshop brought together enforcement agencies, academic researchers, and consumer advocates to share their knowledge of dark patterns, explore whether they harm consumers, and, when practices were identified as unfair or deceptive, how to best address and eliminate them. In this paper, we shine a further light on some common dark patterns and the harms they cause consumers, while putting businesses on notice that the FTC will continue scrutinizing these practices.

# Common Dark Patterns & Consumer Protection Concerns

In this section, we describe examples of common dark patterns—using recent FTC enforcement actions as well as insights from workshop participants—to illustrate the harms posed to consumers and provide recommendations for businesses.

## I. Design Elements that Induce False Beliefs

Some dark patterns manipulate consumer choice by inducing false beliefs.[26] For example, a company may make an outright false claim or employ design elements that create a misleading impression to spur a consumer into making a purchase they would not otherwise make. Classic examples of these types of deceptive dark patterns include advertisements deceptively formatted to look like independent, editorial content[27] and purportedly neutral comparison-shopping sites that actually rank companies based on compensation.[28] Workshop panelists also discussed countdown timers on offers that are not actually time-limited,[29] claims that an item is almost sold out when there is actually ample supply,[30] and false claims that other people are also currently looking at or have recently purchased the same product.[31]

*…disguised advertising and promotional messages are deceptive when they mislead consumers into believing they are independent, impartial, or not from the sponsoring advertiser itself.*

The FTC long has taken action against dark patterns involving companies that use ads deceptively formatted to look like news articles to entice consumers to buy their products.[32] As explained in the FTC's Enforcement Policy Statement on Deceptively Formatted Ads, disguised advertising and promotional messages are deceptive when they mislead consumers into believing they are independent, impartial, or not from the sponsoring advertiser itself.[33] A recent example is an FTC action charging Effen Ads, the operators of a work-from-home scheme, with using fake news stories to trick consumers into buying their program.[34] According to the complaint, Effen Ads sent unsolicited emails to consumers that included "from" lines that falsely claimed they were coming from news organizations like CNN or Fox News.[35]

**Figure 1: Effen Ads**




The FTC's complaint states that consumers who clicked on the links in these emails were routed to additional fake online news stories, and then eventually routed to Effen Ads' sales websites, which pitched the company's work-from-home schemes.[36] These sites guaranteed consumers would make hundreds of dollars if they paid an upfront fee of $97 and worked from home only one hour a day. In reality, according to the complaint, the emailed articles were fake, and the upfront fee didn't result in an actual job.[37]

Comparison websites can also induce false beliefs in consumers when the overall net impression created by various design elements is deceptive.[38] For example, consumers who visit websites where companies have created rankings lists, posted consumer reviews, or otherwise endorsed third parties expect these recommendations to be objective and unbiased.[39] When they aren't—and instead are based on whether the third parties are paying to be promoted, a personal relationship, or other connections— these sites are deceptive. These supposedly neutral rankings sites are using a dark pattern to manipulate consumer choice.[40] Knowing that there is a payment relationship or other connection between the reviewer and the third party would affect the weight or credibility consumers give the review and may influence whether and to what extent consumers choose to interact with that content at all.[41] Deceptive ranking sites may also undermine fair competition, disadvantaging those companies that won't pay-to-play.[42]

The FTC's action against the loan comparison website LendEDU.com is instructive.[43] As detailed in the FTC complaint, LendEDU used its rankings to sort companies in rate comparison tables, thereby giving consumers the impression that LendEDU had evaluated the top-listed company to be the best.[44]

**Figure 2: LendEDU Rate Comparison Tables**







In reality, the FTC alleged, LendEDU boosted companies' numerical rankings and positions on rate tables based exclusively on how much they paid LendEDU.[45] Also, as alleged in the complaint, LendEDU falsely represented to consumers that its rankings of financial services companies were "objective," "honest," "accurate," and "unbiased."[46] Well aware of the effect on consumers, LendEDU employees enticed lenders to pay more by touting statistics showing that consumers were more likely to click on companies in better positions, according to the FTC's complaint.[47]

To comply with the FTC Act, companies should make certain that their online interfaces do not create false beliefs or otherwise deceive consumers. Companies are on the hook for the net impression conveyed by the various design elements of their websites, not just the veracity of certain words in isolation.[48] For example, companies shouldn't give the impression that a ranking or review is objective and unbiased if it is based on or affected by third-party compensation.[49] And if an advertisement strongly resembles editorial content such as a news article, or appears formatted as native content in a publication with a strong journalistic brand, it is unlikely disclaimers will overcome the deceptive net impression.[50] Overall, when designing user interfaces, businesses should look not just at the effect their design choices have on sales, click-through rates, or other profit-based metrics, but also on how those choices affect consumers' understanding of the material terms of the transaction.[51] And if a business becomes aware that a particular design choice manipulates consumer behavior by inducing false beliefs, the company should remediate the problem.

*Overall, when designing user interfaces, businesses should look not just at the effect their design choices have on sales, click-through rates, or other profit-based metrics, but also on how those choices affect consumers' understanding of the material terms of the transaction.*

## II. Design Elements that Hide or Delay Disclosure of Material Information

Some dark patterns operate by hiding or obscuring material information from consumers, such as burying key limitations of the product or service in dense Terms of Service documents that consumers don't see before purchase.[52]

Similarly, some dark patterns trick people into paying hidden fees. For example, the FTC charged that the LendingClub Corporation deceived consumers about hidden fees associated with its online loans.[53] According to the FTC's complaint, LendingClub used prominent visuals to falsely promise loan applicants that they would receive a specific loan amount and pay "no hidden fees," when in reality the company deducted hundreds or even thousands of dollars in hidden fees from the loans it disbursed.[54]

The FTC's complaint lays out how LendingClub hid the existence of its fees. LendingClub used tooltip buttons[55] consumers were unlikely to click on during the online application process, and buried mention of fees later in the application process in an un-bolded itemization sandwiched between more prominent, bolded paragraphs.[56] Furthermore, according to the FTC, in standard screen configurations, the fees appeared "below the fold" and thus required scrolling to be visible.[57] Consumers frequently reported that they only discovered the fee after LendingClub disbursed their loan proceeds, upon seeing that the disbursal amount was smaller than expected.[58]

**Figure 3: LendingClub Tooltip**




On mobile devices, information about the upfront fee and total amount received was not displayed until the consumer had scrolled down approximately four times, depicted below.

**Figure 4: LendingClub Mobile Application Process**




Another variation on the hidden-fee dark pattern is "drip pricing," in which firms advertise only part of a product's total price to lure in consumers, and do not mention other

mandatory charges until late in the buying process. Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction, after the consumer already has spent significant time selecting and finalizing a product or service plan to purchase.[59] Panelists at the FTC's workshop discussed how consumers feel committed to a purchase by the time they reach the checkout screen, and feel "really frustrated that, when they begin this process, they have no idea how much it costs until it's too late."[60]

Drip pricing costs consumers money—one study compared consumer expenditures on a ticketing website that uses drip pricing versus one that disclosed mandatory fees upfront and found that "users who weren't shown the ticket fees upfront ended up spending about 20% more money and were 14% more likely to complete [the transaction]."[61] Drip pricing can also weaken competition by making it harder for consumers to price-compare across sellers.[62] An honest business that sets forth the total price of its product at the outset will be at a significant disadvantage when compared to a seller that advertises an artificially low price to draw consumers in, then adds mandatory charges late in the transaction. As discussed at the workshop, companies should include any unavoidable and mandatory fees in the upfront, advertised price, and failure to do so has the potential to deceive consumers in violation of the FTC Act.[63] Relatedly, companies must not mislead consumers to believe that fees are mandatory when they are not.[64]

*...companies should include any unavoidable and mandatory fees in the upfront, advertised price, and failure to do so has the potential to deceive consumers in violation of the FTC Act.*

Further, particularly where the drip pricing practices involve a credit product, companies must make sure their practices don't treat consumers differently on the basis of race, national origin, or another protected characteristic.[65] The FTC has brought several actions against brick-and-mortar retailers engaged in dark patterns involving drip pricing, charging companies with violations of the FTC Act and ECOA.[66] Additionally, companies whose sales practices target a specific audience, such as children, older adults, or native speakers of other languages, must take into consideration how their claims and design choices will be perceived by these groups.[67] For example, if a business markets a product to older adults, it should avoid design elements that are harder for older consumers to perceive, such as putting important information at the periphery of the screen or in a light color.[68] Also problematic are disclosures made with poor color contrast, such as a white-text disclosure on a yellow background.[69] Failing to factor this in can lead to law violations, including of the FTC Act and COPPA.[70]

*...particularly where the drip pricing practices involve a credit product, companies must make sure their practices don't treat consumers differently on the basis of race, national origin, or another protected characteristic.*

## III. Design Elements that Lead to Unauthorized Charges

Another common dark pattern involves tricking someone into paying for goods or services that they did not want or intend to buy, whether the transaction involves single charges or recurring charges.[71] Along with wasting consumers' time and money, these dark patterns can undermine consumer trust in the market, ultimately hurting other companies who engage in legitimate and honest practices.[72]

Several workshop panelists raised concerns about dark patterns that result in unauthorized charges. One panelist explained how dark patterns can be deployed in children's gaming apps: "Let's say the green button is the button they click to advance from one level to the next level. And then suddenly, that button is suddenly a 'Buy' button. Most children will have been caught, because they've been clicking, clicking, clicking, clicking, and suddenly that's a 'Buy' button."[73]

The FTC has brought enforcement actions against companies involving kids' in-app charges. This was the central issue in the FTC's actions against Amazon, Apple, and Google.[74] Amazon, for example, charged parents and other accountholders for kids' purchases in mobile apps hosted on its app store.[75] The company advertised kids gaming apps as "free" while burying in fine-print on app description pages the fact that app users could make in-app purchases.[76]

**Figure 5: Amazon App Store Example**






Once the account holder downloaded the app and children began playing the game, unbeknownst to the account holder, kids could simply rack up multiple charges, ranging from $0.99 to $99.99 each, by tapping buttons, with no account holder involvement. These purchases were often disguised as play. As explained by the judge in the case decision, "a child may be prompted to use or acquire seemingly fictitious currency, including a 'boatload of doughnuts, a can of stars, and bars of gold,' but in reality the child is making an in-app purchase using real money."[77] Amazon later added a password prompt for account holders only for in-app purchases of $20 or more, and eventually added one in other situations, though not consistently. However, even that prompt failed to disclose that authorizing a single purchase also authorized unlimited purchases for the next 60 minutes.[78] Ultimately, Amazon was forced to make more than $70 million in refunds available to consumers.[79]

Another frequent example of a dark pattern resulting in unauthorized charges is when a company deceptively offers a free trial period, but then, unbeknownst to the consumer, the trial is followed by a recurring subscription charge if the consumer fails to cancel. One workshop panelist discussed his research on dark patterns in the context of a free trial offer. A control group of consumers was told they would receive a one-month free trial of data protection followed by monthly charges if they failed to cancel, while the "hidden information" group was told they would receive a one-month free trial and that terms and conditions apply. For the latter group, the automatic monthly charge information was included only in small gray font at the bottom of the page.[80] The dark pattern was highly effective. More than twice as many consumers in the hidden information group accepted the free trial offer as compared to consumers in the control group.[81]

Seeing a rise in these types of dark patterns, the FTC hosted a workshop[82] in 2007 to analyze the marketing of goods and services through offers with negative option[83] features, then issued a staff report in 2009 that set forth principles to guide sellers offering negative options online.[84] Following this guidance, and years of FTC cases tackling negative option-related deception under the FTC Act and the Negative Option Rule,[85] Congress enacted the Restore Online Shoppers' Confidence Act ("ROSCA") in 2010.[86] ROSCA prohibits charging for goods and services sold over the internet using a negative option feature unless the seller (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtains a consumer's express informed consent before charging the consumer's account; and (3) provides simple mechanisms for a consumer to stop recurring charges.[87] Since then, the FTC has used ROSCA as an additional tool to challenge a variety of

harmful negative option practices that saddle consumers with recurring payments for products and services they never intended to purchase or that they do not wish to continue purchasing.[88]

The FTC's first action alleging ROSCA violations charged Health Formulas, LLC, and several related companies and individuals with advertising "free" trial offers for dietary supplements, but then automatically charging those who signed up $60-$210 per month after the free trial unless they took action to cancel.[89] According to the complaint, the free trial was prominently displayed, while the monthly charges were buried in the middle of smaller, dense font.[90]

**Figure 6: Health Formulas Example**




A related dark pattern makes it hard for consumers to cancel subscription services, resulting in ongoing recurring charges.[91] The FTC's complaint against ABCMouse, the operators of a children's online learning site, offers a particularly striking example of how dark patterns can be used to block consumers' cancellation attempts.[92] According to the FTC, ABCMouse enrolled consumers into 30-day free trials or into 6- or 12-month memberships and, despite promising "Easy Cancellation," many consumers could not cancel even after repeated attempts at calling, emailing, and contacting ABCMouse through a customer support form.[93]

The complaint alleges that the company rejected any cancellation attempt through one of these methods and instead required consumers to navigate a difficult-to-find, lengthy, and confusing cancellation path on the website.[94] Consumers allegedly had to click through several pages of promotions and links that, when clicked, directed consumers away from the cancellation path without warning.[95] For example, the first screen in the path, depicted below, did not mention the word cancellation anywhere or tell consumers that they had arrived at the correct place to cancel:

**Figure 7: First Screen in ABCMouse Cancellation Path**




Another screen in the cancellation path offered consumers a "special Upgrade offer." Only by clicking the "Continue" button could consumers proceed with cancellation, even though, according to the FTC's complaint, the screen appeared to be an offer for a different product.

**Figure 8: Another of Several Screens in ABCMouse Cancellation Path**



In total, the FTC alleged that ABCMouse required consumers to navigate between six and nine screens to cancel their memberships, and consumers could not skip ahead or cancel without visiting each screen.[96] Further, according to the FTC, each screen included multiple links and buttons that, if pressed, would take consumers out of the cancellation path altogether.[97] This is a prime example of what one workshop panelist referred to as "sludge": "a high friction experience that, by its nature, causes people to become fatigued and give up."[98] It is also a dark pattern, an unfair practice under the FTC Act, and a ROSCA violation arising from the failure to provide a simple mechanism to cancel.[99]

How can a company obtain express informed consent from consumers before charging them? The answer depends on the circumstances,[100] but at a minimum, companies looking to stay on the right side of the law should make sure their procedures for obtaining consent include an affirmative, unambiguous act by the consumer.[101] Companies should not hide key terms of a purchase in a general terms and conditions document or behind hyperlinks, pop-ups, or drop-down menus.[102] Acceptance of a general terms of use document that contains unrelated information does not constitute affirmative, unambiguous consent to a particular purchase. Likewise, manipulating consumers into agreeing by employing digital dark patterns designed to subvert their autonomy or impair their decision-making does not effectuate express informed consent.

*Companies looking to stay on the right side of the law should make sure their procedures for obtaining consent include an affirmative, unambiguous act by the consumer.*

Companies should ensure they obtain the express informed consent of the *accountholder* to any charges. This point is critical in mobile apps and games often played by children, where the accountholder may be a parent or someone other than the child who is playing the game. This is also an important consideration for consumers who may have multiple adults sharing a device.[103]

*Companies should ensure they obtain the express informed consent of the accountholder to any charges.*

With respect to cancellation, as explained in the FTC's Enforcement Policy Statement on Negative Option Marketing, ROSCA requires online negative option sellers to provide a simple mechanism for consumers to cancel.[104] To meet this standard, negative option sellers should provide cancellation mechanisms that are at least as easy to use as the method the consumer used to buy the product or sign up for the service.[105] This means that consumers should be able to cancel their subscription through the same medium (such as a website or mobile application) that the consumer used to sign up for the negative option plan in the first place.[106] It also means that negative option sellers should not subject consumers to new offers or similar attempts to save the

account that impose unreasonable delays on consumers' cancellation efforts.[107] In addition, if the seller provides for telephone cancellation, it should, at a minimum, answer all calls to its cancellation number during normal business hours, within a short time frame.[108] Calls to cancel should not be lengthier or otherwise more burdensome than the telephone call the consumer used to sign up.

---

*...negative option sellers should provide cancellation mechanisms that are at least as easy to use as the method the consumer used to buy the product or sign up for the service.*

---

## IV. Design Elements that Obscure or Subvert Privacy Choices

Another pervasive dark pattern involves design elements that obscure or subvert consumers' privacy choices. Because of dark patterns, consumers may be unaware of the privacy choices they have online or what those choices might mean.[109] This may result in a significant deviation from consumers' actual privacy preferences.[110]

The FTC has been addressing dark patterns through privacy cases and policy work for many years. Workshop panelists noted that dark patterns that subvert consumer privacy preferences often take the form of a purported choice offered to consumers related to their data, except that choice is illusory and presented in a way that nudges consumers toward increased data sharing.[111] As discussed in further detail below, workshop panelists discussed how companies incorporate dark patterns into their products in various ways, including through user interfaces that:

(1) do not allow consumers to definitively reject data collection or use;
(2) repeatedly prompt consumers to select settings they wish to avoid;
(3) present confusing toggle settings leading consumers to make unintended privacy choices;
(4) purposely obscure consumers' privacy choices and make them difficult to access;
(5) highlight a choice that results in more information collection, while greying out the option that enables consumers to limit such practices; and
(6) include default settings that maximize data collection and sharing.

The workshop panelists discussed various examples of dark patterns relating to information collection. For instance, one panelist pointed to the commonly used cookie consent dialogue—presenting the consumer with the option whether to allow the company to set a cookie—as one example of a user interface that highlights the company's preferred choice while greying out the disfavored option.[112] This interface "places the option to accept cookies front and center, while the option to deny or modify cookie settings is usually behind, perhaps, several different screens."[113] Another researcher noted that even where users are asked to provide

consent, they are often not informed in a clear and understandable way about the practices that they are being asked to approve.[114]

The workshop panelists also discussed examples of interfaces that maximize information collection and sharing, such as using default settings to make consumer data collection difficult to avoid, even when such collection is unnecessary.[115] One researcher explained that companies now frequently collect mobile phone numbers by default; she argues these numbers have become "the new Social Security number" because consumers so rarely change them.[116] As such, she stated that mobile numbers are seldom actually needed for the provision of an online service, but "companies are often eager to get those [numbers] because it's another way they can identify you," and target you with advertising.[117] Another example of a default setting maximizing data collection discussed at the workshop was the set-up flow for Google's Android phones, which the researcher argued encourages consumers to enable location collection because "the way [Google] portrayed the choices was in such a manner that you would turn on location tracking."[118] As the researcher explained, location data is extremely valuable and can reveal sensitive details about consumers including where they live and work and even their sexual orientation or political and religious affiliations.[119] In fact, the FTC sued data broker Kochava, Inc., related to its sale of consumer location data.[120] The FTC alleged in its complaint that Kochava sold geolocation data from hundreds of millions of mobile devices—data that can be used to trace the movements of individuals to and from sensitive locations, including reproductive health clinics, places of worship, and domestic violence shelters, among others.[121] Thus, subverting a consumer's privacy intentions with respect to location information would be highly problematic.

---

*...subverting a consumer's privacy intentions with respect to location information would be highly problematic.*

---

In addition to the dark patterns discussed at the workshop, the recent FTC Staff Report on the privacy practices of major internet service providers ("ISPs")[122] pointed to similar dark patterns in those companies' user interfaces.[123] First, certain ISPs included interfaces where the ISP's preferred choice was highlighted while the alternative (less favorable to the ISP) was greyed out (e.g., the "Accept" choice is in a bold, blue background, while "Reject" is in muted grey, almost resembling an inactive button).[124] The Staff Report explained how such an interface may indicate to consumers that they have no choice but to select "Accept," or might lead consumers to select "Accept" out of expediency without realizing their ability to "Reject" due to the difference in prominence of the two choices. Second, the Report highlighted interfaces that do not allow consumers to reject data collection or that continuously prompt consumers if they select a disfavored setting. For example, a consumer may be asked to either "accept" the collection of their location information or choose "remind me later," which leads to repeated prompting until a consumer finally succumbs and accepts—likely out of frustration.[125]

Notably, in this situation, the company does not even give a consumer an option to reject data collection altogether. Third, consumer privacy choices may be buried or hidden from consumers, forcing them to search through a number of tabs and sub-tabs in order to review and change their privacy preferences.[126] Finally, the report found unclear toggle settings that can confuse consumers into selecting a privacy setting they did not intend. For example, a "Do Not Sell My Information" option followed by an "off" toggle creates a double negative and might make it unclear whether consumers need to toggle the setting on or off to prohibit the sale of their information.[127]

In addition to our workshops and our ISP 6b study, the FTC has brought cases against companies that use dark patterns to subvert consumer privacy choices. One example is the Commission's case against Vizio, a smart-TV manufacturer. In *Vizio*,[128] the FTC alleged that the company enabled a default setting called "Smart Interactivity," which enabled consumers to receive "program offers and suggestions," but in reality allowed Vizio to comprehensively collect and share consumers' television viewing activity with third parties. The complaint stated that Vizio provided no notice of this default setting to many of its consumers.[129] At a certain point, it provided the below notice to some consumers, which timed out after one minute and provided no direct link to the settings menu or privacy policy.[130] In any event, the FTC alleged that by keeping the setting name vague, Vizio effectively removed consumers' ability to make an informed choice about their data sharing.[131] The alleged conduct was a clear example of a dark pattern that subverted consumers' privacy choices.

**Figure 9: Vizio Privacy Notice**




Businesses should, first and foremost, aspire to become good stewards of consumer personal information. Data minimization measures should be inherent in any business plan—this makes sense not only from a consumer privacy perspective, but also from a business perspective

because it reduces the risk of liability due to potential data exposure. Businesses should collect the data necessary to provide the service the consumer requested, and nothing more.

*Businesses should, first and foremost, aspire to become good stewards of consumer personal information.*

In addition to generally minimizing data collection efforts, businesses should also avoid subverting consumers' privacy choices. First, companies should avoid default settings that lead to the collection, use, or disclosure of consumers' information in a way that they did not expect (and collect information only when the business has a justified need for collecting the data). Second, companies should make consumer choices easy to access and understand. Consumers should not have to navigate through multiple screens to find privacy settings or have to look for settings buried in a privacy policy or in a company's terms of service: they should be presented at a time and in a context in which the consumer is making a decision about their data. Any toggle options presented to the consumer should not be ambiguous or confusing, and one option should not be more prominent than another. Third, choices about sensitive information, in particular, should be presented so that it is clear to the consumer what they are consenting to – as opposed to a blanket consent – and should be presented along with information that they need to make an informed decision (for example, that if the consumer consents to the collection of their information, that information will be shared with third parties). More generally, businesses should take a moment to assess their user interfaces from a consumer's perspective and consider whether another option might increase the likelihood that a consumer's choice will be respected and implemented.

*Consumers should not…have to look for settings buried in a privacy policy or in a company's terms of service: they should be presented at a time and in a context in which the consumer is making a decision about their data.*

Another variation on the privacy-related dark pattern involves lead generators that convey a false affiliation to manipulate consumers into sharing personal information. For example, the FTC charged the lead generator Sunkey Publishing[132] with using websites such as army.com and armyenlist.com, designed to appear as official recruiting websites affiliated with the U.S. military, to target people seeking to join the armed forces and trick them into submitting their information. According to the FTC complaint, Sunkey falsely promised to use the information collected only for military recruitment purposes and not to share it with anyone else.[133]

**Figure 10: Sunkey Information Request Page**




In reality, according to the complaint, Sunkey sold the information as marketing leads to post-secondary schools for $15 to $40 per lead, and consumers received follow-up phone calls from telemarketers giving consumers the false impression that the U.S. military actually endorsed those schools.[134] Similar examples of deceptive lead generator dark patterns can be found in the FTC's cases against *EduTrek,*[135] *Blue Global*,[136] and *ITMedia*.[137]

*Lead generators must be honest about who they are and why they are collecting consumer information.*

Lead generators must be honest about who they are and why they are collecting consumer information. If a company represents that they are collecting consumer information for one audience or one purpose, they cannot then share it with a different buyer or for a different purpose without consumer consent. Deceptive lead generators that manipulate consumers into sharing personal information under false pretenses violate the FTC Act. When the "product" a business sells includes sensitive data, they must take steps to vet prospective buyers and understand how that information is being used. Further, companies who use others to generate leads should monitor what those third parties are doing on their behalf and ensure the leads they use weren't the product of deception.

# Conclusion

While dark patterns may manipulate consumers in stealth, these practices are squarely on the FTC's radar.

The FTC's "Bringing Dark Patterns to Light" workshop and cases involving dark patterns represent the agency's longstanding efforts to study and combat dark patterns and to raise awareness about the dangers they pose to consumers. This Staff Report serves as an additional resource for the public and a guide for businesses as they develop, design, and improve their online interfaces.

Firms that nonetheless employ dark patterns, take notice: where these practices violate the FTC Act, ROSCA, the TSR, TILA, CAN-SPAM, COPPA, ECOA, or other statutes and regulations enforced by the FTC, we will continue to take action.

# Appendix A

## Compilation of Digital Dark Patterns

**Digital Dark Patterns** are design practices that trick or manipulate users into making choices that they might not otherwise have made. Below are some common dark patterns identified by FTC workshop panelists and found in the academic literature.

| Dark Pattern Type | Dark Pattern Variant | Description |
|---|---|---|
| **ENDORSEMENTS (aka "SOCIAL PROOF")** | **False Activity Messages** | Making false claims about others' activity on a site or interest in a product<br>*Example: "24 other people are viewing this listing"* |
| | **Deceptive Consumer Testimonials** | Using phony customer endorsements or presenting other people's experience without revealing material information, such as:<br>(1) the endorsers were compensated;<br>(2) the endorsers have a connection to the company, like being an employee or a family member; or<br>(3) the endorsers' experiences aren't typical of what others will experience in similar circumstances |
| | **Deceptive Celebrity Endorsements** | Featuring testimonials that falsely appear to come from celebrities<br>OR<br>Using celebrities or prominent influencers to endorse a product without disclosing that the celebrity was paid for the endorsement or was given the product for free |
| | **Parasocial Relationship Pressure** | Using characters that children know and trust to pressure them into making a certain choice<br>*Example: Using a well-known cartoon character to encourage children to make in-app purchases* |
| **SCARCITY** | **False Low Stock Message** | Creating pressure to buy immediately by saying inventory is low when it isn't<br>*Example: "Only 1 left in stock – order soon"* |
| | **False High Demand** | Creating pressure to buy immediately by saying demand |

| | | |
|---|---|---|
| | **Message** | is high when it isn't<br>*Example: "20 other shoppers have this item in their cart"* |
| **URGENCY** | **Baseless Countdown Timer** | Creating pressure to buy immediately by showing a fake countdown clock that just goes away or resets when it times out<br>*Example: "Offer ends in 00:59:48"* |
| | **False Limited Time Message** | Creating pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon – but without a deadline or with a meaningless deadline that just resets when reached |
| | **False Discount Claims** | Creating pressure to buy immediately by offering a fake "discounted" or "sale" price |
| **OBSTRUCTION** | **Price Comparison Prevention** | Keeping shoppers from easily comparing prices by bundling things, using different measures (price per unit v. price per ounce), or listing the price per payment (such as $10 per week) without disclosing the total number of payments or overall cost |
| | **Roadblocks to Cancellation** | Making it easy to sign up but hard to cancel, by requiring people to go through tedious, time-consuming cancellation procedures<br>*Example: letting people sign up online, but making them use another means to cancel*<br>*Example: requiring that people cancel by phone but then concealing the phone number, short-staffing the cancellation line, opening the line during limited hours, or requiring people to listen to a sales pitch or upsell while trying to cancel* |
| | **Immortal Accounts** | Making it hard or impossible to delete an account |
| **SNEAKING OR INFORMATION HIDING** | **Sneak-into-Basket** | Automatically adding items to the shopping cart without a shopper's permission<br>OR<br>Tricking a shopper into buying unwanted items by using a pre-checked box |
| | **Hidden Information** | Hiding material information or significant product limitations from people<br>*Example: hiding info in fine print, in lengthy terms of service documents, behind nondescript* |

| | | |
|---|---|---|
| | | *hyperlinks, or in pop-up boxes that only appear if someone hovers over the right thing* |
| | **Hidden Costs** | Adding hidden fees or other charges that people don't know about<br>*Example: an undisclosed origination fee deducted from loan proceeds* |
| | **Drip Pricing** | Advertising only part of a product's total price initially and then imposing other mandatory charges late in the buying process<br>*Example: a "convenience fee" that appears only when a shopper reaches the check-out screen* |
| | **Hidden Subscription or Forced Continuity** | Offering a free trial and, at the end of the trial, automatically and unexpectedly charging a recurring fee if consumers don't affirmatively cancel<br>OR<br>Offering a product for a small one-time fee, then automatically enrolling people into a subscription or continuity plan without their consent |
| | **Intermediate Currency** | Hiding the real cost by requiring consumers to buy things with virtual currency<br>*Example: "coins" or "acorns" in kids' apps* |
| **INTERFACE INTERFERENCE** | **Misdirection** | Using style and design to focus users' attention on one thing in order to distract their attention from another<br>*Example: presenting the subtotal price in a bright green highlighted box, then listing additional mandatory taxes and fees below in a non-highlighted section so users don't notice their final total will be higher* |
| | **False Hierarchy or Pressured Upselling** | In giving options, using contrasting visual prominence to steer users into making a certain selection<br>*Example: during cancellation, presenting the "Keep My Subscription" option as a bright orange button, while presenting the "Cancel My Subscription" option as a smaller font, pale gray hyperlink hidden below the orange button* |
| | **Disguised Ads** | Formatting advertisements to falsely appear to be unbiased product reviews or independent journalism<br>OR<br>Presenting a ranking list, search engine, or comparison- |

| | | |
|---|---|---|
| | | shopping site as neutral and unbiased when it is actually based on advertising dollars |
| | **Bait and Switch** | A choice or interaction leads to an unexpected, undesirable outcome<br>*Example: a user clicks the X in the top right corner of a pop-up but, instead of closing the box, it downloads software*<br>*Example: selling a consumer something that turns out to be materially different than what was originally advertised* |
| **COERCED ACTION** | **Unauthorized Transactions** | Tricking people into paying for goods or services that they did not want or intend to buy, such as mislabeling the steps in a transaction or failing to obtain the express informed consent of the accountholder<br>*Example: a shopping website button labeled "Next" that people think will lead to the next screen but, instead, processes the transaction immediately*<br>*Example: a one-click button in children's gaming apps that charges parents real money* |
| | **Auto-Play** | Automatically playing another video once one video ends in a manner that is unexpected or harmful<br>*Example: after the first video, a less kid-friendly video – or a sponsored ad camouflaged to look like a recommended video – automatically plays* |
| | **Nagging** | Asking repeatedly and disruptively if a user wants to take an action<br>OR<br>Making a request that doesn't let the user permanently decline – and then repeatedly prompting them with the request<br>*Example: asking users to provide their data or turn on cookies then repeatedly presenting the choices as "Yes" or "Not Now" instead of "Yes" or "No"* |
| | **Forced Registration or Enrollment** | Making users create an account or share their information to complete a task<br>*Example: "Create an account to continue with your purchase"* |
| | **Pay-to-Play or** | Saying that things are available with a purchase or |

| | | |
|---|---|---|
| | **Grinding** | download, but then charging users to actually obtain those things<br>OR<br>Making the free version of a game so cumbersome and labor-intensive that the player is induced to unlock new features with in-app purchases |
| | **Friend Spam, Social Pyramid Schemes, and Address Book Leeching** | Asking for an email address or social media permissions for one purpose but then using it for another<br>OR<br>Making users share information about people in their social network |
| **ASYMMETRIC CHOICE** | **Trick Questions** | Using ambiguity or confusing language – often double negatives – to steer a user to things they don't want<br>*Example: "Uncheck the box if you prefer not to receive email updates"*<br>*Example: A checkbox next to the phrase "Decline the option of renewing your loan," which if left un-checked is interpreted as acceptance of auto-renewal terms*<br>*Example: when trying to cancel a subscription service, a button labeled "No, cancel" that doesn't cancel your subscription but instead takes you out of the cancellation path* |
| | **Confirm Shaming** | Using shame to steer users away from certain choices by framing the alternatives as a bad decision<br>*Example: "No, I don't want to save money" appears when a shopper selects a one-time purchase over a recurring one* |
| | **Preselection** | Preselecting a default that's good for the company, but not the user<br>*Example: add-on products such as trip insurance or an extended warranty are automatically tacked on to a purchase unless the customer notices and opts out*<br>*Example: the accept tracking cookies box is pre-checked*<br>*Example: the site automatically shows shoppers the most expensive option, not the cheaper or free option* |
| | **Subverting Privacy** | Tricking users into sharing more information than they |

| | | |
|---|---|---|
| | **Preferences** | really intended to<br>*Example: asking users to give consent but not informing them in a clear, understandable way what they are agreeing to share*<br>*Example: telling users the site is collecting their information for one purpose but then sharing it with others or using it for other purposes*<br>*Example: including default settings that maximize data collection and making it difficult for users to find and change them*<br>*Example: giving users a choice, but one where the "Accept" choice is in a bold, blue background, while "Reject" is greyed out and in small print* |

# Appendix B

Even a single purchase can bring you into contact with many dark patterns. Here are some common ways that you can be tricked or manipulated during online transactions.




Sites can use design, style, and confusing language to steer you to a certain choice. This one wants you to share information – maybe more than you wanted.

*Trick Question, Subverting Privacy Preferences*




This page lies about what others on the site are doing ("20 other people viewed this item") in an effort to boost sales.

*False Activity Messages*




The fake countdown clock on this page pressures you to buy immediately, but the clock just goes away or resets when it times out.

*Baseless Countdown Timer*




Here, an unexpected convenience fee of $4.99 appears only right before you check out.

*Drip Pricing*




This promotion steers you to an unexpected subscription, charges a recurring fee even though the offer is advertised as a free trial, and only lets you cancel by phone.

*Pressured Upselling,*
*Hidden Information,*
*Hidden Subscription,*
*Roadblocks to Cancellation*




This order confirmation page shows a recurring subscription fee in fine print at the bottom of the page that was snuck into your order on the prior page.

*Unauthorized Transaction, Hidden Information*

# Contributors

## Division of Financial Practices

Stephanie Liebner
Brittany Frassetto
Eleni Broadwell
Samuel Jacobson
Sandhya Brown
Malini Mithal

## Division of Privacy and Identity Protection

Gorana Neskovic
Mark Eichorn

## Division of Consumer and Business Education

Marlena Patterson
Lesley Fair
Alvaro Puig

## Division of Enforcement

Brad Winter

## Division of Advertising Practices

Laura Sullivan
Annette Soberats

# Endnotes

[1] *See, e.g.*, European Commission, Directorate-General for Justice and Consumers, Lupiáñez-Villanueva, F., Boluda, A., Bogliacino, F., et al., *Behavioural study on unfair commercial practices in the digital environment: dark patterns and manipulative personalisation: final report* (May 2022), at 19, available at https://data.europa.eu/doi/10.2838/859030 [hereinafter EU Dark Patterns Report] ("Persuasive practices and personalisation predate the online world and are also applied in the brick-and-mortar world. The digital transformation and the data economy, however, have made possible the adoption of these practices to an unprecedented level.").

[2] In pursuance of this mission, the FTC administers a wide variety of laws and regulations, including the Federal Trade Commission Act. Section 5(a) of the FTC Act provides that "unfair or deceptive acts or practices in or affecting commerce . . . are . . . declared unlawful." 15 U.S.C. Sec. 45(a)(1). "Deceptive" practices are defined in the FTC's Deception Policy Statement as involving a material representation, omission, or practice that is likely to mislead a consumer acting reasonably under the circumstances. An act or practice is "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. Sec. 45(n).

[3] *See, e.g.*, *FTC v. Age of Learning, Inc., also d/b/a ABCmouse and ABCmouse.com*, Case No. 2:20-cv-07996 (C.D. Cal.); FTC Press Release, *Children's Online Learning Program ABCMouse to Pay $10 Million to Settle FTC Charges of Illegal Marketing and Billing Practices* (Sept. 2, 2020), at https://www.ftc.gov/news-events/press-releases/2020/09/childrens-online-learning-program-abcmouse-pay-10-million-settle; *FTC v. Prog Leasing, LLC, also d/b/a Progressive Leasing*, Case No. 1:20-cv-01668 (N.D. Ga.); FTC Press Release, *Rent-to-Own Payment Plan Company Progressive Leasing Will Pay $175 Million to Settle FTC Charges It Deceived Consumers About Pricing* (April 20, 2020), at https://www.ftc.gov/news-events/press-releases/2020/04/rent-own-payment-plan-company-progressive-leasing-will-pay-175; *FTC v. LendingClub Corporation*, Case No. 3:18-cv-02454 (N.D. Cal.); FTC Press Release, *LendingClub Agrees to Pay $18 Million to Settle FTC Charges* (July 14, 2021), at https://www.ftc.gov/news-events/press-releases/2021/07/lendingclub-agrees-pay-18-million-settle-ftc-charges; *FTC v. AH Media Grp.*, Case No. 3:19-cv-04022-JD (N.D. Cal.); FTC Press Release, *FTC Halts Online Subscription Scheme that Deceived People with "Free Trial" Offers* (May 8, 2020), at https://www.ftc.gov/news-events/press-releases/2020/05/ftc-halts-online-subscription-scheme-deceived-people-free-trial.

[4] FTC, Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed. Reg 60822 (Oct. 28, 2021), available at https://www.ftc.gov/system/files/documents/public_statements/1598063/negative_option_policy_statement-10-22-2021-tobureau.pdf; FTC Press Release, *FTC to Ramp up Enforcement against Illegal Dark Patterns that Trick or Trap Consumers into Subscriptions* (Oct. 28, 2021), at https://www.ftc.gov/news-events/press-releases/2021/10/ftc-ramp-enforcement-against-illegal-dark-patterns-trick-or-trap;.

[5] FTC, "Bringing Dark Patterns to Light: An FTC Workshop," https://www.ftc.gov/news-events/events-calendar/bringing-dark-patterns-light-ftc-workshop.

[6] There are certain dark patterns that the FTC has consistently found to be unlawful, while others would depend on a case-by-case evaluation of all the attendant facts.

[7] FTC, "Bringing Dark Patterns to Light: An FTC Workshop" Transcript, at 6, 8, https://www.ftc.gov/system/files/documents/public_events/1586943/ftc_darkpatterns_workshop_transcript.pdf [hereinafter "Dark Patterns Workshop Transcript"].

[8] *Id.* at 28; Jamie Luguri, Lior Jacob Strahilevitz, *Shining a Light on Dark Patterns* (March 23, 2021), Journal of Legal Analysis, Volume 13, Issue 1.

[9] *See, e.g.*, EU Dark Patterns Report, at 39-40 ("A key issue that emerged from the research is that unfair commercial practices are rarely presented in isolation…The combination of several dark patterns is even more effective at influencing consumers' choices, and complicates enforcement, which is often based on a practice-by-practice investigation."); United Kingdom Competition & Markets Authority Discussion Paper, *Online Choice Architecture: How digital design can harm competition and consumers* (April 2022), at vi, available at https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1066524/Online_choice_architecture_discussion_paper.pdf [hereinafter "CMA Online Choice Architecture Paper"] ("OCA practices are often not used in isolation, and tend to have stronger effects when they are combined.").

[10] FTC Complaint, *FTC v. RagingBull.com, LLC,* Case No 1:20-cv-3538 (D. Md.), available at https://www.ftc.gov/system/files/documents/cases/ragingbull.com_-_amended_complaint_for_permanent_injunction_and_other_equitable_relief.pdf.

[11] *See* Dark Patterns Workshop Transcript, at 34 ("When you move from a brick-and-mortar environment to a digital environment, there's more aspects of the environment you can manipulate…you can also collect and leverage information about consumers."). *See also* EU Dark Patterns Report, at 120 ("Dark patterns and manipulative personalisation practices can lead to financial harm, loss of autonomy and privacy, cognitive burdens, mental harm, as well as pose concerns for collective welfare due to detrimental effects on competition, price transparency and trust in the market.").

[12] *See, e.g.*, Dark Patterns Workshop Transcript, at 33-37; EU Dark Patterns Report, at 20 ("The large-scale collection and analysis of personal data may be a threat not only for privacy but also due to the manner in which it is used to shape individual decision-making."); CMA Online Choice Architecture Paper, at iii ("The speed and scale of data collection, experimentation, and targeted personalisation available to businesses online also facilitates the development and optimisation of choice architecture in real time."); International Digital Accountability Council ("IDAC"), Public Comment Submitted to FTC on Dark Patterns Issues, FTC-2021-0019-0109, at 2, available at https://www.regulations.gov/comment/FTC-2021-0019-0109.

[13] *See* Dark Patterns Workshop Transcript, at 37; Willis, L. E., *Deception by Design* (2020), Harvard Journal of Law & Technology, 34(1), 115-190 ("Although marketers have long used testing to predict which advertisements will be most effective, the difference between offline human-directed and online real-time machine-controlled experimentation is profound. The speed, scale, and thoroughness of machine experimentation 'make[s] accessible a vast design space that ordinary human iteration wouldn't be able to explore.'"); EU Dark Patterns Report, at 20 ("Online platforms and traders gather data and then test different nudges. They see the reaction and steadily feed the information into machine learning algorithms that produce improved and refined nudges in a self-propelling cycle that is beneficial to them but may be detrimental for consumers.").

[14] *See* Dark Patterns Report Transcript, at 31, 34, 37.

[15] Campaign for a Commercial-Free Childhood and The Center for Digital Democracy, Public Comment Submitted to FTC on Dark Patterns Issues, FTC-2021-0019-0108, at 1, 18-19, 30, available at https://www.regulations.gov/comment/FTC-2021-0019-0108 [hereinafter Digital Democracy Public Comment].

[16] *In the Matter of Credit Karma*, FTC Matter No. 2023138; FTC Press Release, *FTC Takes Action to Stop Credit Karma From Tricking Consumers With Allegedly False "Pre-Approved" Credit Offers* (Sept. 1, 2022), at https://www.ftc.gov/news-events/news/press-releases/2022/09/ftc-takes-action-stop-credit-karma-tricking-consumers-allegedly-false-pre-approved-credit-offers.

[17] FTC Complaint, *In the Matter of Credit Karma*, FTC Matter No. 2023138, available at https://www.ftc.gov/system/files/ftc_gov/pdf/CK%20Complaint%209-1-22%20%28Redacted%29.pdf.

[18] *See* Dark Patterns Workshop Transcript, at 2, 4, 6, 8, 18, 21, 57-59. *See also* EU Dark Patterns Report, at 45 ("Overall, mystery shoppers detected practices that they perceive as dark patterns in 73 out of the 75 websites and apps explored. Given that 97% of the websites/apps covered presented these practices, it is evident that the use of dark patterns is common across the board.").

[19] EU Dark Patterns Report, at 46-57.

[20] *See* Dark Patterns Workshop Transcript, at 10 ("We ultimately found the dark pattern count is frequently higher in apps than in websites, both when you look within a service or across types of the dark pattern."); Gunawan, J., Pradeep, A., Choffnes, D., Hartzog, W., & Wilson, C., *A Comparative Study of Dark Patterns Across Mobile and Web Modalities* (2021). *But see* EU Dark Patterns Report, at 46 ("The prevalence of some dark patterns may thus differ depending on the modality…However, the mystery shopping exercise across 75 websites/apps found that the prevalence of dark patterns was generally similar in mobile apps and websites.").

[21] *See* Dark Patterns Workshop Transcript, at 75.

[22] *See generally* Sara Atske & Andrew Perrin, *Home broadband adoption, computer ownership vary by race, ethnicity in the U.S.*, Pew Research Center (July 16, 2021), available at https://www.pewresearch.org/fact-tank/2021/07/16/home-broadband-adoption-computer-ownership-vary-by-race-ethnicity-in-the-u-s/ ("A quarter of Hispanics are 'smartphone-only' internet users – meaning they own a smartphone but lack traditional home broadband services. By comparison, 12% of White adults fall into this category. Among Black adults, 17% are smartphone dependent, but this share is not statistically different from their White or Hispanic counterparts."). *See also* Dark Patterns Workshop Transcript, at 9-11; Gunawan, J., Pradeep, A., Choffnes, D., Hartzog, W., & Wilson, C., A Comparative Study of Dark Patterns Across Mobile and Web Modalities (2021), at 23 ("Additionally, we are concerned that dark pattern variability across modalities may exacerbate existing social inequalities and exploit vulnerable populations, especially for people whose primary (or only) internet-capable device is mobile."); IDAC Public Comment, *supra* note 12, at 1.

[23] *See, e.g.*, Dark Patterns Workshop Transcript, at 19; EU Dark Patterns Report, at 60 ("Moreover, developments in the area of virtual or blended/augmented reality environments, such as the metaverse, generate additional potential for more immersive dark patterns and manipulative personalisation, which may differ significantly from the classic dark patterns or personalisation techniques used to date, and may have profound implications for consumer decision-making in the digital environment.").

[24] *See, e.g.*, Dark Patterns Workshop Transcript, at 73; EU Dark Patterns Report, at 85 ("Dark patterns are hidden, subtle and manipulative in nature, so it is difficult to spot and report them."); CMA Online Choice Architecture Paper, at 42 ("When encountering a harmful OCA practice, such as a dark pattern, most individuals are unlikely to realise they were under the influence of a bias or heuristic that drove their decision making."); Consumer Reports, Public Comment Submitted to FTC on Dark Patterns Issues, FTC-2021-0019-0119, at 3, available at https://www.regulations.gov/comment/FTC-2021-0019-0119 ("By their very nature, dark patterns are difficult for consumers to identify.").

[25] *See, e.g.*, Dark Patterns Workshop Transcript, at 36; EU Dark Patterns Report, at 85 ("Another possibility is that a consumer who has been manipulated is embarrassed about being tricked and does not want to draw more attention to the problem.").

[26] *See* Dark Patterns Workshop Transcript, at 8.

[27] *See id.* at 67-68, 75; *See also* FTC Enforcement Policy Statement on Deceptively Formatted Advertisements (Dec. 22, 2015), available at https://www.ftc.gov/system/files/documents/public_statements /896923/151222 deceptiveenforcement.pdf; *In the Matter of Lord & Taylor, LLC*, Docket No. C-4576; FTC Press Release, *Lord & Taylor Settles FTC Charges It Deceived Consumers Through Paid Article in an Online Fashion Magazine and Paid Instagram Posts by 50 "Fashion Influencers"* (March 15, 2016), at https://www.ftc.gov/news-events/news/press-releases/2016/03/lord-taylor-settles-ftc-charges-it-deceived-consumers-through-paid-article-online-fashion-magazine.

[28] *See, e.g.*, *In the Matter of LendEDU, et al.*, Docket No. C-4719; FTC Press Release, *Operators of Comparison Shopping Website Agree to Settle FTC Charges Alleging Deceptive Rankings of Financial Products and Fake Reviews* (Feb. 3, 2020), at https://www.ftc.gov/news-events/press-releases/2020/02/operators-comparison-shopping-website-agree-settle-ftc-charges; *FTC v. Victory Media, Inc.*, Docket No. C-4640; FTC Press Release, *Victory Media Settles FTC Charges Concerning Its Promotion of Post-Secondary Schools to Military Consumers* (Oct. 19, 2017), at https://www.ftc.gov/news-events/press-releases/2017/10/victory-media-settles-ftc-charges-concerning-its-promotion-post. *See also* FTC Press Release, *FTC Puts Hundreds of Businesses on Notice about Fake Reviews and Other Misleading Endorsements* (Oct. 13, 2021), at https://www.ftc.gov/news-events/news/press-releases/2021/10/ftc-puts-hundreds-businesses-notice-about-fake-reviews-other-misleading-endorsements;

[29] Dark Patterns Workshop Transcript, at 8, 27. *See also* CMA Online Choice Architecture Paper, at 26 ("There is considerable evidence that consumers react to scarcity and divert their attention to information where they might miss opportunities… false or misleading scarcity claims, such as countdown clocks that reset or stock claims that are exaggerated or unsubstantiated, can put undue pressure on consumers to act.")

[30] Dark Patterns Workshop Transcript, at 6, 72. *See also* CMA Online Choice Architecture Paper, at 26 ("Numerous experiments and studies find an effect of scarcity claims on click-through rates, purchase, perceived value, and favourability towards businesses who offer them.") (citing to several academic research studies).

[31] Dark Patterns Workshop Transcript, at 6, 27.

[32] *See e.g.*, *FTC v. Victory Media, Inc.*, Docket No. C-4640, *supra* note 28; *FTC v. Effen Ads, LLC*, Case No. 2:19-cv-00945 (D. Utah); FTC Press Release, *Operators of Multi-Million Dollar Work-from-Home Scheme Settle FTC Allegations* (Dec. 30, 2019), at https://www.ftc.gov/news-events/press-releases/2019/12/operators-multi-million-dollar-work-home-scheme-settle-ftc; *LeanSpa, LLC, et al.*, Case No 3:11-cv-1715 (D. Conn.); FTC Press Release, *U.S. Circuit Court Finds Operator of Affiliate Marketing Network Responsible for Deceptive Third-Party Claims Made for LeanSpa Weight-loss Supplement* (Oct. 4, 2016), at https://www.ftc.gov/news-events/press-releases/2016/10/us-circuit-court-finds-operator-affiliate-marketing-network.

[33] FTC Enforcement Policy Statement on Deceptively Formatted Advertisements (Dec. 22, 2015), https://www.ftc.gov/system/files/documents/public_statements /896923/151222 deceptiveenforcement.pdf.

[34] *FTC v. Effen Ads, LLC*, Case No. 2:19-cv-00945 (D. Utah); FTC Press Release, *Operators of Multi-Million Dollar Work-from-Home Scheme Settle FTC Allegations* (Dec. 30, 2019), at https://www.ftc.gov/news-events/press-releases/2019/12/operators-multi-million-dollar-work-home-scheme-settle-ftc.

[35] FTC Complaint, *FTC v. Effen Ads, LLC*, Case No. 2:19-cv-00945 (D. Utah), available at https://www.ftc.gov/system/files/documents/cases/1723202catalystcomplaint.pdf.

[36] *Id.*

[37] *Id.*

[38] The advertisement or website must be viewed as a whole, including visual and aural elements. The net impression of the advertisement is controlling. FTC Policy Statement on Deception (Oct. 14, 1983), available at https://www.ftc.gov/system/files/documents/public_ statements/410531/831014deceptionstmt.pdf [hereinafter "FTC Deception Policy Statement"]; *Pfizer Inc.,* 81 F.T.C. 23, 58 (1972); *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976).

[39] For example, a Pew Research Center survey conducted in 2005 reported that 45% of search engine users said they would stop using a search engine if it did not make it clear that some results were paid or sponsored. Pew Internet & Am. Life Project, *Search Engine Users: Internet searchers are confident, satisfied and trusting – but they are also unaware and naïve*, at 20 (Jan. 23, 2005), http://www.pewinternet.org/Reports/2005/Search-Engine-Users/1-Summary-of-Findings.aspx. *See also* FTC, *Soliciting and Paying for Online Reviews: A Guide for Marketers* (January 2022), at https://www.ftc.gov/business-guidance/resources/soliciting-paying-online-reviews-guide-marketers.

[40] *See* CMA Online Choice Architecture Paper, at 37 ("[A]cademic research shows that across several contexts (and particularly online), items appearing (ranked) at the top of the list are more likely to be clicked and chosen. The effectiveness of ranking shares many psychological mechanisms with defaults…including reduced effort, salience, and beliefs about quality or relevance, such that items appearing higher perform better.")

[41] FTC Enforcement Policy Statement on Deceptively Formatted Advertisements (Dec. 22, 2015), available at https://www.ftc.gov/system/files/documents/public_statements /896923/151222 deceptiveenforcement.pdf.

[42] *See* CMA Online Choice Architecture Paper, at 38 ("Third-party businesses may therefore be unable to improve their search ranking or may find it difficult to draw customers away from the incumbent.").

[43] *In the Matter of LendEDU, et al.*, Docket No. C-4719; FTC Press Release, *Operators of Comparison Shopping Website Agree to Settle FTC Charges Alleging Deceptive Rankings of Financial Products and Fake Reviews* (Feb. 3, 2020), at https://www.ftc.gov/news-events/press-releases/2020/02/operators-comparison-shopping-website-agree-settle-ftc-charges.

[44] FTC Complaint, *In the Matter of LendEDU, et al.*, Docket No. C-4719, available at https://www.ftc.gov/system/files/documents/cases/c-4719_182_3180_lendedu_complaint.pdf.

[45] *Id.*

[46] *Id.*

[47] *Id*.

[48] *See* FTC Policy Statement on Deception, *supra* note 38; FTC Enforcement Policy Statement on Deceptively Formatted Advertisements, *supra* note 33.

[49] *See* FTC Deception Policy Statement, at 4 ("Depending on the circumstances, accurate information in the text may not remedy a false headline because reasonable consumers may glance only at the headline. Written disclosures or fine print may be insufficient to correct a misleading representation."); FTC, *Featuring Online Customer Reviews: A Guide for Platforms* (January 2022), at https://www.ftc.gov/business-guidance/resources/featuring-online-customer-reviews-guide-platforms.

[50] *See* Statement in Regard to Advertisements That Appear in Feature Article Format, FTC Release, (Nov. 28, 1967) (In some instances, "the format of [an] advertisement may so exactly duplicate a news or feature article as to render the caption 'ADVERTISEMENT' meaningless and incapable of curing the deception."). *See also* FTC, *Blurred Lines: An Exploration of Consumers' Advertising Recognition in the Contexts of Search Engines and Native Advertising: A Federal Trade Commission Staff Report* (Dec. 2017), at 22, available at https://www.ftc.gov/system/files/documents/ reports/blurred-lines-exploration-consumers-advertising-recognition-contexts-search-engines-native/p164504_ftc _staff _report_re_digital_advertising_and_appendices.pdf [hereinafter "Blurred Lines FTC Staff Report"] ("The Gear Patrol and Chicago Tribune conditions appeared to have fewer indicia separate and apart from the disclosure that they were advertisements. For both these native ads, assessed ad recognition was low to begin with, and seemed to improve very little with the improved disclosures.").

[51] *See* Blurred Lines FTC Staff Report, at 1 ("In other words, consumers should be able to recognize an ad as an ad. If a separate disclosure is necessary to make that happen, the disclosure should be made in a way that ensures consumers can read, process, and understand it."). *See also* FTC Deception Policy Statement, at 4 (design practices that operate to direct consumers' attention away from qualifying disclosures or other material information are deceptive); CMA Online Choice Architecture Paper, at 38 ("[T]here is some evidence from research that these types of disclosures are not always well understood or used by consumers and it may be necessary to construct them carefully.").

---

[52] Dark Patterns Workshop Transcript, at 8 ("Some dark patterns are information-hiding, meaning they delay or hide important information from users."). *See, e.g.*, *In the Matter of Nat'l Payment Network, Inc.*, Docket No. 132 3285 (charging NPN with deceptively pitching consumers an auto payment program it claimed would save consumers money but failing to disclose that the significant fees it charged for the service often cancelled out any actual savings); FTC Press Release, *FTC, Multiple Law Enforcement Partners Announce Crackdown on Deception, Fraud in Auto Sales, Financing and Leasing* (March 26, 2015), at https://www.ftc.gov/news-events/news/press-releases/2015/03/ftc-multiple-law-enforcement-partners-announce-crackdown-deception-fraud-auto-sales-financing; *FTC v. Match Group, Inc.*, Case No. 3:19-02281 (N.D. Texas) (charging the operators of Match.com with deceptively inducing consumers to subscribe to the dating service by promising them a free six-month subscription without adequately disclosing that consumers would need to comply with additional terms before the company would honor the guarantee); FTC Press Release, *FTC Sues Owner of Online Dating Service Match.com for Using Fake Love Interest Ads To Trick Consumers into Paying for a Match.com Subscription* (Sept. 25, 2019), at https://www.ftc.gov/news-events/news/press-releases/2019/09/ftc-sues-owner-online-dating-service-matchcom-using-fake-love-interest-ads-trick-consumers-paying#:~:text=The%20%20FTC%20alleges%20consumers%%2020often%20were%20unaware%20they,the%20free%20six%20months%20%20of%20service%20they%20expected.

[53] *FTC v. LendingClub Corp.*, Case No. 3:18-cv-02454 (N.D. Cal.); FTC Press Release, *LendingClub Agrees to Pay $18 Million to Settle FTC Charges* (July 14, 2021), at https://www.ftc.gov/news-events/press-releases/2021/07/lendingclub-agrees-pay-18-million-settle-ftc-charges.

[54] FTC Complaint, *FTC v. LendingClub Corp.*, Case No. 3:18-cv-02454 (N.D. Cal.), available at https://www.ftc.gov/system/files/documents/cases/lendingclub_corporation_first_amended_complaint.pdf.

[55] A tooltip button is an icon, image, or other graphical element that, when a user interacts with it or their cursor is positioned over it, prompts a textbox displaying relevant information to appear. In other words, such a mouse-over or hover-over causes a pop-up.

[56] FTC Complaint against *LendingClub Corp.*, *supra* note 54.

[57] *Id.*

[58] *Id.*

[59] Dark Patterns Workshop Transcript, at 7, 8, 68. *See also* Mary W. Sullivan, Federal Trade Commission, Bureau of Economics, *Economic Analysis of Hotel Resort Fees* (January 2017), at 36, available at https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf ("This analysis finds that separating mandatory resort fees from posted room rates without first disclosing the total price is likely to harm consumers by increasing the search costs and cognitive costs of finding and choosing hotel accommodations."); CMA Online Choice Architecture Paper, at 29 ("Since consumers often focus on headline prices, showing the total price in increments – 'dripped' through the purchase process – can affect consumer behaviour. Additional fees, compulsory or optional, may be obfuscated and therefore not noticed.").

[60] Dark Patterns Workshop Transcript, at 80. *See also* CMA Online Choice Architecture Paper, at 30 ("Once a

consumer is psychologically committed to a purchase or course of action, abandoning it may cause feelings of uncertainty, dissatisfaction and cognitive dissonance. Businesses may also use drip pricing to draw consumers in on a low headline rate, then rely on the extra effort that would be required for them to go back and find an alternative, such that consumers accept the price increasing later in the purchase process. These mechanisms draw on several behavioural biases, including anchoring (people tend to anchor on initial price information and fail to fully adjust their view of the price as additional fees are revealed), sunk cost fallacy (people tend to continue with a process if they have invested time or effort, such as exploring a product or providing their personal details), and the endowment effect (people tend to place a higher value on objects they own, or have imagined owning).").

[61] Dark Patterns Workshop Transcript, at 7; Blake et al., Price Salience and Consumer Choice (2020).

[62] *See, e.g.*, CMA Online Choice Architecture Paper, at 30.

[63] Dark Patterns Workshop Transcript, at 80. *See also* FTC Press Release, *FTC Warns Hotel Operators that Price Quotes that Exclude 'Resort Fees' and Other Mandatory Surcharges May Be Deceptive*, (Nov. 28, 2012), at https://www.ftc.gov/news-events/news/press-releases/2012/11/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be; *Economic Analysis of Hotel Resort Fees*, *supra* note 59 ("Hotels could eliminate these costs to consumers by including the resort fee in the advertised price. They could still bundle the same resort services with the room and charge the same total price. They could also list the components of the total price separately, as long as the total price is the most prominently disclosed price.").

[64] *See FTC v. Universal City Nissan, Inc.*, et al., (C.D. Cal.); FTC Press Release, *Los Angeles-Based Sage Auto Group Will Pay $3.6 Million to Settle FTC Charges* (March 14, 2017), at https://www.ftc.gov/news-events/news/press-releases/2017/03/los-angeles-based-sage-auto-group-will-pay-36-million-settle-ftc-charges.

[65] The Equal Credit Opportunity Act, or ECOA, prohibits credit discrimination on the basis of race, color, religion, national origin, sex, marital status, age, or because you get public assistance. 15 U.S.C. §§ 1691-1691f.

[66] *See, e.g.*, *FTC v. Liberty Chevrolet, Inc. d/b/a Bronx Honda*, Case No. 1:20-cv-03945-PAE (S.D.N.Y.) (According to the FTC complaint, defendants charged higher financing markups and fees to African-American and Hispanic customers than to similarly situated non-Hispanic white consumers. In addition, the FTC charged defendants caused consumers to pay substantially more than they expected, failing to honor the advertised sales price and inflating the cost through a variety of methods.); FTC Press Release, *Auto Dealership Bronx Honda, General Manager to Pay $1.5 Million to Settle FTC Charges They Discriminated Against African-American, Hispanic Car Buyers* (May 27, 2020), at https://www.ftc.gov/news-events/press-releases/2020/05/bronx-honda-to-pay-over-1-million-to-settle-charges; *FTC and The State of Illinois v. North American Automotive Services, Inc., et al.*, Case No. 1:22-cv-01690 (N.D. Ill.); FTC Press Release, *FTC Takes Action Against Multistate Auto Dealer Napleton for Sneaking Illegal Junk Fees onto Bills and Discriminating Against Black Consumers* (Apr. 1, 2022), at https://www.ftc.gov/news-events/news/press-releases/2022/04/ftc-takes-action-against-multistate-auto-dealer-napleton-sneaking-illegal-junk-fees-bills.

[67] When a representation or sales practice targets a specific audience, such as children, older adults, or the terminally ill, "ordinary consumers" for purposes of Section 5 of the FTC Act includes reasonable members of the targeted group. FTC Deception Policy Statement.

---

[68] *See* Dark Patterns Workshop Transcript, at 50, 74.

[69] *See* Blurred Lines FTC Staff Report at 4, 20.

[70] The Children's Online Privacy Protection Act, or COPPA, requires companies to protect children's privacy and safety online, including by getting parental consent before collecting some types of information from kids under 13. 15 U.S.C. §§ 6501–6505.

[71] Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed. Reg 60822, *supra* note 4.

[72] *See* EU Dark Patterns Report, at 91.

[73] Dark Patterns Workshop Transcript, at 36.

[74] Specifically, while Apple and Google included prompts for parents to enter their password and authorize an initial purchase, the FTC alleged they did not disclose that authorizing a single purchase also authorized unlimited purchases for a limited time thereafter (15 minutes for Apple and 30 minutes for Google). *In the Matter of Apple Inc.*, Docket No. C-4444; FTC Press Release, *Apple Inc. Will Provide Full Consumer Refunds of At Least $32.5 Million to Settle FTC Complaint It Charged for Kids' In-App Purchases Without Parental Consent* (Jan. 15, 2014), at https://www.ftc.gov/news-events/press-releases/2014/01/apple-inc-will-provide-full-consumer-refunds-least-325-million; *In the Matter of Google Inc.*, Docket No. C-4499; FTC Press Release, *Google to Refund Consumers at Least $19 Million to Settle FTC Complaint It Unlawfully Billed Parents for Children's Unauthorized In-App Charges* (Sept. 4, 2014), at https://www.ftc.gov/news-events/press-releases/2014/09/google-refund-consumers-least-19-million-settle-ftc-complaint-it.

[75] *FTC v. Amazon.com Inc.*, Case No. 2:14-cv-01038 (W.D. Wash.); FTC Press Release, *Federal Court Finds Amazon Liable for Billing Parents for Children's Unauthorized In-App Charges* (Apr. 27, 2016), at https://www.ftc.gov/news-events/press-releases/2016/04/federal-court-finds-amazon-liable-billing-parents-childrens.

[76] FTC Complaint, *FTC v. Amazon.com Inc.*, Case No. 2:14-cv-01038 (W.D. Wash.), available at https://www.ftc.gov/system/files/documents/cases/140710amazoncmpt1.pdf.

[77] Order Granting Amazon's Motion for Partial Summary Judgment and Granting the FTC's Motion for Summary Judgment, *FTC v. Amazon.com Inc.*, Case No. 2:14-cv-01038 (W.D. Wash.), at 3, available at https://www.ftc.gov/system/files/documents/cases/160427amazonorder.pdf.

[78] FTC Complaint against *Amazon.com Inc.*, *supra* note 76.

[79] FTC Press Release, *FTC, Amazon to Withdraw Appeals, Paving Way for Consumer Refunds Related to Children's Unauthorized In-App Charges* (Apr. 4, 2017), at https://www.ftc.gov/news-events/press-releases/2017/04/ftc-amazon-withdraw-appeals-paving-way-consumer-refunds-related; FTC Press Release, *Refunds Now Available from Amazon for Unauthorized In-App Purchases* (May 30, 2017), at https://www.ftc.gov/news-events/news/press-releases/2017/05/refunds-now-available-amazon-unauthorized-app-purchases.

---

[80] Dark Patterns Workshop Transcript, at 26-27; Luguri & Strahilevitz, *Shining a Light on Dark Patterns*, *supra* note 8.

[81] Dark Patterns Workshop Transcript, at 28; Luguri & Strahilevitz, *Shining a Light on Dark Patterns*, *supra* note 8.

[82] FTC, "Negative Options: A Workshop Analyzing Negative Option Marketing," at https://www.ftc.gov/news-events/events/2007/01/negative-options-workshop-analyzing-negative-option-marketing.

[83] A negative option is a term or condition under which the seller may interpret the consumer's silence or failure to take action to reject a good or to cancel an agreement as acceptance or continuing acceptance of the offer. A common example of a negative option is a company offering a free trial period, followed by a recurring subscription charge if the consumer doesn't cancel the subscription before the free trial runs out. Other examples include automatic renewals, continuity plans, fee-to-pay conversions, and prenotification plans. *See* Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed. Reg 60822, *supra* note 4. *See also* Telemarketing Sales Rule, 16 U.S.C. § 310.2(w) ("Negative option feature means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer.").

[84] The staff report covered topics such as disclosure of material terms, including their appearance and timing; obtaining consumers' affirmative consent; and appropriate cancellation procedures. FTC, *Negative Options: A Report by the Staff of the FTC's Division of Enforcement* (January 2009), available at https://www.ftc.gov/sites/default/files/documents/reports/negative-options-federal-trade-commission-workshop-analyzing-negative-option-marketing-report-staff/p064202negativeoptionreport.pdf.

[85] Rule on the Use of Prenotification Negative Option Plans, 16 CFR Part 425.

[86] The Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401-8405.

[87] *Id*.

[88] *See e.g.*, *FTC v. AdoreMe, Inc.*, Case No. 1:17-cv-09083 (S.D.N.Y.); FTC Press Release, *Online Lingerie Marketer Prohibited from Deceiving Shoppers About Negative-Option Programs* (Nov 21, 2017), at https://www.ftc.gov/news-events/news/press-releases/2017/11/online-lingerie-marketer-prohibited-deceiving-shoppers-about-negative-option-programs; *In re: UrthBox, Inc.*, Docket No. C-4676; FTC Press Release, *UrthBox Settles FTC Charges Related to Compensated Online Reviews and "Free" Trial Offer* (April 3, 2019), at https://www.ftc.gov/news-events/news/press-releases/2019/04/urthbox-settles-ftc-charges-related-compensated-online-reviews-free-trial-offer; *U.S. v MyLife.com, Inc.*, Case No. 20-cv-6692 (C.D. Cal.); FTC Press Release, *FTC, DOJ Obtain Ban on Negative Option Marketing and $21 Million for Consumers Deceived by Background Report Provider MyLife* (Dec.16, 2021), at https://www.ftc.gov/news-events/news/press-releases/2021/12/ftc-doj-obtain-ban-negative-option-marketing-21-million-consumers-deceived-background-report.

[89] *FTC v. Health Formulas, LLC, also d/b/a Simple Pure Nutrition*, Case No. 2:14-cv-1649-RFB-GWF (D. Nev.); FTC Press Release, *Marketers of Simple Pure Supplements Settle FTC Court Action* (May 3, 2016), at https://www.ftc.gov/news-events/press-releases/2016/05/marketers-simple-pure-supplements-settle-ftc-court-action.

[90] FTC Complaint, *FTC v. Health Formulas, LLC, also d/b/a Simple Pure Nutrition*, Case No. 2:14-cv-1649-RFB-GWF (D. Nev.), available at https://www.ftc.gov/system/files/documents/cases/1604simplepurecmpt.pdf.

[91] *See* Dark Patterns Workshop Transcript, at 4; Helena Vieria, *Bad choice design can be particularly harmful for less educated individuals* (January 31, 2018), at https://blogs.lse.ac.uk/businessreview/2018/01/31/bad-choice-design-can-be-particularly-harmful-for-less-educated-individuals/ (Studying consumers who had been enrolled in fraudulent subscription services, researchers found that cancelling subscriptions by default increased cancellations to 99.8 per cent—63.4 percentage points higher than requiring consumers to actively cancel in response to a complex, five-paragraph letter). In addition to costing consumers money, companies with overly-difficult cancellation procedures may also harm competition; such unlawful customer-retention practices can prevent consumers from being able to switch to other providers in the market who may better fit their interests or offer better price terms. *See, e.g.*, EU Dark Patterns Report, at 92; CMA Online Choice Architecture Paper, at 32.

[92] *FTC v. Age of Learning, Inc., also d/b/a ABCmouse and ABCmouse.com*, Case No. 2:20-cv-07996 (C.D. Cal.); FTC Press Release, *Children's Online Learning Program ABCMouse to Pay $10 Million to Settle FTC Charges of Illegal Marketing and Billing Practices* (Sept. 2, 2020), at https://www.ftc.gov/news-events/press-releases/2020/09/childrens-online-learning-program-abcmouse-pay-10-million-settle.

[93] FTC Complaint, *FTC v. Age of Learning, Inc., also d/b/a ABCmouse and ABCmouse.com*, Case No. 2:20-cv-07996 (C.D. Cal.), available at https://www.ftc.gov/system/files/documents/cases/1723086abcmousecomplaint.pdf.

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] Dark Patterns Workshop Transcript, at 6 ("For example, trying to cancel a premium subscription when you're called to call a phone line during working hours, to then have a rep try and talk you out of it for 10 minutes before you're finally allowed to leave.").

[99] ROSCA requires sellers of good and services over the internet using a negative option feature to provide a simple mechanism for the consumer to stop recurring charges. 15 U.S.C. § 8403(3).

[100] Beyond the general guidance in part III, the FTC has given additional guidance in specific contexts, such as a negative option. *See, e.g.*, FTC, Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed. Reg 60822 at 60825 (Nov. 4, 2021) ("To attain express informed consent, the negative option seller should obtain the consumer's acceptance of the negative option feature offer separately from any other portion of the entire transaction; not include any information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their express informed consent to the negative option feature; obtain the consumer's unambiguously affirmative consent to the negative option feature; obtain the consumer's unambiguously affirmative consent to the entire transaction; and be able to verify the consumer's consent.").

---

[101] *See, e.g.*, definition of "Express, Informed Consent" in the FTC's Orders against *Apple Inc.*, available at https://www.ftc.gov/sites/default/files/documents/cases/140115appleagree.pdf, and *Google*, available at https://www.ftc.gov/system/files/documents/cases/141205googleplaydo.pdf.

[102] *See FTC v. Health Formulas, LLC*, Case No. 2:14-CV-01649-RFB, 2015 WL 2130504, at *17 (D. Nev. May 6, 2015) (inadequate disclosures "cannot serve as the basis for customers' express, informed consent.").

[103] Dark Patterns Workshop Transcript, at 47 ("All your accounts are connected to that [cell phone] device. And it presumes that there's a single user. But in many communities, cell phones are a luxury commodity. They're shared among individuals. There's no way to protect individual users on a cell phone. So we have this bias in the way that we build these technologies.").

[104] Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed. Reg 60822 at 60826, *supra* note 4.

[105] *Id*.

[106] *See* Dark Patterns Workshop Transcript, at 11 ("There's no excuse for not allowing users to leave a service in the same location they signed up for it.")

[107] Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed. Reg 60822 at 60826, *supra* note 4.

[108] *See FTC v. RagingBull.com, LLC*, Case No. 1:20-cv--3538 (D. Md.); FTC Press Release, *Online Investment Site to Pay More Than $2.4 Million for Bogus Stock Earnings Claims and Hard-to-Cancel Subscription Charges* (March 8, 2022), at https://www.ftc.gov/news-events/news/press-releases/2022/03/online-investment-site-pay-more-24-million-bogus-stock-earnings-claims-hard-cancel-subscription.

[109] *See* Dark Patterns Workshop Transcript, at 32; IDAC Public Comment, *supra* note 12, at 1 ("User interfaces for opting out of data sharing are often impossible to navigate, leaving users either unaware of their privacy options or frustrated in their effort to exercise their rights.").

[110] *See* Dark Patterns Workshop Transcript, at 32, 45. One panelist asserted that a dark pattern that subverts consumer privacy preferences also "undermines competition by enabling an incumbent online service to extract valuable consumer data and entrench their market dominance." *Id.* at 32.

[111] *Id.* at 8, 31-32, 38-39, 69; *See also* Transcript of FTC Hr'g, *The FTC's Approach to Consumer Privacy* (Apr. 10, 2019), at 129, available at https://www.ftc.gov/system/files/documents/public_events/1418273/ftc_hearings_session_12_transcript_day_2_4-10-19.pdf (remarks of FTC Commissioner Rebecca Kelly Slaughter, describing privacy consent as illusory because consumers often have no choice other than to consent in order to reach digital services that have become necessary for participation in contemporary society, and even where it appears consumers gave valid consent, that agreement might be a product of manipulative dark patterns); Neil Richards & Woodrow Hartzog, *The Pathologies of Digital Consent*, 96 Wash. U. L. Rev. 1461, 1489 (2019) (describing several examples of what the authors call "coerced consent"—including when a user does not have the option to decline but only to accept "later," or a user interface that words the option to decline in such a way as to shame the user into compliance—which at scale, the authors argue, can accumulate to deplete a user's resolve with respect to their privacy choices).

---

[112] *Id.* at 8. *See also* EU Dark Patterns Report, at 94 ("For instance, the results showed that nudging (highlighting "Accept" buttons or pre-selecting checkboxes) substantially affects people's acceptance of cookies, providing clear evidence for the interference of such dark patterns with people's consent decisions.") (citing Utz, C., Degeling, M., Fahl, S., Schaub, F., & Holz, T., *(Un) informed consent: Studying GDPR consent notices in the field* (Nov. 2019); DuckDuckGo, Public Comment Submitted to FTC on Dark Patterns Issues, FTC-2021-0019-0103, at 2, available at https://www.regulations.gov/comment/FTC-2021-0019-0103; Damien Snyder, Public Comment Submitted to FTC on Dark Patterns Issues, FTC-2021-0019-0001, available at https://www.regulations.gov/comment/FTC-2021-0019-0046.

[113] Dark Patterns Workshop Transcript, at 8.

[114] *Id.* at 33 ("So I'm of the opinion that the present mechanism of hitting 'I Accept' with no attempt to actually inform you in a user-friendly way of what you're consenting to is potentially inherently manipulative."). *See also* EU Dark Patterns Report, at 21 ("Individuals do not give meaningful and conscious consent to the use of their data and their behaviours are easily influenced through environmental cues, such as defaults, and the design of web environments owing to pervasive reliance on heuristics and social norms (see for instance Acquisti et al., 2015 or Richards & Hartzog, 2019).").

[115] Dark Patterns Workshop Transcript, at 32-33, 39. *See also* EU Dark Patterns Report, at 60 ("Overall, an important concern for mystery shoppers was not knowing for sure how the websites/apps used their personal data, and with which other companies they would share it. They noted that some websites/apps were asking them for a lot more personal data than what was considered useful for the functioning of the service (e.g., gender, birthdate, astrological sign, etc)."); DuckDuckGo Public Comment, *supra* note 112, at 3; Digital Democracy Public Comment, *supra* note 15, at 18.

[116] Dark Patterns Workshop Transcript, at 32.

[117] *Id.* at 32 ("cell phone numbers are kind of the new social security number in some ways because we don't change them . . . it's another way they can identify you."); *id.* at 67 (describing as a dark pattern the FTC's allegation that Facebook collected phone numbers purportedly to enable two-factor authentication, but also used the information to target ads).

[118] *Id.* at 39.

[119] *Id.* at 39 ("And location data is extremely valuable and can reveal so many things about you, such as where you live, where you work, where you spend your nights. It can reveal your political affiliation, your religious affiliation, your sexual orientation, and so on."); *see also* Jon Keegan & Alfred Ng, *There's a Multibillion-Dollar Market for Your Phone's Location Data*, The Markup (Sept. 30, 2021), available at https://themarkup.org/privacy/2021/09/30/theres-a-multibillion-dollar-market-for-your-phones-location-data (explaining that a consumer's location data can be sold repeatedly in the location data marketplace, such as to aggregators that resell the data to multiple sources, to location intelligence firms that use the raw data to analyze foot traffic in retail locations and demographics of visitors, and to hedge funds looking for insights into the popularity of certain stores).

---

[120] *FTC v. Kochava, Inc.*, Case No. 2:22-cv-377 (D. Idaho); FTC Press Release, *FTC Sues Kochava for Selling Data that Tracks People at Reproductive Health Clinics, Places of Worship, and Other Sensitive Locations* (Aug. 29, 2022), at https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-sues-kochava-selling-data-tracks-people-reproductive-health-clinics-places-worship-other.

[121] FTC Complaint, *FTC v. Kochava, Inc.*, Case No. 2:22-cv-377 (D. Idaho), available at https://www.ftc.gov/system/files/ftc_gov/pdf/1.%20Complaint.pdf.

[122] FTC Staff Report, *What ISPs Know About You: Examining the Privacy Practices of Six Major Internet Service Providers* (Oct. 21, 2021), available at https://www.ftc.gov/system/files/documents/reports/look-what-isps-know-about-you-examining-privacy-practices-six-major-internet-service-providers/p195402_isp_6b_staff_report.pdf [hereinafter FTC Staff Report—What ISPs Know About You].

[123] FTC Staff Report—What ISPs Know About You, at 39.

[124] *Id.* at 39. *See also* Dark Patterns Workshop Transcript, at 33 ("And I'd really like to see solutions that go further than just giving us kind of new looks on existing interfaces, such as, one of the things we look at is whether the Accept button is highlighted in advance.").

[125] FTC Staff Report—What ISPs Know About You, at 39-40.

[126] *Id.* at 40-41. *See also* FTC Complaint, *PayPal, Inc.*, Docket No. C-4651, available at https://www.ftc.gov/system/files/documents/cases/1623102_c-4651_paypal_venmo_complaint_final.pdf (alleging that where two different settings related to the public visibility of users' transactions on Venmo, Respondent failed to disclose, or failed to disclose adequately, that toggling off one setting did not ensure that future transactions would be visible only to a more limited audience (*i.e.*, only to friends or to other participants in the transaction)).

[127] FTC Staff Report—What ISPs Know About You, at 41.

[128] *FTC v. VIZIO, Inc. and VIZIO Inscape Servs., LLC*, (D. N.J.); FTC Press Release, *Vizio to Pay $2.2 Million to FTC, State of New Jersey to Settle Charges It Collected Viewing Histories on 11 Million Smart Televisions Without Users' Consent* (Feb. 6, 2017), at https://www.ftc.gov/news-events/press-releases/2017/02/vizio-pay-22-million-ftc-state-new-jersey-settle-charges-it.

[129] FTC Complaint, *FTC v. VIZIO, Inc. and VIZIO Inscape Servs., LLC*, (D. N.J.), available at https://www.ftc.gov/system/files/documents/cases/170206_vizio_2017.02.06_complaint.pdf.

[130] *Id.*

[131] *Id.*

[132] *FTC v. Sunkey Publ'g, Inc. et. al*, Case No. 3:18-cv-01444-HNJ (N.D. Alabama); FTC Press Release, *FTC Takes Action against the Operators of Copycat Military Websites* (Sept. 6, 2018), at https://www.ftc.gov/news-events/press-releases/2018/09/ftc-takes-action-against-operators-copycat-military-websites.

---

[133] FTC Complaint, *FTC v. Sunkey Publ'g, Inc. et. al*, Case No. 3:18-cv-01444-HNJ (N.D. Alabama), available at https://www.ftc.gov/system/files/documents/cases/sunkey_filed_complaint.pdf.

[134] *Id.*

[135] *FTC v. Day Pacer LLC, f/k/a College Criteria LLC, also d/b/a Edutrek*, Case No. 1:19-cv-01984 (N.D. Ill.); FTC Press Release, *FTC Charges Telemarketing Operation with Misleading Job Seekers and Making Millions of Illegal, Unsolicited Calls* (Apr. 12, 2019), at https://www.ftc.gov/news-events/press-releases/2019/04/ftc-charges-telemarketing-operation-misleading-job-seekers-making.

[136] *FTC v. Blue Global and Christopher Kay*, (D. Ariz.); FTC Press Release, *FTC Halts Operation that Unlawfully Shared and Sold Consumers' Sensitive Data* (July 5, 2017), at https://www.ftc.gov/news-events/press-releases/2017/07/ftc-halts-operation-unlawfully-shared-sold-consumers-sensitive.

[137] *FTC v. ITMedia Solutions LLC, et al.,* Case No. 2:16-cv-09483 (C.D. Cal.); FTC Press Release, *Lead Generator that Deceptively Solicited Loan Applications from Millions of Consumers and Indiscriminately Shared Sensitive Info Agrees to Pay $1.5 Million FTC Penalty* (Jan. 7, 2022), at https://www.ftc.gov/news-events/press-releases/2022/01/lead-generator-deceptively-solicited-loan-applications-millions.

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
Supervising Deputy Attorney General
KRISTIN A. LISKA
Deputy Attorney General
State Bar No. 315994
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3916
Fax: (415) 703-5480
E-mail: Kristin.Liska@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **NetChoice, LLC,**<br><br>Plaintiff,<br><br>**v.**<br><br>**Rob Bonta, in his official capacity as Attorney General of the State of California,**<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**DECLARATION OF SERGE EGELMAN, PH.D. IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR A SECOND PRELIMINARY INJUNCTION**<br><br>Date: January 23, 2025<br>Time: 9:00 a.m.<br>Dept: 3<br>Judge: The Honorable Beth Labson Freeman<br>Trial Date: Not scheduled<br>Action Filed: 12/14/2022 |

I, Serge Egelman, Ph.D., declare and state as follows:

1. I submit this declaration in support of Defendant's Opposition to Plaintiff's Motion for a Second Preliminary Injunction.

**BACKGROUND & QUALIFICATIONS**

2. I am the Research Director of the Usable Security & Privacy Group at the International Computer Science Institute (ICSI), which is a non-profit research institute affiliated with the University of California, Berkeley. I also hold a position as a research scientist within the Electrical Engineering and Computer Sciences (EECS) Department at the University of California, Berkeley. I received my Ph.D. from Carnegie Mellon University's School of Computer Science. My research has been cited over 13,000 times, and my h-index—the most common metric for scientific impact[1]—is over 50.[2]

3. I have been performing research into online privacy for over twenty years. My research focuses on the interplay of online privacy, computer security, and human factors. In short, I study: consumer privacy and security decision making; consumer privacy preferences; privacy and security expectations; and how those expectations comport with reality (e.g., by performing technical analyses of online services and other software to examine privacy and security practices). This research involves both technical knowledge to build tools for use in measurement studies (e.g., observational studies of how user data is collected and shared in practice), as well as a deep understanding of how to apply social science methodologies (e.g., human subjects research, surveys, interviews, randomized controlled trials, etc.). I have served as an invited expert for several web standards efforts that pertained to privacy and security, and have received over a dozen awards from the research community (including: privacy research awards from two European data protection authorities, AEPD in Spain and CNIL in France; the USENIX Security Symposium Distinguished Paper Award, from one of the top academic computer security conferences; the Caspar Bowden Award for Outstanding Research in Privacy Enhancing

[1] J.E. Hirsch. "An Index to Quantify an Individual's Scientific Research Output," *Proc. Natl. Acad. Sci.* U.S.A. 102 (46) 16569-16572, https://doi.org/10.1073/pnas.0507655102 (2005).

[2] https://scholar.google.com/citations?user=WN9t4n0AAAAJ&hl=en

Technologies; and seven paper awards from the ACM Special Interest Group on Computer-Human Interaction [SIGCHI], the top human-computer interaction conference). I have also been repeatedly invited to speak at the FTC's annual "PrivacyCon" event based on my laboratory's research.

4. Over the past decade, my laboratory has been studying the mobile app ecosystem, which has included building tools to detect when personal information is accessed by mobile apps and the third parties with whom they share it. We have used these tools in peer-reviewed published research studies about consumer privacy, including examining mobile apps' compliance with various privacy regulations and platform policies.

5. One research study performed by my laboratory demonstrated that a majority of child-directed Android apps appeared to be violating COPPA,[3] which led to major policy shifts by both Google and Apple, makers of the two leading mobile platforms. I have since been invited to give keynotes at several international conferences on child development and technology as an expert on online privacy as it pertains to children. I have also testified before the U.S. Senate on how COPPA can be improved to match the realities of modern technology, and have been asked to provide feedback on draft legislation from members of both houses of Congress.

6. My *curriculum vitae*, which sets forth my experience and credentials more fully, is attached as Exhibit A.

7. I have testified as an expert in the following cases:

- *Garner v. Amazon.com, Inc.*, Case No. 2:21-cv-00750 (W.D. Wash.)
- *Lopez et al. v. Apple, Inc.*, Case No. 4:19-cv-04577-JSW (N.D. Cal.)
- *Martinez et al. v. D2C, LLC d/b/a UNIVISION NOW*, Case No. 1:23-cv-21394-RNS (S.D. Fla.).
- *Bloom v. Zuffa LLC*, Case No. 2:22-cv-00412-RFB-BNW (D. Nev.)

---

[3] Irwin Reyes, Primal Wijesekera, Joel Reardon, Amit Elazari Bar On, Abbas Razaghpanah, Narseo Vallina-Rodriguez, and Serge Egelman. *"Won't Somebody Think of the Children?" Examining COPPA Compliance at Scale.* Proceedings on Privacy Enhancing Technologies (PoPETS), 2018(3):63–83.

- *Clark, et. al. v. Yodlee, Inc.*, Case No: 3:20-cv-05991-SK (N.D. Cal.).
- *Czarnionka v. The Epoch Times Association, Inc.*, Case No. 1:22-cv-6348 (S.D.N.Y.)
- *Frasco v. Flo Health, et al.*, Case No. 3:21-cv-00757 (N.D. Cal.).
- *Hart v. TWC Prod. & Tech. LLC*, 526 F. Supp. 3d 592, Case No. 20-cv-03842-JST (N.D. Cal. 2021)
- *District of Columbia v. Town Sports International, LLC*, Case No. 2020 CA 003691 B (D.C. Sup. Ct. 2020)
- *In re Vizio, Inc., Consumer Privacy Litig*., 238 F. Supp. 3d 1204, (C.D. Cal. 2017)
- *In re Linkedin User Privacy Litigation*, 932 F. Supp. 2d 1089 (N.D. Cal. 2013)
- *In re Netflix Privacy Litigation*, Case No.: 5:11-CV-00379 EJD (N.D. Cal. 2012)

8. I am being compensated in the above-entitled case at an hourly rate of $400/hour for preparing this declaration. My compensation is not in any way dependent on the outcome of this or any related proceeding.

9. The opinions in this declaration are my expert opinions, which are based on my education and training, my peer-reviewed published research and the research of others, my knowledge of relevant technologies (including my reading of the public technical documents offered by NetChoice's members about their capabilities), as well as my reading of the legislation.

10. I have reviewed AB 2273, California's Age Appropriate Design Code (AADC) Act. In my expert opinion, this law is necessary to address realities of modern technology that have resulted in the exploitation of minors; its provisions are reasonable and technically feasible to adopt (i.e., the technologies necessary to comply are already in widespread use by NetChoice's members), and I believe that they are substantially similar to policies in other jurisdictions within which NetChoice members operate. The law only applies to services that are likely to be used by children (rather than all online services), and only requires that companies take steps to limit harm to children, allowing them and their parents to make more informed decisions about their online activities and the dissemination of their personal information. Services not likely to be used by children are

unlikely to be impacted by this legislation; child-directed services can comply by simply limiting privacy-invasive tracking and considering potential harms to children. Similar laws already exist in other sectors, which society has accepted: that convenience stores cannot sell tobacco products and alcohol to minors is not viewed as tyrannical overreach or limitations on "freedom to innovate," but instead as a commonsense safeguard.

**COLLECTION & USE OF PERSONAL INFORMATION ONLINE**

11. The "free" Internet is subsidized through the collection of users' personal information for both advertising and analytics purposes. In the case of advertising, this means showing Internet users ads that are specifically tailored to their inferred interests. In the case of analytics, this means observing how users interact with the service in order to maximize its profitability (e.g., strategically placing in-app purchase opportunities based on users' in-app behaviors, identifying the users most likely to buy expensive items based on their inferred demographics, manipulating users into spending more time using a service, etc.). In other cases, this may mean straight up selling the user data to third parties so that those third parties may perform these and other yet-unknown activities.

12. Because so much of the Internet is supported by advertisements, one key metric that online services use is known as "engagement," which refers to the amount of time that consumers spend using a service or the frequency of interactions that consumers have with that service. That is, the more time consumers spend using a service that displays ads, the more ads that consumers are likely to be shown, and therefore the more revenue that the service can derive by charging advertisers to show those ads. Similarly, the more personal information that consumers share with a service, the more likely those consumers are to see "relevant"[4] ads, and therefore the more likely they are to click those ads.

[4] Based on my experience, I am not convinced that highly targeted ads based on consumers' personal information provide benefits for anyone beyond the advertising companies: the liabilities associated with the collection of this data, the fact that a lot of the ads are mistargeted, that consumers are opposed to their data being used in this manner, and that a large portion of the revenue is consumed by middlemen suggests that on balance, contextual ads provide more benefits to consumers and publishers than behaviorally-targeted ads.

13. Thus, many services collect analytics data to measure engagement and then use this data to develop features that are likely to lead to greater levels of engagement (i.e., more time spent using the service or more monetizable personal information divulged to the service).

14. Advertisements are targeted at users based on inferences about those users' interests. Individual users' interests are inferred based on data automatically collected from them: the services they use, how they use them, from where they use them, and so forth. In short, online and offline activities are tracked, which allows companies to maintain detailed profiles of individual user behavior, which in turn is used to predict users' interests, preferences, and even demographics. The collected information may be used to predict a consumer's religion, health conditions, sexual orientation, or political affiliation. Some of this information may be revealed by the phone's location (e.g., where a user lives, who they live with, where they work, etc.), or even by just the name of the app that is being used (e.g., a Bible app revealing religion or a dating app revealing sexual orientation).

15. For example, Meta, a NetChoice member, uses the personally-identifiable information that it collects to build dossiers about users' interests, preferences, activities (both online and offline), location trails, and even social relations. These dossiers are then used to determine which advertisements that Meta is paid for displaying to show to which users.[5] For example, when I accessed the "Ads Manager" interface to go through the steps of posting a targeted advertisement on Facebook (as any advertiser would), I was given the option to target an advertisement based on demographics, interests, and prior observed behaviors (Figures 1–3).

[5] Meta. "Audience Ad Targeting." *Meta Ads*, https://www.facebook.com/business/ads/ad-targeting. Accessed: October 22, 2024.




Figure 1: Facebook Ads Manager showing demographic targeting criteria. Source: https://adsmanager.facebook.com/.




Figure 2: Facebook Ads Manager showing behavioral targeting criteria.
Source: https://adsmanager.facebook.com/.




Figure 3: Facebook Ads Manager showing interest-based targeting criteria.
Source: https://adsmanager.facebook.com/.

16. Specifically, expanding these options shows very fine-grained ad targeting criteria that Meta's advertisers can use to target ads at specific Facebook users.[6] While some of these data points are based on information that Facebook users have posted to Facebook, many others are based on information gleaned from third parties or on metadata gleaned from users' usage behaviors. In other words, despite the fact that Facebook is not in the business of selling products to consumers, it allows advertisers to target ads based on items that Facebook users have recently purchased from third-party websites and physical stores. All together, these fine-grained ad targeting criteria include sensitive personal information such as:

- Demographics
  - i. Age
  - ii. Gender
  - iii. Geographic location
  - iv. Education level
  - v. Field of study (e.g., major)
  - vi. School
  - vii. When someone went to college
  - viii. Income
  - ix. Life events (e.g., anniversary, travel, birthday, new job, new relationship, recent engagement, newlyweds, recently moved, etc.)
  - x. Parental status (including ages of children)
  - xi. Relationship status
  - xii. Employer
  - xiii. Field of employment
  - xiv. Job title
- Interests
  - i. Specific businesses and industries
  - ii. Entertainment interests (e.g., games played, movies and television watched, music interests, reading preferences, etc.)
  - iii. Family interests (e.g., parenting, marriage, etc.)
  - iv. Fitness interests (e.g., bodybuilding, exercise preferences, yoga, etc.)
  - v. Food and drink preferences (including restaurant preferences)
  - vi. Hobbies (e.g., arts and music, current events, politics, home and garden, pets, travel, vehicles, etc.)
  - vii. Shopping and fashion
  - viii. Sports and outdoors
  - ix. Technology
- Behaviors
  - i. Recent purchases

[6] Meta. "Facebook Ads Manager." https://adsmanager.facebook.com/. Accessed: October 22, 2024.

ii. Device usage/ownership
iii. Specific software used
iv. Online activities
v. Travel history
vi. Transit behaviors (e.g., commuters, users of public transit, etc.)

17. Online services are able to offer advertisers such fine-grained ad targeting options due to the breadth of the data they collect from individual Internet users. For example, when people create Facebook profiles and use Facebook, they share a wealth of personal information with Meta: their names, addresses, contact information, gender, preferences (e.g., via use of the "like" button and membership in affinity groups), relationship information, birthdates, and many other types of information. To quote Mark Zuckerberg on peoples' willingness to provide Facebook sensitive information unquestioningly, "[p]eople just submitted it. I don't know why. They 'trust me.' Dumb f[***]s."[7]

18. Tracking of users' online behaviors is made possible by "persistent identifiers." An identifier is any piece of information that allows an individual—or device—to be uniquely identified. "Persistent" identifiers are identifiers that tend to not change over time.[8] For example, motor vehicles have persistent identifiers in the form of license plates: a license plate uniquely identifies a vehicle and vehicles tend to have the same license plate over time. If someone records all the license plates at a particular place over time, they can determine how many times in that period any individual vehicle was there (and thus infer their operators' activities). Similarly, if license plates are recorded at many different locations and that data is combined, one could reconstruct the movements of individual vehicles. Thus, combining a persistent identifier with information about where that identifier was observed (e.g., a website or mobile app) allows a data recipient to reconstruct an individual's activities. Using this knowledge, one could infer information about a person's routines, preferences, demographics, and even relations and social connections by tracking their persistent identifiers. It is for this reason that persistent

[7] Laura Raphael. "Mark Zuckerberg Called People Who Handed Over Their Data 'Dumb F****'." *Esquire*, March 19, 2018, https://www.esquire.com/uk/latest-news/a19490586/mark-zuckerberg-called-people-who-handed-over-their-data-dumb-f/. Accessed: October 22, 2024.
[8] https://www.nnlm.gov/guides/data-glossary/persistent-unique-identifier

identifiers, including ones that identify personal devices—because personal devices tend to be used by one individual and, just as a car's owner is assumed to be its driver absent strong evidence to the contrary, the device's owner can be assumed to be that user—are categorized as personal information under various privacy laws (e.g., CCPA,[9] COPPA,[10] HIPAA,[11] GDPR,[12] GLBA[13]).

19. Online advertisements need not use consumers' personal information: while the *behavioral* or *targeted* advertising described in the prior paragraphs relies on collecting personal information to infer users' interests, *contextual* advertising does not. Contextual advertising refers to choosing ads based on what the user is doing in the moment. In other words, it is based on the type of website or online service that the user is currently visiting, which is where the ad is to appear, and not on a collected profile or tracking information about that user. For example, a mattress review website does not need to collect personal information to know that visitors might be receptive to ads for mattresses or bedding. By definition, contextual advertising does not require the collection of consumers' personal information, because it does not rely on the tracking of their online activities.

20. In addition to questionable economic benefits, over half a century of published research on consumer behavior and preferences has demonstrated that consumers are opposed to this type of tracking by businesses. For example, when Westin performed consumer surveys on public privacy perceptions going back to the 1970s,[14] he consistently found that a majority of the U.S. public are either "very" or "somewhat" concerned with how their personal information is collected and used by businesses. In 2001, one study found

---

[9] Cal. Civ. Code § 1798.140(15).
[10] 15 U.S.C § 6501(8)(F).
[11] 45 C.F.R. § 164.514(b)(2)(i).
[12] GDPR Art. 4 (1).
[13] 16 C.F.R. § 313.3. See also, e.g., https://www.federalregister.gov/documents/2021/12/09/2021-25736/standards-for-safeguarding-customer-information
[14] Ponnurangam Kumaraguru and Lorrie Faith Cranor. "Privacy indexes: a survey of Westin's studies." *Carnegie Mellon University Tech Report* CMU-ISRI-5-138, 2005.

that as many as 64% of consumers refused to shop online due to privacy concerns.[15] A Pew survey from 2020 found that more than half of Americans have refused to use certain products or services due to privacy concerns.[16] In the past two decades, as more and more aspects of daily life have moved online, many consumers have also simply become resigned to having their information used in objectionable ways.[17] A 2019 Pew survey of consumers found that 62% of Americans do not believe it is possible to "go through daily life without companies collecting data about them," 79% are very or somewhat concerned about this, and 81% believe the risks of collecting this data outweigh the benefits.[18]

21. While consumers are overwhelmingly opposed to this type of tracking and the profiling and resale of their information that it supports (one study of U.S. consumers found that up to 86% do not want ads that are tailored based on their online activities),[19] consumers nonetheless continue to engage with services that appear to conflict with their stated privacy preferences. This is known as the "privacy paradox." Some stakeholders like to point out this disconnect and use it to disingenuously claim that it means that consumers do not "really" care about privacy. But the published research on the privacy paradox demonstrates that this argument is incorrect, and that there are several rational explanations for the privacy paradox, which include lack of awareness of data collection methods, poor usability, mismatched incentives, and perceived lack of agency.

---

[15] M J. Culnan and Milne, G. R. "The Culnan-Milne Survey on Consumers & Online Privacy Notices: Summary of Responses." In *Interagency Public Workshop (Ed.) Get Noticed: Effective Financial Privacy Notices*, Washington, D.C., 2001.

[16] Andrew Perrin, "Half of Americans have decided not to use a product or service because of privacy concerns." *Pew Research Center*, August 14, 2020. https://www.pewresearch.org/fact-tank/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/

[17] Nora A. Draper and Joseph Turow. "The corporate cultivation of digital resignation." *New media & society* 21.8 (2019): 1824-1839.

[18] Pew Research Center. "Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information." Nov. 15, 2019. https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/

[19] J. Turow, J. King, C. J. Hoofnagle, A. Bleakley, and M. Hennessy (2009). "Americans Reject Tailored Advertising and Three Activities That Enable It." https://doi.org/10.2139/ssrn.1478214

22. In many cases, consumers simply do not understand when they are making decisions that will impact their privacy. For example, in a series of studies that I co-authored,[20] we presented subjects with different search engine interfaces, including one that annotated search results with privacy information; subjects were instructed to use the search engine to buy items from merchants of their choice. While all subjects expressed strong privacy preferences in a survey administered prior to the study (i.e., subjects were specifically screened for strong privacy preferences, so that we could explicitly test whether interface design impacted their ability to act on those preferences), we observed that without information about privacy practices presented in an easily-accessible manner, subjects made purchases from the cheapest merchants. When search results were annotated with privacy ratings, subjects were significantly more likely to make purchases from merchants with more agreeable privacy policies (i.e., better aligned with participants' stated privacy preferences), even paying more money to do so. These and other studies demonstrate that people often act in ways that seem contrary to their stated privacy preferences when they are not fully aware of a business's privacy practices (e.g., due to well-documented problems with the "notice and consent" framework, such as expecting consumers to read and understand privacy policies, which I describe in subsequent sections).

23. In other cases, convoluted user interfaces make it difficult for consumers to understand how to make privacy-protective decisions. This poor usability often results in consumers sharing personal information without ever being aware of it. For example, while studies have shown that consumers have concerns about sharing personal information with the wrong audiences on social media, they nonetheless continue to overshare,[21] which has

[20] Janice Y. Tsai Serge Egelman, Lorrie Cranor, and Alessandro Acquisti. "The effect of online privacy information on purchasing behavior: An experimental study." *Information systems research* 22, no. 2 (2011): 254-268; Serge Egelman, Janice Tsai, Lorrie Faith Cranor, and Alessandro Acquisti. "Timing is everything? The effects of timing and placement of online privacy indicators." In *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems*, pp. 319-328. 2009; Julia Gideon, Lorrie Cranor, Serge Egelman, and Alessandro Acquisti. "Power strips, prophylactics, and privacy, oh my!." In *Proceedings of the Second Symposium on Usable privacy and security*, pp. 133-144. 2006.

[21] Maritza Johnson, Serge Egelman, and Steven M. Bellovin. 2012. "Facebook and privacy: it's complicated." In *Proceedings of the Eighth Symposium on Usable Privacy and*

(continued…)

been shown to be the result of difficult-to-use privacy settings interfaces (or mismatches between the design of those interfaces and users' mental models).[22] One early study on the use of Facebook found that while participants expressed strong privacy preferences, they nonetheless shared sensitive information because more than one-in-five did not understand what Facebook's privacy settings did or how to use them, and therefore did not change them from the overly-permissive defaults.[23] In a study of file-sharing software, researchers discovered that due to convoluted privacy settings interfaces, many users were inadvertently sharing their entire hard drives.[24] In a study of tools provided by the advertising industry to opt out of behavioral advertising on websites, the researchers observed:

> "Participants found many tools difficult to configure, and tools' default settings were often minimally protective. Ineffective communication, confusing interfaces, and a lack of feedback led many participants to conclude that a tool was blocking [online behavioral advertising] when they had not properly configured it to do so. Without being familiar with many advertising companies and tracking technologies, it was difficult for participants to use the tools effectively."[25]

24. Incentives are also important when studying privacy tradeoffs. Privacy decisions are not made in a vacuum: that consumers engage with services that violate their privacy preferences is often an indictment of the lack of market choice rather than an indication that consumers are behaving hypocritically. Similarly, privacy is often not the only

---

*Security* (SOUPS '12). Association for Computing Machinery, New York, NY, USA, Article 9, 1–15. https://doi.org/10.1145/2335356.2335369

[22] Jennifer King, Airi Lampinen, and Alex Smolen. 2011. "Privacy: is there an app for that?" In *Proceedings of the Seventh Symposium on Usable Privacy and Security* (SOUPS '11). Association for Computing Machinery, New York, NY, USA, Article 12, 1–20. https://doi.org/10.1145/2078827.2078843

[23] Alessandro Acquisti and Ralph Gross. "Imagined communities: Awareness, information sharing, and privacy on the Facebook." In *Privacy Enhancing Technologies: 6th International Workshop*, PET 2006, Cambridge, UK, June 28-30, 2006, Revised Selected Papers 6, pp. 36-58. Springer Berlin Heidelberg, 2006.

[24] Nathaniel S. Good and Aaron Krekelberg. 2003. "Usability and privacy: a study of Kazaa P2P file-sharing." In *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems (CHI '03)*. Association for Computing Machinery, New York, NY, USA, 137–144. https://doi.org/10.1145/642611.642636

[25] Pedro Leon, Blase Ur, Richard Shay, Yang Wang, Rebecca Balebako, and Lorrie Cranor. "Why Johnny can't opt out: a usability evaluation of tools to limit online behavioral advertising." In *Proceedings of the SIGCHI conference on human factors in computing systems*, pp. 589-598. 2012.

consideration: if the costs of protecting one's privacy are unreasonably high (e.g., time invested learning to correctly use privacy settings, monetary costs, abstaining from social life, etc.), many consumers will engage with privacy-violative services because they cannot afford the alternatives. For example, I value my free time, but that I still show up to work does not make me a hypocrite. Similarly, when faced with the choice between protecting their privacy or engaging with their peers online, many younger people will choose the latter, despite the known privacy risks. Many studies have shown that despite the known privacy risks, many young people continue to use social media due to the fear of missing out.[26]

25. Finally, many consumers simply do not believe they have agency when it comes to making online privacy decisions: because many believe that their privacy preferences will not be honored no matter the actions that they take, many choose to engage with privacy-violative services to extract benefits, believing that they will end up paying the privacy costs regardless. A 2015 consumer survey concluded the following:

> "[A] majority of Americans are resigned to giving up their data—and that is why many appear to be engaging in tradeoffs. Resignation occurs when a person believes an undesirable outcome is inevitable and feels powerless to stop it. Rather than feeling able to make choices, Americans believe it is futile to manage what companies can learn about them. Our study reveals that more than half do not want to lose control over their information but also believe this loss of control has already happened."[27]

26. A study specifically on young people and the privacy paradox observed:

> "Based on focus group interviews, we considered how young adults' attitudes about privacy can be reconciled with their online behavior. The "privacy paradox" suggests that young people claim to care about privacy while simultaneously providing a great deal of personal

[26] Vittoria Franchina, Mariek Vanden Abeele, Antonius J. Van Rooij, Gianluca Lo Coco, and Lieven De Marez. "Fear of missing out as a predictor of problematic social media use and phubbing behavior among Flemish adolescents." *International journal of environmental research and public health* 15, no. 10 (2018): 2319; Dmitri Rozgonjuk, Cornelia Sindermann, Jon D. Elhai, and Christian Montag. "Fear of Missing Out (FoMO) and social media's impact on daily-life and productivity at work: Do WhatsApp, Facebook, Instagram, and Snapchat Use Disorders mediate that association?." *Addictive Behaviors* 110 (2020): 106487; Ine Beyens, Eline Frison, and Steven Eggermont. "'I don't want to miss a thing': Adolescents' fear of missing out and its relationship to adolescents' social needs, Facebook use, and Facebook related stress." *Computers in Human Behavior* 64 (2016): 1-8.

[27] Joseph Turow, Michael Hennessy, and Nora Draper. "The tradeoff fallacy: How marketers are misrepresenting American consumers and opening them up to exploitation." *Available at SSRN 2820060* (2015).

information through social media. Our interviews revealed that young adults do understand and care about the potential risks associated with disclosing information online and engage in at least some privacy-protective behaviors on social media. However, they feel that once information is shared, it is ultimately out of their control. They attribute this to the opaque practices of institutions, the technological affordances of social media, and the concept of networked privacy, which acknowledges that individuals exist in social contexts where others can and do violate their privacy."[28]

27. Similarly, users continue to use apps that they find "creepy" due to a sense of learned helplessness: they do not believe that they have the power to control who receives their personal information when they participate in the digital economy.[29]

## TOOLS FOR LIMITING COLLECTION & USE OF PERSONAL INFORMATION

28. **Privacy Policies.** Internet users have few tools to control their online privacy. Since the dawn of the Internet age, the primary framework for managing online privacy has been the "notice and consent" framework, whereby online services post privacy policies ("notice") and consumers can choose whether to engage with services based on their understanding of those policies ("consent"). Unfortunately, this framework is fundamentally detached from reality: decades of research have demonstrated that consumers do not read these privacy policies, consumers do not understand what the policies mean (when they do read them), and worse, privacy policies often do not accurately describe their services' behaviors.

29. In one study in which participants were asked to explicitly confirm that they read and agreed to a website's privacy policy, 80% clicked a box to affirm that they had done so despite not actually accessing or reading the policy.[30] This number likely represents a lower bound, given the presence of "demand characteristics" (i.e., participants were in a

[28] Eszter Hargittai, and Alice Marwick. "'What can I really do?' Explaining the privacy paradox with online apathy." *International journal of communication* 10 (2016): 21.

[29] Irina Shklovski, Scott D. Mainwaring, Halla Hrund Skúladóttir, and Höskuldur Borgthorsson. "Leakiness and creepiness in app space: perceptions of privacy and mobile app use." In *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems (CHI '14)*. Association for Computing Machinery, New York, NY, USA, 2347–2356. https://doi.org/10.1145/2556288.2557421

[30] Nili Steinfeld. "'I agree to the terms and conditions': (How) do users read privacy policies online? An eye-tracking experiment." *Computers in Human Behavior* 55 (2016): 992-1000.

laboratory setting and therefore were likely to pay more attention to the instructions than they would have in the real world), as well as the fact that most online services do not present users with interstitial messages demanding that they read and agree to their privacy policies: most privacy policies are accessed through discreet links outside the user's field of focus. Another study found that privacy-concerned users were influenced by the mere presence of a privacy policy link, despite few reading the policies.[31] This suggests that the mere presence of a privacy policy erroneously signals "good" privacy practices.

30. Nonetheless, if users do opt to read privacy policies, it is often a significant time investment. In 2008, McDonald and Cranor showed that if users read the privacy policies for every website they accessed, they would need to spend up to 300 hours doing so annually (based on average policy lengths, number of websites visited, and reading speeds).[32] Of course, their estimate is based on data from 2008 that showed the average Internet user visits around 1,500 unique websites annually; 15 years later, the number of websites has proliferated, as has the amount of time that consumers spend online, which suggests that the time investment to read and understand privacy policies has only increased.

31. It is also not clear that the time investment to read privacy policies is worthwhile for most consumers: several studies have shown that the privacy policies found on popular websites are written at the college level and therefore may not be understood by a significant proportion of the population (much less children).[33] This also ignores the fact

[31] Jensen, Carlos, Colin Potts, and Christian Jensen. "Privacy practices of Internet users: Self-reports versus observed behavior." *International Journal of Human-Computer Studies* 63, no. 1-2 (2005): 203-227.

[32] Aleecia M. McDonald and Lorrie Faith Cranor. "The cost of reading privacy policies." *I/S: A Journal of Law and Policy for the Information Society*, 4 (2008): 543.

[33] Yuanxiang Li *et al*. "Online privacy policy of the thirty Dow Jones corporations: Compliance with FTC Fair Information Practice Principles and readability assessment." *Communications of the IIMA* 12.3 (2012): 5; Carlos Jensen and Colin Potts. "Privacy policies as decision-making tools: an evaluation of online privacy notices." *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems.* 2004; George R. Milne, Mary J. Culnan, and Henry Greene. "A longitudinal assessment of online privacy notice readability." *Journal of Public Policy & Marketing* 25.2 (2006): 238-249.

that such privacy policies are subject to change at any time without notice, and thus the time investment may all be for naught.

32. Even when policies are noticed, read, and understood, they generally do not explain a service's data practices in sufficient detail for consumers to make informed decisions. For example, despite various laws requiring that services post privacy policies, there are rarely requirements that force those services to name the specific third parties with whom they share data—they are usually only required to specify the broad categories of data recipients. Even though those third parties may have their own data practices that are documented in their own privacy policies, it is nearly impossible for consumers to inform themselves about those practices if they are unable to locate those additional privacy policies because they do not know the identities of the companies. Similarly, it is nearly impossible for consumers to understand the privacy practices of large companies that offer multiple services, as their privacy policies are often written in a manner that aggregates their practices across all of their offered services (e.g., Google's privacy policy,[34] which has nearly 6,000 words and is written at a college reading level, describes their data collection practices across all of their services and does not convey what data may be collected by Google Maps vs. Gmail vs. Docs vs. Search).

33. **Blocking Cookies and Fingerprinting.** In addition to reading privacy policies, there are some technologies that consumers can use in futile attempts to better protect their privacy. "Cookies" are data that websites store in consumers' web browsers, which are then transmitted back to websites when visited in the future. This allows a website to recognize a user over time, without having to log in again (as well as allowing the website to "remember" other settings, such as a default language). Because cookies have been historically abused for invasive tracking and profiling,[35] modern web browser software

[34] https://policies.google.com/privacy?hl=en-US

[35] J. R. Mayer and J. C. Mitchell, "Third-Party Web Tracking: Policy and Technology," *2012 IEEE Symposium on Security and Privacy*, San Francisco, CA, USA, 2012, pp. 413-427, doi: 10.1109/SP.2012.47.

allows users to delete stored cookies or to block cookies set by third-party trackers altogether.

34. However, deleting or blocking cookies is no longer an effective strategy, as tracking now occurs using other means that consumers cannot control.[36] For example, unique "fingerprints"—the aggregation of several data points to create a unique identifier—can be constructed based on seemingly-benign information that is automatically transmitted to online services without user consent: software versions (e.g., the web browser and operating system), language settings, time zones, screen resolution, battery levels, etc.[37] Even what fonts are installed on a computer, which are available to websites, can be used to uniquely identify a website visitor.[38] Apps on mobile devices have additional data points available for constructing unique fingerprints to identify their users, all without the use of cookies and with few actions that users can take to prevent this from occurring. Perversely, whether a user has configured privacy settings away from the defaults is often used as a data point for further tracking (i.e., while some web browsers can transmit a user-configurable "do not track" signal to websites, many websites choose not to honor this and instead use it as another way to identify and track users).[39]

35. Every device connected to the Internet has an Internet Protocol (IP) address, which is used to route information to and from it. While IP addresses must be transmitted to send and

---

[36] N. Nikiforakis, A. Kapravelos, W. Joosen, C. Kruegel, F. Piessens and G. Vigna, "Cookieless Monster: Exploring the Ecosystem of Web-Based Device Fingerprinting," *2013 IEEE Symposium on Security and Privacy*, Berkeley, CA, USA, 2013, pp. 541-555, doi: 10.1109/SP.2013.43; R. Upathilake, Y. Li, and A. Matrawy, "A classification of web browser fingerprinting techniques," *2015 7th International Conference on New Technologies, Mobility and Security (NTMS)*, Paris, France, 2015, pp. 1-5, doi: 10.1109/NTMS.2015.7266460.

[37] See, e.g., https://amiunique.org/; Peter Eckersley. "How unique is your web browser?" In *Privacy Enhancing Technologies: 10th International Symposium, PETS 2010, Berlin, Germany, July 21-23, 2010. Proceedings 10*, pp. 1-18. Springer Berlin Heidelberg, 2010;

[38] David Fifield and Serge Egelman. "Fingerprinting web users through font metrics." *Financial Cryptography and Data Security: 19th International Conference, FC 2015*, San Juan, Puerto Rico, January 26-30, 2015, Revised Selected Papers 19. Springer Berlin Heidelberg, 2015.

[39] Geoffrey A. Fowler, "Think you're anonymous online? A third of popular websites are 'fingerprinting' you." *The Washington Post*, October 31, 2019. https://www.washingtonpost.com/technology/2019/10/31/think-youre-anonymous-online-third-popular-websites-are-fingerprinting-you/; Michael Simon, "Apple is removing the Do Not Track toggle from Safari, but for a good reason." *Macworld*, February 6, 2019. https://www.macworld.com/article/232426/apple-safari-removing-do-not-track.html.

receive data, they can also be used to track users over time. Since devices behind a firewall (e.g., a household WiFi router) will appear to the outside world to share the same IP address, the collection of IP addresses is often used as a way of performing "cross-device tracking," which allows data recipients to infer when the same individual has moved from using a mobile device to a desktop computer to a smart TV; it also allows data recipients to infer when multiple individuals reside within the same household. For example, Meta's privacy policy states that they collect "information about the network you connect your device to, including your IP address" to target advertisements and provide "business services" to unnamed partners.[40] There is little that consumers can do to prevent this, without substantially degrading their online experiences. Worse, there is no way for consumers to know when this type of tracking is even occurring.

36. **Machine-Readable Privacy Policies.** Over 20 years ago, due to the privacy concerns regarding cookies, online tracking, and the acknowledgement that natural language privacy policies are woefully inadequate, several proposals were put forth to create machine-readable privacy policies. The idea behind these proposals was that consumers could use an interface to save their privacy preferences within their web browsers (or other software under their control), websites could post machine-readable policies, and then web browsers could act on consumers' behalf to either alert them when encountering a website with a disagreeable privacy policy (determined by the browser's automatic parsing of a website's machine-readable policy), or take some other action (e.g., automatically negotiating a better policy, blocking cookies or other transmissions, etc.). One of these proposals became a web standard: the Platform for Privacy Preferences Project (P3P),[41] was a web standard developed by the World Wide Web Consortium. (I served on the standards committee as an invited expert.)

37. The P3P standard gained traction, with many industry stakeholders adopting it by posting "P3P policies" on their websites so that web browsers could automatically parse them and

[40] https://www.facebook.com/privacy/policy/
[41] https://en.wikipedia.org/wiki/P3P

alert users when they encountered websites that violated those users' stated privacy preferences. Microsoft's Internet Explorer (IE) browser was the first major web browser to adopt P3P, and by default, IE would block third-party tracking cookies unless the website posted a P3P policy (and then would block third-party cookies in accordance with the user's stated privacy preferences). In response, many companies (e.g., Amazon, Facebook, and Google; all NetChoice members) posted P3P policies that did not actually describe their privacy practices, but nonetheless tricked the IE browser into accepting their tracking cookies, due to the presence of a valid P3P header.[42] One study of over 33,000 websites observed that more than one third were transmitting P3P policies that appeared to be designed to circumvent IE's cookie blocking (and did not accurately describe their sites' actual privacy practices).[43] (The same study found that many of these websites were certified participants in TRUSTe's[44] EU Safe Harbor industry self-regulation program, and concluded that such certified sites were no more likely to comply with the P3P standard than websites not certified.) Some of these P3P policies can still be found today when accessing the websites that include trackers from NetChoice members.[45] For example, as of March 28, 2023, Google Ads[46] transmits a P3P policy header, but the body of the policy is as follows:

CP="This is not a P3P policy! See g.co/p3phelp for more info."

38. Thus, I have come to the conclusion that voluntary online standards that aim to give consumers more control over their privacy are futile, as they are likely to be coopted by the companies that profit.

---

[42] Lorrie Faith Cranor, "Necessary but not sufficient: Standardized mechanisms for privacy notice and choice." *J. on Telecomm. & High Tech. L.* 10 (2012): 273.

[43] Pedro Giovanni Leon, Lorrie Faith Cranor, Aleecia M. McDonald, and Robert McGuire. "Token attempt: the misrepresentation of website privacy policies through the misuse of p3p compact policy tokens." In *Proceedings of the 9th annual ACM workshop on Privacy in the electronic society (WPES '10).* Association for Computing Machinery, New York, NY, USA, 93–104. https://doi.org/10.1145/1866919.1866932

[44] TRUSTe is now known as "TrustArc."

[45] Lorrie Faith Cranor, "Internet Explorer privacy protections also being circumvented by Google, Facebook, and many more." *Technology Academics Policy*, February 18, 2021. https://www.techpolicy.com/Cranor_InternetExplorerPrivacyProtectionsBeing Circumvented-by-Google.aspx

[46] https://adservice.google.com/adsid/google/ui

**SPECIAL CONCERNS REGARDING CHILDREN'S PRIVACY**

39. Data monetization without appropriate oversight is even more concerning when the data comes from children, who are unlikely to understand that this is happening, much less consent to it, but who could potentially face enormous impacts due to future usage of this data. This data may be used for manipulative marketing campaigns, but also may feed biased and unaccountable algorithms that use it to make decisions about a child's future, not to mention outright malicious uses of the data (e.g., non-custodial parents purchasing location data to geolocate a child).

40. In 2016 my research team decided to look at how well mobile apps directed at children appeared to be complying with COPPA, which has been in effect since 2000. We wrote bespoke instrumentation for the Android platform that allows us to run mobile apps and monitor exactly what personal information those apps access and with whom they share it.[47] We also used our instrumentation to determine whether transmissions containing personal information were performed securely and confidentially.

41. Starting in late 2016, we began downloading as many free apps in the "Designed for Families" (DFF) program as we could find, which ended up being just under 6,000 apps.[48] The DFF program is a section of the Play Store, Google's centralized Android app market, which is exclusively for apps that are directed to children. Mobile app developers must

[47] P. Wijesekera, A. Baokar, A. Hosseini, S. Egelman, D. Wagner, and K. Beznosov. "Android permissions remystified: A field study on contextual integrity." In *Proceedings of the 24th USENIX Security Symposium (USENIX Security 15)*, pages 499–514, Washington, D.C., Aug. 2015. USENIX Association; P. Wijesekera, A. Baokar, L. Tsai, J. Reardon, S. Egelman, D. Wagner, and K. Beznosov. "The feasability of dynamically granted permissions: aligning mobile privacy with user preferences." In *Proceedings of the 2017 IEEE Symposium on Security and Privacy*, Oakland '17. IEEE Computer Society, 2017; P. Wijesekera, J. Reardon, I. Reyes, L. Tsai, J.-W. Chen, N. Good, D. Wagner, K. Beznosov, and S. Egelman. "Contextualizing privacy decisions for better prediction (and protection)." In *Proceedings of the 2018 CHI Conference on Human Factors in Computing Systems*, CHI '18, pages 1–13, New York, NY, USA, 2018. Association for Computing Machinery; J. Reardon, A. Feal, P. Wijesekera, A. E. B. On, N. Vallina-Rodriguez, and S. Egelman. "50 Ways to Leak Your Data: An Exploration of Apps' Circumvention of the Android Permissions System." In *Proceedings of the 24th USENIX Security Symposium, USENIX Security '19,* Berkeley, CA, USA, 2019. USENIX Association; We wrote our tools for Google's Android platform only because it is open source: having the source code for the operating system allowed us to modify it for this purpose; at the time, we didn't look at Apple's iOS simply because we didn't have the source code to add the same level of instrumentation.

[48] Reyes *et al.*, *supra* note 3.

participate in the program when they upload their app and disclose to Google that it is directed at children. As part of the program, they must affirm to Google that their app is in compliance with COPPA. Our goal was to evaluate whether that appeared to be the case in practice.

42. Of the child-directed apps that we tested, more than half appeared to be violating COPPA in one way or another: 5% collected location or other contact information and 19% collected personal information without verifiable parental consent and shared it with third parties whose public disclosures indicated they would use them for prohibited purposes (e.g., behavioral advertising); 40% transmitted personal information insecurely. Separately, 39% appeared to be violating Google's platform policies (i.e., an example of industry self-regulation) surrounding the collection of persistent identifiers for advertising and analytics purposes.[49]

43. We also examined mobile apps that had been certified by the COPPA Safe Harbor programs, meaning that the app developer claimed to participate in a private FTC-approved compliance-certification program.[50] (We found it extraordinarily difficult to identify which mobile apps had actually been certified; none of the programs we contacted were willing to share lists of apps with us, and most of their websites did not provide this information.) Of the 237 apps we found that claimed to be Safe Harbor certified, 64% appeared to violate Google's policies on transmitting identifiers for advertising/analytics purposes, 33% transmitted personal information to prohibited third parties, and 32% transmitted personal information insecurely. We concluded that the apps that we examined, which claimed to be certified as COPPA-compliant by Safe Harbor programs, were no more likely to protect children's personal information than apps that had not been certified by these programs.[51] (This result is consistent with prior research on adverse selection in industry self-regulatory certification programs.)[52]

[49] *Ibid.*
[50] 16 C.F.R. § 312.11.
[51] Reyes *et al.*, *supra* note 3.
[52] Benjamin Edelman. "Adverse selection in online 'trust' certifications." In *Proceedings of the 11th International Conference on Electronic Commerce*, pp. 205-212. 2009.

44. Thus, based on this research, I have come to the conclusion that voluntary industry self-regulatory programs are ineffective and do not lead to better outcomes for consumers.

45. Similarly, through this research, I identified several additional gaps in regulation (beyond the inadequacy of the Safe Harbor programs), that I recommended be fixed in my U.S. Senate testimony.[53] Particularly relevant here are COPPA's "internal operations" exemption[54] and "actual knowledge" standard.[55] (These and other recommendations were recently published in a law review article.)[56]

46. Generally, websites and other online services must obtain verifiable parental consent before disclosing children's personal information to third parties, unless it is to support the service's internal operations and is not used for any other purpose. However, from a technical standpoint, most internal operations do not strictly require the collection of persistent identifiers that can be used to track children's activities across different services. In fact, both major platforms provide guidelines on how software developers can perform these activities *without* collecting advertising identifiers or non-resettable device identifiers.[57] For example, by definition, "contextual advertising" involves showing consumers ads *without* using data previously collected about them, and therefore no personal information is needed to show contextual ads. To prevent one user from being shown the same ad repeatedly (known as "frequency capping"), a session-based or installation-based identifier should be used, such that the collected data cannot be used to track the user across other services.

[53] U.S. Congress. Hearing of the Subcommittee on Consumer Protection, Product Safety, and Data Security of the Committee on Commerce, Scient, and Transportation. Hearing on "Protecting Kids Online: Internet Privacy and Manipulative Marketing." Testimony of Serge Egelman, 2021. https://www.commerce.senate.gov/services/files/0DC78E9D-88B2-4D54-8F4A-AE7B4C7D0EF6

[54] 15 U.S.C. § 6501(4)(A).

[55] 15 U.S.C. § 6501(4)(B).

[56] Egelman, S., 2023. "Informing Future Privacy Enforcement by Examining 20+ Years of COPPA." Harvard Journal of Law & Technology, 37(3).

[57] Google, "Best Practices for Unique Identifiers." April 6, 2023. https://developer.android.com/training/articles/user-data-ids; Apple, "User Privacy and Data Use." 2023. https://developer.apple.com/app-store/user-privacy-and-data-use/.

47. Nonetheless, in the course of my research, I have noticed that many privacy policies associated with child-directed services use the phrase "internal operations" when describing the flow of children's personal information to third parties. In many of these cases, these third parties are advertisers whose public disclosures indicate that they may use the data for COPPA-prohibited purposes. Thus, I have concluded that for many developers, the phrase "internal operations" appears to be a shibboleth used to justify privacy-invasive practices.

48. Secondly, COPPA's "actual knowledge" standard, by which it must be shown that an individual within these third-party organizations knew that they received data from children under 13, incentivizes data recipients to simply look the other way if and when they receive children's personal information, even when those third-party transmissions also include the names of the apps or websites that are transmitting them the data. Many of these data recipients are advertising and/or analytics companies that publicly advertise their abilities to target ads based on inferring the demographics of the users of the services sending them data. Furthermore, there are many commercial services that purport to provide the target demographics of a given mobile app or a website, and thus determining whether or not a service is directed at children is readily ascertainable.

49. For example, ironSource is a targeted advertising company that we observed receiving personal information from child-directed apps.[58] Their privacy policy stated they did not knowingly receive personal information from children under 13, a point which was reiterated to my laboratory in a letter from their general counsel.[59] In my response, I pointed out that all developers wishing to use ironSource's services must provide a company name at sign-up, and we observed companies with the following names sending them personal information: "Arial & Babies," "Androbaby," "Babies Funny World," "BabyBus Kids Games," "For Little Kids," "GameForKids," and "KidsUnityApps." From

---

[58] Reyes *et al.*, *supra* note 3.

[59] Serge Egelman, "We get letters." The AppCensus Blog, May 10, 2018. https://web.archive.org/web/20240415123554/https://blog.appcensus.io/2018/05/10/we-get-letters/.

these developer names provided to ironSource, the resulting data was likely coming from children. However, ironSource can deny actual knowledge, so long as no human within the company looks at the data that they are soliciting from developers who use their services.

**DARK PATTERNS**

50. Another way that consumers are manipulated online is through the use of "dark patterns." The term "dark patterns" refers to the strategic use of user interface designs to manipulate consumers into acting against their interests:

> "Dark patterns are user interfaces whose designers knowingly confuse users, make it difficult for users to express their actual preferences, or manipulate users into taking certain actions. They typically exploit cognitive biases and prompt online consumers to purchase goods and services that they do not want or to reveal personal information they would prefer not to disclose."[60]

51. As background, in computing, the "user interface" refers to the mechanisms with which the user directly interacts when using software, hardware, or other systems; it is the point of contact between the human and the computer. The user interface might refer to the physical controls that a user uses to control a device (e.g., a mouse and keyboard) or it may refer to graphical elements found within software that the user must interact with to control that software (e.g., buttons, menus, text, etc.).

52. "Human-computer interaction" (HCI) is a discipline within computer science that has existed for over half a century and studies how people interact with computers. "[HCI] draws on the fields of computer science, psychology, cognitive science, and organisational and social sciences in order to understand how people use and experience interactive technology."[61] This involves studying how people use both software- and hardware-based user interfaces. Practitioners in the field are prevalent throughout industry: online services' revenue is so highly dependent on their customers' abilities to correctly navigate

---

[60] Jamie Luguri, Lior Jacob Strahilevitz, "Shining a Light on Dark Patterns," *Journal of Legal Analysis*, Volume 13, Issue 1, 2021, Pages 43–109, https://doi.org/10.1093/jla/laaa006

[61] Cairns P, Cox AL, eds. "Frontmatter." In: *Research Methods for Human-Computer Interaction*. Cambridge University Press; 2008:i-vi.

their user interfaces that it is standard practice for companies to employ entire teams dedicated to the design of their products' user interfaces.

53. Behavioral economists and others who study decision making have long known that *how* a choice is presented to a person has a profound impact on the choice that person ultimately makes.[62] For example, someone is more likely to purchase a yogurt labeled as being "95% fat free" than if the same yogurt were labeled as "5% fat," even though both labels convey the same information. This type of intentional manipulation of how choices are presented to consumers to influence their decision making is known as "nudging":

> "A nudge, as we will use the term, is any aspect of the choice architecture that alters people's behavior in a predictable way without forbidding any options or significantly changing their economic incentives. To count as a mere nudge, the intervention must be easy and cheap to avoid. Nudges are not mandates. Putting fruit at eye level counts as a nudge. Banning junk food does not."[63]

54. User interface design is a powerful tool that directly influences how users use the system to make various decisions. That is, user interfaces can and do embody nudges: design suggestions that guide users towards a recommended course of action without constraining their choices. As noted earlier, the term "dark patterns" (sometimes known as "deceptive patterns") refers to user interface nudges that are specifically designed to manipulate users into acting against their own interests. To be clear, "dark patterns" does not refer to a specific design, but a type of conduct:

> "Internet users are inundated with attempts to persuade, including digital nudges like defaults, friction, and reinforcement. When these nudges fail to be transparent, optional, and beneficial, they can become 'dark patterns.'"[64]

55. This type of "manipulative design" exists in the physical world, as well. Consider this example of traveling through airports from Brignull's *Deceptive Patterns*:[65]

---

[62] Thaler, Richard; Sunstein, Cass (2008). *Nudge: improving decisions about health, wealth, and happiness*. Yale University Press.

[63] *Id.*

[64] Fagan P. "Clicks and tricks: The dark art of online persuasion." Curr Opin Psychol. 2024 Aug;58:101844. doi: 10.1016/j.copsyc.2024.101844. Epub 2024 Jul 10. PMID: 39029271.

[65] Harry Brignull (2023). *Deceptive Patterns: Exposing the Tricks Tech Companies Use to Control You*. Testimonium Ltd.

> "To understand how businesses can employ design to manipulate users for profit, let's start with a physical example: travelling through an airport. When you travel through London Gatwick Airport, you're advised to 'arrive at least two hours before your flight to allow plenty of extra time to check-in and pass through security.'[66] But after you go through security at Gatwick, you're not allowed to go directly to the departure lounge. You're forced to do something that has nothing to do with your trip, and it consumes your attention, energy and time. You have no choice in the matter – even if you're running late."[67]

> "The London Gatwick mandatory retail experience."[68]

> "In the industry, this is known as a 'forced path' store layout.[69] It's really just a shop that's a long, winding corridor, packed into a rectangular footprint in the same way your gut is packed into your belly – travellers are forced in one end and come out the other. The curved path serves a useful function for the business – it forces retail displays into the centre of the traveller's vision, making it almost impossible for them to avoid looking at the stuff on sale as they navigate their way through the area."[70]

56. Researchers have examined the types of dark patterns found in use by various popular online services and have built taxonomies.[71] For example, "fake scarcity" (Figure 4) is a type of dark pattern in which the consumer is told that only a limited supply of a product remains in order to make them more likely to purchase the product due to "fear of missing out":

> "Fake scarcity works by creating an artificial sense of limited availability around a product or service, pushing users to act quickly out of fear of missing out. This is achieved by displaying misleading messages about low stock levels or high demand. By tapping into the scarcity cognitive bias, this deceptive pattern preys on users' natural tendency to assign more value to items that appear rare or exclusive, pushing them into making hasty purchasing decisions without fully evaluating their options."[72]

---

[66] https://www.gatwickairport.com/faqs/flights-and-airlines/

[67] Harry Brignull (2023). *Deceptive Patterns: Exposing the Tricks Tech Companies Use to Control You*. Testimonium Ltd.

[68] *Id.*

[69] Santos, D. (2018, October 9). Customer Paths and Retail Store Layout — Part 3. Aislelabs. https://www.aislelabs.com/blog/2018/09/26/customer-paths-and-retail-store-layout-part-3.

[70] Harry Brignull (2023). *Deceptive Patterns: Exposing the Tricks Tech Companies Use to Control You*. Testimonium Ltd.

[71] Harry Brignull. "Types of Deceptive Pattern." *Deceptive Patterns*, https://www.deceptive.design/types.

[72] Harry Brignull. "Fake Scarcity." *Deceptive Patterns*, https://www.deceptive.design/types/fake-scarcity.




Figure 4: Example of the "fake scarcity" dark pattern, in which low supply and high demand are being represented to the website visitor.
Source: https://www.deceptive.design/types/fake-scarcity

57. In many cases, dark patterns are outright deceptive: researchers found that many of the websites employing the specific dark pattern above (i.e., communicating fake scarcity) simply used random or fixed numbers, and thus were making misrepresentations.[73]

58. Dark patterns are deployed across many commercial websites and other online services and are often used to encourage consumers to spend additional money or time or to give up privacy.[74]

## CALIFORNIA'S AGE-APPROPRIATE DESIGN CODE ACT

[73] Arunesh Mathur, Gunes Acar, Michael J. Friedman, Eli Lucherini, Jonathan Mayer, Marshini Chetty, and Arvind Narayanan. 2019. "Dark Patterns at Scale: Findings from a Crawl of 11K Shopping Websites." Proc. ACM Hum.-Comput. Interact. 3, CSCW, Article 81 (November 2019), 32 pages. https://doi.org/10.1145/3359183

[74] Fagan P. "Clicks and tricks: The dark art of online persuasion." Curr Opin Psychol. 2024 Aug;58:101844. doi: 10.1016/j.copsyc.2024.101844. Epub 2024 Jul 10. PMID: 39029271; Arielle Pardes. "How Facebook and Other Sites Manipulate Your Privacy Choices." *Wired*, August 20, 2020, https://www.wired.com/story/facebook-social-media-privacy-dark-patterns/.

59. From my understanding of the California Age-Appropriate Design Code Act (AADC), I believe that several of the privacy problems I have identified in my research will be addressed, and that technology to comply with the AADC is already in widespread use (including by NetChoice's members).

60. I understand that the AADC may regulate algorithms. An algorithm is simply a sequence of operations: there is often an input, calculations are performed on that input, and then the results of those calculations are provided as output. Within the context of online services, algorithms are used for everything from recommending content to users to inferring a user's preferences and traits for purposes such as targeted advertising. There is no such thing as a "neutral" algorithm: algorithms are designed for specific purposes. One algorithm might be designed to show ads that maximize ad revenue, whereas another might be designed to optimize engagement through content recommendations; other algorithms might be used for more mundane tasks, such as sorting items chronologically or alphabetically. For example, in determining the tweets that appear in a user's feed (of the hundreds of millions sent per day), the online service formerly known as Twitter weighed factors such as the number of likes, retweets, social relations, recency, perceived topic relevance, and use of embedded media, among other factors.[75]

61. While some algorithms might make objective decisions (e.g., correctly sorting a list of items by date), others are subjective and therefore less straightforward to audit for correctness (e.g., recommending content and choosing advertisements to display).[76] Algorithms are increasingly being used to make decisions about individuals that can have profound consequences, such as extending credit, housing, insurance, employment, or school admissions; in many cases there is little transparency or recourse surrounding these decisions, as they are made automatically and opaquely, and they may also use incorrect

---

[75] Josiah Hughes, "How the Twitter Algorithm Works [2023 Guide]." Hootsuite, December 14, 2022. https://blog.hootsuite.com/twitter-algorithm/

[76] Zeynep Tufekci, "Algorithmic Harms beyond Facebook and Google: Emergent Challenges of Computational Agency," Colorado Technology Law Journal 13, no. 2 (2015): 203-218.

or biased data.[77] Most adults do not understand if, when, and how these decisions are being made, children less so.

62. Algorithms that are optimized for increasing user engagement can also result in harm to consumers. For example, there was public outrage when the public learned that Facebook was using its content recommendation algorithms to intentionally cause emotional distress among its users. (Facebook researchers found that emotionally-charged posts were more likely to lead to user engagement; Facebook thus has an incentive to use its algorithms to prioritize showing users posts that are likely to evoke emotional responses.)[78] More recent research has shown that misinformation leads to greater levels of engagement for social media platforms: "(i) misinformation sources evoke more outrage than do trustworthy sources; (ii) outrage facilitates the sharing of misinformation at least as strongly as sharing of trustworthy news; and (iii) users are more willing to share outrage-evoking misinformation without reading it first."[79]

63. The AADC regulates the use of so-called "dark patterns." Dark patterns are design choices that are used to "nudge" the user into making a decision that is advantageous to the business. For example, making it easier to sign up for a service than cancel it is a dark pattern, as is the use of artificial scarcity (e.g., countdown timers to convey a sense of urgency or "limited time" offers).[80] Research shows that these techniques are prevalent in

[77] Danielle Keats Citron and Pasquale, Frank A., "The Scored Society: Due Process for Automated Predictions" (2014). Washington Law Review, Vol. 89, 2014, p. 1-, U of Maryland Legal Studies Research Paper No. 2014-8, Available at SSRN: https://ssrn.com/abstract=2376209

[78] Kashmir Hill, "Facebook Manipulated 689,003 Users' Emotions For Science." Forbes, June 28, 2014. https://www.forbes.com/sites/kashmirhill/2014/06/28/facebook-manipulated-689003-users-emotions-for-science/

[79] Killian L. McLoughlin et al., "Misinformation exploits outrage to spread online." *Science* 386,991-996(2024). doi:10.1126/science.adl2829.

[80] Sara Morrison, "Dark patterns, the tricks websites use to make you say yes, explained." Vox, April 1, 2021. https://www.vox.com/recode/22351108/dark-patterns-ui-web-design-privacy

child-directed online services,[81] and that children are likely to be more susceptible to manipulations than adults.[82]

64. I understand that the Plaintiff in this case argues that they are unable to estimate the approximate ages of their users. However, the law does not appear to be proscriptive as to how services used by children should perform age estimation. Many such technologies exist, which all have benefits and drawbacks. For example, France's data protection agency, CNIL, published a guide to choosing appropriate technologies.[83] The report recommends that to balance user privacy with age estimation accuracy, services should not perform age estimation themselves, but instead should use independent third parties who can confidentially make guarantees to the child-directed services without revealing additional personal information.

65. The report[84] also links to a prototype "implementation of an age-verification system that allows accessing restricted websites without sharing other personally identifiable data."[85] The recommended system is based on "zero-knowledge proofs," a concept in cryptography that has been well-known for almost 40 years now,[86] which allows an entity to prove the validity of a statement without revealing additional details about that statement. As the CNIL report explains, this technology could easily be used to prove to

---

[81] J. Radesky, A. Hiniker, C. McLaren, E. Akgun, A. Schaller, H. M. Weeks, S. Campbell, & A. N. Gearhardt (2022). "Prevalence and Characteristics of Manipulative Design in Mobile Applications Used by Children." JAMA network open, 5(6), e2217641. https://doi.org/10.1001/jamanetworkopen.2022.17641

[82] Dale Kunkel, Brian L. Wilcox, Joanne Cantor, Edward Palmer, Susan Linn, and Peter Dowrick. "Report of the APA task force on advertising and children." *Washington, DC: American Psychological Association* 30 (2004): 60.

[83] CNIL, "Online age verification: balancing privacy and the protection of minors." September 22, 2022. https://www.cnil.fr/en/online-age-verification-balancing-privacy-and-protection-minors

[84] *Ibid.*

[85] CNIL, "Demonstration of a privacy-preserving age verification process." June 23, 2022. https://linc.cnil.fr/demonstration-privacy-preserving-age-verification-process

[86] S. Goldwasser, S. Micali, and C. Rackoff. 1985. "The knowledge complexity of interactive proof-systems." In *Proceedings of the seventeenth annual ACM symposium on Theory of computing (STOC '85)*. Association for Computing Machinery, New York, NY, USA, 291–304. https://doi.org/10.1145/22145.22178; U. Fiege, A. Fiat, and A. Shamir. 1987. "Zero knowledge proofs of identity." In *Proceedings of the nineteenth annual ACM symposium on Theory of computing (STOC '87)*. Association for Computing Machinery, New York, NY, USA, 210–217. https://doi.org/10.1145/28395.28419.

an online service that a user is above or below the age of 18 without revealing additional personal information about that user.

66. I understand that Plaintiff implies that it is not possible to reliably determine Internet users' geographic locations in order to determine which regulations apply. This is incorrect. There are many widely-used methods for identifying where in the world an Internet user is physically located. At the most basic level, public and private databases exist that map IP addresses—again, these are transmitted with every Internet connection—to physical locations. This technology is known as "geoIP" and is used by many Internet services to automatically determine where in the world their users come from. For example, MaxMind provides a free database for this purpose that claims 99.8% accuracy in determining a user's country and 80% accuracy for state/region.[87] Private databases, such as those maintained by several of NetChoice's members, are likely to be more accurate.

67. For example, Meta is already using geoIP data to automatically determine which Internet users should receive protections under CCPA/CPRA. Their documentation explains: "we will determine if a person is in California or not based on certain available signals which may include IP address or advertising ID, when those are available."[88] Google similarly automatically detects when users are located in California for the purposes of CCPA/CPRA compliance: "you can select the advertising partners that are eligible to receive bid requests for users Google determines are in California."[89]

[87] https://support.maxmind.com/hc/en-us/articles/4407630607131-Geolocation-Accuracy
[88] https://www.facebook.com/business/help/1151133471911882
[89] https://support.google.com/adsense/answer/9560818?hl=en

68. Both companies named above also allow their customers to specifically target ads to Internet users located within California. For example, here is a true and correct screenshot from Google Ads' targeting configuration interface, https://ads.google.com/, accessed on March 28, 2023, which allows advertisers to show ads to people specifically located within California:



69. Below is a true and correct screenshot from Meta's Business Help Center website, https://www.facebook.com/business/help/365561350785642?id=176276233019487, accessed on March 28, 2023, describing how their customers can target ads to residents of specific states:

> **Enter a location**
>
> Enter the names of countries, cities and regions in the box below the dropdown. For best results, enter one location at a time. If you want to reach multiple locations, we recommend you bulk upload them.
>
> **Locations you can search for**
>
> - Countries (up to 25)
> - States
> - Provinces
> - Cities (up to 250)
> - Congressional districts
> - ZIP or post codes (up to 50,000)

70. Yahoo!, another NetChoice member, also allows their customers to target ads to Internet users in specific states, even using California as an example. Below is a true and correct screenshot from Yahoo!'s Developer Network website, https://developer.yahoo.com/dsp/docs/lines/targeting-geos.html#target-geographic-areas, accessed on March 28, 2023:

## Target Named Geographic Locations

Follow the steps below to target named geographic locations, such as countries, states, DMAs, or cities.

1. Select the **Country/State/Region/Sub Region/Metro Area/DMA/City,Zip** radio button.
2. From the Type dropdown, select **Country, State, Region, Sub Region, Metro Area, DMA, City**.

Note

You can start by targeting named locations first and then go back and add zip, postal or prefix codes or vice versa.

3. In the Target text box, type the first few letters of the location you want to target. For example, type all or part of the word "California", then locate it in the dropdown list.




71. In addition to geoIP lookups using available tools (many of which are already in use by NetChoice's members, in many cases for geolocating users to California for the purpose of determining CCPA/CPRA applicability), other methods exist for geolocating users, such as access to GPS hardware or other device sensors. For example, mobile apps running on the Android platform have access to Google's Geolocation services, which use nearby cellular towers and WiFi networks to determine the user's location, including

providing the accuracy radius.[90] Apple's iOS platform offers similar functionality, which also make use of nearby cellular networks, WiFi hotspots, and other sensor data.[91]

72. Similarly, all of the major web browsers support functionality to geolocate their users, [92] which usually make use of multiple methods, including using WiFi network information, GPS hardware, geoIP databases, and other data sources. Using these methods, the operators of online services have the ability to identify their users with street-level accuracy.

73. Thus, the technology to identify California consumers within a reasonable degree of accuracy already exists and is already in use by many of NetChoice's members.

## OPINIONS

74. For the reasons I set out in this declaration, I believe that the AADC takes a reasonable approach to children's online safety. Based on my research and experience, consumers broadly believe that they are being protected by privacy laws that simply do not exist. Requiring online services to disclose policies in a manner accessible to their users and to enforce those policies would go a long way towards helping consumers make informed decisions about their personal privacy.

75. The technologies needed to comply with the AADC's requirements already exist and are already in widespread use. Behaviors that the AADC prohibits have already been prohibited by major platforms. For example, child-directed Android apps are prohibited from collecting location data or performing behavioral advertising.[93]

76. As demonstrated above, consumers overwhelming want the practices this law requires for services that are likely to be accessed by children: limiting privacy-invasive tracking, providing safe defaults, and considering the harm to their users.

---

[90] https://developers.google.com/maps/documentation/geolocation/overview
[91] https://developer.apple.com/documentation/corelocation
[92] https://developer.mozilla.org/en-US/docs/Web/API/Geolocation_API
[93] https://support.google.com/googleplay/android-developer/answer/9893335?hl=en

77. Finally, I believe that it is reasonable for services likely to be used by children to consider the harm they may have on their users. In fact, I think it's not unreasonable to ask that the offeror of any product or service consider the harm they might be causing to others.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 6th, day of December, 2024 in Berkeley, California.

Serge Egelman, Ph.D.

# EXHIBIT 1

# Serge Egelman

**contact**
2150 Shattuck Avenue
Suite 250
Berkeley, CA 94704
USA

egelman@cs.berkeley.edu

## education

2009 **PhD** in Computation, Organizations, and Society — Carnegie Mellon University
School of Computer Science

2004 **BS** in Computer Engineering — University of Virginia
School of Engineering and Applied Science

## experience

**AppCensus, Inc.** — San Francisco, CA
2022–Now Chief Scientist / Co-Founder
2019–2022 CTO / Co-Founder

**International Computer Science Institute** — Berkeley, California
2016–Now Research Director, Usable Security & Privacy Group
2013–2016 Senior Researcher, Networking and Security Group

**University of California, Berkeley** — Berkeley, California
2011–Now Research Scientist, Electrical Engineering and Computer Sciences

**National Institute of Standards and Technology** — Gaithersburg, Maryland
2010–2011 Research Scientist, Visualization and Usability Group

**Brown University** — Providence, Rhode Island
2009-2010 Postdoctoral Researcher, Computer Science Department

**Microsoft Research** — Redmond, Washington
2008 Research Intern, Security and Privacy Group
2008 Research Intern, VIBE Group

**PARC** — Palo Alto, California
2006 Research Intern, Computer Science Laboratory

## publications*

### refereed journal publications

“Protect Me Tomorrow”: Commitment Nudges to Remedy Compromised Passwords
*Peer, E., Frik, A., Gilsenan, C., and Egelman, S.* ACM Trans. Comput.-Hum. Interact. *(Aug. 2024). Association for Computing Machinery.*

The Medium is the Message:
How Secure Messaging Apps Leak Sensitive Data to Push Notification Services
*Samarin, N., Sanchez, A., Chung, T., Juleemun, A. D. B., Gilsenan, C., Merrill, N., Reardon, J., and Egelman, S.* Proceedings on Privacy Enhancing Technologies (PoPETS) *2024.4 (2024) pp. 967–982.*

*Over 13,000 citations and h-index=52: https://scholar.google.com/citations?hl=en&user=WN9t4n0AAAAJ

A Model of Contextual Factors Affecting Older Adults' Information-Sharing Decisions in the U.S.
*Frik, A., Bernd, J., and Egelman, S.* ACM Transactions on Computer-Human Interaction *30.1 (Apr. 2023). Association for Computing Machinery.*

Lessons in VCR Repair: Compliance of Android App Developers with the California Consumer Privacy Act (CCPA)
*Samarin, N., Kothari, S., Siyed, Z., Bjorkman, O., Yuan, R., Wijesekera, P., Alomar, N., Fischer, J., Hoofnagle, C., and Egelman, S.* Proceedings on Privacy Enhancing Technologies (PoPETS) *3 (2023).*

Developers Say the Darnedest Things: Privacy Compliance Processes Followed by Developers of Child-Directed Apps
*Alomar, N., and Egelman, S.* Proceedings on Privacy Enhancing Technologies (PoPETS) *4 (2022) pp. 250–273.*

Data Collection Practices of Mobile Applications Played by Preschool-Aged Children
*Zhao, F., Egelman, S., Weeks, H. M., Kaciroti, N., Miller, A. L., and Radesky, J. S.* JAMA Pediatrics *174.12 (Dec. 2020).*

Nudge Me Right: Personalizing Online Security Nudges to People's Decision-Making Styles
*Peer, E., Egelman, S., Harbach, M., Malkin, N., Mathur, A., and Frik, A.* Computers in Human Behavior *109 (Aug. 2020).*

Disaster Privacy/Privacy Disaster
*Sanfilippo, M. R., Shvartzshnaider, Y., Reyes, I., Nissenbaum, H., and Egelman, S.* Journal of the Association for Information Science and Technology *(Mar. 2020).*

Can You Pay For Privacy? Consumer Expectations and the Behavior of Free and Paid Apps
*Bamberger, K. A., Egelman, S., Han, C., Elazari, A., and Reyes, I.* Berkeley Technology Law Journal *35 (2020).*

The Price is (Not) Right: Comparing Privacy in Free and Paid Apps
*Han, C., Reyes, I., Feal, Á., Reardon, J., Wijesekera, P., Vallina-Rodriguez, N., Elazari, A., Bamberger, K. A., and Egelman, S.* Proceedings on Privacy Enhancing Technologies (PoPETS) *3 (2020).*

Investigating Users' Preferences and Expectations for Always-Listening Voice Assistants
*Tabassum, M., Kosiński, T., Frik, A., Malkin, N., Wijesekera, P., Egelman, S., and Lipford, H. R.* Proceedings of the ACM on Interactive, Mobile, Wearable and Ubiquitous Technologies (IMWUT) *3.4 (Dec. 2019). Association for Computing Machinery.*

Privacy Attitudes of Smart Speaker Users
*Malkin, N., Deatrick, J., Tong, A., Wijesekera, P., Wagner, D., and Egelman, S.* Proceedings on Privacy Enhancing Technologies *2019.4 (2019).*

"Won't Somebody Think of the Children?" Examining COPPA Compliance at Scale
*Reyes, I., Wijesekera, P., Reardon, J., On, A. E. B., Razaghpanah, A., Vallina-Rodriguez, N., and Egelman, S.* Proceedings on Privacy Enhancing Technologies *2018.3 (2018) pp. 63–83.* **Caspar Bowden PET Award**

A Usability Evaluation of Tor Launcher
*Lee, L., Fifield, D., Malkin, N., Iyer, G., Egelman, S., and Wagner, D.* Proceedings on Privacy Enhancing Technologies *2017.3 (2017) pp. 87–106.*

The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study
*Tsai, J., Egelman, S., Cranor, L., and Acquisti, A.* Information Systems Research *22.2 (2011) pp. 254–268.* **AIS Best Publication of 2011 Award / INFORMS Best Published Paper Award (2012)**

P3P Deployment on Websites
*Cranor, L. F., Egelman, S., Sheng, S., McDonald, A. M., and Chowdhury, A.* Electronic Commerce Research and Applications *7.3 (2008) pp. 274–293.*

The Real ID Act: Fixing Identity Documents with Duct Tape
*Egelman, S., and Cranor, L. F.* I/S: A Journal of Law and Policy for the Information Society *2.1 (2006) pp. 149–183.*

**refereed conference publications**

Security and Privacy Failures in Popular 2FA Apps
*Gilsenan, C., Shakir, F., Alomar, N., and Egelman, S.* Proceedings of the 32nd USENIX Security Symposium *(USENIX Security '23), 2023.*

In the Room Where It Happens: Characterizing Local Communication and Threats in Smart Homes
*Girish, A., Hu, T., Prakash, V., Dubois, D. J., Matic, S., Huang, D. Y., Egelman, S., Reardon, J., Tapiador, J., Choffnes, D., and Vallina-Rodriguez, N.* Proceedings of the 2023 ACM on Internet Measurement Conference *(IMC '23), 2023, New York, NY, USA.*

Log: It's Big, It's Heavy, It's Filled with Personal Data!
Measuring the Logging of Sensitive Information in the Android Ecosystem
*Lyons, A., Gamba, J., Shawaga, A., Reardon, J., Tapiador, J., Egelman, S., and Vallina-Rodriguez, N.* Proceedings of the 32nd USENIX Security Symposium *(USENIX Security '23), 2023.*

Can Humans Detect Malicious Always-Listening Assistants?
A Framework for Crowdsourcing Test Drives
*Malkin, N., Wagner, D., and Egelman, S.* Proceedings of the ACM Conference On Computer-Supported Cooperative Work And Social Computing *(CSCW '22), 2022, New York, NY, USA.*

Runtime Permissions for Privacy in Proactive Intelligent Assistants
*Malkin, N., Wagner, D., and Egelman, S.* Eighteenth Symposium on Usable Privacy and Security *(SOUPS 2022), 2022.*

"You've Got Your Nice List of Bugs, Now What?" Vulnerability Discovery and Management Processes in the Wild
*Alomar, N., Wijesekera, P., Qiu, E., and Egelman, S.* Proceedings of the Sixteenth Symposium on Usable Privacy and Security *(SOUPS 2020), 2020.*

Actions Speak Louder than Words: Entity-Sensitive Privacy Policy and Data Flow Analysis with PoliCheck
*Andow, B., Mahmud, S. Y., Whitaker, J., Enck, W., Reaves, B., Singh, K., and Egelman, S.* 29th USENIX Security Symposium *(USENIX Security '20), 2020, Boston, MA.*

Don't Accept Candies from Strangers: An Analysis of Third-Party Mobile SDKs
*Feal, Á., Gamba, J., Tapiador, J., Wijesekera, P., Reardon, J., Egelman, S., and Vallina-Rodriguez, N.* International Conference on Computers, Privacy and Data Protection *(CPDP '20), 2020.*

A Qualitative Model of Older Adults' Contextual Decision-Making About Information Sharing
*Frik, A., Bernd, J., Alomar, N., and Egelman, S.* Workshop on the Economics of Information Security *(WEIS '20), 2020.*

Empirical Measurement of Systemic 2FA Usability
*Reynolds, J., Samarin, N., Barnes, J., Judd, T., Mason, J., Bailey, M., and Egelman, S.* Proceedings of the 29th USENIX Security Symposium *(USENIX Security '20), 2020.*

A Promise Is A Promise: The Effect of Commitment Devices on Computer Security Intentions
*Frik, A., Malkin, N., Harbach, M., Peer, E., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '19), 2019.*

Privacy and Security Threat Models and Mitigation Strategies of Older Adults
*Frik, A., Nurgalieva, L., Bernd, J., Lee, J. S., Schaub, F., and Egelman, S.* Proceedings of the 15th Symposium on Usable Privacy and Security *(SOUPS '19), 2019, Berkeley, CA, USA.*

Information Design in An Aged Care Context
*Nurgalieva, L., Frik, A., Ceschel, F., Egelman, S., and Marchese, M.* Proceedings of the 13th International Conference on Pervasive Computing Technologies for Healthcare *(PervasiveHealth '19), 2019, New York, NY, USA.*

50 Ways to Leak Your Data:
An Exploration of Apps' Circumvention of the Android Permissions System
*Reardon, J., Feal, A., Wijesekera, P., On, A. E. B., Vallina-Rodriguez, N., and Egelman, S.* Proceedings of the 24th USENIX Security Symposium *(USENIX Security '19), 2019, Berkeley, CA, USA.* **USENIX**

**Security Distinguished Paper Award / AEPD Emilio Aced Personal Data Protection Research Award / CNIL-INRIA Privacy Award**

An Experience Sampling Study of User Reactions to Browser Warnings in the Field
*Reeder, R. W., Felt, A. P., Consolvo, S., Malkin, N., Thompson, C., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '18), 2018.*

Contextualizing Privacy Decisions for Better Prediction (and Protection)
*Wijesekera, P., Reardon, J., Reyes, I., Tsai, L., Chen, J.-W., Good, N., Wagner, D., Beznosov, K., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '18), 2018.* **SIGCHI Honorable Mention Award**

Let's go in for a closer look: Observing passwords in their natural habitat
*Pearman, S., Thomas, J., Naeini, P. E., Habib, H., Bauer, L., Christin, N., Cranor, L. F., Egelman, S., and Forget, A.* Proc. of the ACM SIGSAC Conference on Computer & Communications Security *(CCS '17), 2017, New York, NY, USA.*

Turtle Guard: Helping Android Users Apply Contextual Privacy Preferences
*Tsai, L., Wijesekera, P., Reardon, J., Reyes, I., Egelman, S., Wagner, D., Good, N., and Chen, J.-W.* Proceedings of the 13th Symposium on Usable Privacy and Security *(SOUPS '17), 2017.*

The Feasibility of Dynamically Granted Permissions: Aligning Mobile Privacy with User Preferences
*Wijesekera, P., Baokar, A., Tsai, L., Reardon, J., Egelman, S., Wagner, D., and Beznosov, K.* Proceedings of the 2017 IEEE Symposium on Security and Privacy *(Oakland '17), 2017.*

Do or Do Not, There Is No Try: User Engagement May Not Improve Security Outcomes
*Forget, A., Pearman, S., Thomas, J., Acquisti, A., Christin, N., Cranor, L. F., Egelman, S., Harbach, M., and Telang, R.* Proc. of the 12th Symposium on Usable Privacy and Security *(SOUPS '16), 2016.*

Behavior Ever Follows Intention? A Validation of the Security Behavior Intentions Scale (SeBIS)
*Egelman, S., Harbach, M., and Peer, E.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '16), 2016.* **SIGCHI Honorable Mention Award**

The Anatomy of Smartphone Unlocking: A Field Study of Android Lock Screens
*Harbach, M., Luca, A. D., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '16), 2016.* **SIGCHI Honorable Mention Award**

Keep on Lockin' in the Free World: A Transnational Comparison of Smartphone Locking
*Harbach, M., Luca, A. D., Malkin, N., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '16), 2016.* **SIGCHI Honorable Mention Award**

The Teaching Privacy Curriculum
*Egelman, S., Bernd, J., Friedland, G., and Garcia, D.* Proceedings of the 47th ACM technical symposium on Computer Science Education *(SIGCSE '16), 2016.*

Android Permissions Remystified: A Field Study on Contextual Integrity
*Wijesekera, P., Baokar, A., Hosseini, A., Egelman, S., Wagner, D., and Beznosov, K.* 24th USENIX Security Symposium *(USENIX Security 15), 2015, Washington, D.C.*

Is This Thing On? Communicating Privacy on Ubiquitous Sensing Platforms
*Egelman, S., Kannavara, R., and Chow, R.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '15), 2015, New York, NY, USA.*

Scaling the Security Wall: Developing a Security Behavior Intentions Scale (SeBIS)
*Egelman, S., and Peer, E.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '15), 2015, New York, NY, USA.* **SIGCHI Honorable Mention Award**

Fingerprinting Web Users through Font Metrics
*Fifield, D., and Egelman, S.* Proceedings of the 19th international conference on Financial Cryptography and Data Security *(FC'15), 2015.*

Somebody's Watching Me? Assessing the Effectiveness of Webcam Indicator Lights
*Portnoff, R., Lee, L., Egelman, S., Mishra, P., Leung, D., and Wagner, D.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '15), 2015, New York, NY, USA.*

Are You Ready to Lock? Understanding User Motivations for Smartphone Locking Behaviors
*Egelman, S., Jain, S., Portnoff, R. S., Liao, K., Consolvo, S., and Wagner, D.* Proc. of the ACM SIGSAC Conference on Computer & Communications Security *(CCS '14), 2014, New York, NY, USA.*

The Effect of Developer-Specified Explanations for Permission Requests on Smartphone User Behavior
*Tan, J., Nguyen, K., Theodorides, M., Negron-Arroyo, H., Thompson, C., Egelman, S., and Wagner, D.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '14), 2014, Toronto, Canada.*

The Importance of Being Earnest [in Security Warnings]
*Egelman, S., and Schechter, S.* Proceedings of the 17th international conference on Financial Cryptography and Data Security *(FC'13), 2013, Okinawa, Japan.*

My Profile Is My Password, Verify Me! The Privacy/Convenience Tradeoff of Facebook Connect
*Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '13), 2013, Paris, France.*

Does My Password Go up to Eleven? The Impact of Password Meters on Password Selection
*Egelman, S., Sotirakopoulos, A., Muslukhov, I., Beznosov, K., and Herley, C.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '13), 2013, Paris, France.*

When It's Better to Ask Forgiveness than Get Permission: Attribution Mechanisms for Smartphone Resources
*Thompson, C., Johnson, M., Egelman, S., Wagner, D., and King, J.* Proceedings of the Ninth Symposium on Usable Privacy and Security *(SOUPS '13), 2013, Newcastle, United Kingdom.*

Android permissions: user attention, comprehension, and behavior
*Felt, A. P., Ha, E., Egelman, S., Haney, A., Chin, E., and Wagner, D.* Proceedings of the Eighth Symposium on Usable Privacy and Security *(SOUPS '12), 2012, Washington, D.C.* **SOUPS Best Paper Award (2012) / SOUPS Impact Award (2017)**

Facebook and privacy: it's complicated
*Johnson, M., Egelman, S., and Bellovin, S. M.* Proceedings of the Eighth Symposium on Usable Privacy and Security *(SOUPS '12), 2012, Washington, D.C.*

It's all about the Benjamins: Incentivizing users to ignore security advice
*Christin, N., Egelman, S., Vidas, T., and Grossklags, J.* Proceedings of the 15th international conference on Financial Cryptography and Data Security *(FC'11), 2011, Gros Islet, St. Lucia.*

Oops, I did it again: mitigating repeated access control errors on facebook
*Egelman, S., Oates, A., and Krishnamurthi, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '11), 2011, Vancouver, BC, Canada.*

Of passwords and people: measuring the effect of password-composition policies
*Komanduri, S., Shay, R., Kelley, P. G., Mazurek, M. L., Bauer, L., Christin, N., Cranor, L. F., and Egelman, S.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '11), 2011, Vancouver, BC, Canada.* **SIGCHI Honorable Mention Award**

Timing is everything?: the effects of timing and placement of online privacy indicators
*Egelman, S., Tsai, J., Cranor, L. F., and Acquisti, A.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '09), 2009, Boston, MA, USA.*

It's No Secret: Measuring the Security and Reliability of Authentication via 'Secret' Questions
*Schechter, S., Brush, A. J. B., and Egelman, S.* Proceedings of the 2009 IEEE Symposium on Security and Privacy *(Oakland '09), 2009, Los Alamitos, CA, USA.*

It's not what you know, but who you know: a social approach to last-resort authentication
*Schechter, S., Egelman, S., and Reeder, R. W.* Proceedings of the SIGCHI Conference on Human Factors in Computing Systems *(CHI '09), 2009, Boston, MA, USA.*

Crying wolf: an empirical study of SSL warning effectiveness
*Sunshine, J., Egelman, S., Almuhimedi, H., Atri, N., and Cranor, L. F.* Proceedings of the 18th USENIX Security Symposium *(SSYM'09), 2009, Montreal, Canada.*

Family accounts: a new paradigm for user accounts within the home environment

*Egelman, S., Brush, A. J. B., and Inkpen, K. M.* Proceedings of the 2008 ACM Conference on Computer Supported Cooperative Work *(CSCW '08), 2008, San Diego, CA, USA.*

You've Been Warned: An empirical study of the effectiveness of browser phishing warnings
*Egelman, S., Cranor, L. F., and Hong, J.* CHI '08: Proceeding of The 26th SIGCHI Conference on Human Factors in Computing Systems *(CHI '08), 2008, Florence, Italy.* **SIGCHI Honorable Mention Award**

Phinding Phish: Evaluating Anti-Phishing Tools
*Zhang, Y., Egelman, S., Cranor, L. F., and Hong, J.* Proceedings of the 14th Annual Network & Distributed System Security Symposium *(NDSS '07), 2007, San Diego, CA.*

Power Strips, Prophylactics, and Privacy, Oh My!
*Gideon, J., Egelman, S., Cranor, L., and Acquisti, A.* Proceedings of the Second Symposium on Usable Privacy and Security *(SOUPS '06), 2006, Pittsburgh, PA.*

An analysis of P3P-enabled web sites among top-20 search results
*Egelman, S., Cranor, L. F., and Chowdhury, A.* Proceedings of the 8th international conference on Electronic commerce: The new e-commerce: innovations for conquering current barriers, obstacles and limitations to conducting successful business on the internet *(ICEC '06), 2006, Fredericton, New Brunswick, Canada.*

**refereed workshop publications**

Challenges in Inferring Privacy Properties of Smart Devices: Towards Scalable Multi-Vantage Point Testing Methods
*Girish, A., Prakash, V., Egelman, S., Reardon, J., Tapiador, J., Huang, D. Y., Matic, S., and Vallina-Rodriguez, N.* Proceedings of the 3rd International CoNEXT Student Workshop *(CoNEXT-SW '22), 2022, Rome, Italy.*

Identifying and Classifying Third-Party Entities in Natural Language Privacy Policies
*Hosseini, M. B., Pragyan, K., Reyes, I., and Egelman, S.* Proceedings of the Second Workshop on Privacy in Natural Language Processing *(PrivateNLP '20), 2020.*

Do You Get What You Pay For? Comparing The Privacy Behaviors of Free vs. Paid Apps
*Han, C., Reyes, I., On, A. E. B., Reardon, J., Feal, A., Bamberger, K. A., Egelman, S., and Vallina-Rodriguez, N.* The Workshop on Technology and Consumer Protection *(ConPro '19), 2019.*

Privacy Controls for Always-Listening Devices
*Malkin, N., Egelman, S., and Wagner, D.* Proceedings of the New Security Paradigms Workshop *(NSPW '19), 2019, San Carlos, Costa Rica.*

On The Ridiculousness of Notice and Conset: Contradictions in App Privacy Policies
*Okoyomon, E., Samarin, N., Wijesekera, P., On, A. E. B., Vallina-Rodriguez, N., Reyes, I., Feal, A., and Egelman, S.* The Workshop on Technology and Consumer Protection *(ConPro '19), 2019.*

Better Late(r) than Never: Increasing Cyber-Security Compliance by Reducing Present Bias
*Frik, A., Egelman, S., Harbach, M., Malkin, N., and Peer, E.* Workshop on the Economics of Information Security *(WEIS '18), 2018.*

"What Can't Data Be Used For?" Privacy Expectations about Smart TVs in the U.S.
*Malkin, N., Bernd, J., Johnson, M., and Egelman, S.* Proceedings of the European Workshop on Usable Security *(EuroUSEC '18), 2018.*

Personalized Security Messaging: Nudges for Compliance with Browser Warnings
*Malkin, N., Mathur, A., Harbach, M., and Egelman, S.* Proceedings of the European Workshop on Usable Security *(EuroUSEC '17), 2017.*

"Is Our Children's Apps Learning?" Automatically Detecting COPPA Violations
*Reyes, I., Wijesekera, P., Razaghpanah, A., Reardon, J., Vallina-Rodriguez, N., Egelman, S., and Kreibich, C.* The Workshop on Technology and Consumer Protection *(ConPro '17), 2017.*

Information Disclosure Concerns in The Age of Wearable Computing
*Lee, L. N., Lee, J. H., Egelman, S., and Wagner, D.* Proceedings of the NDSS Workshop on Usable Security *(USEC '16), 2016.*

The Myth of the Average User:
Improving Privacy and Security Systems through Individualization
*Egelman, S., and Peer, E.* Proceedings of the 2015 Workshop on New Security Paradigms *(NSPW '15), 2015, Twente, The Netherlands.*

Teaching Privacy: What Every Student Needs to Know
*Friedland, G., Egelman, S., and Garcia, D.* Proceedings of the 46th SIGCSE technical symposium on computer science education *(Workshop), 2015.*

U-PriSM 2: The Second Usable Privacy and Security for Mobile Devices Workshop
*Chiasson, S., Crawford, H., Egelman, S., and Irani, P.* Proc. of the 15th International Conference on Human-computer Interaction with Mobile Devices and Services *(MobileHCI '13), 2013, Munich, Germany.*

Markets for Zero-day Exploits: Ethics and Implications
*Egelman, S., Herley, C., and Oorschot, P. C. van* Proceedings of the 2013 Workshop on New Security Paradigms Workshop *(NSPW '13), 2013, Banff, Alberta, Canada.*

Choice Architecture and Smartphone Privacy: There's A Price for That
*Egelman, S., Felt, A. P., and Wagner, D.* The 2012 Workshop on the Economics of Information Security *(WEIS '12), 2012, Berlin, Germany.*

How Good Is Good Enough? The sisyphean struggle for optimal privacy settings
*Egelman, S., and Johnson, M.* Proceedings of the Reconciling Privacy with Social Media Workshop *(CSCW '12 Workshop), 2012, Seattle, WA.*

It's Not Stealing if You Need It: A Panel on the Ethics of Performing Research Using Public Data of Illicit Origin
*Egelman, S., Bonneau, J., Chiasson, S., Dittrich, D., and Schechter, S.* Proceedings of the 16th International Conference on Financial Cryptography and Data Security *(FC'12), 2012.*

How to ask for permission
*Felt, A. P., Egelman, S., Finifter, M., Akhawe, D., and Wagner, D.* Proceedings of the 7th USENIX conference on Hot Topics in Security *(HotSec'12), 2012, Bellevue, WA.*

I've got 99 problems, but vibration ain't one: a survey of smartphone users' concerns
*Felt, A. P., Egelman, S., and Wagner, D.* Proceedings of the second ACM workshop on Security and privacy in smartphones and mobile devices *(SPSM '12), 2012, Raleigh, North Carolina, USA.*

Toward Privacy Standards Based on Empirical Studies
*Egelman, S., and McCallister, E.* The Workshop on Web Tracking and User Privacy *(W3C Workshop), 2011, Princeton, NJ.*

Please Continue to Hold: An Empirical Study on User Tolerance of Security Delays
*Egelman, S., Molnar, D., Christin, N., Acquisti, A., Herley, C., and Krishnamurthi, S.* Workshop on the Economics of Information Security (WEIS '10) *(WEIS '10), 2010, Cambridge, MA.*

Tell Me Lies: A Methodology for Scientifically Rigorous Security User Studies
*Egelman, S., Tsai, J., and Cranor, L. F.* Proceedings of the Workshop on Studying Online Behavior *(CHI '10 Workshop), 2010, Atlanta, GA.*

This is Your Data on Drugs: Lessons Computer Security Can Learn from the Drug War
*Molnar, D., Egelman, S., and Christin, N.* Proceedings of the 2010 Workshop on New Security Paradigms *(NSPW '10), 2010, Concord, Massachusetts, USA.*

Security user studies: methodologies and best practices
*Egelman, S., King, J., Miller, R. C., Ragouzis, N., and Shehan, E.* CHI '07 Extended Abstracts on Human Factors in Computing Systems *(CHI EA '07), 2007, San Jose, CA, USA.*

The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study
*Tsai, J., Egelman, S., Cranor, L., and Acquisti, A.* Proceedings of the 2007 Workshop on the Economics of Information Security *(WEIS '07), 2007, Pittsburgh, PA, USA.*

Studying the Impact of Privacy Information on Online Purchase Decisions
*Egelman, S., Tsai, J., Cranor, L. F., and Acquisti, A.* Proceedings of the Workshop on Privacy and HCI: Methodologies for Studying Privacy Issues *(CHI '06 Workshop), 2006, Montreal, Canada.*

### book chapters and magazine articles

50 Ways to Leak Your Data: An Exploration of Apps' Circumvention of the Android Permissions System
Reardon, J., Feal, Á., Wijesekera, P., On, A. E. B., Vallina-Rodriguez, N., and Egelman, S. *;login:* 2019, USENIX Association.

Predicting Privacy and Security Attitudes
Egelman, S., and Peer, E. *Computers and Society*, 2015, ACM.

Crowdsourcing
Egelman, S., Chi, E., and Dow, S. *Ways of Knowing in HCI*, 2013, Springer.

Helping users create better passwords
Ur, B., Kelley, P. G., Komanduri, S., Lee, J., Maass, M., Mazurek, M., Passaro, T., Shay, R., Vidas, T., Bauer, L., Christin, N., Cranor, L. F., Egelman, S., and Lopez, J. *;login:* 2012, USENIX Association.

Suing Spammers for Fun and Profit
Egelman, S. *;login:* 2004, USENIX Association.

Installation
Egelman, S. *Peter Norton's Complete Guide to Linux*, 1999, Macmillan Computer Publishing.

User Administration
Egelman, S. *Peter Norton's Complete Guide to Linux*, 1999, Macmillan Computer Publishing.

## awards and recognition

2022 **CNIL-INRIA Privacy Award**
*50 Ways to Leak Your Data: An Exploration of Apps' Circumvention of the Android Permissions System*, with J. Reardon, A. Feal, P. Wijesekera, A. Elazari Bar On, and N. Vallina-Rodriguez.

**Emilio Aced Personal Data Protection Research Award**
*50 Ways to Leak Your Data: An Exploration of Apps' Circumvention of the Android Permissions System*, with J. Reardon, A. Feal, P. Wijesekera, A. Elazari Bar On, and N. Vallina-Rodriguez.

2020 **Caspar Bowden Award for Outstanding Research in Privacy Enhancing Technologies**
*"Won't Somebody Think of the Children?" Examining COPPA Compliance at Scale*, with I. Reyes, P. Wijesekera, J. Reardon, A. Elazari, A. Razaghpanah, and N. Vallina-Rodriguez.

2019 **USENIX Security Symposium Distinguished Paper Award**
*50 Ways to Leak Your Data: An Exploration of Apps' Circumvention of the Android Permissions System*, with J. Reardon, A. Feal, P. Wijesekera, A. Elazari Bar On, and N. Vallina-Rodriguez.

2018 **SIGCHI Honorable Mention Award (Best Paper Nominee)**
*Contextualizing Privacy Decisions for Better Prediction (and Protection)*, with P. Wijesekera, J. Reardon, I. Reyes, L. Tsai, J.-W. Chen, N. Good, D. Wagner, and K. Beznosov.

2017 **Symposium on Usable Privacy and Security (SOUPS) Impact Award**
*Android Permissions: User Attention, Comprehension, and Behavior*, with A. P. Felt, E. Ha, A. Haney, E. Chin, and D. Wagner.

**Elected ACM Senior Member** Association for Computing Machinery (ACM)

2016 **Symposium on Usable Privacy and Security (SOUPS) Distinguished Poster Award**
*Risk Compensation in Home-User Computer Security Behavior: A Mixed-Methods Exploratory Study*, with S. Pearman, A. Kumar, N. Munson, C. Sharma, L. Slyper, L. Bauer, and N. Christin.

**SIGCHI Honorable Mention Award (Best Paper Nominee)**
*Behavior Ever Follows Intention? A Validation of the Security Behavior Intentions Scale (SeBIS)*, with M. Harbach and E. Peer.

**SIGCHI Honorable Mention Award (Best Paper Nominee)**
*The Anatomy of Smartphone Unlocking: A Field Study of Android Lock Screens*, with M. Harbach and A. De Luca.

**SIGCHI Honorable Mention Award (Best Paper Nominee)**
*Keep on Lockin' in the Free World: A Transnational Comparison of Smartphone Locking*, with M. Harbach, A. De Luca, and N. Malkin.

2015 **SIGCHI Honorable Mention Award (Best Paper Nominee)**
*Scaling the Security Wall: Developing a Security Behavior Intentions Scale*, with E. Peer.

2012 **AIS Best Publication of 2011**
*The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, with J. Tsai, L. Cranor, and A. Acquisti.

**ISR Best Published Paper**
*The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study*, with J. Tsai, L. Cranor, and A. Acquisti.

**SOUPS Best Paper Award**
*Android Permissions: User Attention, Comprehension, and Behavior*, with A. P. Felt, E. Ha, A. Haney, E. Chin, and D. Wagner.

2011 **SIGCHI Honorable Mention Award (Best Paper Nominee)**
*Of Passwords and People: Measuring the Effect of Password-Composition Policies*, with S. Komanduri, R. Shay, P. G. Kelley, M. Mazurek, L. Bauer, N. Christin, and L. F. Cranor.

2008 **SIGCHI Honorable Mention Award (Best Paper Nominee)**
*You've Been Warned: An Empirical Study on the Effectiveness of Web Browser Phishing Warnings*, with L. Cranor and J. Hong.

2006 **Tor Graphical User Interface Design Competition**
Phase 1 Overall Winner, with L. Cranor, J. Hong, P. Kumaraguru, C. Kuo, S. Romanosky, J. Tsai, and K. Vaniea.

**Publisher's Clearing House Finalist**
I *may* already be a winner.

## expert testimony and reports

2024 Expert witness for the plaintiffs in *Garner v. Amazon.com, Inc., No. 2:21-cv-00750 (W.D. Wash.)*. I provided a report and testimony explaining how in-home "virtual personal assistants" work, as well as explaining the associated privacy concerns based on the relevant research literature.

2024 Expert witness for the plaintiffs in *Lopez et al. v. Apple, Inc., No. 4:19-cv-04577-JSW (N.D. Cal.)*. I provided a report explaining how in-home "virtual personal assistants" work, as well as explaining the associated privacy concerns based on the relevant research literature.

2024 Expert witness for the plaintiffs in *Martinez et al. v. D2C, LLC d/b/a UNIVISION NOW, No. 1:23-cv-21394-RNS (S.D. Fla.)*. I provided a report and testimony explaining how the Meta Pixel functions and how it was used to transmit consumers' personally-identifiable information in violation of the Video Privacy Protection Act (VPPA).

2024 Expert witness for the plaintiffs in *Bloom v. Zuffa LLC, No. 2:22-cv-00412-RFB-BNW (D. Nev.)*. I provided a report and testimony explaining how the Meta Pixel functions and how it was used to transmit consumers' personally-identifiable information in violation of the Video Privacy Protection Act (VPPA).

2024 Expert witness for the plaintiffs in *Clark, et. al. v. Yodlee, Inc., No: 3:20-cv-05991-SK (N.D. Cal.)*. I provided a report and testimony explaining basic data protection concepts and consumer privacy expectations.

| | |
|---|---|
| 2024 | Independent expert witness appointed by the court in *Czarnionka v. The Epoch Times Association, Inc., No. 1:22-cv-6348 (S.D.N.Y.)*. I was asked to perform a technical analysis to confirm that the terms of the injunctive relief were being followed. |
| 2023-2024 | Expert witness for the plaintiffs in *Frasco v. Flo Health, et al., No. 3:21-cv-00757 (N.D. Cal.)*. I provided an expert report and testimony based on my forensic analysis of a mobile app's data collection behaviors (i.e., privacy analysis). I was deposed and also provided rebuttal reports of opposing experts. |
| 2023-2024 | Expert witness for the California Department of Justice in *NetChoice, LLC v. Bonta, No. 5:22-cv-08861*. I provided a declaration opposing the motion to dismiss. |
| 2022 | Expert witness for the plaintiffs in *Hart, et al. v. TWC Product and Technology LLC, No. 4:20-cv-3842-JST*. I provided a rebuttal report and testimony about mobile app data collection behaviors. |
| 2022 | Expert witness for the District of Columbia Office of the Attorney General in *District of Columbia v. Town Sports International LLC*. I provided a rebuttal report and testimony on proper surveying methodology. |
| 2021 | Expert witness testifying before the U.S. Senate (Committee on Commerce, Science, and Transportation), hearing on "Protecting Kids Online: Internet Privacy and Manipulative Marketing." Testimony available at: https://www.commerce.senate.gov/2021/5/protecting-kids-online-internet-privacy-and-manipulative-marketing |
| 2017-2019 | Expert witness for the plaintiffs in *Vizio, Inc., Consumer Privacy Litigation, No. 8:16-ml-02693-JLS-KES*, assisting with discovery strategy and providing explanations of relevant privacy research on users' willingness to pay for privacy in order to assist in quantifying damages. |
| 2016 | Expert witness for the FTC in *FTC v. Amazon.com, Inc., No. C14-1028-JCC*, providing testimony on human-computer interaction (HCI) evaluation methods and critiquing opposing expert's report. |
| 2014-2015 | Expert witness for the plaintiffs in *Doe vs. Twitter, Inc., No. CGC-10-503630*, providing explanations of relevant privacy research on users' willingness to pay for privacy in order to assist in quantifying damages. |
| 2014 | Expert witness for the plaintiffs in *Levy v. Universal Parking of Florida, LLC No. 13-cv-22122 (S.D. Fla.)*, providing written testimony on basic human-computer interaction concepts as they relate to smartphone usage. |
| 2013 | Expert witness for the plaintiffs in *LinkedIn User Privacy Litigation, No. 12-cv-03088-EJD (N.D. Cal.)*, providing explanations of information security concepts and providing original research on users' privacy expectations in order to demonstrate and quantify damages. |
| 2012 | Expert witness for the plaintiffs in *Netflix Privacy Litigation, No. 5:11-cv-00379-EJD (N.D. Cal.)*, providing explanations of relevant privacy research and the economics of information privacy in order to quantify damages. |

## grants awarded

| | |
|---|---|
| 2023–2026 | **NSA: Improving Security and Safety of Neural Networks through Robust Training, Noise Augmentation, and Safety Metrics (H98230-23-C-0275)** $750,000<br>Co-PI (PI: Michael Mahoney, International Computer Science Institute) |
| 2023–2026 | **NSF: Measuring, Validating and Improving upon App-Based Privacy Nutrition Labels (CNS-2247951/2247952/2247953)** $600,000<br>Principal Investigator (Collaborative with Adam Aviv, George Washington University; Chris Kanich, University of Illinois at Chicago) |

| | | |
|---|---|---|
| 2022–2025 | **NSF: Developer Implementation of Privacy in Software Systems (CCF-2217771/2217772)**<br>Principal Investigator (Collaborative with Primal Wijesekera, International Computer Science Institute; Jon Atwell and Julian Nyarko, Stanford University) | $750,000 |
| 2022–2026 | **KACST-UCB Center of Excellence for Secure Computing**<br>Senior Personnel (PI: David Wagner, University of California, Berkeley) | $6,460,000 |
| 2021–2022 | **CITRIS: Auditing the Compliance of California Consumer Privacy Regulations at Scale**<br>Principal Investigator (Collaborative with Zubair Shafiq, University of California, Davis) | $60,000 |
| 2019 | **Google: ASPIRE: SDK Traffic Identification at Scale**<br>Principal Investigator | $75,000 |
| 2018-2022 | **NSF: Mobile Dynamic Privacy and Security Analysis at Scale (CNS-1817248)**<br>Principal Investigator | $668,475 |
| 2018-2022 | **NSF: Contextual Integrity: From Theory to Practice (CNS-1801501/1801307/1801316)**<br>Principal Investigator (Collaborative with Helen Nissenbaum, Cornell University; and Norman Sadeh, Carnegie Mellon University) | $1,199,462 |
| 2018-2022 | **NSF: Increasing Users' Cyber-Security Compliance by Reducing Present Bias (CNS-1817249)**<br>Principal Investigator | $558,018 |
| 2018-2023 | **NSA: The Science of Privacy: Implications for Data Usage (H98230-18-D-0006)**<br>Principal Investigator (Co-PI: Michael Tschantz, International Computer Science Institute) | $3,236,424 |
| 2018-2019 | **DHS: Scaling Contextual Privacy to MDM Environments (FA8750-18-2-0096)**<br>Principal Investigator | $480,000 |
| 2018-2019 | **Rose Foundation: AppCensus: Mobile App Privacy Analysis at Scale**<br>Principal Investigator (Co-PI: Irwin Reyes, International Computer Science Institute) | $40,000 |
| 2018 | **Cisco: Access Controls for an IoT World**<br>Principal Investigator | $99,304 |
| 2018 | **CLTC: Privacy Analysis at Scale**<br>Principal Investigator | $50,000 |
| 2018 | **CLTC: Secure Internet of Things for Senior Users**<br>Co-PI (PI: Alisa Frik, International Computer Science Institute) | $60,590 |
| 2017 | **Mozilla: Towards Usable IoT Access Controls in the Home**<br>Principal Investigator | $46,000 |
| 2017 | **Data Transparency Lab (DTL) / AT&T: Transparency via Automated Dynamic Analysis at Scale**<br>Principal Investigator | $55,865 |
| 2017 | **CLTC: Secure & Usable Backup Authentication**<br>Co-PI (PI: David Wagner, University of California, Berkeley) | $48,400 |
| 2016 - 2017 | **NSF: Teaching Security in CSP (CNS-1636590)**<br>Co-PI (PI: Julia Bernd, ICSI) | $200,000 |
| 2016 - 2017 | **DHS: A Platform for Contextual Mobile Privacy (FA8750-16-C-0140)**<br>Principal Investigator | $664,378 |
| 2016 - 2018 | **CLTC: The Security Behavior Observatory**<br>Principal Investigator | $195,962 |
| 2016 | **CLTC: Using Individual Differences to Tailor Security Mitigations**<br>Principal Investigator | $100,000 |
| 2015 - 2018 | **NSF/BSF: Using Individual Differences to Personalize Security Mitigations (CNS-1528070/BSF-2014626)**<br>Principal Investigator (Collaborative with Eyal Peer, Bar-Ilan University) | $724,732 |

2015 - 2019 **NSF: Security and Privacy for Wearable and Continuous Sensing Platforms (CNS-1514211/1514457/1513584)** $1,200,000
Principal Investigator (Collaborative with David Wagner, University of California, Berkeley; and Franziska Roesner, University of Washington)

2014 - 2016 **NSF: Teachers' Resources for Online Privacy Education (DGE-1419319)** $300,000
Co-PI (PI: Gerald Friedland, ICSI)

2014 - 2017 **NSA: User Security Behavior** $200,000
Subcontract (PIs: Lorrie Cranor, Rahul Telang, Alessandro Acquisti, and Nicholas Christin; Carnegie Mellon University)

2014 **Google: Improving Security Warnings by Examining User Intent** $71,500
Principal Investigator

2013 - 2015 **NSF: Designing Individualized Privacy and Security Systems (CNS-1343433/1343451)** $132,620
Principal Investigator (Collaborative with Eyal Peer, Carnegie Mellon University)

2013 - 2016 **NSF: A Choice Architecture for Mobile Privacy and Security (CNS-1318680)** $500,000
Co-PI (PI: David Wagner, University of California, Berkeley)

2010 **Google: Designing Usable Certificate Dialogs in Chrome** $60,000
Principal Investigator

## patents awarded

2023 Automatic identification of applications that circumvent permissions and/or obfuscate data flows (US Patent 11,689,551)

## professional activities

### program committees

2024 IEEE Security & Privacy; Workshop on Economics and Information Security (WEIS); Contextual Integrity (CI) Symposium

2023 Privacy Enhancing Technologies Symposium (PETS); IEEE Security & Privacy; Workshop on Economics and Information Security (WEIS)

2022 Contextual Integrity (CI) Symposium

2021 Workshop on Economics and Information Security (WEIS)

2020 ACM CCS; Workshop on Economics and Information Security (WEIS); Symposium on Usable Privacy and Security (SOUPS); USENIX Security

2019 Privacy Enhancing Technologies Symposium (PETS); Workshop on Economics and Information Security (WEIS); Symposium on Usable Privacy and Security (SOUPS)

2018 ACM SIGCHI (Human Factors in Computing Systems); Privacy Enhancing Technologies Symposium (PETS); Workshop on Economics and Information Security (WEIS); ACM Conference on Computer and Communications Security (CCS); Symposium on Usable Privacy and Security (SOUPS); IEEE Security & Privacy ("Oakland")

2017 ACM SIGCHI (Human Factors in Computing Systems); USENIX Security; Privacy Enhancing Technologies Symposium (PETS); New Security Paradigms Workshop (NSPW), **Co-Chair**; Workshop on Economics and Information Security (WEIS); ACM Conference on Computer and Communications Security (CCS); Symposium on Usable Privacy and Security (SOUPS)

| | |
|---|---|
| 2016 | Workshop on the Economics of Information Security (WEIS), **Chair**; New Security Paradigms Workshop (NSPW), **Co-Chair**; ACM SIGCHI (Human Factors in Computing Systems); USENIX Security; Symposium on Usable Privacy and Security (SOUPS); ACM WWW; Financial Cryptography and Data Security; Privacy Enhancing Technologies Symposium (PETS) |
| 2015 | Symposium on Usable Privacy and Security (SOUPS); USENIX Security; ACM SIGCHI (Human Factors in Computing Systems); Privacy Enhancing Technologies Symposium (PETS); Workshop on the Economics of Information Security (WEIS); ACM WWW; Financial Cryptography and Data Security |
| 2014 | ACM SIGCHI (Human Factors in Computing Systems); Financial Cryptography and Data Security; ACM WWW; Privacy Enhancing Technologies Symposium (PETS) |
| 2013 | ACM SIGCHI (Human Factors in Computing Systems); Symposium on Usable Privacy and Security (SOUPS); New Security Paradigms Workshop (NSPW); Anti-Phishing Working Group eCrime Researchers Summit |
| 2012 | Symposium on Usable Privacy and Security (SOUPS); New Security Paradigms Workshop (NSPW) |
| 2011 | Symposium On Usable Privacy and Security (SOUPS); New Security Paradigms Workshop (NSPW); Computers, Freedom, and Privacy (CFP) Conference (poster session co-chair); Software and Usable Security Aligned for Good Engineering (SAUSAGE) Workshop, **Co-Chair** |
| 2010 | Symposium On Usable Privacy and Security (SOUPS) |
| 2008 | Conference on Information and Knowledge Management (CIKM) |
| 2007 | ACM SIGCHI Workshop - Security User Studies: Methodologies and Best Practices; Anti-Phishing Working Group eCrime Researchers Summit (poster session co-chair) |
| 2006 | Computers, Freedom, and Privacy (CFP) Conference |

### standards committees

| | |
|---|---|
| 2007-2008 | W3C Web Security Context (WSC) Working Group |
| 2004-2006 | W3C Platform for Privacy Preferences (P3P) 1.1 Working Group |

### leadership roles

| | |
|---|---|
| 2024-Now | Advisory Board Member, Electronic Privacy Information Center (EPIC) |
| 2012-Now | Director, Berkeley Laboratory for Usable and Experimental Security (BLUES) |
| 2021-2023 | Member, ICSI Scientific Leadership Council |
| 2006-2008 | Legislative Concerns Chair / Board of Directors, National Association of Graduate and Professional Students (NAGPS) |
| 2006-2008 | Vice President for External Affairs, Carnegie Mellon Graduate Student Assembly |

## teaching

Fall 2019 — **Usable Privacy and Security** — University of California, Berkeley
Designed and taught a course as part of the School of Information's Masters in Cybersecurity program. Duties included course design and development, grading assignment and exams, supervising class projects, and holding office hours.

Spring 2017, Spring 2018 — **Human Factors in Computer Security and Privacy** — Brown University
Instructor for a module on "user interfaces for security" as part of the Executive Masters in Cybersecurity program. Duties included course design and development, grading assignments and exams, supervising thesis projects, and holding office hours.

Fall 2007 **Information Security & Privacy (46-861)** Carnegie Mellon University
Teaching assistant duties included developing course materials (topics for lectures, assignments, and exams), grading assignments and exams, holding office hours, and mentoring students about semester-long projects.

Spring 2006 **Computers and Society (15-290)** Carnegie Mellon University
Teaching assistant duties included giving guest lectures, creating assignments and exams, grading assignments and exams, holding office hours, and mentoring students about semester-long projects.

Fall 2003 **Information Security (CS 451)** University of Virginia
Teaching assistant duties included giving guest lectures, creating assignments and exams, grading assignments and exams, and holding office hours.

Fall 2003 **Intellectual Property (TCC 200)** University of Virginia
Teaching assistant duties included grading assignments and holding office hours.

Spring 2003, Spring 2004 **Advanced Software Development Methods (CS 340)** University of Virginia
Teaching assistant duties included grading and holding office hours.

Fall 2002 **Engineering Software (CS 201J)** University of Virginia
Teaching assistant duties included grading assignments and holding office hours.

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
Supervising Deputy Attorney General
KRISTIN A. LISKA
Deputy Attorney General
State Bar No. 315994
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3916
Fax: (415) 703-5480
E-mail: Kristin.Liska@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **NetChoice, LLC,**<br><br>Plaintiff,<br><br>**v.**<br><br>**Rob Bonta, in his official capacity as Attorney General of the State of California,**<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**DECLARATION OF JENNY S. RADESKY, MD IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR A SECOND PRELIMINARY INJUNCTION**<br><br>Date: January 23, 2025<br>Time: 9:00 a.m.<br>Dept: 3<br>Judge: The Honorable Beth Labson Freeman<br>Trial Date: Not scheduled<br>Action Filed: 12/14/2022 |

I, Jenny S. Radesky, MD, declare and state as follows:

I submit this declaration in support of Defendant's Opposition to Plaintiff's Motion for Second Preliminary Injunction.

**BACKGROUND & QUALIFICATIONS**

1. I am a tenured Associate Professor of Pediatrics and Director of the Division of Developmental Behavioral Pediatrics at University of Michigan Medical School and C.S. Mott Children's Hospital. In this role, I lead a team of 11 clinicians and researchers who aim to understand, treat, and advocate for children's developmental, emotional, and educational needs. This work requires theoretical and practical knowledge about child development, parent-child relationships, and the ways children's individual differences – such as mood regulation, executive functioning, trauma exposure, or social skills – shape the way they interact with their families and environments.

2. I am a board-certified practicing Developmental Behavioral Pediatrician with clinical expertise in developmental delays, autism spectrum disorder, attention deficit hyperactivity disorder, mood dysregulation, disruptive behavior disorders, learning disabilities, intellectual disability, parent-child relational problems, and trauma/stressor-related disorders. I work closely with legal advocates, clinical psychologists, special educators, and outpatient therapists to coordinate care for complex patients, and therefore understand the multiple levels of children's experiences that contribute to their health and well-being.

3. I have been researching and publishing in the field of child social-emotional development and digital media for the past 15 years. My research areas include: 1) how early childhood media use is linked with emotion regulation and executive functioning; 2) how parent smartphone use affects parenting stress, parent-child interaction, and child social-emotional development; 3) how parents and children use mobile devices, which we study using passive sensing methods to capture data directly from smartphones and tablets; 4) analysis of educational content/interactive design, including manipulative "dark pattern" design, in apps and platforms popular with children; 5) assessment of the amount, type, and design of advertising in apps and platforms used by children; 6) examination of data collection by apps used by young children,

and how this differs by child socioeconomic status; and 7) interviewing parents and children about their conceptualizations of digital privacy and persuasive design. I also mentor a number of pediatric trainees and doctoral students who study topics including smart home design, child-computer interaction (i.e., how different design affordances influence child behavior and parent-child interaction), and children's interactions with artificial intelligence.

4. I have published 73 peer-reviewed articles (in addition to 4 under review or in press), many in high-impact journals such as *Journal of the American Medical Association, Pediatrics*, *JAMA Pediatrics*, and *Pediatric Research.* I have also published 18 non-peer-reviewed articles, 7 book chapters, and am the editor of a developmental behavioral pediatrics textbook, *Encounters with Children, 5th Edition* (to be published in 2025). My published research has been cited 12,983 times, and my current h-index is 40 (i10-index 61).

5. I founded and run a research program on children and media at the University of Michigan Medical School, studying how modern forms of digital media – including smartphones, tablets, interactive apps, mobile games, advertising, and video-sharing platforms like YouTube – and their unique design affordances influence child social-emotional development. I have a strong track record of funding from the Eunice Kennedy Shriver National Institute of Child Health and Development (NICHD), including: a K23 Career Development Award in 2017 ($831,232), which is a 5-year award providing research training; an R03 award ($155,584) in 2018 examining how design affordances of interactive media shape parent-toddler verbal and social interactions; an R21 award ($427,750) in 2018 examining mobile device use and social-emotional development in 3-4-year-olds; and an R41 Scientific Technology Transfer Research award from NICHD ($150,000) to develop a passive sensing app, Chronicle, which I use in my research to measure app and device usage by children and parents. I currently am funded by two large-scale grants from NICHD, including an R01 award ($3,538,615) that examines associations of media use with executive functioning development in toddlers, and a P01 multi-site award ($279,142) and supplement ($28,409). Over the past 8 years, I have also received funding from several internal university grants, nonprofit organizations like Common Sense Media and the Boston Children's Hospital Digital Wellness Lab, and the Blue Cross Blue Shield Foundation. As a researcher, I

understand the ethical and privacy standards around collection, storage, and destruction of sensitive data about children.

6. Throughout my research career, I have sought cross-disciplinary collaborations with computer engineers, information scientists, privacy researchers, developmental psychologists, public health researchers, and policy-oriented researchers in the United States (U.S.) and internationally, so that my research can reflect the complex ways children interact with modern media. Through these collaborations, my knowledge has extended beyond pediatrics into understanding data collection and marketing methods, how app-based data is collected and stored, monetization practices (e.g., in-app purchases, advertising) used in digital products, and how policy changes might impact business practices.

7. I have intentionally designed my research studies so that they can easily be translated into practical parenting approaches or policies. My research has directly informed the Bright Futures Guidelines for Pediatric Health Supervision, multiple American Academy of Pediatrics (AAP) policy statements, and petitions and complaints to the Federal Trade Commission (FTC) regarding manipulative advertising and interactive design in children's apps, and it has been cited in U.S. Congressional testimony.

8. I have also served in a leadership role at the AAP since 2015, when I was recruited to join the Executive Committee of the AAP Council on Communications and Media. I was lead author on two AAP policy statements – *Media and Young Minds* (2016)[1] and *Digital Advertising to Children* (2020)[2] – which included exhaustive reviews of the research literature on children and digital media. I am Chair of the Council on Communications and Media. Under my leadership, the AAP has broadened its digital media guidance to not only recommend behavior change by pediatric clinicians and families, but also recommend changes in technology policy and digital design.

9. Through the AAP and as an independently-solicited research and clinical expert, I have provided guidance to parents about healthy relationships with technology through my work

[1] Radesky, Jenny and Christakis, Dimitri. (2016). "Media and young minds." *Pediatrics* 138.5.
[2] Radesky, Jenny, et al. (2020) "Digital advertising to children." *Pediatrics* 146.1.

with HealthyChildren.org, PBS Parents, Common Sense Media, and CNN. I also designed the AAP Family Media Plan, an online tool to help parents develop balanced relationships with media. My work has been referenced in U.S. and international media outlets, including Time Magazine, the New York Times, WIRED, CBS News and NPR, among others, and I have been a guest on the TODAY Show twice to discuss my expertise. I offered guidance specific to families coping during the COVID-19 pandemic through my work with Noggin, Scary Mommy, Common Sense Media, and the University of Michigan C.S. Mott Children's Hospital.

10. I also serve as the Co-Medical Director of the AAP's Center of Excellence on Social Media and Youth Mental Health. This Center was founded in 2022 and funded by the Substance Abuse and Mental Health Services Administration to create and disseminate resources on healthy social media use to teens, caregivers, teachers, clinicians, and others who support youth wellbeing. However, resources are not enough. As a Center of Excellence leader, I have heard repeatedly from parents, academics, and other experts that **technology design change is needed to improve children and teens' mental health online**, rather than expecting children and families to shoulder all the burden. This message is prominent in the 2023 National Academies of Science report *Social Media and Adolescent Health*,[3] the U.S. Surgeon General's Advisory on social media and mental health,[4] and the Biden-Harris Interagency Task Force on Kids Online Health and Safety report published in July 2024.[5]

11. Since July 2024, I have served as a Behavioral Expert for the U.S. Federal Trade Commission (FTC) through an Intergovernmental Personnel Agreement with the University of Michigan. In this governmental role, I advise FTC teams on enforcement of the Children's Online Privacy Protection Act and Section 5 of the FTC Act. Through this experience, I have built greater understanding of the policy landscape and how design decisions – or lack of appropriate oversight or transparency of digital products used by minors – impact user health and wellbeing.

[3] National Academies of Sciences, Engineering, and Medicine. 2024. Social media and adolescent health. Washington, DC: The National Academies Press. https://doi.org/10.17226/27396.

[4] Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory (2023). https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf

[5] Online Health and Safety for Children and Youth: Best Practices for Families and Guidance for Industry. Kids Online Health and Safety Task Force (2024). https://www.samhsa.gov/sites/default/files/online-health-safety-children-youth-report.pdf

12. Based on my expertise in children and digital technology, I am regularly invited to speak at both medical and technological conferences nationally and internationally. I have been invited to give Grand Rounds at children's hospitals around the U.S., regularly give plenary lectures at pediatric conferences in the U.S. and internationally (Switzerland, Slovenia), and have been asked to train early childhood providers throughout the U.S., Canada, and internationally (Italy, Denmark, Hong Kong, United Arab Emirates). I have also been invited to speak at conferences with technology industry audiences, including Common Sense Media and the MIPCOM Conference (Cannes, France).

13. I am regularly asked to speak to government bodies on issues related to children's health and technology. My experience providing testimony includes: Michigan State Senate Committee on Education in April 2021 regarding children's mental health and remote schooling; U.S. House of Representatives Subcommittee on Health of the Committee on Energy and Commerce in October 2021 regarding children's health and technology; and an informational hearing for California Assembly Committee on Privacy and Consumer Protection and Arts, Entertainment, Sports, Tourism, and Internet Media in March 2022 about children and digital technology. I have been an invited speaker at Federal Trade Commission Workshops about children's online privacy (October 2019), dark patterns (April 2021), and stealth advertising (October 2022).

14. I was also recently appointed to the Board on Children, Youth, and Families for the National Academies of Science, Medicine, and Engineering.

15. I am on the Steering Committee for Designed with Kids in Mind, a coalition of groups committed to the wellbeing of children and online users across the U.S. This work puts me in frequent contact with other experts in my field. I also collaborate with experts in the United Kingdom (U.K.), European Union (E.U.), and colleagues who work in the technology industry.

16. I have served on advisory boards for two for-profit companies, the scientific advisory board for Noggin/CBS and the Board of Directors for Melissa & Doug toys. This work required understanding the ways companies identify their audiences/consumers, child-centered approaches in digital and non-digital product design, and how companies approach marketing and

data collection.

17. My medical training at Harvard Medical School prepared me to understand complex social, cultural, psychological, and technological determinants of health in parents and children. At Harvard, I completed additional coursework in public health and epidemiology and an honors thesis focusing on preventive health. I completed my pediatrics residency at Seattle Children's Hospital between 2007 and 2010, when mobile technologies were first bursting onto the market and into family life. I witnessed smartphones, tablets, and mobile apps being introduced into family communication and routines as a primary care pediatrician in 2010-2011, working at a clinic that served many families working in Seattle's tech sector. I then completed subspecialty fellowship training in Developmental Behavioral Pediatrics at Boston Medical Center, New England's largest safety-net hospital, from 2011-2014, which solidified my expertise in child development, parent-child relationships, and the systems that shape child wellbeing.

18. My *curriculum vitae*, which sets forth my experience and credentials more fully, is attached as Exhibit A.

19. I am being compensated in the above-entitled case at an hourly rate of $400/hour for preparing this declaration. My compensation is not in any way dependent on the outcome of this or any related proceeding.

20. The opinions in this declaration are my expert opinions, which are based on my clinical and research expertise in developmental behavioral pediatrics, public health, and media research; my experience reviewing the scientific literature about children and digital technology and writing AAP policy statements; my experience translating the scientific literature for teaching parents and professionals nationally and internationally; my experience as a board member at for-profit companies; and my conversations with domestic and international experts doing work at the intersection of technology and child development. My testimony represents my expertise as a pediatrician and researcher, not the views of the University of Michigan, American Academy of Pediatrics, or U.S. Federal Trade Commission.

21. I have reviewed AB 2273, the California Age-Appropriate Design Code Act. In my expert opinion, it is a necessary piece of legislation to reduce harms, ensure that children have

opportunities to participate in age-appropriate digital spaces, and minimize the manipulative and egregious designs that serve industry needs at the expense of child wellbeing.

## ONLINE HARMS TO MINORS

### Global Consensus About Online Harms

22. It is widely accepted that online harms to minors occur and need to be mitigated. In this section, I describe several different harm frameworks that have informed policy decisions globally. In subsequent sections, I will describe the frequency of these harms in U.S. minors and how harms are brought about by specific design features on digital platforms.

23. The Organization for Economic Cooperation and Development (OECD), of which the U.S. is a member, has established a leading framework recognizing harms from 1) Content, 2) Contact, 3) Conduct, and 4) Contract/Commercial sources. They also name cross-cutting harms that exist across these categories, including privacy invasions, predictive analytics, and risks to health and wellbeing.[6] This framework is also recognized by the European Commission.[7] Most recently, the OECD published a report on *Children in the Digital Environment* stating that the digital world exposes children to a range of harms and design safeguards are needed.[8]

24. The World Economic Forum's Global Coalition for Digital Safety released a taxonomy of online harms in 2023 that describes how digital products amplify preexisting social harms for adult and child users. These harms include threats to personal and community safety; harm to health and well-being; hate and discrimination; violation of dignity; invasion of privacy; and deception and manipulation.[9]

---

[6] Organization for Economic Cooperation and Development (2020). Protecting Children Online: An Overview of Recent Developments in Legal Frameworks and Policies. OECD Digital Economy Papers, No. 295. Available at: https://www.oecd.org/content/dam/oecd/en/publications/reports/2020/06/protecting-children-online_0c385619/9e0e49a9-en.pdf

[7] Livingstone, S., & Stoilova, M. (2021). The 4Cs: Classifying Online Risk to Children. (CO:RE Short Report Series on Key Topics). Hamburg: Leibniz-Institut für Medienforschung | Hans-Bredow-Institut (HBI); CO:RE - Children Online: Research and Evidence. https://doi.org/10.21241/ssoar.71817

[8] Organization for Economic Cooperation and Development. Children in the Digital Environment. Available at: https://www.oecd.org/en/topics/children-in-the-digital-environment.html

[9] World Economic Forum. Toolkit for Digital Safety Design Interventions and Innovations: Typology of Online Harms. Insight Report, August 2023. Available at: https://www3.weforum.org/docs/WEF_Typology_of_Online_Harms_2023.pdf

25. In spring 2023, the American Psychological Association[10] and the Office of the U.S. Surgeon General[11] released advisories regarding social media and youth mental health. These reports reviewed research on several harms related to social media use in particular, including 1) problematic/excessive social media use, 2) sleep disruption, 3) bullying/harassment, and 4) negative social media content.

26. The National Academies of Sciences, Engineering, and Medicine (NASEM) conducted a consensus study released in December 2023 entitled *Social Media and Adolescent Health* that involved an in-depth review of published research and input from international scholars.[12] The adolescent health and wellbeing harms enumerated in this report included: 1) negative social comparison, 2) displacement of healthy activities, 3), sleep disruption, 4) interference with attention and learning, 5) overuse and problematic social media use, 6) sexual exploitation, and 7) digital abuse such as cyberbullying.

27. The Biden-Harris Interagency Task Force on Kids Online Health and Safety involved a comprehensive review of research literature in addition to listening sessions with families, youth, and experts across the nation. The Task Force Report, released in July 2024, affirmed the child harm risks described in the NASEM report and provided additional focus on several topic areas that were raised during their nationwide information gathering: 1) problematic/excessive technology use, 2) cyberbullying and online harassment, 3) bias and discrimination, 4) sexual exploitation and abuse, and 5) privacy risks.

28. **Thus, there is national and global consensus that harm can result from digital platform use in minors.** Although harm categories range from broad constructs (e.g., Content, Contact, Cross-cutting health harms, etc.) as in global frameworks to specific constructs (e.g., problematic media use) as in recent U.S. health and scientific publications, they encompass the same child and teen experiences. In this testimony, I focus on the harms to minors that can be tied

---

[10] American Psychological Association (2023). Health Advisory on Social Media Use in Adolescence. Available at: https://www.apa.org/topics/social-media-internet/health-advisory-adolescent-social-media-use.pdf

[11] Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory (2023). https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf

[12] National Academies of Sciences, Engineering, and Medicine. 2024. Social media and adolescent health. Washington, DC: The National Academies Press. https://doi.org/10.17226/27396.

to design features and digital privacy concepts relevant to the California Age-Appropriate Design Code.

**Frequency of Online Harms to Minors**

29. Online harms to minors vary in their **prevalence** and the **magnitude of effect** that they have on a child or teen's mental health. For example, experiences such as negative social comparison during social media use have a smaller effect on a child's depressed or anxious feelings,[13] but are highly prevalent. Since these harms are more common, they may cause small but meaningful shifts in minors' wellbeing across the whole population. Moreover, effects are heterogeneous, meaning they are not uniform across all users: some teens with mental health vulnerabilities will be more negatively impacted by negative social comparison than others.[14] In contrast, experiences such as sexual exploitation have a large negative impact on a child's or teen's mental health but have lower prevalence throughout the population. Both lower-impact high-prevalence harms and high-impact lower-prevalence harms are important to address because they shift the trajectory of child and teen wellbeing. The following paragraphs address specific harms that have been linked to online activity.

30. **Cyberbullying/online abuse** has been reported by nearly half (46%) of U.S. teens, including 32% reporting offensive name-calling; 22% having false rumors spread about them; 17% receiving explicit images they didn't ask for; 15% constantly being asked by someone other than a parent where they are, what they are doing, or who they are with; 10% receiving physical threats; and 7% having explicit images of them shared without their consent.[15] In this survey from Pew Research Center, 74% of teens thought that digital platforms need to do more to prevent online bullying.[16]

31. Rates are even higher among gamers, with 60% of 13-17-year-olds reporting any online harassment while playing online multiplayer video games, including mobile games. This

[13] Cunningham, S., Hudson, C. C., & Harkness, K. (2021). Social media and depression symptoms: a meta-analysis. *Research on child and adolescent psychopathology*, *49*(2), 241-253.

[14] National Academies of Sciences, Engineering, and Medicine. 2024. Social media and adolescent health. Washington, DC: The National Academies Press. https://doi.org/10.17226/27396.

[15] Vogels, E. 2022. Teens and cyberbullying 2022. Pew Research Center. https://www.pewresearch.org/internet/2022/12/15/teens-and-cyberbullying-2022/

[16] *Ibid.*

includes 33% reporting their gameplay interrupted by trolling/"griefing" (defined as deliberate attempts to upset or provoke someone); 29% called offensive names; 19% hearing negative things based on their avatar's appearance, username, or in-game possessions; 17% annoyed or bullied over multiple sessions; 15% personally embarrassed by another player; and 12% excluded from a game or chat because of their identity.[17] In 2024 data on U.S. teens' video game experiences from the Pew Research Center, a significant number say they have been called an offensive name (48% of boys, 32% of girls), physically threatened (15% of boys, 9% of girls), or sent unwanted sexually explicit things (7% of boys, 10% of girls) while playing video games.[18]

32. **Unwanted sexual solicitation, grooming, and sextortion** occur through digital products such as social media and multiplayer video games. In a 2020 survey of teens 12-18 years old in the United Kingdom, 37% of girls and 20% of boys reported receiving sexual photos or videos online; authors reported these were often from adult strangers.[19] A nationally representative survey of U.S. young adults found that 22.5% of participants reported that they had been sexually solicited online as a child or teen, 10.3% had been threatened or coerced into sending sexual images, and 3.1% experienced revenge pornography.[20]

33. Grooming is a deceptive online behavior in which adults present themselves to a child as a potential friend or romantic partner. Sometimes minors do not realize that grooming behavior is of concern, because adult perpetrators appear friendly and flattering,[21] so the frequency of grooming is likely underreported. In a survey of U.S. college students, over 20% reported having online grooming interactions as minors. Of these, 28% met up with the adult in

---

[17] Anti-Defamation League. "Hate is no game: harassment and positive online experiences in online games in 2021" (New York: Anti-Defamation League, 2021). Available at: https://www.adl.org/resources/report/hate-no-game-harassment-and-positive-social-experiences-online-games-2021

[18] Gottfried, J. and Sidoti, O. (2024). Teens and Video Games Today. Pew Research Center. Available at: https://www.pewresearch.org/internet/2024/05/09/teens-and-video-games-today/#bullying-and-violence-in-video-games

[19] Ringrose, J., K. Regehr, and B. Mikne. 2021. Understanding and combatting youth experiences of image-based sexual harassment and abuse. ASCL. https://www.ascl.org.uk/ASCL/media/ASCL/Our%20view/Campaigns/Understanding-and-combatting-youthexperiences-of-image-based-sexual-harassment-and-abuse-full-report.pdf

[20] Finkelhor, D., H. Turner, and D. Colburn. 2022. Prevalence of online sexual offenses against children in the US. JAMA Network Open 5(10):e2234471–e2234471.

[21] National Academies of Sciences, Engineering, and Medicine. 2024. Social media and adolescent health. Washington, DC: The National Academies Press. https://doi.org/10.17226/27396.

person, and of these, 68% went on to have sex with the adult when they were still a minor.[22]

34. Sextortion, in which perpetrators threaten to release intimate images unless money, more images, or sex is provided, happened to 5% of middle and high school students in the U.S., according to a nationally representative study.[23] Three percent of U.S. students in this survey had perpetrated sextortion themselves. As noted in my original testimony, reports of sextortion to the National Center for Missing & Exploited Children more than doubled between 2019 and 2021,[24] likely due to the increased time children and teens spent online during the COVID-19 pandemic.

35. **Child sexual abuse material or child sexual exploitation material (CSAM/CSEM)** can be generated by adult perpetrators or by youth who seek to make money through selling sexually explicit images or videos of themselves. Children and teens who are victims of CSAM/CSEM experience a range of severe outcomes including negative self-perception, aggression, sexualized behavior, self-harming, post-traumatic symptoms, and educational problems.[25]

36. Self-generated CSEM increased by 77% in 2020 compared to the year before, driven by an increase among 11-13-year-old girls; in 2021 there was a three-fold increase among 7-10-year-olds.[26] Compared to “sexting,” in which minors generate sexual imagery to share with romantic partners, self-generated CSEM refers to sexual photos, videos, or live streaming that a minor creates in response to coercion from another person in a position of power or through financial coercion.[27]

37. **Sales of illegal substances** such as methamphetamine, fentanyl, and other

---

[22] Greene-Colozzi, E. A., Winters, G. M., Blasko, B., & Jeglic, E. L. (2020). Experiences and perceptions of online sexual solicitation and grooming of minors: A retrospective report. *Journal of child sexual abuse*, *29*(7), 836-854.

[23] Patchin, J. W., and S. Hinduja. 2020. Sextortion among adolescents: Results from a national survey of U.S. Youth. Sexual Abuse 32(1):30-54.

[24] National Center for Missing & Exploited Children, CyberTipline 2021 Report. https://www.missingkids.org/gethelpnow/cybertipline/cybertiplinedata

[25] Chauviré-Geib, K., & Fegert, J. M. (2024). Victims of technology-assisted child sexual abuse: A scoping review. *Trauma, Violence, & Abuse*, *25*(2), 1335-1348.

[26] Internet Watch Foundation Annual Report, 2022. Available at: https://www.iwf.org.uk/about-us/who-we-are/annual-report-2022/

[27] Bloxsom, G., McKibbin, G., Humphreys, C., Davidson, J., & Halfpenny, N. (2024). Five Forms of Coerced “Self-Produced” Child Sexual Exploitation Material: A Critical Interpretive Synthesis. *Trauma, Violence, & Abuse*, 15248380241271376.

psychoactive drugs regularly occur on social media platforms, according to the U.S. Drug Enforcement Administration (DEA).[28] DEA resources describe how social media drug sales often appear in advertisements that are in ephemeral stories or posts that are posted and removed within 24 hours. These posts include known code words and emojis that indicate elicit substances but are used to evade detection.[29] In a nationally representative survey of U.S. 15–25-year-olds, 2% reported purchasing drugs online (of substance-using respondents, 10% bought drugs online), of which 69% reported using social media.[30]

38. **Privacy invasions** can take the form of interpersonal privacy violations – for example, when a minor's location or activities are revealed through their activities on a digital platform – or data privacy invasions.

39. Interpersonal privacy violations occur due to features such as being tagged in a post without providing consent, automated geotagging, or real-time location-based display or features. Teens have developed a repertoire of defensive usage behaviors to try to control how much is displayed about them online.[31]

40. In comparison, research shows that teens are less aware of institutional or commercial data privacy and focus instead on interpersonal privacy online.[32] However, commercial data collection about minors' online activities is widespread. For example, recent enforcement action by the Department of Justice and Federal Trade Commission have shown that large digital platforms have collected and shared data on children and teens. In a complaint against TikTok, for instance, the U.S. Department of Justice reported that TikTok profiled teens by grade level for advertising purposes and retained data about minors including IP addresses,

---

[28] Drug Enforcement Administration National Drug Threat Assessment 2024. Available at: https://www.dea.gov/sites/default/files/2024-07/2024%20NDTA-updated%207.5.2024.pdf

[29] U.S. Drug Enforcement Administration (2022). "Social Media Drug Trafficking Threat." Available at: https://www.dea.gov/sites/default/files/2022-03/20220208-DEA_Social%20Media%20Drug%20Trafficking%20Threat%20Overview.pdf

[30] Oksanen, A., Miller, B. L., Savolainen, I., Sirola, A., Demant, J., Kaakinen, M., & Zych, I. (2021). Social media and access to drugs online: A nationwide study in the United States and Spain among adolescents and young adults. *The European Journal of Psychology Applied to Legal Context*, 13(1), 29-36.

[31] Chou, H. L., & Chou, C. (2023). How teens negotiate privacy on social media proactively and reactively. *New Media & Society*, *25*(6), 1290-1312.

[32] Stoilova, M., Nandagiri, R., & Livingstone, S. (2021). Children's understanding of personal data and privacy online–a systematic evidence mapping. *Information, Communication & Society*, *24*(4), 557-575.

device IDs, device models, and advertising IDs.[33] The U.S. Federal Trade Commission's recent Staff Report about social media and video streaming platforms,[34] summarizing information provided by companies in response to a regulatory request, described widespread practices of collecting data about users, such as demographic information, location, engagement with content/ads, and audiences – all with the purpose of targeting users with ads. Companies also make inferences about users such as relationship status, education level, household income, or "lifestyle details" that can lead to sensitive inferences about users (e.g., sexuality). The FTC reported that social media companies generally offered no controls over their use of data and treated teens the same as adult users.

41. Video game online platforms and mobile apps also collect data from players and use it to inform nudges to make purchases, for advertising, and to manipulate prices and availability of in-game items on a highly individualized level. As reviewed in a recent Consumer Financial Protection Bureau report, game companies track player behavior such as "purchasing history, spending thresholds, and how a player responds to personalized incentives like dynamic price updates. It also includes non-financial data, like how players interact with characters and the amount of time spent on tasks."[35] In addition to shaping prices and purchase pressure within the game, companies can also combine this data with device data (e.g., location, interactions with social media platforms) to generate a portrait of the player's identity for marketing purposes.

42. Even for children under age 13, when their data should be protected by the Children's Online Privacy Protection Act (COPPA), such data often is collected by mobile apps[36] and shared with marketers. Is has been estimated that ad tech companies collect an average of 72 million data points about a child before they turn 13.[37] Because online behaviors and mobile

---

[33] Complaint at 12, *United States v. Bytedance Ltd.*, No. CV 24-06525-OWD (RAO) (C.D. Cal. August 2, 2024). Available at: https://www.justice.gov/opa/media/1362606/dl?inline

[34] United States Federal Trade Commission. (2024). *A Look Behind the Screens: Examining the Data Practices of Social Media and Video Streaming Services.* Available at: https://www.ftc.gov/system/files/ftc_gov/pdf/Social-Media-6b-Report-9-11-2024.pdf

[35] Consumer Financial Protection Bureau. (2024). Banking in video games and virtual worlds. https://www.consumerfinance.gov/data-research/research-reports/issue-spotlight-video-games/

[36] Zhao, F., Egelman, S., Weeks, H. M., Kaciroti, N., Miller, A. L., & Radesky, J. S. (2020). Data collection practices of mobile applications played by preschool-aged children. *JAMA pediatrics*, *174*(12), e203345-e203345.

[37] Based on an analysis by SuperAwesome's ad exchange Rex. See:

(continued…)

gameplay patterns can reveal much about users' psychological characteristics, such data collection means that children are being profiled for the purposes of marketing before they can even understand their own emerging identities.

43. **Problematic, compulsive, addictive-like** use of digital media, video games, and social media is defined as use that impairs functioning, over which the user has no control, and which gets in the way of other daily activities and/or causes problems such as interpersonal conflict, poor grades, or health problems. Problematic internet use (i.e., internet use that gets in the way of daily functioning such as completing schoolwork, socializing, physical activity or sleep) has been estimated to occur in 4-6% of children 5-9 years old,[38] up to 19% of teens,[39] and 9-11% of a college-aged sample.[40]

44. In a nationally representative U.S. sample of 11-15-year-old girls, over one-third stated that they felt "addicted" to social media.[41] When validated rating scales are used, addictive-like social media use has been found in 5-7% of teens globally.[42]

45. Problematic, compulsive, addictive-like use of media is highly disruptive to child wellbeing and family functioning. In my clinical experience, these children and teens show significant difficulty stopping technology use or detaching from digital platforms and devices when asked. They frequently argue with their caregivers about time limits and consequences of excessive media use, such as poor sleep, missed homework, or refusal to take part in other activities.

---

https://www.thedrum.com/news/2017/12/13/adtech-firms-collecting-vast-amounts-data-kids-despite-online-regulations

[38] Rega, V., Gioia, F., & Boursier, V. (2023). Problematic media use among children up to the age of 10: a systematic literature review. *International Journal of Environmental Research and Public Health*, *20*(10), 5854.

[39] Pontes, H. M., Kuss, D. J., & Griffiths, M. D. (2015). Clinical psychology of Internet addiction: a review of its conceptualization, prevalence, neuronal processes, and implications for treatment. *Neuroscience and Neuroeconomics*, 11-23.

[40] Moreno, M. A., Eickhoff, J., Zhao, Q., Young, H. N., & Cox, E. D. (2019). Problematic internet use: a longitudinal study evaluating prevalence and predictors. *The journal of pediatrics: X*, *1*, 100006.

[41] Nesi, J., Mann, S. and Robb, M. B. (2023). Teens and mental health: How girls really feel about social media. San Francisco, CA: Common Sense. Retrieved from https://www. commonsensemedia.org/sites/default/files/research/report/ how-girls-really-feel-about-social-media-researchreport_final_1.pdf

[42] Boer, M., Van Den Eijnden, R. J., Boniel-Nissim, M., Wong, S. L., Inchley, J. C., Badura, P., ... & Stevens, G. W. (2020). Adolescents' intense and problematic social media use and their well-being in 29 countries. *Journal of adolescent health*, *66*(6), S89-S99.

46. Problematic and addictive-like behaviors occur around video games as well. **Gaming disorder** is defined as loss of control over gaming, prioritizing gaming beyond other things important to the person's life, continuing to game despite negative consequences, and functional impairment such as job loss or relationship problems. Since 2019, it has been recognized by the World Health Organization's ICD diagnostic classification system, which means that it considered a diagnosable mental health disorder. Meta-analyses of gaming disorder suggest a prevalence among teens of 5-9%.[43]

47. Even among teens who do not meet criteria for problematic media use, 46% report being online "almost constantly," which has roughly doubled since 2014-2015, when rates were 24%.[44]

48. **Sleep disruption** or poor sleep quality is extremely common in the U.S. According to data from the Centers for Disease Control and Prevention from 2021, 35% of children under 14 years have insufficient sleep.[45] The prevalence of sleep disruption increases in the teen years: the same 2021 CDC data shows 77% of U.S. high schoolers do not sleep the recommended 8-10 hours overnight.[46] Eight to ten hours of sleep per night is crucial to child health to support neurological development, bone growth, and regulated endocrine system. Children and adolescents with insufficient sleep have a higher risk of obesity, diabetes, injuries, poor mental health, and attention problems.

49. A large body of observational evidence links longer digital media use to shorter sleep duration, later bedtimes, more overnight awakenings, and daytime sleepiness.[47] A key mechanism is thought to be mental stimulation from engaging with design features such as

[43] National Academies of Sciences, Engineering, and Medicine (2024). Social media and adolescent health. Washington, DC: The National Academies Press. https://doi.org/10.17226/27396.

[44] Pew Research Center (2024). Teens and Internet, Device Access Fact Sheet. Available at: https://www.pewresearch.org/internet/fact-sheet/teens-and-internet-device-access-fact-sheet/

[45] Centers for Disease Control and Prevention: https://www.cdc.gov/sleep/data-research/facts-stats/children-sleep-facts-and-stats.html

[46] Centers for Disease Control and Prevention: https://www.cdc.gov/sleep/data-research/facts-stats/high-school-students-sleep-facts-and-stats.html

[47] Brautsch, L. A., Lund, L., Andersen, M. M., Jennum, P. J., Folker, A. P., & Andersen, S. (2023). Digital media use and sleep in late adolescence and young adulthood: A systematic review. *Sleep medicine reviews, 68,* 101742.

message notifications.[48] [49]

50. In our study tracking 11-17-year-olds' smartphones, over half (59%) of participants used their phones overnight on school nights, some of which was initiated by notifications from digital platforms: we found that apps pushed between 1 to 12 notifications per hour to teens' phones between midnight and 5 am. The most used apps overnight on school nights (when teens should be resting to prepare for school the next day) were social media, mobile games, and YouTube.[50]

51. In this study, we interviewed teens to ask about their overnight technology use, and many discussed the negative spiral between technology use and poor sleep – for example, a 10th grader noted: "*I might say that for certain apps, like TikTok, it's really hard to fall asleep once you use it close to when you're gonna go to sleep. I can't use it within an hour, or else I'd struggle … and then I'll just get back on the app 'cause I'm not sleeping anyway.*"

52. Research shows that teens who already have poor sleep in particular have more disruption to sleep from social media.[51] A large-scale experiment in 12-19-year-olds found that reducing the use of screen media after 9 pm for 2 weeks improved teens' sleep onset, total sleep duration, and daytime attention.[52] These findings demonstrate a causal link between nighttime media use and poor sleep.

53. **Negative social comparison** of popularity, appearance, and happiness commonly occurs in youth using social media, and research suggests it may mediate associations between

---

[48] Alonzo, R., Hussain, J., Stranges, S., & Anderson, K. K. (2021). Interplay between social media use, sleep quality, and mental health in youth: A systematic review. *Sleep medicine reviews*, *56*, 101414.

[49] Scott, H., Biello, S. M., & Woods, H. C. (2019). Identifying drivers for bedtime social media use despite sleep costs: The adolescent perspective. *Sleep Health, 5 (6), 539-545*.

[50] Radesky, J., Weeks, H.M., Schaller, A., Robb, M., Mann, S., and Lenhart, A. (2023). Constant Companion: A Week in the Life of a Young Person's Smartphone Use. San Francisco, CA: Common Sense. Available at: https://www.commonsensemedia.org/sites/default/files/research/report/2023-cs-smartphone-research-report_final-for-web.pdf

[51] Shimoga, S. V., Erlyana, E., & Rebello, V. (2019). Associations of social media use with physical activity and sleep adequacy among adolescents: Cross-sectional survey. *Journal of medical Internet research*, *21*(6), e14290.

[52] Perrault, A. A., Bayer, L., Peuvrier, M., Afyouni, A., Ghisletta, P., Brockmann, C., ... & Sterpenich, V. (2019). Reducing the use of screen electronic devices in the evening is associated with improved sleep and daytime vigilance in adolescents. *Sleep*, *42*(9), zsz125.

social media use and negative affect[53] or depression symptoms.[54] Some teens are more susceptible to negative social comparison after browsing social media, and are also most helped by interventions to reduce this phenomenon.[55] Negative social comparison is relatively common in teens using social media; in surveys collected as part of internal research at Meta, released by a whistleblower and compiled by the Harvard Kennedy School Shorenstein Center on Media, Politics and Public Policy, at least 20% of teens experienced negative social comparison on Instagram "often" or "very often."[56]

54. **Financial harms.** Consumer spending on video game content has steadily increased for the past 15 years, estimated at $48 billion in 2023;[57] in-game purchases make up the majority of this revenue for many video game companies.[58] Estimates from global regulators suggest that about one-third of children and teens aged 8–17 years have made in-game purchases in the previous 12 months; in the U.S., 85% of 'core gamers' (teens and young adults who play at least 7 hours per week) make in-game purchases.[59]

55. In-game spending can become excessive: in a recent advisory, the Consumer Financial Protection Bureau reported that "parents have reported an overwhelming amount of unexpected gaming transactions on their credit or debit card statements in consumer complaints to the Federal Trade Commission and Consumer Financial Protection Bureau."[60] A multitude of such cases have been covered by news media, including a recent story about a minor charging

---

[53] Nesi, J., & Prinstein, M. J. (2015). Using social media for social comparison and feedback-seeking: Gender and popularity moderate associations with depressive symptoms. *Journal of abnormal child psychology*, *43*, 1427-1438.

[54] Cataldo, I., Lepri, B., Neoh, M. J. Y., & Esposito, G. (2021). Social media usage and development of psychiatric disorders in childhood and adolescence: a review. *Frontiers in Psychiatry*, *11*, 508595.

[55] Weinstein, E. (2017). Adolescents' differential responses to social media browsing: Exploring causes and consequences for intervention. *Computers in Human Behavior*, *76*, 396-405.

[56] Harvard Kennedy School Shorenstein Center on Media, Politics and Public Policy. (2023). *Discussion Paper: Case Study on Youth Online Harms – Project Daisy*, Appendix A (p.13). Available at: https://shorensteincenter.org/wp-content/uploads/2023/11/Discussion-Paper_Youth-Online-Harms-and-Project-Daisy_For-Shorenstein-Publication.pdf

[57] https://www.statista.com/statistics/252457/consumer-spending-on-video-games-in-the-us/

[58] https://www.statista.com/statistics/1208560/activision-blizzards-revenue-by-composition/

[59] https://www.ipsos.com/en-us/younger-gamers-display-strong-and-diverse-spending-behavior-across-video-game-touchpoints

[60] Consumer Advisory: Video games are targeting your children to get into your wallet (2024). Consumer Financial Protection Bureau. Available at: https://www.consumerfinance.gov/about-us/newsroom/consumer-advisory-video-games-are-targeting-your-children-to-get-into-your-wallet/

$4000 in in-game purchases on his parents' credit card.[61] Teens with problematic media use and gaming disorder are more likely to engage in excessive and impulsive in-game spending, particularly on purchases with gambling-like elements like lootboxes.[62]

**WHY MINORS ARE VULNERABLE ONLINE**

56. In my initial declaration, I described how children and teens differ from adults in several developmental domains. To briefly summarize here, children and teens have underdeveloped executive functions, meaning they have less impulse control, perspective taking, or critical thinking about digital media. They are more susceptible to rewards, both concrete/token-type rewards (e.g., likes, coins, in-game items, skins, etc.) as well as social rewards from peers or parasocial relationships. In this declaration, I add additional detail to lay the context for why children and teens are more vulnerable to specific digital design features than adults.

57. During the late school-age (8-10 years) and adolescent years (11-17 years), minors start showing more risk-taking and exploration behaviors. This helps them individuate from their parents and come to a sense of their own identity. Some teens are more prone to risky behaviors because of sensation-seeking or pleasure-seeking personalities. Because of the general sense of invulnerability teens experience, they often do not pay attention to the risks or future consequences of their immediate behavior[63] – such as spending money or sending a sexually intimate image.

58. Children's and teens' behavior is more reinforced by immediate gratification from rewards or high-pleasure experiences, which can lead to unhealthy habit formation.[64]

59. During adolescence, peer feedback is incredibly important. Social feedback shapes

---

[61] https://abcnews.go.com/GMA/Family/parents-share-warning-after-son-spends-4000-playing/story?id=108845824

[62] Hing, N., Russell, A. M., King, D. L., Rockloff, M., Browne, M., Newall, P., & Greer, N. (2023). Not all games are created equal: Adolescents who play and spend money on simulated gambling games show greater risk for gaming disorder. *Addictive Behaviors*, *137*, 107525.

[63] National Academies of Sciences, Engineering, and Medicine (2024). Social media and adolescent health. Washington, DC: The National Academies Press. https://doi.org/10.17226/27396.

[64] De Decker, Annelies, et al. "Associations of reward sensitivity with food consumption, activity pattern, and BMI in children." *Appetite* 100 (2016): 189-196.

identity through the act of trying out new appearances, thoughts, behaviors, or interests; expressing them to others; and adapting based on reactions from others. Adolescents are therefore particularly susceptible to public bullying and harassment because they are more likely to “put themselves out there” and be highly sensitive to what others say.

60. Teens tend to perceive themselves as the center of others’ attention[65] and therefore are highly conscious of online feedback, social rewards, or sexual attention. Therefore, they may accept or seek out connections with contacts they don’t know in person, based on similar interests or social networks.

61. Children and teens may also over-focus on popularity metrics such as likes and follower counts as an indicator of their self-worth.[66] This is due to their sensitivity to social status as described above, and because of relatively more concrete thinking about quantifiable popularity counts.

## ONLINE HARMS OCCUR DUE TO DESIGN FEATURES THAT FAIL TO PROTECT MINORS’ PRIVACY

### A. Interpersonal Privacy

62. Digital product designs such as public accounts, recommendations to connect with strangers, anonymity, and monetization contribute to contact and conduct harms like CSAM/CSEM, bullying/harassment, and privacy violations.

63. **CSAM/CSEM:** Children and teens may be motivated to make their account public or use ‘friends of friends’ features to add more contacts in order to increase their friend or follower count, a metric of their popularity. Children at this age have a drive for affirmation and validation, but may not be aware of the motives of their followers. In OfCom’s recent in-depth examination of hazards that led to online harms in a group of 42 children aged 7-17 years, youth

[65] National Academies of Sciences, Engineering, and Medicine (2024). Social media and adolescent health. Washington, DC: The National Academies Press. https://doi.org/10.17226/27396.

[66] American Psychological Association. (2024). Potential risks of content, features, and functions: The science of how social media affects youth. Available at: https://www.apa.org/topics/social-media-internet/youth-social-media-2024

reported regularly using these 'friend finding' network-expanding features.[67] Several children reported that they didn't know the people recommended to them with this feature, but nonetheless used it to appear to have a stronger social 'status.' This leads to child users being added to group chats, in which youth are subject to racial slurs or have been sent links for pornography, scams, or discussions about drugs.

64. Youth in this study also reported that, in order to get more engagement and validation for their posts through likes and followers, they posted more risky, shocking or attention-grabbing posts, which puts them at further risk of grooming.[68]

65. Predators may search out youth profiles who have low follower or like counts, who may be more desperate to connect to achieve more validation. Signals of when youth accounts are online or their geolocation may contribute to stalking behavior from predators.

66. In an in-depth investigation from the Stanford Internet Observatory,[69] many underage sellers (ages 13-17 years) of self-generated CSEM were identified on Instagram and X/Twitter. Researchers found that "recommendation algorithms inadvertently boost the network [of buyers/underage sellers]; a user who follows one seller account received related suggestions for others." They concluded "Due to widespread use of hashtags, relatively long life of seller accounts, and, especially, the effective recommendation algorithm, Instagram serves as the key discovery mechanism for this specific community of buyers and sellers." Self-generated CSEM sellers also rely heavily on ephemeral media such as Stories with content menus, promotions, or cross-site links to advertise access to their intimate images.

67. In this way, **profiling of minors based on their prior activity or contacts** can lead to CSAM/CSEM harms through automated recommendation of contacts who share their interest in CSAM/CSEM, or recommendation of youth accounts to perpetrators.[70] **This risk is**

[67] OfCom. (2022) Research into risk factors that may lead children to harm online. Available at: https://www.ofcom.org.uk/siteassets/resources/documents/research-and-data/online-research/keeping-children-safe-online/risk-factors-that-may-put-children-at-harm-online/children-risk-factors-report.pdf?v=328565

[68] Ibid.

[69] Thiel, D., DiResta, R., Stamos, A. (2023). *Cross-platform dynamics of self-generated CSAM.* Stanford Internet Observatory. Available at: https://cyber.fsi.stanford.edu/io/publication/cross-platform-dynamics-self-generated-csam

[70] Bleakley, P., E. Martellozzo, R. Spence, and J. DeMarco. 2023. Moderating online child sexual abuse

(continued…)

**compounded by social quantification metrics such as visible like and follower counts.**

68. **Cyberbullying and harassment** are facilitated by anonymity,[71] a design feature that removes accountability. It can also be reinforced through likes and social quantification metrics in response to harassing posts.

69. **Sale of illegal substances:** In a 2019 report in which avatar teen accounts were created based on real teens' interests, their accounts were discovered by accounts selling illegal substances and pornography, who directly messaged them with solicitations.[72]

**B. Commercial Privacy: Harms from Profiling**

70. When commercial profiles are created about minors based on the data described in sections 40-42, it allows companies to infer preferences and lifestyle characteristics that can be targeted with advertising. In this section, I review examples of how profiling can lead to targeted advertising for harmful or illegal activities for teens (e.g., gambling, alcohol) and manipulative tactics intended to encourage more in-game spending.

71. **Gambling** is now available online in many U.S. states through casino and sports betting apps. The World Health Organization-UNICEF-Lancet Commission has urged that "*new technologies are exacerbating and creating new threats to children that are not well understood. Gambling is a potentially large and unaddressed public health challenge for children*."[73]

72. Most gambling advertising research has been performed in the United Kingdom or Australia, where online gambling and sports betting have been legal for a longer time than in the U.S. These studies show that exposure to gambling ads is common, particularly for youth who follow related accounts. For example, the UK Gambling Commission reported that 37% of 11–16-year-olds reported seeing gambling ads on social media,[74] while another study found that

---

material (CSAM): Does self-regulation work, or is greater state regulation needed? European Journal of Criminology. https://doi.org/10.1177/14773708231181361

[71] National Academies of Sciences, Engineering, and Medicine. 2024. Social media and adolescent health. Washington, DC: The National Academies Press. https://doi.org/10.17226/27396.

[72] 5Rights Foundation. (2021). *Pathways: How digital design puts children at risk.* Available at: https://5rightsfoundation.com/uploads/Pathways-how-digital-design-puts-children-at-risk.pdf

[73] Clark, H., Coll-Seck, A. M., Banerjee, A., Peterson, S., Dalglish, S. L., Ameratunga, S., ... & Costello, A. (2020). A future for the world's children? A WHO–UNICEF–Lancet Commission. *The Lancet*, *395*(10224), 605-658.

[74] Gambling Commission. Young people and gambling 2020. (2020). Available at: https://www.gamblingcommission.gov.uk/statistics-and-research/publication/young-people-and-gambling-2020#files

45.7% of 11–17-year-olds endorsed seeing gambling ads on social media at least once per week.[75] An analysis of over 840,000 gambling ads on Twitter found that large numbers of children (41,000 under age 16) follow gambling accounts. These ads and accounts often include enticements such as celebrity endorsements, free bets, and memes that are highly appealing to teens.[76] This appeal may be because gambling advertisers make heavy use of 'insider sentiments' — 'in jokes' or niche expert information – that elicits the feeling of belonging to a special club,[77] which is a particularly strong psychological pull for adolescents.[78]

73. The reasons for minors seeing such a high volume of gambling ads online may include: 1) teens may not be honest about their age, so the online service thinks they are of a legal age to gamble; 2) teens are being intentionally targeted with gambling ads on social media (which is supported by recent work from the Australia Gambling Commission);[79] and/or 3) their online behaviors – such as following sports betting or football/soccer accounts – lump them together with similar profiles who are interested in gambling.[80] In conditions #2 and #3, profiling is facilitating the introduction of a minor to an activity that is illegal for them. This is important, since exposure to gambling promotions and ads has been associated with gambling interest and behaviors in teens.[81]

74. **Alcohol** advertising exposure is associated with higher intent to try alcohol and drinking behaviors in teens.[82] In an innovative 2024 study in which the phones of 16 children,

---

[75] Rossi R, Nairn A. What are the odds? The appeal of gambling adverts to children and young persons on Twitter [Internet]. University of Bristol. 2021. Available from: https://www.bristol.ac.uk/media-library/sites/management/documents/what-are-the-odds-rossi-nairn-2021.pdf.

[76] *Ibid.*

[77] Smith J, Nairn A. (2019). Biddable youth - sport and esport gambling advertising on Twitter: appeal to children, young & vulnerable people. Available at: https://demos.co.uk/wp-content/uploads/2019/08/Biddable-youth-report.pdf

[78] Rossi, R., & Nairn, A. (2022). New developments in gambling marketing: the rise of social media ads and its effect on youth. *Current Addiction Reports*, *9*(4), 385-391.

[79] VicHealth. "Dark marketing tactics of harmful industries exposed by young citizen scientists." (2023): https://www.vichealth.vic.gov.au/media-and-resources/citizen-voices-against-harmful-marketing

[80] Gainsbury, S. M., King, D. L., Russell, A. M., Delfabbro, P., Derevensky, J., & Hing, N. (2016). Exposure to and engagement with gambling marketing in social media: Reported impacts on moderate-risk and problem gamblers. *Psychology of Addictive Behaviors*, *30*(2), 270.

[81] Noble, N., Freund, M., Hill, D., White, V., Leigh, L., Lambkin, D., ... & Sanson-Fisher, R. (2022). Exposure to gambling promotions and gambling behaviours in Australian secondary school students. *Addictive Behaviors Reports*, *16*, 100439.

[82] Finan, L. J., Lipperman-Kreda, S., Grube, J. W., Balassone, A., & Kaner, E. (2020). Alcohol marketing

(continued…)

teens, and young adults were followed with software that recorded and analyzed every social media ad they saw, teens (14 to 17 years of age) saw an average of one gambling ad, 6 alcohol ads, and 24 junk food ads per day.[83]

75. Thus, it is clear that minors see advertisements on social media for products that are not legal at their age. The targeting mechanisms underlying these ads are not transparent to researchers. However, in a 2021 study conducted by Reset Australia, researchers purchased ads on Facebook, who at the time allowed targeting to teens who had been profiled as having age-inappropriate, harmful or risky interests, including smoking and vaping, alcohol, gambling, products rated 18+, such as Playboy, and online dating services.[84] **This suggests that online services and social media have the ability and the business interest in creating marketing profiles of minors but have not provided sufficient oversight to ensure that such targeting is age-appropriate.**

76. **In-game spending pressure:** Profiling of minors occurs in online and mobile games as well. In an analysis of patents submitted by video game companies, almost all used sophisticated systems involving collection and analysis of player data to optimize the type and scheduling of purchasing offers to increase the probability of purchase.[85] Player data (e.g., purchasing tendencies, available funds, item preferences, inventory) was used to shape sales tactics such as: 1) solicitations (purchasing offers, sometimes interrupting play, often with pressure tactics) and 2) non-disclosure of the fact that the player's data determines what prices, goods, or probabilities are offered to them.

77. In simpler terms, this means that an online or mobile game gets to "know" a player's gaming patterns and can manipulate that player to spend more money or time on the

---

and adolescent and young adult alcohol use behaviors: A systematic review of cross-sectional studies. *Journal of Studies on Alcohol and Drugs, Supplement*, (s19), 42-56.

[83] Backholer, K,. Pathirana, N.L. (2024). #DigitalYouth: How children and young people are targeted with harmful product marketing online. Deakin University. Available at: https://iht.deakin.edu.au/wp-content/uploads/sites/153/2024/06/Digital-Youth-brief-Final-2.pdf

[84] Williams, D., McIntosh, A., Farthing, R. (2021). "Profiling children for advertising: Facebook's monetization of young people's personal data." Reset Australia Policy Memo. https://au.reset.tech/uploads/resettechaustralia_profiling-children-for-advertising-1.pdf

[85] King, D. L., Delfabbro, P. H., Gainsbury, S. M., Dreier, M., Greer, N., & Billieux, J. (2019). Unfair play? Video games as exploitative monetized services: An examination of game patents from a consumer protection perspective. *Computers in Human Behavior*, *101*, 131-143.

game. For example, if a teen tends to make more purchases at certain times of day, at frustrating gameplay points (e.g., running out of 'lives'), or in response to certain types of marketing messages, then the teen will receive more pop-ups, offers, or nudges that are harder for them to resist. Yet, the teen may believe that all players of that game receive the same types of offers and prices. In teens with impulse control problems or gaming disorder, such manipulation may generate financial harms as the game system gets to know the player's purchase patterns and vulnerabilities over time.[86]

**ONLINE HARMS OCCUR DUE TO DESIGN FEATURES THAT EXTEND MINORS' TIME ON DIGITAL PRODUCTS AND FOSTER COMPULSIVE USE**

78. **Minors spend more time online than they intend, feel pressure to engage, and find it hard to stop using platforms**.[87] This leads to problems for children and teens such as not getting a good night's sleep and displacement of other activities like physical activity or in-person activities with family or friends. Youth point to design features like infinite scroll, autoplay, and push notifications as mechanisms that extend their use, make them feel compelled to return to media and displace other things they meant to do.[88] Nearly three-quarters of teenagers believe that technology companies manipulate users to spend more time on their products.[89]

79. **Research backs up these teen perceptions: studies show that more time online is associated with lower child and teen wellbeing** such as poorer sleep,[90, 91] more sedentary

[86] Dreier, M., Wölfling, K., Duven, E., Giralt, S., Beutel, M. E., & Müller, K. W. (2017). Free-to-play: About addicted Whales, at risk Dolphins and healthy Minnows. Monetarization design and Internet Gaming Disorder. *Addictive behaviors*, *64*, 328-333.

[87] Weinstein, Emily, and Carrie James. *Behind their screens: What teens are facing (and adults are missing)*. MIT Press, 2022.

[88] OfCom. (2022). *Research into risk factors that may lead children to harm online.* Available at: https://www.ofcom.org.uk/siteassets/resources/documents/research-and-data/online-research/keeping-children-safe-online/risk-factors-that-may-put-children-at-harm-online/children-risk-factors-report.pdf?v=328565

[89] Rideout, V., & Robb, M. B. (2018). Social media, social life: Teens reveal their experiences. San Francisco, CA: Common Sense Media. Retrieved from https://www.commonsensemedia. org/sites/default/files/research/report/2018-social-mediasocial-life-executive-summary-web.pdf

[90] Janssen, Xanne, et al. "Associations of screen time, sedentary time and physical activity with sleep in under 5s: A systematic review and meta-analysis." *Sleep medicine reviews* 49 (2020): 101226.

[91] Carter, Ben, et al. "Association between portable screen-based media device access or use and sleep outcomes: a systematic review and meta-analysis." *JAMA pediatrics* 170.12 (2016): 1202-1208.

behaviors,[92] more parent-child relationship difficulties,[93] and more behavior problems.[94]

80. **Design features play a role in extending users' time online and re-engaging them repeatedly with digital products.** Although engagement-promoting designs can make digital products more fun and satisfying to use, when they are used to excess to extend minors' time online, there is more potential for harm.[95] Moreover, the use of too many engagement-promoting designs in digital products makes teens frustrated and reduces their sense of control and autonomy.[96]

81. Higher user engagement with digital products is a business goal of companies that generate revenue through advertising. In fact, companies such as Meta and Google report metrics such as 'daily active users' and advertising sales in their quarterly earnings reports to shareholders. Therefore, design teams are instructed to maximize engagement metrics such as time spent and how often users open the app.[97] The effectiveness of different designs at reaching these goals are tested through A/B testing (a process in which two versions of a design are released to different users at random; the more engaging or higher-performing design is retained).

82. In this section, I will describe the digital product design features that contribute to extended use, feelings of compulsion to return to the product frequently, and/or difficulties disengaging when the user intends. This list of design features is informed by the Biden-Harris Interagency Task Force on Kids Online Health and Safety report,[98] extensive academic research that explores how young people interact with digital design, and published experiments that alter

[92] Wang, Xiao, Yuexuan Li, and Haoliang Fan. "The associations between screen time-based sedentary behavior and depression: a systematic review and meta-analysis." *BMC public health* 19 (2019): 1-9.

[93] Sampasa-Kanyinga, H., Goldfield, G. S., Kingsbury, M., Clayborne, Z., & Colman, I. (2020). Social media use and parent–child relationship: A cross-sectional study of adolescents. *Journal of Community Psychology*, *48*(3), 793-803.

[94] Eirich, Rachel, et al. "Association of screen time with internalizing and externalizing behavior problems in children 12 years or younger: a systematic review and meta-analysis." *JAMA psychiatry* (2022).

[95] Montag, C., & Elhai, J. D. (2023). On Social Media Design,(Online-) Time well-spent and addictive behaviors in the age of surveillance capitalism. *Current Addiction Reports*, *10*(3), 610-616.

[96] 5 Rights Foundation. (2023). Disrupted Childhood: The cost of persuasive design. Available at: https://5rightsfoundation.com/resource/updated-report-disrupted-childhood-the-cost-of-persuasive-design/

[97] Lubin, N. and Iyer, R. (2023). How tech regulation can leverage product experimentation results. Lawfare. Available at: https://www.lawfaremedia.org/article/how-tech-regulation-can-leverage-product-experimentation-results

[98] Online Health and Safety for Children and Youth: Best Practices for Families and Guidance for Industry. Kids Online Health and Safety Task Force (2024). https://www.samhsa.gov/sites/default/files/online-health-safety-children-youth-report.pdf

digital design and test effects on user wellbeing.

83. It is important to note that companies that operate digital products hold vast amounts of experimental data about the effectiveness of the below design features in prolonging usage sessions or keeping users coming back. Other than the internal research revealed in the files from Facebook whistleblower Frances Haugen, these experimental results are not currently available to the public.

**Evidence of design features prolonging time online or encouraging repeated engagement**

84. **Designs that elicit Fear of Missing Out (FoMO)** are common on social platforms. FoMO is defined as "pervasive apprehension that others might be having rewarding experiences from which one is absent and is characterised by the desire to stay continually connected with what others are doing."[99] Researchers have interviewed teens and young adults about design features that contribute to FoMO, which include:[100]

a. Tagging that leads to a fear of missing the ability to interact through social reciprocity with someone who tagged them

b. Ephemeral content that leads to a fear of missing information

c. Recommendations to build networks that lead to fears of not having a big enough friend group and tap into the need for belonging and popularity

d. Social traces that show when others are online, such as indicators that someone is active on a platform but is not reacting to the user's posts or messages, that lead to fears of missing important interactions

e. Impression and like counts that trigger pressure to increase popularity or be interesting to other people

f. Notifications that can trigger a fear of missing important

---

[99] Przybylski, A. K., Murayama, K., DeHaan, C. R., & Gladwell, V. (2013). Motivational, emotional, and behavioral correlates of fear of missing out. *Computers in human behavior*, *29*(4), 1841-1848.

[100] Alutaybi, A., Arden-Close, E., McAlaney, J., Stefanidis, A., Phalp, K., & Ali, R. (2019, October). How can social networks design trigger fear of missing out?. In *2019 IEEE International Conference on Systems, Man and Cybernetics (SMC)* (pp. 3758-3765). IEEE.

information

85. Users who experience more FoMO have higher rates of problematic social media use and addiction-like behaviors.[101]

86. **Ephemeral designs** are time-limited features on social media that present content for only a brief time, for example a 24-hour period. Such ephemeral designs essentially ensure that users log in to platforms on a daily basis, so that they do not miss anything posted by friends or accounts they follow. Research shows that people are motivated to engage with ephemeral content out of fear of missing out and social pressure; however, ephemeral content is not always gratifying to users, especially when they feel pressure or obligated to engage with it.[102] For this reason, The Kids Online Health and Safety Task Force recommended that young users have the option to extend the availability of time-limited content.[103]

87. **Notifications** from digital products alert the user to new communication, content, or other new activity on the platform via audio, visual, and/or physical (e.g., vibration) stimuli. Notifications cause an involuntary orienting response, bringing the user's attention to a digital product and causing delayed responses to whatever else the user is doing. Multiple studies in college classrooms have demonstrated that phone notifications cause higher error rates and lower recall of taught material.[104] In experiments, teens show particularly more distractibility and physiologic changes in response to phone notifications, compared to adults.[105]

88. In our study tracking the smartphones of over 200 11-17-year-olds,[106] we

[101] Elhai, J. D., Yang, H., & Montag, C. (2020). Fear of missing out (FOMO): overview, theoretical underpinnings, and literature review on relations with severity of negative affectivity and problematic technology use. *Brazilian Journal of Psychiatry*, *43*(2), 203-209.

[102] Chen, K. J., & Cheung, H. L. (2019). Unlocking the power of ephemeral content: The roles of motivations, gratification, need for closure, and engagement. *Computers in Human Behavior*, *97*, 67-74.

[103] Online Health and Safety for Children and Youth: Best Practices for Families and Guidance for Industry. Kids Online Health and Safety Task Force (2024). https://www.samhsa.gov/sites/default/files/online-health-safety-children-youth-report.pdf

[104] Rosen, L. D. (2017). The distracted student mind—enhancing its focus and attention. *Phi Delta Kappan*, *99*(2), 8-14.

[105] Whiting, W. L., & Murdock, K. K. (2021). Notification alert! Effects of auditory text alerts on attention and heart rate variability across three developmental periods. *Quarterly Journal of Experimental Psychology*, *74*(11), 1900-1913.

[106] Radesky, J., Weeks, H.M., Schaller, A., Robb, M., Mann, S., and Lenhart, A. (2023). Constant Companion: A Week in the Life of a Young Person's Smartphone Use. San Francisco, CA: Common Sense. Available at: https://www.commonsensemedia.org/sites/default/files/research/report/2023-cs-smartphone-research-report_final-for-web.pdf

measured the frequency and timing of notifications from different apps. On a typical day, participants received a median of 237 notifications, with a maximum of 4500 per day in one participant. About a quarter (23%) of notifications arrived during school hours, and about 5% during school night hours, two times of day that are more disruptive to wellbeing. Very few participants received no notifications at all during school hours or school night hours. Snapchat and Discord ranked highest in the number of notifications sent to participants in a typical day, with some participants receiving hundreds of messages from these platforms.

89. Teens interviewed for this study did not find notifications to necessarily be a positive thing, and they exerted energy to manage and mute notifications. Some teens recognized how platforms tried to get their attention through adding new types of irrelevant notifications: One 11th grader made the following observation: *"Another thing with notifications, one thing I've noticed with Instagram is, over time, they keep adding new, different types of notifications. Like when they rolled out reels, they had a notification like, 'Check out the most watched reels for today.' So over time, you have to keep turning off those specific notifications because I still wanna receive messages from my friends through DMs. I don't wanna receive those kind of unimportant messages."*

90. **Social quantification and quantified approval** such as likes, hearts, friend numbers, scores, and streaks have been linked with negative social comparison in Meta's internal research and independent studies.[107] In Project Daisy, an internal Meta experiment in which Instagram users were randomly assigned to visible or hidden Like counts, there was a reported 2% reduction in negative social comparison in the users with hidden Like counts. Teen users reported that hiding Like counts made them less likely to care about likes or compare the number of Likes they received with others.[108]

91. Socially anxious teens report that quantifying relationships increases their anxiety:

[107] Wallace, E., & Buil, I. (2021). Hiding Instagram Likes: Effects on negative affect and loneliness. *Personality and Individual Differences*, *170*, 110509.

[108] Harvard Kennedy School Shorenstein Center on Media, Politics and Public Policy. (2023). *Discussion Paper: Case Study on Youth Online Harms – Project Daisy*, Appendix A (p.15-16). Available at: https://shorensteincenter.org/wp-content/uploads/2023/11/Discussion-Paper_Youth-Online-Harms-and-Project-Daisy_For-Shorenstein-Publication.pdf

*"It becomes almost stressful to post anything, because the amount of likes you get is your social standing. Your popularity or how much you're liked is based upon numbers on a screen"* reported a 16-year-old interviewed by 5 Rights Foundation.[109] Rather than focusing on the quality of burgeoning relationships in the teen years, an essential step in identity development, many teens over-focus on quantity of approval from online contacts, many of whom they may not know. As one 13-year-old stated: "*[There is] pressure of losing your friends and endling lifelong friendships if you forget to send a streak one day."*

92. **Low-friction infinite scroll** has been found to keep users on digital products longer, in part because it induces *normative dissociation*, a mental "flow" state in which people feel "spaced out" and have reduced self-awareness or memory.[110] Many people use digital products to seek out normative dissociation as an escape from stress (e.g., by reading or listening to music), but in studies about digital products, an extended time spent in such dissociation leads to regret and self-blame that has been called the "30-minute Ick Factor"[111] – meaning that after about 30 minutes, users feel that their scrolling is less meaningful and they are less in control of disengaging. This aligns with internal TikTok documents suggesting that approximate 35 minutes of scrolling is needed before users have trouble disengaging, as reported by National Public Radio after reviewing the unredacted Kentucky Attorney General's October 2024 complaint against TikTok.[112]

93. In experiments that added slight friction to infinite scroll feeds, using designs that helped users reflect on what they had read and be self-aware of how much time they spent, users were able to disengage more easily and remember more of what they had consumed on Twitter.[113]

---

[109] 5 Rights Foundation. (2023). Disrupted Childhood: The cost of persuasive design. Available at: https://5rightsfoundation.com/resource/updated-report-disrupted-childhood-the-cost-of-persuasive-design/

[110] Baughan, A., Zhang, M. R., Rao, R., Lukoff, K., Schaadhardt, A., Butler, L. D., & Hiniker, A. (2022, April). "I Don't Even Remember What I Read": How Design Influences Dissociation on Social Media. In *Proceedings of the 2022 CHI Conference on Human Factors in Computing Systems* (pp. 1-13).

[111] Tran, J. A., Yang, K. S., Davis, K., & Hiniker, A. (2019, May). Modeling the engagement-disengagement cycle of compulsive phone use. In *Proceedings of the 2019 CHI conference on human factors in computing systems* (pp. 1-14).

[112] National Public Radio, Oct 11 2024: TikTok executives know about app's effect on teens, lawsuit documents allege. Available at: https://www.npr.org/2024/10/11/g-s1-27676/tiktok-redacted-documents-in-teen-safety-lawsuit-revealed

[113] Zhang, M. R., Lukoff, K., Rao, R., Baughan, A., & Hiniker, A. (2022, April). Monitoring screen time or

(continued…)

94. In fact, experiments that reduce engagement-prolonging features (e.g., scrolling on a feed) are more effective at reducing smartphone overuse, compared to experiments that lock out users or impose time-based alarms.[114] In one innovative experiment, 71 users trained their phones to recognize their unique patterns of overuse, and by adding a brief friction design (e.g., typing in a code to continue scrolling) timed precisely for their usual point of regretting overuse, they were able to cut time on their smartphone by 8-9% over 8 weeks.[115]

95. A different experiment used software that slowed or delayed the reaction of the phone to the input action used while navigating endless feeds, such as swiping, on particular apps the participant chose. These apps included Instagram, YouTube, Reddit, Discord and Twitter/X. This additional scroll friction led to a 16% decrease in time spent on the target apps and a high acceptability from users.[116]

**96. Thus, there is causal evidence that, when infinite scroll features are reduced, this causes users to spend less time on digital platforms – most importantly, less time that they perceive as not meaningful.**

97. **Autoplay** is a design in which videos automatically play when the prior video ends, or the user scrolls and hovers over the video. Research on autoplay suggests that it reduces users' sense of agency because it distracts them from searching or finding the video they initially intended.[117] It also contributes to more mindless viewing.[118] In interview studies, parents report that autoplay contributes to conflict with their children when they try to get their child to stop

redesigning it? Two approaches to supporting intentional social media use. In *Proceedings of the 2022 CHI Conference on Human Factors in Computing Systems* (pp. 1-19).

[114] Adiba Orzikulova, Hyunsung Cho, Hye-Young Chung, Hwajung Hong, Uichin Lee, and Sung-Ju Lee. 2023. FinerMe: Examining App-level and Feature-level Interventions to Regulate Mobile Social Media Use. Proc. ACM Hum.-Comput. Interact. 7, CSCW2, Article 274 (oct 2023). https://doi.org/10.1145/3610065

[115] Orzikulova, A., Xiao, H., Li, Z., Yan, Y., Wang, Y., Shi, Y., ... & Xu, X. (2024, May). Time2Stop: Adaptive and Explainable Human-AI Loop for Smartphone Overuse Intervention. In *Proceedings of the CHI Conference on Human Factors in Computing Systems* (pp. 1-20).

[116] Lu, T., Zheng, H., Zhang, T., Xu, X. O., & Guo, A. (2024, May). InteractOut: Leveraging Interaction Proxies as Input Manipulation Strategies for Reducing Smartphone Overuse. In *Proceedings of the CHI Conference on Human Factors in Computing Systems* (pp. 1-19).

[117] Lukoff, K., Lyngs, U., Zade, H., Liao, J. V., Choi, J., Fan, K., ... & Hiniker, A. (2021, May). How the design of youtube influences user sense of agency. In *Proceedings of the 2021 CHI Conference on Human Factors in Computing Systems* (pp. 1-17).

[118] Chaudhary, A., Saroha, J., Monteiro, K., Forbes, A. G., & Parnami, A. (2022, June). "Are you still watching?": exploring unintended user behaviors and dark patterns on video streaming platforms. In *Proceedings of the 2022 ACM Designing Interactive Systems Conference* (pp. 776-791).

using media.[119] In an experimental study, children showed more negative behavior when asked to transition away from an app with autoplay compared to apps without autoplay or a print book.[120]

98. **Manipulative Gamification.** Gamification occurs through motivational designs like points, leaderboards, earned badges, levels, and rewards. Gamification is known to leverage user psychology to shape behavior. A meta-analysis of experiments testing the impact of gamification features on user behavior found such features had broad effectiveness in keeping users engaged.[121],[122] While gamification is often perceived as entertaining to users, it can also be used in ways that contribute to problematic media use, for example when badges are provided for returning to a game on a strict daily basis or rewards are provided after prolonged periods of usage.

99. **In mobile games,** such engagement-prolonging designs are common. In our review of manipulative designs in mobile apps, we found designs such as daily rewards (e.g., free virtual currency or in-game items) for returning to the app daily, time pressure to return at specific times of day to collect rewards, and notifications sent from characters urging the player to come back to the app.[123] In that study, many mobile games didn't give players the option to save their progress and quit, which contributes to urgency to continue playing. Other research has described pressure for teens to "play by appointment" – a manipulative design in which the mobile game dictates when the player should return for rewards, without regard for whether the player is in school or has other obligations at that time.[124]

100. Mobile games also offer gambling-like designs such as loot boxes (in which a

---

[119] Hiniker, Alexis, et al. "Screen time tantrums: How families manage screen media experiences for toddlers and preschoolers." *Proceedings of the 2016 CHI conference on human factors in computing systems*. 2016.

[120] Munzer, Tiffany G., et al. "Tablets, toddlers, and tantrums: The immediate effects of tablet device play." *Acta paediatrica (Oslo, Norway: 1992)* 110.1 (2021): 255.

[121] Hamari, J., Koivisto, J., & Sarsa, H. (2014, January). Does gamification work?--a literature review of empirical studies on gamification. In *2014 47th Hawaii international conference on system sciences* (pp. 3025-3034). Ieee.

[122] Looyestyn, J., Kernot, J., Boshoff, K., Ryan, J., Edney, S., & Maher, C. (2017). Does gamification increase engagement with online programs? A systematic review. *PloS one*, *12*(3), e0173403.

[123] Radesky, J., Hiniker, A., McLaren, C., Akgun, E., Schaller, A., Weeks, H. M., ... & Gearhardt, A. N. (2022). Prevalence and characteristics of manipulative design in mobile applications used by children. *JAMA network open*, *5*(6), e2217641-e2217641.

[124] Fitton, D., & Read, J. C. (2019, June). Creating a framework to support the critical consideration of dark design aspects in free-to-play apps. In *Proceedings of the 18th ACM international conference on interaction design and children* (pp. 407-418).

player pays real or virtual currency to open a probability-based reward), which give teen users a rush of anticipation and are thought to contribute to compulsive/problematic gaming[125] and gaming-related financial harm.[126]

101. In summary, digital products including social media, video sharing platforms, and mobile games employ a variety of different design features that encourage repeated engagement with or extended use of their products. Studies tie many of these features to problematic media use or video gaming behaviors, while youth describe how such features can contribute to prolonged media use and displacement of healthy activities.

## ONLINE HARMS OCCUR DUE TO DESIGN FEATURES LIKE 'DARK PATTERNS' THAT MANIPULATE OR DECEIVE YOUNG USERS

102. Dark patterns are deceptive and manipulative designs that are recognized internationally. For example, the OECD Committee on Consumer Policy defines them as: "Dark commercial patterns are business practices employing elements of digital choice architecture, in particular in online user interfaces, that subvert or impair consumer autonomy, decision-making or choice. They often deceive, coerce or manipulate consumers and are likely to cause direct or indirect consumer detriment in various ways, though it may be difficult or impossible to measure such detriment in many instances."[127]

103. The California Privacy Rights Act (2020) defined dark patterns as: "a user interface designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision-making, or choice."

104. In practice, dark patterns shape the decisions made by children and teens online, such as what to purchase, what games to play, how long to play, and when to disengage and go do other things. Children may start playing a game because it looks fun or has a favorite character,

[125] González-Cabrera, J., Basterra-González, A., Ortega-Barón, J., Caba-Machado, V., Díaz-López, A., Pontes, H. M., & Machimbarrena, J. M. (2023). Loot box purchases and their relationship with internet gaming disorder and online gambling disorder in adolescents: A prospective study. *Computers in Human Behavior*, *143*, 107685.

[126] Carey, P. A. K., Delfabbro, P., & King, D. (2022). An evaluation of gaming-related harms in relation to gaming disorder and loot box involvement. *International Journal of Mental Health and Addiction*, *20*(5), 2906-2921.

[127] OECD (2022), Dark Commercial Patterns. OECD Digital Economy Papers, No 336, OECD Publishing

but then may receive pressure from characters in the game to make purchases,[128] be presented with countdown clocks and urgent messages while trying to make a decision,[129] or have their decision options obscured altogether. For instance, advertisements can be hidden behind objects that children can't resist tapping, like a sparkling birthday cake or favorite snowman character.[130]

105. The term "dark" is used to describe these designs because they are not always visible to users or may be designed to leverage human biases/instincts. However, in my research lab and others, when we train research assistants to recognize dark patterns in user interface design, they can reliably recognize such designs over 90% of the time.[131] Automated systems have been created to identify dark pattern designs at a large scale.[132] Thus, it is highly feasible to identify and mitigate dark patterns in digital products used by minors.

106. In a recent large-scale "mystery shopper" study,[133] 97% of the most popular websites and apps used by European consumers had at least one dark pattern, the most prevalent being (1) hidden information/false hierarchy, (2) preselection, (3) nagging, (4) difficult cancellations, and (5) forced registration. All of these dark pattern types nudge a user to make a decision that benefits the digital product (for example, signing up for a subscription or making an in-app purchase), not the user. Dark patterns often occurred together and included personalization by a user's prior behavior, which consumers found the hardest to resist.

107. The specific harms caused to minors by dark patterns include:

a. **Financial harms** from designs that promote excessive spending.

---

[128] Meyer, M., Adkins, V., Yuan, N., Weeks, H. M., Chang, Y. J., & Radesky, J. (2019). Advertising in young children's apps: A content analysis. *Journal of developmental & behavioral pediatrics*, *40*(1), 32-39.

[129] Radesky, J., Hiniker, A., McLaren, C., Akgun, E., Schaller, A., Weeks, H. M., ... & Gearhardt, A. N. (2022). Prevalence and characteristics of manipulative design in mobile applications used by children. *JAMA network open*, *5*(6), e2217641-e2217641.

[130] Meyer, M., Adkins, V., Yuan, N., Weeks, H. M., Chang, Y. J., & Radesky, J. (2019). Advertising in young children's apps: A content analysis. *Journal of developmental & behavioral pediatrics*, *40*(1), 32-39.

[131] Radesky, J., Hiniker, A., McLaren, C., Akgun, E., Schaller, A., Weeks, H. M., ... & Gearhardt, A. N. (2022). Prevalence and characteristics of manipulative design in mobile applications used by children. *JAMA network open*, *5*(6), e2217641-e2217641.

[132] Chen, J., Sun, J., Feng, S., Xing, Z., Lu, Q., Xu, X., & Chen, C. (2023, October). Unveiling the tricks: Automated detection of dark patterns in mobile applications. In *Proceedings of the 36th Annual ACM Symposium on User Interface Software and Technology* (pp. 1-20).

[133] European Commission: Directorate-General for Justice and Consumers, Lupiáñez-Villanueva, F., Boluda, A., Bogliacino, F., Liva, G. et al., *Behavioural study on unfair commercial practices in the digital environment – Dark patterns and manipulative personalisation – Final report*, Publications Office of the European Union, 2022, https://data.europa.eu/doi/10.2838/859030

For example, in the FTC case against EPIC Games (the developer of the video game Fortnite),[134] numerous players and parents complained about design tricks that led to purchases of V-bucks (the game's currency) or in-game items without express consent. These designs included confusing buttons and a lack of confirmation that the player wanted to make the purchase, leading to thousands of accidental purchase claims submitted to EPIC.

b. Many studies show that artificial pressure from e-commerce dark patterns such as count-down clocks and false scarcity lead to consumers making impulsive purchasing decisions.[135]

c. **Privacy harms:** Large-scale studies of cookies banners (the notices that appear at the bottom of website screens with information about cookies-based data collection) show a high prevalence of dark pattern designs,[136] which influence users to share their data when they would prefer not to.[137]

d. **Extended time online:** In our review of mobile games played by young children, 64.7% contained at least one dark pattern designed to prolong gameplay, such as pressure from characters, obscured options for navigating away from the game, and rewards presented at the ends of levels to entice the child to keep playing.[138] Dark

---

[134] Federal Trade Commission, 'FTC Finalizes Order Requiring Fortnite maker Epic Games to Pay $245 Million for Tricking Users into Making Unwanted Charges' (March 2023): https://www.ftc.gov/system/files/ftc_gov/pdf/1923203epicgamesfinalconsent.pdf

[135] Wu, Y., Xin, L., Li, D., Yu, J., & Guo, J. (2021). How does scarcity promotion lead to impulse purchase in the online market? A field experiment. *Information & Management*, *58*(1), 103283.

[136] Krisam, C., Dietmann, H., Volkamer, M., & Kulyk, O. (2021, October). Dark patterns in the wild: Review of cookie disclaimer designs on top 500 German websites. In *Proceedings of the 2021 European Symposium on Usable Security* (pp. 1-8).

[137] Borberg, I., Hougaard, R., Rafnsson, W., & Kulyk, O. (2022). So I sold my soul": Effects of dark patterns in cookie notices on end-user behavior and perceptions. In *Usable Security and Privacy (USEC) Symposium* (Vol. 2022).

[138] Radesky, J., Hiniker, A., McLaren, C., Akgun, E., Schaller, A., Weeks, H. M., ... & Gearhardt, A. N. (2022). Prevalence and characteristics of manipulative design in mobile applications used by children. *JAMA network open*, *5*(6), e2217641-e2217641.

patterns often work in combination with one another; for example, in our recent analysis of very large online platforms,[139] each social media app employed 20 or more different dark patterns that appear designed to extend use.

108. When teens experience dark patterns, for example in gaming environments, they state that it causes them emotional distress, cognitive burden, weakened attention (from having to constantly resist design features trying to capture their attention and urging them to do things), and financial distress/pressure (spending more than they wanted). They also felt they had to provide data when they didn't want to.[140]

**STRATEGIES TO MITIGATE ONLINE HARMS**

109. Digital products have a responsibility to mitigate the harms that occur to minors.

110. Although some social media platforms have made attempts to mitigate harms by offering teen accounts with more privacy features, filtered content, or time limits, without transparency and accountability, we don't know whether these measures actually mitigate harms. We also don't know how many youth users turn these settings off.

111. There are now several global initiatives embracing safety-by-design and privacy-by-design approaches for minors. These include several content-agnostic approaches such as preventing profiling of minors, reducing extended use, reducing product features that quantify approval, and increasing accountability so that users know what the risks are and that their flags or reports are responded to.

112. Youth, parents, the Biden-Harris Interagency Task Force on Kids Online Health and Safety, the American Psychological Association,[141] and the National Academies of Science

---

[139] Chen, Y., Fu, Y., Chen, Z., Radesky, J., Hiniker, A. Extended-Use Designs on Very Large Online Platforms. Available at: https://export.arxiv.org/pdf/2411.12083

[140] Sanchez Chamorro, L., Lallemand, C., & Gray, C. M. (2024, July). " My Mother Told Me These Things are Always Fake"-Understanding Teenagers' Experiences with Manipulative Designs. In *Proceedings of the 2024 ACM Designing Interactive Systems Conference* (pp. 1469-1482).

[141] American Psychological Association. (2024). Potential risks of content, features, and functions: The science of how social media affects youth. Available at: https://www.apa.org/topics/social-media-internet/youth-social-media-2024

and Medicine (NASEM) report recommend that such features be uniform across products. Specifically, NASEM recommended age-appropriate design features including:

a. Enhanced privacy protections
b. Auditing features, identifying their risks, and mitigating them
c. Discouraging persuasive design features that extend use or re-engagement
d. Algorithmic responsibility for what content is promoted

113. Digital literacy interventions are necessary but insufficient. As the NASEM report notes, "the complexity and pace of the online environment far exceed what adolescents—or any layperson—could be reasonably expected to understand."

114. Solutions are feasible. For example, experiments described in the academic literature reviewed above include innovative designs such as:

a. Options to increase the time that ephemeral content is available, or event/content recorders that allow a user to see ephemeral content the next time they are online
b. Batching and muting of notifications at particular times of day (school hours, overnight hours)
c. Providing options for additional friction in feeds after a certain usage duration or at a particular time of day/night
d. Status settings that normalize being away from platforms.
e. Hiding social quantification (e.g., likes, follower counts) for minors
f. Platform home pages that remove recommendation feeds and promote user agency

**CALIFORNIA CHILDREN'S AGE-APPROPRIATE DESIGN CODE ACT**

115. The California Children's Age-Appropriate Design Code Act would help children have healthier relationships with digital technology in several ways.

116. By setting minors' accounts to private by default, the Act would take a critical step

in preventing exploitation of children and teens.

117. By preventing profiling of minors, the Act would reduce their exposure to illegal activities such as sexual exploitation, gambling, and alcohol, and would prevent manipulative pricing and nudges during video games that contribute to excessive spending.

118. The Act addresses design features that extend digital media use and displace healthy activities such as sleep. Children, teens, and families currently struggle to manage boundaries around media use and need design options that support disengaging from media when they so choose.

119. Finally, the Act would address dark patterns that manipulate minors into spending more money or time on digital products.

120. The data privacy and design standards established by the Act will be crucial for the safety of emerging digital products. For example, these standards would prevent artificial intelligence-enabled chatbots and companions from using manipulative designs to encourage engagement, or from using the highly sensitive information collected in conversations with minors for marketing purposes.

## OPINIONS

121. Children and teens have generated billions of dollars in revenue for internet services and mobile apps that keep them engaged through profiling and design features that capture and hold onto their attention. These design features—including infinite scroll, autoplay, notifications that ping for attention without regard for whether a young user is trying to sleep or focus on classwork, and designs that make users afraid of losing social status if they don't return to the platform again and again—contribute to extended use and feelings of frustration and regret. In our individualistic society, users typically blame themselves for being "addicted" or wasting their time online; yet, this is not a matter of individual weakness in children and teens. At a digital ecosystem level, the designs at the root of these feelings are pervasive, are purposeful, and are wholly changeable.

122. Over the past few years, investigations into the internal research conducted by

large online platforms have revealed fascinating insights about experiments run on design features and how they engage users. Design choices such as likes, time-limited ephemeral posts, and notifications have been created with clear business objectives, but come with costs to child and teen sleep, social pressure, and distraction.

123. Global movements for safety- and privacy-by-design are not moral panics. They are precise attempts to improve product safety by removing features that increase risk of harm and providing more user control and transparency. Considering that many minors use digital products for more than half of their waking hours, it is crucial that these products be designed in ways that support their wellbeing.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 5, 2024 at Ann Arbor, Michigan.**

**Dr. Jenny S. Radesky**

# EXHIBIT 1

# Jenny Radesky

**Associate Professor**
**734-647-3759 - jradesky@umich.edu**


## Education and Training

### Education

| | |
|---|---|
| 08/1997-05/2001 | BA, Johns Hopkins University, Baltimore, MD |
| 08/2002-06/2007 | MD, Harvard Medical School, Boston, MA |

### Postdoctoral Training

| | |
|---|---|
| 07/2007-06/2010 | Residency, Pediatrics, University of Washington/Seattle Childrens Hospital, Pediatrics, Seattle, WA |
| 07/2011-06/2014 | Clinical Fellow, Developmental Behavioral Pediatrics, Boston University School of Medicine, Pediatrics, Boston, MA |

## Certification And Licensure

### Certification

| | |
|---|---|
| 10/2010-12/2020 | American Board of Pediatrics, General |
| 01/2015-12/2025 | American Board of Pediatrics, Developmental Behavioral Pediatrics |

### Licensure

| | |
|---|---|
| | Michigan, Controlled Substance |
| | Michigan, Medical License |
| 01/2016-Present | Michigan, Medical License |
| 01/2016-Present | Michigan, DEA License |
| 01/2016-Present | Michigan, Controlled Substance |

## Work Experience

### Academic Appointment

| | |
|---|---|
| 07/2014-01/2016 | Assistant Professor, Pediatrics, Boston University School of Medicine, Boston |
| 01/2016-08/2022 | Assistant Professor, Pediatrics, University of Michigan - Ann Arbor, Ann Arbor |
| 09/2022-Present | Associate Professor in Pediatrics - Development - Behavioral, Pediatrics, University of Michigan - Ann Arbor, Ann Arbor, (Tenured) |

### Clinical Appointments

| | |
|---|---|
| 08/2010-06/2011 | Pediatrician, Pediatric Associates Inc, Bellevue, WA |

## Research Interests

- My research examines parent mobile device use, young children's use of mobile and interactive media, parent-child interaction, and social-emotional development.

## Clinical Interests

- Advocacy, underserved populations, autism spectrum disorder, early childhood

## Grants

**Current Grants**

*Children and Technology Advisor - Jenny Radesky - FTC IPA:*
PI
FTC-US
07/2024 - 06/2025
$63,115

P01HD109907:*Growing up in a Digital World: A synergistic approach to understanding media use in children ages 1-8:*
PI
NIH-DHHS-US-SubK sourced funding through Georgetown University
09/2022 - 08/2025
$279,142

K23HD105988:*Longitudinal associations of maternal mobile device use and maternal-infant wellbeing:*
Consultant on (Principal Investigator:Tiffany Munzer)
NIH-DHHS-US
07/2022 - 06/2027
$837,000

R01HD102370:*Technology Use and Emerging Executive Functioning in Early Childhood:*
PI
NIH-DHHS-US
04/2021 - 03/2026
$2,873,938

**Submitted - Open**

R01:*Thriving in a Digital World: Examining Trajectories of Healthy and Problematic Media use from Childhood to Early Adolescence:*
PI
NIH-DHHS-US-SubK sourced funding through Brigham Young University
04/2025 - 03/2030
$53,367

**Past Grants**

P01HD109907:*Growing up in a Digital World: A synergistic approach to understanding media use in children ages 0-8:*
PI
NIH-DHHS-US-SubK sourced funding through Georgetown University
09/2023 - 08/2024
$28,409

*SAMHSA Center of Excellence on Social Media and Mental Health:*
PI
SAMHSA-DHHS-US-SubK sourced funding through American Academy of Pediatrics
09/2022 - 09/2024
$224,795

*Planning the Metaverse for Kids: Social Gaming Walk-Through Study:*
PI
Children's Hospital Corporatio
06/2022 - 05/2024
$121,830

*Teen Smartphone Pilot:*
PI
Common Sense Media
02/2022 - 05/2023
$60,798

*Pediatric Early Autism Recognition System: PEARS:*
Mentor (Principal Investigator:Nicole Hamp)
BCBSM
09/2021 - 12/2022
$9,100

R21NR019402:*Healthy Digital Habits in Parents of Infants:*
PI
NIH-DHHS-US-SubK sourced funding through Parkview Hospital, Inc
05/2021 - 04/2023
$57,255

*YouTube Content Analysis:*
PI
Common Sense Media
02/2021 - 04/2022
$45,600

*YouTube Content Analysis:*
PI
Common Sense Media
01/2020 - 01/2021
$21,386

R41HD:*Beyond Screen Time: Developing an objective mobile media measurement tool:*
PI
NIH-DHHS-US-SubK sourced funding through Open Lattice, Inc.
10/2019 - 08/2020
$51,166

R41HD100230:*Beyond Screen Time: Developing an objective mobile media measurement tool:*
Funded by
Eunice Kennedy Shriver National Institute of Child Health and Human Development
09/2019 - 08/2020
$150,000

R21HD094051:*Longitudinal associations between preschooler emotion regulation, executive function, and digital media use.:*
PI
NIH-DHHS-US
08/2018 - 07/2021
$429,000

R03HD094077:*Parent-toddler interactions during electronic versus print book reading:*
PI
NIH-DHHS-US
08/2018 - 07/2020
$156,000

K23HD092626:*Parent Mobile Device Use and Parent-Child Interaction:*
PI
NIH-DHHS-US
08/2017 - 05/2022
$793,103

*Electronic versus print books: Differences in parent-toddler interactions and toddler behavioral regulation:*
Mentor (Principal Investigator:Tiffany Munzer)
Academic Pediatric Association
03/2017 - 10/2018
$14,780

## Honors and Awards

**National**

| | |
|---|---|
| 2017 | AAP Communication and Collaboration Award, American Academy of Pediatrics |
| 2019 | Student Research Award, Academic Pediatric Association, Mentor, Marisa Meyer |
| 2023 | AAP Innovation Award, American Academy of Pediatrics, For the Family Media Plan |

**Institutional**

| | |
|---|---|
| 2001 | Phi Beta Kappa, Johns Hopkins University |
| 2007 | New England Pediatric Society Prize, Harvard Medical School |
| 2007 | Presidential Scholars Program, Public Service Initiative, Harvard Medical School, Provided loan forgiveness for graduates who worked in subspecialities focusing on public service |
| 2013 - 2014 | Zuckerman Fellowship, Boston University School of Medicine, Pediatrics |
| 2017 - 2018 | Elizabeth Caroline Crosby Award, University of Michigan, ADVANCE Program |
| 2018 | Top Teacher Award, University of Michigan Medical School, Pediatrics |

## Study Sections, Editorial Boards, Journal & Abstract Review

### Study Sections

**International**

| | |
|---|---|
| 2020 - Present | Advisory Board (supported by UNICEF), Power of Zero Anti-Bullying Initiative, (Standing Member) |

**National**

| | |
|---|---|
| 2019 - 2022 | Study Section, NICHD Study Section, (Ad Hoc) |
| 2020 - Present | Advisory Board, Common Sense Media Early Childhood Initiative, (Standing Member) |
| 2021 - Present | Advisory Board, Child Trends News Service for 2 NSF grants, Child Trends, (Standing Member) |

| | |
|---|---|
| 2023 - 2024 | Rudd Center Healthy Eating Research Digital Advertising Expert Panel, (Standing Member) |
| 2024 - Present | Board on Children Youth and Families, National Academies of Science, Engineering, and Medicine, (Standing Member) |
| 2024 | SBIR Study Section, NICHD Study Section, (Ad Hoc) |

### Editorial Boards / Journal & Abstract Reviews

**Editorial Boards**

| | |
|---|---|
| 2017 - 2020 | Editor, Developmental Behavioral Pediatrics, New England Journal of Medicine Journal Watch: Pediatrics and Adolescent Medicine |
| 2018 - 2019 | Editor, Challenging Cases, Journal of Developmental Behavioral Pediatrics |
| 2019 - 2020 | Guest Editor, Cyberpsychology, Behavior, and Social Networking special issue on Children and Smartphones |

**Journal Review**

| | |
|---|---|
| 2011 - 2023 | JAMA Pediatrics |
| 2012 | Archives of Disease in Childhood |
| 2013 | International Journal of Affective Disorders |
| 2014 - 2023 | Pediatrics |
| 2015 | Infancy |
| 2015 | Early Human Development |
| 2015 - 2017 | Maternal Child Health Journal |
| 2015 - 2024 | Journal of Developmental Behavioral Pediatrics |
| 2017 | PLOS One (Ad Hoc) |
| 2017 - 2020 | Computers in Human Behavior (Ad Hoc) |
| 2018 - 2019 | Child Development (Ad Hoc) |
| 2019 | BMJ Open |
| 2020 | Infant Behavior and Development |
| 2020 - 2023 | Acta Paediatrica |
| 2021 | Journal of Children and Media |
| 2021 | New England Journal of Medicine (Ad Hoc) |
| 2021 | Journal of Medical Internet Research (Ad Hoc) |
| 2021 - 2024 | JAMA Network Open |

## Teaching

### Mentorship

**Resident**

| | |
|---|---|
| 07/2018-05/2019 | Rebecca Lane, University of Michigan Medical School, Publication of review/commentary |
| 08/2022-Present | Sarah Frankl, University of Michigan Medical School, Pediatric Neurology, Manuscript in preparation |

**Faculty Member**

| | |
|---|---|
| 07/2019-Present | Tiffany Munzer, University of Michigan Medical School, Multiple publications and national presentations |
| 09/2022-Present | Elizabeth Milkovich, Children's Mercy Hospital, Applying for K23 award |
| 09/2023-Present | Sarah DeHaan, University of Michigan Medical School, General Pediatrics, Mentoring as mini-fellow in DBP; Project in progress |

**Clinical Fellow**

| | |
|---|---|
| 07/2016-06/2019 | Tiffany Munzer, University of Michigan Medical School, Multiple publications and conference presentations |
| 07/2018-06/2021 | Chioma Torres, University of Michigan Medical School, 3 publications |
| 08/2019-Present | Nicole Hamp, University of Michigan Medical School, 1 publication, 1 national presentation, 1 manuscript in preparation |
| 01/2020-06/2021 | Kimberley Levitt, University of Michigan Medical School, 1 publication, 1 manuscript in preparation |

**Medical Student**

| | |
|---|---|
| 09/2021-09/2023 | Nirmeen Chouaib, Michigan State University, Manuscript |

**Graduate Student**

| | |
|---|---|
| 07/2019-Present | Kaiwen Sun, University of Michigan School of Information, Multiple publications and international presentations |

**Undergraduate Student**

| | |
|---|---|
| 10/2017-01/2021 | Marisa Meyer, University of Michigan, 2 publications; 2 national presentations; 2019 APA best abstract award; Mentee won Dept of Psychology award for her thesis, which I mentored |
| 07/2019-09/2020 | Fangwei Zhao, University of Michigan, Publication |
| 09/2019-09/2022 | Caroline McLaren, University of Michigan, 2 publications |
| 05/2024-Present | Madalynn Woods, University of Michigan, Psychology, SRCD abstract, manuscript in submission |

## Teaching Activity

**International**

| | |
|---|---|
| 01/2024-01/2024 | Keynote at Early Childhood Conference, VIA University, Denmark |

**National**

| | |
|---|---|
| 04/2015-04/2015 | Pediatric Academic Societies State-of-the-Art Plenary: "Parent media use and parent-child interaction." (San Diego, CA) |
| 04/2016-04/2016 | 2016 Pediatric Academic Societies Topic Symposium: "Digital Technology and the Word Gap: Barrier or Opportunity?" (Baltimore, MD) |
| 05/2017-05/2017 | 2017 Pediatric Academic Societies, Developmental Behavioral Pediatrics Special Interest Group. "Digital Media and Child Development: Policy Perspectives." (San Francisco, CA) |
| 05/2017-05/2017 | 2017 Pediatric Academic Societies Plenary Lecture. "Digital Media Use and Cognitive Self-Regulation." (San Francisco, CA) |
| 10/2017-10/2017 | 2017 Society for Developmental Behavioral Pediatrics, Annual Conference. "Autism Spectrum Disorder and Digital Media." (Cleveland, OH) |
| 11/2017-11/2017 | Obesity Week Conference. "Using technology to measure technology." (Washington D.C.) |

| | |
|---|---|
| 05/2018-05/2018 | 2018 Pediatric Academic Societies, Invited Science Chair, "Digital Media and Vulnerable Populations." (Toronto, Canada) |
| 11/2018-11/2018 | 2018 American Academy of Pediatrics National Conference and Exhibition: "Digital Media and Early Childhood: The Good, The Bad, and the Unknown." (Orlando, FL) |
| 04/2019-04/2019 | Pediatrics Academic Societies Annual Conference, Topic Symposium "Digital Natives: The Changing Nature of Children's Media Use" (Baltimore MD) |
| 10/2019-10/2019 | American Academy of Pediatrics National Conference and Exhibition. "Social Media: The Good, Bad, and Unknown" (New Orleans, LA) |
| 10/2019-10/2019 | American Academy of Pediatrics National Conference and Exhibition. "Advertising in Apps for Young Children." (New Orleans, LA) |
| 10/2019-10/2019 | American Academy of Pediatrics National Conference and Exhibition Plenary Presentation: "Gamified Childhood" (New Orleans, LA) |
| 10/2020-10/2020 | 2020 American Academy of Pediatrics National Conference an Exhibition, "Digital Health: Helping Families Navigate Digital Media." (Virtual Conference) |
| 03/2023-03/2023 | Lecture regarding social media, technology, and youth mental health, Fairfax School Health Advisory Council, Guest Lecturer |
| 07/2023-07/2023 | Training on children and media for social workers and child welfare professionals in California, Center for Innovation and Resources, Inc |
| 09/2023-11/2023 | ECHO 6-week course on Social Media and Youth Mental Health, American Academy of Pediatrics, ECHO Course Director |
| 09/2023-09/2023 | Expert roundtable on social media and youth mental health, White House Interagency Task Force on Kids Online Safety, Roundtable member |
| 11/2023-11/2023 | Training for educators on child/adolescent social media use, National Center for Safe Secure Learning Environments, Panelist |
| 11/2023-02/2024 | ECHO 6-week course on Social Media and Youth Mental Health, American Academy of Pediatrics, ECHO Course Lead |
| 12/2023-12/2023 | Web-based Workshop on Healthy Media Use, Boston Public Schools |
| 09/2024-Present | Workshop: Strengths-based approaches to supporting healthy media use in primary care, American Academy of Pediatrics, Workshop director |

**Regional**

| | |
|---|---|
| 03/2014-03/2014 | Steven J. Parker Memorial CME Course in Developmental Behavioral Pediatrics. "Smartphone: Friend or Foe?" (Boston, MA) |
| 03/2015-03/2015 | Steven J. Parker Memorial CME Course in Developmental Behavioral Pediatrics. "Colic, Tantrums, and Sleep: Self-regulation Problems in Early Childhood" (Boston, MA) |
| 05/2015-05/2015 | New England School Nurse Association Annual Continuing Education Conference. "Digital Technology Use and Child Development." (Portsmouth, NH) |
| 04/2016-04/2016 | Michigan Head Start Medical Advisory Committee. "Mobile Media Use and Child Social-Emotional Development." (Lansing, MI) |
| 09/2016-09/2016 | Michigan Chapter, American Academy of Pediatrics 2016 Annual Conference. "The ABCs of IEPs." (Boyne, MI) |
| 11/2016-11/2016 | Saint Joseph's Hospital Pediatric Grand Rounds. "Digital Technology and the Word Gap: Barrier or Opportunity?" (Ypsilanti, MI) |
| 04/2017-04/2017 | HighScope International Conference. "Family Technology Use: How to Implement Evidence-based Family-Centered Practices" (Detroit, MI) |
| 06/2017-06/2017 | Saint Joseph's Hospital Pediatric Grand Rounds. "The ABCs of IEPs." (Ypsilanti, MI) |

| | |
|---|---|
| 08/2017-08/2017 | Washtenaw Intermediate School District Early Childhood Conference. "Digital Media and Early Childhood: The New AAP Guidelines and Early Childhood Education." (Ann Arbor, MI) |
| 03/2018-03/2018 | Michigan Head Start Association annual meeting. "Preschoolers and Touchscreens." (Ann Arbor, MI) |
| 10/2018-10/2018 | Michigan Department of Health and Human Services Autism Training Program: "The ASD Team: Perspective from a Developmental Behavioral Pediatrician" (Michigan statewide webinar) |
| 03/2019-03/2019 | Michigan Head Start Association Annual Conference. "Apps and Young Brains." (Ann Arbor, MI) |
| 08/2019-08/2019 | Hurley Children's Hospital Grand Rounds "Digital Media and Early Childhood: The Good, The Bad, and the Unknown." (Flint, MI) |
| 01/2020-01/2020 | Osher Lifelong Learning Institute. "Digital Media and Parent-Child Interaction." (Ann Arbor, MI) |
| 07/2020-07/2020 | Ascension Hospital Pediatrics Grand Rounds: "Beyond Screen Time: The Importance of Relationships, Design, and Disparities." (Detroit, MI - presented virtually) |
| 10/2020-10/2020 | Ann Arbor Public Schools, Lawton Elementary School Parent-Teacher Organization. "Surviving Remote Learning" (Ann Arbor, MI - presented virtually) |
| 10/2022-10/2022 | Media and Child Wellbeing: Thinking Beyond Screen Time, Ann Arbor Public Schools PTO, Guest Lecturer |
| 11/2022-11/2022 | Screen Media and Child Wellbeing, Michigan Medicine Project Healthy Schools, Guest Lecturer |
| 01/2023-01/2023 | Pediatric Early Autism Recognition System, UM Collaborative Office Rounds, Guest Lecturer |
| 05/2023-05/2023 | Parent workshop about media and child development, Unified Child and Family Head Start |
| 08/2023-08/2023 | Professional Training on Children and Media - Early Childhood and Elementary Teachers, Oakland Intermediate School District |
| 10/2023-10/2023 | Workshop for parents about healthy media use, Saline Public Schools, Workshop Leader |
| 02/2024-02/2024 | Workshop for parents about healthy digital relationships with media, Emerson School |
| 02/2024-02/2024 | Webinar on Digital Media and Child Mental Health, MC3 |
| 03/2024-Present | Webinar for early child care providers about media use, Child Care Network of Southeast Michigan, Guest lecturer |
| 04/2024-Present | Webinar for parents about healthy screen use, Monroe Intermediate School District, Guest lecturer |
| 05/2024-Present | Webinar on social media and youth mental health, Coalition for a Drug-Free Baltimore, Guest lecturer |

**Institutional**

| | |
|---|---|
| 04/2012-04/2012 | Pediatric Grand Rounds, Boston Medical Center: "Unsoothable infant crying and risk of maternal depression." |
| 11/2012-11/2012 | Pediatric Case of the Week, Boston Medical Center: "We don't want meds: Nonpharmacologic approaches to ADHD management." |
| 04/2013-04/2013 | Pediatric Grand Rounds, Boston Medical Center: "Behavioral antecedents of early media exposure." |
| 01/2014-01/2015 | Fellow Support Rounds (monthly), Boston Medical Center Division of Developmental Behavioral Pediatrics |

| | |
|---|---|
| 01/2014-01/2015 | Media and Early Childhood Development lecture, pediatric interns |
| 04/2014-04/2014 | Pediatric Grand Rounds, Boston Medical Center. "Patterns of Mobile Device Use by Caregivers of Young Children During Fast Food Meals"/"Are Children with Self-Regulation Problems Differentially Susceptible to Early Parenting?" |
| 07/2015-07/2015 | Pediatric Grand Rounds, University of Michigan. "Mobile Media Use, Parent-Child Interaction, and Child Social-emotional Development." |
| 09/2015-09/2015 | Pediatric Grand Rounds, Boston University School of Medicine. "Mobile Media Use, Parent-Child Interaction, and Child Social-emotional Development." |
| 12/2015-12/2015 | Harvard Combined Neonatology Fellowship Research Lecture Series. "Mobile Media Use, Parent-Child Interaction, and Child Development." |
| 12/2016-12/2016 | University of Michigan Interactive and Social Computing Consortium. "Early Childhood Media Use." |
| 03/2017-03/2017 | University of Michigan Autism Spectrum Disorder CME. "After ASD Diagnosis: IEPs, Non-ABA Treatment Options, and Parent Support" |
| 07/2017-07/2017 | University of Michigan Department of Pediatrics Grand Rounds. "Digital Media and Early Childhood: Update on the New AAP Guidelines." |
| 09/2017-09/2017 | University of Michigan CHEAR (Child Health Evaluation and Research) Unit conference. "Using apps to measure parent and child mobile device use: Opportunities and Limitations." |
| 10/2017-10/2017 | University of Michigan Child Psychology Trainee Lunch Series. "Digital Media and Early Childhood." |
| 12/2018-12/2018 | University of Michigan T32 Training Program in Developmental Science: "Digital Media and Early Childhood: Clinical Cases and Evidence Base" |
| 03/2019-03/2019 | University Center for Child and Family, Ann Arbor, MI – Trainee case conference: "Media and Mental Health." |
| 01/2020-01/2020 | University of Michigan School of Communication and Media invited lecture. "Naturalistic Methods for Studying Child and Parent Media Use." |
| 01/2020-01/2020 | Michigan Privacy Symposium, University of Michigan School of Information. "Children and Technology." |
| 01/2020-01/2020 | Center for Human Growth and Development T32 seminar, "Working with the Media" |
| 05/2020-05/2020 | Michigan Medicine Department of Pediatrics Grand Rounds: "Beyond Screen Time: The Importance of Relationships, Design, and Disparities." |
| 09/2020-09/2020 | Michigan Medicine Pediatrics Residency, "Attachment and Parenting in Early Childhood" |
| 04/2021-04/2021 | Child Psychology Practicum Lecture, Department of Psychiatry, Michigan Medicine |
| 08/2023-08/2023 | Autism Bootcamp, Developmental Behavioral Pediatrics Fellowship |
| 12/2023-12/2023 | Noon conference: Strategic Science to Inform Child Policy, University of Michigan Medical School, Pediatrics, Division of Child Neurology |

**Dissertation Committees**

| | |
|---|---|
| 01/2021-Present | Kaiwen Sun, Interactive Media and Child Development, University of Michigan, School of Information, Committee Member |
| 10/2021-Present | Olivia Richards, University of Michigan, School of Information, Committee Member |

**Preliminary Committee**

| | |
|---|---|
| 06/2024-Present | Cami Goray, Public perceptions of digital privacy and age assurance, University of Michigan, School of Information, Committee Member |

## Memberships in Professional Societies

| | |
|---|---|
| 2002 - 2020 | Member, Massachusetts Medical Society |
| 2007 - Present | Fellow, American Academy of Pediatrics |
| 2012 - Present | Member, Academic Pediatric Association |
| 2012 - Present | Member, Society for Developmental Behavioral Pediatrics |
| 2014 - 2016 | Member, Contextual Influences Working Group, Bridging the Word Gap National Research Network |
| 2018 - Present | Member, Society for Pediatric Research |

## Committee/Service

**International**

| | |
|---|---|
| 2019 - 2023 | Board of Directors, Melissa and Doug, LLC, Board of Directors |

**National**

| | |
|---|---|
| 2015 - Present | Council on Communications and Media, American Academy of Pediatrics, Member |
| 2016 | National Conference and Exhibition Peds21 Planning Committee, American Academy of Pediatrics, Other, Abstract Chairperson |
| 2017 | Council on Communications and Media, Media Visiting Professor Selection Committee, American Academy of Pediatrics, Member |
| 2018 | NICHD Strategic Planning Committee, National Institutes of Child Health and Development, Member |
| 2021 - 2023 | Council on Communications and Media, American Academy of Pediatrics, Vice Chair |
| 2023 - Present | Council on Communications and Media, American Academy of Pediatrics, Chair |
| 2023 | Interagency Task Force on Social Media and Youth Mental Health, United States Government, Other, Scientific subject matter expert |

**Regional**

| | |
|---|---|
| 2016 - Present | Medical Advisory Board, Autism Alliance of Michigan, Member |
| 2017 - 2023 | Board of Directors, Child Care Network of Southeast Michigan, Secretary |
| 2019 | Flint Water Crisis Community Advisory Board, University of Michigan, Member |
| 2019 - 2020 | Autism Evaluation and Treatment Working Group, Michigan Department of Health and Human Services, Member |

**Institutional**

| | |
|---|---|
| 2007 - 2010 | Residency curriculum planning committee, University of Washington/Seattle Children's Hospital, Member |
| 2008 - 2009 | Intern selection committee, University of Washington/Seattle Children's Hospital, Member |
| 2015 | Department of Pediatrics, Chair's Strategic Planning Committee, Boston University School of Medicine, Member |
| 2018 | Zero to Thrive Faculty Selection Committee, University of Michigan Medical School, Member |

| | |
|---|---|
| 2020 - 2022 | Admissions Interviewer, University of Michigan Medical School, Member |
| 2020 - 2023 | Department of Pediatrics Research Symposium Planning Committee, University of Michigan Medical School, Officer |
| 2023 | Health Equity Steering Committee, University of Michigan, Member |

**Departmental**

| | |
|---|---|
| 2022 - Present | Tenure Track Promotions Committee, University of Michigan Medical School Department of Pediatrics, Member |

## Scholarly Activities

## Presentations

### Visiting Professorship

**Keynote**

1. Digital Media and Parent-Child Relationships, University of Lille, 11/2019, Lille, France

### Extramural Invited Presentation

**Keynote**

1. AAP Council on Communications and Media Visiting Professorship, University of Illinois, Chicago, 05/2016, Chicago
2. Digital Media and Literacy/Social-Emotional Development., Akron Children's Hospital, 05/2017, Akron, OH
3. Commercialism is the Missing Link, Children's Screen Time Action Network, 04/2018, Boston, MA
4. Empowering Parents in the Digital Age: Supporting Parent-Child Interactions, Denver Health (Early Childhood Lectureship), 04/2018, Denver, CO
5. Digital Media and the Dyad, World Association of Infant Mental Health, 05/2018, Rome, Italy
6. Digital Media and Parent-Child Interaction, Hospital for Sick Kids Infant Mental Health Program, 02/2019, Toronto, Canada
7. (Keynote Presentations) "Practical Strategies for Addressing Digital Media in Primary Care" and "Digital Media and Early Childhood Outcomes.", University of Wisconsin - Madison, 09/2019, Madison, WI
8. The Digital Playground, MIPJunior, 10/2020, Cannes, France (Presented virtually)
9. Keynote Lecture: Moving Beyond "Screen Time:" Advocating for a Child-Centered Digital Environment, ACM Interaction Design and Children, 06/2021, Athens, Greece (virtual)
10. Digital Media and Child Development: Beyond Screen Time, **Radesky J**, Slovenian Pediatric Society, 09/2022, Bled, Slovenia
11. Stretching Beyond Your Comfort Zone: How Different Lenses and Methods Can Improve Child Health Research, **Radesky J**, Georgetown University Medical Center - Collaborative for Research and Education to Advance Children's Health, 12/2022, Washington, DC (virtual)
12. Social Media and Adolescent Mental Health, **Radesky J**, Hassenfeld Child Health Innovation Institute, 05/2023, Providence, RI
13. Assessing and Managing the Effects of Social Media on Children, **Radesky J**, Lecture for pediatricians on social media and child mental health, Inaugural Rucola Lecture in Pediatrics, 11/2023, Chicago, IL (virtual)
14. Digital Media and Early Childhood, **Radesky J**, Presentation to early childhood practitioners in Denmark, Danish Early Childhood Annual Conference (Smabornekonferencen), 01/2024, Nyborg, Denmark
15. Digital Wellbeing in Early Childhood: Research Updates, **Radesky J**, Digital wellbeing advisory board keynote, Sesame Workshop, 02/2024, New York, NY

16. Screens and Young Children: Strengths-based approaches to support early mental and relational health, **Radesky J**, New York State Early Childhood Technical Assistance Center, 05/2024, New York, NY (virtual)

17. The 5 Cs of Media Use: Early Childhood, **Radesky J**, American Academy of Pediatrics, 05/2024, Washington, DC

18. What Ever Happened to Children's Television?, Radesky J, International Conference on Infant Studies, 07/2024, Glasgow, Scotland

19. Social Media and Student Mental Health, **Radesky J**, Mental Health America – New York State. 2024 Summer Academy for Mental Health, 08/2024, New York, NY (virtual)

20. New approaches to address social media and youth mental health, **Radesky J**, American Academy of Pediatrics National Conference and Exhibition, 09/2024, Orlando, FL

21. Healthy relationships with social media, from birth to adolescence, Radesky J, Montana Chapter AAP, 10/2024, Helena, MT

22. Social Media and Adolescent Mental Health, **Radesky J**, Vermont Child Health Improvement Program, 10/2024, Burlington, VT

**<u>Speaker</u>**

1. Digital Media and Parent-Child Interaction., Reach Out and Read, 05/2017, Denver, CO

2. A Pediatric Perspective on the Impact of Early Media Exposure, National Institute of Child Health and Development, 01/2018, Bethesda, MD

3. Differences in parent-toddler interactions when reading electronic versus print books, Reach Out and Read National Leadership Conference, 05/2018, Cincinnati, OH

4. Digital Media and Parent-Child Interaction, University of California - San Francisco Department of Pediatrics Grand Rounds, 06/2018, San Francisco, CA

5. Parent Technology Use and Parent-Child Interaction, Digitaler Alltag mit Kindren (Digital Everyday Life with Children) conference, Universitats-Kinderspital, 08/2018, Zurich, Switzerland

6. Parent Technology Use and Parent-Child Interaction, Public Health Ontario - Infant Mental Health, 10/2018, Ontario, Canada

7. How Early Childhood Programs Can Support Media Literacy Education, National Leadership Forum, Alliance for Media Literacy in Early Childhood. Erikson Institute, 01/2019, Chicago, IL

8. Screen Media Best Practices: Integrating Media Guidance into Parent-Child Work, ZERO TO THREE, 10/2019, Fort Lauderdale, FL

9. The Digital Playground: App Design, Data Collection, and Policy Implications, U.S. Federal Trade Commission COPPA Workshop, 10/2019, Washington, DC

10. Early use of old (and new) Media and Children's Cognitive Development., University of California - San Diego Department of Pediatrics (Welsh Lectureship), 01/2020, San Diego, CA

11. Digital Media and Parent-Child Interaction, Connecticut Children's Hospital Grant Rounds, 04/2020, Hartford, CT

12. How Digital Media are Shaping Children's Relationships with Parents and the World, ZERO TO THREE Board of Directors Annual Meeting, 05/2020, Washington, DC

13. Advocating for Children's Digital Environments, Reach Out and Read, 06/2020, Webinar

14. Digital Media, Parent-Child Interaction, and Social-emotional Development, Mind HK (Hong Kong Mental Health Conference), 11/2020, Hong Kong (virtual)

15. Advertising and Children, Institute for Digital Media and Child Development, 11/2020, New York, NY (virtual)

16. Demystifying Digital Design and its Impact on Parent-Child Interaction, ZERO TO THREE New York, 01/2021, New York, NY (virtual)

17. Families and Digital Media Use During COVID-19, Connecticut Children's Hospital, 03/2021, Hartford, CT

18. "Optimal Defaults" in Children's Digital Spaces: Relevance for Policy, Research, and Clinical Guidance, Children's Hospital of Philadelphia Grand Rounds, 04/2021, Philadelphia, PA

19. The Science Behind Why Pediatricians Prescribe Play, US Play Coalition National Conference, 04/2021, Virtual

20. The Digital Environment and Child Development: Sorting Facts from Fears, Pediatric Academic Societies, 05/2021, Virtual

21. The role of design and monetization in media's effect on child wellbeing, **Radesky J**, National Academy of Science, 02/2023, Washington, DC (virtual)

22. Strategic Science for Child Technology Policy, **Radesky J**, Designed with Kids in Mind Advocacy Coalition, 02/2023, Washington, DC

23. Spokesperson Training: Social Media and Mental Health, **Radesky J**, Training for AAP spokespeople, American Academy of Pediatrics, 08/2023, Washington, DC (virtual)

24. Social Media and Mental Health in Children and Adolescents, **Radesky J**, Training for pediatricians and mental health professionals, North Dakota Child Psychiatry Access Program, 09/2023, North Dakota, US (virtual)

25. Important Concepts in Social Media and Youth Mental Health, **Radesky J**, AAP COCM H-session, American Academy of Pediatrics, 10/2023, Washington, DC

26. Digital Media, Causality, and Mental Health, **Radesky J**, Invited workshop on social media, child wellbeing, and the law, Columbia Knight First Amendment Institute, 01/2024, New York, NY

27. The Evidence Base for Child Technology Regulation, **Radesky J**, Training for AAP leaders, American Academy of Pediatrics, 03/2024, Washington, DC (virtual)

28. Beyond Screen Time: Researching Child media Use Through Relational and Design Lenses, Radesky J, New York University, 05/2024, New York, NY (virtual)

29. Social Media and Youth Mental Health, **Radesky J**, Ascension Hospital Pediatric Grand Rounds, 06/2024, New Jersey (virtual)

30. Child Development in a Virtual World, **Radesky J**, National Academies of Science Engineering and Medicine, 09/2024, Washington, DC (virtual)

31. Social Media and Youth Mental Health, Radesky J, Tecnologico de Monterrey Medical School, 11/2024, Monterrey, Mexico (virtual)

**Panel**

1. Children and Technology, Common Sense Media, 02/2018, Washington, DC

2. What do children understand about IoT, and how are they vulnerable?, IoT of Toys Conference - Developing a US-EU Public Interest Strategy, 02/2018, Washington, DC

3. Hooked on Tech?, Family Online Safety Institute, 11/2018, Washington, DC

4. Senate Roundtable: Children and Media Research Advancement Act, United States Senate, 02/2019, Washington, DC

5. NSFK: Getting to Quality Content, Common Sense Media, 05/2019, Mountain View, CA

6. Mobile and Interactive Media Use by Children: Design and Policy Implications, Seton Hall Law School Privacy Conference, 11/2019, Newark, NJ

7. House of Representatives Round Table regarding the Children and Media Research Advancement Act, United States House of Representatives, 05/2020, Washington, DC

8. Thinking Beyond Screen Time: Developmental Processes and Design, New York Academy of Sciences, 07/2020, New York, NY (webinar)

9. How Do Dark Patterns Target Kids and Teens?, Federal Trade Commission Workshop on Dark Patterns in Technology Design, 04/2021, Washington, DC

10. Children with Special Needs During COVID-19, New York University, 05/2021, Virtual

11. Stealth Advertising and Children: Developmental Considerations, **Radesky J**, U.S. Federal Trade Commission, 10/2022, Washington, DC (virtual)

12. Roundtable with Surgeon General Vivek Murthy regarding Social Media and Youth Mental Health, **Radesky J**, U.S. Surgeon General's Office, 03/2023, Washington, DC (virtual)

13. New York Child Mental Health Summit: Keynote Panel on Youth and Social Media, **Radesky J**, New York State Governor's Office, 06/2023, New York, NY

14. Children and Social Media, **Radesky J**, Children's Health Fund, 07/2023, New York, NY (virtual)

15. Parenting and Media, **Radesky J**, Research presentation on parent-child relationships and media, Children and Screens: Institute for Digital Media and Child Development, 09/2023, Washington, DC

16. Commercialism and Childhood, **Radesky J**, Presentation on commercial influences in media, Children and Screens: Institute for Digital Media and Child Development, 09/2023, Washington, DC

17. Commercial Determinants of Child Health, **Radesky J**, Annual PRISM Social Media Research Conference, PRISM Institute, University of California San Francisco, 12/2023, San Francisco, CA

18. SAMHSA Mental Health Conference: School mental health panel, **Radesky J**, Substance Use and Mental Health Services Administration, 05/2024, Washington, DC

**<u>Seminar</u>**

1. Digital Media and Parent-Child Interaction, Georgetown University Developmental Science Colloquia, 04/2018, Washington, DC

2. Youth-centered approaches to researching media and child wellbeing, **Radesky J**, National Institutes of Mental Health Director's Innovation Speaker Series, 11/2024, Bethesda, MD

**Intramural Invited Presentation**

**<u>Keynote</u>**

1. Promoting Mental Wellbeing and Healthy Relationships with Social Media, **Radesky J**, University of Michigan Fundamentals of Nursing Conference, 05/2024, Ann Arbor, MI

**<u>Panel</u>**

1. Enhancing Your National Reputation, Michigan Medicine, Faculty Development, 09/2023, Ann Arbor, Michigan

## Publications/Scholarship

(Co-First Author *; Corresponding author **; Co-Last author ***)

## Peer-Reviewed

**<u>Journal Article</u>**

1. Danet M, Miller A, Weeks H, Kaciroti NA, **Radesky J**: Children aged 3-4 years were more likely to be given mobile devices for calming purposes if they had weaker overall executive functioning. *Acta Paediatrica*.111(7): 1383-1389, PM35238076

2. Suh B, Kirkorian H, Kucher S, Barr R, Torres C, **Radesky J**: Measuring Parents' Regulatory Media Use for Themselves and Their Children. *Frontiers in Developmental Psychology*. ,(In Press)

3. Sun K, Gelman S, **Radesky J**, Yip J, Schaub F: "Why is Everything in the Cloud?":Co-Designing Visual Cues Representing Data Processes with Children. *Interaction Design for Children*. ,(In Press)

4. Baughan A, Alsabeh D, **Radesky J**, Rich M, Hiniker A: Investigating Attention and Normative Dissociation in Children's Online Social Games. *Interaction Design for Children*. ,(In Press)

5. Oken E, Ning Y, Rifas-Shiman SL, **Radesky JS**, Rich-Edwards JW, Gillman MW: Associations of physical activity and inactivity before and during pregnancy with glucose tolerance. *Obstet Gynecol*.108(5): 1200-1207, 11/2006. PM17077243

6. **Radesky JS**, Oken E, Rifas-Shiman SL, Kleinman KP, Rich-Edwards JW, Gillman MW: Diet during early pregnancy and development of gestational diabetes. *Paediatr Perinat Epidemiol*.22(1): 47-59, 01/2008. PM18173784

7. Oken E, **Radesky JS**, Wright RO, Bellinger DC, Amarasiriwardena CJ, Kleinman KP, Hu H, Gillman MW: Maternal fish intake during pregnancy, blood mercury levels, and child cognition at age 3 years in a US cohort. *Am J Epidemiol*.167(10): 1171-1181, 05/2008. PM18353804

8. Johnson L, **Radesky J**, Zuckerman B: Cross-cultural parenting: reflections on autonomy and interdependence. *Pediatrics*.131(4): 631-633, 04/2013. PM23509169

9. **Radesky JS**, Zuckerman B, Silverstein M, Rivara FP, Barr M, Taylor JA, Lengua LJ, Barr RG: Inconsolable infant crying and maternal postpartum depressive symptoms. *Pediatrics*.131(6): e1857-e1864, 06/2013. PM23650295

10. Kistin CJ, **Radesky J**, Diaz-Linhart Y, Tompson MC, O'Connor E, Silverstein M: A qualitative study of parenting stress, coping, and discipline approaches among low-income traumatized mothers. *J Dev Behav Pediatr*.35(3): 189-196, 04/2014. PM24633062

11. **Radesky JS**, Kistin CJ, Zuckerman B, Nitzberg K, Gross J, Kaplan-Sanoff M, Augustyn M, Silverstein M: Patterns of mobile device use by caregivers and children during meals in fast food restaurants. *Pediatrics*.133(4): e843-e849, 04/2014. PM24616357

12. **Radesky JS**, Silverstein M, Zuckerman B, Christakis DA: Infant self-regulation and early childhood media exposure. *Pediatrics*.133(5): e1172-e1178, 05/2014. PM24733868

13. **Radesky JS**: The social-ecological context of media use and school success. *J Pediatr (Rio J)*.91(4): 318-319, 01/2015. PM25976266

14. **Radesky JS**, Schumacher J, Zuckerman B: Mobile and interactive media use by young children: the good, the bad, and the unknown. *Pediatrics*.135(1): 1-3, 01/2015. PM25548323

15. **Radesky JS**, Kistin C, Eisenberg S, Gross J, Block G, Zuckerman B, Silverstein M: Parent Perspectives on Their Mobile Technology Use: The Excitement and Exhaustion of Parenting While Connected. *J Dev Behav Pediatr*.37(9): 694-701, 01/2016. PM27802256

16. **Radesky JS**, Peacock-Chambers E, Zuckerman B, Silverstein M: Use of Mobile Technology to Calm Upset Children: Associations With Social-Emotional Development. *JAMA Pediatr*.170(4): 397-399, 04/2016. PM26928293

17. **Radesky JS**, Carta J, Bair-Merritt M: The 30 Million-Word Gap: Relevance for Pediatrics. *JAMA Pediatr*.170(9): 825-826, 09/2016. PM27379489

18. **Radesky JS**, Christakis DA: Increased Screen Time: Implications for Early Childhood Development and Behavior. *Pediatr Clin North Am*.63(5): 827-839, 10/2016. PM27565361

19. Reid Chassiakos YL, **Radesky J**, Christakis D, Moreno MA, Cross C, COUNCIL ON COMMUNICATIONS AND MEDIA: Children and Adolescents and Digital Media. *Pediatrics*.138(5)11/2016. PM27940795

20. COUNCIL ON COMMUNICATIONS AND MEDIA: Media Use in School-Aged Children and Adolescents. *Pediatrics*.138(5)11/2016. PM27940794

21. COUNCIL ON COMMUNICATIONS AND MEDIA: Media and Young Minds. *Pediatrics*.138 (5)11/2016. PM27940793

22. **Radesky JS**, Eisenberg S, Kistin CJ, Gross J, Block G, Zuckerman B, Silverstein M: Overstimulated Consumers or Next-Generation Learners? Parent Tensions About Child Mobile Technology Use. *Ann Fam Med*.14(6): 503-508, 11/2016. PM28376436

23. Peacock-Chambers E, **Radesky JS**, Parker SE, Zuckerman B, Lumeng JC, Silverstein M: Infant Regulatory Problems and Obesity in Early Childhood. *Acad Pediatr*.17(5): 523-528, 07/2017. PM28669453

24. Coyne SM, **Radesky J**, Collier KM, Gentile DA, Linder JR, Nathanson AI, Rasmussen EE, Reich SM, Rogers J: Parenting and Digital Media. *Pediatrics*.140(Suppl 2): S112-S116, 11/2017. PM29093044

25. **Radesky JS**, Leung C, Appugliese D, Miller AL, Lumeng JC, Rosenblum KL: Maternal mental representations of the child and mobile phone use during parent-child mealtimes. *Journal of Developmental Behavioral Pediatrics*.39(4)01/2018

26. McDaniel BT, **Radesky JS**: Technoference: Parent Distraction With Technology and Associations With Child Behavior Problems. *Child Dev*.89(1): 100-109, 01/2018. PM28493400

27. Cliff DP, Howard SJ, **Radesky JS**, McNeill J, Vella SA: Early Childhood Media Exposure and Self-Regulation: Bidirectional Longitudinal Associations. *Acad Pediatr*.18(7): 813-819, 01/2018. PM29704999

28. **Radesky J**, Leung C, Appugliese D, Miller AL, Lumeng JC, Rosenblum KL: Maternal Mental Representations of the Child and Mobile Phone Use During Parent-Child Mealtimes. *J Dev Behav Pediatr*.39(4): 310-317, 05/2018. PM29485515

29. Munzer TG, Miller AL, Peterson KE, Brophy-Herb HE, Horodynski MA, Contreras D, Sturza J, Lumeng JC, **Radesky J**: Media Exposure in Low-Income Preschool-Aged Children Is Associated with Multiple Measures of Self-Regulatory Behavior. *J Dev Behav Pediatr*.39(4): 303-309, 05/2018. PM29538186

30. McDaniel BT, **Radesky JS**: Technoference: longitudinal associations between parent technology use, parenting stress, and child behavior problems. *Pediatr Res*.84(2): 210-218, 08/2018. PM29895837

31. Yogman M, Garner A, Hutchinson J, Hirsh-Pasek K, Golinkoff RM, COMMITTEE ON PSYCHOSOCIAL ASPECTS OF CHILD AND FAM, COUNCIL ON COMMUNICATIONS AND MEDIA: The Power of Play: A Pediatric Role in Enhancing Development in Young Children. *Pediatrics*.142(3)09/2018. PM30126932

32. **Radesky J**, Moreno MA: How to Consider Screen Time Limits…for Parents. *JAMA Pediatr*.172(10): 996, 10/2018. PM30177990

33. Domoff SE, **Radesky JS**, Harrison K, Riley H, Lumeng JC, Miller AL: A Naturalistic Study of Child and Family Screen Media and Mobile Device Use. *J Child Fam Stud*.28(2): 401-410, 02/2019. PM31105418

34. Hiniker A, **Radesky JS**, Livingstone S, Blum-Ross A: Moving Beyond" The Great Screen Time Debate" in the Design of Technology for Children. *Extended Abstracts of the 2019 CHI Conference on Human Factors in Computing Systems*.n/a: 1-6, 05/2019

35. Lane R, **Radesky J**: Digital Media and Autism Spectrum Disorders: Review of Evidence, Theoretical Concerns, and Opportunities for Intervention. *J Dev Behav Pediatr*.40(5): 364-368, 06/2019. PM30973425

36. Munzer TG, Miller AL, Weeks HM, Kaciroti N, **Radesky J**: Parent-Toddler Social Reciprocity During Reading From Electronic Tablets vs Print Books. *JAMA Pediatr*.173(11): 1076-1083, 11/2019. PM31566689

37. Barr R, Kirkorian H, **Radesky J**, Coyne S, Nichols D, Blanchfield O, Rusnak S, Stockdale L, Ribner A, Durnez J, Epstein M, Heimann M, Koch F-S, Sundqvist A, Birberg-Thornberg U, Konrad C, Slussareff M, Bus A, Bellagamba F, Fitzpatrick C: Beyond Screen Time: A Synergistic Approach to a More Comprehensive Assessment of Family Media Exposure During Early Childhood. *Front Psychol*.11: 1283, 01/2020. PM32754078

38. **Radesky J**, Chassiakos YL R, Ameenuddin N, Navsaria D, COUNCIL ON COMMUNICATION AND MEDIA: Digital Advertising to Children. *Pediatrics*.146(1)07/2020. PM32571990

39. **Radesky JS**, Weeks HM, Ball R, Schaller A, Yeo S, Durnez J, Tamayo-Rios M, Epstein M, Kirkorian H, Coyne S, Barr R: Young Children's Use of Smartphones and Tablets. *Pediatrics*.146(1)07/2020. PM32482771

40. Kiefner-Burmeister A, Domoff S, **Radesky J**: Feeding in the Digital Age: An Observational Analysis of Mobile Device Use during Family Meals at Fast Food Restaurants in Italy. *Int J Environ Res Public Health*.17(17)08/2020. PM32825541

41. Domoff SE, Borgen AL, **Radesky JS**: Interactional theory of childhood problematic media use. *Human Behavior and Emerging Technologies*.2(4)10/2020. PM36381426

42. Zhao F, Egelman S, Weeks HM, Kaciroti N, Miller AL, **Radesky JS**: Data Collection Practices of Mobile Applications Played by Preschool-Aged Children. *JAMA Pediatr*.174(12): e203345, 12/2020. PM32897299

43. Torres C, **Radesky JS**, Levitt KJ, McDaniel BT: Is it fair to simply tell parents to use their phones less? A qualitative analysis of parent phone use. *Acta Paediatrica*.110: 2594-2596, 04/2021. PM33905125

44. Yeo SL, Schaller A, Robb MB, **Radesky JS**: Frequency and Duration of Advertising on Popular Child-Directed Channels on a Video-Sharing Platform. *JAMA Netw Open*.4(5): e219890, 05/2021. PM33983402

45. Sun K, **Radesky JS**, Gelman S, Sugatan C, Schaub F: They see you're a girl if you pick a pink robot with a skirt": How Children Conceptualize Data Processing and Digital Privacy Risks. *Proceedings of the 2021 CHI Conference on Human Factors in Computing Systems*.2021: 1-34, 05/2021

46. **Radesky JS**: Establishing Early Literacy Habits in a Profit-Driven Digital World. *Pediatrics*.147 (6)06/2021. PM34031230

47. Hiniker A, Wang A, Tran J, Zhang M, **Radesky J**, Sobel K, Hong S: Can Conversational Agents Change the Way Children Talk to People?. *Proceedings of Interaction Design and Children Conference 2021*.2021: 338-349, 06/2021

48. DeHudy A, **Radesky J**, Schellpfeffer N, Ambrose M, Hashikawa AN: Exploring Camp Policies and Leadership Opinions on Digital Media Use in Camps. *Journal of Youth Development*.16(4): 88-102, 10/2021

49. Sun K, Zou Y, **Radesky J**, Brooks C, Schaub F: Child Safety in the Smart Home: Parents' Perceptions, Needs, and Mitigation Strategies. *Proceedings of the ACM on Human-Computer Interaction*.5 (CSCW2)10/2021

50. Munzer TG, Miller AL, Yeo S, Wang Y, McCaffery H, Kaciroti N, **Radesky J**: Parent Verbalizations and Toddler Responses With Touchscreen Tablet Nursery Rhyme Apps. *Pediatrics*.148(6)12/2021. PM34841433

51. **Radesky J**, Hiniker A: From Moral Panic to Systemic Change: Making Child-Centered Design the Default. *Int J Child Comput Interact*.3103/2022. PM35340408

52. **Radesky JS**, Seyfried JL, Weeks HM, Kaciroti N, Miller AL: Video-Sharing Platform Viewing Among Preschool-Aged Children: Differences by Child Characteristics and Contextual Factors. *Cyberpsychol Behav Soc Netw*.25(4): 230-236, 04/2022. PM35426731

53. Levitt KJ, Munzer T, Torres C, Schaller A, McCaffery H, **Radesky JS**: Remote and Hybrid Schooling During COVID-19: Associations with Child Behavior and Sleep. *J Dev Behav Pediatr*.43(5): e288-e295, 06/2022. PM35583945

54. **Radesky J**, Hiniker A, McLaren C, Akgun E, Schaller A, Weeks HM, Campbell S, Gearhardt AN: Prevalence and Characteristics of Manipulative Design in Mobile Applications Used by Children. *JAMA Netw Open*.5(6): e2217641, 06/2022. PM35713902

55. Meyer MF, Broman AT, Gnadt SE, Sharma S, Antony KM: A standardized post-cesarean analgesia regimen reduces postpartum opioid use. *J Matern Fetal Neonatal Med*.35(25): 8267-8274, 12/2022. PM34445918

56. Munzer T, Torres C, Domoff SE, Levitt KJ, McCaffery H, Schaller A, **Radesky JS**: Child Media Use During COVID-19: Associations with Contextual and Social-Emotional Factors. *J Dev Behav Pediatr*.43(9): e573-e580, 12/2022. PM36106745

57. **Radesky JS**, Kaciroti N, Weeks HM, Schaller A, Miller AL: Longitudinal Associations Between Use of Mobile Devices for Calming and Emotional Reactivity and Executive Functioning in Children Aged 3 to 5 Years. *JAMA Pediatr*.177(1): 62-70, 01/2023. PM36508199

58. Hamp N, DeHaan SL, Cerf CM, **Radesky JS**: Primary Care Pediatricians' Perspectives on Autism Care. *Pediatrics*.151(1)01/2023. PM36550067

59. Kucirkova NI, Livingstone S, **Radesky JS**: Faulty screen time measures hamper national policies: here is a way to address it. *Front Psychol*.14: 1243396, 01/2023. PM37575444

60. Gale M, Shawcroft J, Coyne SM, Brown S, **Radesky J**: McDonalds, Mom, Media, and Me: An Observational Study of Parent and Adolescent Media Use During Public Family Mealtime. *Translational Issues in Psychological Science*.9(3): 216-227, 01/2023

61. Moreno MA, **Radesky J**: Putting Forward a New Narrative for Adolescent Media: The American Academy of Pediatrics Center of Excellence on Social Media and Youth Mental Health. *J Adolesc Health*.73 (2): 227-229, 08/2023. PM37227337

62. McDaniel BT, Pater J, Cornet V, Mughal S, Reining L, Schaller A, **Radesky J**, Drouin M: Parents' Desire to Change Phone Use: Associations with Objective Smartphone Use and Feelings About Problematic Use and Distraction. *Comput Human Behav*.14811/2023. PM37842187

63. **Radesky J**: AI, Parenting, and Child Development. *J Dev Behav Pediatr*.45(1): e2-e3, 01/2024. PM38347670

64. Kucirkova N, Livingstone S, **Radesky J**: Advancing the understanding of children's digital engagement: responsive methodologies and ethical considerations in psychological research. *Front Psychol*.15: 1285302, 01/2024. PM38716271

65. Griffith SF, Hart KC, Casanova SM, Goodman AC, **Radesky JS**, Forehand R, Bagner DM: Promoting Healthy Screen Media Use in Young Children With Externalizing Behavior Problems Through an Adapted Parenting Intervention: Results of an Open Trial. *Cognitive and Behavioral Practice*.01/2024

66. McDaniel BT, Uva S, Pater J, Cornet V, Drouin M, **Radesky J**: Daily smartphone use predicts parent depressive symptoms, but parents' perceptions of responsiveness to their child moderate this effect. *Front Dev Psychol*.201/2024. PM39391205

67. McDaniel BT, **Radesky J**, Pater J, Galovan AM, Harrison A, Cornet V, Reining L, Schaller A, Drouin M: Heavy users, mobile gamers, and social networkers: Patterns of objective smartphone use in parents of infants and associations with parent depression, sleep, parenting, and problematic phone use. *Hum Behav Emerg Technol*.2024(1)01/2024. PM39483684

68. Sun K, Li J, Zou Y, **Radesky J**, Brooks C, Schaub F: Unfulfilled Promises of Child Safety and Privacy: Portrayals and Use of Children in Smart Home Marketing. *Proceedings of the ACM on Human-Computer Interaction*.8(CSCW1)04/2024

69. **Radesky J**, Bridgewater E, Black S, O'Neil A, Sun Y, Schaller A, Weeks HM, Campbell SW: Algorithmic Content Recommendations on a Video-Sharing Platform Used by Children. *JAMA Netw Open*.7 (5): e2413855, 05/2024. PM38809550

70. Torres C, Schaller A, Munzer T, Levitt KJ, **Radesky JS**: Experience of Children With Special Education Needs During COVID-19. *Journal of Developmental and Behavioral Pediatrics*.45(3): e251-e256, 05/2024

71. Munzer TG, Miller AL, Weeks HM, Kaciroti N, **Radesky J**: Greater mobile device-prompted phone pickups are associated with daily parent stress. *Acta Paediatr*.113(8): 1868-1875, 08/2024. PM38698532

72. Moreno MA, **Radesky JS**: Benefits and Harms of Proposed Social Media Legislation. *JAMA Pediatr*.178(9): 857-858, 09/2024. PM39037793

73. **Radesky JS**, Weeks HM, McCaffery H, Kaciroti N, Lumeng JC, Miller AL: Maternal Mobile Device Use and Mealtime Interactions With Children. *J Dev Behav Pediatr*.10/2024. PM39377734

## Books

1. Barr R, Kirkorian H, Coyne S, **Radesky J**. *Early Childhood and the Digital World*. Cambridge University Press, Cambridge, (In Press)

2. **Radesky JS**, Kistin CE. *Dixon and Stein's Encounters With Children, 5th Ed*. 5, Elselvier, Amsterdam, Netherlands, (2024)

## Chapters

1. **Radesky JS**, Zuckerman B: Preventing Early Infant Sleep and Crying Problems and Postnatal Depression. In Cabana MD *2015 Year Book of Pediatrics.*,Elsevier, Philadelphia, PA, (2015)

2. **Radesky J**, Kucirkova N: Digital media and young children's learning: How early is too early and why? Review of research on 0–2-year-olds.. In Sheehy K, Holliman A Ed. *Education and New Technologies*,Routledge, Oxford UK, (2017)

3. **Radesky JS**, Zuckerman B: Learning from apps in the home: Parents and play.. In Kucirkova N *Apps, Technology, and Younger Learners.*,Routledge, Oxford UK, (2017)

4. Chassiakos YL R, **Radesky J**, Dimitri C, Moreno MA, Cross C: Children and Adolescents and Digital Media. *Pediatric Clinical Practice Guidelines & Policies*,American Academy of Pediatrics (AAP), (2017), 567 -584

5. **Radesky JS**: Digital Media. In Augustyn M, Zuckerman B Ed. *Zuckerman Parker Handbook of Developmental Behavioral Pediatrics.*,Wolters Kluwer, (2018)

6. **Radesky JS**, Domoff S: Mobile Media and Parenting.. In Hobbs R, Mihailidis P Ed. *The International Encyclopedia of Media Literacy.*,Wiley-Blackwell, (2019)

7. **Radesky JS**: Mobile Media and Parent-Child Interaction. In Donohue C *Exploring key issues in early childhood and technology: Evolving perspectives and innovative approaches.*,Routledge, (2019)

8. **Radesky J**: Should we give different media guidance for young children with ADHD, autism?. *Pediatric Collections: Autism Spectrum Disorder*,American Academy of Pediatrics (AAP), (2020), 372-373

9. **Radesky JS**, Rosenblum K: A relationship-based framework for early childhood media use. *Contemporary Issues in Perinatal Education: Knowledge into Practice*,(2022), 188-197

## Software / Apps

1. **Radesky J**, Tomopoulos S, Moreno M. American Academy of Pediatrics Family Media Plan. Update of American Academy of Pediatrics Family Media Plan, an evidence-informed resource for families. 07/2022

## Non-Peer Reviewed

### Case Reports

1. **Radesky JS**, Sugar NF: Femur fracture in an infant. *BMJ*.338: b1583, 05/2009. PM19439767

2. **Radesky J**, Reddy A, Steiner N, Augustyn M: "When the prescription pad is not enough": attention-deficit hyperactivity disorder management 2.0. *J Dev Behav Pediatr*.34(2): 138-140, 02/2013. PM23369960

3. Radesky J, Reddy A, Steiner N, Augustyn M: "When the Prescription Pad Is Not Enough": Attention-Deficit Hyperactivity Disorder Management 2.0. *J Dev Behav Pediatr*.38 Suppl 1: S32-S34, 01/2017. PM28141715

4. Herzig L, de Lacy N, Capone G, **Radesky J**: Intellectual Disability and Psychotropic Medications. *J Dev Behav Pediatr*.39(7): 591-593, 09/2018. PM30134288

5. Fogler J, Kuhn J, Prock L, **Radesky J**, Gonzalez-Heydrich J: Diagnostic Uncertainty in a Complex Young Man: Autism Versus Psychosis. *J Dev Behav Pediatr*.40(1): 72-74, 01/2019. PM30601773

6. Quist M, Chopp D, Wilson CM, **Radesky J**: Ineffective Homeschooling in a Child with a Learning Disability. *J Dev Behav Pediatr*.40(2): 152-153, 01/2019. PM30648985

7. Fogler JM, Stein D, Barbaresi WJ, Bridgemohan C, Steinbauer-Schütz A, Dirmhirn A, Holzinger D, **Radesky J**, Fellinger J: High-Functioning Autism, Severe Anxiety, and Bullying in a 26 Year Old. *J Dev Behav Pediatr*.40(4): 312-314, 05/2019. PM31008802

### Commentary on Website

1. **Radesky JS**: PBS Parents Blog, 01/2018

2. **Radesky JS**: The Stuck Inside Guide Blog, 01/2020. ,https://www.melissaanddoug.com/blogpost/?postId=our-best-play-ideas-for-when-kids-are-stuck-at-home

### Comparative Study

1. Kleinman KP, Oken E, **Radesky JS**, Rich-Edwards JW, Peterson KE, Gillman MW: How should gestational weight gain be assessed? A comparison of existing methods and a novel method, area under the weight gain curve. *Int J Epidemiol*.36(6): 1275-1282, 12/2007. PM17715174

### Editorial

1. **Radesky JS**, Christakis DA: Keeping Children's Attention: The Problem With Bells and Whistles. *JAMA Pediatr*.170(2): 112-113, 02/2016. PM26720712

2. Silverstein M, **Radesky J**: Embrace the Complexity: The US Preventive Services Task Force Recommendation on Screening for Autism Spectrum Disorder. *JAMA*.315(7): 661-662, 02/2016. PM26881368

3. Erkoboni D, **Radesky J**: The Elephant in the Examination Room: Addressing Parent and Child Mobile Device Use as a Teachable Moment. *J Pediatr*.198: 5-6, 07/2018. PM29936972

4. **Radesky J**: Digital Media and Symptoms of Attention-Deficit/Hyperactivity Disorder in Adolescents. *JAMA*.320(3): 237-239, 07/2018. PM30027231

5. **Radesky JS**: Smartphones and Children: Relationships, Regulation, and Reasoning. *Cyberpsychol Behav Soc Netw*.23(6): 361-362, 06/2020. PM32511012

6. **Radesky JS**: Young children's online-offline balance. *Acta Paediatr*.110(3): 748-749, 03/2021. PM33200422

**Interview**

1. **Radesky JS**, Rosenblum K, Cousino M, Marcus S: Thrive With Your Family Webinar, 01/2020. ,https://www.mottchildren.org/thrive-with-your-family

2. **Radesky JS**, Tribble A, Marcus S: Back2School Facebook Live, 01/2020

**Letter**

1. Yuan N, Weeks HM, Ball R, Newman MW, Chang Y-J, **Radesky JS**: How much do parents actually use their smartphones? Pilot study comparing self-report to passive sensing. *Pediatr Res*.86(4): 416-418, 10/2019. PM31195401

**Note**

1. Oken E, **Radesky JS**, Wright RO, Bellinger DC, Amarasiriwardena CJ, Kleinman KP, Hu H, Gillman MW: Maternal fish intake during pregnancy, blood mercury levels, and child cognition at age 3 years in a US cohort. *Obstetrical and Gynecological Survey*.63(9): 557-558, 09/2008

**Other**

1. Henderson D, Bailes T, Sturza J, Robb MB, **Radesky JS**, Munzer TG**: YouTube for young children: what are infants and toddlers watching on the most popular video-sharing app?. *Frontiers in Developmental Psychology*.2: 1335922

2. **Radesky JS**, Schaller A, Yeo SL, Weeks HM, Robb MB: Young kids and YouTube: How ads, toys, and games dominate viewing, 01/2020. ,https://www.commonsensemedia.org/sites/default/files/research/report/2020_youngkidsyoutube-report_final-release_forweb_1.pdf

**Patient Education Material**

1. **Radesky JS**, Schaller A, Yeo SL, Robb MB: How to be a YouTube Sleuth, 01/2020

**Video**

1. Albright D, Malas N, Cousino M, **Radesky J**: Thrive with your Family: Episode 5- Children with Chronic Illness During the Pandemic, 05/2020. ,https://www.youtube.com/watch?v=xAh3-ZGURCA

## Abstract/Posters

1. Ogur BR, Hirsh D, Baumer N, Casey C, Epstein J, Foster D, Himes N, **Radesky J**, Siegel J, Wright J, Bor DH: Tales of the Cambridge integrated clerkship, *JOURNAL OF GENERAL INTERNAL MEDICINE*.20, : 36-37, 2005

2. Ogur B, Baumer N, Casey C, Graubard M, Podgurski L, **Radesky J**, Siegel J, Tang M, Gutterson WA, Hirsh D: Themes of longitudinal learning, *JOURNAL OF GENERAL INTERNAL MEDICINE*.22, : 190-191, 2007

3. **Radesky JS**, Zuckerman B, Silverstein M, Rivara FP, Barr M, Taylor J, Lengua LJ, Barr RG: Unsoothable infant crying and maternal postpartum depression, Oral Presentation, Pediatric Academic Societies Annual Meeting, Boston, MA, 2012

4. **Radesky JS**, Silverstein M, Zuckerman B, Christakis DA: Behavioral antecedents of early media exposure, Oral Presentation, Pediatric Academic Societies Annual Meeting, Washington, DC, 2013

5. **Radesky JS**, Zuckerman B, Silverstein M: Are infants with self-regulation problems differentially susceptible to early parenting?, Oral Presentation, Pediatric Academic Societies Annual Meeting, Vancouver, BC Canada, 2014

6. **Radesky JS**, Kistin CJ, Zuckerman B, Nitzberg K, Gross J, Kaplan-Sanoff M, Augustyn M, Silverstein M: Patterns of mobile device use by caregivers and young children during fast food meals, Oral Presentation, Pediatric Academic Societies Annual Meeting, Vancouver, BC Canada, 2014

7. **Radesky JS**, Miller AL, Rosenblum KL, Chen Y, Kaciroti N, Lumeng J: Maternal mobile device use during a parent-child interaction task, Oral Presentation, Pediatric Academic Societies Annual Meeting, Vancouver, BC Canada, 2014

8. **Radesky JS**, Eisenberg S, Kistin C, Zuckerman B, Silverstein M: Parent views regarding mobile device use by young children: Implications for anticipatory guidance, Oral Presentation, Pediatric Academic Societies Annual Meeting, San Diego, CA, 2015

9. **Radesky JS**, Domoff S, Sturza J, Lumeng J, Miller A: Modifiers of parent-child interaction during digital media use, Oral Presentation, Pediatric Academic Societies Annual Meeting, Baltimore, MD, 2016

10. McDaniel B, **Radesky JS**: Technology interference in parent-child activities: Bidirectional associations with internalizing and externalizing child behavior, Poster, Society for Research in Child Development Special Topics Meeting, Irvine, CA, 2016

11. Munzer T, **Radesky JS**: Preschooler screen media use is associated with multiple measures of self-regulation, Poster, Pediatric Academic Societies, San Francisco CA, 2017

12. DeHudy A, Hashikawa AN, Ambrose M, **Radesky J**: Unplugging and Learning: Benefits and drawbacks of digital media use while at summer camp, Poster, Pediatric Academic Societies Annual Meeting, Toronto, CA, 2018

13. **Radesky JS**, Weeks H, Yuan N, Ho T, Chung S, Newman M: How do parents of young children use their smartphones? Implications for parent-child interaction, Oral Presentation, American Psychological Association Mind, Tech, & Society Conference, Washington DC, 2018

14. Munzer T, Miller A, Weeks H, Kaciroti N, Lumeng J, **Radesky J**: Parent-toddler reading engagement differs when reading electronic versus print books, Oral Presentation, Pediatric Academic Societies, Toronto, Canada, 2018

15. Erkoboni D, Caputo C, **Radesky J**: Defining Clinician-Librarian Partnerships to Promote Constructive Digital Media Use for At-risk Youth, Poster, Pediatric Academic Societies, Toronto, Canada, 2018

16. Hiniker A, Lee B, Kientz JA, **Radesky JS**: Let's Play! Digital and Analog Play between Preschoolers and Parents, Oral Presentation, CHI: Computer-Human Interaction, Montreal, Canada, 2018, *Proceedings of the 2018 CHI Conference on Human Factors in Computing Systems*.: 1-13

17. Meyer M, Adkins V, Yuan N, Chang S, **Radesky J**: Advertising in young children's apps: A content analysis, Poster, Pediatric Academic Societies, Toronto, Canada, 2018

18. Munzer TG, Miller AL, Weeks HW, **Radesky JS**: Predictors of positive parent-child interactions around digital media, Oral Presentation, Society for Research in Child Development, Baltimore, MD, 2019

19. McDaniel B, **Radesky JS**: The Distracted Family: Associations between Parent Distraction with Technology, Parenting, and Child Distraction with Technology, Oral Presentation, Society for Research in Child Development, Baltimore, MD, 2019

20. Meyer M, McLaren C, **Radesky J**: Educational quality of children's apps: A content analysis, Oral Presentation, Pediatric Academic Societies, Baltimore, MD, 2019

21. Hiniker A, **Radesky JS**, Livingstone S, Blum-Ross A: Moving Beyond" The Great Screen Time Debate" in the Design of Technology for Children, Oral Presentation, CHI: Computer-Human Interaction, Glasgow, UK, 2019, *Extended Abstracts of the 2019 CHI Conference on Human Factors in Computing Systems*.: 1-6

22. **Radesky JS**, McDaniel B: Longitudinal associations between early childhood externalizing behavior, parenting stress, and media use, Oral Presentation, Society for Research in Child Development, Baltimore, MD, 2019

23. Sun K, Sugatan C, Afnan T, Simon H, Gelman SA, **Radesky JS**, Schaub F: "They See You're a Girl if You Pick a Pink Robot with a Skirt": A Qualitative Study of How Children Conceptualize Data Processing and Digital Privacy Risks, *CHI*.: 687:1-687:1, 2021

24. Torres C, Levitt K, Munzer T, Schaller A, **Radesky JS**: Experience of Michigan Children with Special Education Needs during COVID-19, Poster, Society of Developmental and Behavioral Pediatrics, Austin, TX, 2021

25. Munzer TG, Miller A, Wang Y, Kaciroti N, **Radesky J**: Tablets, toddlers, and tantrums: The immediate effects of tablet device play, Oral Presentation, International Congress for Infant Studies, Virtual, 2021

26. **Radesky J**: Parent smartphone use and parent-child interaction, Oral Presentation, National Council on Family Relations, Minneapolis, MN, 2022

27. Landesman R, **Radesky J**, Hiniker A: Let Kids Wonder, Question and Make Mistakes: How the Designers of Children's Technology Think about Child Well-being, *Proceedings of IDC 2023 - 22nd Annual ACM Interaction Design and Children Conference: Rediscovering Childhood*.: 310-321, 2023

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (*pro hac vice*)
bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**NOTICE OF MOTION AND MOTION FOR SECOND PRELIMINARY INJUNCTION**<br><br>Date: January 23, 2025<br>Time: 9:00 AM<br>Dept.: Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

**TO THE COURT, THE PARTIES AND ALL ATTORNEYS OF RECORD:**

PLAINTIFF NETCHOICE, LLC d/b/a NetChoice moves for a preliminary injunction under Fed. R. Civ. P. 65 before the Honorable Beth Labson Freeman sitting in Courtroom 3 of the United States District Court for the Northern District of California located at San Jose, California, at the date and time stated above, or as soon as the matter may be heard.

DATED: November 1, 2024

DAVIS WRIGHT TREMAINE LLP

By: *<u>/s/ Ambika Kumar</u>*
Ambika Kumar

Attorneys for Plaintiff
NetChoice LLC, d/b/a NetChoice



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

**TABLE OF CONTENTS**

**Page**


TABLE OF AUTHORITIES ..... iii

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 3

A. The Internet Is A Vibrant Forum For Speech ..... 3

B. California Internet Users, Including Children, Have Long Been Protected By State And Federal Privacy Laws ..... 4

C. AB 2273 Attempts To Censor The Internet Under The Guise Of Privacy. ..... 5

D. The First Preliminary Injunction ..... 8

E. The Amended Complaint ..... 9

III. LEGAL STANDARDS ..... 10

A. Preliminary Injunction Standard ..... 10

B. Standard Governing Facial Relief ..... 10

IV. NETCHOICE IS LIKELY TO PREVAIL ON THE MERITS OF ITS FIRST AMENDMENT CLAIMS. ..... 11

A. The Act's Regulations Are Facially Invalid Because They Unconstitutionally Burden Online Services Based On The Content They Publish. ..... 11

B. The Individual Provisions Are Each Independently Facially Unconstitutional To The Extent NetChoice Challenges Them. ..... 14

1. Policy-enforcement mandate (challenged as to specific applications) ..... 14

2. Information-use restrictions (challenged as to specific applications) ..... 15

3. "Dark pattern" restriction (challenged as to specific applications) ..... 17

4. Age-estimation mandate (challenged as to all applications) ..... 19

C. The Individual Provisions Are Vague. ..... 20

D. The Individual Provisions Violate The First Amendment As Applied To NetChoice's Members. ..... 23

V. THE ALREADY-INVALIDATED DPIA PROVISIONS ARE NOT SEVERABLE FROM THE REGULATORY PROVISIONS OF THE ACT. ..... 23

A. The DPIA Provisions Are Not Volitionally Severable Because They Were Critical To The Act's Passage. ..... 24






DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

B. The DPIA Provisions Are Not Functionally Severable Because They Effect The Act's Focus On Compliance ..... 25

VI. NETCHOICE IS LIKELY TO PREVAIL ON ITS OTHER CLAIMS. ..... 27

A. Section 230 Preemption ..... 27

B. COPPA Preemption ..... 28

C. The Dormant Commerce Clause. ..... 28

VII. THE OTHER PRELIMINARY INJUNCTION FACTORS ARE MET. ..... 29

VIII. CONCLUSION ..... 30



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ACLU v. Mukasey*,
534 F.3d 181 (3d Cir. 2008) ........ 20, 22, 23

*Acosta v. City of Costa Mesa*,
718 F.3d 800 (9th Cir. 2013) ........ 23, 24

*Airbnb, Inc. v. City of Boston*,
386 F. Supp. 3d 113 (D. Mass. 2019) ........ 27

*Am. Trucking Ass'n v. City of L.A.*,
559 F.3d 1046 (9th Cir. 2009) ........ 29

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2024) ........ 10, 11, 18, 20

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) ........ 20

*Ass'n for Accessible Meds. v. Ellison*,
704 F. Supp. 3d 947 (D. Minn. 2023) ........ 29

*Backpage.com, LLC v. Hoffman*,
2013 WL 4502097 (D.N.J. Aug. 20, 2013) ........ 27

*Backpage.com, LLC v. McKenna*,
881 F. Supp. 2d 1262 (W.D. Wash. 2012) ........ 27

*Barlow v. Davis*,
72 Cal. App. 4th 1258 (1999) ........ 25

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ........ 27, 28

*Barr v. Am. Ass'n of Pol. Consultants*,
591 U.S. 610 (2020) ........ 11

*Bd. of Osteopathic Exam'rs v. Bd. of Med. Exam'rs*,
53 Cal. App. 3d 78 (1975) ........ 26

*Boos v. Barry*,
485 U.S. 312 (1988) ........ 12, 18

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........ 10, 17, 19, 22



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Bullfrog Films, Inc. v. Wick*,
847 F.2d 502 (9th Cir. 1988) .......... 21

*Butcher v. Knudsen*,
38 F.4th 1163 (9th Cir. 2022) .......... 21

*Cal. Teachers Ass'n v. State Bd. of Educ.*,
271 F.3d 1141 (9th Cir. 2001) .......... 20

*CCIA v. Paxton*,
2024 WL 4051786 (W.D. Tex. Aug. 30, 2024) .......... 23, 27, 28

*Citizens United v. FEC*,
558 U.S. 310 (2010) .......... 14, 16

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022) .......... 11, 12

*City of L.A. v. Patel*,
576 U.S. 409 (2015) .......... 16, 18

*Cnty. of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal. 2017) .......... 29

*Counterman v. Colorado*,
600 U.S. 66 (2023) .......... 22

*Crosby v. NFTC*,
530 U.S. 363 (2000) .......... 27

*CTIA v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) .......... 29

*Cultiva La Salud v. California*,
89 Cal. App. 5th 868 (2023) .......... 25

*Cuviello v. City of Vallejo*,
944 F.3d 816 (9th Cir. 2019) .......... 29

*DoorDash, Inc. v. City of N.Y.*,
--- F. Supp. 3d ----, 2024 WL 4276245 (S.D.N.Y. Sept. 24, 2024) .......... 16

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982) .......... 28

*Elrod v. Burns*,
427 U.S. 347 (1976) .......... 29

*Fair Hous. Council of San Fernando Valley v. Roommates.com LLC*,
521 F.3d 1157 (9th Cir. 2008) (en banc) .......... 27



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Family PAC v. McKenna*,
685 F.3d 800 (9th Cir. 2012) ........ 14

*Foti v. City of Menlo Park*,
146 F.3d 629 (9th Cir. 1998) ........ 22

*Free Speech Coal. v. Reno*,
198 F.3d 1083 (9th Cir. 1999), *aff'd*, 535 U.S. 234 (2002) ........ 22

*Garcia v. City of L.A.*,
11 F.4th 1113 (9th Cir. 2021) ........ 16, 17, 18

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ........ 23

*H.K. ex rel. Farwell v. Google LLC*,
595 F. Supp. 3d 702 (C.D. Ill. 2022) ........ 28

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) ........ 21, 23

*Hotel Emps. & Rest. Emps. Int'l Union v. Davis*,
21 Cal. 4th 585 (1999) ........ 23, 24, 25

*Hunt v. City of L.A.*,
601 F. Supp. 2d 1158 (C.D. Cal. 2009), *aff'd*, 638 F.3d 703 (9th Cir. 2011) ........ 21

*In re Reyes*,
910 F.2d 611 (9th Cir. 1990) ........ 24

*Isaacson v. Horne*,
716 F.3d 1213 (9th Cir. 2013) ........ 14

*Jevne v. Superior Ct.*,
35 Cal. 4th 935 (2005) ........ 24

*John Doe #1 v. Reed*,
561 U.S. 186 (2010) ........ 14, 15, 16, 18

*Jones v. Google LLC*,
73 F.4th 636 (9th Cir. 2023) ........ 28

*McCoy v. Alphabet, Inc.*,
2021 WL 405816 (N.D. Cal. Feb. 2, 2021) ........ 5

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ........ 30

*Mendoza v. California*,
149 Cal. App. 4th 1034 (2007) ........ 25



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Metromedia, Inc. v. City of San Diego*,
32 Cal. 3d 180 (1982) ........ 26

*Montana PIRG v. Jacobsen*,
2024 WL 4023781 (9th Cir. Sept. 3, 2024) ........ 10

*Moody v. NetChoice, LLC*,
144 S. Ct. 2383 (2024) ........ *passim*

*NAACP v. Button*,
371 U.S. 415 (1963) ........ 21

*Nat'l Pork Prods. Council v. Ross*,
598 U.S. 356 (2023) ........ 28, 29

*Nat'l Shooting Sports Found. v. Bonta*,
718 F. Supp. 3d 1244 (S.D. Cal. 2024) ........ 29

*NetChoice LLC v. Fitch*,
2024 WL 3276409 (S.D. Miss. July 1, 2024) ........ 13

*NetChoice LLC v. Reyes*,
2024 WL 4135626 (D. Utah Sept. 10, 2024) ........ 13, 18, 19

*NetChoice LLC v. Yost*,
2024 WL 555904 (S.D. Ohio Feb. 12, 2024) ........ 13

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) ........ *passim*

*New Mexico ex rel. Balderas v. Tiny Lab Prods.*,
457 F. Supp. 3d 1103 (D.N.M. 2020) ........ 28

*Packingham v. North Carolina*,
582 U.S. 98 (2017) ........ 3, 10

*People v. Library One, Inc.*,
229 Cal. App. 3d 973 (1991) ........ 23

*People v. Nguyen*,
222 Cal. App. 4th 1168 (2014) ........ 24

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ........ 11, 12

*Reno v. ACLU*,
521 U.S. 844 (1997) ........ 3, 20

*Roman v. Wolf*,
977 F.3d 935 (9th Cir. 2020) ........ 30



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Sam Francis Found. v. Christies, Inc.*,
784 F.3d 1320 (9th Cir. 2015) (en banc) .......... 28, 29

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......... 16, 18, 20

*United States v. Eichman*,
496 U.S. 310 (1990) .......... 11, 12, 18

*United States v. Hall*,
912 F.3d 1224 (9th Cir. 2019) .......... 23

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000) .......... 11, 12

*United States v. Stevens*,
559 U.S. 460 (2010) .......... 10

*United States v. Williams*,
553 U.S. 285 (2008) .......... 21

*Wash. State Grange v. Wash. State Repub. Party*,
552 U.S. 442 (2008) .......... 13

*Where Do We Go Berkeley v. Cal. Dep't of Transp.*,
32 F.4th 852 (9th Cir. 2022) .......... 10

*Zepeda v. I.N.S.*,
753 F.2d 719 (9th Cir. 1983) .......... 30

*Zeran v. Am. Online, Inc.*,
129 F.3d 327 (4th Cir. 1997) .......... 27

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3 .......... 2, 9, 10, 28, 29

U.S. Const. amend. I .......... *passim*

**Statutes**

Children's Online Privacy Protection Act (COPPA),
15 U.S.C. §§ 6501-05 .......... 2, 4, 9, 16, 28
§ 6501 .......... 2, 4, 16, 28
§ 6502 .......... 4, 28

47 U.S.C. § 230 .......... 2, 3, 9, 27, 28

Cal. Bus. & Profs. Code § 17200 .......... 18



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Cal. Civil Code
§ 1770 .......... 18
§ 1798.99.30. .......... *passim*
§ 1798.99.31 .......... *passim*
§ 1798.99.32 .......... 10
§ 1798.100. .......... 4
§ 1798.120. .......... 4
§ 1798.140 .......... 5, 6, 7, 12, 18
§ 1798.145 .......... 29

**Regulations**

16 C.F.R. § 312.3 .......... 4

11 Cal. Code Regs. § 7004 .......... 18

**Other Authorities**

144 Cong. Rec. 23926 (1998) .......... 4

WARD FARNSWORTH, THE LEGAL ANALYST (2007) .......... 4



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

## I. INTRODUCTION

Without dissent, the Ninth Circuit held that the State's attempt to require online businesses to report and mitigate any risks of "detriment to children" posed by content those businesses publish would have "deputize[d] private actors into censoring speech." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024). The court affirmed this Court's preliminary injunction of that requirement, and remanded for this Court to address whether other aspects of AB 2273 should be similarly enjoined under the standards articulated in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024). The answer is yes.

***First,*** all the Act's regulatory mandates violate the First Amendment. *See* § IV.

The Act's regulatory provisions are all facially invalid because they unconstitutionally burden online services based on the content they publish. The Act defines its scope of coverage by expressly targeting businesses for regulation based on specific content (e.g., "cartoons," "music," "celebrities," and content or "design elements" directed to minors) and those businesses' "audience." The coverage definition also expressly exempts online businesses with predominantly non-expressive appeal (e.g., e-commerce). By so targeting the Act's regulatory burdens, the legislature made clear that the Act's applications—intended and actual—would be censorship. The record confirms that is the State's primary objective. The State has not identified any legitimate application of the Act's content-based burdens, and any such applications would be dwarfed by the unconstitutional suppression of speech across the internet. Facial relief is thus warranted from each of the Act's regulatory provisions in §§ 31(a) and (b). *See* § IV.A.

Several individual provisions of the Act—those addressing content-policy enforcement (§ 31(a)(9)); information use (§ 31(b)(1)-(4)); "dark patterns" (§ 31(b)(7)); and age estimation (§ 31(a)(5)) (collectively, the "Individual Provisions")—independently violate the First Amendment. This Court already held that each of these provisions likely violates the First Amendment in its core application. And as discussed below, these provisions' unconstitutional applications, to the extent challenged in the Amended Complaint, are "substantial" compared to any "legitimate sweep" under *Moody*, 144 S. Ct. at 2397-98. Facial relief is therefore independently warranted as to each Individual Provision. *See* § IV.B.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Each of the Individual Provisions is also unconstitutionally vague under the First Amendment because each turns on undefined terms such as "reasonable level of certainty appropriate to the risks," the "best interests" of minors, and whether something is "materially detrimental," and thus provides businesses inadequate notice of their requirements. *See* § IV.C.

The Individual Provisions are also unconstitutional as applied to NetChoice's covered members who engage in expressive activities for essentially the same reasons they are facially invalid. *See* § IV.D.

***Second***, the Act's regulatory provisions in §§ 31(a) and (b) are not severable from the self-assessment and "cure" provisions, which remain enjoined. *See* § V. These mechanisms would have provided businesses opportunities to avoid liability by identifying and "mitigating" content that might later be deemed to violate the Act, and absent that, by curing any violations before enforcement. The text and legislative history show the State would not have adopted the Act without these provisions. *See* § V.A. And these mechanisms, albeit unconstitutional, were central to the Act's standards- and compliance-oriented functional approach, which would have permitted covered businesses to avoid crippling penalties arising from surprise enforcement. *See* § V.B.

***Third***, the Individual Provisions are invalid on three alternative grounds the Ninth Circuit did not reach—Section 230 of the Communications Decency Act, 47 U.S.C. § 230; the Children's Online Privacy Protection Act (COPPA), 15 U.S.C. §§ 6501-05; and the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. *See* § VI. Section 230 preempts these provisions to the extent they would hold online services liable for the way they publish, moderate, or block third-party content. *See* § VI.A. COPPA preempts these provisions with respect to minors under thirteen because the California legislature deliberately imposed obligations inconsistent with COPPA. *See* § VI.B. And the provisions violate the Commerce Clause by regulating conduct wholly outside California. *See* § VI.C.

***Finally,*** NetChoice members and online publishers everywhere will suffer irreparable injuries if forced to comply with or face liability under a regime that violates their constitutional rights. An order preliminary enjoining each of the Act's mandates and prohibitions on its face, or as applied to NetChoice's covered members, is needed to avert these impending harms. *See* § VII.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

## II. BACKGROUND

### A. The Internet Is A Vibrant Forum For Speech.

The internet is a medium "as diverse as human thought," *Reno v. ACLU*, 521 U.S. 844, 870, (1997) (citation omitted), which in the brief span of a generation has become indispensable to the exchange of information. "[W]ebsites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," and to connect citizens with "principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). Online services "publish diverse material on countless websites that inform, entertain, and connect society in vital ways." Compl. ¶ 1, *United States v. Google LLC*, No. 23-108 (E.D. Va. Jan. 24, 2023), ECF No. 1 (Google Compl.) (California is a named plaintiff). This "extraordinary advance in the availability of educational and informational resources" has "flourished, to the benefit of all Americans, with a minimum of government regulation." 47 U.S.C. § 230(a)(1), (4). And it has been made possible by an internet that is open and accessible to all.

Online providers interact with users in different ways. Most have areas where all users can view content without creating an account. *See, e.g.*, Cairella Decl. (ECF 29-22) ¶ 7; Masnick Decl. (ECF 29-29) ¶ 5; Roin Decl. (ECF 29-25) ¶ 7-9. Many have features available only to users who create an account. *See, e.g.*, Cairella Decl. ¶ 8; Masnick Decl. ¶ 6; Roin Decl. ¶¶ 7-9; Paolucci Decl. (ECF 29-28) ¶ 5. Some provide services and content without charge, relying on advertisements to support the content and services they provide. *See, e.g.*, Cairella Decl. ¶¶ 4, 7, 21; Masnick Decl. ¶ 5; Roin Decl. ¶¶ 7, 9, 10. Others require users to pay subscription fees for extra services. *See, e.g.*, Cairella Decl. ¶ 4; Paolucci Decl. ¶ 5. At any rate, as California has conceded, "today's internet would not exist without the digital advertising revenue that, as a practical matter, funds its creation and expansion." Google Compl. ¶ 1.

A hallmark of modern-day online services is the ability to tailor content to individual users. Suggesting a book or film based on a user's browsing, reading, or listening, for example, creates value by personalizing the service to the user's interests, and connects content creators with an





DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

audience. *See, e.g.*, Roin Decl. ¶¶ 2-6; Cairella Decl. ¶¶ 8, 20; Szabo Decl. (ECF 29-21) ¶ 13. This is true across online media—including music, video, and social networks.

The vast majority of online providers have adopted policies and community standards governing content shared through their services (collectively, "content policies"). These content policies can serve many purposes—including fostering a particular type of community, encouraging debate, setting the tenor of discussion, maintaining a welcoming and respectful environment, and notifying users of the types of conduct that might result in a loss of access. *See* Kumar Decl. (ECF 29-1) Exs. 3-6 (sample content policies); Szabo Decl. ¶¶ 8-12.

### B. California Internet Users, Including Children, Have Long Been Protected By State And Federal Privacy Laws.

Federal child privacy law, codified in COPPA and its regulations, has long "limit[ed] the collection of personal information from children without parental consent." 144 Cong. Rec. 23926 (1998). COPPA defines a child as anyone under 13 and applies to websites that are "directed to children" or have "actual knowledge" they are collecting personal information from a child. 15 U.S.C. §§ 6501(1), 6502. These websites must "provide notice" of information collection, use, and disclosure practices; obtain parental consent before collecting, using, or disclosing a child's personal information; provide parents "reasonable means" to review and refuse consent to the use of a child's personal information; and not condition a child's participation in certain activities on excessive disclosure of personal information. 16 C.F.R. §§ 312.3(a)-(d). COPPA expressly preempts inconsistent child-focused state privacy rules. 15 U.S.C. § 6502(d).

Californians are also protected by a comprehensive state data privacy regime, the 2018 California Consumer Privacy Act (CCPA), which "give[s] consumers of all ages 'an effective way to control their personal information.'" *NetChoice*, 113 F.4th at 1109 (citing 2018 Cal. Legis. Serv. Ch. 55, § 2(i) (A.B. 375)). Under the CCPA, as amended by the 2020 California Privacy Rights Act (CPRA), users have extensive rights to control the data collected about them. *See* Cal. Civ. Code §§ 1798.100 *et seq.* Online services must "inform consumers as to the categories of" and "purposes for which" personal information is being collected, *id.* § 1798.100(b); not collect more information absent notice, *id.* § 1798.100(a)(2); provide notice of any sale or sharing of personal information, *id.* §1798.120(b); honor requests not to do so, *id.* § 1798.120(d); and not sell or share



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

the personal information of a consumer the service knows is younger than 16, absent authorization from that user (or if the user is under 13, their parent or guardian), *id.* § 1798.120(c). Online services have spent significant resources to comply with these requirements. Indeed, a report commissioned by the California Attorney General estimated that initial compliance with the 2018 CCPA would cost $55 billion, with ongoing costs thereafter. *See* Kumar Decl. Ex. 1, at 11. These statutory protections bolster California's long-established common-law privacy rights. *See, e.g.*, *McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *7-8 (N.D. Cal. Feb. 2, 2021).

**C. AB 2273 Attempts To Censor The Internet Under The Guise Of Privacy.**

California enacted AB 2273 in 2022. *See generally* Cal. Civ. Code §§ 1798.99.28 *et seq*. The Act applies to any "business" that "provides an online service, product, or feature likely to be accessed by children," § 31(a), (b), and defines a "child" as anyone "under 18 years of age." § 30(b)(1). A "[b]usiness" is any for-profit entity that meets certain criteria, including if it earns more than $25M in gross annual revenue or shares at least 100,000 customers' information annually. *Id.* § 1798.140(d). The Act expressly exempts non-profits, government entities, medical providers, and online services that provide the "delivery or use of a physical product." *See id.* §§ 30(5), 1798.99.40, 1798.140(d).

Whether a service is "likely to be accessed by children" depends on the content published by the business. Factors include, for example, whether the service, product, or feature is "directed to children," § 30(b)(4)(A); offers "advertisements marketed to children," § 30(b)(4)(C); has "design elements that are known to be of interest to children, including, but not limited to, games, cartoons, music, and celebrities who appeal to children," § 30(b)(4)(E); or has an "audience" routinely or largely composed of children (as indicated by specific sources), § 30(b)(4)(B), (F).

The legislature structured the Act around a central but now-enjoined set of provisions that would have required covered businesses to prepare "data protection impact assessments" (DPIAs) and share those DPIAs with the Attorney General on demand. Despite the reference to "data protection," these requirements had little to do with how entities protect data. *See NetChoice*, 113 F.4th at 1118 (interpreting Act's references to "data management" and data protection as "proxies for content"). They instead were oriented around the premise that online services must redesign



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

their content to be "appropriate for children." AB 2273, Findings and Decls. § 1(a)(7). DPIAs would have addressed whether a provider's features and services "could harm" minors by exposing them to "potentially harmful" content, contacts, or communications; permitting them to "witness" any "potentially harmful, conduct"; or using "algorithms" or "automated processing" to deliver "targeted" content and ads that "could harm" them. § 31(a)(1)(B)(i)-(vii). The provider would have been required to "[d]ocument any risk of material detriment to" minors arising from each service, product, or feature, and "create a timed plan to mitigate or eliminate" those risks "before" minors access it. § 31(a)(2). "Harm" and "material detriment" are undefined. As further discussed below, this Court enjoined the DPIA requirements, and the injunction was affirmed by the Ninth Circuit.

The Act also includes several requirements and prohibitions that rest on the same censorship objectives as the enjoined DPIA provisions. These are as follows.

***Policy-Enforcement Mandate*: *§ 31(a)(9)*.** Online services must "enforce" their policies, including content policies, to the State's satisfaction. § 31(a)(9). The government may thus supervise and second-guess a provider's discretionary decisions about what speech to permit and whether content is inflammatory, threatening, or otherwise contrary to the provider's standards.

***Information-Use Restrictions: § 31(b)(1)-(4).*** The Act contains a series of interrelated restrictions on how a covered service may use "personal information" of minors to organize or deliver content. The definition of "personal information" extends far beyond traditional conceptions of personally identifiable information (like birthdates) to any information "reasonably capable of being associated with, or [that] could reasonably be linked, directly *or indirectly,* with a particular consumer or household." Cal. Civ. Code § 1798.140(v)(1) (emphasis added). This definition encompasses a range of data that is critical to organizing and delivering online content and maintaining useful services. This includes general information about how users interact with a website, and basic device identifiers linked to a machine, not a specific user.

- Delivering Content: § 31(b)(1). The Act prohibits covered providers from using a minor's personal information (including an IP address and browsing history) to deliver content the provider "knows, or has reason to know, is materially detrimental" to the minor's "well-being."



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

- Automated Processing of Personal Information (so-called "Profiling"): § 31(b)(2). The Act restricts covered services from using "automated processing" of a minor's personal information to evaluate "aspects relating to" the user—which the Act brands with the pejorative term "profiling"—unless the Attorney General agrees that the processing is "necessary" to the specific feature with which a [minor] is actively and knowingly engaged," or agrees that a "compelling reason" proves that the processing "is in the best interests of children." *Id.* (incorporating § 30(b)(6)). In practical terms, this ends content personalization for minors based, for example, on "analyzing or predicting" the user's "personal preferences [or] interests," § 30(b)(6).
- Sharing or Retaining Personal Information: § 31(b)(3). The Act prohibits services from sharing or retaining "personal information" unless "necessary" to provide the service "with which a child is actively and knowingly engaged" or there is a "compelling reason" that doing so "is in the best interests of" minors likely to access the service.
- Use of Personal Information for Additional Reasons: § 31(b)(4). The Act forbids providers from using a minor's "personal information" for "any reason other than a reason it was originally collected" unless providers present a "compelling reason" the use is in children's "best interests." *Id.* Again, the Act invites government censors to evaluate whether content is in "the best interests of children" to determine whether businesses have properly "used," "shared," or "processed" information in providing the content. Parents have no way to opt out of this restriction.

***"Dark Pattern" Restriction*: *§ 31(b)(7).*** The Act prohibits covered providers from using so-called "dark patterns" to "lead or encourage" minors to provide more information than "reasonably expected" or "take any action" the provider should know "is materially detrimental" to the minor's "physical health, mental health, or well-being." § 31(b)(7). The State defines a "dark pattern" as any user "interface" that "subverts or impairs user autonomy, decisionmaking, or choice." § 1798.99.140(l). Despite the ominous label and description, the State interprets the term to reach commonplace publishing features that simplify and improve the user experience, such as "autoplay" and "newsfeed" functions that recommend personalized content. Radesky Decl. (ECF



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

51-5) ¶¶ 49, 55; *see NetChoice*, 113 F.4th at 1123 n.8 ("dark patterns may include the 'infinite scroll' feature on X (formerly Twitter), 'autoplay' on YouTube and TikTok, and 'streaks' on Snapchat").

***Age-Estimation Mandate*: *§ 31(a)(5)*.** Online services must estimate the age of their users with "a reasonable level of certainty appropriate to the risks" that could arise from their services, or else apply the "protections afforded to children to all consumers." § 31(a)(5). Covered businesses must therefore choose between equally unattractive options: either perform a subjective, abstract, content-based assessment about the "risks" of their content and require users to disclose age-related information as "appropriate" to those risks; or apply the Act's censorious requirements to "all users," including adults. Adults may not opt themselves out of these restrictions, much less their children. *Id.*

The Act authorizes the Attorney General to obtain penalties for noncompliance of up to $7,500 per "affected child," and injunctive relief. *Id.* § 1798.99.35(a). As originally enacted, the Attorney General could not have sought penalties without first engaging in a notice-and-cure process through which covered providers could avoid penalties by complying with the DPIA requirements and curing noncompliance within 90 days. *Id.* § 1798.99.35(c). That process, however, has been preliminarily enjoined as a result of the constitutional infirmities in the DPIA requirements. *See NetChoice*, 113 F.4th at 1124. As a result, the cure process is no longer available.

### D. The First Preliminary Injunction

This Court granted NetChoice's first motion for a preliminary injunction. *See* ECF 74. The Court considered evidence and submissions of amici curiae showing that the Act broadly censored all sorts of online expression, "including search engines, online publications (including newspapers, magazines, and blogs), social media platforms, and the publishers of books, photographs, videos, music, games, recipes, podcasts, and countless other forms of speech." CCIA Br. (ECF 45-1) at 7; *see also* Roin Decl. (reading app Goodreads); Cairella Decl. (online entertainment encyclopedia IMDb); Masnick Decl. (Techdirt blog); Paolucci Decl. (Dreamwidth, a social media service); NYT Br. (ECF 56-1) at 2-3 (variety of news services, including the *New York Times*). The Court determined that the Act's challenged mandates and prohibitions regulate


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

the "distribution of speech," impede the "availability and use of information" for publication, and compel speech in ways that fail First Amendment scrutiny, and enjoined the entirety of the law. ECF 74 at 13. The State appealed.

The Supreme Court decided *Moody* between this Court's decision to enjoin the Act and the Ninth Circuit's oral arguments in this case. The *Moody* Court took great pains to explain that the First Amendment protects an online service's "editorial judgments" to publish and arrange content "in the way it wants"—including "how to display" it to the public—while remanding to the lower courts to further assess "[w]hat activities, by what actors" the laws challenged there regulate, and whether "a substantial number of [the laws'] applications are unconstitutional, judged in relation to [any] plainly legitimate sweep." *Moody*, 144 S. Ct. at 2394-95, 2397-98 (citation omitted).

The Ninth Circuit thereafter unanimously affirmed this Court's preliminary injunction as to the DPIA regime, which it held "deputiz[ed]" services to act as "censors for the State" in all applications and thus required strict scrutiny that the State fell "well short of satisfying." *NetChoice*, 113 F.4th at 1108, 1113, 1116-22. As to the remainder of the law, the Ninth Circuit remanded for this Court to perform the facial analysis required by *Moody* by clarifying which provisions are being challenged, the principal applications of those provisions to covered services, and how the unconstitutional applications compare to any "legitimate sweep." *Id.* (citing *Moody*, 144 S. Ct. at 2397). The panel did not disturb the Court's reasoning that specific applications of the challenged provisions are likely unconstitutional, nor did it reach NetChoice's other claims under Section 230, COPPA, and the Commerce Clause. *Id.* at 1126 n.9. The panel also concluded that, before undertaking the *Moody* analysis, it would be premature to consider the severability of other provisions from the DPIA requirements. *Id.* at 1124-25.

### E. The Amended Complaint

On November 1, 2024, NetChoice filed an Amended Complaint (ECF 100) clarifying the scope of its challenges and specific relief sought. Am. Compl. ¶¶ 84-90, Prayer ¶¶ 1-13. Specifically, NetChoice brings First Amendment challenges to §§ 31(a) and 31(b) (collectively, the "Regulatory Provisions") on their face because the Act's content-based coverage definition infects all aspects of these provisions, rendering them unconstitutional in every application. *See*



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*id.*, Prayer ¶ 2; *infra* § IV.A. Alternatively, NetChoice seeks facial relief against the Individual Provisions for violating the First Amendment in some or all applications (*infra* § IV.B), and in the alternative, for relief as applied to NetChoice's members (*infra* § IV.D). *See* Am. Compl., Prayer ¶¶ 4-8. NetChoice also seeks facial relief from all the Regulatory Provisions because they are not severable from the already-enjoined DPIA provisions, *see* Am. Compl. ¶ 9; *infra* § V; and facial and as-applied relief from various provisions under its Commerce Clause and preemption theories, *see* Am. Compl., Prayer ¶¶ 10-12; *infra* § VI.

NetChoice does not challenge § 1798.99.32, which creates a working group to "deliver a report to the Legislature" regarding best practices for implementing the Act.

## III. LEGAL STANDARDS

### A. Preliminary Injunction Standard

A preliminary injunction should issue when a plaintiff (1) is likely to prevail on the merits and (2) will suffer irreparable harm absent an injunction, and where (3) equity and (4) the public interest support relief. *See Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir. 2022). These factors are balanced on a sliding scale. *Id.*

### B. Standard Governing Facial Relief

A law is facially invalid under the First Amendment when "a substantial number" of the law's principal applications "are unconstitutional, judged in relation to [any] plainly legitimate sweep." *Moody*, 144 S. Ct. at 2397 (citation omitted). To apply this standard, a court must first determine the law's potential scope, by evaluating "[w]hat activities, by what actors" the law regulates. *Id.* at 2398. The court then evaluates "which of the law['s] applications violate[s] the First Amendment," and "measure[s] them against the rest." *Id.*; *see Montana PIRG v. Jacobsen*, 2024 WL 4023781, at *2 n.2 (9th Cir. Sept. 3, 2024). When a challenged law regulates protected speech in ways that do not survive scrutiny in a substantial number of its applications, the law is facially invalid. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618-19 (2024); *see also Packingham v. North Carolina*, 582 U.S. 98, 110 (2017); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804-05 (2011); *United States v. Stevens*, 559 U.S. 460, 482 (2010).


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

## IV. NETCHOICE IS LIKELY TO PREVAIL ON THE MERITS OF ITS FIRST AMENDMENT CLAIMS.

### A. The Act's Regulations Are Facially Invalid Because They Unconstitutionally Burden Online Services Based On The Content They Publish.

Every application of the Regulatory Provisions regulates speech on the basis of its content and thus triggers strict scrutiny. This is because whether the Act applies to a business depends on the types of content the business publishes. Because the State cannot show these content-based burdens are the least restrictive means to achieve a compelling state interest, the Act's regulatory provisions are unconstitutional "in every case," and thus facially invalid. *Ams. for Prosperity*, 594 U.S. at 618.

Content-based laws are presumptively unconstitutional and valid only when the government meets the heavy burden of strict scrutiny. *See United States v. Playboy Ent. Grp., Inc*., 529 U.S. 803, 813 (2000). A regulation "is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A regulation is also content based when it "cannot be justified without reference to the content of the regulated speech," *id.* at 164 (citation omitted), or it regulates "function or purpose" as a "proxy" for content. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022) (citing *Reed*, 576 U.S. at 163). "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus' toward the ideas contained in the regulated speech." *Reed*, 576 U.S. at 156 (cleaned up). And even if the law "contains no explicit content-based limitation on the scope of prohibited conduct," it is still subject to strict scrutiny if it is "clear that the Government's asserted interest is related to the suppression of free expression." *United States v. Eichman*, 496 U.S. 310, 315 (1990) (cleaned up).

The Act's Regulatory Provisions are content-based across all their principal applications. Because of the Act's coverage definitions under § 30(b)(4)—the "likely to be accessed" or "coverage" standard—the Regulatory Provisions target businesses for "differential treatment" based on the "subject matter" they publish. *Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 618-21 (2020) (plurality op.) (citing *Reed*, 576 U.S. at 163-64, 169). If a business publishes content



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

"directed to" minors, such as "games," "cartoons," "music," "celebrities," "advertisements," or "design elements" that "appeal to" minors, that business must comply with the Regulatory Provisions. § 30(b)(4)(B)-(F); Cal. Civil Code § 1798.140(d). If the business has a "significant audience" or "audience composition" of minors, it too is regulated. *Id.* By contrast, if a provider publishes content that has no appeal to minors and caters to an "audience" that does not include a significant number of minors, it is not subject to the Regulatory Provisions. The Act's focus on "audience" underscores its content basis because it treats a service's "function or purpose" as a "proxy" for the content the service publishes. *City of Austin*, 596 U.S. at 78 (quoting *Reed*, 576 U.S. at 163). Regulating speakers based on "concern for [their] effect" on a particular audience—i.e., children—is "the essence of content-based regulation." *Playboy Ent. Grp., Inc.*, 529 U.S. at 811-12; *see also Boos v. Barry*, 485 U.S. 312, 321 (1988) (regulations "focus[ed] on the direct impact of speech on its audience" are content based).

Content regulation is also the Act's professed objective. By its own terms, the Act seeks to create "safer" online content for children by disabling features that "offer detrimental material" to children, AB 2273, Findings and Decls. § 1(a)(3), (8), and requiring businesses to identify and mitigate "potentially harmful" "content." § 31(a)(1)(B)(i). The Act also incorporates guidance from a U.K. code that overtly regulates on the basis of content. *See* AB 2273, Findings and Decls. § 1(d), (e); Gossett Decl. Exs. 1-4 (guidance for identical provisions require regulation of content, including "detrimental use[s] of data" to promote "offensive language," "sexual material," or "nudity"). California lawmakers advocated for this U.K. model because it would shield children from "adult content," Sieff Decl. (ECF 60-1) Ex. 1 at 1, 3, and "harmful material" inappropriate for their "minds, abilities, and sensibilities." *Id.* Ex. 2 at 16-17. The Attorney General likewise praised the law for "address[ing] … dangerous online *content*," *id.* Ex. 3 at 2, and the Governor vowed to defend it to "shield[]" youth from harmful "content." *Id.* Ex. 4. The State's defense of the Act also repeatedly references purportedly harmful "content." *See, e.g.*, Radesky Decl. ¶¶ 22, 34-41, 48, 50, 60-62, 65, 67, 69-72, 96, 98 (mentioning "content" more than 70 times). In other words, the evidence is "clear that the Government's asserted interest is related to the suppression of free expression." *Eichman*, 496 U.S. at 315. This wolf comes as a wolf.


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

The Act's universal content-based coverage triggers strict scrutiny across all the Regulatory Provisions, not just those that directly regulate expression. Indeed, three federal courts have recently enjoined laws on this basis. *See NetChoice LLC v. Reyes*, 2024 WL 4135626, at *8 (D. Utah Sept. 10, 2024) (facially enjoining Utah law because the "operative provisions each rely on [a] Central Coverage Definition [that] imposes unjustified, content-based restrictions"); *NetChoice LLC v. Fitch*, 2024 WL 3276409, at *8-9, *14 (S.D. Miss. July 1, 2024) (facially enjoining Mississippi law because of the "content-based distinction … inherent in the definition of a [covered] 'digital services provider'"); *NetChoice LLC v. Yost*, 2024 WL 555904, at *11 (S.D. Ohio Feb. 12, 2024) (pre-*Moody*, facially enjoining Ohio law that drew content-based distinctions among online services based on their "engagement with certain topics"). Here too, the coverage definition means that online businesses are always regulated based on content, requiring the uniform application of strict scrutiny that the State falls "well short of satisfying." *NetChoice*, 113 F.4th at 1122; *see also* ECF 74 at 18-37 (challenged provisions fail even intermediate scrutiny).

That is enough to hold all of the Act's Regulatory Provisions facially invalid under the First Amendment. The Act's content-based and "audience"-based coverage definitions and exemptions mean that the Regulatory Provisions are targeted to and will virtually always apply to speech. The Act expressly excludes non-expressive services likely to be accessed by minors, such as e-commerce, telecommunications services, and healthcare portals. *See* § 30(b)(5). Any remaining hypothetical applications that do not involve protected expression—perhaps use of ride-sharing apps or banking services—are not "directed to children," § 30(b)(4)(A), and any minors who use these services would not comprise an "audience," §§ 30(b)(4)(B), (F)—a term denoting persons who receive expression. *See Audience*, Merriam-Webster, https://www.merriam-webster.com/dictionary/audience (last visited Nov. 1, 2024) ("a reading, viewing, or listening public"). Any such hypothetical applications are manifestly insubstantial when compared to the Act's unconstitutional applications. *Cf. Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 450 (2008) (facial analysis should not "go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases").

The State has also failed to cite any meaningful non-expressive applications of the



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Regulatory Provisions. Its expert predominantly cites content-based applications of the Act to videos, gaming, music, educational content, and social media. *See* Radesky Decl. ¶¶ 22, 34-41, 48, 50, 60-62, 65, 67, 69-72, 96, 98; *see also* Gossett Decl. Ex. 11 at 2-4, 9, 11 (discussing popularity of such services among minors). And the "speed filter" on Snapchat—the one *putative* example the State raised, *see* ECF 70 at 2—was eliminated years ago, before the Act was passed. *See* Gossett Decl. Ex. 5. Any imaginable non-speech application of the Act's mandates and prohibitions simply cannot compare to the real-world speech-related applications NetChoice and its amici have identified. *See generally* Cairella Decl.; Roin Decl.; Masnick Decl.; Paolucci Decl.; Rumenap Decl. (ECF 29- 30); Szabo Decl.; Masnick Supp. Decl.; Paolucci Supp. Decl.; *see also* NYT Br. 2-3; Chamber of Progress Br. (ECF 42-1) at 9-15.

### B. The Individual Provisions Are Each Independently Facially Unconstitutional To The Extent NetChoice Challenges Them.

Each Individual Provision also should be enjoined on its face on independent grounds, either in its entirety or as to certain applications.

A facial challenge can be asserted to challenge a law's application to certain *categories* of activities untied to any particular plaintiff. *See John Doe #1 v. Reed*, 561 U.S. 186, 194 (2010) (entertaining facial challenge that was "not limited to plaintiffs' particular case" but did "not seek to strike the [law] in all its applications"); *Family PAC v. McKenna*, 685 F.3d 800, 808 n.5 (9th Cir. 2012) (considering a facial challenge to campaign disclosure rules "as applied to ballot measure committees" without addressing the rules' application to other scenarios). This reflects the principle that the showing required in a facial challenge is derived from the "breadth of the remedy" sought. *Citizens United v. FEC*, 558 U.S. 310, 331 (2010); *see also Isaacson v. Horne*, 716 F.3d 1213, 1230 (9th Cir. 2013) ("extent to which the invalidity of a statute need be demonstrated" is a function of "the remedy" provided).

Under this rule, the Individual Provisions are facially invalid within the range of applications that NetChoice challenges here.

#### 1. Policy-enforcement mandate (challenged as to specific applications)

Under § 31(a)(9), online services must "enforce" to the State's satisfaction their "published terms, policies, and community standards." The Court already concluded this provision is facially



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

invalid under the First Amendment to the extent applied to content policies. *See* ECF 74 at 26-27. It reasoned that § 31(a)(9) regulates speech in these applications by "press[ing] private companies into service as government censors," ECF 74 at 14, and burdening services' rights "to exercise their editorial judgment in permitting or prohibiting content." *Id.* at 27. And it held the provision unconstitutional because "the State fail[ed] to establish a concrete harm" justifying the regulation, failed to present "a causal link between" any "harm to children's well-being," and had not limited this requirement to "policies related to children." *Id.* at 26-27.

The Ninth Circuit vacated the injunction on this provision because it might be constitutional as applied to *other* types of policies, such as privacy policies or garden variety "terms and conditions." *See NetChoice*, 113 F.4th at 1123-24. But to the extent this provision survives NetChoice's facial challenge in Part § IV.A, NetChoice does not challenge its application to such policies. *See* Am. Compl. ¶ 85, Prayer ¶ 5. NetChoice's facial challenge to § 31(a)(9) is limited to content policies, and the provision is facially invalid "to the extent of that reach." *John Doe #1*, 561 U.S. at 194. Since all of the applications within this range are unconstitutional, the provision has no legitimate sweep and is thus facially invalid as challenged. *Moody*, 144 S. Ct. at 2397.

**2. Information-use restrictions (challenged as to specific applications)**

These four provisions each restrict how and for what purposes an online service may use "personal information" they lawfully receive from users under eighteen, *see* §§ 31(b)(1)-(4), and each is unconstitutional to the extent they "apply to covered services' use of personal information," including the retention and sharing of such information, "to publish content or to make information available." Am. Compl., Prayer ¶¶ 6-7.

Section 31(b)(1) restricts covered services' use of this information—including to deliver content—that the provider "knows, or has reason to know, is materially detrimental" to the minor's "well-being." § 31(b)(1). Section 31(b)(2) restricts covered services from using this information to "evaluate" a minor's interests, including to present them personalized content, unless they can show a "compelling reason" that doing so "is in the best interests of children." § 31(b)(2) (incorporating § 30(b)(6)). Section 31(b)(3) prohibits covered services from sharing or retaining this information—including to publish or use it to personalize content—unless doing so is


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

"necessary" to provide the service, or there is a "compelling reason" that doing so "is in the best interests of" minors likely to access the service. *Id.* § 31(b)(3). And section 31(b)(4) forbids covered providers from using a minor's "personal information" for "any reason other than a reason it was originally collected" unless the use is in children's "best interests." *Id.* § 31(b)(4).

The Court previously held these provisions facially unconstitutional, focusing on precisely the range of applications that NetChoice challenges. *See* ECF 74 at 28-32. Specifically, the Court found these provisions regulate speech by restricting the availability and use of information on a content- and speaker-basis. *Id.* at 11-13. It held Section 31(b)(1) was not narrowly tailored and would force services to make subjective assessments as to minors of different ages with the predictable tendency of "burdening substantially more speech than necessary." *Id.* at 28-29. It further held section 31(b)(2) and (b)(3) failed narrow tailoring because they are not limited to preventing minors from receiving "information deemed harmful" (even if that were regulable) but also apply to beneficial targeted content. *Id.* at 29-31. Nor was the Court persuaded the State had a legitimate interest in preventing the dissemination of protected but "unsolicited content." *Id.* at 30-31. And section 31(b)(4) failed scrutiny, the Court held, because the State presented no evidence that it materially alleviated any real harm. *Id.* at 31-32; *see also, e.g., DoorDash, Inc. v. City of N.Y.*, --- F. Supp. 3d ----, 2024 WL 4276245, at *8-9, *13-15 (S.D.N.Y. Sept. 24, 2024) (enjoining ordinance on its face under *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) that similarly "restricts how [delivery apps] can use the customer data they collect").

Any hypothetical application of these provisions to *other* business activities—including the restriction on collecting or selling personal information for other purposes—is beyond the "reach" of NetChoice's facial challenge, *John Doe #1*, 561 U.S. at 194, and NetChoice does not seek relief from these applications. *See Citizens United*, 558 U.S. at 331. Moreover, such applications are immaterial to the facial analysis because they duplicate obligations imposed by the CPRA, CCPA, and COPPA. *See supra*, p. 4-5; *see Garcia v. City of L.A.*, 11 F.4th 1113, 1119 n.7 (9th Cir. 2021) (a mandate or prohibition "that is independently authorized by a legal provision or doctrine other than the challenged law is thus not relevant to that law's facial constitutionality") (citing *City of L.A. v. Patel*, 576 U.S. 409, 418-19 (2015)). Excluding these hypotheticals and



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

considering only the challenged prohibitions that these provisions "independently authorize[]," *Garcia*, 11 F.4th at 1119 n.7, the law's effect is to regulate the use of data to deliver content.

Since these provisions have no legitimate sweep within this range, they are facially invalid to the extent NetChoice challenges them. *Moody*, 144 S. Ct. at 2397.

**3. "Dark pattern" restriction (challenged as to specific applications)**

The "dark pattern" restriction prohibits services from using so-called "dark patterns" to "lead" minors to provide more data than "reasonably expected," or to "take any action" the provider should know "is materially detrimental" to the minor's "well-being." § 31(b)(7). NetChoice seeks facial relief from this restriction only insofar as it "applies to covered services' use of recommendation algorithms, continuous scroll, autoplay, and other design features that organize content." Am. Compl., Prayer ¶ 8. The unconstitutional applications of this requirement within that scope vastly outweigh any legitimate sweep, and so the requirement is facially invalid.

This Court previously found that the "dark pattern" provision regulates speech by restricting how covered services "design" the interfaces they use—like alerts, pop-ups, autoplay thumbnails, and unpaginated continuous content feeds—to present and organize information. ECF 74 at 11-13, 32; *see NetChoice*, 113 F.4th at 1123 n.8 (noting these examples). It then held each of the provision's specific prohibitions invalid under even intermediate scrutiny—finding vague and overbroad the prohibition on design choices that "lead or encourage" minors to "take any action that the business knows, or has reason to know, is materially detrimental" to their well-being. *Id.* at 34; *see also id.* (noting chilling effect arising from the "lack of objective standard" as to what constitutes "materially detrimental" content and the imposition of constructive knowledge ("has reason to know") that could be used to impose retroactive liability). *Id.*

This holding was manifestly correct, and the Ninth Circuit has not disturbed it. Any application of § 31(b)(7) restricts speech by regulating how content may be displayed "through features distinctive to the medium." *Brown*, 564 U.S. at 790 (speech protections "do not vary" despite changes in "ever-advancing" technology). Despite the label "dark patterns," this term encompasses commonplace publishing features that simplify and improve user experience, such as "autoplay" and "newsfeed" functions that recommend personalized content. *See* Radesky Decl.


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

¶¶ 49, 55; Egelman Decl. (ECF ¶ 51-1) n.81; *see also NetChoice*, 113 F.4th at 1123 n.8 (same). *Moody* reaffirmed that the First Amendment protects such "expressive choices" about "how the display" of content "will be ordered and organized." 144 S. Ct. at 2394-95, 2397-98, 2406. And a Utah federal court considering analogous restrictions found no evidence that designs like "seamless pagination, autoplay, and push notification[s]" "foster 'over-indulgence' and 'user addiction'" harmful to minors' well-being, nor any evidence that restricting these design choices "will meaningfully reduce the amount of time" young people spend online or "alter the status quo to such an extent that mental health outcomes will improve and personal privacy risks will decrease." *Reyes*, 2024 WL 4135626, at *15 (restriction facially invalid under *Moody*).

NetChoice does not seek relief from aspects of this restriction that prohibit "dark patterns" used to deceive minors into providing personal information or forgo privacy protections. *See* Am. Compl., Prayer ¶ 8; *John Doe #1*, 561 U.S. at 194*; cf. NetChoice*, 113 F.4th at 1123 (positing applications to *unprotected* deceptive speech). These other applications are in any event "irrelevant" to any facial challenge under *Garcia*, 11 F.4th at 1119 n.7, and *Patel*, 576 U.S. at 418-19, because California law already prohibits such deceptive conduct. *See* Cal. Civil Code § 1798.140(h) (prohibiting using deceptive dark patterns to obtain waiver of privacy protections); *id.* § 1798.185(a)(20)(C)(iii) (to obtain consent to data collection); 11 Cal. Code Regs. §§ 7004(b)-(c) (to obtain consent to share personal information); *see also* Cal. Bus. & Profs. Code § 17200 (prohibiting unfair or deceptive business practices); Cal. Civil Code § 1770 (prohibiting use of deceptive practice in the offer of services). The "dark pattern" restriction is thus facially invalid under the First Amendment to the extent NetChoice challenges it because—in "every case," *Ams. for Prosperity*, 594 U.S. at 618—it "suppresses expression out of concern for its likely communicative impact" upon a particular audience. *Eichman*, 496 U.S. at 317-18 (flag-burning law subject to and failed strict scrutiny for this reason) (citing *Boos*, 485 U.S. at 321).

The State's claimed interest in young people's well-being does not give it license to restrict "catchy," attention-grabbing designs because they are "too persuasive." *Sorrell*, 564 U.S. at 578 (no grounds "to quiet the speech or to burden its messengers" on this basis). All speech "invites" an audience to engage, and "[t]he better it is, the more interactive" and engaging it becomes.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Brown*, 564 U.S. at 798. The State can no more regulate authors of young-adult novels for organizing their works into punchy chapters, showrunners of teen dramas for ending episodes with cliffhangers, or magazine publishers for placing teasers on the front page, than they can restrict online services from presenting information in ways designed to promote engagement through the distinctive features of online media. *Id.* at 790, 798. Nor has the State presented evidence that restricting "materially detrimental" design choices is narrowly tailored to actually advance an interest in youth well-being. *See also Reyes*, 2024 WL 4135626, at *15; Ferguson Decl. ¶¶ 10-40. As the Court found, ECF 74 at 32-34, the predictable result of this restriction will be broad self-censorship. *See also, e.g.*, Roin Decl. ¶¶ 11-16; Cairella Decl. ¶¶ 2, 6, 11; Masnick Decl. ¶¶ 2, 8, 15; Paolucci Decl. ¶ 6.

Since application of § 31(b)(7) to the organization of protected content is unconstitutional in every case, the provision has no legitimate sweep as to such design choices and is thus facially invalid to the extent of that reach. *Moody*, 144 S. Ct. at 2397.

**4. Age-estimation mandate (challenged as to all applications)**

The age-estimation mandate requires covered services to "estimate the age of child users with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business or apply the privacy and data protections afforded to children to all consumers." § 31(a)(5). The application of this mandate is unconstitutional in virtually every application, rendering it facially invalid under *Moody.*

Critically, the age-estimation requirement would effectively "prevent both children and adults from accessing" content protected by the First Amendment. ECF 74 at 15; *see also* Goldman Br. (ECF 34-1) at 2-10. This is the case because: *First*, many online services regulated by the Act provide access to information. *See* Cal. Civil Code §§ 1798.99.30(b)(4), (5). *Second,* an overwhelming amount of that information is protected by the First Amendment. *See, e.g.*, Gossett Decl. Exs. 6, 7, 8 (less than 1% of content on some large services visited by minors is unprotected or harmful); *see also* CCIA Br. 7; NYT Br. 2-3. *Third*, adjusting "data protections," as the term is used in the age-estimation mandate, requires addressing "risks that arise from the data management practices" of a covered service, which in turn "require[s] consideration of content or proxies for


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

content." *NetChoice*, 113 F.4th at 1118 (interpreting § 30(b)(2), which uses the same term as § 31(a)(5), by reference to § 31(a)(1)(B)). *Fourth*, the law would require these services *either* to estimate users' ages and to modify practices based on the user's age, *or* to adjust the content and protections available for *all* users.

Either option would necessarily place "restrictions on the availability" of information, and thus regulates speech. *Sorrell*, 564 U.S. at 571; *see also, e.g.*, Paolucci Supp. Decl. ¶¶ 6-8; Masnick Supp. Decl. ¶¶ 7-8 (describing continuing burdens of age estimation).

Services that respond to the age-estimation requirement by estimating their users' ages—requiring even adults to relinquish personal information—would create an unjustified barrier to all users' protected speech. *See Ashcroft v. ACLU*, 542 U.S. 656, 667, 673 (2004) (affirming on facial challenge injunction of statute that required services to block content or verify user's age); *ACLU v. Mukasey*, 534 F.3d 181, 196-98 (3d Cir. 2008) (permanent injunction of same). The alternative—applying the Regulatory Provisions "to all consumers"—would have "the inevitable effect" of "reduc[ing] the adult population … to reading only what is fit for children," suppressing excessive amounts of speech. ECF 74 at 24 (citation omitted); *see Moody*, 144 S. Ct. at 2403 (strict scrutiny is triggered when a provider is forced to "alter … the mix of speech it wants to convey").

This choice between unconstitutional content-based limitations on speech mars almost *any* possible application of § 31(a)(5), rendering it unconstitutional "in every case." *Ams. for Prosperity*, 594 U.S. at 618. California may not "torch a large segment of the Internet" to prevent discrete potential risks to children. *Reno*, 521 U.S. 882.

**C. The Individual Provisions Are Vague.**

On top of being facially invalid on overbreadth grounds, *see supra* § IV.B, each of the challenged provisions is unconstitutionally vague under the First Amendment.

Vague laws "trap the innocent by not providing fair warning" of proscribed conduct, and invite "arbitrary and discriminatory application" by placing compliance at the whim of "ad hoc and subjective" regulators. *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001) (citations omitted). A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Laws regulating expression face an even "more stringent" test, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010) (citation omitted), because they cause speakers "to steer far wider of the unlawful zone," *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022) (citation omitted). Such laws must be drawn with "[p]recision," *NAACP v. Button*, 371 U.S. 415, 433, 438 (1963), and courts should "not hesitate[]" to invalidate them if they are not. *Butcher*, 38 F.4th at 1169.

Here, each of the Individual Provisions—and others that are similar to them, *see, e.g.*, § 31(a)(6)—is impermissibly vague.

***Policy enforcement.*** This mandate requires covered services to enforce their own policies, *see* § 31(a)(9), but content policies are "necessarily subjective." *Hunt v. City of L.A.*, 601 F. Supp. 2d 1158, 1172 (C.D. Cal. 2009), *aff'd*, 638 F.3d 703 (9th Cir. 2011). Reddit's Content Policy states that Reddit "is a place for creating community and belonging, not for attacking marginalized or vulnerable groups of people" and so users who "promote hate based on identity of vulnerability will be banned." Kumar Decl. Ex. 3. Truth Social, in contrast, allows users to report certain types of content—such as "content that depicts violence or threat of violence"—but expresses a "preference" that "the removal of users or user-provided content be kept to the absolute minimum." *Id.* Ex. 4. The *New York Times* requires the "use [of] respectful language" and tells users (among other things) to "[d]ebate, but don't attack." *Id.* Ex. 5. The *Washington Post* prohibits content that is "hateful," "contains advertising," is "in poor taste," or "is otherwise objectionable." *Id.* Ex. 6. Section 31(a)(9) co-opts these private policies and imbues their open-ended subjective terms with the force of law. Who is to say that what Reddit deems an "attack" on a "marginalized" person is the same as some government regulator? If the *New York Times* publishes content criticizing the California Attorney General for draconian censorship, will the California Attorney General deem that "respectful"? Will his successor? Services cannot know, and the State will have discretion "to act in an arbitrary and discriminatory manner … and still be completely within the scope of" the law. *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 514 (9th Cir. 1988) (cleaned up).

***Information-use restrictions.*** These provisions rely on the phrases "material detriment," "best interests," and "physical health, mental health, and well-being," which are open-ended and



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

subjective, particularly because they apply to any single minor. *See* § 31 (applying standards to "a child"); *NetChoice*, 113 F.4th at 1120 (noting vagueness of "material detriment to children"). Reasonable minds can disagree as to what types of information and ideas are detrimental to a young person's "best interests" or "well-being," and under our Constitution's system of ordered liberty, those judgments belong to individual families according to their values. *See Brown*, 564 U.S. at 794-95. Bestowing them on the government or intermediaries invites haphazard and discriminatory "ad hoc" enforcement, *Foti v. City of Menlo Park*, 146 F.3d 629, 638-39 (9th Cir. 1998), leaving covered services no way to ensure that they are complying with the law. *See Mukasey*, 534 F.3d at 205 (services "forced to guess" what "harmful to minors" means); *Free Speech Coal. v. Reno*, 198 F.3d 1083, 1095 (9th Cir. 1999) (similar), *aff'd*, 535 U.S. 234 (2002). Unrebutted evidence illustrates the "predictable tendency" for such uncertainty to generate broad chilling effects. *Counterman v. Colorado,* 600 U.S. 66, 77-78 (2023); *see* Roin Decl. ¶¶ 11-17; Cairella Decl. ¶¶ 18-19; Masnick Decl. ¶ 15; Paolucci Decl. ¶¶ 16-19; Szabo Decl. ¶¶ 6-7.

***Dark patterns.*** The focus of NetChoice's challenge to § 31(b)(7) is its prohibition of design choices that "lead or encourage" minors to "take any action that the business knows, or has reason to know, is materially detrimental" to their well-being. This Court previously stressed how vague this requirement is—though without using that magic word, as the Court enjoined the provision on other grounds. *See* ECF 74 at 34. The Court specifically noted that it was "troubled by the 'has reason to know' language in the Act, given the lack of objective standard regarding what content is materially detrimental to a child's well-being," and credited evidence of the predictable chilling effect caused by those "uncertainties." *Id.* To the extent this provision is not enjoined on different grounds, it should be enjoined on vagueness grounds. *See Counterman*, 600 U.S. at 77-78 (similar absence of scienter amplified vague statute's unconstitutionality).

***Age estimation.*** Businesses must estimate age with a "reasonable level of certainty appropriate to the risks." § 31(a)(5). This is impermissibly vague. How does a service assess the risk that its content will "potentially" cause some kind of risk to some user under 18? *Cf.* Roin Decl. ¶¶ 11-17; Cairella Decl. ¶¶ 18-19; Masnick Decl. ¶ 15; Paolucci Decl. ¶¶ 16-19; Szabo Decl. ¶¶ 6-7; *see NetChoice*, 113 F.4th at 1120 (Act's phrase "material detriment to children" is vague).



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

What is a "reasonable" level of certainty "appropriate" to that risk? Services cannot know. Some will err on the side of stricter screening. *See* Cairella Decl. ¶ 12. Others will consider barring access to minors altogether. *See* NYT Br. 8-9 (law may limit minors' access to *New York Times*). The First Amendment holds that such vague mandates, "susceptible to many different interpretations," *United States v. Hall*, 912 F.3d 1224, 1227 (9th Cir. 2019), are facially invalid because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). *See, e.g.*, *Mukasey*, 534 F.3d at 205 (COPA facially invalid in part because "publisher[s] will be forced to guess" what content is "harmful to minors").

### D. The Individual Provisions Violate The First Amendment As Applied To NetChoice's Members.

For the same reasons the challenged provisions are facially invalid, they are also invalid as applied to NetChoice's members. *See, e.g.*, Roin Decl. ¶¶ 6-22, 24-25 (describing how challenged provisions will interfere with Goodreads' speech); Cairella Decl. ¶¶ 4-22 (same for IMDb). The Court may award such relief. *See Holder*, 561 U.S. at 15-16 (pre-enforcement as-applied First Amendment challenges are justiciable); *e.g.*, *CCIA v. Paxton*, 2024 WL 4051786, at *9 (W.D. Tex. Aug. 30, 2024) (NetChoice has associational standing to pursue such challenges in the alternative).

## V. THE ALREADY-INVALIDATED DPIA PROVISIONS ARE NOT SEVERABLE FROM THE REGULATORY PROVISIONS OF THE ACT.

Irrespective of the Court's views about the validity of NetChoice's substantive challenges to the Regulatory Provisions, the Court should hold them invalid because the now-enjoined DPIA provisions, § 35(c), cannot be severed from any portion of the Act except § 32, which created the Working Group but imposes no substantive obligations on regulated entities.

An invalid provision can be severed "if, and only if, it is 'grammatically, functionally and volitionally separable'" from the statute's valid remainder. *Hotel Emps. & Rest. Emps. Int'l Union v. Davis*, 21 Cal. 4th 585, 613 (1999) (citation omitted). All three severability criteria must be met. *See Acosta v. City of Costa Mesa*, 718 F.3d 800, 819 (9th Cir. 2013); *People v. Library One, Inc.*, 229 Cal. App. 3d 973, 988 (1991). Here, the Act's invalidated DPIA provisions are neither volitionally nor functionally severable from the Regulatory Provisions.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

**A. The DPIA Provisions Are Not Volitionally Severable Because They Were Critical To The Act's Passage.**

The invalidated DPIA provisions are not volitionally severable. Invalid language is volitionally severable only if it was "not of critical importance to the measure's enactment." *Jevne v. Superior Ct.*, 35 Cal. 4th 935, 961 (2005) (quoting *Hotel Emps.*, 21 Cal. 4th at 613). Courts ask whether the valid portion "would have been adopted by the legislative body had [it] foreseen" the statute's partial invalidation. *People v. Nguyen*, 222 Cal. App. 4th 1168, 1192 (2014). The court must rule "with confidence" that the legislature was "sufficiently focused" on the valid parts that it would have "separately considered and adopted them in absence of the invalid provisions." *Acosta*, 718 F.3d at 817-18 (citation omitted). Any doubt precludes severance. *Id.* at 819.

Here, the DPIA provisions fail the volitional-severability test for two reasons.

***First***, the plain text of the Act counsels against severance. The legislature's decision not to adopt a severability clause demonstrates that the legislature intended the Act's components to "operate together or not at all." *In re Reyes*, 910 F.2d 611, 613 (9th Cir. 1990). The plain text also directs regulators to look to guidance in the U.K. for interpretive assistance. *See* AB 2273, Findings and Decls. §§ 1(d)-(e). That guidance contemplates self-evaluation and compliance-focused enforcement efforts in which monetary penalties are a last resort. *See supra* p. 12. Nothing in the Act's language or history suggests that the legislature "would have" preferred instead to enact a "truncated version" of AB 2273 that could never operate as intended. *Acosta*, 718 F.3d at 818-19. Indeed, the State's decision to import integrated statutory language from the U.K. in bulk—despite the First Amendment, no less—underscores its intent to have these provisions operate together as part of a comprehensive regulatory regime.

***Second***, legislative history shows that the legislature would not have passed the law without the DPIA safe harbor. After an earlier version of the Act was shelved in a "suspense file" (where legislation dies without a vote), *see* Cal. State Senate Comm. on Appropriations, Analysis Addendum: Suspense File, AB 2273 (Aug. 11, 2022), its sponsors tried to resuscitate it by amending it to include a 45-day cure provision to ensure that the bill's provisions shoved online services into proactively censoring content, not by imposing strict liability. *Id.* When that amendment failed to win over the opposition, the bill was further amended on the Senate floor to



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

enlarge the cure period to the 90-day period that the legislature approved. *See* Cal. State Senate, Floor Analysis on Third Reading, AB 2273 (Aug. 22, 2022). The fact that the legislature actually considered—but did not adopt—the bill without the cure provision demonstrates that the legislature *would not* have adopted that version. *See Mendoza v. California*, 149 Cal. App. 4th 1034, 1064 (2007) (holding unconstitutional provisions not severable where legislature considered but declined to adopt alternative version of bill).

Statements in floor debates and by the bill's author confirm the safe harbor provision was crucial to the Act's ultimate passage. Assemblymember Wicks highlighted the cure provision's safe harbor when presenting the final version of the bill for a vote. *See* Transcript, Assembly Floor Session, AB 2273 (Aug. 30, 2022) (calling attention to amendments that "ensure businesses in substantial compliance with the Age-Appropriate Design Code have an opportunity to remedy violations prior to being subject to civil penalties") (attached as Gossett Decl. Ex. 9). Severability is not justified in these circumstances. *See Cultiva La Salud v. California*, 89 Cal. App. 5th 868, 886 (2023) (declining to sever unconstitutional portion of penalty provision where the remaining portions would penalize conduct the legislature never intended to punish).

**B. The DPIA Provisions Are Not Functionally Severable Because They Effect The Act's Focus On Compliance.**

The DPIA provisions are also not functionally severable. An invalid provision is "functionally" severable only when it is "not necessary to the measure's operation and purpose." *Hotel Emps.*, 21 Cal. 4th at 613. That analysis turns on "the intended function of [the] particular statutory scheme." *Barlow v. Davis*, 72 Cal. App. 4th 1258, 1267 (1999). Removing the unconstitutional DPIA provisions forecloses the Act's surviving operative language from operating as the legislature intended.

The legislature intended to create a compliance-based regime enforced primarily through internal compliance bureaucracies, not strict liability. The Act thus would have required companies not only to perform a self-analysis, but to "create a timed plan to mitigate or eliminate" any identified risks. § 31(a)(2). And it would have created a safe-harbor, insulating companies from liability if they cure any noticed violations. § 35(c).

It is indisputable that this is the Act's central method of operation. Before the Ninth Circuit,



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

the State explained that "[t]he role of the DPIA provision is to incentivize businesses to be *proactive* about their management of children's data by offering businesses that complete the DPIA a 90-day period to cure violations of the Act without penalty." State's App. Br. at 34 (emphasis added); *see also* First PI Opp. (ECF 51) at 14, 22, 25 (similarly underscoring the centrality of the cure provision's incentive structure). The Act's co-author emphasized that the purpose of the DPIA provision is to "bring[] [covered services] into the fold of self-regulation, right? Of them thinking through, okay, how am I as a company going to be a good actor in this space when we know we have these challenges. And I think that's also a *different way of thinking about the regulation*." Transcript, *Conversation with California Assemblymember Buffy Wicks*, Husch Blackwell, at 8 (Mar. 7, 2023) (emphasis added) (attached as Gossett Decl. Ex. 10). She explained that the Act is not intended to catch and penalize violations, but to bring businesses that violate the Act into compliance: "[T]he goal of this provision is compliance. You know, we want companies to do the right thing and to adhere to the law. Because that's how we actually protect kids online …. [I]t's not punitive." *Id.* at 8-9. "[I]f [companies] *continue* to fail, … there are penalties and the attorney general has the ability to administer those and go after them. *But that's not the goal of the bill, the goal of the bill is to get … companies, to comply* and to keep our kids safe online." *Id.* at 9 (emphasis added). And the Act relies on the U.K. regulator's application of the U.K. Age-Appropriate Design Code, a standard the U.K. government wields to pressure businesses into changing their practices, not a rule whose violation triggers liability. *See* Keaney Decl. (ECF 51-3) ¶¶ 27, 30, 67; *id.* Ex. A at 13 (describing U.K. regulatory enforcement environment generally); *see also* WARD FARNSWORTH, THE LEGAL ANALYST 164 (2007) (contrasting rules and standards).

Stripping these provisions out would mark a foundational shift in the Act's function and focus. Severance is thus improper. *See Bd. of Osteopathic Exam'rs v. Bd. of Med. Exam'rs*, 53 Cal. App. 3d 78, 85 (1975) (severance may not "accomplish a purpose which the lawmaking power never intended") (citation omitted); *Metromedia, Inc. v. City of San Diego*, 32 Cal. 3d 180, 191 (1982) (severance inappropriate where it would "leave the city with an ordinance different than it intended, one less effective in achieving the city's goals").



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

## VI. NETCHOICE IS LIKELY TO PREVAIL ON ITS OTHER CLAIMS.

### A. Section 230 Preemption

Enacted to bolster First Amendment protections, Section 230 exists to encourage online services to exercise editorial rights over the third-party content they publish without fear they will face liability for moderating content imperfectly. *See Fair Hous. Council of San Fernando Valley v. Roommates.com LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc) (Section 230 seeks "to spare interactive computer services … grim choice" "between taking responsibility for all messages and deleting no messages at all"). Section 230(c)(1) thus preempts state laws that impose liability on (1) an interactive computer service (2) in a way that treats it as the publisher or speaker (3) of information provided by a third-party. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-02 (9th Cir. 2009). Section 230 authorizes pre-enforcement relief. *See, e.g.*, *CCIA*, 2024 WL 4051786, at *19; *Airbnb, Inc. v. City of Boston*, 386 F. Supp. 3d 113, 123 n.11 (D. Mass. 2019); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *6 (D.N.J. Aug. 20, 2013); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1274 (W.D. Wash. 2012).

Section 230 facially preempts portions of the challenged provisions. Section 230(c)(1) preempts the policy-enforcement mandate, § 31(a)(9), to the extent it applies to content policies because any such applications would necessarily impose liability on interactive computer services based on their decisions to publish or not publish third-party content. *See, e.g.*, *CCIA*, 2024 WL 4051786, at *19 (Section 230 preempted Texas law regulating "decisions relating to the monitoring, screening, and deletion of content"); *Airbnb*, 386 F. Supp. 3d at 123 n.11 (Section 230 preempted law requiring services "to enforce local laws" regulating user content). Section 31(a)(9) thus "stands as an obstacle," *Crosby v. NFTC*, 530 U.S. 363, 373 (2000), to congressional policy simultaneously encouraging the widest possible dissemination of online content and active enforcement of private editorial standards. "Congress sought to … allow[]" interactive computer services "to perform some editing on user-generated content without … becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete." *Roommates.com*, 521 F.3d at 1163. It thus enacted Section 230 precisely "to remove the disincentives to self regulation" posed by § 31(a)(9). *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Section 230(c)(1) likewise facially preempts §§ 31(b)(1), (3), (4), and (7) to the extent those prohibitions impose liability upon the publication of third-party content that is "materially detrimental to" or not "in the best interest" of minors. *See CCIA*, 2024 WL 4051786, at *19 (preempting law that imposed liability based on "the type of content a site displays"). Any such application imposes liability on interactive computer services for their decisions to publish third-party content and is thus preempted. *See Barnes*, 570 F.3d at 1101-02.

**B. COPPA Preemption.**

The Individual Provisions are also invalid with respect to minors under 13 because they conflict with, and therefore are preempted by, COPPA. *See New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 457 F. Supp. 3d 1103, 1120-21 (D.N.M. 2020); *H.K. ex rel. Farwell v. Google LLC*, 595 F. Supp. 3d 702, 711 (C.D. Ill. 2022). Though the Court (ECF 74 at 39-40) questioned whether the Act is truly "inconsistent with" COPPA, a comparison of the requirements in the Individual Provisions and COPPA proves it is with respect to minors under 13.

COPPA preempts state laws that impose "contradictory … requirements" or "stand as obstacles to federal objectives." *Jones v. Google LLC*, 73 F.4th 636, 642 (9th Cir. 2023). Central to COPPA's operation is the requirement that a covered service actually know or intend to reach a user under 13 before its regulations apply to their discrete interactions. *See* 15 U.S.C. § 6502(a)(1). The Act expressly eschews that standard, § 29, categorically applying the Individual Provisions more broadly to any service "likely to be accessed by children." §§ 30(b)(4), 31(a)-(b). COPPA also empowers parents to decide what their children can access online; the Individual Provisions strip parents of that power. The Individual Provisions are thus not "parallel to" and do not "proscribe the same conduct" as COPPA. *Jones*, 73 F.4th at 644.

**C. The Dormant Commerce Clause.**

The Commerce Clause denies states power to "directly control[]" interstate commerce. *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc) (citations omitted). As the Supreme Court recently explained a regulation violates the Constitution's "horizontal separation of powers" if its practical effect reaches activities "wholly outside" the State's borders. *Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (citing *Edgar v.*



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*MITE Corp.*, 457 U.S. 624, 641-43 (1982)). The Individual Provisions do exactly that.

The law's application to "residents of California" underscores the issue: Before a covered provider offers service, it must discern if a user is a California resident and restrict its services accordingly, even if that user is out of state. Indeed, this Court observed during the first preliminary injunction hearing that the Act thus "may cause … providers to change their practices nationwide." ECF 66 at 90. That is unconstitutional. *See Christies*, 784 F.3d at 1323 (law invalid for regulating conduct with "no necessary connection with the state other than the residency of the seller"); *cf.* Cal. Civ. Code § 1798.145(a)(7) (CCPA exempts activity "wholly outside of California").

Courts since *Ross* have continued to apply this rule in facial challenges. *See, e.g.*, *Nat'l Shooting Sports Found. v. Bonta*, 718 F. Supp. 3d 1244, 1256 (S.D. Cal. 2024) (state law "directly affecting commercial transactions that take place entirely outside of the state's borders plainly contravenes the dormant Commerce Clause") (cleaned up); *Ass'n for Accessible Meds. v. Ellison*, 704 F. Supp. 3d 947, 953 (D. Minn. 2023) ("[*Ross*] did not change the rule that a state may not directly regulate transactions that take place wholly outside the state and have no connection to it."). It applies here.

## VII. THE OTHER PRELIMINARY INJUNCTION FACTORS ARE MET.

The remaining preliminary injunction factors are also satisfied.

***First***, there is "no difficulty finding that NetChoice" will suffer irreparable harm absent injunctive relief. ECF 74 at 41-42. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Even the "threat of enforcement" that results in a "chill on . . . free speech rights … constitutes irreparable harm." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). Because NetChoice has "demonstrat[ed] the existence of a colorable First Amendment claim," *CTIA v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019), it has established irreparable injury.

NetChoice members also face irreparable harm from "being forced to comply with an unconstitutional law or else face financial injury or enforcement action." *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017); *Am. Trucking Ass'n v. City of L.A.*, 559 F.3d 1046, 1058-59 (9th Cir. 2009). NetChoice "presents evidence that businesses already are



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

expending time and funds preparing for enforcement of the [Act]," and requiring them "to proceed with such preparations without knowing whether [the Challenged Provisions are] valid 'would impose a palpable and considerable hardship' on them." ECF 74 at 41 (citing declarations).

***Second***, the equities and the public interest support an injunction. When the government is a party, the "balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940-41 (9th Cir. 2020). NetChoice has shown the Act violates the First Amendment, so equity and the public interest support an injunction. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (equity and the public interest support constitutional rights); *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) (no interest in enforcement of unconstitutional laws).

## VIII. CONCLUSION

NetChoice respectfully requests an order enjoining the Regulatory Provisions, and any other provisions the Court deems inseverable from the invalid portions of the Act.

DATED: November 1, 2024

DAVIS WRIGHT TREMAINE LLP

By: */s/ Ambika Kumar*
Ambika Kumar

Attorneys for Plaintiff
NetChoice LLC, d/b/a NetChoice



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

AMBIKA KUMAR (admitted *pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

DAVID M. GOSSETT (admitted *pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (admitted *pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (admitted *pro hac vice*)
bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**APPENDIX TO SECOND MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. Beth Labson Freeman<br>Date: January 23, 2025<br>Time: 9:00 a.m.<br>Dept.: Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

# APPENDIX

Pursuant to the Court's instruction at the Status Conference held on September 19, 2024, Plaintiff NetChoice LLC submits the following Tables 1 and 2 of provisions challenged in the Second Motion for Preliminary Injunction, not already enjoined by the Court and the Ninth Circuit:

| Table 1: Provisions Challenged Under The First Amendment (Br. § IV) | | | | |
|---|---|---|---|---|
| | 1A Facial: Content-Based Coverage Definition (Br. § IV.A) | 1A Facial: Unconstitutional In Challenged Applications (Br. § IV.B) | 1A Facial: Vagueness (Br. § IV.C) | 1A As-Applied: Unconstitutional In Challenged Applications to NC Members (Br. § IV.D) |
| Age Estimation: § 1798.99.31(a)(5)* | X | X | X | X |
| Default Privacy: § 1798.99.31(a)(6) | X | | X | |
| Policy Display: § 1798.99.31(a)(7) | X | X | X | X |
| Tracking Signal: § 1798.99.31(a)(8) | X | | | |
| Policy Enforcement: § 1798.99.31(a)(9)* | X | X | X | X |
| Provide Tools: § 1798.99.31(a)(10) | X | | | |
| Personal Info Use: § 1798.99.31(b)(1)* | X | X | X | X |
| Profiling: § 1798.99.31(b)(2)* | X | X | X | X |
| Share or Retain Info: § 1798.99.31(b)(3)* | X | X | X | X |
| Use Info Purposes: § 1798.99.31(b)(4)* | X | X | X | X |
| Geolocation Info: § 1798.99.31(b)(5) | X | | | |
| Geolocation Signal: § 1798.99.31(b)(6) | X | | | |
| Dark Patterns: § 1798.99.31(b)(7)* | X | X | X | X |
| Use Age Verif. Info: § 1798.99.31(b)(8) | X | | | |



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

**Table 2: Provisions Challenged Under Other Arguments (Br. §§ V-VI)**

| | Severability: Not Severable from Invalid DPIA (Br. § V) | Section 230: Preempted In Some or All Applications (Br. §VI.A) | COPPA Preempted (Br. §VI.A) | Violates Commerce Clause (Br. § VI.C) |
|---|---|---|---|---|
| Age Estimation: § 1798.99.31(a)(5)* | X | | X | X |
| Default Privacy: § 1798.99.31(a)(6) | X | | | X |
| Policy Display: § 1798.99.31(a)(7) | X | | | X |
| Tracking Signal: § 1798.99.31(a)(8) | X | | | X |
| Policy Enforcement: § 1798.99.31(a)(9)* | X | X | X | X |
| Provide Tools: § 1798.99.31(a)(10) | X | | | X |
| Personal Info Use: § 1798.99.31(b)(1)* | X | X | X | X |
| Profiling: § 1798.99.31(b)(2)* | X | | X | X |
| Share or Retain Info: § 1798.99.31(b)(3)* | X | X | X | X |
| Use Info Purposes: § 1798.99.31(b)(4)* | X | X | X | X |
| Geolocation Info: § 1798.99.31(b)(5) | X | | | X |
| Geolocation Signal: § 1798.99.31(b)(6) | X | | | X |
| Dark Patterns: § 1798.99.31(b)(7)* | X | X | X | X |
| Use Age Verif. Info: § 1798.99.31(b)(8) | X | | | X |

Provisions marked with an asterisk (*) are referred to as the "Individual Provisions" in NetChoice's Second Motion for Preliminary Injunction. All of the provisions in sections 1798.99.31(a) and (b) are collectively referred to as the "Regulatory Provisions."

DATED: November 1, 2024

DAVIS WRIGHT TREMAINE LLP

/s/ Ambika Kumar
Ambika Kumar

Counsel for Plaintiff
NETCHOICE, LLC d/b/a NetChoice



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (*pro hac vice*)
bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**DECLARATION OF DAVID GOSSETT IN SUPPORT OF NETCHOICE'S MOTION FOR SECOND PRELIMINARY INJUNCTION** |

I, David Gossett, declare as follows:

1. I am a partner in the law firm Davis Wright Tremaine LLP, counsel for Plaintiff NetChoice LLC. I make this declaration from personal knowledge.

2. Attached as **Exhibit 1** is a true and correct copy of the website page *Policies and community standards*, U.K. Information Commissioner's Office, https://tinyurl.com/5aahfw9r (last visited Oct. 28, 2024).

3. Attached as **Exhibit 2** is a true and correct copy of the website page *Detrimental use of data*, U.K. Information Commissioner's Office, https://tinyurl.com/ysvctbe7 (last visited Oct. 28, 2024).

4. Attached as **Exhibit 3** is a true and correct copy of the website page *Nudge techniques*, U.K. Information Commissioner's Office, https://tinyurl.com/yurvjvft (last visited Oct. 28, 2024).

5. Attached as **Exhibit 4** is a true and correct copy of *Profiling*, U.K. Information Commissioner's Office, https://tinyurl.com/ywt97y7z (last visited Oct. 31, 2024).

6. Attached as **Exhibit 5** is a true and correct copy of Bobby Allyn, *Snapchat Ends "Speed Filter" That Critics Say Encouraged Reckless Driving*, NPR (June 17, 2021).

7. Attached as **Exhibit 6** is a true and correct copy of the website page *Adult Nudity and Sexual Activity*, Meta, https://tinyurl.com/2pbu5ktx (last visited Oct. 28, 2024).

8. Attached as **Exhibit 7** is a true and correct copy of the website page *Bullying and Harassment*, Meta, https://tinyurl.com/4t6pn32s (last visited Oct. 28, 2024).

9. Attached as **Exhibit 8** is a true and correct copy of the website page *Transparency Report July 1, 2023 – December 31, 2023*, Snap, https://tinyurl.com/yc89bsca (updated Apr. 25, 2024).

10. Attached as **Exhibit 9** is a true and correct transcript of the California State Assembly Floor Session held August 30, 2022.

11. Attached as **Exhibit 10** is a true and correct transcript of *Conversation with California Assemblymember Buffy Wicks*, Husch Blackwell (Mar. 7, 2023), https://tinyurl.com/7u2bdxx9.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

12. Attached as **Exhibit 11** is a true and correct copy of the study *Teens, Social Media and Technology*, Pew Research Center (December 2023).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 1st day of November 2024 in the District of Columbia.

/s/ *David Gossett*
David Gossett



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

**CERTIFICATION OF COMPLIANCE**

I, Ambika Kumar, hereby certify that pursuant to N.D. Cal. Civil L.R. 5-1, I have obtained authorization from the above signatories to file the above-referenced document and that they have concurred in the filing's content.

Dated: November 1, 2024

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: /s/ *Ambika Kumar*
Ambika Kumar

*Attorneys for Plaintiff*
*NetChoice, LLC d/b/a NetChoice*



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# EXHIBIT 9

# Transcript

Assembly Floor Session – 08-30-2022
05:30:28 to 05:33:15

**AM = Assembly Member*

| | |
|---|---|
| AM Ward: | Also respect your aye vote on concurrence. |
| Chair: | Thank you, Mr. Ward. Seeing no additional comment, Clerk will open the roll. *[Bell]* All Members vote or desire to vote. All Members vote or desire to vote. All Members vote or desire to vote. Clerk will close the roll. Tally vote, Ayes 61, Nos zero. Senate amendments are concurred in. This is file item 338 AB 2273. Clerk will read. |
| Clerk: | A summary of Bill 2273 by Senate Member Wicks and others an act relating to consumer privacy. |
| Chair: | Ms. Wicks. |
| AM Wicks: | Thank you, Mr. Speaker, and Members. AB 2273 will establish the California Age-Appropriate Design Code to help create safer online experiences for kids in our state. Senate amendments reflect numerous conversations with stakeholders and ensure that California youth receive the same robust protection as their peers in the UK and Europe. They include language that will limit enforcement to the attorney general, create robust penalties, and ensure businesses in substantial compliance with the Age-Appropriate Design Code have an opportunity to remedy violations prior to being subject to civil penalties. Should this Bill become law, California will lead the way in making the digital world safer for for American children and take a major step towards creating a global standard for the protection of youth online. That is the side of the story that I want California to be on. I respectfully ask for an aye vote. |
| Chair: | Thank you, Ms. Wicks. Mr. Cunningham. |
| AM Cunningham: | Thank you, Mr. Speaker, I'll be quick. I rise as a proud joint author of AB 2273. I think this is the best bill protecting kids online that is going to come before this legislature, and I respectfully ask for a strong aye vote. |
| Chair: | Thank you, Mr. Cunningham. And Mr. Gabriel. |
| AM Gabriel: | Thank you, Mr. Speaker, I also rise in support of AB 2273. I want to complement our colleagues Assembly Woman Wicks and Assembly Member Cunningham for very skillfully putting together a really important bill here. And we spent a lot of time in the privacy Committee this year talking about all of the challenges that young people face online. |

We heard from so many parents and so many young people about the dangers of navigating the online world. This is a very thoughtful Bill that takes a consumer protection approach. It's going to have a big impact here in the state of California and beyond, far, far beyond. Respectfully urge an aye vote on AB 2273.

Chair: Thank you, Mr. Gabriel. Seeing no other members seeking recognition on this item, Clerk will open the roll. *[Bell]* All members vote who desire to vote.

# EXHIBIT 10

**Transcription of Legislating Data Privacy Streams**

| | |
|---|---|
| 00:00:12 David Strauss | Welcome to another episode of Data Privacy Unlocked. My name is David Strauss. With me today is California Assemblymember Buffy Wicks. Assemblymember Wicks is the primary sponsor of the 2022 California Age Appropriate Design Code Act, a first in the nation law focused on online child safety issues. The Act is set to go into effect on July 1st, 2024, but it is already causing a lot of attention as you might already know. Assemblymember Wicks, thank you for joining us today. |
| 00:00:44 Buffy Wicks | Thank you so much for having me. |
| 00:00:46 David Strauss | So, maybe I can kind of start from the beginning. That's always a good place to begin. How did you get interested in running the AADC? |
| 00:00:54 Buffy Wicks | Well, you know, I'd done some work in the space prior. I did a bill previous to this, the Kids Act, that was looking at more direct regulation of algorithms as it pertained to, you know, you stick your kid on Youtube and watching, you know, Thomas the Train videos, and you come back 40 minutes later and they're watching trainwrecks, or something like that, right? And how those algorithms can move you into different directions. That bill did not end up making it out of the process, but we had really interesting conversations in the Privacy Committee. We have a Privacy Committee here in California. And it's obviously bipartisan as all of our committees are. But really its comprised of parents, you know, and my joint co-author on this bill, Jordan Cunningham is a dad of four, and I have two girls. His kids are a little bit older than mine, so they're kind of in the throes of being teenagers in the era of social media. My kids are six and two, and so they're, I'm looking down the kind of, my future seeing that come towards them. And really we just kind of came together as parents around this notion that we just need strong regulatory environment for our kids, you know. And my kids, they're not going to be Luddites, they're digital natives, you know. My daughter is six years old and she's like, "When do I get to get a phone?" And I'm like, "A long time from now is when you're going to get a phone." But they obviously see us with phones and they're, you know, they're fluent on it. And I just want to create a better environment, you know, and for all of our kids, and you know, I don't know if you saw yesterday, the CDC came out with some pretty alarming research around kids mental health. Sixty percent of young girls are, have experienced sadness and hopelessness over the past year. Sixty percent, you know, suicidal ideation is up. Suicidal attempts are up. I mean, all these things right now. I don't know if we can completely attribute all that to social media, right? I know that's a conversation that happens, but it |

certainly does have an impact. And you know, we need to wrap our heads around this a little bit more. So really I just came to this issue set more as a parent than anything else, as did many of my colleagues who wanted to work on this bill. And in California, you know, Jordan Cunningham is the joint author. And I also had a woman named Coddy Petrie-Norris, who is a member Norris. I represent a very progressive district, Jordan is a Republican and Coddy is sort of a moderate Democrat. And so those are kind of the three parties in the California state legislature. And all three of us just came to it just trying to solve a problem in an era of very divisive politics, we just wanted to solve a problem. So that was, that's what kind of birthed Age-Appropriate Design. Obviously we stole it from the UK, because we like to think that we created everything here in California but we also try to steal other people's good ideas too.

00:03:36 David Strauss Let me ask you about the, where you landed on that one. I mean you say a lot of like unpack, but the UK, for listeners out there, some may be familiar, some may not, the UK has UK Age-Appropriate Design care, it's the same name of the bill. That goes into effect first, and then, how does it happen that you guys become, I mean did you do your own research, is there organizations come to you with that, what's the, what's the process that happens?

00:04:01 Buffy Wicks Yeah, so, prior to being an elected official in 20- sort of 15 and 16, I was working with an organization called Common Sense Media. And we were really working on some of these issues. So I had familiarity with it, and as I mentioned in prior policy working it. I think it sort of developed a reputation of someone who is willing to, you know, tackle some tougher issues as pertaining to tack, specifically around a kids' lens. And some of the folks that worked at Common Sense Media and are working with an organization called Five Rights, Yvonne Kidron, the Baroness, is the one who started that organization and she was really the chief architect of the bill that become law in the UK. And so through various, you know, ways we connected and she flew out here to California and we started talking about it and kind of plotting and scheming and how we thought if we, if they could pass this in the UK we could pass it here in California. Chances are other states may follow suit and maybe our federal government. And if even if no other policies follow suit, other, you know, legislation, certainly if we create a floor of behavior here for tech companies in California and one in the UK, then a lot of the companies may follow suit anyway, because they don't want, you know, it's, it's easier for them if they just have the standard they have to reach in California and the UK, that would work as opposed to having a standard in California that's different than the standard in Nevada, you know? So we thought, you know, if we're able to kind of have a, you know, a marquee law in the EU and a marquee law, although UK's not in the Union anymore, but in Europe,

| | |
|---|---|
| | and a marquee law here in California we could actually potentially create some global change on the issue. |
| 00:05:43 David Strauss | You mentioned right, right before we started, that you're aware that other states are in fact, you know, looking AADC bills. It sounds like that was very intentional on your part. |
| 00:05:51 Buffy Wicks | Yeah, and, you know, this is not new in California, right? We created industry standards around car emissions, you know, other things then I think follow suit in other places. And I think it's also just interesting because we are, like, home of the tech industry? You know, a lot of, obviously Silicon Valley is here. A lot of my constituents work in the tech industry. I represent the East Bay, Oakland, Berkeley and Richmond, so you know we have a lot of the tech industry in my district. And so we've had a lot of these conversations around privacy regulation, tech regulation, anti-trust work, etc. in the California legislature for years. You know, we've passed landmark legislation four years ago I think it was, we did ballot measure work two years ago to create a regulatory agency and privacy. We have a Privacy Committee, I don't think a lot of other state legislatures have a Privacy Committee that's focused on this. So we have, I think, a history here in California of doing this type of stuff and then we also have, like, a really good bipartisan group of people who care about it. And really just want to kind of put party ideology aside and try to think through how we can actually solve the problem. |
| 00:07:02 David Strauss | And now all I see, one of these that really stands out when you read about the AADC is that it passed without a single no vote at any point. Of any committee or in the Assembly or in the Senate. I think that speaks volumes to how this issue resonates across party lines. |
| 00:07:19 Buffy Wicks | I mean, that was my experience, and we have opposition from the tech industry and opposition from trade association groups and we talked a lot with the opposition. But we also spent a lot of time, I as a legislator and my colleagues who were, who were joint authors on the bill, talking to our colleagues about it. And I think again coming in kind of as parents trying to get stuff done to protect our kids, I think was sort of the basis of this. We also had a young woman named Amy who was 15 or 16 at the time testifying in the committees about her experience as a teenager navigating social media, navigating kind of just this new world order. I think those of us, you know, I didn't have social media when I was in high school or college, really. You know, I got social media maybe when I was in my mid-twenties and so I was older. A lot of our legislators are 50, 60, 70, you know, they're older, it's an older, so they don't, I think, understand or appreciate in the same way how kids are grappling with this. So bringing her voice to the table and really centering the conversation on her experience was |

| | |
|---|---|
| | also important for us. So that, so that lawmakers understood, what are our kids navigating right now? And again when you look at the data around their experience of life going through with this information onslaught coming at them on the front end and then on the back end all the information sort of being tracked by them, you know. Our number one job as lawmakers is to keep our community safe, and specifically our kids. And so, yeah, it got a lot of support across the board because I think everyone recognized we need more regulation in this space. We know we do. And, you know, if you're, you know a 45 year old person, you want to spend six hours on TikTok until three o'clock in the morning, by all means go for it. Like, you're an adult, you've made that decision. But when you're 14 years old, and you have a hard time regulating decision, the decision-making process, we should think about some parameters around maybe not sending push notifications, you know, past 9:00 pm, or whatever. Just smart things that help parents also navigate the space that we're in. |
| 00:09:20 David Strauss | Not to get personal on me, but I've got three young kids, ten, eight and six, mine are all boys. So you and I live in alternate universes. You with two girls and mine with all boys. But I know, like, for Christmas we got the boys, you know, gaming console, and it's that sort of repetitive, they keep on playing, they keep on playing, and we took one away from my oldest, and it was like, it was like taking heroin away from – |
| 00:09:45 Buffy Wicks | I know. Yeah. |
| 00:09:47 David Strauss | It's, it's kind of, it's kind of shocking when you, when you approach this, and to your point, I mean, we're of a certain age where we didn't grow up with this. I just, I just, you know, it's hard not to grow up at that age, I guess, to have all that social media influence. Yeah, sorry, I just got on my soapbox there for a minute there, but you had mentioned before, you know, the federal, right and I ask this every time I interview a state lawmaker, right, and I say, you know, do you think this is something that the federal government should do and I strong suspect that I know what your answer is. But I like to hear your point of view on, on you know, what the federal government should be doing. |
| 00:10:25 Buffy Wicks | Well I would love to see policy change at the federal level. You know, and I worked for President Obama for six years, I lived in DC for, on and off, for 15 years. I've had a lot of, I have a lot of connectivity with DC and, you know, worked on the Hill, and so, you know, I got to work on the Affordable Act and all kinds of other things that are great when our federal government actually has the ability to make change. So I would love to see federal lawmakers work on this. Obviously the president would as well. He called for essentially this |



4894-4995-6339v.1 0051461-004957

type of stuff in the State of the Union recently, which was great to hear coming from him. So I would love to see action. And I do think, you know, I mean you look at the politics of this country right now and how bifurcated the conversations are and how toxic they can be sometimes and how difficult it is to get anything done. Although there have been, certainly, some exciting things that have happened in, you know, the bipartisan guns bill last year and what the president has done, he's done, passed so many great things in terms of helping us get out of, you know, COVID and the economic hole that we're in. But having said that, it's difficult to pass anything in Washington DC, we all know that. But I think this issue is a place where we can find commonality and I, I think that because I know it because we did it in California. You know, we had a real bipartisan support on it. And so I think that that can translate in DC as well.

00:11:43 David Strauss It's interesting because, there's no reason for you to know this, but the last year Connecticut passed the privacy bill and it went to the House floor and there was an amendment proposed. And it was around children's privacy. And the interesting thing was it was a Republican who was pushing that amendment, saying this bill doesn't go far enough on children's privacy to the point that Connecticut work group and then you appear on that work group. But it really is, it's one of those ah-ha moments, because you realize that this issue really does cross party lines because everyone has kids and everyone wants to protect them.

00:12:15 Buffy Wicks That's right. Everyone wants to protect their children, and you know, I think it's, you know, from my perspective I think about it again as a parent where, you know, I want them to be fluent and literate online. I want them to be able to access and utilize the newest tools and all those other things, right? I want them to be living in a modern world with the rest of us. While at the same time, I want them to be safe and I want safeguards and I want them, you read so many stories and see so many situations and the pressures that are on them. And not to digress, but I don't know if you saw *The New York Times* did a two-year study, right, really trying to understand why the increase of suicidal ideation and attempts and saw harm in all of these things, and they think it's because, you know, we're having puberty at a younger age and having social media and a bunch of information coming at us at the same time. That's what's happening with kids and they can't handle it, right? And so it's not the direct cause of these problems but it's a piece of the conversation. And so if I as a regular, as a legislator can regulate a better environment for them to help mitigate some of those challenges, I'm going to do everything I can do to do that. As are the Republicans, I think, you know.

00:13:29 David Strauss — Yeah, I, I think it, like I said, I think it does, I mean you see that across the country now, I don't know, but Republicans are, deeply red states are proposing social media regulation bills that probably would be something that, that feels very familiar to you. And some of these same themes. Let me ask you, taking from the general to the specific, then, you came in the work group this past summer in Connecticut, it was talking about children's bias among other things. And you said, I don't expect you'll remember, but you said, I listened to it over the weekend so I, it relates to one of the things that you said, that the goal of the bill was to create high privacy settings by default. Can you talk a little about what you had in mind, maybe you mentioned a few already. But what, what the, what you're hoping to encourage companies to do in that regard.

00:14:19 Buffy Wicks — Yeah, and some of this, we're, we're seeing how it's unfolded in the UK. And so there's some kind of really, I think, tangible examples, right? You know, I think restrictions on DL location settings I think is important. Turning off, making it the default setting to have autoplay turned off, right? And then again, people can go on and adults can go in and change the default settings should they so choose. Some parents want to have the, the, you know, autoplay on if they're on a long car trip and they want their kid to watch, you know, Daniel Tiger for how many hours, I mean, I've been there, I know what it's like to travel with kids, right. But make the default setting not to encourage that kind of, kind of addictive behavior. But you know another example is not allowing for adults that are not in your network to direct message children under the age of 18. I don't know why you, a strange adult should be direct messaging someone who is under the age of 18. So those are some things, and then some of their stuff, you know, that has happened in the UK is just, you know, safe search is the default engine in Google now for those under the age of 18, right. The push notifications, one of the challenges that we know exists is, you know, kids are having their phone in their bedroom and it's next to their bed, and if they're getting push notifications until 10, 11, 12, one o'clock in the morning, then that's what they're doing is they're up on their phone until 10, 11, 12, one o'clock in the morning. And obviously you can say, well, it's the parents' job to take the phone out of the room. I get all that, in, in principle, but in reality, I've also been a parent and understand the challenge of trying to navigate all these things, right? So let's turn off the push notifications after a certain time. Kids need their sleep, teenagers need their sleep in particular, you know. So a lot of this is really common sense stuff that's really focused on the design of the product, not the content. And that's really important because of the Section 230, we really want to be mindful of, there's this, and I'm sure you're going to ask about it, the Net Choice lawsuit, right? But we thoroughly strongly, that this bill is really about the product design and not the content that kids are receiving. So we

| | |
|---|---|
| | think that we are in really strong legal standing in terms of that lawsuit. But it's about, it's about making the products, products that kids access, whether it be apps or websites, etc., they're by design, by default created with kids in mind. And right now they're not, and you know, I spent a lot of time talking to tech companies throughout the process of this bill. I sat down and talked to Meta and it was like three moms at Meta who were talking to me about this sort of stuff, right? They want their kids to be safe, too, you know. And so I think it's a question of, is kid safety like, priority number 45 that kind of doesn't get discussed very often in the C-Sweet meetings or is it items number one, two and three, right? Are we making, and the goal of the bill is to put it at the top of the priority list so that we're forcing the companies to be more mindful about the products that they are creating in terms of kids accessing them. |
| 00:17:12 David Strauss | So let me ask you, there are a number of things to ask you about, about their response. One thing that kind of stuck out at the beginning was, at the age threshold of under 18, CAPA, the federal bill Privacy Protection Act is under 13. I know having been part of the process before, there's a big fight over like, what that age should be, should it be under 16, should it be, you know, under 17. How did you guys land on under 18? |
| 00:17:38 Buffy Wicks | I, because that's the age by which you become an adult, when you're 18. And when you're under 18, you're not an adult, right? And there's a reason for that, you know, and I think, you know, we were pushed to the, you know, 13 and, you know, but 13, 14 year olds like, they need protections too. Are we saying that they're ready to be adults? We're not, right? So we felt strongly that 18 was the right standard, especially for a bill like this, that it's, the right type of regulation that says allow for kids to be online and experience all these things and navigate the world, but we just want them to do it safely. So you know, that was one of, the tech industry wanted to bring the age down, but you know, again, when we had Amy speak, she's, she was I think 16 at the time when she was talking about her experiences and she was begging for regulation. And you hear this more often from teens. There's, there's different, you know, emerging movements from teenagers who are really trying to actually get rid of their phones or take social media off of their phones. Because they understand what they're experiencing, you know. And if you have teenagers who are begging for more regulation of the space, like, let's honor them and let's put them as drivers in this process. And that's why we really try to include people like Amy in the conversation. |
| 00:18:53 David Strauss | One of these you mention is, well, and your answer was, this concept of kind of like, Connecticut and I think wrote into this AADC has a data of protection impact assessment or a data protection assessment |

| | |
|---|---|
| | requirement, which is, you know, I always kind of colloquially refer to this as, like, don't create a stall grab. Right, like you should actually think through when you're designing the product. But you can probably more articulately explain what you guys were getting at with that origin. |
| 00:19:22 Buffy Wicks | Yeah, I mean that is really important, because it sort of gets companies to think about how children under the age of 18 are going to be impacted by their product, right? Or their features or the things that they are proposing. So we want them to be thinking with intentionality as they're creating their product. I mean, listen, like, some of these product designers are, you know, these are the smartest people in the room and they're genius at a lot of the work that they do. But we really want them to be thinking about how does it impact kids. And having a systematic way companies consider new technologies with kids at the forefront of that assessment is critical to practically protecting kids from the harm that we have been seeing. You know, I mean, what if Facebook did that when creating Facebook? You know, maybe Frances Houghton wouldn't have been the whistle-blower that she is now, right? Because that, that thoughtfulness would have been on the front end. So having that kind of internal process for testing new online services and products and features, we think, is really, really important. Because it also brings them into the fold of self-regulation, right? Of them thinking through, okay, how am I as a company going to be a good actor in this space when we know we have these challenges. And I think that's also a different way of thinking about the regulation. It's not, this isn't a bill or we're being punitive and we're trying to shut down companies, we want them to be good actors in this space. And again, as I mentioned, I talked to a lot of tech companies in this process. I think a lot of them do want to be good actor, you know? It's just that there's a rung between doing the right thing but then also navigating that with getting the eyeballs on their website for the advertising dollars for the business model, you know? And so I think this forces their hand around the notion of like, how do we actually do the right thing here for kids in mind, and that's what this regulation is about. And specifically, this piece of it. |
| 00:21:05 David Strauss | Yeah, let me ask you, I mean, you said, you guys are going to stay away from being punitive. I think one of the things that kind of sticks out when you get to the end of the bill is, the law, I should say, is there's a right to cure. And that right to cure doesn't sunset, and I think the point of that, as I understand it, was hey, we want to entice people to comply, we don't want to, you know, shut down tech, we want to, you know, incentive them. |
| 00:21:32 Buffy Wicks | Yeah. I mean, the goal of this provision is compliance. You know, we want companies to do the right thing and to adhere to the law. |

| | |
|---|---|
| | Because that's how we actually protect kids online and that is the goal, right? As I mentioned, like, I, many of my voters work in the tech industry. [Laughs] You know, and it's part of our economic resources out here. The goal is not to kill the tech industry, right? But the goal is to really get these companies to, to comply, to adhere to the law. As I mentioned it's not punitive. Now, if they continue to fail, right, you know, there are penalties and the attorney general has the ability to, to administer those and to go after them. But that's not the goal of the bill, the goal of the bill is to get them, the companies, to comply and to keep our kids safe online. |
| 00:22:17 David Strauss | Let me ask you about, some of, thornier issues in the bill and I think maybe some of it we worked out in the work group this year. There's a few places I think companies are wrestling with. One is the likely to be accessed standard. You know, and one of the criticisms that's been made against it is, well, hey, every, every company out there could be likely be accessed by someone under 18, any online website. But I, I sense that wasn't the intent of the bill, was to wrap everybody out. And what was the point of that standard, I suppose. |
| 00:22:53 Buffy Wicks | Yeah, it's not, I mean, you know, this sort of idea that likely to be accessed sort of sweeps up all companies. You know, I don't agree with that interpretation, you know. The definition of business in this bill is the same meaning as our California Consumer Privacy CCPA Act, so it's similar definitions, you know. And to be subject to the bill, the business have, there's a sort of list of requirements that they would have to meet our thresholds, they would have to meet, you know, gross revenue of over $25 million. Buy, sell or share personal information of 50,000 or more customers. And then I think the third one is receive 50 percent or more of its annual revenue from selling consumer data. So, you know, who comes into that? Facebook does. Google does, right? Companies fall into that. Who doesn't? Like, your local Chinese restaurant's website. Like, they're not, you know, it, there's a threshold here in terms of who actually is incorporated and falls into this bill and, you know. And again, we look at what's happening in the UK, you know, the age-appropriate design code in the UK was adopted there and not all companies have been impacted. So they have a similar threshold. And I looked then, because the other thing that we heard of a lot on the bill, which I suspect you're going to ask, is about the age estimation piece? |
| 00:24:13 David Strauss | My next question, in fact. |
| 00:24:14 Buffy Wicks | Sure, why don't you ask that. |
| 00:24:16 David Strauss | [Laughter] Well, you brought, you're doing my job now. [Laughter] And so, yeah, I mean, it was my next question was, this, this concept |

as you set it up for the listener is, you need to do an age assurance, age verification, depending on terminology there, it gets complicated. And, you know, if you can't assure the age of the individual you default to the highest privacy settings, right? So there's this sort of like gatekeeping threshold issue that's made a lot of companies uncomfortable, I think is maybe an easy way of saying it. How do you respond to that? I mean, it's obviously something you've thought a lot about.

00:24:53 Buffy Wicks — Yeah, I mean, first of all, many of these companies know exactly how old we are. Right? They have a whole engineering team devoted to this question, right? They're, Facebook is pretty sure they know how old we are, by our searches, same with Google, etc. So the companies have a very strong understanding of that and we wanted to make sure that the, the need for age estimation sort of merited the risk that, that was being put forth by the company. So for instance, Tinder, you know. They have pretty strong age verification process set forth, right? It's a dating app, you know, essentially, to be generous. And you know, you don't want 14 year olds on that site, right? Like, that is bad, we can all agree to that, right? Now the Sacramento Bee's website is a little different, you know what I mean, and so it's figuring out depending on what the company has to offer and the risk associated with it for kids, what that process will look like. But that's, this is also why the working group is so important. We have put forth in the bill the notion of the working group, which will be comprised of a number of different people delegated somewhat by the legislature, by the governor, by our regular, privacy regulatory agency here in California, to think through and provide recommendations around some of these tougher questions, so that we're being thoughtful and mindful. And again, to go back to the last question, we look at what is happening in the UK, you know. And there was a lot of fear mongering around this age estimation piece at the end of this sort of life cycle of the bill, where all of a sudden there were a couple of key people saying, "It's going to shut down the internet." You know, like, what are we, what are they doing in California, they're being crazy. But you look at the UK and guess what, the internet is not shut down. It still works. No one is requiring, you know, at every website you have to put forth your driver's license. You know, again, we're, they're going thoughtful ways of age estimation just to make sure that as people are entering their sites, as young people are entering their sites, they're being mindful of that and they're putting forth the right kind of privacy regulations. And so we will do lessons learned from there, and, and follow their lead on what's working, but also the working group is a really important piece of this.

00:27:08 David Strauss — That's, help tease out the working group, because I, I mean, it's in your bill. And frankly, the tech community have been so wrapped up

with CCPA compliance that I think, something that, you know, once we finish up with that, we're going to turn to this and say, oh my goodness, right, we've got a lot, we've got a lot to work through, right? We did the CCPA. The work group, as I understand it, the idea is, it's going to be, you know, made up, you said already, a bunch of people who are nominated by various left-sided officials and they provide a report to the legislature by the end of, I think, this year, if memory serves. What's unclear to me is then, what will happen after that? Will lawmakers sit down and try to resolve some of these issues, or is that considered guidance, I suppose. Like, how's it going to work?

00:27:54 Buffy Wicks Yeah, so the working group that was created in the bill we tasked with regularly engaging relevant stake holders including the legislature and others, the governor and others, you know, in the children's privacy space and making recommendations to the legislature every two years that help us think through how technology is changing and how it's impacting children. You know, we recognize that technology moves faster than the legislative process. We are not known for our speed. So the working groups will all be kind of identify gaps and evaluate how children can be further prioritized in the design and in development and implementation of new online products and services and features and other kind of tasks necessary to ensure that, that the law is effective, right? And so it's really to kind of provide that kind of feedback that we really need, you know? No offense to myself or my colleagues, but many of us are not tech experts. And so we need the, that type of guidance. And really that type of guidance will also serve as a model for companies as they're thinking through their assessments as companies, of what they should be mindful of and how they should be thinking about this. You know, and the AG has the ability, and I think will ask for companies to provide those assessments. You know, and I can only speak to our current AG, attorney general Rob Bonta. He's been a leader in this space. And so I expect he will be kind of a full participant and really trying to be active in ensuring that companies are compliant. And again, not in a punitive way, but in a way that just ensures that they adhere to the law. So with the working group and the assessments and the attorney general's role and the legislature taking input from the working group, we really tried to make this kind of a holistic approach around thinking through what could be pretty complex and ever evolving dynamics, right? And as you mentioned, I know in California we're still figuring out sort of implementation of laws prior, but I think this space is kind of, it is what's on the horizon as the next thing that we need to focus on.

| | |
|---|---|
| 00:29:55 David Strauss | So this, actually, work group will push out guidance for companies to, to adhere to, to be able to ensure that they are in, in compliance, is that the idea? Okay. |
| 00:30:07 Buffy Wicks | Yeah. |
| 00:30:08 David Strauss | So, you mentioned before the Net Choice law. It was shortly after the law passed, a few months after the law passed, Net Choice brought a lawsuit against the AG's office, if memory serves, on the cases that the law is unconstitutional. Sounds like you disagree. [Laughter] |
| 00:30:29 Buffy Wicks | Yeah. I mean, I'm obviously aware of the lawsuit and disagree with the assertion that the age appropriate design bill here are no wise unconstitutional. I mean we had our legislative counsel draft the bill, I went through an exhaustive legislative process. It went through our Judiciary Committee, you know, who are a team of lawyers who look at exactly these types of questions. The bill does not regulate content and we, you know, we were very intentional about staying away from provisions that we thought violate Section 230. So I'm confident that the bill, you know, will hold up against the lawsuit. And I'm not surprised by the lawsuit, right? It's, it's a tech industry trade association group who doesn't want to be regulated. |
| 00:31:12 David Strauss | Last question I'm going to ask you then is, what, what are you working on today? What's next? What's the next thing – |
| 00:31:19 Buffy Wicks | Oh, we, David we are plotting and scheming on some very exciting things in this space. |
| 00:31:23 David Strauss | Is that all you're going to give me? [Laughter] Why are you scheming? |
| 00:31:28 Buffy Wicks | That have yet to be introduced, but will be introduced soon. And I'm happy to come back and chat with you about those. [Laughter] |
| 00:31:34 David Strauss | Okay. Well that's, that's very a lead in some respects, that you'll be working on some new things. We will be anxiously waiting, so many of us out here are, you know, are strangely our lives are completely dependent on what lawmakers do and what they come up with. [Laughter] And try to navigate all these wonderful things. So, I'm just, you know, thanking you and also just give you one last chance if there's any parting thoughts you want to leave everybody with? |
| 00:32:05 Buffy Wicks | No, I mean, I just think, you know, this is a space that I think, you know, more intentionality. I like that this is a space that does not get caught up in party ideology. That this is a space where we can actually put forth kind of common sense measures that help our kids. And I think that is something that everyone can rally around. I think |

that's what you've seen here in California and hopefully what you see in other state legislatures. And you know, I personally welcome Democrats and Republicans trying to work together to solve these problems. And I say that as, like, probably one of the most progressive members of the state legislature, represent Berkeley, a very progressive district. But know that if we're going to solve our problems we've really got to work together, maybe that's what this represents.

| | |
|---|---|
| 00:32:44 David Strauss | Well, certainly. Thank you so much for coming on the program today. We will now, we will be anxious to see what comes next from you. We'll all be paying close attention. |
| 00:32:53 Buffy Wicks | Great, thanks for having me. |

[END OF TRANSCRIPT]