**No. 25-2366**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

---

NETCHOICE, LLC, D/B/A NETCHOICE,

*Plaintiff-Appellee*,

v.

ROB BONTA, *in his official capacity as Attorney General of the State of California*,

*Defendant-Appellant*.

---

On Appeal from the United States District Court
for the Northern District of California
No. 5:22-cv-08861-BLF
The Honorable Beth Labson Freeman

---

# PLAINTIFF-APPELLEE'S SUPPLEMENTAL EXCERPTS OF RECORD VOLUME 1 OF 2 | SER-1 – SER-291

---

Adam S. Sieff
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue
27th Floor
Los Angeles, CA 90071
(213) 633-6800
adamsieff@dwt.com

Ambika Kumar
Bianca G. Chamusco
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104
(206) 757-8030
ambikakumar@dwt.com
biancachamusco@dwt.com

David M. Gossett
Meenakshi Krishnan
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW
Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com
meenakshikrishnan@dwt.com

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, D.C. 20003
(215) 717-3423 Ext. 209
bob.corn-revere@thefire.org

*Attorneys for Plaintiff-Appellee NetChoice, LLC*

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (*pro hac vice*)
bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473

Attorneys for Plaintiff
NETCHOICE, LLC D/B/A NETCHOICE

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

NETCHOICE, LLC d/b/a NetChoice,

Plaintiff,

v.

ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,

Defendant.

Case No. 5:22-cv-08861

**SUPPLEMENTAL DECLARATION OF CHRISTOPHER FERGUSON IN SUPPORT OF PLAINTIFF NETCHOICE'S RENEWED MOTION FOR PRELIMINARY INJUNCTION**

Date: January 23, 2025
Time: 9:00 AM
Dept.: Courtroom 3 - 5th Floor

Action filed: December 14, 2022

I, Christopher Ferguson, declare as follows:

I am over the age of 18 and have personal knowledge of the facts set forth in this Declaration.

**BACKGROUND**

1. **Title**: *Professor of Psychology, Stetson University. Psychologist licensed in Florida and Texas (inactive in Texas).*

2. **Education**: *B.A. in psychology, Stetson University. M.S. in developmental psychology, Florida International University. Ph.D. in clinical psychology, University of Central Florida.*

3. **Previous positions**: *Associate Professor, Texas A&M International University; Assistant Professor, University of Wisconsin - Whitewater*

4. **Research focus**: *Media effects on youth including video games, social media, etc.*

5. **Author or co-author of**: *7 non-fiction books, approximately 268 scientific journal articles, book chapters, reviews, or reports.*

6. **Most relevant publications:**

**Books**

Ferguson, C. J. (2023). Catastrophe! How Psychology Explains Why Good People Make Bad Situations Worse. New York: Rowman & Littlefield.

Ferguson, C. J. (2020). *How Madness Shaped History.* New York: Rowman & Littlefield.

Ferguson, C. J. (2018). Video game influences on aggression, cognition and attention. New York: Springer.

Markey, P.M., & Ferguson, C.J. (2017). *Moral combat: Why the war on video games is wrong.* Dallas, TX: BenBella Books.

Ferguson, C. J. (2016). *Media psychology 101.* New York, NY: Springer.

Ferguson, C. J. (2013). *Adolescents, crime, and the media: A critical analysis*. New York, NY, US: Springer Science + Business Media. https://doi:10.1007/978-1-4614-6741-0.



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

**Research Publications**

Ferguson, C.J., Kaye, L.K., Branley-Bell, D., & Markey, P. (in press). There is no evidence that time spent on social media is correlated with adolescent mental health problems: Findings from a meta-analysis. *Professional Psychology: Research and Practice.*

Ferguson, C.J. (in press). Do social media experiments prove a link with mental health: A methodological and meta-analytic review. *Psychology of Popular Media.*

Ferguson, C.J. (in press). Longitudinal associations between social media use and mental health outcomes in sample of Irish youth: A brief report. *Communication Reports.*

Ferguson, C.J. (in press). Cyberbullying and its relation to right and left authoritarianism, trait victimhood, and mental illness. *Psychology of Popular Media.*

Ferguson, C.J. (in press). Does the internet make the world worse? Depression, aggression and polarization in the social media age. *Bulleting of Science, Technology, & Society.*

Ferguson, C.J., Jeong, E.J., & Wang, J.C.K. (2023). Pathological gaming: A longitudinal study from the perspectives of mental health problems and social stress model. *The Journal of General Psychology, 150,* 323-343.

Ferguson, C.J. (2022). Does exposure to sexualized media lead to boys' objectification of girls and women?: A preregistered, longitudinal reanalysis of Rousseau et al. (2019). *Adolescent Psychiatry, 12,* 60-66.

Garcia, S., Ferguson, C.J., & Wang, C.K.J. (2022). Prosocial video game content, empathy and cognitive ability in a large sample of youth. *Journal of Youth and Adolescence, 51,* 62-73.

Ferguson, C.J., Kaye, L., Branley-Bell, D., Markey, P., Ivory, J., Klisanin, D., et al. (2022). *Like* this meta-analysis: Screen media and mental health**.** *Professional Psychology: Research and Practice, 53,* 205-214.

Ferguson, C.J., & Heene, M. (2021). Providing a lower-bound estimate for psychology's "crud factor": The case of aggression. *Professional Psychology: Research and Practice, 52,* 620-626.



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

Ferguson, C.J., & Wang, C.K.J. (2021). Aggressive video games are not a risk factor for mental health problems in youth: A longitudinal study. *Cyberpsychology, Behavior and Social Networking 24*(1), 70-73.

Ferguson, C.J. (2021). One less reason why: Viewing of suicide-themed fictional media is associated with lower depressive symptoms in youth. *Mass Communication and Society, 24*(1), 85-105.

Ferguson, C.J. (2021). Links between screen use and depressive symptoms in adolescents over 16 years: Is there evidence for increased harm? *Developmental Science, 24*(1) e13008.

Turel, O., & Ferguson, C.J. (2021). Excessive use of technology: Can tech-providers be the culprits? *Communications of the ACM, 64*(1), 42-44.

Drummond, A., Sauer, J.D., & Ferguson, C.J. (2020). Do longitudinal studies support long-term relationships between aggressive game play and youth aggressive behavior? A meta-analytic examination. *Royal Society Open Science.* https://doi.org/10.1098/rsos.200373

Lindner, D., Trible, M., Pilato, I., & Ferguson, C.J. (2020). Examining the effects of exposure to a sexualized female video game protagonist on women's body image. *Psychology of Popular Media Culture, 9*(4), 553-560.

Ferguson, C. J. (2019). 13 reasons why not: A methodological and meta-analytic review of evidence regarding suicide contagion by fictional media. *Suicide and Life-Threatening Behavior, 49*(4), 1178-1186.

Berryman, C., Ferguson, C. J., & Negy, C. (2018). Social media use and mental health among young adults. *Psychiatric Quarterly, 89*(2), 307-314.

Ferguson, C. J., Munoz, M. E., Garza, A., & Galindo, M. (2014). Concurrent and prospective analyses of peer, television and social media influences on body dissatisfaction, eating disorder symptoms and life satisfaction in adolescent girls. *Journal of Youth and Adolescence, 43*(1) 1-14.

7. **Prior Expert Testimony and Compensation**: I consulted with the prosecution in the Nicholas Cruz case in Broward County, FL, approximately 1 year ago. I am being compensated for participation in this declaration at a rate of $300/hour. My compensation is not



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

determined by the outcome of this case. I have consulted with FIRE previously in *Zoulek v. Hass*, No. 2:24-cv-00031-RJS-CMR (D. Utah) and *SEAT v. Paxton*, No. 1:24-cv-00945-RP (W.D. Texas), in addition to this case.

8. To prepare for this declaration, I have reviewed the legislation at the center of these proceedings, the initial declaration by Dr. Radesky (filed 4/21/23), as well as her supplementary declaration (12/6/24). I have also reviewed other filings and declarations made in this case, although my own declaration will primarily relate to the science as discussed in the Radesky declarations.

9. In past generations, society has experienced repeated moral panics over new media and technology, ranging from novels to the radio, to comic books, to various forms of music (jazz, rock, rap, etc.), to video games and the role-playing game Dungeons and Dragons. In each case, politicians and scholars worried about the potentially pernicious effects of these media, often pushing for censorship/regulation. In many instances, some scholars (for instance, psychiatrist Fredric Wertham in the case of comic books) and even professional guild organizations such as the American Psychological Association have been revealed as vastly overstating the evidence for harmful effects, (*see* Elson, M., Ferguson, C. J., Gregerson, M., Hogg, J. L., Ivory, J., Klisanin, D., Markey, P. M., Nichols, D., Siddiqui, S., & Wilson, J. (2019). Do policy statements on media effects faithfully represent the science? *Advances in Methods and Practices in Psychological Science 2*(1), 12-25), in some cases based on very poor quality and ultimately unreplicable meta-analyses. (Ferguson, C.J., Copenhaver, A. & Markey, P. (2020). Re-examining the findings of the APA's 2015 task force on violent media: A meta-analysis. *Perspectives on Psychological Science 15*(6), 1423-1443.) The question before us is whether current concerns about online platforms are a repetition of this moral panic pattern, or whether the scientific data support the conclusion that online media pose a unique problem for youth. Further, there is the question of whether evidence is available that the measures proposed by the state are likely to result in improved outcomes for youth, whether regarding mental health, bullying, "dark practices," etc.



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

**THERE IS NO GLOBAL CONSENSUS ON HARMS**

10. In her declaration, Dr. Radesky claims that there is a global consensus on the issue of harms associated with exposure to online media. This statement suffers from several evident problems. First, it conflates multiple issues (privacy issues, mental health, online behavior, etc.), which renders her claim to be indecipherable and confused. Second, as is often the case with consensus claims, this conclusion about a consensus is reached primarily by simply ignoring divergent conclusions from groups other than those she cites. Third, even for the groups she cites, it is not clear they intended to reach definitive conclusions or advance any sense of consensus. In short, no such "global consensus" exists.

11. For instance, Dr. Radesky cites a report released by the US National Academies of Sciences, Engineering, and Medicine as part of this "consensus," yet that report states that "[t]he committee's review of published literature did not support the conclusion that social media causes changes in adolescent health at the population level" and "[a]vailable research that links social media to health shows small effects and weak associations, which may be influenced by a combination of good and bad experiences. Contrary to the current cultural narrative that social media is universally harmful to adolescents, the reality is more complicated" (National Academy of Sciences, Engineering and Medicine. (2023). *Social Media and Adolescent Health*. Retrieved from: https://nap.nationalacademies.org/resource/27396/Highlights_for_Social_Media_and_Adolescent_Health.pdf). It is not clear from Dr. Radesky's declaration how this report contributes to any particular "consensus" conclusion.

12. Examinations by leading science journals *Nature* and *The Lancet* have also expressed skepticism. The Lancet Commission on self-harm concluded that the research on social or other online media promoting harms among youth was mixed, at best, and that using social and other online media may also have significant benefits for youth (Moran, P., Chandler, A., Dudgeon, P., et al., (2024). The Lancet Commission on Self-Harm. *The Lancet, 404,* 1445-1492.) Writing in December, 2024 about more restrictive bans on teenagers accessing social media, a *Nature* editorial wrote: "researchers say there is minimal evidence to suggest such bans





DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

will keep children safe from online harm" (Conroy, G. (2024). Governments are banning kids from social media: will that protect them from harm?. *Nature.* Retrieved from: https://www.nature.com/articles/d41586-024-03955-5).

13. A summary of evidence submitted by the United Kingdom's Department for Digital, Culture, Media and Sport to the UK parliament likewise concluded evidence was mixed for online harms. Their report concluded "[t]he evidence in this area is not conclusive or robust enough to define the relationship as causal and so the definitive impact of social media and screen use on children's mental health and wellbeing is unknown" and "[a]s set out at the start of this written evidence, research shows that moderate use of social media usage is associated with higher levels of well-being in young people" (Department for Digital, Culture, Media. (2018). Written evidence submitted by the Department for Digital, Culture, Media and Sport (SMH0155). Retrieved from: https://committees.parliament.uk/writtenevidence/89489/pdf/).

14. In addition to the US National Academies of Sciences, Engineering, and Medicine report which was more ambivalent in its findings than Dr. Radesky suggested, other sources she cites also acknowledge significant limitations in the evidence. For instance, the Organization for Economic Cooperation and Development (OECD) in their companion document notes:

> It was observed that policy making for children in the digital environment is often impeded by inadequate evaluation of the impacts of existing policies, as well as by the use of unsubstantiated or partial evidence to justify a response that serves a particular political goal. Additionally, responses may be reactive in nature, with policy often more responsive to sensationalised media reports and high-profile incidents, rather than driven by reliable and representative data. For instance, there is a considerable mismatch between the public discourse and the evidence-base available when it comes to the possible effects of the digital environment on the health and wellbeing of children.

(Organization for Economic Cooperation and Development. (2020). Companion Document to the OECD Recommendation on Children in the Digital Environment. Retrieved from: https://www.oecd.org/en/publications/companion-document-to-the-oecd-recommendation-on-children-in-the-digital-environment_a2ebec7c-en.html). The original OECD document referenced by Dr. Radesky also notes limitations in the evidence base, such as unclear definitions (such as with cyberbullying), lack of clear evidence for policy effectiveness, etc. Consequently, it



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

is not clear that this document was intended to stake out a consensus opinion as opposed to a review of emerging issues.

15. The position statement by the American Psychological Association cited by Dr. Radesky likewise appears to avoid definitive conclusions, noting "[u]sing social media is not inherently beneficial or harmful to young people" and also noting significant limitations to the research evidence base (American Psychological Association (2023). Health Advisory on Social Media Use in Adolescence. Retrieved from: https://www.apa.org/topics/social-media-internet/health-advisory-adolescent-social-media-use.pdf).

16. Although it appears apparent that many organizations feel pressured to make some form of statement about youth and social or other online media, many of these statements have, in fact, avoided making declarative statements of harm. As of yet, most organizations appear to be hesitant to make any kind of consensus claim.

17. For example, although the Surgeon General's Advisory does make some claims about potential harm, it was also equivocal about whether harmful effects from online platforms were well demonstrated. The Advisory's findings indicated that "[s]ocial media can provide benefits for some youth by providing positive community and connection with others who share identities, abilities, and interests" and that "[i]t can provide access to important information and create a space for self-expression." (Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory, U.S. DEP'T OF HEALTH AND HUMAN SERV., 6 (2023)). As the Surgeon General notes, "youth who are often marginalized, including racial, ethnic, and sexual and gender minorities." (*Ibid.*) Further, "[s]tudies have shown that social media may support the mental health and well-being of lesbian, gay, bisexual, asexual, transgender, queer, intersex and other youths by enabling peer connection, identity development and management, and social support." (*Ibid.*) Regarding the consensus nature of the research the Surgeon General states "[d]espite this widespread use among children and adolescents, robust independent safety analyses on the impact of social media on youth have not yet been conducted." (*Ibid.*)

18. Professional organization/guild positions on media effects have been historically common, many of them taking firmer consensus positions than those cited by Dr. Radesky.


DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

However, it has been shown that such statements often gratuitously distort the scientific evidence base in coming to their conclusions (Elson, M., Ferguson, C. J., Gregerson, M., Hogg, J. L., Ivory, J., Klisanin, D., Markey, P. M., Nichols, D., Siddiqui, S., & Wilson, J. (2019). Do policy statements on media effects faithfully represent the science? *Advances in Methods and Practices in Psychological Science 2*(1), 12-25). This is likely because such organizations respond to political pressures and social narratives in ways that, at least in the short term, promote their own self-interests.

19. There also clearly is no consensus among scholars. As will be noted below in varying areas, scholars disagree about many of the purported impacts of social media and use of other online platforms on youth.

20. Whatever agreement may exist regarding potential concerns regarding social media and online use by youth may vary by the specific issue (e.g., mental health effects or bullying), so that claiming a universal consensus across topic areas only creates confusion.

21. Whether or not a consensus does or does not exist also is generally irrelevant to the truth value of a given scientific theory or hypothesis. Many scientific consensus positions have proven wrong, and scientific consensus can change over time, sometimes rapidly. In effect, for multiple reasons, the reliability of relying on claims of scientific consensus is low. This is both because consensus positions are often falsely achieved in the first place by excluding divergent views, but also that their ability to represent factually true scientific outcomes is low.

## MENTAL HEALTH IMPACTS

22. AB 2273 cites youth mental health as a primary objective for instituting the new law and appears targeted toward features that increase youth time spent online. Dr. Radesky acknowledges that evidence for mental health impacts from social media and other online media is weak but concludes this may nonetheless have an important impact on large populations. The first part of this is correct, but the second part is not.

23. There are several dozen studies related to youth mental health and time spent online. A recent meta-analysis of such studies concluded that the evidence was not able to support any correlation between time spent on digital media and youth mental health (Ferguson,





DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

C.J., Kaye, L.K., Branley-Bell, D., & Markey, P. (in press). There is no evidence that time spent on social media is correlated with adolescent mental health problems: Findings from a meta-analysis. *Professional Psychology: Research and Practice*). This finding is consistent with most other related meta-analyses of social and other online media effects on mental health (e.g., Yang, Q., & Feng, Y. (2024). Relationships between Social Networking Site (SNS) Use and Subjective Wellbeing----A meta-analysis and meta-analytic structural equation model. *Helyion.* https://doi.org/10.1016/j.heliyon.2024.e32463; Wong, J., Yi, P. X., Quek, F. Y. X., Lua, V. Y. Q., Majeed, N. M., & Hartanto, A. (2022). A four-level meta-analytic review of the relationship between social media and well-being: A fresh perspective in the context of covid-19. *Current Psychology: A Journal for Diverse Perspectives on Diverse Psychological Issues*. https://doi-org.stetson.idm.oclc.org/10.1007/s12144-022-04092-w; Hancock, J. T., Liu, S. X., Luo, M., & Mieczkowski, H. (2022). Social media and psychological well-being. In S. C. Matz (Ed.), *The psychology of technology: Social science research in the age of Big Data.* (pp. 195–238). American Psychological Association. https://doi-org.stetson.idm.oclc.org/10.1037/0000290-007). Even the meta-analysis cited by Dr. Radesky acknowledges that either time spent on social media or intensity of use was only "weakly" associated with depression, and even then only without controlling for other potential confounding factors (Cunningham, S., Hudson, C. C., & Harkness, K. (2021). Social media and depression symptoms: A meta-analysis. *Research on Child and Adolescent Psychopathology*, *49*(2), 241–253. https://doi-org.stetson.idm.oclc.org/10.1007/s10802-020-00715-7). In fact, effect sizes in the range reported by the Cunningham meta-analysis as well as other similar studies are so low as to be indistinguishable from statistical noise (Ferguson, C.J., & Heene, M. (2021). Providing a lower-bound estimate for psychology's "crud factor": The case of aggression. *Professional Psychology: Research and Practice, 52,* 620-626).

24. Likewise, little evidence has emerged across studies that reducing social media time improves mental health (Ferguson, C.J. (in press). Do social media experiments prove a link with mental health: A methodological and meta-analytic review. *Psychology of Popular Media*).



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

25. Similarly, time spent on social media does not appear to impede youth's ability to form real-life relationships (Steinsbekk, S., Bjorkland, O., Valkenburg, P., et al. (2024). The new social landscape: Relationships among social media use, social skills, and offline friendships from age 10–18 years. *Computers in Human Behavior, 156,* 108235). Even effects for individuals with preexisting social anxiety were so weak and inconsistent as to be indistinguishable from statistical noise, as indicated above.

26. Dr. Radesky raises the issue of a Facebook "whistleblower" case involving Frances Haugen (paragraph 53). However, this study has been criticized by scholars as being weak evidence (e.g., Ritchie, S. (2021). Is Instagram really bad for teenagers? The quality of the company's secret research into mental health is abysmal. *Unherd.* Retrieved from: https://unherd.com/2021/09/facebooks-bad-science/). Asking teens what they *think* social media does to them is weak science practice, as people misattribute cause all the time, and such questions beg certain answers. Nonetheless, much of the news coverage misrepresented the findings anyway, with teens having mixed responses, with smaller numbers thinking social media was both beneficial and harmful, but most having neutral opinions. The episode was certainly embarrassing to Facebook, but it does not present meaningful scientific data.

27. Dr. Radesky raises the potential that some populations of youth may be more vulnerable to negative online media impacts than others. This is a reasonable hypothesis. However, at present, there is little evidence to support it, and this hypothesis has not proven to be true for other media Dr. Radesky refers to such as games. For example, the impact of violent games appears to be negligible both for autistic individuals (e.g., Engelhardt, C. R., Mazurek, M. O., Hilgard, J., Rouder, J. N., & Bartholow, B. D. (2015). Effects of violent-video-game exposure on aggressive behavior, aggressive-thought accessibility, and aggressive affect among adults with and without autism spectrum disorder. *Psychological Science*, *26*(8), 1187–1200. https://doi-org.stetson.idm.oclc.org/10.1177/0956797615583038) and for youth with preexisting mental health or aggression issues (Ferguson, C. J., & Olson, C. K. (2014). Video game violence use among "vulnerable" populations: The impact of violent games on delinquency and bullying among children with clinically elevated depression or attention deficit symptoms. *Journal of*


DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

*Youth and Adolescence, 43*(1), 127-136.). However, Dr. Radesky provides no evidence for this claim (and the National Academy of Sciences she cites also merely speculates). In one study I was involved with using a large sample of Irish youth found no correlation. *See* (Ferguson, C.J. (in press). Longitudinal associations between social media use and mental health outcomes in sample of Irish youth: A brief report. *Communication Reports*). In that study it was possible to reanalyze the effects of social and internet media use on mental health and social outcomes only for those youth with preexisting mental health problems. Even with this population, there was no correlation between social and internet media use and later mental health or social problems. Research evidence for Dr. Radesky's claim is lacking; what little research that exists does not support her claim.

28. In this sense, it is important to distinguish between time spent on social media and other online media versus what is sometimes called problematic use, or what the state vaguely refers to as "addiction." However, most of the interventions the state proposes appear focused on the belief that reducing youth online use would be beneficial (assuming that these interventions would be successful in doing so), but there is little evidence that reducing time spent online is, in and of itself, a useful outcome for youth wellness.

29. It is worth noting that public policy has often been disengaged from actual research on social media and other online platforms. One recent study found that pretrial findings in US cases such as that currently under consideration often connected poorly with the research literature and failed to cite compelling evidence for harms (Richards, J., Niitsu, K., & Kenworthy, N. (2024). Mental Health v. Social Media: How US pretrial filings against social media platforms frame and leverage evidence for claims of youth mental health harms. *SSM Mental Health*). This may be because there is not a compelling body of research evidence in support of the states' cases and to engage with the literature would undermine these cases, given the lack of evidence for either correlation or causation.

**PROBLEMATIC TECHNOLOGY USE**

30. Problematic use of online media, or what is commonly referred to by the state and general public as "addiction," is a controversial term with no consensus position among



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

academics regarding whether it is a valid concept or not. To add to the confusion around this topic, Dr. Radesky herself variably refers to problematic social media use, internet addiction, gaming disorder, etc., fairly interchangeably.

31. At present, there is no scholarly consensus on whether problematic use of technology, either online, including online platforms, or offline is a reliable or valid construct. Similarly, at present, there is no official diagnosis of problematic online media use (social media or otherwise). There is no agreement about whether this is a stand-alone condition, or whether problematic online media use may be a symptom of an underlying disorder such as depression or anxiety. There is no clinical agreement about whether reducing online media time is, in and of itself, a helpful clinical goal or whether it may even backfire and worsen mental health for some youth.

32. Because there are no agreed-upon symptoms for problematic online media use, estimates of prevalence are premature. Indeed, some scholars have demonstrated that by using the vague criteria used in studies of problematic social media or online media more generally, it is possible to make anything look like an addiction, including (whimsically) an "addiction" to offline friends (Satchell, L. P., Fido, D., Harper, C. A., Saw, H., Davidson, B., Ellis, D. A., Hart, C. M., Jalil, R., Bartoli, A. J., Kaye, L. K., Lancaster, G. L. J., & Pavetich, M. (2021). Development of an Offline-Friend Addiction Questionnaire (O-FAQ): Are most people really social addicts? *Behavior Research Methods*, *53*(3), 1097–1106. https://doi-org.stetson.idm.oclc.org/10.3758/s13428-020-01462-9).

33. Dr. Radesky cites figures of 5-7% for prevalence estimates for problematic social media use among teens, although other studies find substantially lower figures. *See*, *e.g.*, Wartberg, L., Kriston, L., & Thomasius, R. (2020), Internet gaming disorder and problematic social media use in a representative sample of German adolescents: Prevalence estimates, comorbid depressive symptoms and related psychosocial aspects. *Computers in Human Behavior*, *103*, 31–36. Dr. Radesky cites a study suggesting one third of teen girls feel "addicted" to social media, although it's difficult to put much meaning upon this finding. The term "addicted" is used colloquially among teens in a different context as in clinical psychology (in the same sense once


DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

might claim to be "addicted" to a favorite TV show or chocolate) and may even have positive connotations to teens when talking about favored media use. Again, without any reliable diagnostic criteria, it is difficult to put prevalence estimates into any context.

34. Social science has, in fact, created reams of purported "addictions," including daydreaming addiction (Soffer-Dudek, N., Somer, E., Abu-Rayya, H. M., Metin, B., & Schimmenti, A. (2020). Different cultures, similar daydream addiction? An examination of the cross-cultural measurement equivalence of the Maladaptive Daydreaming Scale. *Journal of Behavioral Addictions*, *9*(4), 1056–1067. https://doi-org.stetson.idm.oclc.org/10.1556/2006.2020.00080), fishing addiction (Griffiths, M. & Auer, M. (2019. Becoming hooked? Angling, gambling, and "fishing addiction". *Archives of Behavioral Addictions*, 1 (1)) or dance addiction (Maraz, A., Urbán, R., Griffiths, M. D., & Demetrovics, Z. (2015). An empirical investigation of dance addiction. *PLoS ONE*, *10*(5). https://doi-org.stetson.idm.oclc.org/10.1371/journal.pone.0125988)).

35. It is probably true that a small number of people can overdo almost anything, including exercise, work, religion, food, sex, shopping, and apparently daydreaming, dance, fishing and offline friends too. There is little evidence that technology including online media is any different from these other behavioral overuse situations, most of which likely originate from underlying mental disorders such as poor impulse control, depression or autism. The state has shown little interest in intervening on behalf of youth caught in the throes of dance, fishing or exercise addition, and it is unclear that there is any justification for the state to focus exclusively on technology from a clinical perspective.

36. Dr. Radesky also refers to "gaming disorder," a controversial term in the scholarly literature. Although she notes that the WHO created this disorder in 2019, she fails to note that this decision was controversial and, as of yet, not reciprocated by the American Psychiatric Association in the United States. Many scholars opposed the inclusion of gaming disorder by the WHO, both because of the absence of research evidence for its inclusion and because of concerns regarding clinical misuse (Aarseth, E., Bean, A.M., Boonen, H., et al. Scholars' open debate paper on the World Health Organization ICD-11 gaming disorder proposal (2017). *Journal of*



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

*Behavioral Addictions, 6*(3), https://doi.org/10.1556/2006.5.2016.088), as did the media psychology divisions of the American Psychological Association and Psychological Society of Ireland (American Psychological Association Society for Media Psychology and Technology and Psychological Society of Ireland Special Interest Group in Media, the Arts and Cyberpsychology. (2018)). An Official** Division 46 Statement on the WHO Proposal to Include Gaming Related Disorders in ICD-11. Retrieved from: https://div46amplifier.com/2018/06/21/an-official-division-46-statement-on-the-who-proposal-to-include-gaming-related-disorders-in-icd-11/. The American Psychiatric Association has a research category for "Internet Gaming Disorder," though this too has been controversial (e.g., Quandt, T. (2017). Stepping back to advance: Why IGD needs an intensified debate instead of a consensus: Commentary on: Chaos and confusion in DSM-5 diagnosis of Internet Gaming Disorder: Issues, concerns, and recommendations for clarity in the field (Kuss et al). *Journal of Behavioral Addictions*, *6*(2), 121–123) and thus far it has not been included in the Diagnostic and Statistical Manual despite them having done a text revision in 2022. This means it is not an official diagnosis within the American mental health system.

37. Dr. Radesky also refers to in-game purchases (paragraph 55) as an issue for youth. Although it is understandable that parents would want to monitor their youth's purchases, little evidence has emerged to suggest parents are unable to do so with conventional parenting, nor that a crisis has emerged along this front. Even for users who may have difficulty regulating their spending, the excess dollar impacts per month tend to fall in the median range of $10-40 (Drummond, A., Sauer, J. D., Ferguson, C. J., & Hall, L. C. (2020). The relationship between problem gambling, excessive gaming, psychological distress and spending on loot boxes in Aotearoa New Zealand, Australia, and the United States—A cross-national survey. *PLoS ONE*, *15*(3)).

**Sleep**

38. As Dr. Radeky notes, adequate sleep is a challenge for many teens. However, this does not appear to be a new phenomenon during the internet age and it is not clear that social media or other online activity is a primary driver of this issue.


DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

39. Evidence that online media use contributes to sleep problems remains weak. For instance, one recent meta-analysis concluded that social media use was unrelated to sleep problems in youth (Ahmed, O., Walsh, E., Dawel, A., et al., (2024). Social media use, mental health and sleep: A systematic review with meta-analyses. *Journal of Affective Disorders, 367,* 701-712). This review also found that social media time was only weakly associated with some mental health outcomes (again, at a level so low as likely to be statistical noise), and not at all related to others. Other meta-analyses have only found weak associations between social media use and sleep (*e.g.*, Cheng, C., Chen, S., & Chen, S. (2024). Impact of national lockdown measures on the association between social media use and sleep disturbance during COVID-19: A meta-analysis of 21 nations. *Cyberpsychology, Behavior, and Social Networking*, *27*(8), 527–538. https://doi-org.stetson.idm.oclc.org/10.1089/cyber.2023.0571). Once again, these meta-analyses typically do not control for confounding variables, meaning even these weak associations are likely to be overestimates. Further the weak effect sizes in the range observed have a high probability of being statistical noise, not true effects.

40. Similarly, links between smartphone use and sleep remain unclear. For instance, one recent study found no evidence that smartphone use contributed to sleep problems or mental health problems (Sun, X., Haydel, K. F., Matheson, D., Desai, M., & Robinson, T. N. (2023). Are mobile phone ownership and age of acquisition associated with child adjustment? A 5-year prospective study among low-income Latinx children. *Child Development*, *94*(1), 303–314.).

41. Proposals to restrict online screen use have been tried and failed in other countries. For instance, South Korea implemented a "shutdown law" on online gaming in 2011, prohibiting youth access to online gaming communities between midnight and 6 a.m. However, this law was found to be a failure in promoting youth sleep (Lee, C., Kim, H., & Hong, A. (2017). Ex-post evaluation of illegalizing juvenile online game after midnight: A case of shutdown policy in South Korea. *Telematics and Informatics, 34,* 1597-1606). The law was repealed in 2021. The outcome of this policy effort is informative when considering the likelihood of success for the California law.


DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

42. Youth sleep difficulties are undoubtedly multifaceted and complex, but one of the key issues for youth sleep appears to be, not online use, but simply early start times for high school which appear to be poorly coordinated with youth circadian rhythms (Adolescent Sleep Working Group of the American Academy of Pediatrics. (2014). School start times for adolescents. *Pediatrics*, *134*(3), 642–649.) Addressing school start times would likely be a far more constructive approach for the state were they truly concerned about adolescent sleep.

**Bullying**

43. Dr. Radesky refers briefly to cyberbullying/online abuse (beginning paragraph 30). It is certainly a legitimate concern to reduce youth exposure to bullying. However, there is little evidence that the internet age has precipitated a crisis of bullying among youth. In fact, according to the National Center for Education Statistics, reproduced below, bullying has been on a steady decline during the online media age.




44. Even when electronic bullying (social media, texts, etc.) are specifically considered, the pattern is static, not increasing over time.



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899




45. Addressing bullying by, in effect, limiting youth access to technological features they may enjoy is essentially punishing the victim. Media literacy for youth, resilience training, as well as pushing for better content moderation online are likely more productive avenues for reducing bullying than is government regulation.

46. Likewise, Dr. Radesky refers to several issues related to potential child sexual abuse (grooming, sextortion, etc., beginning paragraph 32). These are, of course, very serious matters. However, such activities are already illegal under California law. Further, sexual abuse of minors has fortunately declined during the online media era (Finkelhor, D. (2020). Trends in Adverse Childhood Experiences (ACEs) in the United States. *Child Abuse & Neglect*, *108*), once again suggesting that online media have not precipitated a new crisis in this realm.

47. Dr. Radesky also refers to several other illegal acts, including child pornography, the illegal sale of alcohol or other products, etc. I note only that such activities are already prohibited by California law, and prosecuting those who violate these laws is more productive than placing onerous restrictions on minors.

**ARE MINORS "VULNERABLE" ONLINE?**

48. The question of whether minors have particular vulnerabilities online is a complicated one. To be sure, the state generally recognizes those as under 18 as legally different from those above. And, to be sure, development of cognitive abilities and of the brain continues,


DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

in fact, well into adulthood. But this issue is not a binary one wherein the 17-year-old is uniquely vulnerable, yet the 19-year-old free of all risks. Further, even if we recognize minors as deserving of particular state protections, it remains unclear whether "shielding" youth from online platforms is the most appropriate way to prepare them for dealing with any purported risks associated with those platforms.

49. I focus in this discussion mainly on youth in the teen range (13-17), where we see a rapid development of critical thinking and reasoning. It is reasonable to treat this developmental period as distinct from childhood (12 and younger). By contrast, Dr. Radesky often lumps together "children and teens," ignoring considerable heterogeneity in their development in discussing what "they" can and cannot do. In fact, there is often considerable overlap between what many teens can do and many adults cannot do in the cognitive realms she discusses. This does not negate some age-related mean differences, but the fact remains that many adults are *more* vulnerable than the median teen. There is no simple switch that is turned on at age 18.

50. Dr. Radesky often describes teen behavior such as the "general sense of invulnerability teens experience" in sweeping terms, when teen development is, in fact, far more nuanced and heterogeneous. This is common of overgeneralizations regarding teen development that portray teens as clueless zombies or, as one paper put it, "all gasoline, no brakes, and no steering wheel" (Bell, C. C., & McBride, D. F. (2010). Affect regulation and prevention of risky behaviors. *JAMA: Journal of the American Medical Association*, *304*(5), 565–566). In fact, as a review of the evidence on youth self-control observes, this is entirely false (Casey, B. J., & Caudle, K. (2013). The teenage brain: Self control. *Current Directions in Psychological Science*, *22*(2), 82–87). Related to self-control, self-control develops rapidly during the teen years such that, on most tasks, youth are able to make rational decisions about as well as most adults. When faced with situations that are more stressful or emotionally cued, *on average* teens do perform worse than adults (or, interestingly, young children). However, once again, these group differences mask considerable heterogeneity, such that many teens perform admirably at these tasks, even under emotional cueing, whereas many adults perform poorly. However, this evidence base does not extend well to online platforms and whether the features of online



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

platforms are salient enough to be relevant to this distinction. Further, using this data presents an unusual circumstance wherein one might argue for shielding teens from emotive situations…but not young children.

51. Other reviews likewise suggest that differences between adults and teens in regard to risk taking are due more to experience than anything biologically inherent (Romer, D. (2010). Adolescent risk taking, impulsivity, and brain development: Implications for prevention. *Developmental Psychobiology*, *52*(3), 263–276). Shielding them from perceived risks (as opposed to providing guidance on navigating them) may actually delay cognitive development.

52. Statements such as "[s]ome teens are more prone to risky behaviors because of sensation-seeking or pleasure-seeking personalities" may very well be true, but apply to all age categories, not merely teens.

53. Dr. Radesky implies that teens are more prone to instant gratification than are adults but, once again, the evidence suggests things are not quite this simple. First, evidence suggests instant gratification is an issue for decision making among adults as well as teens (O'Donoghue, T., & Rabin, M. (2000). The economics of immediate gratification. *Journal of Behavioral Decision Making*, *13*(2), 233–250). Second, although youth do indeed experience greater issues such as sensation seeking than adults, evidence suggests that this is trainable and that adult-guided exposure to risky situations, such as is done with driver education, leads to positive outcomes (Romer, D., Duckworth, A. L., Sznitman, S., & Park, S. (2010). Can adolescents learn self-control? Delay of gratification in the development of control over risk taking. *Prevention Science*, *11*(3), 319–330). In this sense, approaches such as media literacy are more likely to be beneficial to youth than are government regulated "shielding" of youth, which actually prevents youth from gaining relevant experience.

54. Many developmental issues related to risk-taking, impulsivity, etc., extend well into the median person's 20s and do not end at 18. Further, with cognitive decline in later years, these may actually reappear in some older adults, such that it's just as easy to argue elderly adults "should" be shielded from online communities as much as teens. Of course, people of all ages should be protected by the state from outright illegal activities, whether scams, harassment, etc.



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

But it is not clear that *all* individuals of a particular age group should be prevented from accessing content because *some* may interact poorly with it. Nor is it clearly that *shielding* youth from this content is superior to guided contact with it via media literacy.

**DESIGN FEATURES, HARMS, AND COMPULSIVE USE**

55. Dr. Radesky portrays teens as worried about their online media use, finding it difficult to stop using, displacing sleep and real-life contacts, with negative experiences overall. However, the research evidence provides a far more nuanced picture.

56. As discussed earlier, evidence that online media use has a widespread disruptive impact on youth sleep is weak. So too does the evidence contradict the notion that social media use is displacing real-life friendships (Steinsbekk, S., Bjorkland, O., Alkenburg, P., et al. (2024). The new social landscape: Relationships among social media use, social skills, and offline friendships from age 10–18 years. *Computers in Human Behavior, 156,* 108235).

57. As for teens' experiences, research on teens' experiences with social media from the Pew Research Center finds a nuanced picture (Pew Research Center. (2023). Teens and social media: Key findings from Pew Research Center surveys. Retrieved from: https://www.pewresearch.org/short-reads/2023/04/24/teens-and-social-media-key-findings-from-pew-research-center-surveys/). The majority of teens are happy with their social media use (55%), although 36% report using it "too much" and 8% "too little." Teens are about evenly split on whether they view it as hard (54%) or easy (46%) to give up social media, although most people would likely find it "hard" to give up anything they enjoyed, so it's not clear how revealing this is. Only 9% of teens worry about social media's impact on themselves (32% worry about the impact on others, though this may merely reflect the concerns they've heard from adults). By contrast, most teens report social media having either a positive (32%) or neutral (59%) on them. This does not suggest widespread worry among teens about social media's impact. Teens overwhelmingly report more positive than negative experiences on social media, reporting social media helps them feel more connected and supported by others (only 29% reported feeling any pressure to post content to get likes). As such, Dr. Radesky's claim (paragraph 78) that "[m]inors spend more time online than they intend, feel pressure to engage,


DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

and find it hard to stop using platforms" appears to overstate the actual data. Not surprisingly, teens may have some varied experiences on online media (as would occur for any age group with any product), but overall report having positive experiences.

58. As indicated earlier, it is not evident that the online media age has ushered in a period of particular challenge for youth. There is little evidence that bullying or other violence has increased, that sleep problems have worsened, or that school grades have declined. Mental health has worsened, but mainly in the US, not in many other high-tech adopting countries, and these mental health issues are actually more prominent among older adults than teens. Furthermore, evidence has not found that social media, smartphone, or internet use is predictive of these mental health trends in the United States.

59. Dr. Radesky points to certain features of online platforms such as infinite scroll, the "like" button, tagging, etc., which she fears may lead to more time online which can then lead to more harms. Of course, it is not unreasonable to suggest that platform designers attempt to make user experiences more engaging (this is not unique to online platforms, but can be seen in how, for instance, book chapters are written to end in the middle of tense scenes or just before big reveals). However, again, it is important to point out that time spent on online platforms is a poor predictor of negative outcomes for youth.

60. The degree to which these design features are "harmful" remains unclear and available research is of very poor quality. My impression of this field is that it is preliminary with studies of generally low quality. For instance, one study concedes "[f]or now, however, it is not clear if (all) individuals do actually use social media more frequently, longer, and in a more problematic way because of such design elements" (Sindermann, C., Montag, C., & Elhai, J. D. (2022). The design of social media platforms—Initial evidence on relations between personality, fear of missing out, design element-driven increased social media use, and problematic social media use. *Technology, Mind, and Behavior*, *3*(4)). This study then uses a self-report survey based design to examine whether design features may promote problematic internet use, finding small correlations. However, this study also makes its hypotheses clear to participants which is itself known to cause false-positive correlations. Further, their results suggest outcomes vary by


DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

the personality of the individual involved, suggesting effects may be as much user-generated as due to design features. It is also not clear that their statistical approach is appropriate given the cross-sectional nature of their data.

61. As with other areas of purported "harm," evidence in this area appears to be mixed. For instance, some research suggests that receiving more "likes" on posts is associated with *improved* self-esteem (Burrow, A. L., & Rainone, N. (2017). How many likes did I get?: Purpose moderates links between positive social media feedback and self-esteem. *Journal of Experimental Social Psychology*, *69*, 232–236.). This finding has been replicated in other places (e.g., Zell, A. L., & Moeller, L. (2018). Are you happy for me … on Facebook? The potential importance of "likes" and comments. *Computers in Human Behavior*, *78*, 26–33).

62. The field lacks clear guidelines for falsification, such that in many cases *any* outcome could be interpreted negatively. For instance, in the above studies, had likes been associated with reduced self-esteem this would clearly have been interpreted negatively. But I suspect that likes being associated with *positive* self-esteem could also be interpreted negatively, such as this is evidence for "addiction." This is what I refer to as "fingercuffs" theories such that any outcome can be interpreted as fitting with a priori hypotheses. This is not a sign of good, rigorous science, but rather advocacy science.

63. Another study found that most such features whether "likes" or friends/followers were unrelated to problematic online media use, although there were slight differences between platforms (Limniou, M., Ascroft, Y., & McLean, S. (2022). Differences between Facebook and Instagram usage in regard to problematic use and well-being. *Journal of Technology in Behavioral Science*, *7*(2), 141–150). Furthermore, the authors concluded that what we've called problematic online media use is likely a coping response to real-life problems, once again questioning whether it is causally linked to technology per se.

64. My impression of this field overall is that it is still very preliminary. Studies could be cited both to support that engagement mechanisms are "good" in some contexts and "bad" in other contexts. Many such studies are potentially conflicting in their results. Many of these studies are poorly designed, with desired study results obvious to participants, creating high


DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

potential for false positive results (this is true irrespective of outcome, positive or negative). Many of the sources Dr. Radesky cites are not peer-reviewed or are in conference proceedings which tend to have very high acceptance rates. Most studies are not with youth. Overall, this field is not producing clear, transparent, replicable work that would raise to the level of reliably guiding policy interventions for youth.

65. Dr. Radesky cites several studies in conference proceedings to cite evidence for causal effects (paragraph 96; e.g., Orzikulova, A., Xiao, H., Li, Z., Yan, Y., Wang, Y., Shi, Y., ... & Xu, X. (2024, May). Time2Stop: Adaptive and Explainable Human-AI Loop for Smartphone Overuse Intervention. In Proceedings of the CHI Conference on Human Factors in Computing Systems (pp. 1-20); Lu, T., Zheng, H., Zhang, T., Xu, X. O., & Guo, A. (2024, May). InteractOut: Leveraging Interaction Proxies as Input Manipulation Strategies for Reducing Smartphone Overuse. In Proceedings of the CHI Conference on Human Factors in Computing Systems (pp. 1-19)). These studies use adult samples, are very small in sample size, and have hypotheses that are obvious to participants, potentially creating false positive results. Further, they use interventions that appear to simply make smartphones more difficult and frustrating to use. I am willing to accept that making something frustrating reduces people's time using that thing, though this would work for anything, not just online platforms. These studies appear to tell us nothing about whether the specific engagement mechanisms in online platforms cause any harm to minors.

66. In one case Dr. Radesky (paragraph 97) refers to an experiment with toddlers suggesting that they experienced more tantrums after transitioning from a tablet with autoplay than one without or from a book (Munzer, T., et al. (2021). Tablets, toddlers, and tantrums: The immediate effects of tablet device play. *Acta Paediatrica, 110*, 255-256. Retrieved from: https://deepblue.lib.umich.edu/bitstream/handle/2027.42/163919/apa15509_am.pdf?sequence=1&isAllowed=y). However, it appears that they found that, in one instance, toddlers had tantrums more after *both* versions of the tablet (not just those with autoplay), but there were no differences between *either* versions of the tablet and the book during a second transition. Further there were no differences between conditions regarding toddler compliance and collaboration. This is not a


DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

strong piece of evidence as it demonstrates no effect for autoplay, and only weak and inconsistent evidence against tablets more generally. These inconsistencies in results could be due to simple chance. Further, this study was done with toddlers, not teens, and with tablets, not online platforms.

67. Dr. Radesky returns to the issue of online games, lootboxes, and gaming disorder, but the limited research in support of this view was covered in an earlier section.

68. Overall, my impression of this field of research is that it remains very preliminary, with weak and inconsistent results. In many cases, weak results appear to be jammed into a preexisting moral narrative, whereas the actual data suggest significance nuances and complexities.

69. In relation to the state's case, at present there is no rigorous, sound, replicable body of scientific evidence to suggest that removing engagement features such as likes, endless scroll, autoplay, notifications, etc., would in any way benefit the wellbeing of youth. We just do not have the evidence required to support this case.

## DARK PATTERNS

70. Dr. Radesky spends a section referring to "dark patterns" which reflect hidden elements of online platforms which limit user autonomy. Although Dr. Radesky provides a definition of "dark patterns," I found the conceptualization to still remain vague and lacking in clear construct validity.

71. I am generally wary of "scientific" terms that carry sinister emotional meaning as these can often be biasing within the scientific community itself. This could be witnessed within video game science when games, often the same games, were referred to as "violent video games" when examining negative impacts (most of which proved to be ephemeral) and as "action games" when discussing positive outcomes such as improved visual intelligence. Although the "dark" in this term is explained as referring to "invisible" aspects of online platforms, one could have simply referred to as "hidden influences" or such, rather than adopting a sinister-sounding term.

72. The body of literature on this topic is very small. A subject search via the scholarly database PsychINFO found only 11 articles related to "dark patterns" as they apply to



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

technology, one of which was an unpublished dissertation. Most of these studies had little to do with youth, examining these issues in travel agencies, marketing, augmented and virtual reality, etc.

73. If one is to suggest that marketers sometimes use deceptive practices in order to swindle the unsuspecting, this is, of course, true. However, this has been true for so long as humans have sold things to other humans. That this would now extend to online contexts is hardly surprising. However, some evidence suggests that online platforms do so at some risk, as buyers are sensitive to these practices and quickly turned off by them, switching to platforms perceived as more honest (Hogan, M., Barry, C., & Lang, M. (2022). Dissecting optional micro-decisions in online transactions: Perceptions, deceptions, and errors. *ACM Transactions on Computer-Human Interaction*, *29*(6), 1–27). Moreover, fraudulent practices are already illegal under California law.

74. One study found that children as young as 11-12 are aware of deceptive practices ("dark patterns") in online platforms (Renaud, K., Sengul, C., Coopamootoo, K., Clift, B., Taylor, J., Springett, M., & Morrison, B. (2024). 'We're not that gullible!' Revealing dark pattern mental models of 11-12-year-old Scottish children. *ACM Transactions on Computer-Human Interaction*, *31*(3), 1–41). However, youth appeared to benefit from digital literacy programs that would aid them in identifying different patterns of deception.

75. Another review of the literature found that although negative experiences with deceptive practices in online platforms were, not surprisingly, perceived negatively by youth, these experiences built resiliency necessary for navigating online worlds (Vissenberg, J., d'Haenens, L., & Livingstone, S. (2022). Digital Literacy and Online Resilience as Facilitators of Young People's Well-Being? *European Psychologist, 27,* 76–85). This again suggests that a media literacy rather than regulatory shielding approach is likely to result in better outcomes for youth.

76. Undoubtedly some online platforms will engage in false advertising or misleading content that leads to outcomes such as unwanted purchases, just as bad practices occur in offline


DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

contexts. These behaviors are already prohibited by law and should be punished accordingly, not by punishing youth themselves by restricting their access to online platforms.

77. The concept of "dark patterns" remains so diffuse and ill-defined that it seems unlikely that any platform would know where the limits are between what constitutes reasonable marketing versus "dark practices."

**CONCLUSIONS**

78. At present, the social science research evidence does not indicate that time spent on online platforms is a meaningful predictor of youth mental health, sleep, exposure to bullying or other significant concerns related to "harm" or mental or social well-being.

79. Concepts such as problematic technology use (social media, smartphones or "gaming disorder") remain controversial in the scholarly community. There is no consensus regarding whether these truly exist as mental disorders or not, nor how to properly define or diagnose them.

80. There is no body of robust, replicable evidence that suggests that changing elements of online platforms such as like buttons, endless scroll, autoplay, etc., are likely to have substantial impact on youth wellbeing.

81. Although engaging with online platforms are likely to carry some potential for negative experiences, this is true also for engaging in the real world. There is little evidence that the explosion of online platforms over the past few decades has created a crisis of youth wellbeing.

82. The concept of "dark patterns" remains ill-defined and lacking in good quality research.

83. Proposals that focus on age restrictions are unlikely to be successful, given that age itself is a poor predictor of outcomes. As the American Psychological Association itself has noted. *See* Am. Psych. Ass'n, Potential risks of content, features, and functions: The science of how social media affects youth (2024), retrieved from: https://www.apa.org/topics/social-media-internet/youth-social-media-2024 ("Creating a bright line age limit ignores individual differences in adolescents' maturity and competency.").



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

84. Some issues such as sexual exploitation, sales of illegal contraband, online harassment, etc., are legitimate issues but are best handled in accordance with existing law in prosecuting perpetrators rather than placing new burdens on youth themselves.

85. A pattern of moral panic has been observed regarding past emerging media and technologies ranging from the radio to comic books to rock music to video games. Although this historical pattern doesn't negate the potential that a new form of technology might carry risks, this pattern is already evidence for online/social media/smartphone concerns. Indeed, the State's failure to consider evidence which does not support its policy is similar to what has been observed in the past, most recently for video games.

86. All social exchanges, whether in real life or online, carry some potential for negative experiences. To the extent that these can occur online, evidence suggests that media literacy, not content regulation is likely to lead to the most positive outcomes for youth. Media literacy is probably best when delivered by parents, although schools, libraries, and other youth-oriented programs may also be helpful in this regard.

87. Enacting poorly supported policies on the *wrong* issue can actually cause harm to youth by distracting society from *real* issues. For instance, using Centers for Disease Control data, researcher Mike Males has identified that exposure to adverse childhood events such as abusive parents, or absent parents, or parent mental illness is a strong predictor of youth mental health problems, whereas engagement with online platforms is not (Males, M. (2024). So … what IS making teens more depressed? Retrieved from: https://mikemales.substack.com/p/so-what-is-making-teens-more-depressed). If legislators want to be serious about youth wellness, time and money would be better spent addressing families in distress, fatherlessness, and economic stress, particularly for low-income families. Furthermore, marginalized youth such as LGBT youth may be particularly vulnerable given stigma they may face from their families.



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

**DECLARATION UNDER PENALTY OF PERJURY**

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the above statements are true and based upon my personal knowledge.

Executed on January 2, 2025.

CHRISTOPHER J. FERGUSON



DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

# **EXHIBIT 1**

PageVault

| | |
|---|---|
| Document title: | 6. Policies and community standards \| ICO |
| Capture URL: | https://ico.org.uk/for-organisations/uk-gdpr-guidance-and-resources/childrens-information/childrens-code-guidance-and-resources/age-appropriate-design-a-code-of-practice-for-online-services/6-policies-and-community-standards/ |
| Page loaded at (UTC): | Mon, 28 Oct 2024 12:32:48 GMT |
| Capture timestamp (UTC): | Mon, 28 Oct 2024 12:33:17 GMT |
| Capture tool: | 10.52.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.6478.234 Safari/537.36 |
| Operating system: | Linux (Node 20.17.0) |
| PDF length: | 3 |
| Capture ID: | svSJqShw4aFuqm9gfEbZUh |
| Display Name: | pauljezick |

PDF REFERENCE #: 7oPEXSxhagHJPnMcRh53Cp

# 6. Policies and community standards



Search this document

Information Commissioner's foreword
Executive summary
Code standards
About this code
Services covered by this code
Transitional arrangements
Standards of age appropriate design
1. Best interests of the child
2. Data protection impact assessments
3. Age appropriate application
4. Transparency
5. Detrimental use of data
6. Policies and community standards
7. Default settings
8. Data minimisation
9. Data sharing
10. Geolocation
11. Parental controls
12. Profiling
13. Nudge techniques
14. Connected toys and devices
15. Online tools
Governance and accountability
Enforcement of this code
Glossary
Annex A: Services covered by the code flowchart
Annex B: Age and developmental stages

Uphold your own published terms, policies and community standards (including but not limited to privacy policies, age restriction, behaviour rules and content policies).

## What do you mean by 'upholding your own standards'?

We mean that you need to adhere to your own published terms and conditions and policies.

We also mean that, when you set community rules and conditions of use for users of your service, you need to actively uphold or enforce those rules and conditions.

## Why is this important?

Article 5(1) of the GDPR says that personal data shall be:

> "processed lawfully, fairly and in a transparent manner in relation to the data subject ('lawfulness, fairness and transparency')"

When children provide you with their personal data in order to join or access your service they should be able to expect the service to operate in the way that you say it will, and for you to do what you say you are going to do. If this doesn't happen then your collection of their personal data may be unfair and in breach of Article 5(1)(a).

Keeping to your own standards should also benefit you by giving children and their parents confidence that they can trust your online service with their personal data.

## How can we make sure that we meet this standard?

To some extent this depends on the content of your published terms and conditions, policies and community standards.

However you should follow the overarching principle that you say what you do and do what you say. You should at least ensure that you do the following:

**Only use personal data in accordance with your privacy policy**

Article 5(1)(b) of the GDPR sets out the 'purpose limitation' principle, that personal data shall be:

> "collected for specified, explicit and legitimate purposes and not further processed in a manner that is incompatible with those purposes..."

Articles 13 and 14 of the GDPR require you to tell data subjects what these purposes are. You do this by providing privacy information, which you may include in a privacy notice, policy or statement.

Article 5(1)(a) of the GDPR requires you to process personal data fairly

Case: 25-2366, 08/11/2025, DktEntry: 26.2, Page 34 of 291
Case 5:22-cv-08861-BLF Document 101-7 Filed 11/01/24 Page 8 of 105

Enforcement of this code

Glossary

Annex A: Services covered by the code flowchart

Annex B: Age and developmental stages

Annex C: Lawful basis for processing

Annex D: DPIA template

Additional resources

> "collected for specified, explicit and legitimate purposes and not further processed in a manner that is incompatible with those purposes..."

Articles 13 and 14 of the GDPR require you to tell data subjects what these purposes are. You do this by providing privacy information, which you may include in a privacy notice, policy or statement.

Article 5(1)(a) of the GDPR requires you to process personal data fairly and transparently.

The combined result of these provisions is that you need to use your privacy information to tell users what you will do with their personal data and why, and then make sure that you follow this through in practice.

**Uphold any user behaviour policies**

If you have any published rules which govern the behaviour of users of your service then you need to uphold these rules and put in place the systems that you have said you will. So if you say that you actively monitor user behaviour, or offer real time, automated, or human moderation of 'chat' functions, then you need to do so.

If you only rely on 'back end' processes, such as user reporting, to identify behaviour which breaches your policies then you need to have made that very clear in your policies or community standards. This approach also needs to be reasonable given the risks to children of different ages inherent in your service. If the risks are high then 'light touch' or 'back end only' processes to uphold your standards are unlikely to be sufficient.

If you do not have adequate systems to properly uphold your own user behaviour policies then your original collection and continued use of a child's personal data may be unfair and in breach of the GDPR.

**Uphold any content or other policies**

If you make commitments to users about the content or other aspects of your online service then you need to have systems to ensure that you meet those commitments.

So if you say that the content of your online service is suitable for children within a certain age range then you need to have systems to ensure that it is. If you say that you do not tolerate bullying, then you need to have adequate mechanisms to swiftly and effectively deal with bullying incidents.

Again, if your systems aren't adequate or you don't keep to your promises then your original collection and continued use of the child's personal data may be unfair and in breach of the GDPR.

If you have different policies depending on the age of your users then you need to take account of the age of the child when upholding your policies.



OGL All text content is available under the Open Government Licence v3.0, except where otherwise stated.

Document title: 6. Policies and community standards | ICO
SER-34
Capture URL: https://ico.org.uk/for-organisations/uk-gdpr-guidance-and-resources/childrens-information/childrens-code-guidance-and-resources/age-appropriate-design…
Capture timestamp (UTC): Mon, 28 Oct 2024 12:33:17 GMT
Page 2 of 2

# EXHIBIT 2

PageVault

| | |
|---|---|
| Document title: | 5. Detrimental use of data \| ICO |
| Capture URL: | https://ico.org.uk/for-organisations/uk-gdpr-guidance-and-resources/childrens-information/childrens-code-guidance-and-resources/age-appropriate-design-a-code-of-practice-for-online-services/5-detrimental-use-of-data/ |
| Page loaded at (UTC): | Mon, 28 Oct 2024 12:32:48 GMT |
| Capture timestamp (UTC): | Mon, 28 Oct 2024 12:34:04 GMT |
| Capture tool: | 10.52.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.6478.234 Safari/537.36 |
| Operating system: | Linux (Node 20.17.0) |
| PDF length: | 5 |
| Capture ID: | hqxTiT3He8JCV4K4vq1Wy9 |
| Display Name: | pauljezick |

PDF REFERENCE #: k31f2eia189A8QQV6YnCPE

# 5. Detrimental use of data



Search this document

Information Commissioner's foreword
Executive summary
Code standards
About this code
Services covered by this code
Transitional arrangements
Standards of age appropriate design
1. Best interests of the child
2. Data protection impact assessments
3. Age appropriate application
4. Transparency
5. Detrimental use of data
6. Policies and community standards
7. Default settings
8. Data minimisation
9. Data sharing
10. Geolocation
11. Parental controls
12. Profiling
13. Nudge techniques
14. Connected toys and devices
15. Online tools
Governance and accountability
Enforcement of this code
Glossary
Annex A: Services covered by the code flowchart
Annex B: Age and developmental stages

Do not use children's personal data in ways that have been shown to be detrimental to their wellbeing, or that go against industry codes of practice, other regulatory provisions, or Government advice.

## What do you mean by 'the detrimental use of data'?

We mean any use of data that is obviously detrimental to children's physical or mental health and wellbeing or that goes against industry codes of practice, other regulatory provisions or Government advice on the welfare of children.

## Why is this important?

Article 5(1)(a) of the GDPR says that personal data must be processed lawfully, fairly and in a transparent manner in relation to the data subject, and Recital 38 that children merit specific protection with regard to the use of their personal data.

Recital 2 to the GDPR states (emphasis added):

> "The principles of, and rules on the protection of natural persons with regard to the processing of their personal data should, whatever their nationality or residence, respect their fundamental rights and freedoms, in particular their right to the protection of personal data. **This Regulation is intended to contribute to … the well-being of natural persons.**"

Recital 75 to the GDPR says that:

> "The risk to the rights and freedoms of natural persons, or varying likelihood and severity may result from personal data processing which could lead to physical, material or non-material damage, in particular:….where personal data of vulnerable natural persons, in particular children, are processed…."

This means that you should not process children's personal data in ways that are obviously, or have been shown to be, detrimental to their health or wellbeing. To do so would not be fair.

## How can we make sure that we meet this standard?

**Keep up date with relevant recommendations and advice**

As a provider of an online service likely to be accessed by children you should be aware of relevant standards and codes of practice within your industry or sector, and any provisions within them that relate to children. You should also keep up to date with Government advice on the welfare of children in the context of digital or online services. The ICO does not regulate content and is not an expert on matters of children's health and wellbeing. We will however refer to other codes of practice or regulatory advice where relevant to help us assess your conformance to this standard.

Enforcement of this code

Glossary

Annex A: Services covered by the code flowchart

Annex B: Age and developmental stages

Annex C: Lawful basis for processing

Annex D: DPIA template

Additional resources

As a provider of an online service likely to be accessed by children you should be aware of relevant standards and codes of practice within your industry or sector, and any provisions within them that relate to children. You should also keep up to date with Government advice on the welfare of children in the context of digital or online services. The ICO does not regulate content and is not an expert on matters of children's health and wellbeing. We will however refer to other codes of practice or regulatory advice where relevant to help us assess your conformance to this standard.

**Do not process children's personal data in ways that are obviously detrimental or run counter to such advice**

You should not process children's personal data in ways that run contrary to those standards, codes or advice and should take account of any age specific advice to tailor your online service to the age of the child. You should take particular care when profiling children, including making inferences based on their personal data, or processing geo-location data.

You should apply a pre-cautionary approach where this has been formally recommended despite evidence being under debate. This means you should not process children's personal data in ways that have been formally identified as requiring further research or evidence to establish whether or not they are detrimental to the health and wellbeing of children.

### What codes or advice are likely to be relevant?

Some specific areas where there is relevant guidance, and that are likely to arise in the context of providing your online service are given below.

However, this is not an exhaustive list and you need to identify and consider anything that is relevant to your specific data processing scenario in your DPIA.

**Marketing and behavioural advertising**

The Committee of Advertising Practice (CAP) publishes guidance about online behavioural advertising which, in addition to providing rules applicable to all advertising, specifically covers advertising to children.

It includes rules which address:

- physical, mental or moral harm to children;
- exploiting children's credulity and applying unfair pressure;
- direct exhortation of children and undermining parental authority; and
- promotions.

It also has rules which govern or prohibit the marketing of certain products, such as high fat, salt and sugar food and drinks and alcohol, to children, and general guidance on transparency of paid-for content and product placement.

**Broadcasting**

Ofcom has published a code practice for broadcasters which covers the protection of under-18s in the following areas:

- the coverage of sexual and other offences in the UK involving under-18s;
- drugs, smoking, solvents and alcohol;
- violence and dangerous behaviour;
- offensive language;
- sexual material;
- nudity;
- exorcism, the occult and the paranormal; and
- the involvement of people under 18 in programmes.

**The press**

The Independent Press Standards Organisation (Ipso) has published The Editors' Code of Practice which includes provisions about reporting and children.

**Online games**

- the involvement of people under 18 in programmes.

**The press**

The Independent Press Standards Organisation (Ipso) has published The Editors' Code of Practice which includes provisions about reporting and children.

**Online games**

The Office for Fair Trading (OFT) has published principles for online and app-based games which includes provisions about:

- exploiting children's inexperience, vulnerability and credulity, including by aggressive commercial practices; and
- including direct exhortations to children to buy advertised products or persuade their parents or other adults to buy advertised products for them.

**Strategies used to extend user engagement**

Strategies used to extend user engagement, sometimes referred to as 'sticky' features can include mechanisms such as reward loops, continuous scrolling, notifications and auto-play features which encourage users to continue playing a game, watching video content or otherwise staying online.

Although there is currently no formal Government position on the effect of these mechanisms on the health and wellbeing of children, the UK Chief Medical Officers have issued a 'commentary on screen-based activities on children and young people'. This identifies a need for further research and in the meantime recommends that technology companies 'recognise a precautionary approach in developing structures and remove addictive capabilities.'

### Does this mean we can't use features such as rewards, notifications and 'likes' within our service?

No, not all such features rely on the use of personal data and you may have designed your feature taking into account the needs of children and in a way that makes it easy for them to disengage without feeling pressurised or disadvantaged if they do so. However, it does mean that you need to carefully consider the impact on children if you use their personal data to support such features. You should consider both intended and unintended consequences of the data use as part of your DPIA.

Given the precautionary advice from the Chief Medical Officers, designing in data-driven features which make it difficult for children to disengage with your service is likely to breach the Article 5(1)(a) fairness principle of the GDPR. For example, features which use personal data to exploit human susceptibility to reward, anticipatory and pleasure seeking behaviours, or peer pressure.

You should:

- avoid using personal data in a way that incentivises children to stay engaged, such as offering children personalised in-game advantages (based upon your use of the individual user's personal data) in return for extended play;
- present options to continue playing or otherwise engaging with your service neutrally without suggesting that children will lose out if they don't;
- avoid features which use personal data to automatically extend use instead of requiring children to make an active choice about whether they want to spend their time in this way (data-driven autoplay features); and
- introduce mechanisms such as pause buttons which allow children to take a break at any time without losing their progress in a game, or provide age appropriate content to support conscious choices about taking breaks, such as that provided in the Chief Medical Officers' advice.

**Further reading outside the code**

Committee on Advertising Practice guidance

The Ofcom Broadcasting Code (with the Cross-Promotion Code and the On Demand Programme Service Rules)

The Editors' Code of Practice

Does this mean we can't use features such as rewards, notifications and 'likes' within our service?

No, not all such features rely on the use of personal data and you may have designed your feature taking into account the needs of children and in a way that makes it easy for them to disengage without feeling pressurised or disadvantaged if they do so. However, it does mean that you need to carefully consider the impact on children if you use their personal data to support such features. You should consider both intended and unintended consequences of the data use as part of your DPIA.

Given the precautionary advice from the Chief Medical Officers, designing in data-driven features which make it difficult for children to disengage with your service is likely to breach the Article 5(1)(a) fairness principle of the GDPR. For example, features which use personal data to exploit human susceptibility to reward, anticipatory and pleasure seeking behaviours, or peer pressure.

You should:

- avoid using personal data in a way that incentivises children to stay engaged, such as offering children personalised in-game advantages (based upon your use of the individual user's personal data) in return for extended play;
- present options to continue playing or otherwise engaging with your service neutrally without suggesting that children will lose out if they don't;
- avoid features which use personal data to automatically extend use instead of requiring children to make an active choice about whether they want to spend their time in this way (data-driven autoplay features); and
- introduce mechanisms such as pause buttons which allow children to take a break at any time without losing their progress in a game, or provide age appropriate content to support conscious choices about taking breaks, such as that provided in the Chief Medical Officers' advice.

**Further reading outside the code**

Committee on Advertising Practice guidance

The Ofcom Broadcasting Code (with the Cross-Promotion Code and the On Demand Programme Service Rules)

The Editors' Code of Practice

OFT principles for online and app-based games

UK Chief Medical Officers' commentary on 'screen based activities and children and young people's mental health and psychosocial wellbeing: a systematic map of reviews'

Previous Next



OGL All text content is available under the Open Government Licence v3.0, except where otherwise stated.

# EXHIBIT 3

Page Vault

| | |
|---|---|
| Document title: | 13. Nudge techniques \| ICO |
| Capture URL: | https://ico.org.uk/for-organisations/uk-gdpr-guidance-and-resources/childrens-information/childrens-code-guidance-and-resources/age-appropriate-design-a-code-of-practice-for-online-services/13-nudge-techniques/ |
| Page loaded at (UTC): | Mon, 28 Oct 2024 12:34:21 GMT |
| Capture timestamp (UTC): | Mon, 28 Oct 2024 12:34:48 GMT |
| Capture tool: | 10.52.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.6478.234 Safari/537.36 |
| Operating system: | Linux (Node 20.17.0) |
| PDF length: | 6 |
| Capture ID: | qU8QFbDRV4TTkYJiJo4JcR |
| Display Name: | pauljezick |

# 13. Nudge techniques



Search this document

- Information Commissioner's foreword
- Executive summary
- Code standards
- About this code
- Services covered by this code
- Transitional arrangements
- Standards of age appropriate design
- 1. Best interests of the child
- 2. Data protection impact assessments
- 3. Age appropriate application
- 4. Transparency
- 5. Detrimental use of data
- 6. Policies and community standards
- 7. Default settings
- 8. Data minimisation
- 9. Data sharing
- 10. Geolocation
- 11. Parental controls
- 12. Profiling
- 13. Nudge techniques
- 14. Connected toys and devices
- 15. Online tools
- Governance and accountability
- Enforcement of this code
- Glossary
- Annex A: Services covered by the code flowchart
- Annex B: Age and developmental stages

Do not use nudge techniques to lead or encourage children to provide unnecessary personal data or turn off privacy protections.

What do you mean by 'nudge techniques'?

Nudge techniques are design features which lead or encourage users to follow the designer's preferred paths in the user's decision making. For example, in the graphic below the large green 'yes' button is presented far more prominently then the small print 'no' option, with the result that the user is 'nudged' towards answering 'yes' rather than 'no' to whatever option is being presented.




In the next example the language used to explain the outcomes of two alternatives is framed more positively for one alternative than for the other, again 'nudging' the user towards the service provider's preferred option.



Enforcement of this code

Glossary

Annex A: Services covered by the code flowchart

Annex B: Age and developmental stages

Annex C: Lawful basis for processing

Annex D: DPIA template

Additional resources

Switch this on if you want to see videos that will really interest you.

Leave this off if you just want to see random videos that you probably won't like.

A further nudge technique involves making one option much less cumbersome or time consuming than the alternative, therefore encouraging many users to just take the easy option. For example providing a low privacy option instantly with just one 'click', and the high privacy alternative via a six click mechanism, or with a delay to accessing the service.

### Why is this important?

Article 5(1)(a) of the GDPR says that personal data shall be:

> "processed lawfully, fairly and in a transparent manner in relation to the data subject ('lawfulness, fairness and transparency')"

Recital 38 to the GDPR states that:

> "Children merit specific protection with regard to their personal data, as they may be less aware of the risks, consequences and safeguards concerned and their rights in relation to the processing of personal data..."

The employment of nudge techniques in the design of online services can be used to encourage users, including children, to provide an online service with more personal data than they would otherwise volunteer. Similarly it can be used to lead users, particularly children, to select less privacy-enhancing choices when personalising their privacy settings.

Using techniques based on the exploitation of human psychological bias in this way goes against the 'fairness' and 'transparency' provisions of the GDPR as well as the child specific considerations set out in Recital 38.

### How can we make sure that we meet this standard?

**Do not use nudge techniques to lead children to make poor privacy decisions**

You should not use nudge techniques to lead or encourage children to activate options that mean they give you more of their personal data, or turn off privacy protections.

You should not exploit unconscious psychological processes to this end (such as associations between certain colours or imagery and positive outcomes, or human affirmation needs).

You should not use nudge techniques that might lead children to lie about their age. For example pre-selecting an older age range for them, or not allowing them the option of selecting their true age range.

**Use pro-privacy nudges where appropriate**

Taking into account the best interests of the child as a primary consideration, your design should support the developmental needs of the age of your child users.

Younger children, with limited levels understanding and decision making skills need more instruction based interventions, less explanation, unambiguous rules to follow and a greater level of parental support. Nudges towards high privacy options, wellbeing enhancing behaviours and parental controls and involvement should support these needs.

As children get older your focus should gradually move to supporting them in

design should support the developmental needs of the age of your child users. Younger children, with limited levels understanding and decision making skills need more instruction based interventions, less explanation, unambiguous rules to follow and a greater level of parental support. Nudges towards high privacy options, wellbeing enhancing behaviours and parental controls and involvement should support these needs.

As children get older your focus should gradually move to supporting them in developing conscious decision making skills, providing clear explanations of functionality, risks and consequences. They will benefit from more neutral interventions that require them to think things through. Parental support may still be required but you should present this as an option alongside signposting to other resources.

**Consider nudging to promote health and wellbeing**

You may also wish to consider nudging children in ways that support their health and wellbeing. For example, nudging them towards supportive resources or providing tools such as pause and save buttons.

If you use personal data to support these features then you still need to make sure your processing is compliant (including having a lawful basis for processing and have providing clear privacy information), but subject to this it is likely that such processing will be fair.

The table below gives some recommendations that you might wish to apply to children of different ages. Although again you are free to develop your own, service specific, user journeys that follow the principle in the headline standard.

You should also consider any additional responsibilities you may have under the applicable equality legislation for England, Scotland, Wales and Northern Ireland.

| **Age range** | Recommendations |
| --- | --- |
| 0-5<br>Pre-literate & early literacy | Provide design architecture which is high-privacy by default. If change of default attempted nudge towards maintaining high privacy or towards parental or trusted adult involvement.<br><br>Avoid explanations – present as rules to protect and help. Consider further interventions such as parental notifications, activation delays or disabling facility to change defaults without parental involvement, depending on the risks inherent in the processing.<br><br>Nudge towards wellbeing enhancing behaviours (such as taking breaks).<br><br>Provide tools to support wellbeing enhancing behaviours (such as mid-level pause and save features). |
| 6-9<br>Core primary school years | Provide design architecture which is high-privacy by default. If change of default attempted nudge towards maintaining high privacy or parental or trusted adult involvement.<br><br>Provide simple explanations of functionality and inherent risk, but continue to present as rules to protect and help.<br><br>Consider further interventions such as parental notifications, activation delays or disabling facility to change defaults without parental involvement, depending on the risks inherent in the processing. |

| | |
|---|---|
| | inherent risk, but continue to present as rules to protect and help.<br><br>Consider further interventions such as parental notifications, activation delays or disabling facility to change defaults without parental involvement, depending on the risks inherent in the processing.<br><br>Nudge towards wellbeing enhancing behaviours (such as taking breaks).<br><br>Provide tools to support wellbeing enhancing behaviours (such as mid-level pause and save features). |
| 10-12<br>Transition years | Provide design architecture which is high-privacy by default. If change of default attempted provide explanations of functionality and inherent risk and suggest parental or trusted adult involvement.<br><br>Present option in ways that encourage conscious decision making.<br><br>Consider further interventions such as parental notifications, activation delays or disabling facility to change defaults without parental involvement, depending on the risks.<br><br>Nudge towards wellbeing enhancing behaviours (such as taking breaks).<br><br>Provide tools to support wellbeing enhancing behaviours (such as mid-level pause and save features). |
| 13 -15<br>Early teens | Provide design architecture which is high-privacy by default.<br><br>Provide explanations of functionality and inherent risk.<br><br>Present options in ways that encourage conscious decision making.<br><br>Signpost towards sources of support including parents.<br><br>Consider further interventions depending on the risks.<br><br>Suggest wellbeing enhancing behaviours (such as taking breaks).<br><br>Provide tools to support wellbeing enhancing behaviours (such as mid-level pause and save features). |
| 16-17<br>Approaching adulthood | Provide design architecture which is high-privacy by default.<br><br>Provide explanations of functionality and inherent risk.<br><br>Present options in ways that encourage conscious decision making.<br><br>Signpost towards sources of support including parents. |

| | |
|---|---|
| | Nudge towards wellbeing enhancing behaviours (such as taking breaks).<br>Provide tools to support wellbeing enhancing behaviours (such as mid-level pause and save features). |
| 13 -15<br>Early teens | Provide design architecture which is high-privacy by default.<br>Provide explanations of functionality and inherent risk.<br>Present options in ways that encourage conscious decision making.<br>Signpost towards sources of support including parents.<br>Consider further interventions depending on the risks.<br>Suggest wellbeing enhancing behaviours (such as taking breaks).<br>Provide tools to support wellbeing enhancing behaviours (such as mid-level pause and save features). |
| 16-17<br>Approaching adulthood | Provide design architecture which is high-privacy by default.<br>Provide explanations of functionality and inherent risk.<br>Present options in ways that encourage conscious decision making.<br>Signpost towards sources of support including parents.<br>Suggest wellbeing enhancing behaviours (such as taking breaks).<br>Provide tools to support wellbeing enhancing behaviours (such as mid-level pause and save features). |

Previous Next

English

Subscribe to our e-newsletter

Your data matters
Official information
Nuisance calls

For organisations
UK GDPR guidance and resources
Freedom of information
EIR and access to information
Direct marketing
Advice and services

Action we've taken
Enforcement action
Decision notices
Audits

About the ICO
Who we are
What we do
Media centre
Careers
Modern Slavery Statement

Contact us | Privacy notice | Cookies | Accessibility | Cymraeg | Publications | Disclaimer | © Copyright

All text content is available under the Open Government Licence v3.0, except where otherwise stated.

# EXHIBIT 4

# 12. Profiling

Contents

Switch options which use profiling 'off' by default (unless you can demonstrate a compelling reason for profiling to be on by default, taking account of the best interests of the child). Only allow profiling if you have appropriate measures in place to protect the child from any harmful effects (in particular, being fed content that is detrimental to their health or wellbeing).

## What do you mean by 'profiling'?

Profiling is defined in the GDPR:

> "any form of automated processing of personal data consisting of the use of personal data to evaluate certain aspects relating to a natural person, in particular to analyse or predict aspects concerning that natural person's performance at work, economic situation, health, personal preferences, interests, reliability, behaviour location or movements"

Profiling can be used for a wide range of purposes. It can be used extensively in an online context to suggest or serve content to users, to determine where, when and how frequently that content should be served, to encourage users towards particular behaviours, or to identify users as belonging to particular groups. It can also be used to help establish or estimate the age of a user (as detailed in the standard on age appropriate application), or for child protection, countering terrorism, or the prevention of crime.

Profiles are usually based on a user's past online activity or browsing history. They can be created using directly collected personal data or by drawing inferences (eg preferences or characteristics inferred from associations with other users or past online choices).

Content feeds based on profiling can include advertising content, content provided by other websites, downloads, content generated by other internet users, written, audio or visual content. Profiling may also be used to suggest other users to 'connect with' or 'follow'.

## Why is it important?

Profiling is mentioned in Recital 38 to the GDPR as an area in which children merit specific protection with regard to the use of their personal data.

There are also specific rules at Article 22 of the GDPR about decisions (including profiling) which are based solely on the automated processing of personal data, and which have a legal or similarly significant effect on the data subject.

> "22(1) The data subject shall have the right not to be subject to a decision based solely on automated processing, including profiling, which produces legal effects concerning him or her or similarly affects him or her"

Recital 71 to the GDPR states that such decisions 'should not concern a child'.

The lawfulness, fairness and transparency principle at Article 5(1) is also relevant because this is an area of largely 'invisible processing' in which it is difficult for children to understand how their personal data is being used, and what the consequences of that use might be.

> "5(1) Personal data shall be
> (a) processed lawfully, fairly and in a transparent manner in relation to the data subject ('lawfulness, fairness and transparency')"

Some profiling may be relatively benign, for example personalisation of a 'walled garden' online environment to incorporate an animal theme in the displayed content. Other profiling, such as content feeds which gradually take the child away from their original area of interest into other less suitable content, raise much more significant concerns.

## Should all profiling be controlled by a privacy setting?

It is important to remember that 'off by default' does not mean that profiling is not possible or banned. Following the safeguards and steps set out in this section, which could include effective consent, can enable profiling using children's data to take place, safely and fairly.

There is no point in offering a privacy setting if the profiling is essential to the provision of the core service that the child has requested. This is because if the profiling were turned off there would be no residual service left for the child to use. This concept should be interpreted narrowly, eg that it is completely intrinsic to the service.

However, whenever you can, you should offer children control over whether and how their personal data is used. So most profiling should be subject to a privacy setting. If you can provide a core or residual service without profiling, then you should provide a privacy setting for any additional aspects of your service which rely on profiling.

You should always provide a privacy setting for behavioural advertising which is used to fund a service, but is not part of the core service that the child wishes to access. Although there may be some limited examples of services where behavioural advertising is part of the core service (eg a voucher or 'money off' service), we think these will be exceptional. In most cases the funding model will be distinct from the core service and so should be subject to a privacy setting that is 'off' by default.

There may also be some other limited circumstances in which it won't be appropriate for you to offer a privacy setting over profiling. For example, if you are profiling in order to meet a legal or regulatory requirement (such as a safeguarding or child protection requirement), to prevent child sexual exploitation or abuse online or to age assure so you can properly apply the provisions of this code to child users.

## How does this fit with PECR requirements?

Profiling may rely on the use of cookies and similar technologies in order to store or 'remember' the information about a user's past online activity.

A cookie is a small text file that is downloaded onto 'terminal equipment' (eg a computer or smartphone) when the user accesses a website. It allows the website to recognise that user's device and store some information about the user's preferences or past actions.

PECR requires that you provide users with clear and comprehensive information about your use of cookies and obtain prior consent for any that are 'non-essential'.

So if you use cookies for the purposes of profiling you need to consider PECR rules for the setting of the cookie, and the GDPR and this code for the underlying processing of personal data (profiling) that the cookie supports or enables.

**Profiling and non-essential cookies**

If the cookie isn't essential to provide the service that the child wants to access, then the underlying profiling it facilitates normally needs to be subject to a privacy setting. This gives the child control over whether their personal data is used for this purpose.

You need consent for the cookie as well as a GDPR lawful basis for processing for the underlying processing (in practice this may also be consent).

**Cookies, profiling, and your core services**

If the cookie is essential to the provision of your core service then it is likely that the underlying profiling that the cookie enables is too. In this circumstance providing a privacy setting which allows the child to control whether their personal data is used for this purpose won't be appropriate. You need a lawful basis (other than consent) for the underlying processing (profiling) and won't need consent for the cookie.

**Cookies, profiling and your non-core services**

Cookies may also be essential for providing your non-core services. However, as these are optional elements of your service you firstly need to provide a privacy setting which gives the child control over whether they wish their personal data to be processed in order to access them.

If the child decides to do so, then you do not need consent for the use of the cookie – as the child is specifically requesting to access part of your service and the cookie is strictly necessary for this purpose.

You do however need a lawful basis for the underlying processing.

**Cookies, profiling, and age estimation or age assurance**

You may also use cookies for profiling that intends to meet the implied age verification requirements of Article 8 of the GDPR, or to age assure in order to properly apply the standards of this code. For more detail about the Article 8 requirements see Annex C Lawful bases for processing.

In this circumstance, the purpose you use the cookies for is regarded as essential for the service, as you need to do so to provide an age appropriate service and comply with the GDPR. Provided that the cookie in question is solely used for this purpose, and not for any other purpose, then the child does not need to consent to the cookie.

For more information about cookies, and when a cookie is essential and non-essential, see our guidance on Cookies and similar technologies.

## How can we make sure that we meet this standard?

**Differentiate between different types of profiling for different purposes**

Because profiling can be used to serve a wide range of purposes it is particularly important to be clear about the purposes for which your service uses personal data to profile its users, and to differentiate between them. Catch-all purposes, such as 'providing a personalised service' are not specific enough.

Where it is appropriate to offer privacy settings then you should offer separate settings for each different type of profiling. It is not acceptable to bundle different types of profiling together under one privacy setting, or to bundle in profiling with processing for other purposes.

Acceptable practice:




Unacceptable practice:




**Ensure features that rely on profiling are switched off by default (unless there is a compelling reason to do otherwise)**

You need to switch any options within your service which rely on profiling off by default, unless you can demonstrate a compelling reason why this should not be the case, taking account of the best interests of the child. You need to assess this in the specific circumstances of your processing.

In practice it is likely to mean that any non-essential features that rely on profiling and that you provide for commercial purposes are subject to a privacy setting which is switched off by default.

In the case of any profiling you do for the purposes of behavioural advertising, which is facilitated by cookies, this approach is supported by the comments of the EDPB. EDPB have indicated that 'legitimate interests' is unlikely to provide a valid lawful basis for processing for this purpose which means that consent is your only viable basis for processing. As valid consent has to be 'opt in', allowing such profiling 'by default' is not an option. You also need to comply with the Article 8 GDPR requirements for parental consent if the child is under the age of 13. For more information about lawful bases for processing and Article 8 requirements see Annex C.

However, you may have a compelling argument that you need to switch profiling options for other purposes on by default.

For example, it may be appropriate for profiling for the purposes of ensuring that a service is accessible to a disabled child (eg identifying that a child has an ongoing need for a subtitled, signed or other supported service) to be switched on by default.

You may be able to demonstrate that profiling for the purposes of informing news content feeds should be allowed by default, in order to recognise the rights of children to access information. Although you still need consent to set the cookies that support the profiling in

Case: 25-2366, 08/11/2025, DktEntry: 26.2, Page 55 of 291

accordance with PECR requirements. This is more likely to be the case if you can demonstrate that you conform with existing regulatory codes of practice which govern media content and practices (such as The Editors' Code of Practice) and have editorial control over the content that children will be shown as a result of the profiling. It is unlikely to apply if you do not have such editorial control or adhere to other regulatory controls. See also our FAQs for the news media.

**Provide appropriate interventions at the point at which any profiling is activated**

At the point any profiling options are turned on, you need to provide age appropriate information about what will happen to the child's personal data and any risks inherent in that processing.

You should also provide age appropriate prompts to seek assistance from an adult and not to activate the profiling if they are uncertain or don't understand.

Depending on your assessment of risk and the age of the child you may wish to make further interventions, which might include further age assurance measures.

**If profiling is on ensure that you put appropriate measures in place to safeguard the child (in particular from inappropriate content)**

If your online service uses any profiling then you need to take appropriate steps to make sure that this does not result in harm to the child.

In practice this means that if you profile children (using their personal data) in order to suggest content to them, then you need suitable measures in place to make sure that children aren't served content which is detrimental to their physical or mental health or wellbeing, taking into account their age. As covered in the section of this code on DPIAs, testing your algorithms should assist you in assessing the effectiveness of your measures.

Such measures could include contextual tagging, robust reporting procedures, and elements of human moderation. It could also include your own editorial controls over the content you display, including adherence to codes of conduct or other regulatory provisions (such as compliance with The Editors' Code of Practice, or the Ofcom Broadcasting Code). We recognise the importance of the rights of children to access information from the media, and the societal and developmental benefits of children being able to engage in current affairs and the world around them. We would therefore accept that adherence to editorial or broadcasting codes of conduct negate the need for providers of online news to take any additional steps in relation to news content for children. See also our FAQs for the news media.

If you are using children's personal data to automatically recommend content to them based on their past usage/browsing history then you have a responsibility for the recommendations you make. This applies even if the content itself is user generated. In data protection terms, you have a greater responsibility in this situation than if the child

were to pro-actively search out such content themselves. This is because it is your processing of the personal data that serves the content to the child. Data protection law doesn't make you responsible for third party content but it does make you responsible for the content you serve to children who use your service, based on your use of their personal data.

Your general approach should be that if the content you promote or the behaviours your features encourage are obviously detrimental, or are recognised as harmful to the child, in one context (eg marketing rules, film classification, advice from official Government sources such as Chief Medical Officers' advice, PEGI ratings) then you should assume that the same type of content or behaviour is harmful in other contexts as well. Where evidence is inconclusive you should apply the same precautionary principle.

Content or behaviours that may be detrimental to children's health and wellbeing (taking into account their age) include:

- advertising or marketing content that is contrary to CAP guidelines on marketing to children;
- film or on-demand television content that is classified as unsuitable for the age group concerned;
- music content that is labelled as parental advisory or explicit;
- pornography or other adult or violent content;
- user generated content (content that is posted by other internet users) that is obviously detrimental to children's wellbeing or is formally recognised as such (eg pro-suicide, pro-self harm, pro-anorexia content. Content depicting or advocating risky or dangerous behaviour by children); and
- strategies used to extend user engagement, such as timed notifications that respond to inactivity.

Ultimately, if you believe that it is not feasible for you to put suitable measures in place, then you are not be able to profile children for the purposes of recommending online content. In this circumstance you need to make sure that children cannot change any privacy settings which allow this type of profiling.

Similarly, if you cannot put suitable measures in place to safeguard children from harms arising from profiling for other purposes (such as profiling to promote certain behaviours), you should not profile children for these purposes either.

## How does this fit with other rules on restricting access to content for children?

You may need to take account of other rules on restricting access to content in order to ensure that you don't use children's personal data in ways that have been shown to be detrimental to their wellbeing (for more detail see the standard on detrimental use of data).

The CAP code requires that when advertising is targeted through the use of personal data, advertisers must show that they have taken reasonable steps to reduce the likelihood of those who are, or are likely to be, in a protected age category being exposed to age-restricted marketing content.

The Ofcom On Demand Programme Service Rules require providers of 'on demand' content to only make certain content ('specially restricted material') available, if it can do so in a way that ensures that those under the age of 18 will not normally be able to see or hear it.

The Audiovisual Media Services Directive 2018 (AVMSD) (if implemented in the UK) will require 'video sharing platform services' to use proportionate measures in relation to how they organise the content they share, to protect minors from content which might impair their physical, mental or moral development.

We consider that it is consistent with these provisions to only allow children's personal data to be used to determine content feeds if you can put suitable measures in place to guard against them being served content that is detrimental to their health and wellbeing

The AVMSD also requires that you should not use personal data collected or generated for the purposes of protecting minors from content which might impair their physical, mental or moral development for commercial purposes such as direct marketing, profiling and behaviourally targeted advertising.

We consider that this requirement is consistent with the purpose limitation principle of the GDPR and with our guidance in the sections of this code on age appropriate application - What if we need to collect personal data in order to establish age? It doesn't mean that services within the scope of the AVMSD can't ever process personal data for commercial purposes. It just means that you can't use personal data collected for one purpose for another. If such services wish to profile children for the purpose of behavioural advertising you will need the child's (or parent's) consent. For more information on consent see Annex C Lawful bases for processing.

We will work with other regulators as necessary where issues of regulatory consistency arise.

**Further reading outside this code**

The Editors' Code of Practice

The Ofcom Broadcasting Code (with the Cross-promotion Code and the on Demand Programme Service Rules)

Directive (EU) 2018/1808 amending Directive 2010/13/EU (Audiovisual Media Services Directive) and the UK government's Audiovisual Media Services Consultation Document

Age Appropriate Design Code FAQs for the news media

# EXHIBIT 5

TECHNOLOGY

# Snapchat Ends 'Speed Filter' That Critics Say Encouraged Reckless Driving

JUNE 17, 2021 · 11:58 AM ET

HEARD ON ALL THINGS CONSIDERED


Bobby Allyn

**3-Minute Listen**

PLAYLIST

Download

Transcript




An iPhone screengrab of Snapchat's speed filter, which allows users to record and share how fast they are moving. Snap told NPR that it is eliminating the tool.
*Bobby Allyn/NPR*

The maker of the Snapchat app is eliminating a feature known as the "speed filter" that lets users capture how fast they are moving and share it with friends, NPR has learned.

The move is a dramatic reversal for Snap, Inc., which introduced the feature in 2013.

Since then, Snap has defended the feature in the face of warnings from safety advocates who have argued that it encourages reckless driving. The company has also faced lawsuits from the families of those who have been injured or killed in car crashes where drivers were moving at excessive speeds, allegedly to score bragging rights on the app.

Sponsor Message

Critics of the speed filter welcomed the news, while also questioning the delay.

"Lives will be saved. Crashes will be prevented, but the lawyer in me says, 'My God, why did it take so long?' " said Joel Feldman, the co-founder of the nonprofit End Distracted Driving, one of the groups that urged Snapchat to remove the speed filter.

What exactly led Snap to scrap the feature now is unclear. Over several weeks, NPR asked Snap a series of questions about why it had stood by the speed filter for so long. A company spokeswoman told NPR, "Nothing is more important than the safety of our Snapchat community."

A month later, the same spokeswoman confirmed the speed filter would soon be gone.

The feature "is barely used by Snapchatters," she said on Thursday. "And in light of that, we are removing it altogether."

She said the company started removing the feature this week, but it may be a couple weeks before it disappears from the app for all of its 500 million monthly active users.

Lawyer Michael Neff, who has represented the families of those involved in car crashes linked to the filter, said the change does not undo the pain of his clients.

Sponsor Message

Ad removed.
Show details

"While this will no doubt serve the safety of the motoring public moving forward, it does not remedy Snapchat's choice to create and distribute the speed filter in the past," Neff said. "We look forward to our day in court and pursuing justice for those who suffered unnecessary losses."

### 'Speed filter' involved in several deadly car crashes

The feature has been connected to a number of deadly or near-fatal car crashes, often with teenagers behind the wheel.

A 2015 collision involving the speed filter left a driver in Georgia with permanent brain damage. That same year, the feature was tied to the death of three young women in a Philadelphia car accident. In 2016, five people in Florida died in a high-speed collision that reportedly involved the speed filter. In 2017, three young men in Wisconsin clocked a speed of 123 miles per hour on the feature before they crashed into a tree and died.




TECHNOLOGY
**Snapchat Can Be Sued Over Role In Fatal Car Crash, Court Rules**

In response, Snap made a number of changes. It moved the speed feature from a "filter" to a "sticker" in Snapchat, lowering its prominence. It also added a "Don't Snap and drive" warning that would appear every time someone used the feature.

The company also quietly capped the top speed for which a post could be shared for "driving speeds" at 35 mph. When NPR inquired about this in May, the Snap spokeswoman confirmed that the limitation had been imposed. Yet the company kept the filter available for use.

And the legal battles continue. Naveen Ramachandrappa, a California lawyer who sued Snap over the speed filter, wrote in a lawsuit that some teenage users of Snap believed they would be rewarded with digital prizes and trophies for recording a speed in excess of 100 miles per hour.

"Or at the very least, they want to find out if they will be so rewarded and so they drive at excessive speeds to see what will happen," he wrote.

Sponsor Message

A federal appeals court in May ruled that the family of the young men who died in the Wisconsin crash should be able to sue Snap for being negligent in designing a product that led to foreseeable harm. Snap this week asked the trial court to toss the case out, arguing the speed filter did not cause the car accident.

Of the some 5 billion "snaps" users make every day, the speed feature barely registers in terms of popularity, which is why Snap officials say it is dropping the tool.

Irina Raicu, the director of the Internet Ethics Program at Santa Clara University, said that increasingly, tech companies are doing risk assessments of new products

and features to try to get ahead of possible abuses.

"If you have a new tool or feature: What does it allow? What does it invite? And what does it incentivize? There are degrees of responsibility based on those three things," she said. "This Snapchat filter seems like maybe it was missing some of those conversations initially."

"Sometimes," Raicu added, "one of the most thoughtful ways to deploy a product is to never deploy it at all."

snapchat speed filter

## Support What You Love with NPR+

While none of us at NPR can predict the next big story, we know one thing for sure: *your donations help make all of our reporting and content possible.*

**So let us say "thank you" with perks from NPR+!** Donate today and unlock podcast bonus episodes, shop discounts, and more.

GIVE TODAY

## More Stories From NPR

# EXHIBIT 6

Page Vault

| | |
|---|---|
| Document title: | Community Standards Enforcement \| Transparency Center |
| Capture URL: | https://transparency.meta.com/reports/community-standards-enforcement/adult-nudity-and-sexual-activity/facebook/ |
| Page loaded at (UTC): | Mon, 28 Oct 2024 12:29:10 GMT |
| Capture timestamp (UTC): | Mon, 28 Oct 2024 12:30:45 GMT |
| Capture tool: | 10.52.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.6478.234 Safari/537.36 |
| Operating system: | Linux (Node 20.17.0) |
| PDF length: | 6 |
| Capture ID: | widWsQ388KA9hbMd3hoadP |
| Display Name: | pauljezick |

PDF REFERENCE #: r4bJnVTfW69YCDJwbkMeJH

# Adult Nudity and Sexual Activity

We restrict the display of adult nudity and sexual activity on Facebook and Instagram. We make some exceptions when it is clear the content is being shared in the context of a protest, for educational or medical reasons or a similar reason. On the other hand, we default to removing sexual imagery to prevent non-consensual or underage content from being shared.

This report does not include metrics related to our separate policy on the promotion of sexual assault, violence or exploitation.

**Read the policy details**

PREVALENCE

## How prevalent were adult nudity and sexual activity violations?






**How we calculate it** ⓘ  **Read about this data**

CONTENT ACTIONED

## How much adult nudity and sexual activity content did we take action on?




**How we calculate it** ⓘ  **Read about this data**

PROACTIVE RATE

## Of the violating content we actioned for adult nudity and sexual activity, how much did we find and action before people reported it?






Found and actioned by us
Reported by users

**How we calculate it** **Read about this data**

## Correcting mistakes

People can appeal our decisions, unless there are extreme safety concerns. We restore content we incorrectly removed or when circumstances change. Restores can happen from appeals or when we identify issues ourselves.

APPEALED CONTENT

### How much of the content we actioned for adult nudity and sexual activity did people appeal?



Facebook

Overview

**Adult Nudity and Sexual Activity**

Bullying and Harassment

Child Endangerment: Nudity and Physical Abuse and Sexual Exploitation

Dangerous Organizations: Terrorism and Organized Hate

Fake Accounts

Hate Speech

Restricted Goods and Services

Spam

Suicide and Self-Injury

Violence and Incitement

Violent and Graphic Content




How we calculate it    Read about this data

RESTORED CONTENT

## How much actioned content for adult nudity and sexual activity was later restored?




How we calculate it    Read about this data

PREVIOUS
Overview

NEXT
Bullying and Harassment

PREVIOUS
Overview

NEXT
Bullying and Harassment

Meta

# EXHIBIT 7

Page Vault

| | |
|---|---|
| Document title: | Community Standards Enforcement \| Transparency Center |
| Capture URL: | https://transparency.meta.com/reports/community-standards-enforcement/bullying-and-harassment/facebook/ |
| Page loaded at (UTC): | Mon, 28 Oct 2024 12:31:02 GMT |
| Capture timestamp (UTC): | Mon, 28 Oct 2024 12:31:31 GMT |
| Capture tool: | 10.52.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.6478.234 Safari/537.36 |
| Operating system: | Linux (Node 20.17.0) |
| PDF length: | 6 |
| Capture ID: | wXSLHRY5V96orSgZgzs9Jy |
| Display Name: | pauljezick |

# Bullying and Harassment

We do not tolerate bullying and harassment on Facebook and Instagram. Because we recognize bullying can be especially harmful for minors, our policies provide heightened protections for them. We want to allow for open and vital discussion of people who are in the news or who have a large public audience, so we do permit more open or critical discourse towards public figures than private individuals.

Because bullying and harassment is highly personal by nature, using technology to proactively detect these behaviors can be more challenging than other types of violations. That's why we also rely on people to report this behavior to us so we can identify and remove it. When measuring prevalence in this area, the metric captures only bullying and harassment where a deeper understanding of context or meaning is not necessary to determine if it violates our policy. We continue to invest in our proactive detection technology to ensure we are tackling the problem and protecting our community.

**Read the policy details**

PREVALENCE

## How prevalent were bullying and harassment violations?






How we calculate it ⓘ    Read about this data

CONTENT ACTIONED

## How much bullying and harassment content did we take action on?




How we calculate it ⓘ    Read about this data

PROACTIVE RATE

## Of the violating content we actioned for bullying and harassment, how much did we find and action before people reported it?




Found and actioned by us
Reported by users

How we calculate it

Read about this data

## Correcting mistakes

People can appeal our decisions, unless there are extreme safety concerns. We restore content we incorrectly removed or when circumstances change. Restores can happen from appeals or when we identify issues ourselves.

APPEALED CONTENT

### How much of the content we actioned for bullying and harassment did people appeal?



Facebook

Overview

Adult Nudity and Sexual Activity

**Bullying and Harassment**

Child Endangerment: Nudity and Physical Abuse and Sexual Exploitation

Dangerous Organizations: Terrorism and Organized Hate

Fake Accounts

Hate Speech

Restricted Goods and Services

Spam

Suicide and Self-Injury

Violence and Incitement

Violent and Graphic Content




**How we calculate it** ⓘ **Read about this data**

RESTORED CONTENT

## How much actioned content for bullying and harassment was later restored?




Restored without appeal | Restored after appeal | Total

**How we calculate it** ⓘ **Read about this data**

PREVIOUS
Adult Nudity and Sexual Activity

NEXT
Child Endangerment: Nudity and Physical Abuse and Sexual

PREVIOUS
Adult Nudity and Sexual Activity

NEXT
Child Endangerment: Nudity and Physical Abuse and Sexual Exploitation

# EXHIBIT 8

| | |
|---|---|
| Document title: | Snapchat Transparency Report \| Snapchat Transparency |
| Capture URL: | https://values.snap.com/privacy/transparency?lang=en-US#:~:text=Overview%20of%20Content%20and%20Account%20Violations&text=During%20the%20reporting%20period%2C%20we,found%20to%20violate%20our%20policies. |
| Page loaded at (UTC): | Mon, 28 Oct 2024 12:31:49 GMT |
| Capture timestamp (UTC): | Mon, 28 Oct 2024 12:32:18 GMT |
| Capture tool: | 10.52.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.6478.234 Safari/537.36 |
| Operating system: | Linux (Node 20.17.0) |
| PDF length: | 8 |
| Capture ID: | 6Sc57U9DLW6JMzfETDmDbN |
| Display Name: | pauljezick |

PDF REFERENCE #: fTgeSDDDhQkdQp5MNPn2cD

# Transparency Report

July 1, 2023 – December 31, 2023

Released:

April 25, 2024

Updated:

April 25, 2024

To further provide insight into Snap's safety efforts and the nature and volume of content reported on our platform, we publish this transparency report twice a year. We are committed to continuing to make these reports more comprehensive and informative to the safety and well-being of our community, and the many stakeholders who care deeply about our content moderation and law enforcement practices.

This Transparency Report covers the second half of 2023 (July 1 - December 31). As with our previous reports, we share data about the global number of in-app content and account-level reports we received and enforced across specific categories of policy violations; how we responded to requests from law enforcement and governments; and our enforcement actions broken down by country.

As part of our ongoing commitment to continually improve our transparency reports, we are introducing a few new elements with this release.

First, we have expanded our main table to include reports and enforcement against content and accounts tied to both Terrorism & Violent Extremism and Child Sexual Exploitation & Abuse (CSEA). In previous reports, we had highlighted account deletions made in response to those violations in separate sections. We will continue to outline our proactive and reactive efforts against CSEA, as well as our reports to NCMEC, in a separate section.

Second, we have provided expanded information on appeals, outlining total appeals and reinstatements by Community Guidelines enforcements.

Finally, we have expanded our European Union section, providing increased insight into Snap's EU activities. Specifically, we are publishing our most recent DSA Transparency Report and additional metrics regarding our CSEA media scanning.

For more information about our policies for combating online harms, and plans to continue evolving our reporting practices, please read our recent Safety & Impact blog about this Transparency Report. To find additional safety and privacy resources on Snapchat, see our *About Transparency Reporting* tab at the bottom of the page.

Please note that the most up-to-date version of this Transparency Report can be found in the en-US locale.

## Overview of Content and Account Violations

From July 1 - December 31, 2023, Snap enforced against 5,376,714 pieces of content globally that were reported to us and violated our Community Guidelines.

During the reporting period, we saw a Violative View Rate (VVR) of 0.01 percent, which means that out of every 10,000 Snap and Story views on Snapchat, 1 contained content found to violate our policies. The median turnaround time to enforce reported content was ~10 minutes.

| Total Content & Account Reports | Total Content Enforced | Total Unique Accounts Enforced |
|---|---|---|
| 19,041,510 | 5,376,714 | 3,315,759 |

Transparency
Transparency Report
About
Glossary
Previous Reports
European Union
Ads Gallery
Australia
California
India
Researchers

| | | |
|---|---|---|
| 19,041,510 | 5,376,714 | 3,315,759 |

| Reason | Content & Account Reports | Content Enforced | % of the Total Content Enforced by Snap | Unique Accounts Enforced | Turnaround Time (in median minutes) |
|---|---|---|---|---|---|
| Sexual Content | 4,271,116 | 2,266,213 | 42.1% | 1,321,205 | 7 |
| Child Sexual Exploitation | 847,430 | 239,820 | 4.5% | 206,904 | 52 |
| Harassment and Bullying | 8,524,054 | 1,193,695 | 22.2% | 934,994 | 7 |
| Threats & Violence | 836,125 | 114,315 | 2.1% | 83,743 | 27 |
| Self-Harm & Suicide | 188,124 | 32,841 | 0.6% | 28,207 | 44 |
| False Information | 439,233 | 1,463 | 0.1% | 1,277 | 12 |
| Impersonation | 440,437 | 14,557 | 0.3% | 14,381 | 3 |
| Spam | 1,981,115 | 1,002,278 | 18.6% | 645,238 | 2 |
| Drugs | 368,732 | 241,227 | 4.5% | 166,562 | 55 |
| Weapons | 115,512 | 13,271 | 0.2% | 9,768 | 35 |
| Other Regulated Goods | 478,665 | 140,554 | 2.6% | 99,768 | 32 |
| Hate Speech | 431,670 | 113,906 | 2.1% | 97,621 | 46 |
| Terrorism & Violent Extremism | 119,297 | 2,574 | 0.1% | 2,136 | 45 |

## Analysis of Content and Account Violations

Our overall reporting and enforcement rates remained fairly similar to the previous six months. This cycle, we saw an approximate 10% increase in total content and account reports.

The Israel-Hamas conflict began during this period, and as a result we saw an uptick in violative content. Total reports related to hate speech increased by ~61%, while total content enforcements of hate speech increased by ~97% and unique account enforcements increased by ~124%. Terrorism & Violent extremism reports and enforcements have also increased, though they comprise <0.1% of the total content enforcements on our platform. Our Trust & Safety teams continue to remain vigilant as global conflicts arise in order to help keep Snapchat safe. We have also expanded our transparency report to include more information at a global and country-level regarding the total reports, content enforced, and unique accounts enforced for violations of our Terrorism & Violent Extremism policy.

## Combating Child Sexual Exploitation & Abuse

Sexual exploitation of any member of our community, especially minors, is illegal, abhorrent, and prohibited by our Community Guidelines. Preventing, detecting, and eradicating Child Sexual Exploitation and Abuse (CSEA) on our platform is a top priority for Snap, and we continually evolve our capabilities to combat these and other crimes.

Sexual exploitation of any member of our community, especially minors, is illegal, abhorrent, and prohibited by our Community Guidelines. Preventing, detecting, and eradicating Child Sexual Exploitation and Abuse (CSEA) on our platform is a top priority for Snap, and we continually evolve our capabilities to combat these and other crimes.

We use active technology detection tools, such as PhotoDNA robust hash-matching and Google's Child Sexual Abuse Imagery (CSAI) Match to identify known illegal images and videos of child sexual abuse, respectively, and report them to the U.S. National Center for Missing and Exploited Children (NCMEC), as required by law. NCMEC then, in turn, coordinates with domestic or international law enforcement, as required.

In the second half of 2023, we proactively detected and actioned 59% of the total child sexual exploitation and abuse violations reported. This reflects a 39% total decrease from the previous period due to enhancements in Snapchatters' options for reporting, increasing our visibility of potential CSEA sent on Snapchat.

| Reason | Total Content Enforced | Total Accounts Disabled | Total Submissions to NCMEC |
|---|---|---|---|
| CSEA | 1,046,296 | 343,865 | 398,736 |

*Note that each submission to NCMEC can contain multiple pieces of content. The total individual pieces of media submitted to NCMEC is equal to our total content enforced. We also have excluded retracted submissions to NCMEC from this number.

## Self-harm and Suicide Content

We care deeply about the mental health and well-being of Snapchatters, which continues to inform our decisions to build Snapchat differently. As a platform designed for communications between and among real friends, we believe Snapchat can play a unique role in empowering friends to help each other in difficult times.

When our Trust & Safety team becomes aware of a Snapchatter in distress, they can forward self-harm prevention and support resources, and notify emergency response personnel when appropriate. The resources that we share are available on our global list of safety resources, and are publicly available to all Snapchatters.

| Total Times Suicide Resources Shared |
|---|
| 28,361 |

## Appeals

In our previous report, we introduced metrics on appeals, where we highlighted the number of times users asked us to re-review our initial moderation decision against their account. In this report, we have expanded our appeals to capture the full range of our policy categories for account-level violations.

| Policy Reason | Total Appeals | Total Reinstatements | Total Decisions Upheld | Median Turnaround Time (days) to Process Appeals |
|---|---|---|---|---|
| Total | 520,962 | 20,982 | 473,475 | 2 |
| Sexual Content | 161,446 | 2,345 | 159,101 | 2 |

Transparency
Transparency Report
About
Glossary
Previous Reports
European Union
Ads Gallery
Australia
California
India
Researchers

| | | | | |
|---|---|---|---|---|
| Total | 520,962 | 20,982 | 473,475 | 2 |
| Sexual Content | 161,446 | 2,345 | 159,101 | 2 |
| Child Sexual Exploitation* | 116,736 | 12,860 | 77,371 | 152 |
| Harassment and Bullying | 19,919 | 535 | 19,384 | 2 |
| Threats & Violence | 1,667 | 87 | 1,580 | 57 |
| Self-Harm & Suicide | 41 | 7 | 34 | 34 |
| False Information | 9 | 0 | 9 | 20 |
| Impersonation | 1,558 | 114 | 1,444 | 19 |
| Spam | 13,745 | 193 | 13,552 | 4 |
| Drugs | 192,947 | 4,487 | 188,460 | 0 |
| Weapons | 2,936 | 83 | 2,853 | 27 |
| Other Regulated Goods | 9,356 | 208 | 9,148 | 13 |
| Hate Speech | 484 | 54 | 430 | 63 |
| Terrorism & Violent Extremism | 118 | 9 | 109 | 46 |

* Stopping the spread of content or activity related to child sexual exploitation is a top priority. Snap devotes significant resources toward this goal and has zero tolerance for such conduct. Special training is required to review CSE appeals, and there is a limited team of agents that handles these reviews due to the graphic nature of the content. In the fall of 2023, Snap implemented policy changes that affected the consistency of certain CSE enforcements; we have addressed these inconsistencies through agent re-training and quality assurance. We expect that Snap's next transparency report will reveal progress toward improving response times for CSE appeals and improving the precision of initial enforcement actions.

## Ads Moderation

Snap is committed to ensuring that all ads are fully compliant with our advertising policies. We believe in a responsible and respectful approach to advertising, creating a safe and enjoyable experience for all of our users. Below we have included insight into our moderation for paid advertisements on Snapchat. Note that ads on Snapchat can be removed for a variety of reasons as outlined in Snap's Advertising Policies, including deceptive content, adult content, violent or disturbing content, hate speech, and intellectual property infringement. Additionally, you can now find Snapchat's Ads Gallery in the navigation bar of this transparency report.

| Total Ads Reported | Total Ads Removed |
|---|---|
| 20,204 | 7,258 |

| | |
|---|---|
| 20,204 | 7,258 |



## Regional & Country Overview

This section provides an overview of the enforcement of our Community Guidelines in a sampling of geographic regions. Our Guidelines apply to all content on Snapchat—and all Snapchatters—across the globe, regardless of location.

Information for individual countries, including all EU Member States, is available for download via the attached CSV file.

Download CSV

| Region | Content & Account Reports | Content Enforced | Unique Accounts Enforced |
|---|---|---|---|
| North America | 6,146,896 | 2,253,147 | 1,377,547 |
| Europe | 5,060,287 | 1,471,363 | 963,225 |
| Rest of World | 7,834,327 | 1,652,204 | 1,011,616 |
| Total | 19,041,510 | 5,376,714 | 3,315,759 |



Australia



Austria



Belgium



Brazil



Canada



Denmark







Transparency
- Transparency Report
- About
- Glossary
- Previous Reports
- European Union
- Ads Gallery
- Australia
- California
- India
- Researchers


Finland


France


Germany


India


Iraq


Ireland


Italy


Mexico


Netherlands


New Zealand


Norway


Poland


Saudi Arabia


Spain


Sweden

Privacy, Safety, and Policy Hub | Policy | Privacy | Safety | Transparency | News

Transparency
- Transparency Report
- About
- Glossary
- Previous Reports
- European Union
- Ads Gallery
- Australia
- California
- India
- Researchers

Saudi Arabia | Spain | Sweden


Turkey


United Arab Emir...


United Kingdom


United States

Government & Intellectual Property Removal Requests

Learn More

About Transparency Reporting

Learn More

Glossary of Transparency Report

Learn More

**Company**
Snap Inc.
Careers
News
Privacy and Safety

**Community**
Snapchat Support
Spectacles Support
Community Guidelines

**Advertising**
Snapchat Ads
Advertising Policies
Political Ads Library
Brand Guidelines
Promotions Rules

**Legal**
Other Terms & Policies
Law Enforcement
Cookie Policy
Cookie Settings
Report Infringement

Snap Inc. Privacy Policy Terms of Service

Language English (US)

# EXHIBIT 11

Pew Research Center

FOR RELEASE DECEMBER 11, 2023

# Teens, Social Media and Technology 2023

*YouTube, TikTok, Snapchat and Instagram remain the most widely used online platforms among U.S. teens*

**BY** *Monica Anderson, Michelle Faverio and Jeffrey Gottfried*

**FOR MEDIA OR OTHER INQUIRIES:**

Monica Anderson, Director, Internet and Technology
Jeffrey Gottfried, Associate Director
Haley Nolan, Communications Manager
202.419.4372

www.pewresearch.org

**RECOMMENDED CITATION**

Pew Research Center, December 2023, "Teens, Social Media and Technology 2023"

## How we did this

Pew Research Center conducted this study to better understand teens' use of digital devices, social media and other online platforms.

The Center conducted an online survey of 1,453 U.S. teens from Sept. 26 to Oct. 23, 2023, through Ipsos. Ipsos recruited the teens via their parents, who were part of its KnowledgePanel. The KnowledgePanel is a probability-based web panel recruited primarily through national, random sampling of residential addresses. The survey was weighted to be representative of U.S. teens ages 13 to 17 who live with their parents by age, gender, race and ethnicity, household income, and other categories.

This research was reviewed and approved by an external institutional review board (IRB), Advarra, an independent committee of experts specializing in helping to protect the rights of research participants.

Here are the questions used for this analysis, along with responses, and its methodology.

### A note on terminology

Our September-October 2023 survey asked about "Twitter (recently renamed to 'X')." The terms **Twitter** and **X** are both used in this report to refer to the same platform.

# Teens, Social Media and Technology 2023

## *YouTube, TikTok, Snapchat and Instagram remain the most widely used online platforms among U.S. teens*

Despite negative headlines and growing concerns about social media's impact on youth, teens continue to use these platforms at high rates – with some describing their social media use as "almost constant," according to a new Pew Research Center survey of U.S. teens.

The survey – conducted Sept. 26-Oct. 23, 2023, among 1,453 13- to 17-year-olds – covered social media, internet use and device ownership among teens.

Here's a look at the key findings related to online platforms:

**YouTube continues to be top platform among teens, followed by TikTok, Snapchat and Instagram**

*% of U.S. teens ages 13 to 17 who say they ever use the following apps or sites*




Note: Those who did not give an answer are not shown.
Source: Survey of U.S. teens conducted Sept. 26-Oct. 23, 2023.
"Teens, Social Media and Technology 2023"

PEW RESEARCH CENTER

**YouTube continues to dominate.** Roughly nine-in-ten teens say they use YouTube, making it the most widely used platform measured in our survey.

**TikTok, Snapchat and Instagram remain popular among teens:** Majorities of teens ages 13 to 17 say they use TikTok (63%), Snapchat (60%) and Instagram (59%). For older teens ages 15 to 17, these shares are about seven-in-ten.

**Teens are less likely to be using Facebook and Twitter (recently renamed X) than they were a decade ago:** Facebook once dominated the social media landscape among America's youth, but the share of teens who use the site has dropped from 71% in 2014-2015 to 33% today. Twitter, which was renamed X in July 2023, has also seen its teen user base shrink during the past decade – albeit at a less steep decline than Facebook.

**Teens' site and app usage has changed little in the past year.** The share of teens using these platforms has remained relatively stable since spring 2022, when the Center last surveyed on these topics. For example, the percentage of teens who use TikTok is statistically unchanged since last year.

And for the first time, we asked teens about using BeReal: 13% report using this app.

## How often do teens visit online platforms?

In addition to asking teens about the types of platforms they use, we also asked them how often they use five specific platforms: YouTube, TikTok, Snapchat, Instagram and Facebook.

**Nearly 1 in 5 teens say they're on YouTube, TikTok 'almost constantly'**

*% of U.S. teens ages 13 to 17 who say they ...*




Note: Those who did not give an answer or gave other responses are not shown.
Source: Survey of U.S. teens conducted Sept. 26-Oct. 23, 2023.
"Teens, Social Media and Technology 2023"

PEW RESEARCH CENTER

YouTube, the most widely used platform measured in the survey, is also frequently visited by its users. About seven-in-ten teens say they visit the video-sharing platform daily, including 16% who report being on the site almost constantly.

At the same time, 58% of teens are daily users of TikTok. This includes 17% who describe their TikTok use as almost constant.

About half of teens use Snapchat and Instagram daily. A somewhat larger share reports using Snapchat almost constantly compared with Instagram (14% vs. 8%).

Far fewer teens say they use Facebook on a daily basis (19%), with only 3% saying they are on the site almost constantly.

## A majority of teens visit YouTube, TikTok daily

*% of U.S. teens ages 13 to 17 who say they visit or use the following apps or sites ...*




Note: Those who did not give an answer or gave other responses are not shown.
Source: Survey conducted Sept. 26-Oct. 23, 2023.
"Teens, Social Media and Technology 2023"

**PEW RESEARCH CENTER**

Taken together, a third of teens use at least one of these five sites almost constantly – which is similar to what we found last year.

**By gender**

Teen girls are more likely than boys to say they almost constantly use TikTok (22% vs. 12%) and Snapchat (17% vs. 12%).

But there are little to no differences in the shares of boys and girls who report almost constantly using YouTube, Instagram and Facebook.

**Teen girls far more likely than boys to say they use TikTok almost constantly**

*% of U.S. teens ages 13 to 17 who say they visit or use the following apps or sites* ***almost constantly***




Note: Those who did not give an answer or gave other responses are not shown.
Source: Survey of U.S. teens conducted Sept. 26-Oct. 23, 2023.
"Teens, Social Media and Technology 2023"

**PEW RESEARCH CENTER**

## By race and ethnicity

We also see differences by race and ethnicity in how much time teens report spending on these platforms.

Larger shares of Black and Hispanic teens report being on YouTube, Instagram and TikTok almost constantly, compared with a smaller share of White teens who say the same.[1]

Hispanic teens stand out in TikTok and Snapchat use. For instance, 32% of Hispanic teens say they are on TikTok almost constantly, compared with 20% of Black teens and 10% of White teens.

### About 1 in 3 Hispanic teens say they're almost constantly on TikTok

*% of U.S. teens ages 13 to 17 who say they visit or use the following apps or sites* ***almost constantly***




Note: White and Black teens include those who report being only one race and are not Hispanic. Hispanic teens are of any race. Those who did not give an answer or gave other responses are not shown.
Source: Survey of U.S. teens conducted Sept. 26-Oct. 23, 2023.
"Teens, Social Media and Technology 2023"

**PEW RESEARCH CENTER**

[1] There were not enough Asian teens in the sample to be broken out into a separate analysis. As always, their responses are incorporated into the general population figures throughout the report.

## How use of online platforms differs across demographic groups

While some sites are commonly used among all teens, there are some differences by gender, race and ethnicity, age, and household income.

### Teen girls more likely than boys to use several sites, including Instagram, Snapchat

*% of U.S. teens ages 13 to 17 who say they ever use the following apps or sites*

100 90 80 70 60 50 40 30 20 10 0

| | YouTube | TikTok | Snapchat | Instagram | Facebook | WhatsApp | Twitter (X) | Reddit | BeReal |
|---|---|---|---|---|---|---|---|---|---|
| U.S. teens | 93 | 63 | 60 | 59 | 33 | 21 | 20 | 14 | 13 |
| Boys | 96 | 59 | 56 | 53 | 29 | 21 | 21 | 18 | 8 |
| Girls | 91 | 68 | 65 | 66 | 36 | 21 | 19 | 10 | 19 |
| White | 92 | 57 | 62 | 56 | 34 | 14 | 18 | 13 | 16 |
| Black | 94 | 80 | 66 | 69 | 37 | 20 | 28 | 16 | 10 |
| Hispanic | 96 | 70 | 59 | 62 | 31 | 28 | 19 | 13 | 7 |
| Ages 13-14 | 94 | 58 | 49 | 45 | 24 | 20 | 12 | 10 | 13 |
| 15-17 | 92 | 67 | 67 | 68 | 38 | 21 | 25 | 16 | 13 |
| Urban | 91 | 67 | 59 | 65 | 35 | 28 | 21 | 14 | 7 |
| Suburban | 94 | 62 | 58 | 58 | 28 | 22 | 22 | 16 | 15 |
| Rural | 94 | 62 | 64 | 55 | 40 | 12 | 16 | 10 | 14 |
| *Household income* | | | | | | | | | |
| <$30,000 | 93 | 71 | 65 | 60 | 45 | 20 | 19 | 14 | 7 |
| $30K-$74,999 | 93 | 66 | 58 | 59 | 41 | 25 | 22 | 14 | 9 |
| $75,000+ | 93 | 61 | 60 | 59 | 27 | 19 | 19 | 14 | 16 |

Note: Not all numerical differences between groups shown are statistically significant. White and Black teens include those who report being only one race and are not Hispanic. Hispanic teens are of any race. Those who did not give an answer are not shown.
Source: Survey of U.S. teens conducted Sept. 26-Oct. 23, 2023.
"Teens, Social Media and Technology 2023"

**PEW RESEARCH CENTER**

### By gender

Teen girls are more likely than teen boys to say they use Instagram (66% vs. 53%). BeReal, TikTok, Snapchat and Facebook also are more commonly used by teen girls.

On the other hand, teen boys are more likely than teen girls to use Discord (34% vs. 22%) and Twitch (22% vs. 11%). Similarly, a larger share of boys than girls use Reddit and YouTube.

**By race and ethnicity**

Eight-in-ten Black teens report using TikTok, compared with 70% of Hispanic teens and 57% of White teens. Racial and ethnic gaps are also present in use of Twitter: Black teens are more likely than Hispanic or White teens to be Twitter users.

When it comes to WhatsApp, Hispanic teens are more likely than Black or White teens to say they use the messaging platform.

BeReal is the only platform asked about that White teens are more likely to use than Black or Hispanic teens.

**By age**

Older teens are more likely than younger teens to use many of the platforms asked about, including Instagram, Snapchat, Facebook, Twitter, TikTok and Reddit. For example, while 68% of teens ages 15 to 17 say they use Instagram, this share drops to 45% among teens ages 13 and 14.

**By household income**

While fewer teens overall are using Facebook, our surveys consistently show that usage remains higher among teens in lower-income households. For example, 45% of teens in households earning less than $30,000 a year say they use Facebook, compared with 27% of those whose annual household income is $75,000 or more.

Income gaps are also present in TikTok use: Larger shares of teens in lower-income households are users compared with those in the highest-income households (71% vs. 61%).

In comparison, BeReal is more commonly used among teens in households earning $75,000 or more a year. Some 16% of teens in this category say they use this app, compared with about one-in-ten whose annual household income falls below $75,000.

## How much time are teens spending online?

In addition to asking teens about their social media use, we also examined the amount of time they report spending online.

Nearly half of teens say they use the internet "almost constantly." This is on par with what we found last year, but roughly double the 24% who said this in the 2014-2015 survey.

Overall, more than nine-in-ten say they use the internet at least daily.

**The share of teens who say they are online 'almost constantly' has roughly doubled since 2014-2015**

*% of U.S. teens ages 13 to 17 who say they use the internet …*




Note: Figures may not add up to NET values due to rounding. Those who did not give an answer are not shown.
Source: Survey of U.S. teens conducted Sept. 26-Oct. 23, 2023.
"Teens, Social Media and Technology 2023"

PEW RESEARCH CENTER

### By race and ethnicity

As was true in previous Center surveys, the amount of time teens report spending online varies by race and ethnicity.

While 55% of Hispanic and 54% of Black teens report being on the internet almost constantly, the share drops to 38% among White teens.

### By age

Older teens ages 15 to 17 are somewhat more likely than younger teens to be near-constant internet users (50% vs. 40%).

**Black, Hispanic teens more likely than White teens to say they are online almost constantly**

*% of U.S. teens ages 13 to 17 who say they use the internet* ***almost constantly***




Note: White and Black teens include those who report being only one race and are not Hispanic. Hispanic teens are of any race. Those who did not give an answer or gave other responses are not shown.
Source: Survey of U.S. teens conducted Sept. 26-Oct. 23, 2023.
"Teens, Social Media and Technology 2023"

PEW RESEARCH CENTER

## Device usage: Smartphones, computers, gaming consoles and tablets

Today's teens have several ways to go online, connect with others and find information.

Our survey finds that most teens have or have access to a smartphone (95%), a desktop or laptop computer (90%), or a gaming console (83%). A smaller share – though still a 65% majority – say the same for tablets.

**Nearly all teens in the U.S. have access to a smartphone**

*% of U.S. teens ages 13 to 17 who say they have access to the following devices at home*




Note: Those who did not give an answer are not shown.
Source: Survey of U.S. teens conducted Sept. 26-Oct. 23, 2023.
"Teens, Social Media and Technology 2023"

PEW RESEARCH CENTER

### By household income

Smartphone ownership is nearly universal among teens of different genders, ages, races and ethnicities, and economic backgrounds. But having access to a home computer remains less common for those in lower-income households.

Roughly seven-in-ten teens living in households earning less than $30,000 a year (72%) say they have access to a home computer. That share rises among those whose annual household income is $30,000 to $74,999 (87%) or $75,000 and above (94%).

Tablet ownership is also less common among teens in lower-income households: 57% say they have access to a tablet at home, compared with 67% of those living in the highest-income households.

### By gender

Most teen boys and girls report having access to a game console at home, but more boys say this than girls (91% vs. 75%).

# Acknowledgments

This report is a collaborative effort based on the input and analysis of the following individuals. Find related reports online at pewresearch.org/internet.

### Primary researchers

Monica Anderson, *Director, Internet and Technology Research*
Michelle Faverio, *Research Analyst*
Jeffrey Gottfried, *Associate Director, Research*

### Research team

Emily A. Vogels, *Research Associate*
Colleen McClain, *Research Associate*
Risa Gelles-Watnick, *Research Analyst*
Olivia Sidoti, *Research Assistant*
Lee Rainie, *Former Director, Internet and Technology Research*
Eugenie Park, *Former Research Intern*

### Editorial and graphic design

Kaitlyn Radde, *Associate Information Graphics Designer*
Anna Jackson, *Editorial Assistant*

### Communications and web publishing

Haley Nolan, *Communications Manager*
Sara Atske, *Digital Producer*

In addition, the project benefited greatly from the guidance of Pew Research Center's methodology team: Courtney Kennedy, Ashley Amaya, Andrew Mercer, Dorene Asare-Marfo, Anna Brown, Arnold Lau and Dana Popky. This project also benefited from feedback by the following Pew Research Center staff: Drew DeSilver, Juliana Horowitz, Besheer Mohamed and John Wade. The Center gained invaluable advice in developing the questionnaire from Craig A. Anderson, Distinguished Professor of Psychology at Iowa State University; Bader Chaarani, Assistant Professor of Psychiatry at University of Vermont; and Dmitri Williams, Professor at University of Southern California's Annenberg School for Communication and Journalism.

# Methodology

The analysis in this report is based on a self-administered web survey conducted from Sept. 26 to Oct. 23, 2023, among a sample of 1,453 dyads, with each dyad (or pair) comprised of one U.S. teen ages 13 to 17 and one parent per teen. The margin of sampling error for the full sample of 1,453 teens is plus or minus 3.2 percentage points. The survey was conducted by Ipsos Public Affairs in English and Spanish using KnowledgePanel, its nationally representative online research panel.

The research plan for this project was submitted to an external institutional review board (IRB), Advarra, which is an independent committee of experts that specializes in helping to protect the rights of research participants. The IRB thoroughly vetted this research before data collection began. Due to the risks associated with surveying minors, this research underwent a full board review and received approval (Approval ID Pro00073203).

KnowledgePanel members are recruited through probability sampling methods and include both those with internet access and those who did not have internet access at the time of their recruitment. KnowledgePanel provides internet access for those who do not have it and, if needed, a device to access the internet when they join the panel. KnowledgePanel's recruitment process was originally based exclusively on a national random-digit-dialing (RDD) sampling methodology. In 2009, Ipsos migrated to an address-based sampling (ABS) recruitment methodology via the U.S. Postal Service's Delivery Sequence File (DSF). The Delivery Sequence File has been estimated to cover as much as 98% of the population, although some studies suggest that the coverage could be in the low 90% range.[2]

Panelists were eligible for participation in this survey if they indicated on an earlier profile survey that they were the parent of a teen ages 13 to 17. A random sample of 3,981 eligible panel members were invited to participate in the study. Responding parents were screened and considered qualified for the study if they reconfirmed that they were the parent of at least one child ages 13 to 17 and granted permission for their teen who was chosen to participate in the study. In households with more than one eligible teen, parents were asked to think about one randomly selected teen and that teen was instructed to complete the teen portion of the survey. A survey was considered complete if both the parent and selected teen completed their portions of the questionnaire, or if the parent did not qualify during the initial screening.

Of the sampled panelists, 1,763 (excluding break-offs) responded to the invitation and 1,453 qualified, completed the parent portion of the survey, and had their selected teen complete the teen portion of the survey, yielding a final stage completion rate of 44% and a qualification rate of 82%. The cumulative response rate accounting for nonresponse to the recruitment surveys and

[2] AAPOR Task force on Address-based Sampling. 2016. "AAPOR Report: Address-based Sampling."

attrition is 2.2%. The break-off rate among those who logged on to the survey (regardless of whether they completed any items or qualified for the study) is 26.9%.

Upon completion, qualified respondents received a cash-equivalent incentive worth $10 for completing the survey. To encourage response from non-Hispanic Black panelists, the incentive was increased from $10 to $20 on Oct. 5, 2023. The incentive was increased again on Oct. 10, 2023, from $20 to $40; then to $50 on Oct. 17, 2023; and to $75 on Oct. 20, 2023. Reminders and notifications of the change in incentive were sent for each increase.

All panelists received email invitations and any non-responders received reminders, shown in the table. The field period was closed on Oct. 23, 2023.

**Invitation and reminder dates**

| | |
|---|---|
| Invitation | Sept. 26, 2023 |
| First reminder | Sept. 28, 2023 |
| Second reminder | Oct. 2, 2023 |

## Weighting

The analysis in this report was performed using separate weights for parents and teens. The parent weight was created in a multistep process that begins with a base design weight for the parent, which is computed to reflect their probability of selection for recruitment into the KnowledgePanel. These selection probabilities were then adjusted to account for the probability of selection for this survey which included oversamples of Black and Hispanic parents. Next, an iterative technique was used to align the parent design weights to population benchmarks for parents of teens ages 13 to 17 on the dimensions identified in the accompanying table, to account for any differential nonresponse that may have occurred.

**Weighting dimensions**

| Variable | Benchmark source |
|---|---|
| Age x Gender<br>Race/Ethnicity<br>Census Region<br>Metropolitan Status<br>Education (parents only)<br>Household Income<br>Household Income x Race/Ethnicity<br>Total Household Size | 2023 March Supplement of the Current Population Survey (CPS) |
| Language proficiency | 2021 American Community Survey (ACS) |

Note: Estimates from the ACS are based on noninstitutionalized adults.

PEW RESEARCH CENTER

To create the teen weight, an adjustment factor was applied to the final parent weight to reflect the selection of one teen per household. Finally, the teen weights were further raked to match the demographic distribution for teens ages 13 to 17 who live with parents. The teen weights were

adjusted on the same teen dimensions as parent dimensions with the exception of teen education, which was not used in the teen weighting.

Sampling errors and tests of statistical significance take into account the effect of weighting. Interviews were conducted in both English and Spanish.

In addition to sampling error, one should bear in mind that question wording and practical difficulties in conducting surveys can introduce error or bias into the findings of opinion polls.

The following table shows the unweighted sample sizes and the error attributable to sampling that would be expected at the 95% level of confidence for different groups in the survey:

| Group | Unweighted sample size | Plus or minus ... |
|---|---|---|
| Teens (ages 13-17) | 1,453 | 3.2 percentage points |
| | | |
| Boys | 735 | 4.5 percentage points |
| Girls | 697 | 4.6 percentage points |
| | | |
| Ages 13 and 14 | 529 | 5.3 percentage points |
| 15 to 17 | 924 | 4.0 percentage points |
| | | |
| White, non-Hispanic | 634 | 4.5 percentage points |
| Black, non-Hispanic | 218 | 8.3 percentage points |
| Hispanic | 454 | 6.1 percentage points |
| | | |
| *Household income* | | |
| <$30,000 | 273 | 8.1 percentage points |
| $30K - $74,999 | 409 | 6.3 percentage points |
| $75,000+ | 771 | 4.1 percentage points |

Note: This survey includes oversamples of Black and Hispanic respondents. Unweighted sample sizes do not account for the sample design or weighting and do not describe a group's contribution to weighted estimates. Refer to the Weighting section for details.

Sample sizes and sampling errors for subgroups are available upon request.

## Dispositions and response rates

The tables below display dispositions used in the calculation of completion, qualification and cumulative response rates.[3]

| **Dispositions** | |
|---|---|
| Total panelists assigned | 3,981 |
| Total study completes (including nonqualified) | 1,763 |
| Number of qualified completes | 1,453 |
| Number of study break-offs | 647 |
| | |
| **Study Completion Rate (COMPR)** | **44.2%** |
| **Study Qualification Rate (QUALR)** | **82%** |
| **Study Break-off Rate (BOR)** | **26.9%** |

| **Cumulative response rate calculations** | |
|---|---|
| Study-Specific Average Panel Recruitment Rate (RECR) | 8.8% |
| Study-Specific Average Household Profile Rate (PROR) | 57.2% |
| Study-Specific Average Household Retention Rate (RETR) | 35.4% |
| **Cumulative Response Rate** | **2.2%** |

© Pew Research Center, 2023

[3] For more information on this method of calculating response rates, refer to Callegaro, Mario, and Charles DiSogra. 2008. "Computing response metrics for online panels." Public Opinion Quarterly.

# Appendix: Teen online platform users by demographics

## U.S. teen YouTube users

*% of U.S. teens ages 13 to 17 who say they ever use* ***YouTube***




Note: White and Black teens include those who report being only one race and are not Hispanic. Hispanic teens are of any race. Those who did not give an answer are not shown.
Source: Survey of U.S. teens conducted Sept. 26-Oct. 23, 2023.
"Teens, Social Media and Technology 2023"

**PEW RESEARCH CENTER**

## U.S. teen TikTok users

*% of U.S. teens ages 13 to 17 who say they ever use* ***TikTok***




Note: White and Black teens include those who report being only one race and are not Hispanic. Hispanic teens are of any race. Those who did not give an answer are not shown.
Source: Survey of U.S. teens conducted Sept. 26-Oct. 23, 2023.
"Teens, Social Media and Technology 2023"

**PEW RESEARCH CENTER**

## U.S. teen Snapchat users

*% of U.S. teens ages 13 to 17 who say they ever use **Snapchat***




Note: White and Black teens include those who report being only one race and are not Hispanic. Hispanic teens are of any race. Those who did not give an answer are not shown.
Source: Survey of U.S. teens conducted Sept. 26-Oct. 23, 2023.
"Teens, Social Media and Technology 2023"

**PEW RESEARCH CENTER**

## U.S. teen Instagram users

*% of U.S. teens ages 13 to 17 who say they ever use **Instagram***




Note: White and Black teens include those who report being only one race and are not Hispanic. Hispanic teens are of any race. Those who did not give an answer are not shown.
Source: Survey of U.S. teens conducted Sept. 26-Oct. 23, 2023.
"Teens, Social Media and Technology 2023"

**PEW RESEARCH CENTER**

## U.S. teen Facebook users

*% of U.S. teens ages 13 to 17 who say they ever use* ***Facebook***




Note: White and Black teens include those who report being only one race and are not Hispanic. Hispanic teens are of any race. Those who did not give an answer are not shown.
Source: Survey of U.S. teens conducted Sept. 26-Oct. 23, 2023.
"Teens, Social Media and Technology 2023"

**PEW RESEARCH CENTER**

# Topline questionnaire

**2023 PEW RESEARCH CENTER'S TEENS SURVEY**
**SEPTEMBER 26-OCTOBER 23, 2023**
**TEENS AGES 13-17**
**N=1,453**

**THE QUESTIONS PRESENTED BELOW ARE PART OF A LARGER SURVEY CONDUCTED ON THE IPSOS KNOWLEDGE PANEL. OTHER QUESTIONS ON THIS SURVEY HAVE BEEN RELEASED OR ARE BEING HELD FOR FUTURE RELEASE.**

**NOTE: ALL NUMBERS ARE PERCENTAGES UNLESS OTHERWISE NOTED. THE PERCENTAGES LESS THAN 0.5% ARE REPLACED BY AN ASTERISK (*). ROWS/COLUMNS MAY NOT TOTAL 100% DUE TO ROUNDING.**

| | Sample size | Margin of error at 95% confidence level |
|---|---|---|
| U.S. teens ages 13-17 | 1,453 | +/- 3.2 percentage points |

**ASK ALL:**
DEVICE At home, do you have or have access to…[4] **[RANDOMIZE ITEMS]**

| | Yes, I do | No, I do not | No answer |
|---|---|---|---|
| a. A smartphone | | | |
| Sep 26-Oct 23, 2023 | 95 | 4 | * |
| Apr 14-May 4, 2022 | 95 | 4 | * |
| Sep 25-Oct 9, 2014 & Feb 10-March 16, 2015 | 73 | 27 | * |
| **NO ITEM b** | | | |
| c. A desktop or laptop computer | | | |
| Sep 26-Oct 23, 2023 | 90 | 10 | * |
| Apr 14-May 4, 2022 | 90 | 10 | * |
| Sep 25-Oct 9, 2014 & Feb 10-March 16, 2015 | 87 | 13 | * |
| d. A gaming console[5] | | | |
| Sep 26-Oct 23, 2023 | 83 | 16 | 1 |
| Apr 14-May 4, 2022 | 80 | 19 | 1 |
| Sep 25-Oct 9, 2014 & Feb 10-March 16, 2015 | 81 | 19 | * |
| e. A tablet computer[6] | | | |
| Sep 26-Oct 23, 2023 | 65 | 34 | 1 |
| Sep 25-Oct 9, 2014 & Feb 10-March 16, 2015 | 58 | 42 | * |

[4] September-October 2014/February-March 2015 question wording was "Do you, personally, have or have access to each of the following items, or not. Do you have…?" (K3) with response options of "Yes" and "No."
[5] September-October 2014/February-March 2015 item wording was "A gaming console like an Xbox, PlayStation or Wii."
[6] September-October 2014/February-March 2015 item wording was "A tablet computer like an iPad, Samsung Galaxy or Kindle Fire." The item about tablet access was not asked in 2022.

**ASK ALL:**
INTREQ About how often do you use the internet, either on a computer or a cellphone?[7]

| Sep 26-Oct 23, 2023 | | Apr 14-May 4, 2022 | Sep 25 – Oct 9, 2014 & Feb 10-March 16, 2015 |
|---|---|---|---|
| 46 | Almost constantly | 46 | 24 |
| 47 | Several times a day | 48 | 56 |
| 4 | About once a day | 3 | 12 |
| 2 | Several times a week | 1 | 5 |
| 1 | Less often | 2 | 3 |
| 1 | No answer | 0 | * |

**DISPLAY TO ALL:**
Now we'd like to learn about your experiences with certain websites and mobile apps…

**ASK ALL:**
TSNS1 Do you ever use any of the following apps or sites? **[RANDOMIZE ITEMS]**

| | | Yes, I use this app or site | No, I do not use this app or site | No answer |
|---|---|---|---|---|
| a. | Twitter (recently renamed to "X")[8] | | | |
| | Sep 26-Oct 23, 2023 | 20 | 79 | 1 |
| | Apr 14-May 4, 2022 | 23 | 77 | * |
| | Sep 25-Oct 9, 2014 & Feb 10-Mar 16, 2015 | 33 | 66 | * |
| b. | Instagram | | | |
| | Sep 26-Oct 23, 2023 | 59 | 41 | * |
| | Apr 14-May 4, 2022 | 62 | 38 | * |
| | Sep 25-Oct 9, 2014 & Feb 10-Mar 16, 2015 | 52 | 48 | * |
| c. | Facebook | | | |
| | Sep 26-Oct 23, 2023 | 33 | 67 | 1 |
| | Apr 14-May 4, 2022 | 32 | 67 | * |
| | Sep 25-Oct 9, 2014 & Feb 10-Mar 16, 2015 | 71 | 29 | * |
| d. | Snapchat | | | |
| | Sep 26-Oct 23, 2023 | 60 | 39 | 1 |
| | Apr 14-May 4, 2022 | 59 | 41 | * |
| | Sep 25-Oct 9, 2014 & Feb 10-Mar 16, 2015 | 41 | 59 | * |
| e. | YouTube | | | |
| | Sep 26-Oct 23, 2023 | 93 | 6 | * |
| | Apr 14-May 4, 2022 | 95 | 5 | * |

**NO ITEM f.**

[7] September-October 2014/February-March 2015 wording was "Overall, how often do you use the internet?" (K2) with response options of "Almost constantly," "Several times a day," "About once a day," "Several times a week," "Once a week" and "Less often." The options "Once a week" (1%) and "Less often" (2%) have been combined and presented together under "Less often" in this table.
[8] September-October 2014/February-March 2015 item wording was "Twitter."

| | | | |
|---|---|---|---|
| g. Reddit | | | |
| Sep 26-Oct 23, 2023 | 14 | 85 | 1 |
| Apr 14-May 4, 2022 | 14 | 85 | 1 |
| h. TikTok | | | |
| Sep 26-Oct 23, 2023 | 63 | 36 | 1 |
| Apr 14-May 4, 2022 | 67 | 33 | * |
| i. Twitch | | | |
| Sep 26-Oct 23, 2023 | 17 | 82 | 1 |
| Apr 14-May 4, 2022 | 20 | 79 | 1 |
| j. WhatsApp | | | |
| Sep 26-Oct 23, 2023 | 21 | 79 | 1 |
| Apr 14-May 4, 2022 | 17 | 82 | * |
| k. Discord | | | |
| Sep 26-Oct 23, 2023 | 28 | 71 | 1 |
| l. BeReal | | | |
| Sep 26-Oct 23, 2023 | 13 | 86 | 1 |

**ASK IF USES INSTAGRAM, FACEBOOK, SNAPCHAT, YOUTUBE OR TIKTOK (TSNS1b-e,h=1):**
TSNS2 Thinking about the sites or apps you use, about how often do you visit or use… **[SHOW IN SAME ORDER AS TSNS1]**

| | Almost constantly | Several times a day | About once a day | Several times a week | Less often | No answer |
|---|---|---|---|---|---|---|
| **NO ITEM a** | | | | | | |
| b. **ASK IF INSTAGRAM USER (TSNS1b=1) [N=863]:** Instagram | | | | | | |
| Sep 26-Oct 23, 2023 | 14 | 46 | 20 | 11 | 8 | * |
| Apr 14-May 4, 2022 | 16 | 44 | 20 | 12 | 8 | * |
| c. **ASK IF FACEBOOK USER (TSNS1c=1) [N=469]:** Facebook | | | | | | |
| Sep 26-Oct 23, 2023 | 9 | 25 | 25 | 18 | 22 | 1 |
| Apr 14-May 4, 2022 | 7 | 26 | 24 | 18 | 24 | 1 |
| d. **ASK IF SNAPCHAT USER (TSNS1d=1) [N=867]:** Snapchat | | | | | | |
| Sep 26-Oct 23, 2023 | 24 | 48 | 13 | 8 | 6 | * |
| Apr 14-May 4, 2022 | 25 | 49 | 11 | 6 | 8 | * |
| e. **ASK IF YOUTUBE USER (TSNS1e=1) [N=1,355]:** YouTube | | | | | | |
| Sep 26-Oct 23, 2023 | 17 | 40 | 18 | 15 | 9 | * |
| Apr 14-May 4, 2022 | 20 | 43 | 18 | 13 | 6 | 0 |
| **NO ITEMS f-g** | | | | | | |
| h. **ASK IF TIKTOK USER (TSNS1h=1) [N=940]:** TikTok | | | | | | |
| Sep 26-Oct 23, 2023 | 27 | 51 | 14 | 6 | 3 | * |
| Apr 14-May 4, 2022 | 25 | 48 | 14 | 8 | 5 | * |
| **NO ITEMS i-l** | | | | | | |

**TSNS2 BASED ON ALL TEENS**

| | Almost constantly | Several times a day | About once a day | Several times a week | Less often | Does not use platform | No answer to TSNS1 | No answer to TSNS2 |
|---|---|---|---|---|---|---|---|---|
| **NO ITEM a** | | | | | | | | |
| b. Instagram | | | | | | | | |
| Sep 26-Oct 23, 2023 | 8 | 27 | 12 | 7 | 5 | 41 | * | * |
| Apr 14-May 4, 2022 | 10 | 27 | 12 | 7 | 5 | 38 | * | * |
| c. Facebook | | | | | | | | |
| Sep 26-Oct 23, 2023 | 3 | 8 | 8 | 6 | 7 | 67 | 1 | * |
| Apr 14-May 4, 2022 | 2 | 8 | 8 | 6 | 8 | 67 | * | * |
| d. Snapchat | | | | | | | | |
| Sep 26-Oct 23, 2023 | 14 | 29 | 8 | 5 | 4 | 39 | 1 | * |
| Apr 14-May 4, 2022 | 15 | 29 | 7 | 3 | 5 | 41 | * | * |
| e. YouTube | | | | | | | | |
| Sep 26-Oct 23, 2023 | 16 | 38 | 17 | 14 | 8 | 6 | * | * |
| Apr 14-May 4, 2022 | 19 | 41 | 17 | 12 | 6 | 5 | * | 0 |
| **NO ITEMS f-g** | | | | | | | | |
| h. TikTok | | | | | | | | |
| Sep 26-Oct 23, 2023 | 17 | 32 | 9 | 4 | 2 | 36 | 1 | * |
| Apr 14-May 4, 2022 | 16 | 32 | 9 | 5 | 4 | 33 | * | * |
| **NO ITEMS i-l** | | | | | | | | |

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (*pro hac vice*)
bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**SUPPLEMENTAL DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: January 23, 2025<br>Time: 9:00 a.m.<br>Dept.: Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

I, Denise Paolucci, declare:

1. ***Identity of Declarant.*** I am the co-owner of Dreamwidth Studios, LLC, which operates the website Dreamwidth.org. I have co-owned and operated Dreamwidth since the site's inception and have worked in multiple roles, including as the head of the Trust and Safety team and head of product development. I make this declaration from personal knowledge and a review of Dreamwidth's records kept in the ordinary course of business. I submit this declaration as a supplement to my February 15, 2023, declaration in support of NetChoice's motion for a preliminary injunction against enforcement of AB 2273.

2. Since NetChoice's motion was initially filed in 2022, Dreamwidth has become an official member of NetChoice. I have followed this litigation and am aware that this Court granted NetChoice's motion. I am also aware that the Ninth Circuit Court of Appeals affirmed that the requirement in AB 2273 that certain businesses submit a "Data Protection Impact Assessment" (DPIA) to the California Attorney General for every "feature" on a website is unconstitutional. And I understand the court for now vacated the injunction against enforcement of the other challenged provisions of the law pending further analysis by this Court.

3. Even without the DPIA requirements, AB 2273's remaining provisions raise many of the same problems for Dreamwidth's ability to maintain its platform for its users to freely express themselves without fear of potentially devastating civil penalties for violating the amorphous provisions of the statute.

4. ***Definition of Covered Businesses.*** A fundamental continuing problem with AB 2273 is that it imposes significant regulatory burdens on online businesses like Dreamwidth (including prohibiting certain practices and mandating certain actions) based on what kind of content the online business publishes. Specifically, the statute applies to online content "likely to be accessed by children," such as those with design elements, cartoons, music, celebrities, or content of interest to minors. If Dreamwidth publishes any material that falls within those categories, that would trigger the various obligations and prohibitions of the statute, many of which would require Dreamwidth to guess at the meaning of vague terms such as "material detriment"


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

and censor content (as I discussed in my original declaration).

5. Dreamwidth has many users between the ages of 13 and 18, and its users post a great deal of material that could conceivably be considered "likely to be accessed" by teens. To avoid having to comply with AB 2273, Dreamwidth would have to somehow reliably identify content that a regulator might consider "likely to be accessed by children" and stop publishing such content altogether. That type of censorship runs exactly counter to the entire spirit and purpose of Dreamwidth.

6. ***Age Estimation.*** One of the most significant remaining burdens imposed by AB 2273 is the requirement that businesses that fall within the statute's coverage "[e]stimate the age of child users with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business[.]" In my prior declaration (in paragraphs 12-15), I explained in detail why reliably determining the age of any user of the site is nearly impossible. Just as important, any of the available options for making that determination would inevitably require the collection of private information that many Dreamwidth users do not wish to share. Age estimation also would effectively block access to the site for many categories of users who wish to use our services anonymously without sharing their age or identity information, particularly those from marginalized groups, or those who lack official documentation that would give Dreamwidth "reasonable certainty" as to their ages. Dreamwidth is committed to being an accessible platform to all users who wish to participate, and to respecting the privacy (and, if desired, anonymity) of themembers of the community. The requirement that Dreamwidth estimate the age of each of its users is antithetical to these core commitments.

7. The fact that the age estimation requirement can be avoided if Dreamwidth were to "apply the privacy and data protections afforded to children to all consumers" is of no comfort, as a practical matter. From what we can tell, AB 2273's use of the term "data protections" in context means protections from potentially harmful content, whatever that means.

8. The age estimation requirement thus puts Dreamwidth in the position of having to either invade the privacy of its users and impede significant portions of its user base from freely accessing the site (absent first determining user age with""reasonable certainty"), or else censor a


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

potentially vast swath of material the site's users post, in order to ensure content available to all users is "appropriate" for children. Either option would be untenable. In order to avoid liability, penalties, and fines under AB 2273 by "apply[ing] the privacy and data protections afforded to children to all consumers", we would need to remove significant amounts of speech from being visible to any visitor to the site, including adults. Not only do we not have the capacity and resources necessary to engage in such broad suppression of speech that we believe has significant social value for both adults and children, doing so is contrary to our guiding principles as a business and to the promises we have made to our users and that they rely on us to uphold.

9. ***Data Collection, Retention, Processing, and Use.*** Even though Dreamwidth does not run advertisements and minimizes the personal data it collects from users, it still collects certain data that is has to use, retain, and share with third-party companies to facilitate the basic operation of the site. It is impossible to know if those practices will be deemed by a state to be "materially detrimental to the physical health, mental health, or well-being of a child" or, in the alternative "necessary" to provide the service. In practice, I fear this application will depend on whether a regulator approves or disapproves of the content that is featured on the Dreamwidth site. After all, as I explained in my earlier declaration, state regulators around the country have taken aggressive action to define certain content by and for marginalized groups as harmful to children, such as material dealing with gender-affirming care and LGBTQ issues generally. So if a 16-year-old creates an account on Dreamwidth to access content that helps them explore their gender identity, a state regulator could decide that content was "harmful" or detrimental to the 16-year-old's "mental health, or well-being," and impose financial penalties against Dreamwidth for not applying sufficient "data protections" for children.

10. ***Effect of Cure Provision Injunction.*** The Court's preliminary injunction of the DPIA requirements relieves Dreamwidth of the need to opine about the "risks" of expressive content and "mitigate" those risks through censorship. But an effect of this ruling is that there is no longer a way for a service subject to the statute to""cure" any perceived violations before the State would impose penalties—including significant monetary fines—for non-compliance. Although the privacy invasion and self-censorship that AB 2273 imposes goes against


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Dreamwidth's core values, the removal of the "cure" provision means that even if Dreamwidth tried to comply with the requirements of the statute, Dreamwidth could be subject to fines that threaten its ability to continue as a business if a state regulator decides those efforts were not good enough at ensuring Dreamwidth's content is in the "best interests of children." Given the inherent inability to determine in advance what the state of California believes is "harmful" to children, this introduces even more uncertainty than the original form of AB 2273 and increases the likelihood that we will need to be significantly over-cautious in removing or restricting the speech of all our users, including both children and adults.

11. As my original declaration explained, Dreamwidth is deeply committed to respecting the privacy and safety of its community, including users under 18. While I acknowledge that statutes like AB 2273 may be animated by similar concerns, I firmly believe that imposing government regulation over what kind of content can be published online is not only unconstitutional, but undermines the very values that the statute was ostensibly designed to protect. I also believe that the provisions of AB 2273, both as enacted and as currently pending after the decisions of the Ninth Circuit Court of Appeals, will cause a significant increase in the amount of data that any website will need to collect about its visitors in order to comply with the age estimation provision of the law, and that this increase in the amount of data that every website will need to collect in order to minimize the amount of governmental restriction on the speech its users are allowed to engage in will be an overall net decrease in privacy and security for all citizens of California, including children.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 31st day of October, 2024, in Baltimore, MD.

Denise Paolucci

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (*pro hac vice*)
bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**SUPPLEMENTAL DECLARATION OF MICHAEL MASNICK IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: January 23, 2025<br>Time: 9:00 A.M.<br>Dept.: Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

I, Michael Masnick, declare:

1. ***Identity of Declarant***. I am the founder and CEO of Floor64, Inc., a California small business that operates a widely-read blog at Techdirt.com (Techdirt), which for over 25 years has been chronicling developments in technology law and policy and their convergence with civil liberties. I am also the founder and editor of Techdirt. I make this declaration from personal knowledge and a review of Techdirt's and Floor64's records kept in the ordinary course of business. I submit this declaration as a supplement to my February 15, 2023 declaration in support of NetChoice's motion for a preliminary injunction against enforcement of AB 2273.

2. In my 2023 declaration, I discussed the ways in which the provisions of AB 2273 threatened Techdirt's ability to operate and publish content.

3. I understand that this Court granted NetChoice's motion and issued a preliminary injunction against enforcement of AB 2273 but that, on appeal, the Ninth Circuit Court of Appeals partially vacated that order and remanded the case for further consideration regarding certain of the provisions of AB 2273. In particular, I understand that the Ninth Circuit held that the provisions of AB 2273 related to the requirement that certain businesses prepare "Data Protection Impact Assessments" (DPIAs) was facially unconstitutional and should be enjoined but vacated the injunction as to the other challenged provisions pending further analysis.

4. I am relieved that the Ninth Circuit recognized that the DPIA requirement was unconstitutional, as compliance with that requirement was infeasible for Techdirt and would have jeopardized Techdirt's ability to continue publishing content available to readers in California. But the other provisions of AB 2273 still raise many of the same problems for Techdirt and thus put Techdirt's ability to publish at same risk. I highlight a few of the most serious problems in this declaration.

5. ***Definition of Covered Businesses.*** AB 2273 (even with the DPIA provisions removed) still reaches Techdirt, and as such imposes a number of burdens. These burdens hinge on whether websites choose to publish content that, in the eyes of California regulators, is "likely to be accessed by children," where "children" defined to include everyone from ages 0-18.

6. As I explained in my 2023 declaration, readers under 13 are forbidden from creating


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

a registered Techdirt account. But many topics covered by Techdirt's reporting—which includes online harassment, school censorship, and social media usage—are particularly relevant to teenage users. To avoid the burdens of—and potential penalties for non-compliance with—the many provisions of AB 2273, Techdirt would have either have to exclude these readers, which, as discussed below, is not possible, or cease publishing material on these subjects. The end result would be severe self-censorship of Techdirt's reporting and commentary.

7. ***Age Estimation.*** Among other compliance difficulties, the statute still imposes an obligation to "[e]stimate the age of child users with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business or apply the privacy and data protections afforded to children to all consumers." In my 2023 declaration, I detailed the many burdens and logistical problems with this requirement, including that complying with it would be prohibitively expensive and would perversely require that Techdirt collect far more private data from its readers than it does now. The requirement would also undermine Techdirt's purposeful choice to facilitate discussion on the important issues covered by Techdirt while remaining anonymous. *See* Prior Declaration ¶¶ 11-13. The absence of the DPIA requirement does not remove the "age estimation" obligation, nor the burdens it imposes. It would therefore chill Techdirt's ability to publish and to facilitate further discussion, including anonymous discussion.

8. I am aware that AB 2273 would theoretically excuse a website from estimating the age of its users by "apply[ing] the privacy and data protections afforded to children to all consumers." But AB 2273 defines and discusses "data protections" in extremely broad terms that depend on the nature of content, including whether material on a website would "harm children" or expose them to "harmful, or potentially harmful content." My only alternative to age-estimation is to censor content for all users.

9. ***Data Collection, Retention, Processing, and Use.*** Even without this express age-estimation requirement, other provisions of the Act effectively require Techdirt to know the ages of its readers before it can publish content available for them to read. For example, §§ 1798.99.31(b)(1)-(4) and (b)(7) restrict online providers from collecting, using, processing,


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

sharing and retaining any information of a minor user if such use is "materially detrimental" to the child or unless such use "is in the best interests of children." Although Techdirt does not currently collect user data for advertising or feature any display advertising, it should have the right and ability to include advertising, and it does still collect limited user data that it must share with third parties for the site to be functional. I don't know whether the use and/or sharing of the data needed to permit site functionality would be considered "materially detrimental" or "in the best interests of children" by California regulators, which leaves Techdirt exposed to potential liability if it does not implement a costly and invasive age-verification system to prevent access by teenage readers.

10. ***Effect of Cure Provision Injunction.*** Though I welcome the Court's order preliminarily enjoining the DPIA requirements overall, by enjoining only part of the statute and not all of it publishers are actually in a worse position than they were before. The injunction had the effect of removing the provision that allowed services that submitted DPIAs to "cure" any violations of the statute before the State initiated enforcement action. But because many of the bill's mandates and prohibitions remain in place, Techdirt now has no ability to avoid penalties if a regulator determines that it is not in compliance with the still-vague and overbroad requirements of AB 2273—not even self-censorship.

11. Thus, although the removal of the DPIA requirement helps mitigate some of the burdens of AB 2273—and eliminated one of the most obviously problematic aspects of the statute—AB 2273 still imposes potentially ruinous and silencing burdens on Techdirt's ability to operate and publish its reporting and commentary.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 31st day of October, 2024, in Redwood City, CA.

*Michael Masnick*

Michael Masnick



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (*pro hac vice*)
bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**DECLARATION OF CHRISTOPHER FERGUSON IN SUPPORT OF PLAINTIFF NETCHOICE'S RENEWED MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: January 23, 2025<br>Time: 9:00 a.m.<br>Dept.: Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

I, Christopher Ferguson, declare as follows:

I am over the age of 18 and have personal knowledge of the facts set forth in this Declaration.

***Background***

1. **Title**: *Professor of Psychology, Stetson University. Psychologist licensed in Florida and Texas (inactive in Texas).*

2. **Education**: *B.A. in psychology, Stetson University. M.S. developmental psychology, Florida International University. Ph.D. in clinical psychology, University of Central Florida.*

3. **Previous positions**: *Associate Professor, Texas A&M International University; Assistant Professor, University of Wisconsin - Whitewater*

4. **Research focus**: *Media effects on youth including video games, social media, etc.*

5. **Author or co-author of**: *7 non-fiction books, approximately 268 scientific journal articles, book chapters, reviews, or reports.*

6. **Most relevant publications:**

**Books:**

Ferguson, C. J. (2023). *Catastrophe! How Psychology Explains Why Good People Make Bad Situations Worse.* New York: Rowman & Littlefield.

Ferguson, C. J. (2020). *How Madness Shaped History.* New York: Rowman & Littlefield.

Ferguson, C. J. (2018). *Video game influences on aggression, cognition and attention.* New York: Springer.

Markey, P.M., & Ferguson, C.J. (2017) *Moral combat: Why the war on video games is wrong.* Dallas, TX: BenBella Books.

Ferguson, C. J. (2016). *Media psychology 101.* New York, NY: Springer.

Ferguson, C. J. (2013). *Adolescents, crime, and the media: A critical analysis*. New York, NY, US: Springer Science + Business Media. doi:10.1007/978-1-4614-6741-0



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017
(213) 633-6800
Fax: (213) 633-6899

**Research Publications:**

Ferguson, C.J., Kaye, L.K., Branley-Bell, D., & Markey, P. (in press). There is no evidence that time spent on social media is correlated with adolescent mental health problems: Findings from a meta-analysis. *Professional Psychology: Research and Practice.*

Ferguson, C.J. (in press). Do social media experiments prove a link with mental health: A methodological and meta-analytic review. *Psychology of Popular Media.*

Ferguson, C.J. (in press). Longitudinal associations between social media use and mental health outcomes in sample of Irish youth: A brief report. *Communication Reports.*

Ferguson, C.J. (in press). Cyberbullying and its relation to right and left authoritarianism, Trait victimhood, and mental illness. *Psychology of Popular Media.*

Ferguson, C.J. (in press). Does the internet make the world worse? Depression, aggression and polarization in the social media age. *Bulleting of Science, Technology, & Society.*

Ferguson, C.J., Jeong, E.J., & Wang, J.C.K. (2023). rkthological gaming: A longitudinal study from the perspectives of mental health problems and social stress model. *The Journal of General Psychology, 150,* 323-343.

Ferguson, C.J. (2022). Does exposure to sexualized media lead to boys' objectification of girls and women?: A preregistered, longitudinal reanalysis of Rousseau et al. (2019). *Adolescent Psychiatry, 12,* 60-66.

Garcia, S., Ferguson, C.J., & Wang, C.K.J. (2022). Prosocial video game content, empathy and cognitive ability in a large sample of youth. *Journal of Youth and Adolescence, 51,* 62-73.

Ferguson, C.J., Kaye, L., Branley-Bell, D., Markey, P., Ivory, J., Klisanin, D., et al. (2022). *Like* This Meta-analysis: Screen Media and Mental Health**.** *Professional Psychology: Research and Practice, 53,* 205-214.

Ferguson, C.J., & Heene, M. (2021). Providing a lower-bound estimate for psychology's "crud factor": The case of aggression. *Professional Psychology: Research and Practice, 52,* 620-626.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Ferguson, C.J., & Wang, C.K.J. (2021). Aggressive video games are not a risk factor for mental health problems in youth: A longitudinal study. *Cyberpsychology, Behavior and Social Networking 24*(1), 70-73.

Ferguson, C.J. (2021). One less reason why: Viewing of suicide-themed fictional media is associated with lower depressive symptoms in youth. *Mass Communication and Society, 24*(1), 85-105.

Ferguson, C.J. (2021). Links between screen use and depressive symptoms in adolescents over 16 years: Is there evidence for increased harm? *Developmental Science, 24*(1) e13008.

Turel, O., & Ferguson, C.J. (2021). Excessive use of technology: Can tech-providers be the culprits? *Communications of the ACM, 64*(1), 42-44.

Drummond, A., Sauer, J.D., & Ferguson, C.J. (2020). Do longitudinal studies support long-term relationships between aggressive game play and youth aggressive behavior? A meta-analytic examination. *Royal Society Open Science.* https://doi.org/10.1098/rsos.200373

Lindner, D., Trible, M., Pilato, I., & Ferguson, C.J. (2020). Examining the effects of exposure to a sexualized female video game protagonist on women's body image. *Psychology of Popular Media Culture, 9*(4), 553-560.

Ferguson, C. J. (2019). 13 reasons why not: A methodological and meta-analytic review of evidence regarding suicide contagion by fictional media. *Suicide and Life-Threatening Behavior, 49*(4), 1178-1186.

Berryman, C., Ferguson, C. J., & Negy, C. (2018). Social media use and mental health among young adults. *Psychiatric Quarterly, 89*(2), 307-314.

Ferguson, C. J., Munoz, M. E., Garza, A., & Galindo, M. (2014). Concurrent and prospective analyses of peer, television and social media influences on body dissatisfaction, eating disorder symptoms and life satisfaction in adolescent girls. *Journal of Youth and Adolescence, 43*(1) 1-14.

7. **Prior Expert Testimony and Compensation**: I provided a declaration in support of the plaintiffs in *Zoulek v. Hass* in the U.S. District Court for the District of Utah, Case No. 2:24-cv-31-RJS-CMR. I also provided a declaration in support of the plaintiffs in *Students Engaged in Advancing Texas v. Paxton* in the U.S. District Court for the Western District of Texas, Case No. 1:24-cv-945-RP. I also consulted with the prosecution in the Nicholas Cruz case in Broward County, FL approximately 1 year ago. I am offering this declaration pro bono.

8. In past generations, society has experienced repeated moral panics over new media and technology, ranging from novels to the radio, to comic books, to various forms of music (jazz, rock, rap, etc.), to video games and the role-playing game Dungeons and Dragons. In each case, politicians and scholars worried about the potentially pernicious effects of these media, often pushing for censorship/regulation. In many instances, some scholars (for instance, psychiatrist Fredric Wertham in the case of comic books) and even professional guild organizations such as American Psychological Association have been revealed as vastly overstating the evidence for harmful effects (Elson, M., Ferguson, C. J., Gregerson, M., Hogg, J. L., Ivory, J., Klisanin, D., Markey, P. M., Nichols, D., Siddiqui, S., & Wilson, J. (2019). Do policy statements on media effects faithfully represent the science? *Advances in Methods and Practices in Psychological Science 2*(1), 12-25.) in some cases based on very poor quality and ultimately unreplicable meta-analyses (Ferguson, C.J., Copenhaver, A. & Markey, P. (2020). Re-examining the findings of the APA's 2015 task force on violent media: A meta-analysis. *Perspectives on Psychological Science 15*(6), 1423-1443.) The question before us is whether current concerns about social media and other online platforms are a repetition of this moral panic pattern, or whether the scientific data support that these online products and services pose a unique problem for youth. I will consider this in relation to the data on youth mental health in society, experimental data, survey data of youth and families and, lastly, an examination of Moral Panic Theory.

9. In preparing this declaration, I reviewed societal data regarding mental health (including research on suicide rates), experimental studies, and correlational/longitudinal studies regarding hypothesized effects of online media use.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

**Societal Data**

10. Critics of social media and other online platforms suggest that a proliferation of social media is directly tied to an increase in youth mental health problems. However, there is no evidence establishing a cause-and-effect relationship between these time trends. And the analysis that legislators and academics rely on ignores that mental health data for less-technology adopting older generations is actually *worse* than for teens, that these trends in youth mental health are not observed for other high-technology adopting countries in Europe or the Anglophone sphere (Canada, UK, Australia, etc.), and that other factors within the US actually provide better explanations for youth mental health trends than does use of online products and services.

11. First, we must understand the reliability of varying data sources. Unreliable data can come from problems with self-report, as well as reporting changes in official statistics. For instance, an oft-discussed increase in the number of hospital admissions for self-injury is now understood to mainly be a function of reporting standards which changed in the 2010s (Corredor-Waldron, A. & Currie, J. (2024). To what extent are trends in teen mental health driven by changes in reporting? The example of suicide-related hospital visits. *The Journal of Human Resources, 59,* S14-S40.) Similarly diagnostic changes in the American Psychiatry Association's Diagnostic and Statistical Manual in 2013 broadened criteria for many mental illnesses, making diagnosis for these conditions easier. Further, as noted in one recent book (Shrier, A., (2024). *Bad Therapy: Why Kids Aren't Growing Up.* Penguin), the 2010s saw the growth of a therapeutic industry within K12 schools, within parenting, and within the general culture. As a positive, this may have destigmatized the reporting of mental health symptoms (a point also made by Corredor-Waldron & Currie, supra), but as a negative may also have led to youth redefining minor worries and sadnesses as mental illness. As such, any trends in youth self-reported mental health or hospital admissions are likely due to changes in diagnosis, reporting standards and cultural perceptions of mental illness, all of which shifted rapidly during the 2010s.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

12. As such, the most reliable data appear to be suicide data which, for the United States, is reported in the Centers for Disease Control (CDC) WISQARS database. Suicide data is not immune to reporting standards changes, but put rather bluntly, at least a body is a body and, as such, easier to count. We see from such data that teen suicides remain rare compared to other age categories, though did rise through the 2010s, only to fall in 2022. If we take the example of teen girls, often the specific focus on debates on the effects of online products and services like social media, teen girl suicide remains the lowest, by far, of any demographic, though their absolute numbers did rise through 2022, falling that year (CDC. (2024). *Vital Statistics Rapid Report.* Retrieved from: https://www.cdc.gov/nchs/data/vsrr/vsrr034.pdf.) For instance, suicides among middle-aged Caucasian men and suicides among mid-20s Native American men are roughly 3-5 times the rate for teen girls. The numbers for middle aged adults are particularly striking, given such individuals are less tech-adopting than teens. Thus, it is a mistake to consider teen mental health in isolation of that of their parents, and in doing so falsely equate it as having been caused by something unique to teens (e.g., social media) rather than something systemic to families.






DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

13. Again, it is worth nothing that suicides among teens and young adults declined in 2022 without the intervention of the state although suicides among older adults continued to increase (CDC, *ibid*.).

14. Further, rates of teen suicide are directly correlated to rates of middle-aged adult suicide, suggesting these phenomena are occurring in concert with each other. Note the trend is similar for teen boys as teen girls. The correlation between these phenomena survives time series analysis (suggesting it is not an ecological fallacy or frivolous correlation).




15. Scholar Mike Males has analyzed other CDC data to pinpoint potential causes for this relationship between teen and adult suicide. In his data (Males, M. (2024). Why do authorities who claim "concern" for bullied teenagers lie shamelessly about who's bullying them? Retrieved from: https://mikemales.substack.com/p/why-do-authorities-who-claim-concern), he finds that social media use is not correlated to teen self-reported suicidal depression. However, emotionally and physically abusive parenting behaviors are. This suggests that, to the extent youth are experiencing a mental health crisis in the United States, this is due to a trickle-down from their parents' mental health crisis, which can take the form of abuse or, alternatively, deaths of despair of parents due to drug overdoses or suicide. Parental mental health problems and poor family environment are well-known predictors of youth suicide (e.g., King, R., Schwab-Stone, M., Flisher, A., et al. (2001). Psychosocial and risk behavior correlates of youth



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

suicide attempts and suicidal ideation. *Journal of the American Academy of Child & Adolescent Psychiatry, 40*, 837-846.)

16. By contrast, we have no data to suggest changes in teens' use of screens or online products and services are predictive of US youth suicide trends. In fact, time series analyses have specifically ruled out social media as a cause of youth suicide trends (Padmanathan, P., Bould, H., Winstone, L., Moran, P., & Gunnell, D. (2020). Social media use, economic recession and income inequality in relation to trends in youth suicide in high-income countries: A time trends analysis. *Journal of Affective Disorders*, *275*, 58–65. https://doi-org.stetson.idm.oclc.org/10.1016/j.jad.2020.05.057). Changes in youth screen use do not appear to have affected youth mental health on a global scale (Vuorre, M., Orben, A., & Przybylski, A.K. (2021). There is no evidence that associations between adolescents' digital technology engagement and mental health problems have increased. (*Clinical Psychological Science, 9* (5), 823-835. https://doi.org/10.1177/2167702621994549.)

17. Advocates for the belief that use of online media has driven changes in US teens' suicide or mental health use only vague goalposts to describe when this may have occurred. Social media initially became available in roughly 2004 with Facebook, with smartphones becoming available around 2009, etc. We are led to believe that *some* change in youth screen use during that time is responsible for *any* change in youth mental health during that same time period from 2004-2024. However, with no clear guidelines for evidence, *any* change in youth wellness between 2004 through the present could have been attributed to changes in technology. In other words, rises in youth suicide which began in the early 2010s has been attributed to social media, but had youth suicides increased in 2004, or 2009, or 2019 or 2024, the same argument could have been made. This lacks any scientific rigor and amounts to post-hoc reasoning. It is worth noting that similar arguments were once made both by politicians (including the Surgeon General) and scholars about movie and television violence and violent crime, and these proved to be false once violent crime began to plummet in frequency in the 1990s (Markey, P. M., French, J. E., & Markey, C. N. (2015). Violent movies and severe acts of violence: Sensationalism versus science. *Human Communication Research*, *41*(2), 155–173. https://doi-



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

org.stetson.idm.oclc.org/10.1111/hcre.12046). This represents, overall, a very poor standard of evidence on which to base public policy.

18. People might reasonably ask what other factors in US society might explain youth mental health suicide increases. As noted before some data suggest that reporting standards changes may be responsible for some data such as hospital reported self-injuries (Corredor-Waldon & Currie, supra p. 6.). Further Shrier (*supra* p. 6) has offered an explosion of a therapeutic industry both in K12 education and in the general public as a potential explanation. Both of these occurred within the relevant timeframe. Other changes occurring within US society in a similar timeframe are myriad and, tragically, in our focus on social media and other online products and services, many have been poorly explored. I offer two examples, both of which hold up in time-series analyses, suggesting more than mere ecological fallacies.

19. For instance, fatherlessness as indicated by births to unwed mothers (data provided by kidscount.org) is associated strongly with youth suicide.




20. So too is income inequality related to youth suicide (a finding also supported by Padmanathan et al., *supra* p. 9.).





DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899




21. Other studies have pointed toward other factors such as a decline in childhood independent activities as a source of youth mental illness (Gray et al., (2023). Decline in independent activity as a cause of decline in children's mental well-being: Summary of the evidence. *Journal of Pediatrics, 260,* 113352). Opportunities for autonomous, reasonably unsupervised play tend to be associated with healthier child development (van der Kaap-Deeder, J., Vansteenkiste, M., Soenens, B., & Mabbe, E. (2017). Children's daily well-being: The role of mothers', teachers', and siblings' autonomy support and psychological control. *Developmental Psychology*, *53*(2), 237–251. https://doi-org.stetson.idm.oclc.org/10.1037/dev0000218), although the trend in parenting in recent decades has been toward risk-aversion, and the suppression of autonomy. "Helicopter parenting" is generally correlated with worse mental health outcomes for youth, though more longitudinal research would be welcome (Vigdal, J.S., & Brønnick, K.K. (2022). A Systematic Review of "Helicopter Parenting" and Its Relationship With Anxiety and Depression. *Frontiers in Psychology, 13*.) This suggests a larger issue with shifting parenting practices, often motivated by shame, guilt and heightened perception of environmental risk, that may be impacting youth mental health in the US in a way that has nothing to do with social media. There are many other potential variables and, undoubtedly, no single explanation is sufficient. But in our rush to judge online products and services like social media, this is causing harm by distracting policy makers from other, better supported risk factors for youth mental health issues, many of which originate from struggling families.


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

22. It is worth also looking at cross-national data on youth suicide. Were online products and services to blame for youth mental health/suicides, we would expect to see similar youth suicide trends in other high technology adopting countries. But according to official statistics (e.g., Eurostat) on violent deaths, this does not appear to be the case. For example, across European countries, though there is between-country variance, the overall trend in youth suicides has been for a slight *reduction* in youth suicide in recent decades.




23. Similarly for Anglophone countries (Ireland, Australia, Canada, etc.), there is no trend in youth suicides that would indicate a consistent cross-national trend in youth suicides:






DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

24. Here we can note the rising US rate (this data does not include the 2022 decline reported by the CDC). Teen suicides in New Zealand are particularly high but show no trend. Overall, across nations, there is no consistent trend in youth suicide. UK data provided by the Royal College of Pediatricians and Child Health ((2021), *State of Child Health.* Retrieved from: https://stateofchildhealth.rcpch.ac.uk/evidence/mental-health/suicide/) report a decline in youth suicides through 2018 when reporting standards changed making further tracking of data confounded.

25. In conclusion, data within US society and cross-nationally do not support either that there is a consistent trend in youth mental health cross-nationally, nor that the specific issue regarding mental health in the US is limited to teens, nor due to online products and services. No good data is on offer to suggest that societal use of online products and services like social media is well-associated with teen suicide trends, and what good data is available, if anything, suggests that social media is a red herring. By contrast, the data we have suggests that youth mental health and suicide is linked to systemic issues within struggling families which are also affecting youth's parents. Rather than indulging yet another media moral panic, it would be more fruitful to examine real family systems risk factors for mental health problems across generations.

**Experimental Studies: Is There Evidence for Causality?**

26. Experimental studies of social media effects typically randomize participants (most often young adults) to either restrict their social media use for some period of time, or to continue using social media as normal. Typically, both before and after the allotted time (some studies may only do so after), participants are asked to rate their own mental health. Such studies have an obvious weakness in that it is fairly obvious to participants what the hypotheses of the study are. When this occurs, participants are likely to report their behavior closer to what they think they experimenters want and, as such, give responses that do not indicate their true feelings or behavior. This obviously limits the degree to which studies are informative.

27. Nonetheless, the results of individual studies vary widely. Some suggest that restricting online media use may help mental health, others find no effect, and some find that





DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

restricting social media is detrimental to mental health. A recent meta-analysis of experimental studies concluded that, across studies, they provided no evidence for the belief that restricting social media improves mental health (Ferguson, C.J. (in press). Do social media experiments prove a link with mental health: A methodological and meta-analytic review. *Psychology of Popular Media.*) Effects were higher in studies where researchers failed to note prior inconsistencies in the literature (a phenomenon called citation bias), which can indicate researcher bias. This means that, in some studies, researcher bias against social media resulted in what were likely artificially inflated results.

28. Critics of online media also regularly fail to acknowledge many studies that did not conclude social media restrictions improved mental health (e.g., Przybylski, A.K., Nguyen, Tv.T., Law, W. *et al.* (2021). Does Taking a Short Break from Social Media Have a Positive Effect on Well-being? Evidence from Three Preregistered Field Experiments. *Journal of Technology and Behavioral Sciences.* 6, 507–514. https://doi.org/10.1007/s41347-020-00189-w; Mitev, K., Weinstein, N., Karabeliova, S., Nguyen, T., Law, W., & Przybylski, A. (2021). Social Media Use Only Helps, and Does Not Harm, Daily Interactions and Well-Being. *Technology, Mind, and Behavior*, *2*(1). https://doi.org/10.1037/tmb0000033).

29. Overall, methodological quality of studies was quite poor, few used open or transparent research practices, and results of some studies are also often misrepresented, sometimes by the study authors themselves. For example, the study Allcott et al., (Allcott, H., Braghieri, L., Eichmeyer, S., & Gentzkow, M. (2020). The Welfare Effects of Social Media. *American Economic Review*, *110* (3), 629-76.), which is cited in both the U.S. Surgeon General's Advisory and the Royal College of Psychiatrists' study, concluded that reducing social media time improved wellness. However, the magnitude of effect was a miniscule .09 standard deviation units, with .00 being no effect at all. This is important because standard deviation units below .21 are unreliable, often due to methodological noise (Ferguson, C.J., & Heene, M. (2021). Providing a lower-bound estimate for psychology's "crud factor": The case of aggression. *Professional Psychology: Research and Practice, 52,* 620-626.) An effect of such small magnitude is simply too small to reliably distinguish from methodological noise. Even if



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

that were not the case, such an effect would account for less than 1% of the variance in mental health.

30. This is a wide problem for social science where, too often, noise results are misinterpreted as evidence for a hypothesis, when they should not be. Put simply, the Allcott et al. study should never be interpreted as evidence that reducing social media time improves mental health. Unfortunately, it is a statistical quirk that noise outcomes can become "statistically significant" when sample sizes are large. (as was the case for Allcott et al.) Too few scholars carefully note this problem in social science and adjust their interpretations appropriately.

31. Other studies are also more complicated than often indicated. For instance, take one study by Lepp and Barkley (Lepp, A., & Barkley, J. E. (2023). The experimental effect of social media use, treadmill walking, studying, and a control condition on positive and negative affect in college students. *Current Psychology, 42*, 26331–26340.) Although it is true that this experiment (which, like most, is limited by its hypotheses being overly obvious to participants, which may have caused them to artificially alter their behavior to please the experimenters, a common phenomenon) found people who exercised were happier than those who used social media, those who used social media were happier than those who did not use social media (the actual control group). It is a very different question to ask whether exercise makes people happier than social media, than to ask whether social media causes harm relative to not using social media. Lepp and Barkley provide no good evidence for the latter concern.

32. In conclusion to this section, experimental studies are severely limited by major methodological weaknesses likely to create false positive results. Further, some studies evidence clear researcher bias as indicated by citation bias. Nonetheless, as a group, they do not provide evidence for causal impacts of online media use on mental health.

**Correlational/Longitudinal Studies**

33. If the evidence for causal effects is poor, we might ask whether at least there is correlation between online media use and youth mental health. Of course, correlational evidence is not evidence for causal effects or harm. Even if a correlation did exist, for instance, it could be



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

that youth who are more distressed use online products and services like social media either to distract themselves or seek information or support regarding their mental illness.

34. There are a great number of correlational studies, many of which are not done with youth, although a fair number are. Studies are generally inconsistent in results, with some finding correlations, some finding no correlations and some even finding that social media use predicts good outcomes.

35. Even meta-analyses of correlational studies come to different conclusions. For example, one recent meta-analysis concluded that social media use did not predict mental health once other factors were controlled (Yang, Q., & Feng, Y. (2024). Relationships between social Networking Site (SNS) use and subjective well-being----- A meta-analysis and meta-analytic structural equation model, *Heliyon*, https://doi.org/10.1016/j.heliyon.2024.e32463). Similarly, a recent meta-analysis which focused specifically on youth mental health outcomes concluded that there was no predictive relationship between social media use and youth mental health (Ferguson, C.J., Kaye, L.K., Branley-Bell, D., & Markey, P. (in press). There is no evidence that time spent on social media is correlated with adolescent mental health problems: Findings from a meta-analysis. *Professional Psychology: Research and Practice.*) This fits with some of the best longitudinal studies of youth wellness which generally find no to weak associations between social media use and teen mental health (e.g., Heffer, T., Good, M., Daly, O., MacDonell, E., & Willoughby, T. (2019). The longitudinal association between social-media use and depressive symptoms among adolescents and young adults: An empirical reply to Twenge et al (2018). *Clinical Psychological Science*, *7*(3), 462–470. https://doi-org.stetson.idm.oclc.org/10.1177/2167702618812727; Jensen, M., George, M. J., Russell, M. R., & Odgers, C. L. (2019). Young adolescents' digital technology use and mental health symptoms: Little evidence of longitudinal or daily linkages. *Clinical Psychological Science*, *7*(6), 1416–1433. https://doi-org.stetson.idm.oclc.org/10.1177/2167702619859336).

36. It is important to recognize that some studies find that social media use is associated with *better* mental health outcomes. For instance, one study found that using social media such as Instagram was associated with decreased loneliness (Pittman, M., & Reich, B.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

(2016). Social media and loneliness: Why an Instagram picture may be worth more than a thousand Twitter words. *Computers in Human Behavior*, *62*, 155–167. https://doi-org.stetson.idm.oclc.org/10.1016/j.chb.2016.03.084). Similarly, another study found that Facebook use was associated with improved life satisfaction (Valenzuela, S., Park, N., & Kee, K. F. (2009). Is there social capital in a social network site?: Facebook use and college students' life satisfaction, trust, and participation. *Journal of Computer-Mediated Communication*, *14*(4), 875–901. https://doi-org.stetson.idm.oclc.org/10.1111/j.1083-6101.2009.01474.x). The key takeaway is that there is simply no clear consistency to indicate a correlation between social media use and mental health. Effects across all studies are generally very weak, whether positive or negative and the extent to which such studies rely on self-report or may not control adequately for relevant confounding variables, often do not present state-of-the-art science.

37. Effects in meta-analyses may also be miscommunicated in several other ways. Some meta-analyses may find effects that are very close to zero and well within the level of effects expected by methodological noise. Yet authors may focus on "statistical significance". But almost all meta-analyses produce "statistically significant" effects due to the massive power of such analyses…even for relationships that are trivial or due to chance. This is, again, one unfortunate quirk of social science which too many scholars have been slow to recognize. Further, some meta-analyses may focus on bivariate correlations which do not adequately control for confounding variables such as biological sex, family stress, prior mental health, etc. This will inadvertently overestimate the true size of correlations.

38. In conclusion, correlational and longitudinal studies vary widely in quality and outcomes. However, between them the evidence they provide for a relationship between social media use and mental health remains weak.

**Potential Benefits of Online Products and Services for Teens**

39. During times of moral panic, it is common to view new media or technology as inherently dangerous and ignore potential benefits. This appears to be reflected in the social science literature which, overwhelmingly, concerns itself with risks (whether evidence is found for them or not), rather than potential benefits. However, some evidence does also point to



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

potential benefits for youth on online media. Of course, this evidence should be subjected to the same scrutiny as that for harms and, at present, I conclude that the evidence here is more "proof of concept" than definitive.

40. One study explains that "many types of content and forms of interaction among adolescents sharing images of self-harm on social networks may have supportive effects through recovery-oriented content." (Vania Martinez, et al., *Social Contagion, Violence, and Suicide Among Adolescents*, CURR OPIN PSYCHIATRY (May 2023), https://tinyurl.com/ye252na8). Moreover, social media may be an effective way of communicating health information to teens (Plaisime, M., et al., (2020). Social media and teens: A needs assessment exploring the potential role of social media in promoting health. *Social Media and Society,* https://doi.org/10.1177/2056305119886025). Youth with chronic health conditions may be able to use social media to find social connections and support (Daniels, S., & Willard, V. W. (2023). Social media interactions after diagnosis: Social experiences of adolescents and young adults (aya) with cancer. *Journal of Psychosocial Oncology*. https://doi-org.stetson.idm.oclc.org/10.1080/07347332.2023.2249876). Social media may be of particularly benefit to LGBT youth, who can use it to find connections and support (Berger M.N. et al., (2022). Social media use and health and well-being of lesbian, gay, bisexual, transgender, and queer youth: Systematic review. *Journal of Medical Internet Research, 24*(9), e38449, doi: 10.2196/38449).

41. One recent large-scale review found there is evidence for multiple areas of benefit for teens in using online products and services (Haddock, A., Ward, N., Yu, R., & O'Dea, N. (2022). Positive effects of digital technology use by adolescents: A scoping review of the literature. *International Journal Environmental Research in Public Health, 19*(21):14009. doi: 10.3390/ijerph192114009.). For social media specifically, the authors concluded there are potential benefits related to social communication and reciprocity, information gathering and creative thinking, and developing real-life relationships. My own personal read is that much of this evidence remains correlational, has similar weaknesses as with the "harm" literature and



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

should be interpreted with some caution. However, it does provide an important counterpoint to the current exclusive focus on "harm" to the exclusion of all else.

42. A Pew Research Center analysis of survey data found that "[t]eens are more likely to report positive than negative experiences in their social media use." (Emily A. Vogels & Risa Gelles-Watnick, *Teens and social media; Key findings from Pew Research Center surveys*, PEW RSCH. CTR. (Apr. 24, 2023). Specifically, Pew found that 80% of teens reported "feeling more connected to what is going on in their friends' lives," 71% of teens reported feeling "like they have a place where they can show their creative side," and 67% of teens reported feeling "like they have people who can support them through tough times" on social media. (*Ibid.*)

43. Underscoring the benefits minors derive from social media is evidence that disconnecting adolescents from social media would be even more harmful than heavy social media use. (Keith N. Hampton et al., *Disconnection More Problematic for Adolescent Self-Esteem than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, SOC. SCI. COMP. REV. 41:2 (Aug. 5, 2022).)

44. My point is not that this research on benefits is any more definitive than that on harms, but rather that any crude policy decisions made in the midst of moral panic may have more deleterious effects than positive.

**Moral Panic Theory**

45. Both politicians and scholars have a long history of indulging moral panics as relate to new media and technology. Moral Panic Theory is well-established in the sociological and criminal justice literature (Cohen, S. (1972). *Folk devils and moral panics*. London: MacGibbon and Kee.) Put briefly, moral panics occur typically when older adults in society become concerned about new media or technology that youth are using and ascribe the use of that media and technology to some social problem, real or imagined. This creates incentives for news media, politicians and scholars to cater to the moral panic in order to garner news headlines, votes, and research funding. During times of moral panic, data which supports the panic may be given far more attention than that which calls it into question. Moral panics tend to last until the generation of older adults who believe in the panic begin to die. Thus, we can look



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

back on panics over everything from Greek plays, to going to the theater, to books, to the radio, to television, to comic books, to video games, to rock music, etc., with something akin to disdain, yet fail to learn from this historical pattern.

46. As noted in this declaration, there is a wide gulf between the rhetoric used by some politicians and scholars in support of the censorship or regulation of online products and services and the actual research evidence to support such claims. In fact, the evidence is, at best, weak and inconsistent. Yet many politicians and even scholars fail to report this faithfully. This does not imply bad faith, merely that such behavior is common to moral panics.

47. The US Surgeon General's Advisory on Social Media and Youth Mental Health, commonly cited by critics of youth social media use, found that "[s]ocial media can provide benefits for some youth by providing positive community and connection with others who share identities, abilities, and interests" and that "[i]t can provide access to important information and create a space for self-expression." (Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory, U.S. DEP'T OF HEALTH AND HUMAN SERV., 6 (2023).) According to the Surgeon General, this is especially true for "youth who are often marginalized, including racial, ethnic, and sexual and gender minorities." (*Ibid.*) In fact, "[s]tudies have shown that social media may support the mental health and well-being of lesbian, gay, bisexual, asexual, transgender, queer, intersex and other youths by enabling peer connection, identity development and management, and social support." (*Ibid.*) And unsurprisingly, the Advisory cautions that "[d]espite this widespread use among children and adolescents, robust independent safety analyses on the impact of social media on youth have not yet been conducted." (*Id.* at 4.)

48. Moreover, the Surgeon General has been something of an engine of moral panics, having promoted moral panics in the past over television, video games and other forms of media. Most notably, during the early 1980s, then-Surgeon General C. Everett Koop described video games as addictive, dangerous both physically and mentally and hazardous "body and soul" (see Associated Press. (1982). Around the Nation; Surgeon General Sees Danger in Video Games. *New York Times.* Retrieved from: https://www.nytimes.com/1982/11/10/us/around-the-nation-surgeon-general-sees-danger-in-video-games.html). It is important to recognize that he was



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

discussing video games such as *Pac Man* or *Space Invaders* which no one today believes to be dangerous in the slightest. Interestingly, in his advisory on social media, the US Surgeon General both acknowledges that social media may have benefits for many youths, but also that there are significant gaps in the research literature. Nonetheless, the Advisory appears to lean into moral panic language with classic reversed burden of proof stating "Nearly every teenager in America uses social media, and yet we do not have enough evidence to conclude that it is sufficiently safe for them." This framing that the harm hypothesis is *true* until it is proven false is exactly the inverse of how science actually works. Nor does the Surgeon General provide any guidelines for what they would consider evidence social media is "safe" despite significant evidence that social media is not harmful. Is there a "perfect" study the Surgeon General would consider definitive? Is there a certain ratio of null to "statistically significant" studies they would find convincing? Is there a certain minimal effect size below which we could safely conclude any social media effects are trivial? Without such clear scientific guidelines any public statements are politicized and unfalsifiable rather than helpful.

**Conclusions**

49. To summarize:

1) There is no clear evidence that there is an international trend in mental health impacting youth whether due to access to online products and services or due to any other cause (see supra paragraphs 10-25).

2) To the extent that a mental health crisis exists specifically in the US, this is not isolated in teens, but appears to be inter-generational, impacting less-tech adopting older adults more than teens (see supra paragraphs 12-13).

3) Mental health in older generations appears to be deeply entwined with mental health in younger generations likely due both to parental suicide, as well as parental emotional and physical abuse (see supra paragraphs 14-15).

4) There is no good evidence that restricting online media time is a panacea for mental health (see supra paragraphs 17, 27-33).



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

5) Nor does time spent on online media appear to be a useful predictor of which youth are likely to develop mental health problems in the future (see supra paragraphs 34-40).

6) Current concerns over online products and services are fitting a well-known and established pattern of moral panic which has been witnessed in prior generations over other forms of media and technology, often with identical sounding language (see supra paragraphs 45-48.)

50. Put simply, there is no reason to believe the California Age-Appropriate Design Code Act will help children; it may even harm children by preventing children who would benefit from online products and services like social media from accessing them, and it opens pernicious doors in the restriction of free speech during a period of moral panic.

51. Such is the course of moral panics. What can appear to be a pressing moral threat today is often clearly harmless with the hindsight of history. However, during moral panics, scientific evidence suggesting we should be more cautious in attributing blame to media and technology is often brushed aside or ignored. This has clearly happened with the State's case regarding online products and services. This can, itself, become dangerous given the precedent that can be set in using an incomplete and flawed reading of the scientific evidence in support of policies that erode the core value of free speech. Censorship often comes in the guise of "protecting" some ostensibly vulnerable group. This time appears to be no different.

**DECLARATION UNDER PENALTY OF PERJURY**

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the above statements are true and based upon my personal knowledge.

Executed on November 1, 2024.

Christopher J. Ferguson



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (*pro hac vice*)
bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Suite 340
Washington, DC 20003
(215) 717-3473 Ext. 209

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Action Filed: December 14, 2022 |

## I. PRELIMINARY STATEMENT

1. Although styled as a privacy regulation to protect minors, the California Age-Appropriate Design Code Act (AB 2273)[1] is a content-based restriction on speech that will subject a global communications medium to state supervision and hobble a free and open resource for "exploring the vast realms of human thought and knowledge." *Packingham v. N. Carolina*, 137 S. Ct. 1730, 1737 (2017).

2. Among its many infirmities, AB 2273 presses companies to serve as roving censors of speech on the Internet. The law imposes on private firms, big and small, the obligation to identify and "mitigate" speech that is "harmful or potentially harmful" to users under 18 years old, and to "prioritize" speech that promotes such users' "well-being" and "best interests." If firms guess the meaning of these inherently subjective terms wrong—or simply reach different conclusions than do government regulators—the State is empowered to impose crushing financial penalties. The State can also impose such penalties if companies fail to enforce their content moderation standards to the Attorney General's satisfaction. AB 2273 does this without so much as a nod to whether the law's restrictions are necessary to serve a compelling state interest.

3. Rather than protect minors, AB 2273 will harm them, along with the Internet as a whole. Faced with arbitrary application of AB 2273's draconian penalties, online businesses will face overwhelming pressure to over-moderate content to avoid the law's penalties for content the State deems harmful. Such over-moderation will restrict the availability of information for users of all ages and stifle important resources, particularly for vulnerable youth who rely on the Internet for life-saving information.[2] Separately, AB 2273 will require businesses to verify the ages of their users, which—to the extent it can even be done to the State's satisfaction—will frustrate anonymous and casual browsing, magnify privacy concerns, and wrest control over minors' online activities from parents and their children.

---

[1] AB 2273 as enacted is docketed as ECF 1 Ex. A and is codified in relevant part beginning at Section 1798.99.28 to Part 4 of Division 3 of the California Civil Code.

[2] *See* "Coalition Letter on Privacy and Free Expression Threats in Kids Online Safety Act" Regarding Opposition to S. 3663 (Nov. 28, 2022) ("Online services would face substantial pressure to over-moderate, including from state Attorneys General seeking to make political points about what kind of information is appropriate for young people."), available at https://cdt.org/wp-content/uploads/2022/11/Coalition-letter-opposing-Kids-Online-Safety-Act-28-Nov-PM.pdf.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

4. For these and other reasons, AB 2273 is facially unconstitutional on at least four grounds and is preempted by two federal statutes: The Act on its face violates the First Amendment, Fourth Amendment, and the Due Process and Commerce Clauses of the United States Constitution; violates Article I, Sections 2(a) and 7(a) of the California Constitution; and is preempted by the Children's Online Privacy Protection Act (COPPA), 15 U.S.C. §§ 6501 *et seq.*, and the COPPA Rule, 16 C.F.R. § 312.1 *et seq.*, as well as Section 230 of the Communications Decency Act, 47 U.S.C. § 230.

5. In addition to its facial infirmities, AB 2273 is unconstitutional as applied to Plaintiff NetChoice LLC, its covered members, and their expressive activities, as further set forth herein. NetChoice accordingly seeks an order declaring AB 2273 invalid and enjoining its enforcement.

## II. PARTIES AND STANDING

6. NetChoice is a non-profit entity organized under Section 501(c)(6) of the Internal Revenue Code created in and existing under the laws of the District of Columbia. NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. A list of NetChoice's members is available at https://netchoice.org/about/. For more than two decades, NetChoice has worked to promote online commerce and speech and to increase consumer access and options through the Internet. NetChoice's members devote significant attention, time, and money to safeguard children online.

7. Most of NetChoice's members are directly subject to and regulated by AB 2273 and could face serious legal consequences if they fail to comply with the Act's directives. And NetChoice itself anticipates having to divert resources to address these consequences and support its members in connection with AB 2273's demands.

8. NetChoice and its members will suffer irreparable harm—including infringement of their constitutional rights—if AB 2273 is not declared invalid and enjoined before it takes effect.

9. Defendant Rob Bonta is the Attorney General of the State of California. Defendant is responsible for enforcing the provisions of AB 2273 challenged by this action, including because the Act authorizes the Attorney General to bring a "civil action … in the name of the people of the


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

State of California." § 1798.99.35(a).

## III. JURISDICTION

10. This action arises under the United States Constitution, particularly the Commerce Clause, art. I, § 8, cl. 3, and Supremacy Clause, art. VI, and the First, Fourth, and Fourteenth Amendments, as well as the California Constitution, art. I, §§ 2(a) and 7(a). It also arises under the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988, the Communications Decency Act, 47 U.S.C. § 230, and COPPA, 15 U.S.C. §§ 6501 *et seq*.

11. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a), and 1367(a) because NetChoice's claims either arise under federal law or else share a common nucleus of operative fact with claims that arise under federal law.

12. This Court has authority under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to decide this dispute and award relief because it presents an actual case or controversy within the Court's jurisdiction.

## IV. VENUE

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) & (2) because Defendant performs his duties and thus resides in this District, and because the injuries giving rise to this action have been and will continue to be suffered by NetChoice and its members in Santa Clara County, California.

## V. DIVISIONAL ASSIGNMENT

14. Assignment to the San Jose Division is proper under Local Civil Rule 3-2(c) & (e) because the injuries giving rise to this action have been and will continue to be suffered by NetChoice and its members in Santa Clara County, California.

## VI. FACTUAL ALLEGATIONS

### A. Online Businesses and Website Architecture

15. Online businesses interact with users in different ways. Most have universally accessible areas, in which a user can view product listings, preview services, and read reviews without creating or logging into an account. Many online businesses also have features that are optimized and available only for individuals who create an account or sign up for membership.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Some social media services, for example, permit non-members to view public portions of a user's profile, but not to view each post in detail. Similarly, many online businesses require users to create accounts before they can use or purchase an online service.

16. Some businesses opt for a free account-based model, where access to online services is provided without charge, but users must provide certain information and create accounts to access those services. Other businesses use a subscription-based model requiring users to create accounts and pay fees to use the online service. Irrespective of model, many online businesses rely on advertisements to earn a significant share of—and in some cases, *all* of—the revenue that supports the content and services they provide.

17. Many online businesses that are principally ad-supported publish and deliver content to users, who engage with particular content by, for example, writing a review, reading a news article, downloading a movie, streaming an album, "liking" a post, or purchasing books based on author or genre. This engagement, in turn, enables online businesses to serve users with advertisements or marketing targeted to their expressed interests.[3] Ads can appear alongside hosted content, in promoted search results, or in email marketing or newsletters. At its core, targeted advertising leverages technology to improve commercial speech and makes possible a wide range of protected *non-commercial* speech. Advertisers pay a premium for the ability to reach a more specific audience; users benefit from subsidized access to content and more relevant advertisements; and online business operators—including smaller niche bloggers and individual "influencers" who use larger services—are able earn a living by monetizing their talents for creating, curating, and publishing popular and interesting content.[4]

18. Even independently of advertising, content promotion is a key service that online businesses offer—and often a key source of revenue. An online service's ability to suggest a new release based on the user's browsing history, for example, creates value for the user, generates business for the service, and connects content creators with an audience. This is true across

[3] *See generally* David S. Evans, "The Economics of the Online Advertising Industry," 7 REV. OF NETWORK ECON. 3 (2008), available at https://doi.org/10.2202/1446-9022.1154.

[4] *See, e.g.*, Joel Matthew, "Understanding Influencer Marketing And Why It Is So Effective," FORBES (July 30, 2018), available at https://tinyurl.com/3fr7zban; Jacob Goldenberg *et al*., "The Research Behind Influencer Marketing," J. OF MARKETING RESEARCH (Feb. 2021), available at https://tinyurl.com/2j2863m5.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

industry—music, movies, television shows, social media posts, and anything else an Internet user might be interested in purchasing, reading, hearing, or viewing.

**B. AB 2273**

19. On September 15, 2022, California Governor Gavin Newsom signed AB 2273.

20. According to the Assembly bill analysis, one of the Act's overarching purposes is to favor certain types of online speech by "elevat[ing] child-centered design in online products and services that are likely to be accessed by children."[5] AB 2273 includes legislative findings that "the design of online products and services on children's well-being has become a focus of significant concern," and that "children should be afforded protections not only by online products and services specifically directed at them, but by all online products and services they are likely to access." AB 2273 § 1(a)(2), (a)(5).

**1. *The breadth of businesses affected by AB 2273***

21. AB 2273 applies to any "business that provides an online service, product, or feature likely to be accessed by children." § 1798.99.31(a)-(b). The law defines "children" as any "consumer or consumers who are under 18 years of age." § 1798.99.30(b)(1). This definition encompasses "children" old enough to drive and who might be just days shy of the right to vote, the right to buy and sell property, the right to marry without parental consent, and the obligation to serve on a jury.

22. The law incorporates the definition of "business" set forth in California Civil Code Section 1798.140(c), which, pursuant to a recent amendment effective January 1, 2023, reaches major enterprises that earn more than $25,000,000 in gross annual revenues, as well as small websites that buy, sell, or merely share information from as few as 100,000 visitors annually, or that obtain more than half their revenue from data monetization. Not-for-profit and governmental entities are excluded.

23. Although AB 2273 purports to regulate "online service[s], product[s], or feature[s]," the statute in fact regulates speech. AB 2273's references to "system design features,"

[5] AB 2273 California Assembly Floor Analysis (Aug. 22, 2022), available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220AB2273#.


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

"algorithms," and "targeted advertising systems" all refer to the methods used to disseminate or circulate speech on the Internet. This fact is underscored by Section 1798.99.30(b)(5)(C), which clarifies that AB 2273's reach excludes "the delivery or use of a physical product."

24. AB 2273 defines "likely to be accessed by children" to "mean[] it is reasonable to expect, based on the following indicators, that the online service, product, or feature would be accessed by children":

> (A) The online service, product, or feature is directed to children as defined by the Children's Online Privacy Protection Act (15 U.S.C. Sec. 6501 *et seq*.).
>
> (B) The online service, product, or feature is determined, based on competent and reliable evidence regarding audience composition, to be routinely accessed by a significant number of children.
>
> (C) An online service, product, or feature with advertisements marketed to children.
>
> (D) An online service, product, or feature that is substantially similar or the same as an online service, product, or feature subject to subparagraph (B).
>
> (E) An online service, product, or feature that has design elements that are known to be of interest to children, including, but not limited to, games, cartoons, music, and celebrities who appeal to children.
>
> (F) A significant amount of the audience of the online service, product, or feature is determined, based on internal company research, to be children.

§ 1798.99.30(b)(4).

25. This definition is vague and potentially limitless, given that AB 2273 defines "children" as all individuals under 18. It is also content-based, as companies must look to the subject matter of their speech—for example, whether they host "advertisements marketed to children" or "cartoons, music and celebrities who appeal to children"—to understand whether they are within the scope of the law.

26. As a practical matter, the law extends so widely as to sweep in the vast majority of companies operating online. The following services, for example, would likely qualify:

> a. All major news outlets, including The New York Times, Wall Street Journal, and Washington Post; ABC, CBS, and NBC; CNN, Fox News, and MSNBC; as well as a significant number of local news services.
>
> b. The websites of every major sports league, including MLB, MLS, NBA, NFL, and NHL, and sports outlets serving the United States, including ESPN, FiveThirtyEight, the Golf Channel, NBC Sports, Sports Illustrated, Telemundo, and Yahoo Sports.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

c. Most online magazines and podcast channels.

d. E-books and e-reader apps, as well as book forums.

e. Online education and credential programs.

f. Social media services.

g. Video and music streaming services.

h. Online video games.

i. Individual blogs and discussion forums, such as those focused on news, economics, political science, ballet, fashion, cooking, chronic illness, physical fitness, mental health, sexuality, religion, history, video games, and countless other topics.

j. Online self-help and suicide-prevention services that treat both adult and child populations.

27. If the law is allowed to take effect, AB 2273 would impose impermissible burdens on an extraordinary range of covered businesses and could result in a fundamentally changed Internet.

**2. *The law's Data Protection Impact Assessments***

28. Section 1798.99.31(a)(1) of AB 2273 mandates that "[b]efore any new online services, products, or features are offered to the public," a covered business must (i) complete a "Data Protection Impact Assessment" (DPIA) for "any online service, product, or feature likely to be accessed by children"; (ii) maintain documentation of the DPIA for as long as that service, product, or feature is likely to be accessed by children; and (iii) biennially review all its DPIAs. A service must complete a DPIA "on or before July 1, 2024, for any online service, product, or feature likely to be accessed by children offered to the public *before* July 1, 2024," § 1798.99.33(a) (emphasis added)—that is, for all existing covered services, products, and features. Accordingly, online businesses must take significant steps *now* to plan for and implement eventual compliance with AB 2273, long *before* AB 2273's purported effective date.

29. Each DPIA must describe "the risks of material detriment to children that arise from the data management practices" related to that online product, service, or feature. It must also state whether the service, product, or feature "could" "harm" minors in various ways, such as by exposing them to "potentially harmful" content, contacts, and conduct; whether algorithms or "targeted advertising" "could harm children"; and whether and how the product, service, or feature



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

"uses system design features to increase, sustain, or extend use of the online product, service, or feature by children, including the automatic playing of media, rewards for time spent, and notifications." § 1798.99.31(a)(1)(B). In conjunction with the DPIA, the business must also "create a timed plan to mitigate or eliminate" any risks identified in the DPIA "before the online service, product, or feature is accessed by children." § 1798.99.31(a)(2).

30. The Act does not define the terms "material detriment," "harm," or "harmful." Thus, the Attorney General apparently has discretion to deem *any* type of asserted harm—however the Attorney General defines "harm," and notwithstanding that others might disagree—as constituting a "risk of material detriment" that must be documented. A business could be expected to document the risks, for example, that photographs and videos depicting the global effects of climate change, the war in Ukraine, school shootings, or atrocities in Syria could cause minors anxiety; or that a content recommendation for the next episode of a cartoon TV series could "harm" a minor who is struggling to focus on homework or to get more exercise.

31. The possibility that the State might consider a particular piece of content or feature "harmful" to some or all minors, combined with the risk of having been found to violate the law due to an inadequate DPIA, will pressure businesses to identify distant or unlikely harms—and to self-censor accordingly.

32. Under the Act, the California Attorney General may at any time order a covered entity to provide him with any DPIA that it has completed, or with a list of all DPIAs it has completed. §1798.99.31(a)(3)-(4).

33. The DPIA requirement applies equally to large global services and single-person blogs, so long as they meet California's definition of a "business." As one independent journalist explained about his own publication: "Our comment system? DPIA. Our comment voting? DPIA. Our comment promotion? DPIA. The ability to listen to our podcast? DPIA. The ability to share our posts? DPIA. The ability to join our insider chat? DPIA. The ability to buy a t-shirt? DPIA. The ability to post our stories to Reddit, Twitter, Facebook, or LinkedIn? DPIA (for each of those, or can we combine them? I dunno). Our feature that recommends similar articles? DPIA. Search?


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

DPIA. Subscribe to RSS? DPIA."[6]

### 3. *The statute's age verification requirements*

34. Section 1798.99.31(a)(5) requires regulated businesses to "[e]stimate the age of child users with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business or apply the privacy and data protections afforded to children to all consumers."

35. The Act does not define "reasonable level of certainty appropriate to the risks." Left in the dark, covered businesses must either configure the privacy settings for each of their offerings to their most speech- and content-restrictive levels for all users regardless of age, or attempt to verify the age of users with near certainty.

36. But age certainty is not realistic. Age verification technologies are inherently unreliable.[7] Most methods rely on users either to attest to their ages or to submit official documents verifying their ages.[8] For users determined to bypass the rules, there are "straightforward workarounds" to both of these methods, which businesses often cannot avert.[9] And any method that involves submitting official documents increases the risk that those documents could be stolen or leaked.[10] More invasive age-verification methods—such as artificial intelligence, facial analysis, or facial recognition technologies—are far from foolproof and pose their own transparency, security, and privacy concerns.[11] To the extent AB 2273's "reasonable … certainty" standard effectively requires companies to adopt such invasive age-verification methods, the law likely conflicts with other states' privacy laws—such as laws that regulate the collection of

---

[6] Mike Masnick, "Dear California Law Makers: How The Hell Can I Comply With Your New Age-Appropriate Design Code," TechDirt (Aug. 24, 2022), available at https://www.techdirt.com/2022/08/24/dear-california-law-makers-how-the-hell-can-i-comply-with-your-new-age-appropriate-design-code/.

[7] French National Commission on Information and Liberties, "Online Age Verification: Balancing Privacy and the Protection of Minors" (Sept. 22, 2022) (concluding that age verification mandates are "inevitably imperfect" because they "can easily be circumvented," noting that "23% of minors say they can bypass blocking measures"), available at https://tinyurl.com/yzv7ynem.

[8] Jackie Snow, "Why Age Verification Is So Difficult for Websites," WALL ST. J. (Feb. 27, 2022), available at https://on.wsj.com/3R0ORMT.

[9] *Id.*

[10] *Id.*

[11] *See* David McCabe, "Anonymity No More? Age Checks Come to the Web," N.Y. TIMES (Oct. 27, 2021), available at https://nyti.ms/3S6U2ME.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

biometric data—and subjects online businesses to a patchwork of inconsistent obligations. Perversely, AB 2273 contradicts the consumer-data-minimization mandates of the State's own privacy law, the California Privacy Rights Act (CPRA), and might well result in a net loss of privacy for California minors and adults alike.

37. In practice, many online businesses are likely to respond to the law by offering to the public only what they predict the Attorney General will deem suitable for the youngest children. The resulting system of self-censorship will dramatically change the vibrant and egalitarian "modern public square" online. *Packingham*, 137 S. Ct. at 1737.

#### 4. *The statute's requirements for the display and enforcement of policies, terms, and standards*

38. Section 1798.99.31(a)(9) requires businesses to "[e]nforce published terms, policies, and community standards established by the business, including, but not limited to, privacy policies and those concerning children."

39. This far-reaching provision empowers the government to oversee and second-guess whether an online publisher has correctly enforced its own discretionary content moderation standards. Content moderation requires discretionary judgment about what speech to permit and whether content is, for example, racist, sexist, inflammatory, spiteful, threatening, or otherwise out of step with an online publisher's values. Different businesses might reach different conclusions depending on the type of community they are trying to create. Federal law explicitly recognizes that such editorial judgment is both discretionary and cannot be regulated by the government. 47 U.S.C. § 230(c)(2).

40. Section 1798.99.31(a)(9) eliminates both this discretion as well as the element of private action by empowering the State to penalize any covered business that fails to adequately enforce its own editorial standards and policies. Permitting the State to monitor an online publisher's content moderation decisions intrudes into the publisher's right to make editorial decisions about the types of content to host or exclude in pursuit of its mission, and incentivizes publishers to forgo content moderation altogether—a dire prospect for content-sharing services,


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

for which content moderation *is* the product they provide.[12]

**5. *The statute's prohibitions on use of information***

41. AB 2273 prohibits covered services from taking actions that are otherwise protected by the Constitution or federal law.

42. First, Section 1798.99.31(b)(1) forbids an online service from using "the personal information of any child in a way that the business knows, or has reason to know, is materially detrimental to the physical health, mental health, or well-being of a child." Under this rule, an online business must guess what constitutes a use that is "materially detrimental" to the mental or physical health—or to the even more amorphous concept of the "well-being"—of a child or teen.

43. Second, Section 1798.99.31(b)(3) bars a business from collecting, selling, sharing, or retaining "any personal information that is not necessary to provide an online service, product, or feature with which a child is actively and knowingly engaged," unless "the business can demonstrate a compelling reason that the collecting, selling, sharing, or retaining of the personal information is in the best interests of children likely to access the online service, product, or feature." The law does not define or delimit what might constitute "the best interests of children" or what might constitute a "compelling reason" for the use of information.

44. Third, if the "end user is a child," Section 1798.99.31(b)(4) precludes a business from using "personal information for any reason other than a reason for which that personal information was collected, unless the business can demonstrate a compelling reason that use of the personal information is in the best interests of children." This requirement too is plagued by generalities and undefined terms.

45. Beyond vague mandates and undefined purposes, these provisions on their face also expressly disallow a range of commonplace online speech, including engaging with users to learn their preferences; using collected information for personalized advertising; providing users recommendations about books, movies, newspaper articles and other content; or even sending automated email updates to users.

[12] *See, e.g.*, Caitlin Vogus, "Chilling Effects on Content Moderation Threaten Freedom of Expression for Everyone," Center for Democracy & Technology (July 26, 2021), available at https://tinyurl.com/2p87nvv9.


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

46. Guessing wrong about what these provisions proscribe is prohibitively expensive—penalties for even negligent errors could exceed $20 billion. Many services will not or cannot risk it. Instead, they will self-censor by banning users whose age they cannot verify; refrain from publishing content to certain users; disable editorial features that control the publication, curation, and promotion of content on their services; forego efforts to connect their customers with suggested content or other users; or shut down altogether. The law poses an existential risk in particular to websites that rely on advertising to support dissemination of speech to and among users.

**6. *The statute's ban on using "dark patterns"***

47. Section 1798.99.31(b)(7) prevents a business from "us[ing] dark patterns to lead or encourage children to," among other things, "take any action that the business knows, or has reason to know, is materially detrimental to the child's physical health, mental health, or well-being."

48. By incorporation, AB 2273 defines "dark patterns" as "a user interface designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision-making, or choice." Cal. Civ. Code § 1798.140(l). Although the statutory term is calculated to sound nefarious, it has been construed to reach benign and widely used features such as "autoplay" and "newsfeed" functions that use programmed algorithms and machine learning to recommend personalized content—features designed to simplify and improve the customer experience.[13]

49. The uncertainty inherent in this prohibition will cause it to sweep far too broadly, and inevitably chill programmed editorial decisions to select, promote, and moderate content to audiences. This includes a newspaper website recommending articles, a social media platform recommending posts, a music- or video-streaming service promoting customized playlists and movies based on prior viewing history, a video-sharing platform promoting particular popular videos, and an independent blogger pushing out new-post alerts to followers.

50. To comply with this provision, online businesses must either guess whether any of

[13] *See, e.g.*, Katharine Miller, "Can't Unsubscribe? Blame Dark Patterns," Stanford University Institute for Human-Centered Artificial Intelligence (Dec. 13, 2021) (explaining that the "[a]utoplay" feature on YouTube by which "an algorithm automatically plays the next video and will endlessly serve you more and more content" is recognized as "a dark pattern"), available at https://tinyurl.com/3em4ckzw.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

these content-promotion decisions might be construed to have a "materially detrimental" effect on a minor before publishing—hoping, again, that they have predicted correctly and that their predictions match the government's own subjective assessments—or elect to self-censor. As with other provisions of AB 2273, many online services are likely to choose self-censorship.

* * * * *

51. The well-being of children is undisputedly of great importance. But AB 2273 regulates far beyond privacy, is not confined to children, and is unnecessary to achieve the Legislature's purported privacy goals. The Act will run roughshod over the constitutional and statutory rights of online services—and ordinary citizens who use and rely on those services—in a misguided effort to redesign the Internet and restrict speech.

## VII. LEGAL PRINCIPLES

52. The provisions of AB 2273 must be evaluated pursuant to federal and state constitutional limits, as well as federal statutory restrictions.

### A. The First Amendment

53. Content-based, viewpoint-based, and speaker-based laws that restrict or burden speech are presumptively unconstitutional under the First and Fourteenth Amendments. This principle extends to the editorial judgments of editors and publishers, both as to their own speech as well as the speech of others. This is true for online media as much as traditional publications because "the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011) (citation and internal quotation marks omitted).

54. Online businesses, including NetChoice's members, regularly publish content and make editorial decisions regarding what content to publish, edit, and remove. It is a long-held and firmly established constitutional principle that such speech is fully protected by the First Amendment. *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997).

55. The First Amendment prohibits prior restraints on speech, including state action designed to deputize private actors to serve as censors by proxy. *Denver Area Educ. Telecomm. Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 754 (1996). Any government regulation that "subject[s]



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

the distribution of publications to a system of prior administrative restraints," including a "system of informal censorship" to promote "juvenile morality" and well-being, carries "a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70-71 (1963).

56. Only certain limited and narrowly defined categories of speech are unprotected by the First Amendment—defamation, incitement, obscenity, and speech integral to criminal conduct—and the Supreme Court has rejected efforts to expand these categories as "startling and dangerous." *United States v. Stevens*, 559 U.S. 460, 470 (2010). In particular, the Court previously rejected as "unprecedented and mistaken" California's attempt to create "a wholly new category of content-based regulation that is permissible only for speech directed at children." *Brown*, 564 U.S. at 794. A state's legitimate interest in child welfare thus "does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-214 (1975).

57. Outside the categories of unprotected speech, the First Amendment prohibits the government from engaging in content-based regulation unless the government can establish that the measure is (i) necessary to advance a "compelling" governmental interest, (ii) narrowly tailored to serve that interest, and (iii) the least restrictive means available to achieve that interest. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). Within this protected sphere, the government cannot dictate a private business's decisions about what to say or what content to disseminate. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). Nor can the government unduly burden or chill protected speech, or discriminate among speakers, particularly where such restrictions "reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 658 (1994).

58. In addition to prohibiting *restrictions* on speech, the First Amendment forbids the government from *compelling* speech in ways that burden and chill constitutionally protected


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

editorial and speech rights. A law "mandating speech that a speaker would not otherwise make" is "necessarily" a "content-based regulation of speech" subject to strict scrutiny because it "alters the content of the speech." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988). Even compelled commercial disclosures must meet certain requirements to pass constitutional muster—namely, the standards alternatively articulated in *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) (*NIFLA*), *Central Hudson Gas & Electric Corporation v. Public Service Commission*, 447 U.S. 557 (1980), and *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).

59. The First Amendment forbids states from imposing liability on publishers for hosting or promoting allegedly unlawful content unless the law imposing the liability requires the publisher to know the nature of the allegedly unlawful content. *Smith v. California*, 361 U.S. 147 (1959).

60. A law is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (citation omitted).

61. Vagueness in a law that regulates expression "raise[s] special First Amendment concerns because of its obvious chilling effect on free speech." *Brown*, 564 U.S. at 807 (quoting *Reno*, 521 U.S. at 871-72).

**B. The Fourth Amendment**

62. Under the Fourth Amendment, "searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable, subject only to a few specifically established and well-delineated exceptions." *City of Los Angeles v. Patel*, 576 U.S. 409, 419 (2015) (cleaned up).

63. One exception to the warrant requirement involves an "administrative search" that seeks to "ensure compliance with [a] recordkeeping requirement." *Id.* at 420. But to fall within this "administrative search exception," "the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Id.* A statutory regime that permits the government to search and seize the commercially sensitive information of an ordinarily



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

regulated business is thus "facially invalid" where it fails to afford such an opportunity to a party compelled to "turn over" records. *Id.* at 421.

**C. Vagueness and the Due Process Clause**

64. The Due Process Clause of the Fourteenth Amendment forbids vague laws—particularly those that regulate speech protected by the First Amendment.

65. The void-for-vagueness doctrine "guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes" and "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).

66. A statute can be impermissibly vague either because "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or because "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

**D. The Dormant Commerce Clause**

67. Article I, Section 8 of the U.S. Constitution vests Congress with the power "to regulate Commerce … among the several States." U.S. Const., art. I, § 8, cl. 3. The Commerce Clause bars state laws that unduly restrict interstate commerce—a restriction on State action referred to as the "Dormant Commerce Clause."

68. Under the Dormant Commerce Clause, even laws that regulate evenhandedly and do not purport to discriminate against other states are unconstitutional if they impose burdens on interstate commerce that are clearly excessive in relation to the putative local benefits. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The Dormant Commerce Clause likewise prohibits states from regulating activities, including speech, when the "practical effect of the regulation is to control conduct" that occurs "wholly outside" the regulating state's jurisdiction. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).

**E. The Children's Online Privacy Protection Act**

69. Enacted in 1998, the Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501 *et seq.*, created a comprehensive federal scheme to facilitate parental control over children's online


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

activities and to protect children's privacy. COPPA defines a "child" as an "individual under the age of 13." 15 U.S.C. §§ 6501(1). The Federal Trade Commission (FTC) has authority to enforce COPPA and has promulgated a rule to implement COPPA, which is known as the COPPA Rule. *See* 16 C.F.R. § 312.1 *et seq.*

70. COPPA makes it "unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed" by the FTC. 15 U.S.C. §6502(a)(1). Online operators therefore cannot be liable under COPPA unless their service is explicitly "directed to children" under 13 or they have "actual knowledge" that they are collecting, using, or disclosing personal information from children under 13. *Id.*; 16 C.F.R. § 312.2. These requirements are critical to ensuring that companies have sufficient notice to structure their activities to comply with COPPA, and to do so without unduly restricting their offerings for all users.

71. COPPA precludes states from imposing child-focused privacy rules that differ from those imposed by COPPA. *See* 15 U.S.C. § 6502(d) (forbidding states from imposing liability "in connection with an activity or action described in this chapter that is inconsistent with the treatment of those activities or actions under this section").

72. Unlike AB 2273, COPPA places the decision-making where it should be—with parents and guardians—and requires covered operators to provide notice of and obtain parental consent to their privacy practices. The COPPA Rule mandates, for example, that a covered business "provide notice on the Web site or online service of what information it collects from children, how it uses such information, and its disclosure practices for such information," 16 C.F.R. § 312.3(a), and "obtain verifiable parental consent prior to any collection, use, and/or disclosure of personal information from children," *id.* § 312.5.

**F. Section 230 of the Communications Decency Act**

73. Section 230 of the Communications Decency Act, 47 U.S.C. § 230, states that: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). It also



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

prohibits the imposition of liability for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." *Id.* § 230(c)(2). An "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." *Id.* § 230(f)(2). The "provider" of such a service includes those who own or operate websites and therefore includes NetChoice's members that are subject to AB 2273.

74. With limited exceptions, Section 230(c)(1) bars the imposition of liability on a website for claims stemming from the publication of information provided by a third party. Publication includes not just determining whether to publish, continue to publish, or withdraw third-party content from publication, but also reviewing, editing, and prioritizing such content. A service's decisions as to whether its content-moderation policies have been violated and how to address any violations, including whether and when to enforce those policies, are protected by Section 230(c)(2).

75. Congress adopted Section 230 to preserve and reinforce First Amendment protections for online services in light of the unique challenges of the medium. *Bennett v. Google, LLC*, 882 F.3d 1163, 1166 (D.C. Cir. 2018).

76. Section 230 expressly preempts inconsistent state laws that seek to hold online service providers liable for engaging (or failing to engage) in editorial and publishing functions protected by Section 230(c). 47 U.S.C. § 230(e)(3).

## VIII. CLAIMS FOR RELIEF

### COUNT ONE:
### VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION, PURSUANT TO 42 U.S.C. § 1983, AND ARTICLE I, SECTION 2(A) OF THE CALIFORNIA CONSTITUTION (FACIAL AND AS APPLIED)

77. Plaintiff incorporates all prior paragraphs of this Complaint.

78. AB 2273 violates the expressive rights of NetChoice and its members under both the First Amendment and Article I, Section 2(a) of the California Constitution.

79. AB 2273 imposes a system of prior administrative restraints that require online



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

services to create DPIA reports for state inspection *before* publishing any "online service, product, or feature" to the public "likely to be accessed by" any user under the age of 18, including teens on the cusp of adulthood. Even if it were crystal clear which services meet the "likely to be accessed" standard or what kinds of content, features, and services constituted a potential harm, the requirement places online services under threat of government sanction for making any service available that could be considered harmful to minors and thus imposes a prior restraint. Service providers face state-imposed sanctions if they publish online without first producing a DPIA, and they face state sanctions even if they do provide a DPIA but fail to prepare "a timed plan to mitigate or eliminate the [undefined] risk before the online service, product, or feature is accessed by children."

80. AB 2273 unconstitutionally deputizes online service providers to act as roving Internet censors at the State's behest. Providers must (i) assess the undefined risks their services and content "could" pose to the "well-being" and "best interests" of children; (ii) devise a plan to prevent or mitigate any such risks; and (iii) develop, publish, and enforce terms of service and "community standards." Failure to predict correctly how the State will choose to view those efforts, or to interpret the law's unbounded and inherently subjective terms, invites the prospect of ruinous liability even for the largest companies. Against the threat of such liability, regulated entities will almost inevitably choose to restrain speech to comply with the State's vague, content-based standards.

81. AB 2273 imposes a battery of viewpoint-, content-, and speaker-based restrictions on speech, and is thus subject to strict scrutiny. AB 2273 only applies, for example, to certain categories of speech (as defined in Section 1798.140) used by qualifying websites, and it selects among speakers by exempting not-for-profit and government speakers altogether. More fundamentally, for businesses that are covered, the law imposes rules and penalties based on what the content is and whether it is "materially detrimental" to the "mental health, or well-being of a child," is strictly "necessary" to provide the service, or is in the "best interests" of minors. These restrictions "reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)," and require strict scrutiny.


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Turner Broad. Sys.*, 512 U.S. at 658.

82. AB 2273 compels speech that a speaker would not otherwise make and thus necessarily operates as content-based regulation because it alters the content of speech.

83. AB 2273's prior restraints, speech restrictions, and compelled speech requirements fail strict scrutiny and also would fail a lesser standard of scrutiny. The law does not serve a compelling government interest nor is it narrowly tailored to achieve any such interest. In fact, it fails to reference any specific legislative findings about the harms the Legislature seeks to address beyond a broadly professed interest in "privacy protections for children." And even though the Legislature recognized that the "same data protection regime may not be appropriate for children of all ages," AB 2273 § 1(a)(7), the statute imposes exactly that. The statute's regime applies to minors of all ages, including teens, and in effect to the entire Internet. For the same reasons, these provisions fail intermediate and "exacting" scrutiny.

84. Section 1798.99.31(a)(1)-(4) compel businesses to create highly burdensome DPIAs. These provisions (i) effectuate an unconstitutional system of prior restraints; (ii) restrict and interfere with the editorial discretion of NetChoice and its members based on content and speaker; (iii) impermissibly compel speech on the basis of content according to the State's assessment of what a DPIA must include; (iv) impermissibly compel disclosure of DPIAs to the Attorney General upon request and thus further compels speech on the basis of content; and at minimum (v) imposes an unduly burdensome compelled commercial speech requirement that is inconsistent with *NIFLA*, 138 S. Ct. 2361, *Central Hudson*, 447 U.S. 557, and *Zauderer*, 471 U.S. 626.

85. Section 1798.99.31(a)(5) requires businesses to "estimate" the age of minor users to a "reasonable level of certainty" specific to each of the risks arising from businesses' individual data management practices, or otherwise to universally apply child-appropriate settings before publishing content. This vague and overbroad provision is a prior restraint and will impermissibly chill the publication of protected speech to adult audiences, infringe on protections for anonymous speech, and deter users from services deploying the invasive age-verification mechanisms that AB 2273 appears to require.


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

86. Section 1798.99.31(a)(9) mandates that businesses enforce community standards and privacy policies. This provision violates the First Amendment on its face, and as applied to NetChoice's covered members, to the extent it impermissibly (i) restricts businesses' and NetChoice's covered members' ability to exercise their own editorial discretion regarding which content to leave up or take down, and what to publish or not to publish; (ii) imposes strict liability on businesses and NetChoice's covered members without requiring any knowledge element; and (iii) chills businesses and NetChoice's covered members from publishing expressive materials.

87. Sections 1798.99.31(b)(1)-(4) limit businesses' ability to collect basic information needed to deliver services to users (regardless of whether the users want to share that information) and the way that businesses may retain, use, or share the information they are allowed to collect. These provisions violate the First Amendment on their face, and as applied to NetChoice's covered members, to the extent they limit an online service's rights to collect information for the purposes of curating, recommending, and delivering protected speech to users.

88. Section 1798.99.31(b)(3) prohibits online services from collecting, sharing, or retaining any "personal information"—in other words, engaging in routine maintenance and dissemination of information—unless doing so is "necessary" to provide the service, product, or feature "with which a child is actively and knowingly engaged" or the service demonstrates a "compelling reason" that the use of such information "is in the best interests of children" likely to access the service. This section violates the First Amendment on its face, and as applied to NetChoice's covered members, to the extent it restricts the collection, retention, and sharing of personal information to publish content or to make content available.

89. Section 1798.99.31(b)(7) prohibits online services from presenting content in a way that leads minors to provide more personal information than is "reasonably expected" or to take actions "detrimental" to their "physical health, mental health, or well-being." This provision, both facially and as applied to NetChoice's members, violates the First Amendment to the extent it: (i) interferes with an online service's editorial discretion, and (ii) impermissibly restricts how publishers may address or promote content that a government censor thinks unsuitable for minors, including through the use of recommendation algorithms, personalization features, and other


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

design features that organize and display content.

90. Unless declared invalid and enjoined, AB 2273 will unlawfully deprive NetChoice's members of their fundamental First Amendment rights and their free speech rights under the California Constitution.

**COUNT TWO:**
**VIOLATION OF THE FOURTH AMENDMENT TO THE U.S. CONSTITUTION, PURSUANT TO 42 U.S.C. § 1983 (FACIAL AND AS APPLIED)**

91. Plaintiff incorporates all prior paragraphs of this Complaint.

92. Section 1798.99.31(a)(1) of AB 2273 violates the Fourth Amendment by requiring regulated businesses, including Plaintiff's members, to generate and provide DPIAs to the Attorney General on demand without any opportunity for precompliance review by a neutral decisionmaker.

93. Plaintiff's members are online services and content publishers with a reasonable expectation of privacy in the commercially sensitive information that Section 1798.99.31(a)(1) commands them to include in their DPIAs and turn over to the Attorney General. None of Plaintiff's members operates in a "closely regulated" industry that would fall outside the ambit of the Fourth Amendment's protections against unrestricted administrative searches under *Patel*, 576 U.S. at 424-25.

94. AB 2273 does not provide any opportunity for precompliance review of the Attorney General's demands by a neutral decisionmaker. It accordingly "creates an intolerable risk that searches authorized by it will exceed statutory limits, or be used as a pretext to harass." *Patel*, 576 U.S. at 421. Section 1798.99.31(a)(1) is thus "facially invalid" and must be enjoined. *Id.* at 428.

**COUNT THREE:**
**VOID FOR VAGUENESS UNDER THE FIRST AMENDMENT AND DUE PROCESS CLAUSE OF THE U.S. CONSTITUTION, PURSUANT TO 42 U.S.C. § 1983, AND ARTICLE I, SECTION 7(A) OF THE CALIFORNIA CONSTITUTION (FACIAL AND AS APPLIED)**

95. Plaintiff incorporates all prior paragraphs of this Complaint.

96. AB 2273 contains a series of provisions that do not provide ordinary persons with


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

fair notice of the proscribed conduct. AB 2273 is so dependent on subjective, undefined standards that it practically mandates arbitrary or discriminatory enforcement against disfavored content, viewpoints, and speakers.

97. AB 2273 fails to define multiple critical terms underpinning the law's central requirements and leaves regulators with unbridled discretion to impose massive penalties on businesses.

98. Section 1798.99.30(b)(4) defines the "likely to be accessed by children" threshold requirement based on whether it is "reasonable to expect," based on certain listed indicators, that a service will be "accessed by children." But this provision offers no clarity to businesses regarding whether they fall within the statute, as the listed "indicators" are ambiguous in numerous respects. Section 1798.99.30(b)(4)(D), for example, covers online services, products, or features that are "substantially similar or the same" as services, products, or features in Section 1798.99.30(b)(4)(B). That subsection qualifies businesses if their services are "determined … to be routinely accessed by a significant number of children." But the statute offers no definition as to "reasonable to expect," "substantially similar," "routinely accessed," or "significant number," depriving businesses of notice as to whether they are subject to AB 2273.

99. Section 1798.99.31(a)(5) requires businesses to estimate the age of minor users "with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business." But the statute includes no definition as to what such an individualized level of certainty entails. Absent any guidance, regulators will have boundless discretion to discriminate among businesses, privately review and evaluate each business's data management practices without any disclosed criteria, and then subjectively determine what constitutes an "appropriate" level of certainty for each business.

100. Section 1798.99.31(a)(6) obliges businesses to configure all default privacy settings provided to minors—children or teens—to a "high level of privacy," unless the business can demonstrate a "compelling reason" that an alternative setting is in the "best interests of children." Here too, the law fails to provide businesses notice as to what it requires. The provision does not, for example, require the business to configure its privacy settings to the "highest" it



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

offers, or otherwise define the term relative to the business's default privacy settings. Instead, it mandates that businesses implement settings with an imprecise, free-floating "high" degree of privacy. Nor does the law define "compelling reason" or "best interests of children." The statute thus provides businesses no way of knowing how to comply.

101. Section 1798.99.31(a)(7) compels businesses to display their privacy policies and community standards "concisely, prominently, and using clear language suited to the age of children likely to access that online service, product, or feature." This provision is rife with ambiguity, as the legislation provides no direction on what such age-appropriate language may look like. If a site is equally accessible to 4-year-olds, 8-year-olds, and 15-year-olds, for example, the provision does not specify which type of language would be "suited"—and whether that language must in all instances to be suited to the youngest child likely to access the site or could differ among users. Nor does the provision give any indication as to how compliance would be measured, again leaving those subjective decisions entirely in the hands of the Attorney General.

102. Section 1798.99.31(b)(1) forbids businesses from "us[ing]" the personal information of minors in any way that the business "knows, or has reason to know" is "materially detrimental to the physical health, mental health, or well-being of a child." The law provides no guidance as to what types of personal-information uses would result in such knowledge, or even the meaning of the undefined term "materially detrimental" harm to a child's "well-being." Under the section's plain text, a business must change its services if a single child might suffer any of these unnamed harms—and again, the Attorney General has complete discretion to assess whether the business should have known about these harms, or even what the harms are in the first place.

103. Sections 1798.99.31(b)(3) and (b)(4) expose online services to significant liability unless they can prove that their use of personal information advances the "best interests of children," however a regulator chooses to define that.

104. Section 1798.99.31(b)(7) precludes businesses from using so-called "dark patterns" to "lead or encourage children … to take any actions that the business knows, or has reason to know, is materially detrimental to the child's physical health, mental health, or well-being." This provision, too, fails to define pivotal terms, including as to the core definition of dark patterns


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

itself, and leaves regulators with impermissible discretion as to application.

105. AB 2273 repeatedly uses vague and undefined terms to describe businesses' key obligations under the law, leaving the Attorney General with virtually boundless discretion. Accordingly, both as a facial matter and as applied to NetChoice's covered members, the law fails to provide constitutionally sufficient notice, and invites arbitrary and discriminatory enforcement against disfavored content, viewpoints, and speakers.

**COUNT FOUR:**
**VIOLATION OF THE COMMERCE CLAUSE OF THE U.S. CONSTITUTION, PURSUANT TO 42 U.S.C. § 1983 (FACIAL AND AS APPLIED)**

106. Plaintiff incorporates all prior paragraphs of this Complaint.

107. AB 2273 violates the Commerce Clause under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), and its progeny because the law seeks to impose an unreasonable and undue burden on interstate commerce that is clearly excessive in relation to any local benefit conferred on the State of California and is likely to subject businesses to inconsistent state regulations.

108. AB 2273 burdens interstate commerce by deterring online service providers from offering services available across state lines, or else limiting the types of services available within and across the United States. This is because the Internet is accessible globally, and whether a covered business wishes to avoid California's regulations or comply with them, doing so inherently requires Internet services to degrade or withdraw their services for all users in all states.

109. AB 2273 also burdens interstate commerce by forcing online service providers to comply with an inconsistent patchwork of state rules. For example, AB 2273 will in practice require covered businesses to adopt age-verification tools that might violate other states' conflicting privacy laws (such as biometric privacy laws).

110. The California Legislature has not identified any local interest (as opposed to an abstract interest in privacy generally) sufficient to justify these onerous impositions on interstate commerce, and the Act admits that the privacy regime it imposes does not even provide an appropriate degree of privacy for all the users it affects. Therefore, even if the identified generalized interest in privacy were deemed sufficiently local, AB 2273's drastic impositions on interstate and online commerce far outweigh what little AB 2273 does to further that purpose.


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

111. AB 2273 also violates the Commerce Clause because it regulates extraterritorially in violation of the rule in *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 336 (1989). For the same reasons that AB 2273 burdens interstate commerce by depressing or degrading the output and quality of Internet services available nationwide, AB 2273 necessarily has the practical and *per se* unconstitutional effect of regulating commercial and speech-related activities that occur wholly outside California, such as by causing an Internet service based in New York to withhold a product or service to users in Florida.

112. Unless declared invalid and enjoined, AB 2273 will operate to unconstitutionally burden interstate commerce in violation of the Commerce Clause.

**COUNT FIVE:**
**COPPA PREEMPTION, 15 U.S.C. §§ 6501 *et seq*.**
**(FACIAL AND AS APPLIED)**

113. Plaintiff incorporates all prior paragraphs of this Complaint.

114. AB 2273 is preempted by COPPA because AB 2273 is wholly "inconsistent" with that federal statute with respect to children under the age of 13. 15 U.S.C. § 6502(d). Because the portions of AB 2273 that apply to children under 13 cannot be severed from the rest of AB 2273, the entire law is preempted.

115. COPPA and the COPPA Rule impose various obligations on businesses with respect to children under the age of 13. The duties and obligations mandated by AB 2273 are inconsistent with, and hence preempted by, COPPA and the COPPA Rule.

116. First, AB 2273's wide-ranging scope is inconsistent with, and thus preempted by, COPPA. COPPA applies to online services "directed" to children under 13, whereas AB 2273 covers services that are not necessarily "directed" to children, but instead "likely to be accessed by children." Even more troubling, covered businesses include those that are "substantially similar or the same" as services that are determined to be "routinely accessed by a significant number of children" or services that have "design elements that are known to be of interest to children." § 1798.99.30(b)(4)(B), (D), (E). Accordingly, whereas COPPA applies to a subset of websites and online services, AB 2273 effectively applies to almost all websites, including those of NetChoice's members.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

117. Second, COPPA preempts AB 2273 because AB 2273 imposes on businesses and online services privacy obligations with respect to children under 13 that are not required by COPPA or the COPPA Rule. Unlike COPPA, AB 2273 would permit the government to effectively censor content that can be seen by all minors—even someone just days away from their 18th birthday or whose parents do not prefer such censorship.

118. AB 2273 imposes substantive obligations on businesses with respect to children under the age of 13 that far exceed the requirements of the COPPA Rule, which are largely notice-and-consent based. In contrast to the COPPA Rule, AB 2273 requires—among other things—that businesses create comprehensive and wide-ranging DPIAs, § 1798.99.31(a)(1)-(4); estimate user ages to a "reasonable level of certainty" or apply universal privacy standards, § 1798.99.31(a)(5); configure privacy settings to a "high" level, unless the business can meet the "best interests of children" showing, § 1798.99.31(a)(6); and enforce published terms and policies, § 1798.99.31(a)(9). COPPA imposes none of these obligations, and therefore AB 2273 is inconsistent with the COPPA notice-and-consent regime.

119. AB 2273 requires businesses to refrain from undertaking other actions that are allowed under the COPPA Rule, including "profiling a child by default" unless the business meets certain narrow requirements, § 1798.99.31(b)(2), and using "dark patterns to lead or encourage children" to provide personal information or take any action that the business should know is "materially detrimental" to the minor, § 1798.99.31(b)(7). These too are inconsistent with COPPA and thus preempted.

**COUNT SIX:**
**SECTION 230 PREEMPTION, 47 U.S.C. § 230 (FACIAL AND AS APPLIED)**

120. Plaintiff incorporates all prior paragraphs of the Complaint.

121. NetChoice's members are "interactive computer service[s]" within the meaning of 47 U.S.C. § 230 because they own and operate interactive websites.

122. Sections 1798.99.31(a)(9), 1798.99.31(b)(1), (b)(3), (b)(4), and (b)(7) of AB 2273 violate NetChoice's members' rights under 47 U.S.C. § 230(c)(1) because they treat NetChoice's members as the publishers or speakers of information provided by other information content providers—that is, their users. By threatening to impose liability on services for failing to enforce



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

their "published terms, policies, and community standards," Section 1798.99.31(a)(9) necessarily and impermissibly violates Section 230(c)(1) because it limits services' discretion in reviewing, editing, promoting, and deciding whether to publish or remove third-party content. Sections 1798.99.31(b)(1), (b)(3), (b)(4), and (b)(7) likewise hold online services liable for their decisions to publish certain third-party content to certain users.

123. Section 1798.99.31(a)(9) also violates NetChoice's members' rights under 47 U.S.C. § 230(c)(2) because it interferes with their right to take "good faith" actions "to restrict access to or availability of material that" they "consider[] to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."

124. Sections 1798.99.31(b)(1), (b)(3), (b)(4), and (b)(7) thus violate and are preempted by 47 U.S.C. § 230(c) to the extent they apply to covered services' publication of third-party content.

125. Section 1798.99.31(a)(9) thus violates and is preempted by 47 U.S.C. § 230(c) to the extent it applies to covered services' enforcement of their content policies and community standards.

126. Sections 1798.99.31(a)(9) and 1798.99.31(b)(1), (b)(3), (b)(4), and (b)(7) thus violate and are preempted by Section 230.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff NetChoice respectfully requests that the Court:

1. Declare that Section 1798.99.30(b)(4) violates the First and Fourteenth Amendments to the United States Constitution on its face;

2. Declare that the mandates and prohibitions contained within Sections 1798.99.31(a) and .31(b) violate the First and Fourteenth Amendments to the United States Constitution on their face because, pursuant to the coverage definition in Section 1798.99.30(b)(4), they impermissibly target online services for regulation based on the content they publish.

3. Declare that Sections 1798.99.31(a)(1)–(4) violate the First and Fourteenth



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Amendments to the United States Constitution on their face;

4. Declare that Section 1798.99.31(a)(5) violates the First and Fourteenth Amendments to the United States Constitution on its face, and as applied to covered NetChoice members;

5. Declare that Section 1798.99.31(a)(9) violates the First and Fourteenth Amendments to the United States Constitution on its face to the extent that section applies to covered services' content policies and community standards, and violates the First and Fourteenth Amendments to the United States Constitution as applied to covered NetChoice members' enforcement of those policies;

6. Declare that Sections 1798.99.31(b)(1)–(2), (b)(4) violate the First and Fourteenth Amendments to the United States Constitution on their face to the extent those sections apply to covered services' use of personal information to publish content or to make information available, and violate the First and Fourteenth Amendments to the United States Constitution as applied to covered NetChoice members' practices to do so;

7. Declare that Section 1798.99.31(b)(3) violates the First and Fourteenth Amendments to the United States Constitution on its face to the extent that section applies to covered services' retention, sale, and sharing of personal information to publish content or to make information available, and violates the First and Fourteenth Amendments to the United States Constitution as applied to covered NetChoice members' practices to do so;

8. Declare that Section 1798.99.31(b)(7) violates the First and Fourteenth Amendments to the United States Constitution on its face to the extent that section applies to covered services' use of recommendation algorithms, continuous scroll, autoplay, and other design features that organize content, and violates the First and Fourteenth Amendments to the United States Constitution as applied to covered NetChoice members' use of such features;

9. Declare that Sections 1798.99.31(a)(5), (9) and 1798.99.31(b)(1)–(4) and (7) are facially invalid because they are not severable from 1798.99.31(a)(1)–(4) and 1798.99.35(c), and declare any remaining provisions of AB 2273 invalid to the extent the Court finds those provisions inseverable from the invalid portions NetChoice challenges;



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

10. Declare that Sections 1798.99.31(a)(1)-(5), (9) and 1798.99.31(b)(1)-(4) and (7) violate the Commerce Clause of the U.S. Constitution on their face;

11. Declare that Sections 1798.99.31(a)(1)-(5), (9) and 1798.99.31(b)(1)-(4) and (7) are inconsistent with and thus preempted by COPPA, 15 U.S.C. §§ 6501 et seq., to the extent applicable to persons under the age of 13;

12. Declare that Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c), preempts Section 1798.99.31(a)(9) on its face to the extent applied to covered services' enforcement of their content policies and community standards; and preempts Sections 1798.99.31(b)(1), (3)–(4), and (7) on their face to the extent these provisions are applied to covered services' publication of third-party content;

13. Preliminarily and permanently enjoin Defendant and his agents, employees, and all persons acting under his direction or control from taking any action to enforce Sections 1798.99.31(a)(1)-(5), (9) and 1798.99.31(b)(1)-(4) and (7) against NetChoice and its members, and any other covered entities, to the extent NetChoice challenges these provisions;

14. Enter judgment in favor of NetChoice;

15. Award NetChoice its reasonable costs and attorneys' fees incurred in bringing this action, pursuant to 42 U.S.C. § 1988; and

16. Award NetChoice all other such relief as the Court deems just and proper.

DATED: November 1, 2024

DAVIS WRIGHT TREMAINE LLP

By: */s/ Adam S. Sieff*
Adam S. Sieff

Attorneys for Plaintiff
NetChoice, LLC d/b/a NetChoice



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

NETCHOICE, LLC, d/b/a NetChoice

Plaintiff,

v.

ROB BONTA, Attorney General of the State of California, in his official capacity,

Defendant.

Case No. 22-cv-08861-BLF

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

[Re: ECF 29]

This suit challenges the enforceability of the California Age-Appropriate Design Code Act ("the CAADCA" or "the Act"), which was recently enacted for the stated purpose of affording protections to children when they access the internet. *See* Cal. Civ. Code § 1798.99.29.[1] The Act applies to for-profit businesses that collect consumers' personal information and satisfy other criteria relating to business size and revenue. *See* CAADCA § 30; Cal. Civ. Code § 1798.140. Effective July 1, 2024, the Act imposes a number of requirements on any covered business that "provides an online service, product, or feature likely to be accessed by children." CAADCA § 31.

Plaintiff NetChoice, LLC ("NetChoice") "is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet." Compl. ¶ 5, ECF 1. NetChoice's members include Google, Amazon, Meta, TikTok and many other companies with strong online presences. NetChoice sues Defendant Rob Bonta, Attorney

[1] The CAADCA is codified at California Civil Code §§ 1798.99.28–1798.99.40. When citing to the Act, the Court will cite to the statute's abbreviated title and last two digits. For example, the Court will cite to Cal. Civil Code § 1798.99.31 as "CAADCA § 31."

United States District Court
Northern District of California

General of the State of California ("the State"), for declaratory and injunctive relief related to the CAADCA, which it asserts is both facially unconstitutional and preempted by federal statute.

NetChoice moves for preliminary injunction based on its claims that the CAADCA violates the First Amendment and the dormant Commerce Clause of the United States Constitution, and is preempted by both the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §§ 6501–6506, and Section 230 of the Communications Decency Act, 47 U.S.C. § 230. *See* Mot., ECF 29. The State opposes the motion, arguing that the CAADCA regulates conduct—the collection and use of children's personal information—that does not implicate the First Amendment. *See* Opp'n, ECF 51. The State also contends that the CAADCA does not violate the dormant Commerce Clause and is not preempted by either COPPA or Section 230. *See id.*

Mindful that the CAADCA was enacted with the unanimous support of California's Legislature and Governor, the Court has given careful consideration to the motion, the State's opposition, NetChoice's reply, the supplemental briefs filed by both parties, the briefs filed by seven sets of amici curiae, and the oral arguments presented at the hearing on July 27, 2023. The Court finds that although the stated purpose of the Act—protecting children when they are online—clearly is important, NetChoice has shown that it is likely to succeed on the merits of its argument that the provisions of the CAADCA intended to achieve that purpose do not pass constitutional muster. Specifically, the Court finds that the CAADCA likely violates the First Amendment. The motion for preliminary injunction is GRANTED on that basis.

## I. BACKGROUND

The internet has become indispensable to the exchange of information. Many online providers allow users to view content and access services without creating an account, while others require the creation of a free account to access services, and still others require users to pay fees. *See* Cairella Decl. ¶¶ 4–8, ECF 22; Masnick Decl. ¶¶ 5–6, ECF 29; Roin Decl. ¶¶ 7–9, ECF 25; Paolucci Decl. ¶ 2, ECF 28. Online providers generally rely on advertising to earn revenue that supports the content and services they offer. *See* Cairella Decl. ¶¶ 4, 21; Roin Decl. ¶ 10. Advertisements are targeted to users based on their interests, which are gleaned from data collected from the users while they are online. *See* Egelman Decl. ¶¶ 13–14, ECF 51-1. Such data

also is used by online providers to tailor content to individual users. *See* Cairella Decl. ¶ 8; Roin Decl. ¶¶ 2–6. In addition, online providers may sell user data to third parties. *See* Egelman Decl. ¶ 11.

Users can manage their online privacy by reading privacy policies before engaging with the provider's services. *See* Egelman Decl. ¶ 24. Users also may change their privacy settings to block or delete "cookies," which are data that websites store in consumers' web browsers, which are then transmitted back to websites when visited again. *See id.* ¶ 29. However, privacy policies can be difficult to understand and privacy settings are not always user friendly. *See id.* ¶¶ 24–30.

These privacy concerns have become increasingly relevant to children, because their internet use has grown dramatically in recent years. *See* Radesky Decl. ¶¶ 21–25, ECF 51-5. During the COVID-19 pandemic, children's access to digital technology and time online went up significantly. *See id.* ¶ 26. Children's time online increased approximately 52% during the pandemic, and heavier technology use habits have persisted. *See id.* Children depend on the internet for both educational and entertainment purposes. *See id.* ¶¶ 26-29. Unplugging is not a viable option. *See id.* ¶ 29.

A federal child privacy law, COPPA, limits the ability of online providers to collect personal information from children. *See* 15 U.S.C.A. §§ 6501–06. COPPA makes it "unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed" under the statute. 15 U.S.C. § 6502(a)(1). "Child" is defined as an individual under the age of 13. 15 U.S.C. § 6501(1). The applicable regulations require the operator to obtain parental consent prior to any collection, use, or disclosure of personal information from children. *See* 16 C.F.R. § 312.3(b).

The California Consumer Privacy Act ("CCPA") imposes limits on the collection of personal information from users generally, requiring among other things that online providers inform users of the categories of personal information to be collected and the purposes of such collection. *See* Cal. Civ. Code § 1798.100(a)(1). The CCPA defines "personal information" to include any information that "relates to, describes, is reasonably capable of being associated with,

United States District Court
Northern District of California

United States District Court
Northern District of California

or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civ. Code § 1798.140(v).

It is against this backdrop that the CAADCA was enacted. The CAADCA goes far beyond the scope of protections offered by COPPA and the CCPA. Whereas COPPA limits the collection of user data by operators of websites and services "directed to children," 15 U.S.C. § 6502(a)(1), the CAADCA "declares that children should be afforded protections not only by online products and services specifically directed at them but by all online products and services they are likely to access," CAADCA § 29. COPPA protects children under the age of 13, *see* 15 U.S.C. § 6501(1), while the CAADCA protects children under the age of 18, *see* CAADCA § 30(b)(1). COPPA gives parents authority to make decisions about use of their children's personal information, *see* 16 C.F.R. § 312.3(b), and the CCPA gives users authority to make decisions about their own personal information, *see* Cal. Civ. Code § 1798.135. In contrast, the CAADCA requires online providers to create a Data Protection Impact Assessment ("DPIA") report identifying, for each offered online service, product, or feature likely to be accessed by children, any risk of material detriment to children arising from the provider's data management practices. *See* CAADCA § 30(a)(1). Providers must create a "timed plan to mitigate or eliminate" the risks identified in the DPIA "before the online service, product, or feature is accessed by children," *id.* § 30(a)(2), and must provide the DPIA reports to the California Attorney General upon written request, *see id.* § 30(a)(2). The CAADCA also requires that online providers comply with a list of enumerated mandates and prohibitions, discussed in detail below. *See id.* § 31(a)–(b).

Covered businesses must complete the required DPIA reports and satisfy related requirements by July 1, 2024, and continue to do so on an ongoing basis. *See* CAADCA §§ 31, 33. The CAADCA authorizes the California Attorney General to bring a civil enforcement action against any business that fails to comply with the Act's requirements. *See id.* § 35. Violators are subject to civil penalties of $2,500 per child for each negligent violation and $7,500 for each intentional violation. *See id.*

NetChoice filed this suit on December 14, 2022, challenging the CAADCA as facially unconstitutional and preempted by federal statute. The complaint asserts the following claims:

(1) violation of the First and Fourteenth Amendments to the U.S. Constitution, and Article I, Section 2(a) of the California Constitution; (2) violation of the Fourth Amendment to the U.S. Constitution; (3) void for vagueness under the First Amendment and Due Process Clause of the U.S. Constitution, and Article I, Section 7(a) of the California Constitution; (4) violation of the dormant Commerce Clause of the U.S. Constitution; (5) preemption by COPPA; and (6) preemption by Section 230. Compl. ¶¶ 76–122. The complaint requests declaratory and injunctive relief prohibiting enforcement of the CAADCA.

NetChoice now seeks a preliminary injunction enjoining enforcement of the CAADCA pending disposition of the suit.

## II. LEGAL STANDARD

"Courts consider four factors in deciding whether to grant a preliminary injunction: the plaintiff's likelihood of success on the merits; her likelihood of suffering irreparable harm in the absence of preliminary relief; whether the balance of equities tips in her favor; and whether an injunction is in the public interest." *Garcia v. City of Los Angeles*, 11 F.4th 1113, 1118 (9th Cir. 2021) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

In this circuit, "[l]ikelihood of success on the merits is the most important factor."[2] *Apartment Ass'n of L.A. Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 912 (9th Cir. 2021) (quoting *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018)). "It is well-established that the first factor is especially important when a plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, --- F.4th ----, 2023 WL 5763345, at *3 (9th Cir. Sept. 7, 2023). "If a plaintiff in such a case shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation." *Id.* Finally, "[w]hen, like here, the nonmovant is the government, the last two *Winter* factors merge." *Id.* at *2 (quotation marks and citation omitted).

---

[2] Where the plaintiff cannot show a likelihood of success on the merits, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). The Court need not apply this alternative formulation of the *Winter* test here because, as discussed below, NetChoice makes a strong showing on likelihood of success and on the other *Winter* factors.

United States District Court
Northern District of California

## III. DISCUSSION

### A. Likelihood of Success on the Merits

NetChoice argues that it is likely to succeed on the merits of its claims that the Act violates free speech rights under the First Amendment (Claims 1 and 3), violates the dormant Commerce Clause (Claim 4), and is preempted by both COPPA (Claim 5) and Section 230 (Claim 6). *See* Mot. 1; Compl. ¶¶ 76–122.

#### 1. First Amendment (Claims 1 and 3)

Claim 1 asserts that the CAADCA violates the First Amendment because it is an unlawful prior restraint on protected speech, is unconstitutionally overbroad, and regulates protected expression but fails strict scrutiny or any lesser standard of scrutiny that may apply. *See* Compl. ¶¶ 76–88. Claim 3 asserts that the CAADCA is void for vagueness under the First Amendment. *See id*. ¶¶ 93–103. NetChoice argues that it is likely to succeed on its First Amendment claims because the CAADCA: (1) is an unlawful prior restraint; (2) is unconstitutionally overbroad; (3) is void for vagueness; and (4) is subject to and fails strict scrutiny. Mot. 7–22.

Before taking up these arguments, the Court notes that both parties appear to have accepted the relaxed standard for standing in a First Amendment facial challenge. That is, although the general rule of standing is that a party may not challenge a statute's constitutionality "on the ground that it may conceivably be applied unconstitutionally to others," *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973), a party making a First Amendment claim has standing to challenge the impact of a regulation on both "its own expressive activities, as well as those of others," *S.O.C. Inc. v. County of Clark*, 152 F.3d 1136, 1142 (9th Cir. 1998). Accordingly, the parties have made—and the Court will consider—arguments about the CAADCA's alleged impact on the expressive activities of individuals and entities who are not NetChoice members.

Turning to NetChoice's four First Amendment arguments on likelihood of success, the Court first addresses the argument that the Act regulates protected expression and fails the applicable level of scrutiny. Because the argument is dispositive, the Court need not address NetChoice's additional First Amendment arguments based on prior restraint, overbreadth, and vagueness.

**a. Legal Framework re Scrutiny for Regulations of Speech**

"The First Amendment generally prevents government from proscribing speech, [] or even expressive conduct, [] because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (internal citations omitted). A law compelling speech is no less subject to First Amendment scrutiny than a law prohibiting speech. *Frudden v. Pilling*, 742 F.3d 1199, 1203 (9th Cir. 2014) (citing *W. Va. State Bd. Of Educ. v. Barnette*, 319 U.S. 624, 633–34 (1943)).

The threshold question in a free speech analysis is whether the challenged law invokes the First Amendment at all. *See Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015). "All manner of speech—from 'pictures, films, paintings, drawings, and engravings,' to 'oral utterance and the printed word'—qualify for the First Amendment's protections; no less can hold true when it comes to speech . . . conveyed over the Internet." *303 Creative LLC v. Elenis*, 600 U.S. —, 143 S. Ct. 2298, 2312 (2023) (citations omitted). That is, the First Amendment's protections apply not only to written or verbal speech, but to any expressive conduct. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989) ("Music, as a form of expression and communication, is protected under the First Amendment."). In determining whether a law regulates protected expression, courts evaluate "whether [activity] with a 'significant expressive element' drew the legal remedy or the ordinance has the inevitable effect of 'singling out those engaged in expressive activity.'" *Int'l Franchise*, 803 F.3d at 408 (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706–07 (1986)). For example, a tax on paper and ink that in effect "single[s] out the press for special treatment" regulates protected expression, although the application of a general sales tax to newspapers does not. *See Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581–82 (1983). A regulation that restricts conduct without a "significant expressive element" is not subject to any level of First Amendment scrutiny. *See HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 684 (9th Cir. 2019); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech.").

If a court finds that a challenged law regulates some manner of protected expression, it must then "determine the scope of the [regulated] speech" in order to apply the appropriate level

United States District Court
Northern District of California

of scrutiny. *Yim v. City of Seattle*, 63 F.4th 783, 791 (9th Cir. 2023). There are several levels of scrutiny that may apply, depending on the type of expression at issue.

**i. Strict Scrutiny**

If the challenged regulation restricts only non-commercial speech, the level of scrutiny depends on whether the law is content based or content neutral. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," that is, if the regulation "draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citations omitted). A law is also content based if, even though facially neutral, it "cannot be justified without reference to the content of the regulated speech, or . . . were adopted by the government because of disagreement with the message the speech conveys." *Id.* at 164 (internal punctuation marks and citation omitted). If the court determines a law is content based, it applies strict scrutiny, "regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Porter v. Martinez*, 68 F.4th 429, 439 (9th Cir. 2023) (citations omitted). Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171; *see also Berger v. City of Seattle*, 569 F.3d 1029, 1050 (9th Cir. 2009) ("Under that standard [of strict scrutiny], the regulation is valid only if it is the least restrictive means available to further a compelling government.") (citing *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000)).

**ii. Intermediate Scrutiny**

"By contrast, a content-neutral regulation of [non-commercial] expression must meet the less exacting standard of intermediate scrutiny." *Porter*, 68 F.4th at 439 (citation omitted). Under this lower standard, "a regulation is constitutional 'if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'" *Id.* (quoting *United States v. O'Brien*, 394 U.S. 367, 377 (1968)).

United States District Court
Northern District of California

### iii. Commercial Speech Scrutiny

If a statute regulates only commercial speech—i.e., "'expression related solely to the economic interests of the speaker and its audience'" that "does no more than propose a commercial transaction," *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (citations omitted)—the court applies commercial speech scrutiny[3] as established by *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). First, commercial speech is not entitled to any First Amendment protection if it is misleading or related to illegal activity. *Cent. Hudson*, 447 U.S. at 563–64; *see also, e.g.*, *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002). For all other commercial speech, the court asks "whether the asserted governmental interest is substantial," "whether the regulation directly advances the governmental interest," and "whether [the regulation] is not more extensive than is necessary to serve that interest." *Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 844 (9th Cir. 2017) (quoting *Cent. Hudson*, 447 U.S. at 566). The regulation is constitutional only if the answer to all three questions is "yes,". *See id.* This analysis applies to commercial speech regardless of whether the regulation is content based or content neutral. *Yim*, 63 F.4th at 793 n.14 (citing *Valle Del Sol, Inc. v. Whiting*, 709 F.3d 808, 820 (9th Cir. 2013)).

### iv. Scrutiny where Commercial and Non-Commercial Speech is Inextricably Intertwined

Finally, if a law regulates expression that "inextricably intertwines" commercial and non-commercial components, the court does not "apply[] one test to one phrase and another test to another phrase," but instead treats the entire expression as non-commercial speech and applies the appropriate level of scrutiny. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) (applying strict scrutiny to content-based regulation of solicitation of charitable contributions by professional fundraisers while assuming professional fundraiser's financial motivation for solicitation intertwined commercial interest with non-commercial advocacy).

With these principles in mind, the Court now assesses whether NetChoice has shown that it

---

[3] The Court will use the phrase "commercial speech scrutiny" in this order to refer to the "intermediate scrutiny standard codified in *Central Hudson*." *Yim*, 63 F.4th at 793.

is likely to succeed both in establishing that the CAADCA regulates protected expression, and in establishing that the CAADCA fails the applicable level of scrutiny.

**b. Protected Expression or Non-Expressive Conduct**

NetChoice argues that the CAADCA regulates speech by requiring internet content providers to take various actions to protect minors from harmful messages, such as making content-based assessments about potential harm to minors in order to comply with the DPIA requirement, and necessarily reviewing content to adhere to the Act's content policy enforcement provision. *See* Mot. 19–21. The State argues that the Act merely regulates business practices regarding the collection and use of children's data, so that its restrictions are only of nonexpressive conduct that is not entitled to First Amendment protection. *See* Opp'n 10–12. The State further contends that the Act does not restrict speech because it does not prevent any particular content from being shown to a minor—even if the content provider knows it would be harmful—as long as the content provider does not use the minor's personal information to do so. *See id.* at 12.

In evaluating whether the CAADCA regulates protected expression, the Court first notes that determining whether the statute applies to a business will often require viewing the content of the online service, product, or feature to evaluate whether it is "likely to be accessed by children" because, for example, it contains "advertisements marketed to children." CAADCA §§ 29(b)(4)(C), 31(a). But having to view content to determine whether the statute applies does not by itself mean that the statute regulates speech. *See, e.g.*, *Am. Soc'y of Journalists & Authors, Inc. v. Bonta*, 15 F.4th 954, 960–61 (9th Cir. 2021) (finding law classifying workers as employees or independent contractors based on criteria including whether worker's output was "to be appreciated primarily or solely for its imaginative, aesthetic, or intellectual content" did not regulate speech) (citing Cal. Labor Code § 2778(b)(2)(F)(ii)). The question is whether the law at issue regulates expression "because of its message, its ideas, its subject matter, or its content." *Id.* at 960 (quoting *Reed*, 576 U.S. at 163). The Court will evaluate this question first with respect to those portions of the statute that prohibit certain actions, *see* CAADCA § 31(b), and then turn to the sections of the statute mandating specific acts, *see id.* § 31(a).

United States District Court
Northern District of California

**i. The Act's Prohibitions (CAADCA § 31(b))**

The CAADCA's prohibitions forbid the for-profit entities covered by the Act from engaging—with some exceptions—in the collection, sale, sharing, or retention of children's personal information, including precise geolocation information, for profiling or other purposes. *See generally id.* § 31(b). The State argues that the CAADCA's regulation of "collection and use of children's personal information" is akin to laws that courts have upheld as regulating economic activity, business practices, or other conduct without a significant expressive element. Opp'n 11–12 (citations omitted). There are two problems with the State's argument. First, none of the decisions cited by the State for this proposition involved laws that, like the CAADCA, restricted the collection and sharing of information. *See id.*; *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 66 (2006) (statute denying federal funding to educational institutions restricting military recruiting did not regulate "inherently expressive" conduct because expressive nature of act of preventing military recruitment necessitated explanatory speech); *Roulette v. City of Seattle*, 97 F.3d 300, 305 (9th Cir. 1996) (ordinance prohibiting sitting or lying on sidewalk did not regulate "forms of conduct integral to, or commonly associated with, expression"); *Int'l Franchise*, 803 F.3d at 397–98, 408 (minimum wage increase ordinance classifying franchisees as large employers "exhibit[ed] nothing that even the most vivid imagination might deem uniquely expressive") (citation omitted); *HomeAway.com*, 918 F.3d at 680, 685 (ordinance regulating forms of short-term rentals was "plainly a housing and rental regulation" that "regulate[d] nonexpressive conduct—namely, booking transactions"); *Am. Soc'y of Journalists & Authors*, 15 F.4th at 961–62 (law governing classification of workers as employees or independent contractors "regulate[d] economic activity rather than speech").

Second, in a decision evaluating a Vermont law restricting the sale, disclosure, and use of information about the prescribing practices of individual doctors—which pharmaceutical manufacturers used to better target their drug promotions to doctors—the Supreme Court held the law to be an unconstitutional regulation of speech, rather than conduct. *Sorrell*, 564 U.S. at 557, 562, 570–71. The Supreme Court noted that it had previously held the "creation and dissemination of information are speech within the meaning of the First Amendment," 564 U.S. at

570 (citing *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001); *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481 (1995); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985) (plurality opinion)), and further held that even if the prescriber information at issue was a commodity, rather than speech, the law's "content- and speaker-based restrictions on the availability and use of . . . identifying information" constituted a regulation of speech, *id.* at 570–71; *see also id.* at 568 ("An individual's right to speak is implicated when information he or she possesses is subject to 'restraints on the way in which the information might be used' or disseminated.") (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984)).

The State argues that *Sorrell* does not necessitate the conclusion that the CAADCA's prohibitions regulate speech because *Sorrell* (1) does not hold that a business has a right to collect data from individuals, and (2) is generally distinguishable on the facts because the physicians described in *Sorrell*, whose information was collected, were willing participants in the data generation who had the power to restrict the use of their information. *See* July 27, 2023 Hr'g Tr. ("Tr.") 27:16–31:13; Opp'n 11–12; *see also id.* 1 ("Plaintiff's members do not have a First Amendment right to children's personal information."). As for the first point, the State is correct that *Sorrell* does not address any general right to collect data from individuals. In fact, the Supreme Court noted that the "capacity of technology to find and publish personal information . . . presents serious and unresolved issues with respect to personal privacy and the dignity it seeks to secure." *Sorrell*, 564 U.S. at 579–80. But whether there is a general right to collect data is independent from the question of whether a law restricting the collection and sale of data regulates conduct or speech. Under *Sorrell*, the unequivocal answer to the latter question is that a law that—like the CAADCA—restricts the "availability and use" of information by some speakers but not others, and for some purposes but not others, is a regulation of protected expression. *Id.* at 570–71. The State's attempt to distinguish *Sorrell* based on the physicians' ability to prevent their information from being collected, *see* Tr. 31:7–10, is not persuasive because the Supreme Court concluded that the law at issue regulated speech based on its restrictions on the use of the information after it was collected, without including any reasoning about the nature of the source of the information. *See Sorrell*, 564 U.S. at 570–71.

Accordingly, the Court finds that NetChoice is likely to succeed in showing that the Act's prohibitions—which restrict covered business from "[c]ollect[ing], sell[ing], shar[ing], or retain[ing] any personal information" for most purposes, *see, e.g.*, CAADCA § 31(b)(3)—limit the "availability and use" of information by certain speakers and for certain purposes and thus regulate protected speech.

**ii. The Act's Mandates (CAADCA § 31(a))**

The Act's ten statutory mandates are more varied than the prohibitions. *See generally* CAADCA §§ 31(a)(1)–(10). One of the main requirements of the Act is that companies create DPIA reports identifying, for each offered online service, product, or feature likely to be accessed by children, any risk of material detriment to children arising from the business's data management practices. *Id.* §§ 31(a)(1)–(4). For example, a DPIA report must assess whether the "design of the online service, product, or feature could harm children, including by exposing children to harmful, or potentially harmful, content on the online service, product, or feature." *Id.* § 31(a)(1)(B). Each business must then create a "timed plan to mitigate or eliminate" the risks identified in the DPIA "before the online service, product, or feature is accessed by children," *id.* § 31(a)(2), and provide a list of all DPIA reports and the reports themselves to the state Attorney General upon written request, *id.* § 31(a)(3)-(4).

The State contended at oral argument that the DPIA report requirement merely "requires businesses to consider how the product's use design features, like nudging to keep a child engaged to extend the time the child is using the product" might harm children, and that the consideration of such features "has nothing to do with speech." Tr. 19:14–20:5; *see also id.* at 23:5–6 ("[T]his is only assessing how your business models . . . might harm children."). The Court is not persuaded by the State's argument because "assessing how [a] business model[] . . . might harm children" facially requires a business to express its ideas and analysis about likely harm. It therefore appears to the Court that NetChoice is likely to succeed in its argument that the DPIA provisions, which require covered businesses to identify and disclose to the government potential risks to minors and to develop a timed plan to mitigate or eliminate the identified risks, regulate the distribution of speech and therefore trigger First Amendment scrutiny. *See* Reply 2, ECF 60; *Sorrell*, 564 U.S. at

570 ("This Court has held that the creation and dissemination of information are speech within the meaning of the First Amendment.") (citations omitted).

Several sections require businesses to affirmatively provide information to users, and by requiring speech necessarily regulate it. *See* CAADCA § 31(a)(7) (requiring businesses "[p]rovide any privacy information . . . concisely, prominently, and using clear language suited to the age of children likely to access that online service, product, or feature"); *id.* § 31(a)(8) (requiring that businesses "provide an obvious signal to [a] child" if the child is being tracked or monitored by a parent or guardian via an online service, product, or feature); *id.* § 31(a)(10) ("Provide prominent, accessible, and responsive tools to help children . . . exercise their privacy rights and report concerns."); *see also, e.g.*, *Rubin*, 514 U.S. at 481 (holding "information on beer labels" constitutes speech). The CAADCA also requires a covered business to enforce its "published terms, policies, and community standards"—*i.e.*, its content moderation policies. CAADCA § 31(a)(9). Although the State argues that the policy enforcement provision does not regulate speech because businesses are free to create their own policies, it appears to the Court that NetChoice's position that the State has no right to enforce obligations that would essentially press private companies into service as government censors, thus violating the First Amendment by proxy, is better grounded in the relevant binding and persuasive precedent. *See* Mot. 11; *Playboy Ent. Grp.*, 529 U.S. at 806 (finding statute requiring cable television operators providing channels with content deemed inappropriate for children to take measures to prevent children from viewing content was unconstitutional regulation of speech); *NetChoice, LLC v. Att'y Gen., Fla.* ("*NetChoice v. Fla.*"), 34 F.4th 1196, 1213 (11th Cir. 2022) ("When platforms choose to remove users or posts, deprioritize content in viewers' feeds or search results, or sanction breaches of their community standards, they engage in First-Amendment-protected activity."); *Engdahl v. City of Kenosha*, 317 F. Supp. 1133, 1135–36 (E.D. Wis. 1970) (holding ordinance restricting minors from viewing certain movies based on ratings provided by Motion Picture Association of America impermissibly regulated speech).

The remaining two sections of the CAADCA require businesses to estimate the age of child users and provide them with a high default privacy setting, or forgo age estimation and

provide the high default privacy setting to all users. CAADCA §§ 31(a)(5)–(6). The State argues that "[r]equiring businesses to protect children's privacy and data implicates neither protected speech nor expressive conduct," and notes that the provisions "say[] nothing about content and do[] not require businesses to block any content for users of any age." Opp'n 15. However, the materials before the Court indicate that the steps a business would need to take to sufficiently estimate the age of child users would likely prevent both children and adults from accessing certain content. *See* Amicus Curiae Br. of Prof. Eric Goldman ("Goldman Am. Br.") 4–7 (explaining that age assurance methods create time delays and other barriers to entry that studies show cause users to navigate away from pages), ECF 34-1; Amicus Curiae Br. of New York Times Co. & Student Press Law Ctr. ("NYT Am. Br.") 6 (stating age-based regulations would "almost certain[ly] [cause] news organizations and others [to] take steps to prevent those under the age of 18 from accessing online news content, features, or services"), ECF 56-1. The age estimation and privacy provisions thus appear likely to impede the "availability and use" of information and accordingly to regulate speech. *Sorrell*, 564 U.S. at 570–71.

The Court is keenly aware of the myriad harms that may befall children on the internet, and it does not seek to undermine the government's efforts to resolve internet-based "issues with respect to personal privacy and . . . dignity." *See Sorrell*, 564 U.S. at 579; Def.'s Suppl. Br. 1 ("[T]he 'serious and unresolved issues' raised by increased data collection capacity due to technological advances remained largely unaddressed [in *Sorrell*]."). However, the Court is troubled by the CAADCA's clear targeting of certain speakers—*i.e.*, a segment of for-profit entities, but not governmental or non-profit entities—that the Act would prevent from collecting and using the information at issue. As the Supreme Court noted in *Sorrell*, the State's arguments about the broad protections engendered by a challenged law are weakened by the law's application to a narrow set of speakers. *See Sorrell*, 564 U.S. at 580 ("Privacy is a concept too integral to the person and a right too essential to freedom to allow its manipulation to support just those ideas the government prefers").

For the foregoing reasons, the Court finds that NetChoice is likely to succeed in showing that the CAADCA's prohibitions and mandates regulate speech, so that the Act triggers First

Amendment scrutiny.

**c. The Type of Speech Regulated by the CAADCA**

Because the Court has found the CAADCA likely regulates protected speech, it must now determine what type of speech is at issue in order to apply the appropriate level of scrutiny. As described above, *see* Part III(A)(1)(a), strict scrutiny applies to a law regulating non-commercial speech in a content-based manner, meaning the law "target[s] speech based on its communicative content." *Reed*, 576 U.S. at 163. To survive strict scrutiny, the "the Government [must] prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 171. A content-neutral regulation of non-commercial speech, on the other hand, "is constitutional as long as it withstands intermediate scrutiny—i.e., if: (1) 'it furthers an important or substantial government interest'; (2) 'the governmental interest is unrelated to the suppression of free expression'; and (3) 'the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'" *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 434 (9th Cir. 2008) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 661–62 (1994)). And if the speech at issue is commercial, courts apply intermediate scrutiny under the four-part test articulated by the Supreme Court in *Central Hudson*, which the Ninth Circuit has described as follows:

> (1) [I]f "the communication is neither misleading nor related to unlawful activity," then it merits First Amendment scrutiny as a threshold matter; [and] in order for the restriction to withstand such scrutiny, (2) "[t]he State must assert a substantial interest to be achieved by restrictions on commercial speech;" (3) "the restriction must directly advance the state interest involved;" and (4) it must not be "more extensive than is necessary to serve that interest."

*Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 903 (9th Cir. 2009) (quoting *Cent. Hudson*, 447 U.S. at 564–66); *see also Junior Sports Mags. Inc. v. Bonta*, --- F.4th ----, 2023 WL 5945879, at *4 (9th Cir. Sept. 13, 2023).

NetChoice argues that the CAADCA regulates non-commercial speech because the speech at issue goes beyond proposing a commercial transaction, Reply 10, and that the speech is "content-based in many obvious respects" because its "very premise [is] that providers must prioritize content that promotes the 'well-being' of minors," Mot. 19. Accordingly, NetChoice

contends that the Act is subject to strict scrutiny. *See* Mot. 19–21; Reply 9–10. The State counters that any protected expression regulated by the Act is at most commercial speech, so that the Act is subject to the lower level of scrutiny described in *Central Hudson*. Opp'n 19. The State argues that the Act affects how businesses persuade consumers to engage with their products—such as by posting policies that aid consumers in deciding whether to engage with certain products—and that consumer engagement in turn drives the regulated businesses' revenue. *Id.* Based on this revenue model, the State concludes that "there can be no doubt that regulated businesses have 'an economic motive for engaging in the [alleged] speech' with regard to the specific products—services likely to be accessed by children—that the Act regulates." *Id.* (quoting *Am. Acad. of Pain Mgmt.*, 353 F.3d at 1106).

Based on the record before it, the Court finds it difficult to determine whether the Act regulates only commercial speech. NetChoice argues in fairly conclusory fashion that the Act "regulates speech that does far more than 'propose a commercial transaction'" and that the for-profit nature of a website "does not render [its] content commercial speech" because many covered businesses rely on advertisements to support the expressive content and services they provide. Reply 10; *see* Mot. 2, 19–21. NetChoice provides some support for the latter argument. *See, e.g.*, Roin Decl. ¶ 10 (stating that the Goodreads application earns the vast majority of its revenue from advertising, including personalized advertisements targeted to registered users). However, the Court notes that some sections of the CAADCA, such as those prohibiting the sale of personal information, *see generally* CAADCA § 31(b), may well be analyzed as regulating only commercial speech. *See, e.g.*, *Hunt v. City of Los Angeles*, 638 F.3d 703, 715–16 (9th Cir. 2011) (finding speech commercial because it was "directed to their products and why a consumer should buy them" and not "inextricably intertwined" with non-commercial speech). Ultimately, the Court finds that NetChoice has not provided sufficient material to demonstrate that it is likely to succeed in showing that the Act regulates either purely non-commercial speech or non-commercial speech that is inextricably intertwined with commercial speech. It is NetChoice's burden to make that showing in order to trigger application of strict scrutiny. *See, e.g.*, *Yim*, 63 F.4th at 793 ("The parties on appeal dispute whether the Ordinance regulates commercial speech and calls for the

application of intermediate scrutiny, or whether the Ordinance regulates [content-based] non-commercial speech and is subject to strict scrutiny review.").

However, as the Ninth Circuit reasoned in *Yim*, the Court "need not decide that question, . . . because [it] conclude[s] that the [Act] does not survive the intermediate scrutiny standard of review" for commercial speech. *Id.*; *see also Junior Sports Mags.*, 2023 WL 5945879, at *4 ("We need not decide this issue because 'the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied.'") (quoting *Sorrell*, 564 U.S. at 571). Accordingly, the Court will assume for the purposes of the present motion that only the lesser standard of intermediate scrutiny for commercial speech applies because, as shown below, the outcome of the analysis here is not affected by the Act's evaluation under the lower standard of commercial speech scrutiny.

#### d. Application of Commercial Speech Scrutiny to the CAADCA

Under the standard for commercial speech scrutiny, if the regulation restricts speech that is neither misleading nor related to unlawful activity, it is the State's burden to show "at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." *Sorrell*, 564 U.S. at 572 (citations omitted); *Junior Sports Mags.*, 2023 WL 5945879, at *5 ("Under *Central Hudson*, a state seeking to justify a restriction on commercial speech bears the burden to prove that its law directly advances that [substantial] interest to a material degree."). That is, "the restriction must directly advance the state interest involved," and it must not be "more extensive than is necessary to serve that interest." *Cent. Hudson*, 447 U.S. at 66. These "last two steps of the *Central Hudson* analysis basically involve a consideration of the fit between the legislature's ends and the means chosen to accomplish those ends." *Hunt*, 638 F.3d at 717 (quoting *Rubin*, 514 U.S. at 786) (internal quotation marks omitted). The government need not employ the least restrictive means to advance its interest, but the means employed may not be "substantially excessive." *Id.* (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 479 (1989)).

##### i. Substantial State Interest

There is no dispute that the CAADCA regulates speech that is neither misleading nor



United States District Court
Northern District of California

related to unlawful activity. The Court thus turns directly to the question of whether the State can show a substantial state interest to which the CAADCA is geared. The State asserts a substantial[4] interest in "protecting the physical, mental, and emotional health and well-being of minors." Def.'s Suppl. Br. 1–2; *see also* Opp'n 20 (describing substantial state interest in "“safeguarding the physical and psychological well-being of a minor"); Tr. 71:6–13 (accord); *id.* at 74:25–75:3 ("[T]he government has a compelling interest [in] the nature of online space for children."). NetChoice does not dispute that "the well-being of children is a compelling interest in the abstract," but argues that the CAADCA does not identify a sufficiently concrete harm that the law addresses. Mot. 21–22. However, the State has presented evidence that children are currently harmed by lax data and privacy protections online. *See* Radesky Decl. ¶¶ 45–47 (privacy settings often allow unwanted contact), ¶¶ 64–68 (profiling leads to children being targeted with ads for monetization and extreme dieting). In light of this evidence, and given that the Supreme Court has repeatedly recognized a compelling interest in "protecting the physical and psychological well-being of minors," the Court finds that NetChoice is not likely to show that the State has not satisfied its burden of showing a substantial interest under the commercial speech scrutiny standard. *Sable Comm'cns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989); *see also New York v. Ferber*, 458 U.S. 747, 756 (1982) ("It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'") (quoting *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 607 (1982)).

**ii. Means-Ends Fit**

After the State shows a substantial interest, the Court evaluates the commercial speech regulation under the last two prongs of the *Central Hudson* analysis, *i.e.*, whether the "restriction . . . directly advance[s] the state interest involved" and whether it is not "more extensive than is necessary to serve that interest." *Metro Lights, L.L.C.*, 551 F.3d at 903 (quoting *Cent. Hudson*, 447 U.S. at 564–66). As noted above, the "last two steps of the *Central Hudson* analysis basically

---

[4] Because the State argues that the CAADCA satisfies both strict scrutiny and commercial speech scrutiny, it occasionally describes its interest as "compelling," rather than "substantial." *See, e.g.*, Opp'n 19–20. The Court treats those arguments as supporting the State's position that it has a substantial state interest as required by the commercial speech scrutiny standard.

involve a consideration of the fit between the legislature's ends and the means chosen to accomplish those ends." *Hunt*, 638 F.3d at 717 (citation omitted). Once again, it is the State's burden to show that the statute satisfies the standards set forth by *Central Hudson*. *Junior Sports Mags.*, 2023 WL 5945879, at *4 (citations omitted); *see also Sorrell*, 564 U.S. at 572.

NetChoice argues that certain provisions of the CAADCA—namely, CAADCA §§ 31(a)(1)–(7), 31(a)(9), 31(b)(1)–(4), and 31(b)(7)—fail commercial speech scrutiny, and that the entire statute must be enjoined because the invalid provisions are not severable from the otherwise valid remainder.[5] *See* Pl.'s Suppl. Br. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Suppl. Br."), ECF 71, at 2–7. The State argues that all of the mandates and prohibitions of the CAADCA satisfy commercial speech scrutiny because each provision is appropriately tailored to the State's substantial interest in protecting the physical, mental, and emotional health and well-being of minors. *See* Def.'s Suppl. Br. 2–7. The Court will first address whether the specific provisions of the Act challenged by NetChoice survive commercial speech scrutiny before turning to the issue of severability.

(1) <u>DPIA Report Requirement (CAADCA § 31(a)(1)-(4))</u>

The State contends that the CAADCA's DPIA report requirement furthers its substantial interest in protecting children's safety because the provisions will cause covered businesses to proactively assess "how their products use children's data and whether their data management practices or product designs pose risks to children," so that "fewer children will be subject to preventable harms." Def.'s Suppl. Br. 2–3. According to the State's expert, "[c]hildren's digital risks and opportunity are shaped by the *design* of digital products, services, and features," and businesses currently take a reactive approach by removing problematic features only after harm is discovered. *See* Radesky Decl. ¶ 40 (emphasis added). For example, the mobile application Snapchat ended the use of a speed filter after the feature was linked to dangerous incidents of reckless driving by adolescents. *Id.* ¶ 41.

[5] The Court refers to those portions of the Act not challenged by NetChoice as a "valid remainder" for the purposes of its decision on the motion for preliminary injunction, but does not intend to suggest it has conducted an analysis and found those unchallenged provisions to be legally valid.

United States District Court
Northern District of California

Accepting the State's statement of the harm it seeks to cure, the Court concludes that the State has not met its burden to demonstrate that the DPIA provisions in fact address the identified harm. For example, the Act does not require covered businesses to assess the potential harm of product *designs*—which Dr. Radesky asserts cause the harm at issue—but rather of "the risks of material detriment to children that arise from the *data management practices* of the business." CAADCA § 31(a)(1)(B) (emphasis added). And more importantly, although the CAADCA requires businesses to "create a timed plan to mitigate or eliminate the risk before the online service, product, or feature is accessed by children," *id.* § 31(a)(2), there is no actual requirement to adhere to such a plan. *See generally id.* § 31(a)(1)-(4); *see also* Tr. 26:9–10 ("As long as you write the plan, there is no way to be in violation."), ECF 66.

"A restriction 'directly and materially advances' the government's interests if the government can show 'the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'" *Yim*, 63 F.4th at 794 (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 626 (1995)). Because the DPIA report provisions do not require businesses to assess the potential harm of the design of digital products, services, and features, and also do not require actual mitigation of any identified risks, the State has not shown that these provisions will "in fact alleviate [the identified harms] to a material degree." *Id.* The Court accordingly finds that NetChoice is likely to succeed in showing that the DPIA report provisions provide "only ineffective or remote support for the government's purpose" and do not "directly advance" the government's substantial interest in promoting a proactive approach to the design of digital products, services, and feature. *Id.* (citations omitted). NetChoice is therefore likely to succeed in showing that the DPIA report requirement does not satisfy commercial speech scrutiny. *See Junior Sports Mags.*, 2023 WL 5945879, at *4 ("Because California fails to satisfy its burden to justify the proposed speech restriction, [Plaintiff] is likely to prevail on the merits of its First Amendment claim.").

(2) <u>Age Estimation (CAADCA § 31(a)(5))</u>

The CAADCA requires that covered businesses "[e]stimate the age of child users with a reasonable level of certainty appropriate to the risks that arise from the data management practices

of the business or apply the privacy and data protections afforded to children to all consumers." CAADCA § 31(a)(5). The State argues that CAADCA § 31(a)(5) promotes the well-being of children by requiring covered businesses to "provide data and privacy protections to users based on estimated age or, if the business does not estimate age, apply child-appropriate data and privacy protections to all users."[6] Def.'s Suppl. Br. 3. This argument relies on the state legislature's finding that greater data privacy "necessarily means greater security and well-being." *Id.* (quoting AB 2273 § 1(a)(4)). NetChoice counters that the age estimation provision does not directly advance the State's substantial interest in children's well-being because the practical process of such estimation involves further information collection that is itself invasive. *See* Reply 5–6; Goldman Am. Br. 2–4.

As described above, for the Act to survive commercial speech scrutiny, the State must show that the CAADCA's challenged provisions directly advance a substantial government interest by materially alleviating real harms. *See Yim*, 63 F.4th at 794; *Junior Sports Mags.*, 2023 WL 5945879, at *5. Based on the materials before the Court, the CAADCA's age estimation provision appears not only unlikely to materially alleviate the harm of insufficient data and privacy protections for children, but actually likely to exacerbate the problem by inducing covered businesses to require consumers, including children, to divulge additional personal information. The State argues that age estimation is distinct from the more onerous exercise of age verification, that the statute requires only a level of estimation that is appropriate to the risk presented by a business's data management practices, and that there are "minimally invasive" age estimation tools, some of which are already used by NetChoice's member companies. *See* Opp'n 15–16. But even the evidence cited by the State about the supposedly minimally invasive tools indicates that consumers might have to permit a face scan, or that businesses might use "locally-analyzed and stored biometric information" to signal whether the user is a child or not. *See id.* at 16 (citing

---

[6] The Court notes that the age estimation provision does not itself require any specific protections; the required data and privacy protections for either minors (if the business estimates age) or all users (if the business does not estimate age) are set forth in the remainder of the statute, and especially at CAADCA §§ 31(b)(1)–(8).

United States District Court
Northern District of California

Radesky Decl. ¶ 96); *see also* Radesky Decl. ¶ 96(b) & n.92 (noting Google's use of facial age-estimation software),[7] ¶ 96(d) (noting businesses receive signals from hardware devices based on "locally-analyzed and stored biometric information" that indicate whether a user is a child). Further, as noted in Professor Goldman's amicus brief, age estimation is in practice quite similar to age verification, and—unless a company relies on user self-reporting of age, which provides little reliability—generally requires either documentary evidence of age or automated estimation based on facial recognition. *See* Goldman Am. Br. 3–4. Such measures would appear to counter the State's interest in increasing privacy protections for children. For these reasons, the State has not met its burden under *Central Hudson* and thus NetChoice is likely to succeed in showing that the age estimation clause does not satisfy commercial speech scrutiny. *See Yim*, 63 F.4th at 794 ("[A] statute cannot meaningfully advance the government's stated interests if it contains exceptions that 'undermine and counteract' those goals.") (quoting *Rubin*, 514 U.S. at 489).

If a business does not estimate age, it must "apply the privacy and data protections afforded to children to all consumers." CAADCA § 31(a)(5). Doing so would clearly advance the government's interest in increasing data and privacy protections for children. NetChoice argues, however, that the effect of this requirement would be to restrain a great deal of protected speech. *See* Mot. 13–14, Reply 12. The Court is indeed concerned with the potentially vast chilling effect of the CAADCA generally, and the age estimation provision specifically. The State argues that the CAADCA does not prevent any specific content from being displayed to a consumer, even if the consumer is a minor; it only prohibits a business from profiling a minor and using that information to provide targeted content. *See, e.g.*, Opp'n 16. Yet the State does not deny that the end goal of the CAADCA is to reduce the amount of harmful content displayed to children. *See id.* ("[T]he Act prevents businesses from attempting to increase their profits by using children's data to deliver them things they do not want and have not asked for, such as ads for weight loss supplements and content promoting violence and self-harm."); Def.'s Suppl. Br. 6 ("Children are

---

[7] Although Dr. Radesky states that Google's current system involves facial recognition only by adults who have been placed in "child mode" through a machine-learning analysis, Radesky Decl. ¶ 96(b), there is nothing to suggest that companies would not request all consumers to undergo such a process.

unable to avoid harmful unsolicited content—including extreme weight loss content and gambling and sports betting ads—directed at them based on businesses' data collection and use practices.").

Putting aside for the moment the issue of whether the government may shield children from such content—and the Court does not question that the content is in fact harmful—the Court here focuses on the logical conclusion that data and privacy protections intended to shield children from harmful content, if applied to adults, will also shield adults from that same content. That is, if a business chooses not to estimate age but instead to apply broad privacy and data protections to all consumers, it appears that the inevitable effect will be to impermissibly "reduce the adult population … to reading only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 381, 383 (1957). And because such an effect would likely be, at the very least, a "substantially excessive" means of achieving greater data and privacy protections for children, *see Hunt*, 638 F.3d at 717 (citation omitted), NetChoice is likely to succeed in showing that the provision's clause applying the same process to all users fails commercial speech scrutiny.

For these reasons, even accepting the increasing of children's data and privacy protections as a substantial governmental interest, the Court finds that the State has failed to satisfy its burden to justify the age estimation provision as directly advancing the State's substantial interest in protecting the physical, mental, and emotional health and well-being of minors, so that NetChoice is likely to succeed in arguing that the provision fails commercial speech scrutiny. *See Junior Sports Mags.*, 2023 WL 5945879, at *4.

(3) High Default Privacy Settings (CAADCA § 31(a)(6))

CAADCA § 31(a)(6) requires covered businesses to "[c]onfigure all default privacy settings provided to children . . . to settings that offer a high level of privacy, unless the business can demonstrate a compelling reason that a different setting is in the best interests of children." The State argues that high privacy settings "demonstrably keep children safe." Def.'s Suppl. Br. 3–4 (citing Radesky Decl. ¶¶ 57–60). The evidence before the Court indicates that lower default privacy settings may quickly lead to individuals perceived as adolescents "receiv[ing] direct messages from accounts they did not follow, including being added to group chats with strangers and contacts from marketers of detrimental material such as pornography and diet products."

Radesky Decl. ¶ 59. Accordingly, the Court finds that the State is likely to establish a real harm, as required under commercial speech scrutiny. *See Yim*, 63 F.4th at 794.

The instant provision, however, does not make clear whether it applies only to privacy settings on accounts created by children—which is the harm discussed in the State's materials, *see, e.g.*, Radesky Decl. ¶ 59—or if it applies, for example, to any child visitor of an online website run by a covered business. NetChoice has provided evidence that uncertainties as to the nature of the compliance required by the CAADCA is likely to cause at least some covered businesses to prohibit children from accessing their services and products altogether. *See, e.g.*, NYT Am. Br. 5–6 (asserting CAADCA requirements that covered businesses consider various potential harms to children would make it "almost certain that news organizations and others will take steps to prevent those under the age of 18 from accessing online news content, features, or services"). Although the State need not show that the Act "employs . . . the least restrictive means" of advancing the substantial interest, the Court finds it likely, based on the evidence provided by NetChoice and the lack of clarity in the provision, that the provision here would serve to chill a "substantially excessive" amount of protected speech to the extent that content providers wish to reach children but choose not to in order to avoid running afoul of the CAADCA. *See Hunt*, 638 F.3d at 717 (citation omitted). Accordingly, the State has not met its burden under *Central Hudson* of showing "a reasonable fit between the means and ends of the regulatory scheme," *Junior Sports Mags.*, 2023 WL 5945879, at *7 (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 561 (2001)), so that NetChoice is likely to succeed in showing the restriction fails commercial speech scrutiny.

(4) Age-Appropriate Policy Language (CAADCA § 31(a)(7))

The CAADCA next requires covered businesses to "[p]rovide any privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children likely to access that online service, product, or feature." CAADCA § 31(a)(7). The State argues this provision "protects the safety and well-being of minors" by "giving children the tools to make informed decisions about the services with which they interact." Def.'s Suppl. Br. 4.

United States District Court
Northern District of California

The evidence submitted by the State indicates that the harm it seeks to address is a lack of consumer understanding of websites' privacy policies. *See id.* (citing Egelman Decl.); *see also* Egelman Decl. ¶ 52. The State has shown that internet users generally do not read privacy policies, and that the reason may be that such policies are often "written at the college level and therefore may not be understood by a significant proportion of the population (much less children)." Egelman Decl. ¶ 27; *see id.* ¶ 24. The Court notes that the research-based claims in Dr. Egelman's declaration do not appear to be based on studies involving minors and the impact of policy language on their use of online services. *See id.* at, *e.g.*, ¶¶ 18–19, 24–27, 52.

Even accepting that the manner in which websites present "privacy information, terms of service, policies, and community standards," CAADCA § 31(a)(7), constitutes a real harm to children's well-being because it deters children from implementing higher privacy settings, the State has not shown that the CAADCA's policy language provision would directly advance a solution to that harm. The State points only to a sentence in Dr. Egelman's declaration stating that he "believe[s] the [Act] addresses this issue [of lack of consumer understanding of privacy policies] by requiring the language to be understandable by target audiences (when their online services are likely to be accessed by children)." Egelman Decl. ¶ 52; *see* Def.'s Suppl. Br. 4 (citing same). Nothing in the State's materials indicates that the policy language provision would materially alleviate a harm to minors caused by current privacy policy language, let alone by the terms of service and community standards that the provision also encompasses. NetChoice is therefore likely to succeed in showing that the provision fails commercial speech scrutiny. *See Yim*, 63 F.4th at 794.

(5) <u>Internal Policy Enforcement (CAADCA § 31(a)(9))</u>

CAADCA § 31(a)(9) requires covered businesses to "[e]nforce published terms, policies, and community standards established by the business, including, but not limited to, privacy policies and those concerning children." As an initial matter, although the State argues that "businesses have to be accountable for the commitments they make to [] consumers" for "children and parents to make informed decisions about the products children access," Def.'s Suppl. Br. 5, the State fails to establish a concrete harm. The State points to Dr. Radesky's declaration, which

United States District Court
Northern District of California

asserts that "[s]tudies have shown that businesses are not enforcing their privacy policies," "mak[ing] it challenging for consumers to make informed decisions about whether they want to join different online communities [without] knowing whether stated policies and standards will be followed." Radesky Decl. ¶ 93; *see* Def.'s Suppl. Br. 5. The State has not provided anything remotely nearing a causal link between whether a business consistently follows its "published terms, policies, and community standards"—or even children's difficulty in making better-informed decisions about whether to use online services—and some harm to children's well-being. On this basis alone, NetChoice is likely to succeed in showing that the policy enforcement provision fails commercial speech scrutiny. *See Yim*, 63 F.4th at 794 (noting the government must show that "the harms it recites are real") (citation omitted).

Further, even if the State is able to show a concrete harm to children's well-being, the provision on its face goes beyond enforcement of policies related to children, or even privacy policies generally. *See* CAADCA § 31(a)(9) (requiring enforcement of terms "including, but not limited to, privacy policies and those concerning children"). The lack of any attempt at tailoring the proposed solution to a specific harm suggests that the State here seeks to force covered businesses to exercise their editorial judgment in permitting or prohibiting content that may, for instance, violate a company's published community standards. The State argues that businesses have complete discretion to set whatever policies they wish, and must merely commit to following them. *See* Opp'n 14; Def.'s Suppl. Br. 5. It is that required commitment, however, that flies in the face of a platform's First Amendment right to choose in any given instance to permit one post but prohibit a substantially similar one. *See NetChoice v. Fla.*, 34 F.4th at 1204–05, 1228 (finding content moderation restrictions impinged on business's protected curation of content).

Lastly, the Court is not persuaded by the State's argument that the provision is necessary because there is currently "no law holding online businesses accountable for enforcing their own policies," Def.'s Suppl. Br. 5, as the State itself cites to a Ninth Circuit case permitting a lawsuit to proceed where the plaintiff brought a breach of contract suit against an online platform for failure to adhere to its terms. *See id.*; *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1108–09 (9th Cir. 2009).

For the multiplicity of reasons described above, Court finds that the State has not met its

burden of justifying the policy enforcement provision, and that NetChoice is therefore likely to succeed in showing that the provision fails commercial speech scrutiny.

(6) Knowingly Harmful Use of Children's Data (CAADCA § 31(b)(1))

As previously noted, CAADCA § 31(a) contains the Act's mandates, and CAADCA § 31(b) enumerates its prohibitions. The first of these prohibitions forbids a covered business from "[using] the personal information of any child in a way that the business knows, or has reason to know, is materially detrimental to the physical health, mental health, or well-being of a child." CAADCA § 31(b)(1).

The Third Circuit's decision in *ACLU v. Mukasey* is instructive here. In *Mukasey*, which went up to the Supreme Court twice and was finally decided by the Court of Appeals, the court held that a law prohibiting the transmission of "material that is harmful to minors" was not narrowly tailored because it required evaluation of a wide range of material that was not in fact harmful, and because the law's definition of a "minor" as anyone under 17 years of age would cause "great uncertainty in deciding what minor could be exposed to" the material. *ACLU v. Mukasey*, 534 F.3d 181, 191, 193 (3d Cir. 2008) (cert. denied). The Third Circuit also rejected the government's affirmative defense that regulated companies could use age verification techniques to achieve greater certainty as to what material was prohibited to a given user. *Id.* at 196–97.

The CAADCA does not define what uses of information may be considered "materially detrimental" to a child's well-being, and it defines a "child" as a consumer under 18 years of age. *See* CAADCA § 30. Although there may be some uses of personal information that are objectively detrimental to children of any age, the CAADCA appears generally to contemplate a sliding scale of potential harms to children as they age. *See, e.g.*, Def.'s Suppl. Br. 3, 4 (describing Act's requirements for "age-appropriate" protections). But as the Third Circuit explained, requiring covered businesses to determine what is materially harmful to an "infant, a five-year old, or a person just shy of age seventeen" is not narrowly tailored. *Mukasey*, 534 F.3d at 191. Although the law in *Mukasey* was evaluated under a strict scrutiny standard, the Court finds the same concerns apply here, so that the State has not met its burden of showing the instant provision is reasonably tailored to the State's substantial interest, and thus NetChoice is likely to

succeed in showing that the provision fails commercial speech scrutiny. NetChoice has provided evidence that covered businesses might well bar all children from accessing their online services rather than undergo the burden of determining exactly what can be done with the personal information of each consumer under the age of 18. *See, e.g.*, NYT Am. Br. 5–6 (asserting CAADCA requirements that covered businesses consider various potential harms to children would make it "almost certain that news organizations and others will take steps to prevent those under the age of 18 from accessing online news content, features, or services"). The provision at issue would likely "burden substantially more speech than is necessary to further the government's legitimate interests," and therefore NetChoice is likely to succeed in demonstrating that it fails commercial speech scrutiny. *See Yim*, 63 F.4th at 795–96 (quoting *Fox*, 492 U.S. at 478).

(7) <u>Profiling Children by Default (CAADCA § 31(b)(2))</u>

CAADCA § 31(b)(2) prevents a covered business from "[p]rofil[ing] a child by default unless" (1) the business "can demonstrate it has appropriate safeguards in place to protect children" and (2) either of the following conditions is met: (a) the profiling is "necessary to provide the online service, product, or feature requested and only with respect to the aspects of the online service, product, or feature with which the child is actively engaged" or (b) the business can "demonstrate a compelling reason that profiling is in the best interests of children." The State argues this provision protects children's well-being because businesses commonly profile children by default and place them into target audience categories for products related to harmful content such as smoking, gambling, alcohol, or extreme weight loss. Def.'s Suppl. Br. 5–6; Radesky Decl. ¶ 66. The Court accepts the State's assertion of a concrete harm to children's well-being, *i.e.*, the use of profiling to advertise harmful content to children, and turns to the issue of tailoring.

NetChoice has provided evidence indicating that profiling and subsequent targeted content can be beneficial to minors, particularly those in vulnerable populations. For example, LGBTQ+ youth—especially those in more hostile environments who turn to the internet for community and information—may have a more difficult time finding resources regarding their personal health, gender identity, and sexual orientation. *See* Amicus Curiae Br. of Chamber of Progress, IP Justice, & LGBT Tech Inst. ("LGBT Tech Am. Br."), ECF 42-1, at 12–13. Pregnant teenagers are

another group of children who may benefit greatly from access to reproductive health information. *Id.* at 14–15. Even aside from these more vulnerable groups, the internet may provide children—like any other consumer—with information that may lead to fulfilling new interests that the consumer may not have otherwise thought to search out. The provision at issue appears likely to discard these beneficial aspects of targeted information along with harmful content such as smoking, gambling, alcohol, or extreme weight loss.

The State argues that the provision is narrowly tailored to "prohibit[] profiling by default when done solely for the benefit of businesses, but allows it . . . when in the best interest of children." Def.'s Suppl. Br. 6. But as amici point out, what is "in the best interest of children" is not an objective standard but rather a contentious topic of political debate. *See* LGBT Tech Am. Br. 11–14. The State further argues that children can still access any content online, such as by "actively telling a business what they want to see in a recommendations profile – e.g., nature, dance videos, LGBTQ+ supportive content, body positivity content, racial justice content, etc." Radesky Decl. ¶ 89(b). By making this assertion, the State acknowledges that there are wanted or beneficial profile interests, but that the Act, rather than prohibiting only certain targeted information deemed harmful (which would also face First Amendment concerns), seeks to prohibit likely beneficial profiling as well. NetChoice's evidence, which indicates that the provision would likely prevent the dissemination of a broad array of content beyond that which is targeted by the statute, defeats the State's showing on tailoring, and the Court accordingly finds that State has not met its burden of establishing that the profiling provision directly advances the State's interest in protecting children's well-being. NetChoice is therefore likely to succeed in showing that the provision does not satisfy commercial speech scrutiny. *See Yim*, 63 F.4th at 794 (noting regulation that burdens substantially more speech than is necessary or undermines and counteracts the state's interest fails commercial speech scrutiny).

(8) Restriction on Collecting, Selling, Sharing, and Retaining Children's Data (CAADCA § 31(b)(3))

CAADCA § 31(b)(3) states that a covered business shall not "[c]ollect, sell, share, or retain any personal information that is not necessary to provide an online service, product, or feature

United States District Court
Northern District of California

with which a child is actively and knowingly engaged . . . unless the business can demonstrate a compelling reason that [such an action] is in the best interests of children likely to access the online service, product, or feature." The State argues that "[e]xcessive data collection and use undoubtedly harms children" because children are "unable to avoid harmful unsolicited content—including extreme weight loss content and gambling and sports betting ads—directed at them" due to the data collection. Def.'s Suppl. Br. 6. As with the previous provision prohibiting profiling, this restriction throws out the baby with the bathwater. In seeking to prevent children from being exposed to "harmful unsolicited content," the Act would restrict neutral or beneficial content, rendering the restriction poorly tailored to the State's goal of protecting children's well-being. And—in light of the State's admission that it seeks to prevent children from consuming particular content—the Court emphasizes that the compelling and laudable goal of protecting children does not permit the government to shield children from harmful content by enacting greatly overinclusive or underinclusive legislation. *See, e.g.*, *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802–04 (2011) (holding California law prohibiting sale or rental of violent video games to minors failed strict scrutiny). For the same reasons described above, *see supra*, at Part III(A)(1)(a)(iv)(9), CAADCA § 31(b)(3) NetChoice is likely to succeed in showing the provision fails commercial speech scrutiny.

(9) <u>Unauthorized Use of Children's Personal Information (CAADCA § 31(b)(4))</u>

CAADCA § 31(b)(4) prohibits a covered business from using a child's "personal information for any reason other than a reason for which that personal information was collected, unless the business can demonstrate a compelling reason that use of the personal information is in the best interests of children." The State clarifies this fairly circular restriction with an example: "a business that uses a child's IP address solely to provide access to its platform cannot also use the IP address to sell ads." Def.'s Suppl. Br. 6. However, the State provides no evidence of a harm to children's well-being from the use of personal information for multiple purposes. *See id.* To the extent the harm is the same profiling concern discussed in the prior two sections, the State has not met its burden to show that the instant provision is not similarly overbroad. *See supra*, at

Parts III(A)(1)(a)(iv)(7)–(8). Because the State has not established a real harm that the provision materially alleviates, NetChoice will likely succeed in showing that the provision fails commercial speech scrutiny. *See Yim*, 63 F.4th at 794.

(10) Use of Dark Patterns (CAADCA § 31(b)(7))

The last CAADCA provision challenged by NetChoice prohibits the "[u]se [of] dark patterns to lead or encourage children to provide personal information beyond what is reasonably expected to provide that online service, product, or feature[,] to forego privacy protections, or to take any action that the business knows, or has reason to know, is materially detrimental to the child's physical health, mental health, or well-being." CAADCA § 31(b)(7). Dark patterns are design features that "nudge" individuals into making certain decisions, such as spending more time on an application. Def.'s Suppl. Br 7; *see also* Opp'n 9 (describing dark patterns as "interfaces designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision-making, or choice"); Radesky Decl. ¶ 54 ("[D]esign features that manipulate or nudge the user in a way that meets the technology developer's best interests – at the expense of the user's interests (i.e., time, money, sleep) – have been termed 'dark patterns.'"). The State argues that businesses use dark patterns to "nudge children into making decisions that are advantageous to businesses," and that "dark patterns can make it difficult or impossible for children to avoid harmful content." Def.'s Suppl. Br. 7. NetChoice contends that the term "dark patterns" has also been "construed by scholars to reach commonplace features that simplify and improve user experience, such as standard 'autoplay' and 'newsfeed' functions that recommend personalized content." Mot. 6 (citation omitted).

The instant provision can be analytically divided into three parts. It first prohibits the use of dark patterns to encourage children to "provide personal information beyond what is reasonably expected to provide that online service, product, or feature." CAADCA § 31(b)(7). This prohibition is similar to the profiling restrictions discussed above in that (1) the State has not shown a harm resulting from the provision of more personal information "beyond what is reasonably expected" for the covered business to provide its online service, product, or feature, and (2) to the extent the harm is the use of profiling information to present harmful content to a

child, the State has not shown that the instant provision is sufficiently tailored to survive commercial speech scrutiny. *See supra*, at Parts III(A)(1)(a)(iv)(7)–(9).

Second, the provision prohibits the use of dark patterns to encourage a child to "forego privacy protections." CAADCA § 31(b)(7). However, the State has not shown that dark patterns causing children to forego privacy protections constitutes a real harm. *See Yim*, 63 F.4th at 794. Many of the examples of dark patterns cited by the State's experts—such as making it easier to sign up for a service than to cancel it or creating artificial scarcity by using a countdown timer, Egelman Decl. ¶ 51, or sending users notifications to reengage with a game or auto-advancing users to the next level in a game, Radesky Decl. ¶ 55—are not causally connected to an identified harm. *See Brown*, 564 U.S. at 799 (finding lack of "direct causal link between violent video games and harm to minors" showed government had not identified "actual problem in need of solving," so that law failed strict scrutiny); *Yim*, 63 F.4th at 794 (noting commercial speech scrutiny requires government to show "the harms it recites are real")

The most concrete potential harm the Court can find is in Dr. Radesky's assertion that "[m]anipulative dark patterns are known to cause monetary harm to children," based on a March 2023 FTC complaint requiring a game developer to pay $245 million "as a penalty for the use of dark patterns to manipulate users into making purchases." Radesky Decl. ¶ 56. The State does not, however, suggest that the CAADCA is an attempt to address monetary harms to children. *See generally* Opp'n; Def.'s Suppl. Br. Similarly, although the State points to an existing federal law limiting the practice of making it inconvenient for users to prevent their data from being sold or shared, *see* Def.'s Suppl. Br. 7 (citing 16 CFR § 312.7), the State does not show how this law indicates a harm to minors caused by the sale of personal information. *See generally id.*; Radesky Decl.; Egelman Decl. To the extent the harm is the use of data to profile users, including children, the State has not shown that the provision is appropriately tailored to survive commercial speech scrutiny for the same reasons described above. *See supra*, at Parts III(A)(1)(a)(iv)(7)–(9). The Court accordingly finds that the State is not likely to show a harm in dark patterns causing children to forego privacy protections, so that NetChoice is likely to succeed in showing that this restriction fails commercial speech scrutiny. *See Junior Sports Mags.*, 2023 WL 5945879, at *7

United States District Court
Northern District of California

(reversing denial of preliminary injunction and reasoning that "[i]n the end, California spins a web of speculation—not facts or evidence—to claim that its restriction on speech will significantly curb" an alleged harm).

The last of the three prohibitions of CAADCA § 31(b)(7) concerns the use of dark patterns to "take any action that the business knows, or has reason to know, is materially detrimental" to a child's well-being. The State here argues that dark patterns cause harm to children's well-being, such as when a child recovering from an eating disorder "must both contend with dark patterns that make it difficult to unsubscribe from such content and attempt to reconfigure their data settings in the hope of preventing unsolicited content of the same nature." Def.'s Suppl. Br. 7; *see also* Amicus Curiae Br. of Fairplay & Public Health Advocacy Inst. ("Fairplay Am. Br.") 4 (noting that CAADCA "seeks to shift the paradigm for protecting children online," including by "ensuring that children are protected from manipulative design (dark patterns), adult content, or other potentially harmful design features.") (citation omitted), ECF 53-1. The Court is troubled by the "has reason to know" language in the Act, given the lack of objective standard regarding what content is materially detrimental to a child's well-being. *See supra*, at Part III(A)(1)(a)(iv)(7). And some content that might be considered harmful to one child may be neutral at worst to another. NetChoice has provided evidence that in the face of such uncertainties about the statute's requirements, the statute may cause covered businesses to deny children access to their platforms or content. *See* NYT Am. Br. 5–6. Given the other infirmities of the provision, the Court declines to wordsmith it and excise various clauses, and accordingly finds that NetChoice is likely to succeed in showing that the provision as a whole fails commercial speech scrutiny.

**iii. Conclusion re Commercial Speech Scrutiny**

For the foregoing reasons, the Court finds that NetChoice is likely to succeed in showing that the CAADCA's challenged mandates and prohibitions fail commercial speech scrutiny and therefore are invalid.

**e. Severability**

NetChoice argues that the CAADCA must be enjoined in its entirety because the challenged provisions of the CAADCA—which are likely invalid—cannot be severed from the

Act's remaining prohibitions and mandates, or from other provisions related to the CAADCA's application, penalties, and compliance. Pl.'s Suppl. Br. 6–7 (discussing CAADCA § 31(a)(8), 31(a)(10), 31(b)(5)–(6), 31(b)(8), 32, 33, and 35). The State argues that almost every provision is severable, and urges the Court to sustain any provisions not found invalid. Def.'s Suppl. Br. 2.

"Severability is a matter of state law." *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1325 (9th Cir. 2015) (quoting *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996)) (alterations omitted). Under California law, the severability of the invalid parts of a statute depends on whether such provisions are grammatically, functionally, and volitionally severable from the valid remainder. *See Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805, 821–22 (1989) (en banc). Putting aside the CAADCA provisions setting forth the statute's title, findings, and definitions, CAADCA §§ 28–30, the valid remainder of the statute involve: restrictions on monitoring children's online behavior and tracking location, CAADCA § 31(a)(8); the provision of responsive tools for children to exercise their privacy rights and report concerns, *id.* § 31(a)(10); the collection of precise geolocation data, *id.* §§ 31(b)(5)–(6); the use of age-estimation information, *id.* § 31(b)(8); the creation of a working group to deliver a report on best practices under the CAADCA, *id.* § 32; the July 1, 2024 deadline for covered businesses to complete DPIA reports, *id.* § 33; and the penalties for violations of the CAADCA, *id.* § 35. *See* Pl.'s Suppl. Br. 6–7.

The Court first notes that there is no severability clause in the CAADCA that would create a presumption in favor of "sustaining the valid part" of the statute. *See Garcia*, 11 F.4th at 1120 (citing *Cal. Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 270 (2011). Turning to the question of functional severability, the Court finds dispositive the status of the DPIA provisions. As noted by NetChoice, the CAADCA provides that the State shall not initiate an action for any violation of the statute without providing written notice to a covered business identifying specific provisions of the Act that are alleged to have been violated. CAADCA § 35(c); *see* Pl.'s Suppl. Br. 7. The Court's determination that NetChoice is likely to succeed in showing that the DPIA report requirement is invalid, *see supra*, at Part III(A)(1)(d)(ii)(1), similarly renders likely invalid a condition precedent for enforcement of the remainder of the statute. Because the CAADCA is not capable of "separate enforcement" without the DPIA requirement, the DPIA provisions are not

functionally severable from the otherwise valid portions of the statute. *People's Advocate, Inc. v. Super. Ct.*, 181 Cal. App. 3d 316, 332 (1986) ("The remaining provisions must stand on their own, unaided by the invalid provisions nor rendered vague by their absence nor inextricably connected to them by policy considerations. They must be capable of separate enforcement.").

Although the Court need not review the severability of any other provision in light of the DPIA report requirement's impact on the entire CAADCA, it notes that the age estimation provision, CAADCA § 31(a)(5), is the linchpin of most of the CAADCA's provisions, which specify various data and privacy protections for children. *See id.* §§ 31(a)(6), (b)(1)–(8). The State concedes only that CAADCA § 31(b)(8)—which prevents the use of personal information collected to estimate age for any other purpose—is rendered obsolete if the age estimation provision is deemed unconstitutional. Def.'s Suppl. Br. 3. However, compliance with the CAADCA's requirements would appear to generally require age estimation to determine whether each user is in fact under 18 years old. The age estimation provision is thus also not functionally severable from the remainder of the statute. *See People's Advocate*, 181 Cal. App. at 1332.

The futility of severance is apparent when one considers the outcome if the Court were to preliminarily enjoin only the challenged provisions that NetChoice has shown are likely violative of the First Amendment. The Act would consist of the provisions setting forth the statute's title, findings, and definitions; two mandates; three prohibitions; and provisions establishing a working group, DPIA report deadlines, and penalties for violating the Act. *See* CAADCA §§ 28–30, 31(a)(8), 31(a)(10), 31(b)(5)–(6), 31(b)(8), 32–33, 35. The DPIA report deadline, *id.* § 33, is meaningless without a DPIA report requirement. Five of the six required recommendations of the working group track provisions of the Act that are likely invalid. *See id.* § 32(d)(1)–(5). Further, even the State agrees that one of the three remaining prohibitions—that on collecting age estimation data, *id.* § 31(b)(8)—"would be made obsolete" in the absence of § 31(a)(5), which NetChoice has shown is likely invalid. Def.'s Suppl. Br. 3. Accordingly, the only meat left of the Act would be four unchallenged mandates and prohibitions that together would require covered businesses to provide children with obvious tracking signals and prominent and responsive tools to exercise their privacy rights, and to refrain from collecting children's precise geolocation data.

*See* CAADCA §§ 31(a)(8), 31(a)(10), 31(b)(5)–(6). All of these provisions require businesses to know their users' ages, but the Court has found NetChoice will likely succeed in showing the age estimation provision does not pass commercial speech scrutiny. And none of the provisions can be enforced without the penalty provision, *id.* § 35, which, as described above, is hamstrung if the State cannot determine whether a covered business is in substantial compliance with the likely-invalid DPIA report requirement. These interdependencies indicate how intertwined with—and thus inseverable from—the challenged provisions are with respect to the valid remainder.

Given that multiple provisions of the CAADCA will be preliminarily enjoined by this order, and the Court's determination that these provisions are not functionally severable from the presumably valid remainder of the statute, the Court concludes that it cannot sever the likely invalid portions from the statute and sustain the remainder. *See Acosta v. City of Costa Mesa*, 718 F.3d 800, 820 (9th Cir. 2013) (refusing to "rewrite[e] the ordinance in order to save it") (internal alterations and citation omitted).

**f. Conclusion re First Amendment Arguments (Claims 1 and 3)**

Based on the foregoing, the Court concludes that NetChoice has demonstrated a likelihood of success on Claim 1, which asserts that the CAADCA violates the First Amendment because the Act's "speech restrictions . . . fail strict scrutiny and also would fail a lesser standard of scrutiny." Compl. ¶ 82. As noted above, *see supra*, at Part III(A)(1), the Court need not and does not here address NetChoice's likelihood of success on its allegations of additional First Amendment violations in Claims 1 and 3.

**2. Other Claims**

NetChoice has demonstrated a likelihood of success on the merits of Claim 1 brought under the First Amendment and, as discussed below, has satisfied the remaining *Winter* factors with respect to Claim 1. NetChoice is entitled to preliminary injunctive relief on that basis. Under these circumstances, the Court must determine whether it is necessary or advisable to address the likelihood of success of NetChoice's other claims for relief at this time: Claim 4, asserting that the CAADCA violates the dormant Commerce Clause; Claim 5, asserting that the CAADCA is preempted by COPPA; and Claim 6, asserting that the CAADCA is preempted by Section 230.

United States District Court
Northern District of California

Once a plaintiff demonstrates that a preliminary injunction is warranted based on the likelihood of success on one claim, district courts in this circuit generally do not consider whether the same injunctive relief could be granted based on other claims. *See, e.g.*, *Shawarma Stackz LLC v. Jwad*, No. 21-CV-01263-BAS-BGS, 2021 WL 5827066, at *19 (S.D. Cal. Dec. 8, 2021) ("The Court need not reach the merits of the remaining state torts claims that SSL raises because the Lanham Act claim and the UCL claim are sufficient to sustain a preliminary injunction."); *Seiko Epson Corp. v. Nelson*, No. 5:21-cv-00320-JWH-SPx, 2021 WL 5033486, at *3 (C.D. Cal. Mar. 31, 2021) ("The Court therefore finds that Plaintiffs have demonstrated a likelihood of success on the merits with respect to their first claim for relief. Plaintiffs have thus satisfied the preliminary injunction standard; the Court need not analyze Plaintiffs' other two claims for relief."); *Faison v. Jones*, 440 F. Supp. 3d 1123, 1136 n.3 (E.D. Cal. 2020) ("Because the Court finds Plaintiffs are likely to succeed on the merits of their viewpoint discrimination theory, the Court need not and does not address Plaintiffs' remaining theories."); *Medina v. Becerra*, No. 3:17-CV-03293 CRB, 2017 WL 5495820, at *12 (N.D. Cal. Nov. 16, 2017) ("As Medina has shown a likelihood of success on the merits for his First Amendment claim, this Court need not address Medina's other claims for relief."). This Court sees no reason to depart from the approach adopted by other district courts in the Ninth Circuit.

Deferring consideration of NetChoice's Commerce Clause claim is particularly appropriate here, because the claim presents thorny constitutional issues that the parties briefed prior to receiving the Supreme Court's latest guidance in *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023).[8] *Ross* provides a comprehensive review of case law on the dormant Commerce Clause, emphasizing that "the Commerce Clause prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors," and clarifying that this "antidiscrimination principle lies at the 'very core' of the Court's dormant Commerce Clause jurisprudence." *Id.*

---

[8] The motion and opposition were filed before *Ross* issued. The reply was filed approximately one week after *Ross* was decided, and *Ross* is cited once therein as secondary authority for an assertion made in the brief. *See* Reply 13.

(quotation marks, alterations, and citation omitted). The decision may call into question the dormant Commerce Clause's application where, as here, the state law at issue does not discriminate against out-of-state competitors but does have an extraterritorial effect. *Ross* observes that "[i]n our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior," and concludes that extraterritorial effects alone are insufficient to implicate the dormant Commerce Clause. *See id.* at 1156–57. In the Court's view, it would be imprudent to engage in an analysis of NetChoice's dormant Commerce Clause claim where such analysis is unnecessary to a ruling on the present motion and the Court does not have the benefit of the parties' views on the impact of *Ross*.

With respect to NetChoice's preemption claims, the Court's initial view is that neither would support the requested preliminary injunction. Claim 5 asserts that the CAADCA is preempted by COPPA, which contains a preemption clause providing, "No State or local government may impose any liability for commercial activities or actions by operators in interstate or foreign commerce in connection with an activity or action described in this chapter that is *inconsistent* with the treatment of those activities or actions under this section." 15 U.S.C.A. § 6502(d) (emphasis added). NetChoice claims that the CAADCA is "inconsistent" with COPPA in the following respects: the CAADCA applies broadly to services "likely to be accessed" by children, whereas COPPA applies only to online services "directed" to children; the CAADCA imposes privacy obligations that are not required by COPPA; and the CAADCA imposes substantive obligations that far exceed those imposed by COPPA. *See id.* ¶¶ 114–16. NetChoice additionally claims that the statutes are inconsistent because the CAADCA prohibits conduct that is permitted under COPPA, including profiling a child by default and using dark patterns to encourage children to provide personal information. *See id.* ¶ 117.

The Ninth Circuit recently held in *Jones v. Google LLC*, 73 F.4th 636, 642 (9th Cir. 2023), that a state law is not "inconsistent" with COPPA for preemption purposes unless the state law contains requirements that contradict those of COPPA or "stand as obstacles to federal objectives" embodied in COPPA. A state law that supplements or requires the same thing as COPPA is not inconsistent with COPPA. *See id.* In the Court's view, it is not clear that the cited provisions of

the CAADCA contradict, rather than supplement, those of COPPA. Nor is it clear that the cited provisions of the CAADCA would stand as an obstacle to enforcement of COPPA. An online provider might well be able to comply with the provisions of both the CAADCA and COPPA, with the possible exception of the CAADCA provisions identified in paragraph 117 of the complaint. However, a determination whether those are inconsistent with COPPA for preemption purposes would require a careful and nuanced analysis. It would make little sense to engage in such analysis at this stage of the proceedings in light of the fact that NetChoice is entitled to the requested injunctive relief based on its First Amendment claims.

Claim 6 asserts that the CAADCA is preempted by Section 230. Section 230 "protects certain internet-based actors from certain kinds of lawsuits." *Barnes*, 570 F.3d at 1099. As relevant here, Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Section 230(c)(2) provides that "[n]o provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be . . . objectionable[.]" 47 U.S.C. § 230(c)(2)(A). NetChoice contends that the CAADCA's requirement that online providers enforce their "published terms, policies, and community standards," CAADCA § 31(a)(9), and restrictions on the use of minors' personal information, CAADCA § 31(b)(1), (3), (4), (7), are inconsistent with Section 230. NetChoice claims that those inconsistencies result in preemption of the CAADCA under § 230(e), which provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). Section 230 may be implicated by an online provider's enforcement of its policies and other acts in compliance with the CAADCA, but it is difficult (if not impossible) to make that determination without knowing what policies or acts are at issue. For that reason, it is the Court's view that a facial challenge to the CAADCA is not the appropriate context in which to consider the applicability of § 230.

Accordingly, the Court need not and does not determine whether NetChoice is likely to succeed on the merits of its claims grounded in the dormant Commerce Clause, COPPA, and

United States District Court
Northern District of California

Section 230. The Court limits its consideration of the remaining *Winter* factors to Claim 1 under the First Amendment, namely, irreparable harm, the balance of equities, and the public interest.

**B. Irreparable Harm**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Baird*, 2023 WL 5763345, at *3. Loss of free speech rights resulting from a threat of enforcement rather than actual enforcement constitutes irreparable harm. *See Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). Consequently, "[i]rreparable harm is relatively easy to establish in a First Amendment case." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019). "[A] party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim." *Id.* (quotation marks and citation omitted). As discussed above, NetChoice has done more than merely assert a colorable First Amendment claim; it has established a likelihood of success on the merits of its claim that the CAADCA violates the First Amendment.

The Court finds unpersuasive the State's argument that the threat of enforcement is insufficient to establish irreparable injury because the Act's challenged provisions do not take effect until July 1, 2024. That date is less than a year away. "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (citation omitted). Moreover, NetChoice presents evidence that businesses already are expending time and funds preparing for enforcement of the CAADCA. *See* Roin Decl. ¶¶ 20, 24–25; Cairella Decl. ¶¶ 14, 19–22; Masnick Decl. ¶¶ 12, 14–19; Paolucci Decl. ¶¶ 16–18; Szabo Decl. ¶¶ 5–7, 12–17. Requiring businesses to proceed with such preparations without knowing whether CAADCA is valid "would impose a palpable and considerable hardship" on them. *See Pac. Gas & Elec.*, 461 U.S. at 201–02 ("To require the industry to proceed without knowing whether the moratorium is valid would impose a palpable and considerable hardship on the utilities[.]").

The Court has no difficulty finding that NetChoice has established a likelihood of

irreparable harm absent issuance of the requested preliminary injunction.

### C. Balance of Equities / Public Interest

"Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940-41 (9th Cir. 2020); *see also Baird*, 2023 WL 5763345, at *2. As discussed above, NetChoice has demonstrated a likelihood of success in proving that the CAADCA violates the First Amendment. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks and citation omitted). Moreover, the State "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983).

The State cites *Maryland v. King*, 567 U.S. 1301, 1303 (2012), for the proposition that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *King* did not involve a motion for preliminary injunction, but rather Maryland's application for a stay of a state appellate court's decision overturning King's rape conviction pending disposition of Maryland's petition for writ of certiorari. *See id*. at 1301. The state appellate court had determined that Maryland's DNA collection statute, which had authorized law enforcement officers to collect King's DNA sample, violated the Fourth Amendment. *See id*. The Supreme Court found that a stay was warranted based on its determination that there was a reasonable probability it would grant certiorari. *See id*. at 1302. It was in that context that the Supreme Court discussed the harm to the State of Maryland flowing from its inability to effectuate its DNA collection statute. *See id*. at 1303. The quoted language has no application here, where (unlike the State of Maryland) the State of California has not made a showing that the challenged statute passes constitutional muster.

The Court finds that NetChoice has established that the last two factors, the balance of equities and the public interest, favor issuance of the requested injunction.

### D. Conclusion

In conclusion, the Court finds that all of the *Winter* factors favor granting the requested

United States District Court
Northern District of California

preliminary injunction. With respect to the first and most important factor, likelihood of success on the merits, NetChoice has demonstrated that it is likely to succeed on at least one of its First Amendment theories set forth in Claim 1 of the complaint. NetChoice also has satisfied the second factor by demonstrating a likelihood that it will suffer irreparable injury if the requested preliminary injunction does not issue. Finally, NetChoice has satisfied the third and fourth factors by showing that the balance of the equities and the public interest favor issuance of the requested preliminary injunction.

"If a movant makes a sufficient demonstration on all four *Winter* factors (three when as here the third and fourth factors are merged), a court must not shrink from its obligation to enforce his constitutional rights, regardless of the constitutional right at issue." *Baird*, 2023 WL 5763345, at *3 (quotation marks, citation, and brackets omitted). "It may not deny a preliminary injunction motion and thereby allow constitutional violations to continue simply because a remedy would involve intrusion into an agency's administration of state law." *Id*. (quotation marks and citation omitted).

NetChoice's motion for preliminary injunction is GRANTED.

**E. Security**

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Ninth Circuit has "recognized that Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (internal quotation marks and citation omitted) (italics in original). Thus, the district court has discretion to dispense with the filing of a bond altogether, or to require only a nominal bond. *See id*. ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."); *see also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("The district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial

review.") (citation omitted).

Neither party addresses the issue of security in its briefing. NetChoice's proposed order, filed with its motion for preliminary injunction, provides that the requested injunctive relief will issue without the requirement of any security bond because NetChoice has shown a likelihood of success and the State will not suffer any harm from maintaining the status quo. *See* Proposed Order, ECF 29-31. The State argues, as a reason to deny injunctive relief altogether, that issuance of the injunction "would inflict irreparable harm upon California by preventing enforcement of a statute enacted by representatives of the people." Opp'n at 30. The State's argument gives no indication, however, whether the State believes a bond should be required in the event a preliminary injunction issues, or the appropriate amount of such bond. *See id.*

The Court finds it appropriate to issue the preliminary injunction without requiring security based on NetChoice's showing that it is likely to prevail on its claim that enforcement of the CAADCA violates the First Amendment—and thus could not be lawfully enforced by the State—and the absence of any argument that a security bond should be required.

//

//

//

United States District Court
Northern District of California

United States District Court
Northern District of California

## IV. ORDER

(1) Plaintiff NetChoice's motion for preliminary injunction is GRANTED as follows:

(a) Rob Bonta, Attorney General of the State of California, and anyone acting in concert with his office are ENJOINED from enforcing the California Age-Appropriate Design Code Act;

(b) This preliminary injunction shall issue without the requirement of a security bond; and

(c) This preliminary injunction shall take effect immediately and shall remain in effect until otherwise ordered by the Court.

(2) This order terminates ECF 29.

Dated: September 18, 2023

BETH LABSON FREEMAN
United States District Judge

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

ROBERT CORN-REVERE (*pro hac vice*)
bob.corn-revere@thefire.org
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, D.C. 20003
Telephone: (215) 717-3473

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

NETCHOICE, LLC d/b/a NetChoice,

Plaintiff,

v.

ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,

Defendant.

Case No. 5:22-cv-08861-BLF

**DECLARATION OF ADAM SIEFF IN SUPPORT OF REPLY FOR MOTION FOR PRELIMINARY INJUNCTION**

Judge: Hon. Beth Labson Freeman
Date: July 27, 2023
Time: 1:30 PM
Dept.: Courtroom 3 – 5th Floor

Action Filed: December 14, 2022



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

I, Adam S. Sieff, declare:

1. I am an attorney at the law firm Davis Wright Tremaine LLP, counsel for Plaintiff NetChoice LLC, d/b/a NetChoice. I make this Declaration from personal knowledge and review of the files and records in this matter.

2. Attached as **Exhibit 1** to this Declaration is a true and correct copy of Concurrence in Senate Amendments to Assembly Bill No. 2273 (Wicks), as amended Aug. 22, 2022.

3. Attached as **Exhibit 2** to this Declaration is a true and correct copy of Senate Judiciary Committee Analysis of Assembly Bill No. 2273 (Wicks) (2021-2022 Reg. Sess.), as introduced Apr. 26, 2022.

4. Attached as **Exhibit 3** to this Declaration is a true and correct copy of a May 3, 2022, letter from Rob Bonta, Attorney General of the State of California to the Honorable Buffy Wicks.

5. Attached as **Exhibit 4** to this Declaration is a true and correct copy of a press release from the Office of the Governor of the State of California, *Governor Newsom Statement on Challenge to California's Child Online Privacy Law* (Feb. 21, 2023), https://www.gov.ca.gov/2023/02/21/governor-newsom-statement-on-challenge-to-californias-child-online-privacy-law/.

6. Attached as **Exhibit 5** to this Declaration is a true and correct copy of Am. Psych. Ass'n, *Health Advisory on Social Media Use in Adolescence* (May 2023).

7. Attached as **Exhibit 6** to this Declaration is a true and correct copy of Aaron Haddock, et al., *Positive Effects of Digital Technology Use by Adolescents: A Scoping Review of the Literature*, Int'l J. Env't Rsch. & Pub. Health (Oct. 27, 2022).

8. Attached as **Exhibit 7** to this Declaration is a true and correct copy of Matti Vuorre, et al., *There Is No Evidence That Associations Between Adolescents' Digital Technology Engagements and Mental Health Problems Have Increased*, Ass'n for Psych. Sci. (2021).


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 19, 2023, in Los Angeles, California.

Adam S. Sieff



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# EXHIBIT 1

CONCURRENCE IN SENATE AMENDMENTS
AB 2273 (Wicks, et al.)
As Amended August 22, 2022
Majority vote

## SUMMARY

Establishes the California Age-Appropriate Design Code Act which generally requires businesses that provide online services, products, or features likely to be accessed by children to comply with specified standards.

**Senate Amendments**

1) Specify the required contents of a data protection impact assessment (DPIA), and clarify that a DPIA must only be completed if an online service, product, or feature is likely to be accessed by children, as defined.

2) Remove the requirement that a DPIA be submitted to a public agency and instead require that a business provide a completed DPIA to the Attorney General (AG) upon request.

3) Exempt DPIAs from the disclosure requirements under the California Public Records Act, and clarify that disclosure of a DPIA to the AG does not waive existing attorney-client or work product privileges.

4) Require the AG to provide written notice to a business in violation of the bill but in substantial compliance with the DPIA requirements of the bill identifying the specific provisions of the bill the AG alleges have been or are being violated before initiating an action to prosecute the violation; and provide that if, within 90 days of the notice, the business cures any noticed violation and provides the AG a written statement that the alleged violations have been cured, and sufficient measures have been taken to prevent future violations, the business shall not be liable for a civil penalty for any violation so cured.

5) Amend the standard of known harm to children that a use of personal information or dark patterns must meet to constitute a violation of the bill from "de minimus" to "materially detrimental."

6) Replace the taskforce created by the bill with a working group, with members appointed by the Governor, Senate, Assembly, California Privacy Protection Agency, and AG, to provide specified recommendations to the Legislature; and require the working group to take input from a broad range of specified stakeholders.

7) Define the term "profiling" to mean any form of automated processing of personal information that uses personal information to evaluate certain aspects relating to a natural person, including analyzing or predicting aspects concerning a natural person's performance at work, economic situation, health, personal preferences, interests, reliability, behavior, location, or movements; and permit a business to profile a child by default only if the business can demonstrate it has appropriate safeguards in place to protect children, and either of the following is true: (a) profiling is necessary to provide the online service, product, or feature requested and only with respect to the aspects of the online service, product, or feature with which the child is actively and knowingly engaged; or (b) the business can demonstrate a compelling reason that profiling is in the best interests of children.

8) Authorize, rather than require, the AG to adopt additional regulations to implement the bill's provisions, as necessary.

9) Clarify the definition of "likely to be accessed by children" by doing both of the following: (a) replacing the reference to "academic or market research" that the service, product, or feature is likely to be accessed by children with "competent and reliable evidence regarding audience composition"; and (b) clarifying that businesses that have advertisements *marketed* to children, rather than businesses that "advertise to children", are within the scope of the bill.

10) Make several technical and clarifying changes.

## COMMENTS

On March 29, 2022, the Privacy and Consumer Protection Committee and the Arts, Entertainment, Sports, Tourism, and Internet Media Committee held an informational hearing entitled, *Protecting Kids Online: Challenges & Opportunities in a Digital World.* Testimony from the hearing indicated that adults, children, and teens alike are frustrated with the effort and expertise it takes to make online experiences safe for children.

As the internet has become more accessible and attractive to children, the government has created some laws to protect children online. Enacted in 1998, the federal Child's Online Privacy Protection Act of 1998 (COPPA), requires the Federal Trade Commission (FTC) to issue and enforce a rule (the Rule) concerning children's online privacy. The FTC notes that:

> The primary goal of COPPA and the Rule is to place parents in control over what information is collected from their young children online. The Rule was designed to protect children under age 13 while accounting for the dynamic nature of the internet. The Rule applies to operators of commercial websites and online services directed to children under 13 that collect, use, or disclose PI from children, and operators of general audience websites or online services with actual knowledge that they are collecting, using, or disclosing PI from children under 13.[1]

In an effort to further protect minors online, California subsequently passed SB 568 (Steinberg), Chapter 336, Statutes of 2013, known as Privacy Rights for California Minors in the Digital World, which prohibits the operator of an internet website or other online service or mobile application from marketing or advertising a product or service to a minor if the minor cannot legally purchase the product or participate in the service in California, or, compiling PI to market those products or services. This prohibition only applies to an operator that has *actual knowledge* that a minor is using its online service or whose site or service is directed to minors. That bill also permits a minor to remove content or information posted to a website or service, as specified.

SB 568 was opposed by the Center for Democracy and Technology, who took issue with the bill's limitation that a website must be *directed to* minors for the provisions of the bill to apply. SB 568, now codified beginning at Business and Professions Code Sec. 22580, provided that a site or service is "directed to minors" if it is "created for the purpose of reaching an audience that

---

[1] FTC: Frequently Asked Questions about the Children's Online Privacy Protection Rule, http://www.ftc.gov/privacy/coppafaqs.shtm, [as of Apr. 2, 2021].)

is *predominantly* composed of minors, and is not intended for a more general audience comprised of adults." (Emphasis added.) The definition adds that a site or service would not be deemed to be "directed at minors" merely because it contained links to sites or services that were directed to minors.

Further protecting the rights of minors, the Legislature enacted the California Consumer Protection Act of 2018 (CCPA; Chau, Chapter 55, Statutes of 2018) which provides various rights to consumers related to the sale of their PI, as defined. Relevant to this bill, the CCPA prohibits any business, as defined, from selling the PI of minors 16 years of age and under, without prior opt-in consent to the sale of the information. For minors between the ages of 13 and 16, the minor can opt-in to the sale of their PI on their own. For minors under 13 years of age, only a parent or guardian may opt-in to the sale of the minor's information. (Civ. Code Sec. 1798.120.)

Notably, the protections for children online largely focus on regulating the collection and sale of children's PI, rather than ensuring that children are protected from manipulative design (dark patterns), adult content, or other potentially harmful design features. In addition, for the most part, the existing laws protecting minors online are only triggered when an online platform has actual knowledge that children are accessing their website. This has incentivized many social media platforms and other online services to ignore the age of their consumers, so that they do not have to adhere to the standards set out in the laws described above.

This bill, modeled after the Age Appropriate Design Code recently enacted in the United Kingdom, seeks to elevate child-centered design in online products and services that are likely to be accessed by children. The bill would additionally require the CPPA to establish a working group to make recommendations to the Legislature concerning best practices for complying with and enforcing the bill's provisions.

This bill would take a different approach to protecting children online than the state and federal laws described above in two distinct ways. First, the bill would require online platforms likely to be accessed by children to turn privacy and safety settings up to a level that is protective of children's mental and physical health and well-being *unless* the online platform can, with an appropriate level of certainty, determine the age of the consumer. In other words, existing law generally permits online platforms to treat all consumers as adults unless there is actual knowledge that the consumer is under 13 years of age. This bill would instead require that websites and other online services likely to be accessed by children offer privacy and safety protections by default, unless there is reasonable certainty that the consumer is an adult.

Amendments taken in the Senate provide greater detail concerning the required content of a DPIA and the circumstances in which such an assessment is necessary. Rather than requiring submission of a DPIA to a public agency, the amendments instead require a business to provide a DPIA to the AG within three days of a request. To further encourage child-centered design and comprehensive assessment of the potential impacts of services, products, and features on children prior to releasing a service, product, or feature, the amendments require that, should a business in alleged violation of the provisions of the bill be in substantial compliance with the DPIA requirements, the AG provide notice of the alleged violation and an opportunity to cure the violation, and indicate steps to prevent future violations, within 90 days.

**According to the Author**

While existing federal and state privacy laws offer important protections that guard children's privacy, there is no coherent, comprehensive law that protects children under 18 from goods, services, and products that endanger their welfare. As a result, online goods, services, and products that are likely to be accessed by kids have been loaded with adult design principals that do not factor in the unique needs of young minds, abilities, and sensibilities, nor offer the highest privacy protections by design and by default. As a result, children under 18 face a number of adverse impacts due to their interactions with online world, including bullying, mental health challenges, and addictive behaviors.

**Arguments in Support**

In support, a large coalition of organizations representing public health, parent, school and youth groups, researchers, and advocacy organizations write:

> Children across the globe are facing an unprecedented mental health crisis. Even before the onset of COVID-19 and subsequent social distancing and isolation, teen suicide was on the rise; in the US the CDC found that between 2007 to 2017 the suicide rate among people aged 10 to 24 increased by 56%. And in the year between spring of 2020 and 2021 emergency room visits for girls ages 12 to 17 increased by 50%.
>
> In 2020, 81% of 14 to 22-year-olds said they used social media either "daily" or "almost constantly." This is by design. As private companies beholden to shareholders, performance incentives for product developers and executives are tied to profit and therefore time spent on their platform. Social media platforms and tech companies do not design these services with their youngest and most vulnerable users in mind.
>
> Ensuring the safety of tech products is long overdue. We have nutrition labels on food packaging, rigorous testing for cribs and car seats, and yet the technology children use daily from the youngest of ages have little to no safeguards.

**Arguments in Opposition**

A coalition of industry trade groups comprised TechNet, California Chamber of Commerce, Entertainment Software Association, and California Manufacturers & Technology Association argues:

> AB 2273 still contains a great deal of subjectivity and our companies would benefit greatly from additional opportunities to seek guidance and feedback from the Attorney General before penalties are instituted. The UK Information Commissioner's Office (ICO), which is the authority that implements the UK Age Appropriate Design Code, produced a robust online resource for companies to better understand the ICO's interpretations of the standard's requirements and also provides the opportunity to ask questions of the regulator. If the goal is to encourage and incentivize companies to take proactive steps to protect children online, companies should have the opportunity to fix mistakes or compare their interpretations with the Attorney General as they try in good faith to comply with this new standard.

## FISCAL COMMENTS

According to the Senate Appropriations Committee:

1) *DOJ:* The Department of Justice (DOJ) reports costs of $2.4 million in Fiscal Year (FY) 2024-25 and $2.3 million in FY 2025-26 and annually thereafter (General Fund). The bill would also generate revenue to the DOJ in an unknown amount, resulting from penalty assessments of up to $7,500 per affected child, to be deposited into the Consumer Privacy Fund with the intent they be used to offset costs incurred by the DOJ.

2) *CPPA*: The [California Privacy Protection Agency] reports total costs of $1.05 million the first year, and $752 thousand ongoing to convene the task force, issue and update regulations, and review Data Protection Impact Assessments (General Fund).

3) *Judicial Branch:* Unknown cost pressures due to increased court workload (Special Fund – Trial Court Trust Fund, General Fund).

## VOTES:

**ASM PRIVACY AND CONSUMER PROTECTION: 10-0-1**
**YES:** Gabriel, Bauer-Kahan, Bennett, Berman, Cunningham, Mike Fong, Irwin, Valladares, Wicks, Wilson
**ABS, ABST OR NV:** Kiley

**ASM APPROPRIATIONS: 16-0-0**
**YES:** Holden, Bigelow, Bryan, Calderon, Carrillo, Megan Dahle, Davies, Mike Fong, Fong, Gabriel, Eduardo Garcia, Levine, Quirk, Robert Rivas, Akilah Weber, Wilson

**ASSEMBLY FLOOR: 72-0-6**
**YES:** Aguiar-Curry, Arambula, Bauer-Kahan, Bennett, Bigelow, Bloom, Boerner Horvath, Mia Bonta, Bryan, Calderon, Carrillo, Cervantes, Chen, Cooley, Cooper, Cunningham, Megan Dahle, Davies, Flora, Mike Fong, Fong, Friedman, Gabriel, Gallagher, Cristina Garcia, Eduardo Garcia, Gray, Grayson, Haney, Holden, Irwin, Jones-Sawyer, Kalra, Lackey, Lee, Levine, Low, Maienschein, Mathis, Mayes, McCarty, Medina, Mullin, Muratsuchi, Nazarian, Nguyen, Patterson, Petrie-Norris, Quirk, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Rodriguez, Blanca Rubio, Salas, Santiago, Seyarto, Smith, Stone, Ting, Valladares, Villapudua, Voepel, Waldron, Ward, Akilah Weber, Wicks, Wilson, Wood, Rendon
**ABS, ABST OR NV:** Berman, Choi, Daly, Gipson, Kiley, O'Donnell

**SENATE FLOOR: 33-0-7**
**YES:** Allen, Archuleta, Atkins, Becker, Bradford, Caballero, Cortese, Dahle, Dodd, Durazo, Eggman, Glazer, Gonzalez, Hertzberg, Hueso, Hurtado, Kamlager, Laird, Leyva, Limón, McGuire, Min, Newman, Nielsen, Pan, Portantino, Roth, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener
**ABS, ABST OR NV:** Bates, Borgeas, Grove, Jones, Melendez, Ochoa Bogh, Wilk

## UPDATED

VERSION: August 22, 2022

CONSULTANT: Landon Klein / P. & C.P. / (916) 319-2200 FN: 0004511

# EXHIBIT 2

**SENATE JUDICIARY COMMITTEE**
**Senator Thomas Umberg, Chair**
**2021-2022 Regular Session**

AB 2273 (Wicks)
Version: April 26, 2022
Hearing Date: June 28, 2022
Fiscal: Yes
Urgency: No
CK

## SUBJECT

The California Age-Appropriate Design Code Act

## DIGEST

This bill establishes the California Age-Appropriate Design Code Act, placing a series of obligations and restrictions on businesses that provide online services, products, or features likely to be accessed by a child. The bill tasks the California Privacy Protection Agency with establishing a taskforce to evaluate best practice and to adopt regulations.

## EXECUTIVE SUMMARY

The General Data Protection Regulation (GDPR) is a regulation in European Union law on data protection and privacy. The law that implemented the GDPR in the United Kingdom included an amendment that effectuated the requirement to offer children-specific protections and required the Information Commissioner to introduce an Age Appropriate Design Code to set standards that make online services' use of children's data "age appropriate."

This bill, modeled after the Age Appropriate Design Code recently enacted in the United Kingdom, institutes a series of obligations and restrictions on businesses that provide an online service, product, or feature likely to be accessed by a child. The bill additionally requires the California Privacy Protection Agency (PPA) to establish a taskforce to evaluate best practices for the implementation of the bill's provisions, to provide support to businesses, and to adopt regulations, as necessary, by a certain date.

The bill is co-sponsored by the 5Rights Foundation and Common Sense. It is supported by a variety of groups, including Oakland Privacy. It is opposed by a variety of groups, including TechNet and the California Chamber of Commerce.

**PROPOSED CHANGES TO THE LAW**

Existing law:

1) Establishes the federal Children's Online Privacy Protection Act (COPPA) to provide protections and regulations regarding the collection of personal information from children under the age of 13. (15 U.S.C. § 6501 et seq.)

2) Provides, in federal law, that a provider or user of an interactive computer service shall not be treated as the publisher or speaker of any information provided by another information content provider. (47 U.S.C. § 230(c)(2).)

3) Provides that a provider or user of an interactive computer service shall not be held liable on account of:
   a) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
   b) any action taken to enable or make available to information content providers or others the technical means to restrict access to such material. (47 U.S.C. § 230(c)(2).)

Existing state law:

1) Requires, pursuant to the Parent's Accountability and Child Protection Act, a person or business that conducts business in California, and that seeks to sell any product or service in or into California that is illegal under state law to sell to a minor to, notwithstanding any general term or condition, take reasonable steps, as specified, to ensure that the purchaser is of legal age at the time of purchase or delivery, including, but not limited to, verifying the age of the purchaser. (Civ. Code § 1798.99.1(a)(1).)

2) Establishes the Privacy Rights for California Minors in the Digital World (PRCMDW), which prohibits an operator of an internet website, online service, online application, or mobile application ("operator") from the following:
   a) marketing or advertising specified products or services, such as firearms, cigarettes, and alcoholic beverages, on its internet website, online service, online application, or mobile application that is directed to minors;
   b) marketing or advertising such products or services to minors who the operator has actual knowledge are using its site, service, or application online and is a minor, if the marketing or advertising is specifically directed to that minor based upon the personal information of the minor; and

c) knowingly using, disclosing, compiling, or allowing a third party to use, disclose, or compile, the personal information of a minor with actual knowledge that the use, disclosure, or compilation is for the purpose of marketing or advertising such products or services to that minor, where the website, service, or application is directed to minors or there is actual knowledge that a minor is using the website, service, or application. (Bus. & Prof. Code § 22580.)

3) Requires, pursuant to the PRCMDW, certain operators to permit a minor user to remove the minor's content or information and to further inform the minor of this right and the process for exercising it. (Bus. & Prof. Code § 22581.)

4) Establishes the California Consumer Privacy Act (CCPA), which grants consumers certain rights with regard to their personal information, including enhanced notice, access, and disclosure; the right to deletion; the right to restrict the sale of information; and protection from discrimination for exercising these rights. It places attendant obligations on businesses to respect those rights. (Civ. Code § 1798.100 et seq.)

5) Establishes the California Privacy Rights Act of 2020 (CPRA), which amends the CCPA and creates the California Privacy Protection Agency (PPA), which is charged with implementing these privacy laws, promulgating regulations, and carrying out enforcement actions. (Civ. Code § 798.100 et seq.; Proposition 24 (2020).)

6) Prohibits a business from selling or sharing the personal information of consumers if the business has actual knowledge that the consumer is less than 16 years of age, unless the consumer, in the case of consumers at least 13 years of age and less than 16 years of age, or the consumer's parent or guardian, in the case of consumers who are less than 13 years of age, has affirmatively authorized the sale or sharing of the consumer's personal information. A business that willfully disregards the consumer's age shall be deemed to have had actual knowledge of the consumer's age. (Civ. Code § 1798.120.)

This bill:

1) Requires a business that provides an online service, product, or feature likely to be accessed by a child ("covered business") to comply with all of the following:
   a) undertake a Data Protection Impact Assessment for any online service, product, or feature likely to be accessed by a child and maintain documentation of this assessment as long as the online service, product, or feature is likely to be accessed by a child;

b) provide a report of the assessment to the California Privacy Protection Agency ("agency") within the first year, with reviews every 24 months or before new features are offered to the public;
c) establish the age of consumers with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business, or apply the privacy and data protections afforded to children to all consumers;
d) configure all default privacy settings offered by the online service, product, or feature to the settings that offer a high level of privacy protection offered by the business;
e) provide any privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children likely to access that online service, product, or feature;
f) if the online service, product, or feature allows the child's parent, guardian, or any other consumer to monitor the child's online activity or track their location, provide an obvious signal to the child when they are being monitored or tracked;
g) enforce published terms, policies, and community standards established by the business, including, but not limited to, privacy policies and those concerning children; and
h) provide prominent, accessible, and responsive tools to help children, or where applicable their parent or guardian, exercise their privacy rights and report concerns.

2) Provides that a covered business shall not:
   a) use the personal information of any child in a way that the business knows or has reason to know the online service, product, or feature more likely than not causes or contributes to a more than de minimis risk of harm to the physical health, mental health, or well-being of a child;
   b) profile a child by default;
   c) collect, sell, share, or retain any personal information that is not necessary to provide a service, product, or feature with which a child is actively and knowingly engaged;
   d) if a business does not have actual knowledge of the age of a consumer, it shall not collect, share, sell, or retain any personal information that is not necessary to provide a service, product, or feature with which a consumer is actively and knowingly engaged;
   e) use the personal information of a child for any reason other than the reason or reasons for which that personal information was collected. If the business does not have actual knowledge of the age of the consumer, the business shall not use any personal information for any reason other than the reason or reasons for which that personal information was collected;

f) notwithstanding Section 1798.120, share or sell the personal information of any child unless the sharing or selling of that personal information is necessary to provide the online service, product, or feature as permitted by paragraphs (1) to (4), inclusive, of subdivision (a) of Section 1798.145;
g) collect, sell, or share any precise geolocation information of children by default unless the collection of that precise geolocation information is necessary to provide the service, product, or feature requested and then only for the limited time that the collection of precise geolocation information is necessary to provide the service, product, or feature;
h) collect, sell, or share any precise geolocation information without providing an obvious sign to the child for the duration of that collection that precise geolocation information is being collected;
i) use dark patterns or other techniques to lead or encourage consumers to provide personal information beyond what is reasonably expected for the service the child is accessing and necessary to provide that service or product to forego privacy protections, or to otherwise take any action that the business knows or has reason to know the online service or product more likely than not causes or contributes to a more than de minimis risk of harm to the child's physical health, mental health, or well-being; or
j) use any personal information collected or processed to establish age or age range for any other purpose, or retain that personal information longer than necessary to establish age. Age assurance shall be proportionate to the risks and data practice of a service, product, or feature.

3) Requires the PPA to establish and convene a taskforce, the California Children's Data Protection Taskforce, to evaluate best practices for the implementation of the bill, and to provide support to businesses, with an emphasis on small and medium businesses, to comply.

4) Requires the PPA's board to appoint, by April 1, 2023, members of the taskforce. Taskforce members shall consist of Californians with expertise in the areas of privacy, physical health, mental health and well-being, technology, and children's rights.

5) Requires the taskforce to make recommendations on best practices regarding, but not limited to, all of the following:
   a) identifying online services, products, or features likely to be accessed by children;
   b) evaluating and prioritizing the best interests of children with respect to their privacy, health, and well-being, and issuing guidance to businesses on how those interests may be furthered by the design, development, and implementation of an online service, product, or feature;
   c) ensuring that age verification methods used by businesses that provide online services, products, or features likely to be accessed by children are

proportionate to the risks that arise from the data management practices of the business, privacy protective, and minimally invasive;
d) assessing and mitigating risks to children that arise from the use of an online service, product, or feature, including specific issues businesses must address to perform a Data Protection Impact Assessment; and
e) publishing privacy information, policies, and standards in concise, clear language suited for the age of children likely to access that service or product.

6) Requires the PPA to adopt regulations, as necessary, in consultation with the taskforce, by April 1, 2024.

7) Codifies that the Legislature declares that children should be afforded protections not only by online products and services specifically directed at them, but by all online products and services they are likely to access and makes the following findings:
   a) companies that develop and provide online services, products, or features that children are likely to access should consider the best interests of children when designing, developing, and providing that service, product, or feature; and
   b) if a conflict arises between commercial interests and the best interests of children, companies should prioritizes the privacy, safety, and well-being of children over commercial interests.

8) Declares that it furthers the purposes and intent of the California Privacy Rights Act of 2020.

## COMMENTS

1. Children online

Survey data found that overall screen use among teens and tweens increased by 17 percent from 2019 to 2021, with the number of hours spent online spiking sharply during the pandemic. A recent survey found almost 40 percent of tweens stated that they used social media and estimates from 2018 put the number of teens on the sites at over 70 percent.

Research has shown that amongst American teenagers, YouTube, Instagram, and Snapchat are the most popular social media sites, and 45 percent of teenagers stated that they are "online almost constantly."[1] A meta-analysis of research on social networking site (SNS) use concluded the studies supported an association between problematic SNS

[1] Zaheer Hussain and Mark D Griffiths, *Problematic Social Networking Site Use and Comorbid Psychiatric Disorders: A Systematic Review of Recent Large-Scale Studies*."

use and psychiatric disorder symptoms, particularly in adolescents.[2] The study found most associations were between such problematic use and depression and anxiety.

As pointed out by recent Wall Street Journal reporting, the companies' employees are aware of the dangers:

> A Facebook Inc. team had a blunt message for senior executives. The company's algorithms weren't bringing people together. They were driving people apart.
>
> "Our algorithms exploit the human brain's attraction to divisiveness," read a slide from a 2018 presentation. "If left unchecked," it warned, Facebook would feed users "more and more divisive content in an effort to gain user attention & increase time on the platform."
>
> That presentation went to the heart of a question dogging Facebook almost since its founding: Does its platform aggravate polarization and tribal behavior?
>
> The answer it found, in some cases, was yes.[3]

A recent New York Times article on leadership at Facebook elaborates:

> To achieve its record-setting growth, the [Facebook] had continued building on its core technology, making business decisions based on how many hours of the day people spent on Facebook and how many times a day they returned. Facebook's algorithms didn't measure if the magnetic force pulling them back to Facebook was the habit of wishing a friend happy birthday, or a rabbit hole of conspiracies and misinformation.
>
> Facebook's problems were features, not bugs.[4]

Another paper recently released provides "Recommendations to the Biden Administration," and is relevant to the considerations here:

---

(December 14, 2018) Frontiers in psychiatry vol. 9 686, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6302102/pdf/fpsyt-09-00686.pdf. All internet citations are current as of June 23, 2022.

[2] *Ibid.*

[3] Jeff Horowitz & Deepa Seetharaman, *Facebook Executives Shut Down Efforts to Make the Site Less Divisive* (May 26, 2020) Wall Street Journal, https://www.wsj.com/articles/facebook-knows-it-encourages-division-top-executives-nixed-solutions-11590507499.

[4] Sheera Frenkel & Cecilia Kang, *Mark Zuckerberg and Sheryl Sandberg's Partnership Did Not Survive Trump* (July 8, 2021) The New York Times, https://www.nytimes.com/2021/07/08/business/mark-zuckerberg-sheryl-sandberg-facebook.html.

> The Administration should work with Congress to develop a system of financial incentives to encourage greater industry attention to the social costs, or "externalities," imposed by social media platforms. A system of meaningful fines for violating industry standards of conduct regarding harmful content on the internet is one example. In addition, the Administration should promote greater transparency of the placement of digital advertising, the dominant source of social media revenue. This would create an incentive for social media companies to modify their algorithms and practices related to harmful content, which their advertisers generally seek to avoid.[5]

A series of startling revelations unfolded after a Facebook whistle-blower, Frances Haugen began sharing internal documents. The Wall Street Journal published many of the findings:

> "Thirty-two percent of teen girls said that when they felt bad about their bodies, Instagram made them feel worse," the researchers said in a March 2020 slide presentation posted to Facebook's internal message board, reviewed by The Wall Street Journal. "Comparisons on Instagram can change how young women view and describe themselves."
>
> For the past three years, Facebook has been conducting studies into how its photo-sharing app affects its millions of young users. Repeatedly, the company's researchers found that Instagram is harmful for a sizable percentage of them, most notably teenage girls.
>
> "We make body image issues worse for one in three teen girls," said one slide from 2019, summarizing research about teen girls who experience the issues.
>
> "Teens blame Instagram for increases in the rate of anxiety and depression," said another slide. "This reaction was unprompted and consistent across all groups."
>
> Among teens who reported suicidal thoughts, 13% of British users and 6% of American users traced the desire to kill themselves to Instagram, one presentation showed.

[5] Caroline Atkinson, et al., *Recommendations to the Biden Administration On Regulating Disinformation and Other Harmful Content on Social Media* (March 2021) Harvard Kennedy School & New York University Stern School of Business, https://static1.squarespace.com/static/5b6df958f8370af3217d4178/t/6058a456ca24454a73370dc8/1616421974691/TechnologyRecommendations_2021final.pdf.

> Expanding its base of young users is vital to the company's more than $100 billion in annual revenue, and it doesn't want to jeopardize their engagement with the platform.
>
> More than 40% of Instagram's users are 22 years old and younger, and about 22 million teens log onto Instagram in the U.S. each day . . . .[6]

The released documents from Instagram make clear that "Facebook is acutely aware that the products and systems central to its business success routinely fail":

> The features that Instagram identifies as most harmful to teens appear to be at the platform's core.
>
> The tendency to share only the best moments, a pressure to look perfect and an addictive product can send teens spiraling toward eating disorders, an unhealthy sense of their own bodies and depression, March 2020 internal research states. It warns that the Explore page, which serves users photos and videos curated by an algorithm, can send users deep into content that can be harmful.
>
> "Aspects of Instagram exacerbate each other to create a perfect storm," the research states.[7]

There are also growing concerns about the systematic collection of information from children and its utilization to target children with advertising or to ensure prolonged engagement with various media. While advertising to children and teenagers via various forms of media is not new, it has reached new heights. In 2018 in the United States, over $3 billion was spent on nondigital and $900 million for digital advertising on children.[8] Children and teenagers encounter advertising through an assortment of media and forms, including mobile apps and games that advertise specific brands. A 2020 policy statement published by the American Academy of Pediatrics explains the dangers of sophisticated utilization of children's personal information for targeted advertising or engagement:

> [M]ost research on children's understanding of advertising involves television and print ads only, but newer forms of advertising found in

[6] Georgia Wells et al., *Facebook Knows Instagram Is Toxic for Teen Girls, Company Documents Show* (September 14, 2021) The Wall Street Journal, https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739?mod=article_inline.
[7] *Ibid.*
[8] Jenny Redesky et al., *Digital Advertising to Children* (July 2020) AAP Council on Communication and Media, Pediatrics, Vol. 146, No. 1, https://publications.aap.org/pediatrics/article/146/1/e20201681/37013/Digital-Advertising-to-Children?autologincheck=redirected.

> mobile and interactive media and smart technologies, often powered by personal data, are more difficult to identify. They do not necessarily occur in a predictable manner and are often integrated into the content. Advertising may also be linked to rewards or be embedded in trusted social networks or personalized digital platforms, which may undermine children's abilities to identify or critically think about advertising messages. Regulations on television advertising have not yet been updated for the modern digital environment. . . .
>
> The nature of media used by children and teenagers has changed dramatically in the past decade, and children now spend more time on the Internet, social media, user-created content, video games, mobile applications (apps), virtual or augmented reality, virtual assistants, and Internet-connected toys. The Internet allows advertisers to contact, track, and influence users, as guided by behavioral data collection; a user's digital trail of location, activities, in-app behavior, likes, and dislikes contributes to a digital profile shared among many companies that can be used to make advertising messages more effective.[9]

The AAP statement elaborates on the depth and ubiquity of data collection and the vulnerability of children to its reach and consequences:

> Data collection for commercial purposes includes use of cookies in a user's browser, which record and follow Web page history; the collection of posts, likes, purchases, and viewing history by apps such as Facebook and Instagram or search engines such as Google; and collection of data via apps granted permission to track device data, such as location or contacts. Software mines such data from user accounts, devices, and virtual assistants and often shares data with third-party companies to develop a profile of the user, which informs the delivery of targeted ads. . . . User data can be aggregated and stored, sold to third parties, and used to infer personal characteristics, such as sexual orientation or health problems. . . .
>
> [S]tudies suggest that teenagers have a more interpersonal, and less technical, conceptualization of privacy, so they may not be as aware of the ramifications of sharing data with governments or corporations compared with sharing private information with friends or parents. Young children are more trusting of privacy-invasive technologies, such as location trackers, likely because of their convenience.

---

[9] *Ibid.*

2. Responding to these concerns abroad

As stated, the UK has recently implemented the Age Appropriate Design Code to set standards that make online services' use of children's data "age appropriate": "The Children's code (or the Age appropriate design code) contains 15 standards that online services need to follow. This ensures they are complying with [their] obligations under data protection law to protect children's data online."

The UK Information Commissioner provides detail on implementation and vision:

> Data sits at the heart of the digital services children use every day. From the moment a young person opens an app, plays a game or loads a website, data begins to be gathered. Who's using the service? How are they using it? How frequently? Where from? On what device?
>
> That information may then inform techniques used to persuade young people to spend more time using services, to shape the content they are encouraged to engage with, and to tailor the advertisements they see.
>
> For all the benefits the digital economy can offer children, we are not currently creating a safe space for them to learn, explore and play.
>
> This statutory code of practice looks to change that, not by seeking to protect children from the digital world, but by protecting them within it.
>
> **This code is necessary.**
>
> This code will lead to changes that will help empower both adults and children.
>
> One in five UK internet users are children, but they are using an internet that was not designed for them.

3. Existing laws protecting children's privacy

The Children's Online Privacy Protection Act of 1998 (COPPA) imposes requirements on operators of websites or online services directed to children under 13 years of age, and on operators of other websites or online services that have actual knowledge that they are collecting personal information online from a child under 13 years of age. (15 U.S.C.S. § 6501; 16 C.F.R. Part 312.) COPPA makes it unlawful for any operator of a Web site or online service directed to children, or any operator that has actual knowledge that it is collecting or maintaining personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed under this part. Broadly, COPPA requires these operators to do the following:

- provide notice on the Web site or online service of what information it collects from children, how it uses such information, and its disclosure practices for such information;
- obtain verifiable parental consent prior to any collection, use, and/or disclosure of personal information from children;
- provide a reasonable means for a parent to review the personal information collected from a child and to refuse to permit its further use or maintenance;
- not condition a child's participation in a game, the offering of a prize, or another activity on the child disclosing more personal information than is reasonably necessary to participate in such activity; and
- establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of personal information collected from children.

The Student Online Personal Information Protection Act (SOPIPA) restricts the use and disclosure of the personally identifiable information or materials of K-12 students. (Bus. & Prof. Code § 22584.) It regulates operators of Internet Web sites, online services, online applications, or mobile applications with actual knowledge that the sites, services, or applications are used primarily for K–12 school purposes and were designed and marketed for K–12 school purposes. It prohibits operators from knowingly engaging in specified activities with respect to their site, service, or application. This includes:

- engaging in targeted advertising when the targeting of the advertising is based upon any information that the operator has acquired because of the use of that operator's site, service, or application;
- use of information, including persistent unique identifiers, created or gathered by the operator's site, service, or application to amass a profile about a K–12 student except in furtherance of K–12 school purposes; or
- selling a student's information.

SOPIPA also restricts disclosing the information but provides various exceptions, including where the disclosure is in furtherance of the K–12 purpose of the site, service, or application. Operators are also required to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, and protect that information from unauthorized access, destruction, use, modification, or disclosure. They must delete a student's information if the school or district requests deletion of data under the control of the school or district.

The CCPA grants consumers certain rights with regard to their personal information, including enhanced notice, access, and disclosure; the right to deletion; the right to restrict the sale of information; and protection from discrimination for exercising these rights. (Civ. Code § 1798.100 et seq.) It places attendant obligations on businesses to respect those rights. In the November 3, 2020 election, voters approved Proposition 24, which established the CPRA. The CPRA amends the CCPA, limits further amendment, and creates the PPA.

The CPRA prohibits a business from selling or sharing the personal information of consumers if the business has actual knowledge that the consumer is less than 16 years of age, unless the consumer, in the case of consumers at least 13 years of age and less than 16 years of age, or the consumer's parent or guardian, in the case of consumers who are less than 13 years of age, has affirmatively authorized the sale or sharing of the consumer's personal information. A business that willfully disregards the consumer's age shall be deemed to have had actual knowledge of the consumer's age. (Civ. Code § 1798.120.)

4. Establishing the California Age-Appropriate Design Code Act.

President Biden has emphasized the critical need for a response to the issues discussed above: "We must hold social media platforms accountable for the national experiment they're conducting on our children. It's time to strengthen privacy protections, ban targeted advertising to children, and demand tech companies stop collecting personal data on our children."

This bill, modeled after the Age Appropriate Design Code enacted in the United Kingdom, responds to this call to action. It institutes a series of obligations and restrictions on businesses that provide an online service, product, or feature likely to be accessed by a child ("covered business"). That term, "likely to be accessed by a child," means it is reasonable to expect, based on the nature of the content, the associated marketing, the online context, or academic or internal research, that the service, product, or feature would be accessed by children. The bill requires these covered businesses to approach design, data collection, and their offerings to better serve the best interests of children.

a. *Requiring someone to think about the children: child-centered design and approaches*

Businesses that provide an online service, product, or feature likely to be accessed by a child are required to make privacy protections for children the default by configuring all default privacy settings offered by the online service, product, or feature to the settings that offer a high level of privacy protection offered by the business. They are prohibited from profiling children by default. Covered businesses are required to provide privacy information, terms of service, policies, and community standards in a manner that is accessible to children likely to access it and to enforce those policies and standards.

Covered businesses must establish the age of consumers with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business, or apply the privacy and data protections afforded to children to all consumers.

Covered businesses are also required to undertake "Data Protection Impact Assessments" for any online service, product, or feature likely to be accessed by a child, maintain documentation of this assessment, and provide a report to the PPA within a year of implementation of this bill.

A data protection impact assessment is defined as a systematic survey to assess and mitigate risks to children who are reasonably likely to access the service, product, or feature at issue that arises from the provision of that service, product, or feature in accordance with specifications promulgated by the California Children's Data Protection Taskforce, discussed below. The assessments must be reviewed every 24 months or before any new features are offered to the public.

*b. Curtailing problematic data collection practices*

Businesses that provide an online service, product, or feature likely to be accessed by a child are also prohibited from a number of data collection and use practices with regard to children and the services and products they access.

A covered business cannot collect, sell, share, or retain any personal information that is not necessary to provide a service, product, or feature unless the business has actual knowledge the consumer is not a child. Additionally, if it is precise geolocation information, it can only be for the limited time that the collection of precise geolocation information is necessary to provide the service, product, or feature. Such sensitive location information can only be collected when providing an obvious sign to the child that such collection is happening for the duration of the collection.

These provisions provide a strong protection for users, making the default data collection abide by data minimization principles. Only when it is determined that a user is not a child can personal information be collected, sold, shared, or retained beyond what is necessary for the user's interaction with the business' service, product, or feature.

Based on this same principle, the bill also does not allow a covered business to use personal information for any reason other than the reason or reasons for which that personal information was collected unless the business has actual knowledge the consumer is not a child.

These businesses are also prohibited from using the personal information of any child in a way that the business knows or has reason to know the online service, product, or feature more likely than not causes or contributes to a more than de minimis risk of harm to the physical health, mental health, or well-being of a child. This centers children's health and welfare over other priorities. Where such risk of harm exists, businesses are able to continue to use the information for purposes other than what it was collected for once they have confirmed the user is not a child.

The bill also looks to protect problematic tactics to deepen the data collection. Specifically, these businesses cannot use dark patterns or other techniques to lead or encourage consumers:

- to provide personal information beyond what is reasonably expected for the service the child is accessing and necessary to provide that service or product;
- to forego privacy protections; or
- to otherwise take any action that the business knows or has reason to know the online service or product more likely than not causes or contributes to a more than de minimis risk of harm to the child's physical health, mental health, or well-being.

The section of the bill laying out these restrictions on businesses' data collection practices when children are involved includes some slightly duplicative provisions and some sections that could benefit from more clarity. In response, the author has agreed to the following amendments that address these concerns and streamline the bill:

Amendment

Amend Section 1798.99.31(b) as follows:

(b) A business that provides an online service, product, or feature likely to be accessed by a child shall not take any of the following actions:
(1) Use the personal information of any child in a way that the business knows or has reason to know the online service, product, or feature more likely than not causes or contributes to a more than de minimis risk of harm to the physical health, mental health, or well-being of a child.
(2) Profile a child by default.
(3) Collect, sell, share, or retain any personal information that is not necessary to provide a service, product, or feature with which a child is actively and knowingly engaged**, or as described in paragraphs (1) to (4), inclusive, of subdivision (a) of Section 1798.145.**
**(4) Use personal information for any reason other than the reason or reasons for which that personal information was collected, where the end user is a child.**
~~**(4) If a business does not have actual knowledge of the age of a consumer, it shall not collect, share, sell, or retain any personal information that is not necessary to provide a service, product, or feature with which a consumer is actively and knowingly engaged.**~~
~~**(5) Use the personal information of a child for any reason other than the reason or reasons for which that personal information was collected. If the business does not have actual knowledge of the age of the consumer, the business shall not use any personal information for any reason other than the reason or reasons for which that personal information was collected.**~~

~~**(6) Notwithstanding Section 1798.120, share or sell the personal information of any child unless the sharing or selling of that personal information is necessary to provide the online service, product, or feature as permitted by paragraphs (1) to (4), inclusive, of subdivision (a) of Section 1798.145.**~~
(7) Collect, sell, or share any precise geolocation information of children by default unless the collection of that precise geolocation information is necessary **for the business** to provide the service, product, or feature requested and then only for the limited time that the collection of precise geolocation information is necessary to provide the service, product, or feature.
(8) Collect~~**, sell, or share**~~ any precise geolocation information **of a child** without providing an obvious sign to the child for the duration of that collection that precise geolocation information is being collected.
(9) Use dark patterns ~~**or other techniques**~~ to lead or encourage ~~**consumers**~~ **children** to provide personal information beyond what is reasonably expected ~~**for the service the child is accessing and necessary**~~ to provide that **online service, product or feature,** ~~**or product**~~ to forego privacy protections, or to ~~**otherwise**~~ take any action that the business knows or has reason to know ~~**the online service, or product,**~~ more likely than not causes or contributes to a more than de minimis risk of harm to the child's physical health, mental health, or well-being.
(10) Use any personal information collected or processed to establish age or age range for any other purpose, or retain that personal information longer than necessary to establish age. Age assurance shall be proportionate to the risks and data practice of a service, product, or feature.

c. *Establishing a taskforce and developing regulations*

The bill additionally requires the PPA to establish a taskforce and appoint its members, who should be experts in specified fields, including privacy and technology. The taskforce will be called the California Children's Data Protection Taskforce and will evaluate best practices for the implementation of the bill's provisions, and provide support to businesses. The PPA, in consultation with the task force, is required to adopt regulations, as necessary, by April 1, 2024. Concerns have been raised about how the taskforce will be constituted and the clarity of their mission. The author may wish to consider further refinement to ensure maximal effectiveness.

5. Stakeholder positions

According to the author:

> The Internet is increasingly shaping how children socialize, consume entertainment, create, and learn. According to data from UNICEF, approximately one in three internet users is a child under 18 years of age. Among parents with children who have access to the internet, there is a

> concern about what kids are accessing, and the potential harmful effects of the way that access occurs. Data from Parents Together show that 85 percent of parents are concerned with how much time their kids are spending online – time that has increased since the pandemic. The same percentage of parents think that Congress should require protections for kids online, and help to stop sexual predators, place limits on deceptive advertising and protect children's privacy.
>
> Data privacy for children is especially important because its misuse can expose children to harmful material, compulsive behavior loops, and other risks. For example, research from the 5Rights Foundation found that, of the top 100 free apps for kids in one of the major app stores, one in three have overt banner ads, including ads that promote adult-appropriate apps requiring a user to watch the full promo before a box could be closed. Additionally, only 36 percent of California teens and 32 percent of California parents say that social networks do a good job explaining what they do with users' data.
>
> While existing federal and state privacy laws offer important protections that guard children's privacy, there is no coherent, comprehensive law that protects children under 18 from goods, services, and products that endanger their welfare. As a result, online goods, services, and products that are likely to be accessed by kids have been loaded with adult design principals that do not factor in the unique needs of young minds, abilities, and sensibilities, nor offer the highest privacy protections by design and by default. As a result, children under 18 face a number of adverse impacts due to their interactions with online world, including bullying, mental health challenges, and addictive behaviors.

An opposition coalition, including the Entertainment Software Association, argues that the "likely to be accessed by a child" standard is too broad and has requested replacing it with the "directed at children" standard found in COPPA:

> In order to ensure our companies are able to implement this bill effectively we suggest aligning the scope of AB 2273 with existing law and definitions, namely by changing "likely to be accessed by a child" to "directed to children". "Likely to be accessed by a child" is an overinclusive standard and would capture far more websites and platforms than necessary and subject them to this bill's requirements. It is also an unfamiliar standard that will present problems for companies trying to determine whether they are in the scope of the bill.
>
> "Directed to children" on the other hand is a term and scope that online services are familiar with as it is defined in COPPA, which companies

have been implementing and complying with since its passage over 20 years ago. Similarly, we suggest aligning the definition of "child" with COPPA as a person under the age of 13.

However, the "directed at" standard is extremely narrow and would carve out most of the places children are actually found online. The author disagrees that the standard should be "directed at": "The Code is designed to ensure companies children are using design their products in an age-appropriate manner with the best interest of children. This is about meeting children where they are online, not making Sesame Street safer for children." In addition, the workability of the standard is holding up in the United Kingdom where this has been the law. However, to address concerns that the likely to be accessed" standard does not provide enough clarity, the author has agreed to the following amendment that outlines the criteria:

Amendment

(6) "Likely to be accessed by a child" means it is reasonable to expect, based on the ~~**nature of the content, the associated marketing, the online context, or academic or internal research, that the service, product, or feature would be accessed by children.**~~ **following factors that the online service, product, or feature would be accessed by children:**

A. **The online product, service, or feature is directed at children as defined by COPPA.**

B. **The online product, service, or feature is determined to be routinely accessed by children through academic, market, or internal company research.**

C. **An online product, service, or feature advertises to children.**

D. **An online product, service, or feature that is substantially similar or the same as an online service, product, or feature covered by paragraph (B).**

E. **An online product, service or feature that has design elements that are known to be of interest to children, including but not limited to, games, cartoons, music, and celebrities who appeal to children.**

This language cabins which online services, products, and features are subject to the bill's obligations and restrictions. It tailors the definition to a narrower range of businesses while still effectuating the strong policy objectives.

Privacy concerns have been raised that the age verification requirements of the bill are going to result in more invasive data collection practices. It should be noted that these businesses are prohibited from using any personal information collected or processed to establish age or age range for any other purpose or retain it longer than necessary to

establish age. The bill also tries to more precisely calibrate the intensity of the required data collection for age verification to the risks and data practice of a service, product, or feature, but a number of provisions will lead to many businesses automatically age-gating their services.

Tim Kendall, the first Director of Monetization at Facebook, "created the advertising model that has driven the company's massive profitability and growth." He writes in support:

> I know from experience that tech workers want to innovate and design products differently to prioritize well-being over profit. But until the profit motive changes, design will be at the expense of our collective well-being, especially our kids'. To change the incentives, we need our political leaders to act. And we need solutions that work.
>
> The world's largest tech companies have already said that the Age Appropriate Design Code, law in the United Kingdom, is spurring positive change. Just last month, a senior Google official told the UK Parliament, "The Age Appropriate Design Code has helped us determine new ways to keep our users safe."
>
> Wouldn't they want to ensure California kids, kids in the United States, are safe as well? By taking some very basic steps – like restricting the collection of kids' data, requiring high privacy settings by default, and providing young people clear resources to report abusive users or block unpleasant content – the State of California can protect the health and wellbeing of millions of young people in our state.
>
> We need lawmakers to regulate in order to shift the incentive structure of the tech industry. Historically, the regulation and enforcement of laws has been a primary catalyst in spurring innovation in virtually every new technology this country has seen. There is no doubt that regulating safer children's experiences online will lead to all kinds of technological innovation.
>
> The California Age Appropriate Design Code Act – already in practice in the UK – gives us the opportunity to usher in a new era of innovative product design that considers, rather than monetizes, the next generation.

Writing in support, Roblox argues:

> The United Kingdom's Age-Appropriate Design Code (AADC) came into effect in September 2021. Despite the fact that it is a Code of Practice specific to the UK, Roblox chose to introduce many of its protections

> globally. We believe that when safety practices faithfully serve the needs of all young people, it makes sense to apply them universally. Consistent with this philosophy, we welcome the introduction of AB 2273 in California, formalizing such protections for California's youth.
>
> Specifically, we note the following characteristics of AB 2273:
>
> - It is Principle-Based: Principle-based approaches to safety promote accountability while remaining flexible enough to allow for future innovation and changes in the technology landscape. Further, as a principles-based approach, the Code can be applied to the diversity of services that are offered to children online today, from nascent, start-up technologies to large, global platforms.
> - It is Risk-Based: Companies are often best positioned to address vulnerabilities that may exist on their platforms. The risk-based approach that underpins AB 2273 allows for a service-specific means to managing potential risks, avoiding the unintended consequences that a "one size fits all" approach can bring to privacy and safety.
> - It Emphasizes the "Best Interests of the Child": AB 2273 requires companies to consider the "best interests of the child" in designing and creating tools and features, helping to ensure that children's well-being remains a key part of the design and implementation process.
> - It is Modeled After Existing Legislation: Having seen similar measures to AB 2273 thoughtfully introduced and implemented by UK policymakers last year, we believe they can scale effectively for children in California.

The opposition coalition also argues for a narrow enforcement mechanism:

> We also suggest enumerating a clear enforcement mechanism such as the one found in CCPA, which grants the Attorney General the authority to investigate and enforce violations. We believe the Attorney General is the appropriate agency to enforce this bill provided our companies have the ability to seek guidance on this bill's subjective requirements and fix mistakes before fines or penalties are levied. The Attorney General's office is best equipped to provide consistent interpretations, guidance, and to enforce this bill's provisions.

In response, the author has agreed to amendments that grant authority to the Attorney General to enforce the bill's provisions and that explicitly preclude the bill serving as the basis for a private right of action:

Amendment:

Add: Sec. 1798.99.35 (a) Any business that violates this title shall be subject to an injunction and liable for a civil penalty of not more than $2,500 per affected child for each negligent violation or not more $7,500 per affected child for each intentional violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General.

(b) Nothing in this Title shall be interpreted to serve as the basis for a private right of action under this title.

**SUPPORT**

5Rights Foundation (co-sponsor)
Common Sense (co-sponsor)
Alcohol Justice
Accountable Tech
ADL West
Avaaz
California Lawyers Association, Privacy Law Section
Center for Countering Digital Hate
Center for Digital Democracy
Center for Humane Technology
Children and Screens
Consumer Federation of America
Consumer Federation of California
Do Curious INC.
Eating Disorders Coalition
Epic
Fair Vote
Fairplay
Je Suis Lá
Joan Ganz Cooney Center - Sesame Workshop
LiveMore ScreenLess
Log Off
Lookup
Me2b Alliance
National Hispanic Media Coalition
Neda
Oakland Privacy
Omidyar Network
Outschool, Inc.
Parents Together Action

Protect Young Eyes
Public Health Advocates
Real Facebook Oversight Board
Remind
Reset Tech
Roblox Corporation
Smart Digital Kids
Sum of Us
Tech Oversight Project
The Children's Partnership
The Signals Network
The Social Dilemma
Tiramisu
Ultraviolet
Two individuals

**OPPOSITION**

California Chamber of Commerce
Entertainment Software Association
MPA - the Association of Magazine Media
TechNet

**RELATED LEGISLATION**

Pending Legislation:

SB 1056 (Umberg, 2022) requires a social media platform, as defined, to clearly and conspicuously state whether it has a mechanism for reporting violent posts, as defined; and allows a person who is the target, or who believes they are the target, of a violent post to seek an injunction to have the violent post removed. This bill is currently in the Assembly Judiciary Committee.

AB 587 (Gabriel, 2022) requires social media companies, as defined, to post their terms of service and report certain information to the Attorney General on a quarterly basis. This bill is currently pending before this Committee and is being heard the same day as this bill.

AB 1628 (Ramos, 2022) requires online platforms to create and post a policy that includes policies regarding distribution of controlled substances and its prevention, reporting mechanisms, and resources. This bill is currently pending before this Committee and is being heard the same day as this bill.

AB 2408 (Cunningham, 2022) establishes a negligence cause of action for a platform's use of any design, feature, or affordance that causes a child user to become addicted to the platform. It also provides for heightened civil penalties in actions brought by public prosecutors. This bill is currently pending before this Committee and is being heard the same day as this bill.

AB 2571 (Bauer-Kahan, 2022) prohibits firearm industry members from advertising or marketing, as defined, firearm-related products to minors. The bill restricts the use of minors' personal information in connection with marketing or advertising firearm-related products to those minors. This bill is currently in the Senate Appropriations Committee.

AB 2879 (Low, 2022) requires social media platforms to implement a mechanism by which school administrators can report instances of cyberbullying, and to disclose specified data related to reported instances of cyberbullying and the platform's response. This bill is currently pending before this Committee and is being heard the same day as this bill.

Prior Legislation: None known.

**PRIOR VOTES:**

Assembly Floor (Ayes 72, Noes 0)
Assembly Appropriations Committee (Ayes 16, Noes 0)
Assembly Privacy and Consumer Protection Committee (Ayes 10, Noes 0)

**************

# EXHIBIT 3

*ROB BONTA*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Telephone: (916) 210-6033
Facsimile: (916) 322-2630
E-Mail: Anthony.Lew@doj.ca.gov

May 3, 2022

The Honorable Buffy Wicks
California State Assembly
1021 O Street, Suite 4240
Sacramento, CA 95814

**RE: AB 2273 (Wicks) California Age-Appropriate Design Code Act- SUPPORT**

Dear Assemblymember Wicks:

The Attorney General is pleased to support your Assembly Bill 2273, the California Age-Appropriate Design Code Act. Your innovative legislation seeks to enhance online privacy and safety protections for children in a digital world increasingly full of pitfalls—many by design and targeted to adults--that threaten harm to California's youngest residents.

Compelling research published by the 5Rights Foundation, the sponsor of AB 2273, illustrates the way that—apparently by design--children are often exposed to and steered towards troubling and inappropriate content online. A key finding of their research was that "the design features of the digital world are not accidental, but are deliberately aimed to increase time, spread and activity with insufficient corresponding mitigations to protect children from the impact - even when it involves harmful material or activity. These are not bugs but features of the digital world."[1]

Expert testimony at a March 2022 information hearing held by the Assembly Committee on Privacy and Consumer Protection supported that key finding, but also highlighted, on a more hopeful note, that there are companies currently employing child-centered standards who are developing apps designed with children in mind, in recognition of their special audience.

The California Attorney General's Office recognizes, as does AB 2273, that as children spend more of their time interacting with the digital world, the impact of the design of digital products and services on children's well-being has become a focus of significant concern. We wholeheartedly agree that more needs to be done to create a safer online space for children to learn, explore, and play. As you may know, my office announced a nationwide investigation last

[1] "Pathways: A summary. Key findings and recommendations from Pathways: How digital design puts children at risk." 5Rights Foundation, Sept. 2021.

fall into whether Meta Platform, Inc., (formerly known as Facebook), provided and promoted its social media platform — Instagram — to children and young adults, despite knowing that such use is associated with increased risks of physical and mental health harm to young people, including depression, eating disorders, and even suicide.

Your bill AB 2273, modeled after the Age Appropriate Design Code recently enacted in the United Kingdom, seeks to elevate child-centered design in online products and services that are likely to be accessed by children. Among other things, AB 2273 would require businesses to establish the age of children, as specified; require a high level of privacy for children by default; and provide appropriate notice and tools to children and parents to effectuate children's privacy rights. The bill would also restrict the use of precise geolocation data, sensitive personal information, and prohibit the use of dark patterns that would encourage children to give up data or engage in harmful conduct. Finally, this bill mandates that the California Privacy Protection Agency (CPPA) establish and convene a Taskforce to evaluate best practices for the implementation of these provisions, and to provide support to businesses, as specified.

Attorney General Bonta reaffirms the need for substantive, enforceable laws in California that protect not only the privacy rights of children, but that address real, demonstrated harms to children associated with the addictive use of social media and dangerous online content. The Attorney General is pleased to support AB 2273, and thanks you for your leadership on this important issue affecting millions of California children.

Sincerely,

ANTHONY LEW
Deputy Attorney General
Office of Legislative Affairs

For ROB BONTA
Attorney General

# EXHIBIT 4

# Governor Newsom Statement on Challenge to California's Child Online Privacy Law

Published: Feb 21, 2023

SACRAMENTO - Governor Gavin Newsom issued the below statement today in response to a recent filing in the tech industry-led lawsuit seeking to block the California Age-Appropriate Design Code Act, a first-in-the-nation measure to protect the well-being, data and privacy of children using online platforms:

"As a father of four children, and the Governor of the nation's most populous state, I am passionate about our state's efforts to lead this fight for children's online privacy. No other state is doing more than California to protect kids - shielding them from harmful data mining, violent content, and automatic GPS tracking that allows adults to track down kids. I was proud to sign the bill last year to put California kids first, and I'm ready to vigorously defend it now."

###

# EXHIBIT 5

AMERICAN PSYCHOLOGICAL ASSOCIATION

AMERICAN PSYCHOLOGICAL ASSOCIATION

# Health Advisory on Social Media Use in Adolescence

MAY 2023



Copyright © 2023 by the American Psychological Association. This material may be reproduced and distributed without permission for educational or research purposes provided that acknowledgment is given to the American Psychological Association. This material may not be translated or commercially reproduced without prior permission in writing from the publisher. For permission, contact APA, Rights and Permissions, 750 First Street, NE, Washington, DC 20002–4242.

Psychological scientists examine potential beneficial and harmful effects of social media[a] use on adolescents' social, educational, psychological, and neurological development. This is a rapidly evolving and growing area of research with implications for many stakeholders (e.g., youth, parents, caregivers, educators, policymakers, practitioners, and members of the tech industry) who share responsibility to ensure adolescents' well-being.[b] Officials and policymakers including the U.S. Surgeon General Dr. Vivek Murthy have documented the importance of this issue and are actively seeking science-informed input.[c] The recommendations below are based on the scientific evidence to date, and the following considerations.

**A.** Using social media is not inherently beneficial or harmful to young people. Adolescents' lives online both reflect and impact their offline lives. In most cases, the effects of social media are dependent on adolescents' own personal and psychological characteristics and social circumstances—intersecting with the specific content, features, or functions that are afforded within many social media platforms. In other words, the effects of social media likely depend on what teens can do and see online, teens' pre-existing strengths or vulnerabilities, and the contexts in which they grow up.[3]

**B.** Adolescents' experiences online are affected by both 1) how they shape their own social media experiences (e.g., they choose whom to like and follow); and 2) both visible and unknown features built into social media platforms.

**C.** Not all findings apply equally to all youth. Scientific findings offer one piece of information that can be used along with knowledge of specific youths' strengths, weaknesses, and context to make decisions that are tailored for each teen, family, and community.[4]

**D.** Adolescent development is gradual and continuous, beginning with biological and neurological changes occurring before puberty is observable (i.e., approximately beginning at 10 years of age), and lasting at least until dramatic changes in youths' social environment (e.g., peer, family, and school context) and neurological changes have completed (i.e., until approximately 25 years of age).[5] Age-appropriate use of social media should be based on each adolescent's level of maturity (e.g., self-regulation skills, intellectual development, comprehension of risks) and home environment.[6] Because adolescents mature at different rates, and because there are no data available to indicate that children become unaffected by the potential risks and opportunities posed by social media usage at a specific age, research is in development to specify a single time or age point for many of these recommendations. In general, potential risks are likely to be greater in early adolescence—a period of greater biological, social, and psychological transitions, than in late adolescence and early adulthood.[7,8]

**E.** As researchers have found with the internet more broadly, racism (i.e., often reflecting perspectives of those building technology) is built into social media platforms. For example, algorithms (i.e., a set of mathematical instructions that direct users' everyday experiences down to the posts that they see) can often have centuries of racist policy and discrimination encoded.[9] Social media can become an incubator, providing community and training that fuel racist hate.[10] The resulting potential impact is far reaching, including physical violence offline, as well as threats to well-being.[11]

**F.** These recommendations are based on psychological science and related disciplines at the time of this writing (April 2023). Collectively, these studies were conducted with thousands of adolescents who completed standardized assessments of social, behavioral, psychological, and/or neurological functioning, and also reported (or were observed) engaging with specific social media functions or content. However, these studies do have limitations. First, findings suggesting causal associations are rare, as the data required to make cause-and-effect conclusions are challenging to collect and/or may be available within technology companies, but have not been made accessible to independent scientists. Second, *long-term* (i.e., multi-year) longitudinal research often is unavailable; thus, the associations between adolescents' social media use and long-term outcomes (i.e., into adulthood) are largely unknown. Third, relatively few studies have been conducted with marginalized populations of youth, including those from marginalized racial, ethnic, sexual, gender, socioeconomic backgrounds, those who are differently abled, and/or youth with chronic developmental or health conditions.

---

a These recommendations do not address the use of all technology among youth, including educationally-based platforms or digital interventions that use evidence-based approaches to promote adaptive health outcomes. Rather, these recommendations reflect the literature on social media specifically, which is defined as technologically-based applications, platforms, or communication systems using online architecture that promotes asynchronous, unilateral, permanent, public, continually-accessible, social cue-restricted, quantifiable, visually-based, or algorithmic-based social interactions.[1,2]

b These recommendations enact policies and resolutions approved by the APA Council of Representatives including the **APA Resolution on Child and Adolescent Mental and Behavioral Health** and the **APA Resolution on Dismantling Systemic Racism** in contexts including social media. These are not professional practice guidelines but are intended to provide information based on psychological science.

c The U.S. Surgeon General released an **Advisory** in 2021 focused on Protecting Youth Mental Health that recognizes the importance of examining the impacts of social media on children.

## RECOMMENDATIONS



**Youth using social media should be encouraged to use functions that create opportunities for social support, online companionship, and emotional intimacy that can promote healthy socialization.**

- Data suggest that youths' psychological development may benefit from this type of online social interaction, particularly during periods of social isolation, when experiencing stress, when seeking connection to peers with similar developmental and/or health conditions, and perhaps especially for youth who experience adversity or isolation in offline environments.[12,13,14,15]
- Youth with symptoms of mental illness, such as adolescents with social anxiety, depression, or loneliness, for instance, may benefit from interactions on social media that allow for greater control, practice, and review of social interactions.[16] Unfortunately, these populations may also be at higher risk for some of the negative facets of social media use as discussed below.[17]
- Social media offers a powerful opportunity for socialization of specific attitudes and behaviors, encouraging adolescents to follow the opinions and prosocial acts of others.[18] The discussion of healthy behaviors online can promote or reinforce positive offline activity and healthy outcomes.
- Social media may be psychologically beneficial particularly among those experiencing mental health crises,[19] or members of marginalized groups that have been disproportionately harmed in online contexts. For instance, access to peers that allows LGBTQIA+ and questioning adolescents to provide support to and share accurate health information with one another is beneficial to psychological development, and can protect youth from negative psychological outcomes when experiencing stress.[20] This may be especially important for topics that adolescents feel reluctant to or are unable to discuss with a parent or caregiver.

**Access to peers that allows LGBTQIA+ and questioning adolescents to provide support to and share accurate health information with one another can protect youth from negative psychological outcomes when experiencing stress**

**Social media use, functionality, and permissions/consenting should be tailored to youths' developmental capabilities; designs created for adults may not be appropriate for children.**

- Specific features (e.g., the "like" button, recommended content, unrestricted time limits, endless scrolling) and notices/alerts (e.g., regarding changes to privacy policies) should be tailored to the social and cognitive abilities and comprehension of adolescent users.[21] As one example, adolescents should be informed explicitly and repeatedly, in age-appropriate ways, about the manner in which their behaviors on social media may yield data that can be used, stored, or shared with others, for instance, for commercial (and other) purposes.

**In early adolescence (i.e., typically 10-14 years), adult monitoring (i.e., ongoing review, discussion, and coaching around social media content) is advised for most youths' social media use; autonomy may increase gradually as kids age and if they gain digital literacy skills. However, monitoring should be balanced with youths' appropriate needs for privacy.**

- Brain regions associated with a desire for attention, feedback, and reinforcement from peers become increasingly sensitive beginning in early adolescence, and regions associated with mature self-control are not fully developed until adulthood.[5] Parental monitoring (i.e., coaching and discussion) and developmentally appropriate limit-setting thus is critical, especially in early adolescence.
- Adults' own use of social media in youths' presence should also be carefully considered. Science demonstrates that adults' (e.g., caregivers') orientation and attitudes toward social media (e.g., using during interactions with their children, being distracted from in-person interactions by social media use) may affect adolescents' own use of social media.
- Preliminary research suggests that *a combination of* 1) social media limits and boundaries, and 2) adult–child discussion and coaching around social media use, leads to the best outcomes for youth.[22]

**Adolescents should be informed explicitly and repeatedly, in age-appropriate ways, about the manner in which their behaviors on social media may yield data that can be used, stored, or shared with others**



## RECOMMENDATIONS *(continued)*

**To reduce the risks of psychological harm, adolescents' exposure to content on social media that depicts illegal or psychologically maladaptive behavior, including content that instructs or encourages youth to engage in health-risk behaviors, such as self-harm (e.g., cutting, suicide), harm to others, or those that encourage eating-disordered behavior (e.g., restrictive eating, purging, excessive exercise) should be minimized, reported, and removed[23]; moreover, technology should not drive users to this content.**

- Evidence suggests that exposure to maladaptive behavior may promote similar behavior among vulnerable youth, and online social reinforcement of these behaviors may be related to increased risk for serious psychological symptoms, even after controlling for offline influences.[24]
- Reporting structures should be created to easily identify harmful content, and ensure it is deprioritized or removed.



**To minimize psychological harm, adolescents' exposure to "cyberhate" including online discrimination, prejudice, hate, or cyberbullying especially directed toward a marginalized group (e.g., racial, ethnic, gender, sexual, religious, ability status),[22] or toward an individual because of their identity or allyship with a marginalized group should be minimized.**

- Research demonstrates that adolescents' exposure to online discrimination and hate predicts increases in anxiety and depressive symptoms, even after controlling for how much adolescents are exposed to similar experiences offline.[25] Similarly, research indicates that as compared to offline bullying, online bullying and harassment can be more severe, and thus damaging to psychological development.[26,27,28] In other words, both online cyberhate and offline bullying can increase risk for adolescent mental health problems. Research suggests elevated risks both for the perpetrators and victims of cyberhate.[29,30]
- Adolescents should be trained to recognize online structural racism and critique racist messages. Research shows that young people who are able to critique racism experience less psychological distress when they witness race-related traumatic events online.[25] As noted above, adults' monitoring and active discussion of online content can also reduce the effects of exposure to cyberhate on adolescents' psychological adjustment.[22]

**Research demonstrates that adolescents' exposure to online discrimination and hate predicts increases in anxiety and depressive symptoms.**



**Adolescents should be routinely screened for signs of "problematic social media use" that can impair their ability to engage in daily roles and routines, and may present risk for more serious psychological harms over time.**

- Indicators of problematic social media use include a) a tendency to use social media even when adolescents want to stop, or realize it is interfering with necessary tasks; b) spending excessive effort to ensure continuous access to social media; c) strong cravings to use social media, or disruptions in other activities from missing social media use too much; d) repeatedly spending more time on social media than intended; e) lying or deceptive behavior to retain access to social media use; f) loss or disruption of significant relationships or educational opportunities because of media use.[31]
- Social media use should not restrict opportunities to practice in-person reciprocal social interactions, and should not contribute to psychological avoidance of in-person social interactions.

**The use of social media should be limited so as to not interfere with adolescents' sleep and physical activity.**

- Research recommends adolescents get at least 8 hours of sleep each night and maintain regular sleep-wake schedules.[32] Data indicate that technology use particularly within 1 hour of bedtime, and social media use in particular, is associated with sleep disruptions.[33,34] Insufficient sleep is associated with disruptions to neurological development in adolescent brains, teens' emotional functioning,[35,36] and risk for suicide.[37,38]
- Adolescents' social media use also should not interfere with or reduce adolescents' opportunities for physical activity and exercise.[39] Research demonstrates that physical activity is essential for both physical and psychological health (i.e., lower rates of depression).[40]

**Insufficient sleep is associated with disruptions to neurological development in adolescent brains, teens' emotional functioning, and risk for suicide**


SER-268

## RECOMMENDATIONS *(continued)*

**Adolescents should limit use of social media for social comparison, particularly around beauty- or appearance-related content.**

- Research suggests that using social media for social comparisons related to physical appearance, as well as excessive attention to and behaviors related to one's own photos and feedback on those photos, are related to poorer body image, disordered eating, and depressive symptoms, particularly among girls.[41,42,43,44,45,46]



**Adolescents' social media use should be preceded by training in *social media literacy* to ensure that users have developed psychologically-informed competencies and skills that will maximize the chances for balanced, safe, and meaningful social media use.**

- Emerging science offers preliminary support for the efficacy of Digital Citizenship and Digital Literacy to increase the frequency of positive interactions online[47]; however, more research is needed in this area.[48]
- Additional competencies could also include: 1) questioning the accuracy and representativeness of social media content; 2) understanding the tactics used to spread mis- and disinformation; 3) limiting "overgeneralization" and "misestimation" errors that lead users to incorrectly estimate others' behaviors or attitudes based on social media content (or reactions to content); 4) signs of problematic social media use; 5) how to build and nourish healthy online relationships; 6) how to solve conflicts that can emerge on social media platforms; 7) how to refrain from excessive social comparisons online and/or better understand how images and content can be manipulated; 8) as noted above, how to recognize online structural racism and critique racist messages; and 9) how to safely communicate about mental health online.[49]

**Substantial resources should be provided for continued scientific examination of the positive and negative effects of social media on adolescent development.**

- A substantial investment in research funding is needed, including long-term longitudinal research, studies of younger children, and research on marginalized populations.
- Access to data among independent scientists (including data from tech companies) to more thoroughly examine the associations between social media use and adolescent development is needed.

**A substantial investment in research funding is needed, including long-term longitudinal research, studies of younger children, and research on marginalized populations.**

## EXPERT ADVISORY PANEL

*Co-Chairs*

**Mary Ann McCabe, PhD, ABPP,** Member-at-large, Board of Directors, American Psychological Association; associate clinical professor of pediatrics, George Washington University School of Medicine

**Mitchell J. Prinstein, PhD, ABPP,** Chief science officer, American Psychological Association; John Van Seters Distinguished Professor of Psychology and Neuroscience, University of North Carolina at Chapel Hill

*Members*

**Mary K. Alvord, PhD,** director, Alvord, Baker & Associates; board president, Resilience Across Borders; adjunct associate professor of psychiatry and behavioral sciences, The George Washington University School of Medicine and Health Sciences

**Dawn T. Bounds, PhD, PMHNP-BC, FAAN,** assistant professor, Sue & Bill Gross School of Nursing, University of California, Irvine

**Linda Charmaraman, PhD,** Wellesley Centers for Women, Wellesley College

**Sophia Choukas-Bradley, PhD,** assistant professor, Department of Psychology, University of Pittsburgh

**Dorothy L. Espelage, PhD,** William C. Friday Distinguished Professor of Education, University of North Carolina at Chapel Hill

**Joshua A. Goodman. PhD,** assistant professor, Department of Psychology, Southern Oregon University

**Jessica L. Hamilton, PhD,** assistant professor, Department of Psychology, Rutgers University

**Jacqueline Nesi, PhD,** assistant professor, Department of Psychiatry and Human Behavior, Alpert Medical School of Brown University

**Brendesha M. Tynes, PhD,** Dean's Professor of Educational Equity, University of Southern California

**L. Monique Ward, PhD,** professor, Department of Psychology (Developmental), University of Michigan

**Lucía Magis-Weinberg, MD, PhD,** assistant professor, Department of Psychology, University of Washington

*Acknowledgements*

We wish to acknowledge the outstanding contributions to this report made by Corbin Evans, JD, Senior Director of Congressional & Federal Relations, American Psychological Association.

## SELECTED PUBLICATIONS AND RESOURCES


1. Nesi J, Choukas-Bradley S, Prinstein MJ. Transformation of Adolescent Peer Relations in the Social Media Context: Part 1-A Theoretical Framework and Application to Dyadic Peer Relationships. *Clin Child Fam Psychol Rev*. 2018;21(3):267-294. doi:10.1007/s10567-018-0261-x
2. Nesi J, Dredge R, Maheux AJ, Roberts SR, Fox KA, Choukas-Bradley S. Peer experiences via social media. In: *Encyclopedia of Child and Adolescent Health*. Elsevier; 2023:182-195. doi:10.1016/B978-0-12-818872-9.00046-7
3. Prinstein MJ, Nesi J, Telzer EH. Commentary: An updated agenda for the study of digital media use and adolescent development - future directions following Odgers & Jensen (2020). *J Child Psychol Psychiatry*. 2020;61(3):349-352. doi:10.1111/jcpp.13219
4. Valkenburg PM, Peter J. The differential susceptibility to media effects model. *J Commun*. 2013;63(2):221-243. doi:10.1111/jcom.12024
5. Somerville LH, Casey BJ. Developmental neurobiology of cognitive control and motivational systems. *Curr Opin Neurobiol*. 2010;20(2):236-241. doi:10.1016/j.conb.2010.01.006
6. Orben A, Blakemore S-J. How social media affects teen mental health: a missing link. *Nature*. 2023;614(7948):410-412. doi:10.1038/d41586-023-00402-9
7. Magis-Weinberg L, Ballonoff Suleiman A, Dahl RE. Context, development, and digital media: implications for very young adolescents in lmics. *Front Psychol*. 2021;12:632713. doi:10.3389/fpsyg.2021.632713
8. Orben A, Przybylski AK, Blakemore S-J, Kievit RA. Windows of developmental sensitivity to social media. *Nat Commun*. 2022;13(1):1649. doi:10.1038/s41467-022-29296-3
9. Noble SU. *Algorithms of Oppression: How Search Engines Reinforce Racism*. NYU Press; 2018. doi:10.2307/j.ctt1pwt9w5
10. Relia K, Li Z, Cook SH, Chunara R. Race, Ethnicity and National Origin-Based Discrimination in Social Media and Hate Crimes across 100 U.S. Cities. *ICWSM*. 2019;13:417-427. doi:10.1609/icwsm.v13i01.3354
11. Tynes BM, Willis HA, Stewart AM, Hamilton MW. Race-Related Traumatic Events Online and Mental Health Among Adolescents of Color. *J Adolesc Health*. 2019;65(3):371-377. doi:10.1016/j.jadohealth.2019.03.006
12. Charmaraman L, Lynch AD, Richer AM, Zhai E. Examining Early Adolescent Positive and Negative Social Technology Behaviors and Well-being During the COVID-19 Pandemic. *Technology, Mind, and Behavior*. 2022;3(1). doi:10.1037/tmb0000062
13. Magis-Weinberg L, Gys CL, Berger EL, Domoff SE, Dahl RE. Positive and Negative Online Experiences and Loneliness in Peruvian Adolescents During the COVID-19 Lockdown. *J Res Adolesc*. 2021;31(3):717-733. doi:10.1111/jora.12666
14. Psihogios AM, Ahmed AM, McKelvey ER, et al. Social media to promote treatment adherence among adolescents and young adults with chronic health conditions: A topical review and TikTok application. *Clin Pract Pediatr Psychol*. 2022;10(4):440-451. doi:10.1037/cpp0000459
15. Holtz BE, Kanthawala S. #T1DLooksLikeMe: Exploring Self-Disclosure, Social Support, and Type 1 Diabetes on Instagram. *Front Commun*. 2020;5. doi:10.3389/fcomm.2020.510278
16. Chassiakos YLR, Radesky J, Christakis D, Moreno MA, Cross C, COUNCIL ON COMMUNICATIONS AND MEDIA. Children and adolescents and digital media. *Pediatrics*. 2016;138(5). doi:10.1542/peds.2016-2593
17. Nesi, J., Mann, S. and Robb, M. B. (2023). Teens and mental health: How girls really feel about social media. San Francisco, CA: Common Sense
18. Armstrong-Carter E, Telzer EH. Advancing measurement and research on youths' prosocial behavior in the digital age. *Child Dev Perspect*. 2021;15(1):31-36. doi:10.1111/cdep.12396
19. Massing-Schaffer M, Nesi J, Telzer EH, Lindquist KA, Prinstein MJ. Adolescent Peer Experiences and Prospective Suicidal Ideation: The Protective Role of Online-Only Friendships. *J Clin Child Adolesc Psychol*. 2022;51(1):49-60. doi:10.1080/15374416.2020.1750019
20. Craig SL, Eaton AD, McInroy LB, Leung VWY, Krishnan S. Can Social Media Participation Enhance LGBTQ+ Youth Well-Being? Development of the Social Media Benefits Scale. *Social Media + Society*. 2021;7(1):205630512198893. doi:10.1177/2056305121988931
21. Introduction to the Age appropriate design code. (2022, October 17). Ico.org.uk. https://ico.org.uk/for-organisations/guide-to-data-protection/ico-codes-of-practice/age-appropriate-design-code/#:~:text=The%20Children
22. Wachs S, Costello M, Wright MF, et al. "DNT LET 'EM H8 U!": Applying the routine activity framework to understand cyberhate victimization among adolescents across eight countries. *Comput Educ*. 2021;160:104026. doi:10.1016/j.compedu.2020.104026
23. Tools and tips to help communicate safely online about suicide - #chatsafe - Orygen, Revolution in Mind. (n.d.). Www.orygen.org.au. Retrieved April 20, 2023, from https://www.orygen.org.au/chatsafe.
24. Nesi J, Rothenberg WA, Hussong AM, Jackson KM. Friends' Alcohol-Related Social Networking Site Activity Predicts Escalations in Adolescent Drinking: Mediation by Peer Norms. *J Adolesc Health*. 2017;60(6):641-647. doi:10.1016/j.jadohealth.2017.01.009
25. Tynes BM, Giang MT, Williams DR, Thompson GN. Online racial discrimination and psychological adjustment among adolescents. *J Adolesc Health*. 2008;43(6):565-569. doi:10.1016/j.jadohealth.2008.08.021

26. Mitchell KJ, Ybarra ML, Jones LM, Espelage D. What features make online harassment incidents upsetting to youth? *J Sch Violence*. 2016;15(3):279-301. doi:10.1080/15388220.2014.990462

27. Li C, Wang P, Martin-Moratinos M, Bella-Fernández M, Blasco-Fontecilla H. Traditional bullying and cyberbullying in the digital age and its associated mental health problems in children and adolescents: a meta-analysis. *Eur Child Adolesc Psychiatry*. December 31, 2022. doi:10.1007/s00787-022-02128-x

28. Gini G, Espelage DL. Peer victimization, cyberbullying, and suicide risk in children and adolescents. *JAMA*. 2014;312(5):545-546. doi:10.1001/jama.2014.3212

29. Fulantelli G, Taibi D, Scifo L, Schwarze V, Eimler SC. Cyberbullying and Cyberhate as Two Interlinked Instances of Cyber-Aggression in Adolescence: A Systematic Review. *Front Psychol*. 2022;13:909299. doi:10.3389/fpsyg.2022.909299

30. Castaño-Pulgarín SA, Suárez-Betancur N, Vega LMT, López HMH. Internet, social media and online hate speech. Systematic review. *Aggress Violent Behav*. 2021;58:101608. doi:10.1016/j.avb.2021.101608

31. Boer M, Stevens GWJM, Finkenauer C, van den Eijnden RJJM. The course of problematic social media use in young adolescents: A latent class growth analysis. *Child Dev*. 2022;93(2):e168-e187. doi:10.1111/cdev.13712

32. Paruthi S, Brooks LJ, D'Ambrosio C, et al. Recommended amount of sleep for pediatric populations: A consensus statement of the american academy of sleep medicine. *J Clin Sleep Med*. 2016;12(6):785-786. doi:10.5664/jcsm.5866

33. Alonzo R, Hussain J, Stranges S, Anderson KK. Interplay between social media use, sleep quality, and mental health in youth: A systematic review. *Sleep Med Rev*. 2021;56:101414. doi:10.1016/j.smrv.2020.101414

34. Hamilton JL, Chand S, Reinhardt L, et al. Social media use predicts later sleep timing and greater sleep variability: An ecological momentary assessment study of youth at high and low familial risk for depression. *J Adolesc*. 2020;83:122-130. doi:10.1016/j.adolescence.2020.07.009

35. Perrault AA, Bayer L, Peuvrier M, et al. Reducing the use of screen electronic devices in the evening is associated with improved sleep and daytime vigilance in adolescents. *Sleep*. 2019;42(9). doi:10.1093/sleep/zsz125

36. Telzer EH, Goldenberg D, Fuligni AJ, Lieberman MD, Gálvan A. Sleep variability in adolescence is associated with altered brain development. *Dev Cogn Neurosci*. 2015;14:16-22. doi:10.1016/j.dcn.2015.05.007

37. Hamilton JL, Tsypes A, Zelazny J, et al. Sleep influences daily suicidal ideation through affective reactivity to interpersonal events among high-risk adolescents and young adults. *J Child Psychol Psychiatry*. 2023;64(1):27-38. doi:10.1111/jcpp.13651

38. Liu RT, Steele SJ, Hamilton JL, et al. Sleep and suicide: A systematic review and meta-analysis of longitudinal studies. *Clin Psychol Rev*. 2020;81:101895. doi:10.1016/j.cpr.2020.101895

39. Shimoga SV, Erlyana E, Rebello V. Associations of Social Media Use With Physical Activity and Sleep Adequacy Among Adolescents: Cross-Sectional Survey. *J Med Internet Res*. 2019;21(6):e14290. doi:10.2196/14290

40. Bustamante EE, Santiago-Rodríguez ME, Ramer JD. Unlocking the promise of physical activity for mental health promotion. *JAMA Pediatr*. 2023;177(2):111-113. doi:10.1001/jamapediatrics.2022.5096

41. Nesi J, Miller AB, Prinstein MJ. Adolescents' Depressive Symptoms and Subsequent Technology-Based Interpersonal Behaviors: A Multi-Wave Study. *J Appl Dev Psychol*. 2017;51:12-19. doi:10.1016/j.appdev.2017.02.002

42. Nesi J, Prinstein MJ. Using Social Media for Social Comparison and Feedback-Seeking: Gender and Popularity Moderate Associations with Depressive Symptoms. *J Abnorm Child Psychol*. 2015;43(8):1427-1438. doi:10.1007/s10802-015-0020-0

43. Padín PF, González-Rodríguez R, Verde-Diego C, Vázquez-Pérez R. Social media and eating disorder psychopathology: A systematic review. *Cyberpsychology*. 2021;15(3). doi:10.5817/CP2021-3-6

44. Fioravanti G, Bocci Benucci S, Ceragioli G, Casale S. How the exposure to beauty ideals on social networking sites influences body image: A systematic review of experimental studies. *Adolesc Res Rev*. 2022;7(3):419-458. doi:10.1007/s40894-022-00179-4

45. Kleemans M, Daalmans S, Carbaat I, Anschütz D. Picture perfect: the direct effect of manipulated instagram photos on body image in adolescent girls. *Media Psychol*. 2016;21(1):1-18. doi:10.1080/15213269.2016.1257392

46. Maheux AJ, Roberts SR, Nesi J, Widman L, Choukas-Bradley S. Longitudinal associations between appearance-related social media consciousness and adolescents' depressive symptoms. *J Adolesc*. 2022;94(2):264-269. doi:10.1002/jad.12009

47. Common Sense Media. (2019, May 10). Digital citizenship | Common Sense Education. Common Sense Education. https://www.commonsense.org/education/digital-citizenship

48. Magis-Weinberg L, Muñoz Lopez DE, Gys CL, Berger EL, Dahl RE. Short Research Article: Promoting digital citizenship through a school-based intervention in early adolescence in Perú (a pilot quasi-experimental study). *Child Adolesc Ment Health*. 2023;28(1):83-89. doi:10.1111/camh.12625

49. Balt E, Mérelle S, Robinson J, et al. Social media use of adolescents who died by suicide: lessons from a psychological autopsy study. *Child Adolesc Psychiatry Ment Health*. 2023;17(1):48. doi:10.1186/s13034-023-00597-9

American Psychological Association apa.org

# EXHIBIT 6

International Journal of
*Environmental Research and Public Health*

MDPI

*Review*

# Positive Effects of Digital Technology Use by Adolescents: A Scoping Review of the Literature

**Aaron Haddock [1,*], Nadia Ward [1], Rondy Yu [2,*] and Nicole O'Dea [1]**

[1] Frances L. Hiatt School of Psychology, Mosakowski Institute for Public Enterprise, Clark University, Worcester, MA 01610, USA
[2] School of Education, University of California, Riverside, Riverside, CA 92521, USA
* Correspondence: ahaddock@clarku.edu (A.H.); rondy@ucr.edu (R.Y.); Tel.: +1-805-895-1476 (A.H.)

**Abstract:** This study examines the research literature published from 2012 to 2022 on the relationship between increases in adolescent consumption of digital technologies and its impact on multiple areas of development, with a focus on how adolescent immersion in an increasingly ubiquitous digital world engenders positive outcomes in terms of brain, cognitive, and social-emotional development. The literature search yielded 131 articles, 53 of which were empirical studies of the relationship between increases in consumption of digital technology and brain development, cognitive development, or social-emotional development among adolescents. Overall, these studies identify positive outcomes for adolescents who use different types of digital tech, including the internet, social media, and video games.

**Keywords:** adolescent; development; digital technology use; positive outcomes

check for updates

**Citation:** Haddock, A.; Ward, N.; Yu, R.; O'Dea, N. Positive Effects of Digital Technology Use by Adolescents: A Scoping Review of the Literature. *Int. J. Environ. Res. Public Health* **2022**, *19*, 14009. https://doi.org/10.3390/ijerph192114009

Academic Editor: Paul B. Tchounwou

Received: 27 September 2022
Accepted: 24 October 2022
Published: 27 October 2022

**Publisher's Note:** MDPI stays neutral with regard to jurisdictional claims in published maps and institutional affiliations.

**Copyright:** © 2022 by the authors. Licensee MDPI, Basel, Switzerland. This article is an open access article distributed under the terms and conditions of the Creative Commons Attribution (CC BY) license (https://creativecommons.org/licenses/by/4.0/).

## 1. Introduction

Today's youth are growing up in a world in which digital technology is ubiquitous and integrated into nearly every aspect of life. Basic human activities, including those related to education, socialization, and recreation, increasingly take place on digital platforms which have spawned new modes of engagement (e.g., socialization via social media, recreation, and learning via video gameplay). According to a recent research report based on a nationally representative survey among a random sample of tweens (8- to 12-year-olds) and teens (13- to 18-year-olds) in the United States, digital media use among teens, which varies across multiple demographic variables (e.g., gender, race/ethnicity, and household income), is on the rise, up nearly 17 percent since the onset of the COVID-19 pandemic [1]. It is estimated that, on average, adolescents today spend roughly eight and a half hours a day engaged with digital media, not including their use of digital technology for schoolwork [1]. The largest increases in digital media use have been in watching online videos, using social media, and browsing websites. Of these activities, both tweens (8- to 12-year-olds) and teens (13- to 18-year-olds) report that watching videos on YouTube is their favorite form of digital media activity, followed in order of preference by Snapchat, TikTok, Instagram, Discord, Facebook, Twitter, Pinterest, Reddit, and Tumblr [1]. On average, teens spend close to an hour and a half a day on social media [1]. Around a quarter of teens play video games on a console or computer daily, but nearly half report playing mobile games daily [1]. In terms of time spent, teens spend the most time watching videos, followed by gaming on various platforms, social media, and browsing websites. In terms of gender differences, boys use more screen media than girls and enjoy video games more; girls enjoy social media more than boys do. In a nationally representative sample of 743 teens in the United States, 97 percent of boys said they play video games compared to 83 percent of girls [2]. About 20 percent of teens regularly listen to podcasts. In the 21st century, digital engagement via various technological devices, platforms, and tools has become necessary for youth to accomplish key developmental tasks.

The saturation of the environment with digital media has prompted adjustments to established theoretical paradigms and birthed the field of media ecology, which examines how interactions with technology in the media environment shape, affect, facilitate, and impede human development. Importantly for this review, media ecology looks specifically at the impact on adolescent development when key developmental activities and interactions are mediated by digital technologies [3,4]. To accomplish this, media ecology draws on research in developmental psychology and Bronfenbrenner's bioecological model of human development, a foundational paradigm for the fields of developmental psychology, applied psychology, pediatrics and childhood studies [5,6].

The bioecological model of human development views individuals as biosocial beings placed at the center of nested systems that reciprocally interact to inform developmental outcomes [6,7]. At the core of this theory is the focus on proximal processes, or the reciprocal interactions between the developing individual and persons, objects or symbols within the immediate ecological context [8,9]. Human development is thus characterized as a product of the transactional relationship between the developing individual as an active agent and drivers of development across ecological contexts [10]. Bronfenbrenner's bioecological model consists of five nested systems. The microsystem is the immediate environment in which the youth lives and includes any immediate relationships or organizations they interact with (i.e., caregivers, other immediate family members, school, or other places of care). Surrounding the microsystem is the mesosystem, which is essentially the different parts of the microsystem working together for the sake of the youth. For example, the mesosystem captures the interrelationships between the technologies youth engage with across home and school contexts. The exosystem includes other individuals and places that youth may not interact with directly but still influence development, including caregivers' workplaces, extended family members, and the larger community context. Further, the macrosystem or outermost system of this model embodies sociocultural factors and ideologies that inform the ways in which youth development is supported across contexts [10]. This might include perceptions of tech engagement and misconceptions about influence that in turn dictate the extent to which youth engage with tech in the first place. Finally, the outermost system, or the chronosystem, captures the historical development of each system and the developing youth over time. This system is particularly important to consider given the historical advances in tech and the shifting discourse on digital tech effects on youth development.

Scholars are now updating the original bio-ecological framework to reflect how digital technology's deep impingement into the microsystem and mesosystem impacts human development [11,12]. For example, Johnson and Puplampu [13] introduced the concept of the ecological techno-subsystem (see Figure 1). As a feature of the microsystem, this subsystem accounts for different types of technology and the interactions they support between the developing individual and others in their system (i.e., family, peers, teachers). This theoretical shift utilizes an ecological perspective to hone in on youth development while drawing from media ecology [14]. Media ecology focuses on the ways in which all types of media shape the psychosocial characteristics of individuals, recognizing the environment that media technologies provide for interaction and identity development [12,14]. Like the intent of this scoping review, a major question stemming from media ecology is how and why various forms of digital engagement facilitate or impede processes of development and in turn, developmental outcomes. Focusing on media ecology as part of the innermost nested subsystem of influence, the role of technology use in development becomes a critical element of consideration that warrants holistic exploration [12].

As a generation known as "digital natives", [12,15] youth have choice and control in the type and frequency of which they engage with technology across ecological contexts that is unparalleled. The need to account for an additional zone that "mediates [the] bidirectional interaction between the child and the microsystem" in the most immediate developmental context underscores the profound influence of digital technology on child development in the 21st century.

Case: 25-2366, 08/11/2025, DktEntry: 26.2, Page 277 of 291
Case 5:22-cv-08861-BLF Document 60-7 Filed 05/19/23 Page 4 of 18






**Figure 1.** Ecological Techno-Subsystem.

*The Current Study*

There is a growing body of research literature that identifies positive outcomes for youth who use different types of digital technologies, including the internet, social media, and video games. This study provides a scoping review of the extant literature examining adolescent consumption of digital technology and its impact on brain, cognitive, and social-emotional development, with a particular focus on how their immersion in an increasingly ubiquitous digital world engenders positive outcomes across these outcomes of interest.

## 2. Materials and Methods

In keeping with the research literature on digital engagement and media effects, this literature review employs the concept of digital media as a superordinate term that encompasses the broad category of types of digital technologies, applications, devices, platforms, and tools. Information and communication technologies (ICT) is another term frequently found in the literature that is synonymous with digital media. Similarly, Crone and Konijn [16] simply use the term media to describe the "media-saturated world, where media is used not only for entertainment purposes, such as listening to music or watching movies, but is also used increasingly for communicating with peers via WhatsApp, Instagram, SnapChat, Facebook, etc". (p. 1).

This literature review employs the term digital engagement to capture youth's "quotidian digital and online activity" and "the digital world". Like digital media, digital engagement is "a broad concept of digital participation, which is not dependent on a specific technological device, platform, or tool" [17] (p. 102). An important aspect of adolescents' and young adults' digital engagement is captured by the concept of socio-digital participation (SDP) [18], which refers to participation in socio-digital activities via socio-digital technologies, defined as "the integrated systems of novel technological tools, social media, and the internet that enable constant and intensive online interaction with information, people, and artifacts" [19] (p. 16). Importantly, social-digital engagement is conceptualized as a participatory social practice reflective of adolescents' lived experiences—and not merely acts of technology usage [19–21]. Typically, adolescents' digital engagement activities are friendship-driven, interest-driven, or a combination of these digital engagement practices [21].

*Search Strategies*

PRISMA is an evidence-based minimum set of items for reporting in scoping reviews, systematic reviews, and meta-analyses. In alignment with the PRISMA guidelines [22], the authors conducted a scoping review to source all literature with relevance to technology

Case: 25-2366, 08/11/2025, DktEntry: 26.2, Page 278 of 291
Case 5:22-cv-08861-BLF Document 60-7 Filed 05/19/23 Page 5 of 18



engagement and youth development. Articles were identified for possible inclusion from five relevant databases PsycINFO, PubMed, Google Scholar, PLoS, and PsychARTICLES; additional searches were conducted using Academic Search Premier, a large database that includes 8500 journals that cut across a range of scientific disciplines. Search terms included: Adolescen*, brain development, cognitive development, college and career readiness, communication skills, digital media, digital technolog*, learning, neuroplasticity, social development, social emotional, technology, youth. All searches included one search term related to technology (i.e., digital technolog*, digital media, technology) and a term related to a developmental outcome of interest (e.g., brain development, cognitive development). Terms were combined using AND when searches were intended to be inclusive of all terms (i.e., adolescen* AND digital technolog* AND cognitive development), while terms that can be interchanged were combined using OR (e.g., adolescen* OR youth). Results were limited to articles that were peer- reviewed and published between 2012–2022.

## 3. Results

The authors conducted an initial screening of all identified articles using the following inclusion criteria: (a) empirical study or review of the literature, (b) examines the effects of the use of digital technologies (i.e., internet, social media, video games) on at least one developmental domain of interest (i.e., brain development, cognitive development, social-emotional development, mental health/well-being). The initial search yielded 131 articles, of which 73 were excluded due to the criteria described above (see Figure 2). Fifty-three articles were fully reviewed between three of the authors. Inclusion decisions were made using a consensus approach where each article was discussed between at least three authors in a group format and then determined by the group to be included or not. Table 1 provides a summative overview of the selected articles organized by developmental domains of interest.




**Figure 2.** PRISMA Flow Diagram for Scoping Review.

SER-278

Case: 25-2366, 08/11/2025, DktEntry: 26.2, Page 279 of 291
Case 5:22-cv-08861-BLF Document 60-7 Filed 05/19/23 Page 6 of 18



**Table 1.** Overview of Selected Articles.

| Developmental Domain | Articles (N = 53) | Tech Types | Major Findings |
|---|---|---|---|
| Brain | 6 | Video games | • Positive association between time spent playing video games and increases in volume of gray matter in various parts of the brain (e.g., hippocampus, prefrontal cortex)<br>• Positive association between time spent playing video games and increases in performances in tasks requiring selective attention, working memory, and visual-motor integration |
| Cognitive | 11 | Video games, Internet use | • Video game training augments gray matter in areas of the brain that relate to cognitive abilities related to spatial navigation, strategic planning, and working memory.<br>• Video games help balance cognitive stimulation and exercise the brain.<br>• Internet use contributes to task completion and skill competencies. |
| Social-Emotional | 22 | Video games, Internet use, Social Media | • Video games promote mental "healthiness", support perceived control and agency, and helps to foster initiative in youth.<br>• Video games create contexts that can help satisfy basic psychological needs (competence, autonomy, relatedness) and, in turn, effectuate positive outcomes.<br>• Video games afford opportunities to virtually experience different identities and situations that can promote self-exploration and goal adoption.<br>• Prosocial gaming does not influence later executive function-specifically fluid reasoning and empathy, a related SEL function.<br>• Game-based SEL programs can increase social-emotional competencies.<br>• Internet use increases the ability to think creatively and reflect on social relationships.<br>• Social media facilitates social connection, identity development, and positive emotions.<br>• Online peer communication via social media enhances friendship quality, perception of social support, connectedness. |
| Mental health and well-being | 14 | Video games | • Video games provide relief for stress and anxiety during periods of adversity (i.e., the COVID-19 pandemic).<br>• Video games promote a sense of connectedness and address feelings of isolation.<br>• Video game play at responsible amounts facilitates positive psychosocial adjustment (e.g., prosocial behavior). |

## 4. Findings

The discourse on the impact of digital media on youth is an extension of an age-old cultural concern and debate over the impact of new forms of technology on youth [23]. As Orben [24] has traced, concern and, at times even panic, over the influence of technology on youth has a long history. For example, in the Phaedrus, written circa 370 BCE, Plato recorded Socrates' concern that the invention of writing and reading would ruin young people's ability to use their memory and make them seem well educated and wise when in fact they were ignorant and unwise. In more recent centuries, tech fears have ranged from the novel giving rise to reading addiction, reading mania, and risky, immoral behavior in the 18th century to concerns about the negative influence of radio, television, smartphones, video games, and social media in the 20th and 21st centuries.

Although research on media effects has established that youth's engagement with digital media can drive both positive and negative outcomes [3,25,26], the public perspective has focused more on its potential harm than benefits. Despite the focus on the negative impacts of technology on child development, the evidence linking digital engagement and negative outcomes is frequently overstated, focused on extreme users, and supported by studies lacking requisite nuance and complexity to discern specific effects [27,28]. Since the literature is largely based on correlational self-report data instead of sophisticated experimental designs, the direction of effects between digital media use and negative outcomes remains unclear [29,30]. When factors such as the type and quality of digital engagement, the social and developmental context, age, and individual differences are taken into consideration, digital engagement can function as a resource or a demand [31]. While it is a commonly held belief that digital engagement displaces important alternate activities, like sleep, interacting with friends and family, reading, and physical activity, the extant research has not substantiated this concern [27,32–34]. Conversely, the empirical evidence indicates that digital media facilitates peer communication, connection, and closeness (e.g., Davis [35]) and that engagement with tech at moderate levels is likely not deleterious [26,36,37] and may be promotive in a digital world (e.g., Giovanelli et al. [38]). For example, Lenhart et al. [39] found that social media use and collaborative gaming can facilitate friendships, social engagement, positive peer relations, and the provision of social support.

Digital media use is, according to Giedd [23], "in fact exquisitely aligned with the biology of the teen brain and our evolutionary heritage" (p. 128). Grounded in research on the neurobiological changes occurring during adolescence, Giedd clarifies how teens' digital engagement is driven by changes in the brain's reward system during puberty (dopamine, serotonin, GABA), teens' efforts to accomplish key developmental tasks (e.g., Borca et al. [40]), and core features of the developing brain. fMRI studies on the adolescent brain demonstrate that, during adolescence, forming social connections becomes particularly salient and highly rewarding, which is reflected in their sensitized socio-affective brain circuits (Somerville, 2013). Given humans' evolutionary history and the importance of strong connections with others, teens experience an existential drive for human connection, acceptance, and identification with groups (e.g., Crone & Dahl [41]; Blakemore & Mills [42]). Similarly, our evolutionary psychology predisposes humans to explore the environment, seek out adventure, and master threats—especially during the adolescent years when all social mammals exhibit increases in sensation seeking and risk taking. Adolescents also find experiences that enhance their affective development, or their emotional capacity to experience, recognize, and express a range of emotions and respond to others' emotional cues, particularly reinforcing [41]. Developing the skills and aptitudes needed to transition to adulthood is highly motivating and rewarding for teens; whether these experiences take place in environments that are real or simulated matters little to the teen mind (e.g., Przybylski et al. [43]). Teens also exhibit a strong desire for information driven by evolutionary survival pressures and the human brain's need for massive amounts of data from the environment for maturation (i.e., brain plasticity) and improved decision making. Thus, when it comes to digital technologies, what adolescents seek and find especially rewarding are opportunities to (1) face and overcome challenges, (2) connect and identify with a group, (3) grow emotionally, and (4) gain immediate access to actionable information.

### *4.1. Digital Tech & the Brain*

While the research linking technology use and changes in the brain is still in its infancy, studies are emerging that indicate that digital engagement may positively (and negatively) influence human brains and behavior. For instance, studies utilizing brain imaging techniques have documented how intensive digital engagement can lead to changes in the brains of children and adolescents and affect brain functions, such as cognition, language, and visual perception (e.g., Firth et al. [44]; Hutton et al. [45]; Winnick & Zolna [46]).

#### 4.1.1. Video Games

Several studies have examined the connection between playing video games and brain structure using structural magnetic resonance imaging (sMRI). In one such study involving 152 adolescent participants in Germany, Kühn et al. [47] found a positive association between the reported amount of time spent playing video games (of any type) and cortical thickness in the prefrontal areas of the left hemisphere (i.e., dorsolateral prefrontal cortex and frontal eye field). They concluded that the thickness of the dorsolateral prefrontal cortex was related to executive control and the thickness of the front eye field was related visual-spatial attention and visual-motor integration.

Additionally, some studies have employed functional magnetic resonance imaging (fMRI) to examine the connection between playing video games and brain activity. For example, Mosaila et al. [48] used fMRI scans to compare the performance of 167 adolescents and young adults in Finland, who varied in terms of how frequently they played video games, on a task with selective attention and working memory demands. Results showed that those who reported playing video games more frequently displayed enhanced working memory functioning and task-difficulty-dependent modulation in a network of frontal and parietal brain areas in both hemispheres.

#### 4.1.2. Social Media/Internet

Studies have also documented specific brain regions engaged to build and maintain online social networks that are different from those used for offline social networks along with changes in the cortical volume of the brain stemming from engagement with peers via social media. Kanai et al. [49] found that, among participants in England, variation in online social network size strongly predicted gray matter volume and density in particular regions of the brain associated with social cognition, including navigating social networks and maintaining positive peer relationships, but not areas associated with understanding others' actions, intentions, and perspectives. Kanai et al. [49] also found that online social network size was associated with areas of the brain responsible for remembering name-face associations. While this study was unable to determine the direction of the relationship between brain structure and participation in online social networks and whether friendships drive observed brain changes, scholars have pointed to these findings as evidence of adolescents' and emerging adults' sensitivity to the interpersonal dynamics involved when engaging with peers on social media.

### *4.2. Digital Tech & Cognitive Development*

Cognitive development is best defined as the processes through which individuals acquire and organize new information or knowledge in order to apply it to novel situations [50]. Youth cognitive development is a salient domain when considering technology engagement. Often, engaging with technology like video games involves developing and sustaining problem-solving skills [51] and honing in on skills that enhance spatial recognition [52]. Below, we summarize findings that emphasize a positive relationship between tech engagement and both problem- solving and spatial skill development.

#### 4.2.1. Social Media/Internet

Fitton and colleagues [53] examined the relationship between internet use and cognitive and psychosocial development among a cohort of adolescents in the United States (N = 128). Authors conducted semi-structured interviews to gather insight on youths' use of technology, level of comfort engaging with it, and how they feel it influences their own development. Overall, technology was perceived by youth as an integral part of their daily lives and a positive influence on their development. Specifically, they emphasized noticeable increases in skills and competencies related to recognizing information that they need and finding it on their own. With that, they recognized enhanced abilities in acquiring knowledge and creative thinking.

4.2.2. Video Games

Uttal and colleagues [52] conducted a meta-analysis of studies that focused on trainings that aimed to improve spatial skills. Spatial skills of interest included: (1) spatial perception, or the ability to determine spatial relationships in relation to an individual's own location even with distraction; (2) mental rotation, or the ability to visualize the movement of an object without any physical movement in order to make judgements; and (3): spatial visualization, or the ability to carry out a series of manipulations of stimuli that is spatially present [52]. Upon close examination of 217 studies involving diverse youth, authors concluded playing video games can be an effective training intervention to enhance spatial skills, where video game players across studies performed significantly better in tasks that require spatial attention and skill. Authors note, however, that the effectiveness of video game play as a spatial training intervention is based on personal characteristics, type of video game, and the duration and frequency of training sessions.

Kühn and colleagues [47] took a closer look at spatial skills by conducting a randomized comparative effectiveness trial with a sample of young adults in Germany (N = 48). The intervention arm, or video game training group, received instructions to complete various spatial tasks whereas the control group was instructed to freely explore during play. The training group engaged in video game training for at least 30 min a day for a span of two months using Super Mario 64, a widely known platformer game. Brain scans were conducted for both groups after the two- month training period. Results demonstrated significant differences between groups in brain imaging, showing an increase in gray matter in areas of the brain that are important for spatial navigation, strategic planning, and working memory. Overall, results supported the notion that video game training can be used to augment gray matter in the brain that are responsible for cognitive abilities.

*4.3. Digital Tech & Social-Emotional Development*

Social-emotional development is characterized by learning how to understand, manage, and express emotions in the context of learning about and building relationships with others [54]. Engaging with technology often involves a social context. Building on the social-emotional development literature, the Collaborative for Academic, Social, and Emotional Learning (CASEL) [55] has provided the most widely utilized definition of social and emotional learning (SEL): "SEL is the process through which all young people and adults acquire and apply the knowledge, skills, and attitudes to develop healthy identities, manage emotions and achieve personal and collective goals, feel and show empathy for others, establish and maintain supportive relationships, and make responsible and caring decisions". Studies outlined below emphasize aspects of social-emotional development that are enhanced by tech engagement. For a research-based review of potential ways technology can be leveraged to support SEL (see Slovák & Fitzpatrick [56]).

4.3.1. Digital Media

Przybylski and Weinstein [26] studied links between digital screen time (i.e., video games, computers, smartphones, films and other media) and mental well-being (i.e., happiness, life satisfaction, psychological functioning, and social functioning) in a sample of 120,115 15-year-olds in the United Kingdom. Female participants reported more engagement with smartphones, computers, and the internet, whereas male participants reported significantly more engagement with video games. Results indicated that moderate digital engagement (e.g., on a weekday, spending less than 1 h and 40 min playing video games or less than 1 h and 57 min using a smartphone) across device types is positively associated with mental well-being and does not appear to displace other activities that foster mental well-being. As the authors conclude, the study results suggest that, when used in moderation, digital technologies may "afford measurable advantages to adolescents" (p. 213), including providing opportunities for communication, creativity, and development.

It should be noted that the relationship between digital engagement and well-being among adolescents is still unclear and appears to vary by individual differences and

Case: 25-2366, 08/11/2025, DktEntry: 26.2, Page 283 of 291
Case 5:22-cv-08861-BLF Document 60-7 Filed 05/19/23 Page 10 of 18



the quantity and quality of digital media use. Studies have documented a variety of associations, including small, negative associations [28,57,58], no association [59], positive associations [60–63], and mixed results [64–66].

#### 4.3.2. Social Media/Internet

Studies have documented how adolescents' social media use enhance social development and enhance relationships and social connections. For example, Reid et al. [67] found that social media platforms facilitate teens' access to and interactions with others different from themselves, which increases understanding and empathy. In a study of 200 adolescents and emerging adults in Israel, Ziv and Kiasi [68] found that Facebook use provided users with a positive community that supported their psychological well-being; these effects were particularly pronounced for users with lower social skills who may have struggled more with in-person interactions. In a quantitative 7-day diary study of 162 adolescent Facebook users in Germany, Wenninger et al. [63] documented the positive association between targeted communication activities on social media that evoke reciprocity, like chatting and exchanging feedback via comments and likes, and positive emotions. As previously noted, this is in part because the adolescent brain is particularly sensitive to forming and maintaining social connections and developing an identity in relation to others.

#### 4.3.3. Video Games

Przybylski [69] examined the relationship between video game engagement and psychosocial adjustment (i.e., prosocial behavior, life satisfaction, and internalizing and externalizing problems) in a sample of 4899 10–15-year-olds from England, Northern Ireland, Scotland, and Wales. Analyses found small (<1.6% of variance) yet statistically significant positive associations between low levels of video game play and psychosocial adjustment. When compared to non-video game players, light video game play (i.e., less than one hour per day) was associated with positive psychosocial adjustment, including higher life satisfaction and prosocial behavior and lower levels of problems with peers, conduct problems, and emotional symptoms. No significant differences were detected for moderate levels of video game engagement (i.e., 1–3 h per day) when compared with nonplaying peers. However, heavy video game play (over 3 h daily) was associated with more negative psychosocial adjustment—indicating a possible dosage effect. Results suggest that playing video games responsibly provides youth with opportunities for socialization, identity development, and cognitive challenges that are facilitative of social-emotional development in a manner similar to more traditional forms of play.

In 2017, Adachi and Willoughby [70] reviewed the literature on the link between playing video games and positive youth outcomes, such as well-being, intrinsic motivation, learning, optimal functioning, and positive peer relationships. The review focuses on studies that apply self-determination theory (SDT) to explain how video games may create contexts that satisfy basic psychological needs (i.e., competence, autonomy, and relatedness) and, in turn, effectuate positive outcomes. Citing numerous studies published between 2000 and 2016, the authors argue convincingly that playing video games afford experiences of independence, interdependence, cooperation, exploration, and challenge that in turn foster enhanced autonomy, competence, human relatedness, and well-being. The review also establishes a link between playing video games and developing problem-solving skills (e.g., identify the problem, generate and evaluate possible solutions) that hold the potential to not only improve adolescents' game play but also their peer relationships. This link is further buttressed by research on how playing online video games cooperatively with diverse youth enhances intergroup relations and feelings of social connection.

EmoTIC is an example of a game-based social-emotional program with demonstrated impact on adolescent social and emotional development [71]. The intervention has a science-fiction theme and is delivered via a digital app. Users participate in four classroom group sessions and complete twelve individual home activities focused on acquiring foundational

SEL concepts (e.g., emotional skills, social skills, enhancing self-knowledge and self-esteem, and assessing growth. Results showed that adolescents in Madrid, Spain between the ages of 11 and 15 ($n$ = 119) who completed the program improved on several measures, including self-esteem, feelings of well-being, emotion regulation, and prosocial behavior.

### *4.4. Digital Tech & Mental Health/Well-Being*

Youth mental health and well-being is an all-encompassing term that represents a balance of emotional, psychological, and social wellness [72]. It involves the ways in which youth handle stress, practice healthy habits, and maintain social engagement. Mental health and well-being are particularly important for youth as they are at the cusp of developmental milestones that heavily rely on mental, social, and emotional wellness.

#### 4.4.1. Video Games

Video games possess the unique ability to enable adolescents to experiment with and "try on" different identities and experiences not available in their current life situation or developmental phase. In a study of emerging adults (nationality not provided) by Przybylski et al. [43], researchers found that when games facilitated alignment between players' ideal-self characteristics and game-self characteristics, players experienced higher levels of intrinsic motivation and well-being. These results suggest that digital engagement experiences that enable adolescents and young adults to simulate and experience ideal aspects of themselves (e.g., helping others, graduating from college, having a desirable career) may enhance motivation to engage in the experience while offering virtual exposure experiences that promote self-exploration and goal identification and adoption.

Barr & Copeland-Stewart [73] examined video game play and youths' overall well-being during the COVID-19 pandemic. Using an online survey with closed and open-ended questions, authors measured game play habits and aspects of mental health and well-being among a large sample of youth (N = 781) during the pandemic. Results indicated that youth engaged in more frequent game play for longer segments of time, describing their extended engagement as an "escape from the pandemic". This finding correlated with increased socialization during the lockdown advisory and decreased anxiety and depression. Further, respondents reported feeling as though engaging in video game play provided more feelings of control and agency during a particularly challenging time. Overall, this article emphasizes that video game play can provide support and relief that contributes to improved mental, social, and emotional wellness.

#### 4.4.2. Social Media/Internet

Multiple studies have demonstrated that most people use social media to support, maintain, and enhance offline social relationships [74–76]. For instance, in a nationally representative survey of teens in the United States (743 youth between the ages of 13 and 17) by the Pew Research Center, 31 percent of teens said that social media has had a mostly positive impact, especially when it comes to connecting and staying in touch with friends and family [2,77]. Respondents also emphasized how their use of social media enabled them to meet and connect with others with similar interests, explore their identity and express themselves, garner peer support, and learn new things. Eighty one percent said social media makes them feel more connected to their friends; 69 percent said it helps them interact with a more diverse group of people; and 68 percent said it makes them feel as if they have people who will support them through tough times. Overall, teens associated social media use with positive emotions, including feelings of inclusion and confidence [2].

Kanai et al. [49] found that variability in the size of users' offline social networks was correlated with variability in the size of users' online networks. Building on this finding, Davis [61] examined the impact of digital media use and online peer communication on friendship quality in 2079 adolescents in Bermuda. Analyses revealed a positive association between more frequent online communications with friends and friendship quality. In discussing the findings, Davis noted that studies support the view that, despite the negative

public perception, the existing evidence suggests that online peer communication is largely positive and serves to enhance peer relationships.

In a systematic review of the literature, which included large numbers of adolescents and emerging adults, Erfani and Abedin [78] found social media use led to increased well-being and had positive effects on users' social support, communication, and connectedness. Meta-analyses have also found that connecting with others via social media enhances both social support and users' perceived social resources [79,80].

There are some potential limitations concerning the results of this study. It is possible that the search terms used were not inclusive of all possible variants and the databases searched were not inclusive of all relevant journals, thus resulting in the exclusion of relevant studies. However, it is important to note that scoping reviews are not intended to be exhaustive [81]. In addition, it is possible that the synthesis literature included in this review suffers from the prevalent issue of non-independence of observations (i.e., overlap among primary-level studies). However, non-independence "may be fairly minimal" in reviews that draw from a broader body of literature that includes sources representing many different disciplines [82].

### *4.5. Conclusions*

In sum, this scoping review of the empirical research literature on the relationship between digital engagement and positive youth development found evidence of specific positive effects on adolescent brain development, cognitive development, social-emotional development, and mental health and well-being. These included improvements in executive control, visual-spatial attention, visual motor integration, problem solving, working memory, strategic planning, and information gathering; increases in social-emotional learning, intrinsic motivation, socialization, social support, social connection, and creativity; and enhancements to autonomy, competence, communication skills, and well-being.

### *4.6. Recommendations for Leveraging Digital Tech Use to Promote Positive Outcomes for Adolescents*

Given the documented impact of digital engagement on adolescent development, tech-based interventions demonstrate promising potential across domains of youth development. There is clearly a unique opportunity to leverage technology in a manner that will positively engage teens and intervene with them to help them learn about themselves, advocate for themselves, and explore careers. However, as evidenced by the scoping review, there is a limited number of articles that focus primarily on positive outcomes. The following recommendations are based on the findings of the scoping review, behavior change design principles, and insights from startup product development.

#### 4.6.1. Employ an Intervention Design Process

When developing tech-based interventions, begin by carefully defining the problem to be solved, the outcomes of interest, the target users, and the target users' relevant contexts. Then, explore a variety of potential solutions. When exploring solutions, consider (a) possible intervention designs and (b) possible tech-based delivery methods. The findings of this literature review are particularly pertinent to this phase of the design process and will help clarify which types of solutions are likely to be most effective. This can be visually represented in an outcome logic map or logic model. Program evaluators employ logic models to define the specific outcomes an intervention is intended to achieve, the activities (i.e., mechanisms of action) that will facilitate achievement of the targeted outcomes, and how the intervention's results will be measured. When applied to tech-enabled interventions, it is especially important to clarify how the intervention will be implemented and used.

Employ a customer discovery approach to determine how best to meet potential users' needs [83]. Interview target users to understand their perspective, motivations, priorities, values, goals, and identities. Explore their reasons for engaging with the intervention being developed. Ask them what tech product features and intervention components they

think will help them achieve the target outcomes (e.g., increased self-knowledge, career exploration). If the intervention aims to change behavior, consider using the Behavior Change Wheel as a product design framework. Based on in-depth research on 19 behavior change frameworks, the Behavior Change Wheel helps product designers identify solutions that enhance users' capability, opportunity, and motivation to change or engage in a particular behavior. See Michie, Atkins, & West's practical guide to intervention design, The Behaviour Change Wheel: A Guide to Designing Interventions [84] and Bucher's Engaged: Designing for Behavior Change [85].

#### 4.6.2. Convene a Youth Advisory Board

If teens are the target users, engage teens at every phase of the design process to create a teen-centric intervention that connects their motivations with the target outcomes. Convene a diverse and inclusive teen advisory board to get their perspectives and solicit their guidance on what teens need, want, and will use. Once a beta version of the intervention is ready, relentlessly collect feedback from teens on what works and what needs to be changed.

Have the teen advisory board work closely with subject matter experts and technologists to ensure the interventions and experiences integrate into their lives and use language they will respond to. Like other popular forms of digital engagement, interventions will work best if they meet youth where they are at in familiar and fun ways.

Highlight teens involvement with the creation of the intervention and provide opportunities for teens to promote it.

#### 4.6.3. Create Authentic and Engaging Digital Experiences

Youth are particularly sensitive and responsive to authentic social media messaging. Social media campaigns and initiatives will be most effective if developed and deployed by youth with the support of subject matter experts. Rallying authentic youth engagement (e.g., "likes", "retweets", etc.) and promotion of the campaign or message is key. For example, a social media campaign aimed at inspiring youth to consider pursuing a technical career as a possible alternative to college could begin by convening a teen advisory board charged with discovering, for example, teens' questions about the decision to pursue a technical career. The youth advisory board's process of gathering this information (e.g., through social media queries, focus groups, surveys, interviews, etc.) could be shared in creative social media posts, videos, and photos and serve to promote the campaign and create a community around the initiative online. This will build trust and buy-in.

Digital interventions that leverage social media should take into consideration the social norms of the platform. There is evidence to suggest that teens are increasingly reluctant to explore, experiment with, and express their identity or emerging identities on mainstream social media platforms like Facebook and Instagram, but continue to do so on YouTube and fanfiction sites and in microblogging communities [86]. Therefore, interventions that aim to facilitate identity exploration and development in the service of greater self-awareness and self-knowledge should keep this in mind and create online spaces where teens feel understood, experience camaraderie, and can be genuine and engage in authentic self-exploration [61,87]. Ideally, an online social network will engender positive growth, provide teens with social support, and connect them with the peers, experts, and professionals that will help them achieve their goals and the intervention's target outcomes.

Tech-based interventions to facilitate self-knowledge, self-awareness, and identity development should provide youth with opportunities to explore different identities, including idealized versions of themselves, and contexts that are not currently accessible. For instance, a video game or virtual reality experience could enable users to try out different careers in a variety of roles (e.g., programmer, team leader, copywriter, marketing director). An app could help teens imagine their future self in college or a career coupled with an opportunity to set short- and long-term goals and create a detailed action plan aligned with their values. The app-based action plan could guide and support users as

Case: 25-2366, 08/11/2025, DktEntry: 26.2, Page 287 of 291
Case 5:22-cv-08861-BLF Document 60-7 Filed 05/19/23 Page 14 of 18



they take concrete steps toward their goals, offer timely tips and encouraging feedback, and celebrate and reward users when they reach important milestones on their journey.

If the digital intervention leverages a social component, provide users with choice. The research is clear that online social support can be beneficial for teens; however, not all users want to engage in a social aspect or have their activities be made public. Nevertheless, provide all users with the option to witness the social engagement of others, even if they do not participate. Research has shown that witnessing the online social engagement of others can be nearly as beneficial as active participation [85].

#### 4.6.4. Leverage the Best Features and Most Popular Forms of Digital Engagement

Teens range freely across digital media platforms and tools. Design tech-enabled interventions that leverage the best features of gaming, social media, online videos, streaming, and digital content creation devices. Take teens' favorite forms of digital media activity into consideration; among teens in the U.S., research indicates watching videos on YouTube is their favorite form of digital media activity, followed in order of preference by Snapchat, TikTok, Instagram, Discord, Facebook, Twitter, Pinterest, Reddit, and Tumblr [1].

Leverage technological innovations to support SEL. For example, use mobile devices to provide youth with just-in-time prompts (e.g., to label emotions and practice emotion regulation skills when high levels of stress are detected by physiological sensors), reminders (e.g., to engage in activities that promote well-being or facilitate social connection), and scaffolding and support (e.g., how to use problem solving skills; prompts to track experiences to facilitate self-reflection and/or discussions at a later time). Use social media sites to support reflection, sharing of experiences, and social-emotional self-awareness. Online social networks can also be used for online support groups that provide, for instance, information on and support around college and career exploration or mental health. Natural language understanding technology is already being used by mental health professionals to monitor therapy sessions and glean evidence-based insights; a similar approach could be applied in everyday life to foster social-emotional development and communication skills.

While virtual reality's (VR) ability to create powerfully immersive experiences continues to hold incredible promise for SEL, skill building, and mental health promotion and treatment [88], currently less than 20 percent of youth have access to VR headsets [1].

#### 4.6.5. Use Video Games to Build Community, Provide Exposure Experiences, Explore Identity, and Enhance Perspective Taking

Video game play among youth is particularly high and thus provides a unique opportunity to engage their interests in a way that promotes development and engages them within the community. Offering opportunities for youth to engage in game play within the community, for example, in-person or virtual tournaments, provides youth with a platform that not only supports their cognitive development and psychosocial wellness, but also maintains social connection during the extended pandemic period. There is also evidence to suggest that interactive media experiences can facilitate perspective taking, communication skills, and collaboration.

When designing video game-based interventions, provide the player with enough challenge to make the game engaging, but not so challenging that the player feels the task is insurmountable. Game-based interventions that provide players with novel opportunities to embody and experience ideal aspects of themselves (i.e., how they would like to experience themselves) will enhance intrinsic motivation to play the game along with enjoyment [43].

#### 4.6.6. Understand the Environment in Which Digital Interventions Are Implemented

Considering how technology now mediates interactions between the developing individual and others in their microsystem (i.e., family, peers, teachers), when designing tech-based interventions it is important to consider the role it will play in teens' techno-subsystem. For example, how will this intervention integrate with what teens are already

doing in their daily lives? How may the reciprocal interactions with other important individuals in the teens' microsystem facilitate or impede intervention effectiveness? How might influential peers, parents, and mentors be recruited to support and amplify the aims of an intervention? Tech-based interventions that easily integrate with existing influential relationships in the youth's microsystem will be most engaging and effective.

In light of changes in the brain occurring during adolescence, the most naturally engaging and effective digital interventions will: (a) be fun, engaging, and social; (b) foster emotional growth; (c) give teens agency over their education; (d) enable identity exploration and experimentation; (e) engage other influential people in teens' developmental context; (f) help teens draw connections between their core values, priorities, and short- and long-term goals, (g) empower exploration and mastery of their environment; (h) facilitate achievement of key developmental tasks; and (i) provide immediate access to actionable information.

**Author Contributions:** Conceptualization, A.H., N.W., R.Y. and N.O.; methodology, A.H., N.W., R.Y. and N.O.; formal analysis, A.H., R.Y. and N.O.; investigation, A.H., N.W., R.Y. and N.O.; writing—original draft preparation, A.H., N.W., R.Y. and N.O.; writing—review and editing, A.H., N.W., R.Y. and N.O.; visualization, R.Y. and N.O.; supervision, A.H. and N.W.; project administration, A.H. and N.W.; funding acquisition, N.W. and A.H. All authors have read and agreed to the published version of the manuscript.

**Funding:** This research was funded by American Student Assistance (ASA).

**Data Availability Statement:** The data presented in the study is available upon request from the first author.

**Conflicts of Interest:** The authors declare no conflict of interest. The funders had no role in the collection, analyses, or interpretation of data; in the writing of the manuscript; or in the decision to publish the results.

## References


1. Rideout, V.; Peebles, A.; Mann, S.; Robb, M.B. *Common Sense Census: Media Use by Tweens and Teens, 2021.*; Common Sense: San Francisco, CA, USA, 2022.
2. Anderson, M.; Jiang, J.; Teens' Social Media Habits and Experiences. Pew Research Center Website. 2018. Available online: https://www.pewresearch.org/internet/2018/11/28/teens-social-media-habits-and-experiences/ (accessed on 15 May 2022).
3. Hur, J.; Gupta, M. Growing up in the web of social networking: Adolescent development and social media. *Adolesc. Psychiatry* **2013**, *3*, 233–244. [CrossRef]
4. Postman, N. *The Humanism of Media Ecology*; Media Ecology Association: New York, NY, USA, 2000; Volume 1, pp. 10–16.
5. Bronfenbrenner, U. *The Ecology of Human Development: Experiments by Nature and Design*; Harvard University Press: Cambridge, MA, USA, 1979.
6. Sameroff, A. *The Transactional Model of Development: How Children and Contexts Shape Each Other*; American Psychological Association: Washington, DC, USA, 2009.
7. Bronfenbrenner, U.; Ceci, S.J. Nature-nurture reconceptualized in developmental perspective: A bioecological model. *Psychol. Rev.* **1994**, *101*, 568. [CrossRef] [PubMed]
8. Rosa, E.M.; Tudge, J. Urie Bronfenbrenner's theory of human development: Its evolution from ecology to bioecology. *J. Fam. Theory Rev.* **2013**, *5*, 243–258. [CrossRef]
9. Tudge, J.R.; Payir, A.; Merçon-Vargas, E.; Cao, H.; Liang, Y.; Li, J.; O'Brien, L. Still misused after all these years? A reevaluation of the uses of Bronfenbrenner's bioecological theory of human development. *J. Fam. Theory Rev.* **2016**, *8*, 427–445. [CrossRef]
10. Bronfenbrenner, U.; Morris, P.A. The Bioecological Model of Human Development. In *Handbook of Child Psychology: Theoretical Models of Human Development*; Lerner, R.M., Damon, W., Eds.; John Wiley & Sons Inc.: Hoboken, NJ, USA, 2006; pp. 793–828.
11. Livingstone, S.; Haddon, L. (Eds.) *Children, Risk and Safety on the Internet: Research and Policy Challenges in Comparative Perspective*; Policy Press: Bristol, UK, 2012.
12. O'Neill, B. Ecological perspectives and children's use of the Internet: Exploring micro to macro level analysis. *Eest. Haridusteaduste Ajakiri. Est. J. Educ.* **2015**, *3*, 32–53. [CrossRef]
13. Johnson, G.M.; Puplampu, K.P. Internet use during childhood and the ecological techno-subsystem. *Can. J. Learn. Technol.* **2008**, *34*, n1. [CrossRef]
14. Strate, L. Media ecology. *Commun. Res. Trends* **2004**, *23*, 1–48.
15. Prensky, M. Digital natives, digital immigrants part 2: Do they really think differently? *Horizon* **2001**, *9*, 1–6. [CrossRef]

16. Crone, E.A.; Konijn, E.A. Media use and brain development during adolescence. *Nat. Commun.* **2018**, *9*, 1–10. [CrossRef] [PubMed]
17. Hietajärvi, L.; Maksniemi, E.; Salmela-Aro, K. Digital Engagement and Academic Functioning. *Eur. Psychol.* **2022**, *27*, 102–115. [CrossRef]
18. Hakkarainen, K.; Hietajärvi, L.; Alho, K.; Lonka, K.; Salmela-Aro, K. Sociodigital Revolution: Digital Natives vs Digital Immigrants. In *International Encyclopedia of the Social & Behavioral Sciences*; Wright, J.D., Ed.; Elsevier Scientific Publ. Co.: Amsterdam, The Netherlands, 2015; pp. 918–923.
19. Hietajärvi, L. *Adolescents' Socio-Digital Engagement and Its Relation to Academic Well-Being, Motivation, and Achievement*; University of Helsinki: Helsinki, Finland, 2019; ISBN 978-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-9.
20. Ito, M.; Baumer, S.; Bittanti, M.; Boyd, D.; Cody, R.; Herr-Stephenson, B.; Tripp, L. *Hanging Out, Messing Around, and Geeking Out*; MIT Press: Cambridge, MA, USA, 2010.
21. Jenkins, H. *Confronting the Challenges of Participatory Culture: Media Education for the 21st Century*; MIT Press: Cambridge, MA, USA, 2009.
22. Page, M.J.; McKenzie, J.E.; Bossuyt, P.M.; Boutron, I.; Hoffmann, T.C.; Mulrow, C.D.; Shamseer, L.; Tetzlaff, J.M.; Akl, E.A.; Brennan, S.E.; et al. The PRISMA 2020 statement: An updated guideline for reporting systematic reviews. *Int. J. Surg.* **2021**, *88*, 105906. [CrossRef] [PubMed]
23. Giedd, J.N. Adolescent brain and the natural allure of digital media. *Dialogues Clin. Neurosci.* **2022**, *22*, 127–133. [CrossRef] [PubMed]
24. Orben, A. The Sisyphean cycle of technology panics. *Perspect. Psychol. Sci.* **2020**, *15*, 1143–1157. [CrossRef] [PubMed]
25. Allen, K.A.; Ryan, T.; Gray, D.L.; McInerney, D.M.; Waters, L. Social media use and social connectedness in adolescents: The positives and the potential pitfalls. *Educ. Dev. Psychol.* **2014**, *31*, 18–31. [CrossRef]
26. Przybylski, A.K.; Weinstein, N. A large-scale test of the goldilocks hypothesis: Quantifying the relations between digital-screen use and the mental well-being of adolescents. *Psychol. Sci.* **2017**, *28*, 204–215. [CrossRef] [PubMed]
27. Odgers, C.L.; Jensen, M.R. Annual research review: Adolescent mental health in the digital age: Facts, fears, and future directions. *J. Child Psychol. Psychiatry* **2020**, *61*, 336–348. [CrossRef] [PubMed]
28. Orben, A.; Przybylski, A.K. The association between adolescent well-being and digital technology use. *Nat. Hum. Behav.* **2019**, *3*, 173–182. [CrossRef] [PubMed]
29. Stavropoulos, V.; Motti-Stefanidi, F.; Griffiths, M.D. Risks and opportunities for youth in the digital era. *Eur. Psychol.* **2021**, *27*, 86–101. [CrossRef]
30. Steers, M.L.N. 'It's complicated': Facebook's relationship with the need to belong and depression. *Curr. Opin. Psychol.* **2016**, *9*, 22–26. [CrossRef]
31. Korunovska, J.; Spiekermann-Hoff, S. *The Human Energy and Fatigue Constructs in Relation to Information and Communication Technologies: A Conceptual Framework*; WU Vienna University of Economics and Business: Wien, Austria, 2020.
32. Dienlin, T.; Johannes, N. The impact of digital technology use on adolescent well-being. *Dialogues Clin. Neurosci.* **2022**, *22*, 135–142. [CrossRef]
33. Melkevik, O.; Torsheim, T.; Iannotti, R.J.; Wold, B. Is spending time in screen-based sedentary behaviors associated with less physical activity: A cross national investigation. *Int. J. Behav. Nutr. Phys. Act.* **2010**, *7*, 1–10. [CrossRef] [PubMed]
34. Neuman, S.B. The displacement effect: Assessing the relation between television viewing and reading performance. *Read. Res. Q.* **1988**, *23*, 414–440. [CrossRef]
35. Davis, K. Friendship 2.0: Adolescents' experiences of belonging and self-disclosure online. *J. Adolesc.* **2012**, *35*, 1527–1536. [CrossRef] [PubMed]
36. Etchells, P.J.; Gage, S.H.; Rutherford, A.D.; Munafò, M.R. Prospective investigation of video game use in children and subsequent conduct disorder and depression using data from the Avon Longitudinal Study of Parents and Children. *PLoS ONE* **2016**, *11*, e0147732. [CrossRef]
37. Parkes, A.; Sweeting, H.; Wight, D.; Henderson, M. Do television and electronic games predict children's psychosocial adjustment? Longitudinal research using the UK Millennium Cohort Study. *Arch. Dis. Child.* **2013**, *98*, 341–348. [CrossRef]
38. Giovanelli, A.; Ozer, E.M.; Dahl, R.E. Leveraging technology to improve health in adolescence: A developmental science perspective. *J. Adolesc. Health* **2020**, *67*, S7–S13. [CrossRef]
39. Lenhart, A.; Smith, A.; Anderson, M.; Duggan, M.; Perrin, A. *Teens, Technology Friendship*; Pew Research Center: Washington, DC, USA, 2015; Volume 10.
40. Borca, G.; Bina, M.; Keller, P.S.; Gilbert, L.R.; Begotti, T. Internet use and developmental tasks: Adolescents' point of view. *Comput. Hum. Behav.* **2015**, *52*, 49–58. [CrossRef]
41. Crone, E.A.; Dahl, R.E. Understanding adolescence as a period of social–affective engagement and goal flexibility. *Nat. Rev. Neurosci.* **2012**, *13*, 636–650. [CrossRef]
42. Blakemore, S.J.; Mills, K.L. Is adolescence a sensitive period for sociocultural processing? *Annu. Rev. Psychol.* **2014**, *65*, 187–207. [CrossRef]
43. Przybylski, A.K.; Weinstein, N.; Murayama, K.; Lynch, M.F.; Ryan, R.M. The ideal self at play: The appeal of video games that let you be all you can be. *Psychol. Sci.* **2012**, *23*, 69–76. [CrossRef]

44. Firth, J.; Torous, J.; Stubbs, B.; Firth, J.A.; Steiner, G.Z.; Smith, L.; Alvarez-Jimenez, M.; Gleeson, J.; Vancampfort, D.; Armitage, C.J.; et al. The "online brain": How the Internet may be changing our cognition. *World Psychiatry* **2019**, *18*, 119–129. [CrossRef] [PubMed]
45. Hutton, J.S.; Dudley, J.; Horowitz-Kraus, T.; DeWitt, T.; Holland, S.K. Associations between screen-based media use and brain white matter integrity in preschool-aged children. *JAMA Pediatr.* **2020**, *174*, 1–10. [CrossRef] [PubMed]
46. Winnick, M.; Zolna, R. Putting a Finger on Our Phone Obsession–Mobile Touches: A Study on How Humans Use Technology. Dscout. 2019. Available online: https://dscout.com/people-nerds/mobile-touches#:~{}:text=People%20tapped%2C%20swiped%20and%20clicked,the%20less%20restrained%20among%20us (accessed on 1 May 2022).
47. Kühn, S.; Lorenz, R.; Banaschewski, T.; Barker, G.J.; Büchel, C.; Conrod, P.J.; Flor, H.; Garavan, H.; Ittermann, B.; Loth, E.; et al. Positive association of video game playing with left frontal cortical thickness in adolescents. *PLoS ONE* **2014**, *9*, e91506. [CrossRef] [PubMed]
48. Moisala, M.; Salmela, V.; Hietajärvi, L.; Carlson, S.; Vuontela, V.; Lonka, K.; Hakkarainen, K.; Salmela-Aro, K.; Alho, K. Gaming is related to enhanced working memory performance and task-related cortical activity. *Brain Res.* **2017**, *1655*, 204–215. [CrossRef] [PubMed]
49. Kanai, R.; Bahrami, B.; Roylance, R.; Rees, G. Online social network size is reflected in human brain structure. *Proc. R. Soc. B Biol. Sci.* **2012**, *279*, 1327–1334. [CrossRef] [PubMed]
50. Gauvain, M.; Perez, S. Cognitive development and culture. In *Handbook of Child Psychology and Developmental Science: Cognitive Processes*, 7th ed.; Liben, L.S., Müller, U., Lerner, R.M., Eds.; John Wiley & Sons, Inc.: Hoboken, NJ, USA, 2015; Volume 2, pp. 854–896.
51. Adachi, P.J.; Hodson, G.; Willoughby, T.; Blank, C.; Ha, A. From outgroups to allied forces: Effect of intergroup cooperation in violent and nonviolent video games on boosting favorable outgroup attitudes. *J. Exp. Psychol. Gen.* **2016**, *145*, 259. [CrossRef]
52. Uttal, D.H.; Meadow, N.G.; Tipton, E.; Hand, L.L.; Alden, A.R.; Warren, C.; Newcombe, N.S. The malleability of spatial skills: A meta-analysis of training studies. *Psychol. Bull.* **2013**, *139*, 352–402. [CrossRef]
53. Fitton, V.A.; Ahmedani, B.K.; Harold, R.D.; Shifflet, E.D. The role of technology on young adolescent development: Implications for policy, research and practice. *Child Adolesc. Soc. Work. J.* **2013**, *30*, 399–413. [CrossRef]
54. Ashdown, D.M.; Bernard, M.E. Can explicit instruction in social and emotional learning skills benefit the social-emotional development, well-being, and academic achievement of young children? *Early Child. Educ. J.* **2012**, *39*, 397–405. [CrossRef]
55. CASEL. Fundamentals of SEL. 2022. Available online: https://casel.org/fundamentals-of-sel (accessed on 7 June 2022).
56. Slovák, P.; Fitzpatrick, G. Teaching and developing social and emotional skills with technology. *ACM Trans. Comput. -Hum. Interact. (TOCHI)* **2015**, *22*, 1–34. [CrossRef]
57. Coyne, S.M.; Stockdale, L.; Summers, K. Problematic cell phone use, depression, anxiety, and self-regulation: Evidence from a three year longitudinal study from adolescence to emerging adulthood. *Comput. Hum. Behav.* **2019**, *96*, 78–84. [CrossRef]
58. Hogan, M.; Strasburger, V.C. Social media and new technology: A primer. *Clin. Pediatr.* **2018**, *57*, 1204–1215. [CrossRef] [PubMed]
59. Jensen, M.; George, M.J.; Russell, M.R.; Odgers, C.L. Young adolescents' digital technology use and mental health symptoms: Little evidence of longitudinal or daily linkages. *Clin. Psychol. Sci.* **2019**, *7*, 1416–1433. [CrossRef]
60. Boniel-Nissim, M.; Barak, A. The therapeutic value of adolescents' blogging about social-emotional difficulties. *Psychol. Serv.* **2013**, *10*, 333–341. [CrossRef] [PubMed]
61. Davis, K. Young people's digital lives: The impact of interpersonal relationships and digital media use on adolescents' sense of identity. *Comput. Hum. Behav.* **2013**, *29*, 2281–2293. [CrossRef]
62. Frison, E.; Eggermont, S. Exploring the relationships between different types of Facebook use, perceived online social support, and adolescents' depressed mood. *Soc. Sci. Comput. Rev.* **2016**, *34*, 153–171. [CrossRef]
63. Wenninger, H.; Krasnova, H.; Buxmann, P. Understanding the role of social networking sites in the subjective well-being of users: A diary study. *Eur. J. Inf. Syst.* **2019**, *28*, 126–148. [CrossRef]
64. Bélanger, R.E.; Akre, C.; Berchtold, A.; Michaud, P.A. A U-shaped association between intensity of internet use and adolescent health. *Pediatrics* **2011**, *127*, e330–e335. [CrossRef]
65. Vanman, E.J.; Baker, R.; Tobin, S.J. The burden of online friends: The effects of giving up Facebook on stress and well-being. *J. Soc. Psychol.* **2018**, *158*, 496–508. [CrossRef]
66. Weinstein, E. Adolescents′ differential responses to social media browsing: Exploring causes and consequences for intervention. *Comput. Hum. Behav.* **2017**, *76*, 396–405. [CrossRef]
67. Reid Chassiakos, Y.L.; Radesky, J.; Christakis, D.; Moreno, M.A.; Cross, C.; Hill, D.; Swanson, W.S. Children and adolescents and digital media. *Pediatrics* **2016**, *138*, e20162593. [CrossRef] [PubMed]
68. Ziv, I.; Kiasi, M. Facebook′s contribution to well-being among adolescent and young adults as a function of mental resilience. *J. Psychol.* **2016**, *150*, 527–541. [CrossRef] [PubMed]
69. Przybylski, A.K. Electronic Gaming and Psychosocial Adjustment. *Pediatrics* **2014**, *134*, 1–7. [CrossRef]
70. Adachi, P.J.; Willoughby, T. The link between playing video games and positive youth outcomes. *Child Dev. Perspect.* **2017**, *11*, 202–206. [CrossRef]
71. de la Barrera, U.; Zegarra, S.P.; Tamarit, A.; Gómez, J.A.G.; Castilla, I.M. Desarrollo de competencias socioemocionales mediante plataforma tecnológica (programa Emotic): Valoración de los beneficios del programa según los participantes. *Know Share Psychol.* **2020**, *1*, 4. [CrossRef]

72. Centers for Disease Control and Prevention. About Mental Health: Mental Health Basics. 2021. Available online: https://www.cdc.gov/mentalhealth/learn/index.htm (accessed on 14 June 2022).
73. Barr, M.; Copeland-Stewart, A. Playing video games during the COVID-19 pandemic and effects on players' well-being. *Games Cult.* **2022**, *17*, 122–139. [CrossRef]
74. Ellison, N.B.; Steinfield, C.; Lampe, C. The benefits of Facebook "friends:" Social capital and college students' use of online social network sites. *J. Comput. -Mediat. Commun.* **2007**, *12*, 1143–1168. [CrossRef]
75. Subrahmanyam, K.; Reich, S.M.; Waechter, N.; Espinoza, G. Online and offline social networks: Use of social networking sites by emerging adults. *J. Appl. Dev. Psychol.* **2008**, *29*, 420–433. [CrossRef]
76. Vanden Abeele, M.M.; Antheunis, M.L.; Pollmann, M.M.; Schouten, A.P.; Liebrecht, C.C.; Van Der Wijst, P.J.; Van Amelsvoort, M.A.A.; Bartels, J.; Krahmer, E.J.; Maes, F.A. Does Facebook use predict college students' social capital? A replication of Ellison, Steinfield, and Lampe's (2007) study using the original and more recent measures of Facebook use and social capital. *Commun. Stud.* **2018**, *69*, 272–282. [CrossRef]
77. Anderson, M.; Jiang, J.; Teens, Social Media and Technology. Pew Research Center Website. 2018. Available online: https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018 (accessed on 15 May 2022).
78. Erfani, S.S.; Abedin, B. Impacts of the use of social network sites on users' psychological well-being: A systematic review. *J. Assoc. Inf. Sci. Technol.* **2018**, *69*, 900–912. [CrossRef]
79. Domahidi, E. The associations between online media use and users' perceived social resources: A meta-analysis. *J. Comput. -Mediat. Commun.* **2018**, *23*, 181–200. [CrossRef]
80. Liu, M.; Wu, L.; Yao, S. Dose–response association of screen time-based sedentary behaviour in children and adolescents and depression: A meta-analysis of observational studies. *Br. J. Sport. Med.* **2016**, *50*, 1252–1258. [CrossRef]
81. Pham, M.T.; Rajić, A.; Greig, J.D.; Sargeant, J.M.; Papadopoulos, A.; McEwen, S.A. A scoping review of scoping reviews: Advancing the approach and enhancing the consistency. *Res. Synth. Methods* **2014**, *5*, 371–385. [CrossRef]
82. Hennessy, E.A.; Johnson, B.T. Examining overlap of included studies in meta-reviews: Guidance for using the corrected covered area index. *Res. Synth. Methods* **2020**, *11*, 134–145. [CrossRef] [PubMed]
83. Blank, S.; Dorf, B. *The Startup Owner's Manual: The Step-By-Step Guide for Building a Great Company*; K S Ranch, Inc.: Pescadero, CA, USA, 2012.
84. Michie, S.; Atkins, L.; West, R. *The Behavior Change Wheel: A Guide to Designing Interventions*; Silverback Publishing: London, UK, 2014.
85. Bucher, A. *Engaged: Designing for Behavior Change*; Rosenfeld Media LLC: New York, NY, USA, 2020.
86. Gardner, H.; Davis, K. *The App Generation: How Today's Youth Navigate Identity, Intimacy, and Imagination in a Digital World*; Yale University Press: New Haven, CT, USA, 2013.
87. Davis, K. Youth identities in a digital age: The anchoring role of friends in youth's approaches to online identity expression. In *Mediated Youth Cultures: The Internet, Belonging, and New Cultural Configurations*; Bennett, A., Robards, B., Eds.; Palgrave Macmillan: New York, NY, USA, 2014; pp. 11–25.
88. Spiegel, B. *VRx: How Virtual Therapeutics Will Revolutionize Medicine*; Basic Books: New York, NY, USA, 2020.