**No. 25-2366**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

---

NETCHOICE, LLC, D/B/A NETCHOICE,

*Plaintiff-Appellee*,

v.

ROB BONTA, *in his official capacity as Attorney General of the State of California*,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Northern District of California
No. 5:22-cv-08861-BLF
The Honorable Beth Labson Freeman

---

**PLAINTIFF-APPELLEE'S SUPPLEMENTAL EXCERPTS OF RECORD VOLUME 2 OF 2 | SER-292 – SER-537**

---


Adam S. Sieff
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue
27th Floor
Los Angeles, CA 90071
(213) 633-6800
adamsieff@dwt.com

Ambika Kumar
Bianca G. Chamusco
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104
(206) 757-8030
ambikakumar@dwt.com
biancachamusco@dwt.com

David M. Gossett
Meenakshi Krishnan
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW
Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com
meenakshikrishnan@dwt.com

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, D.C. 20003
(215) 717-3423 Ext. 209
bob.corn-revere@thefire.org

*Attorneys for Plaintiff-Appellee NetChoice, LLC*

# EXHIBIT 7

Check for updates

ASSOCIATION FOR PSYCHOLOGICAL SCIENCE

*Empirical Article*

Clinical Psychological Science
2021, Vol. 9(5) 823–835
© The Author(s) 2021
Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/2167702621994549
www.psychologicalscience.org/CPS
SAGE

# There Is No Evidence That Associations Between Adolescents' Digital Technology Engagement and Mental Health Problems Have Increased

**Matti Vuorre[1], Amy Orben[2,3], and Andrew K. Przybylski[1,4]**
[1]Oxford Internet Institute, University of Oxford; [2]MRC Cognition and Brain Sciences Unit, University of Cambridge; [3]Emmanuel College, University of Cambridge; and [4]Department of Experimental Psychology, University of Oxford

**Abstract**
Digital technology is ubiquitous in modern adolescence, and researchers are concerned that it has negative impacts on mental health that, furthermore, increase over time. To investigate whether technology is becoming more harmful, we examined changes in associations between technology engagement and mental health in three nationally representative samples. Results were mixed across types of technology and mental health outcomes: Technology engagement had become less strongly associated with depression in the past decade, but social-media use had become more strongly associated with emotional problems. We detected no changes in five other associations or differential associations by sex. There is therefore little evidence for increases in the associations between adolescents' technology engagement and mental health. Information about new digital media has been collected for a relatively short time; drawing firm conclusions about changes in their associations with mental health may be premature. We urge transparent and credible collaborations between scientists and technology companies.

**Keywords**
mental health, depression, social media, adolescents, open materials

Received 10/19/20; Revision accepted 1/8/21

Any understanding of 21st-century adolescence would be incomplete without an appreciation of social-media platforms and other digital technologies, which have become an integral element of young people's everyday lives over the past few decades (Anderson & Jiang, 2018; Taylor & Silver, 2019). Accompanying this growth in popularity of digital technologies, downward trends in adolescent mental health have been observed in certain countries (U.S. Centers for Disease Control and Prevention, 2020). Although there is a large body of correlational and observational research, some of it highly visible, into the association, there is little good evidence that technology use causes decreases in mental health (Dickson et al., 2019). Nevertheless, worries about the potential negative effects of technology have emerged as a dominant topic in popular discussion (Etchells et al., 2016; Jensen et al., 2019; Kardefelt-Winther et al., 2020; Orben et al., 2019; Orben & Przybylski, 2019a; Twenge et al., 2018).

However, concerns about digital technologies are best understood to follow a pattern of societal apprehension that waxes and wanes as novel forms of entertainment and social technologies are invented and gradually adopted by young people (Orben, 2020). Although parents and scholars are currently concerned about the impact of social media and digital technologies such as smartphones on mental health, the early 20th century saw dime novels blamed for eliciting mania and risk taking (Furedi, 2015). A generation later, the immersive nature of radio dramas was thought to make

**Corresponding Author:**
Andrew K. Przybylski, Oxford Internet Institute, University of Oxford
E-mail: andy.przybylski@oii.ox.ac.uk

young listeners vulnerable to ill health, sleep loss, and anxiety (Preston, 1941). These concerns were largely forgotten by midcentury, when the visually stimulating characteristics of comic books and television were implicated as factors predisposing adolescents to maladjustment and antisocial behavior (Wertham, 1954). Most recently, video games were suggested to have produced a generation of violent criminals (Bushman & Anderson, 2002), but this argument has since been refuted (Drummond et al., 2020; Ferguson et al., 2020). Within this cycle, novel technologies spur research that focuses on their distinctive new features, leading to researchers overlooking time-dependent changes within technology's associations with mental health and thus treating them as fixed.

Given this, a more accurate understanding of how children and young people are affected by new technologies would be enabled by studying their effects over time. But because researchers have assumed that technology effects are fixed, at least two time-dependent changes have evaded systematic testing. First, when fears emerge about a new technology, worries about previous technologies are largely abandoned without an agreement on—or good data indicating—whether, why, or how the previous technologies were or were not harmful (Grimes et al., 2008; Orben, 2020). In a stepwise fashion, focus is instead redirected to the new technology of concern, along with the suggestion that it is more harmful because of technological advancement. Because interest moves elsewhere, there are few or no tests of whether the effects of previous technologies, such as those of watching television, actually increased or decreased as society's attention shifted to the possible harms associated with more recent technologies (e.g., playing video games). Therefore, we have not learned how existing technologies' effects change as new technologies emerge and are adopted by young people.

Second, some technologies might have an increasingly harmful influence on adolescent mental health by virtue of their dynamic nature. When a new technology reaches a threshold of popularity in society, a constellation of distinctive features, such as portability, immersiveness, or online connectivity, are often highlighted to explain why society should become worried about this new innovation over and above previous ones. Yet little attention is paid to how a given technology's effects might shift over time as affordances expand or the underlying business models drive designers to change how adolescents use them. This is especially the case with newer digital technologies such as social-media platforms, whose underlying algorithms are continuously optimized to capture attention and data and drive engagement through alterations in design, novel features, or apps (Lewis, 2017; Solon, 2017). Therefore, it remains a reasonable, yet untested, assumption that their possible negative influence on mental health could be magnified over time by virtue of their dynamic nature.

## Understanding Digital Harm

In the present study, we addressed these shortcomings by investigating how the associations between digital technology use and adolescent mental health vary over time. First, we examined the possible declines in observed relationships between television—a technology that public concern has largely shifted away from in recent years—and mental health. Second, we investigated potential increases in negative associations between mental health and social media and digital devices, technologies that we have good reason to think might have increased in harmfulness recently. To provide context for understanding changing associations over time, we first discuss the evidence supporting the idea that digital technologies promote harm in the first place.

Currently, the literature suggesting a negative link between digital technology engagement and mental health is decidedly mixed and grounded on suboptimal methodologies and data (Dickson et al., 2019; Odgers & Jensen, 2020). That is, the observed associations are typically based on between-persons correlations, which make determining causality and directionality difficult and are susceptible to the influence of confounding observed or unobserved variables (Ophir et al., 2020). Literature reviews by academic, medical, and policy collaborations have highlighted both the low-quality evidence in this space and the need for a longitudinal perspective (Appel et al., 2020; Hawkes, 2019; Viner et al., 2019). In secondary data analyses, these problems are compounded by a general lack of adherence to consistent standards (Weston et al., 2019), which threatens the validity and robustness of reported associations because the many choices leading to a reported analysis can engender misrepresentative estimates (Orben & Przybylski, 2019a). Studies that have adopted more systematic approaches to estimating associations between well-being and technology engagement have shown that the resulting relations depend on sex, arbitrary analytic choices, and the exact variables included in the analyses (Bjerre-Nielsen et al., 2020; Jensen et al., 2019; Kreski et al., 2021; Orben et al., 2019). In addition, most of this literature is limited by its use of self-reports of technology use, which are known to be biased and noisy indicators of true amounts of engagement, and lead to inaccurate estimated relations between health and well-being (Johannes et al., 2020; Parry et al., 2020; Scharkow, 2016; Shaw et al., 2020). Nevertheless, recent

analyses and reviews have shown a trend whereby individuals who report greater technology engagement tend to also report higher levels of mental health problems, but the factors underlying these cross-sectional relationships still remain poorly understood (Appel et al., 2020).

## Digital Dynamics

One of the reasons for the lack of consensus around ideas such as digital or online harms might be that studies investigating it do not regularly consider the possibility that technologies' impacts on young people are likely to change over time as the technologies and ways in which they are used change. Technologies are often considered as unitary causes of change in society, through a process called *technological determinism*, and academics therefore rarely treat them as dynamic when trying to understand their effects on young and vulnerable people (Grimes et al., 2008; Orben, 2020). However, technologies and their uses are not static. The contexts and ways in which digital technologies are used are themselves in flux, and different platforms and technologies gain and lose popularity within an adolescent's social group (Boyd, 2014). These shifts have the potential to shape differences over time in user motivations and the associations between technology engagement and mental health and could therefore cause certain technologies' effects on mental health to increase or decrease over long periods of time.

Furthermore, not only do the contexts of use change, but also the technologies themselves are developing. This is particularly true for video gaming and online platforms that are, essentially, continuously updating virtual social hubs. New business and monetization models, features, play modes, and social trends emerge regularly. In other words, material changes in how technologies affect individuals and societies may therefore not be marked by an obvious stepwise shift between two successive forms of technology, say from radio to television. Instead, more subtle advances within a single technological milieu might drive profound changes. For example, the addition of so-called dark patterns—features that are designed to manipulate users to, for example, purchase items (Singer, 2016)—and attention-demanding features that undermine users' psychological autonomy could serve to magnify negative impacts of social media, whereas tools that empower or connect users in new ways could do the opposite and promote health and well-being (Lewis, 2017; Solon, 2017; Verduyn et al., 2017). In the same vein, observed differences might arise between demographic cohorts, such as sexes and age groups, because of algorithmically driven market segmentation of online platforms that are more negatively influential to certain young populations' mental health. One worry, then, is that these technologies are advancing "behind the scenes" and becoming more harmful to adolescent health without parents or society being aware of any obvious changes.

Although the possibility that digital technologies' effects on adolescents are not static would have substantial implications for regulation, and this potential is often discussed in public conversation, the idea has garnered only limited attention in empirical studies, which have typically treated the relation as invariant over time (but see Ferguson, 2021; Kreski et al., 2021). In the current study, we therefore aim to provide one of the first large-scale examinations into whether the associations between adolescent technology use and mental health shift over time.

## The Current Study

To probe whether the associations between technology engagement and mental health have indeed changed over time, a comprehensive perspective is needed. In the current study, we therefore investigated the use of not only smartphones and social media but also television, which elicited comparable levels of academic, public, and policy concern about its potential impact on child development in the mid and late 20th century (Orben, 2020). Although discussions surrounding television's purported harm have largely receded, research never conclusively demonstrated that it ceased being harmful or that the fears were not well founded in the first place. The long time frame of data available regarding television viewing provides a baseline for testing its relations with health outcomes over time to determine whether its associations with mental health did wane as society's and researchers' attention was refocused to newer forms of technology. Furthermore, it provides a point of empirical contrast to contextualize the extent to which shifts in the associations relating digital devices and social-media use to mental health follow the same pattern or have become more negative in the shorter periods of time that they have been used and for which there is data.

In the current study, we therefore analyzed data from three large-scale studies of adolescents living in the United States (Monitoring the Future [MTF] and Youth Risk Behavior Surveillance System [YRBS]) and the United Kingdom (Understanding Society [UndSoc]) to probe how the associations between adolescent mental health and use of various technologies had changed over time. Our primary interest was determining whether the relationship between technology use and adolescent mental health had changed over different time spans.

Because previous literature has highlighted important differences between boys and girls in novel technologies' associations with adolescent mental health (Kelly et al., 2018; Kreski et al., 2021), we also investigated the moderating role of sex as a supplementary analysis.

## Method

### Study design and participants

We focused on three large nationally representative data sets, from the United States and United Kingdom, with pertinent variables on adolescent mental health and technology engagement and a combined total of 430,561 participants. MTF is an annual survey of eighth, 10th, and 12th graders in the United States and has been administered to eighth and 10th graders since 1991 by the University of Michigan Institute for Social Research (Miech et al., 2020). UndSoc is a longitudinal survey of approximately 40,000 households in the United Kingdom and has been conducted since 2009 by the Institute for Social and Economic Research at the University of Essex (University of Essex, Institute for Social and Economic Research, 2019). YRBS is a biennial survey of ninth to 12th graders in the United States and has been conducted since 1991 by the U.S. Centers for Disease Control and Prevention (Kann, 2018).

Although all of these studies also included older participants, we particularly focused on adolescents and thus restricted the analyses to individuals between 10 and 15 years old (MTF does not include participant age, but the eighth and 10th graders in those data are likely to fall within this age range).

### Outcomes

The surveys, particularly MTF and UndSoc, include a variety of health and well-being measures ranging from subjective well-being, such as loneliness and self-esteem, to constructs that are typically thought to indicate more objective mental health problems, such as depression and suicidality. Because our focus was solely on mental health rather than subjective well-being, we narrowed our investigation to the four mental health outcomes detailed below.

Depression was measured in the MTF data set with six items that have been used in previous research (Miech et al., 2020; Newcomb et al., 1981; Twenge et al., 2018), although not always in a consistent manner (Orben & Przybylski, 2019a, see especially Supplementary Table 6). Respondents rated their agreement to each item (e.g., "Life often seems meaningless") on a 5-point scale (1 = *disagree*, 5 = *agree*). A total of 380,924 eighth and 10th graders responded to at least one item on the scale, whose items provided good reliability (α = .85). We averaged these items to a mean score for each individual.

UndSoc queried for externalizing and internalizing mental health problems with the five-item conduct problems (e.g., "I get very angry and often lose my temper") and emotional problems (e.g., "I worry a lot") subscales of the Strengths and Difficulties Questionnaire (Goodman et al., 2000). A total of 19,190 (conduct) and 19,184 (emotional problems) 10- to 15-year-olds rated their agreement on a 3-point scale (1 = *not true*, 3 = *certainly true*) to at least one of these items, which indicated moderate reliabilities (αs = .62 and .69, respectively). We averaged the items in each subscale to assign two mean scores for each individual. Outcomes in the MTF and UndSoc data sets showed low item-level missingness (complete responses: MTF = 95%, UndSoc = 96%); missing item values were ignored in computing the scale means.

YRBS measured depressive mood and suicidal ideation and behavior with five items (e.g., "During the past 12 months, did you ever feel so sad or hopeless almost every day for two weeks or more in a row that you stopped doing some usual activities?" and "During the past 12 months, did you ever seriously consider attempting suicide?") to which participants provided binary yes or no responses.[1] A total of 30,305 individuals, 12 to 15 years old, answered one or more of these items. Because of the heterogeneity between these items, we did not average across them but instead opted for a modeling strategy that accounted for variability between items (see Statistical Analysis section).

### Explanatory variables

All three data sets asked participants to estimate their average weekday TV viewing hours. Social-media use was queried in MTF[2] ("How often do you . . . Visit social networking websites [like Facebook]"; 1 = *never*, 5 = *almost every day*; 120,265 respondents) and in UndSoc ("Hours using social media on weekdays"; 1 = *none*, 5 = *7 or more hours*; 18,999 respondents). YRBS asked about daily digital-device use ("On an average school day, how many hours do you play video or computer games or use a computer for something that is not school work? [Count time spent on things such as Xbox, PlayStation, an iPad or other tablet, a smartphone, texting, YouTube, Instagram, Facebook, or other social media.]"; 1 = *I do not play video or computer games or use a computer for something that is not school work*, 7 = *5 or more hours per day*; 29,672 respondents). All data sets included variables for the year in which the data were collected[3] and the respondents' sex. Rows of data in which the sex variable was missing were

Case: 25-2366, 08/11/2025, DktEntry: 26.3, Page 7 of 246
Case 5:22-cv-08861-BLF Document 60-8 Filed 05/19/23 Page 6 of 14



excluded (MTF: 4%, UndSoc: 0.02%, YRBS: 0.3%) to allow using sex as a moderator in our analyses below.

## Statistical analysis

Our main goal was to investigate how associations between adolescents' technology use and mental health had changed over time. We first adopted the simplifying assumptions of linearity in associations between technology engagement and mental health and any changes therein. That is, we investigated whether there had been overall increases or decreases in the associations. To do this, we estimated eight models, one for each outcome-predictor pair in a given data set. We modeled each outcome (e.g., depression; standardized) on year (centered on 2017, the most recent year for which data were available), the explanatory variable (e.g., TV use; standardized), and their interaction. In addition, sex (contrast coded as −0.5 = male, 0.5 = female) and its interactions with other predictors were included to investigate its moderating roles, particularly of the yearly changes in technology effects. For analyses of the UndSoc data, which is longitudinal, unlike the other two data sets, we assigned random intercepts for individuals (Gelman & Hill, 2007) and used between-persons specific predictors—the person-specific means of the grand-mean deviated predictors—to separate between-persons variation, the target of this study, from within-persons variation. Outcomes in the MTF and UndSoc analyses were treated as normally distributed.

We modeled the binary YRBS item responses as Bernoulli distributed with a probit link function and specified all parameters as random across items. This modeling strategy had two advantages over standard Gaussian analyses of either the individual items or their averages: First, the item responses are not normally distributed, and assuming so would risk distorted effect size estimates. Second, analyzing the items separately would risk spurious findings because of multiple comparisons, but aggregating them would falsely ignore their heterogeneity (e.g., one item measured suicidal behavior, which is less prevalent than anhedonia). Instead, this hierarchical modeling strategy allowed for differences between items while also partially pooling information across them and allowing inferences about their average, which we call *suicidal ideation and behavior* (see below; Gelman & Hill, 2007). Similar to models of the UndSoc and MTF data sets, we ignored missing item-level values. All models were estimated within the Bayesian framework using minimally informative priors (see online analysis supplement); we report posterior means and quantiles as parameters' point estimates and credibility intervals (CrIs; Bürkner, 2017; Carpenter et al., 2017).

## Data and code availability

All annotated study code is available at https://digital-wellbeing.github.io/timetrends and archived at https://osf.io/4zat9/. The data are available at https://www.cdc.gov/healthyyouth/data/yrbs/data.htm (YRBS), https://www.understandingsociety.ac.uk/documentation/access-data (UndSoc), and https://www.icpsr.umich.edu/icpsrweb/ICPSR/series/35 (MTF).

# Results

Before modeling the technology–mental health relations and their changes over time, we estimated Pearson's *r* correlations between the technology metrics and mental health outcomes separately for each year to illustrate the year-specific technology correlations without assuming linear change in them over time. These cross-sectional between-persons relationships are shown in Figure 1, which suggested that changes in the relationship over time were plausible but likely to differ between outcomes and technologies.

We continued our analyses by estimating our models of interest. We first focused on the parameters indexing the association between technology use and mental health in 2017 (analogous to the right-most points in Fig. 1): There were notable differences in associations across the different mental health outcomes and technologies (Fig. 2, top). These parameters indicate the relationship between a given technology and mental health outcome in the year 2017 because year was included in the model and centered at 2017. The parameter magnitudes are in standard deviations because we standardized the variables or, in the case of suicidality, used a probit link function, which is equivalent to assuming a standard normal latent variable underlying the binary responses. Conduct problems were positively related to both TV and social media, whereas depression's relation to both was practically zero. Emotional problems were also related to both technologies, but suicidal ideation and behavior were reliably associated only with digital-device use. The magnitudes of these relations were within the ranges of previous findings (that have mainly ignored differences between years) and are generally considered to be very small.

Most importantly, regarding our main research question, the interaction parameters indexing the change in technology-mental health associations over time are shown in the bottom panel of Figure 2. The parameters indicate the magnitude by which each relationship either increased (positive values) or decreased (negative values) in 1 year. The relationship between social media and TV and conduct problems had remained stable, as indicated by the estimated parameters narrowly centered




**Fig. 1.** Associations between adolescents' technology use and mental health outcomes, estimated separately for each year with Pearson's *r*. Error bars indicate 95% confidence intervals. "Suicide" indicates the mean of the Youth Risk Behavior Surveillance System (YRBS) suicidal ideation and behavior items. The points are horizontally jittered to display overlapping estimates.

on zero. Depression's association with social media and TV had decreased over time. The association between emotional problems and social media had increased, but their association with TV had remained stable. No credible changes were detected in the relationship between suicidal ideation and behavior and either social media or television. Note that even the greatest magnitudes of these parameters did not exceed 0.01 change in standard deviation units, suggesting that changes, if any, were very small.

We also investigated whether changes in technology's relations with mental health described in the bottom panel of Figure 2 were moderated by sex, but none of the estimates were credibly different from zero, suggesting that any changes—or lack thereof—over time were not different between boys and girls. We further investigated the robustness of our results with respect to analysis strategy by estimating analogous structural equation models in which each mental health outcome was treated as a latent variable indicated by the items discussed above (Rosseel, 2012). Those analyses replicated the above results, except that the 2017 TV-suicide association's 95% CrI just excluded zero (95% CrI = [0.001, 0.026]; see online analysis supplement). Overall, there was very little evidence for an increase in the negative associations between technology and mental health over time and some evidence to the contrary.

## *Relaxing the linearity assumptions*

In our focal analyses, we assumed linear relations between technology use and mental health and assumed that any changes to those relations would be linear. Although useful for testing overall decreases/increases, these assumptions may not be tenable. Specifically, the former assumption might be inaccurate because relations between technology use and mental health are sometimes better described by a quadratic function (Przybylski & Weinstein, 2017). The latter assumption, in turn, may be too restrictive and thereby miss more complicated patterns of change over time (see Fig. 1). Although those assumptions were required to test our critical questions, we therefore conducted additional analyses that eschewed these assumptions.

We estimated two generalized additive models (GAMs) of the relation between technology use and mental health using penalized cubic regression splines (Wood, 2017, 2020). The first model included year and technology use as smooth predictors using splines. These splines allowed the associations to take any form

Case: 25-2366, 08/11/2025, DktEntry: 26.3, Page 9 of 246
Case 5:22-cv-08861-BLF Document 60-8 Filed 05/19/23 Page 8 of 14






**Fig. 2.** Parameter estimates, in standard deviation units, from models of associations between technology use and mental health described in the text. The top panel shows the contributions of technology use to each of the mental health outcomes (*y*-axis) for the different technology-engagement indicators in 2017. Thick and thin lines indicate 80% and 95% credible intervals (CrIs), respectively. Parameters for which the 95% CrI excludes zero are indicated by filled symbols. The bottom panel shows magnitudes of change in the technology use–mental health associations per year (i.e., Year × Technology interaction).

indicated by the data without a priori restricting them to, for example, a linear or quadratic form. The second model was identical but included a smooth tensor product interaction between year and technology use, thus allowing the (potentially nonlinear) technology use-mental health association to change (potentially nonlinearly) over time. Because these models allow for more complex patterns, they will necessarily capture a greater proportion of variability in the mental health outcomes than the linear models presented above and therefore provide a useful metric of variance explained in the outcomes. On the other hand, because of the potential complexity of the associations, there is no single parameter that describes the resulting associations, and therefore, testing for overall decreases/increases is not straightforward in this framework.

As can be seen in Figure 3 (top), the technology use-mental health relations were complex and generally curvilinear. However, in line with the previous linear models, the GAMs that included year and technology use, but not their interaction, still explained less than 3% of variance in the outcomes (Fig. 3, bottom left). Critically, most models indicated that the (nonlinear) technology-mental health relationships had not changed over time, as suggested by model comparison using Akaike information criterion (AIC; Fig. 3, bottom right): Only two associations, between social-media use and emotional problems and between television viewing and depression, had changed in potentially nonlinear ways according to the GAM comparisons (Fig. 3, bottom right). The association between TV viewing and depression had generally become slightly more prominently an inverted U-shaped function over time, whereas the association between social-media use and emotional problems had become a slightly more linear trend over time (Fig. 3, top). In sum, even after relaxing assumptions about linearity—in both the relations between technology use and mental health and how they have changed over time—there was little evidence to suggest that there has been dramatic change in the associations over time.

## Discussion

In the present study, we investigated the idea that the associations relating adolescent technology engagement




**Fig. 3.** Results from nonlinear generalized additive models of the associations between technology use and mental health. The top panel shows estimated year-specific regression lines for the relationship between each technology-use variable (two rows) and mental health outcome (columns). Shading around lines indicates 95% credibility intervals. The bottom left panel shows proportion of variance explained by the models with year and technology use as nonlinear predictors (but not their interaction). Points are horizontally jittered to display overlapping values. The bottom right panel shows the Akaike information criterion (AIC) difference in favor of the model that also included a nonlinear interaction between year and technology use (*y*-axis) and the additional proportion of variance explained by that model (*x*-axis). AIC differences greater than 3 (dashed horizontal lines) indicate better model fit for the model including the interaction term (and smaller than −3 indicate better fit for the noninteractive model); values in between indicate inconclusive differences. Not displayed is the television-depression model's point because its high AIC value (90; additional variance explained = 0.03%) rendered the rest of the figure unintelligible.

with mental health are dynamic and might shift over time. We studied this question by modeling four different mental health outcomes against three forms of technology use across three large nationally representative data sets across 9 to 26 years. From these eight models, we found one clinically relevant self-reported mental health outcome, depression, for which the links to technology use had become consistently less negative over time. However, this decline was found for both television and social media, so we did not obtain strong evidence that the relation between television watching and negative mental health outcomes was unique in waning over long periods of time. Furthermore, we found only one case in which social media's relation with mental health had become more negative over time: The argument that fast-paced changes to social-media platforms and devices have made them more harmful for adolescent mental health in the past decade is, therefore, not strongly supported by current data either.

To investigate the relationships' change over time, we first studied the technology associations specific to 2017 and found that technology uses were weakly associated with higher levels of most mental health problems, apart from depression. In context, because the large sample sizes are likely to make even small relations' credibility intervals exclude zero, interpreting the magnitudes in practical terms might be preferred instead. Previous studies have shown that in the case of subjective well-being scales, effects of about a half standard deviation are required for people to subjectively experience change (Anvari & Lakens, 2019). In those terms, our parameter estimates that ranged from zero

Case: 25-2366, 08/11/2025, DktEntry: 26.3, Page 11 of 246
Case 5:22-cv-08861-BLF Document 60-8 Filed 05/19/23 Page 10 of 14



to about 0.15 are not likely to indicate practically meaningful associations with mental health. An additional view to the sizes of these associations is afforded by a more detailed look at the analyses of the YRBS data, which contained binary outcomes. For example, males using an average number of digital devices reported planning for suicide with a 9% probability, and males who were 1 *SD* above the mean on device use endorsed the item with an 11% probability, leading to a small difference (2%, 95% CrI = [1.6%, 2.7%]).

Most importantly to the present investigation, there was no consistent change over time in technology's relations with mental health. Technology associations with conduct problems and suicidality were relatively stable over time. Social media's relations with emotional problems had slightly increased, but television's had not. Unexpectedly, both social media's and television's associations with depression had decreased. The magnitudes of the observed changes over time were small: In all three cases in which parameters' uncertainty intervals excluded zero, the relations were smaller than 0.01 *SD* per year, showing that if effects are changing over time, this change is better characterized as a slow drift rather than a rapid shift. In the context of technology use-mental health associations that ranged between zero and 0.15 in 2017, a yearly linear change of 0.01 is unlikely to translate to meaningful changes in associations outside the statistical model. Finally, we did not find any differences in the time courses between girls and boys. Overall, the ideas that technologies people no longer worry about are becoming less harmful or that technologies people worry the most about now are becoming more harmful were not supported in the data we analyzed.

Nevertheless, the observed patterns of change—the increased association between social-media use and emotional problems and decreased association between technology engagement and depression—hint at the changing roles of emerging technologies in young people's lives and underline the scientific value of considering a more dynamic picture of their associations with mental health. Changes in the ways in which technologies are used, such as whether they are used passively or actively (Verduyn et al., 2017), and changes in the features inherent in them (Lewis, 2017; Solon, 2017) could both underlie observed changes in the technologies' associations with mental health. It is possible, then, that the technological advances in social-media platforms could be interrelated with their use as part of social support seeking and emotional coping processes (Boyd, 2014). However, because the observed patterns in the current study were contradictory to each other and not conceptually replicated across the other related outcomes, we advise caution in making strong inferences on the basis of these observations.

More broadly, what might be responsible for the mixed results with respect to changes in technology's relations with mental health? In the context of older technologies, such as TV, knowledge of social-media and digital-device use is necessarily limited by their comparatively brief existence. Therefore, our results may partly reflect the shorter observation window of social-media and digital-device use, in comparison with TV: As shown in Figure 1, there was an initial long period of relative invariance in TV's relation to mental health, and it is possible that the stability of social-media effects observed here reflect such an early period of invariance. As more data accumulate on adolescents' use of emerging technologies, knowledge of them and their effects on mental health will become more precise. It may, then, be premature to draw firm conclusions about the increasing or declining associations between social media and adolescent mental health.

We acknowledge additional limitations that prevent firm conclusions from the data studied here. First, we studied the between-persons relationships between technology use and mental health. We partially replicated previous findings in which individuals who use more technology were likely to report higher mental health problems; unlike longitudinal within-persons data, however, these findings do not directly afford a causal claim that technology use is responsible for variation in mental health. In fact, some longitudinal studies have found the opposite, whereby mental health problems predict smartphone use rather than phone use predicting mental health problems (Bado et al., 2020), or found bidirectional relationships (Orben et al., 2019). For example, changes, if any, in associations between technology use and mental health could occur if adolescents with underlying problems were less likely to use established technologies and media. In that case, the initially negative noncausal relation between technology use would become attenuated over time.

In addition, it is important to note that this work, along with previous literature on this topic, to some extent risks conflating between- and within-persons associations and causal mechanisms. Although we have discussed associations between technology use and mental health at the level of individuals, it is possible that there are additional or alternative routes of association at other levels of analysis. It is possible, for example, that as a given technology becomes adopted by most individuals in a group, even individuals who do not use that technology could become indirectly affected by it, either through its impacts on peers or, for example, by them being deprived of a novel communication platform in which social life now takes place. This type of relationship between technology adoption and mental health might not be apparent in a correlation between individuals' use of technology

SER-302

and mental health and highlights the importance of carefully considering the different implications of hypothesized relations at different levels of analyses.

We also did not include covariates in our models for two reasons. First, the selection of covariates should be guided by a strong theory that specifies the causal relations between variables (Rohrer, 2018). Currently, no good candidates for such a theory exist, and it was not our purpose here to offer one. It is likely that if meaningful covariates were added, the results might change, but in the absence of a theory, those changes would be difficult to understand and might simply reflect inherent variation between models (Orben & Przybylski, 2019a). Nevertheless, previous studies have found that covariates tend to render related associations smaller (Orben & Przybylski, 2019b), suggesting that the magnitudes we report are overestimates of the true associations. Second, because our investigation spanned three heterogeneous data sets, it would have been difficult to include covariates and at the same time maintain similarity and parsimony across models. With that in mind, we studied the simplest relations between technology use and mental health, controlling only for the included covariates (sex and year and their interactions). In light of this, the exact magnitudes of the relations observed here are unlikely to provide accurate estimates of any underlying causal relations between technology use and mental health, if any exist. Going forward, information about how the technologies are used and in which contexts would be required for meaningful causal analyses of the relations because we would expect that, for example, using devices for staying in touch with relatives would relate to mental health differently than if said devices were used for nonsocial purposes. Therefore, future work should focus on identifying competing theoretical models that could be tested against data and collecting sufficiently detailed data to allow those tests.

In addition to the complexities in determining causal relations, the self-report nature of the current data presents unique problems. Although self-report measures of mental health and technology use have high face validity, they might be poor representations of the actual state of affairs (Shaw et al., 2020): In studies of this topic, self-report measures of technology use are consistently biased and are not highly correlated with objective use (Johannes et al., 2020; Parry et al., 2020; Scharkow, 2016). In addition, true changes in technologies and their associations with health could be difficult to observe in between-persons data because adolescents, too, might change and, for example, adapt to be better able to cope with more harmful technologies.

In light of this, more robust studies of the changing roles of emerging technologies in young people's lives should use data that afford a more detailed, more accurate, and less biased look into the individuals engaging with the technologies. This detail should include not only an increased time frame to be considered and a more fine-grained look at engagement but also information on how exactly the engagement is taking place beyond, for example, the distinction between active and passive use. Fortunately, such data already exist in the confines of the technology companies behind the most popular online platforms and products. Collaborative work between industry-based scientists working for gaming, social-media, and technology companies and independent academic scientists would, from this perspective, be greatly beneficial to studying how technologies are affecting individuals and societies.

Concerns that technology is becoming both more prevalent in young people's lives and likewise more harmful to their mental health have gained traction in recent years. If supported by empirical study, this idea would potentially suggest policy intervention (U.K. Department for Digital, Culture, Media & Sport, 2020). Although we found little evidence suggesting that technology is becoming more harmful over time, we note that data accrued by internet-based and social-media platforms are needed to more rigorously examine these possibilities. It is our hope that transparent and robust science would emerge in collaboration with industry stakeholders to better elucidate the changing roles of technology in young people's lives.

## Transparency

*Action Editor:* Christopher G. Beevers
*Editor:* Kenneth J. Sher
*Author Contributions*
All of the authors have had full access to the data, and M. Vuorre takes responsibility for its integrity and the accuracy of the data analysis. All of the authors conceived of the study and were responsible for investigation and methodology. A. K. Przybylski provided funding, resources, and supervision and had final responsibility for the decision to submit for publication. M. Vuorre provided the software and performed formal analysis and visualization. All of the authors drafted and edited the manuscript and approved the final manuscript for submission.
*Declaration of Conflicting Interests*
The author(s) declared that there were no conflicts of interest with respect to the authorship or the publication of this article.
*Funding*
This research was supported by the Huo Family Foundation and Economic and Social Research Council Grant ES/T008709/1. Monitoring the Future is supported by the

National Institute on Drug Abuse, Understanding Society is sponsored by the Economic and Social Research Council, and Youth Risk Behavior Surveillance System is conducted and funded by the U.S. Centers for Disease Control and Prevention.

*Open Practices*

All materials have been made publicly available via OSF and can be accessed at https://osf.io/rh7gu. This article has received the badge for Open Materials. More information about the Open Practices badges can be found at https://www.psychologicalscience.org/publications/badges.

### ORCID iDs

Matti Vuorre https://orcid.org/0000-0001-5052-066X
Amy Orben https://orcid.org/0000-0002-2937-4183
Andrew K. Przybylski https://orcid.org/0000-0001-5547-2185

### Acknowledgments

We thank Niklas Johannes, Chris Ferguson, and an anonymous reviewer for comments on an earlier draft of the manuscript.

### Notes

1. The fourth item asked about the number of suicide attempts, but we converted it to a yes/no indicator, a decision justified by low cell counts in the higher categories. A fifth item queried the severity of suicide attempts, but we did not use this item because responses to it were conditional on positive response to the attempts question.
2. There were small variations in some questions over time, such as the MTF social-media item, which included MySpace as an example before 2010.
3. UndSoc data include the data collection wave but not the year in which the data were collected. Because the UndSoc data collection for each wave takes place over a 2-year period, we converted waves to years using the year in which that wave's data collection began.

### References

Anderson, M., & Jiang, J. (2018). *Teens' social media habits and experiences*. Pew Research Center. https://www.pewresearch.org/internet/2018/11/28/teens-social-media-habits-and-experiences/

Anvari, F., & Lakens, D. (2019). *Using anchor-based methods to determine the smallest effect size of interest*. PsyArXiv. https://doi.org/10.31234/osf.io/syp5a

Appel, M., Marker, C., & Gnambs, T. (2020). Are social media ruining our lives? A review of meta-analytic evidence. *Review of General Psychology*, *24*(1), 60–74. https://doi.org/10.1177/1089268019880891

Bado, P., Schafer, J., Simioni, A. R., Bressan, R. A., Gadelha, A., Pan, P. M., Miguel, E. C., Rohde, L. A., & Salum, G. (2020). *Screen time and psychopathology: Investigating directionality using cross-lagged panel models*. PsyArXiv. https://doi.org/10.31234/osf.io/q8tur

Bjerre-Nielsen, A., Andersen, A., Minor, K., & Lassen, D. D. (2020). The negative effect of smartphone use on academic performance may be overestimated: Evidence from a 2-year panel study. *Psychological Science*, *31*(11), 1351–1362. https://doi.org/10.1177/0956797620956613

Boyd, D. (2014). *It's complicated: The social lives of networked teens*. Yale University Press.

Bürkner, P.-C. (2017). brms: An R package for Bayesian multilevel models using Stan. *Journal of Statistical Software*, *80*(1), 1–28. https://doi.org/10.18637/jss.v080.i01

Bushman, B. J., & Anderson, C. A. (2002). Violent video games and hostile expectations: A test of the general aggression model. *Personality and Social Psychology Bulletin*, *28*(12), 1679–1686. https://doi.org/10.1177/014616702237649

Carpenter, B., Gelman, A., Hoffman, M. D., Lee, D., Goodrich, B., Betancourt, M., Brubaker, M., Guo, J., Li, P., & Riddell, A. (2017). Stan: A probabilistic programming language. *Journal of Statistical Software*, *76*(1). https://doi.org/10.18637/jss.v076.i01

Dickson, K., Richardson, M., Kwan, I., MacDowall, W., Burchett, H., Stansfield, C., Brunton, G., Sutcliffe, K., & Thomas, J. (2019). *Screen-based activities and children and young people's mental health and psychosocial wellbeing: A systematic map of reviews*. EPPI-Centre, Social Science Research Unit, UCL Institute of Education, University College London. https://eppi.ioe.ac.uk/cms/Portals/0/PDF%20reviews%20and%20summaries/Systematic%20Map%20of%20Reviews%20on%20Screen-based%20activities_08.01.19.pdf?ver=2019-01-29-155200-517

Drummond, A., Sauer, J. D., & Ferguson, C. J. (2020). Do longitudinal studies support long-term relationships between aggressive game play and youth aggressive behaviour? A meta-analytic examination. *Royal Society Open Science*, *7*(7), Article 200373. https://doi.org/10.1098/rsos.200373

Etchells, P. J., Gage, S. H., Rutherford, A. D., & Munafò, M. R. (2016). Prospective investigation of video game use in children and subsequent conduct disorder and depression using data from the Avon longitudinal study of parents and children. *PLOS ONE*, *11*(1), Article e0147732. https://doi.org/10.1371/journal.pone.0147732

Ferguson, C. J. (2021). Links between screen use and depressive symptoms in adolescents over 16 years: Is there evidence for increased harm? *Developmental Science*, *24*(1), Article e13008. https://doi.org/10.1111/desc.13008

Ferguson, C. J., Copenhaver, A., & Markey, P. (2020). Reexamining the findings of the American Psychological Association's 2015 task force on violent media: A meta-analysis. *Perspectives on Psychological Science*, *15*(6), 1423–1443. https://doi.org/10.1177/1745691620927666

Furedi, F. (2015). The media's first moral panic. *History Today*, *65*(11), 46–48.

Gelman, A., & Hill, J. (2007). *Data analysis using regression and multilevel/hierarchical models*. Cambridge University Press.

Goodman, R., Ford, T., Simmons, H., Gatward, R., & Meltzer, H. (2000). Using the Strengths and Difficulties Questionnaire

(SDQ) to screen for child psychiatric disorders in a community sample. *The British Journal of Psychiatry*, *177*(6), 534–539. https://doi.org/10.1192/bjp.177.6.534

Grimes, T., Anderson, J. A., & Bergen, L. (2008). *Media violence and aggression: Science and ideology*. SAGE.

Hawkes, N. (2019). CMO report is unable to shed light on impact of screen time and social media on children's health. *The BMJ*, *364*, Article l643. https://doi.org/10.1136/bmj.l643

Jensen, M., George, M. J., Russell, M. R., & Odgers, C. L. (2019). Young adolescents' digital technology use and mental health symptoms: Little evidence of longitudinal or daily linkages. *Clinical Psychological Science*, *7*(6), 1416–1433. https://doi.org/10.1177/2167702619859336

Johannes, N., Vuorre, M., & Przybylski, A. K. (2020). *Video game play is positively correlated with well-being*. PsyArXiv. https://doi.org/10.31234/osf.io/qrjza

Kann, L. (2018). Youth risk behavior surveillance—United States, 2017. *MMWR. Surveillance Summaries*, *67*(8), 1–114. https://doi.org/10.15585/mmwr.ss6708a1

Kardefelt-Winther, D., Rees, G., & Livingstone, S. (2020). Contextualising the link between adolescents' use of digital technology and their mental health: A multi-country study of time spent online and life satisfaction. *Journal of Child Psychology and Psychiatry*, *61*(8), 875–889. https://doi.org/10.1111/jcpp.13280

Kelly, Y., Zilanawala, A., Booker, C., & Sacker, A. (2018). Social media use and adolescent mental health: Findings from the UK Millennium Cohort Study. *Eclinicalmedicine*, *6*, 59–68. https://doi.org/10.1016/j.eclinm.2018.12.005

Kreski, N., Platt, J., Rutherford, C., Olfson, M., Odgers, C., Schulenberg, J., & Keyes, K. M. (2021). Social media use and depressive symptoms among United States adolescents. *Journal of Adolescent Health*, *68*(3), P572–P579. https://doi.org/10.1016/j.jadohealth.2020.07.006

Lewis, P. (2017, October 6). 'Our minds can be hijacked': The tech insiders who fear a smartphone dystopia. *The Guardian*. https://www.theguardian.com/technology/2017/oct/05/smartphone-addiction-silicon-valley-dystopia

Miech, R. A., Johnston, L. D., O'Malley, P. M., Bachman, J. G., Schulenberg, J. E., & Patrick, M. E. (2020). *Monitoring the future national survey results on drug use, 1975–2019: Volume I, secondary school students*. The University of Michigan. http://monitoringthefuture.org/pubs.html

Newcomb, M. D., Huba, G. J., & Bentler, P. M. (1981). A multidimensional assessment of stressful life events among adolescents: Derivation and correlates. *Journal of Health and Social Behavior*, *22*(4), 400–415. https://doi.org/10.2307/2136681

Odgers, C. L., & Jensen, M. R. (2020). Annual research review: Adolescent mental health in the digital age: Facts, fears, and future directions. *Journal of Child Psychology and Psychiatry*, *61*(3), 336–348. https://doi.org/10.1111/jcpp.13190

Ophir, Y., Lipshits-Braziler, Y., & Rosenberg, H. (2020). New-media screen time is not (necessarily) linked to depression: Comments on Twenge, Joiner, Rogers, and Martin (2018). *Clinical Psychological Science*, *8*(2), 374–378. https://doi.org/10.1177/2167702619849412

Orben, A. (2020). The Sisyphean cycle of technology panics. *Perspectives on Psychological Science*, *15*(5), 1143–1157. https://doi.org/10.1177/1745691620919372

Orben, A., Dienlin, T., & Przybylski, A. K. (2019). Social media's enduring effect on adolescent life satisfaction. *Proceedings of the National Academy of Sciences, USA*, *116*(21), 10226–10228. https://doi.org/10.1073/pnas.1902058116

Orben, A., & Przybylski, A. K. (2019a). The association between adolescent well-being and digital technology use. *Nature Human Behaviour*, *3*(2), 173–182. https://doi.org/10.1038/s41562-018-0506-1

Orben, A., & Przybylski, A. K. (2019b). Screens, teens, and psychological well-being: Evidence from three time-use-diary studies. *Psychological Science*, *30*(5), 682–696. https://doi.org/10.1177/0956797619830329

Parry, D. A., Davidson, B. I., Sewall, C., Fisher, J. T., Mieczkowski, H., & Quintana, D. (2020). *Measurement discrepancies between logged and self-reported digital media use: A systematic review and meta-analysis*. PsyArXiV. https://doi.org/10.31234/osf.io/f6xvz

Preston, M. I. (1941). Children's reactions to movie horrors and radiocrime. *The Journal of Pediatrics*, *19*(2), 147–168. https://doi.org/10.1016/S0022-3476(41)80059-6

Przybylski, A. K., & Weinstein, N. (2017). A large-scale test of the Goldilocks hypothesis: Quantifying the relations between digital-screen use and the mental well-being of adolescents. *Psychological Science*, *28*(2), 204–215. https://doi.org/10.1177/0956797616678438

Rohrer, J. M. (2018). Thinking clearly about correlations and causation: Graphical causal models for observational data. *Advances in Methods and Practices in Psychological Science*, *1*(1), 27–42. https://doi.org/10.1177/2515245917745629

Rosseel, Y. (2012). lavaan: An R package for structural equation modeling. *Journal of Statistical Software*, *48*(1), 1–36. https://doi.org/10.18637/jss.v048.i02

Scharkow, M. (2016). The accuracy of self-reported Internet use—A validation study using client log data. *Communication Methods and Measures*, *10*(1), 13–27. https://doi.org/10.1080/19312458.2015.1118446

Shaw, H., Ellis, D. A., Geyer, K., Davidson, B. I., Ziegler, F. V., & Smith, A. (2020). *Quantifying smartphone 'use': Choice of measurement impacts relationships between 'usage' and health*. PsyArXiv. https://doi.org/10.31234/osf.io/mpxra

Singer, N. (2016, May 14). When websites won't take no for an answer. *The New York Times*. https://www.nytimes.com/2016/05/15/technology/personaltech/when-websites-wont-take-no-for-an-answer.html

Solon, O. (2017, November 9). Ex-Facebook president Sean Parker: Site made to exploit human 'vulnerability.' *The Guardian*. https://www.theguardian.com/technology/2017/nov/09/facebook-sean-parker-vulnerability-brain-psychology

Taylor, K., & Silver, L. (2019). *Smartphone ownership is growing rapidly around the world, but not always equally*. Pew Research Center. https://www.pewresearch.org/global/2019/02/05/smartphone-ownership-is-growing-rapidly-around-the-world-but-not-always-equally/

Twenge, J. M., Joiner, T. E., Rogers, M. L., & Martin, G. N. (2018). Increases in depressive symptoms, suicide-related

outcomes, and suicide rates among U.S. adolescents after 2010 and links to increased new media screen time. *Clinical Psychological Science*, *6*(1), 3–17. https://doi.org/10.1177/2167702617723376

U.K. Department for Digital, Culture, Media & Sport. (2020). *Online harms white paper: Full government response to the consultation*. https://www.gov.uk/government/consultations/online-harms-white-paper/outcome/online-harms-white-paper-full-government-response

University of Essex, Institute for Social and Economic Research. (2019). *Understanding society: Waves 1-9, 2009-2018 and harmonised BHPS: Waves 1-18, 1991-2009* (12th ed.) [Data collection]. UK Data Service. http://doi.org/10.5255/UKDA-SN-6614-13

U.S. Centers for Disease Control and Prevention. (2020). *WISQARS fatal injury reports*. https://webappa.cdc.gov/sasweb/ncipc/mortrate.html

Verduyn, P., Ybarra, O., Résibois, M., Jonides, J., & Kross, E. (2017). Do social network sites enhance or undermine subjective well-being? A critical review. *Social Issues and Policy Review*, *11*(1), 274–302. https://doi.org/10.1111/sipr.12033

Viner, R., Davie, M., & Firth, A. (2019). *The health impacts of screen time: A guide for clinicians and parents*. Royal College of Paediatrics and Child Health.

Wertham, F. (1954). *Seduction of the innocent*. Rinehart.

Weston, S. J., Ritchie, S. J., Rohrer, J. M., & Przybylski, A. K. (2019). Recommendations for increasing the transparency of analysis of preexisting data sets. *Advances in Methods and Practices in Psychological Science*, *2*(3), 214–227. https://doi.org/10.1177/2515245919848684

Wood, S. N. (2017). *Generalized additive models: An introduction with R* (2nd ed.). CRC Press.

Wood, S. N. (2020). *mgcv: Mixed GAM computation vehicle with automatic smoothness estimation* (Version 1.8-33) [Computer software]. https://CRAN.R-project.org/package=mgcv

ROB BONTA
Attorney General of California
ANYA M. BINSACCA, SBN 189613
Supervising Deputy Attorney General
NICOLE KAU, SBN 292026
ELIZABETH K. WATSON, SBN 295221
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3847
E-mail: Elizabeth.Watson@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

**NETCHOICE, LLC d/b/a NetChoice,**

Plaintiff,

**v.**

**ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,**

Defendant.

Case No. 5:22-cv-08861-BLF

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Judge: Hon. Beth Labson Freeman
Hearing Date: July 27, 2023
Time: 1:30 PM
Dept: Courtroom 1– 5th Floor

Action Filed: December 14, 2022

**TABLE OF CONTENTS**


Page

Introduction ..... 1
Background ..... 1
I. Existing Practices & Regulation ..... 1
A. Online Businesses' Collection and Use of Personal Information ..... 1
B. User Tools for Limiting Collection and Use of Personal Information ..... 2
II. Children on the Internet ..... 3
A. Children's Internet Use ..... 3
B. Laws Regulating Children's Online Experience ..... 4
C. Businesses' Interaction with Children Online ..... 4
D. Unique Vulnerabilities of Children Online ..... 5
III. The California Age-Appropriate Design Code Act ..... 6
A. Regulated Businesses ..... 6
B. Requirements for Regulated Businesses ..... 7
1. Proactive Steps to Protect Children's Privacy ..... 7
2. Prohibitions ..... 8
C. Enforcement & Guidance ..... 9
IV. Plaintiff's Challenge to AB 2273 ..... 10
Legal Standard ..... 10
Argument ..... 10
I. Plaintiff is not Likely to Succeed on the Merits ..... 10
A. AB 2273 Does Not Violate the First Amendment ..... 10
1. AB 2273 does not regulate speech or expressive conduct ..... 10
2. None of the challenged provisions impose a prior restraint ..... 12
3. AB 2273 is facially neutral ..... 16
4. AB 2273 withstands any level of First Amendment scrutiny ..... 18
a. At most, intermediate scrutiny applies ..... 18
b. AB 2273 withstands strict scrutiny ..... 19
5. AB 2273 is not overbroad ..... 22
B. AB 2273 Is Not Unconstitutionally Vague ..... 23
C. AB 2273 Does Not Violate the Dormant Commerce Clause ..... 25
1. AB 2273 does not regulate extraterritorially ..... 25
2. AB 2273 satisfies Pike balancing ..... 26
D. AB 2273 Is Not Preempted by Federal Law ..... 27

**TABLE OF CONTENTS**
(continued)

**Page**

1. COPPA ........ 27
2. Section 230 of the Communications Decency Act ........ 29
II. Other Injunction Factors Weigh Against Relief ........ 30
Conclusion ........ 30

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alliance for Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011) .......... 10

*Am. Acad. of Pain Mgmt. v. Joseph*
353 F.3d 1099 (9th Cir. 2004) .......... 19

*Am. Soc'y of Journalists & Authors v. Bonta*
15 F.4th 954 (9th Cir. 2021) .......... 11, 12, 15

*Anheuser-Busch, Inc. v. Schmoke*
101 F.3d 3250 (4th Cir. 1996) .......... 20

*Arizona v. United States*
567 U.S. 387 (2012) .......... 29

*Bantam Books v. Sullivan*
372 U.S. 58 (1963) .......... 13, 14

*Barnes v. Yahoo, Inc.*
570 F.3d 1096 (9th Cir. 2009) .......... 14, 29

*Bolger v. Youngs Drug Prods. Corp.*
463 U.S. 60 (1983) .......... 19

*Broadrick v. Oklahoma*
413 U.S. 601 (1973) .......... 22

*Butler v. Michigan*
352 U.S. 380 (1957) .......... 16

*Cal. Teachers Ass'n v. State Bd. of Educ.*
271 F.3d 1141 (9th Cir. 2001) .......... 23, 24, 25

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*
447 U.S. 557 (1980) .......... 15, 19

*Colacurcio v. City of Kent*
163 F.3d 545 (9th Cir. 1998) .......... 21

*Coyote Publ'g v. Miller*
598 F.3d 592 (9th Cir. 2010) .......... 19, 20

*Denver Area Telecomm. Consortium, Inc., v. FCC*
518 U.S. 727 (1996) .......... 12, 20

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Doe v. Harris*
772 F.3d 563 (9th Cir. 2014) ........ 17, 18

*Doe v. Internet Brands, Inc.*
824 F.3d 846 (9th Cir. 2016) ........ 29

*Dymo Indus., Inc. v. Tapeprinter, Inc.*
326 F.2d 141 (9th Cir. 1964) (per curiam) ........ 10

*Edenfield v. Fane*
507 U.S. 761 (1993) ........ 19

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*
521 F.3d 1157 (9th Cir. 2008) ........ 29, 30

*Ferris v. Santa Clara County*
891 F.2d 715 (9th Cir. 1989) ........ 20, 30

*Fla. Bar v. Went For It, Inc.*
515 U.S. 618 (1995) ........ 20

*G.K. Ltd. Travel v. City of Lake Oswego*
436 F.3d 1064 (9th Cir. 2006) ........ 21

*Ginsberg v. New York*
390 U.S. 629 (1968) ........ 21

*Goldie's Bookstore, Inc. v. Sup. Ct. of Cal.*
739 F2d 466 (9th Cir. 1984) ........ 30

*Gospel Missions of Am. v. City of Los Angeles*
419 F.3d 1042 (9th Cir. 2005) ........ 22, 23

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*
742 F.3d 414 (9th Cir. 2014) ........ 13, 16, 26, 27

*Holder v. Humanitarian Law Project*
561 U.S. 1 ........ 25

*HomeAway.com v. City of Santa Monica*
918 F.3d 676 (9th Cir. 2019) ........ 11, 12, 29

*Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*
984 F.2d 1507 (9th Cir. 1993) ........ 13

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Humanitarian Law Project v. U.S. Treasury Dep't*
578 F.3d 1133 (9th Cir. 2009) .......... 23

*Hunt v. City of Los Angeles*
638 F.3d 703 (2011) .......... 15, 24

*IDK v. Clark County*
836 F.2d 1185 (9th Cir. 1988) .......... 14, 23, 24

*In re Nat'l Sec. Letter*
33 F.4th 1058 (9th Cir. 2022) .......... 19, 22

*In re Three Nat'l Security Letters*
35 F.4th 1181 (9th Cir. 2022) .......... 21

*Int'l Franchise Ass'n v. City of Seattle*
803 F.3d 389 (9th Cir. 2015) .......... 11, 12

*Interstate Cir., Inc. v. City of Dallas*
390 U.S. 676 (1968) .......... 14

*Jacobs v. Clark County Sch. Dist.*
526 F.3d 419 (9th Cir. 2008) .......... 18, 19

*Jones v. Google LLC*
56 F.4th 735 (9th Cir. 2022) .......... 27, 28, 29

*Litton Indus. Inc. v. FTC*
676 F.2d 364 (9th Cir. 1982) .......... 15

*Lone Star Sec. & Video, Inc. v. City of Los Angeles*
827 F.3d 1192 (9th Cir. 2016) .......... 16

*Long Beach Area Peace Network v. City of Long Beach*
574 F.3d 1011 (9th Cir. 2009) .......... 13

*Marquez-Reyes v. Garland*
36 F.4th 1195 (9th Cir. 2022) .......... 15, 22, 23

*Maryland v. King*
567 U.S. 1301 (2012) (Roberts, C.J., in chambers) .......... 30

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*
460 U.S. 575 (1983) .......... 11

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Murphy v. NCAA*
138 S. Ct. 1461 (2018) .... 27

*Nat'l Endowment for the Arts v. Finley*
524 U.S. 569 (1998) .... 12

*Nat'l Fed'n of the Blind v. Target Corp.*
452 F. Supp. 2d 946 (N.D. Cal. 2006) .... 26

*New Energy Co. of Ind. v. Limbach*
486 U.S. 269 (1988) .... 25

*New York v. Ferber*
458 U.S. 747 (1982) .... 27

*Nken v. Holder*
556 U.S. 418 (2009) .... 30

*Perry v. L.A. Police Dept.*
121 F.3d 1365 (9th Cir. 1997) .... 18

*Pharm. Rsch. & Mfrs. of Am. v. Walsh*
538 U.S. 644 (2003) .... 25

*Pike v. Bruce Church, Inc.*
397 U.S. 137 (1970) .... 26, 27

*Prince v. Massachusetts*
321 U.S. 158 (1944) .... 21

*Publius v. Boyer-Vine*
237 F. Supp. 3d 997 (E.D. Cal. 2017) .... 26

*Recycle for Change v. City of Oakland*
856 F.3d 666 (9th Cir. 2017) .... 18

*Reno v. ACLU*
521 U.S. 844 (1997) .... 21

*Roulette v. City of Seattle*
97 F.3d 300 (9th Cir. 1996) .... 11

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.* (*FAIR*)
547 U.S. 476 (2006) .... 12, 18

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Sable Commc'ns of Cal., Inc. v. F.C.C.*
492 U.S. 115 (1989) .... 20

*Se. Promotions, Ltd v. Conrad*
420 U.S. 546 (1975) .... 13

*Sorrell v. IMS Health Inc.*
564 U.S. 552 (2011) .... 11, 12

*Spirit of Aloha Temple v. Cnty. of Maui*
49 F.4th 1180 (9th Cir. 2022) .... 13

*Thomas v. Chi. Park Dist.*
534 U.S. 316 (2002) .... 14

*Turner Broad. Sys., Inc. v. FCC*
512 U.S. 622 (1994) .... 12, 17, 18, 19

*Twitter Inc. v. Garland*
61 F.4th 686 (9th Cir. 2023) .... 17, 21, 22

*U.S. v. O'Brien*
391 U.S. 367 (1968) .... 19

*U.S. v. Playboy Ent. Grp., Inc.*
529 U.S. 803 (2000) .... 20, 21

*U.S. v. Williams*
553 U.S. 285 (2008) .... 22, 23

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*
550 U.S. 330 (2007) .... 25

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*
455 U.S. 489 (1982) .... 23

*Village of Schaumburg v. Citizens for a Better Env't*
444 U.S. 620 (1980) .... 13

*Virginia v. Hicks*
539 U.S. 113 (2003) .... 22

*Willams v. Gerber Prods., Co.*
552 F.3d 934 (9th Cir. 2008) .... 14

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Williams-Yulee v. Fla. Bar*
575 U.S. 433 (2015) ... 20

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) ... 10, 30

**STATUTES**

United States Code, Title 12
§ 5365(i)(2) ... 13

United States Code, Title 15
§§ 6501–6506 ... 4, 28
§ 6502(d) ... 28

United States Code, Title 26
§ 501(r)(3) ... 13

United States Code, Title 47
§ 230 ... 14, 29, 30
§ 230(c)(1) ... 29
§ 230 (e)(3) ... 29

California Business & Professions Code
§ 17500 ... 15
§ 22575 ... 14
§ 22580 ... 4
§ 22581 ... 4

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

California Civil Code
§ 1798.99.29 .......... 6
§ 1798.99.29(b) .......... 17
§ 1798.99.30(a) .......... 6, 26
§ 1798.99.30(b)(1) .......... 26
§ 1798.99.30(b)(4) .......... 6, 7
§ 1798.99.30(j) .......... 26
§ 1798.99.31 .......... 30
§ 1798.99.31(a) .......... 6, 26
§ 1798.99.31(a)(1)–(4) .......... 13
§ 1798.99.31(a)(1)(A)–(B) .......... 7, 8
§ 1798.99.31(a)(1)(B) .......... 14
§ 1798.99.31(a)(3)–(4) .......... 13
§ 1798.99.31(a)(5) .......... 15, 16
§ 1798.99.31(a)(9) .......... 14
§ 1798.99.31(b) .......... 6
§ 1798.99.31(b)(1) .......... 8, 16, 24, 28
§ 1798.99.31(b)(4) .......... 9
§ 1798.99.31(b)(7) .......... 24
§ 1798.99.31(b)(8) .......... 9, 16
§ 1798.99.31(d) .......... 9
§ 1798.99.32 .......... 9
§ 1798.99.32(d) .......... 25
§ 1798.99.32(d)(3) .......... 16
§ 1798.99.32(e) .......... 16
§ 1798.99.33 .......... 9
§ 1798.99.35 .......... 25
§ 1798.99.35(a) .......... 9
§ 1798.99.35(c) .......... 14
§ 1798.99.35(e) .......... 10
§ 1798.99.40 .......... 7
§ 1798.100 .......... 2
§ 1798.120(a) .......... 2
§ 1798.120(c) .......... 4
§ 1798.140(i) .......... 26
§ 1798.140(v) .......... 2
§ 1798.140(b)(4) .......... 24
§ 1798.140(d) .......... 6, 26
§ 1798.140(l) .......... 9, 24
§ 1798.145 .......... 8

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**CONSTITUTIONAL PROVISIONS**

United States Constitution
First Amendment ........ *passim*
Fourth Amendment ........ 10
Fourteenth Amendment ........ 10

United States Constitution Article I
§ 8, Clause 3 ........ 25

**OTHER AUTHORITIES**

Code of Federal Regulations, Rule 16
§§ 312.1–312.13 ........ 28
§ 312.2 ........ 4

## INTRODUCTION

The California Age-Appropriate Design Code Act allows children to explore the internet while reducing threats to their privacy and safety. The Act operates well within constitutional parameters. The regulation of businesses—including online businesses—and protection of children are well-recognized government responsibilities. The Act, which regulates those businesses that trade in consumers' personal information and offer products, services, and features likely to be accessed by children, requires certain actions that proactively protect that information and prohibits certain actions that involve the collection and use of that information. Plaintiff's members do not have a First Amendment right to children's personal information. Nothing in the Act restricts the content that businesses can provide to minors, and any incidental effect the Act may have on businesses' speech is justified by the State's compelling interest in children's welfare. The Act's clear and specific requirements and prohibitions, as well as its procedural protections and scienter requirements, ensure that businesses' rights remain protected. Compliance does not trigger concerns under the dormant Commerce Clause. Nor is the Act inconsistent with existing federal law. This Court should deny Plaintiff's motion.

## BACKGROUND

### I. EXISTING PRACTICES & REGULATION

#### A. Online Businesses' Collection and Use of Personal Information

The collection, sharing, selling, and other use of personal information provides substantial revenue for online businesses. Egelman Decl. ¶¶ 11–12. Internet companies constantly collect data from individuals online and offline. *Id.* ¶ 13. This data includes what services people use, how they use them, and from where they use them. Businesses are able to link this data to unique individuals through persistent identifiers, like the device an individual uses to access the internet, which tend not to change over time. *Id.* ¶ 14. Once data is linked to unique individuals, businesses are able to create thorough individual profiles using information drawn directly from the collected data, and to make predictions and inferences based on that data. *Id.* ¶¶ 13–14. With this data, businesses can learn, predict, or infer things like user's interests, preferences, and behaviors as well as more personal details such as religion, health conditions, sexual orientation, or

socioeconomic status. *Id.* Highly personal individual information can be predicted or inferred from minimal data. *Id.* Geolocation information is a highly valuable piece of data that is widely available through databases that map Internet Protocol (IP) addresses—which are transmitted with every internet connection—to physical locations. *Id.* ¶¶ 13, 31, 55. From this information alone, a business may be able to accurately predict details about a user's religion or sexual orientation. *Id.* ¶¶ 13–14. Once a business has compiled a profile, those profiles can be used or sold to third parties to create targeted advertising and learn more about consumer behavior to maximize profit, among other things. *Id.* ¶¶ 11–14; Radesky Decl. ¶¶ 66, 68, 78, 89.

Because this mass collection of data raises significant privacy concerns, California regulates the collection and use of consumer data. Existing statutes cover consumer's "personal information," which is defined as information that "identifies, relates to, describes," or is reasonably capable of association with, or linking to, a particular consumer or household. Cal. Civ. Code §1798.140(v) (all statutory references are to the Cal. Civ. Code unless otherwise noted). Personal information includes names, addresses, email addresses, IP addresses, commercial information, browsing history, search history, geolocation data, and information regarding a consumer's interaction with an internet website. *Id*. It also includes profiles or inferences made from this information. *Id.* Businesses must notify consumers that their data is being collected and consumers have the right to direct businesses not to sell or share that information. §1798.100; §1798.120(a). In short, California law intends to empower its residents to control their data. However, practically speaking, businesses do not always provide internet users with the necessary tools to do so. Egelman Decl. ¶¶ 24–34.

### B. User Tools for Limiting Collection and Use of Personal Information

**Privacy Settings:** Privacy settings allow users to limit data collection by preventing businesses from storing data, called "cookies," in the user's web browser. Egelman Decl. ¶ 29. However, default settings are usually the least restrictive and changing the settings is not always user-friendly. *Id.* ¶ 19. Even if a user is able to successfully block cookies, businesses now track by other means that are not user-controlled, like "fingerprints"—the aggregating of several data points that are automatically collected, such as personal computer settings and location data, and

used to identify the user. *Id.* ¶¶ 30–31. Users can do little to stop collection of this data. *Id*.

**Terms of Service, Privacy Policies, and Community Standards:** Although terms of service and the like are supposed to allow users to make informed decisions about how and whether to engage with a business, numerous studies have shown that terms of service and privacy policies often prove indecipherable, if a user can even find them, and often do not accurately describe the service's behavior. Egelman Decl. ¶¶ 24–28; Radesky Decl. ¶ 93. These policies typically allow businesses maximum flexibility in using the personal information they collect. *See* Egelman Decl. ¶¶ 13–14, 28. Also, community standards are intended to inform consumers about how the business moderates its own platform, but it is extremely difficult for users to hold businesses accountable for enforcing these policies, and businesses' own enforcement is typically, at best, reactive. Radesky Decl. ¶¶ 72, 95.

**Consumer Reporting:** Most online businesses purport to provide a way for users to contact the business to ask questions or report concerns. But in practice, there is no method for parents or youth seeking to provide feedback (other than blocking/reporting content) or report a recurrent problem with specific platforms. Radesky Decl. ¶ 94. Parents whose children have died after cyberbullying or taking part in social media challenges have reported trying to get in touch with social media companies, but being ignored. *Id.* If a business fails to take adequate action or respond at all to a reported concern, there is little a user can do. *Id.* ¶¶ 94–95.

## II. CHILDREN ON THE INTERNET

Children are especially vulnerable to the risks businesses' data collection practices pose. Radesky Decl. ¶¶ 39, 45–72. Yet, despite their awareness that children use their services and the existence of technological capabilities to provide a safer experience for children, businesses often fail to take steps to provide that safer experience. *Id.* ¶¶ 30–44; Egelman ¶¶ 35–45.

### A. Children's Internet Use

Children's internet use has expanded rapidly in the last decade, with children using digital technologies for an average of 0:49 hours per day for children under 2, 2:30 for 2–4 year olds, 3:05 for 5–8 year olds, 5:33 for 6–12 year olds, and 8:39 for 13–17 year olds. Radesky Decl. ¶¶ 21–25. During the COVID-19 pandemic, children's access to digital technology and time online

increased approximately 52%. *Id.* ¶¶ 26–28. Children use the internet for both educational and entertainment purposes. *Id.* ¶¶ 26–29. Unplugging is not a viable option. *Id.* ¶ 29.

**B. Laws Regulating Children's Online Experience**

Despite the ubiquitous presence of the internet in children's lives, specific legal protections for children in the US are limited. At the federal level, the Children's Online Privacy Protection Act (COPPA) requires that online businesses protect the personal information of children, but only where the platform is "directed towards" children under 13. 15 U.S.C. §§6501–6506. However, unless the website self-identifies as one that "target[s] children as its primary audience[,]" all a website must do is "prevent the disclosure of personal information from visitors who identify themselves as under age 13" without parental consent. 16 C.F.R. §312.2. At the state level, California has passed laws specifically designed to protect minors from particular products, like alcohol, and affords minors special rights, like the ability to have their posts removed by request. Cal. Bus. & Prof. §§22580, 22581. Although generally businesses may not sell or share the personal information of a user if they have actual knowledge the user under 16, §1798.120(c), there is no comprehensive law protecting the collection and use of children's data.

AB 2273 is modeled on the United Kingdom's Age Appropriate Design Code, commonly referred to as the "Children's Code." This Code requires that all websites likely to be accessed by children provide privacy protections by default. Keaney (ICO) Decl. ¶¶ 16–25, 32–34 & Ex. A. As a result, businesses, including some that are represented in this lawsuit, have undertaken positive changes that have resulted in a safer internet for children. *Id.* ¶¶ 65–67; Radesky ¶ 84.

**C. Businesses' Interaction with Children Online**

Existing privacy regulations have inadvertently created a culture of agnosticism about whether and when children use services intended for adults. Radesky Decl. ¶¶ 30–39; Egelman Decl. ¶¶ 44–45. Businesses are disincentivized from identifying their services as "child-directed" because doing so limits the businesses' ability to monetize their products by collecting and selling user data and showing targeted advertisements. Radesky Decl. ¶ 39; Egelman Decl. ¶¶ 44–45. As a result, it is fairly common for apps that were almost certainly intended for children, such as those that appear in the Google Play "5 and under" app store, to avoid these restrictions by

claiming that they were intended for users over 13. Radesky Decl. ¶¶ 31, 36; Egelman Decl. ¶ 45. This leads not only to the over-collection of children's data, but to using this data to lead children to inappropriate ads and other content. Radesky Decl. ¶¶ 31–39. It is only if and when unintended consequences are discovered that these problems are addressed at all. *Id.* ¶¶ 40–42. Essentially, despite federal regulation, businesses have, at best, taken a reactive, rather than proactive, approach towards protecting children's data. *Id.*

### D. Unique Vulnerabilities of Children Online

Children have more curiosity, less impulse inhibition, less critical thinking and abstract reasoning about complicated concepts (like data collection), more responsivity to parasocial and peer relationships, and more attraction to novelty and rewards than adults. Radesky Decl. ¶¶ 45–47. These characteristics are developmentally adaptive and help children learn and build social relationships in non-digital spaces, but can be taken advantage of through digital design. *Id.* ¶ 46.

Businesses design their services to optimize revenue generation by using tactics that children are more susceptible to, like maximizing time spent using the product, bringing more people to the product, and increasing interactions and content generation. *Id.* ¶¶ 48–71; Egelman Decl. ¶¶ 12, 48. For example, multiple interview studies show that children and teens feel like they spend too much time online, feel pressure to engage, and find it hard to stop using platforms. Radesky Decl. ¶ 51. Manipulative dark patterns that work through parasocial relationship pressure, fabricated time pressure, and navigation constraints commonly appear in apps and platforms used by children. *Id.* ¶ 55; Egelman Decl. ¶ 51. One study showed that these features occurred in 80% of apps and were more common in apps played by children from lower-income and lower-education households. Radesky Decl. ¶ 55. Because design features promote content creation and integrate metrics for popularity, children may take part in extreme content generation (e.g., challenges) to receive validation online or engage in other harmful activity, such as disordered eating, self-harm, or gambling, based on what they are seeing online. *Id.* ¶¶ 61–71.

These outcomes are features, not bugs, of current platform designs. *Id.* ¶¶ 64–67. And children, because of their extensive time online and curiosity, and the "pester power" to spend money, are not unintended victims; they are targets. *Id.* ¶¶ 39, 64–67.

## III. THE CALIFORNIA AGE-APPROPRIATE DESIGN CODE ACT

AB 2273 was passed unanimously by the Legislature. Its findings document statewide, national, and international support for increasing children's online privacy protections and safety. In the Act, the Legislature declares and finds that "children should be afforded protections not only by online products and services specifically directed at them but by all online products and services they are likely to access[,]" regulated businesses "should consider the best interest of children when designing, developing and providing" services, and "[i]f a conflict arises between commercial interests and best interests of children, companies should prioritize the privacy, safety, and well-being of children over commercial interests." §1798.99.29.

### A. Regulated Businesses

The Act only applies to large companies that trade in personal information. Regulated businesses are either (1) for-profit entities operating in California that collect consumers' personal information or has it collected on their behalf, determine the purposes and means of processing that information, and have an annual gross revenue of more than $25,000,000; buy, sell, or share the personal information of 100,000 or more consumers annually; or derive 50% or more of their annual revenues from selling or sharing that information; (2) entities that control or are controlled by and share common branding and consumers' personal information with businesses described above; or (3) certain joint ventures or partnerships. §1798.99.30(a); §1798.140(d).

Within that group of businesses, the Act regulates only those that provide an online service, product, or feature (collectively "service") likely to be accessed by children. §1798.99.31(a), (b). "Likely to be accessed by children" means that the business's offering: (1) is directed to children, as defined by COPPA; (2) is determined, based on competent and reliable evidence regarding audience composition, to be routinely accessed by a significant number of children, or is substantially similar or the same as a service for which such a determination has been made; (3) contains advertisements marketed to children; (4) has design elements that are known to be of interest to children, including games, cartoons, music, and celebrities that appeal to children; or (5) is determined, based on internal company research, to have children as a significant amount of its audience. §1798.99.30(b)(4). Broadband internet access, telecommunications services,

delivery and use of a physical product, and certain medical information is excluded from regulation. *Id.* at (b)(5); §1798.99.40.

**B. Requirements for Regulated Businesses**

**1. Proactive Steps to Protect Children's Privacy**

For each service or similar group of services likely to be accessed by children, businesses must identify the service's purpose, "how it uses children's personal information, and the risks of material detriment to children that arise from" the business's data management practice in a Data Protection Impact Assessment ("DPIA"). §1798.99.31(a)(1)(A)–(B); *Id.* at (c)(2). A DPIA completed for compliance with any other similar law, such as the UK Children's Code, is deemed compliant with the Act. *Id.* at (c)(1). A DPIA must address, to the extent applicable, whether the design of the service could (i) harm children, including by exposing children to harmful or potentially harmful content; (ii) lead to children experiencing or being targeted by harmful or potentially harmful contacts; (iii) permit children to witness, participate in, or be subject to harmful or potentially harmful conduct, or (iv) allow children to be party to or exploited by harmful or potentially harmful contacts. *Id.* at (a)(1)(B). The DPIA must also address whether any algorithms and targeted advertising systems used could harm children; whether and how the service uses system design features to increase, sustain, or extend children's use of the service, including the automatic playing of media, rewards for time spent, and notifications; and whether, how, and for what purpose the service collects and processes children's sensitive personal information. *Id*. Regulated businesses must document any risk of material detriment that arises from their data management practices in the DPIA and create a timed plan to mitigate or eliminate these risks before the service is accessed by children. *Id.* at (a)(2).

The DPIA is intended to be the business's internal document. It is "protected as confidential and shall be exempt from public disclosure." *Id.* at (a)(4)(B). Regulated businesses must biennially review all DPIAs, provide the Attorney General with a list of all DPIAs within three days of receiving a written request to do so, and make any specific DPIA available to the Attorney General within 5 days of a written request to do so. *Id.* at (a)(1)(A), (a)(3)–(4). DPIAs retain any legal privilege even if disclosed to the Attorney General. *Id.* at (a)(4)(C).

In addition to DPIAs, regulated businesses must also: (1) estimate the age of a child user with a reasonable level of certainty appropriate to the risks that arise from the business's data management practices, or apply the privacy and data protection afforded to children to all consumers; (2) configure all default privacy settings provided to children to offer a high level of privacy unless the business can demonstrate a compelling reason that a different setting is in the best interest of children; (3) provide any privacy information, terms of service, policies, and community standards concisely, prominently, and using clear language suited to the age of children likely to access the service; (4) if applicable, provide an obvious signal to the child while the child is being monitored or tracked by a guardian or other consumer; (5) enforce published terms, policies, and community standards established by the business, including but not limited to privacy policies and those concerning children; and (6) provide prominent, accessible and responsive tools to help children or their guardians exercise their privacy rights and report concerns. *Id.* at (a)(5)–(10).

**2. Prohibitions**

Regulated businesses are prohibited from engaging in certain business practices that use children's personal information. First, regulated businesses cannot use any child's personal information in a way that the business knows or has reason to know is materially detrimental to the physical health, mental health, or well-being of the child. §1798.99.31(b)(1). Second, regulated businesses are prohibited from profiling a child by default except where the business can demonstrate it has appropriate safeguards in place to protect children and profiling is either necessary to provide the requested service and limited to the aspects of the service with which the child is actively and knowingly engaged, or where the business can demonstrate a compelling reason profiling is in the best interest of children. *Id*. at (b)(2). Third, regulated businesses cannot collect, sell, share, or retain any personal information not necessary to provide a service with which a child is actively or knowingly engaged absent a demonstrated compelling reason that the practice is in the best interest of children likely to access the service. *Id.* at (b)(3). Businesses may engage in these practices as needed to comply with existing laws. *Id.*; §1798.145. Fourth, if the end user is a child, regulated businesses cannot use personal information for any reason other than

the reason for which it was collected absent a demonstrated compelling reason it is in the best interest of children. §1798.99.31(b)(4). Fifth, regulated businesses cannot collect, sell, or share any child's precise geolocation information by default unless that is strictly necessary to provide the requested service and then only for the limited time necessary to provide the service and businesses cannot collect this information without providing an obvious sign to the child while the information is being collection. *Id.* at (b)(5)–(6). Seventh, regulated businesses cannot use dark patterns—interfaces designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision-making, or choice—to lead or encourage children to provide personal information beyond what is reasonably expected to provide the service, to forgo privacy protections, or to take any action that the business knows or has reason to know is materially detrimental to the child's physical health, mental health, or well-being. *Id.* at (b)(7); §1798.140(l). And, any information businesses collect to estimate age may be used for that purpose only, and may not be retained by businesses longer than needed to make the estimate. Age assurance shall be proportionate to the risks and data practice of a service. §1798.99.31(b)(8).

### C. Enforcement & Guidance

Regulated businesses must comply with the above requirements, including completing DPIAs, by July 1, 2024. §1798.99.31(d); §1798.99.33. Violators face injunctions and civil penalties up to $2,500 per affected child for each negligent violation and up to $7,500 per affected child for each intentional violation. §1798.99.35(a). Penalties are assessed and recovered via a civil suit brought by the Attorney General. *Id.* Businesses in substantial compliance with the DPIA requirements will receive written notice from the Attorney General of any alleged violations before the Attorney General initiates a suit. *Id.* at (c)(1). A business will not be liable for civil penalties for any violations cured within 90 days of the notice if it provides written notice of curing and sufficient measures to prevent future violations. *Id.* at (c)(2).

The Act creates the California Children's Data Protection Working Group, which will issue a publicly available report containing best practices for implementation of the Act by January 1, 2024 (six months before the compliance date) and every two years thereafter. §1798.99.32. Regulated businesses "may look to guidance and innovation in response to" the UK Children's

Code when developing services likely to be accessed by children. AB 2273, §1(d). Additionally, the Attorney General may adopt regulations related to the Act. §1798.99.35(e).

## IV. PLAINTIFF'S CHALLENGE TO AB 2273

Plaintiff is NetChoice, a membership group composed of 35 large tech companies including Google, Meta, Amazon, Twitter, and TikTok. It filed this suit on December 14, 2022, alleging that the Act violated the First, Fourth, and Fourteenth Amendments, and the dormant Commerce Clause, and is preempted by federal law. It filed this Motion on February 17, 2023.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) (per curiam). Plaintiff must prove that it is likely to succeed on the merits of its claims, it is likely to suffer irreparable harm without preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Winter*¸ 555 U.S. at 20; *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## ARGUMENT

## I. PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS

### A. AB 2273 Does Not Violate the First Amendment

Plaintiff's members have no right to children's personal information. Thus, AB 2273 does not violate, or even implicate, Plaintiff's members' First Amendment rights. The Act imposes no prior restraints because it does not regulate content, mandate government approval before businesses can act, or restrict what content businesses make accessible to consumers. It is a facially neutral business regulation and thus not subject to any heightened scrutiny. However, even if the Act triggered heightened scrutiny, it could withstand such scrutiny because it serves compelling interests in protecting children from intrusive, privacy-violating practices all too common on the internet today. Far from being overbroad, the Act is carefully tailored to addressing the most substantial threats to child online privacy.

#### 1. AB 2273 does not regulate speech or expressive conduct

Businesses have no First Amendment right to collect and use children's personal

information and "[a] facial freedom of speech attack must fail unless, at minimum, the challenged statute is directed narrowly and specifically at expression or conduct commonly associated with expression." *Roulette v. City of Seattle*, 97 F.3d 300, 305 (9th Cir. 1996) (unless otherwise noted, all internal quotation marks and citations have been omitted throughout). The collection and use of data under the Act is neither speech nor conduct with a significant expressive element. Further, often, children are not even willingly sharing this data. *See* Radesky Decl. ¶¶ 32–33. It can be collected from them, and all consumers, without their knowledge or consent. Egelman Decl. ¶¶ 30–31. This is not a case where two parties wish to share information and the State is standing in the way. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 654–65 (2011) (First Amendment protects two private parties willingly sharing information).

The Act regulates business practices—those related to the collection and use of children's personal information—which are not typically considered conduct with a significant expressive element. *Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015). An entity cannot claim a First Amendment violation simply because it is subject to government regulation. *Am. Soc'y of Journalists & Authors v. Bonta* ("*ASJA*"), 15 F.4th 954, 961 (9th Cir. 2021). "[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct. While the former is entitled to protection, the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *HomeAway.com v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019) (no First Amendment scrutiny for ordinance regulating online booking transactions) (quoting *Sorrell*, 564 U.S. at 567); *see also Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581 (1983) (newspapers can be subject to "generally applicable economic regulations without causing constitutional problems") "To determine whether the First Amendment applies, we must first ask the threshold question [of] whether conduct with a significant expressive element drew the legal remedy or the ordinance has the inevitable effect of singling out those engaged in expressive activity." *Homeaway.com*, 918 F.3d at 685 (quoting *Int'l Franchise*, 803 F.3d at 408). "A court may consider the inevitable effect of a statute on its face, as well as a statute's stated purpose." *Id.* (quoting *Sorrell*, 564 U.S. at 565).

Plaintiff argues that businesses use children's personal information to make specialized recommendations to them, such as for books, movies, and videos to watch, and thus businesses' ability to collect and use children's data implicates businesses' First Amendment rights. Pl. Br. 3, 15. This is simply incorrect. The Supreme Court explicitly "reject[s] the view that conduct can be labeled speech whenever the person engaging in the conduct intends to thereby express an idea." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.* (*FAIR*), 547 U.S. 47, 65–66 (2006) (citing cases). Further, businesses can continue to make recommendations to child users, even including recommendations for content the business knows or has reason to know will harm the child; they just may not use the child's personal information to do so. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 573 (1998) (rejecting claim where law does not "inherently interfere[] with First Amendment rights"). Recommendations based on anything other than the child's personal information are unrestricted. *See Denver Area Telecomm. Consortium, Inc., v. FCC*, 518 U.S. 727, 746 (1996) (regulation to protect children permissible where cable operators could comply through rearranging broadcast times); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 647 (1994) (rule that cable operators must carry broadcast channels permissible given operators controlled every other channel in their package).

The Act's stated purpose further supports that it "was not motivated by a desire to suppress speech[.]" *Int'l Franchise*, 803 F.3d at 409. Rather, the "inevitable effect of the [Act] on its face is to regulate nonexpressive conduct"—the collection and use of children's personal information. *Homeaway*.com, 918 F.3d at 685 (quoting *Sorrell*, 564 U.S. at 565). The Act is generally applicable because limitations apply equally to all regulated businesses. Some organizations, like non-profits and governmental entities, are excluded because they lack the profit motive of the regulated businesses. "[S]uch distinctions do not typically implicate the First Amendment[,]" and the existence of "different, or even broader, carve outs" does not "render[] [a law] generally inapplicable." *ASJA*, 15 F.4th at 964. Nor does the Act deprive businesses of information or the ability to use it in a manner that discriminates between users. *See Sorrell*, 564 U.S. at 577 (invalidating prohibition on sharing information with only certain parties).

**2. None of the challenged provisions impose a prior restraint**

"The relevant question" in determining whether a prior restraint exists "is whether the challenged regulation *authorizes* suppression of speech in advance of its expression[.]" *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1023 (9th Cir. 2009) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 795 n.5 (1989)). The regulation must specifically target, rather than incidentally affect, expression protected by the First Amendment. *Spirit of Aloha Temple v. Cnty. of Maui*, 49 F.4th 1180, 1191 (9th Cir. 2022). "[C]ontent-neutral injunctions that do not bar all avenues of expression are not treated as prior restraints." *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 431 (9th Cir. 2014).

**DPIA Requirement:** This provision requires businesses to internally assess, and prepare confidential reports to the government about their data collection and use practices. §1798.99.31(a)(1)–(4); *see also* ICO Decl. Exs. B1–B3 (UK DPIA samples). Such reporting requirements are well-within the bounds of appropriate government regulation. *See Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1518 (9th Cir. 1993); *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637–38 n.12 (1980) (requirement to "report certain information" on routine basis is permissible); *see also, e.g.* 12 U.S.C. §5365(i)(2) (certain financial institutions must run annual or semiannual internal stress tests); 26 U.S.C. §501(r)(3) (non-profit hospitals must conduct community health needs assessment every three years and adopt implementation strategy to meet identified needs). The DPIA is not subject to public disclosure and need not be approved—or even seen—by the Attorney General before a business can begin offering a service. §1798.99.31(a)(3)–(4).

Contrary to what Plaintiff suggests, Pl. Br. 9–10, the Act does not authorize penalization based on substance communicated in the DPIA. *See Nev. Gaming*, 984 F.2d at 1518 (no prior restraint where "there is no attempt to control the content of any speech or the nature of any organizational activity"); *compare* §1798.99.31(a)(3)–(4) *to Bantam Books v. Sullivan*, 372 U.S. 58, 68 (1963) (law "directly and designedly stopped the circulation of publications"). The AG's only role is to determine if a DPIA addresses all the required points. *Compare* §1798.99.31(a)(3)–(4) *to Se. Promotions, Ltd v. Conrad*, 420 U.S. 546, 554 n.7 (1975) ("approval of an application required some judgment as to the content and quality of the [theater] production"). It is only if the

business does not cure or makes no effort to complete the DPIA that the Attorney General can even attempt to seek penalties through a civil suit. *Compare* §1798.99.35(c) *to Bantam Books*, 372 U.S. at 71 (procedures were "radically deficient").

Unlike the laws in the cases Plaintiff cites, the DPIA must address a "reasonably specific and objective" list of subjects; compliance determinations are not left "to the whim of the administrator." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 324 (2002); *compare* §1798.99.31(a)(1)(B) *to Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 689–90 (1968) (standards did not provide sufficient guidance), *and Bantam Books*, 372 U.S. at 71 ("statutory mandate is vague and uninformative"). That a business may decide to discontinue or never launch a service rather than complete a DPIA does not effect a prior restraint. *See IDK v. Clark County*, 836 F.2d 1185, 1196–97 (9th Cir. 1988) (license requirement "does not operate as a prior restraint on expression").

**Policy Enforcement Provision**: The Policy Enforcement Provision, §1798.99.31(a)(9), permissibly holds online businesses accountable for doing what they say they are going to do. *Barnes v. Yahoo, Inc.*, 570 F.3d 1096, 1109 (9th Cir. 2009) (promissory estoppel contract claim not precluded by Section 230); Cal. Bus. & Prof. Code §22575 (online businesses must abide by posted privacy policies). The government has no control over any content and businesses remain free to create whatever policies they want. They need not commit to taking actions that they do not intend take to or are morally opposed to. *See Willams v. Gerber Prods., Co.*, 552 F.3d 934, 939 n.3 (9th Cir. 2008) ("It is not difficult [for businesses] to choose statements, designs, and devices which will not deceive."). The policies Plaintiff submitted demonstrate the flexibility businesses give themselves in determining how to respond to violations of their policies; most include explicit language reserving final decisions about content exclusively to the website or its moderators. *See e.g.*, Docs. 29-4, 29-6; 29-7, 29-24; 29-26, 29-27. The Act does not permit the Attorney General to rewrite or ignore these terms. Contrary to what Plaintiff suggests, Pl. Br. 10–11, if a business, consistent with its publicly posted policies, has decided to remove or allow content, there is nothing the Attorney General can do.

Further, for a business to publish policies and not abide by them is deceptive and

misleading and thus renders the policy itself unprotected speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980); *Litton Indus. Inc. v. FTC*, 676 F.2d 364, 373 (9th Cir. 1982); Cal. Bus. & Prof. Code §17500 (prohibiting false or misleading advertising). Indeed, "[i]t is an open question whether the prior restraint doctrine even applies to commercial speech." *Hunt v. City of Los Angeles*, 638 F.3d 703, 718 n.7 (2011) (citing cases). Even if it does, requiring businesses to comply with their own posted policies does not authorize the suppression of any protected speech or compel speech.

**Age Estimation & Data Protection Provision:** Requiring businesses to protect children's privacy and data implicates neither protected speech nor expressive conduct. This provision sets forth the level of protections businesses must provide to children. §1798.99.31(a)(5). Businesses that estimate the age of child users need only provide child users the data and privacy protections appropriate to the risks that arise from the businesses' data management practices. *Id.* Businesses that do not estimate the age of child users must apply child-appropriate data and privacy protections to all consumers. *Id.* The provision says nothing about content and does not require businesses to block any content for users of any age.

Plaintiff's challenge is based on mischaracterizations. Pl. Br. 12–13. The Act does not require "age verification" or even age estimation; businesses can opt out of age estimation entirely and instead provide the same data and privacy protections to everyone. Plaintiff contends that either option will affect its member's bottom line: they will either have to cover the costs of age estimation or lose whatever revenue they obtain through providing lesser data and privacy protection to all users. But the financial costs of complying with government regulation cannot alone be the basis of a First Amendment claim. *ASJA*, 15 F.4th at 962.

Plaintiff's inappropriate attempt to raise the third-party claims of children by arguing that age estimation will force children to either comply with invasive age-verification requirements or be deprived access to regulated businesses presents a false choice. *See Marquez-Reyes v. Garland*, 36 F.4th 1195, 1201 (9th Cir. 2022) (explaining limitations on raising third-party rights) (quoting *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 38 (1999)). Further, if businesses choose to engage in age estimation, nothing in the Act requires use of the most

invasive age-estimation tools imaginable. To the contrary, businesses are instructed to use "minimally invasive" tools, §1798.99.32(d)(3), and the estimation only need be appropriate to the level of risk that their data management practices present, §1798.99.31(a)(5). Defendant has provided multiple examples of such tools, Egelman Decl. ¶¶ 53–54; Radesky Decl. ¶ 96; ICO Decl. ¶¶ 37–39, some of which are already being tested by NetChoice members, ICO Decl. ¶ 65, and best practices for implementation will be available six months before businesses are required to comply, §1798.99.32(e). *See Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1199 (9th Cir. 2016) (in a facial challenge courts must consider government's "authoritative constructions, including . . . implementation and interpretation").

Even if Plaintiff could raise claims based on children's right to access information, restricting businesses' use of children's data does not require barring children's access to any content. Unlike the broad content-based laws in cases Plaintiff cites, Pl. Br. 13, the Act does not penalize providing any particular content. *Compare e.g.* §1798.99.31(b)(1) *to Butler v. Michigan*, 352 U.S. 380, 382–83 (1957) (law criminalized making certain books available to the public). Children can have, and businesses can provide, access to any information the child seeks. *See Greater L.A.*, 742 F.3d at 431 ("[C]ontent-neutral injunctions that do not bar all avenues of expression are not treated as prior restraints."). Rather, the Act prevents businesses from attempting to increase their profits by using children's data to deliver them things they do not want and have not asked for, such as ads for weight loss supplements and content promoting violence and self-harm. Radesky Decl. ¶¶ 48, 62–68. Further, Plaintiff misplaces its reliance on cases challenging content-based criminal statutes, like laws prohibiting child sexual exploitation, where age verification of the minor involved could serve as either an affirmative defense to or lack thereof as an element of the crime. *See* Pl. Br. 13–14 (citing cases). Age estimation plays a completely different role here. And, the Act protects children's anonymity by prohibiting information used for age estimation from being used for any other purpose. §1798.99.31(b)(8).

**3. AB 2273 is facially neutral**

Even if AB 2273 does implicate First Amendment concerns, it is not subject to heightened scrutiny because it is content, viewpoint, and speaker neutral. "[A] regulation that serves purposes

unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some . . . messages but not others." *Doe v. Harris*, 772 F.3d 563, 575 (9th Cir. 2014) (quoting *Ward*, 491 U.S. at 791). Such a law is content neutral if it is "*justified* without reference to the content of the regulated speech." *Id.* at 574. On the other hand, a regulation is "facially content based" if it "targets speech based on its communicative content," "prohibit[s] public discussion of an entire topic, or single[s] out specific subject matter for differential treatment." *Twitter Inc. v. Garland*, 61 F.4th 686, 697 (9th Cir. 2023) (citing cases).

To determine whether the Act's "overriding objective" is content-neutral, the court reviews "the Act and its various findings[.]" *Turner*, 512 U.S. at 646. In *Turner*, cable operators challenged a federal rule requiring them to carry broadcast channels as part of their cable packages. *Id.* at 631–32. In concluding that the "overriding Congressional purpose is unrelated to the content of [operator's] expression[,]" the Court cited Congress's findings that the rule's purpose was to preserve access to free television programming—a "substantial and important" government interest—which would be endangered if cable operators refused to carry broadcast stations for economic reasons. *Id.* at 646–47. Though cable operators lost some discretion, "the design and operation" of the rule did not have any of the markers of content-based regulation, such as requiring or prohibiting particular ideas or points of view, penalizing operators because of the content of their programming, compelling operators to affirm points of view with which they disagree, or producing a net decrease in the amount of available speech. *Id.* at 647. In short, because operators were free to carry whatever programming they wished on all stations not subject to the must-carry rule, the rule was deemed content neutral. *Id*. at 646–47.

The same logic applies here. The Legislature clearly explained the Act's purpose: to "prioritize the privacy, safety, and well-being of children over commercial interests." §1798.99.29(b). Currently, businesses have an economic incentive to collect, use, buy, and sell children's data. Egelman Decl. ¶¶ 11–13; Radesky Decl. ¶¶ 33, 39, 64, 78, 101. It is these profit-driven business practices, not any particular message, that AB 2273 restricts. The Act does not carry any markers of content-based regulation. As long as businesses do not use children's data, they can continue to offer, provide access to, and recommend any content they want.

Plaintiff's assertion that the Act is "inherently content-based" because it prioritizes the health and safety of minors, Pl. Br. 19, does not make it so. That some limitations on the use of children's personal information require businesses to consider knowledge they have about how their actions affect children does not make the Act content-based. Those limitations are consistent with the Act's content-neutral purpose: to prioritize children's safety and well-being over profit. Plaintiff's "ability to hypothesize a content-based purpose" that "rests on little more than speculation" "does not cast doubt upon the [Act's] content-neutral character." *Turner*, 512 U.S. at 652. Nor should Plaintiff's highly speculative claims that the DPIA and Policy Enforcement provisions are content-based or compel speech cast any doubt. As described above, Arg. I.A.2, these provisions are common forms of acceptable government regulation. The Act does not affect businesses' speech, require "inherently expressive" conduct, or otherwise "sufficiently interfere with any message" of businesses. *See FAIR*, 547 U.S. at 64–65. Any impact on speech is merely incidental to the Act's regulation of conduct. *Id.* at 62.

Here, the court must ask whether the conduct the law restricts—using children's personal information—is expressive or communicative. *Recycle for Change v. City of Oakland*, 856 F.3d 666, 672 (9th Cir. 2017). It is not. And because it is not, creating exceptions to general bans on such use (like allowing it where it is in the best interest of the child), even ones that refer to content, do not present a constitutional problem. *See Jacobs v. Clark County Sch. Dist.*, 526 F.3d 419, 433 (9th Cir. 2008) (exception to uniform policy did not render policy content-based); *Perry v. L.A. Police Dept.*, 121 F.3d 1365, 1369 (9th Cir. 1997) (neutral ban with exception that refers to content is content neutral). Even if the law incidentally burdens businesses' speech, the Act is content neutral because, for all the reasons already explained, it is "*justified* without reference to the content of the [allegedly] regulated speech." *Harris*, 772 F.3d at 575.

For all of the reasons above, the Act is content neutral. For the same reasons that AB 2273 is generally applicable, it is not speaker-based. Plaintiff does not allege that it is viewpoint-based. Thus, the Act is not subject to heightened scrutiny.

**4. AB 2273 withstands any level of First Amendment scrutiny**

**a. At most, intermediate scrutiny applies**

If the Court determines the Act restricts speech and higher scrutiny is warranted, it should apply, at most, intermediate scrutiny.

"[T]he Supreme Court has repeatedly held that a law restricting speech on a viewpoint and content neutral basis is constitutional as long as it withstands intermediate scrutiny[.]" *Jacobs*, 526 F.3d at 434 (citing *Turner*, 512 U.S. at 661–62). The same is true of laws that have incidental effects on expressive conduct. *Id.* (citing *U.S. v. O'Brien*, 391 U.S. 367, 376–77 (1968)). And here, any speech the Act may implicate is commercial speech, which is also subject to intermediate scrutiny. *Cent. Hudson*, 447 U.S. at 566. For example, businesses' publicly posted policies are supposed to aid consumers in deciding whether to engage with their products. Egelman Decl. ¶ 24; Radesky Decl. ¶ 72. When consumers do engage with those products, the business gains revenue. Egelman Decl. ¶¶ 11–13; Radesky Decl. ¶¶ 49, 55, 100. Indeed, Plaintiff's declarants' objections and their alleged injury are based on the impact the Act will have on their revenue. Pl. Br. 12–13, 30. Thus, there can be no doubt that regulated businesses have "an economic motive for engaging in the [alleged] speech" with regard to the specific products—services likely to be accessed by children—that the Act regulates. *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (listing conditions for commercial speech) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)).

AB 2273 easily survives intermediate scrutiny. As described further below, Plaintiff's members' business practices pose "real" risks to children, and the Act "in fact alleviates th[ose risks] to a material degree" by reducing the use of those business practices. *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993); *see also Coyote Publ'g v. Miller*, 598 F.3d 592, 611 (9th Cir. 2010) ("a reasonable fit between ends and means" meets intermediate scrutiny).

**b. AB 2273 withstands strict scrutiny**

A content-based speech regulation must survive strict scrutiny and, if it is the type of restriction for which procedural safeguards are required, it must provide those safeguards. *In re Nat'l Sec. Letter*, 33 F.4th 1058, 1071 (9th Cir. 2022). "Under strict scrutiny, restrictions may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 1070. AB 2273 is not content based, but can withstand this scrutiny.

"It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling." *Ferris v. Santa Clara County*, 891 F.2d 715, 717 (9th Cir. 1989) (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607 (1982)). Accordingly, courts "have sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *Id.*; *accord Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989). Indeed, "the Supreme Court[] [has] repeated[ly] recogni[zed] that children deserve special solicitude in the First Amendment balance because they lack the ability to access and analyze fully the information presented through commercial media." *Anheuser-Busch, Inc. v. Schmoke*, 101 F.3d 325, 329–30 (4th Cir. 1996) (collecting cases).

Under strict scrutiny, speech restrictions can be justified by "history, consensus, and simple common sense[.]" *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995). Where, as here, the interest is "intuitive[,]" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 445 (2015), or evident from "an impressive historical pedigree" of "public disapproval" of the prohibited conduct, *Coyote Publ'g*, 598 F.3d at 604, little, if any, evidence is required. That children face significant barriers to protecting their personal information online and face serious harms as a result is part of the legislative findings and affirmed by Defendant's experts' testimony. *See* AB 2273, §1; Radesky Decl. ¶¶ 21–72; Egelman Decl. ¶¶ 11–30, 49–51. Here, "an actual problem has been proved[.]" *U.S. v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822 (2000).

And the Act is narrowly tailored. Even if the Act did restrict content, it is well established that the government can regulate mediums that—like the internet—are "accessible to children[,]" are "likely" to have children as an audience, and that "have established a uniquely pervasive presence in the lives of all Americans[.]" *Denver Area*, 518 U.S. at 744–45. Under these circumstances, a "permissive" approach that may restrict content, but does not ban it all together, are "appropriate as a means of achieving the underlying purpose of protecting children." *Id.* at 746. The Act regulates only those businesses that trade in personal information and are likely to be accessed by children. It requires or prohibits specific actions that directly involve the collection and use of children's personal information. The Act need not advance its interest "in

the least restrictive and least intrusive way[,]" *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1073–74 (9th Cir. 2006), and, here, the State's interest would undoubtedly be "achieved less effectively absent" the Act. *Colacurcio v. City of Kent*, 163 F.3d 545, 553 (9th Cir. 1998).

"[P]erfect tailoring" is not required and courts should avoid "wad[ing] into the swamp of calibrating the individual mechanisms of a restriction" when applying strict scrutiny. *In re Three Nat'l Security Letters*, 35 F.4th 1181, 1186 (9th Cir. 2022). In any case, Plaintiff's proposed alternatives are in no way "as effective in achieving the legitimate purpose" of this Act. *Id*. Plaintiff's parental-oversight alternative is a thinly veiled attempt to escape all regulation. Unlike in cases Plaintiff cites, Pl. Br. 21–22, parents cannot simply block children from accessing any online business that collects or uses their children's personal information, Egelman Decl. ¶ 24–31, 34 (user-based attempts to protect privacy are "futile"); Radesky Decl. ¶ 95 ("maintaining digital privacy is a near impossible task" for parents). *See Playboy*, 529 U.S. at 816 (requiring less restrictive alternative be "plausible"). Even if they could, such action would not be consistent with the Act's goals: to allow children to use the internet safely, not prevent them from using it all. Indeed, "[i]t is the interest of youth itself, and of the whole community, that children be both safeguarded from abuses and given opportunities for growth[.]" *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944). Further, "[w]hile the supervision of children" on the internet "may best be left to their parents, the knowledge that parental control or guidance cannot always be provided and society's transcendent interest in protecting the welfare of children justify reasonable regulation[.]" *Ginsberg v. New York*, 390 U.S. 629, 640 (1968). In any case, relying on parental involvement alone would leave vast swaths of children completely unprotected, thus undermining "the State's independent interest in the well-being of its youth[.]" *Reno v. ACLU*, 521 U.S. 844, 865 (1997); *accord e.g.*, *Ginsberg*, 390 U.S. at 640–41. Plaintiff's suggestion that COPPA accomplishes the Act's purpose fares no better. COPPA does not protect all children under 18 nor apply to all businesses likely to be accessed by children.

Finally, the Act is not required to have the procedural safeguards necessary for "traditional censorship regimes," *Twitter*, 61 F.4th at 707, because those "are not required in the context of government restrictions on the disclosure of information transmitted confidentially as part of a

legitimate government process," *id.*, and may not apply where the challenged law "neither requires a speaker to submit proposed speech for review and approval" nor "require[s] a speaker to obtain a license before engaging in business[,]" *Nat'l Sec. Letter*, 33 F.4th at 1077. The Act includes significant procedural safeguards, a cure period and court review, that are "sensitive to the need to prevent First Amendment harms." *Twitter*, 61 F.4th at 705.

**5. AB 2273 is not overbroad**

"Invalidation for overbreadth is strong medicine that is not to be casually employed." *U.S. v. Williams*, 553 U.S. 285, 292 (2008). Plaintiff "bears the burden of demonstrating, from the text of [the law] and from actual fact, that substantial overbreadth exists." *Gospel Missions of Am. v. City of Los Angeles*, 419 F.3d 1042, 1050 (9th Cir. 2005) (citing *Virginia v. Hicks*, 539 U.S. 113, 122 (2003)); *see also Marquez-Reyes*, 36 F.4th at 1202 ("it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."). That the Act regulates conduct, not speech, makes the bar even higher as "the overbreadth doctrine's concern with chilling protected speech attenuates as the otherwise unprotected behavior that it forbids the state to sanction moves from pure speech towards conduct." *Hicks*, 539 U.S. at 124. "[W]here conduct and not merely speech is involved. . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statutes plainly legitimate speech." *Gospel Mission*, 419 F.3d at 1050 (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). Here, it is neither.

Plaintiff has failed to show why any of the conduct required or prohibited by the Act "cannot constitutionally be subject to some regulation." *Gospel Mission*, 419 F.3d at 1050. Plaintiff relies on speculative arguments about children's inability to access content, but, as discussed above, nothing in the Act bars children from seeking, or businesses from providing access to, any content. "The mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Williams*, 553 U.S. at 303.

Plaintiff has not shown that the Act violates the First Amendment in any—let alone a "substantial" number of—potential applications. *Gospel Mission*, 419 F.3d at 1050. Even if the Act might reach some protected speech through its regulation of the use of children's personal

information, "it is not substantially overbroad relative to its legitimate sweep." *Id.* "Whether a statute's chilling effect on legitimate speech is substantial should be judged in relation to what the statute clearly proscribes." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001). For the same reasons the Act is narrowly tailored, it is not overbroad. The Act prohibits certain businesses from using children's personal information for specified reasons, "the vast majority" of applications "raises no constitutional problems whatever." *Williams*, 553 U.S. at 303. Further, "the overbreadth doctrine does not apply to commercial speech." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496–97 (1982). Even if Plaintiff identifies one particular set of circumstances where the First Amendment might protect businesses' use of children's personal information, that would justify an as-applied challenge, not pre-enforcement facial invalidation. *Marquez-Reyes*, 36 F.4th at 1207.

### B. AB 2273 Is Not Unconstitutionally Vague

The Act is not void for vagueness. A law is not vague where it "give[s] adequate notice of what conduct is prohibited and sufficient guidelines to prevent arbitrary and discriminatory enforcement." *IDK*, 836 F.2d at 1197–98. Because the "absence of a significant First Amendment interest is . . . fatal to a facial challenge of a business regulation" unless "[it] is vague in all possible applications[,]" *id.* at 1198, and laws should not be facially invalidated based on the possibility of potential edge cases, *Cal. Teachers*, 271 F.3d at 1155, Plaintiff's challenge must fail. Although laws that "clearly implicate free speech rights" will "survive a facial challenge so long as it is clear what the statute proscribes in the vast majority of its intended applications[,]" *Humanitarian Law Project v. U.S. Treasury Dep't* ("*HLP*"), 578 F.3d 1133, 1146–47 (9th Cir. 2009), that Plaintiff can hypothesize a way the law might be applied to speech does not mean that the law is subject to a higher standard, *Williams*, 553 U.S. at 305–06. *HLP*, 578 F.3d at 1146–47 (applying all-applications test despite First Amendment claims); *see also Flipside*, 455 U.S. at 495 (same). In any case, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Williams,* 553 U.S. at 307. "The touchstone of a facial vagueness challenge in the First Amendment context, . . ., is not whether *some* amount of legitimate speech will be chilled; it is whether a *substantial* amount of legitimate speech will be

chilled." *Cal. Teachers*, 271 F.3d at 1152. The Act meets that standard.

It is well-established that modifiers such as "materially detrimental[,]" "a significant number[,]" or "substantial effect" do not render a statute facially vague. *See Cal. Teachers*, 271 F.3d 1152–53 ("overwhelmingly" and "nearly all" are not vague) (citing cases). "Although the[se terms] are not readily translated into a mathematical percentage, the First Amendment does not require them to be." *Id.* at 1152. Likewise, the "best interest of the child" standard appears in over one hundred California statutes and dozens of federal statutes. It is not suddenly rendered vague here. Nor is "likely to be accessed by children[,]" which is defined by statute, §1798.140(b)(4). *See IDK*, 836 F.2d at 1198 ("terms are narrowly defined in the regulation" so are not vague). Finally, "dark patterns" is a term defined by statute, §1798.140(l), is already regulated by California law, and is commonly used in the tech field. Egelman Decl. ¶ 51; Radesky Decl ¶¶ 53–56, 97. These are "words of common understanding, to which no [regulated party] is a stranger[,]" and thus are not unconstitutionally vague. *Cal. Teachers*, 271 F.3d at 1151–52.

Moreover, the dark patterns provision and several other challenged terms are modified by scienter requirements. *See e.g.*, §1798.99.31(b)(1), (7). The Act's terms must be "read in context with the entire provision[,]" *Hunt*, 638 F.3d at 714, and "[t]he Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that [the] conduct is proscribed." *Cal. Teachers*, 271 F.3d at 1154 (citing cases). For this reason, Plaintiff's stated fear that businesses will be unfairly penalized for an unknowing violation of the Act is a red herring. For example, regardless of the child user's age, if the business did not know or did not have reason to know that its use of children's data would harm children, then the business is not liable. §1798.99.31(b)(1).

As explained above, businesses are not required to estimate children's ages. They can instead apply the same privacy and data protections to all users. And the concept of regulating based on a consumer's age is not novel. State, federal, and international law already provide data privacy protections based on age. Similarly, Plaintiff's argument that they do not understand what makes certain practices "risky" is undermined by their own statements and common sense. As Plaintiff's declarants' statements show, some businesses' policies are more privacy protective

than others and some businesses' data collection practices are more expansive than others. *Compare* Cairella Decl. ¶ 20 *with* Paolucci Decl. ¶ 3 *and* Masnick Decl ¶ 10. It is common sense that less protective privacy policies and expansive collection of personal information are more risky, and more protective privacy policies and minimized data collection are less risky. *See Cal. Teachers*, 271 F.3d at 1151 n.8 (considering purpose of statute and common sense); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 32 n.6 (considering common sense and evidence).

Finally, "[f]acial invalidation is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort[,]" *Cal. Teachers,* 271 F.3d at 1155, and several other factors here weigh against it. Most of Plaintiff's members already are or should be in compliance with the provisions challenged here because they are substantially similar to UK law. ICO Decl. ¶¶ 18–23, 65. Guidance from the UK is readily available. *Id.* ¶¶ 35–52. Guidance in the form of best practices and recommendations is forthcoming. §1798.99.32(d). Even after enforcement begins, the Act provides for notice and a cure period, and no penalties can be assessed unless and until a state court finds that a business violated the Act. §1798.99.35. Given the Act's clear terms and significant protections, Plaintiff's facial vagueness challenge must fail.

### C. AB 2273 Does Not Violate the Dormant Commerce Clause

The Commerce Clause grants Congress the power to regulate commerce among the several States. U.S. Const. art. I, § 8, cl. 3. It has long been interpreted to include "an implicit restraint on state authority[.]" *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.,* 550 U.S. 330, 338 (2007). This "dormant" Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 273 (1988). Here, rather than claiming a discriminatory purpose, Plaintiff alleges only that AB 2273 regulates extraterritorially and that the law's burden on interstate commerce outweighs its benefits.

#### 1. AB 2273 does not regulate extraterritorially

The dormant Commerce Clause's prohibition against extraterritorial legislation is narrow. *See, e.g., Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003) (rejecting extraterritoriality challenge where law regulating in-state sales allegedly affected out-of-state

transactions). Plaintiff alleges that AB 2273 "applies to *all* operations of a provider that does business in California," including out-of-state operations. Pl. Br. 23 (citing cases). Not so. The Act does not control a provider's out-of-state operations. It regulates only a "business" that does business in California, §1798.99.30(a), §1798.140(d), that provides an online service "likely to be accessed by children," §1798.99.31(a), who are residents of California §1798.99.30(b)(1), §1798.99.30(a), (j), §1798.140(i). AB 2273 is thus distinguishable from the California statute challenged in *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997 (E.D. Cal. 2017), that "d[id] not limit its application to California," and as a result, had the effect of controlling conduct occurring "anywhere in the country." *Id.* at 1025.

In addition—and contrary to Plaintiff's outdated view of internet technology—"internet content providers can identify the geographic location of their users and target content based on the location of the users." *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 961 (N.D. Cal. 2006). Modern geolocation technology allows a business to tailor its website to comply with AB 2273's requirements—and indeed, has been widely-used by businesses to comply with other California laws for users in California. Egelman Decl. ¶¶ 55–62.

Accordingly, the Ninth Circuit rejected a similar dormant Commerce Clause challenge. In *Greater Los Angeles*, 742 F.3d 414, the Court held that a California law requiring closed captioning on websites did not regulate extraterritorially because the law "applie[d] only to [the business's] videos as they [we]re accessed by California viewers, [and] d[id] not have the practical effect of directly regulating conduct wholly outside of California." *Id.* at 433. Because that law required CNN to modify its website only for California visitors, "leav[ing] the remainder [of its website] unchanged," CNN could "avoid the potential for extraterritorial application" of the law. *Id.* (citing *Nat'l Fed'n of the Blind*, 452 F. Supp. 2d at 961 (rejecting Target's extraterritoriality claim because it could make a version of its website for California users)). This holding applies with equal force here. Plaintiff's extraterritoriality claim should be rejected.

**2. AB 2273 satisfies *Pike* balancing**

Under the *Pike* balancing test, laws that "regulate[] even-handedly to effectuate a legitimate local public interest" will be upheld unless the plaintiff establishes a cognizable burden on

interstate commerce that "is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Plaintiff alleges that AB 2273 "poses a substantial obstacle to interstate commerce" because it regulates subjects that purportedly require a uniform system of regulation. Pl. Br. 24. The Ninth Circuit rejected that theory in *Greater Los Angeles*, observing that CNN "already serves different versions of its home page depending on the visitor's country," and it "provide[d] no explanation for why it could not do the same for California residents." 742 F.3d at 733. Thus, the supposed "conflicts," Pl. Br. 24–25, between AB 2273 and other states' laws do not pose a cognizable burden; any provider's choice to "self-censor content in all fifty states[,]" *id.* 25, to avoid regulation is not an inevitable consequence of AB 2273. Indeed, if this argument were accepted, few, if any, of the dozens of state laws Plaintiffs identify would survive scrutiny under *Pike*.

Plaintiff also disregards AB 2273's substantial local benefits. As described above, Arg. I.A.4.b, it is undisputed that "safeguarding physical and psychological well-being of a minor is compelling." *Ferber*, 458 U.S. at 756–57; s*ee also* Radesky Decl. ¶¶ 45–85.

None of the burdens Plaintiff alleges clearly exceed these established benefits.

**D. AB 2273 Is Not Preempted by Federal Law**

The Supremacy Clause "specifies that federal law is supreme in case of a conflict with state law." *Murphy v. NCAA*, 138 S. Ct. 1461, 1479 (2018). There are "three different types of preemption—conflict, express, and field—but all of them work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore . . . the state law is preempted." *Id.* at 1480. Here, Plaintiffs rely on express and conflict preemption theories. "Although express and conflict preemption are analytically distinct inquiries, they effectively collapse into one when"—as here—"the preemption clause uses the term inconsistent." *Jones v. Google LLC*, 56 F.4th 735, 741 (9th Cir. 2022).

**1. COPPA**

COPPA sets minimum requirements for businesses that offer online services directed toward children under 13, including requirements to obtain parental consent before collecting,

using, or disclosing children's personal information; provide notice of their privacy policies; and give parents the ability to review and change their children's personal information collected by the operator. 15 U.S.C. §§6501–6506, 16 C.F.R. §§312.1–312.13. Plaintiff contends that because AB 2273 provides protections that are more expansive than COPPA's, AB 2273 replaces the parental control conferred by COPPA with "a host of new and different state-imposed obligations on services." Pl. Br. 26.

This theory fails. AB 2273 does not—and cannot—replace any of COPPA's requirements, which would be in effect regardless of whether the California Legislature had enacted AB 2273. And, COPPA's preemption clause only prohibits states from imposing liability that is "inconsistent with the treatment of those activities or actions under this section." 15 U.S.C. §6502(d). "[I]nconsistent" "refers to contradictory state law requirements, or to requirements that stand as obstacles to federal objectives." *Jones*, 56 F.4th at 740. "[S]tate laws that supplement, or require the same thing, as federal law, do not stand[ ] as an obstacle, to Congress's objectives, and so are not inconsistent." *Id.* at 740–41. COPPA sets minimum requirements for obtaining parental consent for collection, use, or disclosure of personal information from children under 13, and AB 2273 supplements this by placing additional restrictions on the collection and use of children's personal information. *See, e.g.*, §1798.99.31(b)(1). These criteria can apply simultaneously. As confirmed by the Ninth Circuit, COPPA leaves room for states to enact laws that regulate in a manner that is consistent with COPPA. *Jones*, 56 F.4th at 741–42. Because AB 2273 compliments, instead of contradicts COPPA, AB 2273 does not fall within the COPPA preemption clause.

Plaintiff also argues that AB 2273 is preempted by COPPA because AB 2273 regulates platforms likely to be accessed by children under 18, whereas COPPA regulates platforms directed to children under 13, Pl. Br. 27. This argument assumes that COPPA's regulation of platforms directed to a subset of children invalidates state regulation of platforms directed to a broader set of children, and appears to be based on a field preemption theory. To win on field preemption claim, Plaintiff must show that "a framework of regulation [is] so pervasive . . . that Congress left no room for the States to supplement it or [] there is a federal interest . . . so

dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Plaintiff has cited no case law establishing that COPPA occupies the field in this manner. To the extent AB 2273 regulates more platforms or an additional subset of children, it merely supplements—and is not "inconsistent with"—COPPA. *Jones*, 56 F.4th at 740.

**2. Section 230 of the Communications Decency Act**

Section 230 of the Communications Decency Act prohibits a "provider or user of an interactive computer service" from being "treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. §230(c)(1). It permits enforcement of "any State law that is consistent with [Section 230]" and prohibits bringing a cause of action or imposing liability that is "inconsistent[.]" 47 U.S.C. §230 (e)(3). Plaintiff's preemption theory here is that AB 2273's requirements that businesses enforce their own published terms, policies, and community standards, and AB 2273's restrictions on the use of minors' personal information, are inconsistent with Section 230. Pl. Br. at 28–29. Neither of these theories has any merit.

Nothing in Section 230 prevents a State from holding businesses accountable for doing what they say they are going to do, or preempts the numerous state laws regulating false advertising or unfair business practices. And binding precedent explicitly holds that Section 230 does not prevent online businesses from being held liable for their own conduct. *See, e.g.*, *HomeAway.com*, 918 F.3d 676 (rejecting Section 230 immunity for processing rental bookings posted by others on website); *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (rejecting Section 230 immunity for designing website that facilitates discrimination); *Barnes*, 570 F.3d 1096 (promissory estoppel claim not preempted given company's promise to remove fake profiles); *cf. Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852 (9th Cir. 2016) (Section 230 "does not declare a general immunity from liability deriving from third-party content.").

Likewise, AB 2273's restrictions on the collection and use of children's personal information does not conflict with Section 230. As explained above, Arg.I.A.2, businesses can continue to publish and provide children access to the content they search for. AB 2273 simply

prevents businesses from using children's personal information in specified ways. The fact that Plaintiff's members wish to use that information in connection with decisions about publishing third-party content does not immunize the collection of children's personal information from any regulation by the States. It is well-established in this circuit that the government can restrict how businesses collect and use consumer data without running afoul of Section 230. *See Roommates.com*, 521 F.3d at 1171 (rejecting Section 230 immunity where "website is designed to force subscribers to divulge" certain personal information). Indeed, COPPA itself places limitations on the collection and use of children's data; it is implausible that Congress intended for Section 230 to preempt state-law data restrictions similar to those that Congress has itself imposed. AB 2273 is not preempted by Section 230.

## II. Other Injunction Factors Weigh Against Relief

A plaintiff must establish that it will likely suffer irreparable harm if the injunction is not granted. *Winter*, 555 U.S. at 22. As discussed above, Plaintiff has not been deprived of any constitutional right. Because AB 2273 goes into effect on July 1, 2024, any allegation of imminent enforcement fails. §1798.99.31. Plaintiff's vague and speculative allegations of financial injury are insufficient to support a finding of irreparable harm, *Goldie's Bookstore, Inc. v. Sup. Ct. of Cal.*, 739 F2d 466, 472 (9th Cir. 1984), especially given that many of Plaintiff's members must already comply with a substantially similar UK law, ICO Decl. ¶¶ 18–23, 65.

The balance of equities and the public interest also militate against issuing an injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009) (factors merge when government is party). It is in the public interest to advance the safety and protection of minors. *See e.g., Ferris*, 891 F.2d at 717; *see generally* Radesky Decl. ¶¶ 45–85 (children's vulnerability and risks online), ¶¶ 86–103 (efficacy of AB 2273); Egelman Decl. ¶¶ 35–52 (children's privacy and AB 2273). Further, an injunction would inflict irreparable harm upon California by preventing enforcement of a statute enacted by representatives of the people. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). The balancing weighs sharply against granting the motion.

## CONCLUSION

Plaintiff's motion should be denied.

Dated: April 21, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
Supervising Deputy Attorney General
NICOLE KAU
Deputy Attorney General

*/s/ Elizabeth K. Watson*
ELIZABETH K. WATSON
Deputy Attorney General
*Attorneys for Defendant*

# CERTIFICATE OF SERVICE

Case Name: ***NetChoice, LLC v. Rob Bonta***
Case No. **5:22-cv-08861-BLF**

I hereby certify that on April 21, 2023, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
- **DECLARATION OF SERGE EGELMAN, PH.D. IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION with Exhibit A**
- **DECLARATION OF EMILY KEANEY, DEPUTY COMMISSIONER OF REGULATORY POLICY FOR THE INFORMATION COMMISSIONER'S OFFICE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION with Exhibits A to C**
- **DECLARATION OF JENNY S. RADESKY, MD IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION with Exhibit A**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on April 21, 2023, at San Francisco, California.

| | |
|---|---|
| G. Pang | G. Pang |
| Declarant | Signature |

SA2022305631/43662549.docx

ROB BONTA
Attorney General of California
ANYA M. BINSACCA, SBN 189613
Supervising Deputy Attorney General
NICOLE KAU, SBN 292026
ELIZABETH K. WATSON, SBN 295221
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3847
E-mail: Elizabeth.Watson@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **NETCHOICE, LLC d/b/a NetChoice,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,**<br><br>**Defendant.** | 5:22-cv-08861<br><br>**DECLARATION OF SERGE EGELMAN, PH.D. IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Serge Egelman, Ph.D., declare and state as follows:

1. I submit this declaration in support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

**BACKGROUND & QUALIFICATIONS**

2. I am the Research Director of the Usable Security & Privacy Group at the International Computer Science Institute (ICSI), which is a non-profit research institute affiliated with the University of California, Berkeley. I also hold a position as a research scientist within the Electrical Engineering and Computer Sciences (EECS) Department at the University of California, Berkeley. I received my Ph.D. from Carnegie Mellon University's School of Computer Science. My research has been cited over 11,000 times, and my h-index—the most common metric for scientific impact—is 50.[1,2]

3. I have been performing research into online privacy for nearly twenty years. My research focuses on the interplay of online privacy and security and human factors; in short, I study consumer privacy and security decision making, consumer privacy preferences, privacy and security expectations, and how those expectations comport with reality. I have served as an invited expert for several web standards efforts that pertained to privacy and security, and have received over a dozen research awards (including best paper awards from two European data protection authorities, AEPD in Spain and CNIL in France; the USENIX Security Symposium Distinguished Paper Award, from one of the top academic computer security conferences; and seven paper awards from the Special Interest Group on Computer-Human Interaction [SIGCHI], the top human-computer interaction conference).

4. Over the past decade, my laboratory has been studying the mobile app ecosystem, which has included building tools to detect when personal information is accessed by mobile apps and the third parties with whom they share it. We have used these tools in peer-reviewed published research studies about consumer privacy, including examining mobile apps' compliance with various privacy regulations and platform policies.

---

[1] https://en.wikipedia.org/wiki/H-index
[2] https://scholar.google.com/citations?user=WN9t4n0AAAAJ&hl=en

5. One research study performed by my laboratory demonstrated that a majority of child-directed Android apps appeared to be violating COPPA,[3] which led to major policy shifts by both Google and Apple, makers of the two leading mobile platforms. I have since been invited to give keynotes at several international conferences on child development and technology as an expert on online privacy as it pertains to children. I have also testified before the U.S. Senate on how COPPA can be improved to match the realities of modern technology, and have been asked to provide feedback on draft legislation from members of both houses of Congress.

6. My *curriculum vitae*, which sets forth my experience and credentials more fully, is attached as Exhibit A.

7. I have testified as an expert in the following cases:

- *Hart v. TWC Prod. & Tech. LLC*, 526 F. Supp. 3d 592, Case No. 20-cv-03842-JST (N.D. Cal. 2021)
- *District of Columbia v. Town Sports International*, *LLC*, Case No. 2020 CA 003691 B (D.C. Sup. Ct. 2020)
- *In re Vizio, Inc., Consumer Privacy Litig*., 238 F. Supp. 3d 1204, (C.D. Cal. 2017)
- *In re Linkedin User Privacy Litigation*, 932 F. Supp. 2d 1089 (N.D. Cal. 2013)
- *In re Netflix Privacy Litigation*, Case No.: 5:11-CV-00379 EJD (N.D. Cal. 2012)

8. I am being compensated in the above-entitled case at an hourly rate of $400/hour for preparing this declaration. My compensation is not in any way dependent on the outcome of this or any related proceeding.

9. The opinions in this declaration are my expert opinions, which are based on my education and training, my peer-reviewed published research and the research of others, my knowledge of relevant technologies (including my reading of the public technical documents offered by NetChoice's members about their capabilities), as well as my reading of the legislation.

---

[3] Irwin Reyes, Primal Wijesekera, Joel Reardon, Amit Elazari Bar On, Abbas Razaghpanah, Narseo Vallina-Rodriguez, and Serge Egelman. *"Won't Somebody Think of the Children?" Examining COPPA Compliance at Scale.* Proceedings on Privacy Enhancing Technologies (PoPETS), 2018(3):63–83.

10. I have reviewed AB 2273, the California Children's Age Appropriate Design Code (AADC) Act. In my expert opinion, this law is necessary to address realities of modern technology that have resulted in the exploitation of minors; its provisions are reasonable and technically feasible to adopt (i.e., the technologies necessary to comply are already in widespread use by NetChoice's members), and I believe that they are substantially similar to policies in other jurisdictions within which NetChoice members operate. The law only applies to services that are likely to be used by children (rather than all online services), and only requires that companies take steps to limit harm to children, allowing them and their parents to make more informed decisions about their online activities and dissemination of their personal information. Services not likely to be used by children are unlikely to be impacted by this legislation; child-directed services can comply by simply limiting privacy-invasive tracking and considering potential harms to children. Similar laws already exist in other sectors, which society has accepted: that convenience stores cannot sell tobacco products and alcohol to minors is not viewed as tyrannical overreach or limitations on "freedom to innovate," but instead as a commonsense safeguard.

**COLLECTION & USE OF PERSONAL INFORMATION ONLINE**

11. The "free" Internet is subsidized through the collection of users' personal information for both advertising and analytics purposes. In the case of advertising, this means showing Internet users ads that are specifically tailored to their inferred interests. In the case of analytics, this means observing how users interact with the service in order to maximize its profitability (e.g., strategically placing in-app purchase opportunities based on users' in-app behaviors, identifying the users most likely to buy expensive items based on their inferred demographics, manipulating users into spending more time using a service, etc.). In other cases, this may mean straight up selling the user data to third parties so that they may perform these activities and other yet-unknown use cases.

12. Because so much of the Internet is supported by advertisements, one key metric that online services use is known as "engagement," which refers to the amount of time that consumers spend using a service or the frequency of interactions that consumers have with that service. That is, the more time consumers spend using a service that displays ads, the more ads

that consumers are likely to be shown. Thus, many services collect analytics data to measure engagement and then use this data to develop features that are likely to lead to greater levels of engagement. For example, social media platforms have discovered that emotionally manipulating consumers based on what content they are shown results in greater levels of engagement,[4] and therefore many of these platforms are optimized for this purpose.[5] Facebook researchers previously showed that they can manipulate users' content feeds to intentionally upset people, and that this emotional manipulation can then be spread to users' connections.[6] Another study found that moral outrage resulted in more "retweets" on Twitter (i.e., greater engagement due to users resharing a post),[7] and others have found similar results on other social media platforms.[8] For this reason, conspiracy theories also result in greater levels of engagement and spread quickly online,[9] since they make their believers angry (and cater to confirmation bias). Thus, platforms are incentivized to make their users angry so that there is more "engagement," which results in more advertisements being viewed (due to more time spent on the platform), resulting in more revenue.

13. Advertisements are targeted at users based on inferences about those users' interests. Individual users' interests are inferred based on data automatically collected from them: the services they use, how they use them, from where they use them, and so forth. In short, online and offline activities are tracked, which allows companies to maintain detailed profiles of individual user behavior, which in turn is used to predict users' interests, preferences, and even demographics. The collected information may be used to predict a consumer's religion, health

[4] Gilad Edelman, "Facebook Quietly Makes a Big Admission." *Wired,* August 31, 2021. https://www.wired.com/story/facebook-quietly-makes-big-admission-political-content/

[5] Filippo Menczer, "How 'engagement' makes you vulnerable to manipulation and misinformation on social media." *The Conversation,* September 20, 2021. https://theconversation.com/how-engagement-makes-you-vulnerable-to-manipulation-and-misinformation-on-social-media-145375

[6] Adam D. I. Kramer, Jamie E. Guillory, and Jeffrey T. Hancock. "Experimental evidence of massive-scale emotional contagion through social networks." *Proceedings of the National Academy of Sciences* 111.24 (2014): 8788-8790.

[7] William J. Brady *et al.* "Emotion shapes the diffusion of moralized content in social networks." *Proceedings of the National Academy of Sciences* 114.28 (2017): 7313-7318.

[8] Rui Fan *et al*. "Anger is more influential than joy: Sentiment correlation in Weibo." *PloS one* 9.10 (2014): e110184.

[9] Soroush Vosoughi, Deb Roy, and Sinan Aral. "The spread of true and false news online." *Science* 359.6380 (2018): 1146-1151.

conditions, sexual orientation, or political affiliation; some of this information may be revealed by the phone's location alone (e.g., where they live, who they live with, where they work, etc.), or even by just the name of the app that is being used (e.g., revealing sexual orientation, religion, age, or socioeconomic status).

14. Tracking of users' online behaviors is made possible by "persistent identifiers." An identifier is any piece of information that allows an individual—or device—to be uniquely identified. "Persistent" identifiers are identifiers that tend to not change over time.[10] For example, motor vehicles have persistent identifiers in the form of license plates: a license plate uniquely identifies a vehicle and vehicles tend to have the same license plates over time. Thus, if someone records all the license plates at a particular place over time, they can determine how many times in that period any individual vehicle was there (and thus infer their operators' activities). Similarly, if license plates are recorded at many different locations and that data is combined, one could reconstruct the movements of individual vehicles. Thus, combining a persistent identifier with information about where that identifier was observed (e.g., a website or mobile app) allows a data recipient to reconstruct an individual's activities. Using this knowledge, one could infer information about their routines, preferences, demographics, and even relations and social connections. It is for this reason that persistent identifiers, including ones that identify personal devices—because they tend to be used by one individual—are categorized as personal information under various privacy laws (e.g., CCPA,[11] COPPA,[12] HIPAA,[13] GDPR,[14] GLBA[15]).[16]

15. Online advertisements need not use consumers' personal information: while the *behavioral* or *targeted* advertising described in the prior paragraphs relies on collecting personal information to infer users' interests, *contextual* advertising does not. Contextual advertising refers to choosing ads based on what the user is doing in the moment: the type of website or online

---

[10] https://www.nnlm.gov/guides/data-glossary/persistent-unique-identifier
[11] Cal. Civ. Code § 1798.140(15).
[12] 15 U.S.C § 6501(8)(F).
[13] 45 C.F.R. § 164.514(b)(2)(i).
[14] GDPR Art. 4 (1).
[15] 16 C.F.R. § 313.3.
[16] See, e.g., https://www.federalregister.gov/documents/2021/12/09/2021-25736/standards-for-safeguarding-customer-information

service that the user is currently visiting, which is where the ad is to appear, and not based on a collected profile or tracking information. For example, a mattress review website does not need to collect personal information to know that visitors might be receptive to ads for mattresses or bedding. By definition, contextual advertising does not require the collection of consumers' personal information, because it does not rely on the tracking of their online activities.

16. In addition to questionable economic benefits, over half a century of published research on consumer behavior and preferences has demonstrated that consumers are opposed to this type of tracking by businesses. For example, when Westin performed consumer surveys on public privacy perceptions going back to the 1970s,[17] he consistently found that a majority of the U.S. public are either "very" or "somewhat" concerned with how their personal information is collected and used by businesses. In 2001, one study found that as many as 64% of consumers refused to shop online due to privacy concerns.[18] A Pew survey from 2020 found that more than half of Americans have refused to use certain products or services due to privacy concerns.[19] In the past two decades, as more and more aspects of daily life have moved online, many consumers have also simply become resigned to having their information used in objectionable ways.[20] A 2019 Pew survey of consumers found that 62% of Americans do not believe it is possible to "go through daily life without companies collection data about them," 79% are very or somewhat concerned about this, and 81% believe the risks of collecting this data outweigh the benefits.[21]

17. While consumers are overwhelmingly opposed to this type of tracking and the profiling and resale of their information that it supports (one study of U.S. consumers found that

[17] Ponnurangam Kumaraguru and Lorrie Faith Cranor. "Privacy indexes: a survey of Westin's studies." *Carnegie Mellon University Tech Report* CMU-ISRI-5-138, 2005.

[18] M J. Culnan and Milne, G. R. "The Culnan-Milne Survey on Consumers & Online Privacy Notices: Summary of Responses." In *Interagency Public Workshop (Ed.) Get Noticed: Effective Financial Privacy Notices*, Washington, D.C., 2001.

[19] Andrew Perrin, "Half of Americans have decided not to use a product or service because of privacy concerns." *Pew Research Center,* August 14, 2020. https://www.pewresearch.org/fact-tank/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/

[20] Nora A. Draper and Joseph Turow. "The corporate cultivation of digital resignation." *New media & society* 21.8 (2019): 1824-1839.

[21] Pew Research Center. "Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information." Nov. 15, 2019. https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/

up to 86% do not want ads that are tailored based on their online activities),[22] consumers nonetheless continue to engage with services that appear to conflict with their stated privacy preferences. This is known as the "privacy paradox." Some stakeholders like to point out this disconnect and use it to disingenuously claim that it means that consumers do not "really" care about privacy. But the published research on the privacy paradox demonstrates that this argument is incorrect, and that there are several rational explanations for the privacy paradox, which include lack of awareness of data collection methods, poor usability, mismatched incentives, and perceived lack of agency.

18. In many cases, consumers simply do not understand when they are making decisions that will impact their privacy. For example, in a series of studies that I co-authored,[23,24,25] we presented subjects with different search engine interfaces, including one that annotated search results with privacy information; subjects were instructed to use the search engine to buy items from merchants of their choice. While all subjects expressed strong privacy preferences in a survey administered prior to the study (i.e., subjects were specifically screened for strong privacy preferences, so that we could explicitly test whether interface design impacted their ability to act on those preferences), we observed that without information about privacy practices presented in an easily-accessible manner, subjects made purchases from the cheapest merchants. Whereas when search results were annotated with privacy ratings, subjects were significantly more likely to make purchases from merchants with more agreeable privacy policies (i.e., better aligned with participants' stated privacy preferences), even paying more money to do so. These and other studies demonstrate that people often act in ways that seem contrary to their

---

[22] J. Turow, J. King, C. J. Hoofnagle, A. Bleakley, and M. Hennessy (2009). "Americans Reject Tailored Advertising and Three Activities That Enable It." https://doi.org/10.2139/ssrn.1478214

[23] Janice Y. Tsai Serge Egelman, Lorrie Cranor, and Alessandro Acquisti. "The effect of online privacy information on purchasing behavior: An experimental study." *Information systems research* 22, no. 2 (2011): 254-268.

[24] Serge Egelman, Janice Tsai, Lorrie Faith Cranor, and Alessandro Acquisti. "Timing is everything? The effects of timing and placement of online privacy indicators." In *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems*, pp. 319-328. 2009.

[25] Julia Gideon, Lorrie Cranor, Serge Egelman, and Alessandro Acquisti. "Power strips, prophylactics, and privacy, oh my!." In *Proceedings of the Second Symposium on Usable privacy and security*, pp. 133-144. 2006.

stated privacy preferences when they are not fully aware of a business's privacy practices (e.g., due to the well-documented problems with the "notice and consent" framework, i.e., expecting consumers to read and understand privacy policies, which I describe in subsequent sections).

19. In other cases, convoluted user interfaces make it difficult for consumers to understand how to make privacy-protective decisions. This poor usability often results in consumers sharing personal information without ever being aware of it. For example, while studies have shown that consumers have concerns about sharing personal information with the wrong audiences on social media, they nonetheless continue to overshare,[26] which has been shown to be the result of difficult-to-use privacy settings interfaces (or mismatches between the design of those interfaces and users' mental models).[27] One early study on the use of Facebook found that while participants expressed strong privacy preferences, they nonetheless shared sensitive information because more than one-in-five did not understand what Facebook's privacy settings did or how to use them, and therefore did not change them from the overly-permissive defaults.[28] In a study of file-sharing software, researchers discovered that due to convoluted privacy settings interfaces, many users were inadvertently sharing their entire hard drives.[29] In a study of tools provided by the advertising industry to opt out of behavioral advertising on websites, the researchers observed:

*"Participants found many tools difficult to configure, and tools' default settings were often minimally protective. Ineffective communication, confusing interfaces, and a lack of feedback led*

---

[26] Maritza Johnson, Serge Egelman, and Steven M. Bellovin. 2012. Facebook and privacy: it's complicated. In Proceedings of the Eighth Symposium on Usable Privacy and Security (SOUPS '12). Association for Computing Machinery, New York, NY, USA, Article 9, 1–15. https://doi.org/10.1145/2335356.2335369

[27] Jennifer King, Airi Lampinen, and Alex Smolen. 2011. Privacy: is there an app for that? In Proceedings of the Seventh Symposium on Usable Privacy and Security (SOUPS '11). Association for Computing Machinery, New York, NY, USA, Article 12, 1–20. https://doi.org/10.1145/2078827.2078843

[28] Alessandro Acquisti and Ralph Gross. "Imagined communities: Awareness, information sharing, and privacy on the Facebook." In *Privacy Enhancing Technologies: 6th International Workshop*, PET 2006, Cambridge, UK, June 28-30, 2006, Revised Selected Papers 6, pp. 36-58. Springer Berlin Heidelberg, 2006.

[29] Nathaniel S. Good and Aaron Krekelberg. 2003. "Usability and privacy: a study of Kazaa P2P file-sharing." In *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems (CHI '03)*. Association for Computing Machinery, New York, NY, USA, 137–144. https://doi.org/10.1145/642611.642636

*many participants to conclude that a tool was blocking [online behavioral advertising] when they had not properly configured it to do so. Without being familiar with many advertising companies and tracking technologies, it was difficult for participants to use the tools effectively."*[30]

20. Incentives are also important when studying privacy tradeoffs. Privacy decisions are not made in a vacuum: that consumers engage with services that violate their privacy preferences is often an indictment of the lack of market choice rather than an indication that consumers are behaving hypocritically. Similarly, privacy is often not the only consideration: if the costs of protecting one's privacy are unreasonably high (e.g., time invested learning to correctly use privacy settings, monetary costs, abstaining from social life, etc.), many consumers will engage with privacy-violative services because they cannot afford the alternatives. For example, I value my free time, but that I still show up to work does not make me a hypocrite. Similarly, when faced with the choice between protecting their privacy or engaging with their peers online, many younger people will choose the latter, despite the known privacy risks. Many studies have shown that despite the known privacy risks, many young people continue to use social media due to the fear of missing out.[31,32,33]

21. Finally, many consumers simply do not believe they have agency when it comes to making online privacy decisions: because many believe that their privacy preferences will not be honored no matter the actions that they take, many choose to engage with privacy-violative services to extract benefits, believing that they will end up paying the privacy costs regardless. A 2015 consumer survey concluded the following:

[30] Pedro Leon, Blase Ur, Richard Shay, Yang Wang, Rebecca Balebako, and Lorrie Cranor. "Why Johnny can't opt out: a usability evaluation of tools to limit online behavioral advertising." In *Proceedings of the SIGCHI conference on human factors in computing systems*, pp. 589-598. 2012.

[31] Vittoria Franchina, Mariek Vanden Abeele, Antonius J. Van Rooij, Gianluca Lo Coco, and Lieven De Marez. "Fear of missing out as a predictor of problematic social media use and phubbing behavior among Flemish adolescents." *International journal of environmental research and public health* 15, no. 10 (2018): 2319.

[32] Dmitri Rozgonjuk, Cornelia Sindermann, Jon D. Elhai, and Christian Montag. "Fear of Missing Out (FoMO) and social media's impact on daily-life and productivity at work: Do WhatsApp, Facebook, Instagram, and Snapchat Use Disorders mediate that association?." *Addictive Behaviors* 110 (2020): 106487.

[33] Ine Beyens, Eline Frison, and Steven Eggermont. ""I don't want to miss a thing": Adolescents' fear of missing out and its relationship to adolescents' social needs, Facebook use, and Facebook related stress." *Computers in Human Behavior* 64 (2016): 1-8.

*"[A] majority of Americans are resigned to giving up their data—and that is why many appear to be engaging in tradeoffs. Resignation occurs when a person believes an undesirable outcome is inevitable and feels powerless to stop it. Rather than feeling able to make choices, Americans believe it is futile to manage what companies can learn about them. Our study reveals that more than half do not want to lose control over their information but also believe this loss of control has already happened."*[34]

22. A study specifically on young people and the privacy paradox observed: *"Based on focus group interviews, we considered how young adults' attitudes about privacy can be reconciled with their online behavior. The "privacy paradox" suggests that young people claim to care about privacy while simultaneously providing a great deal of personal information through social media. Our interviews revealed that young adults do understand and care about the potential risks associated with disclosing information online and engage in at least some privacy-protective behaviors on social media. However, they feel that once information is shared, it is ultimately out of their control. They attribute this to the opaque practices of institutions, the technological affordances of social media, and the concept of networked privacy, which acknowledges that individuals exist in social contexts where others can and do violate their privacy."*[35]

23. Similarly, users continue to use apps that they find "creepy" due to a sense of learned helplessness: they do not believe that they have the power to control who receives their personal information when they participate in the digital economy.[36]

---

[34] Joseph Turow, Michael Hennessy, and Nora Draper. "The tradeoff fallacy: How marketers are misrepresenting American consumers and opening them up to exploitation." *Available at SSRN 2820060* (2015).

[35] Eszter Hargittai, and Alice Marwick. ""What can I really do?" Explaining the privacy paradox with online apathy." *International journal of communication* 10 (2016): 21.

[36] Irina Shklovski, Scott D. Mainwaring, Halla Hrund Skúladóttir, and Höskuldur Borgthorsson. 2014. Leakiness and creepiness in app space: perceptions of privacy and mobile app use. In *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems (CHI '14)*. Association for Computing Machinery, New York, NY, USA, 2347–2356. https://doi.org/10.1145/2556288.2557421

## TOOLS FOR LIMITING COLLECTION & USE OF PERSONAL INFORMATION

24. **Privacy Policies.** Internet users have few tools to control their online privacy. Since the dawn of the Internet age, the primary framework for managing online privacy has been the "notice and consent" framework, whereby online services post privacy policies ("notice") and consumers can choose whether to engage with services based on their understanding of those policies ("consent"). Unfortunately, this framework is fundamentally detached from reality: decades of research have demonstrated that consumers do not read these privacy policies, do not understand what they mean (when they do read them), and worse, privacy policies often do not accurately describe their services' behaviors.

25. In one study, in which participants were asked to explicitly confirm that they read and agreed to a website's privacy policy, 80% clicked a box to affirm that they had done so despite not actually accessing or reading the policy.[37] This number likely represents a lower bound, given the presence of "demand characteristics" (i.e., participants were in a laboratory setting and therefore were likely to pay more attention to the instructions than they likely would have in the real world), as well as the fact that most online services do not present users with interstitial messages demanding that they read and agree to their privacy policies: most privacy policies are accessed through discreet links outside the user's field of focus. Another study found that privacy-concerned users were influenced by the mere presence of a privacy policy link, despite few reading the policies.[38] This suggests that the mere presence of a privacy policy erroneously signals "good" privacy practices.

26. Nonetheless, if users do opt to read privacy policies, it is often a significant time investment. In 2008, McDonald and Cranor showed that if users read the privacy policies for every website they accessed, they would need to spend up to 300 hours per year doing so

[37] Nili Steinfeld. ""I agree to the terms and conditions": (How) do users read privacy policies online? An eye-tracking experiment." *Computers in Human Behavior* 55 (2016): 992-1000.

[38] Jensen, Carlos, Colin Potts, and Christian Jensen. "Privacy practices of Internet users: Self-reports versus observed behavior." *International Journal of Human-Computer Studies* 63, no. 1-2 (2005): 203-227.

annually (based on average policy lengths, number of websites visited, and reading speeds).[39] Of course, their estimate is based on data from 2008 that showed the average Internet user visits around 1,500 unique websites annually; 15 years later, the number of websites has proliferated, as has the amount of time that consumers spend online, which suggests that the time investment to read and understand privacy policies has only increased.

27. It is also not clear that the time investment to read privacy policies is worthwhile for most consumers: several studies have shown that the privacy policies found on popular websites are written at the college level and therefore may not be understood by a significant proportion of the population (much less children).[40,41,42]

28. Even when policies are noticed, read, and understood, they generally do not explain a service's data practices in sufficient detail for consumers to make informed decisions. For example, despite CCPA and CalOPPA requiring that services post privacy policies, there are no requirements that force those services to name the specific third parties with whom they share data—they are only required to specify the broad categories of data recipients. Even though those third parties may have their own data practices that are documented in their own privacy policies, it is nearly impossible for consumers to inform themselves about those practices if they are unable to locate those additional privacy policies because they do not know the identities of the companies. Similarly, it is nearly impossible for consumers to understand the privacy practices of large companies that offer multiple services, as their privacy policies are often written in a manner that aggregates their practices across all of their offered services (e.g., Google's privacy policy[43] describes their data collection practices across all of their services and does not convey what data may be collected by Google Maps vs. Gmail vs. Docs vs. Search).

---

[39] Aleecia M. McDonald and Lorrie Faith Cranor. "The cost of reading privacy policies." *I/S: A Journal of Law and Policy for the Information Society*, 4 (2008): 543.

[40] Yuanxiang Li *et al*. "Online privacy policy of the thirty Dow Jones corporations: Compliance with FTC Fair Information Practice Principles and readability assessment." *Communications of the IIMA* 12.3 (2012): 5.

[41] Carlos Jensen and Colin Potts. "Privacy policies as decision-making tools: an evaluation of online privacy notices." *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems.* 2004.

[42] George R. Milne, Mary J. Culnan, and Henry Greene. "A longitudinal assessment of online privacy notice readability." *Journal of Public Policy & Marketing* 25.2 (2006): 238-249.

[43] https://policies.google.com/privacy?hl=en-US

29. **Blocking Cookies and Fingerprinting.** In addition to reading privacy policies, there are some technologies that consumers can use in futile attempts to better protect their privacy. "Cookies" are data that websites store in consumers' web browsers, which are then transmitted back to websites when visited in the future. This allows a website to recognize a user over time, without having to log in again (as well as allowing the website to "remember" other settings, such as a default language). Because cookies have been historically abused for invasive tracking and profiling,[44] modern web browser software allows users to delete stored cookies or to block cookies set by third-party trackers altogether.

30. However, deleting or blocking cookies is no longer an effective strategy, as tracking now occurs using other means that consumers cannot control.[45,46] For example, unique "fingerprints"—the aggregation of several data points to create a unique identifier—can be constructed based on seemingly-benign information that is automatically transmitted to online services without user consent: software versions (e.g., the web browser and operating system), language settings, time zones, screen resolution, battery levels, etc.[47,48] Even what fonts are installed on a computer, which are available to websites, can be used to uniquely identify a website visitor.[49] Apps on mobile devices have additional data points available for constructing unique fingerprints to identify their users, all without the use of cookies, and with few actions that users can take to prevent this from occurring. Perversely, whether a user has configured privacy settings away from the defaults is often used as a data point for further tracking (i.e., while some

[44] J. R. Mayer and J. C. Mitchell, "Third-Party Web Tracking: Policy and Technology," *2012 IEEE Symposium on Security and Privacy*, San Francisco, CA, USA, 2012, pp. 413-427, doi: 10.1109/SP.2012.47.

[45] N. Nikiforakis, A. Kapravelos, W. Joosen, C. Kruegel, F. Piessens and G. Vigna, "Cookieless Monster: Exploring the Ecosystem of Web-Based Device Fingerprinting," *2013 IEEE Symposium on Security and Privacy,* Berkeley, CA, USA, 2013, pp. 541-555, doi: 10.1109/SP.2013.43.

[46] R. Upathilake, Y. Li, and A. Matrawy, "A classification of web browser fingerprinting techniques," *2015 7th International Conference on New Technologies, Mobility and Security (NTMS)*, Paris, France, 2015, pp. 1-5, doi: 10.1109/NTMS.2015.7266460.

[47] Peter Eckersley. "How unique is your web browser?." In *Privacy Enhancing Technologies: 10th International Symposium, PETS 2010, Berlin, Germany, July 21-23, 2010. Proceedings 10*, pp. 1-18. Springer Berlin Heidelberg, 2010.

[48] https://amiunique.org/

[49] David Fifield and Serge Egelman. "Fingerprinting web users through font metrics." *Financial Cryptography and Data Security: 19th International Conference, FC 2015*, San Juan, Puerto Rico, January 26-30, 2015, Revised Selected Papers 19. Springer Berlin Heidelberg, 2015.

web browsers can transmit a user-configurable "do not track" signal to websites, many websites choose not to honor this and instead use it as another source of entropy to identify and track users).[50,51]

31. Every device connected to the Internet has an Internet Protocol (IP) address, which is used to route information to and from it. While IP addresses must be transmitted to send and receive data, they can also be used to track users over time. Since devices behind a firewall (e.g., a household WiFi router) will appear to the outside world to share the same IP address, the collection of IP addresses is often used as a way of performing "cross-device tracking," which allows data recipients to infer when the same individual has moved from using a mobile device to a desktop computer to a smart TV; it also allows data recipients to infer when multiple individuals reside within the same household. For example, Meta's privacy policy states that they collect "information about the network you connect your device to, including your IP address" to target advertisements and provide "business services" to unnamed partners.[52] There is little that consumers can do to prevent this, without substantially degrading their online experiences. Worse, there is no way for consumers to know when this type of tracking is even occurring.

32. **Machine-Readable Privacy Policies.** Over 20 years ago, due to the privacy concerns regarding cookies, online tracking, and the acknowledgement that natural language privacy policies are woefully inadequate, several proposals were put forth to create machine-readable privacy policies. The idea behind these proposals was that consumers could use an interface to save their privacy preferences within their web browsers (or other software under their control), websites could post machine-readable policies, and then web browsers could act on consumers' behalf to either alert them when encountering a website with a disagreeable privacy policy (determined by the browser's automatic parsing of a website's machine-readable policy),

---

[50] Geoffrey A. Fowler, "Think you're anonymous online? A third of popular websites are 'fingerprinting' you." *The Washington Post*, October 31, 2019. https://www.washingtonpost.com/technology/2019/10/31/think-youre-anonymous-online-third-popular-websites-are-fingerprinting-you/

[51] Michael Simon, "Apple is removing the Do Not Track toggle from Safari, but for a good reason." *Macworld*, February 6, 2019. https://www.macworld.com/article/232426/apple-safari-removing-do-not-track.html

[52] https://www.facebook.com/privacy/policy/

or take some other action (e.g., automatically negotiating a better policy, blocking cookies or other transmissions, etc.). One of these proposals became a web standard: the Platform for Privacy Preferences Project (P3P),[53] was a web standard developed by the World Wide Web Consortium. (I served on the standards committee as an invited expert.)

33. The P3P standard gained traction, with many industry stakeholders adopting it by posting "P3P policies" on their websites so that web browsers could automatically parse them and alert users when they encountered websites that violated those users' stated privacy preferences. Microsoft's Internet Explorer (IE) browser was the first major web browser to adopt P3P, and by default, IE would block third-party tracking cookies unless the website posted a P3P policy (and then would block third-party cookies in accordance with the user's stated privacy preferences). In response, many companies (e.g., Amazon, Facebook, and Google) posted P3P policies that did not actually describe their privacy practices, but nonetheless tricked the IE browser into accepting their tracking cookies, due to the presence of a valid P3P header.[54] One study of over 33,000 websites observed that more than one third were transmitting P3P policies that appeared to be designed to circumvent IE's cookie blocking (and did not accurately describe their sites' actual privacy practices).[55] (The same study found that many of these websites were certified participants in TRUSTe's[56] EU Safe Harbor industry self-regulation program, and concluded that such certified sites were no more likely to comply with the P3P standard than websites not certified.) Some of these P3P policies can still be found today when accessing the websites that include trackers from NetChoice members.[57] For example, as of March 28, 2023, Google Ads[58]

---

[53] https://en.wikipedia.org/wiki/P3P

[54] Lorrie Faith Cranor, "Necessary but not sufficient: Standardized mechanisms for privacy notice and choice." *J. on Telecomm. & High Tech. L.* 10 (2012): 273.

[55] Pedro Giovanni Leon, Lorrie Faith Cranor, Aleecia M. McDonald, and Robert McGuire. 2010. Token attempt: the misrepresentation of website privacy policies through the misuse of p3p compact policy tokens. In *Proceedings of the 9th annual ACM workshop on Privacy in the electronic society (WPES '10).* Association for Computing Machinery, New York, NY, USA, 93–104. https://doi.org/10.1145/1866919.1866932

[56] TRUSTe is now known as "TrustArc."

[57] Lorrie Faith Cranor, "Internet Explorer privacy protections also being circumvented by Google, Facebook, and many more." *Technology Academics Policy,* February 18, 2021. https://www.techpolicy.com/Cranor_InternetExplorerPrivacyProtectionsBeing Circumvented-by-Google.aspx

[58] https://adservice.google.com/adsid/google/ui

transmits a P3P policy header, but the body of the policy is as follows:

CP="This is not a P3P policy! See g.co/p3phelp for more info."

34. Thus, I have come to the conclusion that voluntary online standards that aim to give consumers more control over their privacy are futile, as they are likely to be coopted.

**SPECIAL CONCERNS REGARDING CHILDREN'S PRIVACY**

35. This data monetization free-for-all is even more concerning when the data comes from children, who are unlikely to understand that this is happening, much less consent to it, but who could potentially face enormous impacts due to future usage of this data. This data may be used for manipulative marketing campaigns, but also may feed biased and unaccountable algorithms that use it to make decisions about a child's future, not to mention outright malicious uses of the data (e.g., non-custodial parents purchasing location data to geolocate a child).

36. In 2016 my research team decided to look at how well mobile apps directed at children appeared to be complying with COPPA, which has been in effect since 2000. We wrote bespoke instrumentation for the Android platform that allows us to run mobile apps and monitor exactly what personal information those apps access and with whom they share it.[59,60,61,62,63] We also used our instrumentation to determine whether transmissions containing personal information were performed securely and confidentially.

---

[59] P. Wijesekera, A. Baokar, A. Hosseini, S. Egelman, D. Wagner, and K. Beznosov. "Android permissions remystified: A field study on contextual integrity." In *Proceedings of the 24th USENIX Security Symposium (USENIX Security 15)*, pages 499–514, Washington, D.C., Aug. 2015. USENIX Association.

[60] P. Wijesekera, A. Baokar, L. Tsai, J. Reardon, S. Egelman, D. Wagner, and K. Beznosov. "The feasability of dynamically granted permissions: aligning mobile privacy with user preferences." In *Proceedings of the 2017 IEEE Symposium on Security and Privacy*, Oakland '17. IEEE Computer Society, 2017.

[61] P. Wijesekera, J. Reardon, I. Reyes, L. Tsai, J.-W. Chen, N. Good, D. Wagner, K. Beznosov, and S. Egelman. "Contextualizing privacy decisions for better prediction (and protection)." In *Proceedings of the 2018 CHI Conference on Human Factors in Computing Systems,* CHI '18, pages 1–13, New York, NY, USA, 2018. Association for Computing Machinery.

[62] J. Reardon, A. Feal, P. Wijesekera, A. E. B. On, N. Vallina-Rodriguez, and S. Egelman. "50 Ways to Leak Your Data: An Exploration of Apps' Circumvention of the Android Permissions System." In *Proceedings of the 24th USENIX Security Symposium, USENIX Security '19,* Berkeley, CA, USA, 2019. USENIX Association.

[63] We wrote our tools for Google's Android platform only because it is open source: having the source code for the operating system allowed us to modify it for this purpose; at the time, we didn't look at Apple's iOS simply because we didn't have the source code to add the same level of instrumentation.

37. Starting in late 2016, we began downloading as many free apps in the "Designed for Families" (DFF) program as we could find, which ended up being just under 6,000 apps.[64] The DFF program is a section of the Play Store, Google's centralized Android app market, which is exclusively for apps that are directed to children. Mobile app developers must participate in the program when they upload their app and disclose to Google that it is directed at children. As part of the program, they must affirm to Google that their app is in compliance with COPPA. Our goal was to evaluate whether that appeared to be the case in practice.

38. Of the child-directed apps that we tested, more than half appeared to be violating COPPA in one way or another: 5% collected location or other contact information and 19% collected personal information without verifiable parental consent and shared them with third parties whose public disclosures indicated they would use them for prohibited purposes (e.g., behavioral advertising); 40% transmitted personal information insecurely. Separately, 39% appeared to be violating Google's platform policies (i.e., an example of industry self-regulation) surrounding the collection of persistent identifiers for advertising and analytics purposes.[65]

39. We also examined mobile apps that had been certified by the COPPA Safe Harbor programs, meaning that the app developer claimed to participate in a private FTC-approved compliance-certification program.[66] (We found it extraordinarily difficult to identify which mobile apps had actually been certified; none of the programs we contacted were willing to share lists of apps with us, and most of their websites did not provide this information.) Of the 237 apps we found that claimed to be Safe Harbor certified, 64% appeared to violate Google's policies on transmitting identifiers for advertising/analytics purposes, 33% transmitted personal information to prohibited third parties, and 32% transmitted personal information insecurely. We concluded that the apps that we examined, which claimed to be certified as COPPA-compliant by Safe Harbor programs, were no more likely to protect children's personal information than apps that

[64] Reyes *et al.*, *supra* note 3.
[65] *Ibid.*
[66] 16 C.F.R. § 312.11.

had not been certified by these programs.[67] (This result is consistent with prior research on adverse selection in industry self-regulatory certification programs.)[68]

40. Thus, based on this research, I have come to the conclusion that voluntary industry self-regulatory programs are ineffective, and do not lead to better outcomes for consumers.

41. Similarly, through this research, I identified several additional gaps in regulation (beyond the inadequacy of the Safe Harbor programs), that I recommended be fixed in my U.S. Senate testimony.[69] Particularly relevant here are COPPA's "internal operations" exemption[70] and "actual knowledge" standard.[71]

42. Generally, websites and other online services must obtain verifiable parental consent before disclosing children's personal information to third parties, unless it is to support the service's internal operations and is not used for any other purpose. However, from a technical standpoint, most internal operations do not strictly require the collection of persistent identifiers that can be used to track children's activities across different services. In fact, both major platforms provide guidelines on how software developers can perform these activities *without* collecting advertising identifiers or non-resettable device identifiers.[72,73] For example, by definition, "contextual advertising" involves showing consumers ads *without* using data previously collected about them, and therefore no personal information is needed to show contextual ads. To prevent one user from being shown the same ad repeatedly (known as "frequency capping"), a session-based or installation-based identifier should be used, such that the collected data cannot be used to track the user across other services.

---

[67] Reyes *et al.*, *supra* note 3.

[68] Benjamin Edelman. "Adverse selection in online" trust" certifications." In *Proceedings of the 11th International Conference on Electronic Commerce*, pp. 205-212. 2009.

[69] U.S. Congress. Hearing of the Subcommittee on Consumer Protection, Product Safety, and Data Security of the Committee on Commerce, Scient, and Transportation. Hearing on "Protecting Kids Online: Internet Privacy and Manipulative Marketing." Testimony of Serge Egelman, 2021. https://www.commerce.senate.gov/services/files/0DC78E9D-88B2-4D54-8F4A-AE7B4C7D0EF6

[70] 15 U.S.C. § 6501(4)(A).

[71] 15 U.S.C. § 6501(4)(B).

[72] Google, "Best Practices for Unique Identifiers." April 6, 2023. https://developer.android.com/training/articles/user-data-ids

[73] Apple, "User Privacy and Data Use." 2023. https://developer.apple.com/app-store/user-privacy-and-data-use/

43. Nonetheless, in the course of my research, I have noticed that many privacy policies associated with child-directed services use the phrase "internal operations," when describing the flow of children's personal information to third parties. In many of these cases, these third parties are advertisers whose public disclosures indicate that they may use the data for COPPA-prohibited purposes. Thus, I have concluded that for many developers, the phrase "internal operations" appears to be a shibboleth used to justify privacy-invasive practices.

44. Secondly, COPPA's "actual knowledge" standard, by which it must be shown that an individual within these third-party organizations knew that they received data from children, incentivizes data recipients to simply look the other way if and when they receive children's personal information, even when those third-party transmissions also include the names of the apps or websites that are transmitting them the data. Many of these data recipients are advertising and/or analytics companies that publicly advertise their abilities to target ads based on inferring the demographics of users of the services sending them data. Furthermore, there are many commercial services that purport to provide the target demographics of a given mobile app or a website, and thus determining whether or not a service is directed at children is readily ascertainable.

45. For example, ironSource is a targeted advertising company that we observed receiving personal information from child-directed apps.[74] Their privacy policy stated they did not knowingly receive personal information from children under 13, a point which was reiterated to my laboratory in a letter from their general counsel.[75] In my response, I pointed out that all developers wishing to use ironSource's services must provide a company name at sign-up, and we observed companies with the following names sending them personal information: "Arial & Babies," "Androbaby," "Babies Funny World," "BabyBus Kids Games," "For Little Kids," "GameForKids," and "KidsUnityApps." From these developer names provided to ironSource, the resulting data was likely coming from children. However, ironSource can deny actual knowledge,

[74] Reyes *et al.*, *supra* note 3.

[75] Serge Egelman, "We get letters." The AppCensus Blog, May 10, 2018. https://blog.appcensus.io/2018/05/10/we-get-letters/

so long as no human within the company looks at the data that they are soliciting from developers who use their services.

**CALIFORNIA CHILDREN'S AGE-APPROPRIATE DESIGN CODE ACT**

46. From my understanding of the California Age-Appropriate Design Code Act (AADC), I believe that several of the privacy problems I have identified in my research will be addressed, and that technology to comply with the AADC is already in widespread use (including by NetChoice's members).

47. I understand that the AADC requires that businesses that provide services, products or features likely to be accessed by children perform Data Privacy Impact Assessments, which includes identifying potential risks to children and how to mitigate those risks, as well as requiring that privacy notices be accessible and that user-configurable privacy settings are set to a high level (unless the business has a compelling reason not to). It also prohibits those same businesses from misleading their users about their policies and procedures, profiling child users (unless it is in the best interest of the child), collecting location data for purposes beyond determining AADC applicability, and sharing personal information with third parties for secondary purposes.

48. I understand that the AADC requires that DPIAs consider whether algorithms could result in harm to children. An algorithm is simply a sequence of operations: there is often an input, calculations are performed on that input, and then the results of those calculations are provided as output. Within the context of online services, algorithms are used for everything from recommending content to users to inferring a user's preferences and traits for purposes such as targeted advertising. There is no such thing as a "neutral" algorithm: algorithms are designed for specific purposes. One algorithm might be designed to show ads that maximize ad revenue, whereas another might be designed to optimize engagement through content recommendations; other algorithms might be used for more mundane tasks, such as sorting items chronologically or alphabetically. For example, in determining the tweets that appear in a user's feed (of the hundreds of millions sent per day), Twitter weighs factors such as the number of likes, retweets,

social relations, recency, perceived topic relevance, and use of embedded media, among other factors.[76]

49. While some algorithms might make objective decisions (e.g., correctly sorting a list of items by date), others are subjective and therefore less straightforward to audit for correctness (e.g., recommending content and choosing advertisements to display).[77] Algorithms are increasingly being used to make decisions about individuals that can have profound consequences, such as extending credit, housing, insurance, employment, or school admissions; in many cases there is little transparency or recourse surrounding these decisions, as they are made automatically and opaquely, and may also use incorrect or biased data.[78] Most adults do not understand if, when, and how these decisions are being made, children less so.

50. Algorithms that are optimized for increasing user engagement can also result in harm to consumers. For example, there was public outrage when the public learned that Facebook was using its content recommendation algorithms to intentionally cause emotional distress among its users. (Facebook researchers found that emotionally-charged posts were more likely to lead to user engagement; Facebook thus has an incentive to use its algorithms to prioritize showing users posts that are likely to evoke emotional responses.)[79]

51. The AADC regulates the use of so-called “dark patterns.” Dark patterns are design choices that are used to “nudge” the user into making a decision that is advantageous to the business. For example, making it easier to sign up for a service than cancel it is a dark pattern, as is the use of artificial scarcity (e.g., countdown timers to convey a sense of urgency or “limited

[76] Josiah Hughes, “How the Twitter Algorithm Works [2023 Guide].” Hootsuite, December 14, 2022. https://blog.hootsuite.com/twitter-algorithm/

[77] Zeynep Tufekci, "Algorithmic Harms beyond Facebook and Google: Emergent Challenges of Computational Agency," Colorado Technology Law Journal 13, no. 2 (2015): 203-218.

[78] Danielle Keats Citron and Pasquale, Frank A., “The Scored Society: Due Process for Automated Predictions” (2014). Washington Law Review, Vol. 89, 2014, p. 1-, U of Maryland Legal Studies Research Paper No. 2014-8, Available at SSRN: https://ssrn.com/abstract=2376209

[79] Kashmir Hill, “Facebook Manipulated 689,003 Users' Emotions For Science.” Forbes, June 28, 2014. https://www.forbes.com/sites/kashmirhill/2014/06/28/facebook-manipulated-689003-users-emotions-for-science/

time" offers).[80] Research shows that these techniques are prevalent in child-directed online services,[81] and that children are likely to be more susceptible to manipulations than adults.[82]

52. Given the problems with privacy policies and the lack of consumer understanding explained above, I believe the AADC addresses this issue by requiring the language to be understandable by target audiences (when their online services are likely to be accessed by children).

53. I understand that the Plaintiff in this case argues that they are unable to estimate the approximate ages of their users. However, the law does not appear to be proscriptive as to how services used by children should perform age estimation. Many such technologies exist, which all have benefits and drawbacks. For example, France's data protection agency, CNIL, published a guide to choosing appropriate technologies.[83] The report recommends that to balance user privacy with age estimation accuracy, services should not perform age estimation themselves, but instead should use independent third parties who can confidentially make guarantees to relying child-directed services without revealing additional personal information.

54. The report[84] also links to a prototype "implementation of an age-verification system that allows accessing restricted websites without sharing other personally identifiable data."[85] The recommended system is based on "zero-knowledge proofs," a concept in

---

[80] Sara Morrison, "Dark patterns, the tricks websites use to make you say yes, explained." Vox, April 1, 2021. https://www.vox.com/recode/22351108/dark-patterns-ui-web-design-privacy

[81] J. Radesky, A. Hiniker, C. McLaren, E. Akgun, A. Schaller, H. M. Weeks, S. Campbell, & A. N. Gearhardt (2022). "Prevalence and Characteristics of Manipulative Design in Mobile Applications Used by Children." JAMA network open, 5(6), e2217641. https://doi.org/10.1001/jamanetworkopen.2022.17641

[82]Dale Kunkel, Brian L. Wilcox, Joanne Cantor, Edward Palmer, Susan Linn, and Peter Dowrick. "Report of the APA task force on advertising and children." *Washington, DC: American Psychological Association* 30 (2004): 60.

[83] CNIL, "Online age verification: balancing privacy and the protection of minors." September 22, 2022. https://www.cnil.fr/en/online-age-verification-balancing-privacy-and-protection-minors

[84] *Ibid.*

[85] CNIL, "Demonstration of a privacy-preserving age verification process." June 23, 2022. https://linc.cnil.fr/demonstration-privacy-preserving-age-verification-process

cryptography that has been well-known for almost 40 years now,[86,87] which allows an entity to prove the validity of a statement without revealing additional details about that statement. As the CNIL report explains, this technology could easily be used to prove to relying online services that a user is above or below the age of 18 without revealing additional personal information about that user.

55. I understand that Plaintiff implies that it is not possible to reliably determine Internet users' geographic locations in order to determine which regulations apply. This is incorrect. There are many widely-used methods for identifying where in the world an Internet user is physically located. At the most basic level, public and private databases exist that map IP addresses—again, these are transmitted with every Internet connection—to physical locations. This technology is known as "geoIP" and is used by many Internet services to automatically determine where in the world their users come from. For example, MaxMind provides a free database for this purpose that claims 99.8% accuracy in determining a user's country and 80% accuracy for state/region.[88] Private databases, such as those maintained by several of NetChoice's members, are likely to be more accurate.

56. For example, Meta is already using geoIP data to automatically determine which Internet users should receive protections under CCPA/CPRA. Their documentation explains: "we will determine if a person is in California or not based on certain available signals which may include IP address or advertising ID, when those are available."[89] Google similarly automatically detects when users are located in California for the purposes of CCPA/CPRA compliance: "you can select the advertising partners that are eligible to receive bid requests for users Google determines are in California."[90]

[86] S. Goldwasser, S. Micali, and C. Rackoff. 1985. The knowledge complexity of interactive proof-systems. In Proceedings of the seventeenth annual ACM symposium on Theory of computing (STOC '85). Association for Computing Machinery, New York, NY, USA, 291–304. https://doi.org/10.1145/22145.22178

[87] U. Fiege, A. Fiat, and A. Shamir. 1987. Zero knowledge proofs of identity. In Proceedings of the nineteenth annual ACM symposium on Theory of computing (STOC '87). Association for Computing Machinery, New York, NY, USA, 210–217. https://doi.org/10.1145/28395.28419

[88] https://support.maxmind.com/hc/en-us/articles/4407630607131-Geolocation-Accuracy

[89] https://www.facebook.com/business/help/1151133471911882

[90] https://support.google.com/adsense/answer/9560818?hl=en

57. Both companies named above also allow their customers to specifically target ads to Internet users located within California. For example, here is a true and correct screenshot from Google Ads', https://ads.google.com/, accessed on March 28, 2023, targeting configuration interface, which allows advertisers to show ads to people specifically located within California:



58. Below is a true and correct screenshot from Meta's Business Help Center website, https://www.facebook.com/business/help/365561350785642?id=176276233019487, accessed on March 28, 2023, describing how their customers can target ads to residents of specific states:



Enter a location

Enter the names of countries, cities and regions in the box below the dropdown. For best results, enter one location at a time. If you want to reach multiple locations, we recommend you bulk upload them.

Locations you can search for

- Countries (up to 25)
- States
- Provinces
- Cities (up to 250)
- Congressional districts
- ZIP or post codes (up to 50,000)

59. Yahoo!, another NetChoice member, also allows their customers to target ads to Internet users in specific states, even using California as an example. Below is a true and correct screenshot from Yahoo!'s Developer Network website, https://developer.yahoo.com/dsp/docs/lines/targeting-geos.html#target-geographic-areas, accessed on March 28, 2023:



## Target Named Geographic Locations

Follow the steps below to target named geographic locations, such as countries, states, DMAs, or cities.

1. Select the **Country/State/Region/Sub Region/Metro Area/DMA/City,Zip** radio button.
2. From the Type dropdown, select **Country, State, Region, Sub Region, Metro Area, DMA, City**.

Note

You can start by targeting named locations first and then go back and add zip, postal or prefix codes or vice versa.

3. In the Target text box, type the first few letters of the location you want to target. For example, type all or part of the word "California", then locate it in the dropdown list.



60. In addition to geoIP lookups using available tools (many of which are already in use by NetChoice's members, and in many cases geolocating users to California for the purpose of determining CCPA/CPRA applicability), other methods exist for geolocating users, such as access to GPS hardware or other device sensors. For example, mobile apps running on the Android platform have access to Google's Geolocation services, which use nearby cellular towers and WiFi networks to determine the user's location, including providing the accuracy radius.[91]

[91] https://developers.google.com/maps/documentation/geolocation/overview

Apple's iOS platform offers similar functionality, which also make use of nearby cellular networks, WiFi hotspots, and other sensor data.[92]

61. Similarly, all of the major web browsers support functionality to geolocate their users,[93] which usually makes use of multiple methods, including using WiFi network information, GPS hardware, geoIP databases, and other data sources. Using these methods, the operators of online services have the ability to identify their users with street-level accuracy.

62. Thus, the technology to identify California consumers within a reasonable degree of accuracy already exists and is already in use by many of NetChoice's members.

**OPINIONS**

63. For the reasons I set out in this declaration, I believe that the AADC takes a reasonable approach to children's online safety. Based on my research and experience, consumers broadly believe that they are being protected by privacy laws that simply do not exist. Requiring online services to disclose policies in a manner accessible to their users and that they enforce those policies would go a long way towards helping consumers make informed decisions about their personal privacy.

64. The technologies needed to comply with the AADC's requirements already exist and are already in widespread use. Behaviors that the AADC prohibits have already been prohibited by major platforms. For example, child-directed Android apps are prohibited from collecting location data or performing behavioral advertising.[94]

65. As demonstrated above, consumers overwhelming want the practices this law requires for services that are likely to be accessed by children: limiting privacy-invasive tracking, providing safe defaults, and considering the harm to their users.

66. Finally, I believe that it is reasonable for services likely to be used by children to consider the harm they may have on their users. In fact, I think it's not unreasonable to ask that the offeror of any product or service consider the harm they might be causing to others.

[92] https://developer.apple.com/documentation/corelocation
[93] https://developer.mozilla.org/en-US/docs/Web/API/Geolocation_API
[94] https://support.google.com/googleplay/android-developer/answer/9893335?hl=en

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 20th, day of April, 2023 in Berkeley, California.

Serge Egelman, Ph.D.

ROB BONTA
Attorney General of California
ANYA M. BINSACCA, SBN 189613
Supervising Deputy Attorney General
NICOLE KAU, SBN 292026
ELIZABETH K. WATSON, SBN 295221
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3847
E-mail: Elizabeth.Watson@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **NETCHOICE, LLC d/b/a NetChoice,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,**<br><br>**Defendant.** | 5:22-cv-08861<br><br>**DECLARATION OF EMILY KEANEY, DEPUTY COMMISSIONER OF REGULATORY POLICY FOR THE INFORMATION COMMISSIONER'S OFFICE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Emily Keaney, declare and state as follows:

1. I am Deputy Commissioner (Regulatory Policy) for the Information Commissioner's Office. The Information Commissioner's head office is Wycliffe House, Water Lane, Wilmslow, Cheshire, United Kingdom SK9 5AF. I am responsible for overseeing the ICO's policy work programme, both domestically and internationally. I provide oversight for the work of the Information Commissioner's Office economic analysis directorate and oversee work in responding to and preparing for major legislative change. I am providing this declaration in support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction to explain the basis on which the ICO adopted the Age Appropriate Design Code (commonly referred to as the "Children's Code") in the UK and how it has been implemented in practice. I make this declaration from personal knowledge and a review of the Information Commissioner's Office's records kept in the ordinary course of business.

**BACKGROUND ON THE INFORMATION COMMISSIONER'S OFFICE**

2. The role of the Information Commissioner is that of a corporation sole[1] and is currently occupied by John Edwards, who was appointed in January 2022. The Information Commissioner's Office is a non-governmental public body which is made up of officers and staff appointed by the Commissioner[2]. All formal powers and duties rest with the Commissioner. For the purposes of this statement, where I reference the ICO, this will include reference to the Information Commissioner and the Information Commissioner's Office.

3. The ICO is the regulator for data protection[3], e-privacy[4], freedom of information[5] and a number of other digital regulatory areas[6].

---

[1] Data Protection Act 2018, Schedule 12, para 1(1)

[2] Data Protection Act 2018, Schedule 12, para 5

[3] Data Protection Act 2018 and The United Kingdom General Data Protection Regulation (UK GDPR)

[4] The Privacy and Electronic Communications (EC Directive) Regulations 2003 (PECR)

[5] The Freedom of Information Act 2000 (FOI)

[6] The ICO has additional duties and powers in respect of the following: The Environmental Information Regulations 2004, INSPIRE Regulations 2009, Regulation (EU) No 910/2014 of the European Parliament and of the Council of 23 July 2014 on electronic identification and trust services for electronic transactions in the internal market and repealing

4. Whilst the ICO is an independent regulator, it is accountable to the UK Parliament and the public for the outcomes it achieves. The Department for Science, Innovation and Technology is the ICO's sponsoring department within the UK Government.

**THE DATA PROTECTION REGIME IN THE UK**

5. The Data Protection Act 2018 (DPA2018), the United Kingdom General Data Protection Regulation (UKGDPR) and the Privacy and Electronic Communications Regulations 2003 (PECR) form the key data protection legislation within the UK.

6. The UK GDPR is derived from European Union (EU) law, having been retained[7] and amended[8] in UK law during the process of the UK leaving the EU, commonly known as "Brexit". The DPA2018 (DPA), which sits alongside the UK GDPR, sets out the regulatory regime for data protection within law enforcement[9] and intelligence services[10]. The DPA2018 also builds upon the obligations under the UK GDPR, which provides the Information Commissioner with specific information gathering and enforcement powers to carry out his role, and sets out the process under which the Commissioner is appointed as the UK data protection regulator[11].

7. PECR sets out legal requirements covering a number of areas, as follows:

- Marketing by electronic means, including marketing calls, texts, emails and faxes.
- The use of cookies or similar technologies.
- Security of public electronic communications services.
- Privacy of customers using communications networks or services as regards traffic and location data, itemised billing, line identification services (eg caller ID and call return), and directory listings.

---

Directive 1999/93/EC (eIDAS), the Re-use of Public Sector Information Regulations 2015, The Network and Information Systems Regulations 2018, and the Investigatory Powers Act 2016

[7] The European Union (Withdrawal) Act 2018, s2

[8] The Data Protection, Privacy and Electronic Communications (Amendments etc) (EU Exit) Regulations 2019

[9] The Data Protection Act 2018, Part 3

[10] The Data Protection Act 2018, Part 4

[11] The Data Protection Act Part 5, s114 and Schedule 12

8. In order to understand how the Children's Code operates and its status under UK law, it is important to explain the underlying law on which it is based. In that regard, the UK GDPR sets out the main substantive provisions of data protection law that applies in the UK. The UK GDPR applies to the processing of personal data in two ways:

- personal data processed wholly or partly by automated means (that is, information in electronic form); and
- personal data processed in a non-automated manner which forms part of, or is intended to form part of, a 'filing system' (that is, manual information in a filing system).[12]

9. The UK GDPR does not apply to certain activities including processing covered by the Law Enforcement Directive, processing for national security purposes and processing carried out by individuals purely for personal/household activities.[13]

10. Article 5(1) of the UK GDPR sets out 'data protection principles' to ensure that personal data is:

- used fairly, lawfully and transparently
- used for specified, explicit purposes
- used in a way that is adequate, relevant and limited to only what is necessary
- accurate and, where necessary, kept up to date
- kept for no longer than is necessary
- handled in a way that ensures appropriate security, including protection against unlawful or unauthorised processing, access, loss, destruction or damage

Under Article 5(2) of the UK GDPR it is for the data controller to demonstrate compliance with the above principles and this is called the accountability principle.

11. Chapter III of the UK GDPR also gives rights to individuals in respect of their personal data. These include the right for individuals to:

- be informed about how their data is being used

[12] Art 2(1) UK GDPR
[13] Art 2(2) UK GDPR

- access their personal data
- have incorrect data updated
- have their personal data erased
- stop or restrict the processing of their personal data
- data portability (allowing individuals to obtain and reuse their personal data for different services)
- object to how their data is processed in certain circumstances

12. The UK GDPR also sets out rights for individuals when an organisation is using personal data for automated decision-making processes (without human involvement) and profiling (Article 22).[14]

13. Under the UK GDPR children warrant special protection in how their personal data is used. This reflects Recital 38 of the UKGDPR, which states:

> "Children merit specific protection with regard to their personal data, as they may be less aware of the risks, consequences and safeguards concerned and their rights in relation to the processing of personal data. Such specific protection should, in particular, apply to the use of personal data of children for the purposes of marketing or creating personality or user profiles and the collection of personal data with regard to children when using services offered directly to a child. The consent of the holder of parental responsibility should not be necessary in the context of preventive or counselling services offered directly to a child."

14. The ICO enforces the UK GDPR, DPA 2018 and PECR through a variety of regulatory interventions. These range from providing guidance and tools to signal clear expectations and to empower responsible personal data use, through to issuing enforcement notices and monetary penalties, where it is necessary to do so. The ICO's interventions aim to create a fairer playing field for compliant organisations and to protect individuals. Further details

[14] 'Profiling' is defined in Article 4(4) UK GDPR as "any form of automated processing of personal data consisting of the use of personal data to evaluate certain personal aspects relating to a natural person, in particular to analyse or predict aspects concerning that natural person's performance at work, economic situation, health, personal preferences, interests, reliability, behaviour, location or movements".

relating to the way in which the ICO uses enforcement powers can be found in the ICO's Regulatory Action Policy.

**Territorial scope of the UK GDPR**

15. Article 3 of the UK GDPR sets out the territorial scope of the UK GDPR. The UK GDPR applies to organisations which have an establishment in the UK and also to organisations based outside the UK if their processing activities relate to:

- offering goods or services to individuals in the UK (irrespective of whether a payment is required); or
- monitoring the behaviour of individuals so far as that behaviour takes place in the UK.

## THE CREATION & APPLICABILITY OF THE CHILDREN'S CODE

**Section 123 of the Data Protection Act of 2018**

16. Under s123(1) of the DPA 2018, the ICO is required to produce a code of practice "on standards of age appropriate design of relevant Information Society Services which are likely to be accessed by children".

17. Under s123(7) DPA 2018 the following definitions apply:

- "age-appropriate design" means the design of services so that they are appropriate for use by, and meet the development needs of, children;
- "information society services" has the same meaning as in the UK GDPR, but does not include preventive or counselling services;
- "relevant information society services" means information society services which involve the processing of personal data to which the UK GDPR applies;
- "standards of age-appropriate design of relevant information society services" means such standards of age-appropriate design of such services as appear to the Commissioner to be desirable having regard to the best interests of children.

**The Applicability of the Children's Code to Information Society Services**

18. An information society service (ISS) is defined in the UK GDPR by reference to the definition under EU law and means any service:

- normally provided for remuneration;
- at a distance;
- by electronic means; and
- at the individual request of a recipient of services.[15]

19. The Children's Code is clear that this is a broad definition, meaning that most online services are ISS and fall within the scope of the Children's Code. This includes apps, programs and many websites, such as search engines, social media platforms, online messaging or internet based voice telephony services, online marketplaces, content streaming services, online games, news or educational websites, and any websites offering other goods or services to users over the internet. Electronic services for controlling connected toys or other devices are also ISS. [16]

20. Services that are outside the scope of the Children's Code include some services provided by public authorities, so long as these services are not typically offered on a commercial basis. Websites that only provide information about a real-world business but do not allow customers to buy products are also out of scope of the Children's Code. Traditional voice telephony and general broadcast services, such as scheduled television and radio transmissions aired to a general audience are not relevant ISS, although if a service offers both general broadcast and on demand services then the latter will be covered by the Children's Code. Finally, the Children's Code does not apply to websites or apps offering online counselling or preventive services to children.[17]

21. The Children's Code will only apply where the provision of the ISS involves the processing of personal data to which UK GDPR applies.

---

[15] See Article 1(1)(b) of Directive (EU) 2015/1535 of the European Parliament and of the Council laying down a procedure for the provision of information in the field of technical regulations and of rules on Information Society services, 9 September 2015.

[16] Information Commissioner's Office. Age appropriate design code: services covered by the code, 2 September 2020, p.16.

[17] Information Commissioner's Office. Age appropriate design code: services covered by the code, 2 September 2020, p.16 and 17.

22. When the Children's Code refers to services that are "likely to be accessed by children", this means services that are:

- intended for use by children; **or**
- not specifically aimed or targeted at children, but are nonetheless likely to be used by under 18s.[18]

23. Even if an ISS states in its terms of service that under 18s should not access the service, the site will still fall within scope of the Children's Code if children access it in practice.[19]

**The Definition of "Children" under the Children's Code**

24. In preparing the Children's Code, the Commissioner was required to consider the UK's obligations under the United Nations Convention on the Rights of the Child (UNCRC), and the fact that children have different needs at different ages. [20] A child is defined in the UNCRC and for the purposes of this code as a person under 18 years of age.

25. In particular, the Children's Code aims to ensure that online services use children's data in ways that support the rights of the child to:

- freedom of expression;
- freedom of thought, conscience and religion;
- freedom of association;
- privacy;
- access information from the media (with appropriate protection from information and material injurious to their well-being);
- play and engage in recreational activities appropriate to their age; and
- protection from economic, sexual or other forms of exploitation.[21]

**The Legal Status of the Children's Code**

[18] Information Commissioner's Office, Age Appropriate Design Code: Services covered by the code, 2 September 2020, p.17.

[19] ICO consultation on the draft guidance for 'Likely to be accessed' in the context of the Children's Code | ICO, 24 March 2023.

[20] The Data Protection Act 2018, s123(4)

[21] Information Commissioner's Office. Age appropriate design code: standard 1 best interest of the child, 2 September 2020, p.24.

26. The Children's Code is a statutory code of practice; it was laid before Parliament on 11 June 2020 and issued on 12 August 2020 under section 125 of the DPA 2018. It came into force on 2 September 2020, with a 12 month transition period, meaning organisations were given 12 months to bring their services into compliance.

27. The Children's Code does not constitute new law and does not itself impose any legal obligations. Instead it explains how relevant organisations should apply the existing requirements set out in the UKGDPR, the DPA 2018 and PECR. In that regard, it should be noted that the DPA 2018 is clear that "A failure by a person to act in accordance with a provision" of the Children's Code "does not of itself make that person liable to legal proceedings in a [UK] court or tribunal."[22]

28. However, the Children's Code does have some legal force. Under section 127 of the DPA 2018, the Commissioner must take the Children's Code into account when considering whether an online service has complied with its data protection obligations under the UK GDPR, DPA 2018 or PECR. The Children's Code is clear that the "Commissioner will take the Children's Code into account when considering questions of fairness, lawfulness, transparency and accountability"[23] under the UK GDPR.

29. Furthermore, in respect of any proceedings before the UK courts or tribunal, the provisions of the Children's Code must be taken into account by the court or tribunal where relevant "in determining a question arising in the proceedings"[24].

30. It should be noted that the DPA 2018 is clear that "A failure by a person to act in accordance with a provision" of the Children's Code "does not of itself make that person liable to legal proceedings in a court or tribunal."[25] Therefore enforcement action will only occur where there is underlying infringement or breach of the UKGDPR, the DPA 2018 or PECR.

---

[22] S127(1) DPA 2018

[23] Information Commissioner's Office. Age appropriate design code: standard 1 best interest of the child, 2 September 2020, p.12.

[24] S127(4) DPA 2018

31. The ICO is clear that online services intended for adult audiences but likely to be accessed by a significant number of children need to take a risk based and proportionate approach by either:

- applying the standards of the Children's Code to all users; or
- reducing access to the service by children (e.g. by using user experience design measures or age assurance systems) so that children no longer represent a significant number of users.[26]

**ABOUT THE UK CHILDREN'S CODE**

32. The Children's Code (attached as Exhibit A) sets out 15 standards of age appropriate design that companies need to implement to ensure their services appropriately safeguard children's personal data and process children's personal data fairly (and thereby comply with UK data protection law). These are as follows:

1. **Best interests of the child:** The best interests of the child should be a primary consideration when you design and develop online services likely to be accessed by a child.
2. **Data protection impact assessments (DPIAs)**: Undertake a DPIA to assess and mitigate risks to the rights and freedoms of children who are likely to access your service, which arise from your data processing. Take into account differing ages, capacities and development needs and ensure that your DPIA builds in compliance with this code.[27]
3. **Age appropriate application**: Take a risk-based approach to recognising the age of individual users and ensure you effectively apply the standards in this code to child users. Either establish age with a level of certainty that

[26] Information Commissioner's Office. Age appropriate design code: services covered by the code, 2 September 2020, p.18. and 'Likely to be accessed' by children – FAQs, list of factors and case studies | ICO – Note this is currently in draft form and out for consultation.

[27] Article 36 of the UK GDPR requires controllers to carry out an assessment of the impact of the envisaged processing operations where a type of processing is likely to result in a high risk to the rights and freedoms of natural persons (taking into account the nature, scope, context and purposes of the processing).

is appropriate to the risks to the rights and freedoms of children that arise from your data processing, or apply the standards in this code to all your users instead.

4. **Transparency**: The privacy information you provide to users, and other published terms, policies and community standards, must be concise, prominent and in clear language suited to the age of the child. Provide additional specific 'bite-sized' explanations about how you use personal data at the point that use is activated.

5. **Detrimental use of data**: Do not use children's personal data in ways that have been shown to be detrimental to their wellbeing, or that go against industry codes of practice, other regulatory provisions or UK Government advice.

6. **Policies and community standards**: Uphold your own published terms, policies and community standards (including but not limited to privacy policies, age restriction, behaviour rules and content policies).

7. **Default settings**: Settings must be 'high privacy' by default (unless you can demonstrate a compelling reason for a different default setting, taking account of the best interests of the child).

8. **Data minimisation**: Collect and retain only the minimum amount of personal data you need to provide the elements of your service in which a child is actively and knowingly engaged. Give children separate choices over which elements they wish to activate.

9. **Data sharing**: Do not disclose children's data unless you can demonstrate a compelling reason to do so, taking account of the best interests of the child.

10. **Geolocation**: Switch geolocation options off by default (unless you can demonstrate a compelling reason for geolocation to be switched on by default, taking account of the best interests of the child). Provide

an obvious sign for children when location tracking is active. Options which make a child's location visible to others must default back to 'off' at the end of each session.

11. **Parental controls**: If you provide parental controls, give the child age appropriate information about this. If your online service allows a parent or carer to monitor their child's online activity or track their location, provide an obvious sign to the child when they are being monitored.

12. **Profiling**: Switch options which use profiling 'off' by default (unless you can demonstrate a compelling reason for profiling to be on by default, taking account of the best interests of the child). Only allow profiling if you have appropriate measures in place to protect the child from any harmful effects (in particular, being fed content that is detrimental to their health or wellbeing).

13. **Nudge techniques**: Do not use nudge techniques to lead or encourage children to provide unnecessary personal data or weaken or turn off their privacy protections.

14. **Connected toys and devices**: If you provide a connected toy or device ensure you include effective tools to enable conformance to this code.

15. **Online tools**: Provide prominent and accessible tools to help children exercise their data protection rights and report concerns.[28]

33. The Children's Code takes a privacy by design approach, consistent with Article 25 of the UKGDPR, and is reflective of the data protection principles in UK GDPR. It provides guidance on the areas that ISS must consider to ensure their services comply with the legislation. The Children's Code states: 'If you don't conform to the standards in this code, you are likely to

[28] Information Commissioner's Office. Age appropriate design code: code standards, 2 September 2020, p.6.

find it more difficult to demonstrate that your processing is fair and complies with the GDPR and PECR. If you process a child's personal data in breach of the GDPR or PECR, we can take action against you.'[29]

34. When devising the Children's Code the ICO undertook a public consultation with a wide range of stakeholders, including industry bodies, online services, child advocacy groups and civil society organisations and, importantly, children and parents themselves. The ICO published a summary and response to the consultation[30] and the final version of the Children's Code reflected significant changes to clarify a range of areas, including age assurance.

**SUPPORTING BUSINESSES TO CONFORM WITH THE CHILDREN'S CODE**

35. The ICO has published a range of guidance and tools to support organisations in complying with the Children's Code and the underlying data protection legislation. The guidance is designed to improve regulatory certainty and support businesses to implement privacy by design practices.

36. Although the standards in the Children's Code are themselves a 'how to' guide, this is also supplemented by detailed guidance on the ICO's Children's code hub page.[31] ISS can then link to guidance available on the wider ICO website to address core data protection principles[32] and more detailed guidance such as our data sharing code of practice[33] and guidance on creating Data Protection Impact Assessments (DPIAs).[34]

**The Commissioner's Opinion on Age Assurance**

37. Standard 3 of the Children's Code relates to age appropriate application:

> "Standard 3: Take a risk-based approach to recognising the age of individual users and ensure you effectively apply the standards in this code to child users. Either

---

[29] Information Commissioner's Office. Age appropriate design code: about this code, 2 September 2020, p.12.

[30] Information Commissioner's Office. Consultation on Age appropriate design: a code of practice for online services Summary of responses, 17 January 2021 <https://ico.org.uk/media/about-the-ico/consultations/aadc/2616996/summary-of-responses.pdf>

[31] Children's Code: additional resources | ICO

[32] Guide to the UK General Data Protection Regulation (UK GDPR) | ICO

[33] Data sharing information hub | ICO

[34] Data protection impact assessments | ICO

establish age with a level of certainty that is appropriate to the risks to the rights and freedoms of children that arise from your data processing, or apply the standards in this code to all your users instead."[35]

38. During the transition period for the Children's Code, stakeholders requested more clarity from the ICO on the approach to age assurance in relation to Standard 3. In 2021, the Commissioner's Opinion on age assurance was published which set out expectations for complying with standard 3.[36] This Opinion explains how age assurance can form part of an appropriate and proportionate approach to reducing or eliminating risks and complying to the Children's Code.

39. Since publishing the opinion, the ICO has continued to engage with industry to further support the adoption of appropriate, accurate and efficient approaches to age assurance, including:

- Research to develop the ICO's understanding of the risks to children across different types of ISS, their varying functionality and their processing of personal data[37].
- Developing the ICO's understanding of how ISS are currently assessing these risks, and identify good practice and opportunities for improvement.[38]
- Developing the ICO's understanding of the available and appropriate mitigations to respond to these risks, and specifically when and what kind of age assurance is likely to be appropriate and proportionate.
- Supporting the development of international age assurance standards through IEEE[39] and ISO[40] standards.

**Children's Code Guidance Products**

---

35 3. Age appropriate application | ICO

36 ICO (2021) Information Commissioner's opinion: age assurance for the Children's Code. Available at: https://ico.org.uk/media/about-the-ico/documents/4018659/age-assurance-opinion-202110.pdf (Accessed: 21 February 2023).

37 Findings from two research reports are available at: Age Assurance research | ICO

38 See Children's Code Self-Assessment Risk Tool | ICO

39 IEEE SA - Children's Data Governance

40 Standards for Age Verification | AVPA (avpassociation.com)

40. The ICO has produced guidance products that sit alongside the Children's Code to assist organisations in their compliance with the Children's Code. Details of these products are provided below.

41. Any further reading or other resources which are mentioned in or linked from the Children's Code do not form part of the Children's Code. There is no statutory obligation under the DPA 2018 for the ICO or courts to take the guidance into account (unless it is another separate statutory code of practice).[41]

42. To support the adoption of privacy by design practices that protect children's data, the ICO developed Children's Code design guidance targeted at businesses' user experience design teams. This was well received by the intended audience and won the Design for Good award 2022 from the Institute of Designers Ireland[42]. A conformance testing tool has also been created to allow designers to test their product ideas against the Children's Code.

43. The ICO received feedback from industry that the principle of the 'best interest of the child' was new to some business, which might lead to uncertainty in how to comply with Standard 1 of the Children's Code. The ICO developed a best interest framework to help business conduct a balancing test on risks and opportunities of their online service to determine if they are in compliance with the best interest standard and children's rights under the UN Convention on the Rights of a Child.

44. The ICO has developed a Children's Code self-assessment tool for industry to help them carry out their own risk assessment of their online service in the context of the UK GDPR and the Children's Code. This toolkit provides them with examples of the practical steps that can be taken to ensure the best approach is adopted to safeguard children's privacy and ensure compliance to the 15 standards of the code.

45. Standard 3 of the Children's Code states that services targeted at children, or which feature high risk processing, must complete a DPIA. To support industry to comply with this standard, the ICO has developed tools for completing DPIAs, and three sample DPIAs for

[41] Information Commissioner's Office. Age appropriate design code: about this code, 2 September 2020, p.13

[42] ICO - Children's Code design guidance - IDI Awards

providers of mobile games or apps, online retail services and connected toys (attached as Exhibits B1, B2, and B3, respectively).

46. The Children's Code is focused on the ICO's regulatory remit of data protection and e-privacy. Standard 5 of the Children's Code states that businesses should not use data to deliver content that is detrimental to children. However, the ICO is not a content regulator and therefore the guidance in the Children's Code focuses on established UK government or industry guidance and standards (e.g. advertising standards) about what is considered to be detrimental to children. The ICO is focused on how the content is delivered through the processing of personal data, not the nature of the content. The ICO has produced guidance that collates sources of guidance from other organisations about protecting children's wellbeing to support ISS in assessing if they are processing data in a way that could detrimentally impact children.

47. The ICO has produced sector specific guidance for the games industry and providers of educational technology addressing compliance questions that specifically arise in the context of these sectors.

48. In addition to these guidance products that relate specifically to the Children's Code, the ICO also has other statutory codes of practice and a wide range of other guidance that helps businesses comply with UK data protection legislation. This guidance covers a range of related topics, including:

- Overview of Data Protection Harms and the ICO's Taxonomy
- Examples of processing 'likely to result in high risk'
- Data sharing code of practice
- Privacy notice templates
- Direct marketing guidance
- Data protection impact assessments

**Certification Schemes**

49. Under UK GDPR, the ICO may approve certification schemes that provide assurance that a service meets an appropriate set of data protection standards.[43] Compliance with a certification scheme is therefore a way for an organisation to demonstrate compliance with UK GDPR.

50. The ICO has issued detailed guidance in respect of certification, which explains that:

> "Certification is a way of demonstrating that your processing of personal data complies with the UK GDPR requirements, in line with the accountability principle. Certification can help demonstrate data protection in a practical way to businesses, individuals and regulators."

51. There have been four certification schemes approved by the ICO to date, and two of these relate to children's privacy:

- The Age Check Certification Scheme;[44] and
- The Age Appropriate Design Certification Scheme.[45]

52. As of February 2023, five organisations have received certification under these schemes and others are progressing through the process. The schemes are based on UK data protection law and the standards set out in the Children's Code.

## SUPERVISION OF THE CHILDREN'S CODE

53. The ICO monitors compliance with the Children's Code using the full range of measures available and takes regulatory action where appropriate and proportionate.

54. The ICO's approach is to encourage compliance. Where non-compliance is identified the ICO takes fair, proportionate and timely regulatory action with a view to guaranteeing that individuals' information rights are properly protected. In deciding whether to

[43] Articles 42 and 43 UK GDPR make provision for certification. The Commissioner's powers to accredit certification bodies and approve criteria of certification are set out in Article 58(3) UK GDPR.

[44] ICO (2021) Age Check Certification Scheme. Available at: https://ico.org.uk/for-organisations/age-check-certification-scheme-accs/ (Accessed: 27 February 2023).

[45] ICO (2021) Age Appropriate Design Certification Scheme. Available at: https://ico.org.uk/for-organisations/age-appropriate-design-certification-scheme-aadcs/ (Accessed: 27 February 2023).

take regulatory action against an organisation, the ICO takes account of a range of factors, including the size and resources of the organisation concerned, the availability of technological solutions in the marketplace, and the risks to children that are inherent in the processing. The ICO takes a proportionate and responsible approach, focusing on areas with the potential for most harm and selecting the most suitable regulatory tool.[46]

55. The ICO has identified three sectors where children access services in large numbers, and where there is likely to be the greatest risks of harm to children. These are online games, social media, and streaming services.

56. Having identified these sectors as priorities for supervision, the ICO asked over 50 organisations to respond to questions about the steps they had taken to implement the Children's Code. The responses received provided an insight into the steps taken and to what extent the organisations had started to build compliance with the Children's Code into the operation of their businesses.

57. Based on this work, the ICO considers that the provisions of the UK GDPR that are the most likely to be infringed as a result of non-compliance with the Children's Code include:

- Article 5(1) UK GDPR, which requires personal data to be processed lawfully, fairly and in a transparent manner.
- Article 8 UK GDPR, which requires that where an ISS is offering a service directly to a child under the age of 13 and seeks to rely on consent as the lawful basis for processing, this consent must be provided by a parent.
- Articles 5(1)(c) and (f) UK GDPR, which respectively relate to data minimisation and data security.

**ICO Children's Code Audits**

58. The ICO has conducted ten audits of organisations under the Children's Code. As set out in the ICO's guidance, Children's Code audits typically assess the organisation's procedures, systems, records and activities in order to:

[46] Regulatory Action Policy (ico.org.uk), pg.3

- ensure that appropriate policies and procedures are in place;
- verify that those policies and procedures are being followed;
- test the adequacy of controls in place;
- detect breaches or potential breaches of compliance; and
- recommend any required changes in control, policy and procedure.[47]

59. The scope of the Children's Code audits carried out by the ICO to date covered some of the following areas:

- governance, transparency and rights;
- diligence and DPIAs;
- minimisation and sharing;
- age assurance;
- detrimental use;
- privacy settings and parental controls;
- geolocation;
- profiling and cookies;
- nudge techniques;
- connected toys and devices; and
- AI & online services.[48]

60. Following the audit, the organisation that has been audited is provided with a report setting out the findings of the audit. A non-confidential summary of the audit is also published on the ICO's website.[49] To date, summaries of six Children's Code audits have been published. These summaries provide similar organisations with an insight into the ICO's expectations regarding compliance with the Children's Code.

61. Following audits of video game design companies, the ICO has produced "top tips" for assisting game designers in complying with the Children's Code.[50]

---

[47] See a-guide-to-audits-for-the-age-appropriate-design-code.pdf (ico.org.uk)
[48] Note that each audit covered three to four of these areas.
[49] See Audits and overview reports | ICO for Children's Code related audit reports.
[50] Top tips for games designers – how to comply with the Children's Code | ICO

**Engagement**

62. The ICO regularly engages with ISS to support their compliance with the Children's Code. Informal feedback to businesses has involved explaining best practice about how organisations handle children's data, including through the use of additional prompts and reminders to users, increased parental controls, and the implementation of family management tools.

63. The ICO also undertook a number of workshops which ISS could apply to attend – these have taken place between 2020 and 2022 and provided an introduction to the Children's Code, with some workshops focussing on "best interests of the child", "risk assessment" and "likely to be accessed guidance".

64. In April 2021 the ICO issued a "transparency champions open call" where participants in the open call were invited to submit ideas and examples of privacy information designs that meet the vision of the Children's Code transparency standard. In June 2021 the ICO issued Insights from the Children's Code transparency champions open call, outlining the findings of the review highlighting thematic areas of good practice.

**IMPACT OF THE CHILDREN'S CODE**

65. The Children's Code has had a significant impact on how ISS process and protect children's data, with changes already announced by large digital economy companies. For example:

- Google pledged to turn location history off for all users under the age of 18 globally, without the option to turn it on[51].
- Google produced resources to help children, young people and their parents to help them better understand its data practices[52].
- Meta has limited personalised advertising to age and location for users under 18[53].

[51] Giving kids and teens a safer experience online (blog.google)
[52] Giving kids and teens a safer experience online (blog.google)
[53] Age appropriate ads for teens - Meta

- Meta has introduced privacy by default settings for teen users of Facebook and Instagram. It is also developing online tools to safeguard teen users[54].
- Meta is testing ways to verify the ages of users on Instagram in situations where users attempt to edit their age from under the age of 18 to over the age of 18. Options currently being tested include ID verification and video selfie verification.[55]
- Snap has launched a digital literacy programme aimed at educating users about data, privacy and online safety; it has removed browsable public profiles for under 18s; and has set default chat functions to friends only.[56]
- Snap has launched a 'Family Centre Hub' which includes parental control features.[57]
- TikTok has removed messaging for users under 16[58] .
- Twitter now requires users to enter their date of birth. Previously, Twitter grouped adults and children in the same categories for targeted advertising purposes.
- Epic Games has introduced improved parental control tools and "Cabined Accounts"[59] so that children under the age of 13 do not have their personal data processed until verifiable parental consents[60] have been obtained.
- Epic has partnered with LEGO[61] to create safe digital play spaces and has committed to safeguard children's privacy by putting children's best interests first.
- Roblox has introduced improved parental control tools and simplified transparency information[62].

---

[54] Protecting teens and their privacy on Facebook and Instagram - Meta
[55] New ways to verify age on Instagram - Meta
[56] https://values.snap.com/en-GB/news/data-privacy-day-supporting-the-privacy-and-wellbeing-of-snapchatters
[57] Family Centre - Parental Control For Teens | Snapchat Safety
[58] TikTok: Under 16s can no longer use direct messaging - BBC Newsround
[59] Introducing Epic Games cabined accounts
[60] Parental controls - Epic Games
[61] The LEGO Group and Epic Games Team Up to Build a Place for Kids to Play in the Metaverse - Epic Games
[62] Age Appropriate Design Code FAQs – Roblox Support

66. The ICO conducted three rounds of research with ISS in scope of the Children's Code covering the 2020-2022 period to track the impact of the Children's Code. The last round of research was conducted in the autumn of 2022, one year after the Children's Code entered into its supervision phase (results attached as Exhibit C). Key findings related to business include:

- Businesses felt the overall impact of the Children's Code would be positive for wider stakeholders. Around three quarters (77%) of businesses (2022 wave) thought there would be a positive impact on parents/guardians and 71% thought it would be beneficial for children. Two thirds (66%) thought it would be positive for their organisation and 63% felt it would have a positive impact on their sector (there was no notable difference in this figure across sectors).
- Three quarters of businesses understand the theory within the Children's Code (72%) and understand what conformance with the Children's Code requires (74%).
- Fewer businesses reported that they incurred costs because of the Children's code in 2022 than in 2021 (29% compared with 35%). As in previous years, smaller companies were less likely to have incurred costs from the Children's Code (6% sole trader, 14% micro, 19% small, 45% medium, 33% large), which was driven by a lower proportion thinking that they are in scope.
- The proportion of businesses that recently incurred costs has also fallen because changes had already been made as businesses move towards conformance over time.
- As in autumn 2021, businesses were more likely to think that they were in scope prior to hearing a definition of the Children's Code, something that was consistent in 2022. Although fewer businesses thought they were in scope in 2022 than in 2021 (81% vs 84%) and slightly more thought they were after the definition (73% vs 68%) these differences were fairly minor.
- Between 2021 and 2022 there was no significant change in the proportion of businesses that consider themselves fully conformant with the Children's Code: 44% of businesses reported this in 2021 and 46% in 2022.

- Ease of being conformant remains consistent with 2021, with just over a fifth (21%) of businesses finding it difficult to be conformant with the Children's Code, but micro business were far less likely to find this (9%) and medium sized businesses were more likely to find it difficult (42% reported this).
- Businesses were generally more likely to have made these changes regardless of the Children's Code. For example, 52% made changes in designing and implementing changes to aspects of the service's user experience independently of the Children's Code compared with 35% who made the change as a direct result of the Children's Code.
- Very few businesses find it difficult to conform with the Children's Code, it tends to be perceived as integrated into the general data protection conformance of the business. Challenges were more often faced by smaller businesses than large businesses.
- While more businesses reported incurring costs in the highest bracket compared to 2021, only a minority stated the costs were directly related to the Children's Code. In general, the number of businesses experiencing costs had fallen, showing no detrimental impact to businesses.

67. In September 2022, John Edwards confirmed that the ICO has "seen real changes since the Children's Code came into force a year ago. These changes come as a result of the ICO's action enforcing the Children's Code, making clear to industry the changes that are required."[63] The ICO continues to work with industry, civil society groups, parents and children to build upon compliance with the Children's Code and the underlying data protection legislation.

[63] "Children are better protected online in 2022 than they were in 2021" - ICO marks anniversary of Children's Code | ICO

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on 19th April 2023, at London, United Kingdom.

Emily Keaney
Deputy Commissioner (Regulatory Policy)
Information Commissioner's Office

# EXHIBIT A

**TO DECLARATION OF EMILY KEANEY, DEPUTY COMMISSIONER OF REGULATORY POLICY FOR THE INFORMATION COMMISSIONER'S OFFICE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Information Commissioner's Office

# Age appropriate design:

## a code of practice for online services

ico.
Information Commissioner's Office

children's code

SER-404

Information Commissioner's foreword 3
Executive summary 5
Additional resources 6
Code standards 7
About this code 9
Services covered by this code 15
Transitional arrangements 21
Standards of age appropriate design 23
1. Best interests of the child 24
2. Data protection impact assessments 27
3. Age appropriate application 32
4. Transparency 37
5. Detrimental use of data 43

# Information Commissioner's foreword

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

The Secretary of State laid the Age Appropriate Design Code to Parliament under section 125(1)(b) of the Data Protection Act 2018 (the Act) on 11 June 2020. The ICO issued the code on 12 August 2020 and it will come into force on 2 September 2020 with a 12 month transition period.

There is more information in the Explanatory Memorandum.

## Information Commissioner's foreword

Data sits at the heart of the digital services children use every day. From the moment a young person opens an app, plays a game or loads a website, data begins to be gathered. Who's using the service? How are they using it? How frequently? Where from? On what device?

That information may then inform techniques used to persuade young people to spend more time using services, to shape the content they are encouraged to engage with, and to tailor the advertisements they see.

For all the benefits the digital economy can offer children, we are not currently creating a safe space for them to learn, explore and play.

This statutory code of practice looks to change that, not by seeking to protect children from the digital world, but by protecting them within it.

**This code is necessary.**

This code will lead to changes that will help empower both adults and children.

One in five UK internet users are children, but they are using an internet that was not designed for them. In our own research conducted to inform the direction of the code, we heard children describing data practices as "nosy", "rude" and a "bit freaky".

Our recent national survey into people's biggest data protection concerns ranked children's privacy second only to cyber security. This mirrors similar sentiments in research by Ofcom and the London School of Economics.

This code will lead to changes in practices that other countries are considering too.

It is rooted in the United Nations Convention on the Rights of the Child (UNCRC) that recognises the special safeguards children need in all aspects of their life. Data protection law at the European level reflects this and provides its own additional safeguards for children.

The code is the first of its kind, but it reflects the global direction of travel with similar reform being considered in the USA, Europe and globally by the Organisation for Economic Co-operation and Development (OECD).

This code will lead to changes that UK Parliament wants.

Parliament and government ensured UK data protection laws will truly transform the way we look after children online by requiring my office to introduce this statutory code of practice.

The code delivers on that mandate and requires information society services to put the best interests of the child first when they are designing and developing apps, games, connected toys and websites that are likely to be accessed by them.

**This code is achievable.**

The code is not a new law but it sets standards and explains how the General Data Protection Regulation applies in the context of children using digital services. It follows a thorough consultation process that included speaking with parents, children, schools, children's campaign groups, developers, tech and gaming companies and online service providers.

Such conversations helped shape our code into effective, proportionate and achievable provisions.

Organisations should conform to the code and demonstrate that their services use children's data fairly and in compliance with data protection law.

The code is a set of 15 flexible standards – they do not ban or specifically prescribe – that provides built-in protection to allow children to explore, learn and play online by ensuring that the best interests of the child are the primary consideration when designing and developing online services.

Settings must be "high privacy" by default (unless there's a compelling reason not to); only the minimum amount of personal data should be collected and retained; children's data should not usually be shared; geolocation services should be switched off by default. Nudge techniques should not be used to encourage children to provide unnecessary personal data, weaken or turn off their privacy settings. The code also addresses issues of parental control and profiling.

**This code will make a difference.**

Developers and those in the digital sector must act. We have allowed the maximum transition period of 12 months and will continue working with the industry.

We want coders, UX designers and system engineers to engage with these standards in their day-to-day to work and we're setting up a package of support to help.

But the next step must be a period of action and preparation. I believe companies will want to conform with the standards because they will want to demonstrate their commitment to always acting in the best interests of the child. Those companies that do not make the required changes risk regulatory action.

What's more, they risk being left behind by those organisations that are keen to conform.

A generation from now, I believe we will look back and find it peculiar that online services weren't always designed with children in mind.

When my grandchildren are grown and have children of their own, the need to keep children safer online will be as second nature as the need to ensure they eat healthily, get a good education or buckle up in the back of a car.

And while our code will never replace parental control and guidance, it will help people have greater confidence that their children can safely learn, explore and play online.

There is no doubt that change is needed. The code is an important and significant part of that change.

**Elizabeth Denham CBE**

# Executive summary

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

Children are being 'datafied' with companies and organisations recording many thousands of data points about them as they grow up. These can range from details about their mood and their friendships to what time they woke up and when they went to bed.

Conforming to this statutory code of practice will ensure that as an organisation providing online services likely to be accessed by children in the UK, you take into account the best interests of the child. It will help you to develop services that recognise and cater for the fact that children warrant special protection in how their personal data is used, whilst also offering plenty of opportunity to explore and develop online.

You have 12 months to implement the necessary changes from the date that the code takes effect following the Parliamentary approval process. The ICO approach to enforcement as set out in our Regulatory Action Policy will apply. That policy and this code both apply a proportionate and risk-based approach.

The United Nations Convention on the Rights of the Child (UNCRC) recognises that children need special safeguards and care in all aspects of their life. There is agreement at international level and within the UK that much more needs to be done to create a safer online space for them to learn, explore and play.

In the UK, Parliament and government have acted to ensure that our domestic data protection laws truly transform the way we safeguard our children when they access online services by requiring the Commissioner to produce this statutory code of practice. This code seeks to protect children **within** the digital world, not protect them from it.

The code sets out 15 standards of age appropriate design reflecting a risk-based approach. The focus is on providing default settings which ensures that children have the best possible access to online services whilst minimising data collection and use, by default.

It also ensures that children who choose to change their default settings get the right information, guidance and advice before they do so, and proper protection in how their data is used afterwards.

You should follow the standards as part of your approach to complying with data protection law. If you can show us that you conform to these standards then you will conform to the code. The standards are cumulative and interlinked and you must implement them all, to the extent they are relevant to your service, in order to demonstrate your conformity.

The detail below the standards provides further explanation to help you understand and implement them in practice. It is designed to help you if you aren't sure what to do, but it is not prescriptive. This should give you enough flexibility to develop services which conform to the standards in your own way, taking a proportionate and risk-based approach. It will help you to design services that comply with the General Data Protection Regulation (GDPR) and the Privacy and Electronic Communications Regulations (PECR).

# Additional resources

Age appropriate design code

# Code standards

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

The standards are:

1. **Best interests of the child:** The best interests of the child should be a primary consideration when you design and develop online services likely to be accessed by a child.
2. **Data protection impact assessments:** Undertake a DPIA to assess and mitigate risks to the rights and freedoms of children who are likely to access your service, which arise from your data processing. Take into account differing ages, capacities and development needs and ensure that your DPIA builds in compliance with this code.
3. **Age appropriate application:** Take a risk-based approach to recognising the age of individual users and ensure you effectively apply the standards in this code to child users. Either establish age with a level of certainty that is appropriate to the risks to the rights and freedoms of children that arise from your data processing, or apply the standards in this code to all your users instead.
4. **Transparency:** The privacy information you provide to users, and other published terms, policies and community standards, must be concise, prominent and in clear language suited to the age of the child. Provide additional specific 'bite-sized' explanations about how you use personal data at the point that use is activated.
5. **Detrimental use of data:** Do not use children's personal data in ways that have been shown to be detrimental to their wellbeing, or that go against industry codes of practice, other regulatory provisions or Government advice.
6. **Policies and community standards:** Uphold your own published terms, policies and community standards (including but not limited to privacy policies, age restriction, behaviour rules and content policies).
7. **Default settings:** Settings must be 'high privacy' by default (unless you can demonstrate a compelling reason for a different default setting, taking account of the best interests of the child).
8. **Data minimisation:** Collect and retain only the minimum amount of personal data you need to provide the elements of your service in which a child is actively and knowingly engaged. Give children separate choices over which elements they wish to activate.
9. **Data sharing:** Do not disclose children's data unless you can demonstrate a compelling reason to do so, taking account of the best interests of the child.
10. **Geolocation:** Switch geolocation options off by default (unless you can demonstrate a compelling reason for geolocation to be switched on by default, taking account of the best interests of the child). Provide an obvious sign for children when location tracking is active. Options which make a child's location visible to others must default back to 'off' at the end of each session.
11. **Parental controls:** If you provide parental controls, give the child age appropriate information about this. If your online service allows a parent or carer to monitor their child's online activity or track their location, provide an obvious sign to the child when they are being monitored.
12. **Profiling:** Switch options which use profiling 'off' by default (unless you can demonstrate a compelling reason for profiling to be on by default, taking account of the best interests of the child). Only allow profiling if you have appropriate measures in place to protect the child from any harmful effects (in particular, being fed content that is detrimental to their health or wellbeing).

.3. **Nudge techniques:** Do not use nudge techniques to lead or encourage children to provide unnecessary personal data or weaken or turn off their privacy protections.

.4. **Connected toys and devices:** If you provide a connected toy or device ensure you include effective tools to enable conformance to this code.

.5. **Online tools:** Provide prominent and accessible tools to help children exercise their data protection rights and report concerns.

# About this code

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

## At a glance

This code explains how to ensure your online services appropriately safeguard children's personal data. You should follow the code to help you process children's data fairly. It will also enable you to design services that comply, and demonstrate you comply, with the GDPR and PECR. If you do not follow this code, you are likely to find it more difficult to demonstrate your compliance with the law, should we take regulatory action against you.


- Who is this code for?
- What is the purpose of this code?
- What is the status of this code?
- How should we use the code?


### Who is this code for?

This code is for providers of information society services (ISS). It applies to you if you provide online products or services (including apps, programs, websites, games or community environments, and connected toys or devices with or without a screen) that process personal data and are likely to be accessed by children in the UK. It is not only for services aimed at children. In this code 'online service' means a relevant ISS. For more information, see the separate section on services covered by this code.

### What is the purpose of this code?

This code addresses how to design data protection safeguards into online services to ensure they are appropriate for use by, and meet the development needs of, children.

It reflects the increasing concern about the position of children in society and the modern digital world in particular. There is agreement at international level and within the UK that much more needs to be done to create a safe online space for them to learn, explore and play. This code achieves this not by seeking to protect children from the digital world, but by protecting them within it.

The UNCRC recognises that children need special safeguards and care in all aspects of their life and requires that these should be guaranteed by appropriate legal protections. European level data protection law reflects this and provides its own additional safeguards for children.

In the UK, Parliament and government have acted to ensure that our domestic data protection laws do truly transform the way we safeguard our children when they access online services by requiring the Commissioner to produce this statutory code of practice. This code delivers on Parliament and the government's intent to use data protection law to make a profound and lasting change to how we look after our children when they access online services.

It takes account of the standards and principles set out in the UNCRC, and sets out specific protections for

children's personal data in compliance with the provisions of the GDPR.

If you provide relevant online services, this code will help you to comply, and demonstrate that you comply, with your data protection obligations. Conforming to the standards in this code will be a key measure of your compliance with data protection laws. Following this code will also show parents and other users of your services that you take children's privacy seriously, you can be trusted with children's data, and your services are appropriate for children to use.

**How does this code take account of the rights of the child?**

In preparing this code, the Commissioner is required to consider the UK's obligations under the UNCRC, and the fact that children have different needs at different ages.

The code incorporates the key principle from the UNCRC that the best interests of the child should be a primary consideration in all actions concerning children. It also aims to respect the rights and duties of parents, and the child's evolving capacity to make their own choices.

In particular, this code aims to ensure that online services use children's data in ways that support the rights of the child to:

- freedom of expression;
- freedom of thought, conscience and religion;
- freedom of association;
- privacy;
- access information from the media (with appropriate protection from information and material injurious to their well-being);
- play and engage in recreational activities appropriate to their age; and
- protection from economic, sexual or other forms of exploitation.

**How does this code support parents?**

Parents (or guardians) play a key role in protecting their children and deciding what is in their best interests. However, in the context of online services, parents and children may find it difficult to make informed choices or exercise any control over the way those services use children's data. Often the only choice in practice is to avoid online services altogether, which means the child loses the benefits of online play, interaction and development. This code therefore expects providers of these services to take responsibility for ensuring that the way their services use personal data is appropriate to the child's age, takes account of their best interests, and respects their rights; as well as supporting parents or older children in making choices (where appropriate) in the child's best interests.

**How does this code support data protection compliance?**

The UK data protection regime is set out in the Data Protection Act 2018 (DPA 2018) and the GDPR. This regime requires you to take a risk-based approach when you use people's data, based on certain key principles, rights and obligations.

This code supports compliance with those general principles by setting out specific protections you need to build in when designing online services likely to be accessed by children, in line with Recital 38 of the GDPR:

> "Children merit specific protection with regard to their personal data, as they may be less aware of the risks, consequences and safeguards concerned and their rights in relation to the processing of personal data. Such specific protection should, in particular, apply to the use of personal data of children for the purposes of marketing or creating personality or user profiles and the collection of personal data with regard to children when using services offered directly to a child…"

In particular, this code sets out practical measures and safeguards to ensure processing under the GDPR can be considered 'fair' in the context of online risks to children, and will help you comply with:

- Article 5(1)(a): the fairness, lawfulness and transparency principle;
- Article 5(1)(b): the purpose limitation principle;
- Article 5(1)(c): the data minimisation principle;
- Article 5(1)(e): the storage limitation principle;
- Article 5(2): the accountability principle;
- Article 6: lawfulness of processing;
- Articles 12, 13 and 14: the right to be informed;
- Articles 15 to 20: the rights of data subjects;
- Article 22: profiling and automated decision-making;
- Article 25: data protection by design and by default; and
- Article 35: data protection impact assessments (DPIAs).

It covers your use of 'inferred data' (information about a child that you don't collect directly, but that you infer from other information or from their behaviours online) as well as data you collect directly from the child.

Annex C also includes some guidance on identifying your lawful basis for processing in the context of an online service. If you rely on consent, it explains the Article 8 rule on parental consent for children under 13.

PECR also set some specific rules on the use of cookies and other technologies which rely on access to user devices, and on electronic marketing messages. This code refers to those requirements where relevant, but for full details on how to comply you should read our separate Guide to PECR.

If you need to process personal data in order to protect children from online harms, such as child sexual exploitation and abuse, then this code shouldn't prevent you from doing so. However, you need to satisfy all the usual data protection requirements before you proceed, such as ensuring that the processing is fair and proportionate to the harm you are seeking to prevent, identifying a lawful basis for processing and providing transparency information.

## What is the status of this code?

**What is the legal status of the code?**

This is a statutory code of practice prepared under section 123 of the DPA 2018:

> "The Commissioner must prepare a code of practice which contains such guidance as the Commissioner considers appropriate on standards of age appropriate design of relevant information society services which are likely to be accessed by children."

It was laid before Parliament on 11 June 2020 and issued on 12 August 2020 under section 125 of the DPA 2018. It comes into force on 2 September 2020.

As was made clear in the Parliamentary debates when the Data Protection Bill passed through Parliament, if your online service fails to conform to a provision of this code you may find it difficult to demonstrate compliance with the law and you may invite regulatory action.

In accordance with section 127 of the DPA 2018, the Commissioner must take the code into account when considering whether an online service has complied with its data protection obligations under the GDPR or PECR. In particular, the Commissioner will take the code into account when considering questions of fairness, lawfulness, transparency and accountability under the GDPR, and in the use of her enforcement powers.

The code can also be used in evidence in court proceedings, and the courts must take its provisions into account wherever relevant.

**What happens if we don't conform to the standards in this code?**

If you don't conform to the standards in this code, you are likely to find it more difficult to demonstrate that your processing is fair and complies with the GDPR and PECR. If you process a child's personal data in breach of the GDPR or PECR, we can take action against you.

Tools at our disposal include assessment notices, warnings, reprimands, enforcement notices and penalty notices (administrative fines). For serious breaches of the data protection principles, we have the power to issue fines of up to €20 million (£17.5 million when the UK GDPR comes into effect) or 4% of your annual worldwide turnover, whichever is higher.

Our approach to using these powers will take account of the risks to children that arise from your data processing, and the efforts you have made to conform to the standards in this code. In cases where we find against you, we are more likely to allow you time to bring your service into compliance if you have a well-documented and reasoned case to support the approach you have taken.

Conversely, if you have not taken proper steps to conform despite clear evidence or constructive knowledge that children are likely to access your service, and clear evidence of significant risk arising from the use of children's data, we are more likely to take formal regulatory action. The established ICO approach to enforcement as set out in our Regulatory Action Policy will apply to use of children's personal data under the GDPR and consideration of this code.

For more information, see the separate section on enforcement of this code.

**How is this code affected when the UK leaves the EU?**

This code is based on and refers to the relevant provisions of the DPA 2018 and GDPR as they apply in the UK in November 2019, before exit day.

If the UK leaves the EU with no deal, the EU version of the GDPR will no longer be law in the UK. However, a UK version of the GDPR will be written into UK law (UK GDPR). The UK GDPR will sit alongside an amended version of the DPA 2018. Although this code is based on the provisions of the DPA 2018 and EU GDPR in effect before exit day, the key data protection principles, rights and obligations underlying this code will remain the same under the UK GDPR.

The standards in this code will therefore still apply. The Commissioner will continue to take the code into account. However, after exit day, you should read references in this code to the GDPR as references to the equivalent provision in the UK GDPR. We have also highlighted a few specific changes throughout this code where directly relevant.

If the UK agrees to leave the EU with a deal, there will be an implementation period during which the GDPR – and this code – will continue to apply in the UK in the same way as before exit day. At the end of the implementation period, the default position is the same as for a no-deal exit, and we expect this code to remain in effect.

If there are any further changes to the details of the future UK regime, the Commissioner will review the standards in this code to ensure they remain relevant and appropriate to support compliance with UK law.

**What is the status of 'further reading' or other linked resources?**

Any further reading or other resources which are mentioned in or linked from this code do not form part of the code. We provide links to give you helpful context and further guidance on specific issues, but there is no statutory obligation under the DPA 2018 for the Commissioner or courts to take it into account (unless it is another separate statutory code of practice).

Where we link to other ICO guidance, that guidance will inevitably reflect the Commissioner's views and inform our general approach to interpretation, compliance and enforcement.

We may also link to relevant guidance provided by the European Data Protection Board (EDPB), which is the independent body established to ensure consistency within the EU when interpreting the GDPR and taking regulatory action.

## How should we use the code?

The standards at the start of this code are the 15 headline 'standards of age appropriate design' that you need to implement. The main body of this code is then divided into 15 sections, each giving more detail on what the standard means, why it is important, and how you can implement it. This further explanation is designed to help you if you aren't sure what to do, but it is not prescriptive. It should give you enough flexibility to develop services which conform to the standards in your own way, taking a proportionate and risk-based approach. It will help you to design services that comply with the GDPR and PECR.

Your conformity to the code will be assessed against the 15 headline standards. However, we recommend that you read the code in full as it will help you understand how you can implement each standard properly. These standards are cumulative and interdependent - you must implement all of them, to the extent they are relevant to your service, in order to demonstrate your conformance to the code.

This code assumes familiarity with key data protection terms and concepts. We have included a glossary at the end of this code as a quick reference point for common concepts and abbreviations, but if you need an introduction to data protection – or more context and guidance on key concepts – you should refer to our separate Guide to Data Protection.

This code focuses on specific safeguards to ensure your data regime is appropriate for children who are

likely to access your service, so that you process their data fairly. It is not intended as an exhaustive guide to data protection compliance. For example, it does not elaborate on your obligations on security, processors or breach reporting. You need to make sure you are aware of all of your obligations, and you should read this code alongside our other guidance. Your DPIA process should incorporate measures to comply with your data protection obligations generally, as well as conform to the specific standards in this code.

**Further reading outside this code**

United Nations Convention on the Rights of the Child
Guide to Data Protection
Guide to PECR
ICO Regulatory Action Policy
DP and Brexit

# Services covered by this code

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

## At a glance

This code applies to "information society services likely to be accessed by children" in the UK. This includes many apps, programs, connected toys and devices, search engines, social media platforms, streaming services, online games, news or educational websites and websites offering other goods or services to users over the internet. It is not restricted to services specifically directed at children.

## In more detail


- What services does this code apply to?
- What do you mean by an 'information society service'?
- What types of online services are not 'relevant ISS'?
- When are services 'likely to be accessed by children'?
- Does it apply to services based outside the UK?
- What about the eCommerce Regulations 2002?


### What services does this code apply to?

Section 123 of the DPA 2018 says that this code applies to:

> "relevant information society services which are likely to be accessed by children."

It says that 'information society services' has the same meaning as it has in the GDPR except that it does not include 'preventive or counselling services', and that 'relevant ISS' are those which involve the processing of personal data to which the GDPR applies.

The vast majority of online services used by children are covered, although there are some limited exceptions that are discussed in more detail below. Annex A to this code provides a flowchart setting out the questions you will need to answer if you are uncertain whether your service is covered.

### What do you mean by an 'information society service'?

The definition is broad and the majority of online services that children use are covered.

'Information society service' is defined as:

> "any service normally provided for remuneration, at a distance, by electronic means and at the individual request of a recipient of services.

For the purposes of this definition:

> (i) 'at a distance' means that the service is provided without the parties being simultaneously present;
>
> (ii) 'by electronic means' means that the service is sent initially and received at its destination by means of electronic equipment for the processing (including digital compression) and storage of data, and entirely transmitted, conveyed and received by wire, by radio, by optical means or by other electromagnetic means;
>
> (iii) 'at the individual request of a recipient of services' means that the service is provided through the transmission of data on individual request."

Essentially this means that most online services are ISS, including apps, programs and many websites including search engines, social media platforms, online messaging or internet based voice telephony services, online marketplaces, content streaming services (eg video, music or gaming services), online games, news or educational websites, and any websites offering other goods or services to users over the internet. Electronic services for controlling connected toys and other connected devices are also ISS.

These services are covered even if the 'remuneration' or funding of the service doesn't come directly from the end user. For example, an online gaming app or search engine that is provided free to the end user but funded via advertising still comes within the definition of an ISS. This code also covers not-for-profit apps, games and educational sites, as long as those services can be considered as 'economic activity' in a more general sense. For example, they are types of services which are typically provided on a commercial basis.

If you are a small business with a website, your website is an ISS if you sell your products online, or offer a type of service which is transacted solely or mainly via your website without you needing to spend time with the customer in person.

## What types of online services are not 'relevant ISS'?

**Some services provided by public authorities**

If you are a public authority which provides an online public service then, as long as the type of service you offer is not typically provided on a commercial basis your service is not a relevant ISS. This is because it is not a service 'normally provided for remuneration'.

If you are a police force or other competent authority with an online service which processes personal data for law enforcement purposes, then your service isn't a relevant ISS. This is because relevant ISS are those which involve the processing of personal data 'to which the GDPR applies'. The GDPR does not apply to processing by competent law enforcement authorities for law enforcement purposes. For further information about the scope of the GDPR and how data protection law applies to processing for law

enforcement purposes see our Guide to data protection.

**Websites which just provide information about a real-world business or service**

If your website just provides information about your real-world business, but does not allow customers to buy products online or access a specific online service, it is not an ISS. This is because the service being offered is not provided 'at a distance'. An online booking service for an in-person appointment does not qualify as an ISS.

**Traditional voice telephony services**

Traditional voice telephony services are not relevant ISS. This is because they are not considered to be 'delivered by electronic means'. This differs from internet based voice calling services (VOIP) which are within scope as they are delivered over the internet by electronic means.

**General broadcast services**

The definition of an ISS does not include broadcast services such as scheduled television or radio transmissions that are broadcast to a general audience, rather than at the request of the individual (even if the channel is broadcast over the internet).

This differs from 'on demand' services which are, by their nature, provided 'at the individual request of a recipient'.

If you provide both a general broadcast and an on demand service, then the on demand element of your service will be covered by the code.

**Preventive or counselling services**

This code does not apply to websites or apps specifically offering online counselling or other preventive services (such as health screenings or check-ups) to children. This is because s123 scopes out 'preventive or counselling services'. However, more general health, fitness or wellbeing apps or services are covered.

## When are services 'likely to be accessed by children'?

This code applies if children are likely to use your service. A child is defined in the UNCRC and for the purposes of this code as a person under 18.

If your service is designed for and aimed specifically at under-18s then the code applies. However, the provision in section 123 of the DPA is wider than this. It also applies to services that aren't specifically aimed or targeted at children, but are nonetheless likely to be used by under-18s.

It is important to recognise that Parliament sought to use the wording 'likely to be accessed by' rather than narrower terms, to ensure that the application of the code did not exclude services that children were using in reality. This drew on experience of other online child protection regimes internationally, that only focused on services designed for children and therefore left a gap in coverage and greater risk.

We consider that for a service to be 'likely' to be accessed, the possibility of this happening needs to be more probable than not. This recognises the intention of Parliament to cover services that children use in reality, but does not extend the definition to cover all services that children could possibly access.

In practice, whether your service is likely to be accessed by children or not is likely to depend on:

- the nature and content of the service and whether that has particular appeal for children; and

- the way in which the service is accessed and any measures you put in place to prevent children gaining access.

You should take a common sense approach to this question. If your service is the kind of service that you would not want children to use in any case, then your focus should be on how you prevent access (in which case this code does not apply), rather than on making it child-friendly. For example, if it is an adult only, restricted, or otherwise child-inappropriate service. This code should not lead to the perverse outcome of providers of restricted services having to make their services child-friendly.

If your service is not aimed at children but is not inappropriate for them to use either, then your focus should be on assessing how appealing your service will be to them. If the nature, content or presentation of your service makes you think that children will want to use it, then you should conform to the standards in this code.

If you have an existing service and children form a substantive and identifiable user group, the 'likely to be accessed by' definition will apply.

Given the breadth of application, the ICO recognises that it will be possible to conform to this code in a risk-based and proportionate manner.

If you decide that your service is not likely to be accessed by children and that you are therefore not going to implement the code then you should document and support your reasons for your decision. You may wish to refer to market research, current evidence on user behaviour, the user base of similar or existing services and service types and testing of access restriction measures.

If you initially judge that the service is not likely to be accessed by children, but evidence later emerges that a significant number of children are in fact accessing your service, you will need to conform to the standards in this code or review your access restrictions if you do not think it is appropriate for children to use your service.

## Does it apply to services based outside the UK?

This code is issued under the DPA 2018. The DPA 2018 applies to online services based in the UK.

It also applies to online services based outside the UK that have a branch, office or other 'establishment' in the UK, and process personal data in the context of the activities of that establishment.

The DPA 2018 may also apply to some other services based outside the UK even if they don't have an establishment in the UK. If the relevant establishment is outside the European Economic Area (EEA), the DPA 2018 still applies if you offer your service to users in the UK, or monitor the behaviour of users in the UK. The code applies if that service is likely to be accessed by children.

If you don't have a UK establishment, but do have an establishment elsewhere in the EEA this code does not apply (even if you offer your service to UK users, or monitor the behaviour of users in the UK).

If the code applies to your processing but, under the GDPR 'one-stop-shop' arrangements you have a lead supervisory authority other than the ICO, then we may ask them to take the code into account when considering your compliance with the GDPR and PECR. Alternatively, if we consider the case to be a 'local' case (affecting UK users only), we may take action ourselves and take the code into account.

**How will this change when the UK leaves the EU?**

When the UK leaves the EU (or at the end of the implementation period, if the UK leaves the EU with a

deal), the UK regime will apply to services established in the EEA who are targeting UK users in the same way as to services established outside the EEA. The UK will no longer be part of the GDPR one-stop-shop system.

If you are established in the EEA and offer your service to UK users, or monitor the behaviour of users in the UK, this code will apply to you from exit day (or from the end of the implementation period if a deal is agreed).

## What about the eCommerce Regulations 2002?

The eCommerce Regulations 2002 (ECR) do not exempt you from compliance with your data protection obligations. Regulation 3(1)(b) of the ECR, as amended by Schedule 19 Part 2 paragraph 288 of the DPA 2018, states that:

> 'Nothing in these Regulations shall apply in respect of –
>
> (b) questions relating to information society services covered by the GDPR and Directive 2002/58/EC of the European Parliament and of the Council of 12th July 2002 concerning the processing of personal data and the protection of privacy in the electronic communications sector (Directive on privacy and electronic communications)'

Whilst the ECR includes a 'safe harbour' regime for certain activities that you may carry out as an 'intermediary' service provider, it is important to note that:

- this does not remove your responsibility for data protection compliance, either in general or in relation to those activities; and
- the provisions of the GDPR are without prejudice to this regime.

The ICO will take the safe harbour regime into account, particularly in cases of complaints and potential regulatory action arising from activities relating to those that the safe harbour regime covers.

You should assess how the legal framework applies to activities you perform in your own right, and those which you perform as an intermediary. For example, an Internet Service Provider (ISP) or Mobile Network Operator (MNO) might provide core connectivity services as an intermediary service provider whilst also providing services such as customer service Apps or corporate websites in their own right. If necessary you may need to obtain specialist legal advice.

For more information, see the section on 'Enforcement of this Code'.

**Further reading outside this code**

For further information on the definition of an ISS see:

Article 1(1) and Annex 1 of Directive (EU) 2015/1535 (Article 4(25) of the GDPR incorporates this definition into the GDPR) Ker-Optika v ANTSZ (CJEU case C-108/09, 2 December 2010)
McFadden v Sony (CJEU case C-484/14, 15 September 2016)
Elite Taxi v Uber (Opinion of the AG in case C-434/15, 11 May 2017)

For more information on whether the GDPR applies, see our guidance:

Introduction to Data Protection - Which regime?

For more information on the GDPR one-stop-shop principle, see the EDPB guidelines on the lead supervisory authority.

The ICO has launched a consultation on a package of support for the providers of online services likely to be accessed by children.

# Transitional arrangements

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

## At a glance

Providers of ISS likely to be accessed by children should bring their processing in line with the standards in this code by 2 September 2021.

## In more detail

- When will the code take effect?
- What should we do about our existing services?

### When will the code take effect?

The code was issued on 12 August 2020.

It comes into force on 2 September 2020.

From 2 September 2021 the Commissioner must take the code into account when considering whether an online service has complied with its data protection obligations under the GDPR and PECR. The courts must also take the provision of the code into account, when relevant, from this date.

Our approach is to encourage conformance and we would encourage you to start preparing for the code taking effect sooner rather than later. In accordance with our Regulatory Action Policy, when considering any enforcement action we will take into account the efforts you have made towards conformance during the transition period, as well as the size and resources of your organisation, and the risks to children inherent in your data processing.

The code will apply to both new and existing services.

### What should we do about our existing services?

We recommend that you start by reviewing your existing services to establish whether they are covered.

For services that are covered, you should already have a DPIA – but you should now review it (or conduct a new one) as soon as possible. This will give you the maximum amount of time available to you to bring your processing into line with the standards in the code. You should focus on assessing conformance with the standards in this code and identifying any additional measures necessary to conform.

You should make changes to your service as soon as possible, and in any event by 2 September 2021.

Where changes include changes to physical rather than purely online products, then you should ensure that the necessary changes are incorporated into manufacturing cycles schedules commencing after 2 September 2021. For example, if you are making changes to packaging, printed information or the physical component of a connected toy or device. You will not be required to recall or amend existing stock, or to

amend manufacturing cycles that were already scheduled to commence before 2 September 2021 when this code came into force.

You should also consider how to manage any changes to the way in which your service operates with your existing users. You should think about how their online experience might change and how best to communicate and prepare them for these changes so that any impact is properly managed.

# Standards of age appropriate design

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

Section 123 of the DPA 2018 says this code must contain:

> "such guidance as the Commissioner considers appropriate on standards of age-appropriate design of relevant information society services which are likely to be accessed by children."

It defines 'standards of age-appropriate design' as:

> "such standards of age-appropriate design of such services as appear to the Commissioner to be desirable having regard to the best interests of children."

The standards are not intended as technical standards, but as a set of technology-neutral design principles and practical privacy features. The focus of the code is to set a benchmark for the appropriate protection of children's personal data. Different services will require different technical solutions.

You must build the standards set out in this code into your design processes from the start, into subsequent upgrade and service development processes and into your DPIA process.

For more information on how we enforce these standards, see the separate section on enforcement of this code.

# 1. Best interests of the child

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

The best interests of the child should be a primary consideration when you design and develop online services likely to be accessed by a child.

## What do you mean by 'the best interests of the child'?

The concept of the best interests of the child comes from Article 3 of the United Nations Convention on the Rights of the Child (UNCRC):

> "In all actions concerning children, whether undertaken by public or private social welfare institutions, courts of law, administrative authorities or legislative bodies, the best interests of the child shall be a primary consideration."

The UNCRC incorporates provisions aimed at supporting the child's needs for safety, health, wellbeing, family relationships, physical, psychological and emotional development, identity, freedom of expression, privacy and agency to form their own views and have them heard. Put simply, the best interests of the child are whatever is best for that individual child.

The UNCRC expressly recognises the role of parents and carers (including extended family, guardians and others with legal responsibility) in protecting and promoting the best interests of the child.

It also recognises the child's right to privacy and freedom from economic exploitation. The importance of access to information, association with others, and play in supporting the child's development. And the child's right, in line with their evolving capacities, to have a voice in matters that affect them.

The UNCRC provides a framework which balances a number of different interests and concerns, with the intention of providing whatever is best for each individual child.

The placing of the best interests of the child as a 'primary consideration' recognises that the best interests of the child have to be balanced against other interests. For example the best interests of two individual children might be in conflict, or acting solely in the best interests of one child might prejudice the rights of others. It is unlikely however that the commercial interests of an organisation will outweigh a child's right to privacy.

## Why is this important?

This is important because the Information Commissioner is required to have regard to the United Kingdom's obligations under the UNCRC in drafting this code.

It is also important because it provides a framework to help you understand the needs of children and the

rights that you have to take into account when designing online services.

Article 5(1)(a) of the GDPR says personal data shall be:

> “processed lawfully, fairly and in a transparent manner in relation to the data subject (‘lawfulness, fairness and transparency)”

And recital 38 to the GDPR says:

> “Children merit specific protection with regard to their personal data, as they may be less aware of the risks, consequences and safeguards concerned and their rights in relation to the processing…”

If you consider the best interests of child users in all aspects of your design of online services, then you should be well placed to comply with the ‘lawfulness, fairness and transparency’ principle, and to take proper account of Recital 38.

The principle of ‘the best interests of the child’ is therefore both something that you specifically need to consider when designing your online service, and a theme that runs throughout the provisions of this code.

## How can we make sure that we meet this standard?

**Consider and support the rights of children**

In order to implement this standard you need to consider the needs of child users and work out how you can best support those needs in the design of your online service, when you process their personal data. In doing this you should take into account the age of the user. You may need to use evidence and advice from expert third parties to help you do this.

In particular you should consider how, in your use of personal data, you can:

- keep them safe from exploitation risks, including the risks of commercial or sexual exploitation and sexual abuse;
- protect and support their health and wellbeing;
- protect and support their physical, psychological and emotional development;
- protect and support their need to develop their own views and identity;
- protect and support their right to freedom of association and play;
- support the needs of children with disabilities in line with your obligations under the relevant equality legislation for England, Scotland, Wales and Northern Ireland;
- recognise the role of parents in protecting and promoting the best interests of the child and support them in this task; and
- recognise the evolving capacity of the child to form their own view, and give due weight to that view.

Taking account of the best interests of the child does not mean that you cannot pursue your own commercial or other interests. Your commercial interests may not be incompatible with the best interests of the child, but you need to account for the best interests of the child as a primary consideration where any conflict arises.

**Further reading outside this code**

United Nations Convention of Rights of the Child

# 2. Data protection impact assessments

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

Undertake a DPIA to assess and mitigate risks to the rights and freedoms of children who are likely to access your service, which arise from your data processing. Take into account differing ages, capacities and development needs and ensure that your DPIA builds in compliance with this code.

## What do you mean by a 'DPIA'?

A DPIA is a defined process to help you identify and minimise the data protection risks of your service – and in particular the specific risks to children who are likely to access your service which arise from your processing of their personal data.

You should begin a DPIA early in the design of your service, before you start your processing. It should include these steps:

- Step 1: identify the need for a DPIA
- Step 2: describe the processing
- Step 3: consider consultation
- Step 4: assess necessity and proportionality
- Step 5: identify and assess risks arising from your processing
- Step 6: identify measures to mitigate the risks
- Step 7: sign off, record and integrate outcomes

The DPIA process is designed to be flexible and scalable. You can design a process that fits with your existing approach to design and development, as long as it contains these key elements, and the outcomes influence the design of your service. It does not need to be a time-consuming process in every case.

**Further reading outside this code**

See our detailed guidance on DPIAs

## Why are DPIAs important?

DPIAs are a key part of your accountability obligations under the GDPR, and help you adopt a 'data protection by design' approach. A good DPIA is also an effective way to assess and document your compliance with all of your data protection obligations and the provisions of this code.

The GDPR says you must do a DPIA before you begin any **type of processing** that is **likely to result in a high risk** to the rights and freedoms of individuals.

This is not about whether your service is actually high risk, but about screening for potential indicators of

high risk. The nature and context of online services within the scope of this code mean they inevitably involve a type of processing likely to result in a high risk to the rights and freedoms of children.

The ICO is required by Article 35(4) of the GDPR to publish a list of processing operations that require a DPIA. This list supplements GDPR criteria and relevant European guidelines, and includes:

> "the use of the personal data of children or other vulnerable individuals for marketing purposes, profiling or other automated decision-making, or if you intend to offer online services directly to children."

Online services may also trigger several other criteria indicating the need for a DPIA, including innovative technology, large-scale profiling, biometric data, and online tracking. In practice, this means that if you offer an online service likely to be accessed by children, you must do a DPIA.

However, DPIAs are not just a compliance exercise. Your DPIA should consider compliance risks, but also broader risks to the rights and freedoms of children that might arise from your processing, including the potential for any significant material, physical, psychological or social harm.

An effective DPIA allows you to identify and fix problems at an early stage, designing data protection in from the start. This can bring cost savings and broader benefits for both children and your organisation. It can reassure parents that you protect their children's interests and your service is appropriate for children to use. The consultation phase of a DPIA can also give children and parents the chance to have a say in how their data is used, help you build trust, and improve your understanding of child-specific needs, concerns and expectations. It may also help you avoid reputational damage later on.

## How can we make sure that we meet this standard?

There is no definitive DPIA template, but you can use or adapt the template included as an annex to this code if you wish.

You must consult your Data Protection Officer (DPO) (if you have one) and, where appropriate, individuals and relevant experts. Any processors may also need to assist you.

Your DPIA must have a particular focus on the specific rights of and risks to children using your service that arise from your data processing. It should also assess and document your compliance with this code. You should build these additional elements into each stage of your DPIA, not bolt them on the end.

You need to follow the usual DPIA process set out in our separate guidance on how to conduct a DPIA, but you should build in the following specific issues at each stage.

**Step 1: Identify when to do your DPIA**

You must embed a DPIA into the design of any new online service that is likely to be accessed by children. You must complete your DPIA before the service is launched, and ensure the outcomes can influence your design. You should not treat a DPIA as a rubber stamp or tick-box exercise at the end of the design process.

You must also do a DPIA if you are planning to make any significant changes to the processing operations

of an existing online service likely to be accessed by children.

An external change to the wider context of your service may also prompt you to review your DPIA. For example, if a new security flaw is identified, or a new public concern is raised over specific features of your service or particular risks to children.

**Further reading outside this code**

ICO list of processing operations that require a DPIA
European guidelines on DPIAs

**Step 2: Describe the processing**

You need to describe the nature, scope, context and purposes of the processing. In particular, you should include:

- whether you are designing your service for children;
- if not, whether children are nevertheless likely to access your service;
- the age range of those children;
- your plans, if any, for parental controls;
- your plans, if any, for establishing the age of your individual users;
- the intended benefits for children;
- the commercial interests (of yourself or third parties) that you have taken into account
- any profiling or automated decision-making involved;
- any geolocation elements;
- the use of any nudge techniques;
- any processing of special category data;
- any processing of inferred data;
- any current issues of public concern over online risks to children;
- any relevant industry standards or codes of practice;
- your responsibilities under the applicable equality legislation for England, Scotland, Wales and Northern Ireland; and
- any relevant guidance or research on the development needs, wellbeing or capacity of children in the relevant age range.

**Step 3: Consult with children and parents**

Depending on the size of your organisation, resources and the risks you have identified, you can seek and document the views of children and parents (or their representatives), and take them into account in your design.

We will expect larger organisations to do some form of consultation in most cases. For example, you could choose to get feedback from existing users, carry out a general public consultation, conduct market research, conduct user testing, or contact relevant children’s rights groups for their views. This should

include feedback on the child's ability to understand the ways you use their data and the information you provide. If you consider that it is not possible to do any form of consultation, or it is unnecessary or wholly disproportionate, you should record that decision in your DPIA, and be prepared to justify it to us. However, it is usually possible to carry out some form of market research or user feedback.

You should also consider seeking independent advice from experts in children's rights and developmental needs as part of this stage. This is especially important for services which:

- are specifically designed for children;
- are designed for general use but known to be widely used by children (such as games or social media sites); or
- use children's data in novel or unanticipated ways.

**Step 4: Assess necessity, proportionality and compliance**

You need to explain why your processing is necessary and proportionate for your service. You must also include information about how you comply with the GDPR, including:

- your lawful basis for processing (see Annex C);
- your condition for processing any special category data;
- measures to ensure accuracy, avoid bias and explain use of AI; and
- specific details of your technological security measures (eg hashing or encryption standards).

In addition, at this stage you should include an explanation of how you conform to each of the standards set out in this code.

**Step 5: Identify and assess risks**

You must consider the potential impact on children and any harm or damage your data processing may cause – whether physical, emotional, developmental or material. You should also specifically look at whether the processing could cause, permit or contribute to the risk of:

- physical harm;
- online grooming or other sexual exploitation;
- social anxiety, self-esteem issues, bullying or peer pressure;
- access to harmful or inappropriate content;
- misinformation or undue restriction on information;
- encouraging excessive risk-taking or unhealthy behaviour;
- undermining parental authority or responsibility;
- loss of autonomy or rights (including control over data);
- compulsive use or attention deficit disorders;
- excessive screen time;
- interrupted or inadequate sleep patterns;
- economic exploitation or unfair commercial pressure; or
- any other significant economic, social or developmental disadvantage.

You should bear in mind children's needs and maturity will differ according to their age and development

stage. Annex B should help you to consider this.

To assess the level of risk, you must consider both the likelihood and the severity of any impact on children. High risk could result from either a high probability of some harm, or a lower possibility of serious harm. You should bear in mind that some children will be less resilient than others, so you should always take a precautionary approach to assessing the potential severity of harm. You may find that there is a high risk for some age ranges, even if the risk for other age ranges is lower.

**Step 6: Identify measures to mitigate those risks**

You must consider whether you could make any changes to your service to reduce or avoid each of the risks you have identified. As a minimum, you should implement the measures set out in this code, but you should also consider whether you can put any additional safeguards in place as part of your service design.

Transparency is important. However, you should also identify and consider measures that do not rely on children's ability or willingness to engage with your privacy information.

**Step 7: Record the conclusion**

If you have a DPO, you must record their independent advice on the outcome of the DPIA before making any final decisions.

You should record any additional measures you plan to take, and integrate them into the design of your service. If you identify a high risk that you are not mitigating, you must consult the ICO before you can go ahead.

It is good practice to publish your DPIA.

**Further reading outside this code**

See our detailed guidance on DPIAs

# 3. Age appropriate application

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

Take a risk-based approach to recognising the age of individual users and ensure you effectively apply the standards in this code to child users. Either establish age with a level of certainty that is appropriate to the risks to the rights and freedoms of children that arise from your data processing, or apply the standards in this code to all your users instead.

## What do you mean by 'age appropriate application'?

This means that the age range of your audience and the different needs of children at different ages and stages of development should be at the heart of how you design your service and apply this code.

It also means you must apply this code so that all children are given an appropriate level of protection in how their personal data is used. There is flexibility for you to decide how to apply this standard in the context and circumstances of your online service. It will usually mean establishing (with a level of certainty that is appropriate to the risks to the rights and freedoms that arise from your data processing ) what age range your individual users fall into, so that you can tailor the protections and safeguards you give to their personal data accordingly, by applying the standards in this code. You should use your DPIA to help you assess this.

Alternatively, if you can't or don't wish to do this, you could choose to apply the standards to all your users instead. This is so that children are afforded some protection against the risks that arise from how their personal data is used, even if you aren't sufficiently certain whether they are children or not.

## Why is this important?

The ultimate aim of this code is to ensure that online services likely to be accessed by children are appropriate for their use and meet their development needs.

Understanding the age range of children likely to access the service – and the different needs of children at different ages and stages of development – is fundamental to the whole concept of 'age-appropriate design'.

Children are individuals, and age ranges are not a perfect guide to the interests, needs and evolving capacity of each child. However, to help you assess what is appropriate for children broadly of that age, you can use age ranges as a guide to the capacity, skills and behaviours a child might be expected to display at each stage of their development. For the purposes of this code, we have used the following age ranges and developmental stages as a guide:

- 0 - 5: pre-literate and early literacy
- 6 - 9: core primary school years
- 10-12: transition years
- 13-15: early teens

- 16-17: approaching adulthood

There is no requirement for you to design services for development stages that aren't likely to access your service, or to use these exact age ranges if you can justify why slightly different age groupings are more appropriate for your particular service.

Further information about relevant capacities, needs, skills and behaviours at each stage is set out at Annex B of this code for reference purposes, and where relevant throughout these standards.

You should also consider the needs of disabled children in line with any obligations you may have under the relevant equality legislation for England, Scotland, Wales and Northern Ireland.

The GDPR and DPA 2018 also specify that if you rely on consent for any aspects of your online service, you need to get parental authorisation for children under 13. If you do rely on consent as your lawful basis for processing personal data then these provisions have significant practical implications for you. Meeting the standards in this code should allow you to comply with these GDPR requirements in a proportionate way. See Annex C for full details.

## How can we make sure that we meet this standard?

**Consider the risks to children that arise from your data processing, and the level of certainty you have that you know the age of your users**

You can implement this standard by following these steps:

- Think about the risks to children that would arise from your processing of their personal data. Your DPIA will help you to do this. You may wish to take into account factors such as: the types of data collected; the volume of data; the intrusiveness of any profiling; whether decision making or other actions follow from profiling; and whether the data is being shared with third parties. Both the ICO and the European Data Protection Board have also provided guidance on DPIAs which consider assessing risk in more detail.
- Consider how well you know your users. How certain are you that an individual user is an adult or a child? How confident are you about the age range your individual child users fall into.
- Decide whether the level of certainty you have about the age of your individual users is appropriate to the risks that arise from your data processing.
- If it is, then you can apply the rest of the standards in this code to your child users only.
- If it isn't, then decide whether you prefer to:
  - reduce the data risks inherent in your service;
  - put additional measures in place to increase your level of age confidence; or
  - apply the standards in this code to all users of your service (regardless of whether they have self-declared as an adult or a child).

## How can we establish age with an appropriate level of certainty?

This code is not prescriptive about exactly what methods you should use to establish age, or what level of certainty different methods provide. This is because this will vary depending on the specifics of the techniques you use. We want to allow enough flexibility for you to use measures that suit the specifics of your individual service and that can develop over time. However you should always use a method that is appropriate to the risks that arise from your data processing.

Some of the methods you may wish to consider are listed below. This list is not exhaustive. Other measures may exist or emerge over time. In assessing whether you have chosen an appropriate method, we will take into account the products currently available in the marketplace, particularly for small businesses which don't have the resources to develop their own solutions.

- **Self-declaration** – This is where a user simply states their age but does not provide any evidence to confirm it. It may be suitable for low risk processing or when used in conjunction with other techniques. Even if you prefer to apply the standards in the code to all your users, self-declaration of age can provide a useful starting point when providing privacy information and age appropriate explanations of processing (see 'What does applying the standards to all users mean in practice?' for more detail).
- **Artificial intelligence** – It may be possible to make an estimate of a user's age by using artificial intelligence to analyse the way in which the user interacts with your service. Similarly you could use this type of profiling to check that the way a user interacts with your service is consistent with their self-declared age. This technique will typically provide a greater level of certainty about the age of users with increased use of your service. If you choose to use this technique then you need to:
  - tell users that you are going to do this upfront;
  - only collect the minimum amount of personal data that you need for this purpose; and
  - don't use any personal data you collect for this purpose for other purposes.
- **Third party age verification services** – You may choose to use a third party service to provide you with an assurance of the age of your users. Such services typically work on an 'attribute' system where you request confirmation of a particular user attribute (in this case age or age range) and the service provides you with a 'yes' or 'no' answer. This method reduces the amount of personal data you need to collect yourself and may allow you to take advantage of technological expertise and latest developments in the field. If you use a third party service you will need to carry out some due diligence checks to satisfy yourself that the level of certainty with which it confirms age is sufficient (PAS standard 1296 'Online age checking' may help you with this), and that it is compliant with data protection requirements. You should also provide your users with clear information about the service you use.
- **Account holder confirmation** - You may be able to rely upon confirmation of user age from an existing account holder who you know to be an adult. For example, if you provide a logged-in or subscription based service, you may allow the main (confirmed adult) account holder to set up child profiles, restrict further access with a password or PIN, or simply confirm the agerange of additional account users.
- **Technical measures** – Technical measures which discourage false declarations of age, or identify and close under age accounts, may be useful to support or strengthen self-declaration mechanisms. Examples include neutral presentation of age declaration screens (rather than nudging towards the selection of certain ages), or preventing users from immediately resubmitting a new age if they are denied access to your service when they first self-declare their age.
- **Hard identifiers** – You can confirm age using solutions which link back to formal identify documents or 'hard identifiers' such as a passport. However, we recommend that you avoid giving users no choice but to provide hard identifiers unless the risks inherent in your processing really warrant such an approach. This is because some children do not have access to formal identity documents and may have limited parental support, making it difficult for them to access age verified services at all, even if they are age appropriate. Requiring hard identifiers may also have a disproportionate impact on the privacy of adults.

We recognise that methods of age assurance will vary depending on whether the service is used by authenticated or non-authenticated users (eg whether users are logged in) and that the risks may also vary

in this context.

## What if we need to collect personal data in order to establish age?

You may be able to collect and record personal data which provides an assurance of age yourself. If so, remember that you need to comply with data protection obligations for your collection and retention of that data, including data minimisation, purpose limitation, storage limitation and security obligations.

The key to this is making sure that you only collect the minimum amount of personal data you need to give you an appropriate level of certainty about the age of your individual users, and making sure you don't use personal data collected for the purposes of establishing or estimating age in order to conform to this code for other purposes.

For example, if you use profiling to help you estimate the age of individual users so that you can apply the standards in this code, then you can use that profile information to ensure that you:

- provide age appropriate privacy information and nudges;
- provide high privacy settings for child users by default; and
- don't serve children content deemed detrimental to their health and wellbeing.

You can't however simply re-purpose that information for other purposes, such as targeting children with advertising for products you think they might like, or sending them details of 'birthday offers'. If you want to profile children for this purpose then you need their consent. See the section of this code on profiling for further detail.

We recognise there is a tension between age assurance and compliance with GDPR, as the implementation of age assurance could increase the risk of intrusive data collection. We do not require organisations to create these counter risks. However, age assurance and GDPR are compatible if privacy by design solutions are used.

Age-assurance tools are still a developing area. The Commissioner will support work to establish clear industry standards and certification schemes to assist children, parents and online services in identifying age-assurance services which comply with data protection standards.

## What does applying the standards to all users mean in practice?

If you don't have a level of certainty about the age of your users that is appropriate to the risks to children arising from your data processing, then your alternative is to apply the standards in the code to all users. This should mean that even if you don't really know how old a user is, or if a child has lied about their age, children will still receive some important protections in how their personal data is used.

However, it doesn't mean that you have to ignore any information you do have about the user's age, or that adult users have to be infantilised. It just means that all users will receive some basic protections in how their personal data is used by default.

You should apply the standards in the code in a way that recognises both the information you do have about the users age and the fact that your level of confidence in this information is inadequate to the risks inherent in your processing. For example, providing privacy information that is appropriate to the self-declared age of the user, but giving them the option to access versions written for different age groups as well.

**Further reading outside this code**

ICO detailed guidance on DPIAs
European guidelines on DPIAs
PAS standard 1296 Online Age Checking- code of practice

# 4. Transparency

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

The privacy information you provide to users, and other published terms, policies and community standards, must be concise, prominent, and in clear language suited to the age of the child. Provide additional specific 'bite-sized' explanations about how you use personal data at the point that use is activated.

## What do you mean by 'transparency'?

Transparency is about being clear, open and honest with your users about what they can expect when they access your online service.

## Why is it important?

Transparency is key to the requirement under Article 5(1) of the GDPR to process personal data:

> "lawfully, fairly and in a transparent manner in relation to the data subject ('lawfulness, fairness and transparency')"

The GDPR also contains more specific provisions about the information that you must give to data subjects when you process their personal data. These are set out at Article 13 (when you have obtained the personal data directly from the data subject) and Article 14 (when you have not obtained the personal data directly from the data subject).

Article 12 of the GDPR requires you to provide children with this information in a way in which they can access and understand it:

> "The controller shall take appropriate measures to provide any information referred to in Article 13 and 14 and any communication under Articles 15 to 22 and 34 relating to processing to the data subject in a concise, transparent, intelligible and easily accessible form, using clear and plain language, in particular for any information addressed specifically to a child. The information shall be provided in writing, or by other means, including, where appropriate, by electronic means. When requested by the data subject the information may be provided orally, provided that the identity of the data subject is proven by other means."

On a wider level transparency is also intrinsic to the fairness element of Article 5(1). If you aren't clear,

open and honest about the service that you provide and the rules that govern that service, then your original collection and ongoing use of the child's personal data is unlikely to be fair.

## How can we make sure that we meet this standard?

**Provide clear privacy information**

Firstly you need to provide the privacy information set out in Articles 13 and 14 in a clear and prominent place on your online service. You should make this information easy to find and accessible for children and parents who seek out privacy information.

However, it is not sufficient to rely on children or their parents seeking out this privacy information.

**Provide 'bite-sized' explanations at the point at which use of personal data is activated**

In order to provide children with the specific protection envisaged by Recital 38 you should also provide clear information about what you do with children's personal data in more specific, 'bite-size' explanations, at the point at which the use of the personal data is activated. This is sometimes referred to as a 'just in time notice'. Depending on the age of the child and the risks inherent in the processing, you should also prompt them to speak to an adult before they activate any new use of their data, and not to proceed if they are uncertain.



You should also consider if there are any other points in your user journey when it might be appropriate to provide bite-sized explanations to aid the child's understanding of how their personal data is being used.

**Provide clear terms, policies and community standards**

All other information you provide for users about your service should also be clear and accessible. This includes terms and conditions, policies and community standards.

In every case you should provide information that is accurate and does not promise protections or standards that are not routinely upheld.

This should help children or their parents make properly informed decisions about whether to provide the information required to access or sign up to your service in the first place, and to continue to use it.

If you believe that you need to draft your terms and conditions in a certain way in order to make them legally robust, then you can provide child-friendly explanations to sit alongside the legal drafting.

**Present information in a child friendly way**

You should present all this information in a way that is likely to appeal to the age of the child who is accessing your online service.

This may include using diagrams, cartoons, graphics, video and audio content, and gamified or interactive content that will attract and interest children, rather than relying solely on written communications.

You may use tools such as privacy dashboards, layered information, icons and symbols to aid children's understanding and to present the information in a child-friendly way. You should consider the modality of your service, and take into account user interaction patterns that do not take place in screen-based environments, as appropriate.

Dashboards should be displayed in a way that clearly identifies and differentiates between processing that is essential to the provision of your service and non-essential or optional processing that the child can choose whether to activate.

**Tailor your information to the age of the child**

You need to consider how you can tailor the content and presentation of the information you provide depending on the age of the user.

There may be some scenarios in which providing one, simplified, accessible to all, set of information may work. For example, if you are an online retailer which only collects the personal data needed to complete online transactions and deliver goods.

However, in many cases a-one-size-fits-all approach does not recognise that children have different needs at different stages of their development. For example, a pre-literate or primary school child might need to be actively deterred from changing privacy settings without parental input, whereas a teenager might be better supported by clear and neutral information which helps them make their own informed decision.

For more information about the developmental needs of children at different ages please see Annex B to this code.

For younger children, with more limited levels of understanding, you may need to provide less detailed information for the child themselves and rely more on parental involvement and understanding. However you should never use simplification with the aim of hiding what you are doing with the child's personal data and you should considerproviding detailed information for parents, to sit alongside your child directed

information.

You should make all versions of resources (including versions for parents) easily accessible and incorporate mechanisms to allow children or parents to choose which version they see, or to down-scale or up-scale the information depending on their individual level of understanding.




The following table provides some recommendations. However, they are only a starting point and you are free to develop your own service specific information and user journeys which take account of the risks inherent in your service.

Depending on the size of your organisation, your number of users, and your assessment of risk you may decide to carry out user testing to make sure that the information you provide is sufficiently clear and accessible for the age range in question. You should document the results of any user testing in your DPIA to support your final conclusions and justify the presentation and content of your final resources. If you decide that user testing isn't warranted, then you should document the reasons why in your DPIA.

You should also consider any additional responsibilities you may have under the applicable equality legislation for England, Scotland, Wales and Northern Ireland.

| Age range | Recommendations |
|---|---|
| 0-5<br>Pre-literate & early literacy | Provide full privacy information as required by Articles 13 & 14 of the GDPR in a format suitable for parents.<br><br>Provide audio or video prompts telling children to |

| | |
|---|---|
| | leave things as they are or get help from a parent or trusted adult if they try and change any high privacy default settings. |
| 6-9<br>Core primary school years | Provide full privacy information as required by Articles 13 & 14 of the GDPR in a format suitable for parents.<br><br>Provide cartoon, video or audio materials to sit alongside parental resources. Explain the basic concepts of online privacy within your service, the privacy settings you offer, who can see what, their information rights, how to be in control of their own information, and respecting other people's privacy. Explain the basics of your service and how it works, what they can expect from you and what you expect from them.<br><br>Provide resources for parents to use with their children to explain privacy concepts and risks within your service. Provide resources for parents to use with their children to explain the basics of your service and how it works, what they can expect from you and what you expect from them.<br><br>If a child attempts to change a default high privacy setting provide cartoon, video or audio materials to explain what will happen to their information and any associated risks. Tell them to leave things as they are or get help from a parent or trusted adult before they change the setting. |
| 10-12<br>Transition years | Provide full privacy information as required by Articles 13 & 14 of the GDPR in a format suitable for parents.<br><br>Provide full privacy information as required by Articles 13 & 14 of the GDPR in a format suitable for children within this age group. Allow children to choose between written and video/audio options. Give children the choice to upscale or downscale the information they see (to materials developed for an older or younger age group) depending on their individual needs.<br><br>If a child attempts to change a default high privacy setting provide written, cartoon, video or audio materials to explain what will happen to their information and any associated risks. Tell them to leave things as they are or get help from a parent or trusted adult before they change the setting. |
| 13 -15<br>Early teens | Provide full privacy information as required by Articles 13 & 14 of the GDPR in a format suitable for this age group. Allow them to choose between written and |

| | |
|---|---|
| | video/audio options. Give them the choice to upscale or downscale the information they see (to materials developed for an older or younger age group) depending on their individual needs.<br><br>If a child attempts to change a default high privacy setting provide written, video or audio materials to explain what will happen to their information and any associated risks. Prompt them to ask for help from a parent or trusted adult and not change the setting if they have any concerns or don't understand what you have told them.<br><br>Provide full information in a format suitable for parents to sit alongside the child focused information. |
| 16-17<br>Approaching adulthood | Provide full information in a format suitable for this age group. Allow them to choose between written and video/audio options. Give them the choice to upscale or downscale the information they see (to materials developed for an older or younger age group) depending on their individual needs.<br><br>If a child in this age group attempts to change a default high privacy setting provide written, video or audio materials to explain what will happen to their information and any associated risks. Prompt them to check with an adult or other source of trusted information and not change the setting if they have any concerns or don't understand what you have told them.<br><br>Provide full information in a format suitable for parents to sit alongside the child focused information. |

**Further reading outside this code**

Guide to the GDPR – lawfulness, fairness and transparency
Guide to the GDPR – the right to be informed

# 5. Detrimental use of data

**This code came into force on 2 September 2020, with a 12 month transition period. Organisations should conform by 2 September 2021.**

Do not use children's personal data in ways that have been shown to be detrimental to their wellbeing, or that go against industry codes of practice, other regulatory provisions, or Government advice.

## What do you mean by 'the detrimental use of data'?

We mean any use of data that is obviously detrimental to children's physical or mental health and wellbeing or that goes against industry codes of practice, other regulatory provisions or Government advice on the welfare of children.

## Why is this important?

Article 5(1)(a) of the GDPR says that personal data must be processed lawfully, fairly and in a transparent manner in relation to the data subject, and Recital 38 that children merit specific protection with regard to the use of their personal data.

Recital 2 to the GDPR states (emphasis added):

> "The principles of, and rules on the protection of natural persons with regard to the processing of their personal data should, whatever their nationality or residence, respect their fundamental rights and freedoms, in particular their right to the protection of personal data. **This Regulation is intended to contribute to … the well-being of natural persons.**"

Recital 75 to the GDPR says that:

> "The risk to the rights and freedoms of natural persons, or varying likelihood and severity may result from personal data processing which could lead to physical, material or non-material damage, in particular:….where personal data of vulnerable natural persons, in particular children, are processed…."

This means that you should not process children's personal data in ways that are obviously, or have been shown to be, detrimental to their health or wellbeing. To do so would not be fair.

## How can we make sure that we meet this standard?

**Keep up date with relevant recommendations and advice**

As a provider of an online service likely to be accessed by children you should be aware of relevant standards and codes of practice within your industry or sector, and any provisions within them that relate to children. You should also keep up to date with Government advice on the welfare of children in the context of digital or online services. The ICO does not regulate content and is not an expert on matters of children's health and wellbeing. We will however refer to other codes of practice or regulatory advice where relevant to help us assess your conformance to this standard.

**Do not process children's personal data in ways that are obviously detrimental or run counter to such advice**

You should not process children's personal data in ways that run contrary to those standards, codes or advice and should take account of any age specific advice to tailor your online service to the age of the child. You should take particular care when profiling children, including making inferences based on their personal data, or processing geo-location data.

You should apply a pre-cautionary approach where this has been formally recommended despite evidence being under debate. This means you should not process children's personal data in ways that have been formally identified as requiring further research or evidence to establish whether or not they are detrimental to the health and wellbeing of children.

## What codes or advice are likely to be relevant?

Some specific areas where there is relevant guidance, and that are likely to arise in the context of providing your online service are given below.

However, this is not an exhaustive list and you need to identify and consider anything that is relevant to your specific data processing scenario in your DPIA.

**Marketing and behavioural advertising**

The Committee of Advertising Practice (CAP) publishes guidance about online behavioural advertising which, in addition to providing rules applicable to all advertising, specifically covers advertising to children.

It includes rules which address:

- physical, mental or moral harm to children;
- exploiting children's credulity and applying unfair pressure;
- direct exhortation of children and undermining parental authority; and
- promotions.

It also has rules which govern or prohibit the marketing of certain products, such as high fat, salt and sugar food and drinks and alcohol, to children, and general guidance on transparency of paid-for content and product placement.

**Broadcasting**

Ofcom has published a code practice for broadcasters which covers the protection of under-18s in the following areas:

- the coverage of sexual and other offences in the UK involving under-18s;
- drugs, smoking, solvents and alcohol;

- violence and dangerous behaviour;
- offensive language;
- sexual material;
- nudity;
- exorcism, the occult and the paranormal; and
- the involvement of people under 18 in programmes.

**The press**

The Independent Press Standards Organisation (Ipso) has published The Editors' Code of Practice which includes provisions about reporting and children.

**Online games**

The Office for Fair Trading (OFT) has published principles for online and app-based games which includes provisions about:

- exploiting children's inexperience, vulnerability and credulity, including by aggressive commercial practices; and
- including direct exhortations to children to buy advertised products or persuade their parents or other adults to buy advertised products for them.

**Strategies used to extend user engagement**

Strategies used to extend user engagement, sometimes referred to as 'sticky' features can include mechanisms such as reward loops, continuous scrolling, notifications and auto-play features which encourage users to continue playing a game, watching video content or otherwise staying online.

Although there is currently no formal Government position on the effect of these mechanisms on the health and wellbeing of children, the UK Chief Medical Officers have issued a 'commentary on screen-based activities on children and young people'. This identifies a need for further research and in the meantime recommends that technology companies 'recognise a precautionary approach in developing structures and remove addictive capabilities.'

## Does this mean we can't use features such as rewards, notifications and 'likes' within our service?

No, not all such features rely on the use of personal data and you may have designed your feature taking into account the needs of children and in a way that makes it easy for them to disengage without feeling pressurised or disadvantaged if they do so. However, it does mean that you need to carefully consider the impact on children if you use their personal data to support such features. You should consider both intended and unintended consequences of the data use as part of your DPIA.

Given the precautionary advice from the Chief Medical Officers, designing in data-driven features which make it difficult for children to disengage with your service is likely to breach the Article 5(1)(a) fairness principle of the GDPR. For example, features which use personal data to exploit human susceptibility to reward, anticipatory and pleasure seeking behaviours, or peer pressure.

You should:

- avoid using personal data in a way that incentivises children to stay engaged, such as offering children personalised in-game advantages (based upon your use of the individual user's personal data) in

return for extended play;

- present options to continue playing or otherwise engaging with your service neutrally without suggesting that children will lose out if they don't;
- avoid features which use personal data to automatically extend use instead of requiring children to make an active choice about whether they want to spend their time in this way (data-driven autoplay features); and
- introduce mechanisms such as pause buttons which allow children to take a break at any time without losing their progress in a game, or provide age appropriate content to support conscious choices about taking breaks, such as that provided in the Chief Medical Officers' advice.

**Further reading outside the code**

Committee on Advertising Practice guidance

The Ofcom Broadcasting Code (with the Cross-Promotion Code and the On Demand Programme Service Rules)

The Editors' Code of Practice

OFT principles for online and app-based games

UK Chief Medical Officers' commentary on 'screen based activities and children and young people's mental health and psychosocial wellbeing: a systematic map of reviews'

# Exhibit A

JENNER & BLOCK LLP
Lindsay C. Harrison
Jessica Ring Amunson (*pro hac vice* pending)
1099 New York Avenue NW, Suite 900
Washington, DC 20001
Tel: (202) 639-6865
lharrison@jenner.com
jamunson@jenner.com

Counsel for *Amicus Curiae*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>*Plaintiff*,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>*Defendant*. | Case No. 5:22-cv-08861-BLF<br><br>**BRIEF OF PROFESSOR ERIC GOLDMAN AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF**<br><br>Date: February 24, 2023 |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................... ii

IDENTITY AND INTEREST OF *AMICUS CURIAE* .................... 1

INTRODUCTION .................... 1

ARGUMENT .................... 2

I. The AADC's Age-Assurance Requirements Impede Access to Constitutionally Protected Online Speech. .................... 2

A. Age Assurance Creates Onerous Barriers for Accessing Content Online. .................... 3

B. Age Assurance Will Deter Internet Usage and Chill Speech Online.................... 4

II. Age-Verification Requirements Chill Online Readers and Authors and Therefore Violate Fundamental First Amendment Principles.................... 7

CONCLUSION .................... 11

## TABLE OF AUTHORITIES

### CASES

*ACLU v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004) ... 8, 9, 10

*ACLU v. Johnson*, 4 F. Supp. 2d 1029 (D.N.M. 1998), *aff'd*, 194 F.3d 1142 (10th Cir. 1999) ... 9

*ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008) ... 8, 9

*ACLU v. Reno*, 929 F. Supp. 824 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997) ... 1

*Ashcroft v. ACLU*, 535 U.S. 564 (2002) ... 8

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ... 8

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ... 10

*PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) ... 9

*Reno v. ACLU*, 521 U.S. 844 (1997) ... 1, 2, 8

*Southeast Booksellers Ass'n v. McMaster*, 371 F. Supp. 2d 773 (D.S.C. 2005) ... 9

*Will Co. v. Lee*, 47 F.4th 917 (9th Cir. 2022) ... 5

### STATUTES

Cal. Civ. Code § 1798.99.29 ... 7

Cal. Civ. Code § 1798.99.29(a) ... 2

Cal. Civ. Code § 1798.99.29(b) ... 7

Cal. Civ. Code § 1798.99.31(a)(1)(B) ... 2

Cal. Civ. Code § 1798.99.31(a)(5) ... 2, 3, 10

Cal. Civ. Code § 1798.99.31(b) ... 2

Cal. Civ. Code § 1798.99.35(a) ... 2

Cal. Civ. Code § 1798.140(c) ... 4

Cal. Civ. Code § 1798.140(ae) ... 4

Child Online Protection Act, Pub. L. No. 105-277, tit. XIV, 112 Stat. 2681, 2681-736 (1998) ... 8

### OTHER AUTHORITIES

Daniel An, *Find Out How You Stack Up to New Industry Benchmarks for Mobile Page Speed*, Think with Google (Feb. 2018), http://bit.ly/3ILJccK ... 5

*Identity Verification*, Yoti, http://bit.ly/3IsASgK (last visited Feb. 24, 2023) ........................................ 6

Nigel Jones, *10 Reasons to Be Concerned About Facial Recognition Technology*, Priv. Compliance Hub (Aug. 2021), https://bit.ly/3XXLWbp ........................................ 4

Brian Leiter, *10 Most-Cited Law & Technology Scholars in the U.S., 2016-2020 (CORRECTED)*, Brian Leiter's L. School Reports (Sept. 9, 2021), http://bit.ly/41fgbgR........................ 1

Ting Li & Paul A. Pavlou, *What Drives Users' Website Registration?* (Dec. 18, 2013), http://bit.ly/3St0ezI ........................................ 6

Miguel Malheiros & Sören Preibusch, *Sign-Up or Give-Up: Exploring User Drop-Out in Web Service Registration*, Symp. on Usable Priv. & Sec. (SOUPS) (2013), https://bit.ly/3ExraIu ........................................ 6

David Morell, *Google+: A Case Study on App Download Interstitials*, Google Search Central Blog (July 23, 2015), http://bit.ly/3ILQY6i ........................................ 6

*Online Age Verification: Balancing Privacy and the Protection of Minors*, CNIL (Sept. 22, 2022), http://bit.ly/3EB1ISN........................................ 3

Jackie Snow, *Why Age Verification Is So Difficult for Websites*, Wall St. J. (Feb. 27, 2022), http://bit.ly/41ngt5m ........................................ 3

Michael Wiegand, *Site Speed Is (Still) Impacting Your Conversion Rate*, Portent (Apr. 20, 2022), http://bit.ly/3EwJWQm........................................ 5

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

Professor Eric Goldman is a Professor of Law at Santa Clara University School of Law, where he is also Associate Dean for Research, Co-Director of the High Tech Law Institute, and Supervisor of the Privacy Law Certificate.[2] Professor Goldman has been researching Internet Law for thirty years, and he has taught Internet Law since 1996. Professor Goldman has also written extensively on a wide range of Internet Law topics. *See, e.g.*, Eric Goldman, *Content Moderation Remedies*, 28 Mich. Tech. L. Rev. 1 (2021); Eric Goldman, *Why Section 230 Is Better than the First Amendment*, 95 Notre Dame L. Rev. Reflection 33 (2019); Eric Goldman, *Search Engine Bias and the Demise of Search Engine Utopianism*, 8 Yale J.L. & Tech. 188 (2006). Professor Goldman is ranked as one of the "10 Most-Cited Law & Technology Scholars in the U.S., 2016-2020."[3]

Professor Goldman submits this *amicus* brief to explain how the California Age-Appropriate Design Code Act creates barriers for both minors and adults seeking to access websites or apps, and how those barriers impermissibly block users from engaging in activities that are protected by the First Amendment.

## INTRODUCTION

The Internet is a "unique and wholly new medium of worldwide human communication." *Reno v. ACLU*, 521 U.S. 844, 850 (1997). Among its many special properties, the Internet makes it easy for users to navigate seamlessly between many websites operated by unrelated entities. *ACLU v. Reno*, 929 F. Supp. 824, 836-37 (E.D. Pa. 1996) ("[L]inks from one computer to another, from one document to another across the Internet, are what unify the Web into a single body of knowledge, and what makes the Web unique[.]"), *aff'd*, 521 U.S. 844 (1997).

---

[1] *Amicus curiae* certifies that this brief was authored entirely by counsel for *amicus curiae* and not by counsel for any party, in whole or part; no party or counsel for any party contributed money to fund preparing or submitting this brief; and apart from *amicus curiae* and their counsel, no other person contributed money to fund preparing or submitting this brief.

[2] Professor Goldman submits this brief in his individual capacity and not on behalf of his employer or any other individual or entity.

[3] Brian Leiter, *10 Most-Cited Law & Technology Scholars in the U.S., 2016-2020 (CORRECTED)*, Brian Leiter's L. School Reports (Sept. 9, 2021), http://bit.ly/41fgbgR.

The California Age-Appropriate Design Code Act (AADC) threatens this foundational principle of the Internet. Enacted under the pretext of protecting children's privacy, the AADC regulates "[b]usinesses that develop and provide online services, products, or features that children are likely to access." Cal. Civ. Code § 1798.99.29(a). Under the AADC, businesses preparing to launch new online services, products, or features are required to prepare a "Data Protection Impact Assessment" detailing how the feature's design could expose minors to "potentially harmful" materials. *Id.* § 1798.99.31(a)(1)(B)(i)-(vii). The AADC also prohibits these online businesses from collecting, using, or distributing a child's personal information in any way inconsistent with "the best interests of children." *Id.* § 1798.99.31(b).

Crucially, the AADC imposes on these businesses an age-assurance requirement. Regulated businesses are required to estimate the age of their users with "a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business" or in the alternative they must "apply the privacy and data protections afforded to children to *all* consumers." *Id.* § 1798.99.31(a)(5) (emphasis added). In other words, businesses must choose between assuring the age of all users (both minors and adults alike) or redesigning all their online features to treat adults as if they were children. Violations of the AADC's requirements can result in penalties of up to $7,500 per "affected child," as well as injunctive relief. *Id.* § 1798.99.35(a).

The AADC's age-assurance requirement erects onerous barriers that would discourage Internet usage and chill protected speech. These barriers to online movements will change how people use the Internet in ways that will hinder the Internet's utility to society—and transgress basic constitutional principles. In short, the AADC casts a "dark[] shadow over free speech, [and] threatens to torch a large segment of the Internet community." *Reno v. ACLU*, 521 U.S. at 882.

## ARGUMENT

### I. The AADC's Age-Assurance Requirements Impede Access to Constitutionally Protected Online Speech.

The AADC is framed as a way to protect children online, but that is a gross misrepresentation. The AADC has substantial, and negative, implications for both adults' and children's Internet experiences.

### A. Age Assurance Creates Onerous Barriers for Accessing Content Online.

The AADC does not require age verification, which involves determining a user's age with precision. Instead, the AADC requires "age assurance," which means determining whether a user is a minor or adult with an appropriate degree of confidence. Specifically, the Act requires covered online businesses to "[*e*]*stimate* the age of child users with a reasonable level of certainty appropriate to the risks." Cal. Civ. Code § 1798.99.31(a)(5) (emphasis added). Though age assurance may sound like a less demanding requirement than age verification, in practice it is a distinction without a difference. Both age verification and age assurance require websites and apps to erect barriers before usage.

The AADC does not specify the exact method that regulated entities must use to perform age assurance. That omission not an accident. It reflects the fact that no one—including the California Legislature—is clear how businesses should implement this law. Every available option is problematic in ways that undercut the Legislature's objective of increasing children's privacy. *See Online Age Verification: Balancing Privacy and the Protection of Minors*, CNIL (Sept. 22, 2022), http://bit.ly/3EB1ISN [hereinafter CNIL Report] ("[T]here is currently no solution that satisfactorily" provides "sufficiently reliable verification, complete coverage of the population and respect for the protection of individuals' data and privacy and their security."); Jackie Snow, *Why Age Verification Is So Difficult for Websites*, Wall St. J. (Feb. 27, 2022), http://bit.ly/41ngt5m. *Amicus* below reviews three of the primary ways to determine a user's age online: self-reporting, document review, and automated estimation.

*Self-reporting*, sometimes called "age-gating," asks users to report their age or check a box certifying their status as an adult. Self-reporting is not considered a reliable method of determining age because of the users' ability and incentive to misreport. As a result, it probably does not satisfy the AADC's requirement that businesses estimate user ages to a "reasonable level of certainty." Cal. Civ. Code § 1798.99.31(a)(5).

*Document review* involves users submitting documentary evidence showing their ages. Typical evidence would be a government-issued form of identification, such as a driver's license. Document review has numerous limitations, including the need to link the submitter with the submitted documents (otherwise, the submitter can use someone else's documents), the cost and time required to review the

submitted documents, and the fact that many people (both children and adults) do not have government-issued documents confirming their age.

*Automated estimation* requires users to expose their faces so that software can estimate their ages or classify them as minors or adults. Age-estimation software has high, but not perfect, accuracy. It also creates significant privacy and security risks. A person's face is considered to be highly sensitive personal information because it is unique to each person but immutable, so if a person's face can be digitally "stolen," it can wreak havoc on that person's life without any good fixes. For that reason, a number of "biometric" privacy laws around the country severely restrict the use of face scans.[4] *See*, *e.g.*, Cal. Civ. Code § 1798.140(c) & (ae) (defining "[b]iometric information" to include "face", "vein patterns" and "faceprints" and specifying that biometric information may qualify as "[s]ensitive personal information"). Further, privacy advocates repeatedly warn consumers about face-scanning technologies due to the privacy and security risks they create. *See*, *e.g.*, Nigel Jones, *10 Reasons to Be Concerned About Facial Recognition Technology*, Priv. Compliance Hub (Aug. 2021), https://bit.ly/3XXLWbp. Widespread deployment of face-scanning technologies on the Internet teaches consumers to disregard that advice and thereby dramatically increases users' privacy and security risks.

### B. Age Assurance Will Deter Internet Usage and Chill Speech Online.

The age-assurance methods discussed above necessarily add a new step to a user's visit to a new website or app. The user must stop what they were doing and complete the age-assurance process before they can reach their objective. For websites and apps where users create accounts (and thus, in effect, have persistent identities with the service), the users may only have to complete the age-assurance process one time. After that, the website or app can store the user's estimated age and authenticate the user when the user presents the login credentials associated with the account. Websites and apps that do not have user

[4] To the extent a scanned person's consent is required to conduct the scan, it does not solve any of the AADC's problems because minors are legally deemed to have diminished capacity to consent for themselves.

accounts will force their users to tediously repeat the age-assurance process each time the user tries to access the website or app.[5]

Regardless of the exact form it takes, the AADC's age-assurance process will act as a burdensome barrier that users must overcome before accessing any website or app. This access barrier will dramatically reduce users' willingness to consume or contribute content via the website or app. The literature on this point is overwhelming. Users are extremely sensitive to any access barriers to the online destinations they seek. Those barriers reduce consumer usage of websites and services and, as a result, undermine their financial viability.

If the age-assurance barriers add a short time delay (called "latency")—of even a few seconds—to a user's access to a new website or service, it would drive many users away. A frequency of users leaving a website after accessing the first page is called the "bounce rate." Small increases in latency can increase bounce rates, often dramatically. *See Will Co. v. Lee*, 47 F.4th 917, 924-25 (9th Cir. 2022) ("Research shows that sites lose up to 10% of potential visitors for every additional second a site takes to load, and that 53% of visitors will simply navigate away from a page that takes longer than three seconds to load." (footnote omitted)); *see also* Daniel An, *Find Out How You Stack Up to New Industry Benchmarks for Mobile Page Speed*, Think with Google (Feb. 2018), https://bit.ly/3ILJccK (showing that a latency increase from one to three seconds increases the bounce probability by 32%, and an increase from one to five seconds increases the bounce probability by 90%).

The reduced audience due to increased latency can cost businesses revenues and profits. For example, "Amazon recently found that every 100 milliseconds of latency cost it 1% in sales." *Lee*, 47 F.4th at 925. Another study showed that for consumer-oriented online retailers, the "difference in e-commerce conversion rate between blazing fast sites and modestly quick sites is sizable. A site that loads in 1 second has an e-commerce conversion rate 2.5x higher than a site that loads in 5 seconds." Michael Wiegand, *Site Speed Is (Still) Impacting Your Conversion Rate*, Portent (Apr. 20, 2022), https://bit.ly/3EwJWQm.

[5] There are few good options to do persistent and reliable age assurance independent of account logins. Devices can be shared between minors and adults, or minors can easily get an adult to do a single but persistent bogus authentication.

Like page latency, the AADC's age-assurance requirement causes a lag between when the user attempts to access the desired page and when the user finally reaches that page. Depending on the exact methodology of the age assurance, those time delays are likely to be measured in seconds[6] or minutes, not milliseconds. The resulting bounce rate is therefore likely to be much higher than the numbers discussed above.

In addition to delaying users from reaching their desired content, the AADC-mandated age assurance will require users to navigate at least one screen—called an "interstitial" screen—before the users can access their desired content. Like latency, the presence of an interstitial screen also increases bounce rates. For example, Google+ used an interstitial screen to promote its mobile app before users could access the service on a mobile device, causing a 69% bounce rate. *See* David Morell, *Google+: A Case Study on App Download Interstitials*, Google Search Central Blog (July 23, 2015), https://bit.ly/3ILQY6i.

The AADC-mandated age-assurance interstitial will result in even higher bounce rates because it will require users to provide private and sensitive information. *See* CNIL Report (noting that age verification "contains particularly sensitive, private information"). These disclosure requirements will discourage users from proceeding because "[u]sers assess the costs and benefits of the personal data disclosure and if they do not consider the benefits to be larger than the costs they will defect." Miguel Malheiros & Sören Preibusch, *Sign-Up or Give-Up: Exploring User Drop-Out in Web Service Registration*, Symp. on Usable Priv. & Sec. (SOUPS) (2013), https://bit.ly/3ExraIu. The privacy and security concerns make the decision to proceed much riskier for the users than pages without privacy-invasive requests, and new users will have to make these decisions without inspecting the website or app to determine if they consider the page trustworthy enough to provide such sensitive information.[7] *See* Ting Li & Paul A. Pavlou, *What Drives Users' Website Registration?* (Dec. 18, 2013), http://bit.ly/3St0ezI

[6] For example, one age-assurance vendor, Yoti, touts that its automated verifications take about eight seconds. *See Identity Verification*, Yoti, http://bit.ly/3IsASgK (last visited Feb. 24, 2023).

[7] If a website or app outsources its age-assurance process to a third-party vendor, it will create several additional concerns: Can the user trust the third-party vendor? What is the relationship between the third-party vendor and the destination? Could a malefactor interpose itself in between the third-party vendor and the destination (sometimes called a man-in-the-middle attack)?

("[I]nformation privacy concerns, trust, and brand awareness are particularly important in users' decisions to disclose personal information to register on commercial websites[.]").

The AADC will cause a combination of the time delays, the intrusiveness of the interstitial process, and the privacy and security risks posed by the age-assurance process that will cause bounce rates to soar. This, in turn, will produce problematic second-order effects. For example, the AADC raises barriers to entry for new websites and apps that users do not yet trust. Users' lack of established trust will deter their willingness to navigate the age-assurance process. That effect, in turn, will benefit incumbents who have already established a strong enough trust relationship with users to get past their reluctance to do age assurance.

Thus, the AADC's purported ambition to protect children's privacy is in complete tension with its age-assurance requirement. As previously discussed, the decision to complete the age-assurance process can be an inherently risky one for users—i.e., users may be prompted to disclose personal and sensitive information. And children, who are still developing their judgment and digital literacy, are not well-equipped to make that decision for themselves. As a result, the AADC makes it easy for malefactors to prey on children's underdeveloped digital skills by getting them to reveal private and sensitive information through illegitimate age-assurance processes. It is hard to imagine how such a requirement advances the legislature's purported objective to "prioritize the privacy, safety, and well-being of children." Cal. Civ. Code § 1798.99.29(b).

## II. Age-Verification Requirements Chill Online Readers and Authors and Therefore Violate Fundamental First Amendment Principles.

The effects of the AADC's age-assurance requirement on user behavior have major First Amendment implications. The AADC requires age assurance before readers can access and consume the content of an application or website. Some of that content may be commercial speech, such as offers to sell goods or services. But most of the content will be speech that qualifies for maximum constitutional protection, i.e., categories of content, restrictions of which face strict scrutiny. *See generally* Cal. Civ. Code § 1798.99.29 (drawing no distinction between commercial and noncommercial speech).

Courts have repeatedly rejected age-verification requirements analogous to the regulations at issue in this case on constitutional grounds. In the late 1990s, Congress and the states passed numerous laws designed to prevent children from accessing purportedly harmful material online. In response, courts thoroughly vetted the implications—and constitutional infirmities—of online age verification.

In 1996, Congress enacted the Communications Decency Act (CDA), which the Supreme Court largely struck down in *Reno v. ACLU* as a vague and content-based restriction of protected speech under the First Amendment. 521 U.S. 844 (1997). The CDA criminalized the "knowing" transmission of "obscene or indecent" messages to minors over the Internet. *Id.* at 859. The law provided an affirmative defense for those who restricted access to covered materials by implementing age-verification measures. *Id.* at 860-61. But the Court held that age-verification requirements "would not significantly narrow the statute's burden on noncommercial speech" because "it is not economically feasible for most noncommercial speakers to employ such verification." *Id.* at 881-82.

In response, in 1998, Congress the Child Online Protection Act (COPA). Pub. L. No. 105-277, tit. XIV, 112 Stat. 2681, 2681-736 (1998). Like the CDA, COPA contained an age-verification provision as an affirmative defense. COPA was the subject of lengthy constitutional litigation, including two Supreme Court rulings,[8] that ultimately ended in its invalidation as unconstitutional by the Third Circuit. The Third Circuit repeatedly emphasized that age-verification provisions—in addition to failing narrow tailoring requirements—are inconsistent with First Amendment protections. The Third Circuit reiterated the district court's factual findings that utilization of age-verification measures would burden protected speech, holding that "users could be deterred from accessing the plaintiffs' Web sites" because "many Web users are simply unwilling to provide identification information in order to gain access to content, especially where the information they wish to access is sensitive or controversial." *ACLU v. Ashcroft*, 322 F.3d 240, 258-59 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004).

Five years later, when the Third Circuit struck down COPA for good, the court condemned age-verification requirements in even stronger terms. *See ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008). Not only was age verification insufficient to cure COPA's lack of narrow tailoring; it also "'raise[d] unique

[8] *See Ashcroft v. ACLU*, 535 U.S. 564 (2002); *Ashcroft v. ACLU*, 542 U.S. 656 (2004).

First Amendment issues' that ma[d]e the statute unconstitutional." *Id.* at 195 (citation omitted). Specifically, the court agreed that the age-verification requirements "present their own First Amendment concerns by imposing undue burdens on Web publishers due to the high costs of implementing age verification technologies and the loss of traffic that would result from the use of these technologies." *Id.* at 196-97. The court found that age verification also deters "many users who are not willing to access information non-anonymously . . . from accessing the desired information." *Id.* at 196 (quotation marks omitted). "It is clear," the court concluded, "that these burdens would chill protected speech and thus that the affirmative defenses fail a strict scrutiny analysis." *Id.* at 197.

In addition, several states passed laws resembling the CDA and COPA, sometimes called "Baby CDA" laws. Those, too, were struck down as unconstitutional when challenged, with courts employing similar logic. *See, e.g.*, *PSINet, Inc. v. Chapman*, 362 F.3d 227, 236-37 (4th Cir. 2004) (finding that an age-verification requirement using credit card numbers "creates First Amendment problems of its own" because "many adults may be unwilling to provide their credit card number online" and "[s]uch a restriction would also serve as a complete block to adults who wish to access adult material but do not own a credit card"); *Se. Booksellers Ass'n v. McMaster*, 371 F. Supp. 2d 773, 782 (D.S.C. 2005) (holding that age verification creates a "First Amendment problem" because "age verification deters lawful users from accessing speech they are entitled to receive"); *ACLU v. Johnson*, 4 F. Supp. 2d 1029, 1033 (D.N.M. 1998) (holding that mandatory age verification "violates the First and Fourteenth Amendments of the United States Constitution because it prevents people from communicating and accessing information anonymously"), *aff'd*, 194 F.3d 1142 (10th Cir. 1999).

The AADC-mandated age-assurance barrier is unconstitutional for all the same reasons that the CDA, COPA, and the Baby CDA laws were unconstitutional. Just like the prior age verification requirements, the AADC's age-assurance provision imposes high implementation costs on regulated businesses, deters user traffic through increased latency and intrusive requests for personal information, and—as a result—chills protected speech. "The effect of the [regulation] . . . is to drive this protected speech from the marketplace of ideas on the Internet. This type of regulation is prohibited by the First Amendment." *Ashcroft*, 322 F.3d at 260-61.

In fact, the AADC goes further than the CDA, COPA, and Baby CDA laws by imposing mandatory age-assurance barriers not only on content readers, but also on content authors. *See* Cal. Civ. Code § 1798.99.31(a)(5) (requiring covered businesses to "[e]stimate the age of child *users*") (emphasis added)). Websites and apps that allow users to author and publish content must conduct age assurance on *every* prospective author before they are given access to the authoring and publication tools. This process will cause high bounce rates for prospective authors and deter their constitutionally protected speech.

Furthermore, the privacy invasions caused by age assurance can increase anonymous authors' concerns that their online posts will be attributed to them. *See* CNIL Report ("[The] need to identify Internet users is, in fact, an issue for privacy and personal data protection, since knowledge of an individual's identity can then be linked to their online activity[.]"). As the Third Circuit cautioned, "[p]eople may fear to transmit their personal information, and may also fear that their personal, identifying information will be collected and stored in the records of various Web sites." *Ashcroft*, 322 F.3d at 259.

***

In 2017, the Supreme Court suggested that "the Cyber Age is a revolution of historic proportions" and cautioned against radical changes that might disrupt such revolutions. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017). The AADC radically changes the Internet's architecture, hindering adult and child readers and authors from engaging in constitutionally protected activities and heightening the privacy and security risks faced by both adults and children. The AADC violates fundamental First Amendment principles and should not be permitted to go into effect.

## CONCLUSION

For the foregoing reasons, *amicus curiae* respectfully requests that this Court grant Plaintiff's motion for preliminary injunction.

Dated: February 24, 2023

Respectfully Submitted,

By: /s/ *Lindsay C. Harrison*
Lindsay C. Harrison
Jessica Ring Amunson (*pro hac vice* pending)
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
Tel: (202) 639-6865
lharrison@jenner.com
jamunson@jenner.com

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2023, I filed the foregoing document via the Court's CM/ECF system. The document will be served electronically on counsel of record for the parties.

/s/ *Lindsay C. Harrison*
Lindsay C. Harrison

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

ROBERT CORN-REVERE (*pro hac vice*)
bobcornrevere@dwt.com
DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**DECLARATION OF STACIE D. RUMENAP IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: June 22, 2023<br>Time: 9:00 a.m.<br>Dept.: Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

I, Stacie D. Rumenap, declare:

1. ***Identity of Declarant***. I am the President of Stop Child Predators (SCP), a 501(c)(3) nonprofit organization founded in 2005 to combat the sexual exploitation of children and protect the rights of crime victims nationwide. I have led SCP since 2006, having worked in all 50 states—including spearheading the passage of Jessica's Law in 46 states. SCP brings together policy experts, law enforcement officers, community leaders, and parents to launch state and federal campaigns to inform lawmakers and the public about policy changes that will protect America's children from sexual predators both online and in the real world. I make this declaration from personal knowledge.

2. ***SCP's Mission***. SCP works with parents, lawmakers, and policy experts to better educate families, schools, and lawmakers about the potential risks children face both in the real world and online, including grooming, luring, bullying, child pornography, and other harms to children. SCP has worked for nearly two decades to open lines of dialogue with lawmakers and technology company stakeholders, to help them determine the best and most practical ways to protect children from these risks.

3. SCP focuses significant policy efforts on keeping social media, and the internet more broadly, safe for children. In 2008, we launched the Stop Internet Predators (SIP) initiative in recognition that child predators often use social-networking platforms to recruit child sex-trafficking victims, to groom children for sexual exploitation, and to sexually victimize children in general, and sex offender management, and that child safety must therefore be addressed both in the real world and online. Our more recent Digital Safety Project adapts the SIP initiative's goals to a new online landscape, and operates from the premise that the private sector plays an important role in protecting children. Through this project, we also work to ensure that the government doesn't unnecessarily interfere with the protection of children or the ability of parents to decide what's best for their children.

4. We believe that the internet and social media have incalculable value for our young people—particularly those who are disabled, suffer from anxiety, or are in other circumstances that make it difficult for them to connect in person. We therefore work with leading online





DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
ANGELES, CALIFORNIA 90017-2566

platforms, including Plaintiff's members, to develop and enforce policies that prioritize children's safety while still promoting free speech and ensuring children have access to valuable technology. Our goal is to help businesses develop tools and mechanisms to identify and promptly take down illegal content (Child Sexual Abuse Material, or CSAM), and to help them identify products and services that may be used by predators to target and lure children. These tools and mechanisms help businesses mitigate the potential for their products and services to be used to cause harm.

5. We believe the private sector plays a critical role in limiting the proliferation of harmful content online. For example, CSAM is prolific on the Internet. In 2018 alone, leading social media platforms reported over 45 million photos and videos of children being sexually abused. In fact, there are so many reports of child exploitation that FBI and Department of Justice officials said that investigating them would require assigning cases to every FBI agent. The government does not presently have the resources to do that. The government's limited resources underscore the importance of private moderation and filtering technologies. In order to detect CSAM, as well as to report it to authorities, online companies can (and must) develop and use advanced algorithms and other screening tools.

6. ***AB 2273***. We are concerned that AB 2273, while ostensibly intended to make the internet safer for children, will instead result in serious negative outcomes for children. For example, the law requires businesses to "[e]nforce published terms, policies, and community standards established by the business," and subjects businesses to civil liability if they do not do so adequately. We are concerned that many businesses will stop having community standards at all rather than expose themselves to liability for failing to enforce in a manner acceptable to California's Attorney General. Community standards are essential to transparent and efficient moderation of CSAM and other content that may expose children to harm, and we oppose any legislation that would discourage the establishment of community standards.

7. We are also concerned about AB 2273's requirement that covered businesses "[e]stimate the age of child users with a reasonable level of certainty." This would require businesses to collect personal information from each of their minor users, creating a trove of sensitive data regarding these children. We consider it not a risk but an inevitability, given the

realities of data security, that one or more of these data sets will be breached, exposing the personal information of children to bad actors. In fact, it would be entirely consistent with predators' *modus operandi* to seek out such information, even by taking a job where they could have access to it.

8. In my work to make the internet safer for children, I have become familiar with the types of technology that companies have considered to verify the ages of their users. I understand that this technology raises accessibility concerns. For instance, a technology that requires a user to take a photograph of their own face would not be accessible to a person who does not have an integrated camera on their device, and may prove practically inaccessible to someone who is vision impaired and cannot easily take a photograph. While we believe the government should be involved in keeping the internet safe for children, we are opposed to a solution that would render portions of the internet inaccessible to disabled and under-resourced individuals.

9. AB 2273 also prohibits a covered business from "[c]ollect[ing], … shar[ing], or retain[ing] any personal information" about children or "us[ing]" children's personal information "for any reason other than a reason for which [it] was collected," unless the business can "demonstrate a compelling reason" that such activities are "in the best interests of children." The problem with these provisions is that they require tracking of children to be justified *before* it happens, when the importance of preserving this information may only emerge *after*.

10. For example, consider a child unknowingly involved in an online exchange with an older predator, who is masquerading as a young person and attempting to lure the child into a dangerous situation. If the child is ultimately entrapped, their online activity (including their conversations with the predator and their search history) could be critically helpful in finding the child, but if sites are prevented from collecting this information in the first place, this valuable evidence will be lost. In fact, a child's online activity could reveal patterns that could help private companies alert the children and their parents to something amiss, but those patterns will not come to light if they are erased before they can be analyzed. To provide an example: A child searching for information about bus routes may not be a concern on its own, but a child searching for information about bus routes immediately *after* interacting online with an adult in another state could trigger an alert to the child and/or their parents. AB 2273 strongly discourages—if not

prohibits altogether—companies from using this kind of harm-prevention technology.

11. Finally, AB 2273 in a number of cases requires companies to evaluate whether content or services could be "harmful" or risk "material detriment" to children, extremely vague standards that would be subject to interpretation by each California Attorney General. By doing this, AB 2273 displaces the individual judgments of families as to what is appropriate for *their* children with the State's monolithic determination of what is appropriate for *all* children. We consider this an unnecessary interference into decisions that should be left in the hands of families. In fact, we believe that children are safer when their families, not the government, are empowered with the tools to guide and guard their online activities.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed at Washington, D.C., this 14th day of February, 2023.

Stacie D. Rumenap

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

ROBERT CORN-REVERE (*pro hac vice*)
bobcornrevere@dwt.com
DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**DECLARATION OF MICHAEL MASNICK IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: June 22, 2023<br>Time: 9:00 A.M.<br>Dept.: Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

I, Michael Masnick, declare:

1. ***Identity of Declarant***. I am the founder and CEO of Floor64, Inc., a California small business that operates a widely-read blog at Techdirt.com (Techdirt), which for over 25 years has been chronicling developments in technology law and policy and their convergence with civil liberties. I am also the founder and editor of Techdirt. I make this declaration from personal knowledge and a review of Techdirt's and Floor64's records kept in the ordinary course of business.

2. ***Techdirt's Expression***. Since our founding in 1997, we have published more than 70,000 articles on Techdirt regarding subjects such as freedom of expression and platform liability, as well as copyright, trademark, patents, privacy, innovation policy, and more. The Techdirt site often receives more than a million page views per month. We also publish a daily newsletter emailed to subscribing readers, and under Techdirt's editorial auspices, we produce an original podcast linked from its website that reacts to cutting-edge technology issues in greater depth.

3. Techdirt's expressive content is authored primarily by a team of employees, freelance writers, and other contributors. Its own content is also augmented by the contributions of readers, who have posted nearly two million comments on Techdirt articles since the site launched. (Readers posted approximately 62,000 comments on 2,056 articles in 2022 alone). These comments, as well as the additional discussions happening in other online forums hosted for Techdirt readers, are themselves expression that advances discovery and discussion, and we regularly highlight those comments that convey particular insight or humor. *See* Leigh Beadon, "Funniest/Most Insightful Comments Of 2022 At Techdirt," TECHDIRT (Jan. 1, 2023), https://www.techdirt.com/2023/01/01/funniest-most-insightful-comments-of-2022-at-techdirt/ (last visited Feb. 16, 2023).

4. With Techdirt, my company, Floor64, and I are able to be a key contributor to online conversations around technology law and policy issues, not just as a central source for related news and information, but also as the host of a community of readers who feel equally empowered to participate in the dialogue. My personal goal, and our business goal, is to keep expanding Techdirt's online influence, audience, and community, as well as ensure that the public


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

has a platform available to debate and discuss the latest technological news of the day, in order to positively affect the policy issues at the heart of this discourse.

5. ***Engaging with Techdirt's Expression***. The majority of Techdirt's expression is free and publicly available to anyone on the internet anywhere in the world. No accounts are needed to read articles, listen to podcasts, or submit user comments. Although Techdirt asks readers for their names and email addresses before they comment, Techdirt does not require this information, and, accordingly, many users leave anonymous comments. We consider user-generated comments—both anonymous and non-anonymous—to be an essential and vibrant part of the online discourse we seek to foster in furtherance of our own expressive interests.

6. Although Techdirt does not require visitors to create an account to access articles or leave comments, users may do so if they wish to create a public profile on the site. With that account, they can more easily track all the comments they have made. Techdirt also offers several subscription tiers to "Techdirt Insiders," who are readers who financially support the site, to provide them with additional perks in exchange for their support. Tiers currently include the "Crystal Ball" tier, which gives subscribers early access to unpublished posts, and the "Watercooler" tier, which enables subscribers to contribute to Techdirt's Discord, an online forum for Techdirt readers to chat with Techdirt staff and contributors. Accounts are needed to be able to benefit from these additional features.

7. ***Techdirt's Readership***. Techdirt is a website aimed generally at the public. It does not, however, deliberately invite the attention of readers younger than 13, and in its privacy notice, it forbids users under 13 from registering for a Techdirt account or submitting any personally identifiable information.

8. Techdirt has, however, historically welcomed readers between the ages of 13 and 18 and allowed them to register for accounts. We anticipate that teenagers may read our articles and potentially want to respond via comments because we know from past experience that many areas of Techdirt's coverage are relevant to them. For example, Techdirt's reporting on issues like online harassment, teenagers' use of social media, and schools' attempts to restrict social media—or, indeed, this very law—are likely of significant interest to teenage users whose lives are directly



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

affected by these issues firsthand. In fact, over the years, Techdirt has been contacted by high school students about its articles because they were aware of, and concerned by, how the subject matter bore on their own interests and speech rights. In our experience, the 13-18 audience is often just as conversant in Techdirt's core areas of coverage as any other demographic and just as interested in looking to Techdirt for breaking technological news and related issue advocacy because they understand how it so directly affects them.

9. ***Supporting Techdirt's Expressive Activities***. In order to ensure that Techdirt's expression can remain available to the public at large, and for free as much as possible, its expressive activities need to be underwritten via other methods. These methods include the aforementioned subscriptions, donations collected via Patreon (a service that enables creators who provide content to obtain financial support from audiences), third-party partnerships, and merchandise and services sold through http://deals.techdirt.com. At times, Techdirt has also depended on advertising, although no ads are currently displayed (except for those advertising products and services sold on the Techdirt website). All of these methods require Techdirt, or the third parties they depend on, to be able to have the operational infrastructure needed to underpin them.

10. ***Data Collection and Sharing***. We believe we foster a better relationship with our readers when we minimize the amount of data we collect from them. However, to operate, maintain, and provide Techdirt's features and services, Techdirt does collect limited user data, such as any information provided when making a purchase through Techdirt's store and information like IP addresses and website visitation details. Techdirt also collects information connected to accounts when supplied by readers. In limited circumstances, Techdirt shares this information with third parties for them to perform various tasks associated with the operation and maintenance of the site and providing its features and services.

11. ***Age Verification***. Techdirt does not track or collect data confirming the age of its readers, nor does Techdirt require readers to verify their ages before accessing content on the site. By not collecting such information in the first place, there is no risk of such sensitive information inadvertently ending up in the wrong hands. Mandating readers provide such information would


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

also interfere with our expressive desire, and practice, of facilitating discourse among anonymous discussants.

12. Techdirt lacks the technology needed to change that practice in order to verify the ages of all of its readers, nor does it have the resources to put such technology in place. Such a change would require fundamentally redesigning Techdirt's publication to be one that requires the public to sign up—and in the process submit sensitive personal information—in order to read it, instead of the generally accessible publication that it is today. Reconfiguring Techdirt's interface to accommodate the submission, collection, and secure storage of sensitive personal information would be extremely difficult and expensive to implement. Techdirt could not absorb the cost of fundamentally rearchitecting its data management practices without a devastating economic impact on the site and its ability to convey expression.

13. Redesigning our publication to verify the ages of our readers would also compromise our deliberate practice to minimize how much data we collect and retain about our readers to both limit our obligations that would arise from the handling of such data as well as preserve trust with our readers and undermine our relationship with our readers of any age, including teenagers, by subjecting them to technologies that are at best, unreliable, and at worst, highly privacy-intrusive (such as facial recognition). Moreover, because a sizeable portion of Techdirt's readership consists of casual readers who access the site for information and news, any requirement that forces users to submit extensive personal information simply to access Techdirt's content risks driving away these readers and shrinking Techdirt's audience.

14. ***Impact of AB 2273 on Techdirt's Expression***. Techdirt understands that AB 2273 will require covered businesses to evaluate and mitigate the risk that "potentially harmful content" will reach children, with children defined to equally cover every age from 0 to 18 despite the substantial differences in developmental readiness and ability to engage in the world around them throughout that nearly two-decade age range. This entire endeavor results in the State directly interfering with my company's and my expressive rights by limiting to whom and how we can communicate to others. I publish Techdirt with the deliberate intention to share my views (and those of other authors) with the public. This law will inhibit my ability to do so in concrete and



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

measurable ways.

15. In addition to its overreaching impact, the law's prohibitions also create chilling ambiguity, such as in its use of the word "harm." In the context of the issues that Techdirt covers on a daily basis, there is no feasible way that Techdirt can determine whether any number of its articles could, in one way or another, expose a child to "potentially harmful" content, however the State defines that phrase according to the political climate of the moment. For example, Techdirt covers a broad array of hot-button topics, including reporting on combating police brutality (sometimes with accompanying images and videos), online child sexual abuse, bullying, digital sexual harassment, and law enforcement interrogations of minors—all of which could theoretically be deemed by the State to be "potentially harmful" to children. Moreover, Techdirt's articles are known for their irreverent and snarky tone, and frequently use curse words in their content and taglines. It would be impossible to know whether this choice of language constitutes "potentially harmful content" given the absence of any clear definition of the term in AB 2273. Screening Techdirt's forum for "potentially harmful" content—and requiring Techdirt to self-report the ways its content and operations could hypothetically "harm" children—will thus cause Techdirt to avoid publishing or hosting content that could even remotely invite controversy, undermining Techdirt's ability to foster lively and uninhibited debate on a wide range of topics of its choosing. Moreover, not only would Techdirt's prospective expression be chilled, but the retroactive application of AB 2273 would result in Techdirt needing to censor its previous expression, and to an enormous degree. The sheer number of posts and comments published on Techdirt makes the self-assessment needed to comply with the law's ill-defined rules functionally impossible, requiring an enormous allocation of resources that Techdirt is unable to dedicate.

16. It is further unclear whether AB 2273 was written to apply only to California users, but even if it is so limited, Techdirt cannot feasibly customize or limit its expressive offerings to readers in a single state. Creating a completely separate service just for California users (or just for those California users under age 18) would be expensive and impractical. In addition, Techdirt is not aware of any reliable technology capable of ensuring that a California user could not evade any geographic blocking. If Techdirt must adjust its services to comply with AB 2273, it would


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

need to do so globally—meaning it could be potentially forced to remove a broad array of information from the site for its entire audience worldwide.

17. The burdens of AB 2273's demands on expression are substantial. For example, AB 2273 appears to require a mandatory harm analysis for every existing Techdirt feature that will remain available in July 2024, as well as for any new feature Techdirt might want to launch between now and then, or after that date. If this is what AB 2273 requires, Techdirt would have to create a separate Data Protection Impact Assessment (DPIA) for every individual website feature—like Techdirt's comment system, comment voting, comment promotion, posts, newsletter subscription, and podcast, just to name a few. This obligation would impose an enormous logistical and resource burden on Techdirt's team and would likely significantly impact Techdirt's capacity to continue publishing at its current rate, as well as constrain its ability to launch any new editorial features.

18. Ultimately the demands of AB 2273 inflict on Techdirt far more than business-altering technical burdens and economic costs. They fundamentally threaten Techdirt's expressive ability, inhibiting its ability to publish content of its choosing, exercise editorial autonomy over that content, build ties to readers, and foster the online conversations that define Techdirt's identity as an expressive outlet. They also will limit Techdirt's ability to explore new editorial-related partnerships with third-party services that would benefit Techdirt's reader community. Taken separately and together, the demands of this law, including the requirement that Techdirt identify and mitigate the "risks" of its content and potentially disclose them to the California Attorney General, will force Techdirt to police its own audience and self-censor its own expression, which impinges on Techdirt's own expressive rights, as well as the expressive rights of its readers.

19. ***Preparing for AB 2273***. Although Techdirt understands that AB 2273's effective date is July 2024, it is not possible to delay complying with a law with an impact of this magnitude. Techdirt is already starting to spend significant time and resources preparing for potential changes to its services in order to comply with the law. Techdirt must now decide whether it can develop and implement the kind of software necessary to verify users' ages (which would take months to develop, if even feasible), determine what makes content "potentially harmful," and implement


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

technical guardrails to keep that content from reaching young users. Alternatively, Techdirt must consider whether it should simply remove all posts of potential interest to adolescent readers in the hopes that those readers will simply stop reading the website. Of course, given that Techdirt is a widely read informational and news site that covers topics of significant public interest, the only way such an approach would work is if adolescent readers suddenly stopped caring about the world around them. Given how unlikely they are to do so, Techdirt must instead prepare for the law to go into effect, which will require the expenditure of significant technical, personnel, and resource costs, and in all events impinge on its expression.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 15th day of February, 2023, in Redwood City, CA.



Michael Masnick



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

ROBERT CORN-REVERE (*pro hac vice*)
bobcornrevere@dwt.com
DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: June 22, 2023<br>Time: 9:00 a.m.<br>Dept.: Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

I, Denise Paolucci, declare:

1. I am the co-owner of Dreamwidth Studios, LLC, which operates the website Dreamwidth.org. I have co-owned and operated Dreamwidth since the site's inception and have worked in multiple roles, including as the head of the Trust and Safety team and head of product development. I make this declaration from personal knowledge and a review of Dreamwidth's records kept in the ordinary course of business.

2. Dreamwidth is an open-source social networking, content management, and personal publishing platform, in operation since 2009. Dreamwidth's registered users can create profiles, post content to their "Journal," comment on content posted by others, search for users with similar interests, and post in community forums. Dreamwidth is committed to open access, personal privacy, transparency, freedom of expression, accessibility, and inclusiveness. It operates according to a set of Guiding Principles and a Diversity Statement. *See* https://www.dreamwidth.org/legal/principles; https://www.dreamwidth.org/legal/diversity. Dreamwidth provides a number of privacy, security, and content-control features, allowing our users a high degree of control over their own data and their own online experience. Our users can choose who sees their content, restrict access to their content in multiple ways, and control the privacy and security of everything they post to the site. Dreamwidth prides itself on being a safe space for marginalized communities, queer and transgender people, and individuals who self-identify outside the norm. Dreamwidth has approximately 4 million registered accounts, and has over 1.8 million unique visitors annually.

3. ***Business Model and Data Sharing***. Dreamwidth does not serve ads or sell user data, and does not accept payment to promote or otherwise change the order or priority of content or to target content or posts to a subset of users.

4. However, like every small business with limited resources, we employ multiple third-party vendors to provide commercially valuable business services we lack the resources to offer ourselves, including Google Analytics (for website traffic and browser capability analysis) and Stripe (for PCI-compliant payment processing). We also use cloud computing services to host the servers that operate the website and to provide both security defense services (to prevent


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

cyberattacks from malicious actors) and content delivery services (to speed up access to the site). These services are necessary to the operation of our site, but they are impossible to use without transferring some amount of identifying user information to our vendors. We do not have the resources to build self-hosted replacements for these systems, and there are no available alternatives that do not involve some transfer of user information. I understand based on the text of AB 2273 that because we share user information with these outside services to ensure the functionality of our for-profit business, we may be a covered "business" under the law.

5. Dreamwidth's revenue comes entirely from fees from subscriptions for paid accounts, which are eligible for extra services on top of the standard services available to all users. For example, paid accounts can add icons to their profiles, have access to additional custom styles and expanded search functionality, and can create an @dreamwidth.org email address. Dreamwidth operates on a limited budget. It is staffed by myself and the company's other co-owner, two part-time employees, and approximately 200 volunteers.

6. ***Content.*** Content posted to Dreamwidth runs the full gamut of subject matter, reflecting the interests and creative drives of its users. Users post shortform and longform original content, artwork, photographs, and commentary to their individual journals, and also participate in interest-based community forums. Many of the most popular Dreamwidth communities are "fan" communities, meaning they are devoted to discussion of one or more fiction books, series, television programs, films, or real life individuals or groups. Fanfiction and role-playing games ("RPGs") are also popular formats for content on Dreamwidth. Fanfiction refers to original fictional works featuring the characters of an existing work. RPGs involve a user taking the identity of another person—generally a fictional character—for purposes of creative writing and/or interactions with other users who may themselves be in character. For example, someone may wish to roleplay a character who has just received their invitation to a magical boarding school they didn't know existed, a character who serves on the crew of a spaceship dedicated to exploring the galaxy, or a character who hunts and fights supernatural beings. This content may be sexual in nature, and indeed, fanfiction in general is an extremely popular format for erotic literature. Some of our users' original content may also touch on other extreme or transgressive themes as



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

well. Dreamwidth believes that users should be able to express themselves fully in a safe environment, and that includes giving them the freedom to explore these themes.

7. Dreamwidth does not "recommend" accounts or content to users. Dreamwidth also does not offer any "algorithmic timeline" that adjusts the display of content based on a prediction that a particular user will be interested in a particular piece of content. Instead, a user's "Reading Page" (our equivalent of a "timeline" or "feed") is populated entirely by content from accounts that user has subscribed to and will always appear in reverse chronological order. The site has rudimentary additional content discovery areas, including a simple keyword search ("Content Search"), a "firehose" feed of public posts that have recently been made to the site ("Latest Things"), and the ability to search for "Interests" other users have added to their profiles. Dreamwidth allows users to opt out of having their posts or accounts included in these additional content discovery areas.

8. ***User Safety***. Dreamwidth provides its users a significant amount of control over who can see their content. Registered users can specify privacy settings for nearly every piece of information they post to the site. Privacy settings can be applied to entire user accounts or community accounts, to individual posts, and even to individual pieces of information users have chosen to add to their profiles such as their email address, their location, or their birthday. For example, posts made to Dreamwidth can be set as "public" (visible to anyone who accesses the user's URL), "access locked" (visible only to other users the poster has affirmatively authorized to see the post), "custom filtered" (visible only to a user-defined subset of the other users the poster has affirmatively authorized to see the post) or "private" (visible only to the user).

9. Users also have the option to add one of two different content restrictions to a post, or to an entire journal or community (in which case each post inherits the same restriction by default). The first form of content restriction, "Viewer Discretion Advised," puts the content behind a click-through warning notice that the poster has advised the content "should be viewed with discretion." Clicking an acknowledgment button will reveal the content. Users who apply this restriction can also enter a specific reason that discretion is advised, which the warning will display. Reasons may include that the content contains "spoilers," may upset or trigger certain


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

audiences, or may contain adult or "not safe for work" content. The second content restriction, "Adult Content," prevents users who are under eighteen years old (based on the birthdate entered by the user during account set up) from loading the content at all. Users registered as over eighteen will get a click-through warning reading "you are about to view content that [username] marked as inappropriate for anyone under the age of 18," though they can disable these warnings in their account settings. If the content is posted publicly, users who are not logged in to Dreamwidth will receive a click-through warning that the content has been "marked as inappropriate for anyone under the age of 18," and have to click a button reading "Yes, I am at least 18 years old" before viewing.

10. Dreamwidth has decided to treat the un-logged-in general public as over-18, in part because we have seen evidence that blocking access to anyone other than users registered as over-18 results in users under-utilizing the Adult Content flag, making Dreamwidth less safe to its registered under-18 users. Users can avoid this workaround using their privacy settings. For example, they can apply the Adult Content restriction and set their content to only be viewable to registered users who subscribe to their journal, so that only subscribers registered as over-18 will be able to view the content. Dreamwidth relies on its users to apply privacy settings in an appropriate manner to ensure the safety of the community. Dreamwidth does not proactively moderate for adult content. In fact, doing so would be contrary to our belief that our users are entitled to wide discretion in how they choose to express themselves. The exception is when someone reports a journal to us that contains a large percentage of adult content. In that case, we retain the right to set an Adult Content restriction on the journal. We also reserve the right to set the Adult Content restriction on pornographic or violent imagery we encounter in the course of our standard site maintenance, but do not proactively search for such content. We do not apply this practice to all written works that include erotic or other mature content.

11. ***User Accounts***. When a user signs up for a Dreamwidth account, they must enter a username, an email address that can be verified through an automatic email link, a password, and a birthdate. The birthdate field displays a notice that "This information is required by law" and "You must enter your real birthdate." We do not accept registrations from users who identify



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

themselves as under thirteen years old. A user cannot change the birthdate entered at setup, and this information is not displayed or used for any other purpose.

12. ***Age Verification***. Despite our efforts to encourage accurate reporting of birthdates at registration, there is no way to verify that the user has entered their real birthdate. Dreamwidth's users are extremely privacy-conscious. We go to great lengths to assure users that the legal birthdates they enter at account registration will be used for no purpose other than legal compliance. We even allow users to specify a separate birthdate to display on their profile. Despite these efforts, our records support the theory that users regularly enter false birthdates when registering their accounts: A review of the legal birthdates supplied at registration indicate over 13,000 registered users reported a legal birthdate of 1923 or earlier, which seems unlikely to be accurate. Additionally, registered users reported a legal birthdate of either 1/1/1990 or 1/1/1980, which I know to be common "dummy" birthdates used by the privacy-conscious, on 87,545 individual accounts—a highly disproportionate 6.7% of our total individual accounts. 1,955 accounts reported a legal birthdate that would make them under 18 years old, but the true number could be higher or lower. It would be contrary to Dreamwidth's principles to demand our users supply proof of legal birthdate, because the only way to do so would be to require identity verification. Dreamwidth's users come to our platform expecting their privacy and anonymity to be respected. Demanding any form of identity verification would alienate our privacy-conscious users. We do not want to be forced to collect this data, and our users do not want to be forced to provide it to us.

13. I am also not aware of any technology—much less technology available to a site with Dreamwidth's limited resources—that could allow us to verify or even estimate our users' ages with any degree of accuracy. I have looked into several proposals for using algorithmic artificial-intelligence-based analysis to estimate the ages of users. Yet these proposals would apply scientifically unvalidated black box systems to our users. Moreover, they carry significant risks of biased and inaccurate results. For example, one proposal I have seen involves using textual analysis of a person's writing style or reading level to estimate that person's age. I believe that any analysis based on writing style or reading level will result in discrimination against people



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

with an underprivileged educational background and, given the reality of disparate educational access, that discrimination will inevitably be worse for people who are already marginalized on the basis of race or national origin. This method would also have a disparate impact on those who are writing in a second language and those experiencing temporary or permanent cognitive disabilities.

14. Another proposal I have seen involves employing facial recognition technology to estimate the age of the person being recorded. I consider the privacy violation inherent in biometric software unconscionable. But even putting that aside, studies have shown that facial recognition technology is more likely to class members of certain racial and ethnic backgrounds as younger than they actually are. *See* Dahlan, Hadi A. "A Survey on Deep Learning Face Age Estimation Model: Method and Ethnicity." INTERNATIONAL JOURNAL OF ADVANCED COMPUTER SCIENCE AND APPLICATIONS 12.11 (2021). Accordingly, this method would have a significant disparate impact on those users. It could also have a disparate impact on our users who are less financially stable, since they may be less likely to be able to afford a device capable of capturing and transmitting photo or video. It is also common for disabled people to use older technology, which is less likely to have a webcam, because their accessibility software won't run on newer hardware, or the cost of an updated software license is prohibitively expensive. In fact, our analytics show that at least some of our users access the site using computers that are too old to have webcam technology or devices that don't have the ability to capture images. Blind people in particular also experience significant problems using any software that requires facial recognition technology, because it is difficult for them to determine when the camera's field of vision includes their face.

15. All of these categories of marginalized people are named in our Guiding Principles as groups whose needs we explicitly seek to not only accommodate, but center. Because of our track record in upholding those Guiding Principles and considering the needs of marginalized groups, members of those groups have grown to trust our services and have become loyal users. To provide only a few illustrative examples of the kinds of marginalized groups who have turned to Dreamwidth, our users include large groups of: (a) Russian or Chinese activists protesting their


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

government's human rights abuses, who are comfortable using our site because we do not cooperate with their government's mandated censorship and do not require them to provide us personally identifying information that may be discoverable by their government; (b) disabled people who are looking for community or seeking to share information on their conditions, who are comfortable using our site because we do not require them to provide us personally identifying information that may be used against them by doctors, insurance companies, employers, etc., and because we employ significant effort to make sure the site is accessible to multiple conflicting disability access needs; (c) blind people who can use our site easily because of the significant effort we employ to ensure the site is one of the most screenreader-accessible products on the internet and because we minimize the steps it takes to create an account; (d) people of marginalized genders and sexualities, who are comfortable using our site because we don't accept advertising and therefore are not affected by companies who are more likely to treat LGBTQ content as age-inappropriate while heterosexual content is treated as acceptable. AB 2273 will require us to betray the promises we have made to respect these people's privacy and to refrain from placing unnecessary barriers to their use of the site.

16. ***DPIAs***. I understand that AB 2273 requires covered businesses to complete a Data Protection Impact Assessment ("DPIA") for any existing "online service, product, or feature likely to be accessed by children" as well as prior to launching any additional such service, product, or feature. I understand further that these DPIAs must include an assessment of a number of factors, including, for example, an evaluation of whether the service, product, or feature at issue could expose a minor to "harmful, or potentially harmful, content." Finally, I understand that AB 2273 requires covered businesses to mitigate any "risk of material detriment to children" that its services, products, or features could create. Preliminarily, Dreamwidth has limited resources to devote to this requirement. We have only two part-time employees, in addition to myself and my co-owner, and do not have the resources to add more staff. We do not have an in-house lawyer who can advise on whether every new service, product, or feature we offer would be "likely to be accessed by children" in the view of California regulators, nor do we have the resources to keep an outside lawyer on retainer to provide this advice on a continuing basis. In order to produce


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

DPIAs for every new service, product, or feature we offer, we would need to somehow train our 200 volunteers to create DPIAs, when many of those volunteers have limited time to contribute in the first place. Even the training process alone—not to mention the time required to actually complete DPIAs and staff time required to review them to ensure completeness—would be a huge drain on our resources and divert attention from more critical issues concerning site functionality and/or user trust and safety. Moreover, our volunteer program is entirely self-directed, with volunteers choosing which tasks to complete. It would change the face of this program to impose additional mandatory training sessions or other time commitments beyond what volunteers choose to contribute.

17. The definition of "service, product, or feature" is also unworkably vague, and does not correspond to how our business operates. The nature of our open source development means that very few changes to our site are made by Dreamwidth employees or owners. Instead, they are made by individual volunteer contributors from around the world. In accordance with our Guiding Principles, we have focused a significant amount of time in teaching our website users how to program, including many people from underrepresented or marginalized groups who have never been given the opportunity to learn programming before. In service of this goal, we have done significant work to lower the barrier to entry for contributions, and to make it easy and simple for volunteer programmers to submit proposed changes, from small typo fixes to the addition of entirely new features. For example, our volunteer programmers developed a feature that made it possible for users to customize the look of their journal any way they would like, Volunteer programmers also built most of our pre-built journal layouts, improved the accessibility of the site for disabled people by introducing assistive features, modernized the code that generates each of our site's pages for contemporary browsers, and have contributed security fixes that help us protect our users' accounts and personal data. AB 2273 is vague and uncertain about which of these user-submitted proposed changes would require an accompanying DPIA. If we are forced to assume, to avoid the risk of fines, that *any* change requires a DPIA, that would place an additional step on the contributing process which would unduly burden our volunteer developers and our limited staff. We may have to withdraw certain services entirely to comply with AB 2273, and have been



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

forced to consider whether our site can continue to operate at all given the burdens the law imposes. In addition to significantly slowing our ability to improve the site, completing DPIAs pursuant to AB 2273 would add significant delays to the process of resolving any privacy or security issue or potential improvement that we discover, since it would add a complex additional prerequisite to implementing many of these changes. This is explicitly contrary to the stated purpose of the AB 2273 to ensure "strong privacy protections" for young web users.

18. I am also very concerned about AB 2273's requirement that we create DPIAs to evaluate, and then mitigate, "the risks of material detriment to children that arise from the data management practices" of our business and the potential that minors could be exposed to "potentially harmful" content on Dreamwidth. These standards of "material detriment" and "potentially harmful" are extremely vague and inherently subjective, and would put us at the whims of whatever a given administration believes at a given time. For example, in the past year, a number of state legislatures have introduced bills that classify providing information about gender-affirming care to any person under age 18 as harmful, with the Texas Attorney General even defining providing gender-affirming care to minors as "child abuse," *see* https://gov.texas.gov/uploads/files/press/O-MastersJaime202202221358.pdf, and the California Attorney General could in theory adopt this definition as well. Yet, at the same time, transgender adolescents are at high risk of suicide: One study found that 86% of transgender adolescents in the study (with a mean age of 16) had experienced suicidal ideation, and 56% had attempted suicide, *see* Austin, Ashley, et al. "Suicidality among transgender youth: elucidating the role of interpersonal risk factors." JOURNAL OF INTERPERSONAL VIOLENCE 37.5-6 (2022): NP2696-NP2718. Another found transgender adolescents had 5 times the risk of suicidal ideation and 7.6 times the risk of attempting suicide. *See* Kingsbury, Mila, et al. "Suicidality among sexual minority and transgender adolescents: a nationally representative population-based study of youth in Canada." CMAJ 194.22 (2022): E767-E774. Although it is impossible to quantify the exact number of transgender individuals on Dreamwidth, our site statistics show that at least 3% of Dreamwidth users identify as neither male nor female, and a full 50% choose not to specify their gender. I expect that a significant amount of content on the site touches on transgender issues,


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

including the process of accessing gender-affirming care. If Dreamwidth restricts access to this content to avoid the specter of huge fines under AB 2273, that could ultimately increase the risk of suicidality among our adolescent transgender users. Thus, under AB 2273, we could be in a scenario where both restricting and not restricting content related to gender-affirming care could be considered "harmful" to adolescents.

19. This is only one of numerous areas where state legislators are waging culture wars by defining certain subject matters as harmful to children. For example, in the past year, a number of state legislatures have introduced or passed bills that target speech about LGBTQ relationships, or speech about structural inequalities experienced by certain marginalized groups. "Potentially harmful" could also arguably be read to encompass original content produced by our users that explores adult themes, since some believe such content could be "detriment[al]" or "harmful" to minors. Dreamwidth operates on a fundamental principle that our users should feel safe to express themselves, and should not be censored even when that expression involves erotic themes. Imposing the government's value judgments on our users' expression would be a knife in the heart of our platform and its community. Dreamwidth is strongly opposed to operating as a proxy for government censorship.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 15 day of February, 2023, in Baltimore, MD.

Denise Paolucci



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

ROBERT CORN-REVERE (*pro hac vice*)
bobcornrevere@dwt.com
DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**DECLARATION OF LIBBY ROIN IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: June 22, 2023<br>Time: 9:00 a.m.<br>Dept.: Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

I, Libby Roin, declare:

1. ***Identity of Declarant***. I am Chief Executive Officer of Goodreads. I make this declaration from personal knowledge and a review of Goodreads' records kept in the ordinary course of business.

2. ***Goodreads Service***. Goodreads is the world's largest site for readers and book recommendations. Its mission is to help people discover books they love and get more out of reading. As of February 2023, Goodreads has approximately 150 million registered users globally.

3. Goodreads was started in 2006 as a website where users could create and share virtual bookshelves to track books they had read, were reading, or planned to read; post book ratings and reviews; and engage in discussions about books with other users. These user-generated reviews and ability to track their reading continues to be a main draw for Goodreads users. Goodreads also now provides personalized book recommendations to its users based on the books they have previously "shelved" or reviewed and publishes original content to the Goodreads News and Interviews page.

4. Goodreads facilitates discussion not only among established book lovers, but also among teen readers who are still developing their love of reading. Teachers have reported that encouraging their students to track reading through Goodreads encourages accountability, motivates students, and fosters a sense of accomplishment. Teachers can encourage students to set goals for themselves through the Goodreads Reading Challenge. Goodreads also facilitates peer-to-peer recommendations among students, with less prolific readers able to benefit from the suggestions of their book-loving classmates.

5. Goodreads also provides a number of services to authors and publishers that allow them to connect with a broad audience of readers. For example, verified authors can register for author accounts that permit them to interact with readers through the "Ask the Author" feature, share their Kindle notes and highlights from their own titles with readers, and write or import blogs. Like any other Goodreads user, authors can also "shelve" books, create book lists, track their reading, and write reviews. Authors and publishers can also sponsor giveaways to promote books on Goodreads.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

6. To connect Goodreads users with books that they might enjoy, Goodreads uses algorithms that take into account user's preferences, including book ratings and favorite genres. One of the genres on Goodreads with which users engage most frequently is "Young Adult," which describes books that span the entire spectrum of fiction genres but are "written for, published for, or marketed to adolescents and young adults, roughly ages 13 to 18." *See* Goodreads, *Genres: Young Adult*, https://www.goodreads.com/genres/young-adult. The individual titles on Goodreads with which users engage most frequently include, among others, Harry Potter and the Sorcerer's Stone, The Hunger Games, Twilight, and The Fault in Our Stars – all young adult novels.

7. ***Means of Accessing Service***. Goodreads is free to users, all of whom are subject to Goodreads' Terms of Service and must be 13 years of age or older to access the services. Goodreads is accessible through a web browser or through the Goodreads mobile app. It is not necessary for users to create or log in to a Goodreads account to access book reviews, book pages, blogs, and other content on the Goodreads site. Users do, however, need to register for a Goodreads account to post their own ratings, reviews, and comments, to add books to digital bookshelves, to connect with friends to share reading lists, and to take advantage of Goodreads' personalized book recommendation services.

8. To create an account, users must provide a verifiable email address (meaning an email address that can be confirmed as functional through an automated verification email) and a name, which is not verified and need not be real. Many users prefer to create their accounts using pseudonyms. Account holders may, but are not required to, provide additional information about themselves, including their birthdays. Goodreads believes that individuals should if they so choose be able to engage in thoughtful discourse about books without having to identify their real identities. Relatedly, users may set their profiles to be viewable to everyone, only to registered Goodreads users, or only to Goodreads friends. Book reviews are always posted publicly but, as noted, may be posted under a pseudonym.

9. Authors can also create specialized accounts through Goodreads' free Author Program, which allows them to manage their author profiles, engage with readers, and promote their books. To claim an author account, a Goodreads user must submit an application with


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

sufficient information to verify that they are in fact the author, including official author contact information, publisher contact information, and other online accounts associated with the author.

10. ***Business Model***. The vast majority of Goodreads' revenue comes from advertising. Goodreads' principal advertisers are book publishers and companies that advertise book-related products, such as films based on popular books. Some Goodreads ads are displayed to all users at a given time, or based solely on the content a viewer is engaged with at that moment. Goodreads also uses "interest-based ads"—also known as personalized ads—to display features, products, and services that might be of interest to registered users. This practice benefits both users (by displaying ads that are likely to interest them) and advertisers (by displaying their ads to those most likely to purchase the advertised product). Users can opt-out of interest-based ads if they choose to. In serving interest-based ads, Goodreads follows the Self-Regulatory Principles for Online Behavioral Advertising developed by the Digital Advertising Alliance (a coalition of marketing, online advertising, and consumer advocacy organizations). *See* Digital Advertising Alliance, *Self-Regulatory Principles for Online Behavioral Advertising* (July 1, 2009), https://digitaladvertisingalliance.org/sites/aboutads/files/DAA_files/seven-principles-07-01-09.pdf.

11. ***Censorship Requirements.*** I understand that AB 2273 will require businesses like Goodreads to assess and mitigate the risk that "potentially harmful content" could reach younger users through Goodreads. Although Goodreads expends substantial resources to create a safe and welcoming community, it is impossible to predict which books or book-related discussion might be considered "potentially harmful" to any category of young readers (let alone any specific young reader).

12. Predictably, books that some might consider controversial or potentially harmful generate lively debate among the Goodreads community. For example, as of January 16, 2023, there are 33,347 reviews posted for *Lolita* by Vladimir Nabokov. There are 12,296 reviews for *Blood Meridian or The Evening Redness in the West* by Cormac McCarthy, "an epic novel of the violence and depravity" of the American West in the 1850s that was named one of the all-time greatest English-language novels by *Time* magazine. There are 5,502 reviews posted for *Lawn*



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Boy* by Jonathan Evison, a novel acclaimed by some but banned by others. *See* Hannah Natanson, "A mom wrongly said the book showed pedophilia; school libraries banned it," *Washington Post* (Dec. 22, 2022), https://www.washingtonpost.com/education/2022/12/22/lawn-boy-book-ban-pedophilia/.

13. Goodreads' automated book recommendation service—one of Goodreads' most crucial services—is designed to match users with books that best fit their profiles. Redesigning this service, or creating a new one, to remove "potentially harmful" content is not feasible. The "potentially harmful" standard is simply too vague and subjective, and does not account for historical or literary value. Moreover, given the millions of titles listed on the site, it would be an extraordinary undertaking for Goodreads to attempt to evaluate the "potentially harmful" nature of each book or even each genre as a whole.

14. Goodreads recognizes that controversy and debate is part and parcel of the exchange of ideas. Indeed, some of the most groundbreaking and critically lauded books in history—books regularly read by teenagers—were considered harmful in their time and might still be considered harmful today. For example, J.D. Salinger's *The Catcher in the Rye* is considered an "all-time classic in coming-of-age literature," Goodreads, *The Catcher in the Rye*, https://www.goodreads.com/book/show/5107.The_Catcher_in_the_Rye, yet it has also been associated with two murders and an attempted assassination. *See* Clemence Michallon, "What happens when books inspire real-life violence?" *Independent* (Feb. 11, 2021), https://www.independent.co.uk/arts-entertainment/books/features/the-turner-diaries-capitol-insurrection-books-b1800572.html. Other important books—including those that document war or historical atrocities such as the Holocaust—impart disturbing information that could negatively affect some readers' emotional well-being. *Maus* by Art Spiegelman, for example, is a graphic novel that "recounts the chilling experiences of the author's father during the Holocaust"; it has been described as "brutally moving," and could disturb a reader's sense of well-being notwithstanding the thousands of positive reviews on Goodreads.

15. Politically controversial books could also be considered harmful by some. Ta-Nehisi Coates' *Between the World and Me*—which has more than 300,000 ratings on Goodreads—


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

was the subject of an investigation by a legislator in another state due to concerns that it "'might make students feel discomfort, guilt, anguish, or any other form of psychological distress[.]'" Emily Donaldson, "Books about race, sexuality spark investigation into Texas schools," *Dallas Morning News* (Oct. 26, 2021), https://www.dallasnews.com/news/education/2021/10/26/school-districts-under-investigation-by-texas-house-over-books-curriculum/. And certain books that may be highly salutary to some audiences can be harmful to others: Maya Hornbacher's bestselling memoir *Wasted: A Memoir of Anorexia and Bulimia* is a "vivid, honest, and emotionally wrenching memoir," *see* Goodreads, *Wasted: A Memoir of Anorexia and Bulimia*, which Hornbacher wrote "to keep people from going where [she] went." Emma Seaber, *Reading Disorders: Pro-Eating Disorder Rhetoric and Anorexia Life-Writing*, 34 Literature and Med. 484, 484-508 (2016). But some academics have argued that it can be read as offering "a positive presentation of anorexia nervosa that may, intentionally or not, induce certain readers to 'try it' themselves." *Id.*

16. While Goodreads understands that these and other works will not be appropriate for all readers, Goodreads is committed to allowing users to openly discuss and debate these and other controversial books. Goodreads believes that parents, not Goodreads, should decide if their children and teens are ready for such works. Goodreads seeks to create a safe space where readers can share, learn about, and discuss challenging literary works honestly and respectfully, without inhibition.

17. Goodreads applies that same ethos to the contributions of its users. Goodreads does not remove user-generated content unless the content violates the Goodreads Community Guidelines or Review Guidelines—for example, if content is plagiarized, self-promotional, or artificially inflates or deflates a book's ratings or reviews. Although identifying such violations is sometimes straightforward, it frequently requires judgment calls. To provide adequate flexibility to respond to a wide range of user content and allocate enforcement resources, the Community Guidelines and Review Guidelines state that Goodreads retains "sole discretion" to decide when content violates our guidelines. True and correct copies of the Community Guidelines and Review Guidelines are attached hereto as **Exhibit 1** and **Exhibit 2**, respectively.


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

18. ***Age Verification***. I understand that AB 2273 will require businesses like Goodreads to "[e]stimate the age of child users with a reasonable level of certainty." Although Goodreads' terms require users to be 13 or older, Goodreads does not require those users to provide more detailed age information (such as birthdate or actual age).

19. Although Goodreads allows users to add birthdays to their profiles, many users do not provide this information, and self-reported birthdates are not a dependable metric for users' ages. Relying on user activity to estimate a user's age would be similarly challenging because genres directed at young people—such as "Young Adult"—are widely read by adults, and teenagers' reading habits are often just as sophisticated as those of adults.

20. To verify the ages of Goodreads' users, Goodreads would need to begin requiring account registration for all users and collecting sensitive personal information that it does not currently collect. These requirements would erect a significant barrier to accessing Goodreads services' and would likely alienate and even exclude many users (such as, for example, those who lack government identification cards).

21. Even if Goodreads were to require users to set up accounts and accountholders to verify their birthdates or ages, that still would not necessarily suffice to verify the identity (and therefore age) of any specific user. An adult could "verify" an account when the account is established—or even if necessary each time she logs in to the account—but there is no guarantee that the account will not thereafter be used by a young person.

22. ***Restrictions on Algorithms, Data Collection, and Data Use***. I understand that AB 2273 might prohibit Goodreads from collecting user information for purposes that are ancillary to the service in which a minor user is "knowingly and actively engaged," or to inform algorithms that make up a core part of Goodreads services. Depending on how these restrictions are interpreted, they could impact Goodreads' ability to use information about a user's engagement with our services (such as through "shelving" books) to recommend books, track and remove "bot" activity, and improve services based on how users interact with the site. In addition, if these restrictions extend to Goodreads' ability to use data to display advertising to users, Goodreads may have to collect revenue from alternate sources—such as users—to sustain its business.


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

23. ***Geographic Reach***. Goodreads has users across the United States. Given AB 2273's broad restrictions on user-generated content, data use, algorithms, and personalization (among other things), Goodreads cannot feasibly limit the changes it must adopt to conform to AB 2273 to impact only users in California. Creating a completely separate service just for California users (or those California users under age 18) would be expensive and impractical.

24. ***Demonstrable Harm to Goodreads***. AB 2273 implicates fundamental aspects of Goodreads' services and will require extensive modifications that will fundamentally alter the nature of Goodreads' services. These include implementing age verification protocols; modifying Goodreads' personalization services; revising significant portions of Goodreads software; and reviewing (and likely amending) Goodreads' content moderation protocols. Such changes will violate Goodreads' core principles, impede access to Goodreads' services, and make those services less helpful to users. They are also costly and require a significant resource and staff investment over many months and possibly longer. Based on my research, age verification alone can cost a dollar or more per verification.

* * *

25. Goodreads operates from an ethos similar to that of libraries and bookstores: that all individuals, especially young people, are entitled to steer their own literary journey and engage with the books that most interest and inspire them. As a matter of principle, Goodreads is opposed to any regulation that would require it to invade users' privacy or restrict the flow of discussion and ideas on its service.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed at San Francisco, California this 17th day of February, 2023.

Libby Roin



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# EXHIBIT 1

# Community Guidelines

goodreads.com/community/guidelines

Readers' Top 100 New Romances >

Our Community Guidelines are intended to provide clarity on interactions with all of Goodreads' features and services. Our goal is to keep Goodreads a welcoming place where people can come together to share reviews, participate in discussions, and enjoy interacting with readers and authors. We appreciate all that you contribute to the Goodreads community. Thanks for being a part of it!

Goodreads is a community where you can discuss exactly what brought you here in the first place—books! Our goal is to help you find and share the books you love. We do that in part by maintaining a welcoming space with the help of all our members. These guidelines apply to all areas of community interaction, and by using Goodreads you agree to abide by them.

- We want you to have the best possible experience on Goodreads. The Goodreads community is diverse and passionate. Not everyone shares the same point of view, and that diversity of opinion is what makes Goodreads a great place to share your ideas. Respectful, lively debates are encouraged, but consider the impact of your contributions on individuals and the community as a whole before jumping in.
- Hate speech, bigotry, threats, and ad hominem attacks are not tolerated. Criticizing the opinions of others is permitted, but attacking individuals for their opinions is not.
- You should communicate openly with other members, but spam and self-promotional content are prohibited. Abusing Goodreads features to promote yourself or your product detracts from the experience of others *and* breaks our rules. (Authors can check out Author Guidelines for specific information on how to interact with readers and use Goodreads.)
- We support original, creative contributions to Goodreads. Where you can add content, go for it. Just make sure it belongs to *you*—plagiarism and copyright infringement are not allowed.
- You are welcome to post images, but images containing nudity, sexually-explicit content, or graphic violence are not allowed.
- Bring your authentic self to Goodreads. Please don’t misrepresent your identity or create accounts to harass other members, abuse features, or evade our rules. Spammers and scammers are not welcome.

- Artificially inflating or deflating a book's ratings or reputation violates our rules. This includes activity like creating fake accounts to manipulate book ratings, purchasing reviews, and incentivizing votes, likes, or other actions on Goodreads. It's not just that we don't tolerate this; this kind of behavior ultimately diminishes the community's trust in *you*.
- If you see content that breaks our rules, flag it or contact us. Don't take it upon yourself to correct other people's bad behavior, and don't encourage bad behavior by acknowledging it. Staff members evaluate each flagged item and take action to educate members about our rules. If a conversation is deteriorating, you can opt to disengage.

Simply put, add value to the community—don't diminish it. If you're here because you adore books *and* you make it your business to treat others with respect, then welcome to your literary home!

Here are a few disclaimers:

- Goodreads reserves the right to remove content at any time for any reason. It is at our sole discretion to decide when content violates our guidelines.
- The content posted on Goodreads contains individual and subjective opinions. The opinions expressed are those of Goodreads members and not of Goodreads. We do not endorse any of the opinions expressed by members.

For additional information about community interaction in groups, please refer to our Group Moderator Guidelines.

# EXHIBIT 2

# Review Guidelines

goodreads.com/review/guidelines

Readers' Top 100 New Romances >

Goodreads has some of the best book reviews anywhere. Our members are passionate, knowledgeable readers, and their contributions to the site are what make it such a vibrant and fun place. These guidelines are presented to help make sure Goodreads' reviews remain the best and most authentic in the world.

## Our Review Philosophy

Goodreads is for expressing your honest opinions about books. Don't be afraid to say what you think about the book! We welcome your passion, as it helps the millions of other readers on Goodreads learn what a book is really about, and decide whether or not they want to read it.

We believe that Goodreads members should see the best, most relevant, thought-provoking reviews (positive and negative) when they visit a book page. Our job is to show members those reviews, and not show reviews that we deem to not be appropriate or a high enough level of quality.

However we value that members trust us with your thoughts and words and take our stewardship of storing your reviews seriously. We promise to always store your reviews on your profile and in your bookshelves and will never delete or modify them – except for certain extreme situations, which are described below. Your thoughts and your words are yours, and we promise you we will always respect that.

Here are some examples of what we allow in reviews:

- Creativity! Some of the best reviews on Goodreads use the book as inspiration for a personal essay or other piece of creative writing. As long as they don't go against our guidelines in other ways, these reviews are welcome and encouraged!
- Images in reviews are fine (and sometimes hilarious) but please, no nudity or graphic violence.
- Pre-publication reviews. Many of our members receive advance copies of books to review, either through Goodreads giveaways or another source. We have no way of knowing the exact date that review copies are available. As such, each book is eligible to be reviewed as soon as it appears on the site.

And here are some of the things that might cause your review to receive a lower priority in our internal ranking system, which may affect whether or not your review appears on the book page:

- Reviews of the author. Mentioning the author in the context of a review is always acceptable, but reviews that are predominantly about an author's behavior and not about the book may be deleted.
- Reviews with off-topic, irrelevant comments about the author's personal life will be deleted. For example, if the author owes you money, that is not appropriate information for a book review, and it will be deleted entirely.
- We will not tolerate abuse of our ratings system, such as rating the same work more than once for the purpose of inflating or deflating the book's average rating. Multiple ratings we determine to be abusive will be removed.
- Reviews that attack other reviewers will be deleted. Statements like "Other reviews have said this book is terrible, but I disagree" are fine, but if the primary purpose of your review is to mock or harass another Goodreads member, we may give it a lower priority or delete it entirely.
- Reviews must be your own original content. Reviews that plagiarize from another source or use copyrighted material without permission will be deleted.
- Self-promotional reviews will be deleted. (i.e., "I'm an author writing about Rome. This book is terrible. For a real history of Rome, check out my new book.").
- Full reviews that link to a blog are acceptable, as long as the blog is not selling a competing book and using the review to denigrate the book being reviewed in favor of its own.
- Reviews that are harassing or threatening, or that contain hate speech or bigotry. These will be deleted outright and anyone posting them risks being removed from the site.
- Spam reviews. These will be deleted immediately.
- Commercial reviews are not allowed and will be deleted. If you received a free copy of the book, you are required to disclose that in your review.

And here are a couple of disclaimers:

- Goodreads reserves the right to remove a review at any time for any reason. It is at our sole discretion and no one else's, that we decide when a review is against our guidelines.
- The reviews posted on Goodreads are individual and subjective opinions. The opinions expressed in reviews are those of Goodreads members and not of Goodreads, Inc. We do not endorse any of the opinions expressed by reviewers.
- If we detect unusual reviewing behavior on a book, we might temporarily limit the ability to submit ratings and reviews.

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

ROBERT CORN-REVERE (*pro hac vice*)
bobcornrevere@dwt.com
DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**DECLARATION OF GIANCARLO CAIRELLA IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: June 22, 2023<br>Time: 9:00 A.M.<br>Dept.: Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

I, Giancarlo Cairella, declare:

1. ***Identity of Declarant***. I am Risk Manager for IMDb.com, Inc. ("IMDb"). I make this declaration from personal knowledge and a review of IMDb's records kept in the ordinary course of business.

2. ***IMDb's Service.*** IMDb is the world's largest online database of information related to films, television programs, streaming content, and video games. IMDb provides a breadth of information on the entertainment industry that is unparalleled by any other source. IMDb contains individual pages for both titles (e.g., a movie or television program) and people in the entertainment industry (e.g., an actor, crew member, or industry executive). Pages for individual people generally contain biographical information, trivia (such as personal quotes), and a list of titles with which that individual was involved. Clicking on a title will take a user to the dedicated page for that title, which can also be accessed directly through a search or the IMDb directory. Title pages can include information on cast, production crew, plot summaries, trivia, soundtrack information, box office numbers and user reviews, as well as multimedia content such as posters, behind-the-scenes photos, and movie trailers. In addition, IMDb publishes original content, such as video programs, podcasts, and news about movies and the entertainment industry. IMDb also offers a subscription service known as IMDbPro that provides users with additional services and features, such as the ability to claim their own pages, post resumes and photos, and access rank and agent information for entertainment professionals. Through these services, IMDb serves as a trusted "one-stop shop" for entertainment-related information that is relevant to both the general public and the entertainment industry.

3. As of 2022, IMDb was estimated to be one of the most visited websites in the world,[1] with more than 250 million unique visitors a month,[2] more than 12.1 million pages for individual actors and crew members, and more than 12.6 million title pages for movie, television, and entertainment programs.[3]

4. IMDb's core service is free and publicly available. IMDb earns revenue

[1] https://ahrefs.com/blog/most-visited-websites/
[2] https://www.imdb.com/pressroom/press-pull-quotes/
[3] https://www.imdb.com/pressroom/stats/



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

predominantly from advertisements displayed directly on the IMDb site. Advertising revenues enable IMDb to keep the vast majority of the information on its site free and available to the public. IMDb also earns revenue, to a lesser extent, from IMDbPro subscription fees and data licensing, and to a much smaller extent from referral fees (collected when users click through to stream or purchase movie tickets from other services linked from IMDb).

5. From its inception as a fan-operated movie database in 1990, IMDb has relied on contributions and input from users around the world to maintain the accuracy of its database. Among other things, users can add new titles to the database; contribute plot summaries, reviews, and ratings; add iconic quotes from a film or television title; and edit filmmakers' biographies. The majority of the information on IMDb is submitted by IMDb users.

6. IMDb's goal is to be as comprehensive as possible in providing information about the broadest range of movies, television programs, and other content—from educational children's television shows like *Sesame Street* to controversial, boundary pushing works, such as Martin Scorsese's *The Last Temptation of Christ*, Stanley Kubrick's *A Clockwork Orange*, and John Waters' *Pink Flamingos*. IMDb likewise includes information about certain morally abhorrent but historically significant works, such as the Nazi propaganda film *Triumph of the Will* and the Ku Klux Klan-glorifying *Birth of a Nation*.

7. ***Means of Accessing Service.*** The majority of the content on IMDb is available for free to anyone who accesses the site or downloads the IMDb mobile app. Users have the option of registering to create a personal account on the site, but they are not required to do so. Most visitors to IMDb are unregistered, meaning that they do not have an IMDb account. Such users can browse the site and look at most of the information on it but cannot take advantage of any personalization features, such as creating a watchlist of titles, voting on movies, or contributing information.

8. Registering for and logging into an account—which requires providing an email address—enables users to access IMDb's personalization features and contribute to or interact with content posted on IMDb.com, such as through title ratings and reviews, plot summaries, quotes, and trivia for individual titles, and credits and biographies for individual cast and crew members.


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Registered users may also interact with the content that other users have contributed by, for example, flagging content as "helpful" or "interesting." Logging into an account also enables users to customize their experience by tracking which titles they have seen and creating a "Watchlist" for titles they wish to see, which enables users to receive personalized recommendations for content in which they may be interested. IMDbPro subscribers also must have an account.

9. As stated explicitly in IMDb's Privacy Notice, IMDb is not intended for use by children under the age of 13, and users may not sign up for an account, submit information about themselves, or contribute information about films and shows if they are under the age of 13. Only users age 18 and above are eligible for IMDbPro accounts.

10. IMDb does, however, permit users between the ages of 13 and 18 to access its services. To assist parents to help guide or oversee IMDb's use by these younger users, if they so choose, many title pages contain a "Parents Guide" section that provides the age ratings for the title in different countries and descriptions of elements within the title that may be of concern, such as the use or depiction of violence, sex, nudity, or profanity. IMDb also restricts the display of pages related to adult titles (including individual pages for adult performers) in search results unless a registered user expressly opts-in to have titles of that genre displayed.

11. Many filmmakers, writers, and other users have talked about how they used IMDb in their youth to learn about film and television and to develop their tastes, as they first read information about works they already loved and then clicked through to find other works involving the same actors or filmmakers.

12. ***Age Verification.*** I understand that AB 2273 will require IMDb to verify the ages of its users with reasonable certainty relative to the risks that IMDb services and content might pose. I find this standard vague and confusing as to what type of age verification is required.

13. Currently, IMDb does not have technology in place to verify the age of every visitor to the site. Users who register for an account may choose to provide a birthdate, but account holders are not required to provide their birthdates, nor does IMDb verify that birthdates entered by account holders are accurate.



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

14. Altering IMDb's user interface to accommodate the submission, collection, and secure storage of individual birthdates and identity information would take time and consume significant resources. More broadly, doing so would require IMDb to fundamentally reconfigure its service from a generally accessible website to one that requires all users to sign up and submit sensitive personal information and/or identification documentation. This would undermine IMDb's core mission to be the default "go to" online resource for anyone seeking information about movies and television. And since the majority (more than 80 percent during the period from January 1-February 7, 2023) of IMDb page views come from unregistered users, a requirement that users submit extensive personal information in order to access the site is likely to reduce IMDb's audience.

15. ***Conditions of Use and Review Guidelines***. I also understand that AB 2273 requires businesses to "[e]nforce published terms, policies, and community standards established by the business." IMDb currently has in place a number of policies governing how users may interact with the site, including Conditions of Use ("Conditions") and user review and image guidelines ("Guidelines") that address the type of content that users may and may not upload to the site. True and correct copies of these policies are attached as **Exhibit 1** and **Exhibit 2** to this declaration. Under the Conditions, users may not post content that is "illegal, obscene, threatening, defamatory, invasive of privacy, infringing of intellectual property rights, or otherwise injurious to third parties." The Guidelines also preclude posting certain types of content such as full or partial nudity and excessive gore, but users are permitted to upload images that are relevant to a title, even if they include violence, horror-themed content, or sexually suggestive non-nude images. Users may also upload quotes from movies containing profanity or other content that some may find offensive. And users may upload information, such as detailed plot summaries, imagery or quotes, from works that contain adult or controversial subject matter.

16. IMDb's Guidelines and Conditions are central to the online community and knowledge base that IMDb seeks to foster. IMDb acts expeditiously to assess reports of content that violates these standards and removes content where the complaints are found to be valid. But IMDb users contribute more than one million items of content every week, and actively reviewing


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

every item to ensure in advance that it does not violate these provisions would be impossible. In general, IMDb's primary concern about title and person contributions is accuracy. IMDb does not routinely screen these contributions based on whether or not they might be offensive or otherwise objectionable. If someone submitted a quote from a film that is accurate (i.e. faithfully reproduces the dialogue of the film), IMDb would almost certainly allow it, even if it could be offensive. For example, the Quotes section for Pulp Fiction (1994) features quotes that some would consider to contain racist, sexist, or otherwise offensive language.[4]

17. IMDb does exercise more editorial discretion over user-submitted reviews, and (for example) does not tolerate profanity, racist, or otherwise discriminatory reviews. But assessing whether reviews actually violate the Conditions or the Guidelines can be a nuanced and subjective task, which requires careful thought and judgment and counsels against a rigid and inflexible application. In one recent example, moderating user-submitted reviews of a gay-themed film presented judgment calls as to when critical commentary crossed the line into discrimination. For these reasons, IMDb's Conditions expressly provide that "IMDb reserves the right to refuse service, terminate accounts, or remove or edit content in its sole discretion."

18. ***Content Requirements of AB 2273***. I understand that AB 2273 will require businesses like IMDb to evaluate and mitigate the risk that "potentially harmful content" or "contacts" will reach users under 18 and to self-report those hypothetical risks to the California Attorney General. I understand that AB 2273 further requires IMDb to either ensure that each individual user is over 18 or else to remove any service, feature, or product that could expose a user under age 18 to "material detriment" or that might be considered a "dark pattern" that encourages minors to provide information.

19. I do not understand how to comply with these requirements because AB 2273 provides no concrete definitions for key terms, such as "material detriment" and "potentially harmful." Therefore, to be absolutely certain that the Attorney General will not conclude that IMDb has violated the law, IMDb would have to assess whether information or commentary in IMDb's podcasts, newsfeeds, or profile and title pages could, in some way or another expose a

[4] https://www.imdb.com/title/tt0110912/quotes/?ref_=tt_trv_qu



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

minor to any type of harm, even if that harm is unlikely to occur. This would be an immense and unrealistic undertaking because there are millions of titles and pages for actors and crew members within IMDb, which—as noted—are user-generated. IMDb also would need to review its news features, which aggregate headlines, stories, and content from a variety of entertainment news sources and cover a wide range of topics that someone might argue could be harmful to children, such as celebrity weight loss, plastic surgery, substance abuse, infidelity, and mental health issues. In addition, IMDb would need to review its podcasts to attempt to ensure that their content and topics could not be deemed potentially harmful to minors. Such compliance efforts would be a highly subjective, burdensome and infeasible exercise. They would also conflict with IMDb's core goal of offering truly comprehensive information and commentary about movies, shows, and the entertainment industry, and not just those that are universally agreed as being appropriate for children. And they would force IMDb to err on the side of caution where there is any doubt about how the State might react to particular content.

20. ***Use of Data.*** IMDb collects and uses certain data from its users. That data includes the information provided by users when they register, the content users contribute about individual titles and filmmakers, and the ratings and viewing activity that users record, as well as IP addresses and website visitation information. This information enables IMDb to provide a range of services, deliver content, process payments, communicate with users, generate revenue from advertising, make recommendations, personalize the user experience, identify and fix errors on the website, remove and minimize "bot" activity, and improve IMDb services.

21. I understand that AB 2273 generally restricts websites from collecting, using, and sharing information from users unless the website verifies that those users are over 18 or the information is "necessary." IMDb does not specifically collect data from its users aged 13-17, nor does it target content to such users. But the across-the-board nature of the restrictions imposed by AB 2273 would degrade the user experience and potentially hamper IMDb's ability to generate revenue through advertising, which is how IMDb is able to offer such a wide array of information to the public free of charge.

22. ***Preparing for AB 2273.*** To prepare for compliance with AB 2273, IMDb must



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

determine whether to either (a) restrict its services to individuals over 18, or (b) modify IMDb's services to comply with AB 2273's numerous requirements and prohibitions. Both options will require IMDb to redesign its services; develop and implement the software necessary to verify users' ages; revise and rewrite significant portions of software; review and amend contracts with third parties; and review and likely revise its revenue model. If IMDb chooses to continue to permit 13-17 year old users to access its services, I anticipate that IMDb will need to further review and potentially modify IMDb's personalization services; review and revise IMDb's Guidelines and Conditions; develop new protocols around enforcement of those Guidelines and Conditions; consider whether to comprehensively review and remove content that could be considered "potentially harmful" to those under 18; and complete DPIAs for its many services and features. I anticipate that these processes will take six to nine months, at a minimum, and require the expenditure of considerable resources.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed at SEATTLE, WA this 16 day of February 2023.

[signature]

Giancarlo Cairella



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# EXHIBIT 1

# Conditions of Use - IMDb

Welcome to IMDb. IMDb.com, Inc. and/or its affiliates ("IMDb") provide its website features and other services to you subject to the following conditions. **If you visit IMDb.com, use other IMDb services, products, or use software or mobile applications provided by IMDb that states that it is subject to these Conditions of Use (collectively "IMDb Services"), you accept these conditions.** Please read them carefully. In addition, when you use any current, future IMDb Services, (e.g., IMDbPro.com) you also will be subject to the guidelines, terms and agreements ("Terms") applicable to that IMDb Service. If these Conditions of Use are inconsistent with the Terms provided for any IMDb service, the Terms will control.

## Privacy

Please review our Privacy Notice, which also governs your use of any IMDb Service, to understand our practices.

## Electronic Communications

When you use any IMDb Service or send e-mails to us, you are communicating with us electronically. You consent to receive communications from us electronically. We will communicate with you by e-mail or by posting notices on this site or through the other IMDb Services. You agree that all agreements, notices, disclosures and other communications that we provide to you electronically satisfy any legal requirement that such communications be in writing.

## Copyright

All content included on this site in or made available through any IMDb Service, such as text, graphics, logos, button icons, images, audio clips, video clips, digital downloads, data compilations, and software, is the property of IMDb or its content suppliers and protected by United States and international copyright laws. The compilation of all content included in or made available through any IMDb Service is the exclusive property of IMDb and protected by U.S. and international copyright laws. All software used in any IMDb Service is the property of IMDb or its software suppliers and protected by United States and international copyright laws.

## Trademarks

IMDb and STARMETER are registered trademarks, and the IMDb logo, IMDbPRO, MOVIEMETER, and other marks indicated in any IMDb Services are trademarks of IMDb in the United States and/or other countries. Other IMDb graphics, logos, page headers, button icons, scripts, and service names are trademarks or trade dress of IMDb. IMDb's trademarks and trade dress may not be used in connection with any product or service that is not IMDb's, in any manner that is likely to cause confusion among customers, or in any manner that disparages or discredits IMDb. All other trademarks not owned by IMDb that appear on this site or in any IMDb Service are the property of their respective owners, who may or may not be

affiliated with, connected to, or sponsored by IMDb.

## License and Site Access

Subject to your compliance with these Conditions of Use and your payment of any applicable fees, IMDb or its content providers grants you a limited, non-exclusive, non-transferable, non-sublicenseable license to access and make personal and non-commercial use of the IMDb Services, including digital content available through the IMDb Services, and not to download (other than page caching) or modify this site, or any portion of it, except with express written consent of IMDb. Additional license terms may be found in the Terms. The IMDb Services or any portion of such services may not be reproduced, duplicated, copied, sold, resold, visited, or otherwise exploited for any commercial purpose without express written consent of IMDb. This license does not include any resale or commercial use of any IMDb Service or its contents or any derivative use of this site or its contents. All licenses are non-exclusive and all rights not expressly granted to you in these Conditions of Use or any applicable Terms are reserved and retained by IMDb or its licensors, suppliers, publishers, rightsholders, or other content providers. You will use all IMDb Services in compliance with all applicable laws.

**Robots and Screen Scraping:** You may not use data mining, robots, screen scraping, or similar data gathering and extraction tools on this site, except with our express written consent as noted below.

**Framing:** You may not frame or utilize framing techniques to enclose any trademark, logo, or other proprietary information (including images, text, page layout, or form) of IMDb without express written consent.

**Meta Tags:** You may not use any meta tags or any other "hidden text" utilizing IMDb's name or trademarks without the express written consent of IMDb. Any unauthorized use terminates the permission or license granted by IMDb.

**Licensing IMDb Content; Consent to Use Robots and Crawlers:** If you are interested in receiving our express written permission to use IMDb content for your non-personal (including commercial) use, please visit our Content Licensing section or contact our Licensing Department. We do allow the limited use of robots and crawlers, such as those from certain search engines, with our express written consent. If you are interested in receiving our express written permission to use robots or crawlers on our site, please contact our Licensing Department.

**Linking to IMDb.com:** You are granted a limited, revocable, and nonexclusive right to create a hyperlink to IMDb.com so long as the link follows our linking guide and does not portray IMDb, its services in a false, misleading, derogatory, or otherwise offensive matter. You may not use any IMDb logo or other proprietary graphic or trademark as part of the link without express written permission except as outlined in our help section.

## Your Account

If you use any IMDb Service, you are responsible for maintaining the confidentiality of log-in information and for restricting access to your computer, and you agree to accept responsibility for all activities that occur under your account or password. IMDb reserves the right to refuse service, terminate accounts, or remove or edit

content in its sole discretion.

## Reviews, Comments, Communications, and Other Content

Visitors may post reviews, comments, and other content; and submit suggestions, ideas, comments, questions, or other information, so long as the content is not illegal, obscene, threatening, defamatory, invasive of privacy, infringing of intellectual property rights, or otherwise injurious to third parties or objectionable and does not consist of or contain software viruses, political campaigning, commercial solicitation, chain letters, mass mailings, or any form of "spam." You may not use a false e-mail address, impersonate any person or entity, or otherwise mislead as to the origin of your content. IMDb reserves the right (but not the obligation) to remove or edit such content, but does not regularly review posted content.

**Your License to IMDb:** If you do post content or submit material, and unless we indicate otherwise, you grant IMDb a nonexclusive, royalty-free, perpetual, irrevocable, and fully sublicensable right to use, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, and display such content throughout the world in any media. You grant IMDb and its sublicensees the right to use the name that you submit in connection with such content, if they choose. You represent and warrant that you own or otherwise control all of the rights to the content that you post; that the content is accurate; that use of the content you supply does not violate this policy and will not cause injury to any person or entity; and that you will indemnify IMDb for all claims resulting from content you supply. IMDb has the right but not the obligation to monitor and edit or remove any activity or content. IMDb takes no responsibility and assumes no liability for any content posted by you or any third party. If you would like to learn more about how we handle content that you submit, please review our Privacy Notice.

## IMDb TV

By viewing content on IMDb TV, you agree to the Amazon Prime Video Terms of Use.

## Copyright Complaints

IMDb respects the intellectual property of others. If you believe that your work has been copied in a way that constitutes copyright infringement, please provide IMDb's copyright agent the written information specified below. Please note that this procedure is exclusively for notifying IMDb and its affiliates that your copyrighted material has been infringed.

- An electronic or physical signature of the person authorized to act on behalf of the owner of the copyright interest;
- A description of the copyrighted work that you claim has been infringed upon;
- A description of where the material that you claim is infringing is located on the site;
- Your address, telephone number, and e-mail address;
- A statement by you that you have a good-faith belief that the disputed use is not authorized by the copyright owner, its agent, or the law;
- A statement by you, made under penalty of perjury, that the above

information in your notice is accurate and that you are the copyright owner or authorized to act on the copyright owner's behalf.

IMDb's Copyright Agent for notice of copyright infringement on it site can be reached as follows:

> IMDb Copyright Agent
> c/o Amazon.com Legal Department
> P.O. Box 81226
> Seattle, WA 98108-1226
> phone (206) 266-4064
> fax (206) 266-7010
> email: copyright@imdb.com

In appropriate circumstances, IMDb will terminate the accounts of account holders who are repeat infringers.

## Disclaimer of Warranties and Limitation of Liability

> THE IMDB SERVICES AND ALL INFORMATION, CONTENT, MATERIALS, PRODUCTS (INCLUDING SOFTWARE) AND OTHER SERVICES INCLUDED ON OR OTHERWISE MADE AVAILABLE TO YOU THROUGH THE IMDB SERVICES ARE PROVIDED BY IMDB ON AN "AS IS" AND "AS AVAILABLE" BASIS. IMDB MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, AS TO THE OPERATION OF THE IMDB SERVICES OR THE INFORMATION, CONTENT, MATERIALS, PRODUCTS (INCLUDING SOFTWARE) OR OTHER SERVICES INCLUDED ON OR OTHERWISE MADE AVAILABLE TO YOU THROUGH THE IMDB SERVICES. YOU EXPRESSLY AGREE THAT YOUR USE OF THE IMDB SERVICES IS AT YOUR SOLE RISK. IMDB RESERVES THE RIGHT TO WITHDRAW ANY IMDB SERVICE OR DELETE ANY INFORMATION FROM THE IMDB SERVICES AT ANY TIME IN ITS DISCRETION.
>
> TO THE FULL EXTENT PERMISSIBLE BY APPLICABLE LAW, IMDB DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. IMDB DOES NOT WARRANT THAT THE IMDB SERVICES, INFORMATION, CONTENT, MATERIALS, PRODUCTS (INCLUDING SOFTWARE) OR OTHER SERVICES INCLUDED ON OR OTHERWISE MADE AVAILABLE TO YOU THROUGH THE IMDB SERVICES, ITS SERVERS, OR ELECTRONIC COMMUNICATIONS SENT FROM IMDB ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. IMDB WILL NOT BE LIABLE FOR ANY DAMAGES OF ANY KIND ARISING FROM THE USE OF ANY IMDB SERVICE, OR FROM ANY INFORMATION, CONTENT, MATERIALS, PRODUCTS (INCLUDING SOFTWARE) OR OTHER SERVICES INCLUDED ON OR OTHERWISE MADE AVAILABLE TO YOU THROUGH ANY IMDB SERVICE, INCLUDING, BUT NOT

LIMITED TO DIRECT, INDIRECT, INCIDENTAL, PUNITIVE, AND CONSEQUENTIAL DAMAGES.

CERTAIN STATE LAWS DO NOT ALLOW LIMITATIONS ON IMPLIED WARRANTIES OR THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES. IF THESE LAWS APPLY TO YOU, SOME OR ALL OF THE ABOVE DISCLAIMERS, EXCLUSIONS, OR LIMITATIONS MAY NOT APPLY TO YOU, AND YOU MIGHT HAVE ADDITIONAL RIGHTS.

**IMDb Software Terms** In addition to these Conditions of Use, the terms found here apply to any software (including any updates or upgrades to the software and any related documentation) that we make available to you from time to time for your use in connection with IMDb Services ("IMDb Software"). If we provide specific Terms for the IMDb Software and there is a conflict between the specific Terms for the IMDb Software and these Conditions of Use, the specific Terms for the IMDb Software will govern.

## Applicable Law

By using any IMDb Service, you agree that the laws of the state of Washington, without regard to principles of conflict of laws, will govern these Conditions of Use and any dispute of any sort that might arise between you and IMDb.

## Disputes

Any dispute or claim relating in any way to your use of any IMDb Service, or any products or services sold or distributed by IMDb or through the IMDb Services will be resolved by binding arbitration, rather than in court, except that you may assert claims in small claims court if your claims qualify. The Federal Arbitration Act and federal arbitration law apply to this agreement.

**a.** There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual basis the same damages and relief as a court (including injunctive and declaratory relief or statutory damages), and must follow the terms of these Conditions of Use as a court would.

**b.** To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claim to our registered agent Corporation Service Company, 300 Deschutes Way SW, Suite 304, Tumwater, WA 98051. The arbitration will be conducted by the American Arbitration Association (AAA) under its rules, including the AAA's Supplementary Procedures for Consumer-Related Disputes. The AAA's rules are available at www.adr.org or by calling 1-800-778-7879. Payment of all filing, administration and arbitrator fees will be governed by the AAA's rules. We will reimburse those fees for claims totaling less than $10,000 unless the arbitrator determines the claims are frivolous. Likewise, IMDb will not seek attorneys' fees and costs in arbitration unless the arbitrator determines the claims are frivolous. You may choose to have the arbitration conducted by telephone, based on written submissions, or in person in the county where you live or at another mutually agreed location.

**c.** You and IMDb each agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action. If for any reason a claim proceeds in court rather than in arbitration you and IMDb each waive any right to a jury trial. You and IMDb also both agree that you or we may bring suit in court to enjoin infringement or other misuse of intellectual property rights.

## Site Policies, Modification, and Severability

Please review our other policies. These policies also govern your use of IMDb Services. We reserve the right to make changes to our site, policies, and these our site, policies, Terms, and these Conditions of Use at any time. If any of these conditions shall be deemed invalid, void, or for any reason unenforceable, that condition shall be deemed severable and shall not affect the validity and enforceability of any remaining condition.

## Our Address

> IMDb.com, Inc.
> P.O. Box 81226
> Seattle, WA 98108-1226
> http://www.imdb.com/

Additional IMDb Software Terms

1. **Use of the IMDb Software**. You may use the IMDb Software only in connection with the IMDb Services. You may not separate any individual component of the IMDb Software for use other than in connection with the IMDb Services, incorporate any portion of it into your own programs or compile any portion of it in combination with your own programs, transfer it for use with another service, use it, or any portion of it, over a network, or sell, rent, lease, lend, loan, distribute or sub-license the IMDb Software or otherwise assign any rights to the IMDb Software in whole or in part. You may not use the IMDb Software for any illegal purpose. We may discontinue some or all of any IMDb Software we provide, and we may terminate your right to use any IMDb Software at any time and in such event may modify it to make it inoperable. Your rights to use the IMDb Software will automatically terminate without notice from us if you fail to comply with any of these terms. Additional third party terms contained within or distributed with certain IMDb Software that are specifically identified in related documentation may apply to that IMDb Software and will govern the use of that IMDb Software in the event of a conflict with these Conditions of Use.
2. **Use of Third Party Services**. When you use the IMDb Software, you may also be using the services of one or more third parties, such as a wireless carrier or a mobile platform provider. Your use of these third party services may be subject to the separate policies, terms of use, and fees of these third parties.
3. **No Reverse Engineering**. You may not, and you will not encourage, assist or authorize any other person to modify, reverse engineer, decompile or disassemble, or otherwise tamper with, the IMDb Software, whether in whole or in part, or create any derivative works

from or of the IMDb Software.

4. **Updates**. In order to keep the IMDb Software up-to-date, we may offer automatic or manual updates at any time and without notice to you.
5. **Export Regulations; Government End Users**. You must comply with all export and re-export restrictions and regulations of the Department of Commerce and other United States agencies and authorities that may apply to the IMDb Software. If you are a U.S. Government end user, we are licensing the IMDb Software to you as a "Commercial Item" as that term is defined in the U.S. Code of Federal Regulations (see 48 C.F.R. § 2.101), and the rights we grant you to the IMDb Software are the same as the rights we grant to all others under these Conditions of Use.

# EXHIBIT 2

# Help Center

How can we help?



**Contribution Information**

Submission Guides: A - Z
How do I contribute data to IMDb?
Contribution of gender identity
Contribution of birthdate
I'm adding data for the first time; what are the top five things I should know?
When will my update be added?
Correcting existing data
I tried to delete data, but it still appears on IMDb. Why?
I submitted several data items at the same time. Why did you add only some of them?
Contribution History
How are user reviews displayed on IMDb?
User review guidelines
How do I add my review to IMDb?
How do I edit or remove a review?
Why didn't you post my review?
Why would you display such a negative user review on a title page?
How do you choose the review displayed on a title's main page?
How can I submit additional verification for a credit submission?
Adding new data
Contributor top-tips
I made a mistake with a submission. How can I correct it before it goes live?
IMDb Update Status FAQ
User Profile Badges
I'm missing a badge. What should I do?
How do I report copyrighted material?
Collaborative editing services Terms & Conditions of use

# User review guidelines

The **minimum length for reviews is 600 characters** to ensure the most value to our users. Reviews which are padded with junk text will be discarded.

## What to include:

IMDb is pleased to provide this forum for you to air your opinions on your favorite (or not-so-favorite) movies and TV-series.

Your reviews should focus on the title's content and context. The best reviews include not only whether you liked or disliked a movie or TV-series, but also why. Feel free to mention other titles you consider similar and how this one rates in comparison to them.

Reviews that are not specific to the title will not be posted on our site. Please write in English only and note that we do not support any mark-up (HTML, XML etc.) within the reviews apart from linking names and titles.

## What not to include:

Resist the temptation to review on other reviews or features visible on the page. This information (and its position on the page) is subject to change without notice. A review form is not an appropriate place to tell us there are errors in the database. If you'd like to tell us about a specific problem, please click the '**Edit page**' button near the bottom of the title page.

Also, please **do not include** the following:

- Profanity, obscenities, or spiteful remarks in either the body or header of your review.
- Expressions of hatred or intolerance for people on the basis of race, ethnicity, nationality, gender or gender identity, religion, sexual orientation, age, or disability, including by promoting organizations with such views.
- Time-sensitive material (i.e. mentions of events, promotional tours, seminars, lectures, etc.).
- Avoid unannounced spoilers! Please don't reveal crucial plot elements, if you include spoilers without warning readers in advance, your review may be subject to removal. To label a spoiler make sure you check the '**contains spoilers**' checkbox. Also, please never include spoilers in your review header as this is always visible.
- Square brackets [ and ] are not allowed apart from when used to link names and titles
- Phone numbers, mail addresses, URLs, email addresses, links to Twitter or Facebook pages etc.
- Availability, price, or ordering/shipping information.
- Advertising, promotions or solicitations of any kind
- Writing in ALL-CAPS! Writing sentences in all-uppercase characters is considered "SHOUTING" and must be avoided.
- Content in languages other than English
- Do not include personal opinions on real life events or subject matter on which a film is based.
- Do not reference or comment on other reviews or users. Reviews should be stand-alone works.

Any review in violation of these guidelines will not be posted or may be edited to conform to the guidelines. In addition, IMDb reserves the right not to post any review for any reason.

## Sort by:

You can now sort by Review Rating on title/reviews and user/reviews pages as well as Review Date, Total Votes and Prolific Reviewer . For example, if you go to the title page user reviews section you can choose the Sort option "Review Rating" and see all reviews that include a rating of 10, 9, etc. You can also sort in the opposite direction by clicking the arrow ↓↑ and see reviews that include a rating of 1, 2 etc. Unrated reviews always appear at the bottom.

**SER-522**

Case: 25-2366, 08/11/2025, DktEntry: 26.3, Page 232 of 246
Case 5:22-cv-08861-BLF Document 29-24 Filed 02/17/23 Page 3 of 8

### Additional Notes:

- All submitted reviews become the licensed property of IMDb as set forth in our copyrights page.
- Your submission must be your own original work.
- You may only have one published user review per title.
- Please write in English only. HTML is not supported though paragraph breaks will be inserted if you leave a blank line between paragraphs.
- The maximum length for a user review is 10,000 characters.

### Frequently asked questions:

- How do I add my film reviews to the site?
- Why didn't you post my review?
- How do I edit or remove a review?
- How do you choose the review displayed on a title's main page?
- Why would you display such a negative user review on a title page?

---

Did this answer your question?

## IMDb general support

Our support community is always around to help

- Need more help? Visit the official IMDb support community powered by Sprinklr.
- Issues logging in to IMDb? Get login help.

Industry professional, not a member yet? Join IMDbPro.

© 1990-2023 IMDb.com, Inc. or its affiliates. IMDb Conditions of Use | IMDbPro Subscriber Agreement | Privacy Policy | Jobs

SER-523

# Help Center

How can we help?



**Images & Videos**

- IMDb Image FAQs
- How can I add video content to IMDb?
- Featured Video Page Display FAQs
- Image Guidelines
- How do I update my poster?
- How do I report a photo issue to IMDb?
- Can I submit screen grabs from my film?

# Image Guidelines

You can upload images and tag names, movies, series, episodes, languages, and countries.

- Images
- Name Tags
- Title Tags
- Language Tags
- Country Tags
- Title Poster Images
- Track My Contribution

## Image Uploads

Below are the guidelines regarding image uploads, although all cases are subject to the discretion of IMDb per our full terms and conditions, which are available at https://www.imdb.com/conditions. IMDb reserves the right to decline or remove an image in our sole discretion. Should you notice any material that contravenes the following guidelines, please use the 'Report Image' feature to let us know about it.

The definition of 'prurient' according to the Oxford English Dictionary is: "Having or encouraging an excessive interest in sexual matters."

**We allow the following:**

- Sexually suggestive, but non-nude *(e.g. the cover for Sante D'Orazio Photographs)*
- Renowned illustrations containing nudity which are tasteful and relevant to the title and gallery
- Tasteful adult bottoms (e.g. the cover for White Women by Helmut Newton)
- Non-prurient child partial nudity (e.g. Sally Mann)
- Mild infrequent drug use
- Infrequent or mild medical or treatment-focused content
- Infrequent or mild references to alcohol, tobacco, or drug use
- Simulated gambling
- Frequent or intense profanity relevant to the title and gallery
- Frequent or intense realistic violence relevant to the title and gallery
- Frequent or intense horror-themed content relevant to the title and gallery

**We do not allow the following:**

- Images that promote, incite or glorify hatred, violence, racial, sexual or religious intolerance or promote organizations with such views.
- Partial nudity *(e.g. female nipples)* regardless of context, excluding renowned illustrations
- Frontal pelvic nudity
- Anuses - tasteful adult bottoms *(e.g. buttocks/cheeks are ok)*
- Prurient nudity *(e.g. fondling, implied masturbation, or implied sexual contact between two or more people)*
- Sexually suggestive or prurient images containing children
- Blatant prurient activity
- Pornography, or images related to pornographic titles, whether they contain nudity or not
- Realistic sex toys, sex toys in an erotic context, or implied use
- Excessive gore. Yes, we allow frequent or intense realistic violence relevant to the title and gallery, but we have our limits

SER-524

- Feces or urine
- Real life death
- Book or Magazine covers
- Soundtrack covers
- Paparazzi photos
- " Selfie" photos
- Fan art
- Customization of any kind
- Leaked images, 'revenge porn', or any images taken under the agreement/reasonable assumption that they would remain private
- Personal contact information
- Any personal information about children under 13
- Product or service advertisements
- Images for which you do not own the copyright or have the necessary rights
- Images displaying third-party ownership or branding, such as watermarks. Watermarks of the title's creators, such as the production company or TV channel, are acceptable
- Poor quality images. Please refer to the in-depth guidelines on this below
- Unnecessary quantities of very similar still images from the same scene
- Spoilers, e.g. an image revealing a major plot twist from later in the film, such as a dead main character

### Image Quality

We are concerned only with the quality of the 'representation' of the image. This means if the original poster was poor quality, but we have a high quality scan or copy of that poor quality poster, the image is totally eligible for display on IMDb. We allow the following:

- Acceptable quality scans of old physical media with fold marks, dog-eared corners, creases, fading, light stains or poor printing artefacts such as low DPI (dots per inch). If a copy of the same image is available with the same scan quality, but without these physical artefacts, obviously the version without the artefacts is preferred.
- Acceptable quality copies of poor quality digital source media. For example, if the film was originally mastered in poor digital quality, in a low bitrate or highly compressed, but the copy at hand isn't significantly further degraded.

We **do not** allow scans or copies with the following:

- Noticeable pixelation or noise
- Bars or framing around the outside of the image
- Stretched aspect ratio
- Observable moiré effect

---

## Name Tags

### Tagging Names

If a person's face is clearly seen in an image, you can tag that image with the person's IMDb 'name page'. However please note that if the image was initially uploaded via IMDbPro, then any additional name tags will not display on those additional name pages.

If their face isn't clearly visible, they can still be tagged in the following cases:

- Faces obscured by masks/disguises/heavy makeup/prosthetic makeup
- Stunt actors and body doubles can be tagged with their own names.
- Voice actors for animated titles can be tagged if the character is clearly displayed within the image. For animated titles, we will display the actor tags within title image gallery, but not within the name image gallery.

However, please do not tag names in:

- Back of the headshots or shots with deliberately out-of-focus or heavily obscured faces. Please use your common sense here. If the person isn't recognizable then don't tag them unless they're eligible as described above.
- Archive footage, e.g. stills from talk shows where images or clips of the person are shown to the audience as part of the show. Put simply, don't tag people in images of images.
- Any images that breach our image upload guidelines (above).

Tagging names to poster images have a few exceptions to the above rules, we will allow names to be tagged to a poster image if they are visible on the poster or if their name appears in the billing block at the bottom of the poster image. If an individual is not featured on a poster in either of the mentioned ways, then their name should not be tagged to the image.

For more information on **name primary images (headshots)**, please make sure to see our manage your images guide content.

SER-525

### Deleting Name Tags

Our aim is to be the most authoritative database of information about movies, TV, video games and the cast and crew that make them. To achieve this we never delete valid information and this includes tags to names or titles on images. If you have an IMDbPro account you can choose and upload images that will appear in your gallery before any other image attached to your page. We hope this will help alleviate any frustration caused by the policy.

## Title Tags

If an image is a poster, still frame, publicity, or event photo for a certain movie, series or episode, you can tag the image to the relevant IMDb 'title page'.

It's not typical for an image to have more than two titles linked and will likely result in the request being rejected. Exceptions *may* be applied on a case by case basis for official; multi-packs or collections, posters or promotions.
Additionally, please **do not** tag titles in:

- Award ceremonies/events
  - Where the person/s in the image are not attending primarily for the title. For example, Ryan Gosling has attended Cannes film festival a number of times, but only one year for the movie Drive (2011), e.g. the Cannes event in 2011. Therefore, Drive (2011) should only be tagged in photos from the 2011 Cannes event.
  - Images that don't consist mostly of people who worked on the title. For example, a photo of Martin Scorcese and Matt Damon should not be tagged with The Wolf of Wall Street (2013) because Matt Damon wasn't involved.
  - Images that don't make sense on a title page. Please use your common sense. For example, please don't tag Drive (2011) in images of Ryan Gosling eating a sandwich somewhere in Cannes.
- Any images that breach our image upload guidelines (above).
- Please do not tag series or season posters with individual episodes

## Language Tags

The language(s) present in a **poster** and/or **product** image can be applied as a 'tag' when adding a *new image* to a title page. They can also be added or deleted from an existing image using the **Edit Tags** button when viewing the image.

The example below has both *English* and *Italian* text visible in the poster and so, both languages should be 'tagged'.




## Country Tags

You can 'tag' a **poster** and/or **product** image with **any** appropriate countries - meaning one poster can be suitable for multiple countries. They can be applied as a 'tag' when adding a *new image* to a title page, and can also be added or deleted from an existing image using the **Edit Tags** button.

SER-526

Many studios create different versions of movie posters to be shown in a specific country or region. The following poster for Joker (2019) was created specifically for the release of the movie in Japan and should be only tagged with '*Japan*' as the country.




Furthermore, many posters may be appropriate for more than one country - for example, the following poster for Yesterday (2019) has more than one country 'tagged'.




**Single poster for multiple countries?**

It's possible, though uncommon - that only one poster is made to promote a title in multiple countries. In these instances a country tag might be appropriate, even if the language visible in the image doesn't match up - editorial discretion will be used to determine the validity in such cases.

## Title Poster Images

For more information on how to add/update a titles 'primary' poster - please see our "How do I update my poster?" article.

## Tracking your contribution

SER-527

You can now track the status of your Images submission and if it has not been approved, we'll tell you the reason why.

More information on how to do this can be found on our help article.

Did this answer your question?

# IMDb general support

Our support community is always around to help

- Need more help? Visit the official IMDb support community powered by Sprinklr.
- Issues logging in to IMDb? Get login help.

Industry professional, not a member yet? Join IMDbPro.

© 1990-2023 IMDb.com, Inc. or its affiliates. IMDb Conditions of Use | IMDbPro Subscriber Agreement | Privacy Policy | Jobs

AMBIKA KUMAR (*pro hac vice*)
ambikakumar@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 757-8030

ADAM S. SIEFF (CA Bar No. 302030)
adamsieff@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800

ROBERT CORN-REVERE (*pro hac vice*)
bobcornrevere@dwt.com
DAVID M. GOSSETT (*pro hac vice*)
davidgossett@dwt.com
MEENAKSHI KRISHNAN (*pro hac vice*)
meenakshikrishnan@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200

Attorneys for Plaintiff
NETCHOICE, LLC d/b/a NetChoice

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 5:22-cv-08861-BLF<br><br>**DECLARATION OF CARL SZABO IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: June 22, 2023<br>Time: 9:00 A.M.<br>Dept.: Courtroom 3 – 5th Floor<br><br>Action Filed: December 14, 2022 |

I, Carl Szabo, declare:

1. ***Identity of declarant.*** I am the Vice President and General Counsel of Plaintiff NetChoice, LLC d/b/a NetChoice. In addition to providing legal counsel to NetChoice, I coordinate our advocacy before legislative bodies, courts, and government agencies. I make this declaration from personal knowledge and a review of NetChoice's records kept in the ordinary course of business.

2. NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. We are dedicated to preserving the internet as a vibrant marketplace for communication, commerce, and the exchange of ideas. When online businesses are free to make their own content publication, personalization, and moderation decisions, they create diverse experiences and choices. We strongly believe in giving users and online service providers autonomy in how they use the internet.

3. For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the internet, while minimizing burdens on businesses, to help make the internet more accessible and useful for both businesses and consumers. Our members include a broad array of online services: Airbnb, Alibaba.com, Amazon.com, AOL, eBay, Etsy, Expedia, Fluidtruck, Google, HomeAway, Hotels.com, Lime, Lyft, Meta, Nextdoor, Oath, OfferUp, Orbitz, PayPal, Pinterest, StubHub, Swimply, TikTok, TravelTech, Travelocity, Trivago, Turo, Twitter, Verisign, VRBO, VSBLTY, Waymo, Wing, and Yahoo!.

4. California's new law, AB 2273, implicates several of NetChoice's members because—although the statutory language is vague and ambiguous—those members could be found to "provide[] an online service, product, or feature likely to be accessed by" individuals under age 18.

5. NetChoice is intimately familiar with the content structures and business models that many online businesses—including our members—use and rely on to provide services to users. Our expertise has led us to conclude that AB 2273 would irreparably harm our members


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

and is fundamentally inconsistent with their business models. Should it be permitted to go into effect, AB 2273 would have long-term, adverse expressive effects on our members' services by dictating the content they publish, moderate, and tailor to users; coercing them into adopting unworkable, privacy-invasive age verification technology or otherwise redesigning their services to be universally child friendly (however that is defined by the State of California); and negatively affecting our members' reputations with their users, advertisers, investors, and others. AB 2273 would also expose our members to stiff civil penalties and enforcement actions brought by the California Attorney General should they not comply with the law's vague dictates to the State's satisfaction. It is no exaggeration to say that AB 2273 threatens not just our members and their services, but also the internet as we know it.

6. ***"Potentially harmful" content.*** Particularly onerous is AB 2273's requirement that businesses evaluate and mitigate the risk that any new or existing "potentially harmful content" will reach users under age 18, and deliver those assessments to the California Attorney General on demand. At the outset, this provision requires members to vet almost all content they publish, which could range into millions or even billions of items posted each day. I know of no reliable way to isolate internet content that is "likely to be accessed by" users under 18, particularly as some minor users (such as 17-year-olds) are likely to access much of the same content that adults access. Even if our members could meaningfully isolate such content, they next would have to engage in the impossible task of determining whether that content "could harm" minors, and propose plans to mitigate those risks.

7. These requirements severely impinge on our members' ability to exercise editorial discretion over the content they publish. Instead of speaking freely on their own services—and inviting their users to do the same—our members will now first have to incur significant costs simply to probe if protected exercises of speech will pass muster under the State's murky harms analysis, however that is defined. In short, AB 2273 imposes both a tax and a muzzle on our members—and their users—before either can utter a word online. In practical effect, the vagueness and breadth of these requirements means that NetChoice members will be chilled from freely publishing a diverse and rich range of content, so as to avoid the risk of liability if the State



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

deems that content "potentially harmful." Such a requirement injures everyone that benefits from a dynamic internet, including NetChoice's members and their users.

8. ***Enforcement of content policies and community standards.*** AB 2273's requirement that members enforce their own content policies and community standards would severely harm members' ability to exercise editorial discretion over their services. NetChoice's members have adopted unique-business-specific content policies and guidelines governing the use of their websites, reflecting their different values. In this way, content moderation reflects a significant means by which online services express themselves and the types of communities they are seeking to create. Choices about whether to allow or prohibit certain kinds of content involve editorial judgments by our members: what speech they want to foster and what speech they wish to distance themselves from.

9. In accordance with their individual content moderation policies, some of our members already review massive amounts of content—including text, videos, audio, and images—each day to make nuanced judgment calls on the type of content they wish to leave up or remove. The volume of users and activity on our members' services is enormous. Some have over a billion users, with an accordingly huge amount of content uploaded daily. This content is posted from all over the globe and reflects a wide range of perspectives, identities, and norms. How our members approach content moderation decisions in turn shapes the type of online experience created for their users and advertisers.

10. There is no one-size-fits-all approach to content moderation, nor does it take place in a vacuum. Instead, moderation efforts entail a complex and dynamic set of interactions among a service's own norms, user preferences, and real-world events. They also involve a range of content moderation tools, including both human review and automated filtering (like algorithms) to handle higher volumes of content. Our members carefully titrate their content moderation efforts to curate communities and experiences consistent with their subjective values: A member might determine that content should be shown despite its controversial nature; that removal or de-prioritization of content is necessary; or that not only should content be removed but that the posting user should be suspended or banned from the service. Content moderation also involves


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

context and service-specific decisions about how to arrange and display content, recommend content to users, and facilitate access to content. On some services, content moderation can even be user-driven, by granting users the option to decide whether they wish to avoid certain content. For example, some of our members permit users to block or mute other users or content marked with certain hashtags, or create lists containing terms or phrases they wish to avoid seeing on the service.

11. Being able to approach content moderation decisions with flexibility and discretion is essential for our members to strike a balance between addressing potentially objectionable content and preserving open and reliable access for users. NetChoice's members already dedicate substantial personnel, resources, and effort to content moderation. But these efforts are ever-changing and responsive to the often unpredictable content that appears on their services each day. For this reason, our members have developed adaptable policies that simultaneously guide future moderation decisions and provide services with the agility to react to unexpected types of content or changed circumstances.

12. Under AB 2273, however, NetChoice members will have to adopt a rigid, one-size-fits-all approach towards content moderation and would be significantly constrained in their ability to address content in the manner they see fit. Our members would be inclined to drop certain content policies and rules that require significant flexibility to monitor, which in turn would deprive users of notice of the types of content that may be removed and deny our members the ability to fashion the tone and tenor of online discussions on their services. AB 2273 would also undermine our members' ability to modify content moderation rules rapidly in response to new developments, whether online or in the physical world. By eliminating businesses' ability to make these sorts of particularized editorial judgments, AB 2273 would irreparably harm members' ability to moderate, organize, curate, and otherwise prioritize their content within the unique circumstances in which it was posted. Given the risk of civil liability, the law may also discourage our members from having content policies and community standards at all, to avoid the risk of unpredictable and punitive penalties.

13. ***Use of algorithms and content personalization.*** AB 2273's restrictions and


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

prohibitions on businesses using algorithms and "personal information" (which includes basic information about a user's interaction with a service), would irreparably harm our members' ability to conduct routine website operations (such as search, newsfeeds, and service improvements), provide tailored content to their users, and maintain the relationships with advertisers that sustain some of their services. For example, AB 2273's prohibitions on "dark patterns" could—depending on how that phrase is interpreted—extend to our members' commonplace use of algorithmic features that order and shape content. Algorithms fundamentally structure our members' websites by permitting them to retrieve and present information responsive to user requests; provide and optimize personalized content recommendations to users; detect bot and spam activity; and serve many other functional purposes. Given the vast amount of user-generated content our members host online, some of our members also use algorithms to make moderation decisions and respond quickly to objectionable content. Accordingly, restricting our members' use of algorithms would significantly impair their ability to flag, remove, and deprioritize content, thereby *undermining* those members' ability to enforce their content policies (as AB 2273 would require). Curtailing online businesses' ability to curate content through these algorithms would lead to irreparable expressive and operational harms for our members.

14. AB 2273's restrictions on the use of information would also irreparably harm our members by affecting their relationships with third parties, including advertisers. Many online businesses, including our members, rely on advertising to remain in business and offer free or low-cost content to users. Advertisers recognize the value of reaching a specific audience, and thus pay more for targeted advertising. And users benefit from targeted advertising both by receiving subsidized access to our members' services and also by seeing more relevant advertising content. AB 2273 will interfere with our members' ability to sell targeted advertising and thereby jeopardize the foundational business and operational model on which many of our members rely. The restrictions will also interfere with our members' ability to share information with other third parties on whom they rely to support and enrich the services they offer, such as vendors for hosting, data analytics, and other important operational services like spam and fraud detection, technical support, and customer support services. AB 2273 will thus require our members to redesign their


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

services.

15. ***Age verification.*** AB 2273 also irreparably harms members by requiring services to "[e]stimate the age of child users with a reasonable level of certainty." Even assuming the technology to age verify accurately were available, this obligation would require many of our members to fundamentally restructure their services by requiring verification of legal identity before the services can be accessed. This would require our members to collect more personal information from users, which many users will not want to provide, either because it is burdensome and inconvenient to do so or because they object to providing such personal information (or both). This will damage our members' relationships with their users, and is nearly certain to decrease the number of users for many services (and thereby damage those services' ability to sell advertising). Many of our members also welcome anonymous users as a matter of principle and as a vital feature of the internet—a feature that AB 2273 will dismantle.

16. ***Impact of AB 2273 on members' reputations.*** For decades, our members have painstakingly built and nurtured relationships with their users, investors, and advertisers. These relationships are based on each member's proven ability to deliver innovative, high-quality services. If AB 2273 is permitted to go into effect, our members will no longer be able to provide the same quality of service that users and others have come to expect. Whether from the law's requirements that members effectively purge their websites of any potentially harmful content, from its restrictions on content personalization, from its prohibitions on our members' use of routine algorithmic operations to enrich users' experiences, or from any number of the law's other burdensome and censorial obligations, the result is clear: AB 2273 will require our members to create, at best, a highly degraded version of their services. In turn, our members' carefully cultivated reputations and user relationships will deteriorate, leading to an inevitable dampening of investor and advertiser support in a time when the technology industry is already suffering economic downturn. Accordingly, AB 2273 will inflict immediate and irreparable long-term, and likely devastating reputational and financial harm on our members.

17. ***Preparing for AB 2273.*** Although NetChoice understands that AB 2273's formal effective date is July 1, 2024, NetChoice's members must start—and are already starting to—



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

prepare for compliance now, including by spending significant resources and preparing for fundamental changes to their services. NetChoice's members must decide now whether they want to (a) restrict their services to individuals over 18 (and attempt to develop a reliable way of verifying that users are in fact over 18); or (b) redesign the entirety of their services to comply with AB 2273's child-appropriate requirements. They are already beginning to incur enormous expense and expend vast amounts of time on, among other tasks: consulting experts to determine how to vet and categorize their existing and forthcoming content as "potentially harmful"; engaging in efforts to determine whether they can enforce their content policies to the State's satisfaction; redesigning and finding substitutes for their essential algorithmic services; and reevaluating their relationships with advertisers and other third parties. At minimum, efforts to comply with AB 2273 will require our members to hire an army of additional personnel, including content reviewers, content moderators, compliance officers, children's experts, privacy experts, customer support services, and legal counsel. These compliance efforts will not only impose staggering and unsustainable costs on our services; they will also derail our members from focusing on supporting expressive content online. Moreover, given the vagueness, breadth, and subjectivity of the law's demands, it is highly doubtful that perfect compliance is even possible.

18. Accordingly, compliance with AB 2273 would not only be severely burdensome, but in many instances, may not be technically workable at all. Though the law does not take effect until next year, its expressive harms are enormous, immediate, and irreparable now. Moreover, NetChoice's members' substantial costs in undertaking this enormously burdensome vetting exercise are unrecoverable, and could not be recouped if Plaintiff's challenge to AB 2273 is ultimately successful on the merits. Similarly, the loss of customer trust and loyalty that would result if our members were required to redesign their services as the law requires would take years to build back (to the extent it could be rebuilt at all).


DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed at Washington D.C., this 16th day of February 2023.

Carl Szabo



DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899