No. 25-2366

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

NETCHOICE, LLC, D/B/A NETCHOICE,

PLAINTIFF -APPELLEE,

v.

ROB BONTA, in his official capacity as Attorney General of California,

DEFENDANT- APPELLANT.

On Appeal from the United States District Court
for the Northern District of California, San Jose
Civil Action No. 5:22-cv-08861-BLF
Hon. Beth L. Freeman, District Court Judge

# BRIEF OF AMICI CURIAE ELECTRONIC FRONTIER FOUNDATION, CENTER FOR DEMOCRACY & TECHNOLOGY, INTERNET ARCHIVE, AND WIKIMEDIA FOUNDATION IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

Samir Jain
Eric Null
Kate Ruane
CENTER FOR DEMOCRACY & TECHNOLOGY
1401 K Street, NW
Washington, DC 20005

Aaron Mackey
*Counsel of Record*
Adam Schwartz
David Greene
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email: amackey@eff.org
Telephone: (415) 436-9333
Fax: (415) 436-9993

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

Dated: August 18, 2025

By: /s/ *Aaron Mackey*
Aaron Mackey

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES.................................................................................iv

STATEMENT OF INTEREST OF AMICI ...........................................................1

INTRODUCTION ....................................................................................................3

ARGUMENT ............................................................................................................4

I. THE AADC'S AGE-ESTIMATION PROVISION VIOLATES THE FIRST AMENDMENT. .........................................................................................4

A. Adults And Children Rely On The Internet To Engage In A Diverse Range Of Free Expression. ...................................................................5

B. The AADC's Age-Estimation Requirement Blocks Access To Protected Expression, Prevents Anonymity Online, And Jeopardizes People's Data Privacy And Security. .................................................11

1. Age-assurance requirements will chill and block access to lawful speech. ........................................................................................13

2. Online age-assurance schemes impermissibly burden the right to be anonymous online. .................................................16

3. Online age estimation puts internet users' sensitive personal data at risk. .........................................................................................17

II. THE AADC'S UNCONSTITUTIONAL AGE-VERIFICATION PROVISION CANNOT BE SEVERED FROM THE REMAINDER. ........20

III. THIS COURT SHOULD NOT CAST DOUBT ON THE VALIDITY OF CONSUMER DATA PRIVACY LAWS NOT BEFORE THIS COURT....21

A. Consumer Data Privacy Laws Face Intermediate Scrutiny. ...............22

1. The consumer data subject to the AADC's privacy provisions is not a matter of public concern. ...........................................23

2. Businesses have solely economic interests in the data covered by the AADC's privacy provisions. ............................24

3. Intermediate scrutiny requires a privacy law to be narrowly tailored to a substantial state interest. ......................................26

B. The Void For Vagueness Doctrine Applies To The AADC. ..............29

C. If This Court Addresses the AADC's Privacy Protections, It Should Carefully Apply Intermediate Scrutiny And The Vagueness Doctrine.........................................................................................29

1. Enforcement of privacy policies. ............................................30

2. Data minimization. .................................................................30

3. Dark patterns.........................................................................31

CONCLUSION ...............................................................................................32

CERTIFICATE OF COMPLIANCE ...................................................................34

CERTIFICATE OF SERVICE............................................................................35

## TABLE OF AUTHORITIES

### Cases

*ACLU v. Gonzales*,
478 F.Supp.2d 775 (E.D. Pa. 2007) ....................................................17

*ACLU v. Mukasey*,
534 F.3d 181 (3d Cir. 2008)....................................................17, 30

*Am. Amusement Mach. Ass'n v. Kendrick*,
244 F.3d 572 (7th Cir. 2001) ....................................................7

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003)....................................................13, 16

*Ashcroft v. ACLU*,
542 U.S. 656 (2004)....................................................11

*Barlow v. Davis*,
72 Cal.App.4th 1258 (1999) ....................................................20

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)....................................................23, 27

*Bd. of Educ. v. Pico*,
457 U.S. 853 (1982)....................................................5

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ....................................................32

*Boelter v. Hearst*,
192 F.Supp.3d 427 (S.D.N.Y. 2016)....................................................26, 27

*Brown v. Entertainment Merchants Ass'n*,
564 U.S. 786 (2011)....................................................13

*Central Hudson Gas & Electric Corp. v. Public Service Commn.*,
447 U.S. 557 (1980)....................................................23, 24, 25, 26

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985)....................................................22, 23

*FCC v. Fox Television, Inc.*,
567 U.S. 239 (2012)....................................................29

*Florida Star v. B.J.F.*,
491 U.S. 524 (1989)....................................................24

*Free Speech Coalition v. Paxton*,
145 S. Ct. 2291 (2025) ....................................................................3, 12, 13

*Friedman v. Rogers*,
440 U.S. 1 (1979) ..........................................................................28, 30, 32

*FTC v. Cyberspace.Com LLC*,
453 F.3d 1196 (9th Cir. 2006) ..........................................................................28

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ..........................................................................................30

*Hotel Emps. & Rest. Emps. Int'l Union v. Davis*,
21 Cal.4th 585 (1999) ........................................................................................20

*In re Anonymous Online Speakers*,
661 F.3d 1168 (9th Cir. 2011) ..........................................................................16

*In re Vizio, Inc., Consumer Priv. Litig.*,
238 F.Supp.3d 1204 (C.D. Cal. 2017) ........................................................28, 32

*Judge v.Saltz Plastic Surgery, P.C.*,
367 P.3d 1006Utah 2016) ..................................................................................24

*King v. Gen. Info. Servs.*,
903 F.Supp.2d 303 (E.D. Pa. 2012) ..............................................................26, 27

*Lamont v. Postmaster General*,
381 U.S. 301 (1965) ..........................................................................................27

*Martin v. City of Struthers*,
319 U.S. 141 (1943) ............................................................................................5

*McCullen v. Coakley*,
573 U.S. 464 (2014) ..........................................................................................26

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ..........................................................................................16

*McMahan v. City & County of San Francisco*,
127 Cal.App.4th 1368 (2005) ...........................................................................20

*Natl. Cable Assn. v. FCC*,
555 F.3d 996 (D.C. Cir. 2009) .....................................................................25, 26

*NetChoice v. Bonta*,
113 F.4th 1116 (9th Cir. 2024) ....................................................................21, 32

*NetChoice v. Bonta*,
770 F.Supp.3d. 1164 (N.D. Cal. 2025) ..................................................... *passim*

*NetChoice v. Moody*,
603 U.S. 707 (2024) ........................................ 30, 31

*Packingham v. North Carolina*,
582 U.S. 98 (2017) ........................................ 4, 5

*PSINet, Inc. v. Chapman*,
167 F.Supp.2d 878 (W.D. Va. 2001) ........................................ 17

