**No. 25-2366**

# In the United States Court of Appeal for the Ninth Circuit

**NETCHOICE, LLC**,

*Plaintiff-Appellee,*

v.

**ROB BONTA,**
**ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,**
**IN HIS OFFICIAL CAPACITY,**

*Defendant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 5:22-CV-08861-BLF
HONORABLE BETH LABSON FREEMAN, PRESIDING

## BRIEF OF *AMICUS CURIAE* COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION IN SUPPORT OF PLAINTIFF-APPELLEE

Anne M. Voigts
PILLSBURY WINTHROP
SHAW PITTMAN LLP
2550 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 233-4075
anne.voigts@pillsburylaw.com

Stephanie A. Joyce
COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION
25 Massachusetts Avenue NW, Suite
300C
Washington, DC 20001
Telephone: (202) 838-3173
stephaniejoyce@ccianet.org

*Counsel for* Amicus Curiae *Computer & Communications Industry Association*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *amicus curiae* Computer & Communications Industry Association ("CCIA") states that it is a trade association operating as a 501(c)(6) non-profit, non-stock corporation organized under the laws of Virginia. CCIA has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS


**Page**

INTEREST OF *AMICUS CURIAE* ........................................... 1

SUMMARY OF ARGUMENT ................................................... 2

ARGUMENT ................................................................. 4

I. CA AB 2273's Content-Based Definition Triggers Strict Scrutiny. ................................................... 4

A. The First Amendment Applies With Equal Force to Online Speech. ............................................ 4

B. AB 2273 Imposes Content-Based Restrictions on Speech and Thus Is Subject to Strict Scrutiny. ................................................................ 8

C. *Free Speech Coalition* Confirms That AB 2273 Is Subject to Strict Scrutiny. ...................................... 10

II. AB 2273's Definition of "Dark Patterns" Is Unconstitutionally Vague. ............................................. 15

A. The History and Origins of the Term "Dark Patterns" Reveal Its Constitutional Infirmities ...... 16

1. "Dark Patterns" Did Not Originate as a Legal Term ...................................................... 16

2. "Dark Patterns" Remains an Amorphous, Boundless Concept. ......................................... 19

B. The District Court Properly Concluded That the "Dark Patterns" Prohibition Was Void for Vagueness. ................................................................ 21

CONCLUSION ............................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)....5

*Bolger v. Youngs Drug Product Corp.*,
463 U.S. 60 (1983)....7

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011)....6

*Bullfrog Films, Inc. v. Wick*,
847 F.2d 502 (9th Cir. 1988)....25

*Butcher v. Knudsen*,
38 F.4th 1163 (9th Cir. 2022)....16, 25

*Erznoznik v. Jacksonville*,
422 U.S. 205 (1975)....6

*Foti v. City of Menlo Park*,
146 F.3d 629 (9th Cir. 1998)....22

*Free Speech Coal., Inc. v. Paxton*,
145 S. Ct. 2291 (2025)....*passim*

*Gentile v. State Bar of Nev.*,
501 U.S. 1030 (1991)....25

*Ginsberg v. New York*,
390 U.S. 629 (1968)....12, 13

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)....26

*Hill v. Colorado*,
530 U.S. 703 (2000)....15

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*,
515 U.S. 557 (1995)....................5

*Johnson v. United States*,
576 U.S. 591 (2015)....................20

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974)....................5, 7

*Miller v. California*,
413 U.S. 15 (1973)....................11

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....................4, 24

*NAACP v. Button*,
371 U.S. 415 (1963)....................26

*NetChoice, LLC v. Bonta*,
692 F. Supp. 3d 924 (N.D. Cal. 2023), *aff'd in part, vacated in part*, 113 F.4th 1101 (9th Cir. 2024)....................16, 24

*NetChoice, LLC v. Bonta*,
770 F. Supp. 3d 1164 (N.D. Cal. 2025).................... *passim*

*United States v. O'Brien*,
391 U.S. 367 (1968)....................12

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)....................9, 10

*Reno v. ACLU*,
521 U.S. 844 (1997)....................6, 25

*Sable Commc'ns of Cal. v. FCC*,
492 U.S. 115 (1989)....................7

*Sessions v. Dimaya*,
584 U.S. 148 (2018)....................20

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)........................................................5, 7

