No. 25-2366

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

NETCHOICE, LLC,

Plaintiff-Appellee,

v.

ROB BONTA,

Defendant-Appellant.

On Appeal from the United States District Court for the Northern District of California, No. 5:22-cv-08861 (Hon. Beth Labson Freeman)

**BRIEF OF AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, ADVANCE PUBLICATIONS, HEARST CORPORATION, THE NEW YORK TIMES COMPANY, REUTERS, AND THE STUDENT PRESS LAW CENTER IN SUPPORT OF APPELLEE**

Gabriel Rottman
*Counsel of Record for Amici Curiae*
Grayson Clary
Mara Gassmann*
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
grottman@rcfp.org

## CORPORATE DISCLOSURE STATEMENTS

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

Advance Publications, Inc. certifies that it has no parent corporation and no publicly held corporation owns any of its stock.

Hearst Corporation is privately held and no publicly held corporation owns 10% or more of Hearst Corporation.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

Reuters News & Media Inc. is a Delaware corporation whose parent is Thomson Reuters U.S. LLC, a Delaware limited liability company. Reuters News & Media Inc. and Thomson Reuters U.S. LLC are indirect and wholly owned subsidiaries of Thomson Reuters Corporation, a publicly-held corporation, which is traded on the New York Stock Exchange and Toronto Stock Exchange. There are no intermediate parent corporations or subsidiaries of Reuters News & Media Inc. or Thomson Reuters U.S. LLC that are publicly held, and there are no publicly-held companies that own 10% or more of Reuters News & Media Inc. or Thomson Reuters U.S. LLC shares.

Student Press Law Center is a 501(c)(3) not-for-profit corporation that has no parent and issues no stock.

# TABLE OF CONTENTS

**Page:**

CORPORATE DISCLOSURE STATEMENTS ........ i

TABLE OF AUTHORITIES ........ iv

SOURCE OF AUTHORITY TO FILE ........ viii

FED. R. APP. P. 29(a)(4)(E) STATEMENT ........ viii

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ........ 1

SUMMARY OF ARGUMENT ........ 4

ARGUMENT ........ 6

I. California's Age-Appropriate Design Code Act regulates online publishers, including news organizations, based on content. ........ 6

II. If upheld, the age estimation provision in the AADC would burden minors' and adults' First Amendment rights to access news reporting. ........ 9

A. Minors have a First Amendment right to receive news. ........ 9

B. The burdens imposed by the AADC will discourage news organizations' websites from permitting access to minors or encourage them to sanitize the news. ........ 12

CONCLUSION ........ 14

CERTIFICATE OF SERVICE ........ 16

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ........ 17

# TABLE OF AUTHORITIES

**Page(s):**

**Cases**

*Ark. Writers' Project, Inc. v. Ragland*,
481 U.S. 221 (1987) ....................................................................................12

*Bd. of Educ. v. Pico*,
457 U.S. 853 (1982) ............................................................................ 10, 11

*Bethel Sch. Dist. No. 403 v. Fraser*,
478 U.S. 675 (1986) ......................................................................................9

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) .............................................................................. 9, 11

*Ginsberg v. New York*,
390 U.S. 629 (1968) ......................................................................................9

*Griswold v. Connecticut*,
381 U.S. 479 (1965) ....................................................................................10

*Mahanoy Area Sch. Dist. v. B.L.*,
594 U.S. 180 (2021) .............................................................................. 9, 10

*Morse v. Frederick*,
551 U.S. 393 (2007) ......................................................................................9

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024)......................................................................14

*NetChoice, LLC v. Bonta*,
770 F. Supp. 3d 1164 (N.D. Cal. 2025)........................................... 4, 5, 12

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000) ......................................................................................8

*Wash. Post v. McManus*,
944 F.3d 506 (4th Cir. 2019) .......................................................................12

**Statutes**


Cal. Civ. Code § 1798.140 ....................6

Cal. Civ. Code § 1798.99.30 .................... 5, 6, 7

Cal. Civ. Code § 1798.99.31 .................... 5, 12


**Other Authorities**


AARP The Magazine, Am. Ass'n of Retired Persons, https://www.aarp.org/membership/members-edition/aarp-the-magazine/ (last visited August 18, 2025)....................6

Anna Iovine, *Do Age-Verification Laws Work? Not According to this Study*, Mashable (Mar. 6, 2025), https://perma.cc/9ASC-EVAQ ....................11

Br. of Amici Curiae Reporters Comm. for Freedom of the Press & 14 Media Orgs., *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024) (No. 23-2969)....................14

