25-2366

IN THE

# United States Court of Appeals
# for the Ninth Circuit

---

NETCHOICE, LLC

*Plaintiff-Appellee*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY
GENERAL OF CALIFORNIA,

*Defendant-Appellant*.

---

On Appeal from the United States District Court for the
Northern District of California, San Jose
No. 5:22-cv-08861-BLF (Hon. Beth L. Freeman)

---

**BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS AND
WOODHULL FREEDOM FOUNDATION IN SUPPORT OF
PLAINTIFF-APPELLEE AND AFFIRMANCE**

---

Lawrence Walters
WALTERS LAW GROUP
195 W. Pine Avenue
Longwood, FL 32750

*Counsel for Woodhull Freedom
Foundation*

Kathleen Farley*
Vice President of Litigation
CHAMBER OF PROGRESS
1390 CHAIN BRIDGE ROAD #A108
McLean, VA 22101
info@progresschamber.org
*admitted in New York

Mark W. Brennan
J. Ryan Thompson
Thomas B. Veitch
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
(202) 637-6409
mark.brennan@hoganlovells.com

*Counsel for Chamber of Progress*

August 18, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record states that, as nonprofit entities organized under § 501(c)(6) of the Internal Revenue Code, amici curiae Chamber of Progress and Woodhull Freedom Foundation have issued no stock. Consequently, no parent corporation nor any publicly held corporation could or does own 10% or more of their stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ....................................................................... iii

INTEREST OF AMICI CURIAE .....................................................................1

SUMMARY OF ARGUMENT ......................................................................3

ARGUMENT ...........................................................................................5

    I.    THE DISTRICT COURT FAILED TO APPLY THE
          COMPLETE SECTION 230 PREEMPTION ANALYSIS
          REQUIRED BY *CALISE* ............................................................5

    II.    THE DELIVERY RESTRICTIONS ARE FACIALLY
          PREEMPTED BECAUSE THEY IMPOSE PUBLISHER
          LIABILITY FOR THIRD-PARTY CONTENT AND
          REQUIRE MONITORING ...........................................................6

    III.    FAILURE TO PREEMPT THE DELIVERY
          RESTRICTIONS WOULD EVISCERATE SECTION
          230'S LEGISLATIVE PURPOSE AND HARM
          MARGINALIZED YOUTH ...........................................................8

CONCLUSION .......................................................................................13

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ........................................................8

*Calise v. Meta Platforms, Inc.*,
103 F.4th 732 (9th Cir. 2024) ...............................................4, 5, 6

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025) .....................................................7

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) .......................................................4

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) .....................................................9

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) ....................................................4, 7

*Isaacson v. Horne*,
716 F.3d 1213 (9th Cir. 2013) .....................................................6

*Jane Doe No. 1 v. Backpage.com, LLC*,
817 F.3d 12 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017)...................4

*Klayman v. Zuckerberg*,
753 F.3d 1354 (D.C. Cir. 2014).....................................................4

*NetChoice, LLC v. Bonta*,
770 F. Supp. 3d 1164 (N.D. Cal. 2025).........................................5

*NetChoice, LLC v. Bonta*,
2025 WL 1918742 (N.D. Cal. July 11, 2025) ...............................8

*Ricci v. Teamsters Union Local 456*,
781 F.3d 25 (2d Cir. 2015) ...........................................................4

# TABLE OF AUTHORITIES–Continued

Page(s)

*Zeran v. America Online, Inc.*,
 129 F.3d 327 (4th Cir. 1997) ......................................................4, 7

*Zeran v. America Online, Inc.*,
 958 F. Supp. 1124 (E.D. Va. 1997) .................................................7

**Statutes:**

47 U.S.C. § 230 ...............................................................................3

47 U.S.C. § 230(c)(1) ................................................................3, 4, 7

47 U.S.C. § 230(e)(3) ..................................................................3, 4

CAADC §§ 31(b)(1)–(4) .................................................................3

CAADC § 31(b)(7) .........................................................................3

**Other Authorities:**

*Adult LGBTQ+ Role Models in the Lives of LGBTQ+ Young People*,
 Trevor Project (May 15, 2024)...............................................10, 11

