No. 25-2366

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

—————————————

NETCHOICE, LLC, D/B/A NETCHOICE, *et al*.,
*Plaintiff-Appellee*,

V.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, *et al*.,
*Defendant-Appellant*.

—————————————

**On Appeal from the United States District Court
for the Northern District of California**
No. 5:22-cv-08861-BLF
The Honorable Beth Labson Freeman

—————————————

## ATTORNEY GENERAL'S REPLY BRIEF ON THE MERITS

—————————————

ROB BONTA
  *Attorney General of California*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
ANYA M. BINSACCA
  *Supervising Deputy Attorney General*
KRISTIN A. LISKA
  *Deputy Attorney General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3916
Fax: (415) 703-5480
Kristin.Liska@doj.ca.gov
*Attorneys for Defendant-Appellant*

September 22, 2025

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................. 1

Argument .................................................................................................... 1

I.     The Lower Court Erred in Enjoining the Entire Act Based on
Plaintiff's Challenge to the Coverage Definition ............................. 1

     A.     The Coverage Definition Does Not Trigger First Amendment
Scrutiny.................................................................................. 2

     B.     Even if the First Amendment Was Implicated, the Coverage
Definition Is Not Content-Based ........................................... 8

     C.     Plaintiff Has Not Met Its Burden for a Facial Challenge, Even if
Strict Scrutiny Applied ........................................................ 11

II.    The District Court Erred in Individually Enjoining the Age
Estimation, Data Use, and Dark Patterns Provisions in the Alternative ....... 14

     A.     The Age Estimation Provision Does Not Violate the First
Amendment .......................................................................... 14

     B.     The Data Use Restrictions and Dark Patterns Restriction Are
Not Unduly Vague ............................................................... 17

III.   The Remainder of the Act Is Severable from the Enjoined Reporting
Requirement ......................................................................................... 21

IV.   The Lower Court's Ruling Cannot Be Sustained on Alternative
Grounds ................................................................................................ 26

     A.     The Lower Court Properly Rejected Plaintiff's First
Amendment Challenge to the Data Use and Dark Patterns
Restrictions .......................................................................... 26

     B.     Plaintiff's Other Arguments Are Not Availing ...................... 27

          1.    Section 230 Preemption ............................................. 27

          2.    COPPA Premption ..................................................... 28

          3.    Dormant Commerce Clause ....................................... 28

Conclusion ................................................................................................ 30

**TABLE OF CONTENTS**
**(continued)**

**Page**

Certificate of Compliance ........................................................................31

# TABLE OF AUTHORITIES

**Page**

CASES

*Alaska Airlines, Inc. v. Brock*
    480 U.S. 678 (1987)................................................................22

*American Society of Journalist & Authors v. Bonta*
    15 F.4th 954 (9th Cir. 2021) ......................................4, 5, 6

*Arcara v. Cloud Books, Inc.*
    478 U.S. 697 (1986)................................................................3

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*
    729 F.3d 937 (9th Cir. 2013) .............................................28

*Barnes v. Yahoo!, Inc.*
    570 F.3d 1096 (9th Cir. 2009) ...........................................27

*Cal. Redevelopment Ass'n v. Matosantos*
    53 Cal. 4th 231 (2011) .......................................................21

*Calfarm Ins. Co. v. Deukmejian*
    48 Cal. 3d 805 (1989) ...................................................23, 25

*California Teachers Ass'n v. State Bd. Of Educ.*
    271 F.3d 1141 (9th Cir. 2001) ...........................................20

*Coates v. City of Cincinnati*
    402 U.S. 611 (1971)..............................................................18

*County of Sonoma v. Superior Court*
    173 Cal. App. 4th 322 (2009) ............................................22

*Dimidowich v. Bell & Howell*
    803 F.2d 1473 (9th Cir. 1986) ...........................................23

*Free Speech Coalition, Inc. v. Paxton*
    145 S. Ct. 2291 (2025)...................................................14, 15

iii

# TABLE OF AUTHORITIES
## (continued)

Page

*Gerken v. Fair Pol. Practices Comm.*
6 Cal. 4th 707 (1993) ....................................................................21, 26

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network*
742 F.3d 414 (9th Cir. 2014) ................................................30

*Hill v. Colorado*
530 U.S. 703 (2000)................................................................20

*HomeAway.com, Inc. v. City of Santa Monica*
918 F.3d 676 (9th Cir. 2019) ..................................................6

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*
702 F. Supp. 3d 809 (N.D. Cal. 2023)....................................27

*Int'l Franchise Ass'n, Inc. v. City of Seattle*
803 F.3d 389 (9th Cir. 2015) ...............................................2, 3

*Johnson v. United States*
576 U.S. 591 (2015)................................................................19

*Jones v. Google LLC*
73 F.4th 636 (9th Cir. 2023) ..................................................28

*Kasler v. Lungren*
72 Cal. Rptr. 2d 260 (Ct. App. 1998) ................................22, 23

*Legislature v. Eu*
54 Cal. 3d 492 (1991) ........................................................22, 26

*Lemmon v. Snap, Inc.*
995 F.3d 1085 (9th Cir. 2021) ................................................27

*McGlothen v. Department of Motor Vehicles*
71 Cal. App. 3d 1005 (1977) ..................................................23

*Mendoza v. California*
149 Cal. App. 4th 1034 (2007) ..........................................24, 25

## TABLE OF AUTHORITIES
### (continued)

Page

*Minneapolis Star & Tribune v. Minnesota Comm'r of Revenue*
   460 U.S. 575 (1983)................................................................6

*Moody v. NetChoice, LLC*
   603 U.S. 707 (2024)...............................................12, 13, 14

*Nat'l Pork Producers Council v. Ross*
   598 U.S. 356 (2023)..............................................................29

*NetChoice, LLC v. Bonta*
   -- F. 4th --, 2025 WL 2600007 (9th Cir. Sept. 9. 2025) ...........................*passim*