*PSINet, Inc. v. Chapman*,
362 F.3d 227 (4th Cir. 2004) ........................................ 13, 17

*Reno v. ACLU*,
521 U.S. 844 (1997) ........................................ 5, 13, 29

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ........................................ 28

*Shulman v. Group W Productions, Inc.*,
955 P.2d 469 (Cal. 1998) ........................................ 24

*Snyder v. Phelps*,
562 U.S. 443 (2011) ........................................ 23

*Sorrell v. IMS Health,*
*Inc.*, 564 U.S. 552 (2011) ........................................ 25, 26

*State v. Weidner*,
235 Wis. 2d 306 (2000) ........................................ 17

*Sterling Drug, Inc. v. FTC*,
741 F.2d 1146 (9th Cir. 1984) ........................................ 28

*Trans Union Corp. v. FTC*,
245 F.3d 809 (D.C. Cir. 2001) ........................................ 25, 26

*Trans Union LLC v. FTC,*
295 F.3d 42 (D.C. Cir. 2002) ........................................ 25

*U.S. v. Playboy Entertainment Group, Inc.*,
529 U.S. 803 (2000) ........................................ 13

*Virgil v. Time, Inc.*,
527 F.2d 1122 (9th Cir. 1975) ........................................ 24

**Statutes**

15 U.S.C. § 1681 ........................................ 22

18 U.S.C. § 2510 ........................................ 22

18 U.S.C. § 2710 ....................22

18 U.S.C. §§ 2721 *et seq* ....................18

47 U.S.C. § 551 ....................22

740 Ill. Comp. Stat. 14 *et seq*. ....................22

Cal. Civ. Code § 1798.100 ....................22

Cal. Civ. Code § 1798.99.30 ....................4

Cal. Civ. Code § 1798.99.31 .................... *passim*

Health Insurance Portability and Accountability Act of 1996, Pub. Law 104-191 ....................22

**Other Authorities**

Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,'* BBC (Nov. 28, 2020) ....................10

Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, EFF Deeplinks Blog (Dec. 2, 2019) ....................18, 19, 23

Brooke Auxier, *Social Media Continue to Be Important Political Outlets for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020) ....................9

Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their Cultures*, Travel & Leisure (Oct. 21, 2022)....................9

Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*, Pew Rsch. Ctr. (Sept. 17, 2024)....................6

Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a Clear Net Benefit*, N.Y. Times (May 24, 2023) ....................10

Common Sense & Hopelab*, A Double-Edged Sword: How Diverse Communities of Young People Think About the Multifaceted Relationship Between Social Media and Mental Health* (2024)....................6

Consumer Fin. Prot. Bureau, *Data Point: Credit Invisibles* (May 2015)....................14

*Digital Advertising in the United States – Statistics & Facts*, Statista (May 20, 2025) ....................19

Douglas A. Blackmon et al., *Birth of a Movement*, Wall St. J. (Oct. 29, 2010)........6

Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times (Jul. 25, 2021) ....................8

Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings From Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023)..................7

Erica Chen et al., *Online Social Networking and Mental Health Among Older Adults: A Scoping Review*, Canadian J. on Aging, (2022)..................................10

Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sept. 22, 2022) ..................................................9

FTC, *Staff Report, Bringing Dark Patterns to Light* (Sept. 2022) ..........................32

Identity Theft Res. Ctr., *2023 Data Brach Report*, (Jan. 2024) .............................19

J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, Nat'l Sexual Violence Res. Ctr., (Mar. 1, 2022)................10

Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minors*, EFF Deeplinks Block, (Mar. 15, 2024) ....................8

Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media Use and Socioemotional Well-Being Through the Lens of the COVID-19 Pandemic*, Persp. Psych. Sci. (May 9, 2022)........................................................................7

Jillian Andres Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge*, Univ. Md. Ctr. for Democracy & Civic Engagement, 2 (Jan. 2024)..................................................................14

Joely Johnson Mork, *Teen's Online Church Draws Young People From Around the World*, Faith & Leadership (Aug. 23, 2016)..................................................9

Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021) ........................................................................9

Kayee Hanaoka, *Face Analysis Technology Evaluation: Age Estimation and Verification*, National Institute of Standards and Technology, U.S. Department of Commerce (May 2024)..........................................................................15

Keith N. Hampton et al., *Disconnection More Problematic for Adolescent Self-Esteem Than Heavy Social Media Use: Evidence From Access Inequalities and Restrictive Media Parenting in Rural America*, Soc. Sci. Comput. Rev. (Aug. 5, 2022)..................................................................................10

Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013)..................................................................................16

Michael J. Hanmer & Samuel B. Novey, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies*, Univ. Md. Ctr. for Democracy & Civic Engagement, 5 (Mar. 2023) ...............................................14

*Position Paper: Online Age Verification and Children's Rights,* European Digital Rights (Oct. 4, 2023) ....................15

*Press Release*, Identity Theft Res. Ctr., ITRC 2023 Consumer Impact Report: Record High Number of ITRC Victims Have Suicidal Thoughts (Aug. 23, 2023) ....................19

Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020) ....................7

Ramona Alaggia & Susan Wang, "*I Never Told Anyone Until the #MeToo Movement": What Can We Learn From Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect 1 (May 2020) ....................6

Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sept. 18, 2020) ....................8

Richard Power, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers*, Carnegie Mellon CyLab, (2011) ....................19

Samuel Bestvater et al., *Americans' Views of and Experiences With Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023) ....................7

Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, Health Expectations (Feb. 2017) ....................17

Second Restatement of Torts ....................24

Suzanne Smalley, *'Junk Inferences' by Data Brokers Are a Problem for Consumers and the Industry Itself*, Record (June 12, 2024) ....................15

*The Robloxian Christians*, Exponential ....................9

Tracy (Kitten) Goldberg, *Child Identity Fraud: A Web of Deception and Loss* 5, Javelin (Nov. 2, 2021) ....................20

Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, 7 Int'l J. for Crime, Just. & Soc. Democracy 44 (2018) ....................10

U.S. Census Bureau, CB 25-58, Quarterly Residential Vacancies and Homeownership, First Quarter 2024 (Apr. 28, 2025) ....................14

Victoria Rideout et al., *The Common Sense Census: Media Use by Tweens and Teens*, Common Sense (2021) ....................8

## STATEMENT OF INTEREST OF AMICI[1]

The Electronic Frontier Foundation (EFF) is a non-profit civil liberties organization with more than 30,000 active donors that has worked since 1990 to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF protects online users' free expression and privacy in courts and legislatures across the country. EFF challenges laws that burden all internet users' rights by requiring online services to verify their users' ages. *See, e.g.*, *ACLU v. Reno*, 929 F.Supp. 824, 825 (E.D. Pa. 1996) (serving as a plaintiff challenging the Communications Decency Act); *ACLU v. Reno*, 31 F.Supp. 2d 473, 480 n.3 (E.D. Pa. 1999) (serving as a plaintiff challenging the Child Online Protection Act). EFF also defends the constitutionality of well-crafted consumer data privacy laws. *E.g., In re Clearview AI Ltgn.*, 585 F.Supp.3d 1111 (N.D. Ill. 2022); *ACA Connects v. Frey*, 471 F.Supp.3d 318 (D. Me. 2020). EFF advocates in Congress and state legislatures to pass consumer data privacy laws.