*Thunder Studios, Inc. v. Kazal*,
13 F.4th 736 (9th Cir. 2021)..............................................6

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994)..........................................................5

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)..........................................................6

*Winters v. New York*,
333 U.S. 507 (1948)........................................................19

Constitution

United States Constitution
First Amendment................................................... *passim*

Statutes and Codes

United States Code
Title 18, Section 16(b)......................................................20

California Civil Code
Section 1798.99.28............................................................2
Section 1798.99.30........................................................2, 14
Section 1798.99.31................................................... *passim*
Section 1798.140.............................................................15

Texas Civil Practice & Remedies Code Annotated
Section 129B.001(6).........................................................11

Rules

Federal Rule of Appellate Procedure
Rule 26.1...........................................................................2
Rule 29.........................................................................1, 28
Rule 32.............................................................................28

Other Authorities

*Bringing Dark Patterns to Light*, FTC Staff Report (September 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf ........ 19

Daniel Castro, *The FTC's Efforts to Label Practices "Dark Patterns" Is an Attempt at Regulatory Overreach That Will Ultimately Hurt Consumers*, INFO. TECH. & INNOVATION FOUND. (Jan. 4, 2023), https://itif.org/publications/2023/01/04/the-ftcs-efforts-to-label-practices-dark-patterns-is-an-attempt-at-regulatory-overreach-that-will-hurt-consumers (last visited August 17, 2025) ........ 20, 21

Harry Brignull, et al., *Deceptive Patterns - About Us*, DECEPTIVE.DESIGN, https://www.deceptive.design/about-us (last visited Aug 17, 2025) ........ 17

Harry Brignull, et al., *Deceptive Patterns - Hall of Shame*, DECEPTIVE.DESIGN, https://www.deceptive.design/hall-of-shame (last visited Aug 17, 2025) ........ 17, 18

Martin Brenncke, *Regulating Dark Patterns*, 14 NOTRE DAME J. INT'L COMP. L. 39 (2024) ........ 18

Colin M. Gray et al., *An Ontology of Dark Patterns: Foundations, Definitions, and a Structure for Transdisciplinary Action* (2023) ........ 18

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* the Computer & Communications Industry Association ("CCIA") is an international not-for-profit trade association that is composed of and advocates for Internet-based businesses. Its members operate a variety of popular websites, apps, and online services.[2] CCIA members employ more than 1.6 million workers, invest more than $100 billion in research and development, and contribute trillions of dollars in productivity to the global economy. For more than 50 years, CCIA has promoted open markets, open systems, and open networks on behalf of those members, including as a party to or *amicus* in litigation. Indeed, CCIA has participated as an *amicus* in this litigation before both this and the district court.

CCIA submits this *amicus* brief in support of Plaintiff-Appellee NetChoice, LLC to urge this Court to affirm the district court's decision preliminarily enjoining AB 2273, the California Age-Appropriate Design

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), *amicus* certifies that no person or entity, other than *amicus* or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. All parties to this appeal have consented to the filing of this *amicus* brief.

[2] A list of CCIA members is available at https://www.ccianet.org/members.

Code Act, codified at Cal. Civ. Code §§ 1798.99.28–1798.99.31. In particular, CCIA submits this brief to address two important questions that are before this Court: first, does AB 2273 (and in particular, the central coverage definition) trigger strict scrutiny (it does); and second, is the prohibition on "dark patterns" unconstitutionally vague (it is). How this Court answers those questions has potentially sweeping consequences for CCIA, its members, and the public.

## SUMMARY OF ARGUMENT

California presents AB 2273 as a constitutionally permissible attempt to protect children's privacy. But good intentions do not excuse bad lawmaking. In the name of children's privacy or protection, AB 2273 governs and restricts virtually every form of online content: search engines, online publications (including newspapers, magazines, and blogs), social media services, and the publishers of books, photographs, videos, music, games, recipes, podcasts, and countless other forms of speech. *See* Cal. Civ. Code § 1798.99.30(b)(5) (exempting only "broadband internet access service[s]," "telecommunications service[s]," and tangible product delivery services).

Applied to that wide range of entities, the statute forbids disseminating amorphous and expansive categories of content—including any content that may be "materially detrimental to the physical health, mental health, or well-being of a child" (that is, anyone under 18 years old)—using a child's "personal information" (defined broadly). *Id.* § 1798.99.31(b)(1)–(8) (defined in Cal. Civ. Code § 1798.140 as "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household" and listing non-exhaustive examples, including inferences drawn from such information). In particular, prohibitions like the one on "dark patterns" leave entities forced to guess at what conduct is restricted and what is not—and faced with heavy penalties if the state decides after the fact that they didn't guess right.