Christine Mui, *The Trouble With Age-Gating the Internet*, Politico (July 10, 2024), http://bit.ly/41emoLD ....................11

Comics, Wash. Post, https://www.washingtonpost.com/entertainment/comics/ (last visited August 18, 2025)....................5

Hero Complex, L.A. Times, https://www.latimes.com/topic/hero-complex (last visited August 18, 2025)....................5

Julie Johnson, *Sonoma Media Investments, Owner of the Press Democrat, Pays Off Debt*, Press Democrat (Apr. 17, 2019), https://perma.cc/GAQ9-5GN6....................4

*Mary Beth Tinker Describes Her Experiences Participating in a Student Protest in 1965*, Iowa PBS (Feb. 21, 2019), https://perma.cc/7NVH-WBMX ....................9

Narjes Geraee et al., *Impact of Media Literacy Education on Knowledge and Behavioral Intention of Adolescents in Dealing with Media Messages According to Stages of Change*, 3 J. Advances Med. Educ. & Professionalism 9 (Jan. 2015), https://pmc.ncbi.nlm.nih.gov/articles/PMC4291508/pdf/jamp-3-9.pdf..............11

Sequoia Carrillo, *California Joins a Growing Movement to Teach Media Literacy in Schools*, N.P.R. (Nov. 24, 2023), https://perma.cc/4B2Q-6BVH ..........................................................................5

## SOURCE OF AUTHORITY TO FILE

Appellant and Appellee have consented to the filing of this amici curiae brief, and amici curiae thus file pursuant to Federal Rule of Appellate Procedure 29(a)(2).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

The Reporters Committee for Freedom of the Press declares that:

1. no party's counsel authored this brief in whole or in part;
2. no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and
3. no person, other than amici, their members or their counsel, contributed money intended to fund the preparation or submission of this brief.

## STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE

Amici curiae are the Reporters Committee for Freedom of the Press ("Reporters Committee"), Advance Publications, Inc., Hearst Corporation, The New York Times Company, Reuters News & Media Inc., and the Student Press Law Center (together, "amici"). As news organizations and advocates for journalists and the press, amici have a strong interest in preserving First Amendment protections against state interference in the editorial autonomy of news organizations. Amici likewise have an interest in ensuring that willing readers, listeners, and viewers – including children, adolescents, and young adults – are able to access news content and engage in public discourse, even when that content or discourse may concern topics or issues that state regulators could perceive as sensitive for minors. Amici write to highlight how the law at issue in this case threatens to impair those protections and interests.

Lead amicus the Reporters Committee is an unincorporated nonprofit association. It was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

Advance Publications, Inc. is a diversified privately-held company that operates and invests in a broad range of media, communications and technology businesses. Its operating businesses include Conde Nast's global magazine and digital brand portfolio, including titles such as Vogue, Vanity Fair, The New Yorker, Wired, and GQ, local news media companies producing newspapers and digital properties in 10 different metro areas and states, and American City Business Journals, publisher of business journals in over 40 cities.

Hearst is one of the nation's largest diversified media, information and services companies with more than 360 businesses. Its major interests include ownership of 15 daily and more than 30 weekly newspapers, including the San Francisco Chronicle, Houston Chronicle, and Albany Times Union; hundreds of magazines around the world, including Cosmopolitan, Good Housekeeping, ELLE, Harper's BAZAAR and O, The Oprah Magazine; 31 television stations such as KCRA-TV in Sacramento, Calif. and KSBW-TV in Monterey/Salinas, CA, which reach a combined 19 percent of U.S. viewers; ownership in leading cable television networks such as A&E, HISTORY, Lifetime and ESPN; global ratings agency Fitch Group; Hearst Health; significant holdings in automotive, electronic and medical/pharmaceutical business information companies; Internet and marketing services businesses; television production; newspaper features distribution; and real estate.

The New York Times Company is the publisher of The New York Times and operates the news website nytimes.com.

Reuters is the world's largest multimedia news provider. Founded in 1851, it is committed to the Trust Principles of independence, integrity and freedom from bias. With unmatched coverage in over 16 languages, and reaching billions of people worldwide every day, Reuters provides trusted intelligence that powers humans and machines to make smart decisions. It supplies business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Student Press Law Center ("SPLC") is a nonprofit, nonpartisan organization which, since 1974, has been the nation's only legal assistance agency devoted exclusively to educating high school and college journalists about the rights and responsibilities embodied in the First Amendment to the Constitution of the United States. SPLC provides free legal assistance, information and educational materials for student journalists on a variety of legal topics.