Kiara Alfonseca & Kat Filardi, *Indigenous TikTokers use social media
 to honor their cultures*, ABC News (Oct. 12, 2021) ....................12

Ashley Austin, et al., *It's My Safe Space: The Life-Saving Role of the
 Internet in the Lives of Transgender and Gender Diverse Youth*,
 21 Int'l J. of Transgender Health 33 (2020) ..........................10

Shimrit Ben-Yair, *Introducing the newest member of our family, the
 YouTube Kids app—available on Google Play and the App
 Store*, YouTube Official Blog (Feb. 23, 2015) ...........................2

Eric Goldman, *Why Section 230 Is Better Than the First Amendment*,
 95 Notre Dame L. Rev. Reflection 34 (2019) ...........................9

Human Rights Campaign Foundation, *2023 LGBTQ+ Youth
 Report* (Aug. 2023)......................................................................10

## TABLE OF AUTHORITIES–CONTINUED

Page(s)

Noelle M. Hurd et al., *Negative Adult Influences and the Protective Effects of Role Models: A Study with Urban Adolescents*, 38 J. YOUTH & ADOLESCENCE 777 (2009) ...................................................10

*Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents*, Facebook.com (Sept. 17, 2024) .........................2

Jeff Kosseff, *A User's Guide to Section 230, and a Legislator's Guide to Amending It (or Not)*, 37 BERKELEY TECH. L.J. 757 (2022) ......................7

Tate LeBlanc & Aerika Loyd, *Freedom dreaming to STEM: A conceptual model for Black youth's racial and STEM identity development through social media*, 13 FRONT. PSYCHOL. 944207 (2022) ............................................................11

J. Maya Hernandez & Linda Charmaraman, *Research on teen social media use has a racial bias problem*, FAST COMPANY (Feb. 22, 2023)................................................................................................11

Jacqueline Nesi et al., *Teens and Mental Health: How Girls Really Feel about Social Media*, COMMON SENSE MEDIA (Mar. 30, 2023) ................................................................................................12

Asaka Park, *I'm a Disabled Teenager and Social Media is My Lifeline*, N.Y. TIMES (June 5, 2019) .......................................................12, 13

Sara Reardon, *Social media helps Native Americans preserve cultural traditions during pandemic*, CNN (Feb. 9, 2021) .........................................12

Alvin Thomas et al., *Taking the good with the bad?: Social Media and Online Racial Discrimination Influences on Psychological and Academic Functioning in Black and Hispanic Youth*, 52(2) J. YOUTH & ADOLESCENCE 245 (2023)................................................11

Shoshana Weissmann, *Social Media Was Useful For Me, As An Ill, Nerdy Teenager*, TECHDIRT (June 28, 2023)..................................................12

## INTEREST OF AMICI CURIAE[1]

Amici are nonprofit organizations committed to promoting a society in which all people benefit from technology and interconnectivity and all people enjoy the speech opportunities available through a safe, open, and equitable Internet.

Chamber of Progress is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. Chamber of Progress seeks to protect Internet freedom and free speech, promote innovation and economic growth, and empower technology customers and users. In keeping with that mission, Chamber of Progress believes that allowing a diverse range of websites and philosophies to flourish will benefit everyone—consumers, store owners, and application developers. Chamber of Progress's work is supported by its corporate partners, but its partners do not sit on its board of directors and do not have a vote on, or veto over, its positions. Chamber of Progress does not speak for individual partner companies, and it remains true to its stated principles even when its partners disagree.

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici curiae, their members, or their counsel made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

1

The Woodhull Freedom Foundation ("Woodhull") is a non-profit organization that works to advance the recognition of sexual freedom, gender equality, and free expression. The organization works to improve the well-being, rights, and autonomy of every individual through advocacy, education, and action. Woodhull's mission is focused on affirming sexual freedom as a fundamental human right. Woodhull seeks to resist governmental attempts to censor or burden the publication of online speech, as sexually-themed expression is often a target of such attempts. Woodhull is particularly concerned with state legislative efforts to undermine Section 230 immunity given their negative impacts on marginalized individuals and the robust marketplace of ideas on the internet.