*NetChoice, LLC v. Bonta*
   113 F.4th 1101 (9th Cir. 2024) ...........................................13

*NetChoice, LLC v. Yost*
   716 F. Supp. 3d 539 (S.D. Ohio 2024) ............................11

*NetChoice, LLC v. Yost*
   778 F. Supp. 3d 923 (S.D. Ohio 2025) .....................10, 11

*Novicki v. Cook*
   946 F.2d 938 (D.C. Cir. 1991).............................................19

*People v. Clay*
   18 Cal. App. 3d 964 (1971) ................................................23

*Porter v. Martinez*
   68 F.4th 429 (9th Cir. 2023) ................................................8

*Project Veritas v. Schmidt*
   125 F.4th 929 (9th Cir. 2025) ..............................................9

*Recycle for Change v. City of Oakland*
   856 F.3d 666 (9th Cir. 2017) ...............................................2

*Reed v. Town of Gilbert*
   576 U.S. 155 (2015)...........................................................8, 9

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Roth v. United States*
354 U.S. 476 (1975).................................................................17

*Santa Barbara Sch. Dist. v. Superior Court*
13 Cal. 3d 315 (1975) .............................................................25

*Simon & Schuster v. Members of New York Crime Victims Board*
502 U.S. 105 (1991)...................................................................6

*Sorrell v. IMS Health, Inc.*
564 U.S. 552 (2011)...................................................................2

*United States v. Bronstein*
849 F.3d 1101 (D.C. Cir. 2017)..........................................17, 18

*Vivid Entertainment, LLC v. Fielding*
774 F.3d 566 (9th Cir. 2014) .................................................21

CONSTITUTIONAL PROVISIONS

United States Constitution
First Amendment ............................................................*passim*

FEDERAL STATUTES

United States Code, Title 15
§§ 6501–6506.........................................................................28
§ 6502(d) ..............................................................................28

United States Code, Title 47
§ 230................................................................................27, 28

CALIFORNIA STATUTES

2022 Cal. Stat., Chapter 320 (AB 2273)
§ 1(a)(4) .................................................................................8
§ 1(a)(6) .................................................................................8
§ 1(a)(7) .................................................................................8

# TABLE OF AUTHORITIES
## (continued)

Page

§ 1(a)(8) ............................................................................................... 7
§ 1(a)(9) ............................................................................................... 8
§ 1(b) .............................................................................................. 1, 8
§ 1(d) ................................................................................................. 7
§ 1(e) ................................................................................................. 7

California Civil Code
§ 1798.99.29 ........................................................................................ 7
§ 1798.99.30(a)(1) ............................................................................ 29
§ 1798.99.30(b)(4) ....................................................................... 3, 13
§ 1798.99.30(b)(4)(A) ........................................................................ 3
§ 1798.99.30(b)(4)(B) ........................................................................ 3
§ 1798.99.30(b)(4)(E) ...................................................................... 10
§ 1798.99.30(b)(4)(F) ........................................................................ 3
§ 1798.99.31(a)(5) ...................................................................... 14, 15
§ 1798.99.31(b)(1) .............................................................. 17, 19, 27
§ 1798.99.31(b)(2) .............................................................. 17, 19, 27
§ 1798.99.31(b)(3) .............................................................. 17, 19, 27
§ 1798.99.31(b)(4) .............................................................. 17, 19, 27
§ 1798.99.31(b)(7) .............................................................. 17, 19, 27
§ 1798.140(d) ................................................................................... 29
§ 1798.140(i) .................................................................................... 29

## OTHER AUTHORITIES

Assembly Bill 1043 (2025-2026), § 1 ................................................ 16

Information Commissioner's Office, *Code Standards*,
  https://ico.org.uk/for-organisations/uk-gdpr-guidance-and-
  resources/childrens-information/childrens-code-guidance-and-
  resources/age-appropriate-design-a-code-of-practice-for-online-
  services/code-standards/ ................................................................ 24

*Reason To Know*, Black's Law Dictionary (12th ed. 2024) .................... 19

vii

## INTRODUCTION

In enacting the California Age-Appropriate Design Code Act, the Legislature made its purpose clear: "[I]t is the intent of the Legislature to promote privacy protections for children." 2022 Cal. Stat., ch. 320 (AB 2273), § 1(b). Plaintiff NetChoice primarily challenges the Act as a violation of the First Amendment. Like the lower court, NetChoice's arguments begin from a misreading of the Act, portraying it as a censorship scheme meant to block undesirable content from children. But the Act's goal is not to sanitize the internet, but rather to protect the safety and privacy of children online. Plaintiff's arguments in support of the decision below are not persuasive.

## ARGUMENT

### I. THE LOWER COURT ERRED IN ENJOINING THE ENTIRE ACT BASED ON PLAINTIFF'S CHALLENGE TO THE COVERAGE DEFINITION

Plaintiff first contends that the lower court correctly held that the coverage definition in the statute—the definition of "likely to be accessed by children"—subjects the Act to strict scrutiny as a whole and the entire Act fails under that standard. Not so. First, the definitional provision does not regulate speech and thus does not implicate the First Amendment. Second, even if the provision did implicate the First Amendment, it is not a content-based regulation. Third, even if strict scrutiny did apply, plaintiff has not carried its burden to show a likelihood of success on a facial First Amendment challenge to the entire Act.

## A. The Coverage Definition Does Not Trigger First Amendment Scrutiny

In support of the decision below, plaintiff contends that the definition of "likely to be accessed by children" is a content-based regulation and thereby subjects the entire Act to First Amendment scrutiny. *E.g.*, Pl.'s Response Br. (RB) 16. But the threshold inquiry under the First Amendment is not whether a statute is content-based; it is whether the statute triggers First Amendment scrutiny to begin with. *See* Attorney General's Opening Br. on the Merits (OBM) 19-20 (citing *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017) and *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015)). The Supreme Court has repeatedly recognized that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011). Thus, that a statute is "not wholly unrelated to a communicative component . . . in itself does not trigger First Amendment scrutiny." *Int'l Franchise Ass'n*, 803 F.3d at 408.