The Center for Democracy & Technology (CDT) is a non-profit public interest organization. For thirty years, CDT has represented the public's interest in an open, decentralized Internet and worked to ensure that the constitutional and

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici certify that no person or entity, other than amici, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties consent to the filing of this brief.

democratic values of free expression and privacy are protected in the digital age. CDT regularly advocates before legislatures, regulatory agencies, and courts in support of First Amendment rights on the Internet, including limits on governmental authority to compel or silence speech, and in support of privacy protections for online users.

The Internet Archive is a public nonprofit organization that was founded in 1996 to build an Internet library. Located in San Francisco, California, the Internet Archive collects, records, and digitizes material from a multitude of sources, including libraries, educational institutions, and government agencies. The Internet Archive provides free public access to its collections to researchers, scholars, and the general public.

The Wikimedia Foundation is a non-profit charitable foundation based in San Francisco, California on a mission to "keep knowledge free." It accomplishes that goal through advocacy work and by hosting thirteen free-knowledge platforms known as the Wikimedia Projects. Wikipedia, the Wikimedia Foundation's most well-known platform, serves as a free online encyclopedia that allows users to write and edit content collaboratively. The Wikimedia Projects host factual and educational content that is created, edited, and moderated by over 275,000 volunteer contributors per month worldwide. Volunteer editors determine whether

a topic is notable enough to deserve its own page, confirm that content remains accurate, and ensure that pages are notable, neutral, and cited by reliable sources.

## INTRODUCTION

The California Age-Appropriate Design Code (AADC) should be struck down in its entirety because its age-verification scheme violates the First Amendment rights of all internet users and is inseverable from the statute's remainder.

The AADC's age-verification provision unlawfully burdens adults' and children's ability to speak and receive information online. This case is not controlled by *Free Speech Coalition v. Paxton*, 145 S. Ct. 2291 (2025) because the AADC applies to all online services likely to be accessed by children and, therefore, to speech that is legal for both adults and minors. *Paxton* turned on minors' lack of First Amendment rights to read and view the prohibited speech—a key distinction that renders the case irrelevant here.

The remaining AADC provisions, which limit how businesses process children's data, are inseverable from the unconstitutional age-verification scheme because they cannot function without it. By affirming the invalidity of the entire AADC in this way, the Court can fully vindicate all internet users' free speech and data privacy rights.

The Court need not and should not separately address the constitutionality of the AADC's consumer data privacy provisions. *See* Sec. 1798.99.31(a)(6)-(10) & (b)(1)-(8). If the Court does so, however, it should hold that those provisions are subject to intermediate First Amendment scrutiny, not strict scrutiny, because they regulate commercial speech on matters of private concern. Some of these provisions are unconstitutionally vague. When those provisions are stripped from the AADC, the remaining privacy principles advanced by the law can survive intermediate scrutiny. The Court should not prejudge the constitutionality of AADC data privacy principles that are essential components of comprehensive and better-drafted consumer data privacy laws.

## ARGUMENT

### I. THE AADC'S AGE-ESTIMATION PROVISION VIOLATES THE FIRST AMENDMENT.

The AADC unconstitutionally burdens adults' and children's ability to speak and to access others' speech online by requiring everyone to first verify their ages. The statute applies to online services that are "likely to be accessed by children," which is defined so broadly as to include most social media, gaming, music, news and other general websites. Sec. 1798.99.30(b)(4). The statute thus impermissibly interferes with users' access to "one of the most important places to exchange views" today—the "'vast democratic forums of the Internet.'" *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (quoting *Reno v. ACLU*, 521 U.S. 844,

868 (1997)). The district court correctly held that the AADC's age-verification provision could not withstand First Amendment strict scrutiny. *NetChoice v. Bonta*, 770 F.Supp.3d. 1164, 1201–03 (N.D. Cal. 2025).

### A. Adults And Children Rely On The Internet To Engage In A Diverse Range Of Free Expression.

The internet plays a dominant role in the exercise of First Amendment rights today, and social media services are "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham*, 582 U.S. at 107. It furthers the "fundamental principle of the First Amendment" that "all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Id.* at 104. The First Amendment protects the right to receive others' speech. *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality). Likewise, "[f]reedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society that . . . it must be fully preserved." *Martin v. City of Struthers*, 319 U.S. 141, 146–47 (1943).

An estimated 5.24 billion people use social media for everything from expressing themselves politically, engaging with elected representatives, learning

new dances, and finding community.[2] Users routinely flock to online forums to get their news. For instance, 80% of Black young people, 69% of Latino young people, and 65% of white young people rely on social media to stay informed.[3] And 54% of American adults "at least sometimes" get their news from social media.[4]

Social media is also central to organizing and participating in social and political activities, including national campaigns across the political spectrum, from the Tea Party movement[5] to the #MeToo movement.[6] Nearly half of American social media users say they have been politically active on social media, whether by participating in a political group, encouraging others to act looking up

---

[2] Number of internet and social media users worldwide as of February 2025, Statista (Feb. 2025), https://www.statista.com/statistics/617136/digital-population-worldwide/.

[3] Common Sense & Hopelab*, A Double-Edged Sword: How Diverse Communities of Young People Think About the Multifaceted Relationship Between Social Media and Mental Health*, 17 (2024), https://www.commonsensemedia.org/sites/default/files/research/report/2024-double-edged-sword-hopelab-report_final-release-for-web-v2.pdf.

[4] Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*, Pew Rsch. Ctr. (Sept. 17, 2024), https://www.pewresearch.org/journalism/fact-sheet/news-platform-fact-sheet/.

[5] Douglas A. Blackmon et al., *Birth of a Movement*, Wall St. J. (Oct. 29, 2010), http://on.wsj.com/2hZCWio.

[6] Ramona Alaggia & Susan Wang, *"I Never Told Anyone Until the #MeToo Movement": What Can We Learn From Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect 1, 4 (May 2020), https://pubmed.ncbi.nlm.nih.gov/32200194/.

information about rallies or protests, or using hashtags to show support for a cause.[7]

Social media helps minors develop their own ideas, learn to express themselves, and engage productively with others in our democratic public sphere.[8] "[I]t is obvious that [minors] must be allowed the freedom to form their political views on the basis of uncensored speech *before* they turn eighteen, so that their minds are not a blank when they first exercise the franchise." *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001) (Posner, J). Social media is a key venue for that.