Moreover, to the extent these provisions' requirements can even be discerned, they unlawfully restrict core publication and editorial choices of online services. They unduly limit how online services ranging from search engines, social media websites, news publishers, and libraries help users quickly find the information most relevant, interesting, or

enjoyable to them. Worse yet, those provisions do so using key terms that are all but impossible to understand, much less apply in any consistent or predictable way. These infirmities impose far too high a constitutional cost, so this Court should affirm the injunction.

## ARGUMENT

### I. CA AB 2273's Content-Based Definition Triggers Strict Scrutiny.

#### A. The First Amendment Applies With Equal Force to Online Speech.

As the Supreme Court recognized in *Moody v. NetChoice, LLC*, 603 U.S. 707, 716–17 (2024), social media services "are indeed engaged in expression," and "while much about social media is new, the essence of that project is" not, *id.* Like traditional publishers and editors, social media websites "select and shape other parties' expression into their own curated speech products." *Id.* at 717. That in turn is expressive activity, and, as the Supreme Court has "repeatedly held," laws curtailing those editorial choices "must meet the First Amendment's requirements." *Id.* "Th[at] principle does not change because the curated compilation has gone from the physical to the virtual world." *Id.*

Four aspects of that principle warrant particular attention here. First, the First Amendment protects with equal force "the exercise of

editorial control and judgment" and the choices that publishers make about what material to include and how to present it. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 257–58 (1974); *accord Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636–37 (1994) ("by exercising editorial discretion over which stations or programs to include in its repertoire, cable programmers and operators seek to communicate messages on a wide variety of topics and in a wide variety of formats" and are protected by First Amendment) (quotation omitted). As the Supreme Court recognized in *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 570 (1995), "the presentation of an edited compilation of speech generated by other persons … fall[s] squarely within the core of First Amendment security."

Second, the First Amendment protects "the acts of 'disclosing' and 'publishing' information." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (citation omitted). "An individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) (citation omitted). Moreover, the First Amendment protects not only the right to share information, but

also the right to access or receive it. And that "protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976). This "right to receive information and ideas, regardless of their social worth, is fundamental to our free society." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 743 (9th Cir. 2021) (quotation omitted). Accordingly, restrictions on how information can be used and disseminated must also pass constitutional muster.

Third, all of these constitutional protections extend to minors. The "values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. Jacksonville*, 422 U.S. 205, 214 (1975). "[O]nly in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id.* at 213. Thus, "[e]ven where the protection of children is the object, the constitutional limits on governmental action apply." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804–05 (2011); *accord Reno v. ACLU*, 521 U.S. 844, 875 (1997) ("[T]he mere fact that a statutory regulation of speech was enacted for the

important purpose of protecting children … does not foreclose inquiry into its validity.”).

Fourth, and as the Supreme Court has also recognized, the fact that the government may be acting with good intentions does not shield constitutional overreach from First Amendment scrutiny. “[T]he government may not ‘reduce the adult population ... to reading only what is fit for children.’” *Bolger v. Youngs Drug Product Corp.*, 463 U.S. 60, 73 (1983) (omission in original) (quotation omitted). In *Sable Commc'ns of California v. FCC*, for example, the Court held that a statute that banned indecent commercial telephone communications violated the First Amendment, notwithstanding the government's contention that it was necessary to protect children—because the constitution did not permit "burn[ing] the house to roast the pig." 492 U.S. 115, 127 (1989) (quotation omitted). That precept also holds true where the government invokes privacy as the justification for regulating speech. *Sorrell*, 564 U.S. at 580 ("Privacy is a concept too integral to the person and a right too essential to freedom to allow its manipulation to support just those ideas the government prefers."). And that is true as well where a statute imposes novel obligations or prohibitions on speech. *Tornillo*, 418 U.S. at 256

("Governmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers.").