## SUMMARY OF ARGUMENT

The California Age-Appropriate Design Code Act (the "AADC" or "Act") reaches far beyond the regulation of data privacy. Appellant's Opening Br. at 2 (arguing AADC is about "*privacy*, not *content*" (emphasis in original)). The Act would require covered entities, including news organizations, to modify or restrict access to lawful content online – including public interest journalism – for fear of running afoul of the law. While the state has a legitimate interest in protecting children's welfare, provisions in the AADC stray beyond that objective into government interference in constitutionally protected editorial choices. Worse, these provisions would do so in a way that impairs access by young people and the public at large to news they need to fully participate in civic life.

Accordingly, amici offer two arguments in support of Appellee.

First, the AADC is, by its plain terms, a content-based restriction on speech, including that of news websites. As the lower court correctly held, one cannot determine whether a business triggers the law's definition of "likely to be accessed by children" without reference to whether the relevant content would appeal to persons below the age of 18. *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164, 1187 (N.D. Cal. 2025). Although each of the definition's subparts require an evaluation of the business's online content to determine if they apply, one, in particular, encapsulates the content-based nature of the restriction: "[a]n online

service, product, or feature that has design elements that are known to be of interest to children, including, but not limited to, games, cartoons, music, and celebrities who appeal to children." Cal. Civ. Code § 1798.99.30(b)(4)(E). Any newspaper with an online comics page would arguably fit within that broad description, regardless of whether the comics or other material were geared to children.

Second, people under the age of 18 have a First Amendment right to access the news, and the AADC burdens that right by requiring age estimation. Age estimation, as a technical matter, is notoriously ineffective and, even if it did work with 100 percent accuracy, many news organizations concerned about their exposure may either bar access entirely to individuals under the age of 18 or sanitize content that could attract minors. In each case, the AADC age estimation requirement violates the First Amendment and would impair minors' and adults' ability to access public interest news and information.[1]

---

[1] Amici also agree with the district court's determination that the policy enforcement provision, Cal. Civ. Code § 1798.99.31(a)(9), would "burden the business's right to exercise its editorial judgment whether to permit or prohibit any given content in any given instance" by requiring the company to enforce its "content policies and community standards to the satisfaction of the State." *NetChoice*, 770 F. Supp. 3d at 1198. Appellant does not challenge that aspect of the preliminary injunction here, and amici therefore focus on the threshold question of whether the "gateway coverage definition" of "likely to be accessed by children" is content-based, *id.* at 1185, and how the age estimation requirement would interfere with the First Amendment right to access news and other information.

# ARGUMENT

## I. California's Age-Appropriate Design Code Act regulates online publishers, including news organizations, based on content.

The AADC is drafted in expansive language that would affect many online services and products, including news organizations. The Act applies to any for-profit business that "collects consumers' personal information" and, as relevant here, earns more than $25 million in gross annual revenues. Cal. Civ. Code §§ 1798.99.30(a), 1798.140(d)(1)(A). That relatively low revenue threshold could sweep in even smaller to mid-sized online publishers. *See, e.g.*, Julie Johnson, *Sonoma Media Investments, Owner of the Press Democrat, Pays Off Debt*, Press Democrat (Apr. 17, 2019), https://perma.cc/GAQ9-5GN6 (reporting that *The Press Democrat* in Sonoma County, a mid-sized California paper, generated $40 million in annual revenue).

Any covered publishers offering online "service[s], product[s], or feature[s]" that are "[l]ikely to be accessed by children" must comply with the Act. Cal. Civ. Code § 1798.99.30(b)(4). "Children" is defined as anyone under the age of 18 years old. *Id.* § 1798.99.30(b)(1). And "[l]ikely to be accessed" is variously defined to include, among other things, a service or product that contains "design elements that are known to be of interest to children, including, but not limited to, games, cartoons, music, and celebrities who appeal to children," or where "[a]

significant amount" of the audience is determined to be children. *Id.* § 1798.99.30(b)(4)(E)–(F).

Many, if not most, news websites are likely to fall within these expansive definitions. Almost all news organizations offer content that could be deemed of interest to all ages, including children, and, indeed, news content itself is central to media literacy educational curricula, an increasing area of focus for schools around the country, including in California. *See* Sequoia Carrillo, *California Joins a Growing Movement to Teach Media Literacy in Schools*, N.P.R. (Nov. 24, 2023), https://perma.cc/4B2Q-6BVH. Similarly, syndicated comic strips and games are a ubiquitous feature of American newspapers, even if not specifically aimed at younger readers. *See, e.g.*, Comics, Wash. Post, https://www.washingtonpost.com/entertainment/comics/ (last visited August 18, 2025). And entertainment news pages routinely focus on topics of potential interest to children and young adults, such as celebrity news, comic book fandom, or video games. *See* Hero Complex, L.A. Times, https://www.latimes.com/topic/hero-complex (last visited August 18, 2025).