*Amici* encourage service providers to implement features that help keep kids safe online. Amici support efforts to design child-friendly features that facilitate age-appropriate content, such as child-dedicated media applications that exclude content not appropriate for children and features that empower parents to control and supervise what children can see and do across an online service's social platforms. *See, e.g.*, Shimrit Ben-Yair, *Introducing the newest member of our family, the YouTube Kids app—available on Google Play and the App Stor*e, YOUTUBE OFFICIAL BLOG (Feb. 23, 2015), https://tinyurl.com/28h4d6v6; *Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents*, Facebook.com (Sept. 17, 2024), https://tinyurl.com/bdcpdauw

2

(summarizing built in-protections enabled by default for Instagram users under 16). However, California's Age-Appropriate Design Code Act ("CAADC") imperils healthy and safe online communities for several reasons. *Amici* write to expand on the important argument that the provisions of the CAADC that require online services to monitor third-party content (or "user-generated content") are preempted by Section 230 of the Communications Act of 1934, as amended ("Section 230"). 47 U.S.C. § 230. *Amici* have a strong interest in preserving the protections afforded by Section 230, which is critical to enabling the free exchange of information online among average citizens. Section 230 has created an international, instantaneous dialogue accessible to all with a personal Internet-connected device, a prerequisite circumstance to permit marginalized communities to access vital resources and build supportive communities in digital spaces.

## SUMMARY OF ARGUMENT

The district court erroneously held that Section 230 does not preempt the CAADC's information-use and "dark pattern" restrictions (the "Delivery Restrictions"), which bar online services from using a minor's personal data (including browsing history) to organize or deliver any content, including user-generated content. CAADC §§ 31(b)(1)–(4), 31(b)(7). This holding represents a fundamental misapplication of this Circuit's precedent and contravenes Congress's express intent for Section 230 to supersede any "inconsistent" state laws. 47 U.S.C.

3

§§ 230(c)(1), (e)(3); *accord, e.g., Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 22 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017); *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 27 (2d Cir. 2015); *Zeran v. America Online, Inc.*, 129 F.3d 327, 334 (4th Cir. 1997); *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1356 (D.C. Cir. 2014).

Appellee NetChoice argues that the Delivery Restrictions are facially preempted by Section 230 to the extent that they would hold online services liable for monitoring for and preventing the publication of third-party content that is "materially detrimental to" or "not in the best interests" of minors. Br. of Plaintiff-Appellee NetChoice at 70. Imposing liability on an online service for distributing user-generated content treats that service as the publisher of said content, which Section 230 expressly prohibits. 47 U.S.C. §230(c)(1) ("No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.") The Delivery Restrictions also mandate that services monitor third-party content to avoid liability—precisely the kind of obligation that Section 230 was designed to eliminate. The district court failed to complete the proper preemption analysis. *See, e.g.*, *Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024); *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 681 (9th Cir. 2019).

4

Allowing these requirements to stand would eviscerate Section 230's core legislative purpose and force online services to prophylactically censor legitimate content. This outcome would disproportionately harm marginalized youth who rely on online platforms to find community, support, and resources unavailable in their offline environments. To prevent these harms, in affirming the district court's injunction, this Court should clarify that Section 230 preempts the Delivery Restrictions.

## ARGUMENT

### I. THE DISTRICT COURT FAILED TO APPLY THE COMPLETE SECTION 230 PREEMPTION ANALYSIS REQUIRED BY *CALISE*.

The district court was correct that "Section 230 does not preempt all claims stemming from third party content." *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164, 1213 (N.D. Cal. 2025) (quoting *Calise*, 103 F.4th at 740). However, the court's analysis stopped prematurely at this general principle without conducting the specific inquiry this Circuit has developed to resolve questions of Section 230 preemption.

The district court became sidetracked by its observation that a single online service may display both third-party content and its own content, noting that Section 230(c)(1) immunity applies only to third-party content. *Id.* While this observation is legally accurate, it has no bearing on the preemption analysis. There is no dispute that the Delivery Restrictions apply to an online service's distribution of third-party

5

content. The fact that the Delivery Restrictions may also apply to first-party content—if an online service uses personal data to organize and deliver both its own and user-generated content—may bear on the showing NetChoice must make to prevail on breadth of the relief to which it is entitled (i.e., whether its preemption challenge is "facial" or "as-applied"),[2] but does not impact this Court's ability to conduct the preemption analysis or tests applied under it. *Isaacson v. Horne*, 716 F.3d 1213, 1230 (9th Cir. 2013). Applying the full analysis, it is clear that Section 230 preempts the Delivery Restrictions.