The test to determine whether the First Amendment's heightened scrutiny applies to a challenged regulation is therefore not, as plaintiff contends, whether the law "burdens speech based on its content." RB 19. Instead, the proper threshold inquiry is "whether conduct with a 'significant expressive element' drew the legal remedy or the ordinance has the inevitable effect of 'singling out those

engaged in expressive activity.'" *Int'l Franchise Ass'n*, 803 F.3d at 408 (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706-707 (1986)). The Act defines "likely to be accessed by children" as meaning that "it is reasonable to expect, based on the following indicators, that the online service, product, or feature would be accessed by children." Cal. Civil Code § 1798.99.30(b)(4). That inquiry neither regulates speech nor inevitably singles out entities engaged in expressive activity. *See* OBM 20-22. Businesses that engage in commercial activity, not expressive activity—such as ride-sharing applications, financial services, fitness products, or ticketing services, *see* OBM 21—would and will be subject to the Act if a significant number of children use their product, service, or feature.

Plaintiff's arguments to the contrary are predicated on a misreading of the statute. It contends that the coverage definition "asks whether [a] service is 'likely to be accessed' by minors pursuant to content-based indicia." RB 23. But that ignores the three indicators in the definition that have nothing to do with content: whether the online service, product, or feature is directed to children as defined by COPPA, is determined to be routinely accessed by a significant number of children, or has an audience with a significant portion being children. *See* Cal. Civ. Code § 1798.99.30(b)(4)(A), (B), (F). If a service, product, or feature meets any of these three criteria, then it is subject to the Act and no further analysis—and no consideration of any content—is needed. Services such as Venmo, Lyft, or

3

StubHub are regulated by the Act if they are used by a significant number of children. Covering such services—along with *all* products, services, and features such children are likely use—serves to further the Legislature's purpose of protecting the privacy and safety of children online.

That the state uses the term "audience" does not change this. For one, a service, product, or feature that is used by a significant number of children is subject to the Act, regardless of whether those children are referred to as an audience, users, or another term altogether. Moreover, the use of the term "audience" in the definition provision does not indicate that the Act was motivated by concerns about any speech's impact on an audience. *Cf.* RB 26. The definitional provision focuses on determining *who* a product, service, or feature's audience is. That is a distinct question from *how* that audience is impacted by any speech or expression.

This Court's decision in *American Society of Journalist & Authors v. Bonta*, 15 F.4th 954 (9th Cir. 2021), is illustrative of the point that a statute that involves consideration of content is not necessarily subject to First Amendment scrutiny. That case involved a First Amendment challenge to the law governing the proper test to apply to determine whether a worker was an employee or an independent contractor. *Id.* at 959. The plaintiffs argued that the rules regarding which test applied were a regulation of speech because "a worker's likelihood of being

4

classified as an employee, rather than an independent contractor turn[ed] on the content of his work." *Id.* at 961. In their view, the law "single[d] out journalism and, more generally, effectuate[d] content-based preferences for certain kinds of speech," making it subject to First Amendment scrutiny because it was a content-based law. *Id.*

This Court rejected that argument. It stated that case law is clear that "an entity 'cannot claim a First Amendment violation simply because it may be subject to . . . government regulation.'" *Id.* (alteration in original) (citation omitted). The underlying law regarding which test applied did not "on its face, limit what someone can or cannot communicate" or "restrict when, where, or how someone can speak." *Id.* While it was true that the law "may indeed impose greater costs" on employers engaged in specific expressive activities, "such an indirect impact on speech does not necessarily rise to the level of a First Amendment violation." *Id.* at 962. The law therefore did not regulate speech. *Id.* Nor did it inevitably single out expressive actors, since the law "applie[d] across California's economy." *Id.* It was thus distinct from laws that did single out specific expressive actors and were thereby subject to First Amendment scrutiny, such as a law that taxed inks and papers used exclusively by newspapers or that taxed only publishers of criminals' books. *See id.* at 962-963 (distinguishing *Minneapolis Star & Tribune*

5

*v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983) and *Simon & Schuster v. Members of New York Crime Victims Board*, 502 U.S. 105 (1991)).

So, too, here. The Act's definitional provision "on its face" does not "limit what someone can or cannot communicate" or "restrict when, where, or how someone can speak," *Am. Soc'y of Journalists*, 15 F.4th at 961. Nor does it "target the press or a few speakers," *id.* at 962, since it applies to *any* service, feature, or product that is likely to be used by children, regardless of any expressive content or message. It is true that applying the Act's definitional provision may involve considering content. But this is no different than considering the expressive content of a worker's speech to determine the proper test to govern whether a worker is an employee or independent contractor. *Cf. id.* at 961. And determining if a service, feature, or product is subject to the Act does not even necessarily involve considering any content. *See supra* at 2-4.

Finally, plaintiff errs in contending the law is subject to First Amendment scrutiny because "[c]ensorship is the Act's avowed and obvious objective." RB 21. This Court has been clear that "absent narrow circumstances, a court may not conduct an inquiry into legislative purpose or motive beyond what is stated within the statute itself." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019). Thus, rather than focusing on statements from the Governor or Attorney General, *cf.* RB 9, 27-28, courts focus on the text of the statute to

6

determine its purpose. The Act clearly lays out its purposes. Its findings declare that "children should be afforded protections not only by online products and services specifically directed to them but by all online products and services they are likely to access"; "[b]usinesses that develop and provide online services, products, or features that children are likely to access should consider the best interests of children when designing, developing, and providing that online service or feature"; and when "a conflict arises between commercial interests and the best interests of children, companies should prioritize the privacy, safety, and well-being of children over commercial interests." Cal. Civil Code § 1798.99.29. None imply that censorship was the Legislature's purpose.