Social media is also a forum for artistic creation. In one study, 71% of teens reported that social media is "a place where they can show their creative side."[9] "In

---

[7] Samuel Bestvater et al., *Americans' Views of and Experiences With Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023), https://www.pewresearch.org/internet/2023/06/29/americans-views-of-and-experiences-with-activism-on-social-media/.

[8] *See* Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020), https://www.pbs.org/newshour/classroom/classroom-voices/student-voices/2020/11/student-voice-how-young-people-use-social-media-to-engage-civically; Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media Use and Socioemotional Well-Being Through the Lens of the COVID-19 Pandemic*, 662, Persp. Psych. Sci. (May 9, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9081105/ ("Social media provides readily-accessible tools for teens to share developing thoughts and experiment with new social identities, particularly without access to traditional methods.").

[9] Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings From Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023),

any given day, about one in 10 tweens and teens will use their digital devices to create some type of art or music."[10] In addition, minors and young adults report that the internet helps them learn about art and music history.[11]

Places of worship use social media to share information about upcoming events, livestream services, and foster community.[12] Social media is specifically a vital source of religious and spiritual community and information for young people.[13] One young person even created "The Robloxian Christians" as a place for kids on the Roblox gaming platform to pray for one another and talk about their

---

https://www.pewresearch.org/short-reads/2023/04/24/teens-and-social-media-key-findings-from-pew-research-center-surveys/.

[10] Victoria Rideout et al., *The Common Sense Census: Media Use by Tweens and Teens*, 41, Common Sense (2021), https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf.

[11] Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minor*s, EFF Deeplinks Block, (Mar. 15, 2024), https://www.eff.org/deeplinks/2024/03/thousands-young-people-told-us-why-kids-online-safety-act-will-be-harmful-minors#art.

[12] Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sept. 18, 2020), https://www.vox.com/recode/2020/9/18/21443661/religion-logging-off-online-engagement-content-creators.

[13] *See* Elizabeth Dias, *Facebook's Next Target: The Religious Experi*ence, N.Y. Times (Jul. 25, 2021), https://www.nytimes.com/2021/07/25/us/facebook-church.html.

faith.[14] It has expanded into a "youth-led virtual church ministry serving upwards of 40,000 young people from over 85 countries."[15]

Finally, social media enables individuals whose voices would otherwise not be heard to make vital and even lifesaving connections with one another, and to share their unique perspectives more widely.[16] For example, people with disabilities use social media to build community, reduce isolation and stigma, and educate others.[17] Survivors of domestic violence rely on the accessibility and

---

[14] Joely Johnson Mork, *Teen's Online Church Draws Young People From Around the World*, Faith & Leadership (Aug. 23, 2016), https://faithandleadership.com/teens-online-church-draws-young-people-around-the-world.

[15] *The Robloxian Christians*, Exponential, https://exponential.org/the-robloxian-christians.

[16] *See*, *e.g.*, Brooke Auxier, *Social Media Continue to Be Important Political Outlets for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020), https://www.pewresearch.org/short-reads/2020/12/11/social-media-continue-to-be-important-political-outlets-for-black-americans; Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their Cultures*, Travel & Leisure (Oct. 21, 2022), https://www.travelandleisure.com/culture-design/how-indigenous-creators-use-tiktok-to-share-their-cultures.

[17] Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sept. 22, 2022), https://www.teenvogue.com/story/chronic-illness-influencers-on-tiktok-are-showing-the-reality-of-being-sick; Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021), https://www.theverge.com/22583848/disabled-teen-cripple-punk-media-representation.

anonymity of online communities to seek advice and resources.[18] Social media use has been shown to reduce loneliness, social isolation, and depression in rural and elderly populations, both of whom face limited mobility and decreased ability to socialize in person.[19] And many young LGBTQ+ people who face discrimination and judgment offline turn to social media for community, exploration, and support.[20]

---

[18] Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, 7 Int'l J. for Crime, Just. & Soc. Democracy 44, 44–45 (2018), https://www.crimejusticejournal.com/article/view/893; *see also*, *e.g.*, J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, Nat'l Sexual Violence Res. Ctr., (Mar. 1, 2022), https://www.nsvrc.org/blogs/online-communities-survivors-websites-and-resources-offering-support-and-help1.

[19] Keith N. Hampton et al., *Disconnection More Problematic for Adolescent Self-Esteem Than Heavy Social Media Use: Evidence From Access Inequalities and Restrictive Media Parenting in Rural America*, Soc. Sci. Comput. Rev. (Aug. 5, 2022), https://journals.sagepub.com/doi/full/10.1177/08944393221117466; Erica Chen et al., *Online Social Networking and Mental Health Among Older Adults: A Scoping Review*, Canadian J. on Aging, 26-27 (2022), https://psycnet.apa.org/record/2022-43114-005.

[20] *See* Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a Clear Net Benefit*, N.Y. Times (May 24, 2023), https://www.nytimes.com/2023/05/24/upshot/social-media-lgbtq-benefits.html; Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,'* BBC (Nov. 28, 2020), https://www.bbc.com/news/av/uk-55079954.

### B. The AADC's Age-Estimation Requirement Blocks Access To Protected Expression, Prevents Anonymity Online, And Jeopardizes People's Data Privacy And Security.

The AADC effectively requires all internet users to prove their age to access a diverse range of online expression. Imposing age-estimation mandates burdens the First Amendment rights of all internet users in several respects. *See Ashcroft v. ACLU*, 542 U.S. 656 (2004).

The AADC requires that online services "likely to be accessed by children," Sec. 1798.99.31(a), shall "[e]stimate the age of child users with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business or apply the privacy and data protections afforded to children to all consumers." *Id*. at (a)(5). This requirement is central to the law's entire regulatory scheme: the law imposes various duties and prohibitions on online services with respect to child users if children are likely to access them *See id.* at (a)(1)-(4), (a)(6)-(10), & (b)(1)-(8). The AADC broadly defines a regulated "online service, product, or feature" to include most general-purpose websites, from search engines to social media. All those services will have to estimate all their users' ages and classify them as children or adults.[21]

---

[21] While the AADC permits services to avoid age verification should they "apply the privacy and data protections afforded to children to all consumers," *id*. at (a)(5), this is a false choice. These services are highly unlikely to treat all their users as children, as they would forgo the revenue they generate from monetizing adults' private information.

The Supreme Court's recent decision in *Paxton*, 145 S.Ct. 2291, does not save the AADC's age-estimation scheme. It unconstitutionally restricts all Californians' access to content on a broad range of online services, including general-purpose social media and websites. The vast majority of this speech is fully protected as to *all* internet users. By contrast, the Texas law upheld in *Paxton* only aims to blocks minors' access to speech they have no First Amendment right to access. The Court reasoned that history, tradition, and precedent allow states to "prevent children from accessing speech that is obscene to children." *Id.* at 2303. The Court explained that "because the First Amendment permits States to prohibit minors from accessing speech that is obscene to them, it likewise permits States to employ the ordinary and appropriate means of enforcing such a prohibition." *Id.* at 2307.