### B. AB 2273 Imposes Content-Based Restrictions on Speech and Thus Is Subject to Strict Scrutiny.

The district court began with two threshold questions: does the First Amendment apply, and, if so, what level of scrutiny is triggered. As it correctly found, "the Act regulates protected speech through its coverage definition." *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164, 1185 (N.D. Cal. 2025) (noting that AB 2273 regulates "business[es] that provide[] an online service, product, or feature likely to be accessed by children" (alterations in original) and citing Cal. Civ. Code § 1798.99.31(a), (b)). As it also correctly found, that definition is content-based and thus triggers strict scrutiny. *Id.* at 1185–86.

Appealing from those well-founded conclusions, the state takes the position here that the central coverage definition does not regulate speech, and that even if it does, it is not content-based and thus does not trigger strict scrutiny. *See* Cal. Br. at 17–18. That is wrong on both counts.

The "crucial first step" in evaluating a First Amendment challenge to a law regulating expression is "determining whether the law is content neutral on its face." *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015). "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Id.* (quotation omitted). A law is facially content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163. But even a law that is facially content-neutral does not evade constitutional scrutiny: it will still be considered a content-based regulation of speech if the law "cannot be justified without reference to the content of the regulated speech." *Id.* at 164 (quotation omitted). "Those laws, like those that are content based on their face, must also satisfy strict scrutiny." *Id.*

*Reed* involved a First Amendment challenge to a town's code regulating the display of outdoor signs that treated signs differently based on their message. 576 U.S. at 159. The Supreme Court found the disparate treatment to be "a paradigmatic example of content-based discrimination." *Id.* at 169. Rejecting the argument that the code was

content-neutral because it did not endorse or discriminate against any particular ideas within each category of sign, it held that "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Id.*

Here, as the district court correctly found, AB 2273's coverage definition "makes the Act content-based in every application." *NetChoice,* 770 F. Supp. 3d at 1185–88 (citing Cal. Civ. Code §§ 1798.99.31(a), (b)). Under that definition, "[b]usinesses that provide online services, products, or features 'likely to be accessed by children' are subject to heightened regulation, while other businesses are not." *Id.* at 1186. And whether those services, products, or features are "likely to be accessed by children," is determined by specific statutory criteria that "unavoidably require[] an evaluation of content." *Id.* at 1186–87.

### C. *Free Speech Coalition* Confirms That AB 2273 Is Subject to Strict Scrutiny.

The Supreme Court's recent decision in *Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291 (2025) ("*FSC*"), far from undermining the district court's analysis, confirms that AB 2273 imposes a content-based restriction on speech and thus must be subjected to strict scrutiny.

HB 1181, the Texas statute at issue in *FSC*, placed restrictions on "sexual material harmful to minors," which it defined as material that (1) "is designed to appeal to or pander to the prurient interest . . . with respect to minors," (2) depicts or describes various defined sexual acts and anatomical features "in a manner patently offensive with respect to minors," and (3) "lacks serious literary, artistic, political, or scientific value for minors." *Id.* at 2300 (quoting Tex. Civ. Prac. & Rem. Code Ann. § 129B.001(6)). Texas HB 1181 did not ban such material outright, but rather required websites displaying it to verify that users were above the age of majority using government-issued identification or other similar means. *Id.*

Texas HB 1181, unlike California AB 2273, was targeted directly at "prevent[ing] children from accessing speech that is obscene to children." *Id.* at 2303. That purpose comported with a longstanding power of the states, recognized at the Founding and not abridged by the First Amendment, to limit children's access to material that is obscene (not merely objectionable) to them. *Id.* Because the First Amendment does not prevent states from restricting speech meeting the definition of obscenity articulated in *Miller v. California*, 413 U.S. 15, 24 (1973), it

also does not prevent states from regulating minors' access to material that is obscene as to young people, *FSC*, 145 S. Ct. at 2304 (citing *Ginsberg v. New York*, 390 U.S. 629, 638 (1968)).

The Supreme Court applied intermediate scrutiny to Texas HB 1181 because it placed a burden—age verification—on adults' right to access material that is obscene only as to children. *Id.* at 2309. The Court drew an analogy to *United States v. O'Brien*, 391 U.S. 367 (1968), a precedent upholding a prohibition on the destruction of draft cards. That prohibition was not found to be unconstitutional, even though it placed an incidental burden on the right to burn draft cards as an act of protest. *Id.* at 376–77. Likewise, HB 1181's primary target—obscenity—does not regulate protected speech, and, in that specific context and with regard to that particular type of speech, the statute places only an "incidental burden" on adults' freedom to access some of that same content. *FSC*, 145 S. Ct. at 2309.