The court below correctly found the definition of "likely to be accessed by children" to be content-based. Indeed, the discussion above shows how the AADC's definition necessarily requires the regulator to evaluate the content published by the relevant business. That is, a regulator browsing a news website

could find that the presence of comic strips, coverage of celebrities and entertainment genres popular among children, and educational material specifically geared to young people would trigger the definition while, say, the AARP's monthly members-only magazine would not. *See* AARP The Magazine, Am. Ass'n of Retired Persons, https://www.aarp.org/membership/members-edition/aarp-the-magazine/ (last visited August 18, 2025) ("Dive into engaging stories, expert insights and practical tips tailored to life at 50 and beyond[.]"). In all cases, the regulator will have to evaluate the relevant content to determine whether the definition applies. And, indeed, the district court correctly noted that the U.S. Supreme Court has expressly found this to be the case: that where the justification for the regulation "is concern for the effect of the subject matter on young viewers" the law is *necessarily* content-based. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 811 (2000) (finding law "not justified without reference to the content of the regulated speech" (citation and internal quotation marks omitted)).

For that reason, the court below correctly found the "likely to be accessed" definition to be content-based, triggering strict scrutiny. And given that the definition is the threshold for whether the law applies at all, the district court also properly enjoined the AADC in its entirety.

## II. If upheld, the age estimation provision in the AADC would burden minors' and adults' First Amendment rights to access news reporting.

### A. Minors have a First Amendment right to receive news.

The Supreme Court has repeatedly affirmed that individuals under the age of 18 have robust First Amendment rights. *See, e.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) ("[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." (citation omitted)); *Morse v. Frederick*, 551 U.S. 393, 404–05 (2007) (noting that student's speech would have been protected by First Amendment outside the school context); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 688 (1986) (Brennan, J., concurring) (same). Although the Court has permitted some First Amendment restrictions on children that would not otherwise be permissible for adults, these are only in specific circumstances, such as to avoid disruption of school activities or restricting access to sexually explicit material. *See, e.g.*, *Ginsberg v. New York*, 390 U.S. 629, 637 (1968).

The Supreme Court recently reaffirmed these principles in rejecting punishment for a high school freshman who was disciplined by her school for using expletives on social media. *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 187–88 (2021). The Court re-emphasized that minors have substantial First Amendment rights and that their speech cannot be curtailed – even in the school

environment – absent specific circumstances. *Id.* at 193–94. As Justice Alito noted in concurrence, when a student engages in off-campus speech, "the student is subject to whatever restraints the student's parents impose, but the student enjoys the same First Amendment protection against government regulation as all other members of the public." *Id.* at 207. And, as relevant here, the Court affirmed that the state itself has an affirmative interest in students being exposed to even offensive, unpopular, and controversial speech. "America's public schools are the nurseries of democracy," the Court wrote, and protections for the free exchange of ideas must "include the protection of unpopular ideas, for popular ideas have less need for protection." *Id.* at 190.

Just as minors have a right to speak freely, they also have the right to access news and information to facilitate their engagement in public discussion and debate. *See, e.g.*, *Bd. of Educ. v. Pico*, 457 U.S. 853, 866–67 (1982) ("Our precedents have focused not only on the role of the First Amendment in fostering individual self-expression but also on its role in affording the public access to discussion, debate, and the dissemination of information and ideas." (citation and internal quotation marks omitted)); *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) ("[T]he State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge. The right of freedom of speech and

press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read . . . .”).

This right to receive information is an “inherent corollary of the rights of free speech and press,” in that “the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom.” *Pico*, 457 U.S. at 867; *see also Mary Beth Tinker Describes Her Experiences Participating in a Student Protest in 1965*, Iowa PBS (Feb. 21, 2019), https://perma.cc/7NVH-WBMX (noting how news coverage of the Vietnam War prompted the student protest that led to the *Tinker* decision). And, as the *Brown* decision highlights, minors' First Amendment rights, including the right of access to information, may not be circumscribed outside limited contexts like pornographic materials, even if some may consider the information offensive or controversial. *Brown*, 564 U.S. at 794–99.

The throughline in the above discussion is that the freest flow of information to all is essential to an informed electorate. Minors – that is, voters-in-training – must be able to access news and other forms of civic information, including news and information that may make some uncomfortable, as a democratic imperative. And, as discussed below, the burdens imposed by the AADC, and especially by the age estimation requirement, would significantly constrain that access.