## II. THE DELIVERY RESTRICTIONS ARE FACIALLY PREEMPTED BECAUSE THEY IMPOSE PUBLISHER LIABILITY FOR THIRD-PARTY CONTENT AND REQUIRE MONITORING.

*Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 742 (9th Cir. 2024) distills this Circuit's decisions about the scope of Section 230's protection into a two-pronged inquiry that resolves the question of Section 230 preemption. First, courts must examine whether the state statute imposes liability based on the online service's status as a publisher. *Calise*, 103 F.4th at 741. Second, courts must ask what a

---

[2] In any event, Plaintiff-Appellee asserts facial and as-applied preemption challenges to the Distribution Requirements. Furthermore, because there is no subset of online services that can be held liable for third-party content consistent with Section 230, the Distribution Requirements are facially preempted to the extent they render an online service legally responsible for content it delivered, but did not create. *Isaacson*, 716 F.3d at 1230 (explaining that if a statute is invalid for the same reason as to all persons it affects, it is subject to a facial challenge).

defendant must do to avoid liability under the state statute. If the defendant online service is obliged to " 'monitor third-party content'—or else face liability—then that too is barred by § 230(c)(1)." *Id.* (citing *HomeAway.com*, 918 F.3d at 682).

The Delivery Restrictions clearly satisfy this first prong. Liability under the CAADC stems from distributing third-party content to minors that is "materially detrimental to" them or not "in [their] best interests." This constitutes classic distributor liability, which, in interpreting Section 230, courts have held "is merely a species or type of liability for publishing" and is therefore barred. *Zeran v. America Online, Inc.*, 958 F. Supp. 1124, 1133 (E.D. Va. 1997), *aff'd*, 129 F.3d 327 (4th Cir. 1997); *see also* Jeff Kosseff, *A User's Guide to Section 230, and a Legislator's Guide to Amending It (or Not)*, 37 BERKELEY TECH. L.J. 757, 774-77 (2022).

Here, just as in *Doe v. Grindr Inc.*, 128 F.4th 1148, 1151 (9th Cir. 2025), the Delivery Restrictions impose liability by treating the online service as a publisher of third-party content. The requirements on their face impose liability if the services present and distribute material created by third parties to minors in a way that depends on *the nature of the third-party content.* At bottom, the obligations imposed by the Delivery Restrictions are inextricably tied to the content of third-party posts and require services to make editorial judgments about that content's appropriateness for specific audiences. These are fundamentally publishing decisions that fall within Section 230's protective scope.

The second prong of the Section 230 preemption analysis is equally satisfied. The Delivery Restrictions explicitly require online services to monitor and assess third-party content to determine whether it meets the statutory standards for presentation to minors. Services must then modify their distribution and presentation practices based on this content assessment or face liability. *See NetChoice, LLC v. Bonta*, 2025 WL 1918742, at \*10 (N.D. Cal. July 11, 2025). This monitoring obligation—coupled with liability for failure to act appropriately on the results of such monitoring—is precisely the type of burden that Section 230 was designed to eliminate.

## III. FAILURE TO PREEMPT THE DELIVERY RESTRICTIONS WOULD EVISCERATE SECTION 230'S LEGISLATIVE PURPOSE AND HARM MARGINALIZED YOUTH.

Section 230 serves the crucial legislative purposes of "promot[ing] the free exchange of information and ideas over the Internet and [] encourag[ing] voluntary monitoring for offensive or obscene material." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099–100 (9th Cir. 2009). The statute accomplishes this by providing online services with immunity from liability for third-party content, thereby removing the economic disincentives that would otherwise lead to excessive censorship or complete withdrawal from hosting user-generated content.