In response, plaintiff points to three of the Act's findings. RB 21. Two of these generally reference laws and policies from the United Kingdom for guidance in implementing the Act; neither says anything about censoring or sanitizing online content. *See* AB 2273, § 1(d), 1(e). The third states that "[o]nline services, products, or features that are likely to be accessed by children should offer strong privacy protections by design and by default, including disabling features that profile children using their previous behavior, browsing history, or assumptions of their similarity to other children, to offer detrimental material." *Id.* § 1(a)(8). This is a thin reed on which to hang plaintiff's claim that the Legislature's purpose was censorship. The section references disabling features that profile a child to offer

detrimental content as an example of the stronger privacy protections children should be afforded.  If anything, this emphasizes that the Act's purpose is privacy protection and not censorship—a theme echoed throughout AB 2273's findings. *E.g.*, *id*, § 1(a)(4) ("enhance privacy protections for children"), 1(a)(6) (survey shows "81 percent of voters said they wanted to prohibit companies from collecting personal information about children without parental consent"), 1(a)(7) ("children of all ages should be afforded privacy and protection"), 1(a)(9) ("[e]nsuring robust privacy protections for children by design").  And AB 2273 expressly states that "it is the intent of the Legislature to promote privacy protections for children pursuant to the California Age-Appropriate Design Code." *Id.*, § 1(b).  The Act is abundantly clear that its purpose is to protect children's privacy and safety online, not censorship.

### B. Even if the First Amendment Was Implicated, the Coverage Definition Is Not Content-Based

Even if the Act's definitional provision subjected the Act to First Amendment scrutiny, it is not content-based.  As this Court has articulated, "[t]he 'crucial first step in the content-neutrality analysis,'" is "'determining whether the law is content neutral on its face'—that is, whether it 'draws distinctions based on the message a speaker conveys.'"  *Porter v. Martinez*, 68 F.4th 429, 438-439 (9th Cir. 2023) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).  "The second step in the content-neutrality analysis is to ask whether the law is content based in

8

its justification"—that is, whether the law can "'be justified without reference to the content of the regulated speech.'" *Id.* at 439 (quoting *Reed*, 576 U.S. at 164). The Act's coverage definition does not draw distinctions based on a speaker's message and is justified without reference to the content of any regulated speech. *See* OBM 25-31.

In response, plaintiff repeats the same flawed argument as the lower court below:  because determining whether a product, service, or feature is likely to be accessed by children may involve looking at content, the law is content-based. *E.g.*, RB 23.  But case law is clear: a law is not content-based simply because "one must examine the content of [speech] to determine whether it is lawful or unlawful." *Project Veritas v. Schmidt*, 125 F.4th 929, 947 (9th Cir. 2025) (en banc).  "[N]ot every regulation that turns on the content of speech in the loosest sense is content based in the constitutional sense.  A regulation may remain content neutral despite touching on content to distinguish between classes or types of speech." *Id.* at 950.  Thus the mere fact that some—but not all—of the indicators in the definitional provision involve looking at content does not make the definitional provision necessarily or automatically content-based. *See* OBM 31-32.

Plaintiff also contends that the law is content-based because it regulates "content that has . . . appeal to minors." RB 20.  But regulating online platforms that are "appealing to minors" is not the same as regulating a specific message—in

9

contrast to a law that singles out directional signs, robocalls to collect debt, or yoga classes for regulation in particular, *cf.* RB 21. Determining whether a product, service, or feature uses "design elements that are known to be of interest to children," Cal. Civ. Code § 1798.99.30(b)(4)(E), such as bright colors, flashing lights, and curlicue fonts may involve considering content, but it does not involve any consideration of message or viewpoint. Moreover, determining whether a product is appealing to children may not involve *any* consideration of content: if a product, service, or feature is used by children, it is subject to the Act's regulations regardless of any content.

In any event, plaintiff cites no case law for the proposition that regulations of products that appeal to children are necessarily content-based. Its contention that "seven other" district courts have held that "similar coverage definitions require strict scrutiny" ignores that those cases did *not* involve definitional provisions that defined a law's scope around whether children were likely to use a particular product. *See* RB 20 n.6. Rather, those cases all involved definitions of "social media platform." *See, e.g.*, *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 954 (S.D. Ohio 2025).[1] In fact, one case that addressed a definitional provision akin to

---

[1] Moreover, the extent to which these cases are persuasive is unclear in light of this Court's recent ruling that the definition of "social media platform" in another California law was not content-based. *See NetChoice, LLC v. Bonta*, -- F. 4th --, 2025 WL 2600007, at *8 (9th Cir. Sept. 9. 2025) (hereinafter "*NetChoice* (SB 976)").

that here did *not* hold that that provision was content-based.  *See id.* at 953; *see also NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 556 (S.D. Ohio 2024) ("NetChoice has not shown that this language—'targets children' and 'reasonably anticipated to be accessed by children'—are examples of content-based regulation.").

Nor is the Act content-based because of any impermissible purpose.  Contrary to plaintiff's contention (at 21), the definitional provision—like the Act itself— serves purposes that have no connection to speech.  As the district court in *Yost* explained when analyzing similar language, the Act's definitional provision "tailors the Act's applicability to only the platforms that have a chance of attracting the children the Act seeks to protect."  778 F. Supp. 3d at 953.  Nor is the Act's purpose to suppress any particular expressive message.  Rather the Act serves to protect the privacy and safety of children online.  *See supra* at 7-8; *see also* OBM 30.  At its core, the Act's definitional provision tailors its applicability to those products, services, and features likely to be used by children regardless of message or content.  That is not a content-based distinction to draw.