The Court found that the Texas law imposed an "incidental" burden on adults' protected speech—thus triggering intermediate, rather than strict, scrutiny—only because it was aimed at "harmful to minors" speech. *Id*. at 2315. As the Court explained, "where the speech in question is unprotected, States may impose 'restrictions' based on 'content' without triggering strict scrutiny." *Id*. at 2314. *Paxton* also left open whether the Texas law violated the First Amendment as applied, given that its age-verification requirement could block access to speech that is protected as to both minors and adults. *Id*. at 2308, n. 7.

Critically, strict scrutiny remains "the standard for reviewing the direct targeting of fully protected speech." *Id.* at 2310. And it applies "even where the protection of children is the object." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 804–05 (2011). The AADC thus triggers strict scrutiny because its age-verification provision burdens access to all manner of protected speech for both minors and adults. And the AADC fails strict scrutiny. *See U.S. v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000). Moreover, a state's interest in protecting children from speech that is obscene to them "does not include a free-floating power to restrict" them from accessing speech online. *Brown*, 564 U.S. at 794.

**1. Age-assurance requirements will chill and block access to lawful speech.**

Should social media companies require age verification via government-issued identification or similar means to comply with the AADC, it will "serve as a complete block" to adults and children who do not have the necessary form of identification. *PSINet, Inc. v. Chapman*, 362 F.3d 227, 237 (4th Cir. 2004); *see also Reno*, 521 U.S. at 856; *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003) (invalidating age-assurance requirement that would make "adults who do not have [the necessary form of identification] . . . unable to access those sites"). About 15 million adult U.S. citizens do not have a driver's license, while

about 2.6 million do not have any form of government-issued photo ID.[22] Estimates show that another 34.5 million adult citizens use driver's licenses or state IDs card that lack their current names or addresses.[23]

Other age-estimation methods also block the First Amendment rights of many internet users. Age assurance based on public or private transactional data will exclude many adults, as many do not own homes or have credit cards.[24] And information provided by data brokers to estimate users' ages is exactly that, just an

---

[22] Jillian Andres Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge*, Univ. Md. Ctr. for Democracy & Civic Engagement, 2 (Jan. 2024), https://cdce.umd.edu/sites/cdce.umd.edu/files/pubs/Voter%20ID%202023%20survey%20Key%20Results%20Jan%202024%20%281%29.pdf.

[23] *Id.* at 2, 5; *see also* Michael J. Hanmer & Samuel B. Novey, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies*, Univ. Md. Ctr. for Democracy & Civic Engagement, 5 (Mar. 2023), https://www.voteriders.org/wp-content/uploads/2023/04/CDCE_VoteRiders_ANES2020Report_Spring2023.pdf ("Over 1.3 million voting-age citizens in [Georgia, Indiana, Kansas, Mississippi, Tennessee, and Wisconsin] likely did not have the identification needed to vote in 2020.").

[24] *See* U.S. Census Bureau, CB 25-58, Quarterly Residential Vacancies and Homeownership, First Quarter 2024, 5 (Apr. 28, 2025), https://www.census.gov/housing/hvs/files/currenthvspress.pdf (reporting that 35 percent of Americans do not own a home); Consumer Fin. Prot. Bureau, *Data Point: Credit Invisibles*, 12 (May 2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf (reporting that 26 million Americans are "credit invisible").

estimate, and is often inaccurate or outdated, and will thus block some adult users from accessing social media.[25]

Age-estimation systems are inherently inaccurate and can be biased. Because these systems rely on predictions, not certainty, they often have a margin of error of several years, even when working properly.[26] Recent studies have also found that biometric-based identification especially struggles with accuracy for people of color and for women.[27] Task-based age estimation, in which age is predicted based on each user completing a certain movement or task, similarly has the potential to discriminate against people with disabilities.[28] These forms of age estimation therefore create an unacceptable risk that adults will be wrongly and discriminatorily blocked from speech they legally can access because of their demographic or health characteristics.

---

[25] Suzanne Smalley, *'Junk Inferences' by Data Brokers Are a Problem for Consumers and the Industry Itself*, Record (June 12, 2024), https://therecord.media/junk-inferences-data-brokers.

[26] *See id*.

[27] *See* Kayee Hanaoka, *Face Analysis Technology Evaluation: Age Estimation and Verification*, National Institute of Standards and Technology, U.S. Department of Commerce (May 2024), https://nvlpubs.nist.gov/nistpubs/ir/2024/NIST.IR.8525.pdf; *Position Paper: Online Age Verification and Children's Rights*, European Digital Rights, 16-17 (Oct. 4, 2023), https://edri.org/wp-content/uploads/2023/10/Online-age-verification-and-childrens-rights-EDRi-position-paper.pdf.

[28] *See Position Paper: Online Age Verification and Children's Rights*, *supra* note 27, at 21, 23.

### 2. Online age-assurance schemes impermissibly burden the right to be anonymous online.

Even adults who are not wrongfully blocked from accessing lawful speech online will still be chilled because the age-estimation required by the AADC fails to protect anonymous internet access. *See Am. Booksellers Found.*, 342 F.3d at 99 (age-verification schemes "require that website visitors forgo the anonymity otherwise available on the internet"). A reported 86% of internet users have taken steps online to minimize their digital footprints, and 55% have done so to "avoid observation by specific people, organizations, or the government."[29]

Anonymity is "an aspect of the freedom of speech protected by the First Amendment"—no matter whether its use is "motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995). "[T]he ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely[.]" *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011).

[29] Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013), https://www.pewresearch.org/internet/2013/09/05/anonymity-privacy-and-security-online/.

The absence of anonymity will chill users' ability to engage in dissent, access or discuss "sensitive, personal, controversial, or stigmatized content," or seek help from online support communities.[30] *ACLU v. Gonzales*, 478 F.Supp.2d 775, 806 (E.D. Pa. 2007); *PSINet, Inc.*, 362 F.3d at 236; *see also State v. Weidner*, 235 Wis. 2d 306, 320 (2000) (age verification "constitutes an encroachment into the personal lives of those who use the internet precisely because it affords anonymity").

### 3. Online age estimation puts internet users' sensitive personal data at risk.

Even if users are comfortable with forgoing their anonymity, legitimate privacy and security concerns may dissuade them from submitting to age estimation to access social media. *Gonzales*, 478 F.Supp.2d at 806; *see also ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008); *PSINet, Inc. v. Chapman*, 167 F.Supp.2d 878, 889 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004) ("Fear that cyber-criminals may access their [identifying information] . . . . may chill the willingness of some adults to participate in the 'marketplace of ideas' which adult Web site operators provide.").