In addition to *O'Brien*, the Court's *FSC* decision relied heavily on *Ginsberg v. New York*, in which the Court upheld a New York law making it a crime to knowingly sell pornography to a minor. 390 U.S. at 631. The Court explained that it had "readily upheld the statute" because, like

the Texas law, it fit well within the states' historically sanctioned power to prevent minors from accessing materials obscene to them. *FSC*, 145 S. Ct. at 2310. Because there was no incidental impact on First Amendment rights, the statute in *Ginsberg* warranted only rational basis review. *Id.* at 2316. By contrast, because the statute in *FSC* did necessarily impose an incidental burden on First Amendment rights, it warranted intermediate scrutiny. *Id.* at 2316 (intermediate scrutiny "plays an important role in ensuring that legislatures do not use ostensibly legitimate purposes to disguise efforts to suppress fundamental rights").

None of that reasoning is at odds with that of the district court here. Unlike Texas HB 1181, AB 2273 has nothing to do with the states' "traditional power to protect minors from speech that is obscene from their perspective." *Id.* at 2309. And as the Supreme Court has recognized, that power is not a freewheeling authority to regulate children's access to any material that the state finds somehow objectionable. Instead, it is a "distinct power[]" recognized by "history, tradition, and precedent." *Id.* at 2303; *see also id.* at 2311 n.9 (distinguishing case where statute restricted "indecent," rather than

obscene, speech). AB 2273 is not an obscenity statute, and the state does not argue that it is. Instead, the statute sweeps in vast quantities of protected speech under the guise of protecting children's privacy.

Nor is AB 2273 grounded in any other pedigreed exception to the First Amendment. To the contrary, California emphasizes that it is addressing a problem that has arisen "[i]n recent years." Cal. Br. at 4. Accordingly, AB 2273 provides a six-part definition of content that it deems "[l]ikely to be accessed by children," none of which is rooted in any existing legal standard. Cal. Civ. Code § 1798.99.30.

The speech restrictions imposed by AB 2273 are in no sense "incidental" to any lawful power of the state. AB 2273 imposes serious burdens on both adults' and minors' ability to access speech. Those burdens are not incidental—they are intentional. They are a feature, not a bug. Far from an exercise of a recognized power that only incidentally burdens some protected speech, AB 2273 is a novel restriction on a broad swath of protected speech, with that speech defined by whether it appeals to children. That means AB 2273 "target[s] speech based on its communicative content" and is a content-based law, subject to all the rigors of strict scrutiny. *FSC*, 145 S. Ct. at 2302 (quoting *Reed*, 576 U.S.

at 163). For all the reasons set forth in NetChoice's answering brief, it cannot survive that level of constitutional scrutiny.

## II. AB 2273's Definition of "Dark Patterns" Is Unconstitutionally Vague.

Among its many sweeping provisions, AB 2273 imposes a prohibition on so-called "dark patterns." The Act prohibits covered providers from using "dark patterns" to "lead or encourage" minors to provide more information than "reasonably expected" or to "take any action" the provider should know "is materially detrimental" to the minor's "physical health, mental health, or well-being." Cal. Civ. Code § 1798.99.31(b)(7). In turn, it defines a "dark pattern" as "a user interface designed or manipulated with the substantial effect of subverting or impairing user autonomy, decisionmaking, or choice." Cal. Civ. Code § 1798.140(l). As a review of the term's history makes clear, it may be catchy, but that does not make it constitutional.

The district court correctly found that AB 2273's prohibition on "dark patterns" is unconstitutionally void for vagueness. "A statute can be impermissibly vague for either of two independent reasons." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Specifically, a statute is unconstitutional "if it fails to provide people of ordinary intelligence a

reasonable opportunity to understand what conduct it prohibits"; or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* "Although perfect clarity is not required even when a law regulates protected speech, vagueness concerns are more acute when a law implicates First Amendment rights, and, therefore, vagueness scrutiny is more stringent." *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022) (quotations omitted). "Consistent with these principles, courts have not hesitated to reject on vagueness grounds laws regulating speech protected by the First Amendment." *Id.* (collecting cases).