### B. The burdens imposed by the AADC will discourage news organizations' websites from permitting access to minors or encourage them to sanitize the news.

A covered business must estimate the age of users "with a reasonable level of certainty appropriate to the risks that arise from the data management practices of the business *or* apply the privacy and data protections afforded to children to all consumers." Cal. Civ. Code § 1798.99.31(a)(5) (emphasis added). As the court below recognized, this provision would prompt covered businesses to either bar access entirely to individuals below the age of 18 or sanitize all content to "comport with the highest risk level." *NetChoice*, 770 F. Supp. 3d at 1201. Amici offer two points to underscore how this provision would specifically impact covered news organizations.

First, the law makes certain protected speech "more expensive to host than other speech because compliance costs attach to the former and not to the latter." *Wash. Post v. McManus*, 944 F.3d 506, 516 (4th Cir. 2019). Put concretely, an online magazine for teenagers could have to implement an age estimation requirement because it is clearly geared to young adults, whereas one focused on seniors would not have to.

That type of discrimination among different media organizations based on their editorial choices clearly violates the First Amendment. *See, e.g.*, *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228 (1987) (holding intra-media

discrimination violates First Amendment even absent "censorial motive"). Further, it creates an incentive for publishers to avoid disseminating speech subject to the additional burden, which, here, would also carry the unintended consequence of minors being unable to access indisputably valuable speech. And it could even interfere in a child's education. For instance, media literacy curricula need to expose students to content that a regulator could deem sensitive for children. *See, e.g.*, Narjes Geraee et al., *Impact of Media Literacy Education on Knowledge and Behavioral Intention of Adolescents in Dealing with Media Messages According to Stages of Change*, 3 J. Advances Med. Educ. & Professionalism 9 (Jan. 2015), https://pmc.ncbi.nlm.nih.gov/articles/PMC4291508/pdf/jamp-3-9.pdf.

Second, age estimation technologies are notoriously inaccurate and easily circumvented. *See* Christine Mui, *The Trouble With Age-Gating the Internet*, Politico (July 10, 2024), http://bit.ly/41emoLD; Anna Iovine, *Do Age-Verification Laws Work? Not According to this Study*, Mashable (Mar. 6, 2025), https://perma.cc/9ASC-EVAQ. Moreover, the age estimation requirement in the AADC requires companies to apply more aggressive age estimation measures as the "risks" from its data management practices increase. That could prompt outlets covering topics like eating disorders or suicide, which have been cited by state regulators as especially sensitive, to preclude access completely to anyone below the age of 18. *See* Br. of Amici Curiae Reporters Comm. for Freedom of the Press

& 14 Media Orgs. at 6–9, *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024) (No. 23-2969) (surveying regulators' concerns over specific news topics and value of those stories to minors). Conversely, news organizations concerned with the inherent lack of reliability in age estimation technologies could decide to avoid publishing news on sensitive topics altogether. And all of this would apply to speech that is fully protected under the First Amendment – for both adults and minors.

As this Court recognized with respect to the currently enjoined mandate in the AADC that covered businesses prepare a Data Protection Impact Assessment, the law seeks to "deputize[] covered businesses into serving as censors for the State." *NetChoice*, 113 F.4th at 1118. The same is true for the other provisions of the AADC that improperly burden news organizations publishing content appealing to children. Worse, the AADC does so by putting covered news organizations to an impossible choice: either restrict access to minors completely or make sure that all news is appropriate for the youngest children. Not only does that dynamic violate the First Amendment on multiple fronts, it threatens to impoverish public discourse to the detriment of children themselves.

## CONCLUSION

For the foregoing reasons, amici respectfully urge affirmance.

Dated: August 18, 2025 Respectfully submitted,

/s/ *Gabriel Rottman*
Gabriel Rottman
*Counsel of Record for Amici Curiae*
Grayson Clary
Mara Gassmann*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
grottman@rcfp.org

**Of counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2025, I caused the foregoing Brief of Amici Curiae the Reporters Committee for Freedom of the Press and [TK] News Organizations to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send notices of such filing to all counsel of record.

/s/ *Gabriel Rottman*
Gabriel Rottman
*Counsel of Record for Amici Curiae*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s):** No. 25-2366

I am the attorney for amici curiae the Reporters Committee for Freedom of the Press and Other News & Media Organizations.

**This brief contains 3,068 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[**X**] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** /s/ *Gabriel Rottman* **Date:** August 18, 2025