Without Section 230's protections, online services face what this Circuit has termed "death by ten thousand duck-bites"—endless costly legal consequences that

would make hosting user-generated content economically irrational. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008) (en banc). Absent Section 230, the most economically rational decision for online services would be to prophylactically censor legitimate, non-harmful content that even touches on subjects that could be considered harmful to minors to reduce the potential for fines under the Delivery Restrictions—or to stop distributing third-party content altogether. *See* Eric Goldman, *Why Section 230 Is Better Than the First Amendment*, 95 Notre Dame L. Rev. Reflection 34, 37-39 (2019) (explaining how liability for third-party content inevitably leads to over-censorship).

This reduction and censorship of user-generated content would impact marginalized youth the most severely. Websites that rely on user-generated content, such as Facebook, Twitter, and TikTok, have allowed users with similar interests, views, and identities to find community in shared spaces online, which is especially beneficial to people in historically marginalized groups. Young people from historically disenfranchised groups rely on the internet to find communities where they can engage in open dialogue in ways that may not be possible offline. Diminishing user-generated content is therefore particularly likely to harm these groups. Moreover, any content that may deviate from perceived societal norms could get caught in filters that seek to sanitize content, compounding these problems.

LGBTQ+ youth provide a compelling example of this phenomenon. These young people frequently find solace in online spaces, reducing feelings of isolation, anxiety, and suicidal ideation that often accompany their experiences in less accepting offline environments. Ashley Austin, et al., *It's My Safe Space: The Life-Saving Role of the Internet in the Lives of Transgender and Gender Diverse Youth*, 21 INT'L J. OF TRANSGENDER HEALTH 33 (2020); see also Human Rights Campaign Foundation, *2023 LGBTQ+ Youth Report* (Aug. 2023), https://bit.ly/3UCHIYO ("Over 8 in 10 . . . LGBTQ+ youth have ever used the internet to seek out LGBTQ+ specific sexual health and behavior information, and well over 9 in 10 . . . have used the internet to seek out information about LGBTQ+ identities, and their own identity as an LGBTQ+ person . . . ."). For many LGBTQ+ youth, particularly those in rural areas or conservative communities, online platforms provide the only accessible venue for connecting with others who share their experiences and for accessing affirming resources and information.

Youth from marginalized groups are systematically less likely to have access to adult role models or resources to foster their interests and development. *See* Noelle M. Hurd et al., *Negative Adult Influences and the Protective Effects of Role Models: A Study with Urban Adolescents*, 38 J. YOUTH & ADOLESCENCE 777 (2009); *Adult LGBTQ+ Role Models in the Lives of LGBTQ+ Young People*, TREVOR PROJECT (May 15, 2024), https://www.thetrevorproject.org/research-briefs/adult-lgbtq-role-

models-in-the-lives-of-lgbtq-young-people/. Consider a young woman from a smaller town with an interest in engineering who comes from a family without any college degrees and who has never met a female engineer. Through social media, she may discover posts from women sharing their experiences in STEM fields or their formative experiences at a summer engineering camp. This kind of exposure has the power to spark passions, change lives for the better, and diversify entire professions by making career paths visible to young people who would otherwise never encounter them.

Similarly, recent research on teens of color and social media demonstrates that these platforms have been instrumental in supporting academic success, (*see* Alvin Thomas et al., *Taking the good with the bad?: Social Media and Online Racial Discrimination Influences on Psychological and Academic Functioning in Black and Hispanic Youth*, 52(2) J. YOUTH & ADOLESCENCE 245, 245-57 (2023); Tate LeBlanc & Aerika Loyd, *Freedom dreaming to STEM: A conceptual model for Black youth's racial and STEM identity development through social media*, 13 FRONT. PSYCHOL. 944207 (2022)) alleviating feelings of loneliness and isolation, (*see* J. Maya Hernandez & Linda Charmaraman, *Research on teen social media use has a racial bias problem*, FAST COMPANY (Feb. 22, 2023), https://www.fastcompany.com/90853552/research-on-teen-social-media-use-has-a-racial-bias-problem) and helping young people find acceptance within broader