### C. Plaintiff Has Not Met Its Burden for a Facial Challenge, Even if Strict Scrutiny Applied

Finally, the lower court erred in concluding that the entire Act is invalid under strict scrutiny because plaintiff has not carried its burden to establish a successful facial First Amendment challenge.  Such "facial challenges are 'hard to win.'"

OBM 33 (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024)). To prevail on such a challenge, a plaintiff must first establish "how a statute works in '*all* of its applications.'" *NetChoice* (SB 976), 2025 WL 2600007, at *12 (quoting *Moody*, 603 U.S. at 744) (emphasis in original). Next, the plaintiff must establish that "the ratio of unconstitutional applications" to constitutional ones "is 'lopsided.'" *Id.* (citation omitted).

At the threshold, plaintiff errs in contending that the State must "show that any application of the Act's substantive provisions satisfied any level of First Amendment review." RB 30. Rather, it is *NetChoice's burden*, not the State's, to establish the full range of activities a law covers and to provide the necessary factual record to evaluate the constitutionality of these applications. *NetChoice* must establish "a developed record that explains not only how plaintiff['s] platforms work, but also how a wide range of third-party services operate" and provides "information not only about the law's scope, but also about the facts that determine the law's constitutionality in each of its applications." *NetChoice* (SB 976), 2025 WL 2600007, at *12. "If, for example, a law is unconstitutional because it is insufficiently tailored, the court needs to know the facts that underlie that tailoring determination—for every application." *Id.* "Failing to carry these burdens at either step . . . is fatal. The Court has not only made this clear, but it has made this clear to NetChoice." *Id.*

12

Plaintiff has wholly failed to carry that burden here. *See* OBM 34-38. And plaintiff cannot short circuit that burden by contending that every application of the entire Act is the same as to every business. *See* RB 38. That is manifestly untrue. Not even the threshold definitional provision applies the same to every business. Some products may be subject to the Act because they contain design elements that appeal to children, while others will be subject to the Act because data indicates children use the product. *See* Cal. Civil Code § 1798.99.30(b)(4). The various challenged (and not challenged) substantive provisions will impact different businesses differently depending on whether they collect personal data from child users and what they do with that data. And in turn, what level of scrutiny is appropriate will vary—if information is used to provide advertisements to a child, for instance, that is commercial speech subject to a lower standard. Not to mention, as this Court noted in its prior ruling, most of the Act's provisions "by their plain language, do not necessarily impact protected speech in all or even most application." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1122 (9th Cir. 2024).

Plaintiff has chosen to raise a facial challenge to the Act. "[T]hat decision comes at a cost." *Moody*, 603 U.S. at 723. As it has in other cases, plaintiff here has "failed to develop a record that would allow the court to 'determine [the] law's full set of applications.'" *NetChoice* (SB 976), 2025 WL 2600007, at *13. Indeed, plaintiff does not even definitively state whether services such as StubHub, Lyft, or

13

Venmo are subject to the Act. It has thus not shown a likelihood of success in a facial First Amendment challenge to the Act as a whole.

## II. THE DISTRICT COURT ERRED IN INDIVIDUALLY ENJOINING THE AGE ESTIMATION, DATA USE, AND DARK PATTERNS PROVISIONS IN THE ALTERNATIVE

The lower court's alternative holding that plaintiff is likely to prevail on its First Amendment challenge to the Act's age estimation provision and its vagueness challenges to the Act's data use and dark patterns restrictions is similarly erroneous. Plaintiff's arguments to the contrary are unpersuasive.

### A. The Age Estimation Provision Does Not Violate the First Amendment

As explained in the opening brief, the age estimation provision does not violate the First Amendment. This provision does not regulate speech or single out expressive actors and thus is not subject to First Amendment scrutiny. *See* OBM 39-40. Even if it was, it would survive any standard of review. *See* OBM 41-44.

In response, plaintiff claims that "online age-screens are always subject to at least *some level* of First Amendment scrutiny because 'age verification necessarily' burdens the 'First Amendment right to access speech.'" RB 49 (quoting *Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291, 2316 (2025)). But that proposition is incorrect, both as a matter of logic and of law. After all, the First Amendment would pose no barrier to an "online age-screen" to purchase alcohol, tobacco, or lottery tickets. Rather, the law at issue in *Free Speech Coalition*

14

implicated the First Amendment because it "require[d] proof of age to access content." 145 S. Ct. at 2309. Indeed, it was for this precise reason that this Court recently held that a challenge to another age-verification requirement was not ripe: "without knowing what age-verification the Act will require," this Court could not "determine whether those procedures will unconstitutionally chill the speech of users." *See NetChoice* (SB 976), 2025 WL 2600007, at *14. That was "especially true if . . . NetChoice members can verify users' age in the background without requiring user input." *Id.*

The age estimation requirement in the Act does *not* prohibit access to content. *See* OBM 42. The text of the relevant provision requires a company to "[e]stimate the age of child users with a reasonable level of certainty" or "apply the privacy and data protections afforded to children to all consumers." Cal. Civil Code § 1798.99.31(a)(5). Those "privacy and data protections" are the Act's other substantive regulations, half of which are not even challenged by NetChoice in this suit. If any provision of the Act "requires covered services to age-screen before providing access to all content, or else to alter all content to be age-appropriate for the youngest viewer," RB 49 (emphasis removed)—though none do—it is not the *age-estimation requirement*, but rather one of the Act's challenged substantive regulations.

Plaintiff further errs in contending that the age-estimation requirement will "forc[e] services to extract personal information from users" or "collect some form of age identification." RB 51, 50. The Act nowhere requires a company to collect additional data to estimate age—indeed, the record evidence indicates that some platforms might be able to estimate age with the data already collected. *See* 3-ER-416-419; *see also NetChoice* (SB 976), 2025 WL 2600007, at *14. Nor does the Act require a company to collect identification to estimate age, but rather allows a company to use other reliable means. For instance, Assembly Bill 1043 would require devices to provide application developers with information about a user's age beginning in 2027. *See* Assembly Bill 1043 § 1 (2025-2026). Relying on this information would suffice to comply with the Act's age estimation requirement.