---

[30] *See, e.g.*, Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, Health Expectations (Feb. 2017), https://pubmed.ncbi.nlm.nih.gov/26725547/.

These privacy and security concerns are real. The personal data that platforms may collect to estimate users' ages is often extremely sensitive and immutable.[31] For example, users' personal information contained in a government-issued ID (such as date of birth, name, and home address) are difficult to change, and biometrics are permanent. Many users reasonably fear that if they provide their personal data to a website, that data will be stolen by thieves, misused for other purpose by employees, and seized by police.

Although California enacted the AADC out of concern for children's wellbeing, the law's online age-estimation regime will make children and adults less safe given the realities of the online advertising industry and data insecurity. All online data is transmitted through a host of intermediaries. So when a user shares their documents, or credit card information, or biometrics with a website to verify their age, that data is often transmitted beyond the site, including to age-assurance vendors.[32] Moreover, almost all websites and services host dozens of third-party trackers managed by data brokers and advertisers that are constantly

---

[31] *See, e.g.*, Driver Privacy Protection Act, 18 U.S.C. §§ 2721 *et seq*.

[32] *See* Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, EFF Deeplinks Blog (Dec. 2, 2019), https://www.eff.org/wp/behind-the-one-way-mirror.

collecting data about browsing activity.[33] Personal information collected online sells for astonishing profits.[34]

The data collected as required by the AADC will also be a tempting target for data thieves. A record 3,205 data breaches occurred in 2023, up 78% from the year prior.[35] Over 350 million people—more than the entire population of the United States—have been affected by these breaches, and 69% of general consumers have been victims of an identity crime more than once.[36]

Children are an attractive target for identity theft due to their "uniquely valuable" unused Social Security numbers.[37] A 2021 study found that one in 50

---

[33] *Id.*

[34] *See Digital Advertising in the United States – Statistics & Facts*, Statista (May 20, 2025), https://www.statista.com/topics/1176/online-advertising/#topicOverview (the U.S. digital advertising market boasted "a revenue of over 317 billion dollars in 2024").

[35] Identity Theft Res. Ctr., *2023 Data Brach Report*, (Jan. 2024), https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf.

[36] *Id.*; *see also Press Release*, Identity Theft Res. Ctr., ITRC 2023 Consumer Impact Report: Record High Number of ITRC Victims Have Suicidal Thoughts (Aug. 23, 2023), https://www.idtheftcenter.org/post/2023-consumer-impact-report-record-high-number-itrc-victims-suicidal-thoughts/.

[37] Richard Power, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers*, Carnegie Mellon CyLab, 3 (2011), https://www.akleg.gov/basis/get_documents.asp?session=29&docid=40175 ("A child's identity is a blank slate, and the probability of discovery is low, as the child will not be using it for a long period of time.").

U.S. children were victims of identity fraud, and one in 45 children had personal information exposed in a data breach.[38]

The risk of data breach, aggravated by the AADC's age estimation scheme, is likely to reasonably chill constitutionally protected expression.

## II. THE AADC'S UNCONSTITUTIONAL AGE-VERIFICATION PROVISION CANNOT BE SEVERED FROM THE REMAINDER.

California's severability doctrine requires this Court to strike down the AADC in its entirety without addressing the validity of other provisions of the law. California requires "three criteria for severability: the invalid provision must be grammatically, functionally, and volitionally separable." *Barlow v. Davis*, 72 Cal.App.4th 1258, 1264 (1999). "All three criteria must be satisfied." *McMahan v. City & County of San Francisco*, 127 Cal.App.4th 1368, 1374 (2005). Functional severability requires the remaining provisions to be effective without the voided provisions. *Hotel Emps. & Rest. Emps. Int'l Union v. Davis*, 21 Cal.4th 585, 613–14 (1999); *see Barlow*, 72 Cal.App.4th at 1265–66.

The AADC's age-estimation regime is functionally inseverable from the law's other provisions. The only way an online service can know whether it must comply with the AADC's duties (Sec. 1798.99.31(a)(1)-(10)) and prohibitions (*id.*

[38] Tracy (Kitten) Goldberg, *Child Identity Fraud: A Web of Deception and Loss* 5, Javelin (Nov. 2, 2021), https://www.javelinstrategy.com/research/child-identity-fraud-web-deception-and-loss.

at (b)(1)-(8)) regarding children is to estimate its users' ages. *Id.* at (a)(5). Thus, the provisions that rely on knowing a minor's age are not effective absent the age-estimation provision. Similar to the previous appeal, this Court can conduct a severability analysis in a facial challenge because the AADC's statutory obligations apply to all online services likely to be accessed by children. *See NetChoice v. Bonta*, 113 F.4th 1116 (9th Cir. 2024).

## III. THIS COURT SHOULD NOT CAST DOUBT ON THE VALIDITY OF CONSUMER DATA PRIVACY LAWS NOT BEFORE THIS COURT.

Because the AADC's age-estimation scheme is unconstitutional and cannot be severed from the remainder of the statute, this Court should strike down the entire AADC, without addressing its consumer data privacy provisions. This would avoid casting doubt on other consumer data privacy laws with provisions similar to the AADC's.[39]

Should this Court address the constitutionality of the AADC's privacy provisions, it should hold that they do not raise the same First Amendment concerns as the AADC's age-estimation provision. Congress and the states have long enacted data privacy laws that limit how businesses may process consumers'

---

[39] Because *amicus* Wikimedia Foundation is not engaged in the commercial sale or use of internet users' data, most consumer data privacy laws do not apply to its services.

personal information.[40] When consumer privacy laws regulate commercial data processing that is not a matter of public concern, as here, courts apply intermediate scrutiny, requiring narrow tailoring between their means and ends.

At the same time, as the district court below correctly held, some clauses in the AADC's privacy provisions are unconstitutionally vague, especially because their capaciousness could reach protected non-commercial expression, including intruding on online services' First Amendment rights to moderate content. *Bonta*, 770 F.Supp.3d at 1204. But these drafting errors should not foreclose well-crafted laws that advance internet users' privacy.

### A. Consumer Data Privacy Laws Face Intermediate Scrutiny.

Courts routinely apply intermediate First Amendment scrutiny to consumer data privacy laws, for two intertwined reasons. First, "speech solely in the individual interest of the speaker and its specific business audience" that concerns "no public issue" warrants "reduced constitutional protection." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 & n.8 (1985). Second, "expression related solely to the economic interests of the speaker and its

---

[40] *E.g.,* Fair Credit Reporting Act of 1970, 15 U.S.C. § 1681; Cable Communications Privacy Act of 1984, 47 U.S.C. § 551; Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510; Video Privacy Protection Act of 1988, 18 U.S.C. § 2710; Health Insurance Portability and Accountability Act of 1996, Pub. Law 104-191; Illinois Biometric Information Privacy Act of 2007, 740 Ill. Comp. Stat. 14 *et seq*.; California Consumer Privacy Act of 2018, Cal. Civ. Code § 1798.100.

audience" is "commercial speech" that receives "lesser protection" compared to "other constitutionally guaranteed expression." *Central Hudson Gas & Electric Corp. v. Public Service Commn.*, 447 U.S. 557, 561, 563 (1980).