### A. The History and Origins of the Term "Dark Patterns" Reveal Its Constitutional Infirmities.

#### 1. "Dark Patterns" Did Not Originate as a Legal Term.

The use of "dark patterns" as a term is generally attributed to Harry Brignull, a user experience designer with a background in cognitive science who now serves as an expert witness in "dark pattern" cases. Simply, the term "dark patterns" is intended to encompass "design features that 'nudge' individuals into making certain decisions, such as spending more time on an application." *NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924, 957 (N.D. Cal. 2023), *aff'd in part, vacated in part*, 113 F.4th 1101 (9th Cir. 2024). Having coined the phrase "dark patterns" in

2010, Dr. Brignull summarizes the history of the term and the website where he first published the term as follows:

> This website was previously called darkpatterns.org and the category of manipulative, coercive or deceptive design practice was referred to as "dark patterns". Under advice from the Tech Policy Design Lab of the World Wide Web Foundation, the domain name was changed to deceptive.design and the term was changed to "manipulative, deceptive and coercive patterns", or in abbreviated form, "deceptive patterns" The change reflects a commitment to avoiding language that might inadvertently carry negative associations or reinforce harmful stereotypes.[3]

On that website, Dr. Brignull provides a "Hall of Shame,"[4] listing more than 680 purported examples of "dark patterns," citing, for example: failures of websites to have "cost control" features that would notify users about their own spending habits; "pushy" account requirements such as having to scroll down to type in passwords on pages; wait times in order to use a cable company's "support chat" feature; advertisements on free versions of apps in locations that "may accidentally" be touched; autoplay

---

[3] Harry Brignull, et al., *Deceptive Patterns – About Us*, DECEPTIVE.DESIGN, https://www.deceptive.design/about-us (last visited Aug 13, 2025).

[4] Harry Brignull, et al., *Deceptive Patterns – Hall of Shame*, DECEPTIVE.DESIGN, https://www.deceptive.design/hall-of-shame (last visited Aug 13, 2025).

functions on television applications that proceed to the next episode of a show automatically; 50% discounts on upgraded memberships for dating sites; empty homepages on video websites where users have opted out of the watch history; language that "shames" users into buying flight insurance; and repeated requests to access contacts or send notifications.[5]

With this wide-reaching range of examples, it is no wonder that courts, regulators, and even academic advocates of regulation have struggled to converge on a definition. As one academic candidly conceded: "The term lacks a commonly accepted definition[.]"[6] That lack of consensus, and AB 2273's failure to provide a clear definition in the absence of such a consensus, make it impossible to predict where the statutory line could or should be drawn.

---

[5] *Id.* (citations omitted). As an example of how capacious the concept is, the list even included physical world anti-homeless architecture.

[6] Martin Brenncke, *Regulating Dark Patterns*, 14 NOTRE DAME J. INT'L COMP. L. 39, 45 (2024) (citing Colin M. Gray et al., *An Ontology of Dark Patterns: Foundations, Definitions, and a Structure for Transdisciplinary Action* 1 (2023)).

### 2. "Dark Patterns" Remains an Amorphous, Boundless Concept.

Given its cultural origins, the concept of "dark patterns" does not survive constitutional scrutiny—not least the requirement that a law give clear notice of what it precludes. Though the term has become common parlance, there is no precedent articulating a coherent definition of "dark pattern." At most, regulators have warned that some "dark patterns" may be deceptive practices that violate Section 5 of the FTC Act.[7] That distinction is important: while the government can pursue enforcement for deceptive *acts*, it cannot gatekeep online speech based on a vaguely defined *design category*.

Statutes must "give fair notice of what acts will be punished" or else be struck for vagueness. *See Winters v. New York*, 333 U.S. 507, 509 (1948) (holding that a New York statute criminalizing distribution of publications "principally made up of criminal news" or "stories of deeds of bloodshed, lust, or crime" was unconstitutionally vague because it

---

[7] *See generally Bringing Dark Patterns to Light*, FTC Staff Report (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf (last visited Aug. 13, 2025).

failed to provide adequate notice of prohibited conduct, thus impermissibly burdening freedom of speech and press).[8] The same constitutional defect arises when lawmakers invoke an amorphous and value-laden term like "dark patterns" without codifying objective, ascertainable criteria for its application. That leaves businesses and speakers left to guess at the scope of prohibited conduct—and to bear the cost if they guess wrong.