communities (*see* Jacqueline Nesi et al., *Teens and Mental Health: How Girls Really Feel about Social Media*, COMMON SENSE MEDIA (Mar. 30, 2023), https://www.commonsensemedia.org/sites/default/files/research/report/how-girls-really-feel-about-Social-media-researchreport_final_1.pdf (finding that 7 out of 10 adolescent girls of color who use TikTok (71%) or Instagram (72%) report encountering positive or identity-affirming content related to race at least monthly on these platforms)). Indigenous youth use social media to honor and share their cultures while advocating for their communities' needs and rights. Kiara Alfonseca & Kat Filardi, *Indigenous TikTokers use social media to honor their cultures*, ABC NEWS (Oct. 12, 2021), https://abcnews.go.com/US/indigenous-tiktokers-social-media-honor-cultures/story?id=80303748; Sara Reardon, *Social media helps Native Americans preserve cultural traditions during pandemic*, CNN (Feb. 9, 2021), https://www.cnn.com/2021/02/08/health/coronavirus-native-americans-internet-khn-wellness-partner/index.html. Youth with disabilities rely on social media to access information, advocate for accessibility and disability inclusion, build relationships and communities, and launch their careers in environments that can be more accommodating than traditional offline spaces. *See* Shoshana Weissmann, *Social Media Was Useful For Me, As An Ill, Nerdy Teenager*, TECHDIRT (June 28, 2023), https://www.techdirt.com/2023/06/28/social-media-was-useful-for-me-as-an-ill-nerdy-teenager; Asaka Park, *I'm a Disabled Teenager and Social Media is My*

*Lifeline*, N.Y. TIMES (June 5, 2019), https://www.nytimes.com/2019/06/05/learning/im-a-disabled-teenager-and-social-media-is-my-lifeline.html

The Delivery Restrictions would greatly reduce the amount of user-generated content available online, eliminating these and countless other benefits that flow from the free and open dialogue that Section 230 was specifically designed to promote. By forcing platforms to err on the side of censorship when content might be deemed "materially detrimental" to minors—a vague and subjective standard—the requirements would deprive marginalized youth of the very resources and communities that help them thrive and develop into successful adults.

This outcome would be particularly tragic given that the stated purpose of the CAADC is to protect children. Regulations that ultimately isolate vulnerable youth from supportive communities and educational content serve neither genuine child welfare nor the broader public interest in maintaining robust online discourse that benefits society as a whole.

## CONCLUSION

The district court's refusal to conduct the proper preemption analysis as to the Distribution Requirements should be reversed. Beyond the legal error, setting the precedent that state laws that treat online services as publishers and require them to monitor third-party content would undermine Section 230's essential purpose of

fostering open dialog online and would disproportionately harm marginalized youth who depend on robust online discourse for community, support, and opportunity. The Delivery Restrictions create a looming liability threat that would inevitably lead to excessive self-censorship that deprives society of the benefits that Section 230 was designed to preserve and promote.

For these reasons, amici respectfully urge this Court, in affirming the district court's injunction, to clarify that Section 230 preempts the Delivery Restrictions.

Respectfully submitted,

Kathleen Farley*
Vice President of Litigation
CHAMBER OF PROGRESS
1390 CHAIN BRIDGE ROAD #A108
McLean, VA 22101
info@progresschamber.org
*admitted in New York

/s/ *Mark W. Brennan*
Mark W. Brennan
J. Ryan Thompson
Thomas B. Veitch
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-6409
mark.brennan@hoganlovells.com

*Counsel for Chamber of Progress*

Lawrence Walters
WALTERS LAW GROUP
195 W. Pine Avenue
Longwood, FL 32750

August 18, 2025

*Counsel for Woodhull Freedom Foundation*

14

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 2,935 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

/s/ *Mark W. Brennan*
Mark W. Brennan

## CERTIFICATE OF SERVICE

I certify that on August 18, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


/s/ *Mark W. Brennan*
Mark W. Brennan

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 18. Certificate for Paper Copy of Electronic Brief

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form18instructions.pdf](http://www.ca9.uscourts.gov/forms/form18instructions.pdf)

**9th Cir. Case Number(s)**   25-2366

My name is   Mark W. Brennan

I certify that this brief is identical to the version submitted electronically on *(date)*:

August 18, 2025 .

**Signature**   s/Mark W. Brennan          **Date**   Aug. 18, 2025

*(either manual signature or "s/[typed name]" is acceptable)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 18**                                                                 *Rev. 12/01/2018*