Finally, plaintiff's argument that the age estimation requirement is not properly tailored under any First Amendment standard is not persuasive. Plaintiff focuses its argument on the tailoring of the *substantive regulations*, not of the *requirement to estimate age*. As explained in the Attorney General's opening brief (at 41-44), there is no more-tailored way to regulate the data and privacy practices for *only* children than to require companies to distinguish between adult and child users—which is precisely what the age estimation requirement does.

16

### B. The Data Use Restrictions and Dark Patterns Restriction Are Not Unduly Vague

As the lower court did, plaintiff focuses exclusively on two particular phrases in arguing that the challenged data use restrictions and dark patterns restriction are vague. First, plaintiff focuses on the phrase "materially detrimental," which appears in the first of the four data use restrictions and in the dark patterns restrictions. Cal. Civ. Code § 1798.99.31(b)(1), (b)(7). And plaintiff focuses on language from the *exemption* in the other three data use restrictions, which permit a company to profile a child by default; collect, sell, share, or retain any personal information not necessary to provide a service the child is actively and knowingly engaged in; or use personal information for a reason other than it was collected if the business can "demonstrate a compelling reason that [doing so] is in the best interests of children." *See id.* § 1798.99.31(b)(2), (b)(3), (b)(4).

None of these provisions are vague. *See* OBM 44-52. The statutory phrases that plaintiff highlights have plain meanings. *See* OBM 45-46. This is not changed by plaintiff's contention (at 54) that "[r]easonable minds can disagree" when applying the provisions. "[A] statutory term is not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Roth v. United States*, 354 U.S. 476, 491 (1975)). A court is "not concerned with vagueness in the sense that the term 'requires a person to

17

conform his conduct to an imprecise but comprehensive normative standard,'
whose satisfaction may vary depending upon whom you ask." *Id.* (quoting *Coates
v. City of Cincinnati*, 402 U.S. 611, 614 (1971)). "'As a general matter,' the
vagueness doctrine does 'not doubt the constitutionality of laws that call for the
application of a qualitative standard . . . to real world conduct; the law is full of
instances where a man's fate depends upon his estimating rightly . . . some matter
of degree.'" *Id.* at 1118 (quoting *Johnson v. United States*, 576 U.S. 591, 603-604
(2015)) (alterations in original).

Moreover, plaintiff's argument that the challenged provisions are vague
proceeds from a misunderstanding of how these provisions operate. Plaintiff
portrays the data use and the dark patterns restriction as requiring a company to
undertake a survey and determine when, if ever, a child is harmed by its actions.
But the provisions require no such thing. The first data use restriction and the dark
patterns restriction prohibit certain actions when a business "knows, or has reason
to know" that doing so is "materially detrimental to the physical health, mental
health, or well-being of a child." Cal. Civ. Code § 1798.99.31(b)(1); *see also id.*
§ 1798.99.31(b)(7). A business "has reason to know" something when it possesses
"[i]nformation from which a person of ordinary intelligence . . . would infer that
the fact in question exists or that there is a substantial enough chance of its
existence that, if the person exercises reasonable care, the person can assume the

18

fact exists." *Reason To Know*, Black's Law Dictionary (12th ed. 2024); *see also Novicki v. Cook*, 946 F.2d 938, 941 (D.C. Cir. 1991) (quoting similar definitions from Restatement (Second) of Torts and Restatement (Second) of Agency). Neither standard—knows or reason to know—"imposes [a] duty of inquiry; it merely requires that a person draw reasonable inferences from information already known to him." *Novicki*, 946 F.2d at 941.

So, too, with the other three data use provisions. These provisions provide an exemption from their general restrictions when a company "can demonstrate a compelling reason that [doing so] is in the best interests of children." Cal. Civ. Code § 1798.99.31(b)(2), (b)(3), (b)(4). Thus, the only situation in which a business may find itself needing to consider what is in the best interests of a child is when the business wishes to utilize the *exemption* from the statute's general prohibition. In other words, any application of the settled family law "best interest of the child" standard will arise when a company wishes to determine whether a specific otherwise-prohibited behavior might be permissible because the exception applies. As with the other three data use provisions, there is no general requirement that a business undertake a general inquiry into or survey of what is in a child's best interests.

Furthermore, while plaintiff chides defendant for "cherry-pick[ing] plausible examples," it does the same in its attempt to demonstrate the law is vague. *See* RB

19

55. But "uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.'" *California Teachers Ass'n v. State Bd. Of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001) (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)). "[E]ven when a law implicates First Amendment rights, the constitution must tolerate a certain amount of vagueness." *Id.* And while defendant's examples involve situations that fall within the scope of the statute—for instance, using a child's information to connect them to a known abuser, *see* OBM 46—plaintiff's examples do not necessarily implicate all (or any) of the data use or dark patterns restrictions. For instance, how does the requirement not to profile a child by default have any connection to a child "staying up late reading something interesting on Wikipedia"? And how does a child having "hurt feelings . . . from defending an unpopular political opinion on social media" have any connection to a company's use of a child's data? Plaintiff has not laid the foundation to establish that its posed hypothetical questions about whether or how children are harmed online have a link to the behavior that is impacted by the challenged provisions— and thus that it will need to consider or address such questions to begin with.

At bottom, plaintiff's arguments regarding the data use and dark patterns restrictions proceed from a misreading of the statutory text and a misunderstanding of how they work. The provisions impose no obligation on businesses to

undertake a study to determine whether harm will occur or engage in a systematic review of all possible harm that could arise. Rather, a company simply needs to conform its behavior to the knowledge it already has at hand. It is not unconstitutionally vague to require a company not to act when it knows doing so will cause material harm to a child.