If this Court addresses the AADC's privacy provisions (though it should not), it should apply intermediate scrutiny. Here, most applications of the AADC's privacy provisions limit the way online services may process consumer data. *See* Sec. 1798.99.31(a)(6)-(10) & (b)(1)-(8). The context is widespread corporate tracking of consumers' online behavior and monetizing that data, such as to target ads.[41] This consumer data is not a matter of public concern, and the business interests are solely economic.

### 1. The consumer data subject to the AADC's privacy provisions is not a matter of public concern.

"[W]here matters of purely private significance are at issue, First Amendment protections are often less rigorous." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). *See, e.g., Dun & Bradstreet*, 472 U.S. at 759 (defamation); *Snyder*, 562 U.S. at 451–53 (intentional infliction of emotional distress); *Bartnicki v. Vopper*, 532 U.S. 514, 532–35 (2001) (wiretapping).

The Supreme Court has "pointedly refused" to hold that the First Amendment categorically precludes liability for invasions of privacy. *Florida Star*

[41] Cyphers & Gebhart, *supra*, n. 32.

*v. B.J.F.*, 491 U.S. 524, 533 (1989). Rather, "clashes between First Amendment and privacy rights" should be resolved by "relying on limited principles that sweep no more broadly than the appropriate context of the instant case." *Id.*

This is reflected in the common law privacy torts that limit the collection of truthful private information (intrusion on seclusion) and its publication (public disclosure of private facts). *See* Second Restatement of Torts §§ 652B, 652D. The absence of matters of public concern often alleviates many of the First Amendment concerns that arise in privacy torts. *See, e.g., Judge v.Saltz Plastic Surgery, P.C.*, 367 P.3d 1006, 1011 & n.4 (Utah 2016); *Shulman v. Group W Productions, Inc.*, 955 P.2d 469, 479 (Cal. 1998); *Virgil v. Time, Inc.*, 527 F.2d 1122, 1128–29 (9th Cir. 1975).

Here, the individual online behavior of millions of consumers is not a matter of public concern. Instead, the businesses' purpose is to monetize data for their own commercial interests. The overwhelming majority of tracked and targeted consumers will not engage in matters of public concern in relation to their online behavior. Many businesses that collect this information do not distribute it publicly. Those that do distribute it only to a select set of paying clients.

#### 2. Businesses have solely economic interests in the data covered by the AADC's privacy provisions.

The Supreme Court defines "commercial speech" as "expression related solely to the economic interests of the speaker and its audience." *Central Hudson*

*Gas*, 447 U.S. at 561. Here, the business practices regulated by the AADC's privacy provisions are "related solely to the economic interests" of online services. *Id*. The services are processing data about the online behavior of millions of consumers solely for commercial purposes, typically to target ads, to analyze it for their own business purposes, or to sell it to third parties. Thus, when faced with First Amendment challenges to laws that protect consumer privacy from commercial data processing, courts apply intermediate judicial review under the commercial speech doctrine. *See, e.g.*, *Trans Union Corp. v. FTC* (*Trans Union I*), 245 F.3d 809, 818–19 (D.C. Cir. 2001); *Trans Union LLC v. FTC* (*Trans Union II*), 295 F.3d 42, 52–53 (D.C. Cir. 2002); *Natl. Cable Assn. v. FCC*, 555 F.3d 996, 1000–02 (D.C. Cir. 2009). Such decisions focused not just on the commercial motivation, but also the lack of a matter of public concern. *See, e.g., Trans Union I*, 245 F.3d at 818; *Trans Union II*, 295 F.3d 52–53.

*Sorrell* confirms that even content-based commercial speech restrictions are subject to intermediate scrutiny. 564 U.S. at 557. The Vermont law violated the First Amendment because it discriminated against speakers and viewpoints: it targeted "detailers—and only detailers," and its "purpose and practical effect" was to "diminish the effectiveness of marketing by manufacturers of brand-name drugs." *Id.* at 563–65. The Court was explicit that the fault in Vermont's law was its viewpoint-based discrimination: "This is not to say that all privacy measures

must avoid content-based rules." *Id.* at 574. The court also left the door open to "more coherent" privacy legislation, *id.* at 573, and noted that "[t]he capacity of technology to find and publish personal information … presents serious and unresolved issues with respect to personal privacy and the dignity it seeks to secure," *id.* at 579. After *Sorrell*, courts still apply *Central Hudson* review to consumer data privacy laws. *See, e.g., Boelter v. Hearst*, 192 F.Supp.3d 427, 449–50 (S.D.N.Y. 2016); *King v. Gen. Info. Servs.*, 903 F.Supp.2d 303, 308–09, 313 (E.D. Pa. 2012).

### 3. Intermediate scrutiny requires a privacy law to be narrowly tailored to a substantial state interest.

To satisfy intermediate scrutiny, a speech restraint must "directly advance" and be "narrowly drawn" to a "substantial interest." *Central Hudson*, 447 U.S. at 564–65. Under narrow tailoring in intermediate scrutiny, the speech restriction "must not burden substantially more speech than is necessary to further the government's legitimate interests," though it "need not be the least restrictive or least intrusive means of serving the government's interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (internal quotations omitted).

Here, the AADC's consumer data privacy provisions advance at least five substantial government interests.

***Information privacy*****:** California has a "substantial" interest in protecting consumer data privacy. *See Trans Union I*, 245 F.3d at 818; *Natl. Cable*, 555 F.3d

at 1001; *King*, 903 F.Supp.2d at 309–10; *Boelter*, 192 F.Supp.3d at 448. Laws advance information privacy by, for example, limiting how online services use sensitive data, such as a weather app collecting location data to show users forecasts and then using that same data for ad targeting. This state interest has dramatically increased as online services collect ever-greater amounts of personal information.

***Free expression*:** California has a substantial interest in protecting free speech, which often rests on privacy. "In a democratic society privacy of communication is essential if citizens are to think and act creatively and constructively." *Bartnicki*, 532 U.S. at 543. Corporate surveillance of consumers' online activity threatens First Amendment activities that depend on privacy. For example, some data brokers compile precise phone app geolocation data about hundreds of millions of people and use it to help police identify everyone present at a particular time and place. Such data collection chills First Amendment activity. *See Lamont v. Postmaster General*, 381 U.S. 301, 307 (1965) (striking down a mail surveillance program given its "deterrent effect").