That lack of clarity has real-world consequences:

> If the FTC continues down this path of labeling data-driven design practices as potentially illegal activity and conflating illegal practices with bad design, businesses will face a legal minefield where they will face penalties for failing to anticipate regulators' subjective analysis of their product design decisions, ultimately limiting the development of better online apps, games, and services for consumers.

[8] *Cf. Johnson v. United States*, 576 U.S. 591, 597–98 (2015) (residual clause of Armed Career Criminal Act, which defined "violent felony" to include any offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another," was unconstitutionally vague because it required courts to assess risk based on a judicially imagined "ordinary case" rather than real-world facts, resulting in unpredictable and arbitrary enforcement); *Sessions v. Dimaya*, 584 U.S. 148, 174 (2018) (Immigration and Nationality Act's incorporation of 18 U.S.C. § 16(b)'s definition of "crime of violence" as a felony "by its nature" involving a substantial risk of "physical force" was unconstitutionally vague because it necessarily involved "guesswork and intuition," thus inviting arbitrary enforcement) (citing *Johnson*, 576 U.S. at 597).

Daniel Castro, *The FTC's Efforts to Label Practices "Dark Patterns" Is an Attempt at Regulatory Overreach That Will Ultimately Hurt Consumers*, INFO. TECH. & INNOVATION FOUND. (Jan. 4, 2023), https://itif.org/publications/2023/01/04/the-ftcs-efforts-to-label-practices-dark-patterns-is-an-attempt-at-regulatory-overreach-that-will-hurt-consumers (last visited August 17, 2025).

As a general matter, the concept of "dark patterns" lacks definitional clarity, judicial support, and constitutional reliability. Its open-ended reach invites arbitrary enforcement and raises profound due process concerns, especially where, as here, the law implicates interface design that affects protected speech or expression. For these foundational reasons, the term "dark patterns" cannot serve as a lawful basis for state regulation.

### B. The District Court Properly Concluded That the "Dark Patterns" Prohibition Was Void for Vagueness.

That is particularly true here. While California has attempted, via Cal. Civ. Code § 1798.99.31(b)(7), to prohibit businesses from using "dark patterns" "to lead or encourage children to provide personal information beyond what is reasonably expected," or to "take any action" the business has reason to know "is materially detrimental" to children's health or

well-being, it provides no guidance as to what that means, and the addition of other vague elements does not cure the constitutional problems with the use of the term "dark patterns," it compounds them.[9]

As the district court correctly recognized, "[r]easonable minds may differ on what is 'detrimental' to a child's 'physical health, mental health, or well-being,' as those terms are used in California Civil Code § 1798.99.31(b)(1)." *NetChoice,* 770 F. Supp. 3d at 1205. Those terms do not effectively limit the scope of the prohibition or shed light on its parameters because they "have no established meaning and [AB 2273] provides no guidance." *Id.* Consequently, § 1798.99.31(b)(1) runs afoul of the constitutional requirement that "a statute must clearly delineate the conduct it proscribes." *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998) (quotation omitted).

In the district court, the state did not offer a proposed definition or means for determining how to decide what is "detrimental" to a child's

[9] NetChoice has not challenged the first prong of AB 2273's dark patterns provision, prohibiting the use of "dark patterns" to deceive minors into providing personal information or forgoing privacy protections. *See* 1-SER-176 ¶ 8. Instead, NetChoice has only challenged the second prong, which prohibits taking any action a business has reason to know is materially detrimental to children's health or well-being.

"physical health, mental health, or well-being." Instead, it argued that the provision is clear on its face. Perhaps in the state's view the provision is clear, but for those caught in AB 2273's orbit, it is not. The language is vague and ambiguous, offering little to no guidance to those it purports to regulate. Yet, as the district court recognized, "a covered business *must* understand what is 'detrimental' to a child's 'physical health, mental health, or well-being,' in order to have fair notice of what conduct is prohibited by § 1798.99.31(b)(1)." *Id.* (emphasis added).

AB 2273 delegates subjective, design-based enforcement discretion to regulators without anchoring those decisions in predictable legal standards. That delegation violates basic separation-of-powers principles by allowing agencies or judges to define prohibited conduct on a case-by-case, *post hoc* basis—in effect legislating after-the-fact through enforcement and substituting unelected regulators for state lawmakers. Indeed, the state's own proposed interpretation makes clear that there are no real statutory guideposts in AB 2273. The state and its *amici* would, for example, interpret the term to reach commonplace publishing features that simplify and improve users' ability to access content, such

as newsfeed functions that recommend personalized content. 4-ER-610–12 ¶¶ 49, 55; *see also, e.g., NetChoice*, 113 F.4th at 1123 n.8.