## III. THE REMAINDER OF THE ACT IS SEVERABLE FROM THE ENJOINED REPORTING REQUIREMENT

The lower court also erred in holding that the rest of the Act was not severable from the provision that remained enjoined under the prior preliminary injunction. *See* OBM 52-56. Severability is purely a question of state law. *E.g.*, *Vivid Entertainment, LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir. 2014). At issue is solely the requirement of volitional separability under California severance law: that is, "whether the remainder 'would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute.'" *Cal. Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 271 (2011). "The test is whether it can be said with confidence that the [Legislature's] attention was sufficiently focused upon the parts to be severed so that it would have separately considered and adopted them in the absence of the invalid portions." *Gerken v. Fair Pol. Practices Comm.*, 6 Cal. 4th 707, 714-715 (1993) (citation omitted). That standard is met here. *See* OBM 51-56. The legislative history reflects that the Legislature was deeply focused on the remaining fourteen substantive provisions of the Act,

such that it would have passed them even without the enjoined reporting requirement. *See id.*; *see also, e.g.*, 3-ER-305 (legislative report describing substantive regulations of Act); 3-ER-336-338 (same).

In arguing to the contrary, plaintiff first contends that this Court begins with a "presumption of inseverability." RB 40. But the California Supreme Court has never recognized a "presumption of inseverability." *Cf. Legislature v. Eu*, 54 Cal. 3d 492, 535 (1991) ("[I]t is clear that severance of particular provisions is permissible despite the absence of a formal severance clause."). This makes sense. As the U.S. Supreme Court has observed, "[i]n the absence of a severability clause," the Legislature's "silence is just that—silence." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987). Such silence should not "raise a presumption against severability." *Id.*

Instead of citing a California Supreme Court case that establishes a "presumption of inseverability," plaintiff cites a single California Court of Appeal decision, *Kasler v. Lungren*, 72 Cal. Rptr. 2d 260, 273 (Ct. App. 1998), *rev'd on other grounds*, 23 Cal. 4th 472 (2000).[2] But that decision similarly did not cite any California cases recognizing a "presumption of inseverability"; rather, the decision quotes the phrase from a Sixth Circuit opinion on the severability of an Ohio law

_____

[2] Plaintiff also points to *County of Sonoma v. Superior Court*, 173 Cal. App. 4th 322, 352 (2009), but that case says nothing about a "presumption of inseverability."

22

similar to the California statute under review there. *See id.* at 273 ("The 'presumption of inseverability' mentioned in *Springfield* is, at best, 'a weak one.'"). A single Court of Appeal decision does not even bind subsequent panels of any California Court of Appeals. *See, e.g. McGlothen v. Department of Motor Vehicles*, 71 Cal. App. 3d 1005, 1017 (1977). For this reason, this Court has rejected California Court of Appeals decisions on state law. *E.g., Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986). The references in *Kasler* to a "presumption of inseverability" are an insufficient basis for this Court to apply such a principle as a settled part of California severability law.

Next, plaintiff faults defendant for "admit[ting] it is 'possible' . . . that the addition of the notice-and-cure provision 'led to the bill's passage,'" saying such a statement makes it doubtful whether the Legislature would have passed the remainder of the statute. RB 43. But the question for volitional separability is not if there is *some* level of doubt as to whether the Legislature would have passed the statute. Rather, courts ask whether the invalid portion is "so critical to the enactment" of the challenged law that it "would not have been enacted in its absence." *Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805, 822 (1989). Thus, "[w]here it is manifest that the Legislature would never have passed a law without the unconstitutional provision, the remainder of the law must also fall." *People v. Clay*, 18 Cal. App. 3d 964, 971 (1971). But "pure speculation whether or not the

Legislature would have enacted the statute without the unconstitutional phrase" is a different matter. *Id.* [3]

Defendant's argument is precisely that: it is pure speculation that the Legislature would have declined to enact the *fourteen* substantive provisions of the Act without the enjoined reporting requirement or notice-and-cure provision. *See* OBM 53-55. Nor does plaintiff's argument about the Legislature drawing on the U.K. Age-Appropriate Design Code move the needle. After all, the U.K. statute includes many of the same substantive requirements that the Act contains— including all four challenged data use restrictions. *See* 3-ER-306, 3-ER-334 (legislative history discussing substantive regulations of UK law). [4] If anything, the

---

[3] Plaintiff cites to *Mendoza v. California*, 149 Cal. App. 4th 1034 (2007) as an example of a statute where the Legislature "considered but declined to adopt" an alternative version of the statute and volitional separability was not met. *See* RB 42. That case is not persuasive here. In that case, the previous version of the statute that was considered and then rejected included *a severability clause*. *Mendoza*, 149 Cal. App. 4th at 1063-1064. It was the Legislature's express decision to *remove* the severability clause, combined with the Legislature's concerns about the invalidity of portions of the law, that led the Court of Appeal of conclude volitional separability was not met. *Id.* at 1064. Those facts are far afield from here.

[4] The Information Commissioner's Office, the administrative agency responsible for administering the law in the United Kingdom, provides an overview of the statutory requirements online. *See* Information Commissioner's Office, *Code Standards*, https://ico.org.uk/for-organisations/uk-gdpr-guidance-and-resources/childrens-information/childrens-code-guidance-and-resources/age-appropriate-design-a-code-of-practice-for-online-services/code-standards/ (last accessed Sept. 21, 2025).

Legislature's intent to draw on the U.K. law as a model *supports* the conclusion it would have chosen to enact the remaining portions of the Act had the Legislature foreseen the invalidity of the reporting requirement.