***Information Security*:** California has a substantial interest in protecting information security. Intruders regularly obtain personal data from businesses and use or distribute it for their own purposes. Consumer data privacy laws limit the damage: if businesses hoard less data, there will be less to steal.

***Equal Opportunity*****:** California has a substantial interest in protecting equal opportunity. *E.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). Corporate data surveillance often disparately burdens people of color, women, and other vulnerable groups. Lower-income people are often less able to avoid corporate surveillance, because lower-priced technologies often leak more data, and companies have charged a higher price for privacy. Also, companies can use this data in discriminatory ways, including targeting vulnerable groups with dangerous products like subprime loans, and excluding them from ads for homes and jobs. Finally, lower-income people may suffer the most from data breaches, because it costs money and takes considerable time to freeze and monitor one's credit reports, and to obtain identify theft prevention services.

***Reducing Deceptive Commercial Speech*****:** California has a substantial interest in reducing deceptive commercial speech, which is entitled to little or no First Amendment protection. *See Friedman v. Rogers*, 440 U.S. 1, 9 (1979). This interest extends to "dark patterns" that manipulate internet users into surrendering personal information, signing up for services they do not intend to use, and other harms. Dark patterns can be a fraudulent omission, *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F.Supp.3d 1204, 1213 (C.D. Cal. 2017), or a "deceptive visual representation," *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1152 (9th Cir. 1984). *See also FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200–01 (9th Cir. 2006).

### B. The Void For Vagueness Doctrine Applies To The AADC.

The "void for vagueness" doctrine of the Due Process Clause requires "clarity of regulation" for two reasons. First, "regulated parties should know what is required of them." *FCC v. Fox Television, Inc.*, 567 U.S. 239, 253 (2012). Second, "those enforcing the law" must be cabined from acting "in an arbitrary or discriminatory way." *Id*. A vague law regulating expression "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno*, 521 U.S. at 871–72. Thus, "[w]hen speech is involved, rigorous adherence to those [anti-vagueness] requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox Television, Inc.*, 567 U.S. at 253–54.

### C. If This Court Addresses the AADC's Privacy Protections, It Should Carefully Apply Intermediate Scrutiny And The Vagueness Doctrine.

To avoid restraining comprehensive consumer data privacy laws that are consistent with the Constitution, this Court must carefully apply the intermediate scrutiny and vagueness doctrines to the AADC's privacy provisions. Or better yet, as stated above, this Court should strike down the entire AADC as inseverable from the facially invalid age-verification rule, without further addressing these provisions.

**1. Enforcement of privacy policies.**

The AADC requires online services to enforce their own published policies, including content moderation and privacy policies. Sec. 1798.99.31(a)(9). The district court correctly held that Section 31(a)(9)'s application to content moderation policies is facially invalid. *Bonta*, 770 F.Supp.3d at 1198–99. Indeed, such application will always invade online services' protected editorial discretion. *See NetChoice v. Moody*, 603 U.S. 707, 731 (2024).

The district court also correctly held that applying Section 31(a)(9) to community standards rendered the provision unconstitutionally vague, because the terms of those policies (such as "don't attack") often require subjective judgments. *See Mukasey*, 534 F.3d at 205; *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

Section 31(a)(9), however, is not facially unconstitutional when applied to online services' privacy policies: requiring services to adhere to their promises regarding the processing of users' private information directly advances the state's interest in reducing deceptive commercial speech. *See Friedman*, 440 U.S. at 9.

**2. Data minimization.**

Four AADC rules limit how an online service can process various kinds of personal data. *See* Sec. 1798.99.31(b)(1)-(4). The district court correctly held that two terms are unconstitutionally vague: "materially detrimental to the . . . well-

being of a child" in Section 31(b)(1), and the "best interests of children" in Sections 31(b)(2)-(4). *Bonta*, 770 F.Supp.3d at 1205–06. Further, application of these rules to services' content moderation practices would generally violate the First Amendment. *Moody*, 603 U.S. at 731.

That said, stripped of their vague language, these four AADC data minimization provisions would often provide common and important protections for internet users' privacy. The data minimization principle reflected in Section (b)(3), for example, bars the collection, disclosure, or retention of personal information unless necessary to provide a service that the person is currently using. Likewise, Section (b)(4) bars use of personal information for a reason other than the reason for its collection. These provisions directly advance the substantial state interests of privacy, data security, free expression, and equal opportunity of users, and are not more restrictive than necessary.

#### 3. Dark patterns.

The AADC prohibits use of dark patterns to facilitate privacy harms. Sec. 1798.99.31(b)(7). Again, the clause "materially detrimental to the child's . . . well-being" is unconstitutionally vague. *Bonta*, 770 F.Supp.3d at 1206–07. And again, application of this rule to an online service because of its content, or features used to deliver content, would generally violate the service's First Amendment rights. *Moody*, 603 U.S. at 731.

Stripped of the AADC's vague language, however, a dark pattern restriction is a critical privacy protection that does not violate the First Amendment on its face. This Court's previous opinion left open whether the AADC's dark-pattern ban burdened speech and triggered First Amendment scrutiny. *Bonta*, 113 F.4th at 1123. The district court correctly held it does. *Bonta*, 770 F.Supp.3d at 1200–01. This Court also left open what test to apply. *Bonta*, 113 F.4th at 1123. Intermediate scrutiny should apply to most privacy-protective regulations of dark patterns, because they directly advance the substantial state interest of limiting deceptive commercial speech, which enjoys little to no First Amendment protection. *Friedman*, 440 U.S. at 9.

Regulating dark patterns also advances privacy, speech, information security, and equal opportunity because companies often use dark patterns to trick customers into giving up their data.[42] *See, e.g.*, *In re Vizio*, 238 F.Supp.3d at 1213; *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857–58 (9th Cir. 2022).

## CONCLUSION

This Court should affirm the judgment below, striking down the entire AADC on its face, because the age-verification scheme is unconstitutional, and inseverable from the remainder of the statute.

---

[42] FTC, *Staff Report, Bringing Dark Patterns to Light* 15-19 (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.

Dated: August 18, 2025

By: /s/ *Aaron Mackey*

Aaron Mackey

Adam Schwartz
David Greene
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Fax: (415) 436-9993
amackey@eff.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify as follows:

1. This Brief of Amici Curiae Electronic Frontier Foundation, Center for Democracy & Technology, Internet Archive, and Wikimedia Foundation in Support of Plaintiff-Appellee and Reversal complies with the type-volume limitation of Fed. R. App. P. 32(a)(5) because this brief contains 6,953 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: August 18, 2025

By: /s/ *Aaron Mackey*
Aaron Mackey

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on August 18, 2025.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

Dated: August 18, 2025

By: /s/ *Aaron Mackey*
Aaron Mackey

*Counsel for Amici Curiae*