In this appeal, the state persists in advocating for a dangerously expansive interpretation of AB 2273. It argues that businesses have an economic incentive to maximize the "engagement"—the amount of time and activity online—and data collected from users, whether child or adult. Cal. Br. at 6 (citing 3-ER-415, 3-ER-489). It further argues that businesses do so by using tactics that children are more susceptible to, such as autoplay, endless scroll, and predictive algorithms. *Id.* (citing 3-ER-488-496). "They also use manipulative dark patterns, … that children are uniquely vulnerable to such as those involving parasocial-relationship pressure, fabricated time pressure, and navigation constraints." *Id.*

That argument makes two things abundantly clear: first, the state is explicitly targeting expressive choices—what content to present and how are fundamentally expressive choices fully protected by the First Amendment. *Moody*, 603 U.S. at 731–32. Second, the state's argument boils down to a claim that businesses bear an obligation not to make their product too good—and the practices the state identifies (for example, a

predictive algorithm intended to direct users to content that they want to see—and, ironically, to prevent them from seeing inappropriate content) are not intrinsically or obviously bad. As a result, there are no clear criteria for understanding what the statute prohibits, or for adapting one's conduct based on that understanding. That the state might 'know it when it sees it' (even if ostensibly regulated parties do not) is no satisfactory guide for navigating the First Amendment landscape.

How or even if those commonplace features properly fall within vague, undefined terms like "material detriment," "best interests," and "well-being" is fundamentally unclear, and that lack of clarity invites arbitrary and subjective censorship. And in this context, such vagueness "raises special First Amendment concerns because of its obvious chilling effect on free speech," *Reno*, 521 U.S. at 871–72 (citing *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991)), because it "enable[s] … officials to 'act in an arbitrary and discriminatory manner … and still be completely within the scope of'" the law, *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 514 (9th Cir. 1988).

Under AB 2273, "regulated parties [do not] know what is required of them so they may act accordingly." *Butcher*, 38 F.4th at 1168

(quotation omitted). These "[u]ncertain meanings" will "inevitably lead citizens to 'steer far wider of the unlawful zone,'" *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (citation omitted), leading to self-censorship that will suffocate the "delicate," "vulnerable," and "supremely precious" First Amendment freedoms that "need breathing space to survive," *NAACP v. Button,* 371 U.S. 415, 433 (1963). Simply put, because it is all but impossible to understand, much less apply in any consistent or predictable way, AB 2273's prohibition on "dark patterns" is hopelessly vague and necessarily overbroad. The district court should be affirmed on these additional grounds.

## CONCLUSION

*Amicus curiae* appreciates that the state approached AB 2273 with good intentions. But good intentions cannot save an unconstitutional statute, and they cannot fill in for a fatal lack of clarity. This Court should confirm that AB 2273 is subject to strict scrutiny, affirm the district court's decision, and in particular find that its prohibition on "dark patterns" is void for vagueness.

Dated: August 18, 2025

Respectfully submitted,

*/s/ Anne M. Voigts*
Anne M. Voigts
PILLSBURY WINTHROP
SHAW PITTMAN LLP
2550 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 233-4075
anne.voigts@pillsburylaw.com

Stephanie A. Joyce
COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION
25 Massachusetts Avenue NW,
Suite 300C
Washington, DC 20001
Telephone: (202) 838-3173
stephaniejoyce@ccianet.org

*Counsel for* Amicus Curiae
*Computer & Communications*
*Industry Association*

## CERTIFICATE OF COMPLIANCE

In compliance with Fed. R. App. P. 29(a)(4) Circuit Rule 32-1, I certify that the foregoing brief is in 14-point, proportionally spaced Times New Roman type and contains 5,151 words excluding the items exempted by Fed. R. App. P. 32(f), which is less than the number of words that Fed. R. App. P. 32(a)(7) generally affords to a party for its principal brief.

Dated: August 18, 2025

*/s/ Anne M. Voigts*
Anne M. Voigts

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2025, I caused the foregoing Brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that all participants in this appeal are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: August 18, 2025

*/s/ Anne M. Voigts*
Anne M. Voigts