To be clear, defendant's argument is not that the Legislature would have pursued its goals through any means or that it "would have enacted *any* version of the Act, no matter how punitive, incomplete, or divorced from its original design." RB 46. Rather, defendant's argument is that it is "eminently reasonable to suppose that those who favor the [Act] would be happy to achieve at least some substantial portion of their purpose." *Santa Barbara Sch. Dist. v. Superior Court*, 13 Cal. 3d 315, 332 (1975); *see also, e.g.*, *Calfarm Ins.*, 48 Cal. 3d at 822 ("The voters who enacted Proposition 103 would presumably prefer" remainder of statue to the legal regime "which existed before the initiative was enacted."). This is not a case where the Legislature "placed undue emphasis" on the notice-and-cure provision or the DPIA provision compared to other aspects of the statute, *Legislature*, 54 Cal. 3d at 535. Rather, the legislative history establishes that the DPIA provision, and its notice-and-cure component, were viewed as part of a much more comprehensive regulation to protect children's privacy and safety online. *See supra* at 21-22. The California Supreme Court has been clear: "if a part to be severed reflects a 'substantial' portion of the [legislature's] purpose, that part can

and should be severed and given operative effect." *Gerken*, 6 Cal. 4th at 715. That is precisely the situation the Court confronts here.

## IV. THE LOWER COURT'S RULING CANNOT BE SUSTAINED ON ALTERNATIVE GROUNDS

Finally, plaintiff argues that the decision below can be upheld on alternative grounds. None of these arguments are availing.

### A. The Lower Court Properly Rejected Plaintiff's First Amendment Challenge to the Data Use and Dark Patterns Restrictions

Plaintiff first argues that this Court can sustain the preliminary injunction on the basis of its First Amendment challenges to the data use and dark patterns restrictions individually. The lower court properly held plaintiff was unlikely to prevail on such claims. *See* 1-ER-33-36. Rather than grapple with the lower court's ruling on *this* motion for a preliminary injunction, plaintiff rests its argument entirely on the lower court's *prior* ruling for a preliminary injunction. Plaintiff contends that the "district court originally held [the challenged] provisions facially unconstitutional, focusing on precisely the range of applications NetChoice now challenges," RB 63-64—nowhere acknowledging that the lower court *did not* so hold in the ruling under review. And plaintiff contends that this Court's prior ruling "did not disturb the district court's reasoning that these specified applications of the information-use provisions violate the First Amendment," RB 64—nowhere acknowledging that the district court *did not* adopt that reasoning in

the ruling under review.  This Court should not take plaintiff up on its request to revive the vacated portions of the prior injunction—particularly when the lower court itself did not do so.

### B.  Plaintiff's Other Arguments Are Not Availing

Plaintiff also raises three other alternative arguments for why the injunction should be affirmed.  None are persuasive.

#### 1.  Section 230 Preemption

Plaintiff contends that the Act is preempted by Section 230 of the Communications Decency Act.  Section 230 does not preempt a state law unless it regulates (1) a provider or user of an interactive computer service by (2) treating it as a publisher or speaker of (3) third-party content.  *E.g.*, *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009).  Under this framework, Section 230 does not preempt the challenged provisions.  Each provision regulates the collection, use, or sale of personal information or the platform's design choices.  *See* Cal. Civ. Code § 1798.99.31(b)(1), (b)(2), (b)(3), (b)(4), (b)(7).  These provisions regulate a platform's own conduct unrelated to publishing choices.  *See, e.g.*, *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021) (holding claims not preempted where company could have satisfied a duty "without altering the content that [its] users generate"); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, 702 F. Supp. 3d 809, 830 (N.D. Cal. 2023) (holding claims not preempted

27

where data was collected by the business but not "published at the request of a third-party"). Accordingly, the challenged provisions are not preempted by Section 230.

### 2. COPPA Premption

COPPA sets baseline privacy regulations for businesses that offer online services directed toward children under 13. *See generally* 15 U.S.C. §§ 6501–6506. Like Section 230, COPPA preempts only "inconsistent" state laws, 15 U.S.C. § 6502(d), which are those that are "contradictory" or "stand as obstacles to federal objectives," *Jones v. Google LLC*, 73 F.4th 636, 642 (9th Cir. 2023) (citations omitted). Laws that only "supplement" COPPA are not preempted. *Id.* at 642 (citation omitted). Insofar as the Act merely regulates platforms not covered by COPPA or actions that COPPA neither prohibits nor requires, it properly supplements COPPA's baseline privacy protections and is not preempted.

### 3. Dormant Commerce Clause

The Commerce Clause imposes "a self-executing limitation on the power of States to enact laws imposing substantial burdens" on interstate commerce. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 947 (9th Cir. 2013) (citation omitted). This "dormant" Commerce Clause "prohibits the enforcement of state laws 'driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening

out-of-state competitors.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (citation omitted) (alteration in original).

Plaintiff contends that the Act is unconstitutional under the dormant Commerce Clause because it regulates wholly extraterritorial conduct. RB 68. Not so. The Act regulates only companies that (1) do business in California and (2) provide an online service likely to be accessed by children residing in California, Cal. Civ. Code § 1798.99.30(a)(1), 1798.140(d), (i), and thus has no impact on transactions wholly outside the State, *see Greater L.A. Agency on Deafness, Inc. v. Cable News Network*, 742 F.3d 414, 433 (9th Cir. 2014) (rejecting argument that California law requiring closed captioning on cable company's online videos regulated extraterritorial conduct). It therefore does not violate the dormant Commerce Clause.

///

///

## CONCLUSION

For the foregoing reasons, the decision below should be reversed.


Dated:  September 22, 2025                    Respectfully submitted,

                                             *s/ Kristin Liska*
                                                     _____

Rob Bonta
  *Attorney General of California*
Thomas S. Patterson
  *Senior Assistant Attorney General*
Anya M. Binsacca
  *Supervising Deputy Attorney General*
KRISTIN A. LISKA
  *Deputy Attorney General*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 25-2366

I am the attorney or self-represented party.

**This brief contains** | 6,980 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Kristin Liska | **Date** | September 22, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                     *Rev. 12/01/22*

31